07-214651-FC



OAKLAND JUDGE DANIEL P. O'BRIEN
COUNTY PEOPLE          V MCBURNEY.ST

## STATE OF MICHIGAN

IN THE DISTRICT COURT FOR THE COUNTY OF
52ND DISTRICT     1ST DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

RECEIVED FOR FILING
—v—OAKLAND COUNTY CLERK

'07 SEP 14 A10 :20

District Court Case No.:
06-007954-FY
Circuit Court Case No. :

BY. _____
STEVEN LINDSEY MCBURNEY,
DEFENDANT/

### PRELIMINARY EXAMINATION
### VOLUME I

BEFORE HONORABLE BRIAN MACKENZIE, DISTRICT JUDGE, P24097

NOVI, MICHIGAN

April 27, 2007

APPEARANCES:

| | |
|---|---|
| FOR THE PEOPLE: | JOHN M. SKRZYNSKI (P33013)<br>SARA POPE-STARNES (P42398)<br>1200 North Telegraph Road<br>Pontiac, MI 48341<br>(248) 858-0656 |
| FOR THE DEFENDANT:<br>BY: | SASHABAW LAW CENTER<br>ROBERT F. WHITE (P31788)<br>4345 Meigs Avenue, Suite B<br>Waterford, MI  48329<br>(248) 674-4320 |
| RECORDED BY:<br>TRANSCRIBED BY: | PAUL WARD, CER-07759<br>CHRISTINE EBEL, CER-5827 |

ORIGINAL

TABLE OF CONTENTS

**WITNESSES FOR THE PEOPLE:**                              **PAGE/LINE**

**MRS. HEATHER MCBURNEY**
Direct examination by Mr. Skrzynski            07-14
Cross-examination by Mr. White                 21-11


**SERGEANT CHRISTOPHER SOVIK**
Direct examination by Mr. Skrzynski            51-20
Voir Dire by Mr. White (objection)             57-05
Resume Direct examination by Mr. Skrzynski     72-22
Cross-examination by Mr. White                 74-20
Redirect examination by Mr. Skrzynski          78-16
Recross-examination by Mr. White               93-10

**SERGEANT PAUL SUMNER**
Direct examination by Mr. Skrzynski            109-06
Cross-examination by Mr. White                 132-08


**DEFENSE EXHIBITS:**                 **INTRO**    **REC'D**

Exhibit A:
Photograph of Madison's Crib        43-18      44-07

1          NOVI, MICHIGAN

2

3           Friday, April 27, 2007 at about 10:08

4   a.m.

5

6           (The Court, counsel, and all parties

7   present.)

8          THE COURT:    Calling the matter of

9   People versus Steven McBurney.  That would

10  be 06-7954.  Put your appearances on the

11  record.

12         MR. SKRZYNSKI: Good morning Your Honor,

13  my name is John Skrzynski, I am here for the

14  Prosecutor.

15         MS. SARA POPE-STARNES:   Sara

16  Pope-Starnes, Assistant Prosecuting Attorney.

17         MR. WHITE:    Robert White appearing on

18  behalf of Mr. McBurney who is seated to my

19  immediate left.

20         THE COURT:    All right.  Let's do some

21  housekeeping matters.  As I understand this,

22  the Prosecution is going to have three

23  witnesses today.

24         MR. SKRZYNSKI: Yes.

25         THE COURT:    But, their fourth witness

```
 1          is unavailable at this point.

 2                  MR. SKRZYNSKI: That's correct.

 3                  THE COURT:      And they are going to be

 4          requesting an adjournment over Defense

 5          objections which I am inclined to grant.

 6          That occurred in the in-chambers conference.

 7          Are there any stipulations that we are going

 8          to place on the record before we start

 9          taking testimony?

10                  MR. SKRZYNSKI: I don't believe so.

11                  MR. WHITE:      I don't think so, Judge.

12                  THE COURT:      All right, there is

13          something that I have got to draw both sides

14          attention to, so would you wander up here?

15          (Bench conference held at 10:09 a.m., Court

16          reconvened at 10:09 a.m.)

17                  THE COURT:      Okay, everybody ready?

18                  MR. WHITE:      Yes.

19                  MR. SKRZYNSKI: Yes.

20                  THE COURT:      So, who is going to take

21          control of that document or whatever it is?

22                  MR. SKRZYNSKI: I think probably the

23          Court; it's addressed to the Court.

24                  THE COURT:      Okay, it may well be, but

25          I am not allowed to look at anything at this
```

1      point unless it comes up as a question of

2      evidence or bond.

3           MR. SKRZYNSKI: Well, I will take custody

4      of it and make a copy for Defense Counsel.

5           THE COURT:    All right.

6           MR. SKRZYNSKI: We'll copy it.

7           THE COURT:    Then let's place it all

8      on the record.  I received an envelope; I

9      noticed an envelope in the file that had

10     "confidential" written on it.  I presumed,

11     since it is in a 52nd District Court envelope

12     that it was delivered to the staff unsealed,

13     and that someone on my staff opened it.  I

14     myself have not reviewed it, I have no idea

15     what the contents are.  Having noticed a

16     confidential document in the court file and

17     not knowing what it is, I called counsel to

18     the bench and provided it to the Prosecution

19     and to Defense to review jointly.  I still

20     don't know what's in it.  I have given it to

21     the Prosecution.  I understand they are

22     going to make a copy of whatever it is and

23     give it to defense, is that correct?

24          MR. SKRZYNSKI: That's correct, Your

25     Honor.  We will retain custody of the

1      original and give a copy to Mr. White.

2           MR. WHITE:      Yes, that's correct.

3           THE COURT:      All right.

4           MR. SKRZYNSKI: Thank you Judge.

5           THE COURT:      Let's proceed.

6           MR. WHITE:      I would like to sequester

7      the balance of the prosecutor's witnesses.

8           THE COURT:      All right.  If you are

9      going to be testifying in this case, other

10     than the Officer in Charge of the case, if

11     you will please step out of the courtroom

12     until such time as you have been called to

13     testify.  Any other preliminary matters?

14          MR. WHITE:      None Judge.

15          MR. SKRZYNSKI: The record should reflect

16     only the first witness is present.

17          THE COURT:      All right.  Call your

18     first witness.

19          MR. SKRZYNSKI: Heather McBurney.

20          THE COURT:      Ma'am, if you would step

21     into the witness stand, remain standing, and

22     raise your right hand I would appreciate it.

23     Do you solemnly swear or affirm the

24     testimony you are about to give is the truth,

25     the whole truth, and nothing but the truth?

```
1                THE WITNESS:   I do.

2                THE COURT:      Be seated please.   I

3        would like you to state your name for the

4        record and then spell it.

5                THE WITNESS:   Heather McBurney,

6        H-e-a-t-h-e-r M-c-B-u-r-n-e-y.

7                THE COURT:      Can everyone hear her?

8                MR. WHITE:      Yes.

9                THE COURT:      Okay.  Ma'am, I am going

10       to need you to pull that microphone a little

11       bit closer to you.  Not the chair.  You

12       could actually take it out if you want to

13       hold it, if that would be easier for you.

14       No, you don't have to play with that.  You

15       can actually just take it right out of the

16       thing and hold it.  And that way -- well

17       let's do a little test.

18               THE WITNESS:   Can you hear me now?

19               THE COURT:      Can everyone hear her?

20               MR. SKRZYNSKI: I can.

21               THE COURT:      Perfect.   Let's do it

22       that way.  And, ma'am?

23               THE WITNESS:   Uh-huh.

24               THE COURT:      Welcome to my courtroom.

25               THE WITNESS:   Thank you.
```

```
 1              THE COURT:      I know it's not easy.

 2              THE WITNESS:     Thanks.

 3              THE COURT:      Go ahead.

 4                     ^CHEATHER MCBURNEY

 5         Called by the Prosecution at 10:13 a.m.,

 6         sworn by the Court and testified.

 7                     ^CDIRECT EXAMINATION

 8    BY MR. SKRZYNSKI:

 9    Q    Ma'am, do you know a person by the name of

10         Steven McBurney?

11    A    Yes, I do.

12    Q    Is he in the courtroom today?

13    A    Yes.

14    Q    Can you just point at him and let us know

15         what he is wearing so we know who you're

16         talking about?

17    A    He is wearing orange.

18              MR. SKRZYNSKI: Let the record reflect

19         that the witness has identified --

20              THE COURT:      So reflect.

21              MR. SKRZYNSKI: Thank you.

22    BY MR. SKRZYNSKI:

23    Q    How do you know Mr. McBurney?

24    A    He is my husband.

25    Q    And how long have you been married, ma'am?
```

```
 1    A    I have been married for a little over two
 2         years.
 3    Q    Okay.  When were you married, do you know the
 4         date?
 5    A    It's March 5th, 2005.
 6    Q    Okay.  Did you have any children?
 7    A    Yes.
 8    Q    How many?
 9    A    One.
10    Q    All right.  What was the child's name?
11    A    Madison McBurney.
12    Q    Okay.  Is that the child that died in this
13         matter?
14    A    Uh-huh.  Yes.
15    Q    Okay.  What was the birth date of that child?
16    A    12/27/05.
17    Q    Okay.  Ma'am, I want to direct your attention
18         to the date of November the 30th of this last
19         year 2006.  That was a Thursday, do you recall
20         that date, ma'am?
21    A    Yes, I do.
22    Q    Okay.  On that date, were you working?
23    A    Yes.
24    Q    Where were you working?
25    A    I work at Hartland Healthcare Center in Ann
```

```
 1            Arbor.

 2    Q    Okay.  And where did you live at that time?

 3    A    In South Lyon.

 4    Q    What was the address?

 5    A    311 Scott Street.

 6    Q    Did there come a time that day when you went

 7         to work?

 8    A    Yes.

 9    Q    What time was that?

10    A    I left about six o'clock.

11    Q    Okay.  Who else was living at the house with

12         you?

13    A    Steve and Madison, Steve McBurney and Madison

14         McBurney.

15    Q    Okay.  Was that it, just the three of you?

16    A    Yes.

17    Q    Okay.  Now, on that day when you went to

18         work, you said around six p.m.?

19    A    Yes.

20    Q    Okay.  Was anybody home when you left?

21    A    Yes, Steve and Madison.

22    Q    Okay.  Who was going to take care of Madison

23         after you left that day?

24    A    Steve was.

25    Q    At this time, how old is Madison?
```

```
 1   A   Eleven months old.

 2   Q   Okay.  Was there anyone else that was going

 3       to be present to take care of Madison?

 4   A   No.

 5   Q   Okay.  Was this the normal course of business

 6       for the family?

 7   A   Yes, uh-huh.

 8   Q   You would go to work every day and Steven --

 9   A   I worked nights and he worked days.

10   Q   Okay.  So he -- did he work that day?

11   A   No.

12   Q   What condition had Madison been in during the

13       course of that day?

14   A   She was not feeling very well that morning.

15       She had thrown up and was a little tired, a

16       little clingy that morning, but she was back

17       pretty much to her normal self I would say

18       by the time I left.  Maybe just a little

19       tired still.

20   Q   How did she appear to you when you left?

21   A   She was fine.  I went in and laid her down

22       in her crib.  She used to take a little

23       power nap while I left for work so she

24       didn't get upset when one of us left, so she

25       was laying in her crib playing with a toy,
```

```
 1              so.

 2      Q    So, she appeared to be normal to you?

 3      A    Yes.

 4      Q    Like she is every day?

 5      A    Uh-huh.

 6      Q    Or was; okay.  Did you end up going to work,

 7              Ms. McBurney?

 8      A    Yes.

 9      Q    All right.  Did there come a time when

10              anything happened unusual in the course of

11              that evening?

12      A    Yes, I got a phone call.

13      Q    About what time was that?

14      A    Um --

15      Q    Well, how soon after -- I'm sorry go ahead.

16      A    It was close to seven.  I don't know the

17              exact time, but it was around that time.

18      Q    All right.  Who was calling you?

19      A    Steve.

20      Q    All right.  Did he tell you -- why was he

21              calling?

22      A    He said that she had collapsed and the

23              paramedics were there working on her.

24      Q    Did he tell you anything else?

25      A    He said for me to come home, but I knew that
```

1          they would be taking her to a hospital with

2          the ambulance there.  So, I had hung up and

3          went out to my car and called him back to

4          find out what hospital they were going to.

5     Q    And did you find out where they were going?

6     A    And he said that they were going to U of M

7          Hospital.

8     Q    So, did you go there?

9     A    Yes.

10    Q    All right.  When Steve talked to you on the

11         phone, you said he said that Madison had

12         collapsed?

13    A    Uh-huh.

14    Q    Did he say anything else about her condition?

15    A    No.

16    Q    Okay.  So, you went to -- what -- you went

17         to U of M Hospital?

18    A    Yes.

19    Q    Okay.  What happens once you get there?

20    A    My boss drove me up there and we pulled in

21         the parking lot just as the ambulance was

22         getting there and they were taking her off

23         the back of the ambulance.

24    Q    Okay.  Did you see Steven there?

25    A    Yes.

```
 1    Q    Where was he?

 2    A    He was in the back of the ambulance with her.

 3    Q    Okay.  Did you go to him?

 4    A    Yes, I went over to them.

 5    Q    What happened then?

 6    A    I pretty much was just seeing what kind of

 7         condition she was in and we walked in to the

 8         E.R. where they were going to, you know,

 9         take care of her.

10    Q    Did Steven tell you what condition she was in?

11    A    No, he -- when we got in there I asked what

12         had happened and he told me that she had

13         collapsed at home.

14    Q    Now, Ms. McBurney, I want you to tell me when

15         you leave for work -- when you usually left

16         for work, did Madison act a certain way

17         whenever you would leave?

18    A    She was having a -- she was going through a

19         little bit of a separation anxiety.

20    Q    How would that manifest itself?

21    A    Mostly she would just make noise, want me to

22         come back in the room.  She did that when I

23         was at home alone with her, too.  If I

24         stepped in the kitchen, she would start

25         making noise wanting me back in the room.
```

1    Q   Okay. How long would that go on before she

2         could be comforted?

3    A   Usually, I mean, I never was away from her

4         when I was at home alone. I don't know when

5         I left how long she would fuss for.

6    Q   Now, you said that when you left she was in

7         the crib, she was playing with a toy?

8    A   Uh-huh.

9    Q   Okay. Now, I want you to -- we were talking

10       about November the 30th, I want you to fast-

11       forward a little bit to December the 2nd.

12    A   Okay.

13    Q   Had you still -- had you been at the hospital,

14       did you stay there all day --

15    A   Yes.

16    Q   -- on the 30th?

17    A   Yes.

18    Q   And then all day on December the 1st?

19    A   The only time I went home was to change out

20       of my work clothes and get some stuff to

21       come back to the hospital. I was probably

22       gone two hours.

23    Q   Did you do that on December the First?

24    A   The next day, yes, that friday.

25    Q   Okay. And then you came back?

```
 1    A    Yes.

 2    Q    You stayed overnight on the December the

 3         First?

 4    A    Yes.

 5    Q    I want to point out the early morning hours

 6         of December the 2nd to you.

 7    A    Uh-huh.

 8    Q    Do you remember that time?

 9    A    Yes.

10    Q    Okay.  You were -- where were you at that

11         point, like early morning hours, say maybe two

12         in the morning?

13    A    It was about two, I am guessing about two.

14         I don't know the exact time.

15    Q    Where were you?

16    A    I was in Madison's room.

17    Q    Who was with you?

18    A    Steve.

19    Q    Okay.  And Madison as well?

20    A    Yes.

21    Q    And what happened at that time?

22    A    The nurse came in and just took me out of

23         the room, said she needed to ask me

24         something.  And I came out of the room and

25         she said that -- that the police --
```

1    MR. WHITE: Excuse me, I just want

2    to object as to what the nurse said.

3    MR. SKRZYNSKI: Okay.

4    THE COURT: Sustained.

5 BY MR. SKRZYNSKI:

6 Q  I mean, don't tell me what the nurse said.

7    She told you something and then did you do

8    something?

9 A  She took me out of the room, yes.

10 Q  And where did you go?

11 A  And then she said that --

12 Q  Well, don't tell me what she said, just tell

13    me what you did, I'm sorry.

14 A  She took me into the room where the police

15    officers were.

16 Q  Okay. What kind of a room was that?

17 A  It was like a small conference room with a

18    table and chairs.

19 Q  Okay. How many Police Officers were there?

20 A  Two.

21 Q  Okay. Was it Detective Sederlund seated

22    there, he was one of them?

23 A  Yes.

24 Q  And you saw Detective Sovik earlier?

25 A  Yes.

```
 1    Q    Was he the other?

 2    A    Yes.

 3    Q    Okay.  And at that point, what did they do?

 4    A    They asked me questions about Madison's

 5         condition and how she was doing, and I

 6         brought up you know some of her medical

 7         stuff and I was just trying to explain to

 8         them what I had known so far about her

 9         condition.

10    Q    How long did they talk to you?

11    A    I don't know how long I was in there.

12    Q    How did they behave toward you?

13    A    They -- they just talked to me like a -- you

14         know like a conversation.  They didn't raise

15         their voice or anything like that, it was

16         just back and forth talking.

17    Q    Were they polite?

18    A    Yeah.

19    Q    How long of a conversation was it?

20    A    I don't know how long I was in there.

21    Q    Did there come a time when it was over and

22         you left the room?

23    A    Yes.

24    Q    And where did you go when you left?

25    A    I went back to Madison's room.
```

1    Q    And what happened then?

2    A    Then Steve was taken in the other room by

3         the nurse, and taken to talk to them.

4    Q    All right. Do you know, was there a time

5         when you were sitting there alone with

6         Madison after he left?

7    A    Yes.

8    Q    About how long did that last?

9    A    I don't know. I didn't look at the clock.

10   Q    Okay. Were you asked to come back in that

11        conference room with the Detectives?

12   A    Yes.

13   Q    And when you went there who was there?

14   A    The -- I think those cops were there.

15   Q    Okay.

16   A    And Steve was there.

17   Q    Okay.

18   A    Yeah, they were both there, both cops and

19        Steve were there.

20   Q    And what happened at that time?

21   A    They --

22        MR. WHITE:    You know what, I am

23        going to lodge an objection at this point if

24        we are going to get into this. If the

25        Prosecutor intends to ask about the

1      statements of the accused then, as I

2      indicated to you in chambers, I believe that

3      there was a custodial interrogation that was

4      going on.  Mrs. McBurney was brought back

5      into it, and the foundation has not been

6      laid for -- either through this witness or

7      any police witness to introduce his

8      statements at this point.  Because they

9      brought in a third-party does not excuse

10     lack of proper constitutional protection.

