07-214651-FC



STATE OF MICHIGAN

JUDGE DANIEL P. O'BRIEN
PEOPLE                V MCBURNEY,STE'

IN THE DISTRICT COURT FOR THE COUNTY
52ND DISTRICT     1ST DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

      -v-

District Court Case No.:
        06-007954-
FY
Circuit Court Case No.:

RECEIVED FOR FILING
OAKLAND COUNTY CLERK

'07 SEP 19 A8:57

STEVEN LINDSEY MCBURNEY,
         DEFENDANT/

DEPUTY COUNTY CLERK

PRELIMINARY EXAMINATION
VOLUME II

BEFORE HONORABLE BRIAN MACKENZIE, DISTRICT JUDGE, P24097

NOVI, MICHIGAN
May 17, 2007

APPEARANCES:
FOR THE PEOPLE:                    JOHN M. SKRZYNSKI (P33013)
                                    1200 North Telegraph Road
                                    Pontiac, MI 48341
                                    (248) 858-0656

FOR THE DEFENDANT:          SASHABAW LAW CENTER
BY:                            ROBERT F. WHITE (P31788)
                                      4345 Meigs Avenue, Suite B
                                    Waterford, MI  48329
                                    (248) 674-4320

RECORDED BY:                 PAUL WARD, CER-07759
TRANSCRIBED BY:              CHRISTINE EBEL, CER-5827

# ORIGINAL

## TABLE OF CONTENTS

**WITNESSES FOR THE PEOPLE:**                    **PAGE/LINE**

**LJUBISA JOVAN DRAGOVIC**
Direct examination by Mr. Skrzynski               07-13
Voir Dire by Mr. White                            09-04
Continuation of Direct exam by Mr. Skrzynski      19-25
Cross-examination by Mr. White                    33-06
Redirect examination by Mr. Skrzynski             57-18

| **PEOPLE'S EXHIBITS:** | **INTRO** | **REC'D** |
| --- | --- | --- |
| Exhibit #1: | | |
| Copy of Medical Examiner's Report | 08-09 | 19-21 |
| | | |
| Proposed Exhibit #2: | | |
| Certified Conviction from Wayne | | |
| County Circuit Court from 1998 | | |
| concerning Mr. McBurney | 60-05 | |
| **Denial of Proposed Exhibit #2 | | 96-22 |
| | | |
| Proposed Exhibit #3: | | |
| Records from Children's Hospital | | |
| re: 1988 case re: Steven McBurney | 64-23 | |

**DEFENSE EXHIBITS:**
Exhibit A from prelim exam 4/27
Photo of Madison McBurney's crib               38-25

1      NOVI, MICHIGAN

2

3      Thursday, May 17, 2007 at about 2:24 p.m.

4

5      (The Court, counsel, and all parties

6      present.)

7      THE COURT:    Call it Mr. Prosecutor.

8      MR. SKRZYNSKI: Good afternoon, Your

9      Honor, my name is John Skrzynski, I am here

10     for the Prosecutor.  This is the case of

11     People against Steven McBurney, this is your

12     case 06 280580 --

13     THE COURT:    Well, I don't have the

14     Defendant.

15     MR. SKRZYNSKI: I'm sorry, that's the

16     wrong number.  The number is 06 007954.

17     MR. WHITE:    Robert White appearing on

18     behalf of Mr. McBurney.  Can we take care of

19     a preliminary matter while --

20     THE COURT:    No, I haven't got your

21     client.

22     MR. WHITE:    Okay.

23     THE COURT:    Calling the matter of

24     People versus Steven McBurney, 06 7954.  I

25     need your appearances again gentlemen.

1     MR. SKRZYNSKI: Good afternoon, John

2     Skrzynski for the People.

3     MR. WHITE:     Robert White appearing on

4     behalf of Mr. McBurney.

5     THE COURT:     All right.  And I

6     understand that we were at the following

7     place; we are about to hear testimony from

8     the medical examiner.  After we have heard

9     that, there is going to be a proffer by the

10    Prosecution to admit an exhibit that are

11    hospital records of an alleged prior

12    incident.  Defense is objecting to that on a

13    number of grounds and you're going to need

14    to argue that, but rather than do that now,

15    everyone has agreed we can pretty much do

16    the medical examiner and then we can shift

17    over into that argument since it not only

18    ties into admissibility, but most ultimately

19    I think as to whether or not I am going to

20    bind this matter over.  So, let's proceed in

21    that manner unless there is some objection.

22    MR. WHITE:     No objection, Your Honor.

23    I do have a preliminary matter.

24    THE COURT:     What is it, Counsel?

25    MR. WHITE:     I have made a Motion to

1      Sequester the Prosecutor's witness, not only

2      the witnesses that would be appearing here

3      at the preliminary examination, but

4      ultimately at trial.   There are two people

5      sitting in the back that I believe will be on

6      the Prosecutor's Trial Witness List.   The

7      mother of the child from the 1998 case and

8      the grandmother.   Both were interviewed as

9      part of this case.   I would ask that they be

10      removed from the courtroom, unless the

11      Prosecutor agrees that they are not going to

12      testify in the ultimate criminal trial if

13      there is one.

14         MR. SKRZYNSKI: No, I can't say that they

15      will not testify in a trial.

16         THE COURT:     I am not going to

17      exclude them.   I don't do frivolous acts.

18      If I excluded them and then handed them a

19      transcript or they ordered a transcript they

20      would know exactly what they would hear, and

21      frankly my view of human memory isn't such

22      that them listening to this testimony

23      assuming that I bound it over would be able

24      to cause them to remember several months

25      from now what to testify to.   Purposes, I

1      think, are not served under those

2      circumstances.

3          If they were going to be testifying at

4      this exam I would agree with you, Counsel.

5      But, since the transcripts are public record

6      I don't see any reason to do that.  Motion

7      is denied.

8          MR. WHITE:      Thank you.

9          THE COURT:      With the exception that

10     if you are going to call anyone other than

11     the medical examiner.

12         MR. SKRZYNSKI: No, Your Honor.

13         THE COURT:      Then those people shall

14     step out of the courtroom.  And if the

15     Defense is going to call anyone at this

16     proceeding who has not yet testified they

17     will step out of this courtroom.  All right,

18     call your witness.

19         MR. SKRZYNSKI: At this time, the People

20     call L.J. Dragovic.

21         THE COURT:      If you would take the

22     witness stand, remain standing and raise your

23     right hand I would appreciate it.  Do you

24     solemnly swear or affirm the testimony you

25     are about to give is the truth, the whole

1    truth, and nothing but the truth?

2         THE WITNESS:    I do.

3         THE COURT:    Be seated please.  Will

4    you please state your name for the record

5    and then spell it for my court recorder.

6         THE WITNESS:    I am Ljubisa Jovan

7    Dragovic, that's L-j-u-b-i-s-a, middle

8    J-o-v-a-n, last D-r-a-g-o-v-i-c.

9         THE COURT:    Doctor, a pleasure to see

10   you again.

11        THE WITNESS:    Thank you, Your Honor.

12        THE COURT:    All right, are we going

13   to get a stipulation to his expertise or do

14   we need to go through it?

15        MR. WHITE:    No, I am just going to

16   stipulate the doctor is an expert.

17        THE COURT:    All right, he is an

18   expert in the area that the prosecution has

19   proffered him, which is medical examination.

20        MR. SKRZYNSKI: Correct Judge, in the

21   area of both forensic pathology and forensic

22   neuropathology.

23        THE COURT:    With that stipulation, is

24   that correct, Counsel?

25        MR. WHITE:    That's correct, Judge.

1                    THE COURT:      All right.   Let's proceed,

2           having cut all of about ten minutes.

3                    MR. SKRZYNSKI: Thank you.

4                         LJUBISA JOVAN DRAGOVIC

5           Called by the Prosecution at 2:28 p.m., sworn

6           by the Court and testified.

7                         DIRECT EXAMINATION

8    BY MR. SKRZYNSKI:

9    Q   ·Doctor, you are the Chief Medical Examiner of

10          Oakland County, correct?

11   A    That's correct.

12   Q    All right.  And you are licensed to practice

13          medicine in the State of Michigan?

14   A    Yes, I am.

15   Q    Okay.  Did you perform an autopsy protocol

16          on a person by the name Madison Olivia

17          McBurney?

18   A    Yes, sir.

19   Q    Okay.  Did you prepare an autopsy protocol on

20          that person?

21   A    Yes, sir.

22                   MR. SKRZYNSKI: Okay.  May I approach the

23          witness, Judge?

24                   THE COURT:     Yes.

25   BY MR. SKRZYNSKI:

```
1    Q   I want to show you what I have marked as
2        People's Proposed Exhibit Number One.  And I
3        am asking you, first of all, is that several
4        pages stapled together?
5        (People's Proposed Exhibit Number One, Copy of
6        Medical Examiner's Report, introduced at 2:30
7        p.m.)
8    A   This is material or a stack of ten pages, it's
9        the photostatic copy of the original that I
10       have here in my file pertaining to Madison
11       Olivia McBurney; eleven month old white female
12       child.
13   Q   And is that a true and accurate copy of your
14       original?
15   A   Yes, it is.
16   Q   Thank you.  And are these -- is an autopsy
17       protocol kept in the normal course of business
18       at the Oakland County Medical Examiner Office?
19   A   Yes, they are.
20   Q   And is it part of the business of the Oakland
21       County Medical Examiner to keep such records?
22   A   Yes, sir.
23           MR. SKRZYNSKI: All right.  At this time,
24       Your Honor, we proffer Proposed Exhibit One.
25           MR. WHITE:     Your Honor, may I voir
```

```
 1          dire?
 2              THE COURT:     You may.
 3                          VOIR DIRE
 4     BY MR. WHITE:
 5     Q   Doctor, Robert White, we have met before.
 6     A   Yes.
 7     Q   It appears that the date of examination was
 8         December 6th, 2006?
 9     A   That is correct.
10     Q   Okay.  And as part of the autopsy protocol
11         you conducted an examination of the deceased,
12         correct?
13     A   That is correct.
14     Q   And also it appears from the -- actually the
15         package that I received from the Prosecutor
16         that prior to conducting the autopsy protocol
17         that you had been provided a copy of a police
18         report from South Lyon Police Department, is
19         that true?
20     A   I believe that there was -- and there is a
21         police report.  I don't know if it is a
22         complete one, but yes that is correct, there
23         is a copy of the police report.
24     Q   In fact, it was faxed to your office on
25         December 4th, 2006, isn't that correct?
```

```
 1    A    That is correct, sir.

 2    Q    And it contained a variety of statements from

 3         various witnesses including E.M.S. personnel,

 4         the accused in this case, the mother, and the

 5         investigating police officers, correct?

 6    A    It does.

 7    Q    Okay.  And you reviewed this report prior to

 8         your preparation of the autopsy protocol, is

 9         that true?

10    A    I reviewed this report, I believe, prior to

11         the actual examination --

12    Q    Okay.

13    A    -- of the body.

14    Q    Okay.  And also as part of the package that I

15         received from the Prosecutor was a document

16         called an Oakland County Medical Examiner

17         Investigation, which it looks like a series of

18         computerized notes.

19    A    Yes, sir.

20    Q    And they are dated December 5th, 2006?

21    A    That's correct.

22    Q    And it includes notations of contact made with

23         U of M Physicians and a summary of the

24         circumstances of death on page four?

25    A    Page four?
```

```
 1    Q   Actually, at the bottom right-hand corner,
 2        it's on page 575 of the --
 3    A   No, no, no.  This would be page three of
 4        five.
 5    Q   Three of five, you're absolutely right.
 6    A   Yeah, thank you.
 7    Q   It contains a summary of the statements made
 8        by U of M Officials supposedly, correct?
 9    A   U of M Officials?  I am seeing here that it
10        was University of Michigan Hospital contacts.
11        I wouldn't call them University of Michigan
12        Officials.
13    Q   Okay.  Physicians?  Physicians?
14    A   Yes.
15    Q   Okay.
16    A   That would be.
17    Q   And you used that information also as part of
18        the preparation of your autopsy protocol, is
19        that true?
20    A   No, that's not true.  This is the information
21        that I used prior to looking at the body.
22    Q   Okay.  So --
23    A   And that's the standard procedure that
24        preliminary investigation is done; gathering
25        of information is accomplished, and of course
```

1          it's in progress because the investigation

2          may be ongoing.  But, that preliminary

3          investigation is summarized in these

4          documents and provided to me or my deputies

5          for the purpose of continuing assessing the

6          case.

7     Q    Sure.  So, it was certainly part of the

8          information that you had at the time that you

9          conducted the examination of Madison McBurney?

10    A    Sure.

11    Q    Okay.  And that that, based along with your

12         examination, ultimately went into your

13         conclusions containing your autopsy protocol,

14         correct?

15    A    Let me just double-check this.  I do not see,

16         strictly speaking in my opinion, anywhere

17         that there are conclusions made in reference

18         to these particular documents, so.

19    Q    I am not asking -- I am not asking that,

20         Doctor.  I am asking you --

21    A    Then I misunderstood your question, I'm sorry.

22    Q    Didn't, in fact, you used the information that

23         you received from the South Lyon Police

24         Department police reports and the statements

25         made by the U of M Physicians about the

1           circumstances of death as part of your --

2           part of your analysis and conclusions in your

3           autopsy protocol?

4      A    I did review the information.  I considered

5           the information.  But, I don't necessarily

6           use the information in that fashion as you

7           may feel or believe.  So, if someone says,

8           well there was such and such thing I take a

9           note of it, I consider it, but whether such

10          and such thing takes place or not is a

11          completely different issue.

12              So, while the information may be

13          provided while I assess the information and I

14          give it all due consideration, I do not

15          necessarily factor all of that information

16          into any of my subsequent considerations.

