STATE OF MICHIGAN

IN THE 6TH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

THE PEOPLE OF THE STATE OF MICHIGAN,

v                                  No. 07 214651 FC.

STEVEN LINDSEY MC BURNEY,

Defendant,

_____/

OAKLAND COUNTY    07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

WALKER HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

September 25, 2007

* * * *

Sarah Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of defendant

RECEIVED FOR FILING

2008 AUG 14 A 11: 25

OAKLAND COUNTY CLERK
BY:
DEPUTY COUNTY CLERK

Barbara Reznick, Court Reporter

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1

# I N D E X

**WITNESSES**

Chris Sederlund
    Direct examination by Ms. Pope Starnes       6
    Cross examination by Mr. White       56
    Redirect examination by Ms. Pope Starnes       152

Heather McBurney
    Direct examination by Mr. White       157
    Cross examination by Ms. Pope Starnes       168

Christopher Sovik
    Direct examination by Ms. Pope Starnes       186
    Cross examination by Mr. White       225

**EXHIBITS**

People's Exhibit 1       56
People's Exhibit 2       196
People's Exhibit 3       197

Defendant's Exhibit A       65
Defendant's Exhibit B       148

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Pontiac, Michigan

September 25, 2007

\* \* \* \*

THE CLERK: The Court calls The People v McBurney, case number 07 214651 FC.

MS. POPE STARNES: Good morning, Your Honor, Sara Pope Starnes on behalf of the People.

MR. WHITE: Robert White, appearing on behalf Mr. McBurney, Your Honor.

THE COURT: Counsel and is it –

A        McBurney.

THE COURT: Thank you.

MS. POPE STARNES: Your Honor, today is the date and time set for a Walker Hearing, based upon defendant's motion.

THE COURT: Okay.

MR. WHITE: Your Honor, as a preliminary matter, I would like my client to be able to take notes and in his current confinement it is not possible.

THE COURT: It's up to the people in charge back there, deputy do you have any problem with that?

DEPUTY: I'm sorry Your Honor?

THE COURT: Is there any problem with him being de-chained for writing notes, if it's simply a function of your policy, I'm not going to ask for any exceptions.

DEPUTY: We can do that.

3

MR. WHITE: Thank you. And secondly, Your Honor, I'd ask that you sequester the prosecutor's witnesses.

THE COURT: Do you have any witnesses yourself besides your client?

MR. WHITE: Just my client and I believe – well, I intended, if the prosecutor does not intend to call, I intend to call Heather McBurney, his wife, who is out in the hallway. These are his mother and father that are here in the courtroom.

THE COURT: Any objection to a mutual sequestration?

MS. POPE STARNES: Well, my objection is that these officers are both the officer in charge of the case, they worked on the case together and presented as the officer in charge together.

I don't intend to call defendant's wife, we did subpoena her, because we understood that defense was going to call her. She's outside of the courtroom.

THE COURT: Okay. Other than the two officers then, you don't have any objection to the mutual sequestration?

MS. POPE STARNES: No.

THE COURT: All right. And any response to the two officers?

MR. WHITE: Well, I'd like the People to designate one officer in charge, Your Honor, I believe that that's appropriate under the circumstances.

I – so if they're both going to testify, I'd ask that the officer in charge testify first and the other officer be sequestered.

FORM CSR- LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

THE COURT: All right. Very well. The Court will direct –
I'm not going to require the People to designate an officer in charge
but for purposes of this hearing, we'll have only one officer here. You
can take your pick as to which one will stay. And the other one
respectfully have a seat out in the hallway. And with respect to the
others, by stipulation, it will be a mutual sequestration.

MS. POPE STARNES: May I have just a moment?

THE COURT: You may.

MS. POPE STARNES: Your Honor, we will ask that Officer
Sederlund remain in the courtroom as the officer in charge and the
People will call Sergeant Sovik to the stand.

THE COURT: Very well. Thank you.

MR. WHITE: Your Honor, then I interpret that Sederlund is
not going to testify then?

THE COURT: One is the officer in charge and the other one is
her witness that she's calling.

MR. WHITE: She's already said she's got two officers in
charge and she's circumventing the Court's orders by saying well I'll
designate one and have him sit in the courtroom and then call my non-
officer in charge as my witness.

THE COURT: Your objection is noted. I understand. That's
how we will proceed.

Officer, will you please face my clerk and raise your right hand
to be sworn.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MS. POPE STARNES: Your Honor, would the Court prefer that I call Detective Sederlund first?

THE COURT: I don't have any druthers. You're okay to go this way if you'd like to accommodate, then go ahead and switch it the other way around, however you want to handle it.

MS. POPE STARNES: I'd be happy to do that Your Honor.

THE COURT: Very well.

MS. POPE STARNES: Sergeant Sovik would you please have a seat in the hallway.

The People would call Officer Sederlund.

THE COURT: Officer Sederlund, please raise your right hand to be sworn.

CHRIS SEDERLUND,

Was thereupon called as a witness herein and after having been first duly sworn, was examined and testified as follows:

MS. POPE STARNES: May I proceed Your Honor.

THE COURT: You may. Do you waive any openings?

MS. POPE STARNES: Yes, so long as –

MR. WHITE: Yes.

THE COURT: Very well, go ahead.

DIRECT EXAMINATION

BY MS. POPE STARNES:

Q    Please state your name and spell your last name for the record?

A    Officer Chris S-e-d-e-r-l-u-n-d.

Q    How are you employed, sir?

6

A    City of South Lyon.

Q    You're employed as a police officer?

A    Correct.

Q    How long have you been a police officer?

A    Thirteen years.

Q    Has all of your work as a police officer been with the City of South

Lyon?

A    Yes, it has.

Q    Approximately how many officers work at your department?

A    I think twenty.

Q    Now Officer Sederlund, currently you're assigned to road patrol?

A    Yes, I am.

Q    And in December of 2006 what was your assignment?

A    The detective bureau.

Q    How long did you work as a detective for your department?

A    Throughout the thirteen years?

Q    Yes?

A    I'd say probably six or seven years.

Q    How does the assignment to the detective bureau come down?

A    It rotates.

Q    Rotates between all the officers?

A    Yeah, most of them don't want it and when it comes around I take it

usually.

Q    So in December of 2006 it was your turn in the rotation?

A    Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Now did there come a point that you were assigned an investigation in regards to an injury that later resulted in the death of a child by the name of Madison McBurney?

A    Yes.

Q    When were you assigned that case?

A    December 2nd of '06.

Q    Do you recall approximately what time of day you were assigned that?

A    No, I don't, I remember receiving a call at around 8 p.m. at night.

Q    And had you worked a regular shift that day?

A    No, it was a Saturday I believe.

Q    After you received this call at home at about 8 p.m. what did you do then?

        MR. WHITE:  Your Honor, objection, I don't believe he stated he was at home.

        MS. POPE STARNES:  He did, Your Honor --

        THE COURT:  Okay.

        MS. POPE STARNES:  -- he said I received a call at 8 p.m. at home.

        MR. WHITE:  I didn't – well, my apology, I'd just ask him to keep his voice up.

        THE COURT:  Okay.  Keep your voice up.

A    Okay.

        THE COURT:  Thank you.

Q    (By Ms. Pope Starnes, continuing):  What did you do after you received the call?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    I responded to my work and was briefed by Sergeant Baaki.

Q    When you say work, what do you mean?

A    South Lyon Police Department.

Q    Was anyone else assigned by Sergeant Baaki besides you to the case?

A    Sergeant Sovik.

    COURT REPORTER: Pardon?

A    S-o-v-i-k.

Q    (By Ms. Pope Starnes, continuing): Approximately what time did you arrive at the police department?

A    I can't recall the time I arrived, I would say it was within an hour and a half.

Q    Okay. Now can you tell the Court how you were dressed at that point?

A    I had a dress shirt on, I don't believe I had a tie and some dress slacks.

Q    Were you not in uniform?

A    No, I was not in uniform.

Q    Did you have any kind of jacket?

A    It was a black wool type jacket.

Q    When you arrived at the station was Sergeant Sovik there?

A    Not yet, no, he was not.

Q    After he arrived, what did you do next?

A    We were briefed by Sergeant Baaki and we talked about what we were going to do next.

Q    Did you begin your investigation?

A    Yes, the investigation started at the station.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    What did you do after you talked about what you were going to do next?

A    We spoke with fire personnel and ambulance personnel, ran lien on Mr. McBurney, noticed that he had a prior and we called Northville.

     MR. WHITE: Your Honor, I'd ask that the officer testify from his own perspective, not what the other officer did, unless he's going to say that he did it in conjunction with him, which I don't believe he will testify to that.

     THE COURT: Just to the — just try to keep it only personal knowledge and not — I'm not saying that you have spoken about what Sovik discovered but just kind of focus on your own, okay; unless counsel asks you otherwise and we'll take it one step at a time.

     Go ahead.

     MS. POPE STARNES: Thank you Your Honor.

Q    (By Ms. Pope Starnes, continuing): Did you personally speak with fire and ambulance or EMT personnel?

A    I believe Sergeant Sovik spoke to fire and I spoke with, I believe his last name was Calus, from South Lyon Ambulance.

Q    Okay.

A    I couldn't get a hold of the other ambulance guy, Dennis Timmerman.

Q    Did you personally review Mr. McBurney's criminal history?

A    Yes, I did.

Q    Would you recognize Mr. McBurney if you saw him again?

A    Yes, I would.

Q    Is he in court today?

A    Yes.

Q    Can you tell the Court where he is located and describe what he is

wearing today?

A    Next to defense counsel in the orange suit.

MS. POPE STARNES:  May the record reflect the witness has

identified the defendant.

THE COURT:  Any objection?

MR. WHITE:  No objection.

THE COURT:  So noted.

Q    (By Ms. Pope Starnes, continuing):  Now, does Mr. McBurney have

prior contact with the police?

A    Yes.

Q    How many?

A    The one that I remember specifically is the 1998 contact out of

Northville Township.

Q    And did that result in charges?

A    Yes, it did.

Q    What else did you do in the course of your investigation, if anything?

A    We responded down to U of M Hospital.

Q    Who went to U of M Hospital?

A    Sergeant Sovik and I.

Q    Did you ride in the same car?

A    Yes.

Q    Approximately what time did you respond to the hospital?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I can't recall exactly, I know it was late, may have been eleven p.m. or twelve midnight.

Q    It was somewhere in the very late or early morning hours of the 2nd and 3rd of December?

A    Yes.

MR. WHITE: Your Honor, if he says that he cannot say, he doesn't know, he's speculating and the prosecutor is asking him to further speculate and making a suggestion.

THE COURT: Noted, I've got you, I've got you. Okay. Let's move on.

MS. POPE STARNES: May I continue Your Honor?

THE COURT: You may.

Q    (By Ms. Pope Starnes, continuing): When you arrived at the hospital, what did you do?

A    We spoke to, I believe she was Washtenaw County C.P.S. caseworker Sarah Weaver.

Q    Where in the hospital did you do that?

A    The first floor, it was kind of a commons area where you sit on couches.

Q    And after you spoke with her, what did you do next?

A    We were escorted up to the – I want to say the fourth floor pediatric unit.

Q    Now who escorted you to the fourth floor pediatric unit?

A    I don't recall, he was a security guard, I remember he was tall and skinny, that's all I remember about him, he was a young guy.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Okay.  Where did the security guard come from if you know?

A    The hospital I'm assuming, he just walked up because you have to have an escort up to the ped's unit by elevator and the security guard has to take you up there.

Q    So this was an elevator that you couldn't get access to without the security guard, is that right?

A    No, I don't even believe there are stairs going up to the ped's unit, there is no visitors unless you're escorted up.

Q    Okay.  Do you recall what the security guard was wearing?

A    I think it was just the typical security uniform, I think it was a white shirt, I believe if I remember correctly, and some gray pants.

Q    Besides you and Sergeant Sovik, did you have any other officers from the South Lyon Police Department at the hospital?

A    No.

Q    Did you call for uniform officers from your department at any time?

A    No.

Q    Were there any other officers from the Oakland County Sheriff's Department there?

A    No.

Q    Did you have any officers from the Michigan State Police there?

A    No.

Q    How many of these security guards were with you when you were escorted up to the ped's unit?

A    One.

Q    Had you requested this security guard's assistance?

13

A    No.

Q    What happened after you got off the elevator to the ped's unit?

A    We met with the nurses and eventually with Dr. Fleming.

Q    Okay. When you first met with the nurses where did you meet with them?

A    In the conference room.

Q    Where was the conference room?

A    Directly – if you're standing at the nurses' station, it's directly to the left of the nurse's station.

Q    Now at this point when you go to the conference room, where was the security officer?

A    I have no idea. I wasn't paying attention.

Q    Did he remain with you?

A    No.

Q    Did you ask for any assistance from him?

A    No.

Q    Did you ask him to remain on the floor with you?

A    No.

Q    After you spoke with the nurses, what did you do then?

A    We spoke with Dr. Fleming and eventually we asked to speak with Heather McBurney.

Q    Okay. Now during this time when you were with Sergeant Sovik, did you have an opportunity to observe what he was wearing?

A    Sergeant Sovik?

Q    Yes?

14

FORM CSR- LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    I know he had a tie on, he had a dress shirt and tie on and he had his

black leather jacket on.

Q    Did he have – does your department have a police uniform?

A    Yes.

Q    Okay.  Did he have your department's police uniform on?

A    No.

Q    Approximately what time did you request to speak with Heather

McBurney?

A    I'm going to say it was around 1 a.m., possibly 2 a.m., at around 2 a.m.

Q    How did you make a request to speak with Heather?

A    We asked the nurses to go and get her for us in Madison's room.

Q    And where were you and Sergeant Sovik at the time that you asked the

nurses to do that?

A    In the conference room.

Q    Was anyone else in the conference room with you at that point?

A    I believe Sarah Weaver was and I believe a nurse, I think – it starts

with an R – ReginaS, I think if I remember correctly.

Q    Did Heather McBurney come back to the conference room to speak

with you?

A    Yes.

Q    When she came to the conference room to speak with you did anyone

remain during the time you spoke with her?

A    The - Sarah Weaver did, the nurse did –

     THE COURT:  I'm sorry?

A    Sarah Weaver did and the nurse did.

15

THE COURT: Okay. So everybody that you said that was in there originally remained in there?

A    Yes, that's correct.

THE COURT: One, two, three four people, not counting Heather?

A    Correct.

THE COURT: Okay.

Q    (By Ms. Pope Starnes, continuing): At the time that you were in the conference room, were you wearing a gun belt?

A    No.

Q    Did you have your gun with you?

A    I don't believe so, no.

Q    Why don't you believe so?

A    I never – when I was in the detective bureau I rarely carry a gun; I did when I'd pick up prisoners and I was spoken to about – my lieutenant spoke to me about it, I just never carried the gun.

Q    Were you wearing anything to identify yourself as a police officer?

A    I think I had a badge on my waistband.

COURT REPORTER: I'm sorry?

A    I had a badge on my waistband here.

Q    (By Ms. Pope Starnes, continuing): Do you have that with you?

A    No, it's your typical one snap belt.

Q    And is it the same shape as the badge that –

A    No – no –

Q    -- the silver badge on your shirt?

FORM CSR • LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    It's – not this one, but its that shape (indicating).

Q    You're showing what is a standard shield. Would you show that to the
     Court please.

     Did you have anything else on your belt besides the badge?

A    My phone, my personal phone.

Q    Now officer, at this point, did you have any recording equipment with
     you?

A    No.

Q    Did you attempt to bring any recording equipment with you?

A    Yes.

Q    Can you tell the Court about that attempt?

A    When I first arrived at the station we were briefed by Sergeant Baaki,
     I went to the back squad room we have a couple desks back there, the
     drawers are just jammed full of stuff. I found a recording device
     inside the – it was a mini recorder about that size (indicating) black,
     pushed play, it did not work. I thought the batteries were dead, opened
     up the back, the thing where the batteries were at, it was all corroded.

Q    What did you do after you found it was corroded?

A    Put new batteries in, it didn't work, I threw it in the trash can.

Q    I'm sorry, you said that very quickly?

A    Put new batteries in, it didn't work and I threw it in the trash can, it
     was garbage.

Q    Now, do you have an equipment room that you go to at your station
     where you can check equipment in and out?

A    No.

17

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q  How is equipment such as a recorder maintained in your department?

A  They're really not maintained, if you can find you got one.

Q  Were you able to locate any other recording devices?

A  No.

Q  Did you want to have a recording device with you?

A  Yes.  We wouldn't be here if we had one.

Q  At the time that you were in this conference room, did you have a video camera that you could record this interview with?

A  No.

Q  Does your department have a video camera available to you?

A  They have one of those big old – old big ones, but yeah, who knows where it's at, we have no idea where its at.

Q  Okay.  At the time – you said you had your personal cell phone with you?

A  Yes.

Q  Was your personal cell phone set up in such a way that you could record things?

A  No, you can't do it on the cell phone.

Q  When you were at the hospital, did you have a standard camera with you?

A  No, we did not.

Q  Did you personally take any photographs when you were at the hospital?

A  No.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q   Did you ask the hospital if they had any recording equipment that you could borrow?

A   No.

Q   To your knowledge was there any recording equipment in the conference that you used at the hospital?

A   No.

Q   Are there any audio or video recordings of the interview with Heather McBurney?

A   No.

Q   Are there any audio or video recordings of your interview of the defendant?

A   No.

Q   When you spoke with Heather McBurney, who was asking questions?

A   Both Sergeant Sovik and I were.

Q   Was anyone taking notes?

A   Yeah, we both were.

Q   Did you observe Sergeant Sovik taking notes?

A   I was – I should say I assumed he was taking notes, I wasn't paying – I was paying more attention to the answers.

Q   Did you personally take notes?

A   (No verbal response)

Q   Can you describe –

       THE COURT: I'm sorry, did you say yes?

A   Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    (By Ms. Pope Starnes, continuing):  Can you describe Heather
     McBurney's demeanor when you were interviewing her?

A    She was – she was in shock, she was upset.

Q    Approximately how long did you speak with her?

A    I'd say no more than an hour.

Q    After you spoke with her, what did you do next?

A    I requested the nurses to bring in Steve McBurney

Q    Okay.  Now let's talk about this conference room, how is this set up?

A    This is where I was sitting in the conference room (indicating) the door
     is right here directly to my right, it's a long table approximately from
     here to down there (indicating) –

Q    To the court's clerk?

A    Yes, it's wooden, probably eight to ten chairs around it, Sergeant
     Sovik is directly across from me and both Heather and Steven sat right
     here.

     THE COURT:  Not –

A    They sat at the end of the table, right –

     THE COURT:  Not together.

A    No, two different times, they both sat in the same seat at the table.

Q    (By Ms. Pope Starnes, continuing):  So Steven was at the end or the
     head of the table?

A    Right.

Q    And how many doors were there to this room?

A    One.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q      And where was the door in relation to whether Heather McBurney was

       sitting?

A      To the right, directly to the right of me, behind me.

Q      Behind you. During your interview with Heather McBurney was that

       door locked?

A      No.

Q      Was it open or closed?

A      Closed.

Q      Why was it closed?

A      Just closed –

              THE COURT:  Let's back up one second.  The door is closest

       to which person in the room?

A      The people we were speaking with.

              THE COURT:  The interviewee, if you will?

A      Yes, Steven and Heather.

              THE COURT:  Okay.  Now I can picture it in my mind I think,

       thank you, go ahead.

Q      (By Ms. Pope Starnes, continuing):  Are there any windows in this

       conference room?

A      As I recall, there is one above the door, I think there's a big one if I

       was facing the door this side it was to the left of the door.

Q      Where did that window go to?

A      You could see the nurses' station, basically, out in the hallway.

Q      So it's an interior window in the building, not to the outside of the

       building –

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

21

A    No –

Q    -- but to the –

A    Just to the ped's unit, the nurses' station.

Q    During the time that you were interviewing Heather McBurney, did

     you observe the security officer that you previously testified about

     outside of that window?

A    Not that I can recall, no.

Q    Did you observe any other security officers?

A    No.

Q    Did you observe any other police officers?

A    No.

Q    Now you testified that after you completed your interview with

     Heather McBurney, that you requested the defendant?

A    Correct.

Q    How did you do that?

A    I think we asked the nurse if she would have someone get Steve –

          MR. WHITE:  Your Honor, I'd ask if he testify for himself

     alone.

A    I recall –

          THE COURT:  It's easy to –

A    -- who asked.

          THE COURT:  Okay.

A    I did or Sergeant Sovik.

Q    (By Ms. Pope Starnes, continuing):  Were you present when a nurse

     was requested to get him?

22

A    Yes.

Q    Did you go and get him?

A    No.

Q    Did Sergeant Sovik go and get him?

A    No.

Q    Did Heather McBurney leave the room at this point?

A    I believe so, yes.

Q    Did you leave the room during the time immediately following the request of the nurse?

A    The request of the nurse for Steven?

Q    Yes?

A    I may have went to the nurse's station to request him – in fact I know I did, I walked to the nurses station, because I wasn't going to the room myself because I did not want to see the victim, I stopped and asked them to get Steve for me.

Q    Okay. So you left the conference room and went to the nurses' station and asked?

A    Yes.

Q    Did Mr. McBurney come into the conference room?

A    Yes.

Q    Was anyone with him when he came into the conference room?

A    No.

        THE COURT: I'm sorry, what?

A    No. I'm sorry Judge.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    (By Ms. Pope Starnes, continuing):  Who was present at this point in
     the conference room when he first came in?

A    Sergeant Sovik and I.

Q    Now –

          THE COURT:  Hold on one second.

A    They left – we were –

Q    (By Ms. Pope Starnes, continuing):  When had they left?

A    After they – with Heather.

Q    Now at this point when defendant comes in the room, are you still
     without a gun belt?

A    No.

Q    You're not in possession of a gun?

A    No.

Q    Was your badge still showing on your belt?

          MR. WHITE:  Your Honor, he said he didn't know, he didn't
     know whether he had his gun or not.  So now he knows – it's a fact not
     in evidence –

          MS. POPE STARNES:  That's argument –

          MR. WHITE:  No, it's not, she's leading the witness –

          THE COURT:  In fairness –

          MR. WHITE:  -- he says he doesn't know.

          THE COURT:  Okay.  Your objection is noted.  Fortunately
     we're not in front of a jury, I'm privy to it now, I'll take your
     comments and we'll hear them at closing arguments as well.

          MR. WHITE:  Thank you.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q  (By Ms. Pope Starnes, continuing):  Officer Sederlund, if you can

recall, were you wearing a gun when Mr. McBurney came into the

room?

A  I don't believe so.

Q  Were you wearing a gun belt if you can recall when Mr. McBurney

came into the room?

A  No.

Q  You talked about a badge on your belt?

A  Correct.

Q  Were you wearing that when Mr. McBurney came into the room?

A  My badge, yes.

Q  Did you have anything else on your belt when he came in the room?

A  My personal cell phone.

MR. WHITE:  I didn't hear you?

A  My personal cell phone.

MS. POPE STARNES:  May I proceed Your Honor.

Q  (By Ms. Pope Starnes, continuing):  At the time he came into the

room, were you able to see if there were any security guards outside

through that window you talked about?

A  I didn't see any.

Q  Had you called for any security at this point?

A  No.

Q  What happened when Mr. McBurney came into the room?

A  We asked him to sit down and began –

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MR. WHITE: Again, I would ask him to say what he said, not we.

THE COURT: Got you, we've got it.

Q    (By Ms. Pope Starnes, continuing): Do you recall who asked Mr. McBurney to sit down?

A    No, I don't.

Q    Did someone ask Mr. McBurney to sit down?

A    Yes.

Q    Who was in the room with Mr. McBurney?

A    Sergeant Sovik and I.

Q    Did you and Sergeant Sovik introduce yourselves?

A    Yes, we did.

Q    What happened next?

A    We explained to Mr. McBurney why we were there –

MR. WHITE: Objection, Your Honor, to what he said –

THE COURT: I know counsel, I've got it –

MR. WHITE: -- Your Honor, this is very important –

THE COURT: I understand, I understand. It's difficult to –

we do it all the time in normal conversations, but just try to and he'll stand up – just try to say me, okay.

Q    (By Ms. Pope Starnes, continuing): Did you introduce yourself to the defendant?

A    Yes, I did.

Q    Did Sergeant Sovik introduce himself to the defendant?

A    Yes, he did.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    What happened next?

A    Introductions were made –

        THE COURT:  Let me interject, when you say introduced, did

you just say I am – how did you identify yourself?

A    I said I'm Officer Sederlund of South Lyon Police.

        THE COURT:  Okay.

Q    (By Ms. Pope Starnes, continuing):  At this point did you tell the

defendant that he was under arrest?

A    No.

Q    Was the door to the room open or closed?

A    Closed.

Q    Was it locked or unlocked?

A    Unlocked.

Q    I'm sorry?

A    Unlocked.

Q    Did you talk to him about whether or not he was free to leave?

A    No.

Q    Did you tell him he was not free to leave?

A    No.

Q    Did you give him Miranda Warnings at that point?

A    No.

Q    After you and Sergeant Sovik had introduced yourselves to the

defendant, what happened next?

A    Mr. McBurney was told why we were there – why I was there and why

Sergeant Sovik was there.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Who told him that?

A    I don't recall.

Q    What was he told?

A    That we had a -- South Lyon Police Department had a call for a child

     with seizures and brain injuries that were irrecoverable and that the

     child was probable to die within forty-eight hours.

Q    What happened next?

A    Mr. McBurney was asked about his relationship with Heather.

Q    Who asked him that?

A    I believe I may have. He said he'd been married for two years, they

     had a child in common, Madison, they had a good marriage.

Q    What happened next?

A    We asked him, I believe Sergeant Sovik asked him about Nicholas

     Kennedy.

Q    Did Mr. McBurney respond to that?

A    He said he's not my son.

Q    What happened next?

A    We asked about injuries to Nicholas Kennedy.

Q    Who asked about the injuries to Nicholas?

A    I believe Sergeant Sovik asked.

Q    And who did he ask about the injuries to Nicholas Kennedy?

              THE COURT: I'm what's the last name?

A    Nicholas Kennedy.

Q    (By Ms. Pope Starnes, continuing): Can you spell Kennedy please?

A    K-e-n-n-e-d-y.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q     Sergeant Sovik asked the defendant about injuries to Nicholas
      Kennedy?

A     If I remember correctly.

Q     What happened next?

A     Mr. McBurney said the injuries were worse on Nicholas than they
      were on Madison.

Q     What happened next?

A     He said he was not responsible for the injuries. He then commented to
      – that he ran out of attorney fees and it cost him about thirty thousand
      dollars, he ran out of attorney fees and that's why he stopped the case
      and he took a plea.

Q     What happened next?

A     I believe he said the plea was from 1st Degree Child Abuse to 2nd
      Degree Child abuse.

Q     What happened then?

A     I don't recall – can I get my report?

Q     Did you make a report of this case?

A     Yes, I did.

Q     Would your report refresh your memory as to what happened next?

A     Yes, it would.

           MS. POPE STARNES:  My I approach the witness, Your
      Honor?

           THE COURT:  You may.

Q     (By Ms. Pope Starnes, continuing):  Officer Sederlund is this a copy of
      your South Lyon police report from this incident?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes, it is.

Q    I'd ask you to read that to yourself and hand it back to me when
     you've had the opportunity to refresh your memory?

A    I'm sorry.

Q    Does that refresh your memory?

A    Yes, it does.

Q    What happened next?

A    When we had – I'm sorry, when Steven was told about Heather
     knowing about Nicholas he was very – he acted surprised because he
     didn't tell her.

Q    Who told him that Heather knew about Nicholas Kennedy?

A    Who told Steven?

Q    Yes?

A    We did, Sergeant Sovik and I both told him.

Q    What happened next?

A    He acted very surprised and he stated that Heather never told him that,
     it was never discussed.

Q    What happened after this discussion?

A    We asked him if he was – we started inquiring about Madison.

Q    Who was inquiring about Madison?

A    Both Sergeant Sovik and I.

Q    You were both asking questions?

A    Yes.

Q    What type of questions were you and Sergeant Sovik asking about
     Madison?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A     We started doing the background.

Q     What does that mean?

A     Just a background on who was home with her, who cared for her during this time and he said that he was home with her, his wife was working and that the only caregivers for the past couple days had been him and Heather.

Q     Did you ask him whether or not there were any day care providers or babysitters or other caretakers?

A     I don't believe so, I don't believe so.

Q     What happened then?

A     We started inquiring about the injuries to Madison.

Q     What did he say?

A     He said that he was at home with Madison at his residence and that Madison had been sick that day, I believe he said she vomited a few times –

       THE COURT: Was there a reference to what day we're talking about?

A     November 30, 2006.

       THE COURT: The day before –

A     Well, we were there –

       THE COURT: -- two days later?

A     The 2nd and/or 3rd of December.

       THE COURT: Okay. So he said he was home with her on the 30th?

A     Yes, at 6 p.m. because his wife Heather had just left for work.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT:  Thank you.

Q      (By Ms. Pope Starnes, continuing):  What happened then?

A      He said she was very cranky.

Q      Who was cranky?

A      Madison.

Q      He said that he tried to give her a bottle, she spit it out, at that time he picked her up, took her into her bedroom, changed her, he mentioned that she had hip dysplasia so they had to put a brace on her so he had to put a brace on her that she wears at night.  He said that once he got her back out into the living room, he put her in the bouncy seat type thing and – no, I believe he sat her on the floor if I remember correctly, he sat her on the floor and that's when he heard her start gurgling and having trouble breathing.

Q      What happened next?

A      He said that she then fell backwards, went unresponsive and he called 911.

Q      What did he say happened next?

