## STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

STATE OF MICHIGAN

        Plaintiff,

    V

STEVEN LINDSEY MCBURNEY

        Defendant

_____/

OAKLAND COUNTY 07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

### WALKER HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

SEPTEMBER 26, 2007
* * * *

RECEIVED FOR FILING
OAKLAND COUNTY CLERK
BY:
DEPUTY COUNTY CLERK
2008 AUG 14 A 11: 22

**APPEARANCES:**

Sarah Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of Defendant

Barbara Reznick, Court Reporter

1

# I N D E X

**PAGE**

**WITNESSES-PEOPLE**

**OFFICER SOVIK**

Continued Cross-Examination, by Mr. White.........05

Redirect Examination, by Ms. Pope-Starnes.........32


**WITNESSES-DEFENSE**

**STEVE MCBURNEY**
Direct Examination, by Mr. White..................38
Cross-Examination, by Ms. Pope-Starnes............67


**CLOSING ARGUMENTS**

By Ms. Pope-Starnes...................................88
By Mr. White..........................................94
By Ms. Pope-Starnes...................................99

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

2

1                          Pontiac, Michigan

2                          TUESDAY, SEPTEMBER 26, 2007

3                          * * * *

4          THE CLERK:   The Court calls case number 07

5     214651 FC.

6          MS. POPE-STARNES:   Good afternoon, Your Honor.

7     Sarah Pope-Starnes on behalf of the People.

8          THE COURT:   Good afternoon.

9          MR. WHITE:   Robert White on behalf of Steven

10    McBurney.

11         THE COURT:   Good afternoon Counsel and good

12    afternoon, Sir.

13         Where were we?

14         MR. WHITE:   We left off with my cross-

15    examination of Officer Sovik.

16         THE COURT:   Officer Sovik, if you'd approach

17    please.   It's another day and we'd ask you to please

18    raise your right hand to be sworn.

19         THE CLERK:   **Do you swear that the testimony you**

20    **are about to give will be the truth, so help you God?**

21         THE WITNESS:   **I do.**

22         THE COURT:   You can have a seat there.

23         MR. WHITE:   Your Honor, my client is

24    handcuffed.   I asked the officer if they would

25    consider taking off one cuff so he could continue to

                              3

1    take notes and he said, 'It's up to you.'

2         THE COURT:   It's up to the guys with a gun.

3    Is it against any regulations or if you don't mind,

4    if it's all right with the deputies.

5         THE OFFICER:   It is a policy that we do not.

6         THE COURT:   Okay.

7         THE OFFICER:   Now if you would like us to undo

8    his hands we can take him down and put the shackles

9    on.

10        THE COURT:   Mr. --- was he in the shackles

11   yesterday?

12        THE OFFICER:   That I don't ---

13        THE COURT:   (Interposing)   You know what, Mr.

14   White?   I'm not going to disrupt the policies of the

15   deputy's department.   And if indeed that is the rule

16   it's going to cause for further delay.   We'll

17   proceed right now as it goes.   And if he has any

18   questions or whatever he can bring them to your

19   attention.

20        MR. WHITE:   The delay is not ours.

21        THE COURT:   What is the harm in ---

22        MR. WHITE:   (Interposing)   It's his case.   He

23   should be able to take notes.   He should be able to,

24   that's all there is to it.

25        THE COURT:   All right.   Well I'm yielding to

4

1        the deputy's policy, so we'll proceed.    Thank you.

2                **O F F I C E R    S O V I K**

3            **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND**

4        **AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH,**

5        **THE WHOLE TRUTH AND NOTHING BUT THE TRUTH WAS**

6        **EXAMINED AND TESTIFIED AS FOLLOWS:**

7                **CONTINUED CROSS-EXAMINATION**

8    BY MR. WHITE:

9    **Q**   Officer Sovik, we left off yesterday in conclusion of

10        Heather's interview.    Heather was taken out of the

11        room by Regina Keynard (phonetic), correct?

12   A   If you could refresh my memory as to what time, when?

13   Q   At the conclusion of Heather's interview on December

14        3rd, 2006,

15   A   (Interposing)    Yes, Sir.

16   Q   When you were in the pediatric intensive care unit,

17        4th floor, University of Michigan Hospital, Ann

18        Arbor, ---

19   A   (Interposing)    Yes, Sir.    She was, yes.

20   Q   Okay.

21            And --- and you and Officer Sederlund remained

22        in the room, correct?

23   A   Yes, Sir.

24   Q   And Sarah Weaver remained in the room, correct?

25   A   I think for a short period of time, yes.

                             5

1   Q   And then the next person to enter the room was Steven

2        McBurney, isn't that true?

3   A   Yes, Sir.

4   Q   And uh --- at the time he entered the room you turned

5        to Sarah Weaver and said, 'Do you need anything

6        else', isn't that true?

7   A   It may have been.  I don't recall.

8   Q   And isn't it also true that she said, 'No, I have

9        everything I need'?

10   A   Possibly.

11   Q   It could have happened, you just can't remember?

12   A   That's true.

13   Q   Okay.

14        And then Sarah Weaver walked out of the room,

15        correct?

16   A   Yes, Sir.

17   Q   She was the Child Protective Services worker assigned

18        to this case, correct?

19   A   Yes, Sir.

20   Q   Okay.

21        And at that point you identified yourself to Mr.

22        McBurney, correct?

23   A   Yes, Sir.

24   Q   And Officer Sederlund did also?

25   A   Yes, Sir.

6

```
 1   Q   And then you told him to take a seat, correct?

 2   A   We asked him to sit down.

 3   Q   Well what did you say?

 4   A   Well actually I don't even know if we asked him to

 5       sit down.  I think he just came in and sat down.

 6   Q   You didn't say, 'Take a seat'?

 7   A   I don't believe I did, no.

 8   Q   Did Sederlund?

 9   A   I don't think so, no.

10   Q   And um --- the seat that he sat in was the same seat

11       that Heather sat in previously at the head of the

12       table, isn't that true?

13   A   Yes, Sir.

14   Q   And um --- then you began your interrogation, isn't

15       that true?

16   A   My interview, yes, Sir.

17   Q   More like an interrogation, you're asking questions,

18       correct?

19   A   Yes, Sir.

20   Q   Okay.

21       And Sederlund is asking questions too?

22   A   Yes, Sir.

23   Q   Okay.

24       And the purpose of asking questions was in the

25       course of your investigation of non-accidental
```

7

```
 1              injuries to Madison McBurney, isn't that true?

 2   A     Yes, Sir.

 3   Q     I'll try not to speak so softly.

 4              And this interrogation continued from

 5        approximately two a.m. (2:00 a.m.), a little after,

 6        correct?

 7   A     (No verbal response.)

 8   Q     Until after four a.m. (4:00 a.m.), correct?

 9   A     Yes, Sir.

10   Q     And he was ultimately handcuffed and arrested,

11        handcuffed and escorted out of the hospital

12        approximately five a.m. (5:00 a.m.), isn't that true?

13   A     Yes, Sir.

14   Q     Okay.

15              Now all times from the beginning of the

16        interrogation to the time he was escorted out of the

17        hospital he was under your direct supervision, isn't

18        that true?

19   A     What do you mean direct supervision?

20   Q     He was either with you in your presence or he was in

21        that conference room and you were immediately

22        outside, true?

23   A     That is correct.

24   Q     Okay.

25              He went to the bathroom one time, correct?
```

8

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1   A    I don't ---

 2   Q    (Interposing)   You escorted him to the bathroom?

 3   A    I never escorted him to the bathroom.

 4   Q    Okay.

 5        And he was escorted one time to Madison's room,

 6        correct?

 7   A    I didn't escort him.

 8   Q    Okay, you didn't do that either?

 9   A    No.

10   Q    Okay.

11        But at all times you knew where he was, correct?

12   A    He was sitting at the table with us.

13   Q    At all times you knew where he was, is that true?

14   A    No.

15   Q    From the beginning of the interrogation until the

16        time he was escorted out of the hospital?

17   A    I lost sight of him at one point when he went back to

18        Madison's room.

19   Q    You didn't know where he was?

20   A    No, I didn't.

21   Q    You didn't have any idea?

22   A    Well no.   You're talking about like looking at him.

23        I did not see him the entire time.

24   Q    I'm talking about did you know where he was?

25   A    Yeah, he was on the fourth floor.   I knew he was on
```

9

```
 1          there somewhere.
 2   Q      And at that point you'd already made up your decision
 3          you were going to arrest him?
 4   A      Yes.
 5   Q      Correct?
 6   A      Yes.
 7   Q      So you certainly weren't going to let him out of your
 8          supervision and control, isn't that true?
 9   A      Yes.
10   Q      So from that whole period of time, from the beginning
11          of the interrogation till the time he was escorted
12          out of the hospital, you never asked him his age,
13          isn't that true?
14   A      No, I did not ask him his age.
15   Q      So it is true, right?
16   A      Yes.
17   Q      Isn't it also true you never asked him his
18          educational level?
19   A      I don't believe I did, no.
20   Q      Now that's true also, isn't it?
21   A      Yes.
22   Q      Okay.
23          And isn't it also true that you never asked him
24          whether he was under the influence of any drugs or
25          alcohol?
```

10

1  A   That's true.

2  Q   Isn't it also true you never asked him about how much

3      sleep he had on the days before this particular

4      interrogation?

5  A   That is true.

6  Q   And also you didn't --- you never asked him how much

7      -- how long he had been in the hospital, correct?

8  A   (No verbal response.)

9  Q   Isn't that true?

10 A   Correct.

11 Q   You also asked him --- never asked him whether he was

12     under any disability, mental or emotional, isn't that

13     true?

14 A   Sure.

15 Q   You also never asked him whether he wanted anything

16     to drink or eat, isn't that true?

17 A   That is correct.

18 Q   Okay.

19         And during this whole process you also never

20     informed him of his Miranda rights at any time, isn't

21     that true?

22 A   That is correct.

23 Q   Any one of them, isn't that true?

24 A   I didn't need to.

25 Q   Isn't it true that you never informed him of any of

11

```
 1              his Miranda rights?

 2   A    That is correct.

 3   Q    Okay.

 4              And you know what those rights were at that

 5         time, isn't that true?

 6   A    Yes.

 7   Q    Okay.

 8              And you know what they are now, right?

 9   A    Yes.

10   Q    You never informed him of his right to remain silent?

11   A    I did not.

12   Q    You never informed him of his right to have an

13         attorney, correct?

14   A    I did not.

15   Q    Never informed him of his right to have a Court

16         appointed attorney if he couldn't afford his own

17         attorney, correct?

18   A    That is true.

19   Q    You never informed him that if he did say anything,

20         what he said could and would be used against him in a

21         Court of law, isn't that true?

22   A    True.

23   Q    Okay.

24              And you never informed him at any time that he

25         was not under arrest, isn't that true?
```

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

```
 1   A    True.
 2   Q    You never informed him that he was not free to leave,
 3        isn't that true?
 4   A    True.
 5   Q    You never informed him that he was free to leave
 6        either, did you?
 7   A    Never asked.
 8   Q    Did you ever inform him that he was free to leave?
 9   A    No.
10   Q    And you also never informed him that he was not in
11        custody, isn't that true?
12   A    That is correct.
13   Q    And you also never informed him that the door behind
14        him was unlocked?
15   A    No, Sir.
16   Q    You never informed him that he could consult with an
17        attorney, isn't that true?
18   A    He never asked for one.
19   Q    Do you understand the question?
20   A    Try me again.
21   Q    Did you ever inform him that he could consult with an
22        attorney?
23   A    No.
24   Q    Did you ever consult --- did you ever inform him that
25        he could consult with any doctor?
```

                                13

```
 1   A     No.

 2   Q     Did you ever inform him that he was going home that

 3         night?

 4   A     No.

 5   Q     Did you ever tell him that he could make a phone

 6         call?

 7   A     No.

 8   Q     Now um --- you asked him about Madison, correct?

 9   A     (No verbal response.)

10   Q     His daughter?

11   A     Yes.

12   Q     You asked him about his marriage, correct?

13   A     Yes.

14   Q     You asked him about the events leading up to the nine

15         one call - the nine-one-one call (911), November

16         30th, correct?

17   A     Yes.

18   Q     And you were doing the questioning and Sederlund was

19         doing note taking?

20   A     It was back and forth.

21   Q     Okay.

22   A     He was doing most of the note taking.  I was asking

23         questions.  Sederlund was also asking some

24         questions.