11     That was not afforded to my client.

12          MR. SKRZYNSKI: Okay.  I can do this a

13     different -- we are going to present the

14     officers, so I will just do this different.

15          THE COURT:     All right.

16 BY MR. SKRZYNSKI:

17 Q   All right.  When you came back in, did you

18     sit down somewhere?

19 A   Yes.

20 Q   Where?

21 A   In one of the chairs --

22 Q   Were you sitting next --

23 A   I think one of the officers was sitting next

24     to me, Steve was sitting on the other side.

25 Q   Okay.  Were you close to -- sitting close to

1           Steve?

2     A     Yes.

3     Q     Okay.  Was there then a conversation --

4               MR. WHITE:     I'm sorry, what did you

5           just say?  I didn't hear you.

6               MR. SKRZYNSKI: Was he sitting close to

7           her.

8               MR. WHITE:     Were you sitting close --

9           I'm sorry.  I'm sorry.

10    BY MR. SKRZYNSKI:

11    Q     Now, following that, was there further

12          conversation between the Police Officers and

13          Steven?

14    A     They --

15    Q     You don't have to tell me what they said or

16          what he said.  I am just asking, was there a

17          conversation between them?

18    A     A statement, they only really --. not a full

19          conversation.

20    Q     Steve was doing the talking?

21    A     Yeah, mostly.

22    Q     Okay.  How long did that last once Steve

23          started talking while you were there?

24    A     I don't -- I don't know.

25    Q     Okay.  Did there come a time when you left

```
 1        the room?

 2   A    I don't --

 3   Q    You don't remember?

 4   A    I don't remember some of --

 5   Q    Okay.  Okay.  Let me ask you this, ma'am, did

 6        you ever leave the hospital with Madison?

 7   A    No.

 8   Q    Okay.  Did she pass away at the hospital?

 9   A    Yes.

10   Q    What -- do you remember what date that was?

11   A    It was December 4th.

12   Q    December the 4th, okay.  Basically, at that

13        time, did the doctors approach you about her

14        condition?

15   A    Yes.

16   Q    And were you asked to make a decision of some

17        kind?

18   A    They said they would test to see if there

19        was any brain activity left.

20   Q    Okay.  And what happened then?

21   A    They told me no.

22   Q    And then what?

23   A    And then I had to just -- I made a decision

24        to take her off the life support.

25   Q    Okay.  Do you know about what time of day
```

1          that was, do you remember?

2    A    It was about eight o'clock at night.

3              MR. SKRZYNSKI: Okay.  Okay.  Thank you,

4         ma'am.  I don't have any further questions.

5              MR. WHITE:    If you need a break, you

6         can ask the Judge.

7              THE WITNESS:   I'm okay.

8                    ^CCROSS-EXAMINATION

9    BY MR. WHITE:

10   Q    Heather, how old are you?

11   A    Huh?

12   Q    How old are you?

13   A    I'm 34.

14   Q    Okay.  And did you attend college?

15   A    Yes.

16   Q    Okay.  What college did you attend?

17   A    Oakland Community College.

18   Q    And did you receive a degree?

19   A    Yes.

20   Q    Okay.  And do you have any specific

21        professional license?

22   A    I am a Registered Nurse.

23   Q    And how long have you been a Registered Nurse?

24   A    I have been a Registered Nurse for about

25        going on nine years.

1    Q    And since you became a registered nurse, have

2         you held that position continuously?

3    A    Yes.

4    Q    And the type of work that you do in your R.N.

5         capacity is what?

6    A    Right now what kind of --

7    Q    Yes, what kind of work?

8    A    I work in a physical rehab short-term

9         facility, it's a step down from the hospital.

10   Q    Okay.  And that's in Ann Arbor?

11   A    Yes.

12   Q    Okay.  And at the time that Madison was born

13        you worked in the same place?

14   A    Yes.

15   Q    Okay.  And the time that you married Steve

16        were you working in the same place?

17   A    Yes.

18   Q    Okay.  And Madison was born by cesarean

19        section?

20   A    Yes.

21   Q    Cesarean section, correct?

22   A    Yes.

23   Q    And why was that?

24   A    She was breach.

25   Q    Okay.  And breach in what way?

```
 1    A    Her head was up high, feet were down low, and
 2         positioned to where she had to be delivered
 3         C-Section.
 4    Q    Okay.  Had labor started at that point?
 5    A    No.
 6    Q    Was this the anticipated delivery date, 12/27?
 7    A    Yes.
 8    Q    And the doctor who delivered her?
 9    A    Doctor -- her regular doctor was Dr. Dino
10         Davidou (sp), but the doctor that was there
11         for the hospital that day was Dr. Brandeman.
12    Q    Okay.  And she was delivered at St. Joseph's
13         Mercy Hospital in Ann Arbor, correct?
14    A    Yes.
15    Q    Okay.  And she had a condition when she was
16         born, correct?
17    A    Yes.
18    Q    And tell the Judge what that condition was.
19    A    She was born with hip dysplasia.  Her hips
20         were dislocated when she was born and -- but
21         she wasn't -- they thought that her hips
22         were okay, because they didn't have a click,
23         but she was diagnosed in April with the
24         definite hip dysplasia.
25    Q    And were you given any explanation of how
```

```
 1            that happened, was it during the birth?

 2    A    No.

 3    Q    Was it congenital?

 4    A    It's just a congenital condition.

 5    Q    Other than that, Heather, were there any other

 6         complications in the birth of Madison?

 7    A    She was born with some open spots on the

 8         back of her head that she was later

 9         diagnosed with the Aplasia Cutis Congenita.

10    Q    Okay.  And open spots?

11    A    Yes.

12    Q    How many open spots were there?

13    A    There were three.

14    Q    Okay.  And when you say "open spots", could

15         you explain to the Court how you would say

16         that they were open?

17    A    Pretty much it looks like if you were to --

18         like skin your knee.

19    Q    Okay.

20    A    You know, the top layers of skin pretty

21         much, you know, the superficial open areas,

22         no bleeding or anything, not deep enough to

23         bleed.

24    Q    All right.  Anything else, any other kind of

25         unusual things about Madison's birth other
```

| | | |
|---|---|---|
| 1 | | than hip dysplasia and the spots on her head? |
| 2 | A | I don't -- not that I can remember. |
| 3 | Q | And you were discharged from the hospital on |
| 4 | | December 30th? |
| 5 | A | It was December 30th or the 31st, one of |
| 6 | | those dates. |
| 7 | Q | And you went home? |
| 8 | A | Yes. |
| 9 | Q | To 311 Scott in South Lyon? |
| 10 | A | Yes. |
| 11 | Q | And where you lived with Steve? |
| 12 | A | Yes. |
| 13 | Q | And how long were you off work, Heather? |
| 14 | A | I went back to work in February. |
| 15 | Q | Okay. And February -- so you were off |
| 16 | | approximately four to six weeks? |
| 17 | A | Six weeks. |
| 18 | Q | Okay. And when you went back to work, what |
| 19 | | was the child care arrangements for Madison? |
| 20 | A | I went back to work working midnights and |
| 21 | | Steve worked days. He was still on |
| 22 | | unemployment at the time, but I was starting |
| 23 | | to work evenings at that time and going to |
| 24 | | eventually work to midnights because it's -- |
| 25 | Q | Okay. |

1    A    -- they were giving me the opportunity to

2         get used to working midnights.

3    Q    So, when you worked midnights, Steve would be

4         at home with Madison?

5    A    Yes.

6    Q    And then he would go to work, or when he

7         returned to work, you would be at home with

8         Madison?

9    A    Yes.

10   Q    And then you were the two care-givers for

11        your daughter then?

12   A    Yes.

13   Q    And her pediatrician, who was she treated by?

14   A    Dr. Adams, Robert Adams.

15   Q    And did you take her to all of her well-visit

16        check-ups?

17   A    Yes.

18   Q    Okay.  And my notes indicate this -- and

19        please -- January 24th, January 31st, March

20        17th, May 17th, July 24th and October 24th,

21        those were normal well-visit check-ups for

22        Madison?

23   A    Uh-huh.  Yes.

24   Q    Anything unusual, any findings during those

25        periods of time?

1    A   No.

2    Q   Okay.  And, in fact, on October 24th she had

3        a series of lab tests done, correct?

4    A   Yes.

5    Q   Okay.  And they all came back normal?

6    A   Yes.

7    Q   Okay.  On February 16th, did anything unusual

8        happen that day?

9    A   I believe that's the day that -- that I was

10        at work and Steve had -- was carrying Madison

11        in the chair and tripped and fell with her.

12    Q   Okay.  He called you at work?

13    A   Yes.

14    Q   Okay.  And he said that he was carrying

15        Madison in her, what you guys called her,

16        bouncy chair?

17    A   Yes.

18    Q   And that as he was going into the computer

19        room --

20    A   Yes.

21    Q   -- he lifted the chair up, tripped, and she

22        fell out?

23    A   Yes.

24    Q   And fell on the floor?

25    A   Yes.

```
1    Q    And hit her head, is that true?

2    A    Yes.

3    Q    And he asked you what should be done,

4         correct?

5    A    Yes.

6    Q    And you both agreed that she should be taken

7         to St.  Joseph's Mercy Hospital, correct?

8    A    Yes.

9    Q    And he drove her to your work?

10   A    Yes.

11   Q    And from your work you went to the hospital,

12        correct?

13   A    Yes.

14   Q    And there was -- Madison was seen through

15        emergency?

16   A    Yes.

17   Q    Okay.  And she was examined?

18   A    Uh-huh.

19   Q    And there was no finding of any abnormality

20        at that point?

21   A    No.

22   Q    Okay.  There was no x-rays done?

23   A    No.

24   Q    No M.R.I. or CAT Scan that you can recall?

25   A    No.
```

1    Q    Okay.  And after seeing the doctor and

2         talking to the doctor she was released to

3         you and Steve to go home, correct?

4    A    Yes.

5    Q    Now, the hip dysplasia actually wasn't

6         diagnosed until Dr. Craig of the U of M

7         Hospital, correct?

8    A    Actually, she was diagnosed at St. Joe's.

9    Q    That's correct.

10   A    She had an ultrasound there.

11   Q    Okay.  Okay.  And then she started treating

12        with Dr. Craig?

13   A    Yes.

14   Q    And Doctor Craig treated her, and again let

15        me -- she saw Doctor Craig April 20th, May

16        4th, June 8th, July 6th, September 12th and

17        November 14th, does that appear to be a fair

18        recollection of the times that she treated

19        with Doctor Craig for her hips?

20   A    Yes.

21   Q    And, initially, she had a pavlack harness,

22        correct?

23   A    Pavlack harness.

24   Q    And then she went to a Hewitt Brace, correct?

25   A    Uh-huh.

1   Q   Is that true?

2   A   Yes.

3   Q   Okay. And the brace was -- she wore initially

4       24 hours, correct?

5   A   The harness she wore for 24 hours at first.

6   Q   Okay.

7   A   And was gradually weaned down and when she

8       got older she had to be moved to the brace

9       because --

10  Q   And the brace was approximately -- when was

11      it that Madison started wearing that?

12  A   I don't know exact -- she had been in it for

13      a few months.

14  Q   Okay. And she had an x-ray with Doctor Craig

15      on July 6th of 2006?

16  A   At six months I believe is when they told me

17      she was old enough to start getting x-rays.

18  Q   Okay. And to your knowledge, what part of

19      her was she x-rayed; what did she have

20      x-rayed?

21  A   The pictures of the x-ray I could see from

22      she was put in like a frog position.

23  Q   Okay.

24  A   I could see from about where her belly-button

25      would be all the way down her legs.

1    Q    Okay.   Were there any x-rays of her upper
2         body and skull during this period of time
3         that she was being treated by Doctor Craig?
4    A    No.
5    Q    Okay.   Now, the last appointment you had with
6         Doctor Craig was on November 14th, correct?
7    A    Uh-huh.
8    Q    And I think -- is that true?
9    A    Yes.
10   Q    Okay.
11   A    Sorry.
12   Q    And I believe the advice was to come back in
13        three months, correct?
14   A    Yes.
15   Q    Okay.   And did she continue to wear the
16        Hewitt brace, correct?
17   A    Yes.
18   Q    Okay.   Now, the condition that you referred
19        to before that she was born with the Aplasia
20        Cutis Congenita?
21   A    Yes.
22   Q    Will you explain to the Court what that is,
23        what your understanding of it is?
24             MR. SKRZYNSKI: Well, Judge I have to
25        object.   I don't think that this witness is

```
 1        competent to say that.   What she is going to

 2        say is going to be hearsay.

 3             MR. WHITE:      She is an R.N. Judge.

 4             THE COURT:      So.  Do you want to

 5        establish the foundation for her expertise in

 6        this area?  She is not testifying as a

 7        expert, Counsel.

 8             MR. WHITE:      She is not testifying as

 9        an expert, she is testifying as --

10             THE COURT:      And if she hasn't done the

11        examination herself --

12             MR. WHITE:      She is testifying as a

13        mother and what information she has --

14             THE COURT:      Approach the bench.

15        (Bench conference held)

16             THE COURT:      Are you okay, ma'am?

17             THE WITNESS:    Uh-huh.

18             THE COURT:      All right, let's go.

19        Objection is sustained unless you lay a

20        foundation for her expertise in the area that

21        you're asking her about.

22   BY MR. WHITE:

23   Q    The Aplasia Cutis Congenita, that was a

24        diagnosis for the spots that she had on her

25        when she was born?
```

1    A    Yes.

2    Q    Those spots continued to remain from the time

3         of birth, correct, up to the time that she

4         was admitted to the hospital?

5    A    Two of them healed, one never closed.

6    Q    One never closed?

7    A    Yes.

8    Q    Okay.  And who did you seek treatment from?

9    A    I went to, I believe, it was Dr. Pyro at

10        first.

11   Q    Okay.

12   A    A dermatologist; and he referred her to U of

13        M.

14   Q    Okay.  And would you have seen Dr. Pyro on

15        June 1st, does that sound --

16   A    That sounds about the right time.

17   Q    Okay.  And would you have seen -- did you go

18        to U of M on June 28th for the treatment of

19        the skin condition?

20   A    Yes.  Yes.

21   Q    Okay.  And is any treatment that was

22        prescribed, treatment that was rendered to

23        Madison for this skin condition, was what?

24   A    They -- I was told to just -- that it would

25        heal up from the U of M doctors and that

```
 1        they wanted me to follow-up with an M.R.I.
 2        for her.
 3   Q    Was she given any medications?
 4   A    No.
 5   Q    Okay.  And an M.R.I. was done through U of M,
 6        correct?
 7   A    Yes.
 8   Q    On August 31st, 2006, correct?
 9   A    Yes.
10   Q    And then, subsequently, there was a CAT Scan
11        done also of her head?
12   A    Yes.
13   Q    On September 11th through U of M?
14   A    Yes.
15   Q    Is that true?
16   A    Yes.
17   Q    Okay.  Now, the last treatment that she
18        received for this -- or a connection with this
19        condition, though, would have been the CAT
20        Scan of September 11th?
21   A    The wound was still not healing, so I went
22        out of network to another dermatologist.
23   Q    And why would you go out of network?
24   A    Because I was concerned that that wound was
25        still open.
```

1    Q    And who did you see?  Would it have been Dr.

2         Lipkin?

3    A    Yes.

4    Q    Okay.  Would it have been October 30th?

5    A    Yes, they had done a culture.

6    Q    Okay.  So, they did a culture that day?

7    A    Yes.

8    Q    And you actually came back on November 14th?

9    A    Yes, two weeks later.

10   Q    Two weeks later you were informed that she

11        had a bacterial infection, correct?

12   A    Yes.

13            MR. SKRZYNSKI: Judge, that's hearsay

14        too.  I mean, the diagnosis of her condition,

15        that's got to be done by a doctor.  It's

16        hearsay as to this witness.

17   BY MR. WHITE:

18   Q    Your understanding of the condition that she

19        had --

20            THE COURT:    Well, response?  Or are

21        you just going to move to a different

22        question?

23            MR. WHITE:    My question was her

24        understanding.  I am not asking her to tell

25        me what the doctor said.

```
 1                THE COURT:    His objection, I think,
 2         goes to hearsay information as a foundational
 3         basis.
 4                MR. WHITE:    That's not what I asked
 5         her.
 6                THE COURT:    And if that issue is
 7         relying on hearsay as opposed to her own
 8         knowledge, then she can't answer the
 9         question.   So, lay your foundation that she
10         actually can talk to this from her own
11         knowledge as opposed to -- objection
12         sustained on a foundation basis.   If you can
13         lay a foundation, I will allow it.
14    BY MR. WHITE:
15    Q    She had a culture taken on October 30th,
16         correct?
17    A    Yes.
18    Q    Okay.   And you had a return visit on
19         November 14th, correct?
20    A    Yes.
21    Q    Okay.   And who was present during this return
22         visit?
23    A    I was returning to Dr. Lipkin, it was just
24         Madison and I.
25    Q    Okay.   And were you informed by the doctor --
```

1        don't tell me what the doctor said, but were

2        you informed the doctor's results of his

3        investigation to the culture and the reasons

4        why this sore was still open on her head?

5   A   Yes.

6   Q   All right.  And did he prescribe any specific

7        treatment?

8   A   Yes.

9   Q   Okay.  And what was the treatment?

10   A   She was prescribed Bactroban Ointment and to

11        use a solution on her head, I believe it's

12        called Domeboro Solution.

13   Q   Okay.

14   A   I think I was doing that three times a day

15        to her.

16   Q   Okay.  And, as a result of this conference

17        with the doctor and the prescription, did

18        you remove -- at this point, excuse me, let

19        me back up.  Madison had started day-care, is

20        that true, October 18th, correct?