17     Q    Well, I am asking about this particular case.

18     A    Yes.

19     Q    And did you use any information provided by

20          the South Lyon Police Department police

21          report and the U of M Physician statements

22          as part of your autopsy protocol?

23     A    No.

24     Q    No; okay.  And did -- also I see there is a

25          letter in there written or signed by you

1          asking for U of M records, medical records,

2          and that letter is dated December 13th, 2006?

3     A    Yes, sir.

4     Q    Okay.  Did you receive those records?

5     A    I believe so, they are contained here.

6     Q    And when was your autopsy protocol prepared?

7     A    My autopsy protocol was prepared -- I'll give

8          you the exact date; 18th day of April of 2007,

9          sir.

10    Q    And you were in receipt of -- 18th day of

11         April?

12    A    Yes, sir.  Or some time before that point, I

13         can't tell you exactly.  I can only tell you

14         that there was a certified copy of autopsy

15         report mailed to the Attorney General's

16         Office, and it might have been available

17         earlier than that, but that --

18    Q    Okay.

19    A    -- that's about the solid point that I know

20         that it was available.

21    Q    And is it true, Doctor, that you received the

22         U of M Hospital records prior to completing

23         your autopsy protocol?

24    A    Sure.

25    Q    And is it true also, Doctor, that you

1           reviewed those records?

2     A     Yes.

3     Q     And is it also true that those records were

4           used as a basis for your opinion, any opinion,

5           as part of your autopsy protocol?

6     A     No, sir.

7     Q     So, what you're -- is there anything else that

8           you did as part of your preparation of your

9           autopsy protocol besides the examination,

10          besides the review of the South Lyon Police

11          Department records, besides the review of the

12          statements made by the U of M Physicians,

13          besides the review of the U of M medical

14          records, anything else that you did?

15    A     Of course.

16    Q     What?

17    A     All of the viewed things that I was supposed

18          to do in assessing this particular case,

19          because a continuation of examination of this

20          case was of such nature that included

21          examination of the brain at subsequent dates.

22    Q     I --

23    A     And then examination of microscopic slides

24          that were taken from those tissues that are

25          critical to the assessment.  So, all of that

1         process went on for several months.  Nothing

2         to do directly, or even indirectly, with

3         anything that was provided as evidence from

4         the hospital.

5    Q    So, my question then is, other than your

6         physical exam and the subsequent tests that

7         you did, medical tests that you have just

8         described, anything else that you did in order

9         to prepare your autopsy protocol?

10   A    When you are talking medical tests, I need to

11        clarify those.  These are not medical tests

12        that are done in clinical setting.  These

13        are neuropathology procedures that are done

14        as part of the general assessment process on

15        any given case when there is brain trauma.

16        And that process was accomplished and it took

17        some time, but that would be the scope of

18        things that I did.

19   Q    Okay.  So, if I am understanding your

20        testimony correct, your opinions based on

21        your autopsy protocol then are solely based

22        upon your physical examination and these

23        neuropathological tests, is that true?

24   A    No, upon my physical examination of the whole

25        body, upon the consideration of the age, the

```
 1           size of this child, and upon the autopsy

 2           findings that are in the body and in the head

 3           as well.

 4      Q    Okay.

 5      A    So, it's the overall assessment of all of the

 6           things considered.

 7      Q    Okay.  But, it had nothing to do with the

 8           police report?

 9      A    The police report I did review.

10      Q    That's a yes or no, sir.

11      A    Well --

12      Q    Did it have anything to do with the police

13           report?

14      A    Let me --

15                MR. SKRZYNSKI: Well, Judge I'll object.

16           This has been asked and answered.  He asked

17           him before if those matters had any basis --

18                THE COURT:        Sustained.

19                MR. SKRZYNSKI: Thank you.

20      BY MR. WHITE:

21      Q    It had nothing to do with the U of M records?

22                MR. SKRZYNSKI: Same objection.

23                THE COURT:        Approach.

24           (Bench conference held at 2:42 p.m.; Court

25           reconvened at 2:43 p.m.)
```

1           THE COURT:     The Court is going to

2      take a brief recess.  I want to see Counsel

3      in chambers.

4      (The Court in recess at 2:43 p.m., the Court

5      reconvened at 3:02 p.m.)

6           THE COURT:     Proceed.

7           MR. WHITE:     Just a couple more

8      questions, Your Honor.

9                     RESUME VOIR DIRE

10     BY MR. WHITE:

11     Q    Dr. Dragovic --

12     A    Yes, sir.

13     Q    Is there any other information that you

14          received from outside sources prior to the

15          preparation of your autopsy protocol, other

16          than the South Lyon Police Department records,

17          U of M records, the statements from the U of

18          M Physicians, anything else from any outside

19          source?

20     A    Not that I can remember off the top of my

21          head.

22     Q    Okay.  And if you would review your file,

23          would that help you answer that question

24          more fully?

25     A    I believe that you have the contents of this

1           file, so I don't see anything else here that

2           is -- constitutes communication by any

3           outside entity.

4                MR. WHITE:      Thank you, Judge.  Nothing

5           further.

6                THE COURT:      Objection?

7                MR. WHITE:      Yes, Your Honor.  I object

8           pursuant to MRE.703 that requires that

9           anything that the facts are presented in a

10          particular case upon which an expert relies,

11          bases an opinion on, or an inference shall be

12          in evidence, and I know that there has been

13          some discussion about whether Dr. Dragovic

14          actually relied on the documents, but let me

15          tell you, first of all, South Lyon Police

16          Department records were never introduced into

17          evidence.  The U of M medical records were

18          never introduced into evidence.  There has

19          been no U of M doctor ever testify.  And for

20          us to now say that he did not use those as

21          part of his preparation of his autopsy

22          protocol, I believe it stretches the bounds

23          of reason.

24               And I do believe, initially, he stated

25          that he factored the Police Department

1     records and the statements of the physicians

2     as part of the overall -- his overall

3     preparation of the autopsy protocol.  And

4     that, I believe, invalidates his -- this

5     particular document and I would ask pursuant

6     to MRE.703 that it not be admitted.

7          THE COURT:     Response?

8          MR. SKRZYNSKI: Judge, he testified that

9     in forming his opinion he relied on the

10     physical examination of the body, the

11     protocol and the procedures of the

12     neuropathologist, which he himself is and

13     which he performed.  He said that he did not

14     -- he read those things before he did the

15     autopsy and before he prepared the autopsy

16     protocol, but he did not base his opinion on

17     those things.

18          THE COURT:     That's my understanding

19     of his testimony.  Objection is noted.

20     Overruled; received.

21     (People's Exhibit Number One, Photocopy of

22     Medical Examiner's Report, received and

23     admitted into evidence at 3:06 p.m.)

24          MR. SKRZYNSKI: Thank you, Your Honor.

25          THE COURT:     Proceed to Direct.

```
 1              CONTINUATION OF DIRECT EXAMINATION
 2     BY MR. SKRZYNSKI:
 3     Q    Doctor, you performed this autopsy on December
 4          6th of 2006, correct?
 5     A    December 6th, that's correct, sir.
 6     Q    Okay.  Doctor, did you do an examination of
 7          the body itself?
 8     A    Yes, sir.
 9     Q    What did you find when you examined the body;
10          external examination?
11              THE COURT:      Wait, just a moment.
12          The Court is going to have to take a two
13          minute recess.
14          (The Court in recess at 3:07 p.m., the Court
15          reconvened at 3:08 p.m.)
16     BY MR. SKRZYNSKI:
17     Q    What were your findings when you examined
18          the body externally?
19     A    Well, this was a 28 inch long, 32 pounds in
20          weight, female infant.
21     Q    Was that appropriate for an 11 month old?
22     A    Yes, it would be in that span of 11 months
23          of age, yes sir.  There was -- there were
24          some defects on the scalp that were part of
25          the congenital problem of the skin.  There
```

1    were -- there was evidence of medical .

2    surgical intervention, and with a  catheter

3    in the right side of the head there was no

4    trauma anywhere on the body; on the surface

5    of the body.

6  Q  Now, Doctor, the three lesions that you saw,

7    where were they on the head?

8  A  They were in the mid-line of the head.  They

9    were kind of apart from each other, and one

10   was seven-eighths of an inch.  The next one

11   was a quarter of an inch, and there was --

12   the one that was toward the back of the

13   head, that was three-quarters of an inch

14   defect.

15 Q  After you examined -- after you completed the

16   entire autopsy of this body, did you find that

17   those three lesions had anything to do with

18   the cause of death of Madison McBurney?

19 A  They did not.

20 Q  Thank you.  All right, Doctor, did you

21   subsequently open the body and examine it

22   internally?

23 A  Yes.

24 Q  What did --

25 A  I opened the body, the usual procedure;

| | | |
|---|---|---|
| 1 | | examined the contents of the body cavities. |
| 2 | | That is the chest cavity, the body cavity. |
| 3 | | and the cranial cavity; the head. |
| 4 | Q | What did you find? |
| 5 | A | Examination of the head revealed, first of |
| 6 | | all, severe swelling of the brain, and |
| 7 | | bilateral organizing subdural hemorrhage. |
| 8 | | And then I preserved the brain tissue for |
| 9 | | further examination because it needed |
| 10 | | fixation.  So, apart from those findings |
| 11 | | right there, subsequently I discovered upon |
| 12 | | examination of the brain extensive necrosis |
| 13 | | of the brain, multiple infarcts.  That all |
| 14 | | represented the complications of severe brain |
| 15 | | swelling due to a reaction to the blunt |
| 16 | | trauma of the head that was the cause of |
| 17 | | bilateral subdural bleed. |
| 18 | Q | Can you explain, Doctor, what a bilateral -- |
| 19 | | first of all, the term bilateral, what does it |
| 20 | | mean? |
| 21 | A | Both sides, both the right and left side. |
| 22 | Q | And subdural, what does that mean? |
| 23 | A | Subdural is pertaining to accumulation of |
| 24 | | blood underneath the hard covering of the |
| 25 | | brain.  There is, anatomically speaking, |

1      there is the skull that is covered tightly by

2      the scalp of the outside.  Underneath the

3      skull there is a hard tough membrane that we

4      refer to as dura, meaning hard.  That is the

5      membrane that is tightly adherent to the

6      inside of the skull and touching upon the

7      surface of the brain, which is right then and

8      there covered by soft membranes called the

9      piarachnoid that actually covering directly

10     the surface of the brain.

11         In between those soft meninges and the

12     hard meninges is a virtual space, it's not a

13     real space, it doesn't really exist unless

14     there is accumulation of fluid in it and that

15     becomes a subdural space.  If there is

16     bleeding, there is subdural hemorrhage.  And

17     if there is there bleeding over both halves

18     of the brain, that's a bilateral subdural

19     hemorrhage.  So, this is a situation that I

20     found that there was organizing bilateral

21     subdural hemorrhage.

22   Q  When you say "organizing", what does that

23      mean?

24   A  When I say organizing, it means that there is

25      a process of healing that starts the moment

1          the injury takes place.  And, obviously,

2          there was indication there by the degree of

3          this healing that injury occurred days prior

4          to my examination.

5      Q   Okay.  Now, Doctor, you said that you also

6          saw that there was severe brain swelling, is

7          that correct?

8      A   That is correct.

9      Q   All right.  Can you explain to us how brain

10         swelling can occur?

11     A   Brain has tissue, the human body, any living

12         organism in animal kingdom is a structure

13         that when there is some injury of some

14         unfavorable circumstance that is brought upon

15         it, it reacts by swelling.  Immediately

16         reacts by starting to swell.  That swelling

17         may take time.  It may occur over a period

18         of hours, it may complicate over a period of

19         days, but that's the only biological reaction

20         that the brain reacts to something that

21         acutely puts the brain in an unfavorable

22         circumstance.

23     Q   All right.  So, in this case, you did detect

24         that the brain had swelled?

25     A   Correct.  And then I have to clarify, it's

1           not only physical trauma to the brain that

2           can cause swelling. It may be deprivation of

3           oxygen for a period of time that would allow

4           the brain to react by swelling. So, any

5           unfavorable circumstance in general would

6           create this response, the biological response

7           of the brain in the form of swelling.

8    Q   Once the brain starts to swell, Doctor -- the

9           skull is a closed compartment, is it not?

10   A   That is correct, sir.

11   Q   Once the brain starts to swell, can it swell

12          beyond the capacity of the interior of the

13          skull?

14   A   It would have a tendency in severe head

15          trauma to try to swell beyond the capacity,

16          and when that happens beyond the confines of

17          the skull, the inner confines of the skull,

18          when that happens then the brain will seep

19          through the openings in the base of the

20          skull, and that is referred to in

21          neuropathology and pathology as herniation.

22          Simply bulging brain tissue, which is soft

23          and generally light, through the openings at

24          the bottom of the skull.

25   Q   Did you find those conditions here on this

1           little girl?

2     A     Yes, sir.

3     Q     Okay.  What are the consequences of brain

4           herniation?

5     A     Brain herniation causes interference with

6           blood supply to the brain above those points

7           of herniation.  It also creates a risk for

8           further herniation and pressure of the brain

9           stem; interference with breathing as a vital

10          function of a living body.

11    Q     Now, Doctor, you said that the supply of

12          blood to the brain can be inhibited by the

13          swelling, is that correct?

14    A     Yes, simply by mechanical pressure, because

15          the expanding swelling brain pushes on the

16          blood vessels that are on the surface of the

17          brain and at the bottom of the brain,

18          because the brain bulges toward and that

19          traps in those blood vessels, and that's why

20          you have necrosis.  You have infarcts that I

21          found in this particular case.

22    Q     When you say the word "infarct", can you

23          explain what infarct means?

24    A     Infarct means basically necrosis meaning dying

25          of tissue while someone is still alive.

1    Q    That's a necrosis?

2    A    That's the necrosis.

3    Q    Now, infarct --

4    A    Infarct is necrosis caused by blockage of

5         blood supply.