A      He said being as she was having labor breathing when he's speaking to the dispatchers he gave her rescue breaths per the instructions of the dispatcher, at that point fire ambulance personnel arrived.  She was in the – I believe he disrobed her and brought her into the living room right in front of the door awaiting the medic personnel.

Q      What happened then during the course of the interview?

A      I believe Sergeant Sovik told him, if I remember correctly, I believe he told him that in speaking with medical personnel at the hospital that

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

there was non-accidental trauma to Madison and that he and Heather

were the only two home with her for the past couple days.

Q    What was the defendant's response to that?

A    He told us first off, he did not do it, and our response to him was well

if you didn't do it then Heather must have.

Q    Who asked him or stated to him if you didn't do it Heather must have?

A    I don't recall, possibly Sergeant Sovik.

Q    What was his response when he was asked whether or not – or there

was a statement put to him that Heather must have done it?

A    He just stared straight ahead.

Q    Pardon?

A    -- he – originally he said that he didn't believe that she could do

something like that, and then just stared straight ahead.

Q    Were there period or lapses of silence during this interview?

A    Yes.

Q    How often?

A    I don't recall how often but it was – he'd stare straight ahead

sometimes a minute, sometimes thirty seconds, sometimes two

minutes.

Q    What happened at this point, after he'd stare straight ahead, after

saying he didn't think that Heather could do this.

A    We explained to him that, you know, good people some times make

mistakes.

Q    Who said that?

A    This specifically was Sergeant Sovik saying this.

33

Q    Specifically Sergeant Sovik said to him –

A    I remember Sergeant Sovik telling him this.

Q    -- good people can do what?

A    Make mistakes, you know, it doesn't make them bad people. We

     understand you're a good father, Heather told us you're a great dad

     and good husband.

Q    What happened next?

A    He made a comment to the affect my life is over.

Q    Who made that comment?

A    Steven McBurney.

Q    What happened after he said that?

A    We spoke to him more about Madison.

Q    Who spoke to him?

A    Both Sergeant Sovik and I.

Q    When you say you and Sergeant Sovik both spoke to him about

     Madison, what do you mean by that?

A    We were doing the investigation, we would ask questions, you know,

     ask questions together.

Q    Were you yelling at him?

A    Absolutely not.

Q    Did you raise your voice at all to him during this interview?

A    No.

Q    Did you hear Sergeant Sovik raise his voice at all?

A    Never.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   After you and Sergeant Sovik had put some more questions to him
    about Madison, what happened then?

A   We asked him –

        THE COURT: You –

A   -- I'm sorry.

        THE COURT: That's okay, go ahead.

A   I explained, I know I specifically explained to him that he owed
    Madison and his wife an explanation of what happened, he owed them,
    that that's the least that he owed him.

Q   (By Ms. Pope Starnes, continuing): What happened –

A   I asked that specifically.

Q   What happened after you said that?

A   Sergeant Sovik said would it be easier to speak to your wife Heather.

Q   It was specifically Sergeant Sovik that asked that?

A   Yes, he said would you like to speak with your wife.

Q   And what was defendant's response?

A   He said yes, that he would like to.

Q   What did you do after he said that?

A   I – Sergeant Sovik advised me to go advise the nurses to get Heather.

Q   Did you do that?

A   Yes, I did.

Q   How did you do that?

A   I opened the door, went to the nurses' station and said can you please
    get Heather and they said yes.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q      At the point that you got up and went to the nurses' station you said
       that you opened the door, did you leave the door open or did you close
       it behind you when you went to the nurses' station?

A      I don't recall, it maybe on one of those switches that automatically
       closes, I don't recall if I closed it or not.

Q      Okay. Approximately how long were you gone from the room to get a
       nurse from the nurses' station?

A      Ten seconds, fifteen seconds.

Q      How many feet was it approximately from the nurses' station to the
       conference room?

A      Twenty-five thirty –

              MR. WHITE:  I'm sorry?

A      Twenty-five thirty feet.

Q      (By Ms. Pope Starnes, continuing):  Did you request a nurse to go and
       get Heather McBurney?

A      Yes.

Q      What did you do after you made that request?

A      I walked back in the room.

Q      Okay.  Now at the point when you went out to the nurses' station to
       get a nurse to get Heather McBurney, did you see any security guards
       out there?

A      No, I didn't, I didn't see anybody out there other than the nurses.

Q      Did you request a security guard assistance at that point?

A      No.

Q      Did Heather McBurney come back to the room?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Yes.

Q     Who if anyone was with her?

A     I think the nurse walked her to the room and brought her in the room, asked her to sit down and the door was closed.

Q     At this point, when Heather McBurney returns to the room, who is in the room?

A     Sergeant Sovik and I, Steven and Heather.

Q     Is the door open or closed behind Heather after she came in the conference room?

A     It was closed.

Q     Was it locked or unlocked?

A     Unlocked.

Q     Did you have keys to the room?

A     No.

Q     Now you testified previously about where you and Sergeant Sovik and defendant were seated in the room. Did that change when Heather McBurney came into the room?

A     Nope, it did not.

Q     Where did Heather McBurney sit in the room?

A     If I remember correctly, she sat next to Sergeant Sovik and kind of scooted to the front of Steven. So if I'm here (indicating), Steven is here (indicating), Sergeant Sovik is here (indicating) she sat here but was – I think it was more open for Steven she was sitting with the chair in front of Steven, I don't think there was a table between her and Steven.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   So she was sitting between Sergeant Sovik and the defendant?

A   Yes, she was.

Q   And which way was her body facing?

A   Back towards the wall, she was facing Steve and me.

Q   Who is the closest to the door at this point?

A   I'd say Steven.

Q   After Heather McBurney came into the room and was seated, what happened then?

A   Steven asked her about Nicholas, how she knew about Nicholas.

Q   Had you and Sergeant Sovik, either one of you said anything at this point when Heather McBurney came back in the room?

A   No.

Q   Were you asking any questions?

A   No.

Q   So who is the first person to speak after Heather McBurney comes into the room?

A   If I remember correctly, Steven.

Q   And what happened after he said this about Nicholas Kennedy?

A   She said her friend – his friend Kyle, I think that was the name, Kyle, a while back told her about Nicholas.

Q   What happened then?

A   Steven said that he wanted to tell her but didn't want to because the relationship was moving along great and he didn't want to ruin anything.

Q   At this point had you said anything –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    No –

Q    -- since Heather McBurney had come in the room?

A    No.

Q    Had Sergeant Sovik said anything since Heather McBurney came into the room?

A    Not to my knowledge, no.

Q    What happened next?

A    Heather then told him, what do you have to tell me about Madison and Steven said I made a mistake. And Heather said what happened.

Q    What happened next?

A    He told her that he'd been requesting her, begging her to be on day shift as opposed to being night shift as a nurse because Madison was so difficult at night from separation anxiety, he said that – regarding that, he wished that she was there and he threw her into the crib because she was crying so much.

Q    At this point had you said anything since Heather McBurney came in the room?

A    No.

Q    Had Sergeant Sovik, had you witnessed him say anything since Heather McBurney came into the room?

A    No.

Q    What happened then?

A    He said he threw her into the crib and she hit her head on the back of the spindle and started seizing.

Q    What happened then?

39

A   That's when Sergeant Sovik and I started speaking.

Q   Okay. And this had been the first time that you began speaking again?

A   Yes.

Q   And it's the first time that Sergeant Sovik began speaking again?

A   Yes.

Q   Do you recall who spoke first?

A   No, I don't.

Q   And what happened next?

A   We asked him to – Steve was asked to explain what happened on the night of the 30th.

Q   Do you recall which one of you asked at this point what happened on the night of the 30th?

A   I don't recall, it could have been myself or Sergeant Sovik.

Q   What happened next?

A   Steven stated that on the 30th his wife left for work as usual, at 6 p.m. and they usually put Madison down during this time because of the separation anxiety, evidently she cries a lot when mom leaves and he said Heather went to work and Madison started crying hysterically. He tried to console her, he had fed her first and she spit a bottle up. He said when she spit the bottle up on the floor, this was in the living room, she was in her bouncy seat at the time, he picked her up and took her into the bedroom to change her, I believe he changed her diaper and clothes and put the leg brace on. During this time she was crying, having fits and he picked her up and tried to console her and I

40

believe he said she was screaming in his ear and at that point he lost it and threw her into the crib.

Q    What happened then after he said that?

A    Steven was asked how far away he was from the crib.

Q    Do you recall who asked him how far he was away from the crib?

A    I don't recall.

Q    Was it you or Sergeant Sovik or was it Heather McBurney who asked him that?

A    I don't recall, I don't recall.

Q    What was Heather McBurney doing at this point?

A    She was in shock, she was in shock.

Q    Was she talking any more?

A    Not to my knowledge, I cannot remember her talking. I believe she sat back and listened.

Q    What happened then?

A    He explained that he had been two or three feet away from the crib when he threw her, he said that he – when she hit the crib the back of her head hit a spindle and that she immediately began seizing.

Q    What happened after he said that?

A    He said that he grabbed her out of the crib and tried to console her, she wasn't breathing very well, he put her on the floor, disrobed her and took her out – he said he remembered disrobing her because he could not tell if she was breathing or not so he took her clothes off and – with the exception of the diaper and took her out to the living room and called 911.

41

Q    What happened next?

A    When he called 911 he explained to them about the labored breaths, he
     said he gave her a couple respiratory breaths.

Q    What happened next?

A    He said EMS arrived and both he and Madison were transported to U
     of M.

Q    What happened next during the course of the interview?

A    We – Sergeant Sovik and I then left the room.

Q    Now did you say anything about leaving the room?

A    No.  We – at that time – I believe Sergeant Sovik explained to Steven
     and to Heather go ahead and talk and we got up and we left the room,
     we asked – we requested him to write out a written statement.

Q    You requested who to write out a written statement?

A    Steven.

Q    Who made the request of Steven to write out this statement?

A    I believe that was Sergeant Sovik.

Q    Was he left with anything to write a statement?

A    A piece of paper.

Q    At this point had you told the defendant that he was under arrest?

A    No.

Q    Had you told him he was not free to leave?

A    No.

Q    Had Sergeant Sovik told him that he was under arrest?

A    No.

Q    Had Sergeant Sovik told him that he was not free to leave?

A   No.

Q   Did you and Sergeant Sovik actually leave the room?

A   Yes.

Q   Where was Heather McBurney when you and Sergeant Sovik left the room?

A   She was still seated next to Steven.

Q   And when you left the room what was the position of the door?

A   Closed and unlocked.

Q   Did you lock it at any time that the defendant and Heather McBurney were in the room?

A   No.

Q   Did you have a key at that point to lock it?

A   No.

Q   Did you say anything to the defendant about what was going to happen after you went out in the hallway?

A   No.

Q   Did you hear Sergeant Sovik say what was going to happen next at that point?

A   No.

Q   When you and Sergeant Sovik were in the conference room, at any point had the two of you had a discussion in front of the defendant as to whether or not you were going to place him under arrest?

A   No.

Q   What happened when you got out in the hallway?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A   Well, this would be my first homicide case and Sergeant Sovik's first

    homicide case, we called the prosecutor.

Q   Okay. Now where did you make that call?

A   I'm going to say we were probably ten, fifteen feet down the hallway

    from the door.

Q   And at this point when you're out in the hallway, do you see any

    security guards present?

A   No.

Q   Did you call for security at that point?

A   Nope.

Q   Did you have any uniformed police officers from your department

    there?

A   No.

Q   Did you see any officers from any other law enforcement agency there

    at that point?

A   No.

Q   Did you leave any recording devices in the conference room while you

    were in the hallway?

A   No.

Q   Who called, if you can recall, the duty prosecutor?

A   I did.

Q   How did you do that?

A   My personal cell.

Q   Who spoke with the duty prosecutor?

A   I did.

44

Q    What was your purpose for calling the duty prosecutor?

A    Explained to her the situation, what we had and just to get some advice from her regarding, you know, the incident.

Q    Had you made a decision at this point as to whether or not you were going to arrest the defendant?

A    I don't believe so, no.

Q    Did you speak with the duty prosecutor?

A    Yes.

Q    After you spoke with the duty prosecutor, what did you do next?

A    I spoke to her for a little while and Sergeant Sovik and I put out heads together and we said – she left the decision up to us, at that point we said you know what, he's not free to leave at that point. It had been probably three to five minutes.

Q    Three to five minutes of what?

A    We had left the room.

         MR. WHITE:  Pardon, was it three to five minutes or thirty-five minutes?

A    Three to five minutes.

Q    (By Ms. Pope Starnes, continuing):  So three to five minutes after you left the room you and Sergeant Sovik put your heads together as you put it?

A    Yes, to discuss the case.

Q    Did you discuss how you were going to handle placing the defendant under arrest?

A    I don't believe so, no.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      At the point that you two made this decision together, did you call for
       security?

A      No.

Q      Did you call for any other officers from your department?

A      No.

Q      What happened after you and Sergeant Sovik made this decision?

A      We walked into the room and we explained to him –

Q      Let me stop you there –

A      -- I'm sorry.

Q      When you walked in the room, where is the defendant?

A      Seated at the table next to Heather.

Q      Same seat as you testified before?

A      Yes.

Q      And where was Heather McBurney?

A      To his right.

Q      Same place as you testified previously?

A      Yes.

Q      When you came back in the room is the door open or closed?

A      I believe it was closed.

Q      Locked or unlocked?

A      Unlocked.

Q      You testified that you had left him with a piece of paper to write a
       statement?

A      Correct.

Q      Were you able to see that piece of paper when you came in the room?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes, it was sitting in front of him with the pen.

Q    And were able to see at that point if there was writing on that piece of paper?

A    Yes.

Q    What happened then?

A    I want – I believe Heather and Steven were spoken to regarding a consent to search the home.

Q    Who spoke with the defendant and Heather about the intent to search the home?

A    I don't recall, it could have been me, it could have been Sergeant Sovik.

Q    All right. What happened after that?

A    They both agreed. We explained to them that we needed the crib and they both said no problem and they signed a consent form to search the residence.

Q    Okay. And where did the consent form come from?

A    We had a piece of paper, a statement form.

Q    So is it – you used the statement form, is that what you used?

A    If I remember correctly, we may have.

Q    Okay. Is it something that you or Sergeant Sovik just wrote out?

A    No, I don't believe so, no.

Q    Okay. And who signed it?

A    Both Heather and Steven.

Q    What happened then?

A    We contacted Sergeant Baaki.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Where were you when you made contact with Sergeant Baaki?

A    I don't recall, I don't recall.

Q    What was the purpose of calling Sergeant Baaki or making contact?

A    Advisement, you know, about consent to search the home and get the crib.

Q    What happened then?

A    Steven was explained what was going to happen next.

Q    Who explained to him what was going to happen next?

A    I believe Sergeant Sovik did.

Q    Okay. And what did Sergeant Sovik say was going to happen?

A    We explained that we had no choice in this matter, we have to take him into custody for the assault on Heather – or, I'm sorry, on Madison.

Q    After that was explained to him, is the defendant allowed to leave the room?

A    At that point?

Q    Yes?

A    No.

Q    Was there a point where you allowed him to leave the room?

A    He could have left any time he wanted during the interview.

Q    Well, was there a point you allowed him to leave the room and to go back to Madison's room?

A    Yes.

Q    When was that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

A    I believe I put cuffs in front of him and I explained to him that he can

go say goodbye to his daughter one last time.

Q    So he's handcuffed in front?

A    Yes.

Q    And did you allow him to go down to Madison's room to say

goodbye?

A    Yes.

Q    Who went with him?

A    I believe he and Heather did.

Q    Where were you and Sergeant Sovik at that point?

A    Standing by the nurses' station.

Q    At that point could you see security anywhere?

A    No.

Q    Now, you testified about Sergeant Sovik telling the defendant after

getting the consent from the defendant and Heather that what was

going to happen next; is this the first time that you had heard any

communication to the defendant that he was not free to leave?

A    Yes.

Q    Between the time that you entered the room and saw the piece of paper

that the defendant had written the statement on with the pen on top of

it, and the time that Sergeant Sovik told the defendant what was going

to happen next, did you see the defendant write anything out on that

statement?

A    Nothing.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   Now during the time that you have been a police officer, have you received training in detecting people who are under the influence of controlled substances?

A   Yes.

Q   Did you have any reason to believe based on your training and experience that the defendant was under the influence of any controlled substance of any sort?

A   No, he seemed normal to me.

Q   Do you have training and detecting people who are under the influence of alcohol?

A   Yes.

Q   Have you had occasion in the course of your work to observe people who are under the influence of alcohol?

A   Yes.

Q   During the time that you were with the defendant did you have any reason to believe that he was under the influence of alcohol?

A   Not to my knowledge, no.

Q   At any point had he complained to you of any medical condition?

A   No.

Q   Did you observe any obvious medical conditions of the defendant which gave you concern?

A   No.

Q   At any point did you deprive him of sleep?

A   No.

Q   Did you deprive him of anything to eat?

A    No.

Q    Did you deprive him of anything to drink?

A    No.

Q    At any point during your interview of the defendant did he ask for an
     attorney?

A    No.

Q    At any point did he tell you he didn't want to speak to you any more?

A    No.

Q    Did he agree to speak with you?

A    Yes.

Q    Did you use any force or coercion to get the defendant to speak with
     you?

A    No.

Q    Did you use any trickery or deceit?

A    No.

Q    Did you specifically touch or poke the defendant at any time during
     the interview?

A    No.

Q    Did you threaten him?

A    No.

Q    How long in total was your interview of the defendant?

A    Approximately two hours.

Q    And are you aware of whether or not he had been able to sleep at all
     before you had your interview with him?

A    No, I don't recall if he was sleeping, I couldn't see him when he was
     in the room.

Q    Did he complain about lack of sleep to you during the interview?

A    Not that I can recall.

Q    Up until the point that you testified that the handcuffs were placed on
     him and he was handcuffed in front, was he restrained at all during the
     interview?

A    No.

Q    Did he appear to understand what you said to him through the
     interview?

A    Yes.

Q    At any point was there slurred speech?

A    No.

Q    At any point did the defendant express any problems or concerns or
     reluctance to talk to you?

A    No.

Q    You testified that previously you were brought up to the ped's floor by
     a security officer from the hospital?

A    Correct.

Q    Was there ever a time during that period that you were at the hospital
     that you saw the security officer again?

A    Yes.

Q    When?

A    When we escorted Mr. McBurney back down the elevator.

Q    And describe how that happened?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A      I – really – to tell you the truth, he came out of nowhere, I don't know

       if the nurses' station called him, I don't know but he came said are you

       guys ready to go? And we had Mr. McBurney cuffed and we said yes,

       we're ready to go.

Q      And did he provide you access to the elevator?

A      Yes.

Q      After you had completed your investigation, when was it that you

       made your police report?

A      Next day.

Q      Where was Sergeant Sovik, if you know, when you were doing your

       police report?

A      Right next to me.

Q      And how was the report written?

A      We both compared our notes and wrote the report together.

Q      Typed the report?

A      We both did.

Q      How many reports did you and Sergeant Sovik make as a result of

       your interview and investigation?

A      I don't recall.  We have one main body report and I believe the next

       point is regarding the prosecution of it.

Q      What I'm asking, do you have separate reports or one report together?

A      Main body it's all together.

Q      And as a matter of practice, after you have made your written police

       report what do you do with your notes?

A      Destroy them.

Q    What did you do with your notes from this case?

A    Shred them in the shredder.

Q    Okay. Now were there any notes that you ever turned over to the prosecutor's office?

A    Just names that we had written down of people we had made contact with throughout the investigation.

Q    And how many pages was that?

A    One.

Q    And were there any other notes that you turned over to the prosecutor?

A    Swear to that I had written – Sergeant Sovik and I had both written, the swear to.

Q    How many pages was that?

A    I believe one.

Q    And what was the purpose of the swear-to, as you call it, notes?

A    For the swear to and the warrant that I had in front of me when I swore to in front of a judge.

Q    And are there any other notes remaining from your investigation?

A    No.

Q    Do you have a copy of the written statement that the defendant made for you during the interview?

A    I believe it should be in the folder somewhere if I could see the folder to find it. It's right here.

          MS. POPE STARNES: May I have this marked, Your Honor, as People's proposed Exhibit 1.

          THE COURT: There's stickers on the podium there.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MS. POPE STARNES: There are. Thank you.

Q    (By Ms. Pope Starnes, continuing): This is just a copy of the statement officer?

A    Yes.

MS. POPE STARNES: Let the record reflect I am showing counsel – may I approach the witness?

THE COURT: You may.

Q    (By Ms. Pope Starnes, continuing): Is this a copy, People's proposed Exhibit 1 of the written statement by the defendant?

A    Yes, it is.

Q    Has anything been added to this form besides what the defendant wrote?

A    The signature of Sergeant Sovik and –

THE COURT: Signature of Sergeant Sovik and what?

A    At the bottom, the complaint number 0674 and a stamp copy.

Q    (By Ms. Pope Starnes, continuing): Stamp of the word copy?

A    Yes.

MS. POPE STARNES: I'd move for the admission of People's proposed Exhibit 1.

THE COURT: Any objection?

MR. WHITE: I just wonder where the original is?

A    It's back at the station. We keep the originals with our original reports, we don't take the originals out of the station.

MR. WHITE: No objection.

THE COURT: So admitted.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

(Whereupon People's Exhibit 1

was received in evidence)

MS. POPE STARNES: May I –

MR. WHITE: And obviously for purposes of this hearing?

THE COURT: Understood.

MS. POPE STARNES: May I tender this to the Court?

THE COURT: You may.

MS. POPE STARNES: Thank you Your Honor I have nothing

else of this witness.

THE COURT: Cross examine.

MR. WHITE: Your Honor, I believe I'm going to be a little

while, is it possible to take a quick break at this point before I get

started?

THE COURT: Yes. How long do you need just so the deputies

know whether to take him down or bring him up?

MR. WHITE: Just run to the bathroom.

THE COURT: Okay. Deputies, its up to you.

(Whereupon a pause was had in

these proceedings)

THE CLERK: The Court recalls the People v McBurney, 07-

214651 FH.

MS. POPE STARNES: Sara Pope Starnes, assistant

prosecuting attorney.

THE COURT: Thank you.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

MR. WHITE: Robert White on behalf of the defendant, Your Honor.

THE COURT: Thank you. We're resuming with cross exam, I'll remind you sir you're still under oath, required to testify truthfully and honestly.

A      Yes, Your Honor.

THE COURT: Thank you.

CROSS EXAMINATION

BY MR. WHITE:

Q      Officer, my name is Robert White, I represent Mr. McBurney. I'm going to ask you some questions, if at any time you do not understand me, please ask me to rephrase my questions.

A      Okay.

Q      Because if you give me a response I will assume that you heard my question and are giving me a full and fair response, do you understand?

A      Yes.

Q      And I'd ask that you try to avoid the word, we, if you –

A      I understand –

Q      -- can testify from your personal perspective, I don't want to continually interrupt you.

A      I understand..

Q      Now you testified that you've been a police officer for thirteen years?

A      Correct.

Q      All with the South Lyon Police Department?

A    Correct.

Q    Continually?

A    Yes.

Q    So that would put your date of hire somewhere around 1994?

A    Correct.

Q    And what – did you graduate from high school?

A    Yes, sir.

Q    What high school?

A    Is that relevant? I don't want to give my personal – is that relevant

where I graduated from high school?

THE COURT:  Do you have any –

MR. WHITE:  It's relevant to me.

THE COURT:  Well, let's go back to the law for a minute.

Counsel do you object as to relevance?

MS. POPE STARNES:  Well, I do.  He's testified he graduated

from high school, I think it's irrelevant as to what high school he

graduated from.

THE COURT:  Response?

MR. WHITE:  Well, he's the one who offered the background,

I guess I wanted to find out a little bit about —

THE COURT:  Do you have an offer of proof that there's some

high schools out there that are not legitimate?

MR. WHITE:  No, I don't, I'm going to ask him just about his

familiarity with the community, his familiarity with his police

experience, I believe that's important.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: I'll –

MS. POPE STARNES: And actually I don't see how that could ever impact anything, Judge.

THE COURT: All right. In fairness, I'll sustain the objection, you can ask those other questions, if those are relevant.

Q    (By Mr. White, continuing): And what year did you graduate from high school?

A    '89.

Q    And when you graduated from high school what was your grade point average?

MS. POPE STARNES: Objection as to relevance, Your Honor.

THE COURT: Counsel?

MR. WHITE: Well, it's certainly relevant because you'll see, Judge that his – the testimony is that he took notes to form this, prepare this report and not only to prepare this report but the testimony today is far beyond his notes.

So my understanding where his academic performance is in the past is very important, I think it's important for you to consider whether he's adding things or – and it's certainly important for a jury to consider.

THE COURT: Okay. Your response is noted. I respectfully sustain the objection. Go ahead.

Q    (By Mr. White, continuing): What was your class standing?

A    Class standing?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q     Yes?

A     I don't recall.

Q     Did you receive honors or anything, academic honors?

A     I don't recall.

Q     Did you have any particular curriculum that you studied?

A     College prep.

Q     Okay.  And did you attend college?

A     Yes, I did.

Q     Where did you attend college?

A     Michigan State University.

Q     And when did you attend Michigan State?

A     I graduated in 1993.

Q     How many years did you attend?

A     Four.

Q     So you started in 1989, is that correct?

A     Yes.

Q     And you went continuously?

A     Correct.

Q     And your curriculum?

A     Criminal justice.

Q     And did you receive a Bachelor of Science or Bachelor of Arts?

A     B A I believe, I'm digging.

Q     I'm sorry –

A     I'm digging way back.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      And did you know your class standing when you graduated from

       Michigan –

              MS. POPE STARNES:  Objection to relevancy Your Honor.

              THE COURT:  Do you know it?  If you know, just yes or no?

A      No, I know my grade point.

Q      (By Mr. White, continuing):  Well, what was your grade point?

              MS. POPE STARNES:  Objection to relevance, Your Honor.

              MR. WHITE:  Judge, I don't know how you can say its not

       relevant. I mean certainly if its his recall, his independent recall is of

       importance to this case as you will see.

              THE COURT:  All right. We've got – you stated that you

       graduated and you have a degree from college, correct?

A      That's correct., Your Honor.

              THE COURT:  All right. The Court will sustain the objection.

Q      (By Mr. White, continuing):  Do you have a photographic memory?

A      Do I?

Q      Yes?

A      I have a good memory.

Q      Do you have a photographic memory?

A      I don't know, I'm not an expert to recall whether I have a photographic

       memory or not counsel.

Q      And have you ever testified in this case before?

A      In this case?

Q      Yes?

A      No.

Q    Now I believe you indicated that you testified before a Magistrate or
     Judge for the swear to?

A    That's correct.

Q    When was that?

A    I don't recall the exact date, soon after – I'd say Monday or Tuesday
     of the following week.

Q    And who did you testify in front of?

A    I believe it was Judge MacKenzie.

Q    Who?

A    Judge MacKenzie.

Q    How many times did you testify, more than once?

A    Yes.

Q    And did you testify the second time – the first time was Monday or
     Tuesday following the arrest of Mr. McBurney, when was the second
     time?

A    I don't recall.

          MR. WHITE:  Your Honor, if I may approach the witness. Are
     you using numbers?

          MS. POPE STARNES:  Numbers.

          MR. WHITE:  I have proposed Exhibit A.

Q    (By Mr. White, continuing):  Officer, I'm handing you proposed
     Exhibit A, can you identify that?

A    Yes.

Q    And what is it?

A    It is the -- a copy of a swear to.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    It's handwritten notes, is it not?

A    Yes.

Q    Whose notes are those?

A    I'm at the bottom, Sergeant Sovik's writing is at the top.

Q    Would you read what is Sergeant Sovik's writing?

A    On 11/30/06 at approximately 7:20 –

      COURT REPORTER:  I'm sorry –

      THE COURT:  You've got to go slow.

A    On 11/30/06 –

      THE COURT:  Hold on a minute.  Did you ask him to read the swear to?

      MR. WHITE:  I asked him to read that which is Sergeant Sovik's writing on that piece of paper.

      THE COURT:  All right. Just read it slow, okay.

A    On 11/30/06, at approximately 7:20 members of the South Lyon Fire department – SOFD, I'm sorry, and Huron Valley Ambulance responded to 311 Scott Street at the request of Steven McBurney.

Q    (By Mr. White, continuing):  Now, is it true, officer that there's writing after that, correct?

A    That's correct.

Q    And all of the writing after that is your writing, correct?

A    Yes.

Q    Okay.  And when was Exhibit A prepared?

A    Prior to the swear to –

Q    When?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A        Prior to the swear to, I don't recall the exact date.

Q        Okay.  Can you tell me where it was prepared?

A        In my office at the South Lyon Police Department.

Q        Okay.  And when – you can't say when it was prepared?

A        Prior to the swear to.

Q        Obviously then you can't say that.  You don't know – who was present

         when it was prepared?

A        Sergeant Sovik and I.

Q        You prepared it sitting together?

A        Yes.

Q        Is there some reason that Sergeant Sovik wrote part of it and you wrote

         part of it?

A        No reason.

Q        And are the statements contained in proposed Exhibit A true?

A        Yes.

Q        Okay.  And where did you get the information that you prepared

         Exhibit A from?

A        Through our investigations.

Q        Did you use your notes that you took during the interviews with

         witnesses in this case, including Mr. McBurney?

A        We used our police report.

Q        The police report was completed?

A        Yes.

Q        Okay.  And where were your notes at the time Exhibit A was

         prepared?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Shredded.

Q    Is there anything else that you used to prepare Exhibit A, other than your police report?

A    No.

Q    Are the statements contained in Exhibit A true?

A    Yes.

Q    And you used those notes within – then to testify in front of Judge MacKenzie on two occasions, is that true?

A    Yes, I believe so.