25   Q     Okay.
```

14

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1           And you asked --- and you brought up about

2      Nicholas Kennedy, isn't that true?

3  A    Yes.

4  Q    Okay.

5           And you asked how Nicholas Kennedy had sustained

6      skull fractures, isn't that true?

7  A    Yes.

8  Q    Okay.

9           And you made him aware that you were aware then

10     of the prior arrest and prosecution for First Degree

11     Child Abuse, correct?

12 A    Yes.

13 Q    And that you were aware also of his plea of No

14     Contest to second degree?

15 A    Yes.

16 Q    Okay.

17          Umm --- and you also made him aware that, in

18     your opinion, the injuries to Madison were the same

19     as the injuries to Nicholas, isn't that true?

20 A    Yes.

21 Q    Okay.

22          And um --- you also informed him that you had

23     evidence that the injuries to Madison were not

24     accidental, correct?

25 A    Correct.

15

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q    And that it was indicative of shaken-baby syndrome,

2        correct?

3   A    Yes, Sir.

4   Q    Okay.

5        And then you said after some further discussion,

6        'We know that you did it', isn't that true?

7   A    Yes.

8   Q    Okay.

9        And you said it on more than one occasion, isn't

10       that true?

11  A    I may have.

12  Q    Okay.

13       Do you know how many times you said it?

14  A    I do not.

15  Q    Okay.

16       More than five?

17  A    I don't think so.

18  Q    Less than five?

19  A    I think so.

20  Q    Okay.

21       And you said it because you believed it, isn't

22       that true?

23  A    I was trying to uh --- yes, and I was trying to

24       elicit some more information from him.

25  Q    Okay.

16

1      So at the point that you said this, 'We know
2    that you did it,' and said it several times, even
3    though you can't remember how many times, we know at
4    that point he had not made any statement, for
5    instance, that his life was over, correct?
6  A  He had not made that statement, yes.
7  Q  He had not made any statement that umm --- he got
8    frustrated?
9  A  That's correct.
10  Q  He had not made any statement that he got mad?
11  A  At that point, no.
12  Q  And he had not made any statement that he'd made a
13    mistake, isn't that true?
14  A  Yes.
15  Q  He had not made any statement that he threw the child
16    into the crib, isn't that true?
17  A  Are you still up until that point?
18  Q  Up until that point.
19  A  Yes, he had not made any of those statements.
20  Q  Okay.
21      And he had not made any statements about the
22    child screaming?
23  A  Correct.
24  Q  And he had not made any statements about the child
25    screaming in his ear?

17

```
 1  A    Correct.

 2  Q    And he had not made any statement that he threw the

 3       child in the crib from two feet away?

 4  A    Correct.

 5  Q    And he had not made any statement about her head

 6       hitting the bars or the spindles, isn't that true?

 7  A    Correct.

 8  Q    In fact he had not made any confession whatsoever,

 9       correct?

10  A    That is correct.

11  Q    Okay.

12           It's only after that you told him on several

13       occasions that, 'We know you did it,' that Steven

14       McBurney made statements that you deemed to be a

15       confession, isn't that true?

16  A    Yes.

17  Q    Okay.

18           Umm --- now it was you who suggested that

19       Heather come back in the room, isn't that true?

20  A    Yes.

21  Q    Okay.

22           And umm --- Heather was brought back into the

23       room and umm --- the first thing that was said was

24       you saying, 'Don't you have something to tell

25       Heather', isn't that true?
```

18

1   A    No, actually I think I addressed Heather first.

2   Q    Okay.

3          And what did you say to Heather?

4   A    I said, 'Heather', I said, 'Steven has something to

5        tell you.'

6          Uh --- I believe he said something like ---

7   Q    (Interposing)   I'm asking what you said.

8   A    I said, okay.  Umm --- I said, 'Heather, Steven has

9        something to tell you.'  Umm --- 'He's going to tell

10       you you he made a mistake.'  'He doesn't think that

11       you're going to continue to love and support him.'

12       'I told him that that was wrong.'  Those were pretty

13       much the gist of what I said.

14   Q    Okay.

15          And then at that point there was a discussion

16       between Steven and Heather, correct?

17   A    Actually there was a short pause after I had said

18       that information to her.

19   Q    Okay.

20          Umm --- after Heather was brought back into the

21       room and you made those statements, that's when

22       Steven said, according to you, 'I made a mistake',

23       correct?

24   A    Eventually he said that, yes.

25   Q    He said, 'I threw her into her crib', correct?

1   A    Yes.

2   Q    And he said, according to you, 'That it was

3        approximately two feet away', correct?

4   A    Yes.

5   Q    Screaming, crying, frustrated, mad.   All those

6        statements were made after Heather was brought back

7        into the room, isn't that true?

8   A    Yes, Sir.

9   Q    And you were present during all those statements?

10  A    Yes, Sir.

11  Q    Okay.

12           And uh --- you deemed that a confession, those

13       statements, isn't that true?

14  A    Yes, Sir.

15  Q    Okay.

16           And umm --- at the conclusion of that particular

17       discussion you asked him to write a written

18       statement?

19  A    Yes, Sir.

20  Q    Okay.

21           And that written statement, I've got it here.

22       It's marked People's Exhibit 1.

23           MR. WHITE:    If I may approach, Your Honor?

24           THE COURT:    You may.

25  **Q    (By Mr. White, continuing)**   And you've seen that

                          20

```
 1              before?

 2    A    Yes, Sir.

 3    Q    And, in fact, you saw it that night, true?

 4    A    Yes, Sir.

 5    Q    Okay.

 6              And you asked Steve to write the statement and

 7         you and Sederlund walked out of the room, correct?

 8    A    Yes.

 9    Q    And shut the door behind you?

10    A    Yes.

11    Q    Okay.

12              And you left your coat in the room?

13    A    Yes.

14    Q    Okay.

15              And that's when you called, actually Sederlund

16         called the duty Prosecutor, true?

17    A    Yes, Sir.

18    Q    Okay.

19              And you remained approximately two feet outside

20         that doorway, correct?

21    A    Well I was outside.

22    Q    Certainly Steven McBurney could not have left that

23         room without passing directly by you, correct?

24    A    Well we were actually off to the left side.   So he

25         may have just walked out and to the right if he
```

21

```
 1            wanted to go out.   We were on the left side of the
 2            door.
 3   Q    Okay.
 4            So you were going to just let him walk out?
 5   A    No.
 6   Q    Okay.
 7            So you certainly had every intention in the
 8            world to arrest him at that point, isn't that true?
 9   A    If he attempted to walk out of that room we were
10            going to stop him.
11   Q    My question, Sir is, ---
12            MS. POPE-STARNES:   (Interposing)   Your Honor,
13            I object.
14            He's trying to answer the question.   I ask that
15            he be allowed to finish answering the question.
16            THE COURT:   If you're not finished, you can
17            continue.
18            Then you can follow up.
19            MR. WHITE:   He's not answered the question,
20            Judge.
21   Q    (By Mr. White, continuing)   Isn't it true that ---
22            THE COURT:   (Interposing)   No.   You'll get --
23            - you'll get --- go ahead with what you're saying and
24            then you can say the question again.
25            THE WITNESS:   If Mr. McBurney would have walked
```

22

1 out of the room, we would have stopped him because we

2 were still in the process of deciding what we were

3 actually going to do with him. We were getting

4 assistance from the Prosecutor. But I mean he

5 wasn't going to be able to just walk out and go to

6 the cafeteria or walk anywhere else. I mean when he

7 came out of the room we were going to ---

8 Q **(By Mr. White, continuing)** (Interposing) So he

9 was in your custody?

10 A Temporarily, yes.

11 Q Until when?

12 A Until we got off the phone with the Prosecutor.

13 Q So isn't it true that you had every intention of

14 arresting him?

15 A Actually, no, not until we talked to the Prosecutor.

16 I mean we --- Detective Sederlund and I didn't know

17 what we were going to do after we got the confession.

18 We called the Prosecutor to get some further

19 assistance. Because if they would have said, 'Well

20 you know what, don't arrest him', then we wouldn't

21 have.

22 Q What question are you answering?

23  THE COURT: Come on. Let's move --- come on.

24  MR. WHITE: Well I mean it's not a free-for-

25 all.

23

1        THE WITNESS:   Your last question.

2        THE COURT:   Let's move on.

3   Q   **(By Mr. White, continuing)**   Okay.

4        Umm --- and then you came back in the room and

5        the written statement was on the table, correct?

6   A   Yes, Sir.

7   Q   You had already formed the belief at that time, the

8        decision, that you were going to arrest him, correct?

9   A   Yes, Sir.

10  Q   Okay.

11       And you had a discussion about that written

12       statement, isn't it true?

13  A   I had a discussion?

14  Q   With Steven McBurney about that written statement?

15  A   No, Sir.

16  Q   You never had --- you never discussed it whatsoever?

17  A   No.

18  Q   In fact, didn't you tell him that you were --- that

19       he needed to add some language to that statement?

20  A   No, Sir.

21  Q   Did Sederlund do it in your presence?

22  A   No, Sir.

23  Q   Was that statement the way it is right now the same

24       way as it was the first time you saw it?

25  A   I believe so.

24

1   Q   Okay.

2       You didn't tell him to add the word Madison?

3   A   No, Sir.

4   Q   You didn't tell him to add the word seizure?

5   A   I didn't have any discussion with him after he wrote

6       the statement.   I never discussed --- no.

7   Q   Now let me ask my question.

8   A   No.

9   Q   You didn't ask --- you didn't tell him to put the

10      word frustrated in there?

11  A   No.

12  Q   You didn't tell him to put the word mad in there?

13  A   No.

14  Q   In fact, you didn't tell him to put anything in

15      there, did you?

16  A   I didn't.

17  Q   Umm --- now who handcuffed him?

18  A   You know I thought I did yesterday.   I can't be

19      sure.   I think I said yesterday that I did and we

20      handcuffed in the back but I --- I don't know who

21      handcuffed him but I know he was handcuffed in the

22      front.

23  Q   Okay.

24  A   I don't know who handcuffed him.

25  Q   Handcuffed and escorted out of the police --- out of

25

```
 1         the hospital, correct?

 2   A     Yes, Sir.

 3   Q     And escorted by you, Sederlund, and at least one

 4         other security guard, correct?

 5   A     I believe so, yes.

 6   Q     Okay.

 7             And that security guard is the same security

 8         guard that brought you up to the pediatric intensive

 9         care unit, isn't that true?

10   A     Yes, Sir.

11   Q     A tall, thin man, correct?

12   A     Yes, Sir.

13   Q     Was there more than one?

14   A     Yes, Sir.

15   Q     In fact, there was three, wasn't there?

16   A     Yes, Sir.

17   Q     And when was the first time that you saw the three

18         security guards?   We know you saw the first one when

19         he brought you up to intensive care.   What about the

20         other two?   When is the first time that you saw

21         them?