21   A   Yes.

22   Q   And it was at Pitter Patter?

23   A   Uh-huh.

24   Q   Is that true?

25   A   Uh-huh.

```
 1    Q    You have to say yes or no, I'm sorry.

 2    A    Yes.

 3    Q    I'm sorry.  And she had started day-care on

 4         October 18th?

 5    A    Yes.

 6    Q    And the time period that she was in day-care

 7         was when; when was the actual time of day?

 8    A    She was taken there about seven in the

 9         morning and I picked her up about two

10         o'clock in the afternoon.

11    Q    And who would take her at seven o'clock?

12    A    Steve would take her in the morning.

13    Q    And then he would go to work?

14    A    Yes.

15    Q    Okay.  And then you would pick her up in the

16         afternoon?

17    A    Yes.

18    Q    Okay.  And this was the first child care that

19         Madison ever had outside you and Steve?

20    A    Yes.

21    Q    When, on a regular working -- normal working

22         day basis, correct?

23    A    Yes.

24    Q    So, you must have been then changed to the

25         morning -- excuse me, working the day shift?
```

```
 1    A    Yes.

 2    Q    And Steve is working the day shift?

 3    A    Yes.

 4    Q    And she was removed from child care on that

 5         date, on November 14th, the same day?

 6    A    Yes.

 7    Q    Okay.  And she returned to see Dr. Lipkin on

 8         November 28th?

 9    A    Yes.

10    Q    Okay.  For treatment of the condition --

11    A    Uh-huh.

12    Q    -- that was diagnosed, correct?

13    A    Yes.

14    Q    Okay.  And on November 28th -- excuse me, at

15         any time, Heather, did Dr. Lipkin have any x-

16         rays or CAT Scans or M.R.I.s done --

17    A    No.

18    Q    -- on Madison?

19    A    No.

20    Q    Okay.  The type of examination that he was

21         doing during these three visits, October 30th,

22         November 14th and November 28th, what would he

23         do?

24    A    He would physically look at the wound on her

25         head to see how the wound was doing.
```

```
 1    Q    Okay.  And then after October 28th you were

 2         supposed to make an appointment with an

 3         Infectious Disease --

 4    A    Yes.

 5    Q    -- doctor, is that correct?

 6    A    Yes.

 7    Q    After November 28th, after the last

 8         appointment, you were supposed to make an

 9         appointment with Infectious Disease doctor, is

10         that true?

11    A    He had already had one made.

12    Q    Okay.  And which doctor was that, do you

13         recall which office?

14    A    That was another Doctor Craig.

15    Q    All right.  On October 27th she had her first

16         cold, she was -- you took her to the doctor

17         for her first cold?

18    A    Uh-huh.

19    Q    You took her to Dr. Adams?

20    A    Yes.

21    Q    Okay.  And that was not a normal well-visit,

22         isn't it true?

23    A    Right, yes.

24    Q    That was something that you took her to --

25    A    Yes.
```

```
 1   Q   -- because she had congestion, runny nose, all
 2       the symptoms of a child having a cold?
 3   A   Yes.  Yes.
 4   Q   And she was prescribed Tylenol, Tylenol Cold
 5       and Cough, is that true?
 6   A   Yes.  Yes.
 7   Q   And she was having fevers, isn't that --
 8       about that time too, also?
 9   A   Yes.
10   Q   And after four or five days it didn't clear
11       up, did it?
12   A   No.
13   Q   And Steve took her back on November 3rd?
14   A   Yes.
15   Q   Okay.  And she was prescribed Amoxicillin?
16   A   Yes.
17   Q   Okay.  And you and Steve administered the
18       Amoxicillin?
19   A   Yes.
20   Q   All right.  How -- did she continue to have
21       fevers at that point, Heather, after Steve
22       took her back to Dr. Adams?
23   A   For a few days.
24   Q   For a few days?
25   A   Yes.
```

1   Q   And there was some indication that she might

2         have had an ear infection also?

3   A   He prescribed the Amoxicillin when he looked

4         into her ears, he said that there was a

5         possible small ear infection.

6   Q   Did her cough and cold resolve itself to your

7         satisfaction after November 3rd?

8   A   Yeah, eventually it went away, yeah.

9   Q   Did it clear up?

10   A   Yeah.

11   Q   Do you have any idea how long after November

12         3rd, Heather?

13   A   No.

14   Q   No?

15   A   No.

16   Q   Was she still showing any effects as of on

17         November 30th before you went to work?

18   A   No.

19   Q   Okay. So, that if I am correct then, the

20         only times that doctor -- that the only time

21         that Madison saw a doctor out of a normal

22         routine check-up or treatment is on February

23         16th when she went to St. Joe's as a result

24         of falling out of the bouncy chair?

25   A   Yes.

```
 1    Q    And then the two appointments in October for

 2         the treatment of the cough and the fevers?

 3    A    Yes.

 4    Q    Okay.  Now, on November 30th she is out of

 5         day care, correct?

 6    A    Yes.

 7    Q    And the program at that point was you had

 8         gone back to midnights?

 9    A    Yes.

10    Q    Okay.  And what time would you normally leave

11         the house?

12    A    I usually left the house at six-thirty.

13    Q    And Steve was working during the day?

14    A    Yes.

15    Q    And then Steve would provide the care for

16         Madison?

17    A    Yes.

18    Q    And then when he would go to work in the

19         morning you would get up and care for her?

20    A    Yes.

21    Q    The day of November 30th, Steve didn't work,

22         did he?

23    A    No.

24    Q    He worked -- in fact you had a sewer problem,

25         correct?
```

```
1    A    Yes.
2    Q    And he was around the house that day,
3         correct?
4    A    Yes.
5    Q    You had gotten home at approximately four a.m.
6         in the morning?
7    A    Yes.
8    Q    Checked on Madison; she seemed fine?
9    A    Yes.
10   Q    And then Steve got up before she did and went
11        outside and started working on the sewer,
12        correct?
13   A    Yes.
14   Q    And then you got up and started caring for
15        Madison approximately seven o'clock that
16        morning?
17   A    Yes.
18   Q    Okay.  Now, I believe according to the
19        Prosecutor's questioning you had said that
20        Madison seemed just a little off that day?
21   A    Yes.
22   Q    Okay.  Normal time getting up seven o'clock?
23   A    Yes.
24   Q    Okay.  And when you went in to get her from
25        her bed, she had her harness on, correct?
```

```
 1    A    Yes.

 2    Q    She slept with it on?

 3    A    Yes.

 4         MR. WHITE:      If I may approach the

 5         witness, Your Honor, I actually want to

 6         approach the court reporter?

 7         THE COURT:      You may.

 8    BY MR. WHITE:

 9    Q    Heather, I am going to show you Proposed

10         Exhibit A. And I know this is difficult.

11         (Defense Proposed Exhibit A, Photograph of

12         Madison's Crib, introduced at 10:53 a.m.)

13    A    Okay.

14    Q    Is that a picture of Madison's crib?

15    A    Yes.

16    Q    Madison had her own room?

17    A    Yes.

18    Q    Does that accurately depict the condition of

19         the crib and its' placement in the room as

20         of November 30th, 2006?

21    A    Yes.

22         MR. WHITE:      I would move for entry

23         of the Exhibit.

24         MR. SKRZYNSKI: No objection.

25         THE COURT:      Received.
```

1           (Defendant's Exhibit A, Photograph of

2           Madison's Crib, received and admitted into

3           evidence at 10:54 a.m.)

4     BY MR. WHITE:

5     Q    Now, when you went in to get her that

6           morning you noticed something unusual, did

7           she have a little vomit on her?

8     A    It was a little dried spit-up on her --

9     Q    Okay.

10    A    -- cheek and a little bit on her sleeper.

11    Q    Okay.  Was this something that was unusual?

12    A    Yes.

13    Q    Okay.  Did she -- did she vomit very often,

14          was she subject to spitting up her bottle or

15          --

16    A    She spit up a lot when she was younger, but

17          not at that age she didn't.

18    Q    Okay.  And did you notice anything about her

19          stomach?

20    A    Yeah, her stomach was rumbling, making a lot

21          of noise when I got her up.

22    Q    And you got her out of her bed?

23    A    Yes.

24    Q    Got her her bottle?

25    A    Yes.

```
 1    Q    She took her bottle, and then you were
 2         playing with her and she fell asleep on you?
 3    A    Yes.
 4    Q    Okay.  And that would have been approximately
 5         nine, nine-thirty?
 6    A    That sounds right, yes.
 7    Q    Okay.  And was this unusual for her to nap at
 8         this point?
 9    A    Yes.  Usually it was later.
10    Q    And later being?
11    A    About eleven; I would say close to eleven.
12    Q    Okay.  And Steve was still outside working on
13         the sewer?
14    A    Yes.
15    Q    In fact, he had another gentleman that came
16         over and was helping him, correct?
17    A    Yes.
18    Q    Okay.  And you and Madison napped on the couch
19         in the front room?
20    A    Yes.
21    Q    Okay.  And, at this point, did you form a
22         belief that she was not feeling well?
23    A    Yes.
24    Q    Okay.  And when she got up you took her to
25         the bath; took her to her bath?
```

1   A   Yes.

2   Q   Okay. Did anything unusual happen in her

3       bath?

4   A   When I was getting her undressed that's when

5       she had vomited.

6   Q   Okay. Was it vomiting that you thought was

7       unusual under these circumstances?

8   A   It was quite a bit; pretty forceful. I was

9       also sitting her up at the same time that

10      she vomited, but she -- that was the first

11      time that I had ever seen her to vomit --

12   Q   And with that level of force?

13   A   Yes.

14   Q   Okay. Would you call it projectile vomiting?

15   A   I can't say for sure.

16   Q   Okay.

17   A   Because it could have been also the -- as I

18      was sitting her up being part of that, too.

19   Q   Okay. Okay. And the content, was it the

20      bottle from this morning?

21   A   The bottle and apple sauce that she had

22      gotten that morning.

23   Q   Okay. Anything else unusual that you noticed

24      about her that day, about the way she was

25      acting?

```
 1    A    She was a little -- little more laid back I
 2         guess is the way -- she still played with her
 3         toys, still ate.  I kept her, you know, her
 4         food bland that day because of the vomiting,
 5         but she ate all of her food.  She just
 6         seemed a little more not as wild playing I
 7         guess.
 8    Q    Okay.  Did she vomit again?
 9    A    A little bit.  It was more like a big
10         spit-up, it wasn't a -- you know.
11    Q    And that was approximately when?
12    A    Probably an hour after her bath.
13    Q    Okay.  So, then there would have been three
14         -- three times or three periods of vomiting,
15         one she had already done it when you woke
16         her up, when she was awoke, excuse me, one
17         in the bath tub where you were getting her
18         ready for her bath, and then approximately
19         an hour after her bath?
20    A    About an hour; yeah.
21    Q    Did she act in any way to indicate that her
22         head or neck were hurting?
23    A    She seemed whiny when I would lay her back
24         to change her diaper.  It's hard to say if,
25         you know, if something wasn't comfortable,
```

```
 1         she kind of would pout out her lip, as soon
 2         as she laid down she would stop.  I don't
 3         know, she was just kind of fussy, if it was
 4         her stomach bothering her.-
 5    Q    Did -- was Madison prone to temper tantrums?
 6    A    No.
 7    Q    Did she -- would you ever characterize as in
 8         Madison's crying ever to the level of
 9         screaming?
10    A    One time when she had real bad gas pain.
11    Q    Okay.  Approximately when was that?
12    A    She was about three months old.
13    Q    Okay.  Other than that time, would you have
14         ever characterized her crying or being upset
15         as screaming?
16    A    No.
17    Q    Now, by the time you were ready to go to
18         work, you felt that she was her normal self?
19    A    Yes.
20    Q    And her normal self was what?
21    A    Laying on the floor, she was playing with me
22         on the floor, smiling.  She was eating fine.
23    Q    Did you see Steve with Madison that day; did
24         Steve have any interaction with her that day?
25    A    A little bit.
```

```
 1              THE COURT:      Stop for a minute.
 2       Approach again.
 3              MR. WHITE:      I'm sorry.
 4       (Bench conference held at 11:01 a.m.)
 5              THE COURT:      Continue.
 6  BY MR. WHITE:
 7  Q    So, would you say her normal self is
 8       playing/smiling?
 9  A    Yes.
10  Q    Okay.  And would she nap when she would
11       normally -- when you laid her down for a nap,
12       would she normally fall asleep?
13  A    Yes.
14  Q    Okay.  Any problems with getting her to sleep
15       over the course of her life?
16  A    Not for me, no.
17  Q    All right.  And now you talked about her
18       separation anxiety?
19  A    Yes.
20  Q    Okay.  That is when you would leave the room
21       there would be some protest?
22  A    Yes.
23  Q    And that level of protest was what?
24  A    Mostly she would just start making like a
25       whiny noise.
```

```
 1   Q   Okay.  It wasn't screaming, was it?

 2   A   No.

 3   Q   It was crying?

 4   A   No.

 5   Q   It wasn't a temper tantrum?

 6   A   No.

 7   Q   It was a noise?

 8   A   Yes.

 9   Q   Okay.  And this is true if you left the room

10       and in order to do this, to facilitate you

11       leaving for work you and Steve would lay her

12       down for what you would call a power nap?

13   A   Yes.

14   Q   Shortly before you would leave, correct?

15   A   Yes.

16   Q   And that power nap she would actually go to

17       sleep?

18   A   Sometimes.  Sometimes she would just lay in

19       there and play.

20           MR. WHITE:      Okay.  Excuse me one

21       second, Your Honor.

22           THE COURT:      Uh-huh.

23           MR. WHITE:      I have nothing further of

24       this witness.

25           THE COURT:      Redirect?
```

1      MR. SKRZYNSKI: None, thank you.

2      THE COURT:     You may step down.   The

3   Court is going to take a five minute recess.

4   (The witness was excused at 11:04 a.m.)

5      MR. SKRZYNSKI: May this witness be

6   excused, Your Honor?

7      THE COURT:     She may.

8   (The Court was in recess at 11:04 a.m., the

9   Court reconvened at 11:07 a.m.)

10      MR. SKRZYNSKI: The People call Detective

11   Chris Sovik.

12      THE COURT:     All right.   If you would

13   take the witness stand and remain standing I

14   would appreciate it.   Do you solemnly swear

15   or affirm the testimony you are about to

16   give is the truth, the whole truth, and

17   nothing but the truth?

18      THE WITNESS:    I do.

19      THE COURT:     Be seated please.   State

20   your name for the record and spell it.

21      THE WITNESS:   Christopher Sovik, S-o- V

22   as in Victor, -i-k.

23      ^CDETECTIVE CHRISTOPHER SOVIK

24   Called by the Prosecution at 11:07 a.m.,

25   sworn by the Court and testified.

```
1              ^CDIRECT EXAMINATION
2   BY MR. SKRZYNSKI:
3   Q   What is your occupation, sir?
4   A   I am a Sergeant with the South Lyon Police
5       Department.
6   Q   Were you involved in the investigation of this
7       matter?
8   A   Yes.
9   Q   Okay.  I want to point the date of December
10      the Second 2006 on the hour of about two
11      o'clock in the morning.  Do you recall that
12      date and time?
13  A   I do, yes.
14  Q   Where were you at that time?
15  A   I was -- are you talking about the December
16      2nd?
17  Q   December the Second 2006.
18  A   Okay.  I eventually ended up going to the U
19      of M Hospital.
20  Q   Okay.  In Ann Arbor?
21  A   Yes, sir.
22  Q   All right.  Did you subsequently meet with
23      Steven McBurney?
24  A   Yes.
25  Q   Is he in the courtroom today?
```

```
1    A    Yes.

2    Q    What is he wearing?

3    A    An orange suit.

4              MR. SKRZYNSKI: Okay.  Would the record

5         indicate the Defendant has identified the

6         witness -- the witness has identified the

7         Defendant?

8              THE COURT:    So reflected.

9              MR. SKRZYNSKI: Thank you.

10   BY MR. SKRZYNSKI:

11   Q    Where did you have contact with Mr. McBurney?

12   A    When did I?

13   Q    Where?

14   A    It was in a large conference room, I think.

15        I believe it was on the fourth floor of the

16        children's hospital.

17   Q    Okay.  How is it that you made -- can you

18        describe what happened from the beginning, the

19        moment you start contact with him?

20   A    Yeah, we had -- Detective Sederlund and I

21        were in this conference room and we had

22        somebody go and retrieve Mr. McBurney.  He

23        came back to the room and we identified

24        ourselves, explained why we were there and

25        told him that we would ask him some
```

1           questions about the incident involving his

2           daughter on November 30th.

3     Q     Okay.  Now, the place where you were, you

4           said that it was a conference room?

5     A     It was a very large conference room, yes sir.

6     Q     Can you describe it?

7     A     If you walk into the -- there was one door

8           leading in.  There was a large door, there

9           was windows on each side and on top.  As

10          soon as you walk into the door there was a

11          large wooden conference room table with about

12          eight chairs all together and there were some

13          other medical supplies in the room also.

14    Q     Okay.  Were there any windows to the room

15          besides the door window?

16    A     No, there was not.

17    Q     Okay.  When you asked Mr. McBurney to come

18          in, who else was there?

19    A     Detective Sederlund and I.

20    Q     Okay.  When he entered you said you

21          identified yourself?

22    A     Yes.

23    Q     And you told him -- why did you tell him you

24          were there?

25    A     We told him --

1    Q   I'm sorry, what was the reason you told him

2        you were there for?

3    A   We needed to ask him some questions about the

4        injuries that his daughter Madison sustained a

5        couple days earlier.

6    Q   Okay.  What was the seating arrangement?

7    A   As soon as you walk into the room Mr.

8        McBurney was sitting down, so he would have

9        his back to the door.

10   Q   Was the door locked or unlocked?

11   A   It was unlocked, it was closed but it was

12       unlocked.

13   Q   Okay.

14   A   Immediately to Mr. McBurney's right is where

15       I stood or I sat, and then December the

16       Second was to his left.

17   Q   Okay.  Was Mr. McBurney restrained in any

18       way?

19   A   No, sir.

20   Q   Okay.  What happened then?

21   A   We just basically asked him to tell us about

22       the incident that occurred on the 30th, why

23       the paramedics were responding to his --

24       responding to his home.