6    Q    Okay.  Now, you said you did find necrosis in

7         this little girl's brain?

8    A    On both sides of the brain, yes sir.

9    Q    Where in the brain?

10   A    I can be more specific here.  There were

11        infarcts of both sides involving the front

12        part of the halves of the brain, both the

13        right and left half of the brain.  There was

14        additional area of infarct in the left

15        temporal lobe, which would be lower part, I

16        mean left lower part of the left half of the

17        brain.  And there was -- it was also this

18        downward displacement of the middle part, the

19        central part, of the brain that we refer to

20        as diencephalon which was the result of this

21        bulging, the herniation that I talked about.

22        There were also thrombosis of the veins of

23        the brain on the surface of the brain.

24   Q    Thrombosis, Doctor, is a blood clot?

25   A    Yes, it's clotting because circulation has

```
 1              seized because of the physical pressure on

 2              those areas.

 3       Q      Okay.

 4       A      And there were also infarcts in both the

 5              right and left occipital lobes, that pertains

 6              to the back of both right and left half of

 7              the brain.  Left half of the brain being in

 8              the back of the head and the right half of

 9              the brain, the back part was also infarcted,

10              so those areas were infarcted as a result of

11              pressure on the blood vessels at the base of

12              the brain.  Again, as a result of this

13              downward bulging or herniation.

14       Q      Doctor, what was the condition of the brain

15              stem?

16       A      The brain stem showed necrosis again as a

17              result --

18       Q      That's dying tissue?

19       A      Dying tissue as a result of those pressures

20              and impaired circulation.

21       Q      Now, Doctor, what is the function of the brain

22              stem?

23       A      The function of the brain stem is to control

24              general vital functions of breathing and the

25              heart beat and maintaining someone basically
```

1          alive.

2     Q    If the brain stem becomes necrotic or full of

3          necrosis here, what effect does that have on

4          the person's ability to breath?

5     A    Well, that individual would be, for all

6          practical purposes brain dead and they can

7          only sustain breathing through artificial

8          respiration, through mechanical apparatus

9          that is brought in and pumps the air into

10         the lungs on its' own.  The person does not

11         breath on his or her own.

12    Q    So, Doctor, is that what happened with Madison

13         McBurney in this case, because of the infarct

14         and the necrosis to the brain stem?

15    A    Yes, the necrosis to the brain stem is a

16         consequence of the head trauma.  Those changes

17         occurred as a result of accumulation of blood

18         over the brain.  The brain got swollen, forced

19         and bulged downward pressed to the brain stem,

20         impaired the circulation throughout the brain.

21         And then this child was artificially kept on

22         ventilator for some days there, for I think

23         for about five days or so.

24              Obviously, there was no possibility of

25         this child to breath on her own with this

```
 1              situation, so mechanical ventilation would be

 2              the only option.  But, for all practical

 3              purposes, the person is dead.

 4     Q    Doctor, you also examined the eyes of this

 5              little girl?

 6     A    Yes.

 7     Q    What did you find?

 8     A    There was extension of the bleeding from

 9              subdural space into the -- and around optic

10              nerves.  And the left eye showed some broken

11              blood vessels, which are known diagnostically

12              in the clinical world as retinal hemorrhage.

13     Q    Okay.

14     A    There was -- I don't believe grossly that

15              there was evidence of those in the right

16              eye, but the left eye showed some.

17     Q    Okay.

18     A    And those are the result of impaired

19              circulation and increased pressure within the

20              head.

21     Q    Now, Doctor, you did a microscopic examination

22              of tissues of the brain, did you not?

23     A    That's correct.

24     Q    What did you find?

25     A    I found those infarctions, the necrosis
```

1    throughout the brain and the structures.

2    Kind of subsets of the brain, including the

3    cerebellum in the brain stem and of course I

4    examined the hard coverings of the brain

5    which showed organizing subdural hemorrhage,

6    but also showed on the special stains it

7    takes that there was some evidence of

8    remotely in those areas by the presence of

9    blood pigment that was there in the layers

10    of the tissue.

11   Q    What does a remote hemorrhage mean?

12   A    A remote hemorrhage means that something,

13        some head trauma occurred, some months prior

14        to the head trauma that led to the death of

15        this baby.  So, that would be an indicator

16        that there was some injury back at some

17        point in time.

18   Q    Before this current injury?

19   A    Before the current injury.  Before the

20        injury that complicated to the demise of the

21        child.

22   Q    Okay.  Doctor, after completing your

23        examination, including the neuropathological

24        examination, did you come up with a diagnosis

25        of what had happened to this child?

1    A    Yes, sir.

2    Q    What is that?

3    A    This child died of a blunt force trauma of

4         head and its' complications.

5    Q    Now, when you say "blunt force trauma",

6         Doctor, what does that mean?

7    A    That means that there is a force applied to

8         the head in blunt fashion, and that means

9         that there is a force that changes the

10        natural setting within the head and displaces

11        the brain as a result of that to the point

12        of tearing the blood vessels that are on the

13        surface of the brain and these resulting in

14        subdural hemorrhage.  This is generally

15        observed in circumstances where head is a

16        booming object and strikes an unyielding

17        surface.

18   Q    Okay.

19             MR. WHITE:      Just the word "unyielding

20        surface"?

21             MR. SKRZYNSKI: Unyielding surface.

22             THE WITNESS:    Unyielding surface.   For

23        example, if I demonstrate a person and throw

24        the person into the wall, throw the person on

25        the floor, that would be the unyielding

1    surface.  And that would be if the back of

2    the head impacts that unyielding surface,

3    then the lag of the brain and displacement of

4    the brain, because brain still has a little

5    bit of space.

6         And, remember, I talked about this being

7    a jelly-like substance, the brain will lag

8    for maybe one-sixteenth of an inch and that

9    sudden snapping movement will create ripping

10   of those fine venous vessels on its' surface

11   and result in bleeding into the subdural

12   space.

13   BY MR. SKRZYNSKI:

14   Q    Doctor, are the injuries that you found on

15        autopsy consistent with the following

16        hypothetical?  Someone taking this child and

17        throwing it two feet, from two feet away,

18        into a crib and the baby hitting its' head

19        against the wooden slats of the side of the

20        crib?

21   A    Yes, it's consistent with that.

22   Q    Okay.  So, Doctor, the cause of death in this

23        case is?

24   A    The cause of death was blunt force trauma of

25        head and complications.

```
 1    Q    And the complications are all of the matters

 2         that you just talked about?

 3    A    The brain swelling, the herniations, and the

 4         brain necrosis which becomes incompatible with

 5         life.

 6    Q    All right.. Did you come to an opinion to

 7         within a reasonable degree of medical

 8         certainty about the manner of death in this

 9         matter?

10    A    Yes, sir.

11    Q    What is that?

12    A    It was homicide.

13    Q    Why is that, sir?

14    A    Because, homicide is a category of death by

15         definition is where death results from

16         purposeful acts of another person occurs.

17         And in order to generate this injury in this

18         kind of child, this age, being 11 months of

19         age, it had to be inflicted by someone else.

20         This child could not self-create this type of

21         injury.

22              MR. SKRZYNSKI:  Okay.  Thank you very

23         much, Doctor, I have no further questions.

24              THE WITNESS:   You're welcome.

25              THE COURT:     Cross?
```

```
 1              MR. WHITE:     If I may, Your Honor.
 2                     CROSS-EXAMINATION
 3       BY MR. WHITE:
 4       Q    So, if I am correct, Doctor, there are
 5            absolutely  no external signs of injury on
 6            this child, is that true?
 7       A    Not that I detect.
 8       Q    Okay.  Not a bruise, right?
 9       A    Correct.
10       Q    Not a scrape?
11       A    Correct.
12       Q    Other than the lesions that were on the top
13            of the head, a well nourished, healthy child?
14       A    Correct.
15       Q    And then the internal examination showed no
16            fractures?
17       A    Correct.
18       Q    No fractures of any bone in the body or the
19            head, correct?
20       A    That is correct.
21       Q    And also I believe your report indicates that
22            there is no soft tissue injuries that you
23            could detect either, correct?
24       A    That is correct.
25       Q    Specifically in the neck area?
```

```
 1    A    That is correct.

 2    Q    Okay.  So, the blunt trauma, where did it

 3         occur on Madison, on her head?

 4    A    Based on the injury of head and the findings

 5         at autopsy it had to have been the back of

 6         the head.

 7    Q    Could you be a little bit more specific,

 8         Doctor?

 9    A    Anywhere in the back of the head.

10    Q    Anywhere.  And do you know how many times the

11         blunt force trauma was -- occurred?

12    A    At the minimum, once, and I can only

13         consider that.  Can I exclude some

14         multiplicity?  Theoretically, no.  But, I can

15         say that there is a minimum of one situation

16         resulting in this damage.  You have only one

17         impact needed against the unyielding surface

18         to create this type of damage.

19    Q    So, but you did not find in your findings

20         there was any more than one, did you?

21    A    No, sir.

22    Q    Okay.  And the surface, do you have any

23         opinion about what that surface was?

24    A    Whatever the surface was, it was enough to

25         not yield to complete continuation of
```

1          movement of the head.  Whether it was

2          somewhat padded or not I cannot tell.  It's

3          possible that it was at least partially

4          padded by something, because I did not find

5          any evidence of damage to the scalp itself.

6     Q    Is that unusual, Doctor, to not find any

7          evidence of damage to the scalp?

8     A    Not in babies.  I mean, if you are asking in

9          general, an adult?

10    Q    I'm talking about a child at this age.

11    A    Yeah, in babies it's not unusual.

12    Q    Is there any type of measurement that we

13         could look to for you to guide us and tell

14         me how much force was used to cause these

15         injuries?

16    A    No, the measure of the force is the

17         occurrence of the damage.  The damage -- the

18         result, is the measure of the force.  If the

19         force is not enough, this damage does not

20         occur.  If the force is sufficient to create

21         this deadly damage, it's there.

22              That is how the nature has set it up and

23         there is no way by any mathematical or

24         mathe-magical concept to try to calculate

25         something and present.  Many people have

```
 1            tried to no avail, to no success.

 2     Q     Okay.  Would you adopt a version that I hear

 3            on a repeated basis, force equivalent to a

 4            child being thrown out of a 35 mile per hour

 5            vehicle?

 6     A     That's nonsense.

 7     Q     Okay.  Thank you.

 8     A     You're welcome.

 9     Q     So, the measurement is based upon the damage

10            itself that was done, correct?

11     A     That is correct.  If there is enough to

12            create the damage, that's it.  If there is

13            not enough to create the damage, then we're

14            not talking about the damage.

15     Q     And, Doctor, when did this blunt force trauma

16            occur with respect to your examination on

17            December 6th?

18     A     It would have been days prior to the time

19            when I examined.  I don't know exactly what

20            moment of whenever and how long prior to

21            what was reported this child being

22            non-responsive.  I cannot tell that with any

23            specificity.  It might have been within an

24            hour, within longer than an hour, within

25            minutes.  I can't talk any specific day.
```

```
1    Q    Would you say within days -- would you say

2         within days, within seven days?

3    A    No, no, no, no, no.

4    Q    Within five days?

5    A    I mean, you are mischaracterizing.  I am

6         talking about the -- we all know as a fact

7         that this child became non-responsive on a

8         certain date.  That there was E.M.S.

9         arriving there.  And, at that point in time,

10        somewhere around that time, I don't know

11        exactly when and how long prior to this child

12        being non-responsive the injury occurred.

13        But, it occurred somewhere around that time

14        during that date.  I don't know exactly when.

15             So, if you measure the time from that

16        point when the child was reported

17        non-responsive to the point I examined the

18        child, considering that the child died on the

19        fourth of December, and we know for a fact

20        that the child was taken off the respirator

21        on the fourth of December.

22   Q    My question, though, is --

23   A    Then we are talking about days, and I have

24        answered your question.

25   Q    My question, though, is from your examination
```

1          and your examination alone, can you tell the

2          Court when the blunt force trauma occurred?

3    A     When exactly?

4    Q     Yes.

5    A     No, I cannot provide the minute or the hour.

6          I can estimate the day and that will be the

7          day when the child became non-responsive.

8    Q     But, that information you based upon the

9          information you gleaned from the police

10         reports and hospital records, correct?

11   A     No, that is the information of the E.M.S.

12         generated, and that's not the information by

13         the way that was factored into this report so

14         that we keep the record clear.  That is the

15         information you are asking me to factor in

16         in giving you the interpretation or the

17         answer to your question, sir.

18   Q     And my question is excluding all of the

19         external information that you received about

20         the nature and circumstances of this young

21         child's injury, could you tell by the

22         examination alone on December 6th when the

23         blunt force trauma occurred?

24   A     On basis of just the examination of the body I

25         could tell that it occurred days prior to my

```
 1              examination.

 2    Q    How many days?

 3    A    That I cannot specifically say without

 4         knowing the external examination.  And that

 5         is not something that is offered in a vacuum

 6         under any circumstances.

 7              MR. WHITE:    If I may approach the

 8         witness, Your Honor?

 9              THE COURT:    You may.

10    BY MR. WHITE:

11    Q    I have an exhibit.  Doctor, if I may

12         approach and show you Defendant's Exhibit A

13         and ask you have you ever seen that picture

14         before?

15         (Defendant's Exhibit A, Photograph of Madison

16         McBurney's crib, received and admitted in

17         Volume I, introduced)

18    A    I am not sure off the top of my head if I

19         have seen this picture or not.  I see

20         thousands of pictures on a daily basis, but I

21         see a crib here, sir.

22    Q    I know, I just asked if you could remember.

23         But, assume hypothetically that this was the

24         crib of Madison and assume hypothetically that

25         Madison was tossed into that crib from
```

1    approximately two feet away.  Do you believe

2    that that could have caused the injuries, the

3    blunt force trauma impact that caused the

4    hemorrhaging in her brain?