Q    Are there any other notes that you used to testify in front of Judge MacKenzie –

A    Not that I can recall –

Q    -- for the purpose of the swear to?

A    Not that I can recall.

Q    Why wasn't Exhibit A destroyed?

A    It ended up in the folder.

Q    Why wasn't it destroyed?

A    I don't know.

        MR. WHITE:  I'd move for entry of Exhibit A, Your Honor.

        MS. POPE STARNES:  No objection.

        THE COURT:  So admitted.

                (Whereupon Defense Exhibit A

                was received in evidence)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q       (By Mr. White, continuing):  Now I believe you testified that this was

        your first homicide case – or this is your first homicide case, is that

        true?

A       First that I'd conducted investigations on.

Q       Okay.  First that you'd been the officer in charge of?

A       Correct.

Q       Okay.  This is your first child abuse case also?

A       No.

Q       And how many other child abuse cases have you had prior to this?

A       I don't recall the exact number.

Q       More than five?

A       I don't recall an exact number.

Q       Less than five?

A       I don't know.

Q       Were you ever involved in the investigation of a first degree child

        abuse case?

A       I believe I was, yes.

Q       How many?

A       I don't recall an exact number.

Q       More than one?

A       I don't recall an exact number.

Q       Have you ever testified in court before, before the swear to?

A       Yes.

Q       Do you know how many times you'd testified in court?

A       No, I don't.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

THE COURT: You need to speak a little bit louder.

A   No, I don't.

Q   (By Mr. White, continuing): Have you ever testified in circuit court
before?

A   No, I have not.

Q   Is this your first time testifying in Oakland County Circuit Court?

A   Yes, it is.

Q   In any circuit court?

A   Yes, it is.

Q   And in preparation for your testimony, did you review any documents?

A   Yes, I did.

Q   What did you review?

A   The report.

Q   The report you're referring to, the report that you've testified was
prepared by you and Sergeant Sovik?

A   Correct.

Q   Did you review any other documents?

A   The transcripts from district court.

Q   The whole transcript?

A   No, no.

Q   What did you review of the transcript?

A   I believe I reviewed maybe half of Sovik's testimony, if that, about
five minutes, just briefly read through.

Q   Anything else that you used to review before your testimony today?

A   No.

Q     From your review of the police report that was prepared by you and

      Sergeant Sovik for this case, are the statements contained therein true?

A     Absolutely.

Q     They were true at the time that you wrote it?

A     They are true right now, yes.

Q     I ask --

A     They were true from the time we wrote them to the time right now.

Q     True today, okay. And you also are testifying to this Court that you

      have independent recollection of the events that occurred on December

      2nd and December 3rd?

A     It's a very difficult to forget.

Q     Did you want to answer the question?

A     Yes.

Q     You have independent recollection, is that true?

A     Yes.

Q     Is there anything else that you used to refresh your recollection of

      those events before you testified today?

A     Anything else?

Q     Anything else besides reviewing the report –

            MS. POPE STARNES:  Objection, asked and answered, he has

      already said no.

            THE COURT:  Go ahead.  Did you look at anything besides

      the transcript and the police report?

A     No.

Q   (By Mr. White, continuing): Okay. Now I believe you indicated that the day that you were assigned to this case was a Saturday?

A   Yes.

Q   And you were not scheduled to work that day?

A   No.

Q   Okay. And you were on the detective bureau at that point?

A   Yes.

Q   Okay. And how long had you been on this assignment in the detective department?

A   If I remember correctly, throughout my career?

Q   That particular rotation?

A   Year, year and two months.

Q   And you also indicated that its not a favorable assignment to some people in the department?

A   I didn't say that.

Q   You didn't say that?

A   People like the road better than detective bureau –

Q   Okay.

A   -- so it comes around quite often –

Q   Why not?

A   I don't know, personal preference.

Q   What about you, do you have any personal –

A   I enjoy doing it –

Q   -- preference as to detective versus road –

A   I enjoy doing them both.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q      Let me finish my question. Do you have any personal preference as to
       being a road patrol officer or a detective?

A      No.

Q      And at that time what were your duties as a detective for the City of
       South Lyon Police Department?

A      Follow up investigations, court work, swear to's, prisoner pick ups,
       prisoner transports, you name it, we did it all.

Q      Okay. Interrogations?

A      Interrogations, everything. Some departments – like the sheriff
       department will have certain units, we don't, we follow up with
       everything.

Q      And in the course of your job as a detective and interrogation, is there
       any set protocol, rule or regulation with the South Lyon Police
       Department as to how interrogations were to be conducted?

A      No.

Q      As of December 2nd?

A      Not to my knowledge, no.

Q      And are there rules and regulations of the department?

A      Yes.

Q      Okay. And there were none – there are none in existence regarding the
       procedure used to do interrogations?

A      Not to my knowledge, no.

Q      So as far as, at that point, when you are to interrogate a suspect in a
       case, felony case, homicide case, you're given sole discretion on how
       it would be done, is that true?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes

Q    Where it would be done?

A    Yes.

Q    Okay. Under what parameters?

A    Correct – define parameters.

Q    Outlined?

A    Define outlines?

Q    Well, on – under what specific circumstances it would be done?

A    Explain the question again?

Q    At the time that you conducted the interrogation in December of 2006
     on this case, it was in your sole discretion as to how the interrogation
     would take place, correct?

A    Myself and Sergeant Sovik, my boss, yes.

Q    So it's your discretion, is that true?

A    Yes.

Q    Okay. And including the use of any recording devices?

A    I'm sorry?

Q    Including the use of any recording devices?

A    I'm not understanding your question?

Q    It's within your discretion –

A    Correct –

Q    -- it was within your discretion in December 2006?

A    Correct.

Q    And did you have any particular procedure that you used at that point
     when you were going to interrogate a possible felony suspect?

71

A    Any procedures?

Q    That you personally have?

A    No.

Q    I believe you indicated that you did search for a recorder, that's true, right?

A    Correct.

Q    And why did you search for a recorder?

A    It was a homicide investigation, you know, when we got the station it was kind of frantic, we were being briefed and spoke with Sergeant Baaki, I looked for one, found one and it didn't work, destroyed.

Q    And why were you searching for a recorder at that point?

A    As part of my investigation –

Q    You were searching for a recorder so then you could record the interviews of witnesses then and record the interviews with the defendant, correct?

A    Correct.

Q    Okay. And so there would never any doubt as to what was said or what was not said, correct?

A    Correct.

Q    But we can agree that if you actually recorded the witness interviews and the interrogation of the defendant there would be never any dispute as to what was said and what was not said, correct?

A    Correct.

Q    Okay. And especially in the case that it was your first homicide case of this nature, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

A        Correct.

Q        It was very important at that point, correct?

A        Yes.

Q        I believe you indicated you went to a back drawer in the squad room I
         believe --

A        Yes --

Q        -- to search for some kind of recorder, correct?

A        Yes.

Q        And you couldn't -- you found one but it would not work?

A        That's correct.

Q        Okay. Did you find more than one?

A        It was the only one around.

Q        Okay. And the reason why it wouldn't work was what?

A        The -- I pushed play, it didn't work, didn't spin, so I looked at the
         batteries, I pulled the battery compartment cover off and it was
         corroded all around the side, I put batteries in it and pushed play again,
         nothing, in the trash can it went.

                  THE COURT: Try to go just a little bit slower -- I've got it but
         -- she's good but --

Q        (By Mr. White, continuing): And did you make any other attempts to
         get any other kind of recording equipment?

A        No. I believe I just -- when I went to my investigation, I started talking
         to ambulance personnel and I didn't make any more attempts, no.

Q        Did you go to the store?

A        No, I did not go to the store.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       You didn't make any request of any other police department?

A       No, I didn't.

Q       So the full attempt that you made to record the interviews was this one

        check in the squad room, correct?

A       That's correct.

Q       Okay. With this one cassette recorder?

A       That I had, yes.

Q       Do you remember what you did the day of Saturday December 2nd,

        what you were doing that day?

A       Personally?

Q       Yes?

A       I remember I was eating dinner when I got called, with my wife and

        family.

Q       Do you remember what time you got up that day?

A       Saturday, I always sleep in, probably ten or eleven o'clock.

Q       Do you remember that or are you just saying it from –

A       Oh, I love to sleep, so –

Q       Let me finish my question, sir. Do you remember it or are you saying

        it's a matter of practice?

A       It's a matter of practice.

Q       Do you remember what you did during the day?

A       No, I don't.

Q       Did you – you said you were having dinner at the time you received

        the call from Sergeant Baaki?

A       Yes, I remember where I was sitting –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Pardon?

A      I remember the seating when I got the call.

Q      Okay. So did you have your – did you actually eat your dinner?

A      What? I'm sorry?

Q      Did you actually eat your dinner?

A      About half of it.

Q      During that day did you consume any kind of prescription medication?

A      No.

Q      Did you consume any kind of alcohol?

A      No.

Q      Were you scheduled to work that night?

A      No.

Q      I believe you indicated that you received a call, can you tell me what time it was?

A      At or about 8 p.m.

Q      And you arrived at the station at what time?

A      I'm going to say within an hour and a half, I didn't look at my watch when I arrived there, no.

Q      I'm sorry?

A      I didn't look at my watch when I arrived there.

Q      And you indicated you were dressed in a dress shirt, correct?

A      Yes.

Q      Slacks?

A      Yes.

Q      And a black wool jacket?

A     Yes.

Q     Okay. And that's the clothes that you had on throughout this
investigation, up to the point of handcuffing and escorting Steve
McBurney out of the hospital, correct?

A     That's correct.

Q     And when you arrived at the station Sergeant Sovik was not there,
correct?

A     No, I don't believe he was there.

Q     Did you have any conversation with Sergeant Baaki about –

A     I may have –

Q     -- the circumstances of this case?

A     I may have.

Q     Okay. And what did he tell you about the case before Sergeant Sovik
arrived?

A     He said that they had a baby at the hospital that has an injury to the
brain, a non-accidental injury of the brain, trauma, and that was
expected to die within forty-eight hours.

Q     And did Sergeant Baaki indicate to you whether there was – that he
had run a criminal history of either of the parents involved in this
case?

A     I don't recall.

Q     So immediately you're told that we have a child that's near death, will
die within forty-eight hours and it looks like a homicide, is that
correct?

A     He didn't say homicide.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

76

Q    He said non-accidental –

A    Non-accidental injury, the child is expected to die.

Q    Okay.  So its formed in your mind that there is a belief that this could

     be a homicide, correct?

A    I didn't form anything in my mind at that point, I didn't know what

     was going on.

Q    And did Sergeant Sovik arrive at some point?

A    He arrived soon after I did, I would say fifteen, twenty minutes after I

     arrived.

Q    And did Sergeant Baaki offer any other information to him in your

     presence regarding circumstances of the case?

A    No, not to my knowledge.

Q    And did in fact he indicate that he indicate that he had run the criminal

     histories of both Heather McBurney and Steve McBurney?

A    I don't know who ran the crims – criminal histories.

Q    My question though is did Sergeant Baaki indicate to you that he had

     run this criminal history of both Steven and Heather McBurney?

A    I don't recall.

Q    Now, is there anything else that Sergeant Baaki told you about this

     case that you can recall, either by cell phone or Sergeant Sovik?

A    That the baby was at U of M Hospital and they received a call from

     Sarah Weaver with Washtenaw County C.P.S., that's how the call

     came through.

Q    Was there anything else that was disclosed to to start your

     investigation?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Not – I could review my report – I don't recall, no.

Q    And would you like to re-read, review your report to see if there was anything else that was disclosed to you?

A    Sure.

        MR. WHITE:  Mine is all – do you have a copy of the report? Mine is all written over.

        MS. POPE STARNES:  It's right here.

        MR. WHITE:  Thank you.

        If I may approach, Your Honor?

        THE COURT:  You may.

Q    (By Mr. White, continuing):  What I've handed you, officer, is the report you testified was prepared by you and Sergeant Sovik from the notes that you and Sergeant Sovik took on the date of December 2nd and December 3rd of 2006, correct?

A    Correct.

Q    The first document I handed you was the report of Sergeant Baaki, isn't that correct, the first two pages?

A    This report here, which is point one, its very difficult to explain, we have point one, point two, point three, point fours; okay, point one is Sergeant Baaki; point two is myself and Sergeant Sovik; when I closed out, I believe point three is mine, we close them out after certain times and then reopen another point and go on from there, for instance, this investigation closed out, the next point I opened was court services points, okay, and the interview with Kennedy's mother.

Q    Okay.  And this is all done on the computer?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Yes.

Q     And so the report, the second set of documents is your report prepared by yourself and Sergeant Sovik, correct?

A     That's correct.

Q     And the first three paragraphs of page one that you have there reference to the interview that you have with Sergeant Baaki, correct, and the information you received, correct?

A     Uh-huh (affirmatively)

Q     And its true, officer, there's no mention of you running any criminal histories of either Heather or Steven McBurney, isn't that true.

A     With the contact with Sergeant Baaki?

Q     With the –

A     Is that what you're referring to?

Q     Your report you have in front of you, is there any mention whatsoever that you ran a criminal history of Heather or Steven McBurney?

A     The entire report, you're asking about this (indicating)?

Q     Any report, any part? I'm not asking you to look at his report, Sergeant Baaki's report, I'm looking at your report; you said you ran the criminal history, I'm asking, tell me in your report where it says that you ran the criminal histories of Heather and Steven McBurney?

A     Well, briefly I can't find it.

Q     Does that refresh your recollection whether you in fact did run the criminal history or not?

A     I didn't run the criminal history, no.

Q   Okay. You didn't. In fact it was run by Sergeant Baaki, isn't that true?

A   I guess, if that's what he told.

Q   Why – I didn't ask you to guess sir, just tell me if you know?

A   I know I didn't run the criminal history.

Q   Okay. But isn't it true, sir, in the briefing by Sergeant Baaki you were provided the criminal history by Heather and Steven McBurney?

A   Was I? I don't recall whether I was or Sergeant Sovik was.

Q   One or both of you, you or him in your presence, isn't that true?

A   Were we told about the Northville case?

Q   Yes?

A   Yes.

Q   By Sergeant Baaki, correct?

A   I believe so.

Q   Okay. And what were you told about the Northville case by Sergeant Baaki?

A   That he was convicted of second degree child abuse.

Q   Anything else?

A   That's all the criminal history says, what he's charged with and what the judicial segment is.

        THE COURT: You've got to go a little bit slower.

A   I'm sorry.

Q   (By Mr. White, continuing): Now we agree that you did not include that information in your report, correct?

A   It's included in – what, regarding the –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       Sergeant Baaki's disclosure to you, the criminal history of Heather and
        Steven McBurney?

A       It's in our report. It says on the bottom, Sergeant Sovik contacted
        Northville Township Police –

            THE COURT: You've got to go slower –

A       I'm sorry. On page two, bottom of the paragraph, Sergeant Sovik
        contacted Northville Township Police Department and requested a
        copy of the report of 1998, NTPS case number 98-95 – or 1950. This
        report was taken as a result of injuries suffered by a four and a half
        month old boy, Nicholas Kennedy. So –

Q       Did you understand the question, sir?

            THE COURT: Just ask it, just ask the question again.

Q       (By Mr. White, continuing): My question is it's not in the report that
        Sergeant Baaki disclosed to you the criminal histories of Steven and
        Heather McBurney, isn't that true?

A       I would say that it is because we contacted Northville Township
        regarding –

Q       Tell me where it says –

A       Okay.

Q       -- where it says that Sergeant Baaki told us the criminal histories of
        Steven and Heather McBurney?

A       I guess I'm looking a little deep into it then, because –

Q       Does it say that –

A    -- when you call Northville Township, we're going – we're calling for a reason, obviously, we were told by Sergeant Baaki about a prior child abuse –

Q    Obviously, right?

A    Right.

Q    Right.

A    Correct.

Q    Obviously you were told, right? And obviously you didn't put that in your report either, did you?

        MS. POPE STARNES: I'm going to object at this point he's becoming argumentative. It's clear that it's not in the report and he believes its based on what he was told.

        MR. WHITE: I'd agree if we could have that stipulation Your Honor.

        MS. POPE STARNES: I'm not going to stipulate, Your Honor, I think the evidence and the testimony is clear.

        THE COURT: I've got it all. Let's move on.

Q    (By Mr. White, continuing): Is there anything else that Sergeant Baaki told you that's not included in your report?

A    Not that I can recall.

Q    Your first step of your investigation after the briefing by Sergeant Baaki was what?

A    My first step?

Q    First step?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Speaking with Sergeant Sovik and deciding who we were going to talk
     to at the station.

Q    Okay. And then what was your next step?

A    Looking for a recorder.

Q    And then your next step?

A    I spoke with Calus and attempted to speak with Timmerman from
     Huron Valley Ambulance.

Q    And how did you speak to Calus – that's C-a-l-u-s, correct?

A    Correct.

Q    How did you speak to him?

A    If I remember correctly I may have spoke to him on the phone.

Q    And when you spoke to him on the phone how did you record his
     statements?

A    Through a pen on to notes.

Q    Okay. And do you know what time you spoke to him?

A    I don't recall exactly.

Q    Do you know how long you spoke to him?

A    Ten minutes.

Q    Did everything he tell you get put in your notes?

A    Yes.

Q    So you wrote down what he said verbatim?

A    No –

Q    Word for word?

A    No, I did not write down verbatim.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    The notes that you took, did you use those to put down in your report what Calus said to you?

A    Yes, I did.

Q    Did you include everything that he said to you in your written report?

A    Of course I did, yes.

Q    Pardon?

A    Of course I did, yes.

Q    So everything he said, word for word, is included –

A    No –

      MS. POPE STARNES:  Objection, asked and answered three times.

      THE COURT:  I've got it.

Q    (By Mr. White, continuing):  So you said you made attempts to talk to Timmerman also?

A    Yes.

Q    How did you make that attempt?

A    I believe I called South Lyon Ambulance and they called or gave me his phone number, his home phone number, and I left a message at his home.

Q    Okay.  Did you ever speak to Timmerman about this case?

A    I believe I did.

Q    Okay.

A    It wasn't the night of.

Q    Did you make any notes of your conversation with him?

A    Of course I made notes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did you incorporate those notes into your written report?

A    Yes, of course I did.

Q    Okay. And then have you provided that written report of the conversation with Timmerman to the prosecution?

A    I would have, yes, its in the statement.

Q    Do you know when you originally spoke to him?

A    No, I don't recall.

Q    And did you incorporate everything that he said to you into your notes?

A    Yes, I would have.

Q    Word for word?

A    Verbatim?

Q    Yes?

A    No.

Q    And did you incorporate everything that he said to you verbatim into your written report?

A    Yes, I would.

Q    And what was the next step of your investigation?

A    Sergeant Sovik talked with fire fighters.

Q    And from your knowledge, were you present, were you present during the interview of South Lyon fire fighters?

A    No, I was not.

Q    And do you know where this interview took place, or these interviews?

A    Either at the station or the fire hall, one of the two.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    All right. But you weren't present, this is information you received

       from Sergeant Sovik, correct?

A    Correct.

Q    And while he was doing that what were you doing on the case?

A    I don't recall.

Q    This was all December 2nd, correct?

A    Yes.

Q    Now what's the next step that you took?

A    We made contact with Northville Township Police Department.

Q    How did you make contact?

A    I believe we called – I believe Sergeant Sovik called first.

Q    And did he do that in your presence?

A    I can't recall.

Q    And did you do anything else, to your knowledge, other than Sergeant

       Sovik calling Northville Police Department, in regards to the prior

       case?

A    We drove there.

Q    Okay.  And you drove there together?

A    Yes.

Q    And did you arrive at the police department?

A    Yes.

Q    Did you speak to anyone in particular?

A    I believe we spoke to one of the officers.

Q    Do you remember that person's name?

A    No.

86

Q    Was that person's name included in your report?

A    I'd have to review the report.

Q    Bottom of page two, top of page three.

A    Regarding what counsel?

Q    Contact with Northville Police Department?

A    Yes, but there's also another page you'd have to review to see if they are in there. Okay. I have a name.

Q    Do you have a person's name?

A    Ellen Putman (phoen).

Q    And her position with Northville Police Department?

A    Clerk.

Q    Anybody else that you spoke to while you were there?

A    I believe just the – I remember they called her in from home.

Q    How long were you at the Northville Police Department?

A    I don't recall exactly, the exact time.

Q    And were you provided any documents or any kind of tangible material regarding the prior case?

A    At that point no.

Q    Okay. And were provided information about the prior case?

A    Sergeant Sovik reviewed the microfiche –

         COURT REPORTER: Reviewed the what?

A    The microfiche, it was a small system, but that was malfunctioning.

Q    (By Mr. White, continuing): Anything else besides Sergeant Sovik reviewing the microfiche?

A    No.

87

Q    Did either you or Sergeant Sovik take notes?

A    Sergeant Sovik did.

Q    Okay. And from those notes, were they incorporated into your report that you prepared?

A    Yes.

Q    And does the report contain all of the information that you received from the Northville Police Department on December 2, 2006?

         MS. POPE STARNES: I'm going to object because its speculation on his part. Sergeant Sovik would have to testify since he's the person that reviewed the microfiche and took the notes. The question is proper before Sergeant Sovik who will be testifying.

         MR. WHITE: I believe I can ask him from his knowledge, Your Honor, since they were together –

         THE COURT: Ask the question again, let me hear it.

Q    (By Mr. White, continuing): The question is from your knowledge of the information that was gathered and the notes that were taken have all of the information that you were provided through Northville Police Department either orally or through a review of the microfiche, was it included in your report that you subsequently prepared?

         THE COURT: From your perspective, not Sergeant Sovik's, everything that you –that came into your head from Northville is translated to paper?

A    Being Sergeant Sovik and I sat down next to each other and put the report together, both of us, yes, they were transferred.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q       (By Mr. White, continuing):  All right.  And it included everything that
        was disclosed, correct?

A       Correct.

Q       And that I believe is the information that is contained on the top of
        page three of your report then?

A       In that binder right there which contains the entire report.

Q       I'm talking about that which you would have had available to you on
        December 2, 2006?

A       That was just a brief synopsis of what was in the microfiche.
        Obviously we didn't have time to go through two hundred pages.

Q       You did not have the whole report at that time, correct?

A       We were having difficulties pulling it up – Sergeant Sovik had
        difficulty pulling the report up.

Q       Were you given any written report whatsoever?

A       No, we were not. At a later date, yes.

Q       So you were apprised that there was a prior conviction of Steven
        McBurney for second degree child abuse, correct?

A       Correct.

Q       You already knew that though, right?

A       From lien, yes.

Q       Okay.  And you were apprised this involved a four and a half month
        old child named Nicholas Kennedy, correct?

A       Correct.

Q       Okay.  And I believe it says in your report:

"Kennedy suffered very similar injuries to
Madison's at the hands of Steven McBurney"

And I'm quoting from page three of the report. Was that information

provided to you on December 2, 2006?

A     You'd have to ask Sergeant Sovik.

Q     Can you say that that was true at that point?

A     You'd have to ask Sergeant Sovik.

         THE COURT: Well, in fairness the question is was that

information provided to you? And it sounds like – I won't – was it

provided to you on December 2nd?

A     Sergeant Sovik read the microfiche.

         THE COURT: So then it wasn't provided to you?

A     No.

         THE COURT: Okay. That's all.

Q     (By Mr. White, continuing): Were you supplied any information about

Steven McBurney's past other than his conviction?

A     Through our investigation?

Q     No, at the time you were at the Northville Police Department?

A     No.

Q     And you knew, you were aware that it was first degree child abuse

charge reduced to second degree, correct?

A     That's correct.

Q     Anything else that you were – any other information that you were

supplied at or by the Northville Police Department personnel then?

A     No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    And it's true, officer, that at the time that you were conducting this investigation, you knew that Heather McBurney's criminal history, there was none, correct?

A    Correct.

Q    And it's also true that Steven McBurney's criminal history, there was only one entry and that was for a conviction of second degree child abuse, correct?

A    If I remember correctly, yes.

Q    And the time that you left Northville Police department was when?

A    I don't recall the exact time.

Q    And what was the next step of your investigation?

A    U of M Hospital.

Q    And did you go directly to U of M from Northville?

A    Yes.

Q    And what time did you arrive at U of M?

A    Eleven, twelve, sometime in that area, if I remember correctly.

Q    Eleven p.m., twelve p.m.?

A    Twelve a.m.

Q    Twelve midnight. So – and you and Sergeant Sovik are together, correct?

A    Yes.

Q    And the first thing that you did when you got to U of M was what?

A    Spoke to Sarah Weaver, we met up with her.

Q    And Sarah Weaver was a Washtenaw County Child Protective Services worker, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Correct.

Q     And she was the one who had called your department, correct?

A     Correct.

Q     And you met with her at the first floor of the hospital, correct?

A     Yeah, it's like a commons area where you sit on couches.

Q     Okay. And it's just you and Sergeant Sovik, correct?

A     Correct.

Q     And Ms. Weaver, correct?

A     Correct.

Q     And did you ask her questions?

A     Yes.

Q     And did Sergeant Sovik ask her questions?

A     Yes.

Q     And how did you record her statements?

A     We didn't.

Q     So did either one of you take notes?

A     Yes.

Q     Okay. Who took the notes?

A     I took notes. I wasn't paying attention to Sergeant Sovik.

Q     And did you write down everything that she said word for word?

A     Not word for word, no.

Q     From your notes did you include the conversation with Sarah Weaver

in your written report that you've testified that you prepared?

A     Yes, we did.

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.   800-626-6313

Q     And the substance of the conversation was that you were informed
      again that Madison's injuries were not accidental, isn't that correct?

A     For the most part, yes.

Q     Okay. Is it also true that you were informed that Steven McBurney
      was home alone at the time of this incident, correct?

A     That's correct.

Q     Right?

A     That's correct.

Q     Heather had gone to work, correct?

A     That's correct.

Q     Okay. And you were informed that there were no other characters
      involved with the child, correct?

A     At that point I'd have to read my report if she told us that.

Q     Right.

A     I'm sorry, what was the question counsel?

Q     The question was you were informed that there were no other
      caregivers that were possible suspects, I added that, regarding the
      injuries caused to Madison McBurney?

A     I don't believe she said anything about that. She said Steven was home
      with her alone.

Q     You were informed that she had subdural hematoma and retinal
      hemorrhaging, correct?

A     Yes, with a clear skeletal – I don't know the terms she used, skeletal –

Q     And anything else that she – you can remember her telling you that's
      not included in your report?

FORM CSR- LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    No, it would be in the report.

Q    And we can agree, officer, that there's no quotations used in any of the statements attributable to Sarah Weaver, isn't that true?

A    Yes.

Q    And it's also true through your interview with Paramedic Calus, true?

A    I'd have to review it, no, it's untrue. There's quotes on Calus' first line.

Q    I'm sorry, the one quote is, "infant barely breathing"?

A    Nope, fifth line up from the bottom.

Q    And those quotes are attributable directly to Paramedic Calus?

A    Yeah, the whole statement is, the whole statement is attributable to what he told me.

Q    Okay.  But the things you put in quotations of his are things that he said?

A    I do that all the time.

Q    The things that he said verbatim?

A    I don't think its verbatim.

Q    The things that you put in quotes attributable to Calus are the things that he said verbatim?

A    I don't agree with that, no.

Q    Well then why did you put it in quotes?

A    I don't – I really don't know, I've done it for thirteen years, I put some things in quotes and not quotes.

Q    So what you're testifying then is when you put something in quotes for

     a particular witness, it may be his statement or her statement or may

     not, is that your testimony?

A    I'm sorry?

Q    What you're testifying then is, if I understand you correctly, is when

     you put something in quotes, it may be that person's statement or it

     may not?

A    No, it's their statement.

Q    So the things that you put in quotes then are verbatim from what was

     said?

A    No, they're not.

Q    We can agree that nothing was put in quotes in Sarah Weaver's –

A    I'm sorry, you were referring to Mr. Calus, I'm sorry.

Q    No, with – I'm switching to Sarah Weaver. Anything in quotes there?

A    No, no quotes, quotations.

Q    Was anybody else present during this interview?

A    With Sarah Weaver?

Q    Yes?

A    Sergeant Sovik.

Q    And how long did the interview take?

A    Brief, maybe twenty minutes.

Q    And what was your next step?

A    Security guard escorted us up to the ped's unit.

Q    And –

A    I think it was the fourth floor.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q     How was the security guard – did you ask for him?

A     When we came into the hospital he was there and I don't know if he
      was waiting for us or what, if that's why he was at the entrance of the
      hospital, he took us to Sarah Weaver and then he walked away if I
      recall.

Q     Okay. And how did he return?

A     When we got up and he was way down the hallway and he looked at
      us and he said are you guys done? Yep, and he came walking back up
      to us.

Q     And then he took you up to the fourth floor, pediatric intensive care
      unit?

A     Correct, fourth floor if I remember correctly, yes.

Q     You know it was the Pediatric Intensive Care Unit, correct?

A     Yes, I did know that.

Q     And what was the purpose of going there?

A     To investigate a child that had a non-accidental trauma to the head.

Q     Okay. And you were aware at this point that Steven McBurney and
      Heather McBurney were in the hospital, correct?

A     I don't know if I recall that or not. I didn't know if they were there at
      the time, I don't know, I can't recall that.

Q     Do you remember discussing it with Sarah Weaver at all?

A     She may have told us that they were up there with their daughter.

Q     Okay. Certainly it's not included in your report, correct?

A     I'm sorry?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    It's not in your report, in your discussion with Sarah Weaver, that she

     may have told you that Steven and Heather were there, correct?

A    No.

Q    And so can we agree the purpose of then going to that floor was to

     interview both Heather and Steven McBurney?

A    Yes, I'd agree, and Dr. Fleming.

Q    Did you know who Dr. Fleming was before you went to the fourth

     floor, I mean before you went to the pediatric intensive care unit?