22   A     When he was handcuffed and escorted to the elevator.

23   Q     Okay.

24             Did you call for their assistance?

25   A     No, Sir.
```

26

| | | |
|---|---|---|
| 1 | Q | Did Sederlund in your presence? |
| 2 | A | No, Sir. |
| 3 | Q | Did anybody in your presence? |
| 4 | A | No, Sir. |
| 5 | Q | Do you know how they got there? |
| 6 | A | No idea. |
| 7 | Q | Okay. |
| 8 | | And as you were walking out there was a |
| 9 | | discussion about football, do you remember that? |
| 10 | A | I do not. |
| 11 | Q | Okay. |
| 12 | | And when Mr. McBurney was taken from the |
| 13 | | hospital where did he go? |
| 14 | A | To our vehicle. |
| 15 | Q | To your vehicle? |
| 16 | A | Yes, Sir. |
| 17 | Q | And from the vehicle where did he go? |
| 18 | A | To South Lyons Police Department. |
| 19 | Q | And what happened at South Lyons Police Department? |
| 20 | A | I believe he was processed. |
| 21 | Q | What is processed? |
| 22 | A | Booked.  Fingerprinted.  I believe that's what |
| 23 | | happened. |
| 24 | Q | What else? |
| 25 | A | I left shortly after that. |

27

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1 Q Anything else besides fingerprinted?

2 A Do you mean photographed?

3 Q Yes.

4 A Possibly. I didn't do that so I'm just assuming

5   that's what happened.

6 Q Okay.

7    Were mug shots taken?

8 A I --- yes, I believe so.

9 Q Do you have those?

10 A I don't, no.

11 Q Are they here in your file today?

12 A I don't know. I don't believe we have them,

13   Counselor.

14 Q Do they exist?

15 A I believe so.

16 Q Who took the photos?

17 A I don't know. I could guess.

18 Q Go ahead.

19 A Sergeant Baaki or Officer Barbour, I believe. Those

20   were the two officers working that night, maybe

21   Officer Whitrock. One of those three.

22 Q Now you signed an affidavit in this case, Officer

23   Sovik, that --- and I assume that you've seen it?

24 A Yes, Sir.

25 Q In paragraph five it says, 'I did not use or possess

28

1      any recording device during the interview with Steven

2      McBurney'?

3  A   Yes, Sir.

4  Q   And is that a true statement?

5  A   Absolutely.

6  Q   Okay.

7          And umm --- then, 'I did not use or possess any

8      recording devices during my interview of any

9      witnesses involving the Madison McBurney homicide.'

10     Is that a true statement?

11 A   Yes, Sir.

12 Q   It said also, paragraph seven, 'That any notes I took

13     during the interviews of witnesses during the

14     McBurney investigation were destroyed after the

15     written police reports were completed.'   Is that

16     true?

17 A   Yes, Sir.

18 Q   Remember when I asked you about the notes when we

19     were in front of Judge Mackenzie?

20 A   Possibly.

21 Q   And umm --- I asked you if you had your notes still

22     and you said, 'Yes.'   'They may be around the uh ---

23     the uh --- the police department?

24 A   Mm-hmm.

25 Q   Is that a 'Yes'?

                            29

1    A    Yes.

2    Q    Okay.

3         Remember that testimony?

4    A    Yes.

5    Q    Okay.

6         That was on April 27th of this year?

7    A    Yes, Sir.

8    Q    And you said, 'Sederlund's notes could be around the

9         police department also?

10   A    Could be.

11   Q    And now you're saying they're destroyed?

12   A    Yes, Sir.

13   Q    Okay.

14        And umm --- were they destroyed --- when were

15        they destroyed?

16   A    Probably a couple of days after the investigation.

17        They weren't all destroyed all at one time.  It just

18        kind of --- after we write the written report we take

19        the notes from the field notes, put them on the

20        report, check the report and get rid of them.

21   Q    Okay.

22        So why didn't you tell me that on April 27th?

23   A    I don't know.

24   Q    Were you having a difficult time with your memory

25        that day?

30

1    A    There's a lot of things I don't remember.

2    Q    Pardon?

3    A    There's a lot of things I don't remember.

4    Q    Were you having a difficult time that day?

5    A    I don't remember.

6    Q    Now isn't it true, Officer, that you had a recording

7         device in that room during the interview of Heather

8         McBurney and Steven McBurney?

9         MS. POPE-STARNES:    Objection.    Asked and

10        answered.

11        THE COURT:    I'll allow it.

12        THE WITNESS:    Absolutely not.

13   **Q**  **(By Mr. White, continuing)**    Isn't it true that that

14        recording device was a camera that could record?

15   A    Absolutely not.

16        THE COURT:    I'll treat it as a standing

17        objection from the People, but I'll allow it.

18        Let's move on.

19   **Q**  **(By Mr. White, continuing)**    Okay.

20        Isn't it true that it's the same camera that you

21        used to take his mug shots?

22   A    No.    It's impossible.

23   Q    Why is it impossible?

24   A    Because I didn't have one.    I didn't have one.    I

25        didn't take any photos.    I never had one at the

31

1        hospital with me.

2    Q   Did you have any piece of equipment?

3    A   No.   None.

4            MR. WHITE:   Nothing further, Judge.

5            THE COURT:   Counsel.

6            **REDIRECT EXAMINATION**

7    **BY MS. POPE-STARNES:**

8    **Q**   Describe the mug-shot camera used by your partner.

9    A   The mug-shot camera is actually umm --- it's part of

10       the new computer system.   It's mounted on the wall

11       in our booking room and then just kind of focuses

12       down and takes pictures of people we've arrested.

13   Q   So it's permanently affixed to this system?

14   A   Yes, Ma'am.

15   Q   Is it portable?

16   A   No.

17   Q   That was the system that you used in December of two

18       thousand and six (2006)?

19   A   Yes.

20   Q   After the preliminary examination, did you go back

21       and check to see if there were any notes left in your

22       file?

23   A   Yes.

24   Q   Now you were asked some questions about whether or

25       not the Defendant was in your custody when you were

32

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       in the hallway.

2           At the point that you decided in your mind that

3       you were going to place him under arrest, did you

4       communicate that to the Defendant at that point?

5    A  No.

6    Q  You were asked questions about when you said to the

7       Defendant something about we know that you did it,

8       how did you say that to the Defendant?

9    A  In a very calm, matter-of-fact, conversational, I

10      said, 'Listen, we know you're responsible for the

11      injuries to Madison.'

12   Q  Why did you say that?

13   A  We were taught in interview school that that's --- if

14      you can try and get on the same page as the substep -

15      -- subject, you can try to elicit more information

16      from them.   Kind of get our common ground.   You

17      know, I know, we know.   Let's try and move on.

18      Give us some more information.

19   Q  Why did you tell Heather McBurney and/or the

20      Defendant that these were the same injuries that

21      Madison had as Nicholas?

22   A  Same injuries that Dr. Fleming talked about, the head

23      trauma.   That was not accidental injuries, head

24      trauma.

25   Q  Were you speaking directly about the skull fractures

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    that Nicholas had?

2  A    Nah.    I was speaking about the trauma to his head,

3        not accidental injuries.

4  Q    When you talked to Dr. Fleming, did he talk to you

5        about a window of time between the time injuries are

6        received and symptoms being displayed by the child?

7  A    Yes.

8  Q    And what kind of window of time did he give you?

9  A    He said on head trauma there's usually --- sometimes

10       symptoms don't or behaviors don't occur until twenty-

11       four (24) to forty-eight (48) hours after the injury

12       is sustained.

13  Q   So you needed to find someone within twenty-four (24)

14       to forty-eight (48) hours of the nine-one-one (911)

15       call?

16  A   Yes.

17  Q   Did you have information about who was with Madison

18       during that twenty-four (24) to forty-eight (48)

19       hours?

20  A   Yes.    I ascertained that from Mr. and Mrs. McBurney.

21  Q   Was it anyone more than just the Defendant?

22  A   No.    Oh.    It was Heather McBurney.

23  Q   You were asked questions about whether or not you

24       walked into Madison's room.    And I believe that you

25       said you didn't.

34

1              Were you ever able to see into Madison's room?

2   A   Yes.

3   Q   How were you able to see?

4   A   Her room's got a very large glass window in front of

5       it.

6   Q   When you were on the pediatric intensive care unit

7       floor, did you check to see how many exits or

8       entrances there were?

9   A   No.

10   Q   Do you have any idea how many there are?

11   A   No clue.

12   Q   Were you drinking a Mountain Dew that night?

13   A   No.

14   Q   Was anyone?

15   A   Yes.

16   Q   Who?

17   A   Steven.

18   Q   You were asked questions about whether or not you had

19       taken notes of the statements or your interview with

20       the firefighters on December 2nd before you left umm

21       --- for the Northville Township Police Department and

22       the hospital.

23       Did you obtain written statements from the

24       firefighters?

25   A   Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

1    Q    When did you get those?

2    A    That night.

3    Q    When you first came into the station on December 2nd

4        and you spoke with, I believe it was Baaki, and you

5        talked to him about the fact that you had a case that

6        could possibly result in homicide, did you know who

7        had done that at that point?

8    A    No.

9           MS. POPE-STARNES: I have no other questions.

10       Thank you.

11          THE COURT: Mr. White?

12          MR. WHITE: I have no further questions.

13          THE COURT: Thank you, Officer. You're all

14      set. You may be excused.

15          Ms. Pope-Starnes, the People rest?

16          MS. POPE-STARNES: No, thank you. I have no

17     other witnesses, Your Honor.

18          THE COURT: Mr. White?

19          MR. WHITE: Yes, Your Honor. We'd like to

20     call Mr. McBurney under **MRE 104** forseeably as a

21     witness in this case without prejudicing his right to

22     take the fifth amendment to trial and not testify.

23          THE COURT: Okay. Noted. Thank you.

24          Deputies how do you want ---

25          MS. POPE-STARNES: (Interposing) Your Honor,

1    if I could just make it clear for the right --- the

2    record, of course it doesn't prejudice his right to

3    testify at trial but if he chooses to take the stand

4    at trial and testifies contrary to his testimony

5    here, the case law is clear that his testimony here

6    may be used against him to impeach him.

7         THE COURT:  Yield to that law, Mr. White?

8         MR. WHITE:  We understand the law.

9         THE COURT:  Okay.  All right.  Thank you.

10        Deputies how do you want ----

11        THE OFFICER:  (Interposing)  What would you

12   like, Your Honor?

13        THE COURT:  Can you use it without breaching

14   any policies; I don't want to do that.  Can you

15   bring him up here?

16        THE OFFICER:  Absolutely.

17        THE COURT:  Okay.  Yeah.  Bring him on up.

18        Sir, obviously you are chained, as best as you

19   can, there you go, raise your right hand to be sworn?

20        **Do you swear ---**  go ahead.

21        THE CLERK:  **Do you swear that the testimony you**

22   **are about to give will be the truth, so help you God?**

23        THE WITNESS:  **I do.**

24        THE COURT:  Okay.  Go ahead and have a seat up

25   here.

37

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1 Thank you.

2 Mr. White.

3 **S T E V E N M C B U R N E Y**

4 **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND**

5 **AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH,**

6 **THE WHOLE TRUTH AND NOTHING BUT THE TRUTH WAS**

7 **EXAMINED AND TESTIFIED AS FOLLOWS:**

8 **DIRECT EXAMINATION**

9 **BY MR. WHITE:**

10 **Q** Please state your full name.

11 A Steven Lindsey McBurney.

12 Q How old are you, Mr. McBurney?

13 A Thirty-two (32).

14 Q And uh --- you are presently incarcerated?

15 A Correct.

16 Q Immediately before you were incarcerated where did

17 you live?

18 A 311 Scott Street in South Lyon.

19 Q And how long did you live there?

20 A About two years.

21 Q Who did you live there with?

22 A My wife and my daughter.

23 Q And your wife's name?

24 A Heather McBurney.

25 Q And your daughter's name?

38

1   A    Madison McBurney.

2   Q    And would you describe to the Court your educational

3        background?   Did you graduate from high school?

4   A    I graduated high school and I went to Ferris State

5        University for a year.

6   Q    Okay.

7            Did you have any particular curriculum in that

8        year?

9   A    No.

10  Q    Did you ever receive a college degree?

11  A    No.

12  Q    Do you have any specific vocational training or

13       license?

14  A    I don't.

15  Q    Do you have any kind of effective certification?

16  A    I don't.

17  Q    Umm --- and immediately before your incarceration

18       were you employed?

19  A    I was.

20  Q    And where were you employed?

21  A    S.M. Lawn Service.

22            THE COURT REPORTER:   I'm sorry?

23            THE WITNESS:   S.M. Lawn Service.

24  Q    **(By Mr. White, continuing)**   And umm --- what is the

25       nature of that business?

39

1    A    Landscaping and lawn service.

2    Q    And what was your position with the company?

3    A    I was a crew leader for two lawn service crews.

4    Q    Okay.

5         And how long had you maintained that employment?

6    A    About five years.

7    Q    Okay.

8         And any other significant employment other than

9         your job as a lawn service crew leader?

10   A    No.

11   Q    Okay.

12        And you were previously arrested?

13   A    Previously?

14   Q    Have you ever been previously arrested?

15   A    Yes.

16   Q    When was that?

17   A    Nineteen ninety-eight (1998).

18   Q    And was that arising from the incident with Nicholas

19        Kennedy?

20   A    That's correct.

21   Q    And you were charged ultimately?

22   A    I was.

23   Q    First degree Child Abuse?

24   A    Correct.

25   Q    And you pled No Contest to second degree Child Abuse?

40

1    A    Correct.

2    Q    If I could direct your attention to November 30th,

3         2006.   Umm --- do you recall what day of the week

4         that was?

5    A    It was a Thursday.

6    Q    And do you recall what time of day --- what time of

7         that day you woke up?

8    A    Six a.m. (6:00a.m.).

9    Q    Did you --- were you at your house that day?

10   A    I was.

11   Q    At 311 Scott Street?

12   A    Correct.

13   Q    And did you remain at your house that day?

14   A    Not for the whole day.

15   Q    Okay.

16        Was there a time when you left your house?

17   A    There was.

18   Q    And approximately what time was that?

19   A    Noon (12:00p.m.)

20   Q    Okay.

21        And did you return?

22   A    I did.

23   Q    And was there another time that you left the house?

24   A    When I had to go to the hospital.

25   Q    Okay.

41

```
 1                And approximately what time was that?