25   Q   Okay.  Now, was there -- could you observe

| | | |
|---|---|---|
| 1 | | the Defendant's physical condition at that |
| 2 | | time? |
| 3 | A | Yes. |
| 4 | Q | Did he answer the questions that you asked |
| 5 | | him? |
| 6 | A | Yes. |
| 7 | Q | Did he seem to have any problems |
| 8 | | understanding what you were asking him? |
| 9 | A | No. |
| 10 | Q | Did he speak in a slurred voice at all? |
| 11 | A | No. |
| 12 | Q | Were his eyes red or glossy, or bloodshot? |
| 13 | A | I don't believe so.  I believe that he had |
| 14 | | just woken up a little bit earlier prior to |
| 15 | | us getting him, but other than that he |
| 16 | | seemed okay. |
| 17 | Q | Did he say he was in need of food or drink, |
| 18 | | or any kind of sleep? |
| 19 | A | No. |
| 20 | Q | Did he say he had any kind of medical |
| 21 | | condition that was bothering him at that time? |
| 22 | A | No. |
| 23 | Q | Did he express any kind of problems that he |
| 24 | | was having to you that was causing him |
| 25 | | discomfort at the time he was talking to you? |

```
 1    A    No.

 2    Q    All right.  What happened then?

 3    A    We just asked him to basically tell us about

 4         the incident that happened on the 30th and

 5         he responded.

 6    Q    Okay.  What did he say?

 7              MR. WHITE:      Well, let me lodge my

 8         objection, Your Honor.

 9              THE COURT:      Response?

10              MR. SKRZYNSKI: Judge, I think this is in

11         a hospital conference room.  He is not

12         restrained, he is not -- the door is

13         unlocked, he appears to be in good health

14         and I think that this is not a custodial

15         interrogation.

16              MR. WHITE:      May I voir dire, Your

17         Honor?

18              THE COURT:      What is the basis of your

19         objection?

20              MR. WHITE:      As the Court is aware,

21         the test is under the totality of the

22         circumstances whether a reasonable person

23         could believe that he was free or not free

24         to leave.  And I believe that under these

25         circumstances if I may elicit some testimony
```

```
 1            from the Officer that it is certainly at this
 2            point reasonable for Steve McBurney to
 3            believe --
 4                 THE COURT:      You wish to voir dire him?
 5                 MR. WHITE:      Yes, I do.
 6                 THE COURT:      I'll allow it.
 7                              ^CVOIR DIRE
 8     BY MR. WHITE:
 9     Q    Officer Sovik, this conference room is on the
10          fourth floor of the pediatric intensive care
11          unit, correct?
12     A    I believe so, sir, yes.
13     Q    And in the conference room that you were
14          using for your questioning you had previously
15          questioned Heather McBurney, right?
16     A    Yes, sir.
17     Q    And in this conference room was -- it was
18          approximately 100 feet from Madison's room?
19     A    Yes.  Yes, approximately.
20     Q    Okay.  And there was one way in and one way
21          out of this conference room, correct?
22     A    As I can recall, yes sir.
23     Q    The door, correct?
24     A    Yes, sir.
25     Q    Okay.  And there was no windows in the
```

```
1              conference room other than the window in the

2              door, correct?

3        A     No, there were no windows to the outside

4              nature, there were windows surrounding the

5              door in the conference room leading to the

6              hallway, so you could see who was out in the

7              hallway.

8        Q     Okay.

9        A     There were plenty of those windows.

10       Q     No windows to the outside, correct?

11       A     Yes, sir.

12       Q     Okay.  And immediately outside the conference

13             room there were three uniformed police

14             officers, correct?

15       A     No, sir.

16       Q     There weren't any police officers there, any

17             uniformed police officers?

18       A     Not at the time of the investigation, no.

19             There were never any police officers there the

20             rest of that night.  There were no police

21             officers other than Detective Sederlund and I.

22       Q     No Oakland County Sheriffs?

23       A     No, sir.

24       Q     No South Lyon Police Officers?

25       A     No, sir.
```

1    Q    Okay.  Was there anybody -- after Steven

2         McBurney came in that conference room you

3         identified yourself, correct?

4    A    Yes, sir.

5    Q    And Sara Weaver, Case Worker, was in the

6         conference room standing, correct?

7    A    At what time?

8    Q    When Steven McBurney was brought in?

9    A    I believe she was, yes.

10   Q    Okay.  And you or Sederlund asked her, "Do

11        you need anything else", is that true?

12   A    I don't recall that.  He may have asked her,

13        I don't recall saying that.

14   Q    Do you recall it being said?

15   A    I can't -- I don't recall.

16   Q    Do you recall her -- in fact she said in

17        response to either your question or

18        Sederlund's question, "No I have everything I

19        need", isn't that true?

20   A    It might be, but I don't know.

21   Q    Okay.  And she walked out of the room?

22   A    Yes, sir.

23   Q    Okay.  And either you or Sederlund stood up

24        and opened the door for her, correct?

25   A    I don't recall.

1    Q    Okay.  And Steven McBurney was sitting with

2         his back to the door?

3    A    Yes, sir.

4    Q    Okay.  And then it was just you, Sederlund

5         and Steven McBurney, correct?

6    A    Yes, sir.

7    Q    Okay.  And you identified yourself as a

8         Police Officer?

9    A    Yes, sir.

10   Q    Both of you had; and you identified the

11        reason that you were there, correct, to ask

12        him questions about injuries to his daughter,

13        correct?

14   A    Yes, sir.

15   Q    Okay.  And did you make any determination --

16        did you or Officer Sederlund make any

17        determination whether Steven McBurney was

18        under the influence of any drugs?

19   A    Did we ask him?

20   Q    Did you make any determination in any form?

21   A    Just from looking at him I determined that

22        he didn't look like he was under any

23        medication or any drugs or anything.

24   Q    Is there anything else that you did?  Did you

25        ask him any questions about whether he took

```
 1            any alcohol or drugs?

 2     A      No, sir.

 3     Q      Okay.  Did Sederlund in your presence?

 4     A      No, sir.

 5     Q      Okay.  Did you make any determination of

 6            whether Mr. McBurney was sleep-deprived?

 7     A      No.

 8     Q      Okay.  When he walked into the room, isn't

 9            it true that he appeared that he had just

10            woken up?

11     A      Yes, sir.

12     Q      Okay.  Did you make any determination of how

13            long he had slept?

14     A      No.

15     Q      Did you make any determination how long he

16            had been at the hospital?

17     A      No, sir.

18     Q      Okay.  And did it appear to you, Officer,

19            that this is a person that -- and we know that

20            Madison at this point was admitted

21            approximately eight o'clock on November 30th,

22            correct?

23     A      Yes, sir.

24     Q      This is, in fact, now December 2nd, is it?

25     A      This is December 3rd.
```

1    Q    December 3rd, correct?

2    A    Yes, sir.

3    Q    And it is approximately two a.m. in the

4         morning, correct?

5    A    Yes, sir.

6    Q    Okay.  Did you make any determination whether

7         Steve McBurney had slept at all from November

8         30th through the time period immediately

9         preceding this questioning?

10   A    No, sir.

11   Q    Okay.  And did Officer Sederlund in your

12        presence?

13   A    Not that I can recall.

14   Q    Okay.  And did you ask him whether he had any

15        disabilities or was on any medications?

16   A    No, sir.

17   Q    Okay.  So, what you're saying is, just from

18        your observation of his appearance that he

19        appeared to be in appropriate condition to ask

20        questions, correct?

21   A    Yes, sir.

22   Q    Now, at this point, you had already talked --

23        you had in the course of your investigation

24        you had been -- you came to the station,

25        correct, had been briefed by Sergeant Baaki,

```
 1          correct?
 2   A      Yes, sir.
 3   Q      And a criminal history had been provided to
 4          you on both Heather and Steve?
 5   A      At one point they were provided, yes.  I
 6          don't know if I requested them or --
 7          eventually they were, yes.
 8   Q      Certainly before this interrogation, correct?
 9   A      Yes.  Yes, sir.
10   Q      Okay.  And you were also apprised of a prior
11          incident, correct?
12   A      Yes, sir.
13   Q      With Mr. McBurney's son, correct?
14   A      Yes, sir.
15   Q      And you had talked to the paramedics, the
16          fire fighters, correct, you had interviewed
17          them?
18   A      Yes, sir.
19   Q      Okay.  And then on December 2nd you and
20          Sederlund came to U of M Hospital, correct?
21   A      Yes, sir.
22   Q      Okay.  And you had spoke to the case worker,
23          social worker, Sarah Weaver?
24   A      Yes, sir.
25   Q      And then after that you had interviewed a Dr.
```

```
 1        Jeffrey Fleming, correct?
 2    A   Yes, sir.
 3    Q   And any other steps in your investigation at
 4        this point -- the next step was to interview
 5        Heather, correct?
 6    A   Yes, sir.
 7    Q   Any other steps in your investigation that I
 8        have omitted?
 9    A   Well, we stopped by the Northville Police
10        Department to try to obtain a copy of the
11        report from the 1998 incident.
12    Q   But, you didn't get that report, did you?
13    A   No, we did not.
14    Q   Okay.  So, at the time this interrogation
15        started was approximately two a.m., correct?
16    A   Yes, sir.
17    Q   December 3rd?
18    A   Yes, sir.
19    Q   And you had formed a belief in your mind that
20        Steven McBurney was responsible for the
21        injuries caused to his daughter, correct?
22    A   He could have been responsible, yes.
23    Q   Okay.  You had formed that opinion at that
24        time, correct?
25    A   Yes.
```

1  Q  Okay.  Did you bring any recording devices?

2  A  No, sir.

3  Q  Were they available for you to bring?

4  A  No, sir.

5  Q  No, sir.  Okay.  All right.  Not a tape

6     recorder; South Lyon Police Department doesn't

7     have a tape recorder?

8  A  You know I think we tried to get one of

9     those mini-cassette recorders, we had a

10    problem with batteries.  We don't -- I

11    haven't used them in years.

12 Q  Does South Lyon Police Department have a tape

13    recorder?

14 A  I'm sure we do somewhere.

15 Q  Okay.  And did you bring it with you?

16 A  No, sir.

17 Q  Okay.  Did you have other standard police

18    equipment?

19 A  A pen, or what do you mean?

20 Q  Well --

21 A  Video?  Or, no.

22 Q  Did you have a gun?

23 A  Yes, sir.

24 Q  Okay.  Did you have hand-cuffs?

25 A  Yes, sir.

1    Q    Okay.  Did you have a camera?

2    A    No, sir.

3    Q    You didn't have a camera?

4    A    I don't believe so.

5    Q    Did Detective Sederlund have a camera?

6    A    I don't recall.

7    Q    Okay.  Was it your intent to then question

8         Steven McBurney without any kind of recording

9         device whatsoever?

10   A    Yes, sir.

11   Q    Okay.  And you were the one who wrote the

12        notes?

13   A    I believe we both may have, I believe so.

14        Yes, I took some notes, too.

15   Q    Okay.  You -- both you and Sederlund took

16        notes?

17   A    Yes, sir.

18   Q    Okay.  And who had asked the questions?

19   A    We both did.

20   Q    Both of you asked the questions?

21   A    Yes, sir.

22   Q    Okay.  Was anybody primarily responsible for

23        asking the questions of you --

24   A    Not really.

25   Q    Okay.  You prepared a police report in this

```
 1           case, correct?

 2    A      Yes, sir.

 3    Q      The police report, does it accurately reflect

 4           the substance of the interrogation of Steven

 5           McBurney on December 3rd at approximately two

 6           a.m?

 7    A      To the best of my ability, yes.

 8    Q      Okay.  And the topics of -- you have reviewed

 9           it today, haven't you?

10    A      Yes, sir.

11    Q      Okay.  Did it refresh your recollection of

12           what happened?

13    A      Yes, sir.

14    Q      And the topic sequence that occurs in the

15           police report, does that follow the topics in

16           which you asked him questions that night?

17    A      I believe so, yes.

18    Q      Okay.  So, the first topic of conversation

19           was background?

20    A      Yes.

21    Q      How Madison got there?

22    A      Yes.

23    Q      The second was the questions about his son,

24           Nicholas?

25    A      Yes, sir.
```

1    Q    Okay.  And the injuries caused -- sustained,

2         correct?

3    A    Yes, sir.

4    Q    And then at that point you informed him that

5         you had conclusive evidence that Steven was

6         responsible for the injuries to Madison,

7         isn't that true?

8    A    I believe that I said I had medical --

9         conclusive medical evidence, yes.

10   Q    So you, in fact, at that point you informed

11        him that he -- Steven was responsible for the

12        injuries to Madison, correct?

13   A    Eventually through the interview, yes.

14   Q    Okay.  So, up to this point, now we certainly

15        didn't inform him of his rights to Miranda,

16        correct?

17   A    That is correct.

18   Q    Okay.  And Sederlund -- neither you or

19        Sederlund did, true?

20   A    True.

21   Q    And you know what those rights are?

22   A    Yes, sir.

23   Q    You didn't inform him of any one of the

24        rights; the right to remain silent?

25   A    I did not.

1   Q   Did Sederlund?

2   A   No.

3   Q   You didn't inform him of his right that if he

4        did say something it could be used against

5        him or would be used?  Did either one of you

6        inform him of that right?

7   A   No, sir.

8   Q   Did you inform him of his right to have an

9        attorney present?

10   A   No, sir.

11   Q   Did either one of you inform him of his right

12        to have an appointed attorney if one could

13        not be appointed (sic)?

14   A   No, sir.

15   Q   Did either one of you inform him that he was

16        not under arrest?

17   A   No, sir.

18   Q   Did either one of you inform him at any time

19        that he was free to leave?

20   A   No, sir.

21   Q   Did either one of you inform him that the

22        door behind him was unlocked?

23   A   No, sir.

24   Q   Did Mr. McBurney become upset as a result of

25        the questioning when you directed your

```
 1          question to him -- or excuse me, the

 2          accusation to him that he was responsible

 3          for his daughter's injuries?

 4     A    Upset?  I don't believe so.

 5     Q    No, he didn't?  Okay.  And, in fact, he asked

 6          to speak to a doctor, did you not -- he asked

 7          to speak to Madison's doctor?

 8     A    I don't recall that.

 9     Q    Okay.  And he asked to speak to his wife,

10          too, didn't he?

11     A    Eventually, when we offered it to him he did,

12          yes.

13     Q    Okay.  Did you ever offer him to speak to an

14          attorney?  Did you ever tell him he could

15          speak to an attorney?

16     A    No, sir.

17     Q    Okay.  And then the next topic after you

18          informed him that he was responsible for the

19          injuries to his daughter you gave the analogy

20          about the funeral, correct, the funeral

21          analogy, isn't that true?

22     A    I believe that was before.  Yeah, in the

23          sequence of events I think that was

24          beforehand.

25     Q    Okay.  And then there was a discussion about
```

```
 1            polygraph, correct?

 2    A      Yes, sir.

 3    Q      Okay.  And then after you continued to accuse

 4           him of being responsible, that's when you

 5           decided to bring in his wife, correct?

 6    A      Later on, yes sir.

 7    Q      Okay.  And how far into the interview, how

 8           long was it?

 9    A      Probably, I think it was a little over two

10           hours into it probably.

11    Q      Okay.  And, at this point, he was in that

12           room continuously for two hours?

13    A      Yes, sir.

14    Q      Subject to questioning by you and Sederlund?

15    A      That is correct.

16    Q      Okay.  And the time -- how long was Heather

17           in the room?

18    A      Forty minutes.

19    Q      Okay.  And then while Heather was in the room

20           questioning continued, correct?

21    A      What do you mean, after Heather was brought

22           back in there?  Yes, briefly.

23    Q      Yes?

24    A      Yes.  Yes.

25    Q      Okay.  Both by you and Sederlund?
```

1   A   Mainly by me.

2   Q   Okay.  And were you both continuing to write

3       notes?

4   A   I don't recall.

5   Q   Okay.  And at the conclusion of the -- when

6       did the interrogation conclude?

7   A   I want to say around -- somewhere a little

8       before five o'clock.

9   Q   Okay.  And at the conclusion of the

10      interrogation he was hand-cuffed and arrested,

11      correct?

12  A   Eventually, yes.

13  Q   When was that?

14  A   We allowed him to spend some time with his

15      wife.  He wrote out a statement for us.  We

16      contacted the Prosecutor for assistance and --

17  Q   My question is -- I have a question; when was

18      he arrested?

19  A   Shortly after five o'clock.

20  Q   Okay.  And he was in that room continuously

21      from the time the interrogation was started to

22      the point of arrest, correct?

23  A   Yes, sir.

24  Q   Okay.  And when you said you let him spend

25      some time with his wife, you stood outside

```
 1           the room, correct?

 2    A      Yes, sir.

 3    Q      There is no way that he could have left that

 4           room without passing by you or Sederlund,

 5           correct?

 6    A      Well yeah, correct.

 7    Q      Okay.  In fact, the purpose of you standing

 8           outside the room was to make sure that he

 9           would not abscond, correct?

10    A      That is true.

11    Q      He was not free to leave, true?

12    A      Yes.

13    Q      Anybody else come in the room at any time

14           during the interrogation other than Sederlund,

15           yourself, Steven McBurney and Heather

16           McBurney?

17    A      I don't believe so.

18    Q      Okay.  At any time -- and at no time did you

19           ever inform him of his Miranda Rights, isn't

20           that true?

21    A      That is correct.

22              MR. WHITE:      Okay.  Nothing further at

23           this time.  I renew my objection.

24              MR. SKRZYNSKI: I just have --

25              THE COURT:      Approach the bench.
```

1          (Bench conference held at 11:29 a.m.)

2               ^CRESUME DIRECT EXAMINATION

3     BY MR. SKRZYNSKI:

4     Q    Detective Sovik, you mentioned before that at

5          some point the Defendant was not free to

6          leave, correct?

7     A    That is correct.

8     Q    When was that point?

9     A    That was after we had spoken with the

10         Prosecutor, after he had spent time with his

11         wife.

12    Q    Was this after he made the statement or

13         before?

14    A    This was after he made a statement.

15    Q    Was it after he made the written statement?

16    A    Yes.

17    Q    Okay.

18              THE COURT:     I think he was clarifying

19         that.

20    BY MR. SKRZYNSKI:

21    Q    Did you ever tell him he was under arrest?

22    A    Never.

23    Q    Did you ever tell him that he was not free

24         to leave?