5   A   Yes, sir.

6   Q   Okay.  Without making any determination of

7    where she hit the pad or the wood or --

8   A   Well, I see padding around and it is quite

9    possible that the bedding was an intervening

10    intermediary surface as the back of the head

11    impacted the side of the crib.  So, that's

12    possible.  That's possible based on the fact

13    that there is no defined damage to the scalp

14    itself, but that's all I can say.

15   Q   Is it possible, Doctor, that the blunt force

16    trauma was caused by the child hitting the

17    padded mattress of the crib?

18   A   Sure, that is possible.  When throwing or with

19    some additional force it all depends on the

20    speed; speed of the moving head.  And that

21    speed creates the kinetic energy that is that

22    transforming into the situation of brain

23    lagging and causing the blood vessels to get

24    ripped.

25   Q   And if that person is standing approximately

1          two feet away from that crib, that child would

2          have had to have been thrown up in the air

3          to a certain extent and arched, is that

4          correct?

5     A    No, I don't see where your imagination is

6          going there.  This is not necessary.  You can

7          throw directly into the crib and that's the

8          fastest way.

9     Q    Okay.  And assume --

10    A    Unless you are offering some theory of

11         something going up and down or something.

12    Q    No, I am just asking a question Doctor, I am

13         not offering any theory.  Assume that the

14         person standing at the crib with the baby,

15         with Madison, and throws her into the crib

16         which is approximately two feet away from the

17         top of the crib, would that be enough force

18         to cause the injuries that you found in

19         examining her?

20    A    This question doesn't make sense.  I will

21         explain why.  You are saying, assuming that

22         the person is standing next to the crib or

23         at the crib, is that enough force.  You are

24         not giving me the source of the force to

25         assess the force, you are just giving me the

```
 1              position of the person standing at the crib.

 2              Sure, a person standing at a crib can cause

 3              this injury to the baby.  But, the force

 4              that you are asking about has nothing to do

 5              with a person standing at the crib.

 6    Q    Well, I --

 7    A    I mean, it's not the logical setting.

 8    Q    The Prosecutor didn't give you the amount of

 9         force either.

10    A    I am not talking about --

11    Q    My question -- my question is --

12    A    I am not even beginning, but you are

13         mentioning force.

14              THE COURT:     Gentlemen?  Gentlemen?

15         Let me be clear on how this courtroom works.

16              MR. WHITE:     I'm sorry.  I was just

17         trying to help him.

18              THE COURT:     I understand that, but

19         there is a clear pacing to courtroom

20         procedures.  Counsel asks a question, witness

21         responds to the question.  Counsel let's

22         witness finish the response and then asks

23         another question.  Witness waits until the

24         question is completely asked before

25         responding.  If a witness is non-responsive
```

1           the objection is to me and I will deal with

2           it.  If Counsel gets interrupting the

3           witnesses answer then I will interrupt the

4           Counsel's questioning.  Let us all be clear.

5                MR. WHITE:      Maybe then the witness --

6                THE COURT:      I have been very clear

7           on what each person's role in this is.

8                MR. WHITE:      And if the witness doesn't

9           answer, I can offer --

10               THE COURT:      Then you would direct to

11          me as a non-responsive response.

12               MR. WHITE:      And then are you going to

13          interrupt the witness' response?

14               THE COURT:      I will take care of --

15          Counsel, how long have you been in my

16          courtroom?

17               MR. WHITE:      This is, I think, more

18          than the second time.

19               THE COURT:      Yeah.  Yeah.  You know

20          how my courtroom works.

21               MR. WHITE:      Thank you, Judge.

22               THE COURT:      Allow me to operate it in

23          the way that I do.  Proceed.

24      BY MR. WHITE:

25      Q   Can you answer my question, though, Dr.

```
 1              Dragovic, from the person standing at the crib

 2              throwing the child into the crib hitting the

 3              padded surface, was that -- is that enough

 4              force to cause the injuries that you detected

 5              in your examination?

 6        A     It is a nonsense question, sir, because you

 7              don't assess the amount of force by the fact

 8              that the person is standing at the crib.  All

 9              I can tell you is if the person is standing at

10              the crib, it's possible to create this injury

11              by throwing the child into a crib, but not

12              talking enough or insufficient force, because

13              it doesn't make any sense.

14        Q     So, is it possible or not?

15        A     Is it possible what?

16        Q     That the injuries that you detected in your

17              examination were caused by this child being

18              thrown in a crib by the person -- a person

19              standing at the crib --

20        A     Sure.

21        Q     Approximating -- and throwing her

22              approximately -- I eye-ball that

23              approximately two feet down?

24        A     Sure, it's possible.

25        Q     Into the padded surface?
```

```
 1    A    Into the padded surface, sure.

 2    Q    Okay.  Doctor, was this a shaken baby?  Was

 3         Madison a shaken baby?

 4    A    What?

 5    Q    Was Madison a shaken baby?

 6    A    I don't see any evidence of such a thing or

 7         entity here.

 8    Q    Thank you.

 9    A    You're welcome.

10    Q    Now, we know that blunt force head trauma,

11         was it the third leading cause of death in

12         this country?

13    A    We can check the statistics.  And blunt force

14         head trauma comes from everything, from

15         traffic collisions, from assaults; sure.

16    Q    Falls also?

17    A    Falls, sure.  If there are people walking down

18         the street, they step on the ice, they fall

19         and sustain head injury.  People step on

20         banana peel that is carelessly discarded on

21         the street, they sustain the same kind of

22         injury.

23    Q    Sure.  And because someone has suffered a

24         blunt force trauma to the head doesn't

25         necessarily mean it's non-accidental, correct?
```

1    A    In general?

2    Q    Yes, in general.

3    A    In general, first every situation is assessed

4         and investigated in order to see if it is

5         untoward effect of some circumstances or if

6         it is a result of purposeful act.  Then one

7         goes to conclude about the category of the

8         manner how injury occurred.  That's how I go

9         about things.  I don't call things

10        non-accidental -- or these are -- the

11        nebulous terms that are used in clinical

12        medicine.

13   Q    But, because you're examining someone that

14        died as a result of blunt force trauma and

15        complications, it doesn't necessarily mean

16        there is a homicide, isn't that true?

17   A    Well, this is why I am paid by the tax payers

18        to investigate --

19   Q    Isn't that true, Doctor?

20   A    -- and to -- yes.  Yes, it is true.

21   Q    And blunt force trauma there is -- they look

22        at the primary injury, isn't that true; the

23        injury that occurs on impact?

24   A    I am not following you.

25   Q    Well, do you have any understanding of primary

1          versus secondary injury in blunt force trauma

2          cases?

3     A    Primary versus secondary?

4     Q    Uh-huh.

5     A    I am not familiar with the terminology that

6          you are using.  Maybe you have something to

7          share with me, so.

8     Q    No, so you have never heard that term

9          "primary versus secondary injury"?

10    A    Well, I hear a lot of terms, but do they make

11         sense that's a different thing.

12    Q    No, I am asking you that term, sir.

13    A    I am not --

14    Q    Primary versus --

15    A    I am not prepared to comment on that.  If

16         you show me something that you have there, I

17         will comment on it.

18    Q    Can you explain to the Court what hypoxic

19         ischemic injury is?

20    A    Sure.

21    Q    What is it?

22    A    Hypoxic means lack of oxygen supply.  Ischemic

23         means lack of blood supply.  If you say

24         hypoxic ischemic it means that there is a

25         combination of lack of oxygen supply and

1           lack of blood supply.  Well, you will then

2           have the question which one is which, because

3           there is lack of blood supply, and then if

4           there is lack of blood supply, there will be

5           lack of oxygen supply.  There are instances

6           where you don't have a lack of blood supply,

7           but you have a lack of oxygen supply and

8           those are truly hypoxic injuries.

9    Q      And was there a hypoxic ischemic injury to

10          Madison McBurney?

11   A      Sure, there was plenty of it.  We talked

12          about necrosis, we talked about infarcts, and

13          these are all those type of damages that

14          occur as complication of the trauma to the

15          head.

16   Q      Correct.  Those are the complications you are

17          referring to, Doctor, isn't that true?

18   A      That is what is listed in the autopsy

19          protocol, sir.

20   CORRECTED

21   Q      And the hypoxic ischemic injury doesn't

22          necessarily occur at the moment of impact,

23          isn't that true?

24   A      Oh, that's true.

25   Q      Okay.  In fact, you could have trauma that is

1    not fatal, but becomes fatal because the brain

2    swell continues to swell as a result of loss

3    of -- lack of oxygen and lack of blood,

4    correct?

5  A    Correct.

6  Q    And then a traumatic event that is non-fatal

7    becomes fatal because the person is not

8    properly oxygenated and blood supply is not

9    properly motivated to the brain, correct?

10  A    Well, no you have packed in something there.

11    First of all --

12  Q    My question is a yes or no answer, sir.

13  A    And I can't answer this kind of question with

14    a yes or no, sir.  I have to clarify.  If

15    you allow me; if you don't, I can't answer

16    the question.

17  Q    So, did Madison suffer injury as a result of

18    continued brain swelling after the initial

19    traumatic impact?

20  A    Of course she did.

21  Q    Okay.  And did she suffer injury as a result

22    of a lack of oxygen to the brain?

23  A    Among other things, yes.

24  Q    Continued lack of oxygen to the brain?

25  A    Sure.

1    Q    Continued lack of blood to the brain?

2    A    Lack of blood supply.

3    Q    Blood supply, correct.

4    A    Yes.

5    Q    And that causes the brain to continue to

6         swell?

7    A    The brain first became -- at first it

8         started to swell at the point when the injury

9         occurred.  As a result of brain swelling, it

10        was compromised of blood supply and

11        compromised of oxygen supply.  So, the brain,

12        the swelling of the brain led to these

13        complications.  It was not that these

14        complications occurred before the brain

15        started to swell.

16   Q    But, we reduce the swelling or we curb the

17        swelling by making sure that there is adequate

18        oxygen and blood after the traumatic event,

19        correct?

20   A    I don't know how you do it.  I don't know how

21        your surgeons do it.  They --

22   Q    Is that a yes or no answer?  I am not asking

23        what I do.

24   A    I can't answer that question, sir.  It

25        doesn't make sense to me.

1    Q    Swelling is reduced by making sure that blood

2         and oxygen are adequately provided to the

3         person who has suffered the blunt force

4         trauma, true?

5    A    Possible.

6    Q    And isn't it true, Doctor, that it's really

7         the secondary part, the secondary injuries,

8         that come as a result of loss of blood --

9         excuse me, to cause the brain to swell as a

10        result of loss of blood and oxygen that

11        ultimately lead to the fatality when a

12        traumatic brain injury occurs, isn't that

13        true?

14   A    Loss of blood, sir?

15   Q    Lack of blood and lack of oxygen that causes

16        the brain to continue to swell that causes the

17        fatality in traumatic brain injury cases,

18        isn't that true?

19   A    Only parts of it is true the way you put it.

20        And if you want me to elaborate I can

21        elaborate.

22   Q    Please.

23   A    As I explained earlier, any time there is

24        trauma to the brain, the brain reacts by

25        swelling.  It is that swelling that prevents

1     the continuation of normal circumstances and

2     normal environment for the brain.  That

3     swelling because it goes beyond the confines

4     of the head itself impairs the blood supply,

5     and by so doing it also impairs the oxygen

6     supply.  And then there is a combination of

7     this ongoing process of oxygen deprivation to

8     the brain and pressure on the structures

9     that control the breathing, so that is how it

10    happens.

11        I think your formulation is lacking

12    something, and that's why I can't agree with

13    it a hundred percent, and that's why I

14    cannot answer yes or no, sir.

15  Q  But, the ultimate brain swelling causes the

16     herniation, correct?

17  A  The ultimate -- well the brain swelling causes

18     herniation.  I am not sure what we are

19     talking when we say "ultimate".  The brain

20     swelling starts the moment the head is

21     injured or the brain is injured.

22  Q  Impact, correct?

23  A  Well, if there is an impact, yes.  If there is

24     oxygen deprivation by a pressure of the neck,

25     you don't need an impact.  Then the brain will

1          start swelling because of oxygen deprivation.

2          So, you see there are multiple factors that

3          are possible.  We have to specify them and

4          define them in order to keep the track of --

5     Q    Are you familiar -- I'm sorry.  Are you done?

6          I'm sorry.

7     A    Yes.

8     Q    Are you familiar with the term "diffuse axonal

9          injury"?

10    A    It's called "diffuse".

11    Q    Okay.  "Diffuse axonal injury"?

12    A    It's a misnomer.

13    Q    Okay.  But --

14    A    I am familiar with that.

15    Q    Did Madison McBurney suffer diffuse axonal

16         injury?

17    A    Not in the sense in which this is commonly

18         used.  There certainly was diffuse damage in

19         the brain based on lack of oxygen supply and

20         lack of blood supply, but not in the context

21         where generally in literature people use

22         diffuse axonal injury.