A    No.

Q    Did you know who you were going to be interviewing regarding

     nature and extent of Madison's injuries?

A    Not at first, no, we knew that later.

Q    Do you know how was it that Dr. Fleming was chosen?

A    He was the doctor that was doing rounds in the ped's unit that night,

     was caring for Madison.

Q    Okay.  And you spoke to him, correct?

A    Correct.

Q    Where did you speak to him?

A    Conference room.

Q    Conference room where the interrogation of Steven McBurney took

     place?

A    Yes.

Q    Okay.  And officer, the pediatric intensive care unit, there's one door

     going in and out of the unit, correct, a set of doors, isn't that true?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       I don't know, the elevator – going in – are you talking about going into the ped's unit?

Q       The ped's unit?

A       There's an elevator, that's how we got in there.  I don't know if there is any other exits or entrances.

Q       Okay.  And so as far as you knew that evening the only way to get in and out was through that elevator, correct?

A       It's how we got there was through the elevator.

Q       Okay.  And the actual unit itself is rectangular in shape?

A       I didn't walk around the unit.

Q       Okay.  The conference room is approximately how many feet from the elevator?

A       I don't recall, I do not recall.

Q       One conference room?

A       One conference room.

Q       Okay.  And that was the room that you chose to conduct the interview with Dr. Fleming, correct?

A       That's where they directed us.

Q       They directed you, who directed you there?

A       I believe it was the nurses, because they went to get Dr. Fleming, they had us have a seat in there.

Q       Okay.  And in that conference room there's one door in and out, correct?

A       That's correct.

Q       Okay.  And there's a large table in there, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-826-6313

A    Yes.

Q    And there was no windows to the outside of the building, correct?

A    No, no windows to the outside world.

Q    Dr. Fleming came into the room?

A    Yes.

Q    Okay.  And will you describe him for me, please?

A    Kind looks like you.

Q    Okay.

A    I remember him being tall and skinny, kind of balding on top, he was

     kind of like you.  You asked, counsel.

Q    And did you introduce yourself?

A    Yes.

Q    Did you ask him questions?

A    Yes.

Q    Did Sergeant Sovik ask him questions?

A    Yes.

Q    And was that interview recorded?

A    No.

Q    And did you take notes?

A    Yes.

Q    And did Sergeant Sovik take notes?

A    I believe so, yes.

Q    Okay.  And were you seated at the time?

A    Yes, we were seated.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   Okay. And did you record in your notes everything he said word for word?

A   Not word for word, no.

Q   So you used your notes then to ultimately prepare your report regarding your interview with Dr. Fleming?

A   Yes.

Q   And Dr. Fleming reiterated to you that this was a non-accidental injury?

A   Yes.

Q   Indicative of shaken baby syndrome?

A   Yes.

Q   That is not a typical seizure type of injury, correct?

A   Correct.

Q   And that Madison was not expected to live?

A   He explained to us that she was not expected to live and that they had, per policy of the hospital, they had to wait for the Phenobarbital levels to drop.

Q   Okay. And this was an injury not typical of someone falling off a chair or a couch?

A   I believe the way he described it was sudden deceleration.

Q   So in your mind and again you're reiterating that this is an intentional injury, correct, intentionally caused injury?

A   We didn't know at that point.

Q   You didn't know?

A   We didn't know, I mean this was the doctor telling us --

Q       You didn't have any idea?

        MS. POPE STARNES: I'm going to object and ask he be
allowed to finish answering the question, he's being interrupted by
counsel.

        THE COURT: Go ahead.

A       At that point we were in the middle of the investigation, we're in the
middle of an investigation and that's where we're at. I mean the doctor
is telling us this, you know, we were right in the middle of the
investigation. Did we know how it happened? No. Did we know who
did it? No.

Q       (By Mr. White, continuing): You didn't have any idea?

A       No.

Q       Didn't have any idea whether it was Steven McBurney, Heather
McBurney or someone else, is that your statement?

A       We had no idea at that point in the investigation who was responsible.

Q       And it's true that nothing was put in quotations from Dr. Fleming's
interview either, is that correct?

A       That's true.

Q       Okay. Is there anything that he said that you can recall now, officer,
that was not included in the report?

A       No.

Q       And how long did this interview take place?

A       I would say maybe twenty minutes, half hour.

Q       Did anybody else come in the room besides you, Sergeant Sovik and
Dr. Fleming?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Not that I can recall.

Q     And the next step in your investigation was what?

A     Had the nurses get Heather McBurney for us.

Q     And you said that you did not want to go to the victim's room, was that your statement?

A     Yeah, I started crying.

Q     Did you actually start crying that evening?

A     Yes, I saw her, through the window and I started crying and had to walk away.

Q     Had you walked down to the room?

A     No, I got half way down.

Q     Is that when you returned to the nurses' station?

A     Yeah, I got to the nurses' station and I saw the big picture window and she was laying on the bed with a bandage over her head and tubes were in her mouth.

Q     And who did you ask to get Heather McBurney?

A     One of the nurses, I don't recall who it was, there was probably four or five standing there.

Q     Do you remember a nurse named Regina?

A     Yes.

Q     Black woman?

A     As I recall, yes.

Q     Okay. Was it her that you asked to get Heather?

A     It could have been.

Q     And you went to the conference room?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Yes.

Q     Whoever went to get Heather, you and Sergeant Sovik then were in the
      conference room, correct?

A     That's correct.

Q     And I'm going to make a little diagram for you, okay, please tell me if
      I'm wrong, okay.

A     Okay.

              MR. WHITE:  May I, Your Honor?

Q     (By Mr. White, continuing):  The conference room had one door in
      and out, right?

A     That's correct.

Q     There was a long table inside, correct?

A     Right.

Q     And you sat on this side?

A     Correct.

Q     And Sergeant Sovik sat on this side?

A     Correct.

Q     And there was one chair here?

A     Correct.

Q     And that chair you used to have Heather sit and be interviewed,
      correct?

A     Correct.

Q     And that was the same chair that you had used to have Steven sit in the
      interview?

A     Correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    With the back to the door?

A    Correct.

Q    Okay. And the nurses' station was this way (indicating)?

A    Right out the door.

Q    Right here (indicating)?

A    No, right out – once you walk out the door, if you walk straight you're

     right at the nurses' station.

Q    Okay. Right in this area (indicating) ?

A    Yes.

Q    Okay.

A    And actually, it was long; it wasn't that ways long, it was the other

     ways long.

Q    Okay. It was long this way (indicating)?

A    Yes.

Q    And the elevator you once told me of egress –

A    That way (indicating) and I think down the hall.

Q    Down the hall here (indicating)?

          MS. POPE STARNES: I'm going to object to counsel's

     characterization of once told me of egress; the officer testified that he

     did not walk the floor, he did not know if there were any other

     entrances or exits, the only thing he was aware of was the elevator. So

     I think that that should be struck, the once told me of egress, there was

     no testimony of that.

          MR. WHITE: Obviously he can only answer from what he

     knows –

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.  800-626-6313

MS. POPE STARNES: No, it's not obvious, Your Honor.

THE COURT: The record speaks for itself. Thank you. Move on.

Q (By Mr. White, continuing): The elevator was down here?

A To the best of my recollection, yes.

Q Okay. And this is how you came in?

A Through an elevator, yes.

Q And this is how you went out, correct?

A Through an elevator, yes.

Q And you don't have any other knowledge of other – any means to get in and out –

A I didn't walk the floor, I don't even know what's – the only place I stayed is right in that area right there.

Q Okay. And Madison's room was?

A Straight past the nurses' station.

Q Okay.

A You would be writing up top (indicating), you'd be writing on the wood.

Q Okay. Up here (indicating)?

A No, above the –

Q Here (indicating)?

A –– nurses' station.

Q Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Back this way (indicating). Back further, right there (indicating).

Q     Okay. And Heather came in and sat down, correct, you told her to sit
      down?

A     Yes.

Q     You identified yourself as a South Lyon Police Officers, correct?

A     Yes.

Q     And Regina stayed in the room, is that true?

A     Yes.

Q     And where was she?

A     Regina was sitting in the chair that Heather sat in when she came and
      talked to Steven, so between Sergeant Sovik and Heather, I think
      Sarah Weaver sat on the opposite side of Sergeant Sovik.

Q     So Sarah Weaver sat over here (indicating)?

A     I believe so, yes.

Q     And Regina sat over here (indicating)?

A     I believe so, yes.

Q     Okay. And why did you keep other people in the room during this
      time, Regina and Sarah Weaver?

A     No particular reason.

Q     Okay. And do you know who began questioning first, you or Sergeant
      Sovik?

A     I don't recall.

Q     Okay. And you said she was in a state of shock?

A     She was crying, yes, she was in the state of shock.

Q     And was she able to answer your questions?

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Yes.

Q     And you asked her questions about her history with Steve?

A     Correct.

Q     You asked her about Madison?

A     Correct.

Q     Okay. And you asked her about the circumstances of November 30th?

A     Yes, we did.

Q     And she responded to you?

A     Yes.

Q     Topic by topic, correct?

A     Yes.

Q     And you also, you and Sergeant Sovik informed her of the other case involving another son, correct?

A     Sergeant Sovik did.

Q     Okay.

A     I do remember that.

Q     And Sergeant Sovik stated to her that he had another son, correct?

A     Yes.

Q     And he also stated that this son suffered injuries at the hands of Steven McBurney, correct?

A     I'd have to review my report. I believe he said similar injuries, I don't know, you said at the hands of McBurney, I'd have to read my report.

Q     Okay. And go ahead and read the report.

      THE COURT: Can we just, to save some time, just read what it is and see —

Q    (By Mr. White, continuing):  Okay.  I'm going to read it while you
     read it, okay, sir.

A    Where are you at now?

Q    Okay.  Last paragraph.

A    Okay.

Q    "Sergeant Sovik informed Heather that Steven does have a child from
     a previous relationship and that he was charged with first degree child
     abuse by the Wayne County Prosecutor's Office in 1998.  Sergeant
     Sovik also informed her that the four and a half month old boy
     sustained the same injuries as Madison did."

A    Correct.

Q    Okay.

A    But not at the hands of Steven, he never said that.

          THE COURT:  We've got it.

Q    (By Mr. White, continuing):  Okay.  Did Steven – what were the
     injuries that Nicholas Kennedy had suffered?

A    Retinal hemorrhaging and subdural hematoma.

Q    Where did you receive that information?

A    The report there.

Q    You didn't have that report at that time?

A    I don't believe so, no.

Q    Okay.  Where did you receive the information on the night of
     December – actually, it's December 3rd at this point in the morning,
     that Nicholas Kennedy had suffered subdural hematoma and retinal
     hemorrhaging?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     You'd have to ask Sergeant Sovik, he read the microfiche.

Q     Did you receive that information?

A     No.

Q     So as far as you knew, you did not know whether Nicholas had

      sustained the same injuries or not, isn't that true?

A     Correct.

Q     Okay. Did you ask a question, sir, isn't it true that you never asked

      Heather whether she was responsible for the injuries to Madison, isn't

      that true?

A     She was asked that question, yes.

Q     Who asked her that question?

A     I don't recall.

Q     Isn't it true that she was never a suspect in the injuries caused to

      Madison McBurney?

A     She was a suspect.

Q     She was a suspect at that time?

A     Well, as I told you before in prior testimony, we didn't know what was

      going on. We knew that there were two caregivers.

Q     So are you telling me that she was a suspect at the time that you were

      interviewing her on December 3, 2006?

A     Prior to the interview?

Q     At the time of the interview?

A     I guess they'd both be suspects, yes.

Q     Did you ask her about her involvement at the time that she provided

      care to Heather – excuse me – to Madison, within the days before this?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    She said she was sick.

Q    Did you ask her?

A    I'm –

Q    Sir, my question is, I apologize, that's a bad question. Did you ask Heather about the circumstances under which she provided care for Madison in the days before the injury?

A    I don't believe so.

Q    So she's a possible suspect and you're not asking whether she provided any care alone to the child?

A    Our investigations –

Q    Pardon?

A    -- our investigations were not concluded.

Q    Did you receive any information whether Heather was ever involved alone with the child in the days before the injury?

A    Not to my knowledge.

Q    Why wouldn't you ask her the question about her time alone with the child?

A    I don't know.

Q    Did Sergeant Sovik ask her any questions about her time alone with the child?

A    Not to my knowledge.

Q    I note in your report that you indicate that the interview began at approximately 12:40 a.m. is that true, it does say that?

A    Yes, if the report says it, yes. I don't remember the exact times.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Okay. Why would you record the times of this interview but not any

     of the other interviews?

A    I don't know.

Q    Isn't it true, Officer, that either you or Sergeant Sovik said to her that

     Steven McBurney had a violent past?

A    I think we explained to her about the previous child.

Q    My question is isn't it true that you said, either you or Sergeant Sovik,

     said to Heather that Steven had a violent past?

A    I don't recall that, no.

Q    Isn't it true that you said to her that Steven was – had caused the injury

     to Madison?

A    I think we explained to her that if she didn't do it then Steven must

     have, she couldn't believe it.

Q    So the answer to my question is yes?

A    Yes.

Q    Okay. And isn't it true that you asked her, what do you think should

     be done to people who abuse their children?

A    I believe we asked Steven that.

Q    You didn't ask Heather that?

A    No.

Q    Isn't it true, officer, that you and Sergeant Sovik both tried to suggest

     to Heather McBurney that Steven was violent, and violent during his

     marriage to Heather?

A    No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    When would you have received the information that Steven had a violent past?

A    I don't believe we explained to her that he had a violent past, we explained to her that he had a prior child abuse and a prior – and he has another child. At first she told us that's not true and then she later said yeah, I talked to a buddy that said that.

Q    And was everything that Heather said to you recorded by notes, word for word?

A    No, not recorded.

Q    Did both you and Sergeant Sovik take notes?

A    I did, I believe Sergeant Sovik did.

Q    And did you use your notes then to prepare your report?

A    Of course.

Q    So everything that Heather said to you, word for word, included in the report which says the interview with Heather McBurney?

A    Word for word are you asking me?

Q    Yes?

A    No.

Q    Anything that you can remember that you did not include?

A    No.

Q    Now Heather became increasingly upset during this interview, is that a fair statement?

A    Yes, I believe she did.

Q    And she became increasingly upset about the statements that you and Sergeant Sovik were making about Steven, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I don't recall. I think she was crying because she said my child is dying.

Q    Okay. We know that that's not included in the report, is it?

A    No. She was upset.

Q    Anything else that you can remember her saying that's not included in your report?

A    No. We all knew her child was dying; it's everywhere else in the report.

Q    My question is anything else that she said that –

A    I didn't write her statement in there word for word, I explained that to you.

Q    And when she said to you that she was not involved in the injuries to Madison, did you believe her?

A    At the time, I didn't know, I didn't know.

Q    We know that –

A    We're lied to every day.

Q    We know that you didn't ask any follow up questions, right?

A    I don't recall if we did or not.

Q    So it would be reflected in your report, wouldn't it?

A    If there were follow up questions, of course there would be.

Q    Okay. So if you can, tell me whether any follow up questions about her involvement in that report?

A    I don't recall.

Q    Can you look at the report and tell me?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    She said she wasn't involved and she did not believe Steven was responsible for it, we concluded the interview.

Q    That was the extent of your questions, were you involved, she said no and that was it?

A    We may have thanked her for her time and offered our condolences and –

Q    My question is was that the extent of your questioning of her involvement then; were you responsible, she said no, and that's it?

A    At that point of the investigation, yes.

Q    Okay. And I believe you indicated that the interview ended approximately two a.m.?

A    Correct.

Q    The word I that is used in this report, for instance when it says, 'I asked her if she was responsible for the injuries sustained by Madison' is that I you or Sergeant Sovik?

A    It's both of us, I mean it's both of us, we both put it together, it's just both of us.

Q    Who asked that question?

A    If she was responsible?

Q    Yes?

A    I don't recall.

Q    And then were Regina and Sarah Weaver in the room at all times during this interview?

A    Yes, they were.

Q    And the next step taken?

114

A       We asked to speak to Steven.

Q       Who did you ask to speak with Steven?

A       I don't recall, maybe it was Regina again, I don't recall.

Q       Okay.   Did you leave the room between the time that Heather left and

        Steven came in?

A       I don't recall, I don't believe so, no.

Q       Did you stay seated in the same position?

A       If I remember correctly, yes.

Q       Okay.  And do you know who summoned Steven McBurney to the

        room?

A       Which nurse?

Q       Yes, what personnel?

A       I don't recall, like I said, it could have been Regina, I don't know,

        because she was sitting in the room I may have said can you bring

        Steven, I don't know.

Q       Okay.  So –

A       It was a nurse.

Q       Okay.  And after Heather left the room how long was it before Steven

        came to the room?

A       Thirty seconds, a minute.

Q       Okay.  And what was he wearing?

A       I remember him wearing a tee-shirt; he was in a tee-shirt if I remember

        correctly.

Q       Is it –

A       It may have been pajama bottoms too.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    When you say may, are you guessing or do you know?

A    I'm – if I remember correctly, he was wearing pajama bottoms, when
     we were walking outside it was cold outside and we turned the heat on
     for him when he was in the back of the car, he said he was freezing so
     we turned the heat on for him, we had no partition so he got the heat.

Q    And what color shirt was he wearing?

A    I don't know.

Q    What color were the pajama bottoms?

A    I remember they were checkered and purple, they were like a purplish
     color if I remember correctly.

Q    Is it a fair statement, officer, that was the first time you had ever seen
     Steven McBurney?

A    At the hospital?

Q    At any time?

A    At any time, yes, I didn't know him, I'd never seen him before.

Q    Okay. Well, how was it that you knew you were talking to Steven
     McBurney when he came into the room? Did you ask for any
     identification?

A    No, we did not.

Q    Okay. So what step did you take to make sure that you were talking to
     the father of the child?

A    The nurse went to get him; obviously the nurse knew who he was.

Q    No, I'm asking you, what steps did you take?

A    We didn't take any steps.

116

Q    And Mr. McBurney presented himself at the conference room door,
     correct?

A    Yes.

Q    And it appeared that he had just woken up, isn't that true?

A    I don't recall.

Q    And Sarah Weaver was standing in the room at that point, isn't that
     true?

A    I don't recall.

Q    And is it also true that either you or Sergeant Sovik asked Sarah
     Weaver, do you need anything else?

A    That's a possibility.

Q    And isn't it also true that Sarah Weaver said no, I have everything I
     need.

A    Don't recall.

Q    Do you remember her making that statement?

A    No, I don't, I don't recall.  She may have.

Q    Is it possible that she said no, I have everything I need?

A    I think so.

Q    And then she exited the room through the one door, isn't that true?

A    Correct.

Q    She shut the door behind her, correct?

A    I don't know who shut the door.

Q    But the door was shut?

A    Correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And Steven was seated in a seat directly to the front of the door with
     his back to the door, correct?

A    Correct, yes.

Q    And you and Sergeant Sovik were in the position that are on the board,
     correct?

A    Right.

Q    And you began your interrogation, isn't that true?

A    Correct.

Q    And you identified yourself?

A    Yes.

Q    South Lyon police officers?

A    Correct.

Q    You gave your names, correct?

A    Yes.

Q    And what's the first thing that you would have said after your
     identification?

A    Explained to him why we were there.

Q    Who explained to him why you were there?

A    I don't recall.

Q    What was said? What were the words that were said?

A    I believe Steven was told that it's customary in these types of
     circumstances when we have a child that's been injured that CPS calls
     us and we respond to the hospital.

Q    Okay.

A    And we have to look into it.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    And – okay, so at this point we know that this interview, interrogation

     is being conducted at your request, correct?

A    Did we summons him, yes, we asked him to come into the room, yes.

Q    Okay. And you were going to ask him questions, correct?

A    Yes.

Q    And you had him sit in the chair with his back to the door, correct?

A    Correct.

Q    You selected the chair, correct?

A    Well, I think we just sat down, we didn't select – he's going to sit here,

     we didn't plan it out, he just sat down.

Q    You selected the room, correct?

A    That's where we were put, when we were waiting for Dr. Fleming.

Q    We know Steven didn't select the room, correct?

A    No.

Q    That's true?

A    That's true.

Q    And you in fact told him to sit in the chair nearest to the door, correct?

A    We said have a seat.

Q    In that specific chair, correct?

A    If he had sat somewhere else, we wouldn't have cared.

Q    You directed him to sit in that chair, isn't that true?

A    l don't believe we did –

            MS. POPE STARNES: Your Honor, I'm going to object, this

     is becoming argumentative, it's been asked and answered repeatedly.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MR. WHITE:  When I get an answer I quit, so – but I'll move on.

Q    (By Mr. White, continuing):  And Sarah Weaver had just left the room, isn't that true, after making that statement?

A    She –

MS. POPE STARNES:  Objection, asked and answered and he's already testified he can't recall whether or not she said anything, she may have, it's possible he said, I believe he said anything is possible but he can't recall. It's asked and answered, Your Honor, I'd ask him to move on.

THE COURT:  Just lop off the phrase at the end about after she made a statement, she left.

Q    (By Mr. White, continuing):  And she just left the room, correct?

A    Correct.

Q    Okay.  And you explained to him why you were there and did you ask Mr. McBurney whether – how old –

A    I'm sorry?

Q    Did you ask him how old he was?

A    We may have, I don't recall.

Q    It's not in your report, is it?

A    I don't recall if we even asked him that.

Q    We agree it's not in the report?

A    I'd have to read my report. I don't believe we did.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: How about we just – I'll certainly go through this, but counsel, if you can tell him, you don't see it in there and we can trust his word that it's not in there.

Q   (By Mr. White, continuing): We certainly know you didn't ask him about his educational level, correct?

A   Correct.

Q   You didn't ask him whether he was under any drugs or alcohol?

A   Correct.

Q   You didn't ask him whether he had slept at all, did you?

A   No.

Q   Did you or did you not?

A   We didn't ask him, no.

Q   You didn't ask him how long he had been in the hospital, did you?

A   I don't believe so, no.

Q   And you didn't ask him whether he was suffering from any kind of disability, mental or physical, isn't that true?

A   That's true.

Q   Okay. And we certainly know that you didn't advise him of his Miranda Rights at the time that you began this interrogation, isn't that true?

A   That's correct.

Q   And at that point in time, did you know an accused's rights under Miranda?

A   I'm sorry?

Q    Did you know as of December 2006 what a person's rights under
     Miranda v Arizona?

A    When they're in custody.

Q    Okay. Do you know the specific rights?

A    Are you talking about your right to remain silent, anything you say?

Q    Yes?

A    Yeah, for the most part of know them, I don't know them verbatim, I
     have a card with me.

Q    You didn't have a card with you, was it your intention at any point to
     give him his Miranda Rights?

A    Not until he became a – not until he was in custody, no.

Q    Okay. Did you ever, ever apprise Steven McBurney of his rights
     under Miranda v Arizona?

A    Not to my knowledge, no.

Q    Did Sergeant Sovik ever apprise Steven McBurney of his rights under
     Miranda v Arizona?

A    You'd have to ask Sergeant Sovik.

Q    I'm asking you, did Sergeant Sovik ever do that in your presence?

A    I don't know, I don't know.

Q    It's not in your report, isn't that true?

A    I'd have to read my report.

Q    Do you want to look through your report or just accept it's not in the
     report?

A    It's not in my report.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    And we know that at any point during this interview that you never

     told Steven McBurney that he was not under arrest?

A    We never told Steven McBurney that he was under arrest at any time.

Q    You never told him that he was not under arrest either, did you?

A    No.

Q    Isn't that true?

A    That's true.

Q    Isn't it also true that you never told him that he was not in custody?

A    Yeah, we never told him that he was in custody.

Q    You also never told him that he was free to leave?

A    No, we never told him he was free to leave.

Q    Okay.  You never told him that the door was unlocked, did you?

A    No.

Q    Isn't that true?

A    That's true.

Q    Isn't it also true that you never told him that he could terminate the

     interview or interrogation at any time, isn't that true?

A    That's true.

Q    Isn't it also true that you never told him that he could consult an

     attorney?

A    True.

Q    Isn't it also true that you never told him that he could consult any other

     person, including a doctor?

A    True.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q     Isn't it also true that you told him – excuse me – isn't it also true that you never told him that he could go home that night?

A     I'm sorry?

Q     Isn't it also true that you never told him that he could go home that night?

A     I never told him that, no.

Q     Isn't it also true that you never told him that he could make a telephone call?

A     Never told him, no.

Q     And what was the first topic that you discussed that evening, the first topic of interrogation was?

A     To the best of my knowledge, I believe it was his relationship with Heather.

Q     And he provided answers, correct?

A     How long they were married, you know, Madison was their one child and I think he started talking about that she had hip dysplasia, if I remember correctly.

Q     He told you about Madison's medical conditions, correct?

A     Correct, hip dysplasia.

Q     Including the hip dysplasia?

A     Hip dysplasia only that I remember.

Q     And you also asked him questions about November 30th, the events leading up to the 911 call, correct?

A     That's correct.

Q     And were you taking notes or was Sergeant Sovik?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

A    I believe we both were, I know I was but again, I wasn't paying

attention to Sergeant Sovik.

Q    Sergeant Sovik was sitting directly across from you?

A    Yes.

Q    And you couldn't tell whether he was taking notes or not?

A    He was – he had a paper and pen out in front of him.

Q    Let me ask you did you actually ever see him write anything down?

A    Throughout the investigation, yes.

Q    During the interview with Steven McBurney?

A    He may have.

Q    Did you see him write anything down?

A    I can't recall.

Q    Just let me finish my question, I don't mean to be rude but she's taking

this down.

Did you see him write anything down during the

interview/interrogation of Steven McBurney?

A    I don't recall.

Q    And Steven responded to your questions, you're and Sovik's

questions, isn't that true?

A    That's true.

Q    Okay.  And after you discussed the 911 call, they took him to U of M

Hospital, isn't that true?

A    That's true.

Q    And then Sergeant Sovik brought up Nicholas Kennedy, isn't that

true?

A     Yes, and I remember Sovik specifically bringing up Nicholas Kennedy.

Q     Okay. And in fact it was brought up that Steven had a prior conviction for second degree child abuse, isn't that true?

A     That's true.

Q     And that was brought up by Sovik, correct?

A     Yes, that's true.

Q     And Steven was questioned by Sergeant Sovik of how those injuries occurred, isn't that true?

A     Yes, I believe that's true.

Q     In your report it says, "I asked him how the child sustained skull fractures"

A     Can I look at that.

Q     Page four, at the bottom.

A     Yes.

Q     Who asked him that statement?

A     Sergeant Sovik.

Q     Where did the information come from that Nicholas Kennedy sustained a skull fracture?

A     You'd have to ask Sergeant Sovik.

Q     Did you receive any information as of that evening that Nicholas had sustained skull fractures?

A     I don't recall.

Q       Okay. And when it says a few lines later it says I said that the injuries

        sustained by Madison were the same injuries sustained by Nicholas,

        who made that statement?

A       I'm going to guess Sergeant Sovik, he asked him about Nicholas

        Kennedy.

Q       And it says after that, he said 'those injuries were worse (referring to

        Nicholas)'. Who made that statement?

A       Your client.

Q       Mr. McBurney?

A       Mr. McBurney made that statement.

Q       Are those his exact words?

A       I don't recall.

Q       Were you taking notes at this time?

A       Yes.

Q       Okay. And in the next line it says, next paragraph, I informed him that

        there was inconclusive evidence provided by the medical staff that

        Madison suffered non-accidental injuries due to trauma or abuse or

        neglect, do you see that statement?

A       Yes.

Q       Who made that statement?

A       Sergeant Sovik or I, one or the other, I can't recall who exactly made

        that statement.

Q       Is that a correct statement?

A       Yeah, we got that from Dr. Fleming.

Q       That Madison had suffered inconclusive injuries, is that correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

A       Inconclusive evidence.

Q       Inconclusive evidence, is that the correct word?

A       Dr. Fleming explained to us that she suffered non-accidental trauma to
        the head that was consistent with shaken baby syndrome, he said you
        don't get this from falling off the couch or tripping and falling, you get
        this from sudden deceleration, head going off a spindle is sudden
        deceleration.

Q       So what was being said was that there was evidence that this was an
        intentional injury, correct?

A       Was there evidence that this was an intentional injury –

Q       What would –

A       -- Dr. Fleming said –

Q       -- no, I'm asking you what was being said to Steven McBurney at this
        time by you or Sergeant Sovik that you had evidence that this was a
        non-accidental injury?

A       Yes.

Q       And you believe you had conclusive evidence, isn't that true?

A       We believed we had evidence that this was a non-accidental injury.

Q       And you also informed him that this was a symptom of shaken baby
        syndrome?

A       I believe we did, yes.

Q       That there were only two persons that could be responsible, him and
        Madison, isn't that true?

A       Heather.

Q       I'm sorry, him and Heather, I'm sorry.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes.

Q    Okay. And you asked him if he was responsible, correct?

A    Correct.

Q    And you also asked him whether Heather was responsible?

A    He said he didn't think she could do something like that.

Q    But he expressed to you that he didn't believe that his wife caused the injuries to her daughter, correct?

A    Correct.

Q    And there was further discussion about Madison's injuries, and then if you look at the third full paragraph on page five, it says, first line, it says 'we informed him that we knew that he caused the injury to Madison?'

A    We informed him that – Sergeant Sovik and I pointed out that if he didn't cause the injuries, then his wife must have.

Q    I'm looking at the line, the paragraph --

A    Where?

Q    -- next paragraph.

A    Yes.

Q    It says we knew, it says we informed him that we knew that he caused the injuries to Madison, who made that statement?

A    Sergeant Sovik or I, one of us did, yes.

Q    Is it possible both of you made that statement to him?