 2    A    Seven-thirty (7:30).

 3    Q    Okay.

 4                How did you go to the hospital?

 5    A    In the ambulance.

 6    Q    Okay.

 7                And the ambulance was transporting your

 8         daughter?

 9    A    Correct.

10         MS. POPE-STARNES:    Your Honor, I'm going to

11         object at this point.    This is direct examination.

12         I'd ask that he not be using leading questions.

13         THE COURT:    Sustained.

14    Q    (By Mr. White, continuing)    Okay.

15                And umm --- do you know what time that you got

16         to the hospital that night?

17    A    Around eight (8:00).

18    Q    Okay.

19                And what hospital was it?

20    A    U. of M.

21    Q    And when you got to the hospital what did you do?

22    A    We --- the uh --- staff came out and got Madison and

23         Heather and I went inside and went into the ER.

24    Q    Okay.

25    A    And waited.
```

42

1  Q   Did you remain at the hospital for the balance of
2      that night?
3  A   Absolutely.
4  Q   Okay.
5      Umm --- did you remain at the hospital up to the
6      point that you became --- that you were interrogated
7      by Sederlund and Sovik?
8  A   All for two hours.
9  Q   Okay.
10     When you say, 'All for two hours', when did you
11     leave the hospital?
12 A   On December --- December 2nd, two-thirty p.m. (2:30
13     p.m.).
14 Q   Okay.
15     And where did you go?
16 A   I went home.
17 Q   And how long did you stay there?
18 A   Two hours.
19 Q   Did you return to the hospital?
20 A   I did.
21 Q   Okay.
22     And did you sleep at any time while you were at
23     your house for those two hours?
24 A   No.
25 Q   Did you sleep at any time umm --- before the

43

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

| 1 | | interrogation by Sederlund and Sovik? |
| 2 | A | About an hour-and-a-half before the interrogation. |
| 3 | | Really none.   No significant --- even a nap, |
| 4 | | otherwise. |
| 5 | Q | If I could direct your attention to immediately |
| 6 | | before the interrogation, where were you? |
| 7 | A | I was in Madison's room. |
| 8 | Q | Okay. |
| 9 | | And was Heather there? |
| 10 | A | She was. |
| 11 | Q | Okay. |
| 12 | | Was there a time that Heather left the room? |
| 13 | A | Shortly after midnight.   Some time after midnight. |
| 14 | Q | Okay. |
| 15 | | And do you know why she left the room? |
| 16 | A | I don't. |
| 17 | Q | Okay. |
| 18 | | Was there a time that she came back? |
| 19 | A | She did. |
| 20 | Q | Okay. |
| 21 | | And do you know what time she came back? |
| 22 | A | Around two (2:00). |
| 23 | Q | Okay. |
| 24 | | And umm --- did she say anything to you? |
| 25 | A | No. |

44

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q   Did you say anything to her?

2   A   No.

3   Q   Was anything said to you?

4   A   By the nurse.

5   Q   Who --- and what nurse was that?

6   A   Regina.

7   Q   Okay.

8       And what did she say?

9   A   She said, 'They want to speak to you now.'

10   Q   Okay.

11       Did she --- could you describe her tone?

12   A   Unfriendly.   Uncharacteristic.   We've --- we've .

13       talked to her on different occasions and she was very

14       friendly to us.

15   Q   That particular time?

16   A   Unfriendly.

17   Q   And when she said, 'They want to talk to you,' do you

18       know what she was talking about?

19   A   I didn't know who they were.

20   Q   Okay.

21       And did she direct you in anyway to where you

22       were going?

23   A   She said, 'To the conference room, it's on the other

24       side of the nurse's station.'

25   Q   Okay.

45

```
1              And did you go to that conference room?

2    A    I did.

3    Q    Okay.

4              And umm --- had you ever been in that conference

5         room before?

6    A    No.

7    Q    Okay.

8              Immediately before you went into that conference

9         room did you notice anything unusual?

10   A    I sure did.

11   Q    What did you notice?

12   A    There was three officers of --- uniformed officers to

13        --- it would be to my left going into the room.

14   Q    Okay.

15             And had you ever seen those officers before?

16   A    No.

17   Q    Could you describe what kind of uniforms they had on?

18   A    Two were a brownish color and one was a light blue.

19   Q    And umm --- did you see whether they had weapons?

20   A    I didn't.

21   Q    Did you see whether they had badges?

22   A    They did.   I don't know what kind.

23   Q    Okay.

24             Umm --- and will you describe how they were

25        standing, Mr. McBurney?
```

46

```
 1   A    Shoulder to shoulder.

 2   Q    Okay.

 3             And were they standing, obviously they had been

 4        on the floor for some time?

 5   A    Yes.

 6   Q    Okay.

 7             Did you know where the exit was from that floor?

 8   A    I sure did.

 9   Q    Okay.

10             Was there more than one exit or entrance to that

11        floor?

12   A    There's one.

13   Q    Okay.

14             And where were these police officers standing?

15   A    They were standing at the intersection in the hallway

16        closer to the conference room.

17   Q    Okay.

18             Could you have left that floor without passing

19        directly by ---

20   A    (Interposing)   No.

21   Q    (Continuing)   those police officers?

22             When you got in the conference room did you see

23        anybody in there?

24   A    I did.

25   Q    Who?
```

47

```
 1   A    Sederlund was on the left side of the table, Sovik
 2        was on the right side of the table and Sarah Weaver
 3        was in the back left corner.
 4   Q    Okay.
 5   A    Standing up.
 6   Q    Okay.
 7            Had you ever seen Officer Sederlund before?
 8   A    No.
 9   Q    Had you ever seen Officer Sovik before?
10   A    No.
11   Q    Umm --- and I believe you said they were seated?
12   A    They were.
13   Q    Okay.
14            And Sarah Weaver was where?
15   A    She was in the back left corner at the table
16        standing.
17   Q    And had you ever seen her before?
18   A    I have.
19   Q    And when did you see her?
20   A    December 2nd about six p.m. (6:00 p.m.).
21   Q    Okay.
22            And where did you see her?
23   A    I was coming back from making a phone call, heading
24        back to Madison's room and we ran into each other,
25        not physically but ...
```

48

1   Q   Okay.

2         And umm --- did she make any statement to you?

3   A   She did.   She asked me if I was going to stay the

4        night at the hospital.

5   Q   Okay.

6         And did you respond?

7   A   I did.

8   Q   Okay.

9         And your response was?

10  A   I was definitely staying.

11  Q   Did you know who she was at that point?

12  A   I did.

13  Q   Okay.

14       And who did you believe her to be?

15  A   Child Protective Services.

16  Q   Okay.

17       Did she have any kind of badge on?

18  A   She did.

19  Q   Okay.

20       Did you discuss the circumstances of Madison's

21      injuries at that time with her?

22  A   No.

23  Q   Okay.

24       Did you ever discuss the circumstances of

25      Madison's injuries with Sarah Weaver?

49

```
 1   A    No.

 2   Q    When you walked into the room and saw her standing

 3        there, what was the first thing that was said?

 4   A    Sovik said to her, 'Is there anything else that you

 5        need?

 6   Q    And what was her response?

 7   A    'No, I think I have everything I need.'

 8   Q    And what did she do?

 9   A    She grabbed her belongings and left the room.

10   Q    And umm --- had you ever had any contact with

11        Children's Protective Services before?

12   A    Once.

13   Q    And when was that?

14   A    It was in nineteen ninety-eight (1998).  I don't

15        remember the specific date.

16   Q    And it was arising in what context?

17   A    Uh --- an investigation into an abuse on Nicholas

18        Kennedy.

19   Q    Okay.

20            And during that --- what was your contact with

21        Children's Protective Services in that case?

22   A    It was in a conference room on that same floor, a

23        doctor, Child Protective Services, uh --- the mother

24        and myself.

25   Q    Were you interviewed?
```

50

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1 A  We were.

2 Q  Okay.

3     You were asked questions by the Protective

4    Services worker?

5 A  Yes.

6 Q  And the mother also?

7 A  Yes.

8 Q  And did you give responses?

9 A  Yes.

10 Q  Okay.

11     When Sarah Weaver walked out of the room saying

12    no, that she had everything she had, what did you

13    think?

14 A  It was very shocking to me.  I immediately thought

15    of the last case where I was questioned with the

16    mother and I wasn't being questioned at all.

17 Q  Did you think, Mr. McBurney, at this point, that you

18    were free to leave that room?

19 A  Yes.

20 Q  And what was the first thing that was said to you?

21 A  Uh --- Sovik identified himself and Sederlund as

22    Sergeant and Detective, respectively.

23 Q  Okay.

24     And umm --- did they say anything to you about

25    where to sit?

1    A    Sovik said, 'Have a seat'.   And he kind of motioned

2         in --- there was only one seat available when I

3         walked in.

4    Q    That was where?

5    A    At the head of the table.

6    Q    Okay.

7         And where were you positioned in respect to the

8         door?

9    A    I had my back facing the door.

10   Q    Okay.

11        Was the door open or closed?

12   A    It was open when I went in and it was closed after

13        Sarah Weaver left.

14   Q    Who closed it?

15   A    Sederlund did.

16   Q    And what was the first thing said when you sat down?

17   A    They identified themselves.

18   Q    Okay.

19        And after the identification of them as police

20        officers?

21   A    The very first thing he asked us about our marriage

22        and uh --- was Madison our only child.   And then he

23        said, 'Tell me about Madison.'   'Tell me a little

24        about her.'

25   Q    And did you do that?

                              52

1   A     I tried to.

2   Q     Okay.

3         And when you say you tried to, what happened?

4   A     I was, you know, talking about her and he cut me off

5         and said, 'Tell me about the events on November

6         30th.'

7   Q     Okay.

8         And what was your response to that?

9   A     I did so.

10  Q     And umm --- umm --- did there come a time when there

11        was any discussion about Nicholas?

12  A     There was.

13  Q     Okay.

14        And who brought up Nicholas?

15  A     Sovik did.

16  Q     What was the question that was asked of you?

17  A     Do you have another child?   Do you have a son?

18  Q     Okay.

19        And umm --- anything else that he stated about

20        this case?

21  A     He informed me that he knew about the charge and that

22        I had pled No Contest to a lesser charge.

23  Q     Okay.

24        Anything else that he said about the case?

25  A     Umm --- actually yes.   He asked me about the

53

1       injuries.

2   Q   Okay.

3           And what did he --- how was that framed?    What

4       was that question?

5   A   Do you know how the injuries happened to him?

6   Q   Okay.

7           And umm --- did he make any comparison between

8       Madison's and Nicholas's symptoms?

9   A   A little later.   Not at that point.

10  Q   Okay.

11          And what was the comparison being made?

12  A   That they were the same injuries.

13  Q   Okay.

14          And the statement, 'Those were worse,' whose

15      statement was that?

16  A   Sovik.

17  Q   Was it your statement?

18  A   No.

19  Q   Umm --- what after the discussion about Nicholas,

20      what was the next topic of discussion?   What was the

21      next question that you were asked by the officer?

22  A   He told me that the injuries were the same and then

23      it became accusatory at that point.   'We know you

24      did it.'

25  Q   Was there any discussion about Madison's injuries

54

```
 1          being non-accidental?
 2   A      Yes.
 3   Q      Okay.
 4          And was this the first time that you had heard
 5          any of that accusation?
 6   A      Yes, it was.
 7   Q      Okay.
 8          And who said that Madison's injuries were non-
 9          accidental?
10   A      I believe it was Sovik.
11   Q      Okay.
12          And what was your response?
13   A      I was really shocked by that because I had never
14          heard that up until that point.
15   Q      Okay.
16          And did you --- did you make a verbal response
17          to Sovik?
18   A      I asked to speak to her doctor.
19   Q      Okay.
20          And what was the response?
21   A      'No.'
22   Q      And did you make any further requests to speak to
23          Madison's doctor?
24   A      Yes, I did.
25   Q      And what was the response.
```

55

```
 1   A   'No.'

 2   Q   Okay.

 3           And whose response was that?

 4   A   I believe it was Sovik.

 5   Q   Okay.

 6           At this time Mr. McBurney, who's asking the

 7       questions?

 8   A   Sovik said pretty much everything up until that

 9       point.

10   Q   Was he taking any notes?

11   A   He was not.

12   Q   Okay.

13           Was Sederlund taking any notes?

14   A   Yes, he was.

15   Q   Okay.

16           And after you asked for his doctor ---- to speak

17       to Madison's doctor several times and it was

18       declined, what was the next thing that came out of

19       Sovik's mouth?

20   A   'Look.'   'We know you did it.'   'That you're

21       responsible for her injuries.'

22   Q   And at that point did you believe that you were free

23       to leave that room?