25    A    No.

```
1    Q    Okay.

2              THE COURT:      So, let me be clear on

3         this.  The point where you made the statement

4         where he was not free to leave was after you

5         had gathered all of this information?

6              THE WITNESS:     That is correct, Your

7         Honor.

8              THE COURT:     All right.

9    BY MR. SKRZYNSKI:

10   Q    Did you ever tell him before making arrest

11        that he was not free to leave?

12   A    No.

13   Q    Okay.  So, it was only until you told him?

14   A    Yes.

15   Q    All right.  You said you have hand-cuffs and

16        a gun; where were they?

17   A    Underneath my jacket here on my waist.  I had

18        my gun on my right side here and I had the

19        hand-cuffs around my belt in the back; my

20        rear.

21   Q    Were those visible?

22   A    No.

23   Q    Okay.  And how about Detective Sederlund?

24   A    I don't recall.

25   Q    All right.  Did you remember seeing hand-cuffs
```

```
 1          or guns on him?

 2   A     I don't recall.

 3   Q     Okay.  I have no further -- I think we have

 4          laid the proper foundation.

 5              MR. WHITE:      Your Honor, may I ask a

 6          couple more questions.

 7              THE COURT:      Response; go ahead.  You

 8          want to ask a couple more questions I might

 9          as well let you.

10                      ^CCROSS-EXAMINATION

11   BY MR. WHITE:

12   Q     Your testimony is then, Sergeant, that Steven

13          McBurney was free to leave?

14   A     At what point?

15   Q     Okay, let's say 15 minutes into it?

16   A     Yes, sir.

17   Q     He was -- if he would have gotten up and

18          walked out it would have been fine with you

19          despite your subjective belief that he was

20          responsible for Madison's injuries?

21   A     Yes, sir.

22   Q     Okay.  And he was free to leave after your

23          discussion about Nicholas, his prior son?

24   A     Yes, sir.

25   Q     Okay.  And he was free to leave after the
```

|    |   |                                                        |
|----|---|--------------------------------------------------------|
| 1  |   | interrogation became accusatory when you told          |
| 2  |   | him that he was responsible for Madison's              |
| 3  |   | injuries, is that true?                                 |
| 4  | A | Yes, sir.                                               |
| 5  | Q | Okay. And then he was free to leave before             |
| 6  |   | Heather was brought into the room?                      |
| 7  | A | Yes, sir.                                               |
| 8  | Q | Okay. And then he was free to leave after              |
| 9  |   | his conversation with Heather?                           |
| 10 | A | Not -- no.                                              |
| 11 | Q | Okay. And so at what time wasn't he free to            |
| 12 |   | leave, what time was it?                                 |
| 13 | A | Pretty much after he had time with Heather             |
| 14 |   | and he wrote out the statement. While he                |
| 15 |   | was doing that is when I called the                     |
| 16 |   | Prosecutor, so it was about that time.                  |
| 17 | Q | Okay. When -- he wrote out a written                   |
| 18 |   | statement, correct?                                     |
| 19 | A | Yes, sir.                                               |
| 20 | Q | Had you talked to the Prosecutor yet?                   |
| 21 | A | I was in the process of talking with her               |
| 22 |   | when he was writing out the statement.                  |
| 23 | Q | Okay. You were in the room?                            |
| 24 | A | I was not, no.                                           |
| 25 | Q | Okay. And the time then, what time was this            |

```
 1          that you talked to the Prosecutor?

 2    A     Around five some time.

 3    Q     And you called the Prosecutor?

 4    A     I believe Detective Sederlund called her, yes.

 5    Q     Okay.  Detective Sederlund called her on what,

 6          his cell phone?

 7    A     Yes, sir.  One of our cell phones.

 8    Q     Okay.  Any indication of the time that call

 9          was made?

10    A     I don't recall.  It was around five somewhere.

11    Q     So, excuse me for being slow, but was he free

12          to leave before he wrote out his written

13          statement?

14    A     No.

15    Q     No.  Then how long before that was he not

16          free to leave?  If he wasn't free to leave

17          before he wrote his written statement --

18    A     Okay.

19    Q     -- how long before that?  Let's try it this

20          way.

21    A     Yes.

22    Q     How long had Heather been in the room?

23    A     Five minutes at the most.

24    Q     Five minutes?

25    A     Uh-huh.
```

```
 1   Q    Okay.  At that point, you made the decision
 2        that Steven McBurney was not free to leave?
 3   A    That is correct.
 4   Q    Okay.  Did you communicate that to Detective
 5        Sederlund at all?
 6   A    We were discussing it.  Actually, I never
 7        actually told him like, "He's not free to
 8        go".  I made it my decision in my mind that
 9        he wasn't going to be free to go, let's
10        contact the Prosecutor for assistance to see
11        what's going to happen, see what they want
12        to do.
13   Q    Okay.  What my question is, did you
14        communicate that to Detective Sederlund?
15   A    I think I may have at some point.
16   Q    And how did you communicate to him?
17   A    I was talking to him.
18   Q    Talking to him where?
19   A    Outside the hall-- room, in the hallway
20        outside the room.
21   Q    My question is when you made the decision that
22        Steven McBurney was not free to leave did you
23        communicate it at that time?
24   A    No, sir.
25   Q    Okay.  And you made that communication to
```

```
 1          Sederlund when?

 2     A    About -- after we left the room and left him

 3          with Heather.

 4     Q    Okay.  So, you were talking to the

 5          Prosecutor?

 6     A    Yes, sir.

 7     Q    Okay.  Did you make that determination before

 8          you talked to the Prosecutor?

 9     A    Yeah.

10     Q    Okay.  Before he wrote his written statement?

11     A    Yes.

12          MR. WHITE:     Okay.  Nothing further.

13                   ^CREDIRECT EXAMINATION

14     BY MR. SKRZYNSKI:

15     Q    Okay.  But, at no time did you ever inform

16          him that he was not free to leave until you

17          actually arrested him, is that correct?

18     A    That is correct.

19     Q    All right.  And that was after he had made

20          the oral statement and after he had done the

21          written statement, is that correct?

22     A    Yes, sir.

23     Q    Okay.

24          THE COURT:     All right.  Let me be

25          clear on this.  At some point, in your own
```

1    mind, if he tried to get up you would have

2    stopped him?

3         THE WITNESS:   Yes, sir.

4         THE COURT:      Where was that point in

5    this process?

6         THE WITNESS:   That was after he had told

7    Heather that he was responsible for the

8    injuries to Madison.

9         THE COURT:      So, after he made the oral

10   statement before he made the written

11   statement?

12        THE WITNESS:   Yes, sir.

13        THE COURT:      Okay.  I think that,

14   gentlemen, I am satisfied I know where the

15   boundary line is.

16        MR. SKRZYNSKI: Judge, it doesn't make any

17   difference what the subjective belief of the

18   police are, even if the police believe that

19   he is not free to leave and would not have

20   let him go.  The question is whether he

21   could reasonably believe that he was free to

22   leave or not.  It's not the police's

23   subjective impression at all.  That's -- the

24   United States Supreme Court case Stanford

25   against California 511.US.318.  So, as long

1     as they don't -- as long as they don't

2     communicate that to him then their thinking

3     is irrelevant, and that was -- it's perfectly

4     obvious during the course of his testimony

5     they didn't talk about arresting him, they

6     didn't tell him he was under arrest until

7     they actually formally arrested him. And all

8     of that occurred after all both oral and

9     written statements were made.

10          So, I think that the proper foundation

11    has been laid. This was not a custodial

12    interrogation and Miranda doesn't attach.

13          THE COURT:     Thank you. Response?

14          MR. WHITE:      Your Honor, the subjective

15    beliefs of the Police Officers are relevant

16    when they were communicated to the accused,

17    and they were in this case shortly after this

18    interview started. The topics; background,

19    how Madison got there. Topic number two, his

20    prior son. Topic number three, "we believe

21    you caused the injuries to your daughter".

22    At that point it became accusatory. At that

23    point they had the duty to Mirandize him.

24    At that point it became -- at least at that

25    point it became a custodial interrogation.

1          THE COURT:     Thank you.

2          MR. WHITE:     Judge, the parameters are

3     that it was -- the test is on the totality

4     of the circumstances whether it's reasonable

5     to believe that Steven McBurney believed that

6     he was not free to leave.  The child

7     admitted at eight o'clock on November 30th,

8     this is two a.m. on December 3rd.  We know

9     -- we can -- I don't think it would take

10    much for the Court to imagine the trauma

11    that was going on with both Steve and his

12    wife about the hospitalization of his

13    daughter.

14         The methods used to determine whether he

15    was of right mind; sound mind, none really

16    competent to speak of.  Your Honor, I do

17    believe under these circumstances, which are

18    unique in the sense of the length of time

19    that he was at the hospital, the length of

20    time of the interrogation, the topic when it

21    became accusatory before there was any

22    incriminating statements is when it became

23    incriminating and he says approximately 15

24    minutes into the interview.

25         Well, when was Heather brought in,

1    approximately five o'clock or excuse me,

2    about four ten for 15, he said about 40

3    minutes before the arrest.  So, almost two

4    hours of accusatory interrogation going on.

5    Is it reasonable to believe that this

6    Defendant or any Defendant would believe that

7    he is not free to leave with the

8    circumstances of his back sitting to the

9    door, two Police Officers accusing him of a

10   heinous crime.  I believe, Judge, it is

11   properly excluded under the Fifth Amendment.

12        THE COURT:     Thank you.  The Court

13   has had the experience of reading Michigan

14   Law carefully and Federal Law and has made a

15   number of rulings.  I have been reversed

16   three times without propagation.  Whenever I

17   found that any sort of custodial

18   interrogation was, in fact, in need of

19   Miranda Warnings before proceeded, I have

20   done it where people were locked -- twice

21   that I can recall where people were locked in

22   hand-cuffs in the back of a police car and

23   interrogated for hours.  But, the Court

24   called it, the Court of Appeals, temporary

25   detention for investigative purposes.  They

1   have published that decision.  I think I know

2   why.  But, I am keenly aware in Michigan

3   there seems to be a set of cases that propel

4   us to this outcome.  And until the police say

5   a Defendant is under arrest Miranda doesn't

6   apply.

7       I have phenomenal trouble with that

8   statement, because it encourages police to

9   lie under oath.  It basically says to them,

10  as long as you -- even if you have made the

11  determination to arrest a Defendant and they

12  are not free, as long as you are willing to

13  go on the stand and say, "I didn't tell him

14  he was under arrest and it doesn't matter

15  what my subjective thinking -- and I really

16  didn't intend to arrest him, he was free to

17  leave, Miranda doesn't apply".

18      I don't think that has happened here by

19  the way.  I think I got an honest piece of

20  testimony from this officer.  I am very

21  impressed by the honesty of his testimony.  I

22  want to compliment you, frankly, on that.

23  His credibility went up significantly.  Not

24  that it wasn't good to begin with, but it

25  went up significantly with me today, because

1    I thought he tried to tell the truth as he

2    knew it exactly.

3        And while the Court's ruling in this

4    matter is going to be sort of splitting down

5    the hair from a philosophical basis I think

6    that it's very clear that when he says that

7    he had not made the decision to detain him,

8    he had not made that decision at that point.

9    I am going to allow the oral portion of the

10   statement.  I will not allow the written

11   statement, in that, I find Miranda should

12   have been applied at that point.

13       I do that with the clear understanding

14   if it ever gets to a higher court, there is

15   fair chance that the court won't agree with

16   me on that.  They haven't agreed with me

17   before.  Of course, they haven't been willing

18   to say it publicly either.  I think the

19   standard is better and would encourage all

20   and it would be a better standard of justice

21   if we returned to the old focus test.  When

22   a person became a focus of interrogation you

23   gave them Miranda Warnings.  It didn't seem

24   to hurt police's ability to get statements

25   and I think I am going to fact resulted in a

1   stronger belief in justice both from the

2   standpoint of the police and Defendants.

3       Having said that, I don't believe that

4   is the standard.  I believe the standard is

5   until the police have made a determination

6   that the Defendant is not free to leave then

7   Miranda doesn't apply.  As Counsel has then

8   -- as the Prosecutor pointed out, it may well

9   be that you can extend that standard even

10   when they have made that determination, but

11   haven't told the Defendant, you might go to

12   that standard.  But, I really believe that

13   that encourages perjury.  I don't think it

14   happened with this officer.  In fact, I am

15   absolutely certain it didn't happen with this

16   officer.  I am just incredibly impressed by

17   that testimony.  But, I certainly could see

18   officers where they would make such

19   statements, and I wonder why we in the

20   judiciary would want to encourage that.

21       Anyway, for purposes of this proceeding

22   without getting into the dicta of my point

23   of view on this, I believe that there is

24   clear testimony on this record, which I

25   believe absolutely that until the Defendant's

1    written statement occurred he was free to

2    leave and I am going to allow the Prosecutor

3    to present the evidence of the oral

4    statement.  So, the objection is sustained in

5    part and denied in part.

6         MR. SKRZYNSKI: Very well, Your Honor.

7    BY MR. SKRZYNSKI:

8    Q   So, when he came in and you sat him down and

9        you started to talk to him, what did he say?

10   A   Well, I just basically asked him about -- I

11       asked him if Heather -- if he and Heather had

12       any other children, if he had ever been

13       married before and he said, "No".  They only

14       had one child in common, which was Madison.

15       I asked him if he had any other children

16       from another relationship and he said, "No".

17         Then I asked him to tell me about the

18       incidents that occurred as to why the

19       paramedics responded to his house that day,

20       the 30th, and he said that -- he said that

21       him and his wife, Heather, have this process

22       to relieve some anxiety from their daughter

23       Madison because his wife works in the

24       afternoon, she leaves at six o'clock, they

25       have a habit of putting her down around six

1     o'clock.  His wife, Heather, leaves and then

2     he wakes her up like an hour later and then

3     he can spend some time with her.

4          On that night the same thing happened,

5     he said that she was kind of throwing up

6     throughout the day and not feeling that well,

7     but when she woke up that evening at seven

8     o'clock she was a bit cranky, but nothing

9     out of the ordinary.  He prepared a bottle

10    for her, he put her in the baby seat, a

11    bouncy seat, which is in the living room and

12    he gave her a bottle.  A couple minutes

13    later the baby spit up the bottle.  He

14    retrieved the baby from the bouncy seat,

15    took her into Madison's bedroom, changed her

16    diaper, changed her clothes, put her leg

17    brace on and then put her on the ground in

18    the bedroom.  A couple minutes later he

19    noticed that the baby was gurgling, having

20    trouble breathing and he said that that

21    happens sometimes she gurgles on her spit

22    that she has from the bottle.

23         So, the baby fell backwards, and seized,

24    her legs became kind of rigid and then

25    eventually she became unresponsive and then

1   he called 911 and he got some instructions

2   from the dispatcher to give her -- help her

3   -- assist her in breathing.  He disrobed her

4   with everything except the diaper and then

5   he brought her back to the living room

6   inside the near front door to wait for

7   medical personnel for assistance.

8   Q  Okay.  Did there come a time when he gave a

9      different version of that?

10  A  Eventually, yes.

11  Q  Okay.  When did that happen?

12  A  Later on in the interview just prior to us

13     -- well he eventually ended up telling --

14     when we brought his wife Heather back in is

15     when he told us -- after that he told us --

16     he told Heather about what had happened and

17     then we got some more details about what

18     exactly happened that day.

19  Q  Prior to Heather coming into the room, do you

20     remember the events that transpired just

21     before she came back into the room?

22  A  Yes.

23  Q  What happened?

24  A  Basically said, "Hey listen, we know you are

25     responsible for this".  I said, "I know how

```
 1            it is".  I said, "I have got three kids of
 2            my own".  I said, "I know how they get
 3            inconsolable", blah, blah, blah.  You know I
 4            said, "They cry if they're fussy, I
 5            understand that".  And I said -- and then as
 6            I was talking to him there were several
 7            periods of like just lengthy silence and
 8            stares, and then after I got done talking he
 9            said --
10    Q       Lengthy silences and stares?
11    A       Yes.
12    Q       Was he staring?
13    A       Oh yes.
14    Q       Okay.
15    A       And --
16    Q       Were you staring at him?
17    A       Well, we were looking at each other, but he
18            was just kind of like staring -- he was
19            looking straight ahead and we were on the
20            side --
21    Q       You are indicating over your shoulder, is that
22            --
23    A       No, we're talking like just straight ahead.
24    Q       Oh, okay.
25    A       Because we were on each side of him, he was
```

1        looking straight ahead.

2   Q    Okay.

3   A    So, during the conversation we told him

4        about, you know, how good people make

5        mistakes and I know about the children issue

6        and he said, "My life is over".

7   Q    Okay.

8   A    And I said, "Well . . .", I said, "No your

9        life is not over".  I said, "You're still

10       young".  I said, like I said, "Good people   .

11       make mistakes".  I said -- I said, "Heather

12       said you are a good father, you are a good   .

13       provider".  I said, "She is going to need

14       you through all of this".  I said, "If

15       nothing else . .  .", I said, "she is going

16       to need, you know, some closure to this as

17       to what happened".

18            A lengthy silence, more stares, more

19       conversation.  And I said to him, I said

20       basically, I said, "Well, why don't you just

21       tell me what happened, you know, just get it

22       off your chest and tell me what happened".

23       More silence.  And then I said, "Well I'll

24       tell you what . . .", I said, "Would it be

25       easier for you to tell us if we brought

1    Heather in here so you could explain it to

2    her"?  He said, "Yeah I would like to talk

3    to her".

4         Detective Sederlund went out and

5    retrieved Heather, brought her back in here.

6    She sat down next to me, which is right next

7    to Mr. McBurney, and the first thing they

8    discussed actually was the fact that Heather

9    knew that he had another son, Nicholas

10   Kennedy, but they never discussed it, he

11   never told her.

12        After getting that issue out of the way,

13   Heather looked at him and said, "What

14   happened"?  He looked at her and said, "I

15   made a mistake".  And she is like, "What

16   happened"?  He said, "I threw her into the

17   crib".  Then he went on to say, "You know

18   how difficult she has been, I wanted you to

19   work days so we could tag-team her at night.

20   You know it's difficult for me here by

21   myself.  You know, she is inconsolable

22   sometimes".  And that was pretty much it.