23              People use diffuse axonal injury to

24         point out the mechanical damage to the

25         brain; direct injury to the brain for which

1           there was no evidence in this case.
2    Q    Thank you.  And we certainly know that --
3           assume hypothetically that the impact occurred
4           approximately November 30th at a little bit
5           after seven p.m., she did not pass until
6           December 4th according to your recollection,
7           isn't that true?
8    A    Well, she was shut down from artificial
9           support on December 4th, sir.
10   Q    Okay.
11   A    The question is when the first signs of brain
12          dead occurred, and that's -- that you can
13          track in the clinical records.
14   Q    When did the first signs of brain dead --
15   A    I do not recollect off the top of my head.
16          It is not important for me to know.
17   Q    And you certainly couldn't tell that from your
18          examination, could you?
19   A    That is correct.
20   Q    And let me ask you this, Doctor --
21   A    Yes.
22   Q    -- was there a lucid interval after the
23          impact of Madison McBurney?
24   A    I don't know.  I wasn't there when Madison
25          McBurney sustained the injury.  Only the

```
 1              individuals who were there could define the
 2              presence or absence of a lucid interval.
 3        Q     Okay.
 4        A     Is it possible?  Sure.  And was it there for
 5              a fact, I cannot tell.
 6        Q     What is a "lucid interval" for the Court's
 7              edification?
 8        A     Lucid interval is a situation where after
 9              sustaining a head injury one continues to
10              demonstrate apparent well being and normal
11              functioning.
12        Q     And from your review of the U of M Hospital
13              records, did Madison McBurney have a lucid
14              interval?
15        A     How could hospital records indicate that?  I
16              mean --
17        Q     Do you know or not, sir?
18        A     Number one, even if someone put it in the
19              records, it would make no sense, because
20              only an individual being there and being
21              present could comment to a lucid interval,
22              sir; no one else.
23        Q     So, what's the answer to my question?
24        A     I don't have an answer to your question, sir.
25              Because, quite frankly to me it doesn't make
```

1              sense.

2    Q    Okay.

3    A    So, I can't answer yes or no.

4    Q    Okay.  Let me then dissect a little bit.  You

5         reviewed the U of M Hospital records, correct?

6    A    Yes, back in January.

7    Q    Okay.  And from your review of the hospital

8         records did Madison McBurney have a lucid

9         interval?

10   A    I have no clue.

11   Q    Okay.  Thank you.  Now, you mentioned

12        pursuant to the Prosecutor's questioning that

13        the congenital condition regarding the scalp

14        had no effect on your ultimate determination

15        of whether this was a homicide or not, was

16        that your testimony?

17   A    It had nothing to do with head trauma or the

18        manner of death, that's correct, sir.

19   Q    Did you note in your examination, sir, that

20        she had any kind of an infection in the

21        skull, in the tissue in the skull, in the

22        skin?

23   A    No, sir.

24   Q    Are you familiar with the term "MRSA", a

25        bacterial infection abbreviated?

```
 1    A    Methicillin Resistant Staphylococcus Aureus?

 2    Q    Yes.

 3    A    Sure, yeah.

 4    Q    Any indication whatsoever during your

 5         examination of Madison McBurney that she was

 6         suffering from this bacterial infection?

 7    A    No, sir.

 8    Q    If she did, if she had that infection, would

 9         that impact your findings in any way?

10    A    Well, if a person has staphylococcal infection

11         in the body then it's pretty obvious when you

12         look at the body, when you examine the inside

13         of the body, if there is anything inside of

14         the body.  There is no consideration about

15         that, so the answer is no.

16    Q    My question is, assume that it was in her

17         head, on her head and her scalp.

18    A    I did not find any evidence of that, sir.

19    Q    Okay.  Any evidence of meningitis?

20    A    No, sir.

21    Q    Encephalitis?

22    A    No, sir.

23    Q    The thrombosis, the different areas of

24         thrombosis and the veins, was there any

25         indication, Doctor, that she suffered from
```

```
 1              blood clotting at or near the injury?

 2    A    No, no.  These blood clots appear as a

 3         result of compromised brain function, sir.

 4    Q    Any indication, Doctor, that she had suffered

 5         a stroke at or near the injury?

 6    A    No.

 7    Q    So, we could agree, Doctor, that the fatality

 8         was not caused by a trauma itself, the actual

 9         fatal blow, but the complications that arose

10         from it, is that a fair statement?

11    A    No, it's not a fair statement, sir.  The

12         cause of death is specifically blunt trauma

13         of head and complications.

14    Q    So, then Madison died at the moment of impact?

15    A    I didn't say so.

16    Q    So, that's not a true statement.  She did not

17         die at the moment of impact, correct?

18    A    Well, there is a difference in the question

19         when the child died and what the child died

20         of, sir.  You can't mix them as mangos and

21         papayas with apples and oranges.  So, we

22         have to separate those things, and once we

23         separate those things then you can get a

24         straight answer from me, because then I am

25         able to provide the yes or no as you said.
```

```
 1    Q    All right.  But, we would agree that she did

 2         not -- we agree that Madison McBurney did not

 3         die at the moment the blunt force trauma of

 4         her head, correct?

 5    A    That was obvious; yeah that's quite clear.

 6    Q    Correct.  And she died later as a result of

 7         the complications, correct?

 8    A    That's correct.  But, the complications would

 9         not have occurred had there not been the

10         impact, sir.

11    Q    Do you have an opinion, Doctor, whether she

12         was properly oxygenated after E.M.S. arrived

13         on the scene?

14    A    None whatsoever, sir.

15    Q    Okay.  Do you have an opinion whether her

16         I.C.P. and her cranial pressure was properly

17         monitored at U of M?

18    A    None whatsoever.

19              MR. WHITE:      Thank you.

20              THE WITNESS:   You're welcome, sir.

21              THE COURT:     Redirect?

22                   REDIRECT EXAMINATION

23    BY MR. SKRZYNSKI:

24    Q    Doctor, I just want to cover --

25              THE COURT:     Counsel, I would note that
```

```
 1              recross -- Counsel, I note recross is a right
 2              not often allotted in this courtroom, so you
 3              should feel free to object to any redirect
 4              by the Prosecution that goes beyond the
 5              scope of your cross-examination.
 6                   MR. WHITE:        Thank you.
 7                   THE COURT:        Go ahead Mr. Prosecutor.
 8         BY MR. SKRZYNSKI:
 9         Q    Doctor, you said that you saw no evidence of
10              a shaken baby?
11         A    That's correct, sir.
12         Q    What would you look for to find that?
13         A    Violent shaking as a concept dictates the
14              finding of physical evidence of violent
15              contact with certain parts of the body, and
16              that would be the upper arms, the sides of
17              chest, those areas.
18         Q    What would you look for in those areas?
19         A    Bruises, healing bruises.
20         Q    And there was none of that here?
21         A    That's correct, sir.
22         Q    Okay.  Retinal hemorrhaging, can that be a
23              sign of shaking?
24         A    I think that's -- that is being thrown out
25              scientifically quite a bit ago.  Retinal
```

1      hemorrhages accompany head trauma.  Retinal

2      hemorrhages accompany increased inter-cranial

3      pressure.  They accompany interior circulation

4      in the eyes as a result of brain trauma or

5      various other processes in the brain that

6      include bleeding, spontaneous bleeds in the

7      brain, or for blunt trauma of the brain.

8           So, retinal hemorrhages are not a

9      specific pathognomonic or diagnostic finding

10     of anything other than the altered situation

11     in the circulation of the eye.

12  Q  And that could be caused by the brain swelling

13     as well?

14  A  Oh, it can be caused by -- as a matter of

15     fact, that was described first by Tirson

16     back in at the end of the nineteenth century

17     as a result of brain swelling reacting to

18     hypertensive bleed in an adult.

19          MR. SKRZYNSKI: I have no further

20     questions.

21          THE COURT:    You may step down, Doctor.

22     Thank you for your testimony, you're free to

23     go about your business.

24     (The witness was excused 4:03 p.m.)

25          THE WITNESS:   Thank you, Your Honor.

1        MR. SKRZYNSKI: At this time, we would

2    simply move -- Your Honor I want to mark as

3    Proposed Exhibit Number Two, a certification

4    of a document, which is the criminal case,

5    the result of the criminal case in 1998 in

6    Wayne County Circuit Court, the Third

7    Judicial Court, where it sets forth the plea

8    and conviction for Second Degree Child Abuse

9    to which Detective Sumner testified during his

10   testimony a couple weeks ago as to Mr.

11   McBurney, and as a result of the treatment

12   of the child in 1998, which he mentioned in

13   his statement to Detective Sumner.

14   (People's Proposed Exhibit Number Two,

15   Certified Conviction from Wayne County

16   Circuit Court from 1998 concerning Mr.

17   McBurney, introduced at 4:03 p.m.)

18        THE COURT:     Counsel, what is your

19   position on the fact that he has proffered

20   asking me I think to take judicial notice.

21        MR. SKRZYNSKI: I am offering this under

22   803.8 Public Record and 902.4, which is the

23   self-authenticated document.

24        THE COURT:     Well, it may be both of

25   those things, but it isn't also something I

1          can take judicial notice of flatly.

2               MR. SKRZYNSKI: It is; it is also.

3               MR. WHITE:     But, it's not relevant to

4          this case, so --

5               THE COURT:     What's the relevance Mr.

6          Prosecutor?

7               MR. SKRZYNSKI: It corroborates the

8          testimony of Detective Sumner when he

9          testified that the Defendant had admitted to

10         shaking and man-handling his son in the 1998

11         case, and knowing that he had caused

12         injuries to that child in that case.  And it

13         also corroborates Detective Sumner's

14         testimony that the Defendant ultimately pled

15         guilty to Second Degree Child Abuse in that

16         case.

17              MR. WHITE:     I believe Detective Sumner

18         testified that the statements of Steven

19         McBurney were that he had Nicholas on his hip

20         and bounced him too hard.

21              THE COURT:     What he is essentially

22         arguing is that he wants this to be seen to

23         go through one of the elements that he is

24         arguing about your client's knowledge.

25              MR. WHITE:     I agree; yes.

1         THE COURT:    And he is arguing, as I

2    understand it, his previous legal experience

3    with regard to injury done to a child and

4    its' impact on his life would go to his

5    knowledge if I understand his theory.

6        MR. SKRZYNSKI: That's correct, Your

7    Honor.

8        THE COURT:    Respond directly to that,

9    because this is clearly something I can take

10   judicial notice of, so it's only a question

11   of relevance.

12       MR. WHITE:    Sure, you can take

13   judicial notice of it.  The question is,

14   that's Second Degree Child Abuse.

15       THE COURT:    I agree.  Basically, I

16   see it as corroborative as he argued of the

17   officer's testimony, that the Defendant did

18   make some statements in regard to activities

19   that resulted in him being convicted of

20   Second Degree Child Abuse.

21       MR. WHITE:    That doesn't have

22   anything to do with knowledge.  It's not

23   relevant.  This is an allegation of knowingly

24   and intentionally causing serious physical

25   harm.

1          THE COURT:     The Prosecutor's request

2    under advisement, it's clear that I can take

3    it.   I can receive this under taking judicial

4    notice of an action of another court, I can

5    receive the documents as a reflection of that.

6          MR. WHITE:     Can I just give you a

7    cite, CJI.2nd.17.20(3) the Standard to Find

8    the Defendant Guilty of Child Abuse Second

9    Degree, which that is a conviction of, a Plea

10   of No Contest that Defendant did some

11   reckless act.

12         THE COURT:     I think the Prosecutor is

13   arguing and the Defense arguing in this

14   matter goes back and forth as to how the

15   Court should view the prior actions of the

16   Defendant with relation to the action that

17   resulted in -- what the Prosecutor is

18   attempting to establish was the murder of

19   this child that day.   I sort of lean the

20   Prosecutor's way there, but I want to think

21   about that one.

22         So, it's clear on this matter that I can

23   take judicial notice of it, I am going to

24   hold it under advisement as I sort of think

25   on this a little bit more.   Go ahead, Mr.

1        Prosecutor.

2            MR. SKRZYNSKI: In addition, Your Honor,

3        I have marked as People's Proposed Exhibit

4        Number Three, records from Children's

5        Hospital of Michigan which document the

6        admission of Nicholas Kennedy who was the

7        victim in the 1998 abuse case.  And it shows

8        an admission date of 2/27/98, and subsequent

9        discharge date as well; I can't see what that

10       is.  But, it documents -- I am submitting

11       both pages of that record.  Counsel has

12       indicated that he would stipulate to the

13       business record foundation so that the keeper

14       of the records at the Children's Hospital is

15       not necessary to be here to testify that

16       these are medical records kept in the normal

17       course of the business of the hospital.

18           And I am asking for admission of four

19       pages; the face sheet of the case, which

20       identifies the patient, and three other

21       documents which indicate the discharge

22       summaries of the patient, and document the

23       injuries that were suffered by Nicholas

24       Kennedy in 1998 to which the Defendant

25       admitted he had committed or caused when he

1     spoke with Detective Sumner.  These are

2     offered to demonstrate the knowledge of the

3     Defendant regarding the serious injuries that

4     can be caused to an infant upon rough

5     treatment of that infant.

6         It is offered to show his knowledge,

7     because one of the elements of First Degree

8     Child Abuse which is predicate felony for the

9     felony murder case is that he must knowingly

10    or intentionally inflict serious harm;

11    serious injury to the victim.  And this shows

12    that he does know that serious harm can

13    result from such rough treatment.  And

14    certainly throwing a baby two feet away into

15    a crib, banging its' head constitutes that

16    kind of rough treatment for which he knows

17    that serious injury can result.

18        I am offering this to demonstrate his

19    knowledge, and I am offering it under the

20    business records exception, and pursuant to

21    the memorandum that I wrote to the Court and

22    the new case that I cite for the Court

23    today, the case of Kirtdoll, a Michigan

24    Supreme Court case from 1974.  I am also

25    arguing that this business record does not

1          infringe on the Defendant's Sixth Amendment

2          Right to confront the witnesses under the

3          analysis of U.S. Supreme Court in the

4          Washington against Crawford case.

5          (People's Proposed Exhibit Number Three,

6          Records from Children's Hospital re: 1988

7          case re: Steven McBurney, introduced)

8                THE COURT:      Thank you.  Response?

9                MR. WHITE:      First of all, Judge,

10         regarding the statements that Mr. McBurney,

11         my client, admitted to causing specific

12         injuries to Nicholas Kennedy in March of

13         1998, that's absolutely not founded in the

14         record.  The statements by the police

15         officer were that Mr. McBurney admitted

16         bouncing Nicholas on his hip, shaking him,

17         and causing injuries.  The specific date of

18         interview was March 2nd, 1998.  Some of the

19         -- three of the documents that the

20         Prosecutor seeks to admit are not dated until

21         the day after.  That's a correction of the

22         factual record.  The legal argument, though,

23         is does the admission of these documents

24         violate my client's right of confrontation

25         under the Sixth Amendment, and I believe it

1      does.  Because, in that case, the balance --

2      the medical records will show that on

3      February 27th Nicholas was admitted, on

4      February 28th there was a report made by a

5      doctor that suspected child abuse and that

6      report then was sent to F.I.A. to begin

7      their investigation.  And the documents that

8      are -- and from that point on, from February

9      28th, 1998 through his discharge date of

10     March 3rd, are littered with references to

11     medical and legal terms substantiating child

12     abuse allegedly at the hands of Mr. McBurney

13     for the purpose of ultimately proving the

14     case by the Family Independence Agency, Child

15     Protective Services Unit, and ultimately the

16     Wayne County Prosecutor's office.

17         Once that report was made of suspected

18     child abuse, it certainly was within that

19     definition of Crawford that says statements

20     that were made under circumstances that would

21     lead an objective witness reasonably to

22     believe that the statement would be available

23     for use at a later trial.