A    I wouldn't say both of us made it at the same time, no, one of us made it.

Q    Okay. What was that the statement that you said?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I'm sorry?

Q    Do you remember the words verbatim?

A    No, I don't remember the exact words verbatim, no.

Q    But the statement was you and/or Sovik knew that Steven McBurney caused these injuries to Madison, correct?

A    Correct, he was possibly responsible for the injuries to Madison.

Q    It doesn't say possibly responsible, does it?

A    No.

Q    It says, you knew the injuries, the non-accidental injuries were caused by you, correct?

A    Correct.

Q    That's what you stated?

A    Correct.

Q    Okay. And how many times was that said to Steven McBurney?

A    I believe just the one time.

Q    And you said that to him because you had made up your mind at that point that Steven McBurney had caused the non-accidental injuries to Madison, isn't that true?

A    That is not true.

Q    That is not true. So you said it to him falsely?

A    Investigative tool.

Q    So you were saying it to him falsely?

A    It was an investigative tool, during investigation.

Q    You were saying it to him falsely?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MS. POPE STARNES: Your Honor, it's been asked and answered.

MR. WHITE: Not answered.

MS. POPE STARNES: It is, he testified it's an investigative tool.

THE COURT: I'll allow the answer.

Q    (By Mr. White, continuing): Were you making a false statement to Steven McBurney that you knew that he caused the injuries –

A    We were using –

Q    -- wait a minute, let me ask my question.

A    I apologize.

Q    Did you make a false statement to Steve McBurney that you knew that he caused the injuries to Madison?

THE COURT: Just back up and ask the question, the foundational question beforehand.

There is a statement in there that says, apparently, I haven't seen it, that says – hold on a minute – did you utter that statement to him or you don't know?

A    Myself or Sergeant Sovik did.

THE COURT: Okay. So if it's possible that you said it, if you said it, the statement says I know, we know that you did it, did you say that, is it possible that you said it, either you or Sovik said it?

A    Yes, it's possible.

THE COURT: All right. At that time that you said it, did you believe it?

131

A        We didn't know.

THE COURT: Okay.

A        We were – we didn't know.

THE COURT: Okay. I've got the answer.

Q        (By Mr. White, continuing): And you believe it was said one time?

A        To my knowledge, yes.

Q        Okay. And then Sovik went into the good parents do bad things at this
         stage –

A        I remember him specifically saying that, yes.

Q        Well, we can agree, up to the point where he said that statement, either
         you or Sovik, we informed him that we knew that he caused the
         injuries to Madison, Steven had not said my life is over, correct?

A        Correct.

Q        He had not said I made a mistake?

A        Correct.

Q        He had not said I threw her into her crib?

A        Correct.

Q        He had not said anything about the separation anxiety and imploring
         Heather to stay home and work during the day and be home a night,
         isn't that true?

A        True.

Q        He had not said anything about being frustrated?

A        True.

Q        He had not said anything about the child screaming?

A        True.

Q   He had not said anything about throwing her into her crib from

approximately two feet away?

A   True.

Q   He had not said anything about hitting her head on the back of –

excuse me, one of the spindles, correct?

A   Correct.

Q   In fact, it was only after you told him – you or Sovik – excuse me, you

or Sovik told him that you knew that he caused injuries that you

believe that Mr. McBurney confessed, isn't that true?

A   I don't understand your question.

Q   Isn't it true, officer, that it was only after you said that you knew that

he caused the injuries to Madison that Steven McBurney confessed?

A   That is true.

Q   Now you said in your direct examination in response to – these pauses

were sometimes thirty minutes – excuse me, thirty seconds to one

minute in length, was that your testimony?

A   That's correct.

Q   And how do you remember that, sir?

A   Again, this is not a – I'll never forget.

Q   Were you timing them?

A   No, absolutely not.

Q   And how many pauses were there?

A   I don't recall. More than one.

Q   And we agree that there is nothing in your report about the length of

those pauses, correct?

A      The exact time?

Q      The length of the pauses, correct?

A      The exact time, no, correct.

Q      When they occurred?

A      Correct.

Q      How long they were, correct; nothing in your report, correct?

A      I believe it just says long, he stared straight ahead, I believe that's what it says.

Q      Now in this report with Steven there are certain sentences that you put in quotes, correct?

A      Correct.

Q      And the third – excuse me, if I may, on the third full paragraph on page five, 'my life is over', correct?

A      Page five?

Q      Third full paragraph –

A      Yes, okay, it's there.

Q      The next paragraph, there are two quotes, 'I made a mistake'?

A      Correct.

Q      'I threw her into the crib'?

A      Correct.

Q      And on page six, I'm not finding anything in quotes, is that true?

A      That's true.

Q      And the three quoted statements were all made after you informed him that you knew the injuries to Madison, correct?

A      I'm sorry?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q     The three quoted statements that we just went over were all made after

      you informed him that you knew that he made these injuries to –

A     Yes –

Q     -- Madison, correct?

A     -- correct.

Q     Now, the purpose of the quotes, again, let's just say that these were

      things that were said precisely by Steven McBurney?

A     Said by Steven McBurney, yes.

Q     Okay.  And if it's not in quotes, it's being paraphrased by you, correct?

A     I'm sorry?

Q     And when it's not in quotes, the statements contained within your

      report is being paraphrased by you or Sovik, isn't that true?

A     Yes, sir.

Q     All right –

A     I guess, I'm not understanding what you're exactly asking?

Q     Okay.  What you have in quotes, you believe that Steven said exactly,

      correct?

A     Whatever he said in the report is in there.

Q     When it's not in quotes, you're paraphrasing?

A     Yeah, I guess I can understand that, yes, yes.

Q     Okay.  So we can agree, officer, in your direct testimony when you

      said that she was very frightened, that's nowhere in your report, is it?

A     I said cranky –

Q     Not very cranky –

A     I apologize, a bit cranky –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Okay.

A      Forgive me.

Q      We also note that when you said that she was crying hysterically, that wasn't in the report either, was it?

A      Are you talking about the interview with Steven?

Q      Yes?

A      I guess I – screaming and crying.

Q      Is the word hysterical –

A      No, it's not –

Q      -- in there?

A      No.

Q      And the other phrase that you used, the child having fits, that's not in the report either, is it?

A      I guess I attribute that to screaming and crying.

Q      Is it in your report?

A      No.

Q      And the other phrase, it says that Steven lost it, that's not in your report either, is it?

A      No.

Q      And we can agree that the word screaming is not in quotes, correct?

A      To my knowledge, no.

Q      We can agree that the words she got mad is not in quotes, correct?

A      Correct.

Q      And that – excuse me, screaming in his ear, not in quotes, correct?

A      Correct.

136

Q   And that – about two feet away is not in quotes, correct?

A   (No verbal response)

Q   Correct?

A   Correct, I'm sorry.

Q   And the back of her head hit the bars, that's not in quotes either?

A   Correct.

Q   Now, the statement, when you said you knew that he caused the injuries to Madison, that was done before Heather was brought into the room, correct?

A   I'm sorry?

Q   The statement that you made, you and/or Sergeant Sovik that you informed him that you knew that he caused the injuries to Madison, that was made before Heather was brought into the room, isn't that correct?

A   Yes, that's correct.

Q   Okay. And then afterwards Heather was brought into the room is when the other statements were made that you put in quotes, correct?

A   My life is over, no, he said that while Sovik and I were in there.

Q   I'm sorry. I made a mistake, and I threw her into the crib, that was made after Heather was brought into the room, correct?

A   I'm sorry, what did you say?

Q   The two comments, I made a mistake and I threw her into the crib was made after Heather was brought back into the room?

A   Yes, yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Okay.  Now is there anything else he said that you can recall describing the injuries to Madison or how they happened that you did not include in your report?

A      No, I don't think so.

Q      Did he use the word hysterical?

A      What?

Q      Did Steven use the word hysterical?

A      I don't recall.

Q      Did he use the words, lost it?

A      I believe – no, he did not.

Q      Did he use the words, having fits, referring to Heather – excuse me, Madison?

A      I don't recall.

Q      Did he use the word screaming?

A      That she was screaming?

Q      Yes?

A      Yes, he used that word, screaming, yes.

Q      Did he use the word mad?

A      Yes.

Q      Did he use the phrase he threw her two feet away?

A      Yes, he did.

Q      Okay.  When that statement was made, who was present in the room?

A      Four of us, me, Sergeant Sovik, Heather and Steven.

Q      Okay.  Were there questions being asked?

A      At that time I don't think so.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Do you recall Sovik asking Steven where he was at the time?

A    Where he was at the time of what?

Q    Throwing her into the crib?

A    In her bedroom.

Q    No, my question is do you recall Sovik asking Steven where he was,

     my question is do you recall the question, did he ask Steven where he

     was when he threw her into the crib?

A    Where Steven was?

Q    Yes?

A    Do I recall Sergeant Sovik asking that question?

Q    Yes?

A    I don't recall, you'd have to ask Sergeant Sovik.

Q    Now there came a time before you left the room, that you determined

     that Steven had confessed to the crime, correct?

A    I'm sorry? The typing is –

Q    I'm sorry, I know, you've been up here a long time. You've already

     stated that you believe that the statement Steven made constituted a

     confession, correct?

A    The statements he made to Heather?

Q    In your presence?

A    Yes, the statement he made in my presence after Heather walked in,

     yes.

Q    Constituted a confession –

A    Yes –

Q    -- in your mind?

139

A       Yes.

Q       That he was responsible for the injuries to Madison?

A       Correct.

Q       Okay. And that was before that he wrote out a written statement, isn't
        that true?

A       That's true.

Q       And after you deemed that he had made a confession, you and Sovik
        then asked him to make a written statement, isn't that true?

A       That's true.

Q       And then you stepped out of the room, both you and Sovik?

A       Yes.

Q       Okay. Right outside the conference room door, correct?

A       I believe we were down the hallway, we weren't directly outside the
        door.

Q       The door was shut?

A       Yes.

Q       Okay. And at all times you were able to determine who was going to
        enter and leave that room, isn't that true?

A       I don't even think we even thought about who was going to enter and
        leave at that point, no.

Q       But you just had someone confess –

A       I guess I'm misunderstanding your question.

Q       Okay. When you stepped out of the room –

A       Yes –

Q       -- okay, you shut the conference room door –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A Yes –

Q -- left Steven and Heather –

A Yes –

Q -- only one way out, one way in, correct?

A I thought you were referring to nurses and doctors, I apologize, going in and out –

Q -- that door, the conference room?

A That conference room, yes.

Q And at all times you were able to make a determination who entered and left that room, correct?

A At that time?

Q Yes?

A Yes.

Q Because he had just confessed in your mind, correct?

A Yes.

Q Okay.  So you were certainly not going to let him walk out of that room, correct?

A Yes.

Q Okay.  And at that point –

   THE COURT:  You mean yes, you agree that you were not – he was not free to leave after that?

A At that point, Sergeant Sovik and I, as I said, we called the prosecutor and –

   THE COURT:  Hold on.  That's – that's taking me outside of the room –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       Okay.

        THE COURT: You hear him talk to his – to Heather and you
at that point, am I tracking it correctly, at that point, once you heard it
you made the statement in your mind or the thought in your mind he
just confessed; you're still in the room at this time?

A       Yes, he had confessed to the crime.

        THE COURT: Right. And you make that mental conclusion,
you draw that mental conclusion in your mind right at that time?

A       We didn't make that – I don't think I even thought about it, now would
I have let him leave the hospital? probably not. But we didn't discuss
it between Sergeant Sovik and I, after we talked to the prosecutor, we
said no, we have to take him, we can't let him leave.

        THE COURT: I've got you.

A       But in our mind if he started running out of the hospital, yeah, I would
have went after him but –

        THE COURT: I've got you.

Q       (By Mr. White, continuing): So before you even left the room, correct,
he was not free to leave?

A       If he tried to get up out the chair and leave the room, yes, he was not
free to leave at that point.

Q       Okay. Before he had done the written statement, correct?

A       Yes.

Q       And again, because you had deemed that he had confessed to the
crime, correct?

A       Correct.

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

Q      Then you left the room, called the prosecutor, correct?

A      That's correct.

Q      Asked direction?

A      Yes.

Q      And you allowed him to pay his last respects to his daughter, correct?

A      Yes.

Q      And he was handcuffed before he went to Madison's room?

A      I believe he was, I think he was.

Q      And then he was escorted down the hall to the elevator and out of the
       hospital, correct?

A      ·That is correct.

Q      And who escorted him out of the hospital?

A      Sergeant Sovik and I.

Q      And the security guard also?

A      Yes.

Q      When Steven came into the conference room initially –

A      Yes –

Q      -- you were seated inside the conference room, correct?

A      I believe so, yes.

Q      And you stayed in that conference room throughout the duration of the
       interview and interrogation, correct?

A      With Steven?

Q      Yes?

A      Yes – no, I'm sorry, I apologize, I got up and asked them to get
       Heather, I went to the nurses' station.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q  Okay.  I apologize too; there was the one time that you left to go to the
   nurses' station to get Heather then you came back?

A  It was brief, yes.

Q  And at any time did you know the whereabouts of that security guard
   when you were in that room?

A  I didn't pay attention.  He wasn't anywhere near the room, that I saw.

Q  My question is do you know where he was?

A  No, I don't.

Q  He was a male, correct, tall skinny guy in uniform, correct?

A  Yes.

Q  Okay.  Had a badge –

A  I don't –

Q  -- a security badge?

A  -- even recall if he had a badge.

Q  Did he have a weapon?

A  I would assume he didn't.

Q  Do you know, I'm asking?

A  No.

Q  Do you remember him –

A  I don't know if he had a weapon or not.

Q  -- or seeing a weapon on him?

A  No.

Q  Any kind of protective device, mace or anything that you saw?

A  Don't even recall.

Q    Do you know when you were in the conference room when Steven
     initially came in, you couldn't see what was out in the hallway, isn't
     that true?

A    Yeah, cause there's a big window in the room facing – to the left of the
     door was a big picture window.

Q    Okay. And beyond – what was down the hall by the elevator, could
     you see who was there?

A    Down to the right or left – no, I couldn't see who was there, no.

Q    Okay. So you could see some of the pediatric intensive care unit but
     not all of it, isn't that true?

A    You could see a nurse walk by here and there and you could see a
     couple rooms out the window.

Q    You could see some of the pediatric intensive care unit but not all of it,
     isn't that true?

A    Correct.

Q    Okay. And you said that particular security officer assisted you in
     escorting Steven from the fourth floor, isn't that true?

A    He approached us, said are you guys ready to go and we said yes.

Q    Okay.

A    That was it to the best of my recollection.

Q    And where was he at the time he approached?

A    He came down from the hallway, we were standing outside the door,
     put the cuffs on him and he walked – you know, he went and paid his
     last respects and he came walking out and he said are you guys ready
     and we said yeah.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Okay. And at that point what time of the night was it or early
      morning?

A    Five a.m.ish.

Q    So the interview started at 2 a.m., correct?

A    Yes, I think it was possible 5 a.m., maybe 4:30.

Q    So Mr. McBurney was interrogated approximately three hours?

A    No, I'd say two.

Q    Two hours?

A    Yes.

Q    And the interrogation stopped at what point in time?

A    I'm going to guess fourish, four thirtyish.

Q    We know your report says began at 2 a.m., correct?

A    Correct.

Q    And – but there is no indication when it stopped, isn't that true?

A    That's correct.

         THE COURT:  Counsel, I don't want to rush you, if you're at
the tail end, we can wrap it up, otherwise.

         MR. WHITE:  I have a few more questions on another subject,
Judge that will take about fifteen minutes and I'll be done.

         THE COURT:  We'll break at this time and we'll resume at
1:30. Deputies, thank you very much. You can be excused at this
time. Keep everything in order and don't talk about the case unless the
prosecutor wants to talk to you or something.

         Thank you.

         THE CLERK:  All rise.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

(Whereupon a pause was

had in these proceedings)

THE CLERK: The Court recalls People v McBurney, case

number 07-214651 FC.

MS. POPE STARNES: Sara Pope Starnes, Assistant

Prosecuting Attorney.

MR. WHITE: Robert White for the defendant, Your Honor.

THE COURT: Good afternoon. Officer, if you'd come on

back up. We're resuming on cross examination, you're reminded

you're still under oath, required to testify truthfully and honestly.

A     Okay.

THE COURT: Go ahead and have a seat.

MR. WHITE: If I may approach, Your Honor, the witness?

THE COURT: You may.

Q     (By Mr. White, continuing): Officer Sederlund, I'm handing you

proposed Exhibit B, and ask you if you can identify that?

A     Yes.

Q     And what is that?

A     This is my handwritten notes of the case reference the death of

Madison, people we'd talked to.

Q     And when were these notes prepared?

A     Before and after the case was prepared.

Q     So –

A     We talked, for instance, Kelly Chard, she was the prosecutor I called

the night of.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Okay. But I'm asking when the notes were prepared, so was it December 3rd –

A    I'm going to say – I can't recall but I would say it was after our interview with Steven –

Q    Okay.

A    -- it was probably on Monday of the following – of that week.

Q    And these notes were not destroyed?

A    No. I found them in the case file, they should have – I can't believe they were even in there, but they were in there.

Q    They should have been destroyed?

A    Well, I found them inside the case file.

Q    Okay. And – but your other notes were destroyed?

A    Yes.

Q    The interviews, et cetera?

A    Yes, they were.

         MR. WHITE: I'd move for entry of Exhibit B.

         THE COURT: Any objection?

         MS. POPE STARNES: No objection, Your Honor.

         THE COURT: So admitted.

                    (Whereupon Defense Exhibit B

                    was received in evidence)

Q    (By Mr. White, continuing): Now Mr. McBurney's written statement which has been admitted as Exhibit 1, I believe you testified in direct examination that he wrote this statement out when you and Officer Sovik were out of the room, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A   Yes, that's correct.

Q   Okay. You told him to write out the statement before you left the room, he wrote it out while you were out of the room and you came back in the piece of paper and pen were on the table?

A   That's correct.

Q   Is that your testimony?

A   That's correct.

Q   Okay. And I believe you also indicated that there were no additions or anything else written after that, was that your testimony?

A   May have been, after he wrote it and Sergeant Sovik and I signed at the bottom.

Q   Okay.

A   And we may have entered the case number on the top of it.

Q   Okay.

A   That's it – and stamped copy, that's it.

Q   And what happened at that point to the written statement?

A   To my knowledge it remained on the desk.

Q   Okay. And was there any discussion between you Sovik and/or Mr. McBurney about the content of the written statement?

A   I don't recall, I don't believe so.

Q   Isn't it true, officer, that Officer Sovik suggested that there be additional language put in this statement?

A   I do not recall.

Q   Did you read the statement?

A   Yes, I believe I read it, yes.

149

Q    No, I mean at that time, did you read the statement?

A    I may have, yes, I believe I did, yes.

Q    Okay. Did you witness Officer Sovik read the statement?

A    I believe he read the statement also.

Q    Okay. Isn't it true that Officer Sovik suggested that Steven put in

     there that Heather – excuse me – Madison was screaming?

A    You'd have to ask Sergeant Sovik, I don't recall that.

Q    I'm asking you, again, from what you can recall of the case, isn't it

     true that Officer Sovik suggested to Mr. McBurney that he put in there

     that he was two feet away from the crib?

A    I don't recall that, no.

Q    Is there anything that you can recall about what was suggested to Mr.

     McBurney that he include in the written statement?

A    The only thing I can recall regarding his written statement, he wrote

     his statement and when we got back there it was sitting there on the

     table.

Q    Anything that you can recall about anything suggested that he include

     over and above what he'd already written when he came back in the

     room?

A    I didn't hear Sergeant Sovik ask any of those questions.

Q    And you didn't either, did you?

A    I didn't ask, no.

Q    Okay. Now from the beginning of the interrogation of Steven

     McBurney until he is led out of the hospital, he was under your

     custody or control, correct?

FORM CSR- LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       When we escorted him out of the hospital he was, yes.

Q       From the beginning of the interrogation, he was never out of your

        sight, isn't that true?

A       Correct.

Q       And he was – his whereabouts were always known to you?

A       I'm sorry, can I rephrase or go back to the last question?  He was out

        of our sight when we walked out of there.  The door was closed and

        we were down the hallway, we had no sight of him.

Q       You knew where he was, correct?

A       Yes, that's correct.

Q       You knew exactly where he was, he was in the conference room, right,

        or he was in Madison's room,  correct?

A       Correct.

Q       So at no point was he in any place where you did not know where he

        was, correct?

A       When we first got there I didn't know where he was.

Q       From the beginning of the interrogation to the time that he was led out

        of the hospital?

A       Yes, we knew where he was.

Q       You always knew where he was, correct?

A       Yes.

Q       And you were always capable of stopping him should he flee the

        hospital, correct?

A       Yes.

                MR. WHITE:  Nothing further of this witness, Your Honor.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: Redirect.

### REDIRECT EXAMINATION

BY MS. POPE STARNES:

Q    You testified that there were two swear to's; why were there two swear

to's?

A    Madison hadn't passed away yet. The Phenobarbital level hadn't

dropped yet and if I remember correctly, your office had charged

Steven with first degree child abuse, that was swore to and then once

Madison had passed away, we obviously had the warrant amended,

additional charges added.

Q    At the time of your swear to you gave enough information for probable

cause?

A    That's correct.

MR. WHITE: Objection, that's a magistrate's decision, Judge,

that –

MS. POPE STARNES: No, this goes to questioning by

counsel because he asked detailed questions about this statement and

whether or not this statement contained all the information in the case.

THE COURT: Well, we'll let – you can be specific in that

regard if you want.

Q    (By Ms. Pope Starnes, continuing): In this exhibit that's been

admitted as Defense Exhibit A, did you list every detail of every single

thing you knew about this case?

A    Yes.

Q    Every single solitary detail?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MR. WHITE: Asked and answered.

THE COURT: Sustained.

Q   (By Ms. Pope Starnes, continuing): Did you give the magistrate every single detail and piece of evidence that you knew about this case?

A   I gave it to a judge, it wasn't a magistrate.

Q   I'm sorry. Did you give the magistrate or the judge every single detail and piece of evidence for this case at your swear to?

A   That we had, yes.

Q   You testified previously that you have never testified in the Oakland County Circuit Court, have you testified before Judge Warren?

A   Yes, I have, as a juvenile case.

Q   So he was on the family court bench at that time?

A   Yes.

Q   On the day of December 2nd you testified that you had been off that day until you were called in some time during dinner time?

A   Correct.

Q   Did you take notes through the day about what you were doing?

A   No.

Q   Do you use the same attention to detail in your personal life about what you are doing as you do when you're working?

A   No.

Q   Now you were asked some questions about whether or not you spoke with Mr. Timmerman, do I have that name right?

A   Yes, Dennis Timmerman.

Q   And he is a EMT?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    He works with Huron Valley, he's a paramedic.

Q    Where in your report does it say that you spoke with Mr. Timmerman?

A    It doesn't.

Q    Do you recall whether or not you did speak with him?

A    I don't believe I did, I don't believe I did.

Q    You were asked a question by defense counsel that you didn't record the time of any other interviews besides Heather's in your report, do you recall that question?

A    Yes, I do.

Q    Did you record a certain time of any other interview?

A    I believe Steven's.

Q    What time did you record that, Mr. McBurney's interview starting?

A    I want to say, if I may refresh my memory –

Q    Would your report refresh your memory?

A    Yes.  Shortly after two a.m.

Q    You were asked some questions about why didn't you ask follow up questions to Heather McBurney when you spoke with her, was your investigation completed at that time?

A    Far from it.

Q    Would it have been possible for you to interview her later if necessary?

A    Absolutely.

Q    Now, during the course of the interview of the defendant, you were asked questions about the order in which the subject's came out in the interview, do you recall that?

154

A      Yes.

Q      Prior to either you or Sergeant Sovik saying that you knew that the

       defendant had caused Madison's non-accidental injuries, was there a

       discussion with him about well, if he didn't do it, then Heather must

       have done it?

A      A discussion with Sergeant Sovik?

Q      With the defendant?

A      No.

Q      Did you ask any questions about that?

A      I guess I'm not understanding your question.

Q      Do you recall counsel asking you questions about the order of events

       of the interview?

A      Yes.

Q      Okay.  And at some point in the interview either you or Sergeant Sovik

       said to the defendant I know you caused the injuries to Madison?

A      Yes, I'm sorry, yes.

Q      Prior to that, had you or Sergeant Sovik asked the defendant questions

       about well, if you didn't do this, then Heather must have done it?

A      I believe we asked him that, yes.

Q      When you left the room with Sergeant Sovik to go in the hallway to

       call the duty prosecutor did you tell the defendant he was in custody?

A      No.

Q      Had you given him any sign that he was in custody?

A      No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MS. POPE STARNES: I have no other questions, Your

Honor.

THE COURT: Anything further?

MR. WHITE: Nothing further.

THE COURT: Thank you officer. You're all set.

A    Thanks.

THE COURT: You can call your next witness if you want.

MR. WHITE: Your Honor, I discussed with —

THE COURT: Hold on, just one second. Yes Mr. White.

MR. WHITE: I discussed with sister counsel the possibility of

calling Heather McBurney out of order since she was not going to call

her, she's been waiting here all day and I was wondering if I could call

her, question her.

THE COURT: As your witness in your case so to speak?

MR. WHITE: Yes.

THE COURT: Do you have any objection, Ms. Pope Starnes?

MS. POPE STARNES: No.

THE COURT: All right. You may call her.

Good afternoon, ma'am. If you'd just follow Mr. White up

here, he'll bring you up to the witness chair and I'd ask you to please

raise your right hand to be sworn.

HEATHER MC BURNEY,

Was thereupon called as a witness herein and after having been first

duly sworn, was examined and testified as follows:

THE COURT: You can have a seat there.

156

## DIRECT EXAMINATION

BY MR. WHITE:

Q       Please state your full name?

A       Heather McBurney.

Q       And you reside where?

A       311 Scott Street, South Lyon, Michigan.

        THE COURT:  Speak a little bit louder, okay.

Q       (By Mr. White, continuing):  And you're married to Steven

McBurney?

A       Yes, I am.

Q       And you two had a daughter Madison?

A       Yes.

Q       Passed away on December 4, 2006?

A       Yes.

Q       And if I could direct your attention to December 2, 2006, and ask you

in the late evening hours that night, where were you at?

A       I was in Madison's hospital room and was called into a conference

room to talk to the police officers.

Q       In the conference room – where was she in the hospital?

A       She was in the PICU, just across the hallway from the conference

room.

Q       And that was at what hospital?

A       U of M.

Q       Okay.  And do you remember what floor it was?

A       No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    How long had you been at U of M Hospital?

A    Since – it was the 30th she went into the hospital.

Q    And had you been there continuously since that point?

A    Yes.

Q    And at that time when you were summoned to speak or go the conference room, was anybody else with you in Madison's room?

A    Steve.

Q    Okay. How were you summoned to go into the conference room?

A    The nurse that was on duty for Madison took me out of the room and brought me to the conference room.

Q    Okay. And the conference room, was it on the same floor?

A    Yes.

Q    Do you know how far it was away from Madison's room?

A    Probably from this wall right here (indicating) to that wall (indicating), maybe a little longer.

Q    Okay. And when you walked into the conference room, did you recognize anybody that was in there?

A    No.

Q    Okay. Being here today, do you recognize anybody that was in that conference room?

A    Yes.

Q    And who do you recognize?

A    Officer Sederlund.

Q    And anybody else?

A    No.

Q     Was Officer Sovik, was he in the room also?

A     Yes.

Q     Is he out in the hall?

A     Yes.

Q     Okay. And anybody else in that conference room at the time that you

      walked in there?

A     Yes, I believe her name is Sarah Weaver from Child Protective

      Services.

Q     Okay. And anybody else?

A     The nurse that was on duty for Madison that night.

Q     And what was the first thing that was said by anybody to you?

A     They introduced themselves to me –

Q     When you say they introduced?

A     The officers and Sarah --

Q     Okay.

A     -- introduced themselves to me and then I don't remember exactly

      what they asked first of me.

Q     When they introduced themselves, the officers, did they introduce

      themselves as police officers?

A     Officer – yeah, I think they introduced themselves as officer and their

      name.

Q     Did you understand them to be police officers?

A     Yes.

Q     Okay. And had you ever met either Sederlund or Sovik before that

      night?

A   No.

Q   Did you know who Sarah Weaver was?

A   No.

Q   Okay.  Had you ever met her before walking into that conference room?

A   No.

Q   Okay.  And were you asked questions in that conference room?

A   Yes.

Q   Was the door open or closed?

A   Closed.

Q   Okay.  Where were you seated?

A   I was at the head of the table.

Q   And when you were asked questions,  Heather, did you respond?

A   Yes.

Q   Do you know, did you notice whether anybody in the room was taking any notes?

A   I remember Officer Sovik had a note pad with him and pen.

Q   Okay.  What about Officer Sederlund, did you see him taking notes?

A   I don't remember.

Q   Okay.  Did you see any kind of equipment or anything when you came in the conference room, anything, cameras, recording devices or anything like that?

A   No.

Q   Did you see anything on any of the police officers, badges?

A   No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Guns?

A      No.

Q      And did each officer have a jacket on?

A      Yes.

Q      What was the color of Officer Sederlund's jacket?

A      I think it was tan, I don't really remember what color his was.

Q      What about Sovik?

A      Black.

Q      And do you remember what the first topic of conversation was, the questions?

A      I don't remember what the first topic was.

Q      Do you remember discussing anything at all?

A      Yes.

Q      What was the first thing you remember?

A      I remember them asking me what the doctor said, told me about Madison.

Q      Okay.  And what's the next thing you remember discussing?

A      I told them about her medical history, they asked me questions, to explain what her medical history was when they brought up her conditions.