24   A   Absolutely not.

25   Q   When Sovik said, 'Look, we know that you did it', did
```

56

1      he say it more than once?

2   A  Throughout the rest of the interrogation it was said

3      repeatedly.

4   Q  Okay.

5      Do you know how many times he said it?

6   A  Not exactly.

7   Q  Okay.

8      Was it more than five?

9   A  I believe so.

10  Q  Okay.

11     Whose suggestion was it to bring Heather into

12     the room?

13  A  I had asked for her a couple of times but Sovik did

14     say, 'Would you like to speak with her?'

15  Q  And umm --- when Heather was brought back into the

16     room, what was the first statement that was made?

17  A  Sovik said to her that they had been talking to me

18     and that Steven --- or that I wanted to tell her some

19     things.

20  Q  Okay.

21     And did Sovik make any other statements?

22  A  Not at that point.

23  Q  Okay.

24     Now --- and then there was discussion between

25     you and Heather?

57

1   A    Yes.

2   Q    Okay.

3        At some point did umm --- Sederlund and Sovik

4        leave the room?

5   A    They did.

6   Q    Okay.

7        And when they left the room did you know where

8        they went?

9   A    They were outside the room.

10  Q    Okay.

11       When they left the room do you believe that you

12       were free to leave at that point?

13  A    No.

14  Q    At any time after he said initially, 'We know that

15       you did it', did you ever believe that you were free

16       to leave the hospital under your own free will?

17  A    No.

18  Q    Did you believe that you were going to be arrested

19       and taken from the hospital?

20  A    Most definitely.

21  Q    Okay.

22       And umm --- you said, 'Sederlund and Sovik were

23       right outside the room.'   Could you hear them?

24  A    I could hear voices.

25  Q    Okay.

58

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    And was there a discussion between you and

2    Heather?

3  A    There was.

4  Q    Okay.

5    Did you notice anything unusual in the room, Mr.

6    McBurney?

7  A    Yes, I did.

8  Q    What did you notice?

9  A    There was a silverish device underneath Sovik's

10    chair.

11  Q    Okay.

12    And had you seen that device before that ---

13    when Sederlund and Sovik had left the room?

14  A    I noticed it when I walked in.

15  Q    Okay.

16    And when you walked in what did you believe it

17    to be?

18  A    A camcorder, a camera of some type.

19  Q    Okay.

20    And when they left the room and you're talking

21    to Heather, did you have an opportunity to look at

22    that again?

23  A    I --- I never touched it but I looked at it.

24  Q    Okay.

25    What did you believe it to be?

59

```
 1   A      A camcorder, or a camera.

 2   Q      Okay.

 3          Was there a discussion between you and Heather

 4          about what that was?

 5   A      The very first thing Heather said when they left the

 6          room was, 'You know we're being recorded, right?'

 7   Q      And did you believe that you were being recorded?

 8   A      I --- I --- it was reasonable to believe that, yes.

 9   Q      Okay.

10          Now you've had an opportunity to review the

11          police reports in this case?

12   A      I have.

13   Q      Prepared by Sederlund and Sovik?

14   A      Yes.

15   Q      Some of the discussion that you and Heather had

16          privately in that room before Sederlund --- I mean

17          while Sederlund and Sovik were gone, was that

18          included in the police report?

19   A      Yes.

20   Q      Okay.

21          That particular device, did you see it again

22          that evening?

23   A      Yes, I did.

24   Q      Where did you see it?

25   A      At the police department.
```

60

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    Q    And where at the police department?

2    A    We went through a garage and into a --- a booking

3         area.

4    Q    Okay.

5    A    And that's where I saw it again.

6    Q    And where was it when you saw it again?

7    A    In Sovik's hands.

8    Q    And what was he doing with it?

9    A    He was holding it initially and then he took my

10        picture with it.   Took two pictures of me, my face.

11   Q    You heard his testimony a few minutes ago about the

12        device that was used to take your picture?

13   A    Yes.

14   Q    Is there any question in your mind that that

15        mechanical device, electronic device that was in the

16        room during your interrogation was the same device

17        used to take the picture?

18   A    Is there any question that it ---

19   Q    (Interposing)   Any question?

20   A    Not at all.

21   Q    Now before Sederlund and Sovik left the room was

22        there any request made of you to provide a written

23        statement?

24   A    There was.

25   Q    Okay.

61

```
 1              And was that request made right before they left
 2      the room?
 3   A  It was.
 4   Q  Okay.
 5              And was a pad, excuse me, was a piece of paper
 6      and a pen provided to you?
 7   A  Correct.
 8   Q  And did you write out a statement?
 9   A  I did.
10   Q  Okay.
11              And umm ---
12              MR. WHITE:   If I may approach now, Your Honor?
13              THE COURT:   You may.
14   Q  (By Mr. White, continuing)   I'm handing you People's
15      Exhibit 1.
16              Is that a copy of the statement you wrote out on
17      December 3rd, 2006?
18   A  Yes, it is.
19   Q  And it was approximately how long after the
20      interrogation began?
21   A  Two and a half hours.
22   Q  And umm --- it was done at the police officer's
23      request?
24   A  That's correct.
25   Q  And when you finished writing what did you do with
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      the paper that you wrote out?

2  A   I just dropped it on the desk.

3  Q   Okay.

4  A   The table.

5  Q   And at some point did Sederlund and Sovik come back

6      in?

7  A   Actually I believe that Sederlund was the only one

8      that came back in at that point.

9  Q   Okay.

10     Was there any discussion about your statement?

11 A   He read it.   And then he wanted me to add, he didn't

12     know who her was, so he wanted me to write Madison

13     above that.

14 Q   He, him being ---

15 A   (Interposing)   Sederlund.

16 Q   (Continuing)   Sederlund.

17     Anything else he wanted to add?

18 A   He --- he said I had to put in the information about

19     her having a seizure and that I called nine-one-one

20     (911).

21 Q   Anything else that he wanted you to add?

22 A   That was it.

23 Q   When you --- I assume that you left the hospital?

24 A   I did.

25 Q   Okay.

63

1    And when you left the hospital you were taken

2    out of the conference room?

3    A    Correct.

4    Q    Were you handcuffed?

5    A    I was.

6    Q    Who handcuffed you?

7    A    I believe Sovik did.

8    Q    Okay.

9    And were you allowed to go to Madison's room?

10   A    I was.

11   Q    Okay.

12   And were you handcuffed at that time?

13   A    No, I wasn't.

14   Q    Okay.

15   And when you returned from Madison's room, umm -

16   -- where were you handcuffed, in the conference room

17   or outside?

18   A    I was right outside the --- almost in the doorway,

19   but right outside the room.

20   Q    Was that the first time that you had left the room

21   since your interrogation had begun?

22   A    Yes, it is.

23   Q    Okay.

24   When you came back out of the room did you

25   notice those three uniformed police officers?

64

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   A      I sure did.

2          MS. POPE-STARNES:    I'm going to object.

3   There's been no testimony there were police officers.

4          MR. WHITE:    He testified that he believed they

5   were police officers.

6          THE COURT:    Then --- then just rephrase that

7   who you believed to be police officers, is that

8   right, Sir?

9          THE WITNESS:    I believed they were officers,

10  yes.

11         THE COURT:    Go ahead.

12         MR. WHITE:    Okay.

13  Q      **(By Mr. White, continuing)**    Umm --- and umm ---

14  where were they when you came back out of the room?

15  A      Same location.    A little closer to where I was

16  standing handcuffed.

17  Q      Okay.

18         And when you were handcuffed what, if anything,

19  did they do?

20  A      When I was handcuffed?

21  Q      Yeah.    Right after you were handcuffed.

22  A      They were just standing there waiting for us to go.

23  Q      Okay.    Okay.

24         Did you exit the uh --- ward?

25  A      Yes.

65

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   Okay.

2         And did those officers assist?

3   A   Escorting us?

4   Q   Yes.

5   A   Yes, they did.

6   Q   And any particular characteristic of any one of them

7       that you can recall?

8   A   I remember one being really tall.

9   Q   Were they Caucasian?  Were they African-American?

10   A   They were all Caucasian.

11   Q   Were they male, female?

12   A   All male.

13   Q   Could you tell, Mr. McBurney, what particular entity

14       they worked for?

15   A   I have no idea.

16   Q   Whether they were a county sheriff, local deputy,

17       security guard?

18   A   I don't know.

19   Q   The time though that you saw them initially after you

20       saw them this time, you believed they were police

21       officers?

22   A   Yes.

23       MS. POPE-STARNES:  I'm going to object.  This

24   is leading, Your Honor.  This is direct examination.

25       THE COURT:  Sustained.

66

1    Q    **(By Mr. White, continuing)**   Umm --- was there any

2         discussion as you were being escorted out of the

3         hospital?

4    A    Yes, there was.

5    Q    What was the discussion?

6    A    College football.

7    Q    Were Sederlund and Sovik involved in that discussion?

8    A    At least one of them.

9         MR. WHITE:   I don't think I have anything

10        further at this time.

11        THE COURT:   Cross-exam.

12                    **CROSS-EXAMINATION**

13   **BY MS. POPE-STARNES:**

14   Q    Let's talk about your prior police contact.

15        Do you recall that?

16   A    Yes.

17   Q    You were interviewed by Detective Sumner from

18        Northville Township Police Department at your

19        apartment in Northville on March 2nd of ninety-eight

20        ('98) is that correct?

21   A    Correct.

22   Q    And after he interviewed you there he left, didn't

23        he?

24   A    Correct.

25   Q    You were not placed under arrest, were you?

                              67

```
 1   A      That's correct.

 2   Q      And subsequent to that, the same day, you went to the

 3          police department later in the evening and spoke to

 4          him, didn't you?

 5   A      That's correct.

 6   Q      And after you spoke with him and made a statement

 7          about bouncing or shaking Nicholas too hard, he told

 8          you that a warrant was going to be issued, correct?

 9   A      That's correct.

10   Q      And you were allowed to leave the police station,

11          weren't you?

12   A      I was.

13   Q      You were not arrested until three days later on the

14          fifth of March, correct?

15   A      I don't remember the exact day but it was at least

16          after that evening.

17   Q      Now you testified that you never really had any other

18          substantive jobs besides this last one that you

19          testified about.   Do you recall that?

20          MR. WHITE:   I don't believe I asked that

21          question, Judge.

22          THE WITNESS:   No, I don't.

23          MR. WHITE:   I don't believe that was the

24          question.   If that was the question I don't believe

25          that was the response.
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

 1                THE COURT:    What was the question?

 2              MS. POPE-STARNES:    I believe the question was

 3    he testified about this lawn service job that he's

 4    held for five years.    And there was a question about

 5    has that been the longest or the most substantive job

 6    that he's had.

 7                THE COURT:    I'll allow it.

 8  **Q**  **(By Ms. Pope-Starnes, continuing)**    In fact, Sir, the

 9        time that you were booked by the Northville Township

10        Police Department, you told them that you were an

11        assistant supervisor at Home Depot, didn't you?

12  A    That's correct.

13  Q    And you told them that you'd held that position for

14        over two years, correct?

15  A    That's correct.

16  Q    Do you remember having a psychological evaluation for

17        a neglect case out of Wayne County?

18              MR. WHITE:    Objection.    This has no bearing on

19    this case, Judge.

20             MS. POPE-STARNES:    It does.    It's going to go

21    to a statement that he made during this hearing to

22    impeachment.

23             MR. WHITE:    The purposes of this hearing it

24    doesn't have any relevance.

25             THE COURT:    I'll allow it.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1       MS. POPE-STARNES:   I'm laying a foundation,

2   Your Honor.

3       THE COURT:   I'll allow it.

4       It will be subject to a motion to strike, Mr.

5   White.

6       Go ahead.

7  Q  **(By Ms. Pope-Starnes, continuing)**   Do you recall

8   having a psychological evaluation in a neglect case

9   that arose out of the incident with Nicholas Kennedy?

10 A  I do.

11 Q  And do you recall telling the evaluator that you did

12   have a specific program that you studied at Ferris

13   State?

14 A  I don't.

15 Q  Do you recall stating that you studied accounting for

16   two years?

17 A  Two years where?

18 Q  At Ferris State.

19 A  I didn't attend Ferris for two years.

20 Q  Did you study accounting?

21 A  I took some classes for accounting.

22 Q  So the answer is 'Yes'?

23 A  Yes.

24 Q  Now, in fact, Nicholas, his injuries were similar to

25   Madison's weren't they?

70

1    MR. WHITE:   Objection, Your Honor.   This has

2    nothing to do with this case, this hearing.   Nothing

3    to do whatsoever.

4    MS. POPE-STARNES:   It has been brought up

5    repeatedly by Counsel as to whether or not the

6    officers were asking him some leading questions about

7    whether or not the injuries were similar or not.

8    MR. WHITE:   It goes to the state of mind of the

9    police and as it was being put into my client's state

10   of mind the question is whether he believed it was

11   reasonable to believe that he was in custody, okay?

12   It has nothing to do with the determination of

13   this Court.   And I'm going to instruct him not to

14   answer, because what you're going to do is you're

15   going to incriminate him, okay?

16   THE COURT:   I'll  ---

17   MR. WHITE:   (Interposing)   You know where this

18   is leading.

19   THE COURT:   All right.

20   The Court will overrule the objection.   We'll

21   allow it to be inquired into.   I understand your

22   argument.   You can make further argument at the

23   closing and I'm going to limit it to the confines of

24   what this hearing is about in any event.

25   Go ahead.

71

1            MS. POPE-STARNES:   Thank you.

2  **Q**   **(By Ms. Pope-Starnes, continuing)**   Do you recall the

3      question, Sir?

4  A   I don't.

5  Q   In fact, Nicholas injuries --- Nicholas's injuries

6      were similar to Madison's, weren't they?

7  A   A little bit.

8  Q   Well Nicholas and Madison both had cerebral

9      hemorrhaging, didn't they?

10  A   Correct.

11  Q   And they both had subdural hematomas, didn't they?

12  A   That's correct.

13  Q   Whose injuries were worse?

14  A   Nicholas.

15  Q   Except that Madison died, correct?

16  A   That's correct.

17  Q   Do you recall telling the officers that you didn't

18      think that you were Nicholas's father?

19  A   Yes, I do.

20  Q   But, in fact, you were named as the father in the

21      neglect case involving Nicholas, correct?

22         MR. WHITE:   What does this have to do with this

23      case?

24         MS. POPE-STARNES:   It goes to his credibility,

25      Your Honor.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1        MR. WHITE: He's already admitted that he told

2    --- he said, 'No.'

3        THE COURT: As it relates to pleadings filed by

4    others --- other people purporting him to be the

5    father, the Court will sustain the objection.

6        If you have some evidence that he has suggested

7    otherwise I'll entertain that at that time.

8        MS. POPE-STARNES: I'll rephrase it if I may,

9    Your Honor?

10  **Q**  **(By Ms. Pope-Starnes, continuing)** Did you ever

11    contest the allegations that you were Nicholas's

12    father during the neglect case?

13        MR. WHITE: It has no relevance to the

14    determination of whether these particular statements

15    are admissible under --- it has nothing --- she is

16    impeaching him for the purpose as if a Jury was

17    there, Judge.

18        THE COURT: Your record --- your record is

19    noted. I'll respectfully overrule the objection.

20    This goes to credibility. The Court will limit it

21    accordingly.

22  }    Go ahead.

23        THE WITNESS: I did not.

24  **Q**  **(By Ms. Pope-Starnes, continuing)** Did you ever ---

25    did you have a medical condition during the time that