23 Q  Did you ask him to go further after that?

24 A  Yes.

25 Q  All right.  What happened?

```
1    A    I basically asked him to tell me what happened
2         and he said that -- the first part was right
3         -- he kind of went over the systems they have
4         about Heather and the anxiety issue, and after
5         Heather had left for work he got her up from
6         her nap, he gave her a bottle, put her in the
7         bouncy seat in the living room.
8              MR. WHITE:    Objection as to -- if he
9         is testifying to events, he can't do that.
10        He can testify as to statements, and I am
11        wondering who is making these statements.  Is
12        it Heather or --
13             THE COURT:    Yeah, be clear on this Mr.
14        Prosecutor.
15   BY MR. SKRZYNSKI:
16   Q    Whose statements are these?
17   A    This is my conversation with Mr. McBurney.
18        These are Mr. McBurney's statements.
19   Q    All right, go ahead.
20   A    So, he prepares a bottle for her, puts her in
21        the bouncy seat in the living room.  She is
22        crying, she is cranky, she is screaming.  She
23        spits the bottle out, that makes him upset.
24        He goes into the room, he takes her out of
25        the bouncy seat, he brings her into Madison's
```

```
 1           bedroom.  He is changing her diaper, he is
 2           changing her clothes, putting the leg brace on
 3           her and while he is doing that she is still
 4           crying and she is inconsolable.  He picks her
 5           up and she starts screaming in his ear.  He
 6           said he got mad and frustrated and he threw
 7           her into her crib.
 8     Q     Did he say from how far?
 9     A     I asked him that and he said he was about
10           two feet away.
11     Q     All right.  Did he describe how it was when
12           the baby landed or where she landed?
13     A     He said that -- he said that the back of her
14           head hit one of the wooden spindles that was
15           in the crib.
16     Q     Okay.  And then what?
17     A     And then he said that she seized up, so he
18           grabbed her, he called 911.
19     Q     When he said, "seized up", what did he mean?
20     A     Had a seizure.
21     Q     Okay.
22     A     He believed that she had a seizure.
23     Q     All right.
24     A     He called 911, explained what was going on
25           with them.  The dispatcher assisted him in
```

```
 1              giving breaths and then the paramedics and
 2              personnel eventually showed up.
 3                   MR. SKRZYNSKI: Okay.  Your Honor, if I
 4              may have a moment?
 5                   THE COURT:     Yes.
 6       BY MR. SKRZYNSKI:
 7       Q   Can you describe the Defendant's demeanor as
 8           he was telling you these last facts?
 9       A   He -- actually he was kind of quiet.  I
10           mean, just a lot like I said, sometimes
11           there was some lengthy pauses and stares and
12           his voice seemed to lower a little bit, but
13           other than that he just seemed like he was
14           like the conversation we had been having for
15           hours prior.
16       Q   Okay.  Just being factual?
17       A   Yes, sir.
18                   MR. SKRZYNSKI: Okay.  I have nothing
19              further.
20                   THE COURT:     Cross?  Recalling that
21              you have already had a significant cross on
22              him.
23                   MR. WHITE:     Well, I have got some
24              more.
25                   THE COURT:     I know.  Well, approach
```

1     the bench.

2     (Bench conference held)

3         THE COURT:     Breaking for lunch, see

4     you all at one-thirty.

5     (Court in recess at 11:44 a.m., Court

6     reconvenes eyetooth)

7         THE COURT:     All right.  Recalling the

8     matter of People versus Steven McBurney.

9     Deputy, after you have got him seated please

10    take the cuffs off of him.

11        DEPUTY:        Yes, sir.

12        THE COURT:     Let's have the witness

13    retake the stand.  Detective, remember you

14    are still under oath.

15        THE WITNESS:   Yes, sir.

16        THE COURT:     Proceed.

17              ^CRECROSS-EXAMINATION

18    BY MR. WHITE:

19    Q   Sergeant, it's a true statement that it was

20        on December 2nd you became first involved in

21        this case, correct?

22    A   Yes, sir.

23    Q   And the time that you received notice

24        regarding your involvement?

25    A   About nine o'clock.

1    Q    Nine p.m?

2    A    Yeah, I think when I got a call from

3         Sergeant Baaki it was around seven-thirty and

4         I said I would be in around nine or

5         nine-thirty.

6    Q    And the time you got up that day?

7    A    Five o'clock in the morning.

8    Q    Okay.  And did you stay up awake

9         continuously since five?

10   A    Yes.

11   Q    Throughout the day?

12   A    Yes.

13   Q    Okay.  And then we know that we had gone over

14        what you had done, the steps that you had

15        taken, and did -- up to the point of the

16        interview with Steven McBurney, which was

17        December 3rd approximately two a.m., had you

18        slept at all?

19   A    No, sir.

20   Q    Okay.  And after the interview, and I believe

21        you said the time of the arrest was

22        approximately five a.m., correct?

23   A    I think so, a little bit after five o'clock,

24        yes.

25   Q    And then you arrested him, took him to

```
 1            Oakland County Jail --
 2    A    Yes.
 3    Q    -- correct?
 4    A    No.
 5    Q    And --
 6    A    I did not transport him to Oakland County
 7         Jail.
 8    Q    Okay.  After the arrest, what did you do?
 9    A    We brought him back to the South Lyon Police
10         Department.
11    Q    Okay.  And then what did you do after that?
12    A    I did some paperwork and then I went home.
13    Q    Okay.  And the paperwork was involving this
14         case?
15    A    Yes.
16    Q    Okay.  And the written report, the typewritten
17         report that is prepared in this case, did you
18         prepare it?
19    A    It was a joint effort on Detective Sederlund
20         and I.
21    Q    Okay.  Both of you did it together?
22    A    Yes.
23    Q    You sat next to each other and typed it up?
24    A    Yes.  Yes, sir.
25    Q    And over what period of time did you do that?
```

```
 1    A    I believe it was the next day we came in for

 2         like three hours and then -- a day had

 3         passed.  We took Sunday off, if I can

 4         recall, and then we came back in Monday --

 5         if I can recall the days.

 6    Q    That's when you completed your written report,

 7         the typewritten report?

 8    A    Actually, I believe it was the following

 9         Monday, actually.

10    Q    Okay.

11    A    The following Monday.

12    Q    And you transcribed it from what?

13    A    From my notes.

14    Q    From the notes?

15    A    Yes.

16    Q    And the notes from -- and Sederlund's notes

17         also?

18    A    Yes, sir.

19    Q    Okay.  Did you preserve those notes?

20    A    I may have them in the station somewhere.

21    Q    Okay.  Did you -- when you provided a

22         discovery request to the Prosecution did you

23         look for those notes anywhere?

24    A    No.

25    Q    Okay.  Those notes could still exist?
```

1    A   They may.

2    Q   And Sederlund's also?

3    A   Possibly.

4    Q   Okay.  We know there is no recording of it,

5        correct?

6    A   That is correct.

7    Q   Okay.  You reviewed the typewritten report

8        today before you testified?

9    A   Yes, sir.

10   Q   And is it accurate regarding the statements

11       made by you, Sederlund, and Mr. McBurney?

12   A   Yes, sir.

13   Q   Okay.  Any changes you want to make right

14       now?

15   A   No, sir.

16   Q   Okay.  And did you graduate from high school?

17   A   Yes, sir.

18   Q   And what high school; what year?

19   A   Bethel Park Senior High School in Bethel Park,

20       Pennsylvania 1985.

21   Q   Okay.  And did you attend college?

22   A   Yes, sir.

23   Q   What college?

24   A   I went two years to Washington and Jefferson

25       College in Washington, Pennsylvania.

1   Q   Okay.

2   A   And then I transferred to Olivette Nazarene

3       University in Kankakee, Illinois.

4   Q   Okay, did you receive a degree?

5   A   Yes, sir.

6   Q   And what degree; what was your degree?

7   A   Psychology and a minor in Sociology.

8   Q   What was your grade point in high school?

9   A   Between maybe 3.2, somewhere around there.

10  Q   And what about in college?

11  A   Same thing.

12  Q   Okay.  And how long have you been a Police

13      Officer in the State of Michigan?

14  A   Over -- about 15 years and four or five

15      months.

16  Q   Continuously?

17  A   Yes, sir.

18  Q   With the South Lyon Police Department?

19  A   Yes, sir.

20  Q   Okay.  And besides your position as Sergeant,

21      have you held any other positions?

22  A   I was a Road Patrol and I was a Detective

23      for a while.

24  Q   How long were you on patrol?

25  A   Five years.

| | | |
|---|---|---|
| 1 | Q | And a Detective? |
| 2 | A | Probably -- I was Detective Sergeant for |
| 3 | | maybe a year. |
| 4 | Q | And how long have you been -- I believe your |
| 5 | | classification now is Sergeant? |
| 6 | A | Yes, sir. |
| 7 | Q | And how long have you been a Sergeant? |
| 8 | A | I have been a Sergeant since February of |
| 9 | | '96/'97. |
| 10 | Q | All right. |
| 11 | A | About ten years. |
| 12 | Q | Ten years? |
| 13 | A | Yes, sir. |
| 14 | Q | Okay.  And you have received specific |
| 15 | | training in the context of your position |
| 16 | | being a Police Officer, true? |
| 17 | A | Yes, sir. |
| 18 | Q | Including the use of the -- how to |
| 19 | | interrogate, is that true? |
| 20 | A | Yes, sir. |
| 21 | Q | Okay.  Have you ever worked on a First Degree |
| 22 | | Child Abuse case before? |
| 23 | A | No, sir. |
| 24 | Q | Ever worked on a Felony Murder case before? |
| 25 | A | No, sir. |

| | | |
|---|---|---|
| 1 | Q | So, this is your first as to both of those? |
| 2 | A | Yes, sir. |
| 3 | Q | Okay. Have you ever testified in court |
| 4 | | before? |
| 5 | A | Yes, sir. |
| 6 | Q | Do you know how many times? |
| 7 | A | Twenty. |
| 8 | Q | Okay. And has it always been in your |
| 9 | | position as a Police Officer? |
| 10 | A | Yes, sir. |
| 11 | Q | Testifying for the People, the Prosecution? |
| 12 | A | Yes, sir. |
| 13 | Q | All right. Besides the report that was |
| 14 | | prepared by you and Detective Sederlund, did |
| 15 | | you use any other documents to review; did |
| 16 | | you review any other documents before you -- |
| 17 | A | No, sir. |
| 18 | Q | -- testified today? |
| 19 | A | No, sir. |
| 20 | Q | Now, I noticed in the report that there are |
| 21 | | certain sentences and words that are quotes, |
| 22 | | correct? |
| 23 | A | Yes, sir. |
| 24 | Q | And others that are not, correct? |
| 25 | A | Yes, sir. |

```
 1   Q   And is it a fair statement to say that the
 2       words that are in quotes you are saying that
 3       were directly made by Steven McBurney, is
 4       that true?
 5   A   Correct.
 6   Q   Okay.  And the words that are not in quotes
 7       are phrases and words that you are using to
 8       paraphrase his testimony, correct?
 9   A   Yes, sir.
10   Q   Okay.  So, when you said earlier that he
11       said, "My life is over", that was a direct
12       quote, correct?
13   A   Yes, sir.
14   Q   And when you said he said, "I made a mistake",
15       that was a direct quote, correct?
16   A   Yes, sir.
17   Q   Okay.  And so then we can agree when the word
18       screaming is in the report, he didn't say
19       that word, did he?
20   A   No, he did actually.
21   Q   But, it's not in quotes, is it?
22   A   That is correct.
23   Q   Okay.  In fact, you said that word.  You
24       said, "Madison was screaming in your ear",
25       and Steven didn't agree, did he?
```

```
1    A    No.

2    Q    Okay.  But, we agree it's not in quotes?

3    A    That is correct.

4    Q    Any reason why it's not in quotes?

5    A    No.

6    Q    Okay.  And we can also agree that the word

7         inconsolable was not used by Mr. McBurney?

8    A    That is correct.

9    Q    Okay.  That is your word, correct?

10   A    Yes, sir.

11   Q    And it was not in quotes in the report,

12        correct?

13   A    Correct.

14   Q    And we can also agree that the word mad was

15        not Mr. McBurney's word either, was it?

16   A    Yeah, I don't recall.

17   Q    Okay.  But, we can agree that the word is not

18        in quotes in your report?

19   A    That is correct.

20   Q    Okay.  And we can also agree that your

21        report says, he said that he got mad and

22        frustrated and threw her into her crib, that

23        was not Mr. McBurney's words, was it?

24   A    No, I think that was.  I think --

25   Q    But was -- but we don't have it in quotes in
```

```
 1        your report, do we?

 2   A    No, we don't.

 3   Q    Okay.  And we also can agree that when it

 4        says here, he said he was about two feet

 5        away, that wasn't Mr. McBurney's statement

 6        either, was it?

 7   A    No, it was.

 8   Q    Okay.  But, that's not in quotes either, is

 9        it?

10   A    No.

11   Q    Okay.  And we can also agree that the

12        statement, Steven stated when he threw Madison

13        into the crib, the back of her head hit the

14        bars, that wasn't his statement either, was

15        it?

16   A    No, that was his statement.

17   Q    Okay.  But, that is not in quotes either?

18   A    That's correct.

19   Q    Okay.  And the word spindle that you used in

20        your direct testimony, that's not Mr.

21        McBurney's word, is it?

22   A    I can't recall.

23   Q    But, we know that's not in your report, is it?

24   A    The word "spindle"?

25   Q    Spindle.
```

1    A    Yeah, it's not.

2    Q    Okay.  When you said several times in your

3         direct testimony that Steven McBurney stared

4         for a lengthy period of time; well how long is

5         lengthy?

6    A    Twenty seconds, sometimes like a minute,

7         sometimes it was longer.

8    Q    Okay.  And you have independent recollection

9         of this?

10   A    Yes, sir.

11   Q    And did you actually time the period of time

12        that these lengthy stares were going on?

13   A    No, sir.

14   Q    Okay.  We can agree, Officer, that there is no

15        indication whatsoever in your report the

16        definition of "lengthy", isn't that true?

17   A    That is correct.

18   Q    Okay.  No; it was 20 seconds or up to a

19        minute, correct?

20   A    That is correct.

21   Q    You are telling me now here, you know April

22        27th, you can independently recall how long it

23        was --

24   A    Yes, sir.

25   Q    -- in an interview on December 3rd at two

```
 1          a.m. in the morning after you had not slept
 2          for how long?
 3   A      Almost 24 hours.
 4   Q      Twenty-four hours?
 5   A      Yeah, without a doubt.
 6   Q      Okay.  Now, what are the dimensions of the
 7          conference room?
 8   A      If I had to say approximate, let's say maybe
 9          twelve feet wide by about twenty feet long,
10          probably.
11   Q      Okay.
12   A      If I had to estimate.
13   Q      You certainly didn't measure it, did you?
14   A      No.  No, sir.
15   Q      Did you or Officer Sederlund take any pictures
16          of Madison?
17   A      I didn't, no.
18   Q      Were any pictures taken in your presence?
19   A      No, sir.
20   Q      Were you at the hospital when she passed
21          away?
22   A      No, sir.
23   Q      In the report there is a statement that says,
24          "I informed him that there was inconclusive
25          evidence provided by the medical staff that
```

```
 1          Madison suffered non-accidental injuries due

 2          to trauma or abuse or neglect", do you recall

 3          that statement?

 4    A     Yes, sir.

 5    Q     Inconclusive?

 6    A     I believe so.

 7    Q     Is that a correct statement?  I -- first of

 8          all, who is the "I" referred to in this

 9          statement?

10    A     Me.

11    Q     Okay.  You?

12    A     Yes, sir.

13    Q     Okay.  And when the word "inconclusive" is

14          used, is that a correct statement?

15    A     Probably not.

16    Q     Okay.  So, there is at least one error,

17          correct?

18    A     Yeah, could be more.

19    Q     Okay.  Could be more.  Do you want to tell

20          me of any more right now?

21    A     No.

22    Q     Do you want to look at this to tell me if

23          there is any more?

24    A     No, sir.

25    Q     You're sure that -- you're sure?
```

1    A    Continue; we're good.

2    Q    In the sequence -- the topic sequence you

3         said, that is the topic sequence as it is in

4         your report, that's the way it was at the

5         time throughout the questioning and

6         interrogation of Steven McBurney, correct?

7    A    Yeah, the best I can recall, yes sir.

8    Q    Okay.  And the discussion about Heather,

9         Heather being there, that was really about

10        Heather assisting Steven with the -- when

11        Madison -- when she went into distress, isn't

12        that true?

13   A    I don't understand the question.

14   Q    You recall the topic when Steve and Heather

15        had been brought back in the room?

16   A    Yes, sir.

17   Q    Okay.  And Steve said that he wished that she

18        had been there?

19   A    Yes, sir.

20   Q    Okay.  In fact, that context was he wished

21        that she had been there, because as he

22        stated, she would have -- when Madison went

23        into distress that Heather could have helped,

24        correct?

25   A    No, I don't believe so.  I didn't interpret

1       it that way.

2              THE COURT:       I have to ask you to

3       stay at the microphone, my clerk is --

4              MR. WHITE:       I'm sorry.

5              THE COURT:       -- having some trouble

6       picking up.

7              MR. WHITE:       I'm sorry, I will speak

8       louder and stand still.

9              THE COURT:       Okay.

10              MR. WHITE:       I don't think I have

11       anything further at this time, Your Honor.

12              THE COURT:       Thank you.  Any redirect?

13              MR. SKRZYNSKI: No thank you, Your Honor.

14       May this witness be excused?

15              THE COURT:       He can be, or he can

16       remain in the courtroom now that he has

17       testified.

18              MR. SKRZYNSKI: Thank you.

19       (The witness was excused)

20              MR. SKRZYNSKI: The People call Paul

21       Sumner to the stand.

22              MR. WHITE:       Your Honor, just so long

23       as he is going to be in the courtroom that

24       there be no rebuttal of this witness.

25              THE COURT:       If they call him again, he

1        better be out of the courtroom if they have

2        any reason to recall him, because once he is

3        in the courtroom he doesn't testify.

4             MR. WHITE:     And I beg your pardon,

5        please, I have one more question of

6        Detective Sovik, sir, I'm sorry.

7             THE COURT:     Approach the bench.

8        (Bench conference held)

9             THE COURT:     All right.  Detective,

10       please step back into the witness stand for

11       one question, I am going to allow it.

12            MR. WHITE:     My apologies to the Court.

13            THE COURT:     I think it's a reasonable

14       question.

15   BY MR. WHITE:

16   Q    Sergeant?

17   A    Yes, sir.

18            THE COURT:     Remember you are still

19       under oath?