24         Certainly, Judge, other than page one of

25     the Prosecutor's Proposed Exhibit, which is

1    the admission record, the other three pages

2    are the discharge summary.  All three of

3    those other pages made after this report of

4    suspected abuse, made after Detective Sumner

5    provided a plethora of information, which is

6    clearly reflected in the records, were made

7    in anticipation -- would it be reasonable

8    for a person to assume that their findings

9    were going to be used in a child abuse case

10    later at trial and in a Prosecutorial sense?

11    Absolutely Judge.

12       Now, the case of The People versus

13    Lonsby, 268.Mich.Ap.375, now that

14    specifically has to do with a crime lab

15    work-up that was introduced into evidence

16    under the business records exceptions.  And

17    the person who did the work-up did not

18    testify; it was barred.  But, on page 391 of

19    Lonsby, there are notations and out-of-court

20    cases, People versus Hernandez out of New

21    York, Los Vegas versus Walsh, People versus

22    Rogers out of Pennsylvania -- excuse me, New

23    York, and the Commonwealth versus Carter out

24    of Pennsylvania, all have to do with medical

25    legal tests.

1          Medical tests in the sense that they are

2     being conducted in a medical setting, but

3     ultimately for a legal purpose.  And this

4     clearly on all of those cases, those tests

5     were held in violation of the accused Sixth

6     Amendment Right.  And this is the same in

7     this case.  You have medical tests being done

8     for the purpose of ultimately a legal

9     process, and I believe that the discharge,

10    the three pages, which include references to

11    medical/legal terms are clearly in violation

12    of my client's rights under Crawford.  So, I

13    think that they should be -- and I request

14    that they should be excluded.

15          THE COURT:      Response?

16          MR. SKRZYNSKI: Your Honor, Crawford

17    talks about statements that are testimonial,

18    and the Court cites a long history of those

19    kinds of statements.  And the Court talks

20    about things like depositions given before

21    Magistrates, talks about statements being

22    taken by police, it talks about ex-parte

23    examinations of people taken by officials.

24    In other words, it talks about statements

25    that are made in an official capacity

1     designed specifically to accuse.

2          The statements that are contained in

3     these medical records are diagnosis of a

4     condition of a sick child that is brought

5     into a medical facility that is designed to

6     do medical work. The cases that the Defense

7     cites have to do with crime labs, police

8     crime labs, that are doing work for the

9     police in --

10         THE COURT:    I am aware of what he is

11    talking about.

12         MR. SKRZYNSKI: All right. That's not

13    what is going on here. The -- another thing

14    the Court says is that the information can

15    not have been gleaned in an adversarial

16    process. The examination of a sick child by

17    a doctor for purposes of diagnosing what the

18    problem is and treating the problem is not

19    information that is gleaned in an adversarial

20    circumstance. It's a medical circumstance,

21    they are making medical findings.

22         I cite to the Court several cases, only

23    one of which is published. But, these are

24    instructive cases, these have to do with the

25    admission specifically of hospital records

1          that have to do with diagnosis of physical

2          conditions.  And, in those cases, the Court

3          said that these -- in each of the cases, the

4          Court says that the findings in those

5          medical records are not the kind of

6          testimony that the Court in Crawford is

7          addressing.  The ex-parte examinations by

8          Magistrates or Police Officers, the context

9          in which they are done is designed to

10         diagnose a problem and to give medical

11         treatment.  That's exactly what these records

12         -- now I have redacted any reference to how

13         these injuries occurred.  But, the injuries

14         themselves are the product of physical

15         examinations of a physical body.  The

16         Court in The People against Miller case, the

17         unpublished Court of Appeals case which I

18         gave to the Court, talked about a medical

19         examiner who was allowed to testify to the

20         findings of some neuropathologist to who he

21         had submitted brain tissue that he obtained

22         from an autopsy that he was performing.  And

23         those neuropathologists had done a study of

24         that brain tissue, come up with some

25         opinions, submitted that back to the medical

1   examiner, and he incorporated those medical

2   opinions into his own and gave his opinion

3   about the cause and manner of death.  And

4   the Defendant objected and said that him

5   testifying to those medical records that were

6   submitted by the neuropathologist was a

7   violation of the Sixth Amendment Right to

8   confront those neuropathologists.

9        The Court in that case said, look, these

10  were physical observations made by doctors on

11  real physical evidence, and done at the

12  request of another doctor to diagnose the

13  cause of death, the actual physical reasons

14  that the person died.  And the Court in that

15  situation held that these statements from

16  these neuropathologists were not testimonial

17  statements.  They were not the kind of

18  statements that the U.S. Supreme Court was

19  concerned with in Crawford.  The type of

20  ex-parte examinations by people in

21  adversarial settings and litigious settings,

22  these were observations made by doctors on

23  tissues that they were examining.  And the

24  Court pointed out that these are not

25  Affidavits, these are -- this was physical

1          observation of physical evidence.

2             And for that reason the Court in Miller

3          said, this is not a violation of his Sixth

4          Amendment Right to Confrontation, these

5          reports of neuropathologists are not

6          testimonial as the Crawford case was

7          concerned with.

8             Likewise, in this case, these records from

9          Children's Hospital document the physical

10         injury that this child had based on physical

11         examinations by the doctors in a medical

12         context for a medical purpose.  Those things

13         are analogous to the neuropathology opinions

14         that were submitted in the Miller case, which

15         the Court said were not testimonial.

16           There are several other cases that I

17         cite.  Specifically, there is a case called

18         Brown, Commonwealth against Brown, it comes

19         from Virginia.  It is an unpublished case,

20         too, but I think that its' reasoning is

21         instructive.  In that case, the Defendant is

22         charged with Rape and several other related

23         charges.  And the victim in that case was

24         examined by a S.A.N.E. Nurse, s-a-n-e, and

25         that's -- S.A.N.E. stands for a certain type

1          of nurse, but it's a nurse examiner who is

2          like a forensic examiner.  And the Court --

3          the Prosecutor in that case offered the

4          report of the S.A.N.E. Nurse who had

5          examined the rape victim because that nurse

6          had died.  And so the Prosecutor was just

7          offering that report; he had redacted all of

8          the opinions of that nurse, and what was

9          left was simply the physical observations

10         that the nurse made.  And the Court in the

11         Brown case said that the physical

12         examinations were not the type of thing that

13         Crawford was concerned with.  The Court said

14         the fact that is identified in Crawford that

15         would compel to suppress the evidence are

16         not present.  The report contained no

17         accusations, just like the medical records

18         here.  It was the result of physical

19         examination of the victim, that's exactly

20         what the report here is.  It reports the

21         injuries, that's what this report does.  It

22         does other things; indicate the tissue and

23         the biological samples taken, and these

24         things were submitted for laboratory

25         analysis.  The Court says that these were not

1      derived from information gathered in an

2      adversarial setting.  And that's exactly what

3      we have here.  This is not information

4      gathered in an adversarial setting.

5           In that case, the Court said, for the

6      reasons stated we find that the same report

7      as redacted does not implicate the Sixth

8      Amendment concerns raised in Crawford, and

9      they allow that it should have been let in.

10     So, you can say the same things about the

11     hospital records that are here in this case.

12          In addition to that, that Court, the

13     Virginia Court, cited a New York Court in a

14     foot note and stated on page four of four,

15     the copy that I gave you, it said the use of

16     these records as evidence in a homicide case

17     does not mean that they were composed for

18     that adversarial purpose, or that their use

19     by the Prosecution is the inevitable

20     consequence of their composition.

21          Obviously, criminal cases involve the

22     use of medical reports all the time.  But,

23     just because ultimately a Prosecutor may use

24     it in order to get evidence against the

25     Defendant doesn't mean that that was the

1       purpose for which it was created.  Crawford

2       is concerned about the purpose for which

3       statements are made.  It can't be said in

4       this Children's Hospital record that the

5       statements of these doctors, the diagnosis of

6       the injuries to the child that were made were

7       done for the purpose of giving evidence in a

8       criminal case.  The fact that they are

9       incidentally used for that purpose doesn't

10      mean that that's why they were created.

11          And the whole question in Crawford is

12      why the person is saying what he is saying.

13      That's what makes the person either

14      trustworthy or not.  That's what makes the

15      person someone who the Defense has to

16      cross-examine versus someone that they don't,

17      because what they are saying is trustworthy.

18          The Court has also said that -- I cited

19      the case of United States against Garner,

20      that's a Federal Court of Appeals from the

21      Sixth Circuit; that's our Circuit.  And

22      that's unpublished, but the Court there it

23      cited to a case called the United States

24      against Kromer, and in that case the test

25      was whether the declarant intends to bear

1     testimony against the accused.   That intent

2     may be determined by whether a reasonable

3     person in the declarant's position would

4     anticipate a statement being used against the

5     accused in investigating and prosecuting the

6     case.   And the Court there said about the

7     records that were offered there, the records

8     at issue were prepared at the Defendant's

9     request.   The physicians involved were not

10    preparing the reports in the context of a

11    criminal prosecution, and had no reason to

12    anticipate that their statements were being

13    used against the Defendant.

14         The introduction of these non-testimonial

15    medical records thus did not violate Garner's

16    rights.   This is the Sixth Circuit talking in

17    our own jurisdiction.   The case   here is very

18    similar.

19         Finally, in the case of Richardson

20    against the State, this is an Indiana Court,

21    again unpublished, but instructive.   The

22    Court there said that -- it cited the

23    Crawford case and said that the Supreme

24    Court did comment on existing hearsay

25    exceptions stating most -- this is Judge

1          Scalia's words, most hearsay exceptions,

2          covered statements, that by their nature were

3          not testimonial; for example, business

4          records.  And that's exactly what we have

5          here.  The Court in that case went on to say

6          that we find no persuasive reason pointed to

7          by the Defendant to cause us to disagree with

8          the Supreme Court's Rule as stated in

9          Crawford that business records by their very

10         nature are not testimonial.

11         So, to begin with, because this is a

12         business record from Children's Hospital, it

13         is by it's very nature even under Justice

14         Scalia's view to be not testimonial.  And it

15         doesn't offer any ex-parte statements that --

16         THE COURT:     Actually, I thought that

17         that was Roberts -- not Roberts, I'm sorry,

18         Renquist's position rather than Scalia's.

19         MR. SKRZYNSKI: Well, you could be right.

20         You are right.  I think you are right.

21         Anyway, it came out of the Crawford case

22         itself.

23         THE COURT:     It did.

24         MR. SKRZYNSKI: And it mentioned that

25         these are business records -- are usually not

```
 1            testimonial.  And there is nothing -- again,

 2            I could submit records which have hearsay

 3            inside of them and that may lead to

 4            objection, and there has to be separate

 5            hearsay exceptions.  In those cases -- in

 6            those quotes inside of business records have

 7            to be analyzed in terms of Crawford, too.

 8            But, that's not what I am offering here.  I

 9            am specifically offering only the diagnosis

10            of the injury that the child had.

11                 Again, these are medical impressions of

12            physical findings.  The Miller Court has said

13            -- all these courts have said the same thing,

14            that that kind of testimony when you are

15            talking about diagnosis, the actual physical

16            findings that come from a physical body,

17            that's not the kind of testimony that is

18            considered testimonial under Crawford.  That

19            doesn't implicate the Sixth Amendment.  It

20            doesn't offend the Sixth Amendment.  And,

21            again, I urge the Court to read the Kirtdoll

22            case, that was the case in 1974 --

23                 THE COURT:    I have read what you

24            have given me.

25                 MR. SKRZYNSKI: Okay.  But, it did analyze
```

1          specifically hospital records in relation to

2          the Sixth Amendment's confrontation clause,

3          and said that they are admissible, they don't

4          offend, and cited a number of reasons why.

5          And they did, like I said, that whole

6          analysis was in light of the Sixth

7          Amendment's confrontation clause.  So, that's

8          -- our Supreme Court ruled on that and they

9          came to about the same conclusion regarding

10         business records, and for the reasons that

11         were stated in those -- in that opinion.

12             That opinion states -- it also cites

13         Wigmore on evidence and another very famous

14         treatise on evidence in which those

15         professors commented the reason that those

16         records are reliable and could be business

17         record exceptions to the hearsay rule is

18         because a doctor in treating a patient, that

19         the patient's health, the patient's life may

20         depend on the -- not only the accuracy of

21         the doctor's observations, but in his

22         accuracy in recording it so that other

23         doctors who would also be treating that

24         patient, but who can't talk to the original

25         doctor, would have access to the correct

1    information.  It's vital information that's

2    got to be right in order to treat the

3    patient.

4        It's not information that is designed to

5    convict the Defendant or to help the

6    Prosecutor.  It is information that is

7    designed to treat the patient.  And so it's

8    totally different from the testimonial

9    evidence that Crawford is concerned about and

10   rightfully so.