Q      Okay. So what's the next thing that you remember the police were asking you about?

A      They asked if I had been married before, if I had any kids, if Steve had been married before or had any kids; they asked how long we'd been married, how long we dated before we got married.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did they ask you anything about Steven's – any violent propensities
     before?

A    They asked me if I knew that Steve said that he had admitted that he
     was a violent person.

Q    Okay. And did they ask you about any violence within your marriage?

A    Yes, they asked if we had ever had fights and I – I told them no and
     they asked if I had a perfect marriage.

Q    Did they ask you about any violence between Steve and Madison?

A    I don't remember if they asked.

Q    Was there a discussion about Steve's other child, Nicholas?

A    Yes.

Q    The other case?

A    Yes.

Q    Okay. And what did they ask you about the other child, Nicholas?

A    They told me that he had a son and that – asked me if I knew that he
     had a prior conviction for child abuse and told me that Nicholas had
     the same injuries as Madison, they didn't specify what the injuries
     were.

Q    Did they ask you anything that you construed to be accusatory towards
     you?

A    No.

Q    Did they ask you if you were responsible for Madison's injuries?

A    No.

Q    Did either Sederlund or Sovik ask you about any other person
     providing care for Madison in the days or weeks before November 3rd?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    They asked if anybody ever watched her and I can't remember if I told

     them about the – if she went to day care or not.

Q    Did either Sederlund or Sovik ask you directly did you cause the

     injuries to Madison?

A    No.

Q    Did they ask you if Steve did?

A    They asked me how I thought it happened.

Q    Did they ever ask you whether you believed that anybody else was

     responsible for the injuries to Madison, any other person?

A    I don't remember.

Q    And at some point you left the room?

A    Yes.

Q    Okay. And then you went back to Madison's room?

          MS. POPE STARNES: Your Honor, I'm going to object, this

     is direct examination, I would ask the questions be asked in a non-

     leading manner.

          MR. WHITE: I'm just trying to speed things up.

          THE COURT: She's objecting, sustained.

          MR. WHITE: Okay.

Q    (By Mr. White, continuing): Did you leave the room?

A    Yes.

Q    And where did you go?

A    I went to Madison's room.

Q    Okay. And who was in Madison's room?

A    Steve.

Q    Okay. And when you left the room, the conference room, who was
still in that room, who was in that room?

A    In the conference room?

Q    Yes?

A    Nobody else had left that room.

Q    Okay. And when you got back to Steve – to Madison's room, what
happened after that?

A    The nurse that brought me back there then took Steve out of Madison's
hospital room.

Q    Okay. Do you remember what was said?

A    No.

Q    Did Steven leave the room?

A    Yes.

Q    Okay. Was there a point in time, Heather, that you returned to the
conference room?

A    Yes.

Q    And when you returned to the conference room, who was in there if
you recall?

A    The two police officers, Officer Sederlund and Sovik.

Q    Okay. Anybody else?

A    No, Steve.

Q    Okay. And where was Steve sitting?

A    Steve was sitting at the head of the table.

Q    And what about Sederlund and Sovik?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A   Sederlund was sitting – Sovik was sitting to the right of me, Sederlund was sitting across from me.

Q   Okay. And what did you do when you came into the room?

A   I just sat there.

Q   Where did you sit? Can you tell the Judge where you were sitting with respect to Steven?

A   Steve was to the left of me.

Q   Okay. Do you know why you were being brought back into the conference room?

A   No.

Q   Okay. What was the first thing that anyone said when you came back into the room?

A   They said that Steve –

        MS. POPE STARNES: Objection as to they, I'd ask the witness to be specific.

        THE COURT: Sustained.

Q   (By Mr. White, continuing): Do you remember, when you said they?

A   Officer Sovik, sorry –

Q   Okay.

A   -- said that Steve was a good guy and that he had something that he needs to tell you about.

Q   Okay. And what was the next thing that was said?

A   He told us that he threw Madison into her crib.

Q   And do you know what the next thing that was said was?

A   No.

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did the police say anything more while you – either Sederlund or
     Sovik, say anything more while you were in the room?

A    No.

Q    Okay.  To your recollection did Steve say anything more while
     Sederlund, Sovik and you were in the room?

A    No.

Q    Okay.  Was there a time when Sederlund and Sovik left the room?

A    Yes.

Q    Okay.  And do you know where they went?

A    No.

Q    Did the door – when they left the room did they exit through the door?

A    Yes.

Q    Was the door closed or open?

A    They – when they left they closed the door.

Q    Okay.  And when you – when Sederlund and Sovik left the room, was
     there a discussion between you and Steven?

A    Yes.

Q    What was the substance of that discussion?

A    That I asked him about his son –

Q    Okay.

A    -- I asked him what his name was, he told me a little bit about going to
     court, I don't remember everything that he said.  He said he didn't tell
     me about him because things were going well between us and he
     didn't want to ruin anything.  And –

Q    Was there any discussion about the schedule that you and Steve had
     with regard to Madison?

A    I don't remember.

Q    Okay.  Did you notice anything unusual when you were in the room
     alone with Steve?

A    Unusual?

Q    Was there any equipment in the room?

A    Yes.

Q    What?  What did you notice?

A    The tape recorder.

Q    Where did – where was that at?

A    It was sitting next to – I believe it was sitting on the floor, it was either
     on the floor or on his chair where Officer Sovik was sitting.

          THE COURT:  On the chair or on the floor?

A    I can't – I remember it standing upwards, I can't remember if it was
     standing or sitting on the chair or on the floor, his jacket was over the
     back of the chair, I remember just seeing it from the position I was
     sitting in.

Q    (By Mr. White, continuing):  Had you seen it before?

A    Yes.

Q    Okay.  And when you had seen it before, where was it?

A    Officer Sovik had it strapped around him, underneath his jacket.

Q    Okay.  And when you saw it initially, did you believe it to be a
     recording device?

A    Yes.

Q    Okay.  When you saw it again when they were out of the room did you
     believe it to be a recording device?

A    Yes.

Q    Okay.  Did you make any statements regarding this device?

A    Yes.

Q    What did you say?

A    I said something to Steve that they have a tape recorder.

Q    When you had come in and out of the conference room, I believe at
     this point it would be two occasions, initially alone and then you came
     back with Steve, either time that you went in or out, did you see any
     uniformed police officers or security guards?

A    Not that I remember, no.

Q    And did Steve make any statement to you regarding any uniformed
     police officers?

A    When we were in the room alone together he said I'm going to jail,
     guaranteed, and I asked him why and he said that he saw the cops were
     standing outside when  he came in.

          MR. WHITE:  I have nothing further.

          THE COURT:  Cross examine.

          MS. POPE STARNES:  If I may have one moment.

          CROSS EXAMINATION

BY MS. POPE STARNES:

Q    Mrs. McBurney –

A    Yes.

168

Q   Madison was your only child, correct?

A   Yes.

Q   How old was Madison at the time she passed away?

A   She was eleven months old.

Q   About what time was it on November 30th when you learned that she had been taken to the hospital?

A   When she was taken – when I got the phone call?

Q   Yes?

A   It was – it had to have been a little bit past seven.

Q   In the evening?

A   Yes.

Q   And after you got that phone call you went directly to U of M Hospital, correct?

A   Yes.

Q   And did you go home from U of M Hospital between that time on November 30, 2006 and when you met with the police officers on December 3rd of 2006?

A   That next morning I went to get clothes, we went home and got clothes.

Q   So you were home for a very short period of time just to get some clothes, correct?

A   Yes.

Q   How much did you sleep during the period of time between the time that you found out and got this phone call and the time you talked with the police officers?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    How much sleep?

Q    Yes?

A    Occasionally dozed off, no significant amount of sleep.

       THE COURT:  Help me –

A    I –

       THE COURT:  -- out – no, not that question.  You got a phone call, you were at work?

A    Yes.

Q        THE COURT:  And that was November?

A    30th.

       THE COURT:  What day of the week, do you remember?

A    It was on a Thursday.

       THE COURT:  Thursday. And then the police came on a Saturday?  Am I mixed up?

       MS. POPE STARNES:  Late Saturday night or early Sunday morning.

A    Yes.

       THE COURT:  Okay.  Okay, got you.

Q    (By Ms. Pope Starnes, continuing):  So during that period of time between Thursday evening and the time you saw the police sometime late Saturday night or early Sunday morning, you didn't get any significant sleep?

A    Right.

Q    What do you think was the maximum amount of time that you slept in a row?

A    Hour, hour and a half.

Q    And where was it you would sleep when you were at the hospital?

A    Usually when I would fall asleep there would be chairs in her room that stretched out that I could lay in.

Q    At U of M they have like a hotel for parents, did you use that service?

A    No, I did not.

Q    So you stayed right in the room and slept in a chair in the room?

A    Yes.

Q    You didn't get a very good sleep, did you?

A    No.

Q    How did you feel about what was going on with Madison?

A    I was very upset.

Q    How long after you came to U of M Hospital was it before you realized that Madison was in critical condition?

A    When we first got there and they took her up to the unit, they told us that she was critical but stable and her condition worsened each day.

Q    You do work as a nurse?

A    Yes.

Q    So you understood the severity of Madison's condition, didn't you?

A    Yes.

Q    At some point before you talked to the police officers on late Saturday night, early Sunday morning, had you realized that Madison was going to die?

A    Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Now you testified here today that – about a conversation that you and
     your husband had about Nicholas Kennedy, correct?

A    Yes.

Q    Isn't it true that when you spoke to the police officers you first told
     them that your husband did not have any other children?

A    Yes.

Q    Isn't it also true that you later admitted to the police officers when you
     were in your interview that you had been made aware by a friend of
     your husband that he did have a son and that there had been some
     previous allegations of child abuse?

A    No, about the child abuse, no. I knew that he had a son and he was
     never able to tell me if it was actually his son or not so I didn't know if
     saying he had a son was the right answer or not.

Q    Why would you deny to the police officers that neither one of you had
     any children from a previous relationship?

A    Because I didn't know if that was his son or not, I couldn't say if it
     was the right answer or not.

Q    Since your husband was arrested, how many times have you gone to
     visit him in the jail?

          MR. WHITE:  Objection, Your Honor, irrelevant.

          MS. POPE STARNES:  It is, it goes to her credibility, Your
     Honor.

          MR. WHITE:  It's not relevant whatsoever.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: I'll sustain the objection at this time. At the end of the questioning I'll revisit the issue and decide relevance at that time. But at this juncture I'll –

MS. POPE STARNES: Well, if I may, Your Honor, I'd like to ask this question.

Q      (By Ms. Pope Starnes, continuing): Have you spoke with your husband since that day at the hospital about this case?

MR. WHITE: Objection, Your Honor, it's not relevant –

THE COURT: I'll allow it –

MR. WHITE: -- to this inquiry –

THE COURT: I'll allow it.

A      About this case?

Q      (By Ms. Pope Starnes, continuing): Yes?

A      The only thing we discuss would –

THE COURT: Just a yes or no question if you spoke to him about the case?

A      I can't give an answer on that.

THE COURT: Okay.

A      Mostly dates when things are coming up.

Q      (By Ms. Pope Starnes, continuing): Describe the conference room for me?

A      It had – as you walk in the door, had a long conference table, there were chairs on each side, there was a TV on there, some kind of cart in the back corner, the door – there was a window on the back wall with blinds on it, I'm not sure what else.

173

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q      Isn't it true there was a computer in the room?

A      That could have been a computer on that cart, I remember a screen on a cart.

Q      Was there other hospital property or equipment in the room?

A      Not that I remember, I don't remember.

Q      When was it that you became aware, as you testified, that you believed that Sergeant Sovik had something under his jacket?

A      It was when he said what if I told you that Steve had a son and I told him I knew, he leaned back in his chair, he had on a black jacket, he leaned his left arm back and he reached at it and I saw it.

Q      He reached at what?

A      The – it was a – it was a tape recording device on a brown strap –

Q      The strap was brown?

A      Yes, I believe it was brown.

Q      What kind of material was it made out of?

A      I don't know.

Q      You keep gesturing across your body, is it some kind of strap that you're indicating –

A      Yes –

Q      -- went across his chest –

A      Yes, it was –

Q      -- from the left to the right side or from the right to the left?

A      Yes.

Q      Okay. And what was the size of the tape recorder?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

174

A        I would say about the size of a three by five card, or – probably about

that big (indicating).

MR. WHITE:  Judge, she made – she –

A        Oh, you want me to show you what I did?  I showed about there

(indicating) .

THE COURT:  The record reflects about two thirds of a

Kleenex box.

A        Yes.

THE COURT:  Okay.  Thank you.

Q        (By Ms. Pope Starnes, continuing):  And which hip was it that you saw

that this was on?

A        Left.

Q        Was he wearing a badge?

A        Not that I remember.

Q        What kind of clothing was he wearing?

A        I remember he had a black leather jacket on and I remember he was

drinking a Mountain Dew. I don't remember what color shirt he had

on.

Q        Was he wearing a tie?

A        I don't remember – no, no tie, I don't think I seen a tie.

Q        What was Officer Sederlund wearing?

A        I don't remember as much as he was wearing, I was mostly looking at

Officer Sovik.  I think he had tan on but I can't say for sure, I thought

he had a tan jacket on.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Now describe for us please when Sergeant Sovik removed the tape

recorder and put it on the chair or the floor?

A    When he removed it?

Q    Yes?

A    I didn't see him remove it.

Q    Well my understanding is you testified that he had this on under a

jacket, correct?

A    Yes.

Q    So in order to take this off, he would have had to remove his jacket,

correct?

A    Yes.

Q    And then he was wearing this strap from the shoulder to the other hip,

he would have had to lift that off over his head –

A    Uh-huh (affirmatively) –

Q    -- or put it down and step out of it in order to take that tape player off,

correct?

A    Yes.

Q    Did you see him do either of those motions?

A    No.

              MS. POPE STARNES:  May I have just a moment, Judge.

Q    (By Ms. Pope Starnes, continuing):  Who is Kyle?

A    Kyle, he's an equal friend between Steve and I.

Q    He's the friend that spoke to you about Steve  having another child,

correct?

A    Yes.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And you gave the officer's Kyle's name, didn't you?

A    Yes.

Q    Do you recall one of the officer's asking you if you were responsible for the injuries sustained by Madison?

A    No.

Q    Do you recall stating to them that you had no involvement in injuries sustained by Madison and you didn't believe that Steve could do that?

A    I did say to them that I don't believe Steve did anything.

Q    You became short with the police officers during the interview, didn't you?

A    I didn't feel that I did.

Q    Do you remember saying to the police officers my daughter is dying and you're asking me all these questions?

A    Yes.

Q    Did you think it was important for them to investigate what happened to Madison?

       MR. WHITE:  Objection, Your Honor, that's –

       MS. POPE STARNES:  I'll –

       MR. WHITE:  -- no, wait, let me make my objection.

       THE COURT:  Go ahead, make your objection.

       MR. WHITE:  It's not relevant for purposes of this –

       THE COURT:  Got it, got it.  Any response?

       MS. POPE STARNES: It goes to her credibility, Your Honor.

       THE COURT:  I'll sustain the objection.  Let's move on.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q     (By Ms. Pope Starnes, continuing): Did you see any security guards

      during the time that Officer Sederlund and Sergeant Sovik were there?

A     No.

Q     Did you ever ask the police officers about this alleged recording

      equipment?

A     No.

Q     Why not?

A     I don't know, I didn't have any reason to ask them about it, I didn't

      know if they could have it or not, I don't --

Q     Do you recall talking to me about this incident?

A     About?

Q     About the interview with the police officers and whether or not there

      had been recording equipment?

A     Recently?

Q     Yes?

A     Yes.

Q     Do you recall saying that --

            MR. WHITE:  Objection, Your Honor, this is highly improper,

      because you know what she does, she's going to make herself a

      witness so if that's what she wants to do, it's clearly clearly a conflict,

      it's not permissible to say well, did you tell me, because all she does is

      makes = she disqualifies herself from any further involvement in this

      case because then she's going to be on the witness stand at the trial.

            THE COURT:  Is your objection to the question that's asked or

      the consequence from the question?

> MR. WHITE: The objection is the question that is asked and its consequences Judge.

> THE COURT: Very well. The Court overrules the objection as to the objection as to the question, there's nothing improper about the question and we'll leave for another chapter the issue of the consequences. Go ahead.

Q (By Ms. Pope Starnes, continuing): Do you recall telling me that the officer must have had some kind of recording equipment or else they wouldn't have the information in the police report that they have?

A Yes.

Q Now at some point you were asked some questions about whether or not the officers asked you if you knew, if you knew Steve said he was a violent person, do you recall that line of questions?

A Yes.

Q How did the officers ask you that?

A Their exact words that they said?

Q Yes?

A They said that – do you know that Steve has admitted to being a violent person.

Q Violent was the word that the officers used?

A Yes.

Q Isn't it true what they asked you was if you knew that he had a previous conviction for child abuse?

A They asked me that too.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q      And how did they ask you the question about whether or not there had
       ever been any violence in your home?

A      The only thing they really asked was if we ever had any fights, that's
       all I remember them asking about violence in the home.

Q      Now, when you were brought back into the room you testified that the
       first thing that was said was Sergeant Sovik said that Steven was a
       good guy and that he had something he needed to tell you, correct?

A      Uh-huh (affirmatively).

                    THE COURT:  You have to say yes or no.

A      Yes.

Q      (By Ms. Pope Starnes, continuing):  And then you said Steven said he
       threw Madison into her crib, correct?

A      Yes.

Q      Isn't it true what happened was that after you sat down the defendant
       stared in space for some time and then turned to you and asked you if
       you knew about Nicholas Kennedy?

A      No.

Q      Isn't it true that you said to him that you knew about the situation and
       you had been told by Kyle some time before?

A      When Steve and I were alone.

Q      And isn't it true that he told you that he would have told you earlier in
       the relationship but things were going well and he didn't want to ruin
       it?

A      When we were alone together.

Q    Isn't it true that he then stared into space and you asked what

     happened to Madison while you were at work?

A    I don't remember that.

Q    Isn't it true that the first thing he said to you about it was, I made a

     mistake?

A    I don't remember that.

Q    And then you asked him again what happened, correct?

A    I don't remember.

Q    And then after that he said I threw her into the crib, correct?

A    He said that first.

Q    And you just testified on direct examination you don't remember what

     was said after that, do you?

A    I said after –

Q    He told you that he had thrown her into the crib?

A    I didn't remember.

Q    Why is it that you don't remember what was said after that?

A    I don't know, I can't give a reason --

          MR. WHITE:  Wait a minute –

A    -- for that –

          MR. WHITE:  -- excuse me just for a second.

          She's asking her – this person, how come they don't

     remember? The form of the question asks her to speculate.

          THE COURT:  If you don't know why you can't remember,

     you can say that, ma'am, but if you – and I don't mean to be coy but if

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

its because you went out and three pounds of cocaine, well then maybe

that would be the reason why. Are you following my reasoning?

A    Right.

    THE COURT: Okay. So if you know why you can't

remember, it's kind of a –

A    I don't know why –

    THE COURT: -- tricky – tough question –

A    –- I can't remember.

    THE COURT: But you can't remember?

A    No.

Q    (By Ms. Pope Starnes, continuing): Could it be because you were so

upset because your husband had just told you what he had done to

Madison?

A    I would guess, yes.

Q    It's rather shocking to find out that he had done that, correct?

A    Yes.

    MS. POPE STARNES: May I have just a moment, Judge.

    THE COURT: You may.

Q    (By Ms. Pope Starnes, continuing): You testified that the police didn't

say anything else while you were in the room, correct, before they left?

A    Officer Sovik said that they would give us a few minutes alone and

left.

Q    Isn't it true that they also left a piece of paper and a pen or pencil for

Steven to write out a statement?

A    When they left the room?

FORM CSR- LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Before they left the room?

A    I don't know if they left it, if they told him that or not, I don't – I don't

know if it was in there.

Q    Do you recall him writing out the statement during the time that the

police officers were out of the room?

A    No.

Q    How long were the police officers out of the room?

A    I don't know, I didn't have a watch on.

Q    During the time that you were in the room with Steven and the police

officers, did they say to him at any time that he was under arrest?

A    No.

Q    Do you recall when the police officers came back into the conference

room?

A    Not very much.

Q    Do you recall a piece of paper with a pen sitting on it on the

conference table when the officers came back into the room?

A    I don't know if it was sitting there or they brought something in.

        MS. POPE STARNES:  Your Honor, may I have People's

Exhibit 1.

        THE COURT:  Yes, you can approach.

        MS. POPE STARNES:  May I approach the witness?

        THE COURT:  You may.

Q    (By Ms. Pope Starnes, continuing):  How long had you known the

defendant?

A    For five years.

Q     Are you familiar with his handwriting?

A     Yes.

Q     Have you seen it frequently?

A     Yes.

Q     I'm showing you what has been admitted as People's Exhibit 1, do you recognize that handwriting?

A     Yes.

Q     Whose handwriting do you recognize that to be?

A     Steve's handwriting.

        MS. POPE STARNES:  Thank you. May I tender this back to the Court.  Thank you. I have no other questions Your Honor.

        MR. WHITE:  I have no further questions, Judge.

        THE COURT:  Thank you ma'am. You're all set, you can be excused.

A     Okay.

        THE COURT:  I'm sorry about your loss. Are we going back to your case now?

        MR. WHITE:  Your Honor, if I may just take a quick break, two minutes.

        THE COURT:  Yes. Deputies, do you want to treat this as our afternoon break?  It's up to you.  We'll take a break for a few minutes.

                        (Whereupon a pause was

                        had in these proceedings)

        THE CLERK:  The recalls The People v McBurney, case number 07-214615 FC.

184

MS. POPE STARNES: Sara Pope Starnes, Assistant Prosecuting Attorney.

MR. WHITE: Robert White for Mr. McBurney, Your Honor.

MS. POPE STARNES: Judge, the deputies were just telling me they needed to get an idea of how late the court will be going today so they can make arrangements.

THE COURT: I'll be they are trying to make arrangements.

MS. POPE STARNES: They need to make arrangements for personnel.

THE COURT: Nope, 4:30, is that all right.

MR. WHITE: Your Honor, if we don't finish today, what would be the –

THE COURT: What do we have tomorrow afternoon? We'll find out. It will be this week, we'll finish it up this week.

MR. WHITE: My – if I could ask the Court to indulge, Thursday morning would be great, tomorrow afternoon is a mess.

MS. POPE STARNES: I don't – I'm sorry, I can't do it Thursday, I have a jury trial.

THE COURT: Okay. We'll talk about it.

MR. WHITE: Thank you.

THE COURT: We're back on the People's case?

MS. POPE STARNES: Yes.

THE COURT: And you're calling your next witness?

MS. POPE STARNES: Sergeant Sovik please.

THE COURT: Sergeant Sovik if you would please approach and raise your right hand to be sworn.

CHRISTOPHER SOVIK,

Was thereupon called as a witness herein, and after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. POPE STARNES:

Q    Please state your name and spell your last name for the record?

A    Christopher S-o-v-i-k.

Q    How are you employed, sir?

A    I am a Sergeant with the City of South Lyon Police Department.

Q    How long have you been a police officer?

A    Fifteen years, ten months.

Q    And has all that time been with the City of South Lyon?

A    Yes.

Q    How long have you worked as a sergeant?

A    About ten years.

Q    If I can direct your attention back to December 2, 2006, what was your assignment at that point?

A    To investigate the suspicious injuries to Madison McBurney.

Q    Were you working on that day?

A    I was not.

Q    And was your usual assignment in the detective bureau or road patrol or where was that?

A    Normally I take calls and review reports, assignments, stuff like that.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    So you were called in from off duty?

A    Yes.

Q    Approximately what time were you called in?

A    I received a call from Sergeant Baaki around – between seven and
     seven thirty.

Q    What did you do after you received that call?

A    Dropped my wife and – dropped my wife off at home and went into
     the police department.

Q    About what time did you arrive at the police station?

A    Shortly after nine, nine fifteen, somewhere around there.

Q    How were you dressed at that point?

A    I was dressed in a dress shirt, tie, khaki pants.

Q    What color dress shirt?

A    Light blue.

Q    What color tie?

A    Red.

Q    This was December, were you wearing a jacket?

A    I was, yes.

Q    What type of jacket?

A    Black leather jacket.

Q    Do you have that jacket in court with you today?

A    I do.

Q    And what did you do when you arrived at the police station?

187

A    I was briefed by Sergeant Baaki as to what we were assigned to do and just covering some background investigation to prepare for our investigation that was going to happen at the hospital later.

Q    Who did you work on the investigation with?

A    At the time he was a detective, it was Officer Sederlund who was the detective at the time.

Q    And after you and Officer Sederlund spoke with – is it Sergeant or Lieutenant Baaki –

A    Sergeant Baaki.

Q    Sergeant Baaki, what did you do next?

A    We tried to gather some information, I believe we tried to contact Northville Township Police Department –

        MR. WHITE:  Your Honor, I just – I knew this is a new officer, I'd just ask him to speak from his own perspective as opposed to we.

        THE COURT:  Just things that you did and –

A    Okay.

        THE COURT:  -- if you're going to talk about what someone else did then you'll have to first speak about how you know that that person did it.

A    Okay, Your Honor.

Q    (By Ms. Pope Starnes, continuing):  What did you do?

A    I went into the supply room to look for a recorder and I believe I was – I looked over the criminal history for Mr. McBurney.

Q    Were you able to find a recorder in the supply room?

A     No.

Q     Where did you get the criminal history that you looked at?

A     I believe Sergeant Baaki provided me with it.

Q     And did Mr. McBurney have prior contact with the police?

A     Yes, he did.

Q     For a case involving child abuse?

A     That's correct.

Q     When was that?

A     1998.

Q     And did that result in charges?

A     Yes, it did.

Q     What happened then?

A     We gathered up our stuff, Detective Sederlund and I, discussed how we were going to do it and then we stopped by – actually, I had talked to a couple of fire fighters that just happened to be at the fire station at the time before we went to the Northville Township Police Department in an attempt to gain access to a report from the 1998 incident.

Q     Who were the fire fighters that you spoke with?

A     I spoke with Craig Johnston, his son David Johnston and Kevin Schultz (phoen).

Q     Both Craig and his son work for the fire department?

A     Yes.

Q     And what was the purpose of speaking with them?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     They were two of the – well, the fire fighters were the first responders, they respond to the incident involving the injuries to Madison McBurney on a couple days prior.

Q     On what day?

A     I believe it was November 30, '06.

Q     And following your chance to speak with the fire fighters, then what did you do next?

A     We gathered up our stuff and we drove to Northville Township Police Department.

Q     Do you recall what Officer Sederlund was wearing at the time?

A     I think he had a pair of khaki pants on, I don't know the shirt, but I know he had some type of like – he wears this dress tweed type jacket, oversized dress jacket sort of.

Q     What color?

A     Brownish.

Q     And did you go to the Northville Police Department?

A     Yes, we did.

Q     And what do you when you got there?

A     Well, we tried to – well, we attempted to –

          MR. WHITE:  I'd just ask that – I'd ask to speak as I or –

          THE COURT:  Just you.

A     Okay.  I spoke with either a dispatcher or a clerk in there and I asked her if we could see a copy of a report from 1998 involving Mr. McBurney.

Q     (By Ms. Pope Starnes, continuing):  Were you able to do that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes and no.  We weren't actually able to get a copy of the report

because they were in a transition.  We were able to sift through it on

microfiche.

Q    Did you read the microfiche?

A    Yes, some of it, it was pretty lengthy.

Q    Okay.  What were you able to learn from the microfiche?

A    That Mr. McBurney was eventually – he was charged with first degree

child abuse to Nicholas Kennedy and he later on pled to second degree

child abuse and was given probation.

Q    Were you able to determine from your review of the microfiche

whether or not he had ever been interviewed by any police officer

regarding the Northville incident?

A    I believe I – yes, he was.

Q    What did you do after you had an opportunity to look at this

microfiche at Northville Police Department?

A    I, along with Detective Sederlund, drove down to the U of M Hospital.

Q    From the microfiche, were you able to determine what if any injuries

the child in the prior case had sustained?

A    I believe that they were skull fractures.

Q    Approximately what time did you arrive at U of M Hospital?

A    Around twelve thirty, somewhere around twelve thirty the following

day, which would be December 3rd at this time.

Q    Twelve thirty in the morning?

A    Yes.

Q    And what happened when you arrived at the hospital?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A      We spoke with, I think a case worker.

Q      Who was the case worker that you spoke with?

A      I believe it was Sarah Weaver.

Q      Case worker from where?

A      I believe it was Washtenaw County, I can't remember, Child

       Protective Services.

Q      Okay.  And where did you speak with Sarah Weaver?

A      She was – we were in a – one of the first floor, it wasn't any special

       room, just in a lounge area I think.

Q      And who spoke with her?

A      Detective Sederlund and I did.

Q      After you spoke with her what did you do next?

A      We were actually escorted up to the fourth floor pediatric area.

Q      Who escorted you?

A      I think one of the security guys.

Q      Do you know how it came to be that security came to the floor with

       you?

A      I do not know.

Q      Did you request any assistance from security?

A      No.

Q      How, if you can recall, was the security officer dressed?

A      I think he had – he might have had a black jacket on and a white shirt,

       I don't know if he had any gun or anything, but security.

Q      And when you say black jacket, are you talking suit jacket or what

       type jacket?

A    No, it was just a regular – almost like a windbreaker type jacket.

Q    Did you take any officer other than Officer Sederlund from your department to the hospital with you?

A    No.

Q    Did you ask at any point any officers from your department to respond?

A    No.

Q    Were there any officers from any other police agencies there at the hospital with you?

A    No.

Q    Where did the security guard take you?

A    Took – he escorted us into an elevator and they took us to the fourth floor pediatric unit.

Q    What happened then?