```
 1            you spoke with the officers?

 2   A    Which officers?

 3            No.

 4   Q    Detective Sov --- Sederlund and Sergeant Sovik.

 5   A    No.

 6   Q    You never complained to them that you were hungry or

 7        thirsty, did you?

 8   A    No.

 9   Q    You never complained to them that you were tired, did

10        you?

11   A    No.

12   Q    You weren't under the influence of drugs or alcohol,

13        correct?

14   A    I was not.

15   Q    You testified that you went home on the twenty-second

16        (22nd) at two-thirty (2:30) for two hours.

17            What did you do at home?

18   A    That was on December 2nd.

19   Q    December 2nd, thank you.

20            What did you do at home?

21   A    Showered and changed and grabbed clothes for my wife,

22        also.

23   Q    Now you testified that when the nurse came into

24        Madison's room to get you that she said, 'They want

25        to talk to you,' and you didn't know who they were,
```

74

```
 1        correct?
 2   A    Correct.
 3   Q    Did you ask?
 4   A    No.
 5   Q    Why not?
 6   A    I just went where I was told to go.
 7   Q    These uniforms that you saw when you left the room,
 8        describe what they were wearing?
 9   A    Uh --- the two on the left were wearing brown pants,
10        brown shirt.  The one on the right was wearing a
11        light blue shirt with a darker blue pants.
12   Q    Were any of them wearing jackets?
13   A    No, they weren't.
14   Q    Did you --- what type of badges did you see?
15   A    I don't know exactly.  Shiny.
16   Q    Where did you see the badges on them?
17   A    On their chest.
18   Q    What were these badges made of?
19   A    They were shiny so I'm assuming metal.
20   Q    Were they wearing gun belts?
21   A    I didn't notice that.
22   Q    Were they wearing radios?
23   A    I don't recall that.
24   Q    Were they wearing handcuffs?
25   A    I didn't see any.
```

1    Q    Any of them wearing a baton or asp?

2    A    I didn't see that.

3    Q    You testified that there was one exit and one

4         entrance to this floor, is that correct?

5    A    Yes, there is.

6    Q    How many days had you been on this floor?

7    A    Three.

8    Q    And what was this one exit and entrance?

9    A    The hallway leading into the intersection that goes

10        into the PICU unit.

11   Q    Stairs, elevator, escalator, what type of entrance or

12        exit?

13   A    The elevator.

14   Q    So it's your testimony that there was no stairwell

15        anywhere?

16   A    I didn't see any.

17   Q    Did you see fire signs showing exits?

18   A    No, I did not.

19   Q    When was the first time that you saw Sarah Weaver?

20   A    December 2nd about six o'clock (6:00).

21   Q    Did she introduce herself to you?

22   A    She did not.

23   Q    So it's your testimony that Sarah Weaver never

24        interviewed you?

25   A    That's correct.

76

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  Q   Is it also your testimony today that between the time
2      that Madison came to the hospital on November 30th
3      and the time these officers talked to you on December
4      3rd, that no doctor had talked to you about Madison's
5      injuries being non-accidental?
6  A   Absolutely not.
7  Q   Did you ask questions of the doctors of how Madison
8      could have sustained these injuries?
9  A   I did.
10 Q   And what was the response?
11 A   There was many.
12 Q   For example?
13 A   Encephalitis, sepsis.
14 Q   What doctor told you encephalitis?
15 A   I don't recall the name.  We talked to two
16     primarily, Dr. Owen and Dr. Steven Lieber (phonetic).
17 Q   Did Dr. Owen or Dr. Lieber tell you encephalitis?
18 A   I don't recall who told me.
19 Q   Who told you sepsis?
20 A   I don't recall.  We spoke to many doctors.
21 Q   Did Dr. Owen or the other doctor, Dr. was it Lieber?
22 A   Yes.
23 Q   Did either of them say it was sepsis?
24 A   I don't recall.
25 Q   Any doctors give --- tell you any other reasons for

77

1        Madison's injuries?

2   A   I don't think so.

3   Q   When a doctor told you about this encephalitis, was

4        your wife present?

5   A   I don't --- I don't recall.

6   Q   Your wife's a registered nurse, correct?

7   A   That is correct.

8   Q   When the doctor told you about sepsis, was your wife

9        present?

10   A   I don't recall.

11   Q   Now you testified that in the prior case you had

12        spoken to --- to someone --- you met with CPS and the

13        mother before in the same conference room.

14           Isn't it true that Nicholas was treated at

15        Children's Hospital and not at University of

16        Michigan?

17   A   I said in a conference room.

18   Q   Isn't it true Nicholas was treated at Children's

19        Hospital and not at University of Michigan?

20   A   That's correct.

21   Q   How many seats were at the table in the conference

22        room when you were with officers Sederlund and Sovik?

23   A   How many seats?  Eight to ten.

24   Q   And how many seats did Officer Sederlund take up?

25   A   One.

FORM CSR - LASER  REPORTERS PAPER & MFG CO.  800-626-6313

| | | |
|---|---|---|
| 1 | Q | How many seats did Sergeant Sovik take up? |
| 2 | A | One. |
| 3 | Q | So that left more than one seat available for you, |
| 4 | | didn't it? |
| 5 | A | It would have been very difficult to get to any other |
| 6 | | seat. |
| 7 | Q | There were other empty seats, weren't there? |
| 8 | A | Yeah.  Yes. |
| 9 | Q | And you were sitting the closest to the door in the |
| 10 | | room, weren't you? |
| 11 | A | Correct. |
| 12 | Q | Did you ever ask to leave the room? |
| 13 | A | I did not. |
| 14 | Q | When the officers stepped out of the room, where did |
| 15 | | you remain in the room? |
| 16 | A | I was in my chair that I was in before.  I had slid |
| 17 | | over a little bit closer to Heather. |
| 18 | Q | You stayed in the room? |
| 19 | A | I did. |
| 20 | Q | You stayed in the chair? |
| 21 | A | Yep. |
| 22 | Q | Your attention was focused on Heather? |
| 23 | A | For the most part. |
| 24 | Q | You wrote out the statement that was given to you? |
| 25 | A | I did. |

79

```
 1   Q   Isn't it true that when Heather came into the

 2       conference room that the first thing that you and

 3       Heather discussed was you asked her how she knew

 4       about Nicholas Kennedy?

 5   A   Not true.

 6   Q   Isn't it true that she told you that she was aware of

 7       Nicholas because she'd been told by your friend Kyle

 8       some time ago?

 9   A   Not at that time.

10   Q   Isn't it true you told her that you would have told

11       her earlier in your relationship but things were

12       going well and moving quickly and you didn't want to

13       ruin it?

14   A   Not at that time.

15   Q   This alleged recording device, did you ever ask the

16       officers about it?

17   A   No.

18   Q   Why not?

19   A   I didn't care if I was being recorded.

20   Q   Why not?

21   A   It didn't bother me.   I wish it would have been.

22   Q   Why?

23   A   Then there wouldn't be any discrepancy in what was

24       said.

25   Q   What is the discrepancy in what was said?
```

80

1          MR. WHITE:   Objection, Your Honor.   This has

2     no relevance to your determination whether the

3     statements --- whether he was in custody.   And

4     that's the sole determination you have to make.   Not

5     what was said but whether he was in custody.

6          THE COURT:   The whole scenario is necessary for

7     me to decide whether he was, in fact, in custody or

8     not.

9          The Court respects your objection but overrules

10    it.

11         THE WITNESS:   The question again, please.

12  Q   **(By Ms. Pope-Starnes, continuing)**   I asked what ---

13    what was the discrepancy?

14  A   The order of their report is inaccurate.   The

15    statements that they include at the end of the

16    statement, they weren't in the room when they were

17    said.   And there's details that they've included in

18    the statement that they said I said and I did not

19    say.

20  Q   That are untrue?

21  A   That is correct.

22  Q   Which statements are untrue?

23         MR. WHITE:   Objection, Your Honor.   Objection.

24    This goes to the heart of the case.

25         MS. POPE-STARNES:   Again, the totality of the

1  circumstances, Your Honor.

2    MR. WHITE:   As to what's true and what's not

3  true ---

4    MS. POPE-STARNES:   (Interposing)   He is ---

5    THE COURT:   (Interposing)   One at a time,

6  Counsel.

7    MR. WHITE:   Okay.

8    MS. POPE-STARNES:   He is attacking the

9  credibility ---

10    THE COURT:   (Interposing)   No.   Just a

11  minute.   What's your objection.

12    MR. WHITE:   My objection is it's not relevant

13  for the purpose of your determination, okay?

14    And you're asking him to incriminate him ---

15  she's asking him to incriminate himself.   And that's

16  what not --- this is not what this hearing is about.

17  She's asking him what's true and what's not true.

18  She's asking him to incriminate himself and I'm going

19  to tell him not to answer because that has no bearing

20  on --- to your determination whether he was in

21  custody.

22    THE COURT:   Why doesn't it have bearing?   Why

23  isn't that the issue to be determined here?   How can

24  I decide whether or not to suppress a statement if

25  it's contested whether the statement was made?

FORM CSR - LASER REPORTERS PAPER & MFG. CO.   800-626-6313

1      MR. WHITE:   He didn't --- she didn't ask that.

2  She asked whether the statement was true.

3      THE COURT:   That's just what I said.

4      Counsel, response?

5      MS. POPE-STARNES:   My response is the Court has

6  to examine the totality of the circumstances.   He

7  has said that part of what the officers have said he

8  said was untrue.   And I asked what they have said or

9  purported that he said was untrue.   This goes to the

10  credibility of this witnesses (sic), and attacking

11  the credibility of the police officers.   And it goes

12  to the totality of the circumstances so the Court can

13  make a decision based on all of the evidence as to

14  whether or not the statement is admissible or should

15  be suppressed.

16      THE COURT:   Anything in response ---

17      MR. WHITE:   (Interposing)   Are we trying ---

18      THE COURT:   (Continuing)   to that?

19      MR. WHITE:   (Continuing)   the case?   Are we

20  trying the case?

21      THE COURT:   Okay.   All right.   We are not in

22  the gate --- we are not in the business of rhetorical

23  questions.   The Court has heard your objection.

24  I've heard your response.   The Court finds it

25  germane to this issue.   Respectfully overrules the

1    objection.

2  **Q**   **(By Ms. Pope-Starnes, continuing)**   My question was,

3       what did the officers report that you said that was

4       untrue?

5  A   That I threw her from two feet away from the crib.

6       That I said, 'Screaming.'   That I said, 'Mad.'   And

7       that her head hit the bars, specifically.

8  Q   Let's talk about your written statement.   You said

9       that, 'Officer Sederlund told you to insert things in

10      the statement.'   You have that right in front of

11      you, People's Exhibit 1.

12 A   That's correct.

13 Q   Isn't it true, Sir, that that statement follows

14      chronologically the things that you said happened on

15      November 30th, of two thousand and six (2006)?

16      MR. WHITE:   Objection.   Same objection.

17      Let's have a free trial.   Let's have a free case.

18      THE COURT:   Noted, your objection.

19      Sustaining objection, noted.

20      Continue.

21      MS. POPE-STARNES:   I'm sorry, Your Honor.

22      You're sustaining the objection?

23      THE COURT:   No.   Sustaining objection.   The

24      Court overrules it for the previous reason stated.

25      Go ahead.

84

```
 1              THE WITNESS:   Can you say it again?