20            THE WITNESS:   Yes, sir.

21   BY MR. WHITE:

22   Q    What time did Steve say that Madison woke up

23       on November 30th after Heather went to work?

24   A    About seven o'clock.

25   Q    Thank you.  That is seven p.m., right?

```
 1    A    Yes, sir.
 2              MR. WHITE:      Thank you.
 3              THE COURT:      All right, step down.
 4         Any other questions?  That's it, gang.
 5              MR. WHITE:      That's it, thank you.
 6         (The witness was excused eyetooth
 7              THE COURT:      Bring in the next
 8         witness.  If you would step into the witness
 9         stand and remain standing and raise your
10         right hand I would appreciate it.  Do you
11         solemnly swear or affirm the testimony you
12         are about to give is the truth, the whole
13         truth, and nothing but the truth?
14              SUMNER:    I do.
15              THE COURT:      State your name -- be
16         seated please.  State your name for the
17         record.
18              MR. SUMNER:      Paul Sumner, S-u-m-n-e-r.
19              THE COURT:      Proceed Mr. Prosecutor.
20                   ^CSERGEANT PAUL SUMNER
21         Called by the Prosecution eyetooth, sworn by
22         the Court and testified.
23                   ^CDIRECT EXAMINATION
24    BY MR. SKRZYNSKI:
25    Q    What is your occupation, sir?
```

```
 1   A    Currently a Police Sergeant for Northville
 2        Township Police in Wayne County.
 3   Q    Okay.  How were you employed in March of
 4        1998?
 5             MR. WHITE:    Your Honor, I guess we
 6        should deal with these evidentiary issues now.
 7             THE COURT:    I don't want to
 8        anticipate, let's just see where he is going.
 9             MR. WHITE:    All right, thank you.
10             THE COURT:    Make your objection and
11        I'll deal with it.
12   BY MR. SKRZYNSKI:
13   Q    How were you employed?
14   A    In 1998 I was a Police Detective for
15        Northville Township Police Department.
16   Q    Okay.  On March the 2nd of 1998, did you have
17        contact with a person by the name of Steven
18        McBurney?
19   A    Yes, I did.
20   Q    Is that person in the courtroom today?
21   A    Yes, I did, he is seated next to the Defense
22        and he is wearing an orange smock.
23             MR. SKRZYNSKI: Would the record indicate
24        the witness has identified the Defendant?
25             THE COURT:    So reflect.
```

1              MR. SKRZYNSKI: Thank you.

2     BY MR. SKRZYNSKI:

3     Q    How did you have contact with him on that

4          date; why did you have contact with him on

5          that date?

6     A    I was contacted by Protective Services

7          regarding a child abuse investigation that

8          they had began in regard -- and Mr. McBurney

9          was the father of the child, Nicholas Kennedy

10         --

11    Q    Okay.

12    A    -- who was currently hospitalized with

13         injuries.

14              MR. WHITE:      Objection.  Objection,

15         this goes to hearsay.  There is no way that

16         he would know this, Judge, other than what he

17         was told.

18              MR. SKRZYNSKI: Well, I think that -- I

19         am not offering it for the truth of the

20         matter, I am offering it to tell why he was

21         doing what he was doing.

22              THE COURT:      It denotes the relevance.

23              MR. SKRZYNSKI: Because he -- it has to be

24         explained why he goes and talks to Mr.

25         McBurney.

```
 1              THE COURT:      Objection sustained, it
 2         doesn't help me get anywhere on this exam.
 3              MR. WHITE:      And again, I'll tell you
 4         that this has nothing to do with our case.
 5              THE COURT:      Counsel, one moment at a
 6         time.
 7              MR. WHITE:      Okay.
 8              THE COURT:      That's the way these
 9         things work.
10              MR. WHITE:      Thank you.
11    BY MR. SKRZYNSKI:
12    Q    Did you have contact with Mr. McBurney on
13         that date?
14    A    Yes sir, I did.
15    Q    About what time?
16    A    It was approximately three-thirty on that date
17         at his residence.
18    Q    Okay.  And -- at his residence, and where was
19         that?
20    A    It was in North Ridge Apartment complex.
21    Q    Okay.  And what were you interviewing him
22         about?
23    A    I was interviewing Mr. McBurney regarding a
24         child abuse investigation that I was looking
25         into, injuries from his son.
```

1    Q    Nicholas Kennedy?

2    A    Yes, sir.

3    Q    Okay.  What did you ask him?

4    A    I asked him --

5         MR. WHITE:    Objection as to relevance

6         to this case, Judge.

7         MR. SKRZYNSKI: The reason I am offering

8         this witness is to demonstrate knowledge by a

9         prior act under the 768.27.B.  The Statute

10        states that except as provided in sub-section

11        four in a criminal action in which the

12        Defendant is accused of an offense involving

13        domestic violence, evidence of the

14        Defendant's commission of other acts of

15        domestic violence is admissible for any

16        purpose for which it is relevant if it is not

17        otherwise excluded under Michigan Rule of

18        Evidence 403; 403 is the balancing test

19        weighing probative value against unfair

20        prejudice.

21        Domestic Violence is defined in Section

22        5A as offense involving domestic violence.

23        It means an occurrence of one or more of the

24        following:  Causing or Attempting to Cause

25        Physical or Mental Harm to a Family or

1       Household Member.  And Family or Household
2       Member means any of the following: An
3       individual with whom the Defendant -- the
4       person resides or has resided.
5           The Statute allows me to get evidence in
6       about his prior acts of domestic violence
7       when they involve an act as defined in the
8       Statute against a person as defined in the
9       Statute.  Nicholas Kennedy was his son, and
10      this is testimony regarding an act of
11      violence against Nicholas Kennedy, which
12      resulted in the hospitalization of Nicholas
13      Kennedy, severe brain injuries to Nicholas
14      Kennedy, the charging of the Defendant and
15      the Plea of the Defendant to Second Degree
16      Child Abuse in Wayne County in 1998.
17          The reason for this is to show that he
18      had knowledge that the kind of treatment
19      that he treated his own son; daughter to --
20      Heather -- I'm sorry, Madison McBurney in
21      2006 he did knowing that it would cause
22      severe injury to her, because he had done it
23      to Nicholas Kennedy eight years before.
24          This goes to his knowledge, and
25      knowledge is one of the elements of this

```
 1                offense of First Degree Child Abuse and of
 2           ·    First Degree Felony Murder.
 3                    THE COURT:     Response?
 4                    MR. WHITE:     Your Honor, the Court
 5                Rule, Michigan Rule of Evidence allows that
 6                to --
 7                    THE COURT:     This is also a new
 8                Statute from what I hear you saying.
 9                    MR. WHITE:     -- Statute, and the
10                Statute also.  The Court Rule, the Michigan
11                Rule of Evidence says it cannot be offered
12                to prove that the Defendant acted in
13                conformity therewith.  It can be offered for
14                proof of motive, opportunity, intent,
15                preparation, plan or system, scheme of doing
16                things.  There is but one reason that this is
17                being offered at this point.  That is to
18                prove that -- and not that we have any proof
19                whatsoever the level and extent of injuries
20                to the prior child.  We have nothing; this
21                record is absolutely absent.
22                    THE COURT:     It might as well be if I
23                don't allow the testimony.
24                    MR. SKRZYNSKI: There might, but --
25                    MR. WHITE:     Sure. ·Sure.
```

1          MR. SKRZYNSKI: -- I haven't offered it

2     yet.

3          MR. WHITE:    We're putting the cart

4     before the horse.  They're only -- the only

5     reason that it's being offered by the People

6     is to prove -- suggest to this Court because

7     of a prior act that he acted in conformity

8     therewith.  First of all, the Court Rule I

9     think speaks to trial and a notice of

10    intent, and in response to a defense.  This

11    is preliminary examination, all matters are a

12    little --

13         THE COURT:    Well, I love it when the

14    Prosecutor throws it at me, too.  I don't

15    pay any attention to that argument, I never

16    have.  It has frustrated the Prosecutor's

17    office on more than one occasion.  Don't

18    expect me to start paying attention to it on

19    behalf of the Defense.

20         Counsel, if I bought that particular

21    argument and it were the only way the

22    Prosecution could prove their case, and they

23    could prove it at trial, but I didn't allow

24    it at exam, that would seem to me contrary

25    to the intent of the legislature in terms of

1    setting up the preliminary exam system.  I
2    can't believe that they would want it to
3    occur that way.
4         MR. WHITE:    Well, that's a different
5    threshold.
6         THE COURT:    When the Prosecutor makes
7    that argument I don't believe it, when the
8    Defense makes that argument I don't believe
9    it.  Mainly this helps you guys rather than
10   them.
11        MR. WHITE:    Sure, but this is a
12   probable cause hearing, Judge.
13        THE COURT:    I understand that, and
14   therefore that argument doesn't fly with me.
15   I am interested in his argument about your
16   404.B, though, if you want to expand on that.
17        MR. WHITE:    Judge, first of all,
18   there is nothing at issue, except for
19   everything because this is a preliminary
20   examination.  We have offered no testimony,
21   we have offered no -- no evidence
22   whatsoever.  So --
23        THE COURT:    Well, let's focus in on
24   your argument that this doesn't meet the
25   technical nature of 404.B in terms of the

1    proof and then I'll hear from you on that.

2    And then you need to respond to his argument

3    under the new State Statute with regard to

4    domestic violence.

5         MR. WHITE:     Well, domestic violence I

6    think Your Honor --

7         THE COURT:     The definition

8    encompasses the charge.

9         MR. SKRZYNSKI: Sure.  Sure it does.

10        THE COURT:     But, I don't want to

11   distract you.  I am interested in your 404.B

12   argument.

13        MR. WHITE:     And remember there is

14   always -- there is a weighing also.  There is

15   a weighing probative value versus prejudice.

16   And evidence of crimes, wrongs, acts, not

17   admissible to prove the character or person

18   in order to show an action in conformity

19   therewith.  We know, Judge, that the

20   conviction in and of itself is not admissible

21   under 609.  He would have to testify,

22   correct?  He is not testifying at preliminary

23   examination, nor even if he did testify

24   would there be -- it wouldn't be admissible.

25        THE COURT:     That's not the issue in

1    front of me.  What the issue in front of me

2    is, and I heard you say this, and I don't

3    know that I agree with you, but at least as

4    an argument that somehow the reason he is

5    offering it here is not in conformance with

6    404.B.

7        MR. WHITE:    Judge, at this point,

8    there is only one reason it could be offered.

9    To show -- to tell you, to offer as proof

10   that Steven McBurney acted in conformity in

11   this case before you as he did in a prior

12   case, that is his suggestion.  There is

13   nothing else -- there is no other reason that

14   the People could offer it at this time.

15   There is no -- they are not responding to

16   any defense, they are not responding to any

17   evidence, they are not responding to

18   anything.  They are saying, we offer this to

19   show you because he did before, he did again.

20       THE COURT:    Mr. Prosecutor, I am

21   going to want you to respond on the 404.B,

22   but I also want Counsel -- for you to have

23   an opportunity to talk about the new

24   Statute.  That seems to allow just about

25   anything in so long as it is related to

1          domestic violence.

2                 MR. SKRZYNSKI: As far as 404.B is

3          concerned, evidence of other crimes or wrongs

4          is not admissible to prove the character of

5          somebody to show that the act in conformity.

6          However, it may be used to show other

7          things.  Included in those other things

8          under 404.B is the word "knowledge".  You can

9          use a prior bad act to show knowledge.

10                One of the elements of the crime of First

11         Degree Child Abuse upon which the Felony

12         Murder is predicated, is that the Defendant

13         must have knowingly or intentionally caused

14         serious physical harm to the victim;

15         knowingly.

16                Now, "knowingly" means that he knew that

17         when he -- when he performed this act he was

18         going to cause serious injury.  How can I

19         prove that he knew that what he did was

20         going to cause serious injury?  Because he

21         has done it before, and he knows what

22         happens when you treat a child with that kind

23         of force.  He did it before in 1998, and

24         that's what this Detective is here to testify

25         about.  So, it's a permissible purpose.  It's

1    not just to show that he is a bad guy, he

2    did it once, he probably did it again.  It's

3    to show that he has the knowledge that is

4    required by the elements.  And there is no

5    other way to show that.  He didn't say, "I

6    knew that when I threw the baby in the crib

7    that -- and the baby banged his head that

8    that was going to cause serious injury, and

9    then I did it", but that is implied from the

10   fact that he has done this before, and he

11   has caused serious injury to a child with the

12   kind of treatment that he gave the child.

13        And as a result of that, that act of

14   domestic violence, that that child was his

15   offspring, as a result of that act of

16   domestic violence he has got the knowledge

17   that is required in order to prove -- in

18   order to show that his action is First Degree

19   Child Abuse.  And in the commission of First

20   Degree Child Abuse he killed the baby, and

21   that's Felony Murder.

22        So, that's the purpose, it's a proper

23   purpose for which I am offering it.  Not

24   just to show that if he did it once he

25   probably did it again.

1          MR. WHITE:     First of all, Judge, the

2     injuries -- I will make an Offer of Proof;

3     injuries to Nicholas Kennedy, again not in

4     this record, are different than Madison

5     McBurney.  Injuries to Nicholas Kennedy

6     resulted in hospitalization and total and

7     complete recovery.  I make an offer of proof.

8          THE COURT:     That may be.

9          MR. WHITE:     I can offer a proof that

10    there was no finding adjudication or

11    admission of First Degree Child Abuse in the

12    previous case.  There was no adjudication

13    either by admission or trial that Mr.

14    McBurney knowingly or intentionally caused

15    serious physical, or serious mental harm to

16    a child; it didn't happen.

17         You have nothing before this Court,

18    other than a Police Officer's recitation,

19    albeit inaccurate, in our opinion, about what

20    was stated by Steven McBurney.  You don't

21    have a cause of death, you don't have any of

22    Madison McBurney, you don't have anything

23    related to her injuries.  So, how are you

24    supposed to make a determination whether this

25    is prior similar acts for any reason where we

1      don't know the nature and extent of either

2      child's injuries that are on this record?

3              THE COURT:      All right.  You want to

4      talk about --

5              MR. SKRZYNSKI: Can I respond to that,

6      Judge?

7              THE COURT:      Just a minute, Mr.

8      Prosecutor.  You want to talk about the new

9      Statute?

10             MR. WHITE:      The Statute regarding

11     domestic violence, Your Honor?

12             THE COURT:      Which basically allows

13     anything.

14             MR. WHITE:      To the extent that --

15             THE COURT:      And I have some serious

16     questions about its --

17             MR. WHITE:      Constitutionality.

18             THE COURT:      Well, it hasn't been -- it

19     hasn't been attacked constitutionally

20     anywhere I am aware of.

21             MR. WHITE:      To the extent that

22     Statute would allow in any evidence of any

23     kind against anybody charged with domestic

24     violence or anything where there is an

25     allegation that one had committed an act of

1       violence against a family member, and I

2       believe that that Statute is over-broad and

3       violates our right to confrontation.  And I

4       don't believe in this case that you could

5       actually in any way, other than rule that

6       there is no unfair prejudice in any way by

7       any act that somehow he was tardy for school

8       in high school or he may have pushed another

9       kid in Junior High, and this is probative of

10      whether he committed First Degree Child Abuse

11      and --

12          THE COURT:     Well, there is a time

13      limitation on that Statute unless the Court

14      chooses to go beyond that.

15          MR. WHITE:     Right.  But, still I mean

16      you could take any possible act under that

17      Statute of alleged anti-social aggressive

18      behavior and put it in as a prior act.

19          THE COURT:     No, there are limitations

20      to that.  Those acts have to be in a family

21      or relationship circumstance as defined by

22      the Domestic Violence Statute.  All right,

23      thank you.

24          Gentlemen, Mr. Prosecutor, let me ask

25      you a question, because it relates to the

```
 1            404.B discussion.  As I understand it, you
 2            are proffering this for what reason?
 3                 MR. SKRZYNSKI: To show that he had
 4            knowledge of what -- that what he was doing
 5            was going to cause --
 6                 THE COURT:     An absence of mistake?
 7                 MR. SKRZYNSKI: Not necess -- well it
 8            could be that, too.  But, it's his knowledge,
 9            which is one of the elements, and it's also
10            under 404.B.  I mean, knowledge is
11            specifically cited as one of the --
12                 THE COURT:     I understand what 404.B
13            says.  All right, let me -- in looking at
14            People versus M-a-r-t-z-k-e
15            251.Mich.Appeals.282, clearly 404.B is
16            allowed depending on the People's theory.
17            And the record in front of the Court -- and
18            while I think Counsel has a point about the
19            Court Rule requirements at trial, which will
20            ultimately require that the People provide
21            some further notice to them, I can't think
22            for a moment that the Court, when it adopted
23            these rules, meant it to exclude that such
24            testimony from preliminary examination.  And,
25            in fact, I would think that this whole
```

1          proceeding would be to the Defense's

2          advantage if this is bound over, in that they

3          would have a fuller sense of what the People

4          were trying to establish with similar acts.

5          I am going to note Defense's objection to

6          that, but, I am going to allow it on that

7          basis.

8              Then I want to come to the question of

9          404.B itself.  As I say, the case that I

10         have just cited says that the Court needs to

11         have some sense of the theory.  Clearly,

12         discern the theory of events by both Defense

13         and the Prosecution when it comes to the

14         question of 404.B.  The Prosecution is

15         arguing that under the Rule as cited that

16         they are going to proffer this testimony to

17         show knowledge and I think there is a fair

18         question of absence of mistake.

19             I specifically ask that question to the

20         Prosecution because if they are proffering

21         this to show that in each occasion the

22         Defendant engaged in actions that resulted in

23         injury to his child, it does seem to me to

24         be relevant that this would be something he

25         would be aware of based on prior acts and

1      that this would tend to show that whatever

2      occurred with this child in light of what I

3      heard in the earlier testimony was not a

4      mistake.

5          Therefore, I think 404.B in this

6      circumstances applies.  It is certainly the

7      ruling of this Court that in this

8      circumstance as to this proceeding it would

9      be allowed for that purposes.

10         More, while I think there is going to be

11     a lot of litigation about the new Domestic

12     Violence Statute, the two times that that

13     Statute has already come up in this

14     courtroom, both seem to be -- provide

15     direction to this Court that it should allow

16     in certain types of testimony.  I don't

17     think that in either case the statute itself

18     as applied to the evidence that is being

19     proffered would be vague or outside

20     constitutional mandates.