11       And for those reasons, Judge, I think it

12   does not offend Crawford, it is a business

13   record exception and it does have relevance

14   in this case in that it reflects the

15   Defendant's knowledge of the seriousness of

16   the injuries that can be caused by the

17   maltreatment of an infant.  And for all those

18   reasons I ask that the Court allow them in.

19            THE COURT:     Response.

20            MR. WHITE:     I think the problem lies

21   is that the People would like to suggest to

22   the Court that the medical records being

23   proffered are antiseptic, they are merely for

24   showing medical condition; and that's hardly

25   the case, because if it was merely offered

1    to show the medical condition of a child then

2    there would have never been any police

3    involvement with the hospital or hospital

4    personnel making statements about what Mr.

5    McBurney allegedly said.  And they certainly

6    wouldn't have been a referral to the Family

7    Independent Agency regarding suspected child

8    abuse.  And there certainly wouldn't have

9    been a referral to the Prosecutor, the local

10   Police Department, regarding a child abuse

11   investigation; all which occurred prior to

12   the last three pages of the Prosecutor's

13   Proposed Exhibit occurring.

14        At the point of the referral, it became

15   not only a medical process, it became a

16   prosecutorial process also.  It became a

17   child abuse prosecution.  It became

18   inseparable.  You cannot say that it was

19   merely for medical purpose.  The Prosecutor

20   generously offers to redact alleged

21   statements made by my client, but it is so

22   permeated in the documents that they seek to

23   introduce that you cannot redact it, Your

24   Honor.  You cannot.

25        You cannot redact medical legal terms in

1          its' use by doctors.  You cannot say, "Well

2          it was merely for examination and medical

3          purpose", because the whole purpose of the

4          documents being prepared -- excuse me, not

5          the whole purpose, but a primary purpose was

6          for a prosecution for child abuse, not just

7          treatment of a child.

8              The cases -- the Miller case that the

9          People rely on has to do with consulting

10         neuropathologist's report that the

11         neuropathologist did not testify, it was

12         referred to by another pathologist as part of

13         the People's case and they said that is not

14         testimonial.  But, you should also note

15         Judge, that is an unpublished opinion and

16         that the Court --

17             THE COURT:      I do know that.

18             MR. WHITE:      The Court held that it's

19         dicta anyway since the Defendant's expert

20         witness relied on the same report to make his

21         findings and conclusions to the Court.  So,

22         that really has no, you know, preferential

23         value to the Court.

24             The case in which the same report was

25         made, the rape kit by the nurse, redacted

1     from that report where the doctor's opinions

2     and statements allegedly made by the victim

3     and we don't have that either.  So, this is

4     not just merely a medical diagnosis, there is

5     medical legal terms being proffered to the

6     Court that go beyond treatment and diagnosis.

7          The Miller -- excuse me, the Sixth

8     Circuit Court case, the Garner case, was the

9     woman's own medical records that were being

10    offered by the Prosecutor to show that in

11    her claim that she had worked for the Post

12    Office and then she took a disability and

13    that was to refute her own claim that she

14    was disabled at the time she was taking

15    benefits from the Post Office and working on

16    the side.  It had nothing to do with any

17    prosecution whatsoever.

18         In each one of the cases that are cited

19    and Lonsby being the footnote, the

20    out-of-state cases, there was a medical

21    purpose and there was a legal purpose.  The

22    collecting of blood in Los Vegas versus

23    Walsh.  A blood test in People versus

24    Rogers, and excuse me in Commonwealth versus

25    Carter it has to do with a test regarding

1      presence of drugs; a combination

2      medical/legal, and that's exactly what we

3      have in this case Judge.

4          You can see from the testimony of the

5      medical examiner in this case that one's

6      diagnosis about injuries is subject to a

7      variety of different interpretations and

8      that's why the right under the Sixth

9      Amendment to confront the witness against you

10     is so important, because what is given face

11     value may not have that kind of substance

12     behind it.  And so if the Prosecutor thought

13     it was so absolutely necessary as part of

14     this case that the doctor's diagnosis in the

15     prior case come in, then why wasn't the

16     doctor presented so we could cross-examine

17     that doctor.  Because, remember he is saying

18     that he is using a prior case, the People

19     are saying they use this prior case to show

20     knowledge.

21         The prior case involves conviction to a

22     reckless act, not intentional and purposeful

23     harm.  So, I can't see how that would

24     support the People's position.  The medical

25     support for the position that there was an

1          intentional act in the 1998 case certainly

2          would be subject to cross-examination as it

3          was and it should have been in this case

4          also.  So, Your Honor, to say that we can

5          have this admitted to show knowledge when

6          knowledge was not the component in the prior

7          case, but use it to show knowledge in this

8          case without having the right to

9          cross-examine that critical witness I don't

10         believe comports with our Constitutional

11         Rights.

12              And, I believe, under the Michigan Court

13         of Appeals, this jurisdiction's

14         interpretation of Crawford in this state even

15         though there is not a case directly on point

16         that I can find, the combination of the

17         medical legal part of it renders it

18         excludible under Crawford.

19              Again, once the referral was made, which

20         was mandatory, then it became a legal case

21         also.  And, is it conceivable that the

22         statements that were made under circumstances

23         would lead an objective witness reasonably to

24         believe that the statement would be for use

25         -- used later at trial is certainly within

1      that definition. The discharge summary, the

2      last three pages, are clearly within that

3      definition. There was going to be a child

4      abuse proceeding, there was going to be a

5      child abuse prosecution, and that was part of

6      the reason it was being prepared.

7           MR. SKRZYNSKI: Judge, could I just

8      respond to one thing he is saying?

9           THE COURT:     Sure.

10          MR. SKRZYNSKI: Because, he has a clear

11     misunderstanding of -- and I don't know why,

12     but he has a clear misunderstanding of what I

13     am trying to offer these records for. I

14     keep saying to you, and I hope he hears it

15     this time, that the knowledge I am talking

16     about --

17          MR. WHITE:     Wait, wait, I -- wait --

18          THE COURT:     All right.

19          MR. WHITE:     It's nothing personal.

20          THE COURT:     Whether he understands it

21     or not, I guess, is unimportant to me.

22          MR. SKRZYNSKI: All right.

23          THE COURT:     It is whether I

24     understand.

25          MR. SKRZYNSKI: All right. The knowledge

1      I am talking about has to do with the

2      knowledge of the seriousness of the injury.

3      It has nothing to do with the intentional or

4      unintentional act.  And the fact that the

5      Second Degree Child Abuse doesn't involve an

6      intentional act is irrelevant; it involves

7      serious injury.

8           The knowledge I am imputing to the

9      Defendant through his prior experience in

10     doing the same -- a similar kind of thing, is

11     the knowledge that he will cause a serious

12     injury; that's all.  Not that he is doing an

13     intentional act.  It's that he knows he is

14     going to cause a serious injury.

15          Furthermore, the other point I wanted to

16     make is that when a crime lab is doing a

17     report they are doing it at the behest of

18     the police.  The taking of blood in these

19     other cases was done at the behest of the

20     Prosecutor in order to aid the prosecution.

21     And you can't possibly say that just because

22     somebody at the hospital filed a 3200 form

23     with the -- well whatever entity it was at

24     that time, makes this a legal case as far as

25     the doctors are concerned, and that they may

1          skew their diagnosis or they may falsify

2          their diagnosis in order to convict the

3          Defendant.

4             I mean, that's basically what we're

5          saying.  That if they are making this

6          statement to the police at the request of

7          the police in order to help investigation of

8          the case or help to prosecute the Defendant,

9          the worry is in Crawford and elsewhere that

10         they are going to skew their testimony.

11         That their testimony is not reliable, because

12         the police are involved, they are making

13         their statements for the police.

14            Just because somebody got Social Services

15         involved in this case doesn't mean that the

16         diagnoses that were being made of this child

17         by these doctors was done at the behest of

18         the Police.

19            As I quoted that Brown case, the Brown --

20         Commonwealth against Brown case, they cite a

21         New York case that said just because

22         eventually somebody's medical report might be

23         used as an exhibit doesn't mean that that's

24         why it was created.  It is used incidentally

25         as an exhibit, but the main reason it's

1       created is to help to diagnose and treat a

2       medical condition.  That's the important

3       part, and that's why it's reliable, that's

4       why it's not testimonial.

5              THE COURT:     Reliability is no longer

6       the test under Crawford, Hammond, and Davis.

7              MR. SKRZYNSKI: I understand.

8       Testimonial is; but that's why it's not

9       testimonial is because it's not done in an

10      adversarial condition, it's not done by an

11      official Magistrate or an official, it's not

12      done in that kind of a context.

13             THE COURT:     Nine-one-one (911)

14      operator is not a Magistratical Official

15      position either.  All right, this matter

16      comes before the Court on the admissibility

17      of documents and an objection based on the

18      new doctrine that has come out of a series

19      of cases out of the United States Supreme

20      Court that sort of in short hand, and I

21      think by a number of people, is Crawford,

22      Hammond, and Davis.  It's Washington versus

23      Davis, and Indiana versus -- or I'm sorry,

24      Washington versus Crawford, and I think it's

25      Indiana versus Davis; or perhaps Washington

1       versus Davis.

2           It's real clear to me that the Supreme

3       Court in that has changed the ground works

4       of confrontation in this country. The old

5       Robert's Test is clearly dead; just

6       absolutely dead and reliability is not the

7       issue. And I don't think any Court that

8       makes a ruling and uses the old Davis

9       language of reliability will be sustained in

10      its' analysis. It may ultimately be

11      sustained in its' result, but not in its'

12      analysis.

13          It's equally clear to me that Crawford

14      and Hammond and Davis do not in any way,

15      shape, or form define what the Supreme Court

16      has meant by this, and that it is going to

17      take years to figure it out, because in just

18      a simple review of the cases in this area,

19      some of which were cited by Counsel; your

20      Courts are all over the map. The analysis,

21      and I have read some of it just in

22      preparation for this, it's just everywhere.

23          There doesn't seem in my research to be

24      any case dealing with hospital medical

25      records that I can find that are post

1   Hammond/Davis that have any analysis that is

2   worth citing on this record, and I really

3   don't think that Counsel has provided me any

4   that I would regard dealing with the issue

5   that is right squarely in there.  And I

6   think both the Prosecutor and Defense Counsel

7   have touched on it, and I think the

8   Prosecutor has clearly seen it in his

9   argument that the question under Davis is how

10  far does it extend when it comes to the

11  question of confrontation and individuals.

12      I think it's fairly clear to say that a

13  statement to a family member doesn't fall

14  under the current doctrine that this Court,

15  at least as far as I understand, that a

16  Police Officer, an extension of a Police

17  Officer clearly does.  A 911 Operator is the

18  core of the Davis case.

19      I think a fair way, one of the fair ways

20  one could define the limitations of Davis, is

21  that it applies to individuals who work for

22  the government.  I would think lab reports,

23  autopsies, those such documents when prepared

24  by government in the course of either legally

25  mandated acts that could result in use at

1      criminal prosecutions, I believe really

2      clearly fall within the reasoning of this.

3          Any question about that?  Ultimately, I

4      may prove to be wrong, but I don't think how

5      you cannot read those string of cases and

6      not clearly come to an understanding that

7      investigatory work that is either legally

8      mandated or done in preparation of criminal

9      investigation fall within that purview.

10          There is a series of cases that say it,

11      but I recognize that if there is a series of

12      cases that go the other way.  There is a

13      series of cases on laboratory reports and

14      they are all over the map.  But, if you read

15      them, and I have, I am persuaded that the

16      Supreme Court's decision in State versus

17      Birchfield, it's an Oregon Supreme Court

18      decision that holds that a lab report without

19      the testimony of the person preparing it is

20      violation of confrontation.  The reasoning on

21      that is just powerful.

22          Whereas, if you look at the Supreme

23      Court's decision in People versus Cage it

24      goes exactly the opposite way.  At best, I

25      think can be characterized as highly into

1    confusion that comes out of this.  If you

2    look at this, the Court in trying to

3    interpret Davis found that the statements

4    were non-testimonial, because the doctors

5    were not coordinated in their testimony with

6    law enforcement.  Even though they clearly

7    had an understanding of what they were doing

8    could be used by law enforcement.  And they

9    rely on this sort of structure versus

10    non-structure argument that has arisen since

11    Davis and I just don't see that that argument

12    -- I don't see how you call a 911 call which

13    is the analysis that the Supreme Court

14    brought to Bear, a structured environment, I

15    don't see this.  So, as I look at this, I

16    see a great deal of confusion out there.

17        But, there is one thing that strikes me

18    about the California decision that I think I

19    have to deal with in this case.  The Supreme

20    Court holds that Davis doesn't extend, and I

21    am speaking about the Supreme Court decision

22    now, doesn't extend to a doctor's question

23    when it's made for purposes of obtaining

24    medical treatment, and therefore any

25    statement given then would be

1       non-testimonial.  I don't find anything in

2       the Supreme Court's decision that suggests

3       that.

4           But, I cite it to say because I think

5       that it is an opinion that touches on the

6       issue that we are talking about here.  It's

7       a different set of circumstances, but in

8       that case the Supreme Court said quite

9       explicitly that a doctor's request for

10      information for treatment purposes does not

11      fall under the purview of Hammond and Davis,

12      but the Supreme Court in doing that

13      explicitly said that the statement -- that

14      it rejected the view that a statement could

15      be testimonial if a reasonable declarer could

16      expect it to be used prosecutorially.

17          That really diverts from the whole

18      thrust of the Davis case, which is why I

19      don't believe that it's accurate.  And I get

20      to say this, even though they are obviously

21      wiser than I am because they are in the

22      California Supreme Court.

23          I am satisfied that the better view is

24      if the record is made mandatory, and I am

25      speaking of government or medical personnel

1    who are not connected to the Police; if the

2    requirement of the document, if there is a

3    requirement that the document be made by

4    law, there is an understanding that such a

5    document could be used in subsequent

6    prosecution.  And, in fact, it would have to

7    be reported, then I do not see how that

8    document can avoid a Davis analysis.  And I

9    think any Davis analysis on that would find

10   it to be testimonial, and in absence of the

11   witness I will not allow it in.  The

12   objection is upheld.