A    We – I was led into a room and we spoke with, I believe it was one of the doctors that was there.

Q    Now what type of room was this?

A    It was actually a large, I remember it was a large conference room, big table, wooden table, wooden chairs, there's a door there and above the door was a window and on each side of the doors was larger windows. Inside the conference room, like I said, a big table and there was some other type medical supplies and stuff further on back.

Q    Were there any TV's or computers in the room?

A    Yes, I believe there was a computer that one of the doctor's used.

Q    And approximately how many chairs were at the table?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    If I had to guess, I'd say eight, at least eight, it was a pretty big table.

Q    Now Sergeant Sovik while you were in this room, were you wearing a jacket?

A    At one point I was, yes.

Q    When?

A    When I first got in there.

Q    When did you remove your jacket?

A    You know, I want to say probably, maybe an hour or hour or two into it, I know it started getting warm after that, so I ended up taking it off.

Q    Do you recall who if anyone was in the room when you took it off?

A    Actually I think Heather McBurney was in there, Detective Sederlund, myself and maybe one of the – one of the nurses and possibly even Sarah Weaver.

Q    Were you wearing any type of badge that day?

A    I was, yes.

Q    Where were you wearing a badge?

A    I have this shield with a badge on it and it just sits right in my pocket, my front left pocket.

Q    Were you wearing any type of gun belt?

A    No, just a regular dress belt.

Q    Were you wearing any type of strap across your chest?

A    Strap, no, ma'am.

Q    Does your department uniform have any type of strap that goes across the chest from shoulder to hip?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Dress uniform for funerals and special events, I have one, but I was not wearing it.

Q    Were you wearing any type of equipment?

A    I had – I had a gun on my right side in a holster.

Q    Is that a shoulder holster or waist?

A    It's a waist holster, actually, it's nylon, it's called Uncle Mike's waist holster.

Q    What did that –

A    It was black in color, it was flexible, so it just kind of fits on your side.

Q    Is that something that's attached to any special belt?

A    No, actually you can – you can wear it and you can secure it to your waist using your dress belt which is what I did.

Q    Did you have any cell phone with you?

A    I did, yes.

Q    Your personal or department cell phone?

A    My personal.

Q    And did you have any recording capability with your cell phone?

A    No.

Q    Did you have a tape recorder concealed under your jacket?

A    No.

Q    Now I'm going to show you what has been marked as People's proposed Exhibit 2 and ask you if you recognize this?

A    I do, yes.

Q    What is that?

A    That's my leather jacket I was wearing that night.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Are there any straps on that jacket?

A    Yes, there's a couple on the inside.

Q    What type of strap?

A    You can tie straps if you want to have it tight around your waist.

Q    So a waist strap to tighten the inside of the jacket?

A    Yes.

Q    When you were wearing this jacket on December 2nd and December 3rd of 2006, did you have any type of recording devices tied to those straps?

A    No.

MS. POPE STARNES:  I would move for the admission of People's Exhibit 2, proposed Exhibit 2.

THE COURT:  Any objection?

MR. WHITE:  No.

THE COURT:  So admitted.

(Whereupon People's Exhibit 2

was received in evidence)

MS. POPE STARNES:  May I approach the witness, Your Honor.

THE COURT:  You may.

Q    (By Ms. Pope Starnes, continuing):  I'm showing you what has been marked as People's proposed Exhibit 3 and ask you what that is?

A    That is my badge, my pocket badge.

Q    This is the pocket badge that you referred to previously in your testimony?

A    Yes.

Q    This is the same pocket badge that you were wearing on December 2nd
     and December 3rd of 2006?

A    Yes.

     People's proposed Exhibit 3 as People's Exhibit 3.

          MR. WHITE: No objection.

          THE COURT: So admitted.

                         (Whereupon People's Exhibit 3

                         was received in evidence)

Q    (By Ms. Pope Starnes, continuing):  Where were you wearing that on
     your person?

A    Right here on my top left hand pocket right here.

Q    So in your shirt, top left hand pocket you're indicating?

A    Yes.  There's a fold where you can just tuck it in your shirt so it stays
     secure.

Q    Now I believe you testified that after you were in the conference room
     that you spoke with a doctor?

A    Yes.

Q    If you can recall, who was that?

A    Jeffrey Fleming.

Q    What was the purpose of speaking to Dr. Fleming?

A    I was just trying to figure out, we're just trying to ascertain what he
     knew.  He said he wasn't the attending doctor but he just kind of gave
     us a rundown of some of Madison's injuries.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      What did you do after you spoke with Dr. Fleming?

A      I believe we spoke with Heather McBurney.

Q      Who is we?

A      Detective Sederlund and I, and in the room, when we talked to her

       there was one of the nurses and Sarah Weaver was there with us also.

Q      How was it that Heather McBurney came to be in the room?

A      I think one of the nurses went to retrieve her from wherever she was

       at.

               MR. WHITE:  Objection if he's going to speculate, Judge.

               THE COURT:  Fair enough, fair enough.

A      I don't know.

Q      (By Ms. Pope Starnes, continuing):  Okay.  Did you go and get her?

A      No.

Q      Did anyone come back to the room when Mrs. McBurney came into

       the room?

A      Yes.

Q      Who?

A      The nurse.

Q      Okay.  Do you recall that nurse's name?

A      I don't offhand, no.

Q      What happened when Heather McBurney came into the room?

A      As far as?

Q      Well, let's start out with where did she go in the room?

A      She came in and she – we were all kind of around one of the corners,

       she came in and she sat down, there was – I was sitting on one side, I

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

believe there was a nurse, there was Heather, Sarah Weaver and then Detective Sederlund.

Q   Was there a head of the table?

A   Yes.

Q   And where was the head of the table in relation to the door?

A   It was directly behind the door.

Q   And where did Heather McBurney sit in relation to the head of the table?

A   She was pretty much close to the head of the table.

Q   And if you can recall, were you to her left or her right?

A   I was to her right.

Q   And where was Officer Sederlund in relation to Heather McBurney?

A   To her left.

Q   Now, at the time that you spoke with Heather McBurney did you have any recording devices?

A   No.

Q   Did you introduce yourself to her?

A   Yes.

Q   How did you introduce yourself to her?

A   I introduced myself as Sergeant Sovik and this is Detective Sederlund from the South Lyon Police Department.

Q   What happened then?

A   Just basically told her why we were there.

Q   What did you tell her?

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I told her that we were there to ask her some questions about the injuries sustained by her daughter and I just told her that whenever injuries of this type occur the medical staff has an obligation to contact the police department and it's our responsibility to follow up and investigate.

Q    Did you have an opportunity to observe Heather's demeanor?

A    Yes, I did.

Q    Can you describe that to the Court?

A    She looked frail, she looked worried, she looked upset, she looked like she had the weight of the world on her shoulders, she looked rough.

Q    Do you recall approximately what time it was when you began to speak with her?

A    Around twelve forty.

Q    After you gave this introduction of yourself and told her why you were there, what happened next?

A    I think we –

        MR. WHITE: Objection as to we –

        MS. POPE STARNES: Well, Your Honor, at this point I'm going to ask that he be allowed to finish the sentence, depending on what it is he may be able to say we, we walked out of the room; if he's present with him and he says that, he can say that. Until he finishes the sentence I don't know what it is to be able to address it with the officer.

        MR. WHITE: She didn't ask – she didn't ask what Sederlund did, she asked –

MS. POPE STARNES: I'm asking –

THE COURT: Let's – hey –

MS. POPE STARNES: -- what happened ext.

THE COURT: Why don't we all do this. Stop. Let's start over. Okay.

Q  (By Ms. Pope Starnes, continuing): My question was simply what happened next?

THE COURT: Okay.

A  I'd have to look back at my report to say exactly.

Q  (By Ms. Pope Starnes, continuing): Did you make a report in this case?

A  I did, yes.

Q  And would this report refresh your memory?

A  It would, yes.

Q  Do you have a copy of it with you today?

A  I do.

Q  And is that a copy of your report?

A  It is.

Q  Go ahead and look at that and let me know when you've had an opportunity to do that.

A  Okay.

Q  Does that refresh your memory?

A  It does, yes.

Q  What happened next?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    We started – I asked her questions, whether or not she was – how long
     she had been married to Steven, how many children they had and if
     any of them had been previously married before or had any children
     from previous relationships.

Q    What was her response to that?

A    She said no.

Q    What happened then?

A    I believe – we – I or one of us informed her that we were aware that
     Mr. McBurney, Steven, had a child from a previous incident, previous
     relationship.

Q    Do you recall which one of you informed her of that?

A    I believe it was me.

Q    What happened next?

A    She told us that she was aware that Steven had a child from another
     relationship.

Q    Did you ask her about what had happened on November 30, 2006?

A    Yes, I did.

Q    And did she give you details about what she recalled or the events of
     that day?

A    Yes.

Q    Now Sergeant Sovik, at any point during your interview of Heather
     McBurney, did you ask her questions about whether or not she was the
     person responsible for Madison's injuries?

A    I did.

Q    What did you ask her?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I asked her if she was responsible for the injuries that Madison sustained.

Q    What did she say?

A    She said no.

Q    Did you ask her anything else about that?

A    I asked her if she thought Steven was responsible, if Mr. McBurney was responsible for the injuries.

Q    And what was her response then?

A    I think she said something to the fact like I can't believe he would do something like that.

Q    Did you talk to her about whether or not there was anyone else who could be responsible for the injuries?

A    I believe I asked her if there were any other caretakers a couple days prior to this incident.

Q    What was her response?

A    She said it's -- her and Steven are the main caregivers.

Q    What was her demeanor towards the end of the interview?

A    The same, I mean she was pretty consistent throughout the entire interview.

Q    Did she ever begin to complain to you during the interview?

A    No.

Q    How did the interview end with Heather McBurney?

A    I believe she was escorted out by one of the nurses.

Q    The nurse that had been in the room or someone else?

A    I think the nurse that had been in the room the entire time.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q     And you talked about Sarah Weaver being in the room, does she

      remain in the room the entire time?

A     With Heather McBurney?

Q     Yes?

A     Yes.

Q     Approximately how long was your interview with Heather McBurney?

A     A little over an hour.

Q     What happened then?

A     Heather McBurney left.

Q     Were you ever able to look outside through these windows that went

      into the hallway that you testified about?

A     Yes.

Q     Now you testified about being escorted upstairs by a security guard?

A     Yes.

Q     During the time that you were speaking with Heather McBurney, do

      you recall whether or not you ever saw a security guard outside those

      windows?

A     I never saw him the entire time we were there that night till later on.

Q     What happened after Heather left the room?

A     The nurse left and Sarah Weaver left.

Q     Then what happened?

A     Then Mr. McBurney came in.

Q     Now when Mr. McBurney came in, was Sarah Weaver still in the

      room?

A     I don't believe – I can't recall.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    What happened when he came in the room?

A    He sat down at the head of the table.

Q    How was it that he came into the room, who brought him?

A    I believe one – one of the nurses.

Q    Did you leave the room to get him?

A    No, ma'am.

Q    Now when Mr. McBurney came into the room, was your jacket on or off at that point?

A    I believe it was off.

Q    And do you know where it was in the room?

A    It was right on my – I believe it was right on the back of my chair hanging over.

Q    What was said by you when Mr. McBurney came in the room?

A    I basically told him the same thing, why we were there, identified ourselves, I explained why we were there.

Q    Did he have a seat?

A    Yes, he was seated at that time.

Q    Okay. How did he come to sit down?

A    I think we maybe asked him to sit down.

Q    And where did he sit?

A    He sat up at the head of the table.

Q    Is this the same seat that you described that Heather McBurney sat in?

A    Yes.

Q    And where were you seated in relation to him?

A    I was on his right side.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    And where was Officer Sederlund?

A    On his left side.

Q    Would you recognize Mr. McBurney if you saw him again?

A    Yes.

Q    Is he in the courtroom today?

A    Yes, he is.

Q    Can you tell the Court please where he's located and describe what he's wearing today?

A    Sitting to the right of counsel, Mr. White, wearing a white shirt and orange uniform.

Q    At any time – excuse me –

         MS. POPE STARNES:  May the record reflect he's identified the defendant?

         MR. WHITE:  So stipulated.

         THE COURT:  So noted.

Q    (By Ms. Pope Starnes, continuing):  At any time during the interview of the defendant, did you have a recording device?

A    No.

Q    After you introduced yourself and you testified that you told him why you were there, what did you tell him was the reason why you were there?

A    I said that there's – the same thing I told Heather, I said we were there because whenever there is suspicious injuries to a child, I said medical staff has an obligation to contact the police department and then we have an obligation to investigate.

Q    Did you begin asking questions?

A    Yes.

Q    During your experience as a police officer, have you had an

     opportunity to observe people that are under the influence of

     controlled substances or alcohol?

A    Yes.

Q    Do you have training in detecting when somebody is under the

     influence of a controlled substance or alcohol?

A    Yes.

Q    During your observation of the defendant, did you have any reason to

     believe that he was under the influence of any controlled substance or

     alcohol?

A    No.

Q    At any time during the interview, did you threaten him?

A    No.

Q    Did you use force or coercion to get him to speak with you?

A    No.

Q    Did you use any trickery or deceit?

A    No.

Q    Did you physically abuse or assault him?

A    No.

Q    Did you observe Officer Sederlund do any of these things?

A    No.

Q    At any point did he complain to you that he had a medical condition

     that would affect his ability to speak with you?

A    No.

Q    Did you observe any condition that you thought could affect his ability
     to speak with you?

A    No.

Q    Did he appear to understand you?

A    Yes.

Q    Did you deprive him of food?

A    No.

Q    Did you deprive him of anything to drink?

A    No.

Q    Did you have any information as to whether or not he had had any
     sleep?

A    No.

Q    Did you deprive him of sleep?

A    No.

Q    Did he complain to you at any point that he was tired and he couldn't
     do this and he needed to stop?

A    No.

Q    At any point did you see any sign that he was tired?

A    He may have yawned once or twice.

Q    During the course of your interview with Heather McBurney, did you
     take notes?

A    Yes, I think I may have taken a couple.

Q    Okay. During the course of your interview with the defendant, did you
     take notes?

A    I think I might have taken a couple, yes.

Q    Did you observe whether or not Officer Sederlund took notes during
     the interview with Mr. McBurney?

A    I think he did. I think he did most of the note taking.

Q    After you began to speak with him what was the first thing that you
     asked him?

A    I asked him if he had any children from other relationships.

Q    What did he tell you?

A    He said no.

Q    Then what happened?

A    I asked him to tell me about the – why the paramedics and fire fighters
     were called to his house on the 30th.

Q    And what did he say?

A    He said that – well, he said the child was being difficult and he said
     Madison has some type of separation anxiety when Heather goes and
     leaves for work, he had said that Madison was, I think, throwing up
     throughout the day and wasn't feeling that well. He said that Heather
     had left for work, usually around six around, when she leaves for work
     they put her down for a nap before she goes to help ease the anxiety
     and then she's off to work and then when he wakes her up a little bit
     later then he takes care of her. This day was the same thing, he said he
     got up after Heather had left, got Madison up from the nap, gave her, I
     believe he gave her a bottle and put her in the bouncy seat in the living
     room. A little bit later I think she spit the bottle up. He took her out of
     the bouncy seat, he brought her into the bedroom, I think he changed

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

her clothes, changed her diaper, put the leg brace on because of a condition she had at birth and then he sat her down on the floor while he – I believe he was putting away clothes and throwing away the diaper.

Q     What else did he say if anything?

A     He said he noticed the baby was gurgling, he said it wasn't unusual for her to spit up and gurgle and then the baby just kind of fell backward and had a seizure, I think he said her arms got real tight and legs, and then she became unresponsive, Madison. He then contacted 911. I think he got some instructions on how to give some rescue breaths from the dispatcher when he called 911.

Q     Now you used the word difficult, did he use that word difficult when describing Madison's behavior that day or was that your word?

A     I can't remember. I know later on he said during the interview, he said that at one point she was difficult, he told me she was difficult.

Q     After he gives you this version of events that had happened on November 30, 2006, what happened next?

A     We asked him about Nicholas Kennedy.

Q     Who asked him about Nicholas Kennedy?

A     I did.

Q     What did you ask him about Nicholas Kennedy?

A     I told him that we were aware that he had a son from a previous incident – previous relationship and he said that she told me it wasn't my son; I said well, that individual child, Nicholas Kennedy, had sustained injuries like Madison's. He said he wasn't responsible for

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

the injuries. I said well how did this child get skull fractures? And then right away I think he went into talking about the previous case, how his lawyer was progressing, he spent about thirty thousand dollars in lawyer fees and so he ended up taking a plea to second degree child abuse.

Q   Did you ask him whether or not he had ever told his wife about this prior incident?

A   I can't remember if I asked him that or not. I think – actually, I think I may have. I believe he said that he hadn't talked – him and Heather hadn't discussed it, he thought that Heather was not aware that he had a previous child from a relationship.

Q   Now from your interview with her, you were aware that she did know about the child?

A   Yes.

Q   Did you confront him with that?

A   Yes.

Q   What was his response to that?

A   He was surprised.

Q   When you told him that the injuries that Madison sustained were the same as the injuries that Nicholas had, did he respond to that?

A   Yes. He said that the injuries that Nicholas Kennedy sustained were more severe than the injuries to Madison.

Q   Did he go into detail about that?

A   No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   Did you talk to him about whether or not Madison had been in anyone
    else's care that could have caused these injuries to her?

A   Yes.  I asked him if there were any other caregivers besides he and
    Heather days prior to the November 30th incident and he said that they
    were the only two caregivers.

Q   What happened then during the interview?

A   I told him that there was evidence provided by doctors that suggest
    that these injuries to her were not accidental, that they were due to like
    trauma or neglect, they were commonly known as – these injuries were
    commonly known as shaken baby syndrome, that there was a subdural
    hematoma and retinal bleeding and these were indications that the
    baby was shaken.

Q   Now I want to ask you a question about your police report, the word
    inconclusive is used in your police report, are you aware of that?

A   I am, yes.

Q   In what context is that word used in your police report?

A   Actually, it's an error.

Q   What should – what is the correct way that the police report should be
    worded?

A   It should have read conclusive evidence.

Q   It should not say there was inconclusive evidence, but there was
    conclusive evidence?

A   Yes.

Q   Okay.  And so what you told the defendant was that there was
    conclusive evidence, not inconclusive evidence?

212

A    You know I may have told him that there was inconclusive evidence thinking about it, but I can't recall, but I may have said inconclusive evidence, I can't be sure.

Q    Okay. But the police report is incorrect using that word?

A    Yes.

     MR. WHITE: Well, Your Honor, he says he might have used either word so I – for him to say it was right or wrong –

     THE COURT: I know, we're talking about what's contained in the police report.

     MR. WHITE: Right.

Q    (By Ms. Pope Starnes, continuing): And specifically, when you spoke with him, you spoke with him about the injuries and the information that you had from the doctor?

A    Yes.

Q    What happened then?

A    I told him, I said well there's only two people that could have been responsible for the injuries, I said it's either her, it was either Heather or it was him and I asked him if he was responsible and he said no and I said well, so you're telling me that Heather is responsible for these injuries to Madison? And I think he said I don't know, I can't believe she'd do something like that.

Q    During the course of this interview, did you raise your voice with the defendant?

A    Never.

Q    Did you ever hear Officer Sederlund raise his voice?

213

A    No.

Q    Were there pauses in the conversation?

A    There were several pauses, I mean with the interview with Heather McBurney and Steven McBurney.

Q    I'm talking specifically about the interview with Steven McBurney?

A    Yes, there were several pauses.

Q    Describe one?

A    We'd ask him a question and he would stare straight ahead, sometimes twenty seconds, sometimes a minute, and we'd be thinking – I'm thinking to myself well, Steven, why don't you say something here, cause we're – you know, this is our first big case, I thinking why don't you say something?  We're having trouble figuring out what we're going to say next.  So – sometimes it would last, you know, twenty seconds a minute, sometimes longer.

Q    At any point during these pauses, did defendant appear not to understand what you had asked him?

A    No.

Q    What happened next during the interview?

A    Detective Sederlund asked him about a polygraph.

Q    After that discussion is there some point where you told him that you knew he caused the injuries to Madison?

A    Yes, that was – yes.

Q    How did you say that?

A    I said, I said we know you caused the injuries to Madison, I said you know what, good things happen to – good people do bad things, I said

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

we all understand it, we all got kids of our own, I got three of my own,
I know how it is, I said Heather said he was a really good father, he
was an excellent provider, good father, good husband, I said just – that
sometimes good people do some bad things, make mistakes.

Q    What happened next?

A    He said my life is over.

Q    And then what happened?

A    I started talking some more saying no, your life is not over, you guys
need each other now, referring to Steven and Heather, I said she needs
– she needs you more than ever, you guys have got to get through this,
that's what, you know, good marriages do, just trying to, you know,
keep it going, actually just trying to keep him talking. And then one
time I asked him, you know, I said well, why don't you tell me what
happened and he just kind of stared straight ahead for awhile and I said
well, would it be better if we brought Heather back in here, your wife,
you can tell her what happened, and he said yeah, I'd like to talk to
her.

Q    Okay. Now, at any point up to this point, Sergeant, had you told the
defendant that he could not leave?

A    No.

Q    At any point had you told him that he was under arrest?

A    No.

Q    At any point had you done anything to convey to him that he couldn't
leave this room and he was under arrest?

A    No.

Q    Did you have handcuffs?

A    I had handcuffs, yes.

Q    Where were they?

A    They were lapped in my back, my waist, there's my belt, my dress

belt, I had one slid and the other just kind of held on and I had them

flipped over my belt on my back behind me.

Q    Okay. And where were those during this interview?

A    They were above my butt the whole time.

Q    They stayed there?

A    Yes.

Q    The interview room door, was it locked or unlocked if you know?

A    Unlocked.

Q    At the point that he told you that he would like to talk to Heather, what

happened then?

A    Detective Sederlund left the room and I was in there with him, with

Steven.

Q    Okay. And did you talk to him further while Detective Sederlund was

out of the room?

A    Yes, briefly.

Q    What did you say?

A    I just said you know, Heather said he was a good father, a good

husband, I said your life is not over, those kind of things.

Q    So more of the same things you had said before Detective Sederlund

left the room?

A    Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    What happened after Detective Sederlund returned to the room?

A    Heather McBurney was brought into the room also.

Q    So now at this point there's just the four of you in the room?

A    Yes.

Q    And where did Heather go when she came into the room?

A    She actually sat to my left and she was like, she was kind of – if this

     was the table (indicating), she was here (indicating) I was here

     (indicating) Steven was right here (indicating) and Officer Sederlund

     was still over here (indicating).

Q    So she was between you and the defendant?

A    Yes.

Q    And what happened when she came into the room?

A    There was a long – there was a pause for awhile and then eventually

     Steven, the defendant asked Heather about Nicholas Kennedy.

Q    What did he say?

A    I think he was surprised that she knew, he asked her, you knew about

     Nicholas? And she said yeah and he said well, how did you know and

     she said well your friend Kyle told me about it.

Q    At the point that Heather McBurney came back into the room, before

     the defendant brought up Nicholas Kennedy, did you say anything?

A    As far as when or?

Q    Once Heather came back into the conference room –

A    Okay.

Q    -- and you testified that there was a silence and then the defendant said

     something to her about Nicholas Kennedy; at any time between the

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

time she came into the room and the time that he said anything about Nicholas Kennedy, did you say anything?

A    Yes.

Q    What did you say?

A    I think I told her that – explained to Heather, I said Steven wants to tell you something, I said he doesn't think that you're going to love him or support him after this, and I told him that that was not correct. And I told him to tell her what happened.

Q    After he began this statement about Nicholas Kennedy, what happened then?

A    He then tells her that he made a mistake.

Q    Then what?

A    She said well, what happened? And he said that he threw Madison into the crib.

Q    Are you certain that this conversation about Nicholas Kennedy occurred before he told her that he threw Madison into the crib?

A    Absolutely

Q    What happened after the defendant told Heather that he had thrown Madison into the crib?

A    She said well, what happened? And he said I threw her into the crib, he said you know how difficult she has been, he said that's why I wanted you to work days so that we could tag team her at night because of how difficult she's been.

Q    During this conversation, are you saying anything?

A    No.

218

Q   Since the time that you said basically the defendant has something to
    tell you, up to this point, have you said anything?

A   No.

Q   Has Officer Sederlund said anything?

A   No.

Q   The conversation is between the defendant and Heather?

A   Yes.

Q   After he makes this response to her about knowing how difficult
    Madison had been, what happens next?

A   I asked him to tell us what happened.

Q   And what did he say?

A   He starts over talking about the separation anxiety, said that Heather
    went to work, put her down for a nap, put Madison down for a nap,
    when Madison woke up Heather was already at work. He said that he
    had given her a bottle, put her in a bouncy seat and then put her in the
    front living room. Shortly after that he said she spit up the bottle, I
    think he removed her from the baby seat and brought her into
    Madison's bedroom, he changed her clothes, changed her diaper and
    put the leg brace on her. He said while he was doing this he said she
    kept on, she was screaming, he was frustrated, he was mad, he picked
    her up and she was screaming in his ear he said then he threw her into
    the crib and then he said when her head hit one of the bars or hit one of
    the bars of the crib, and the baby started – I think he said the baby
    started seizing so he grabbed her and tried to console her. I don't
    know if he called 911 before he even unrobed her, he unrobed her

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

down to the diaper, I believe he was giving her rescue breaths and he brought her to the front of the house, the front door to wait for the medical personnel for assistance.

Q      After he gives you this statement, what happened then?

A      I asked him to – actually I said we're going to leave you and Heather alone for a couple of minutes. I asked him if he would write out a statement as to what happened with the incident, I said Detective Sederlund and I are going to step outside in the hallway for awhile, give you a couple minutes, in the meantime if you could write out a statement as to what happened, it would be great.

Q      And what if anything did you give him to write the statement on?

A      Yellow – yellow legal paper like that and a pen.

Q      And was there any – had you written anything on that paper prior to giving it to him?

A      No.

Q      At this point, before you leave the room, did you say anything to him about being under arrest?

A      No.

Q      Did you tell him that you're – he's not free to leave?

A      No.

Q      What happened after you leave the room?

A      Detective Sederlund and I had talked about what had just transpired and said we need to contact the prosecutor to find out how to proceed further.

Q    And did one or both of you speak with the detective prosecutor – or excuse me, duty prosecutor?

A    Yes, I believe Detective Sederlund had actually contacted her, Kelly Chard; I don't know if I talked to her or not, but I know that Detective Sederlund did most of the talking with her.

Q    And after he went out to speak with her did you or Detective Sederlund talk about whether or not you should place the defendant under arrest?

A    Yes, after we talked to her we did, we discussed it.

Q    What was your conversation?

A    We said we can't let him go, there's a couple things that could happen, he's either going to go – he's either going to flee or he may go out and hurt himself because of what happened.  So we made the decision – we decided to make the arrest.

Q    When you were out in the hallway speaking with Detective Sederlund was the door to the room open or closed?

A    I believe it was closed.

Q    Do you know if it was locked or unlocked?

A    I think it was unlocked.

Q    And how far were you from the room?

A    Just maybe a couple feet back from the door.

Q    Did you observe any of the security people from the hospital in the hallway?

A    Later on we did but not when we were out there deciding whether or not we were going to arrest him though.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      And before you left that conference room, leaving the defendant and

       his wife in there, did you place any recording devices on a chair or on

       the floor?

A      No.

Q      Do you have any idea what defendant and his wife said to each other

       when you were out in the hallway?

A      I have no clue.

Q      Did you and Officer Sederlund return to the room?

A      Yes.

Q      Approximately how long were you gone from the room?

A      Five to ten minutes at the most, it wasn't long.

Q      When you came back in the room, were you able to observe the

       witness form that you had left?

A      Yes.

Q      Where was that?

A      On the table right in front of Mr. McBurney.

Q      And was it still blank or had it been completed at that point?

A      It was completed.

              MS. POPE STARNES:  Your Honor, may I have People's

       Exhibit 1, may I approach, Your Honor?

              THE COURT:  You may.

Q      (By Ms. Pope Starnes, continuing):  I'm showing you what has been

       admitted as People's Exhibit 1, do you recognize that?

A      Yes.

Q      What is that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A      It's a copy of Mr. McBurney's statement.

Q      Thank you. When you came back in the room what did you do?

A      I believe we placed Mr. McBurney under arrest, told him he was under
       arrest.

Q      Did you obtain consent to search the home from Mr. McBurney and
       Heather McBurney?

A      Yes, we did that on the advice of the prosecutor.

Q      And did you do that before or after you placed him under arrest?

A      That was before I believe.

Q      Okay. And how did you convey to him that he was under arrest?

A      Just told him, he's under arrest.

Q      What happened then?

A      We told him to – we told him to go say goodbye to his daughter.

Q      And when you did that was he cuffed or uncuffed?

A      He was uncuffed.

Q      Who cuffed him if you can recall?

A      I did.

Q      And at what point, if you can recall, was it that you cuffed him?

A      After he got back from the room, from Madison's room, he came back
       in the hallway where the conference room was at.

Q      And how did you cuff him?

A      Hands behind his back handcuffed his hands.

Q      When he left the conference room to go to Madison's room, did you
       speak to security officers at that point?

A      I think they may have been there.

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q  Did you call for them?

A  No.

Q  Did you ask for their assistance?

A  Nope.

Q  And when you left the hospital with Mr. McBurney, did a security officer escort you to the elevator and down the elevator and did they escort you out?

A  Yes.

Q  At any point prior to the time that you and Detective Sederlund came back to the conference room, after talking to the prosecutor, did you convey to the defendant that he was under arrest?

A  No.

Q  At any point did you convey to him that he was in custody?

A  No.

MS. POPE STARNES:  May I have just a moment, Your Honor.