 2    Q    (By Ms. Pope-Starnes, continuing)    Yes.

 3              Isn't it true the statement there (indicating),

 4         People's Exhibit 1, is written in chronological order

 5         of the events that occurred on November 30th, of two

 6         thousand and six (2006)?

 7    A    Yes.

 8    Q    Now is it your testimony that Officer Sederlund told

 9         you to insert the information about calling nine-one-

10         one (911)?

11    A    Correct.

12    Q    Isn't it true that the information about nine-one-one

13         (911) is the third to last statement, the third to

14         last line in this paragraph?

15    A    It is.

16    Q    And that's not written between any other sentences,

17         an extra little space in-between, is it?

18    A    The sentence after that describes the procedure after

19         and as I had called nine-one-one (911) and that

20         completes the statement.

21    Q    And that follows chronologically, doesn't it, with

22         what happened that day?

23    A    It does.

24    Q    Now you've testified that this silverish device that

25         you saw that was left in the room, how did it get out
```

85

1        of the room?

2  A    Someone carried it out.

3  Q    Did you see them carry it out?

4  A    No.

5  Q    Then how do you know it was carried out?

6  A    Because he had it when we got to the station.

7  Q    And where did he have it when you got to the station?

8  A    In his hands.

9  Q    Who booked you?

10  A    Sovik did most of it and then it was turned over to

11        Officer Whitrock (phonetic).

12  Q    And who took your booking photographs?

13  A    Sovik did.

14  Q    With that device?

15  A    He did take pictures of me.

16  Q    With the device he held in his hand?

17  A    Yes, he did.

18  Q    Do you recall seeing this computer, this mounted

19        camera in the booking room, that Sergeant Sovik

20        tested --- testified about?

21  A    I remember seeing a computer.

22  Q    And it's your testimony today your photograph was not

23        taken with that?

24  A    I don't recall that, no.  It may have been.  I

25        don't recall that.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1   Q   Now you're saying it may have been?

2   A   It may have.   I don't recall that.

3   Q   When during the sequence of events was it that you

4       asked the officers if you could speak with Heather?

5   A   It would be after I asked for a doctor and they told

6       me they knew I did it.   There was a discussion about

7       um ---

8   Q   (Interposing)   Let me stop you there.

9           When did you ask for a doctor?

10  A   I asked for a doctor after they told me the injuries

11      were non-accidental.

12  Q   What doctor did you ask for?

13  A   I asked for Madison's doctor.

14  Q   Which was who?

15  A   It was different every day.   Every shift it was

16      different.

17  Q   Who was it that evening?

18  A   I don't know.   We didn't speak to one at that

19      point.

20  Q   Madison was in the pediatric intensive care unit?

21  A   That's correct.

22  Q   And in pediatric intensive care unit there is one

23      nurse assigned to one patient during the whole shift,

24      correct?

25  A   During a shift?   Correct.

87

1    Q    And how many times during a shift did a doctor come

2         in and look in on Madison?

3    A    At least once.

4    Q    You never asked for a lawyer, did you?

5    A    No, I didn't.

6              MS. POPE-STARNES:    I have no other questions,

7         Your Honor.

8              THE COURT:    Redirect.

9              MR. WHITE:    I have no further questions.

10             THE COURT:    Thank you, Sir.    You're all set.

11        You can escort him back down.

12             MR. WHITE:    We have no further witnesses, Your

13        Honor.

14             THE COURT:    The Defense rests.

15             Any rebuttal from the People?

16             MS. POPE-STARNES:    No, Your Honor.

17             THE COURT:    Closing arguments.

18                      **CLOSING ARGUMENTS**

19   **BY MS POPE-STARNES:**

20             Your Honor, the question here is not the

21        subjective beliefs of the police officers.    I gave

22        to Court and to Counsel umm --- on Monday a

23        memorandum of law.    And in that case I cited the

24        case of Stansbury (phonetic) versus California.    And

25        I think it's a very interesting case factually, Your

                             88

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

1    Honor, because in that particular case the police are

2    investigating a homicide and they have one suspect.

3    And they interview the suspect and they believe that

4    that person is responsible for the murder.

5    And they bring in a second person who they

6    believe is a witness. And during the course of the

7    interview the person that they believe is a witness

8    he releases or gives to the police details that only

9    the person responsible for the murder would know.

10   And the officer begins to realize that this

11   person is the person responsible for the murder he is

12   investigating. And he continues to ask questions.

13   And he admits in his testimony during their hearings

14   that person's not pretty dull. He knows this is the

15   murderer. And he continues to ask questions and

16   gets more detail. And at some point leaves the room

17   and another investigator comes in and gives that

18   person Miranda. And then the Miranda rights are

19   invoked.

20   And in that case they contest the admissibility

21   of those statement --- statements, saying it is the

22   subjective view of the police officer that that

23   person is in custody and is not free to leave. And

24   therefore it's custody, custodial interrogation,

25   Miranda is invoked and those statements should not be

89

1    admitted.

2        And the United States Supreme Court said, 'That

3    is not correct.'   The subjective view of the police

4    officers, the subjective view of the Defendant or

5    suspect is irrelevant.   What is relevant is what the

6    officers communicate through word or through action

7    and the totality of the circumstances.   And in that

8    case those statements are allowed.

9        In this case before the Court we have a

10   Defendant who has been interviewed by the police

11   before.   And he knows in a prior case involving

12   similar circumstances, he's interviewed at his home

13   and a police officer leaves and he is not placed

14   under arrest.   He goes to the police station later

15   that day and is interviewed and gives a statement

16   about shaking and bouncing the baby too hard.   And

17   he's told that an officer is going to obtain a

18   warrant.   And he admits he was allowed to leave the

19   station and was not placed under arrest.

20       There is no evidence in the totality of the

21   circumstances in this case that it was reasonable for

22   this Defendant to believe that these officers ---

23   that he was in custody, that these officers would not

24   allow him to leave.   They brought his wife into the

25   room and let him speak to her.   They left the room

90

1    and left him in there.

2        Both his written statement and his oral

3    statement should be admitted into evidence.   Because

4    under the totality of the circumstances it is not

5    reasonable to believe that he knew that he was in

6    custody.   That he did not have a reasonable belief

7    of that based on the evidence in this case.

8        Now, Your Honor, in regards to this whole

9    business about the credibility of this recording

10   device.   With all due respect to Heather McBurney, I

11   think she was a grieving mother.   She's not home.

12   She's at work.   She gets called to the hospital.

13   And she testified here that she knew her daughter was

14   in critical condition and she was getting worse.

15   Her testimony was that she is a registered nurse.

16   She knew what was going on, Your Honor.   She

17   testified that she'd gotten very little sleep over

18   those days.   That she was upset.   She testified

19   that at the point her husband made the statement that

20   he had thrown Madison into the crib she really

21   doesn't even remember what was said after that.   She

22   even testified she doesn't remember anything about

23   this written statement.

24       I think that Heather McBurney, based on the

25   testimony that the Court heard, may think she

91

1        remembers that there was a recording device but she
2        doesn't really remember.  Her memory is not a
3        hundred percent (100%) accurate about what happened.
4        She was in shock.  Sergeant Sovik testified that
5        they had the nurse stay in the room that day because
6        they were concerned about how frail Heather McBurney
7        was.

8            It's interesting to note that what the Defendant
9        is arguing here is that the police officers are too
10       accurate in what they say, not that they've
11       misconstrued things.  They were too accurate.  They
12       only could've known this if they were in the room.
13       Both officers testified these statements were made
14       when they were in the room, that they did not have a
15       recording device.  They didn't know what was being
16       said in there.  They left them alone for a time
17       alone.

18           That action by the officers is consistent with
19       the consideration the officers gave the Defendant,
20       which he admits, that he was allowed to go to
21       Madison's room and to say goodbye to her.

22           I would submit to the Court that the testimony
23       of the Defendant is not credible.  We are required
24       to show by promise of the evidence that the totality
25       of circumstances were such that this was a voluntary

                              92

1       statement and that the Defendant was not in custody.

2       Granted they did not give him Miranda but they did

3       not have to.   It requires a custodial interrogation.

4              Were they asking him questions?

5              Yes.

6              Was this custody?

7              No.

8              And I would ask the Court to admit both the oral

9       statement and the written statement in People's

10      Exhibit 1.   And I would encourage the Court to look

11      at People's Exhibit 1 and the Court can see there's

12      nothing inserted in here.   This is written in a

13      chronological time frame.

14             THE COURT:   Counsel, you can approach.

15             MS. POPE-STARNES:   Thank you.

16             THE COURT:   Mr. White is getting ready and you

17      can present me with your Exhibits.

18             Counsel, you can do the same.

19             MS. POPE-STARNES:   That concludes my argument,

20      Judge.

21             THE COURT:   Thank you, Counsel.

22             There's more Exhibits too.   There's a jacket, I

23      think, and some other things.   I better consider

24      everything.   There'll all admitted so...

25             Go ahead Mr. White.

93

1          MR. WHITE:    I think I just have A and B, Your

2     Honor.

3          MS. POPE-STARNES:    Thank you, Your Honor.

4          THE COURT:    Thank you.

5          Parties agree I have all the Exhibits now?

6          COUNSEL:    (No verbal response.)

7          THE COURT:    Great.    They're now in Court's

8     possession.

9          MS. POPE-STARNES:    You have the People's, yes,

10    Your Honor.

11          THE COURT:    All right.

12          Mr. White?

13          MR. WHITE:    I believe so.

14          THE COURT:    Thank you.

15          MR. WHITE:    Just briefly, Your Honor.

16          THE COURT:    Go right ahead.

17                    **CLOSING ARGUMENTS**

18    **BY MR. WHITE:**

19          I thank you for your patience in sitting through

20    this.    You know the law and the totality of the

21    circumstances, what a reasonable person would believe

22    under the circumstances that presented themselves to

23    Steven McBurney on December 3rd, 2006, approximately

24    two o'clock (2:00 a.m.) in the morning to

25    approximately five o'clock (5:00 a.m.) in the

                          94

1   morning.

2          It's clear that there was one and only one

3   suspect from the time that Sederlund and Sovik left

4   the police department and that is the person who had

5   the prior conviction for child abuse, second degree.

6          That belief on their part was corroborated

7   throughout their investigation, specifically by Sarah

8   Weaver and Jeffrey Fleming.   And there was no

9   intention to ever question Heather McBurney whether

10  she was involved in any injuries to Madison McBurney.

11  The sole focus of their inquiry was the criminal

12  responsibility of Steven McBurney.

13         And why is that important?   Why is their

14  subjective belief important?   Because it was

15  conveyed to Mr. McBurney.   It was conveyed to him

16  repeatedly throughout the interrogation.

17         First of all, the question about Nicholas

18  Kennedy.   This prior case, the injuries, the

19  circumstances of the plea and how the injuries

20  compared to Madison.   Uh --- it was conveyed by the

21  police officers saying that they had evidence that

22  Madison's injuries were non-accidental.   And it was

23  firmly conveyed by Sovik's statement to Mr. McBurney

24  that, 'We know you did it.'   And that statement was

25  made repeatedly.   So under Stansbury (phonetic) it's

95

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    true the subjective beliefs of the officers are not

2    relevant unless they are conveyed to the accused and

3    they certainly were in this case.

4         So before there's any statement that can be

5    construed as incriminating, Mr. McBurney was told in

6    so many --- in very clear language that we, the

7    interrogating officers, know you did it.   Tell us

8    what happened.

9         So then, at that point, is it reasonable for Mr.

10   McBurney, who's testified that at that point he knew

11   he was not free to leave, was it reasonable, Judge,

12   for him to have that conclusion?

13        Uh --- yes, it was reasonable for him to have

14   that conclusion based upon his prior contact, based

15   upon his prior Child Protective Services interview,

16   in the other case when he was actually interviewed,