21         I have a real concern, frankly, about

22     what a jury is going to do with some of this

23     evidence in terms of its' prejudicial nature.

24     But, I don't really think that that is an

25     issue that is in front of me.  I am a

1    District Judge doing a preliminary

2    examination, and the prejudice to a jury I

3    think is different than the more outward look

4    at my viewing of the evidence as

5    significantly different than how a jury might

6    be affected by evidence.

7        Now, I say that because in the last case

8    I am relatively satisfied that that evidence

9    was extremely emotionally powerful. I don't

10   know what this evidence would be. I have

11   that concern, but I don't think it is one

12   that is appropriate for me to address. That

13   is one that the Circuit Court will have to

14   address, or the Court of Appeals in the

15   event that such cases result in convictions

16   and they need to sort out the Statute. I

17   think it's admissible under either theory, I

18   am going to allow the evidence.

19       MR. WHITE:        Thank you.

20       THE COURT:        Holding forth that I am

21   only ruling on those -- on the theory that

22   it is being proffered and that I think that

23   the only evidence that is being proffered is

24   the statement by the Defendant. If there is

25   other evidence or other testimony that is

1      hearsay in nature, that, it seems to be is a

2      different analysis and I have not reached the

3      confrontation question that the Supreme Court

4      has set up forth in its' rulings now and in

5      proffered Hammond and Davis to which I

6      understand could come up in this proceeding.

7      And if it does we will need to look at

8      separately.  Proceed Mr. Prosecutor.

9           MR. SKRZYNSKI: Thank you.

10     BY MR. SKRZYNSKI:

11  Q   So, you went to his place of abode and you

12      talked to him?

13  A   Yes, sir.

14  Q   Where were you talking to him?

15  A   Initially made contact at the front door,

16      asked to come into the residence; was allowed

17      in.  I had a uniformed officer that drove

18      separately, but met me there at the location

19      as well.  Subsequently sat down at the

20      kitchen table and started speaking with Mr.

21      McBurney.

22  Q   Okay.  And what did you ask him and what did

23      he say?

24  A   Went over the injuries of the child,

25      Nicholas, his four month old child at the

|     |   |                                                  |
|-----|---|--------------------------------------------------|
| 1   |   | time, and spoke regarding who was watching       |
| 2   |   | the child at the time.  Confirmed that he        |
| 3   |   | was the one that actually called for the         |
| 4   |   | rescue for the child not breathing at the        |
| 5   |   | time.  And then I determined that in             |
| 6   |   | speaking with Mr. McBurney that Mr.              |
| 7   |   | McBurney, Krista Kennedy, which was the          |
| 8   |   | mother of Nicholas Kennedy, and then Linda       |
| 9   |   | Kennedy which is the mother of Krista, were      |
| 10  |   | the care-givers for the child.                   |
| 11  | Q | The Defendant told you this?                     |
| 12  | A | Yes, he did.                                     |
| 13  | Q | Okay.  What else did he say?                     |
| 14  | A | Subsequently, in the conversation I asked him    |
| 15  |   | if he had injured the child in any way, or if    |
| 16  |   | he knew any plausible reason why the child was   |
| 17  |   | injured.  Mr. McBurney explained to me that      |
| 18  |   | he knew of no plausible injury, and then         |
| 19  |   | went into a --                                   |
| 20  | Q | No plausible reason?                             |
| 21  | A | No plausible reason, excuse me.                  |
| 22  |   | MR. WHITE:  Objection.  I would ask              |
| 23  |   | that, with all due respect, let's let the        |
| 24  |   | witness testify and not lead him.                |
| 25  |   | THE COURT:  With all due respect I               |

1          think he has got a point.  Go ahead.

2     BY MR. SKRZYNSKI:

3     Q    Go ahead.

4     A    I asked Mr. McBurney if he knew -- if he

5          knew of a reason why the child was injured.

6          Mr. McBurney explained to me that he had no

7          reason why the child was injured.  He then

8          explained to me -- I asked him if there was

9          any falls or anything that took place of that

10         nature inside of the residence that he knew

11         of.  He says that at one time he was

12         stepping over a child's gate with Nicholas in

13         his arms and that he tripped over the child

14         gate and that he fell, but that Nicholas

15         never hit the ground.

16              Subsequently, I had Mr. McBurney write a

17         written statement.  I then was engaging him

18         in a conversation about wanting to take a

19         look through the house.  And I then noticed

20         after speaking with him several times about

21         the scarring across his knuckles and his

22         forehead.  I asked Mr. McBurney how he

23         obtained this scarring and Mr. McBurney said

24         that when he was younger he had an anger

25         issue and that he had been in several fights

1    and that he obtained the scarring on his

2    forehead from, I believe, it was a bottle,

3    and the scarring on his hands from being in

4    a fight and then hitting a window, if I

5    remember correctly.

6        Subsequently, I asked to look through the

7    residence to see where Nicholas spent his

8    time or where Nicholas' room was.  I went

9    into the room, the room itself and the

10   child's belongings were in good order.

11   Everything -- the room looked in -- without

12   exception to on the way back out I noticed

13   that there was a bathroom window with a --

14   or excuse me, a bathroom door with a large

15   hole in the center of it.  I then asked Mr.

16   McBurney how the hole was placed in the

17   door.  Mr. McBurney explained to me that

18   that was -- he became angry when he was

19   locked out of the bathroom and that he

20   punched the door.

21       I explained to Mr. McBurney that I would

22   be in touch with him in several days, and

23   that this was the beginning of an

24   investigation and that we would be in

25   contact.  I left my business card, and then

1       I left the residence and went back to my

2       station.

3    Q   Now, that contact with him was made at about

4       what time?

5    A   Approximately three-thirty, four o'clock.

6    Q   Okay.  Now, that same day at a later hour,

7       did you have any further contact with Mr.

8       McBurney?

9    A   Yes sir, I did.

10   Q   Do you know what time?

11   A   I believe Mr. McBurney called the station

12      asking for me, and subsequently he came to

13      the station and I interviewed him

14      seven-thirtyish that evening.

15   Q   Okay.  What happened then?

16   A   Mr. McBurney came to the station and he had

17      explained to me on the phone that he wanted

18      to come in and tell me what happened.  So,

19      he came in the station and we sat down in

20      one of the offices.  We didn't have any

21      interview rooms at that time in our Police

22      Department.

23          He said that when Nicholas was about a

24      month and a half old that he had Nicholas on

25      his lap and that Nicholas fell from

1      approximately two or three feet and Nicholas
2      struck the back of his head on their carpeted
3      cement floor.  He didn't notice Nicholas'
4      head had swollen the next day and that he
5      didn't notify anyone of that.
6   Q  What else happened?
7   A  The interview continued and Mr. McBurney
8      started to cry.
9   Q  What happened then?
10  A  At that point, I asked him was there
11     something else he needed to tell me about --
12     was there something else that happened to
13     Nicholas and that we needed to get this
14     information to the doctors?
15  Q  And what did he say?
16  A  He told me that on the 27th he arrived home
17     from his midnight shift at about six-thirty
18     a.m.
19  Q  The 27th of which month?
20  A  February 27th.
21  Q  Okay.  Of 1998?
22  A  Yes, sir.
23  Q  Okay.  At six-thirty he arrived home you
24     said?
25  A  It was approximately six-thirty a.m. after

1     working a midnight shift.

2   Q   Okay.

3   A   His girlfriend, Krista Kennedy, handed

4       Nicholas off to Mr. McBurney when she left

5       for work at approximately seven a.m.

6   Q   What happened then?

7   A   Nicholas was fussing and crying, so Mr.

8       McBurney attempted to give him a bottle.

9       Mr. McBurney said that Nicholas continued to

10      fuss and cry and he became very frustrated,

11      and began shaking the child.

12  Q   What else happened; what else did he say?

13  A   While he was shaking the child, the child

14      went limp; what he believed stopped breathing

15      and subsequently he called for emergency or

16      the 911.

17  Q   Go ahead, what else?

18  A   I asked Mr. McBurney if he felt that shaking

19      Nicholas was too hard, and he explained to me

20      that shaking Nicholas was harder than Krista

21      did it and that he felt that his actions

22      caused the injury to Nicholas.  He

23      subsequently wrote a secondary written

24      statement and referred to those comments in

25      his own written form.

```
 1    Q    Did you seek a warrant from the Prosecutor,

 2         the Wayne County Prosecutor based on this

 3         statement?

 4    A    Yes.   Mr. McBurney left that night and then I

 5         submitted the warrants several days later for

 6         a warrant review from the Wayne County

 7         Prosecutor's Office.

 8    Q    And did you obtain a warrant?

 9    A    Obtained a warrant for Child Abuse in the

10         First Degree.

11              MR. WHITE:      Objection, that's not

12         relevant Your Honor.

13              THE COURT:      What's the relevance?

14              MR. SKRZYNSKI: Well, he was -- I am

15         going to put in the Certified Copy of the

16         Conviction of Mr. McBurney for Second Degree

17         Child Abuse.   And I wanted to establish

18         through the Detective that he is the one that

19         sought the charges.   That there was a charge

20         issued that it was First Degree in order to

21         explain when I offered the Certified Copy of

22         the Conviction for Second Degree; explain how

23         that comes to be.

24              THE COURT:      What's the relevance of

25         that?
```

1       MR. SKRZYNSKI: To demonstrate that he

2       did, in fact, do this.

3            MR. WHITE:       Whether this officer

4       sought a warrant for First Degree or Second

5       Degree, whatever, I think it's irrelevant.

6            THE COURT:      Yeah, I don't see how

7       that gets us anywhere.   Sustained.

8            MR. SKRZYNSKI: I have no further

9       questions.

10           THE COURT:      Cross?

11                     ^CCROSS-EXAMINATION

12   BY MR. WHITE:

13   Q    Detective Sumner?

14   A    Yes, sir.

15   Q    I note that I have been provided with a full

16       copy of your report today.   And that copy

17       contains page three, that -- when did you get

18       this copy?

19   A    May I see the copy?

20   Q    Sure.

21           MR. WHITE:      If I may approach the

22       witness, Your Honor?

23           THE COURT:      You may.

24           THE WITNESS:    This is my written report

25       that I began in 1998.

```
1    BY MR. WHITE:
2    Q    Okay.  Where did you get that report; written
3         report?
4    A    This report I pulled off my department
5         computer that I keep my documents on.
6    Q    Your own computer?
7    A    It's a department issued computer that I -- no
8         one has access to.
9    Q    Okay.  Did your -- are the rest of the
10        reports kept in another computer?
11   A    Yes.  Regarding when a report is finished,
12        like the investigator's portion, those
13        reports are turned over to records.  This is
14        a 1998 case.  I couldn't keep all of my
15        cases and files open, I turn them in over to
16        the Records Bureau.  They subsequently -- at
17        that time they used what is called a
18        canti-file system, they scan them in and then
19        they discard the hard copy.
20   Q    And so you knew you were subpoenaed to come
21        here to testify today?
22   A    Yes.
23   Q    You needed to refresh your recollection?
24   A    Yes, sir.
25   Q    Okay.  And you needed your full report in
```

```
 1        order to do so?
 2    A   I -- yes.
 3    Q   Okay.  And that full report is that which I
 4        approached to you, correct?
 5    A   Right.  That report and the report you are
 6        referring to that where page three is missing.
 7    Q   Yes.
 8    A   Yes, and all the other supplements were
 9        written throughout this.
10    Q   Throughout the case, but it's prior to the
11        interview that you did with Steven McBurney on
12        March 2nd?
13    A   Two interviews; yes sir.
14    Q   Two interviews, one in his apartment and one
15        at the Department, those are accurately
16        reflected in the report that you have in
17        front of you?
18    A   Correct.
19    Q   Okay.  If I approach?
20    A   Yes, sir.
21            MR. WHITE:      Thank you, Your Honor.
22            THE COURT:      You may.
23    BY MR. WHITE:
24    Q   And then now here we are almost nine years,
25        in fact, in excess to nine years later, the
```

```
 1              report, is it accurate?

 2    A     Yes, sir.

 3    Q     Do you have independent recollection of these

 4              two interviews?

 5    A     There might be portions, I would have to

 6              look at that document, but I have read it

 7              several times.

 8    Q     Okay.  And you testified also in 1998, both

 9              in the Abuse and Neglect Jury Trial in front

10              of Judge Pitts, correct?

11    A     I believe that Mr. McBurney under Plea

12              Agreement by the Second Degree.  I don't

13              believe I testified at the criminal trial in

14              this matter.

15    Q     My question though is, do you recall

16              testifying before Judge Pitts at the Lincoln

17              Hall of Justice in the Abuse and Neglect case

18              and the Jury Trial?

19    A     In the -- you will have to assist me here,

20              Counsel, in the child termination trial?

21    Q     Correct.

22    A     Yes, I did testify during that trial.

23    Q     And you testified also at the preliminary

24              examination, correct?

25    A     At 35th District Court, correct.
```

1    Q    Now, your testimony today, Officer, you have

2         added some things beyond your report about the

3         scarring and the reasons for the scarring on

4         Mr. McBurney's hands and head.  You said

5         there was a problem and there was a fight

6         incident.  That's not referenced in your

7         report, is it?

8    A    No, but I believe we spoke about those

9         during the child termination trial.

10   Q    So, you are having independent recollection of

11        this interview nine years ago?

12   A    Yes, and subsequent during the trial as well.

13        It was a four day trial.

14   Q    Okay.  And --

15             MR. SKRZYNSKI: Well, Judge -- Judge,

16        before we go on I just want to object,

17        because if he is trying to impeach this

18        witness based on what is in the report, those

19        facts regarding the scarring on his hands,

20        arms and forehead, are all in that report.

21        They are on page two of that report.  So, if

22        --

23             THE COURT:    So, essentially what

24        you're trying to say is, is that if he goes

25        too far on an issue you intend to walk

```
 1              through the door he is opening?

 2                   MR. SKRZYNSKI: Right.

 3              THE COURT:      Approach the bench.

 4              MR. WHITE:      Now, that wasn't the

 5         nature of my question, Judge.

 6              THE COURT:      Approach the bench.

 7         (Bench conference held eyetooth

 8              THE COURT:      Go ahead, Counsel.

 9    BY MR. WHITE:

10    Q    Also, Detective, the use of the word

11         "shaking", are you absolutely sure that when

12         Steven McBurney came in to the apartment at

13         seven-thirty on that day and you sat down

14         and talked to him that he used the word

15         "shaking"?

16    A    Yes sir, I am.

17    Q    And didn't, in fact, he used the word

18         bouncing Nicholas on his hip?

19    A    I believe that word was used also, but he was

20         bouncing -- and he told me that he got very

21         frustrating and he was shaking the child.

22    Q    And you had Mr. McBurney prepare a written

23         statement twice, correct?

24    A    Yes, sir.

25              MR. WHITE:      Okay.  Nothing further,
```

```
 1        Judge.
 2             THE COURT:      Redirect?
 3             MR. SKRZYNSKI: Nothing further, thank
 4        you.
 5             THE COURT:      You can step down, thank
 6        you.
 7        (The witness was excused)
 8             MR. SKRZYNSKI: May this witness be
 9        excused?
10             THE COURT:      He is.  Approach.
11             THE WITNESS:    Thank you.
12             THE COURT:      Have a good day.
13             THE WITNESS:    Thank you, Your Honor.
14             THE COURT:      Enjoy Wayne County when
15        you get back to it.
16             THE WITNESS:    A few more years.
17        (Bench conference held eyetooth
18             THE COURT:      Let's go back on the
19        record.  Okay, I understand the situation as
20        is follows: There are two remaining issues.
21        There is the proffer that the Prosecution
22        intends to make about hospital record
23        regarding this prior act that we have heard
24        testimony on.  The Court, under our old law,
25        I don't think there would be an issue.  But,
```

1      I do think that there may be a

2      Crawford/Davis/Hammond issue raising now.

3           I recognize quite clearly that the

4      Supreme Court has not spoken to this issue in

5      Hammond about the admissibility of this

6      document, and I think it is directly related

7      to the reasoning there.  And, Counsel, you

8      need to be prepared to make an appropriate

9      and intelligent objection if you are going

10     to.  If you're not, it would be nice if you

11     would tell everybody and we wouldn't have to

12     do all of the research.  I think this is a

13     gray area.  I would like to know what your

14     thoughts are on both sides.

15          Second, I understand that the good

16     doctor will be testifying on this date and

17     that he is the only other witness that the

18     Prosecution intends to proffer, and that we

19     have already picked out another half-day for

20     this in May.  I don't have the date

21     off-hand, but I understand my staff has

22     cleared that.

23          I would point out that the Court, as I

24     did at the bench conference, the Court has

25     one-third of 60, well 57,000 cases to be

1    entirely accurate, and finding a half-day or

2    a day is a difficult thing to do.  I think

3    this case has gone on long enough, and I

4    would like it to finish as quickly as

5    possible.  Since I have got the good doctor

6    in here I would hope that we could do it in

7    that time frame, because if we cannot, and I

8    am willing to go late, this will only mean

9    that the Defendant sits in jail awaiting

10   trial for a longer period of time, which is

11   not my goal.

12        I think this has been long enough.  And

13   I don't even like the fact that I booked a

14   day for this today, and all of a sudden I

15   had a witness not being able to appear when

16   this has been sitting for a long time.  It's

17   not anybody's fault, I am not being

18   critical.  I am simply noting that I don't

19   like it, and I am going to finish this so

20   that it gets to the next stage, if it gets

21   to the next stage.  All right, thank you all.

22        MR. WHITE:       Thank you, Judge.

23        MR. SKRZYNSKI: Thank you, Judge.

24        THE COURT:       This matter is adjourned.

25        (The preliminary exam was adjourned)

STATE OF MICHIGAN)

               ) SS:

COUNTY OF OAKLAND)

        I, Christine E. Ebel, CER-5827, do hereby certify that I transcribed the foregoing Preliminary Examination, Volume I, recorded by Paul Ward, held April 27, 2007, before the HONORABLE BRIAN W. MACKENZIE, Judge of the 52nd/1st District Court, located at 48150 Grand River Avenue, Novi, Michigan, 48374, and that this is a complete, true, and correct transcript of the electronic recordings.

CHRISTINE E. EBEL, CER-5827

DATED:    June 4, 2007