13       MR. SKRZYNSKI: Judge, then I would like a

14   recess of this matter so that I can produce

15   the doctor that did the M.R.I.

16       THE COURT:    Approach the bench.  In

17   fact, I want to see both Counsel in chambers.

18   (The Court in recess at 4:50 p.m.; the Court

19   reconvened at 5:02 p.m.)

20       THE COURT:    All right.  We're back on

21   the record.  I understand that the

22   Prosecution has decided not to call the

23   witness, is that correct?

24       MR. SKRZYNSKI: That is correct, Your

25   Honor.

1      THE COURT:      And you have no other

2  witnesses to proffer, is that correct?

3      MR. SKRZYNSKI: That is correct, Your

4  Honor.

5      THE COURT:      All right.   Motion -- are

6  there any witnesses for the Defense?

7      MR. WHITE:      None, Your Honor.

8      THE COURT:      Motion.

9      MR. SKRZYNSKI: Your Honor, I move at

10  this time to bind over on charges of First

11  Degree Felony Murder and First Degree Child

12  Abuse.

13      We had testimony from Heather McBurney,

14  the mother of the child, that the Defendant

15  was in care of the victim.  And that we

16  further had testimony that he knowingly

17  caused serious harm.  There was testimony

18  about the fact that he told Detective Sovik

19  that he took the baby and threw the baby

20  into the crib two feet away, that the baby

21  hit the rails of the crib with its' head and

22  immediately started to seize and then shortly

23  thereafter the baby went limp and he called

24  911.

25      He has had previous experience doing the

1       same kind of a thing and causing injury to a

2       child.  He knew that, and anybody would know,

3       that throwing an infant two feet away into a

4       crib is likely to cause serious harm to the

5       kid and that's exactly what happened.  We

6       also have testimony by Heather that the child

7       was only 11 months old, so that's under 18.

8           The testimony of Dr. Dragovic reflected

9       that the baby died as a result of blunt

10      force trauma and the complications.  And the

11      doctor explained extensively what those

12      things were, including the fact that the

13      brain swelling led to death of the brain

14      stem, which led to brain death, which

15      ultimately is the cause of death here.

16          As far as felony murder is concerned,

17      there is no question that the Defendant

18      caused the death of the child.  And no

19      question that out of the three intents that

20      are necessary for Second Degree Murder that

21      he at least created a very high risk of

22      death or great bodily harm knowing that death

23      or great bodily harm was the likely result.

24      And he did this in the course of committing

25      a First Degree Child Abuse, which I said

1    before has been shown by the People, and

2    there of course was no justification or

3    excuse, or anything that would reduce this to

4    a lesser crime.

5         For those reasons, Judge, I am asking to

6    bind him over on First Degree Felony Murder

7    and First Degree Child Abuse.

8         THE COURT:        Response.

9         MR. WHITE:        Yes, Your Honor.    The

10   quantum leap that the People ask you to make

11   is finding probable cause that a statement

12   made by Steven McBurney that -- supposedly

13   to Sergeant Sovik that he threw Madison from

14   two feet away into her crib and her head hit

15   the wood is enough to -- for you to conclude

16   that he knowingly and intentionally caused

17   serious physical harm to this child.

18        This is the crib -- this is the padded

19   crib, pad around, and a mattress at the

20   bottom.  We would have to say that this is

21   as of throwing a child on concrete, throwing

22   a child out of a car, throwing a child onto

23   a hard floor.  We don't have anything close

24   to that.

25        Assuming that Mr. McBurney did make that

1    statement, Your Honor, we don't have anything

2    close to the threshold necessary to impute

3    knowledge to him that this act would cause

4    the injuries that ultimately presented

5    themselves with Madison and the subsequent

6    complications that arose from those injuries.

7         The testimony of Heather was that

8    Madison had a variety of medical conditions.

9    She was in treatment on a regular basis, she

10   was seen by a doctor once or twice a month

11   for her whole life.  If this was an abused

12   child, certainly someone would have known it

13   prior to November 30th, 2006.  Heather

14   herself was an R.N.

15        The statement by Sergeant Sovik that the

16   client -- that my client supposedly made

17   that the -- threw the child from

18   approximately two feet away, I suggest Judge

19   is inherently suspect, because when I was

20   asking the police officer, you know, the

21   things that were in quotes in your report

22   were they direct quotes by the Defendant;

23   yes, but the things that were not in quotes

24   he said sometimes yes sometimes no.

25        Well, we know that from my

1    cross-examination the fact that he has

2    allegedly threw the child from two feet away

3    was not in quotes, it was his paraphrasing.

4    And that the circumstances under which that

5    statement was allegedly made are, again,

6    inherently suspect.  Why wasn't it recorded?

7    Why wasn't it at least, you know, cassette

8    recorded or something of that nature to

9    ensure accuracy?  Is that what law

10   enforcement is reduced to in order to obtain

11   convictions?

12        So, I believe that Sergeant Sovik's

13   testimony should cause this Court great

14   concern, because without this statement being

15   offered into evidence, that there is nothing

16   to suggest there was any intention to harm

17   whatsoever.  Now, the good Dr. Dragovic's

18   testimony, I will renew my Motion that you

19   strike autopsy and his testimony in its'

20   entirety, because if the doctor as he

21   testified solely relied on examination of the

22   child's body and the subsequent

23   neuropathological tests and did not look at

24   the South Lyon Police Department's report and

25   did not look at the U of M records, or the

1          statements by U of M doctors, then how would

2          he know whether this child fell out of a car,

3          a third story window, or what?

4              That is an inherent incredibility, Judge,

5          that cannot be overcome. How would he know,

6          because all of those pieces of information

7          were not introduced into evidence in this

8          case, not the police report, not the

9          hospital records, not one U of M physician.

10         So, I believe under MRE.703 that you should

11         strike that autopsy in its' entirety and

12         strike the good doctor's testimony supporting

13         it.

14

15             But, assuming that you don't grant my

16         Motion, Judge, the doctor at some point

17         would have to -- did extend his level of

18         expertise, level of scientific certainty to a

19         point that causes -- would cause any jurist

20         and, I believe, it should cause this Court

21         great concern too, that standing over this

22         crib and throwing a child onto a padded

23         surface is enough to cause blunt trauma brain

24         injury ultimately leading to a fatality.

25         That's what he testified to, that's what he

1    said.  And I think, Judge, at some point you

2    have got to say that's enough.

3         You do have credibility responsibility,

4    you do have as an examining Magistrate, the

5    obligation to not only hear what is said, but

6    determine whether it's plausible under a

7    common sense standard.  And to suggest that

8    that is enough to cause fatal brain injury is

9    irresponsible, and it came out of that

10   witness stand in this Court.

11        So, I don't believe, Your Honor, that the

12   Prosecutor has shown anything approaching a

13   knowledgeable and intentional act to cause

14   serious harm, an intention to kill, an

15   intention to cause great bodily harm, or a

16   reckless -- knowingly created a high risk of

17   death or great bodily harm by a reckless act.

18        The prior conviction that the Prosecutor

19   has relied on is merely a finding of

20   recklessness.  And that in this case, at most

21   what you have, is a finding of recklessness;

22   an unforeseen injury.  The Prosecutor has

23   not met his burden, Judge.  I believe at

24   most you should bind this over on a Second

25   Degree Child Abuse; at most.  If you do

1    grant my Motion to Strike the Doctor's

2    testimony then you should not bind it over

3    at all.  This matter should be dismissed.

4    And, at the conclusion of the Court's ruling

5    I would like to address the issue of bond.

6         THE COURT:     All right.  This matter

7    comes before the Court on a charge of First

8    Degree Murder, and that the Prosecution has

9    charged the Defendant on or about November

10   30th, 2006 in the City of Lyon, while in the

11   perpetration or attempt of perpetration of

12   Child Abuse in the First Degree and Murder

13   one Madison McBurney.

14        It is further charged that the Defendant

15   did knowingly and intentionally cause serious

16   harm to Madison McBurney, age 11 months,

17   child.

18        As far as the ruling, the Court is going

19   to not receive People's Exhibit Two.

20   (Denial of admission of People's Proposed

21   Exhibit Number Two by the Court)

22        THE COURT:     On reflection, I don't

23   think I need it.  I don't find it to be

24   relevant to my analysis.  I know the

25   Prosecutor's position on this, but I don't

1          happen to share it.

2               Defense asks -- advocates that I reject

3          the findings of the medical examiner's.

4          It's difficult to do that under current

5          standards, in that, I would have to reject

6          the -- I would have to find the medical

7          examiner's testimony to be inherently

8          incredible, and I don't see how I can find

9          that.  I have nothing on this record that

10         would make his testimony inherently

11         incredible.

12              What I have is a dead 11 month old girl.

13         And I have a dead 11 month old girl who

14         didn't die for no reason.  Her heart didn't

15         stop, she didn't suffer from cancer.  She

16         died, I think, according to the medical

17         examiner's testimony, as a result of an

18         injury that came as a result of trauma.

19         And, interestingly enough, that trauma seems

20         to have come exactly at the point when the

21         actions of the Defendant and the testimony

22         that I have had, it's a real simple analysis

23         for me.

24              I have a dead child, I have a reason the

25         child is dead by the actions of the

1    Defendant.   The actions of the Defendant I

2    believe are sufficient under the evidence

3    that presented to me to meet the standard to

4    establish that he did intentionally and

5    knowingly cause serious injury.   I happen to

6    think that throwing a child of that age at

7    that distance -- I can remember many times

8    being told by my wife as I pitched my child

9    up into the air to catch him, how dangerous

10   that was.   And I remember I didn't believe

11   her, because I loved to throw my son and my

12   daughter into the air, and my nieces and

13   nephews.

14        As this as a side, I went to a doctor and

15   talked about it and I was told about how

16   dangerous it could be at that age.   Your

17   client didn't have that knowledge, and I

18   can't attribute it to him.   But, I can say

19   that any reasonable human being throwing a

20   child the distance that he says he threw the

21   child, seems to me, knows that he could

22   intentionally or knowingly cause serious

23   harm.   That is satisfactory to me with regard

24   to this case.

25        More; she's dead.   She is dead as a

1    result of a trauma and there is reason to

2    believe the medical examiner is correct in

3    that trauma, since there is no other

4    reasonable explanation for the reason that

5    trauma exists, but the throwing by the

6    Defendant.

7        Given the Statute with regard to First

8    Degree Murder, that I think is satisfactory.

9    And while both sides have wanted me to take,

10   I think, a more complicated look at this than

11   that, I don't think that the law requires

12   that I take a more complicated look than I

13   have just taken at it.  I think much of what

14   the Prosecutor proffered me beyond that

15   analysis is not necessary to my finding,

16   which is the basis of my ruling with regard

17   to two.  And I am not all together certain I

18   am comfortable with that additional stuff in

19   terms of the knowledge argument that the

20   Prosecutor has put out, but I don't to reach

21   that issue.  I was thinking about it when I

22   was making the Crawford ruling that I

23   probably didn't have to reach that issue.

24       But, having said all that, I am

25   satisfied that the Prosecution's burden to

1    establish that the crimes charged have been

2    committed has been met, and their burden to

3    establish the Defendant is the person who

4    probably committed those crimes has been met.

5    And thus I am obligated under the law to

6    bind this matter over to Oakland County

7    Circuit Court and I so do on both counts.   I

8    will hear you on bond.

9    (The Court binds Defendant over on both

10   counts)

11        MR. WHITE:     Your Honor, in light of

12   the bind over, I ask that you set bond.

13   There is no bond set.

14        THE COURT:     Mr. Prosecutor, what is

15   your opinion on that?

16        MR. SKRZYNSKI: Judge, the circumstances

17   have only changed for the worst for the

18   Defendant, and I think that it's appropriate

19   that he be held without bond.  It's a First

20   Degree Murder.

21        THE COURT:     How can you tell me he is

22   not a flight risk?  You can't.  I am just

23   denying it.

24        MR. WHITE:     Well, Your Honor, he was

25   charged with a serious offense before and

1    there was never a problem with him going to

2    court.

3            THE COURT:      Counsel --

4            MR. WHITE:      He was charged with a 15

5    year felony before, and there isn't any

6    indication whatsoever --

7            THE COURT:      Counsel, this is life.

8    The reason that your Courts can deny bond is

9    because of that very basis, and I can't rule

10   with any degree of certainty based on

11   anything I have in front of me that your

12   client will not flee.

13           I, frankly, don't see him as a danger to

14   the community, I really don't.  But, I don't

15   -- were I in his circumstances where I'm

16   charged with First Degree Murder with the

17   murder of an 11 month old child, and knowing

18   I was going to trial in front of an Oakland

19   County Jury, I would say to myself, "Hmm,

20   what are the odds there"?  Even with a

21   brilliant defense attorney I would have to

22   calculate those odds, and I might decide

23   that my odds were better in Canada.

24           MR. SKRZYNSKI: Thank you, Judge.

25

1                    (At 5:00 p.m., the preliminary exam was

2                    concluded)

STATE OF MICHIGAN)

        ) SS:

COUNTY OF OAKLAND)

       I, Christine E. Ebel, CER-5827, do hereby

certify that I transcribed the foregoing Preliminary

Examination, Volume II, recorded by Paul Ward, held May

17, 2007, before the HONORABLE BRIAN W. MACKENZIE, Judge

of the 52nd/1st District Court, located at 48150 Grand

River Avenue, Novi, Michigan, 48374, and that this is a

complete, true, and correct transcript of the electronic

recordings.

                                _____
                            CHRISTINE E. EBEL, CER-5827

DATED:    June 4, 2007