THE COURT:  You may.

Q  (By Ms. Pope Starnes, continuing):  I've asked you about video equipment, at any point during the interview with either Heather McBurney or the defendant did you have any type of recording equipment like a video cassette player or any other type of recording equipment?

A  No.

Q  How long was your interview with the defendant?

A  A little over two hours.

Q    At any point during your interview with the defendant was he restrained?

A    No.

        MS. POPE STARNES: May I have just one moment.

        THE COURT: Yes.

Q    (By Ms. Pope Starnes, continuing): At any point during your interview of the defendant up to the time you placed him under arrest, did you give the defendant his Miranda warnings?

A    No.

Q    Why not?

A    He wasn't in custody.

Q    At any point did he ask you for an attorney?

A    No.

Q    At any point did he ask you for an opportunity to speak with anyone other than Heather?

A    No.

Q    And when he asked to speak with Heather you allowed him to do that?

A    Yes.

        MS. POPE STARNES: Thank you. I have no other questions.

        THE COURT: Cross examine.

        CROSS EXAMINATION

BY MR. WHITE:

Q    Sergeant Sovik are you okay to continue now?

A    Pardon?

Q    Are you okay to continue now?

A    Oh, yes, sir. Can I get some more water please.

Q    You've been a police officer, your entire tenure has been with South Lyon Police Department, isn't that true?

A    Yes, sir.

Q    And you've held a variety positions including road patrol, detective and sergeant, correct?

A    Yes, sir.

Q    And you've had – in December 2006, you were a sergeant?

A    Yes, sir.

Q    And how do the duties of a sergeant differ from that of a detective as of that point?

A    I'm in charge of scheduling, I'm in charge of reviewing reports and assigning them to the detective bureau and that's pretty much it, special events, escorting.

Q    And how long had you been a sergeant prior to December of 2006?

A    About ten years.

Q    And how many people, police officers are presently in the South Lyon Police Department?

A    There are eighteen from the chief on down to the low seniority guy.

Q    And you've been so employed continuously since you began your employment at South Lyon Police Department?

A    Yes, sir.

Q    Okay. And are you on road patrol now or still a sergeant?

A    I'm still a sergeant, I also take calls as other officer's do.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And on November 30th to December 2nd of 2006, the time of day that
     you got up that day?

A    December 2nd?

Q    December 2nd – I believe that was the date that you first received
     notice –

A    Yes, sir –

Q    -- of this –

A    -- five thirty, five forty, somewhere in that area, it was early.

Q    Okay. And do you know what day of the week that would have been?

A    Saturday.

Q    Did you work in your capacity as a police officer that day?

A    No.

Q    Okay. Do you remember what you did that day?

A    Yes.

Q    What did you do that day?

A    I was at a business meeting in Indianapolis that day.

Q    Police?

A    No, sir.

Q    And when did you return to Michigan?

A    Probably hit the Michigan Indiana line somewhere around seven
     maybe.

Q    Seven?

A    P.M., that night.

Q    And the call I believe you said occurred from Baaki approximately
     seven or seven thirty?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO  800-626-6313

A      Somewhere around there, yes.

Q      Okay.  And you were with your wife I believe?

A      Yes.

Q      And you said you dropped her off at home –

A      Yes –

Q      -- and went to the police department?

A      Yes.

Q      Had you had anything of an alcoholic nature to drink that day?

A      No, sir, I don't drink.

Q      Pardon?

A      I don't drink, no, sir.

Q      And had you had any kind of prescription medication?

A      No, sir.

Q      Okay.  You were not scheduled to work that night, isn't that correct?

A      That's correct.

Q      Okay.  And when you got to the police department was Sederlund

already there?

A      I believe so, yes.

Q      Okay.  And did Baaki brief you as to the nature and circumstances of

your assignment?

A      Yes, sir.

Q      And what did he say to you?

A      He said that he received a call from child protective services that a

child sustained suspicious injuries and was expected to die.

Q      Anything else you can recall that he said?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    I don't recall anything else.

Q    And did he indicate to you what your respective duties were, you and
     Sederlund, as to this investigation?

A    No, we were just to investigate it.

Q    And did he indicate to you, did Baaki indicate to you that he had ran a
     criminal history of the parents of the child, correct?

A    Yes, sir.

Q    In fact he related to you that Heather's criminal history had come back
     with no entries, right?

A    I can't recall.

Q    And Steven McBurney's criminal history had come back with – that
     he had been charged in 1998 with child abuse first degree?

A    Yes, sir.

Q    Ultimately pled to child abuse second degree?

A    Yes, sir.

Q    Wayne County Circuit Court?

A    Yes, sir.

Q    Arising from a case in Northfield Township?

A    Northville –

Q    Northville –

A    Yes, sir.

Q    So immediately you were aware of the prior offense, correct?

A    Yes, sir.

Q    And did he indicate to you who Sarah Weaver was?

A    Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Okay. And did he indicate that she was with Child Protective Services for Washtenaw County, correct?

A    Yes, sir.

Q    And that this was non-accidental trauma, correct?

A    Correct, sir.

Q    And the child was going to die?

A    Yes, sir.

Q    So immediately in your mind this was a homicide case, correct?

A    It was going to be, yes, sir.

Q    Upon the death of the child it was going to be a homicide?

A    Yes, sir.

Q    And this was going to be your first homicide investigation, correct?

A    Yes, sir.

Q    Now have you ever testified in circuit court before?

A    Yes, sir.

Q    Okay. In Oakland County Circuit Court?

A    Yes, sir.

Q    Okay. Have you ever been – how many times?

A    I believe twice.

Q    When was the most recent time?

A    Oh, it was 1998.

Q    Okay. And in your capacity as a police officer?

A    Yes, sir.

Q    Have you ever had a first degree child abuse case before where you were the investigating officer?

230

A   No, sir.

Q   Any kind of child abuse case involving a child, allegations of abuse?

A   I believe so, yes.

Q   Okay. First degree, second degree, third degree, do you remember?

A   It wasn't as serious as this, maybe more to do with neglect.

Q   Have you ever been called at any time in any capacity investigating a traumatic brain injury to a child?

A   No, sir.

Q   Did you understand that this was that kind of case from the beginning?

A   Yes, sir.

Q   Do you have any specific medical training, officer?

A   No, sir.

Q   And the first step in your investigation was to search for a tape recorder?

A   No, that wasn't the very first thing I did, but in the course of preparing to leave that was one of the things I did, yes.

Q   You said that wasn't the first thing, what was the first thing?

A   Getting the criminal histories, getting more background information from Sergeant Baaki, getting my gun and my handcuffs.

Q   When you say you got additional information from Baaki, what did you get?

A   Just the incident about the Northville Township and then he — someone, I believe he had called or somebody had called and we were going to go down there and try and get a copy of the report.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    When you obtained your gun and handcuffs and anything else, is it
     necessary for you as being a South Lyon police officer, to have an
     equipment log registration?

A    No, sir.

Q    Equipment that you were going to take on a particular assignment?

A    No, sir.

Q    Okay. And did you search for a recording device?

A    Yes.

Q    And where did you look?

A    I looked – well, I looked in what is called the supply room, it's where
     a lot of the clericals keep their old records, in my first tender years
     there there was always a cassette recorder, like one of these (phoen)
     only smaller, that was wrapped with a cord around it on top of the
     shelving area.

Q    Okay. And could you find it?

A    No, sir.

Q    Did you find any recording device?

A    I didn't, no, sir.

Q    And you were looking for it because you wanted to record the
     statement, correct?

A    Yes, sir.

Q    Okay. In fact you had the anticipating of recording the statements of
     Steven McBurney, isn't that true?

A    That would have been nice, yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q  Okay. But that was your intention, one of the reasons of getting the
   recorder, correct?

A  Yes, sir.

Q  Okay. And we know that if you record the statements there's no
   question about what was said and what's not said, correct?

A  That's correct.

Q  And a recorded statement is of the utmost importance, can we agree?

A  Yes, sir.

Q  Do you know if Sederlund in your presence looked for any kind of
   recording device?

A  Yes, he did.

Q  Okay. And where did he look?

A  I think he looked in some of the sergeant's drawers in the sergeant's
   office.

Q  And do you know what if anything he found?

A  I think he found – he did find one of these mini cassette recorders and
   upon later inspection I think there was some corrosion or something
   between the leads and the battery.

Q  So is it a fair statement that there was absolutely no recording device
   available at the South Lyon Police Department for you and Sederlund
   to use in the course of your investigation of this homicide?

A  At that time during the preparation, that is correct.

Q  And did you make any attempt to go to any store?

A  No, sir.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did you make any attempt to go to any other source to find a recording device?

A    No, sir.

Q    Did you discuss with Sederlund how you were going to accurately record the statements from witnesses in this case?

A    No, we didn't discuss that.

Q    All right. And the next step in your investigation was what, sir?

A    Going to the Northville Township Police Department.

Q    Okay. In fact there was a step before that, correct?

A    Yes, sir, you're correct.

Q    You interviewed a South Lyon fire fighter?

A    That's correct.

Q    Johnston, Johnston and –

A    Schultz (phoen)

Q    -- Schultz, correct?

A    Yes, sir.

Q    During this interview they made statements to you pursuant to your questions, correct?

A    Yes.

Q    And you recorded those statements how?

A    Maybe written down, they were very brief.

Q    And when you say you may have wrote them down, do you remember what you did, sir?

A    I can't remember if I wrote them down or not.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Okay. But the police report that was prepared in this case, you've had

      an opportunity to look at again today, correct?

A    Yes, sir.

Q    Before your testimony and during your testimony?

A    Yes, sir.

Q    Okay. And that was prepared by you and Sederlund, correct?

A    Correct.

Q    And it was – there's notations about interviews with these three fire

      fighters, correct?

A    Yes, sir.

Q    And how is it that you were able to translate or put their statements in

      there from the interviews of December 2nd, what did you do, just use

      your memory?

A    Yes, sir.

Q    So you didn't use any notes?

A    I don't think I did.

Q    When you include the statements of Johnston and Johnston and

      Schultz (phoen) I assume you've had an opportunity to look at them

      today?

A    Yes, sir.

Q    Okay. Does it include everything that each person said to you

      December 2nd?

A    As accurate as I can remember, yes, sir.

Q    So is it verbatim of what they said?

A    No, sir.

Q    In fact there was another person you interviewed also, isn't that true?

A    I don't know – oh, yes, Alex Smith.

Q    Alex Smith, okay, so let's include him.

A    Okay.

Q    Is his statement contained within your police report an accurate
     description of the statements made by those four fire fighters to you on
     December 2, 2006?

A    Yes, sir.

Q    And you prepared this report when?

A    I prepared a little bit of it Sunday morning December 3rd and I think I
     may have prepared it a little bit later on Sunday afternoon, we came in
     for about three hours and then more on Monday.

Q    When was it completed?

A    I believe it's maybe Monday or Tuesday, there was a lot of stuff going
     on, a lot of calls and a lot of follow up, I believe it was maybe Monday
     or Tuesday was – it took awhile.

Q    So it would have been the 4th or 5th of December?

A    Yes, sir.

Q    Okay. Was it completed, sir, before the first warrant was obtained for
     Steven McBurney's arrest?

A    As far as our portion I believe it was, yes, sir.

                 MR. WHITE: If I may approach the witness, Your Honor.

                 THE COURT: You may.

Q    (By Mr. White, continuing): I'm going to hand you Exhibit A and ask
     you to take a look at that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes, sir.

Q    Have you ever seen that document before?

A    I have, yes, sir.

Q    And what is it?

A    This is the swear to of the warrant that I initiated.

Q    Okay. And let's look – the swear to to the warrant that you initiated, are those written notes?

A    Yes.

Q    Are they your notes?

A    The first three lines are, yes.

Q    Okay. And the balance of that is whose notes?

A    Officer Sederlund.

Q    And when was it prepared? What time? What date?

A    Monday or Tuesday evening I believe, I know I think we were on the highway, we were on our way home from – it might have been the prosecutor's officer, I think it was Monday.

Q    Are you telling me or asking?

A    No, I think it is, I know it was late one evening probably at seven o'clock, I think it was on the way home from – after obtaining the first warrant I think.

Q    After obtaining the first warrant?

A    Or when – no, no, when they issued the warrant. When the prosecutor's office issued the warrant, we had to write down, we had to swear to the warrant as to what happened.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Okay.  So this document was prepared in a car when you and

Sederlund were in it, correct?

A    I believe I started in the car –

Q    Okay.

A    -- don't know if it was finished in the car, but –

Q    Where was it finished at?

A    If it wasn't finished in the car it was probably at the South Lyon Police

Department.

Q    I'm not asking to guess, sir, if you can tell me –

A    I don't know for sure.

Q    Okay.  And when was it finished, Monday night?

A    I believe it may have been Monday night.

Q    And the swear to was when?

A    I don't know, I'd have to look at the rest of it, I don't know.

Q    The initial warrant was obtained for Steven McBurney?

A    Uh-huh (affirmatively)

Q    Was when?

A    I can't recall without having something in front of me saying when it

was issued, I don't know, I wasn't a part of that process.

Q    Were you the one that appeared before the judge or magistrate and

gave testimony to obtain the warrant?

A    No, sir.

Q    On either occasion?

A    No, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q   Okay.  When Exhibit A was prepared by you and Sederlund, had you
    completed your police report?

A   I believe we had, yes, sir.

Q   Okay.  Does Exhibit A accurately reflect the nature of circumstances
    of the investigation of Steven McBurney and the death of Madison
    McBurney?

A   I believe so, yes, sir.

Q   So back to your investigation, you didn't take notes during the
    interviews with the South Lyon fire fighters?

A   No.

Q   Your next step was to go, after that, to Northville Police Department,
    correct?

A   Yes.

Q   And you and Sederlund go together?

A   Yes, sir.

Q   And you arrive there approximately when?

A   It was late, probably around eleven something.

Q   That would have been p.m.?

A   Yes, on the 2nd.

Q   On that Saturday, December 2nd?

A   Yes, sir.

Q   And who did you speak to initially when you went in?

A   It was one of the clerks that was there, I don't know her name.

Q   Okay.  And did she provide you with any information regarding the
    prior offense?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

A      No, she didn't.

Q      Okay.  Did she provide you any assistance at all by helping you gather
       information?

A      Yes.

Q      And how did she do that?

A      She showed us the microfiche.

Q      Okay.  And when you – when she showed you the microfiche, what
       did you do?

A      I started leafing, we were trying to pick up some information.

Q      And did you?

A      A little bit.

Q      Okay.  And what information did you pick up?

A      That one of the detectives had questioned Mr. McBurney and he was
       charged with first degree child abuse and later pled to second degree,
       there was a lot of medical records, things I didn't understand, it was
       like two hundred and fifty pages long and –

Q      I'm sorry, two hundred what?

A      Two hundred fifty pages, most of it was medical, I didn't know what I
       was looking at.

Q      But you did glean from a review of the records that Steven McBurney
       was previously interrogated by a Northville detective, correct?

A      Yes, sir.

Q      And during that interrogation, he supposedly confessed regarding the
       injuries to Nicholas Kennedy?

A      No, I don't know if he confessed or not, I don't recall.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    You don't recall that. Okay. Did you recall making any findings or
     making any determination what the extent of Nicholas Kennedy's
     injuries were?

A    I think they were skull fractures, I think I saw that somewhere in the
     report.

Q    Did you have any information whatsoever at this point that Madison
     McBurney had suffered skull fractures?

A    When I was at the Northville Township Police Department?

Q    Yes?

A    No, sir.

Q    At any point in your investigation did you ever receive any
     information that Madison McBurney suffered skull fractures?

A    I don't believe – I don't believe it was actually skull fracture was the
     term that was used, no, sir.

Q    Any other information that you received from Northville Police
     Department, either directly from an officer or a clerk or from viewing
     the microfiche?

A    No, sir.

Q    Did you take any notes at the time that you were there when you were
     viewing the microfiche?

A    Yes, I think I retrieved the address from Nicholas Kennedy and his
     mother.

Q    Any other notes whatsoever?

A    I don't think so, no, sir.

Q    The nature and extent of the injuries?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A     No, sir.

Q     And from those few notes that you incorporate your findings, the information you received into your police report?

A     Yes, sir.

Q     And the police report, at top of page three, you also determined that it was a four and a half month old child?

A     Yes, sir.

Q     Nicholas Kennedy?

A     Yes, sir.

Q     And if I can quote from the police report, it says Kennedy suffered very similar injuries to Madison's at the hands of Steven McBurney?

A     Yes, sir.

Q     That's your police report, correct?

A     That's correct.

Q     Did you make that determination on December 2nd when you were at the Northville Police Department, that Kennedy suffered very similar injuries to Madison's at the hands of Steven McBurney?

A     No, because I hadn't even talked to anyone from the hospital at that point.

Q     And your next step, sir?

A     I believe we – after the Northville Township police we drove to the University of Michigan Hospital.

Q     How long was that drive?

A     It wasn't that far from Northville, fifteen, twenty minutes.

Q     And you arrived at the hospital at what time?

A     It was after midnight some time.

Q     Do you know when then?

A     Not exactly.

Q     Okay. Had you been up continuously, sir, since approximately five or five thirty that morning?

A     Yes, sir.

Q     Had you taken any kind of medication to help you stay up?

A     No, sir.

Q     Had you consumed any caffeine during the course of the day?

A     No, sir.

Q     Coffee?

A     No, I don't drink coffee.

Q     Pop, no Coke, Diet Coke, anything of that nature?

A     No, sir.

Q     And I believe you indicated that your first contact at the hospital was Sarah Weaver?

A     Yes, sir.

Q     First time you met her?

A     Yes, sir.

Q     Identified herself as Children's Protective Services worker, correct?

A     Yes, sir.

Q     And she made certain statements regarding the injuries to Madison?

A     I believe so, yes.

Q     And you questioned her about the nature and extent of those injuries, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes, sir.

Q    And possible suspects, isn't that true?

A    I didn't ask her about suspects, I think she kind of gave me a brief

rundown of who was the caregiver at the time when it happened.

Q    Okay. And –

        THE COURT: I'm sorry. Are you talking about Heather or are

you talking about Ms. Weaver?

        MR. WHITE: Ms. Weaver.

        THE COURT: Got you, okay.

Q    (By Mr. White, continuing): And at the time that you spoke to her,

who were the suspects of the injuries to Madison McBurney?

A    Well the only two suspects could have been—well, the only suspect at

the time Sarah Weaver claimed that Steven was home when the

injuries were sustained by Madison.

Q    So the information you got from her was there's one possible suspect

and that's the father, Steven McBurney?

A    Yes, sir.

Q    True?

A    Yes, sir.

Q    Okay. And she also explained to you that there was a subdural

hematoma and retinal hemorrhaging, correct?

A    Yes, sir.

Q    And that Steven had made a statement about – regarding how 911 was

called, correct?

A    Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Did you take any notes during this interview?

A    No, sir.

Q    Did Sederlund take any notes during this interview?

A    He may have.

Q    Okay. Is everything that Sarah Weaver said incorporated into your
     police report on page three?

A    I believe so.

Q    Okay. Anything left out?

A    Not that I can recall.

Q    Okay. Anything that you said left out of this particular part of the
     report regarding your interview with Sarah Weaver?

A    No, sir.

Q    Anything that Sederlund said that was left out?

A    I don't think so.

Q    Okay. And did you inform Sarah Weaver at that point that Steven
     McBurney had a prior first degree child abuse that was reduced to
     second degree in 1998?

A    I believe so.

Q    Okay. And what was her response to that?

A    I don't recall any response.

Q    Okay. Did you also inform her that Heather's criminal history was
     clean?

A    I don't remember doing that.

Q    Okay. Your next step sir was then to be escorted up to the pediatric
     intensive care unit by a security officer, isn't that true?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     That wasn't my request. They – are you asking if it was my request?

Q     I'm asking –

A     No.

Q     -- the next thing that happened?

A     Oh, yes, sir.

Q     You completed your interview with Sarah Weaver?

A     Yes, sir.

Q     You didn't take any notes, Sederlund might have, correct?

A     Yes.

Q     You said or someone says we want to go up to the pediatric intensive care unit, correct?

A     Yes, sir.

Q     Who said that, you or Sovik?

A     Sederlund?

Q     I'm sorry, you or Sederlund?

A     I don't recall, it was one of us.

Q     And the purpose of going up there was to interview Heather McBurney and Steven McBurney, isn't that true?

A     That was going to be part of it, yes.

Q     Okay.  Because you knew from talking to Sarah Weaver that both Heather and Steven were upstairs, correct?

A     Yes, sir.

Q     In their daughter's room, true?

A     I knew they were upstairs, I didn't know exactly where they were at.

Q     Okay.  And you went upstairs, you went up by an elevator, correct?

A    Yes, sir.

Q    And when you got off that elevator, did you notice any other means of

egress or ingress into that particular pediatric intensive care unit?

A    I didn't look around, no, sir.

Q    Did you notice any other means of ingress or egress?

A    No, I did not.

Q    And the first thing that you did was speak to a Doctor Jeffrey Fleming,

isn't that true?

A    Yes.

Q    Okay.  And that interview occurred in a conference room, correct?

A    Yes, sir.

Q    The conference room that you previously described, correct?

A    Yes, sir.

Q    And present during that interview were you, Sederlund and Dr.

Fleming, correct?

A    Yes, sir.

Q    Okay.  And there was no one else present, isn't that true?

A    I don't recall, I don't believe there was.

Q    And – by the way, how long did the interview with Sarah Weaver last?

A    Not long, ten minutes maybe.

Q    And how long did you speak with Dr. Fleming?

A    Twenty minutes maybe.

Q    And had you ever met Dr. Fleming before?

A    No, sir.

Q    Did you ask him questions?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

A    Yes, sir.

Q    Did Sederlund ask him questions?

A    Yes, sir.

Q    And did he give you responses?

A    Yes, sir.

Q    Did you take notes?

A    I don't know, I may have, I think Sederlund did most of the note taking, he had out the foldout book and tablet and everything.

Q    Do you remember if you took notes or not?

A    I don't remember if I took any notes from Dr. Fleming.

Q    Do you remember if Sederlund took notes or not?

A    I think he did, yes.

Q    And Sederlund – excuse me, Dr. Fleming reaffirmed your information that this was a non-accidental injury, correct?

A    Yes, sir.

Q    Traumatic brain injury, correct?

A    Yes, sir.

Q    Not typical of seizure victims?

A    Yes, sir.

Q    Not typical of a child falling off a couch or a high chair, correct?

A    Correct, sir.

Q    It's indicative of what's known as shaken baby syndrome, correct?

A    Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q     And he also indicated that Madison was brain dead, being kept alive
      and was expected to pass away within the next forty-eight hours,
      correct?

A     Yes, sir.

Q     So you reaffirmed all of the information that you had received up to
      that point that this was a homicide, correct?

A     It wasn't a homicide at that point.

Q     It was going to be a homicide upon her death, correct?

A     That's correct.

Q     And the next step was to speak to Heather, isn't that true?

A     Yes, sir.

Q     And whose decision was it to speak to Heather before Steven?

A     I don't know, maybe it was mine, I don't know, I don't think we
      discussed it.

Q     Okay.  And was Sarah Weaver in the room when you spoke to Dr.
      Fleming?

A     I believe she may have been.

Q     And how was it that you decided to go get Heather?

A     I think one of the nurses went to get her.

Q     How was it decided that – who was going to get her, how was she
      going to be brought into the room?

A     I think we just asked one of the nurses if she would go and get Heather
      McBurney for us.

Q     Okay.  Do you remember who asked, you or –

A     I think I may have.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did Sederlund make any attempt to go get Heather?

A    No, sir.

Q    Did you make any attempt to get Heather?

A    No, sir.

Q    Did either one of you ever visit Madison's room during the period of
     time that you were at the hospital?

A    Actually walk into the room?

Q    Yes?

A    No, sir.

Q    And then Heather was escorted into the conference room, correct?

A    Yes, sir.

Q    Escorted by the nurse, correct?

A    Yes, sir.

Q    Her name was Regina Cannard (phoen)?

A    That sounds familiar.

Q    Isn't that true?

A    Yes, sir.

Q    A black woman?

A    Yes, sir.

Q    And the door was shut behind her, correct?

A    Yes, sir.

Q    And in this room was Sarah Weaver, Regina Cannard (phoen),
     yourself, Officer Sederlund and Heather McBurney?

A    Yes, sir.

Q    Seated as you previously described at the conference table, correct?

A    Yes, sir.

Q    And you began asking Heather questions officer, did you not?

A    Yes, sir.

Q    And Sederlund asked questions also?

A    Yes, sir.

Q    Did you take notes during this interview?

A    Not too many.

Q    Okay. Is that a yes?

A    I would say I don't recall, usually when I'm interviewing somebody I

     don't like to take a lot of notes, I like to keep the conversation flowing,

     so I don't – I didn't take a lot of notes during the interview with

     Heather McBurney or Steven McBurney.

Q    My question though is did you take any notes?

A    With Heather McBurney, I don't think I did.

Q    Okay. What did you have with you take notes?

A    I had a pad and a – I take a tablet with me, or I had one, Officer

     Sederlund's yellow tablets.

Q    And is it a fair statement, sir, that the only police equipment that you

     had at that point was your weapon, correct?

A    Yes.

Q    Your badge, your handcuffs and was there anything else?

A    No, sir.

Q    You had that black leather jacket on?

A    Yes, sir, initially.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       You had that black leather jacket on, according to you, approximately
        one to two hours, isn't that true?

A       Probably wasn't two hours, probably closer to – probably closer to one
        hour than two.

Q       Okay. Is there any reason why Regina Cannard (phoen) and Sarah
        Weaver were left in the room when you talked with Heather?

A       When we brought Heather McBurney in she looked kind of, like I said
        before, rough, I mean she was really frail and didn't know if she was
        going to start breaking down or something or – the way she looked we
        just thought maybe it would be a good idea to have a nurse in there
        with us just in case something happened to her.

Q       What about Sarah Weaver, why did you let her stay in the room?

A       I think she wasn't – she didn't have too much information, I think she
        just wanted to get some more information.

Q       Is that what she said to you, I need more information?

A       I don't believe so, I don't recall. But I think during our initial
        interview with her she didn't have a lot of details for us either.

Q       Did Sarah Weaver take any notes during the interview with Heather
        McBurney?

A       I believe she did.

Q       Was she seated at the time she was taking her notes?

A       Yes, sir.

Q       Okay. Now you – both you and Sederlund explained why you were
        there, correct?

A       Yes, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    And I.D.'d yourself as police officers before that?

A    Yes, sir.

Q    And indicated that the nature and extent of Madison's injuries required

     notification by hospital to the police department, correct?

A    Yes, sir.

Q    And you explained to her that these were injuries that were consistent

     with non-accidental trauma, isn't that true?

A    Yes, sir.

Q    Okay. And you got some history from Heather, correct?

A    Yes, sir.

Q    Okay. And she gave you some history about that particular day –

A    Yes –

Q    -- November 30th and Madison vomiting several times?

A    Yes, sir.

Q    In fact Heather told you that Madison vomited three times, isn't that

     true?

A    I don't remember, I don't remember the three times but I do remember

     her saying she had vomited throughout the day.

Q    Okay. And at that point you informed Heather of the prior case,

     correct?

A    Yes, sir.

Q    You informed Heather of Steve's prior son, Nicholas Kennedy?

A    Yes, sir.

Q    And charged with first degree child abuse down to second degree?

A    Yes, sir.

Q     And you also informed her that Nicholas sustained the same injuries as
       Madison, isn't that correct?

A     Yes, sir.

Q     And at this point had you received any information that Madison had
       suffered skull fractures?

A     I don't recall. I know the terms, the answer to your question is I don't
       recall, but I do know that there was subdural hematoma, as the doctor
       explained it.

Q     My question is as to skull fractures?

A     I don't recall, I don't think so.

Q     Now isn't it true, officer, at this point you really had no good faith
       belief that Heather was a suspect in this case, isn't that true?

A     That's true.

Q     Okay. In fact, your one and only suspect at this point in your mind is
       Steven McBurney, isn't that true?

A     Yes, sir.

Q     Okay. And there was never even asked – there was never any
       questions asked of Heather whether she was responsible for the
       injuries, isn't that true?

A     I did ask her.

Q     You did ask her?

A     Yes, sir.

Q     Okay. And her response was?

A     No.

Q     Okay. And you also asked her whether Steven responsible also?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Yes, sir.

Q    And her response was she couldn't believe that he would do something
     like this, correct?

A    That's correct.

Q    Now I believe you indicated on direct testimony that you also asked
     her whether there was any other caregivers, correct?

A    I think so.

Q    Can you tell me anywhere in your report where you made this request
     whether there were any other caregivers; because my review of your
     report is – that questions was never asked?

A    I believe you're correct, I don't know if I did or not.

Q    All right. And did Heather have any difficulty understanding your
     questions?

A    I don't believe so.

Q    Okay. And did it reinforce your belief that there's really only one
     suspect in this case, Steven McBurney?

A    Yes, sir.

          MR. WHITE:  I'm going to start with Mr. McBurney and this
     will probably be an hour or so.

          THE COURT:  Okay.  In light of the situation with Heather,
     okay. All right.  It's almost four thirty now, we'll break, thank you
     officer.  You're excused.  And deputies, were all set and we can talk
     off the record about the return date. We'll give you a call downstairs.
     Yes, you're all set.

                         *   *   *   *

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

        I, Barbara Reznick, Court Reporter, State of Michigan, do

hereby certify that the foregoing pages comprise a full, true and correct

transcript of the proceedings had in the matter of The People v Steven Lindsey

McBurney, before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on

September 25, 2007.

        Barbara Reznick, CER 1333
        1200 N. Telegraph, Pontiac, MI 48341
        (248) 858-5841

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-826-6313