17   the mother and him together along with the doctor.

18   And in this case when he walks into the room for the

19   interrogation, the Child Protective Service worker

20   that he'd previously met, in so many words says, 'I

21   have --- I need nothing more.'

22        That means I have my mind made up.   There's no

23   interview of Mr. McBurney.   There's no questions of

24   Heather about any possible --- other possible

25   caregivers.   There's no questions of Mr. McBurney

96

1      about any other responsible person.     Is it

2      reasonable for Mr. --- Mr. McBurney when he said ---

3      when Sovik says, 'We know you did it', to believe

4      that he was in custody?   Yes, it was.

5           And was it reasonable for him to continue to

6      believe that, as he did?   Yes, it was because the

7      interrogation, the accusatory nature of the

8      interrogation continued throughout.

9           Under the totality of the circumstances, he was

10     in custody.   There's no reason why Miranda should

11     not have been given from the beginning or at any

12     point along the line during this interrogation, Your

13     Honor.

14          And I direct your attention specifically to

15     People versus Coomer.   It's at **245 Mich App 206.**

16     When in that case there was a, what police deemed to

17     be a confession, and then a request to have a written

18     statement.   And that written statement was

19     suppressed because there was no Miranda and, in fact,

20     there was a confession.   I believe that's

21     dispositive of the written statement in this case.

22          I'm going to ask you, Judge, to rule that at the

23     beginning of this interview there was no question it

24     was reasonable for him to believe it was for him ---

25     he was in custody.   And certainly at the time that

                              97

1     they made the declarative form that he --- they knew

2     that he was responsible it was reasonable for him to

3     believe.   The length of time that he had been at the

4     hospital, prior contact, CPS's involvement in the

5     case, lack of interview, I believe all those factors,

6     Judge, and the case actually cited by the Prosecution

7     is very helpful for determining the factors the Court

8     should consider.   And all the factors point to ---

9     that this --- that these statements should be

10    suppressed.

11        There's no question there was no Miranda.

12    There's no question that he was never informed that

13    he was going to be free to leave, that he was not

14    under arrest, that --- that he was not in custody.

15        THE COURT:   Do any of those cases indicate that

16    they have uh --- if not an outright express

17    responsibility but some --- some stretch of the

18    imagination suggests that they do have the

19    affirmative obligation to advise him, 'You're free to

20    leave,' or 'You're not under arrest'?

21        MR. WHITE:   Uh --- I'm not saying that.   It

22    goes to the point of the reasonable state of mind.

23        THE COURT:   I'm with you.   It's not anything -

24    -- you're arguing that this would lend itself more to

25    had they done that.

1          MR. WHITE:    Right.

2          THE COURT:    But it's not an express requirement

3    obviously?

4          MR. WHITE:    Exactly.   For instance, in People

5    versus Mays, **202 Mich App 181,** at the bottom of page

6    one-ninety (190),

7                    "Although the police officer testified

8                    that the Defendant was free to leave at

9                    any time, there was no evidence that this

10                   message was conveyed to Defendant.

11                   These facts could support finding the

12                   Defendant reasonably believe --- believed

13                   he was not free to leave."

14         THE COURT:    Right.

15         MR. WHITE:    And again, who selected the time of

16   the interview?    It's quite different from the prior

17   case.    The police officer is who selected the place

18   of the interview, who selected who was present.    All

19   these were conditions imposed upon my client.

20         So, Your Honor, I do believe People versus

21   Coomer says the written statement stays out.    All

22   the cases, People versus Zahn (phonetic), People

23   versus Rourke, uh --- the Stansbury versus California

24   case referenced by sister Counsel, all support a

25   finding that he was in custody, certainly, at least

1       at the time when they said, 'We know you did it', and

2       then repeated it.

3           Thank you.

4           THE COURT:   Thank you, Mr. White.

5           MS. POPE-STARNES:   No, there is no case law

6       that says the officers have an affirmative belief to

7       say you're free to leave.   And, in fact, one of the

8       things this case law talks about is, it is not

9       uncommon for police officers to get a confession, to

10      have enough to arrest someone and to let them leave,

11      to get a warrant at another period of time to

12      complete their investigation.   And then, later have

13      the person arraigned.   And that was this Defendant's

14      experience.

15          I cite in uh --- the memorandum of law,

16              "The police are not required to guess at

17                  their peril the precise moment at which

18                  they have probable cause to arrest a

19                  suspect, risking a violation of the

20                  Fourth Amendment if they act too soon

21                  and a violation of the Sixth Amendment

22                  if they wait too long."

23              Hoffa versus United States.

24          The fact that Sarah Weaver was present at one

25      point really isn't relevant.   The Defendant said on

                              100

1     cross-examination when he met her the day before she

2     didn't introduce herself as a protective services

3     worker.    So there is no evidence he knew a

4     protective services investigation was going on.

5          He talked about these people, these men,

6     standing shoulder to shoulder in the hallway.    But

7     the officers testified they were brought up in the

8     elevator by one person, that he was wearing a

9     windbreaker.    That --- and the Defendant said,

10    'These people weren't wearing any type of jackets.

11    The officer said, 'The same person that brought them

12    up was the same person that took them down.'

13         The officers testified there were no other

14    police officers there.    There was a security person

15    that had to escort them to the floor because that's

16    how you got access from the elevators to that unit.

17    They never asked for police officer assistance.

18    They never asked for the security guard's assistance.

19         The Defendant said he doesn't know who these

20    people were.    The police officers testified that the

21    person that they met was a security guard.    And they

22    were asked repeatedly throughout their testimony,

23    could you see outside the window when you were out in

24    the hallway?    Were any of the security people there?

25    And they said, 'No.'

101

1                    The person sitting closest to the door during

2          this investigation is the person whose experiences

3          that after he admits some responsibility for an

4          action involving a child, he's allowed to leave.

5          The time ---

6                    THE COURT:    (Interposing)    What's that last

7          part that you just said that the fact that ---

8                    MS. POPE-STARNES:    (Interposing)    His prior

9          experience is that he's allowed to leave after he

10         admits some responsibility.    That's this Defendant's

11         personal experience.

12                   THE COURT:    What relevance is that here?

13                   MS. POPE-STARNES:    Because it goes to his

14         beliefs.

15                   THE COURT:    But I thought it was objective,

16         thought it was objective, not his.

17                   MS. POPE-STARNES:    But in the total totality of

18         the circumstances it goes to that.

19                   THE COURT:    So did you ---

20                   MS. POPE-STARNES:    (Interposing)    It talks in

21         the case law ---

22                   THE COURT:    (Interposing)    Hold on.    Let me

23         just ask you, am I on the right track?    You're

24         saying it's an objective review but to determine the

25         objectivity you nevertheless look at the subjective

1    facts?

2         MS. POPE-STARNES:    Yes.    And the case law

3    talked about you can look at a suspect or Defendant's

4    prior experience with policemen.    And that's why

5    it's relevant, to help the Court in making a

6    determination of the totality of the circumstances.

7         THE COURT:    To determine whether something is

8    objective you can look at it subjectively.

9         Hey, I'm not arguing.    If that's what the law

10   is that's what the law is.

11        MS. POPE-STARNES:    You can look at the person's

12   personal experiences.

13        THE COURT:    The particular person ---

14        MS. POPE-STARNES:    (Interposing)    Yes.

15        THE COURT:    (Continuing) although I'm looking

16   at an objective perspective?

17        MS. POPE-STARNES:    Yes.

18        THE COURT:    So be it.    Let the higher powers

19   speak.

20        Go ahead.

21        MS. POPE-STARNES:    The Defendant wants this

22   Court to believe that just simply saying, 'We know

23   you did it,' is communicating to a person that they

24   are not free to leave.    That they've communicated

25   that to the Defendant.    That is not correct.    The

                         103

1    test for custody is whether under objective

2    circumstances a reasonable person would believe that

3    his movement is restrained to a degree associated

4    with formal arrest.

5        The statement, 'We know you did it', doesn't

6    communicate you're under arrest.  You are not free

7    to leave.  I'm going to put you in handcuffs.

8    You're going to jail.  It doesn't communicate that.

9        That's what the Defendant's arguing here.  And

10   looking at the totality of the circumstances that's

11   not what was going on.  His wife was allowed to come

12   into the room.  The police left the room and left

13   them alone.  It is not a reasonable belief that he

14   was not free to leave.

15       And again, there was no communication that he

16   was under arrest or in custody until after the

17   officers walked back in and saw that written

18   statement sitting on the table with a pen on top of

19   it.  He'd already executed that statement.  He'd

20   already made it.

21       So their subjective belief from when they're

22   standing out in the hallway and they've talked to the

23   duty Prosecutor and they say to each other, 'You know

24   what?'  'We better arrest him.'  'We don't know if

25   he's going to run.'  'We don't know if he might hurt

104

1      himself.'    'We think we're going to go in and arrest

2      him.'    That statement's already made.    It's already

3      done.    It's admissible.

4          I would ask the Court not to suppress either of

5      the statements and to allow both into evidence.

6          THE COURT:    Thank you, Counsel.

7          Well presented.

8          It's now twenty minutes to five o'clock (4:40

9      p.m.) and I appreciate the deputies willingness to

10     stick around but I don't want to rush to justice.    I

11     will review these matters and you can take him back

12     down now.

13         Thank you, Deputies.

14         And I'd ask Counsel, I know, Mr. White, you're

15     on Dixie Highway aren't you?

16         MR. WHITE:    No, I moved over to near ----

17     Tunuta's, Judge.

18         THE COURT:    To where?

19         MR. WHITE:    On Meigs.

20         THE COURT:    Where's that?

21         MR. WHITE:    It's about a mile and a half from

22     my old office.

23         THE COURT:    Oh.

24         MR. WHITE:    On Dixie Highway.

25         THE COURT:    Okay.    Okay.

105

1    Umm --- can you meet me in the office tomorrow?

2    MR. WHITE:   I'll be here tomorrow morning in

3    front of Judge Warren.

4    THE COURT:   Okay.   You're in a jury trial so

5    we're just going to have to coordinate.   Both of you

6    just check with us and we'll see because I'll try to

7    ---

8    MR. WHITE:   (Interposing)   I'll give your

9    clerk my cell phone.

10   THE COURT:   All right.   Very well.   Then

11   we'll try to track you down.

12   MS. POPE-STARNES:   I'll be with Judge Chabot.

13   THE COURT:   And deputies --- you want your

14   client to be here I take it if I have a ruling

15   tomorrow?

16   MR. WHITE:   Yes, Judge.

17   THE COURT:   I can respect that.   Can you uh --

18   -

19   THE DEPUTY:   (Interposing)   You want him to

20   appear tomorrow?

21   THE COURT:   Bring him downstairs tomorrow and

22   then we'll ---

23   THE DEPUTY:   (Interposing)   Yes, Your Honor.

24   THE COURT:   (Continuing)   call him when we

25   need him.

106

1           THE DEPUTY:   Okay.

2           THE COURT:   All right.

3           Thank you, folks.

4           MR. WHITE:   This is just a matter of

5     housekeeping.   He doesn't need to be here.   The

6     pretrial is scheduled for Monday.   Could we have an

7     adjournment for one week?

8           THE COURT:   Well let's --- we'll deal with that

9     tomorrow.

10          Okay?

11          MR. WHITE:   Okay.

12          THE COURT:   Thank you then.

13          MR. WHITE:   Thank you.

14          THE COURT:   Good night.

15          (Whereupon the matter was concluded.)

16                * * * *

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

      I, Barbara Reznick, Court Reporter, do hereby certify that the foregoing pages comprise a full, true, and correct transcript of the proceedings had In the Matter of Jenkins before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on September 25, 2007.

                        *Barbara Reznick*

                  Barbara Reznick,   CER 1333

                  1200 N. Telegraph, Pontiac, MI. 48341

                  248) 858-5841

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313