STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN

OAKLAND COUNTY   07-214651-FC

Plaintiff,

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

V                                No. 07 214651FC

STEVEN LINDSEY MCBURNEY

Defendant

_____/

JURY TRIAL

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

FEBRUARY 21, 2008
* * *

OAKLAND COUNTY CLERK
BY: _____
DEPUTY COUNTY CLERK

2008 AUG 14  A 11: 25

RECEIVED FOR FILING

APPEARANCES:

Sara Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of Defendant

Barbara Reznick, Court Reporter

1

# I N D E X

**PAGE**

**OPENING STATEMENTS**

By Ms. Pope Starnes...................................37
By Mr. White.........................................51


**WITNESSES-PROSECUTION**

**ATHENA SIKAVITSAS**
    Direct Examination, by Ms. Pope-Starnes..........77
    Cross-Examination, by Mr. White.................110
    Redirect Examination, by Ms. Pope-Starnes.......138
    Recross-Examination, by Mr. White...............141


**HEATHER MCBURNEY**
    Direct Examination, by Ms. Pope-Starnes..........143
    Cross-Examination, by Mr. White.................178


**EXHIBITS**

    Exhibit 1.........................................82
    Exhibits 2 through 6............................176
    Exhibit B........................................191
    Exhibit I........................................260
    Exhibit H........................................261
    Exhibit D........................................264
    Exhibit
J.........................................266266

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1                          Pontiac, Michigan
 2                          THURSDAY, FEBRUARY 21, 2008
 3                    * * *
 4          THE CLERK:   The Court calls People versus
 5   McBurney, case number 07 214651 FC.
 6          MS. POPE-STARNES:   Good morning Your Honor.
 7   Sarah Pope-Starnes, assistant prosecuting attorney.
 8          THE COURT:   Good morning.
 9          MR. WHITE:   Robert White appearing on
10   behalf of Mr. McBurney.
11       Let me first apologize Judge.   We were supposed
12   to be back to you yesterday about whether this is ---
13   whether we continue today with picking the Jury or
14   whatever.   I'm sorry.   I completely forgot.
15          THE COURT:   Don't worry.   Forgot.   Sounds
16   like my brother.   I forgot.
17          MR. WHITE:   Well I'm telling the truth.
18   Your brother I can't vouch for.
19          THE COURT:   That's another story.   All
20   right.   No problem.
21       What do you guys --- folks think?
22          MS. POPE-STARNES:   I just notified the
23   Court yesterday morning that I don't have an objection
24   to just seating thirteen (13) Jurors.   I think
```

3

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    everything is clear with all of them.    Umm --- what

2    we're talking about in regards to time.

3              THE COURT:    Okay.

4              MR. WHITE:    My fear Judge is that we're

5    going to have a problem with the length of the trial.

6    I do believe that.    I do believe we're going to have

7    a problem.    Maybe somebody, maybe more than one but

8    then you know we'd have a problem with starting the

9    trial over again.

10             THE COURT:    So you tell me.    I --- I ---

11   whether ---

12             MR. WHITE:    (Interposing)    I do believe we

13   need fourteen (14) Jurors.

14             THE COURT:    Okay.    Is there any dispute if

15   we go that route and I yield to that, if I decide to

16   do that and go that route, that we've got to bring in

17   these thirteen (13)?    Have them sit as I go through

18   the good morning Ladies and Gentlemen and all that

19   stuff?

20             MR. WHITE:    Your Honor, can I do this?

21             THE COURT:    Believe me Mr. White, because

22   I'm not --- I'm not disagreeing with your perspective.

23   I'm just taking it all in.    So don't --- don't read

24   me the wrong way.

25             MR. WHITE:    Can I --- can I do this.    Can

                              4

1   I have ten minutes and run down to talk to my guy?

2        THE COURT:   Yeah.

3        MR. WHITE:   Would that be possible?

4        THE COURT:   Yes.   Yeah.   Sure.

5        MR. WHITE:   Okay.

6        MS. POPE-STARNES:   Judge we have three

7   other brief things that I'd like to ---

8        THE COURT:   (Interposing)   In fact, I

9   think your client's coming up Mr. White anyway.   So

10  go ahead Ms. Pope-Starnes.

11       MS. POPE-STARNES:   Number one, umm--- in

12  the discussion of the records we were talking about

13  earlier this morning.   Counsel indicated that he had

14  an objection to a line from the University Of Michigan

15  Medical records from Doctor Leena Dev's report.   The

16  sentences he's objecting to are, 'The child protection

17  team was notified on December second, two thousand ---

18       THE COURT:   (Interposing)   Go a little bit

19  slower when you read it.

20       MS. POPE-STARNES:   (Continuing)   I'm

21  sorry.

22     'On December second, two thousand and six (2006),

23  Madison's father admitted to throwing Madison in the

24  crib.'

25     \    The second sentence was, 'The team was also

5

1    notified that the father had previous conviction for

2    child abuse for the shaking of another infant in

3    nineteen-ninety-eight (1998)'.

4        I agree the word conviction should not be in

5    there.   I believe that should simply be struck from

6    the sentence.

7            THE COURT:   Read it without that word in

8    there.

9            MS. POPE-STARNES:   The team was also

10   notified that her father had a previous blank for

11   child abuse for the shaking of another infant in

12   nineteen ninety-eight (1998).

13           THE COURT:   That sounds like the elephant

14   in the room.

15           MS. POPE-STARNES:   Well we can change the

16   word.   We can put in the word investigation.   That's

17   the word that the Court has allowed.   I have no

18   objection to doing that.

19           THE COURT:   Okay.

20      So we want to take them piecemeal Mr. White?

21           MR. WHITE:   The first sentence is regarding

22   the notification by Officers Sederlund and Sovik about

23   the admission of he threw the child into the crib.

24           THE COURT REPORTER:   I can't hear you.

25           MR. WHITE:   I'm sorry.   I'm sorry.

6

1    First sentence. Well obviously she's

2 introducing her records before officers testify. So

3 we're putting the cart before the horse. And I

4 assume they're going to testify that that's what he

5 said. Okay, so that's just a matter of timing.

6     THE COURT: Okay.

7     MR. WHITE: Okay.

8   And uh --- and assuming that the officers are

9 going to testify in which I believe that they are, you

10 know as long as that is not published to the Jury

11 before they're testifying. I assume that they're

12 going to testify and conform as therewith, there's not

13 a problem Judge.

14     THE COURT: Okay.

15     MR. WHITE: The second sentence, I believe

16 it should be deleted altogether. Uh --- in view of

17 the evidence that we have agreed and you have ordered

18 would be entered, that is, the records from Children's

19 Hospital and the testimony of Detective Sederlund

20 about a child abuse investigation. There is a

21 conclusion in that sentence that is uh --- that is not

22 permissible. That is that there was an admission of

23 shaking okay? There is a dispute of shaking.

24     THE COURT: Hold on a minute. Are we

25 still talking about Madison's father's statement or

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1    the statement by your client as to Madison?

2           MR. WHITE:   No as to Nicholas.

3           THE COURT:   Oh.   We're at the Nicholas

4    matter?

5           MR. WHITE:   Yes.

6           THE COURT:   The statement one more time Ms.

7    Pope-Starnes is?   Say it again for me.

8           MS. POPE-STARNES:   'The team was also

9    notified that her father had a previous ---

10          THE COURT:   (Interposing)   Investigation.

11          MS. POPE-STARNES:   (Continuing)   for child

12    abuse for the shaking of another infant in nineteen-

13    ninety-eight (1998).'

14          THE COURT:   One more time slower.   Say it

15    again.

16          MS. POPE-STARNES:   'The team was also

17    notified that her father had a previous investigation

18    for child abuse for the shaking of another infant in

19    nineteen ninety-eight (1998).

20          THE COURT:   Okay.   Okay.

21      Go ahead Mr. White.

22          MR. WHITE:   There is a dispute, and you'll

23    see Judge about whether that the previous child

24    Nicholas was actually shaking or where there was a

25    skull fracture caused by a fall.   I'm concerned that

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    the sentence is a conclusion that there was a finding
2    of shaking, okay?   Because there is a dispute I
3    believe the proper sentence should read, The team was
4    also notified that her father had a prior ---
5    previous child abuse investigation.   And that's it.
6             MS. POPE-STARNES:   Again Judge, I go back
7    to the basis for the no contest plea is the sentence,
8    'The stipulation is that the Defendant recklessly
9    caused serious physical harm to Nicholas Kennedy by
10   shaking him.'
11            THE COURT:   Well let me ask you this.
12            MS. POPE-STARNES:   He wants to relitigate -
13   --
14            THE COURT:   (Interposing)   Well let me ask
15   you this.
16            MS. POPE-STARNES:   (Continuing)   what's
17   already been litigated.
18            THE COURT:   How duplicative by itself might
19   not be dispositive but it's how --- how do you --- why
20   do you need it again Ms. Pope-Starnes.
21            MS. POPE-STARNES:   Well because first of
22   all they're arguing that the old and new or the
23   chronic and acute subdural hematomas are from this
24   chronic condition and not from abuse.   And Doctor Dev
25   I believe is going to testify that it's her opinion

                              9

1    based on the records of the MRI from August of two

2    thousand and six (2006) as well as the CAT scan from

3    September eleventh of two thousand and six (2006),

4    that there's old abuse.   That the priors are abuse,

5    the prior subdural hematomas.

6              THE COURT:   Even if ---

7              MS. POPE-STARNES:   (Interposing)   There's

8    a history of this Defendant of abuse of this child.

9    And his abuse of Nicholas is important for the Jury to

10   know.   This is not an accident and he knows what will

11   happen when he treats a child like that.

12             THE COURT:   Let me ask you this.   What

13   would be the relevance if Ms. Reznick said to the

14   Jury, 'It's been reported that the father had an

15   incident or an investigation with the son before'?

16        In terms of the speaker, this is the people who

17   have worked on Madison who are talking about what

18   someone else did with respect to Nicholas.   What's

19   the relevance of this person or the author of that

20   document speaking as to what someone else told them?

21             MS. POPE-STARNES:   This is the director of

22   the child protection team.   This is the expert in

23   pediatrics and child abuse and she testifies and gives

24   her opinion based on all the information she has.

25             THE COURT:   So is she relying on propensity

10

1    evidence to draw her medical conclusion that it was

2    shaken baby syndrome this time?

3            MS. POPE-STARNES:   It's not propensity

4    evidence Your Honor.

5            THE COURT:   Well why did that author utter

6    those words in writing?

7            MS. POPE-STARNES:   Because it's ---

8            THE COURT:   (Interposing)   What is it ---

9            MS. POPE-STARNES:   (Continuing)   part of

10   her consideration in everything that she is looking

11   at.

12           THE COURT:   Why?   And I don't mean to be

13   cute but why?   Why didn't they talk about pickles?

14   There has to be some thread connecting.   I have

15   diagnosed that Madison was abused and here is my basis

16   for it.   Her head was in this condition.   The bed

17   was in this condition.   And the father had a previous

18   child abuse with Nicholas.   It sounds precisely like

19   that person made the diagnosis based on propensity.

20           MS. POPE-STARNES:   And there's no medical

21   evidence and there's been no history given that is

22   consistent with an accident.   That she was in an

23   automobile accident.   That she fell from two or three

24   stories causing this type of trauma.   But they're

25   going to argue that this is a chronic subdural

                        11

1    hematoma that rebled.   That it's a medical condition.

2    And this goes to that.

3            THE COURT:   Okay.   Anything further?

4            MS. POPE-STARNES:  No.

5            THE COURT:  Mr. White, anything further?

6            MR. WHITE:   Uh --- yes.   I do believe

7    Judge because Doctor Uscinski will testify that this

8    hematoma that was diagnosed on the August thirty-first

9    (31st) MRI could have been as a result of birth.

10    Could have been as a result of a February sixteenth,

11    two thousand six (2006) fall in which the child was

12    seen at St. Joseph Mercy Hospital.   There is medical

13    evidence to support that this hematoma that ultimately

14    became a chronic subdural hematoma ---

15            THE COURT:   (Interposing)   I --- I've

16    interrupted her and I'll interrupt you, respectful

17    without trying to be offensive.   But it sounds like

18    all we're doing is arguing the whole entire Nicholas

19    evidence matter all over again.

20      And my simple question is why it's not

21    duplicative and why it should come in?   Since it's --

22    - I've already ruled.   I've already ruled that it's

23    coming in.

24            MR. WHITE:   Right.

25            THE COURT:   She's given me further support

12

1    for it and you're giving me further reason against it.

2    I just want to know why is this not duplicative and

3    what do you need it again for?   And maybe you

4    answered it Ms. Pope-Starnes.

5            MR. WHITE:   Well I'm --- I'm sorry.

6            THE COURT:   Go ahead.

7            MR. WHITE:   I got off track Judge.

8        My belief is it should not come in through these

9    records whatsoever.   Okay?   Whatsoever.

10           THE COURT:   Why not?

11           MR. WHITE:   Because there's another

12   vehicle.   Because I don't want the conclusion in

13   there that there's a finding in a previous case of

14   abuse that there was shaking when there's disputed

15   evidence and disputed evidence as to shaking.

16   Disputed evidence as to the nature and cause ---

17           THE COURT:   (Interposing)   I --- I see

18   your hand Ms. Pope-Starnes.

19           MS. POPE-STARNES:   Well it's in the

20   Children's Hospital medical records.

21           THE COURT:   Just --- just a second.

22           MR. WHITE:   Well ---

23           THE COURT:   (Interposing)   We're getting -

24   -- we're getting a little bit too loose here.

25           MR. WHITE:   Well all I asked is this

13

1    particular --- you know, we've addressed the sentence

2    regarding the possible testimonies of Sevik --- Sovik

3    and Sederlund.   You know, again, as long as that's

4    not published ---

5              THE COURT:   (Interposing)   We got it.   We

6    got it.

7              MR. WHITE:   Okay.   The second is, there is

8    no reason for it at this point if you've said there is

9    another vehicle for it to come in.   I don't want

10   there to be the possibility of contradictory evidence.

11   You know this, this needs to be redacted altogether.

12   It's not necessary Judge for this particular witness

13   at this particular ---

14             THE COURT:   (Interposing)   You're not

15   needing this for opening statements are you Ms Pope-

16   Starnes?   This particular item here?

17             MS. POPE-STARNES:   No.   What these records

18   will come in through the first witness.

19             THE COURT:   Okay.

20        Let me take a look at that document and let's ---

21   and I'll give you an answer shortly.   It might not be

22   until after the opening statements but we'll do it

23   before a witness testifies if you present that.

24        What else do you have?

25             MS. POPE-STARNES:   The other issue I have

14

1    Your Honor is umm --- if they are going to accept

2    thirteen (13) Jurors then I just need a few minutes to

3    setup my PowerPoint for my opening.

4              THE COURT:    Well do you want to talk ---

5              MS. POPE-STARNES:    (Interposing)    I need

6    to do that and if you want to give me a few to do

7    that.    Furthermore umm --- the crib, I believe is in

8    the chambers.    Counsel has indicated that he would

9    like that setup before mother's testimony but that he

10   wouldn't need that till this afternoon.    Umm --- so I

11   would just like a few minutes for the officers to be

12   able to do that before the start of her testimony so

13   that that is done.

14        And finally mother indicated on Monday that she

15   is considering requesting that she be allowed to sit-

16   in through the trial so that she can hear all the

17   evidence.    Umm --- and Counsel umm --- I was present

18   when Counsel told her that he was concerned that he

19   might need to call her in rebuttal.    And I'd like to

20   indicate to the Court that under the Crime Victim's

21   Rights Act umm --- which is **MCL 87 --- 80 point 751**

22   and then the ensuing statutes.    **752 paragraph 12**

23   says,              **"Victim means any of the following:**

24                      **I or double I**

25                      **The following individuals other than**

15

1                    **the Defendant if the victim is**

2                    **deceased sub paragraph c, a parent of**

3                    **the deceased victim."**

4        It further goes on to state at **780 point 761**

5                    **"A victim has a right to be present**

6                    **throughout the entire trial of the**

7                    **Defendant unless the victim is going to**

8                    **be called as a witness.   If the victim**

9                    **is going to be called as a witness the**

10                   **Court may for good cause shown order the**

11                   **victim to be sequestered until the**

12                   **victim first testifies.   The victim**

13                   **shall not be sequestered after he or she**

14                   **first testifies."**

15       Now it was my intent to call Mrs. McBurney as

16   first witness.   Because we had an issue and we're not

17   going yesterday, and I have a doctor that's leaving

18   tonight I need to call her first.   I intend to call

19   Mrs. McBurney as the second witness.

20       But I would ask pursuant to the Crime Victims

21   Rights Act that after she first testifies, if she

22   wishes to sit-in for the trial that she be allowed to

23   do so pursuant to the Crime Victims Rights Act.

24             THE COURT:   Well it's hard for me.   I'm

25   not going to issue any advisory opinions.   I don't --

16

1    - does she choose or if --- or is it yeah, you can.

2    And then she doesn't even show up.   I'm not going to

3    make the call unless I have to.

4              MS. POPE-STARNES:    She's here and she said

5    she would like to make the decision as soon as she is

6    done testifying.

7              THE COURT:    And then she can make that

8    decision and I'll address it at that time.

9              MS. POPE-STARNES:    Your Honor I'm bringing

10   this to the Court's attention now is the case law is

11   clear this issue must be addressed outside the

12   presence of the Jury.

13             THE COURT:    Anything Mr. White?

14             MR. WHITE:    All I ask Judge is that if she

15   is in this courtroom, you know, after she testifies,

16   there is the possibility because we have so many

17   witnesses that she may have to be called as part of

18   the defense witnesses also.   So that she not be

19   disqualified because she sat in this courtroom.

20   That's all I ask is that if you're going to make a

21   ruling that says allows her in this courtroom after

22   the conclusion of her testimony as part of the

23   Prosecutor's case-in-chief that that not disqualify

24   her because there may be something that comes up where

25   I need her as part of ---·

17

1          THE COURT:   (Interposing)   How do you

2    address the statute in her argument that first

3    testifies, means first testifies and therefore she's

4    free to sit in here.   They don't talk about rebuttal.

5    First testifying, I guess Ms. Pope-Starnes, the same

6    means the first literal time she testifies.   And the

7    second time in rebuttal doesn't qualify for first

8    testifies.   In other words, I'm interpreting the

9    statute.   How do you --- how do you respond?

10        It sounds like what you're saying is first

11   testifies kind of as a broad encompasing phrase that

12   encompasses her whole time that she testifies in the

13   trial whether it's in the case-in-chief, in rebuttal

14   or what.   I've just got to get your perspective on

15   the statute.

16          MR. WHITE:   Actually Judge can I look at

17   the statute for a second?

18          THE COURT:   Yes.

19        Do you want to take a minute and talk to him?

20          MR. WHITE:   Yeah.   Can I take a minute and

21   talk to him and then we may be able to streamline this

22   somewhat.

23          THE COURT:   Okay.   Okay.   Very well.

24   Let me know when you folks are ready.

25        And can I get a copy of that, the thing, the

18

1   record?

2          (Whereupon a brief recess was had.)

3                      * * *

4          THE CLERK:   The Court calls People versus

5   McBurney, case number 07 214651 FC.

6          THE COURT:   Ms. Pope-Starnes, Mr. White,

7   your appearances are noted for the record.

8       Your client is here.

9       Good morning everyone.

10      And as to the number of Jurors, Mr. White?

11         MR. WHITE:   Your Honor, I just conferred

12  with Mr. McBurney and I believe we're satisfied with

13  the Juror selection of thirteen (13) Jurors.

14      And if I may ask my client to agree?

15         THE COURT:   Sure.

16         MR. WHITE:   You're Mr. Steven McBurney?

17         THE DEFENDANT:   Steven McBurney, yes.

18         MR. WHITE:   And we've discussed the fact

19  that we could have another Jury pool brought in and a

20  fourteenth (14th) Juror selected?   And at the end,

21  you know that there's only twelve (12) there that go

22  in the Jury room.   And that by having thirteen (13)

23  we're waiving our right to have that possible

24  alternate.   Do you understand that?

25         THE DEFENDANT:   I understand that.

                        19

1          MR. WHITE:    And is that your wish?

2          THE DEFENDANT:    That is my wish.

3          MR. WHITE:    Okay.

4          THE COURT:    Okay.    All right.

5      And likewise so stipulate, Ms. Pope-Starnes?

6          MS. POPE-STARNES:    Yes as previously

7      indicated.

8          THE COURT:    Let's all keep our fingers

9      crossed then.    Thank you.

10     And then we have the issue about the statute and

11     Madison's mother.    And I think there's kind of a

12     concession or a recognition of the statute, that if

13     she chooses after she testifies to stay she may do so?

14         MR. WHITE:    That's correct.

15         THE COURT:    Okay.

16         MS. POPE-STARNES:    And I've advised her of

17     the conversation of the Court in chambers and that

18     it's up to her and she's free to come in and to leave

19     whenever she chooses.

20         THE COURT:    Okay.

21         MS. POPE-STARNES:    And she doesn't have to

22     ask the Court's permission.

23         THE COURT:    Thank you.    All right.    Very

24     well.

25     The last issue is the matter concerning the

1   document that I've received which I will uh --- just

2   call it, it's entitled University Of Michigan

3   Hospitals and Health Centers medical Documents.   And

4   in the lower right hand corner it's noted as page

5   thirty-seven (37) of ninety-one (91).

6        And uh --- is it, first of all both parties

7   stipulate that --- that the document must be modified.

8   The uh --- let me back up.   Is it this document that

9   also contains the statement by the father that you

10  were talking about Mr. White or is that a different

11  document?   That it comes in but recognizing that it's

12  going to be followed up by the Detective's testimony?

13            MR. WHITE:    That's correct.

14            THE COURT:    That's in this document?

15            MR. WHITE:    That is the sentence that

16  precedes the sentence you're addressing.

17            THE COURT:    Gotcha.    Okay.

18       So all right.    There being no dispute as to the

19  --- that statement, we'll leave it at that.    I'll

20  adopt a stipulation of the recognition by the parties

21  in that regard.

22       The last issue that the Court is called upon to

23  decide is the statement that reads as follows:

24       "The team was also notified that her father had a

25  previous conviction for child abuse for the shaking of

21

1     another infant in nineteen ninety-eight (1998)."

2          Both parties stipulate that that statement in

3     that document must be modified.   The Prosecutor says,

4     "To modify it by substituting investigation for

5     conviction."

6          The Defendant says uh --- agrees with that and

7     also says in addition remove the reference to the word

8     shaking.   Uh --- the Prosecutor's argument against

9     removing the reference to shaking is well thought out

10    however the Court yields to the Defendant here for the

11    reasons that he stated.   Though the Court has

12    admitted evidence elsewhere uh --- of this, the Court

13    finds it duplicative here and getting a bit far afield

14    from the purpose behind the document.   Perhaps it is

15    not far afield from a doctor's or a medical

16    professional's perspective but this Court finds

17    respectfully that it is a bit far afield from

18    evidentiary perspective.   So I'll leave it to Counsel

19    to modify that accordingly.   And I think that covers

20    everything preliminarily?

21          MS. POPE-STARNES:   Well I believe Counsel

22    asked that the entire sentence be struck.   Is the

23    Court ordering the sentence be struck or that those

24    two particular words be taken out?

25          THE COURT:   Just the two words.   And I

1    thought that was the position of the defense in any...

2        Is that correct Ms. ---

3        I know you were for the reasons stated in

4    pretrial motions think the whole sentence should be

5    struck but recognizing the Court's previous rulings

6    and yield to that and your proposal was those couple

7    of words, correct?

8            MR. WHITE:    Yes.

9            THE COURT:    Okay.

10           MR. WHITE:    The Court recognizes my

11   objection to the ---

12           THE COURT:    (Interposing)    Thank you.

13           MR. WHITE:    (Continuing)    evidence as a

14   whole but ---

15           THE COURT:    (Interposing)    That's reserved

16   for ---

17           MR. WHITE:    (Continuing)    conviction and

18   shaking should be struck.

19           THE COURT:    Very well.    All right.

20           MR. WHITE:    And it should be struck.    So -

21   -- but I don't --- my fear Judge is that the Jury

22   starts examining it, that sentence and what we do with

23   it, they're going to try and put in things, you know.

24   That's my fear is that they're going to try and fill-

25   in the blank.

23

1          THE COURT:   In fairness, I'm only reacting

2     to the different proposals that everybody gave.   And

3     *once I get rid of conviction and put in investigation*

4     *and there wasn't any dispute over that and I've*

5     *accepted that.*

6          MR. WHITE:   I did ask ---

7          THE COURT:   (Interposing)   It is what it

8     is.   I've ruled so...

9     Jeff, can you give that back to the Prosecutor?

10    And are we ready to proceed then?

11         MS. POPE-STARNES:   Yes.

12         THE COURT:   Okay.

13    We'll have the Jury brought in and then I'll go

14    through the preliminary instructions.   And then it'll

15    take us ten minutes or so and then we'll proceed right

16    to opening statements.

17    Just so Counsel is aware as well, I'll kind of

18    informally mention to the Jurors since I did tell them

19    before that we were going to choose fourteen (14) that

20    we've agreed to go with only thirteen (13).

21    THE CLERK:   Please rise for the Jury.

22    (Whereupon the Jury was returned to the courtroom.)

23         *  *  *

24         THE CLERK:   Please be seated.

25         THE COURT:   The record will reflect that

                              24

1   the Jury is back.   Well the possible Jury.   We'll

2   get to that in just a couple of moments.

3        The case has been called.   Counsels' names have

4   been noted for the record.

5        And uh --- let me just say I apologize though

6   we've been working on this matter and you've been

7   sitting back there for a while.   And I know you were

8   prompt when I asked you to come back at eight-thirty

9   (8:30) and I appreciate that.   Even though you've

10  been sitting back there a long time, I think that

11  we've actually, believe it or not, saved some time.

12  As you can see we have seat number four vacant.   And

13  we were going to have to bring in a whole new batch of

14  potential Jurors and go through the whole entire thing

15  all over again.   Counsel has agreed that we will,

16  even though I said we would select fourteen (14)

17  Jurors, we're going to proceed with only one

18  alternate, thirteen (13), keeping our fingers crossed

19  obviously that everything will be all right.   That

20  will save, in addition to let us getting things going,

21  it will save a whole lot of time so that we can

22  proceed now.   So Counsel has agreed to only proceed

23  with thirteen (13) rather than fourteen (14).   And we

24  do have a Jury subject to you all taking the oath.

25       So with that Ladies and Gentlemen of the Jury, I

25

1      --- I have to read these additional instructions to

2      you.

3          You have been chosen to decide the criminal

4      charge made by The State Of Michigan against one of

5      your fellow citizens.

6          Are we empty?

7              MR. WHITE:    I was just looking for some

8      cups.

9              THE COURT:    Okay.

10         Jeff, in a couple of minutes do you have the oath

11     ready?

12             THE CLERK:    Yes Your Honor.

13             THE COURT:    Okay.   We'll get you folks

14     that.

15         Now I'm going to ask you to stand and swear to

16     perform your duty, to try the case and justly reach a

17     true verdict please.

18         By the way, I don't know if it's applicable here

19     but if anyone has any religious beliefs that do not

20     permit you to take the oath, then I just ask you to

21     affirm to try the case justly and reach a true

22     verdict.   And if you'd just listen to Mr. Rondack

23     (phonetic) now and raise your right hands to be sworn.

24             THE CLERK:    **Do you swear that you will well**

25     **and truly try the issues pending before the Court and**

26

1  **unless discharged by the Court render a true verdict?**

2  **And that you will do so solely on the evidence**

3  **introduced and in accordance with the instructions of**

4  **the Court, so help you God?    If so, say 'I do.'**

5        THE JURORS EN MASSE:    **I do.**

6        THE COURT:   Okay.    Thank you everyone.

7     If you would please be seated.

8     I do have some preliminary instructions to go

9  over with you.    It'll be about ten minutes or so and

10 then we're going to proceed to opening statements.

11 So just, if you would, please just keep this --- just

12 listen attentively.

13    A person accused of a crime is presumed to be

14 innocent.    This means that you must start with the

15 presumption that the Defendant is innocent.    This

16 presumption continues throughout the trial and

17 entitles the Defendant to a verdict of not guilty

18 unless you are satisfied beyond a reasonable doubt

19 that he is guilty.

20    Every part --- every crime is made up of parts

21 called elements.    The Prosecutor must prove each

22 element of the crime beyond a reasonable doubt.    The

23 Defendant is not required to prove his innocence or to

24 do anything.    If you find that the Prosecutor has not

25 proven every element beyond a reasonable doubt then

27

1    you must find the Defendant not guilty.

2         A reasonable doubt is a fair honest doubt growing

3    out of the evidence or lack of evidence.   It is not

4    merely an imaginary or possible doubt but a doubt that

5    is based on reason and common sense.   A reasonable

6    doubt is just that, a doubt that is reasonable after a

7    careful and considered examination of the facts and

8    circumstances of this case.

9         A trial follows this procedure.   First, the

10   Prosecutor makes an opening statement where she gives

11   her theories about the case.   The Defendant's lawyer

12   does not have to make an opening statement but he may

13   make an opening statement after the Prosecutor makes

14   hers or he may wait until later.   These statements

15   are not evidence.   They are only meant to help you

16   understand how each side views the case.   Next the

17   Prosecutor presents her evidence.   The Prosecutor may

18   call witnesses to testify and may show you Exhibits

19   like documents or exhibits.   The Defendant's lawyer

20   has the right to cross-examine the Prosecutor's

21   witnesses.   After the Prosecutor has presented all

22   her evidence, the Defendant's attorney may also offer

23   evidence but does not have to.

24        By law the Defendant does not have to prove his

25   innocence or produce any evidence.   If the Defense

28

1    does call any witnesses the Prosecutor has the right

2    to cross-examine them.    The Prosecutor may also call

3    witnesses to contradict the testimony of the defense

4    witnesses.

5        After all the evidence has been presented the

6    Prosecutor and the Defendant's lawyer will make their

7    closing arguments.    Like the opening statements these

8    are not evidence.    They are only meant to help you

9    understand the evidence and the way each side sees the

10   case.    You must base your verdict only on the

11   evidence.

12       My responsibilities as the Judge in this trial

13   are to make sure that the trial is run fairly and

14   efficiently, to make decisions about evidence and to

15   instruct you about the law that applies to this case.

16   You must take the law as I give it to you.    Nothing I

17   say is meant to reflect my own opinions about the

18   facts of the case.

19       As Jurors you are the ones who --- you are the

20   ones who will decide this case.    Your responsibility

21   as Jurors is to decide what the facts of the case are.

22   This is your job and no one else's.    You must think

23   about all the evidence and all the testimony and then

24   decide what each piece of evidence means and how

25   important you think it is.    This includes how much

                              29

1    you believe what each of the witnesses said.   What

2    you decide about any fact in this case is final.

3       When it is time for you to decide this case you

4    are only allowed to consider the evidence that was

5    admitted in the case.   Evidence includes only the

6    sworn testimony of the witnesses, the Exhibits

7    admitted into evidence and anything else I tell you to

8    consider as evidence.

9       It is your job to decide what the facts of this

10    case are.   You must decide which witnesses you

11    believe and how important you think their testimony

12    is.   You do not have to accept or reject everything a

13    witness says.   You are free to believe all, none, or

14    part of any person's testimony.   In deciding which

15    testimony you believe you should rely on your own

16    common sense and everyday experience.   However in

17    deciding whether you believe a witness's testimony you

18    must set aside any bias or prejudice you have based on

19    the race, gender, or national origin of the witness.

20       There is no fixed set of rules for judging

21    whether you believe a witness but it may help you to

22    think about these questions.   Was the witness able to

23    see or hear clearly?   How long was the witness

24    watching or listening?   Was anything else going on

25    that might have distracted the witness?   Does the

1   witness seem to have a good memory?   How does the

2   witness look and act while testifying?   Does the

3   witness seem to be making an honest effort to tell the

4   truth or does the witness seem to evade the questions

5   *or evade --- evade the questions or argue with the*

6   lawyers?   Does the witness's age or maturity affect

7   how you judge his or her testimony?   Does the witness

8   have any bias or prejudice or any personal interest in

9   how this case is decided?   Have there been any

10   promises, threats, suggestions or other influences

11   that affect how the witness testifies?   In general,

12   does the witness have any special reason to tell the

13   truth or any special reason to lie?   All in all how

14   reasonable does the witness's testimony seem when you

15   think about all the other evidence in the case?

16      The questions the lawyers ask the witnesses are

17   not evidence only the answers are evidence.   You

18   should not think that something is true just because

19   one of the lawyers asks questions that assumes or

20   suggests that it is.

21      I may ask some of the witnesses questions myself.

22   These questions are not meant to reflect my opinion

23   *about the evidence.   If I ask the questions my only*

24   reason would be to ask about things that may not have

25   been fully explored.

1      During the trial the lawyers may object to

2  certain questions or statements made by the other

3  lawyer or witnesses.    I will rule on these objections

4  according to the law.   My rulings for or against one

5  side or the other are not meant to reflect my opinions

6  about the facts of the case.

7      Sometimes the lawyers and I will have discussions

8  out of your hearing.   Also while you are in the Jury

9  room I may have to take care of other matters that

10  have nothing to do with this case.   Please pay no

11  attention to these interruptions.

12      You must not discuss the case with anyone

13  including your family or friends.   You must not even

14  discuss it with the other Jurors until the time comes

15  for you to decide the case.   When it is time for you

16  to decide the case I will send you to the Jury room

17  for that purpose.   Then you should discuss the case

18  amongst yourselves but only in the Jury room and only

19  when all the Jurors are there.   When the trial is

20  over you may wish --- you may, if you wish, discuss

21  the case with anyone.

22      If I call for a recess during the trial I will

23  either send you back to the Jury room or allow you to

24  leave --- allow you to leave the courtroom to go on

25  and about your business.   But you must not discuss

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1 the case with anyone or let anyone discuss it with you

2 in your presence. If someone tries to do that tell

3 him or her to stop and explain that as a Juror you are

4 not allowed to discuss the case. If he or she

5 continues, leave and report the incident to me as soon

6 as your report to Court. You must not talk to the

7 Defendant, the lawyers or the witnesses about anything

8 at all even if it has nothing to do with the case.

9 It is very important that you only get information

10 about the case in Court when you are acting as the

11 Jury and when the Defendant, the lawyers and all ---

12 and I are all here.

13     I don't know if this is going to be applicable

14 but just to be safe. During the trial do not read,

15 listen to, or watch any news reports about the case.

16 We talked about that earlier if you remember.

17     Under the law the evidence you consider to decide

18 the case must meet certain standards. For example,

19 witnesses must swear to tell the truth and the lawyers

20 must be able to cross-examine them. Because news

21 reports do not have to meet these standards they could

22 give you incorrect or misleading information that

23 might unfairly --- unfairly favor one side or the

24 other. So to be fair to both sides you must follow

25 this instruction.

33

1    Okay.  That's another emphasis I'm not reading

2    any news reports.

3    Do not go to the scene of the alleged crime.  If

4    it is necessary for you to view the scene, I don't

5    think this will be applicable, but you would be taken

6    there as a group under my supervision.  Do not

7    investigate anything about this case or make your own

8    experiments.

9    You may take notes during the trial if you wish

10   but, of course, you don't have to.  If you do take

11   notes you should be careful that it does not distract

12   you from paying attention to all the evidence.  When

13   you go to the Jury room to decide your verdict, you

14   may use your notes to help you remember what happened

15   in the courtroom.  If you do take notes, do not let

16   anyone except the other Jurors see them.  And then

17   we'll probably have to figure out an arrangement for

18   note pads and so forth.  Umm --- in fact, so I don't

19   forget a couple of things and I'm going to digress for

20   just a moment.  We'll get engrossed and I might be

21   doing some things here or getting involved in

22   listening to Counsel, if anybody needs to take a

23   break, feel free to raise your hand.  Just let us

24   know.  And likewise if there is anybody that uh ---

25   would want some note taking just let us know and then

34

1    we can distribute the uh --- the note pads for you.

2    And you can bring them in with you otherwise.   And

3    assuming no one does then we'll just continue and rely

4    on your collective memories, okay?

5       *You can see that we have chosen a Jury of*

6    *thirteen (13) as I've talked about.   After you've*

7    *heard all the evidence and my instructions, we will*

8    *draw lots to see --- to decide which one of you will*

9    *be dismissed in order to form a Jury of twelve (12).*

10      Possible penalties should not influence your

11   decision.   It is the duty of the Judge to fix the

12   penalty within the limits provided by the law.

13      I may give you more instructions during the

14   trial.   And at the end of the trial I will give you

15   detailed instructions about the law in this case.

16   You should consider all of my instructions as a

17   connected series.   Taken altogether they are the law

18   that you must follow.

19      After all the evidence has been presented and the

20   lawyers have given their arguments, I'll give you

21   detailed instructions about the rules of law that

22   apply to this case.   Then you will go to the Jury

23   room to decide on your verdict.   A verdict must be

24   unanimous.   That means every Juror must agree on it

25   and it must reflect the individual decision of each

35

1    Juror.

2         It is important for you to keep an open mind and

3    not make a decision about anything in the case until

4    you go to the Jury room to decide the case.

5         Again, I emphasize, anybody needs a break just

6    please, just raise your hand and we'll accommodate

7    you.   I know you're being very cooperative with us

8    and I appreciate that.

9         One of the things that might be helpful

10   especially when we have a large Jury like this, when

11   you go out and when you get ready to come in, maybe

12   lineup out in the hallway out back so nobody is

13   tripping over each other because it is tight quarters

14   in here.   If you think of it, just kind of remember

15   your seat.   And we will leave that spot vacant

16   because it's easier for Ms. Reznick to --- when she's

17   transcribing.   Thanks.

18        No talking about the case.   If you need

19   anything, I think we've got a buzzer or just write a

20   note.   Everything has to be in written form now.

21   You can't just communicate with Mr. Rondack or myself

22   or anyone else.

23        As I've indicated I know both lawyers.   They're

24   very nice folks and they're very personable.   The

25   detective, everybody is really nice.   But if you see

                             36

1    anybody in the hallway just turn away.   And if they

2    do the same thing don't take it personal.   I know

3    that there are sociable folks but we want to avoid

4    even the appearance of impropriety.   So that's kind

5    of the idea behind all of that.

6         So with that, ready to proceed to opening

7    statements Ms. Pope-Starnes?

8              MS. POPE-STARNES:   Yes Your Honor.

9              MR. WHITE:   Yes Your Honor.

10             THE COURT:   Thank you.

11             MS. POPE-STARNES:   May I move the podium

12   Your Honor?

13             THE COURT:   You certainly may.

14             **OPENING STATEMENTS**

15   **BY MS. POPE-STARNES:**

16        Good morning.

17             THE JURORS EN MASSE:   Good morning.

18   Q    **(By Ms. Pope-Starnes, continuing)**   As you know Ladies

19   and Gentlemen, the Defendant is charged with two

20   counts in this case.   Count One is First Degree

21   Felony Murder.   And Count Two is Child Abuse In The

22   First Degree.   Now the Judge was just telling you

23   when he was talking to you about the instructions that

24   it is the responsibility of the People to prove each

25   and every element or part of a crime beyond a

                              37

1  reasonable doubt.

2      Now I want to talk to you about the crimes that

3  the Defendant is charged with.  At the end of the

4  trial the Judge will give you the law.  And you

5  should always follow the law as the Judge gives it to

6  you.  But I want to kind of talk to you about it so

7  that you have a roadmap as we go through this trial

8  and you can compare the evidence to the crime and the

9  elements.

10     Now there was a lot of discussion during Jury

11  selection about television programs.  Things like CSI

12  and House and different programs like that.  And very

13  often on television when you hear about murder, you

14  hear people talking about first degree premeditated

15  murder, murder that is premeditated or planned ---

16  planned.

17     In this particular case we are not talking about

18  first degree premeditated murder.  We are talking

19  about first degree felony murder.  It is a different

20  type of crime.  So I want to talk to you about the

21  parts or the elements of first degree felony murder.

22     First that the Defendant caused the death of

23  Madison McBurney.  That is that Madison died as a

24  result of injuries inflicted by the Defendant causing

25  blunt force trauma.  Now that's the first element of

38

1    felony murder that we need to prove.    Very simply

2    that he caused the death of Madison.

3         The second element or part that we have to prove

4    is one of three things.    And we don't have to prove

5    all three things.    We only have to prove one of those

6    three things.    Either that he intended to kill

7    Madison or that he intended to commit great bodily

8    harm to Madison or that he knowingly created a very

9    high risk of death or great bodily harm knowing that

10   death or such harm would likely be the result of his

11   actions.    And that's the one I'm going to ask you to

12   focus on because that's the one that I think that the

13   evidence will prove in this case, the third part.

14   That he did knowingly create a very high risk of death

15   or great bodily harm knowing that such death or harm

16   would be the likely result of his actions.

17        And finally that he was committing a felony while

18   he did this, the felony of first degree child abuse.

19   First degree child abuse is made up of parts or

20   elements just as felony murder is and they're very

21   simple.

22        Number one that he is the parent or guardian of

23   Madison McBurney.    Number two that Madison was less

24   than eighteen (18) years old when it happened.    And

25   number three that he did knowingly or intentionally

39

1    cause serious physical harm.

2         And when the Judge gives you the instructions at

3    the end of the trial, he'll define for you what

4    serious physical harm is.   That it is things like

5    broken bones or burns or scalds or brain injuries such

6    as subdural hematoma.

7         Now the Defendant is charged in count two with

8    child abuse in the first degree and we've already

9    talked about that.   You already know what those parts

10   or elements are.

11        Ladies and Gentlemen, that's all we have to

12   prove.   We don't have to prove anything else.   We

13   simply have to prove that these parts or elements of

14   felony murder ---

15             MR. WHITE:   (Interposing)   Your Honor I'm

16   going to object.   This does not state the law.   This

17   clearly does not state the law.   If the Prosecutor is

18   saying this is a correct statement of the Jury

19   instructions that you will give that's clearly error

20   Judge.

21             MS. POPE-STARNES:   Your Honor I have stated

22   them for the record.   And my argument is ---

23             MR. WHITE:   (Interposing)   And I asked

24   them to be removed.

25             THE COURT:   One at a time.   One at a time.

                         40

1        MR. WHITE:  Because this is not the law.

2        MS. POPE-STARNES:  I have stated them

3  clearly in my argument directly from the Jury

4  instructions for the Jury.  These are notes as if I

5  was writing on a note board.

6        THE COURT:  I gotcha.

7        MS. POPE-STARNES:  And I can make notes and

8  have notes up there as to the key elements.

9        THE COURT:  Ladies and Gentlemen as I've

10  said to you before and I'll --- yes?

11        A JUROR:  May I be excused for a minute?

12        THE COURT:  Yeah.  In fact we'll hold.

13  Go ahead.  We'll not talk.

14    All rise for the Juror please.

15    You may all be seated.

16    In fact when I say all rise, you guys are the

17  Judges so you can stay seated.

18    Does anyone else need a break?  I mean I know

19  we're just kind of getting started but are you okay to

20  hang tight for a few?

21        THE JURORS:  (No verbal response.)

22        THE COURT:  All right.  We'll just keep it

23  that way.  We'll resume when she comes back.

24    (Whereupon a brief delay was had.)

25        * * *

41

1          THE COURT:    All rise for the Juror.

2      You may all be seated.

3      You okay?

4          THE COURT REPORTER:    I'm fine.

5          *THE COURT:    Okay.*

6      The record will reflect the Juror has come back

7      and uh --- as we were --- and everybody is still here

8      just so the record is clear that was here before.

9      And we were in the Prosecutor's opening statement when

10     I was beginning to tell you, just remind you of there

11     was an instruction.    And I've told you and I'll tell

12     you at the end and I'll tell you again now, what the

13     lawyers say is not evidence.    What we call

14     demonstrative Exhibits or things such as this

15     (indicating), they're not evidence as well.    They're

16     just tools to assist the Prosecutor making her

17     statements.    So what I tell you what the law is, is

18     the law.    And these statements again are not

19     evidence.

20          And Ms. Pope-Starnes, you may proceed.

21          MS. POPE-STARNES:    Thank you.

22 **By Ms. Pope-Starnes, continuing:**    As I was saying Ladies

23     *and Gentlemen, as I've talked to you about the*

24     *elements, that's all we have to prove.    That's it.*

25     We have to prove each of those elements beyond a

42

1  reasonable doubt.  And as the Judge just said, and as
2  I said previously, the Judge will give you the law and
3  talk to you about those same things.  And listen to
4  the law as the Judge gives it to you.

5  Now on November thirtieth (30th) of two thousand
6  and six (2006), Madison McBurney was about eleven (11)
7  months old.  She lived with her parents, the
8  Defendant and his wife Heather McBurney, in the city
9  of South Lyon on Scott Street here in Oakland County.
10 You're going to hear testimony from Heather's mother
11 that --- from Madison's mother Heather, that Madison
12 was born with hip dysplasia and that was being treated
13 first with a harness and later with a brace.

14 You'll hear testimony that on November thirtieth
15 (30th) of two thousand and six (2006) when Madison
16 woke up in the morning she wasn't feeling very well.
17 Mrs. McBurney will testify that she gave her a bath at
18 some point that morning and that Madison threw up at
19 bath time.  But Mrs. McBurney will also testify that
20 at the end of the day when she left for work, Madison
21 had returned to her normal self, had eaten, had kept
22 food down and was fine.  She'll testify that she left
23 for work at about six o'clock pm (6:00pm) and the last
24 time that she saw Madison, Madison was in her crib
25 playing with a toy.

43

1          You'll hear testimony from EMT's and paramedics

2     from the South Lyon Fire Department and from Huron

3     Valley Ambulance that some time around seven-nineteen

4     (7:19) or seven-twenty pm (7:20pm), not even an hour-

5     and-a-half later they were dispatched to Madison's

6     home.   The only people there were Madison and her

7     father.   Madison had been left in the Defendant's

8     care.   They'll tell you that they responded to that

9     home on a call of a child that was having difficulty

10    breathing.

11         You're going to hear testimony from them that

12    when they got there they began immediately to take

13    care of Madison.   They quickly got her in an

14    ambulance and began to transport her to University of

15    Michigan Hospital.   You're going to hear testimony

16    from one first responder that he heard the Defendant

17    say that, 'Madison had been sick all day.'   He'd

18    given her a baby bottle.   He'd gone in the other room

19    and when he came out she was shaking like she was

20    having a seizure.

21         You'll hear testimony from a different first

22    responder that he heard the Defendant say that he'd

23    been feeding Madison in a bouncy seat; that Madison

24    had spit out her bottle and that he picked her up and

25    taken her to her room to change her.   And that when

                              44

1     he got her to her room she stopped breathing.

2          The first responders, the EMTs and the

3     paramedics, are going to testify that they were

4     administering oxygen through a mask valve bagging

5     procedure in the ambulance.   And they'll testify that

6     Madison's condition began to worsen as they were

7     transporting her to University of Michigan Hospital.

8          You'll hear testimony from Doctor Athena

9     Sikavitsas, who was the emergency room physician, who

10    treated Madison.   She'll testify that the history

11    that she was given was that Madison had thrown up

12    three times that day at home.   That she was sitting

13    on the floor with her father, that she made a gurgling

14    or choking noise and fell over and that EMS was

15    called.   The doctor will testify that she intubated

16    Madison in order to make sure that they had an airway.

17    They continued to make sure that she had oxygen.

18    They began to treat her.   And when her condition

19    didn't improve they requested further testing, blood

20    tests and a CAT scan.   And Doctor Sitka ---

21    Sikavitsas will testify that the results of those CT

22    scans or those CAT scans show that Madison had

23    subdural hemorrhaging.   She had brain hemorrhages.

24         She'll testify that Madison was transferred to

25    the pediatric intensive care unit.   And you're going

45

1    to hear testimony that Madison was treated by a

2    variety of physicians, pediatric intensivists,

3    neurologists, neurosurgeons.   You'll hear testimony

4    from Doctor Cormac Maher who was one of the

5    neurosurgeons who treated Madison.   That at one point

6    they placed through a medical procedure something

7    called an ICP monitor, an inter --- intracranial

8    pressure monitor.   And after they did that they

9    learned that her intracranial pressure in her head was

10   very high.   Dangerously high.   She was in much worse

11   condition than they thought.

12        You'll hear testimony about how they continued to

13   treat her over the days.   And that eventually Madison

14   died as a result of those injuries.   You'll hear

15   testimony that an ophthalmologist was called in to

16   consult.   An ophthalmologist examined Madison and

17   found evidence of retinal hemorrhage.

18        You'll hear testimony from Doctor Leena Dev who

19   is the director of the child protection team at Mott

20   Children's  Hospital at University of Michigan.

21   Doctor Dev will testify about her training and

22   experience in evaluating children to see whether or

23   not they have been victims of child abuse or whether

24   or not there are medical conditions that have caused

25   whatever problem is going on with them.   And Doctor

46

1      Dev will testify and say as part of those duties when

2      she went to see Madison, she talked to Madison's

3      parents and she got a history of what happened.    And

4      that she was told when she was given the history that

5      Madison was fine all day.   That she was told by the

6      Defendant that after mother had left for work that he

7      got Madison up, that he gave her a bottle in her

8      bouncy chair, that she spit it out and threw it on the

9      floor, that he picked her up, took her into her room,

10     began to change her diaper, change her into her

11     pajamas, put the brace on her.   That he sat her on

12     the floor while he was finishing up what he was doing

13     and that she was making these gurgling noises and when

14     he went to her she fell over.

15          Doctor Leena Dev will testify that based on

16     Madison's injuries, the retinal hemorrhaging, the

17     subdural hematomas, both old and new, that it's her

18     opinion that this child was the victim of child abuse.

19     That these injuries are consistent with nonaccidental

20     trauma, with abusive head trauma, with something that

21     used to be known as shaken baby syndrome.

22          Ladies and Gentlemen, you're going to hear

23     testimony from Doctor Dragovic who is the Oakland

24     County Medical Examiner.   That after Madison died

25     that he conducted an autopsy.   And that when he

47

1    examined her body, when he looked at the brain, he

2    found extensive injuries consistent with blunt force

3    trauma to this child.   Blunt force trauma to her

4    head.   And he will testify in his opinion that her

5    death was by homicide, that that was the manner of

6    death.

7        You'll hear testimony from the detectives that

8    were assigned from the South Lyons Police Department

9    that they were notified on December second of two

10   thousand and six (2006) that Madison was in the

11   hospital and there were concerns and suspicions about

12   her injuries.   That they began to conduct their

13   investigation speaking with witnesses and late on

14   December second they went to University Of Michigan

15   Hospital.   They met there with Sarah Weaver from

16   Washtenaw County Protective Services and spoke with

17   her.   They met with a doctor and they spoke with him

18   and got information about Madison's medical condition

19   and what was going on.   And then in a conference room

20   they spoke to Madison's mother with a nurse and Sarah

21   Weaver from protective services present.   After they

22   spoke with her they spoke with the Defendant.   And

23   you'll hear testimony that he was not in custody at

24   the time.

25        The detectives will tell you that he gave them a

48

1    story fairly consistent with what the Defendant had

2    told Doctor Dev from the child protection team.    But

3    that they confronted him and told him that was not

4    consistent with Madison's injuries.    You'll hear

5    testimony that eventually Madison's mother was brought

6    back into the room with the detectives and the

7    Defendant.    And the detectives will testify that at

8    that point the Defendant began to admit what had

9    happened.

10    That he claimed that Madison had been screaming

11    and crying while he was changing her diaper and into

12    her pajamas and putting on her brace.    That she

13    continued to scream and cry.    That he picked her up

14    and she was screaming and crying in his ear so he

15    threw her a distance of approximately two feet.    He

16    threw her and her head struck the crib and she began

17    seizing.

18    Now Ladies and Gentlemen, you're going to hear

19    testimony from Detective Sergeant Paul Sumner from the

20    Northville Township Police Department.    And the

21    purpose of this testimony is to show that this was not

22    an accident and that the Defendant knew what the

23    likely result of his actions were.    Knew what rough

24    handling of a child can result in.    There will be

25    Exhibits admitted about the medical records of a child

49

1    by the name of Nicholas Kennedy who is the son of the

2    Defendant, who at age four-and-a-half months was taken

3    to Children's Hospital of Michigan with skull

4    fractures, subdural hematomas and retinal

5    hemorrhaging.

6        And you'll hear testimony from Detective Sergeant

7    Sumner that he investigated the cause of Nicholas's

8    injuries.  You'll hear testimony from him that the

9    Defendant admitted his actions that caused the injury

10   to his son.  That the Defendant told him that

11   Nicholas was screaming and that he bounced him too

12   hard.  He admitted that he bounced him harder than

13   his mother would.  The purpose of this evidence is to

14   show the Defendant knew what would happen if he was

15   too rough in the handling of an infant.

16       Remember we talked about the second thing that we

17   have to prove.  We have to prove one of those three

18   things.  Knowingly create a very high risk of death

19   or great bodily harm knowing that such death or such

20   harm would likely be the result of his actions.  And

21   the People will admit the testimony of Detective

22   Sergeant Sumner and those medical records from

23   Children's Hospital for the purpose of evidence of

24   showing that he knew.

25       The People will prove beyond a reasonable doubt

50

1       each and every element of the crime of First Degree

2       Felony Murder and First Degree Child Abuse.   The

3       evidence that comes from this stand and the Exhibits

4       that are admitted will show the Defendant knowingly

5       committed this crime.   And at the end of this trial

6       Ladies and Gentlemen, the People will ask you to find

7       the Defendant guilty as charged of First Degree Felony

8       Murder and First Degree Child abuse.

9            Thank you.

10               THE COURT:   Thank you Ms. Pope-Starnes.

11           Mr. White.

12               **OPENING STATEMENT**

13   **BY MR. WHITE:**

14           As I indicated to you when we were going through

15       the selection process this --- this case will

16       challenge every bit of your being to your core.

17       Viscerally, intellectually, everything that we as

18       human beings are and hope to be will challenge you in

19       deciding the case, deciding the fate of this gentleman

20       accused of murdering his daughter.   It will be, in my

21       opinion, the toughest decision that you will ever have

22       to make about someone else's life other than your own

23       and your families.

24           In the opening statement an accusation by the

25       Prosecution, they're emotionally charged.   And the

                                51

1    idea throughout this for the witnesses will be to

2    attack your emotions because we have a dead eleven

3    (11) month old little girl.  Let your emotions be so

4    high that you cannot intellectually sort through the

5    evidence and lack of evidence.

6         And what you'll see though when you pay attention

7    to the testimony, to the Exhibits, to that which was

8    not said, that which was not proven, is that the

9    charges against my client are more a product of

10   ambition, of agenda, of protocol and a refusal to

11   admit that there may have been a mistake made in a

12   diagnosis long before November thirtieth (30th).

13        The evidence will show that Steven, Heather,

14   Steven graduated from Farmington High School in

15   nineteen ninety-three (1993), parents Jim McBurney and

16   Cindy McBurney.  Has a brother Chris.  Heather

17   graduated from Brighton High School in nineteen ninety

18   (1990).  Family of Gary --- her mother is Susan

19   Linville, father Gary Linville and she has a sister

20   Shannon.

21        Steve went off to Ferris State and returned after

22   about a year-and-a-half.  Heather pursued her nursing

23   degree and obtained it from Oakland County Community

24   College.  And she had been a registered nurse for

25   over nine years.  All the time that she's been going

52

1    out with Steven.   Steve during the period of time

2    that he's been dating and eventually marrying Heather,

3    worked for S. M. Lawn Service and not only lawn crews

4    but snow removal.   They met through their mutual

5    friend Kyle in July of two thousand two (2002) and

6    started dating in September, two thousand two (2002).

7    And at that point Steve is working for S. M. Lawn

8    Service and Heather is working where she works now and

9    that is Heartland Healthcare in Ann Arbor in the care

10   of the elderly.

11        They eventually start living together in July of

12   two thousand three (2003) in an apartment in Novi and

13   then the house on Scott Street in South Lyon.   The --

14   - it was purchased by Heather in two thousand four

15   (2004) and at the end of April moved in.   And they

16   were married in March of two thousand five (2005) in

17   Las Vegas attended by their friends and family.

18        They --- it appears that they conceived at their

19   reception a short time later because Heather found out

20   that she was pregnant.   And they're living in the

21   house on Scott Street excited about the fact that they

22   were going to have a baby.   Heather's pregnancy was

23   uncomplicated other than the fact that she had a

24   condition which I can't quite pronounce in which she

25   monitored this on a daily basis many times per day.

                           53

1        On December twenty-seventh (27th), two thousand

2    five (2005) she was going in for a checkup.    It

3    wasn't her due date but it was determined, discovered

4    that she was --- the baby was breech and the baby

5    needed to be born right away.    And there she went

6    from her ob-gyn's office directly to St. Jo's.

7    Actually she went home first, got Steve and went to

8    St. Jo's and they had their baby, Madison Olivia

9    McBurney.    Born with both hips dislocated.    Born C-

10   section and breech before she was taken by Cesarean

11   section.    In all other respects other than some spots

12   that were on her head she was a healthy baby.

13        No one quite had an explanation for the spots but

14   Heather was --- Madison was taken home on December

15   thirtieth (30th) uh --- to the house that they lived

16   in.    They had her room prepared.    Umm --- and six

17   weeks later Heather returned to work for Heartland

18   Healthcare.    Steve was not working at the time during

19   the day because of obviously it being the winter he

20   was doing lawn --- he was doing snow at night.  So

21   when Heather returned to work during the day Steve

22   would watch Madison during the night.    And when Steve

23   returned to work in the spring, the lawn service,

24   Heather switched to the night shift so they could

25   alternate.    And this was the way Madison was cared

54

1    for, for the whole summer up until the fall.    And it

2    was two ambitious young people trying to make do,

3    alternating the childcare arrangements.

4         But then it became apparent that there was a

5    concern about Heather driving home at night, so early

6    in the morning after working and then only getting

7    three, four hours of sleep a day, the possibility that

8    she could fall asleep.   So they said, 'We have to

9    entertain the idea of childcare.   We have to.'

10        And they did.   And as good parents they

11   interviewed as many as five different childcare places

12   in the South Lyon, Novi area.   They finally selected

13   Pitter Patter on Ten Mile Road in South Lyon.   And uh

14   --- she was there from October eighteenth (18th) until

15   November fourteenth (14th).   And you'll hear from two

16   of the witnesses that cared for her, the director Lynn

17   Peterson and really the primary caregiver Sharon

18   Klump, about their experience with Madison.   And they

19   will tell you that she was a delightful little girl.

20   And, in fact, at that point the only girl in the

21   infant's category at the range of this age group.

22   That she never screamed.   She only cried once and

23   that was a little bit.   That she was brought in the

24   morning by her father who would be waiting in the

25   parking lot for them to open at seven o'clock (7:00).

                              55

1    She would be brought in clothed, fed.  He would make

2    them aware of her --- how she was doing and uh ---

3    embrace her, kiss her and then be on his way.   And

4    then her mother would pick her up in the afternoon.

5        And they will also tell you they'd never been

6    interviewed by the police.   Never been interviewed by

7    the Prosecutor the last time I talked to them.   Never

8    been contacted about anything about this case.   This

9    is --- they stopped it on November fourteenth (14th)

10   is the last day of childcare.   Why?   Because the

11   child was diagnosed with MRSA, a methicillin-resistant

12   Staphylococcus aureus.   It is a staph infection of --

13   - that is very contagious.   So when the diagnosis was

14   given on November fourteenth (14th) that the child had

15   this, that the child had to be removed from childcare

16   because of the potential of infection to other

17   children.

18       And then the part Steve and Heather went back.

19   Heather had to go back to the nightshift.   Steve

20   providing care during that period of time vice-versa.

21       Testimony will show that Madison's conditions

22   where she had besides her hips being dislocated, she

23   had what's called this hip dysplasia on the left side.

24   It's a shallow hip socket which requires the use of a

25   harness called a pub --- Pavlik harness which helped

56

1   her keep her hips or legs in so that she could

2   properly mold her own bones.

3       She also had something with spots on her head

4   were eventually diagnosed as aplasia cutis congenita.

5   It is a skin, a dermatological condition which near

6   the sutures of the skull the skin does not form over

7   the --- as quickly as it should and actually in this

8   case remained open a lot longer than expected.    And

9   the parents, both Steve and Heather, were wondering

10  why these, especially this one spot would not heal and

11  then it became apparent on November fourteenth (14th)

12  why.    It was because she had a staph infection.    But

13  besides the well-baby checkups that she had with

14  Doctor Adams of Brighton Family Care, the treatments,

15  the regular treatments for hip dysplasia, the ACC

16  aplasia cutis congenita, and the MRSA prior to

17  November thirtieth (30th), two thousand six (2006),

18  there were as many as thirty-two (32) different

19  contacts with doctors and in a variety of capacities

20  her pediatrician, uh --- her doctor's seeing her for

21  her hip, including the doctors at U of M, the doctors

22  seeing her for the conditions on her head.

23      Now why is that important?

24      Why is that important?

25      Because you've heard and you'll hear this over

57

1    and over again, is that Madison was repeatedly abused.

2    Repeatedly abused.    That's the finding of U of M on

3    November thirtieth (30th) and thereafter.    That she

4    was subject to repeated abuse by their viewing of the

5    MRI's and the CT scans that showed old and new

6    hematomas, subdural hematomas.    The dura is a

7    connective tissue directly under the skull.    And a

8    subdural hematoma is a collection of blood under that

9    and a hemorrhaging.    And they say that because there

10   is old and new blood in these hematomas, hemorrhaging,

11   that she was a victim of continuing child abuse.

12         And I will tell you now and I will tell you at

13   the end of the case, find one shred of evidence to

14   support that.    One shred.    A bruise, a scrape, an

15   observation of Steve's mishandling of her.    Anything,

16   anything to support medically or by a lay person's

17   observation, anything to support the conclusion that

18   this child was subject to repeated child abuse over

19   possibly months of time.    There will --- the

20   Prosecutor will not present one witness that will

21   testify that they saw Steve --- that they saw anything

22   on Madison.    A grandparent, a friend, the mother who

23   was a registered nurse, a neighbor, anybody that's to

24   support a finding of physical evidence that she was an

25   abused child.

                          58

1        So how can the hospital say that this is evidence

2    of repeated abuse?   This is --- there's no question.

3    You'll hear the terms and some of you know that the

4    terms acute, subacute, and chronic.   Acute meaning in

5    medical terms, acute meaning of recent origin.   Sub -

6    -- and sometimes there's a variety of definitions, but

7    one to three days.   Subacute is midrange three to

8    fourteen (14) days.   Chronic is fourteen (14) days

9    and greater.   And they will say at the hospital that

10   she had acute blood, acute hemorrhaging, subacute and

11   chronic.   That is weeks, not only a recent injury but

12   old, old injury also.   And it will show that they'll

13   say that that old injury could have extended weeks and

14   months back.

15       And, in fact, Madison had an MRI at the

16   University of Michigan in conjunction with her

17   diagnosis for aplasia cutis congenita on August

18   thirty-first (31st), two thousand six (2006), which

19   showed possible blood products in the brain.   A

20   possible hematoma.

21       And because of that the pediatrician was notified

22   and they decided let's follow-up.   Let's see that

23   this --- what could this be.   So they had a CAT scan,

24   a CT scan on September eleventh (11th) and the CT scan

25   didn't show that although the records clearly showed

59

1     that the radiologist said there's a possibility that

2     the scan could not pickup this level of blood in the

3     brain.    But everything was left at that.    There's

4     nothing further done.    This blood that was on her

5     brain on August thirty-first (31st), two thousand six

6     (2006), became a chronic subdural hematoma.

7          And you'll hear from Doctor Ronald Uscinski in

8     this case and I believe it will be next Tuesday the

9     twenty-sixth (26th), a renowned pediatric

10    neurosurgeon, how some thirty (30) years experience,

11    who regularly operates and conducts his medical

12    practice in conjunction with his practice as an expert

13    witness.    That this August thirty-first (31st), two

14    thousand six (2006). The MRI was a red flag that the

15    child had a hematoma.    And that hematoma could have

16    been caused by an innocuous event.    It could have

17    been caused on February sixteenth (16th).    It could

18    have been caused by her birth.    It could have been

19    caused by a fall on February sixteenth (16th), two

20    thousand six (2006) when Steve was watching Madison.

21    He picked her up in her bouncy seat and tried to step

22    over something and he dropped her.    He dropped her to

23    the floor.    He --- Heather was contacted.    Steve

24    brought Madison to Ann Arbor where she was working and

25    from there they went to St. Josephs Mercy Hospital.

60

1    And the child was fully examined.  No x-rays were

2    taken.  No tests were done but she was released and

3    the idea that if there was any kind of further problem

4    that she should immediately --- the parents should

5    immediately seek emergency help and the use of

6    Tylenol.

7         Doctor Uscinski will tell you that acute subdural

8    hematomas, that is this bruise and this blood, the

9    medical profession doesn't know how they're created

10   per se, or how much force is created per se.   I

11   should say how much force.  It could be something

12   innocuous.  It could be something uh --- traumatic.

13   But Doctor Uscinski will tell you this.  They do

14   sometimes acquire a life of their own in the young and

15   in the old.  What happens is the blood begins to

16   accumulate and have a membrane.  And in a young

17   person's skull, the skull continues to expand and grow

18   and so does the brain.  But the hematoma, by its very

19   nature, at sometimes will bring in new blood and grow.

20   And the brain and skull actually accommodate it.

21        What happens with old people as we get older, our

22   skull stays the same but our brain shrinks.  And

23   chronic subdural hematomas in old people are common in

24   that because the space is created in the subdural

25   space.

61

1    And no one ever says, 'Well it must be abuse to

2    an old person', because they have a chronic subdural

3    hematoma.   But the prevailing thought and you'll see

4    it in the U of M doctors, a chronic subdural hematoma

5    in a young person must be nonaccidental in treatment.

6    And this chronic subdural hematoma became symptomatic

7    on November thirtieth (30th), two thousand six (2006)

8    before Heather had left for work.   We're not sure

9    when but we know this.   The conditions under which --

10   - the conditions of Madison throughout the day had

11   been downplayed.   That she was well.   Let's hear the

12   doctor's notes or see the doctor's testimony.

13   Doctor Dev will say that the parents said that,

14   'She was well all day.'

15   That's absolutely incorrect.   That's not what

16   they said.   She vomited at least three times.   She

17   had spit up when she woke up.   When Heather gave her,

18   her bath at approximately ten am (10:00am), she, as

19   she was leaning Madison forward, she vomited so hard

20   Heather characterized it as projective.   She vomited

21   again later.   Heather will tell you that she was

22   whiny and clingy all day, something quite different

23   from her disposition.   She will also tell you that as

24   she leaned Madison back to change her diaper on at

25   least two occasions that she gave a pained expression

62

```
 1    as if there was pain in the neck or her head.   Her

 2    mother, the registered nurse, will tell you this

 3    observe --- these observations are her child.

 4         And she went to work and you will hear some very,

 5    very difficult testimony from the mother of this child

 6    about second-guessing her decision to go to work.

 7    The practice was, because Madison had separation

 8    anxiety, that she --- both Heather and Steve when they

 9    would leave the room she would --- she never cried,

10    what she did was whine.   The suggestion that she

11    screamed, screamed on November thirtieth (30th), two

12    thousand six (2006), no one will ever support that.

13    No person, no person who knew Madison will every say

14    that she ever screamed once in her life.   Not a

15    childcare worker, not a relative, not --- not the

16    mother of the child.   Madison was a happy baby who

17    rarely cried and if she did cry it was over quickly.

18    But because she had the separation anxiety, she ---

19    they would put her down before Heather would go to

20    sleep, put her in her crib.   And then let her have

21    her powernap and then Steve would get her up.

22         Now she had had a cold approximately two weeks

23    before.   Steve took her to Doctor Adams and it wasn't

24    really, you know, she had some fever umm --- so

25    Heather took her back.   She had doctor's appointments
```

63

1    up to November twenty-fourth (24th) for, I believe

2    that was her last appointment, for uh --- her aplasia.

3    But on this particular night, Doctor Uscinski will

4    testify that those symptoms that were presented to her

5    mother and father on that day, are classic signs of

6    nervous system dysfunction.    That this chronic

7    subdural hematoma was becoming symptomatic at bed.

8        Detectives Sederlund and Sovik, both work for the

9    South Lyon Police Department.    One thirteen (13)

10   years, one fifteen (15) years,  very, very nice

11   fellows.    When they received the call to come into

12   the office, the South Lyon Police Department on

13   Saturday to be assigned to this case, umm --- this was

14   going to be --- this is their first big case.    Never

15   worked on a homicide before as an officer-in-charge.

16   Suspected child abuse report even though Madison was

17   still viable at this point that there's probability

18   the child will not survive.    And when they get to the

19   police department they are apprised of the facts that

20   there's a prior child abuse investigation involving

21   Steven McBurney.    That was, in their mind, that

22   created a target.    They had one --- one suspect and

23   one out and that is that Steven McBurney is the one

24   who did it and Steven McBurney must have done it

25   intentionally.

64

1    So they went through, they'll testify, some

2    efforts before they're going to embark upon their

3    evening of investigation.   They went, they'll tell

4    you, and tried to obtain some kind of recording

5    device.   Something because they were going to go and

6    speak to another police department.   They were going

7    to go to the hospital.   They were going to interview

8    medical personnel.   They were going to interview the

9    mother of the child.   And they were going to

10    interrogate Steven McBurney.

11    And they'll tell you that they were not capable

12    for some reason or another, of obtaining a device that

13    would record these statements.   And that they decided

14    it was going to be note taking in a field that they

15    really had no knowledge of and a possible homicide

16    case in which both of them were, at this point, it's

17    approximately (inaudible), both of them stood

18    deprived.

19    And they interviewed Sarah Weaver, the protective

20    services worker.   They interviewed a Doctor Fleming

21    and then they interviewed Heather with no intent of

22    ever asking Heather any questions of it's --- it's a

23    possible child abuse case.   There was never any

24    belief in their mind that Heather was responsible.

25    They had idea who she was.   They wanted --- they

65

1    wanted evidence against Steve McBurney.   They wanted

2    evidence against him.   And they certainly did not get

3    it from Heather McBurney because she was truthful and

4    there's no suggestion whatsoever that Steve would ever

5    or did harm Madison.

6        So then they interrogated Steve in this

7    conference room at approximately two o'clock (2:00) in

8    the morning, December third.   And the interrogation

9    proceeded for approximately two hours in which Steve

10   said at some point, 'My life is over.'

11       And that's in quotes in this police recount of

12   the events that evening.   And they --- Sergeant Sovik

13   said, 'Would it be easier for you to discuss this with

14   Heather in the room?'

15       And he said, 'Please, please.   Get my wife.'

16       And so they went to Madison's room or actually

17   the nurse did and got Madison --- Heather from

18   Madison's room at the pediatric intensive care unit at

19   University of Michigan Hospital.   Brought her into

20   the room where Steve was.   The sarge --- sergeant,

21   there was a silence.   Sergeant Sovik says, 'Steve

22   wants to tell you he made a mistake.'

23       And Steve says quote, 'I made a mistake.'

24       Quote 'I threw her into the crib.'   That's all

25   he said.

66

1          There was some other discussions about childcare

2     arrangements and how she was earlier in the day uh ---

3     and --- but those are the things that the police

4     officers in their note taking attribute to my client

5     *saying in that hospital conference room directly on*

6     *December third, two thousand six (2006) early in the*

7     *morning.*

8          But you'll see that there's been a lot added

9     including the word screamed.   That she screamed in

10    his ear.   That he was mad.   That he threw her from

11    two feet away.   That her head hit one of the rails.

12         Heather will testify that it's her firm belief

13    that they were being recorded by a device that

14    Sergeant Sovik had with him.   Either it was a camera,

15    a recording device, something that he had on his

16    person that eventually made it to the floor.   Now

17    he'll deny this over and over again, that there was

18    any recording device.   This is the year two thousand

19    and eight (2008) that the police are going to

20    investigate a homicide without some level of

21    recounting what the accused actually said.   And they

22    actually left the room to allow Heather and Steve to

23    talk alone.   And Heather said, 'Look, they're

24    recording us.'

25         This will be denied.   They'll say that they took

67

1    notes.   They took notes.   And even though on October

2    --- April twenty-seventh (27th) of two thousand seven

3    (2007) in a prior hearing on this case, Sergeant Sovik

4    testified that these notes may still be around the

5    police department, somehow they got shredded.

6    Somehow they got shredded.   And it appears that now

7    they're going to say, 'They were shredded right after

8    they completed their police report.'

9        Let's analyze the witnesses that will come

10   forward to testify about whether this particular act

11   of throwing her into her crib, 'I threw her into her

12   crib', is enough to cause these injuries.   The

13   prosecution has suggested that, through it's testimony

14   of the medical examiner, that this blunt force trauma

15   is sufficient to cause the nature and extent of the

16   injuries that Madison presented at the emergency room

17   on November thirtieth (30th) two thousand and six

18   (2006).   That's the finding of Doctor Dragovic who'll

19   testify next Monday I believe.   That's not in

20   accordance with the findings of the University of

21   Michigan.   Because first of all, there's no evidence

22   of any external injuries on her.   None.   This child

23   is gone over, over and over again.   Not a bruise, not

24   a scrape.   The skeleton x-ray, nothing.   Nothing.

25   She was a healthy well-nourished baby.

68

1    So there's a problem with the proofs that the

2    prosecution intends to offer to support this medical

3    examiner's testimony.   There's a problem with the

4    medical --- with the U of M testimony that she must

5    have been a shaken baby.   Well you can have a shaken

6    baby, you know, without --- supposedly without

7    external signs of injury but it's not uncommon to have

8    some people grab the arms so hard that there's

9    bruises.   Sometimes there's rib fractures.   And a

10   baby that is so severely abused there's not --- it's

11   not uncommon to have other signs of injury.   But we

12   have none of that.   There's nothing.

13   And you will hear Doctor Uscinski testify that

14   this theory of shaking baby --- shaken baby is

15   predicated upon what's called rapid acceleration

16   deceleration of forces that cause the brain to

17   violently bounce, bounce against the skull.   And that

18   theory is based upon some studies that were

19   misinterpreted over the years and --- but now as

20   sister Counsel said, 'They're abandoning this.

21   They're now moving away from shaken baby into abusive

22   head trauma.'

23   Why?   Because Doctor Uscinski will tell you that

24   long before the brain of an infant can sustain damage

25   as a result of being shook, assuming the human body

69

1    can create enough force, you'd have to have injury to

2    the neck.    You're talking about an eleven (11) month

3    old baby.    A human being doesn't even hold his or her

4    head up until four months independently.    And we have

5    *absolutely not a shred of evidence that this child's*

6    neck was in cervical strain, fractured, anything to

7    suggest that.

8        Murder and murder with the intent to cause death

9    or serious physical harm or creating a risk of serious

10   physical harm knowing that death or serious physical

11   harm could occur.    Carelessness, poor judgment, and

12   you may even find this repulsive, that he threw her

13   into her crib, and this --- that it's under that.

14   The cover right there it's got to be uncovered here

15   quickly.

16       Ask yourselves when you hear the testimony

17   whether anybody has done anything to substantiate that

18   the child's head hit a bar on that crib, a rail.    One

19   shred of forensic evidence.    Show me the bar that it

20   hit.    Show me a point of impact on the skull.    Did

21   they even look?    No.    They had Steve's statement, 'I

22   threw her into her crib.'

23       And from that they extrapolated.    Well we have

24   to fill in the blanks because this isn't enough.    She

25   could have just hit the pad.    Doctor Dragovic will

70

1    tell you, 'That's enough.'    If he threw her down into

2    her crib onto her mattress and let's say that that

3    point consists of approximately two feet, that's

4    enough to cause the nature and extent of these

5    injuries.    Old and new.

6        There is a target placed on Steve as a result of

7    the prior investigation ten years ago.    The facts of

8    the police and the medical professionals have been

9    tailored towards finding a result that supports a

10   finding of intentional injury to this child.    Not

11   only intentional injury, intentionally fatally

12   injuring this child.

13       We discussed it during the Jury selection because

14   we have to be able to sort out why this evidence is

15   being submitted to you.    How is it important?

16   Whether it has any relevance in you deciding whether

17   Madison McBurney was murdered by her father as he

18   attempted to cause her serious physical harm as he

19   did?

20       The reason is, you'll see now, that in this case

21   it has been brought up because there's not one shred

22   of evidence to support a finding that he intended to

23   hurt his daughter.    Throwing her into her crib is

24   repulsive.    It's just a terrible, terrible parental

25   act out of frustration.    But is it enough to cause

71

1    what happened?   No, it's not, in --- in no

2    conceivable set of facts.   There's one explanation

3    for what happened to Madison McBurney.   She had a

4    chronic subdural hematoma.   It's capable of

5    rebleeding spontaneously even without trauma.   Even

6    minute amounts of trauma can cause a subdural --- a

7    chronic subdural hematoma to go into symptomatic

8    state.   And that's what happened on November

9    thirtieth (30th).   And that's why there was so much

10   old blood in the hemorrhaging as well as new blood.

11        And I'll ask you to look at that date when you

12   hear all the testimony of witnesses and how many

13   doctors and how many people were in her life on a

14   regular basis would ever, ever offer any evidence that

15   she was subject to repeated abuse.   She was adored by

16   her father and she adored him.   She was adored by her

17   mother who she adored also.

18        Now you can at the conclusion of this case you

19   can say 'Steven McBurney is a careless irresponsible

20   man.'   But he is not a murderer.   He did not murder

21   his daughter.   He did not intend to cause her

22   physical harm by throwing her into her crib.   You

23   might --- might find that repulsive but

24   intellectualize, cognize the facts, separate the

25   emotions.   And you'll see that the verdict is not

72

1    guilty.   Not guilty.

2          Thank you.

3                THE COURT:    Okay.

4          Anybody need to use the bathroom or go right to –

5     --

6                THE JURORS:    (Interposing)    (No verbal

7     response.)

8                THE COURT:    Want to?

9          Okay.    Take a short break.    In fact, we can

10    have the next witness ready.    We'll take a short

11    recess.

12                THE CLERK:    All rise for the Jury.

13    (Whereupon the Jury was returned to the Jury room.)

14                * * *

15                THE COURT:    You may be seated.

16          The record will reflect that the Jury is excused.

17          What are you deputies say?

18                A DEPUTY:    We need to go down to the

19    restroom.

20                THE COURT:    Want to do that and come on

21    right back up, okay?

22          Jeff, just keep an eye on the door that the Jury

23    doesn't come in and out, okay?

24          We'll take a short recess.    Thanks.

25                THE CLERK:    All rise.

73

1         (Whereupon a short recess was had.)

2             * * *

3         THE CLERK:    The Court recalls case number

4  214651 FC.

5         THE COURT:   Ms. Pope-Starnes, Mr. White,

6  your appearances are noted for the record.   Client is

7  present.   Ready to proceed?

8         MS. POPE-STARNES:   Yes Your Honor.

9         MR. WHITE:   Yes Judge.

10        THE COURT:   Okay.

11   Thank you.

12   Jeff if you would bring in the Jury.

13        THE COURT:   Ms. Pope-Starnes, if you don't

14  mind or don't have any problem, just have the witness

15  come on up here right now and we'll just have her

16  sworn in once the Jury's in.

17        MS. POPE-STARNES:   Doctor?

18        THE COURT:   Ma'am if you'll come on up here

19  and just have a seat.   And once the Jury's empaneled

20  we'll have you stand and sworn, okay?

21        THE WITNESS:   Up there?

22        THE COURT:   Straight up here, yep.

23        THE CLERK:   All rise for the Jury.

24  (Whereupon the Jury was returned to the courtroom.)

25            * * *

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      THE COURT:    Good morning again everyone.

2    You may all be seated.

3        The record will reflect that the Jury is back,

4    the case has been called, Counsels' names have been

5    noted for the record.    You can see that we have a

6    witness here already.

7        And Ma'am, I'd ask if you'd please stand and face

8    my clerk and raise your right hand to be sworn.

9            THE CLERK:    **Do you swear that the testimony**

10   **you are about to give will be the truth, so help you**

11   **God?**

12           THE WITNESS:    **So help me God.**

13           THE COURT:    Okay, you can have a seat

14   there.

15       By the way folks, I don't know if I've told you

16   or not, but kind of the hours will be, give or take,

17   eight-thirty (8:30) to twelve (12:00).    And then

18   we'll break until one-thirty (1:30) for lunch and then

19   we'll go from one-thirty (1:30) to four-thirty (4:30),

20   you know with a few breaks in-between.    All day

21   today, all day Friday, half a day Monday.    Monday

22   morning and then Wednesday afternoon.    But otherwise

23   we should have full days and try to keep it as smooth

24   as possible, okay?    Thank you.

25       Ms. Pope-Starnes you may proceed.

75

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      MS. POPE-STARNES:    Your Honor, at this

2   point I would move for the admission of People's

3   Exhibit --- Proposed Exhibit 1, this certified copy of

4   the medical records from the University of Michigan

5   Hospital *for Madison McBurney beginning through*

6   November thirtieth (30th) of two thousand and six

7   (2006) through the date of her death as People's

8   Exhibit 1.    I believe they're admissible as self-

9   authenticating pursuant to **MRE 902 paragraph 11.**

10      THE COURT:    Thank you.

11   Mr. White?

12      MR. WHITE:    Well there was going to be

13   something done and I haven't seen ---

14      MS. POPE-STARNES:    (Interposing)    It's

15   taken care of.

16      THE COURT:    Oh.    You haven't seen it yet?

17      MR. WHITE:    I would like to see it.

18      THE COURT:    Okay.

19   You should certainly show it to him and then

20   we'll come back to it.    Can you proceed with the

21   witness right now while he's looking at it?

22      MS. POPE-STARNES:    Although I would like

23   the admission of these records so that the witness can

24   use them if she needs to, to refresh her memory.

25      THE COURT:    While Mr. White can take a look

76

1    at that while she's getting at least your name and so

2    forth for the record.    You can proceed, Ms. Pope-

3    Starnes.

4                **A T H E N A   S I K A V I T S A S**

5    **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

6    **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

7    **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

8    **AND TESTIFIED AS FOLLOWS:**

9                    **DIRECT EXAMINATION**

10   **BY MS. POPE-STARNES:**

11   Q    Would you please state your name and spell your last

12        name for the record?

13   A    Sure.    My name is Athena Sikavitsas.    And my last

14        name is S as in Sam, I K A V I T S A S.

15   Q    Can you tell the Jury please what is your educational

16        background?

17   A    I am a pediatric emergency room physician.    Went to

18        medical school.    I did pediatrics and then I grand-

19        fathered into doing pediatric emergency room medicine.

20   Q    Where did you attend medical school?

21   A    I went to the University of Osteopathic Medicine in

22        Des Moines, Iowa and ---

23   Q    (Interposing)    When did you graduate?

24   A    Nineteen eighty-six (1986).

25   Q    And did you complete a residency program?

77

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   A     Yes.   I did a rotating internship first and then I

2        did a pediatric residency at Rush Presbyterian in

3        Chicago.   And that's the end of it.   And I was done

4        with that in nineteen-ninety (1990).

5   Q     Now your residency, did that focus on the area of

6        pediatrics?

7   A     Yes.

8   Q     Okay.

9        Did you also focus on the area of emergency room

10       medicine at that point?

11   A    Umm --- we do a lot of rotations through the emergency

12       room but then once I left there and went to Cook

13       County Children's Hospital my emphasis there was on

14       emergency room medicine.   When I first got out of

15       practice there really wasn't that specialty yet.   So

16       I am what's considered the original people who

17       grandfathered into that specialty.   You can't do what

18       I do now without additional training after your

19       pediatrics.

20   Q     So you got the training through actual hands-on

21       experiences?

22   A     Mm-hmm.

23   Q     I'm sorry.   I can't hear ---

24   A     (Interposing)   Yes.   I'm sorry.   Yes.

25   Q     Can you tell the Jury please what states you pull or

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1          have health medical licenses in?
 2   A      Illinois and Michigan.
 3   Q      Okay.
 4              And do you still currently hold the license in
 5          the state of Illinois?
 6   A      Yes.   It's on what you call since I'm not actively
 7          practicing, it's just on hold.
 8   Q      What hospitals are you affiliated with?
 9   A      Right now just with the University of Michigan.
10   Q      How long have you worked for the University of
11          Michigan Hospital?
12   A      Uh --- I believe it's been five years now.
13   Q      And prior to that where were you employed?
14   A      I was with the Henry Ford Health Systems.
15   Q      And what work did you do with Henry Ford Health
16          System?
17   A      I was the assistant director of the pediatric
18          emergency room through the Henry Ford Health System.
19   Q      How long were you with Henry Ford Health System?
20   A      Umm --- three years with them.
21   Q      And prior to that?
22   A      Nine years with the Cook County Children's Hospital in
23          Chicago, Illinois.   And also assistant director there
24          before I left.
25   Q      Doctor, approximately how many children do you see in
```

79

1       the emergency room a year?

2  A   A year?  I think our annual visits at University of

3       Michigan are about twenty thousand (20,000) that we

4       see.  And that ---

5  Q   (Interposing)  And that would be all the emergency

6       room physicians?

7  A   Umm --- yes.  For all of us.  That's how many

8       patients we have rotating through our ped's emergency

9       room.

10  Q  And at the University of Michigan you have an

11      emergency room just for children separate from adults?

12  A  Correct.

13  Q  Are you --- do you hold a board certification?

14  A  I have two board certifications.  One in pediatrics

15      and the other one in pediatric emergency room

16      medicine.

17  Q  How long have you been board certified in pediatrics?

18  A  Since nineteen-ninety (1990).

19  Q  And how long have you held the board certification in

20      pediatric emergency room medicine?

21  A  Since nineteen ninety-six (1996).

22  Q  Have you ever testified before?

23  A  Yes.

24  Q  And have you ever been qualified as an expert before?

25  A  Yes.

80

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q     Okay.

2               In what Courts if you can recall?

3   A     In Illinois.

4   Q     Umm --- and in what types of cases?

5   A     Child maltreatment cases.

6   Q     And would this be civil or criminal or both?

7   A     Both.

8   Q     And approximately how many times have you been

9         qualified as an expert?

10  A     Three times in Illinois.

11  Q     Okay.

12              And what areas were you qualified as an expert

13        in?

14  A     Sexually abused, nonaccidental trauma and medical

15        neglect.

16              MS. POPE-STARNES:   Your Honor, I would move

17        that this witness be qualified as an expert in

18        pediatric emergency medicine.

19              MR. WHITE:   No objection.

20              THE COURT:   Thank you.

21         So qualified.

22              MS. POPE-STARNES:   Have you had an

23        opportunity to look at those records Counselor?

24              MR. WHITE:   Can I ask ---

25              MS. POPE-STARNES:   (Interposing)   Move for

81

1      admission Your Honor.

2                    MR. WHITE:    Can we approach?

3                    THE COURT:    You may.

4      (Whereupon a discussion was held at the Bench out of

5      hearing of the Jury and the Court Reporter.)

6                         *  *  *

7                    THE COURT:    With that limit which we talked

8      about and we'll get that fixed up later Exhibit 1 is

9      admitted.

10  Q   **(By Ms. Pope-Starnes, continuing)**    Now Doctor, I'm

11     going to direct your attention back to um --- November

12     thirtieth (30th) of two thousand and six (2006).    I

13     believe it was a Thursday.

14         Were you working in the emergency room of Mott

15     Children's Hospital at the University of Michigan on

16     that day?

17  A   Yes.

18  Q   And did you come in contact with a child by the name

19     of Madison McBurney?

20  A   Yes.

21  Q   How did you first come into contact with her?

22  A   Umm --- she was brought in emergently into what we

23     call our resuscitation bay area by ambulance.    And

24     the uh --- we --- we're prenotified when there's an

25     emergency run from an ambulance and kind of have an

                           82

1    idea of what's going on.   So we had an idea that they

2    had a young infant who is unresponsive.   And that

3    they were doing bag mask ventilation at the time of

4    presentation.   So we were ready for them in the

5    resuscitation bay because you never know what you're

6    going to have to deal with.

7  Q  Now when you say emergently you mean this was an

8    emergency?

9  A  Yes.

10 Q  Okay.

11       And can you tell the Jury please what is the

12   resuscitative bay area?

13 A  We umm --- at the University of Michigan we have the

14   adult emergency room and then we have a child ---

15   children's emergency room.   And we share what we call

16   a resuscitation bay.   So what they are --- we have

17   three separate areas.   So when things need to be done

18   emergently we can address them emergently.   And most

19   of our ambulance runs when they are emergent will come

20   to that area.

21 Q  What was the chief complaint of Madison on her

22   presentation?

23 A  Umm --- I think the chief complaint that the ambulance

24   had said was unresponsiveness.

25 Q  Were you able to get a history from anyone when

83

1      Madison presented to the emergency room?

2   A  Umm --- at the initial point when we saw her or after

3      the parents arrived?

4   Q  Well let's talk about initially when you saw her.

5   A  *Initially when we saw her on* --- the *paramedics*

6      *brought her in and gave us a report what we realized*

7      *is we had a seizing child.   They're unresponsive* ---

8              MR. WHITE:    (Interposing)   Excuse me.

9      I'm sorry.   I don't mean to interrupt but I'd just

10     ask the doctor to speak from her own personal

11     perspective and not we.   If you'd be so kind.

12             THE COURT:   In fairness, maybe it's choice

13     of words.

14             THE WITNESS:   Oh.

15             THE COURT:   But we just want your --- when

16     you say we it ---

17             THE WITNESS:   (Interposing)   I'm sorry.

18             THE COURT:   (Continuing)   *makes it sound*

19     *like you're speaking on behalf of someone else.*

20             THE WITNESS:   Can I just mention also that

21     when we do --- we're a team.   So it's nursing staff,

22     myself, my residents.   When you have a resuscitation

23     *that comes in like this, we're a team.   You know,*

24     it's not just me.   It's me seeing this patient but we

25     are a team.

84

1            THE COURT:   Okay.

2       But the question and if she asks for as to what

3     other people did and what other peoples perspectives

4     were, we'll cross that bridge when we get to it but

5     right now it's only just your own --- what you did,

6     okay?

7            THE WITNESS:   Sure.   Okay.

8       Can you repeat that question please?

9 **Q**   **(By Ms. Pope-Starnes, continuing)**   Well let me ask

10     you this doctor.

11       When you have this team, you as the emergency

12     room physician, are you in charge of this team?

13 A   Yes.

14 Q   So you're directing what they're doing and what's

15     going on?

16 A   Correct.

17 Q   Okay.

18       Now --- so when you first saw Madison were you

19     able to obtain a history from the ambulatory

20     personnel?

21 A   Yes.   We obtained the history that they received.

22     That they got to the house.   Found an unresponsive

23     child.   Umm --- actually I believe tried to intubate

24     her at the house and were unsuccessful.   And then

25     continued bag mask ventilation and brought her into

1    us.

2  Q   When you first saw her was she intubated?

3  A   No.

4  Q   Can you explain to the Jury what we mean when we're

5      saying intubation?

6  A   We put a tube down into the airway to the trachea and

7      we breathe for them.

8  Q   Okay.

9          Was Madison being assisted in her breathing in

10     any way when she first came into the emergency room?

11 A   Yes.   They were giving her oxygen and then by mask --

12     - and by mask and a big valve bag if you've ever seen

13     it.   And what they were doing is just giving her

14     oxygen that way and an occasional breath.

15 Q   Now when she came into the emergency room did you do

16     anything to make sure that she was getting enough

17     oxygen?

18 A   We continued oxygenation and um --- what we do rather

19     quickly is assess to see what is going on.   Is her

20     airway patent?   Is she breathing on her own?   And

21     how is her circulation?   And neurologically if she's

22     alert and awake for us.   Umm --- her airways ---

23 Q   (Interposing)   What did you find in your assessment?

24 A   Her airway was patent.   She was breathing on her own.

25     She just needed a little help.   Circulation was okay.

86

1    And then what we noticed was neurologically her tone

2    was increased.  She was in essence, she was seizing

3    when she presented.

4  Q  What does tone increased mean?

5  A  Umm --- seizures can be all different types.  You can

6    have what are called generalized seizures.  You can

7    have partial seizures.  I think people are most

8    familiar with when people convulse or have seizures

9    and they're called a tonic-clonic.  So what's

10   happening is that the arms are moving clonically and

11   then tonically.  In Madison's ---

12 Q  (Interposing)  Let me stop you doctor.

13 A  Sure.

14 Q  When you say clonically you have your both arms down

15   at your side and you're brining both of the lower arm

16   areas up towards your body?

17 A  Correct.

18 Q  And then ---

19 A  (Interposing)  And then they straighten up.

20 Q  And you called that?

21 A  That's (indicating) a clonic movement.

22 Q  So straightening them out is the tonic movement?

23 A  Mm-hmm.

24 Q  What if anything else did you observe at that point?

25 A  Umm --- that she wasn't responsive to us.  And we

87

```
 1        felt that she probably wasn't --- I felt she wasn't

 2        responsive because she was still seizing.

 3   Q    What happened then?

 4   A    Umm --- there was no IV access in her so when we see

 5        that somebody is seizing what we actually administer

 6        umm --- she's still seizing.   It's very difficult to

 7        obtain an IV in somebody who is still seizing so what

 8        we did is we gave a rect --- medication rectally to

 9        help stop the seizures.

10   Q    What kind of medicine?

11   A    I believe it was Ativan that we gave her.

12   Q    What happened then?

13   A    Actually it seemed to calm her down because then we

14        were able to obtain IV access after that.   Umm ---

15   Q    (Interposing)   And do you recall what area of the

16        body you had the IV access?

17   A    I'm assuming it was in an arm but I --- I cannot

18        remember that.

19   Q    Okay.

20            Would a review of your medical records refresh

21        your memory?

22   A    It might.   But I'm not sure if we would record that.

23        That might be in the nursing notes as far as to where

24        the IV was obtained.

25               MS. POPE-STARNES:   Can I approach the
```

88

1      witness Your Honor?

2             THE COURT:   You may.

3  Q   **(By Ms. Pope-Starnes, continuing)**   I'm showing you

4      what has been admitted as --- admitted as People's

5      Exhibit 1.

6      Doctor are those --- do you recognize those as

7      medical records from University of Michigan Hospital

8      for Madison McBurney?

9  A   It appears to be records from the University of

10     Michigan.   I'm trying to find where our emergency

11     room records would be.   The abridgment part still

12     appears to be from when she was in the intensive care

13     unit.   So let me just browse through her and see if I

14     can find our records.

15  Q   Doctor if it helps, if I can direct you to page at the

16     bottom right-hand corner, page --- beginning with page

17     fifty-nine (59) of ninety-one (91) ---

18  A   (Interposing)   Okay.

19  Q   (Continuing)   of the medical documents.

20  A   That would help.   Okay.   This looks like our ER

21     note.   I see umm --- our ER dictated note.   But I

22     don't see the nursing note there.   And that one would

23     indicate where our IV had been placed because that's

24     usually kept on the nursing record.   I don't think we

25     would usually record that.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q   Do you have on page sixty (60) of ninety-one (91), it

2       says peripheral IV access was obtained.   What would

3       that mean?

4   A   That's ---

5               MR. WHITE:   (Interposing)   Objection Your

6       Honor.

7               THE WITNESS:   I'm sorry.

8               THE COURT:   Hold on one second Doctor.

9               MR. WHITE:   I object to the leading nature

10      of the question.

11              MS. POPE-STARNES:   Your Honor, ---

12              THE COURT:   (Interposing)   Go ahead.

13              MS. POPE-STARNES:   (Continuing)   I don't

14      believe it's leading.   The record has been admitted

15      into evidence.   It speaks for itself.   I'm directing

16      the witness and I asked her what would that mean.

17      I've not suggested the answer to the question.

18              THE COURT:   Okay.

19          I'll allow her --- you can ask the question what

20      that means.   Not to reference to any point or

21      anything but just answer the question Ma'am.

22  Q   **(By Ms. Pope-Starnes, continuing)**   What does

23      peripheral IV access obtained mean?

24  A   A peripheral IV means that an IV was obtained

25      somewhere on the extremities on the periphery.

                        90

1    Either on an arm or a leg.   It's not --- do you want

2    me to continue or --- it's not a central IV access

3    where we would put it into a bigger deeper vein that's

4    in the body.

5 Q   What happened then?

6 A   Umm --- I believe she seized again and we gave her IV

7    Ativan at that point.   Umm --- and then if you

8    noticed not only --- her seizures were --- remember I

9    described tonic-clonic?   Hers was tonic.   She was

10    just tense like this (indicating) and then slowed

11    down.   She also had some right-eye deviation that we

12    had noticed.

13 Q   What does that mean?

14 A   Well that means that when you looked at her eyes

15    instead of being straight she was shifting towards the

16    right and we all noticed that, that she had a right-

17    eye shifting.   Umm --- which is always ---

18         MR. WHITE:   (Interposing)   Your Honor ---

19         THE COURT:   (Interposing)   Same thing.

20    You're not --- just what you observed not what we

21    observed, okay?

22         THE WITNESS:   Okay.   Sorry.

23         MR. WHITE:   If she needs the records to

24    refresh her recollection she can ask but I don't think

25    it's appropriate for her to continue to read.

91

1          MS. POPE-STARNES:    Your Honor, I would ask

2    that the record applies.    At the point she's

3    testifying about the right-eye deviation she was not

4    looking at the records.

5          THE COURT:    Just --- just so we don't have

6    any confusion Doctor.    If it's all right, if you

7    could just take the stack and just ---

8          THE WITNESS:    (Interposing)    Sure.

9          THE COURT:    (Continuing)    set it off to

10   the side.    And if you need to refer to it just let us

11   know, okay?

12        Thank you.

13  Q   **(By Ms. Pope-Starnes, continuing)**    I'm sorry for the

14      interruption Doctor.

15  A   It's okay.

16  Q   You were saying that you observed that the eyes were

17      shifted towards the right?

18  A   Correct.

19  Q   What does that mean for you as a physician when you

20      see that?

21  A   Umm --- when we see that we have more concerns of an

22      abnormal focus on the brain that's contributing to the

23      seizure that they're shifting to the right.

24  Q   What happened then?

25  A   Umm --- I'm trying --- we gave her a second dose of

92

1    Ativan.    I believe she had stopped seizing or maybe

2    she was continuing to seize.    I don't remember.    And

3    then I know that we also gave her peripheral

4    Phenobarb. to help stop the seizure.    And by --- do

5    you want me to continue?

6  Q    What is peripheral Phenobarb.?

7  A    It means that it went through the IV.

8  Q    What happened then?

9  A    I believe our concern with Madison at that point is

10    that she still wasn't responding.    We were giving her

11    medications.    Umm --- the side-effects of anti-

12    seizure medications of course is to decrease their

13    respiratory effort.    And she was already having some

14    issues with her respiratory effort.    And I think at

15    that point we made a decision to eluctively (sic)

16    intubate her so that we could support her respiratory

17    effort.

18  Q    So it was --- the intubation then as I understand it

19    was a precautionary procedure?

20  A    Correct.

21  Q    And were you able to measure her oxygenation levels as

22    this was going on?

23  A    Umm --- not her true oxygenation level when it was

24    gone, just an idea about what her oxygenation is.

25  Q    How do you do that?

93

1  A   We use a pulse oximeter reading to give us an idea of

2      how well saturated she is.   But it only gives us an

3      idea of what the saturation is.   It doesn't really

4      give us a number of what her oxygenation is.

5  Q   And how does that work?   Can you describe it for us?

6  A   Oh.   It's an easy thing.   It's an infrared signal

7      that's done either on the fingers or in the toes or

8      even on the earlobe and it gives you an idea of how

9      well that area is being oxygenated.

10 Q   And did you use that with Madison?

11 A   Yes.   That was on Madison.

12 Q   And the levels of oxygenation that were being reported

13     from this pulse oximeter, were you satisfied with

14     those?

15 A   They were acceptable.

16 Q   What happened then?

17 A   Umm --- after we had her umm --- intubated,

18     oxygenating, we --- she was more sedated at that

19     point.   And then I think once we had her stable, what

20     we would call stabilized after intubation, we had her

21     go to our CT scanner.

22 Q   Now what does the CT stand for?

23 A   It's a CAT scan.   It takes umm --- continuous, kind

24     of a continuous x-ray of a specific area.   This one

25     took an x-ray of her head.

94

1  Q    Now when she was sent to have the CAT scan done what

2       if anything did you do?

3  A    I don't think I did anything at that point.

4  Q    Did there come a point where you were able to speak to

5       her parents and to obtain a history from them?

6  A    Yes.   I think I --- I'm trying to use --- I'm trying

7       to recollect at what point I was able to step away

8       from Madison to talk with them.   I don't remember if

9       I was able to do that before we intubated her or after

10      we had intubated her.   Umm --- things are happening

11      very quickly.   You've got a patient who you're trying

12      to take care of quickly and umm --- and we have a very

13      open area in our resuscitation area and we allow

14      parents to come in.   I don't think any of us have any

15      issues with that.   But I don't remember where in that

16      part I spoke with the family.

17 Q    Do you recall where you spoke with them?

18 A    Yes.   We have, if you can picture, our bed is here

19      (indicating), and at that very end of the bed we have

20      a counter that has our computer screens and there's

21      chairs.   And I believe our social worker had obtained

22      the father and mother and they were both there.

23           MR. WHITE:   Objection.   Objection as to

24      what the social worker did Your Honor.

25           THE COURT:   Okay.

                          95

1    MS. POPE-STARNES:    Judge ---

2    THE COURT:    (Interposing)    You aren't

3    going to talk about what the social worker said just

4    what the person was doing?

5    THE WITNESS:    No.    I was only saying our

6    social worker brings them into the ER.

7    MS. POPE-STARNES:    That's not hearsay Your

8    Honor.

9    MR. WHITE:    Well ---

10    THE COURT:    (Interposing)    Let's --- let's

11    before you tell him it's not hearsay, let's wait for

12    him to say that it is.

13    MS. POPE-STARNES:    No.    That was my

14    response to his objection.

15    THE WITNESS:    Sorry.

16    THE COURT:    I know.    I know.

17    MS. POPE-STARNES:    That is not hearsay what

18    she observes.

19    THE COURT:    We're good.    I think we're all

20    good.    We're all good.

21      Go ahead.

22    THE WITNESS:    Umm --- so I spoke with ---

23  Q   **(By Ms. Pope-Starnes, continuing)**    (Interposing)

24    Let me stop you there Doctor.

25      So you spoke with them when they were in that

96

1        area around the chairs?

2   A    Correct.

3   Q    Okay.

4            And would you recognize either of the parents if

5        you saw them again?

6   A    I'm not sure.

7   Q    Okay.

8            Do you see the mother in the courtroom at this

9        point?

10  A    I don't think so.

11  Q    Okay.

12           And do you see the father in the courtroom?

13  A    I'm assuming it's the Defendant.

14  Q    Do you recognize him?

15              MR. WHITE:   Objection Your Honor.

16              MS. POPE-STARNES:   Your Honor I can follow

17       up with ---

18              MR. WHITE:   (Interposing)  Quiet.  Quiet.

19       Let me make my objection.

20              THE COURT:   Both of you wait until the

21       other person is done talking.   You want to speak on

22       it or?

23              MR. WHITE:   I would just ask if she says

24       she can't recognize him that that's a fair statement.

25       I appreciate the Doctor's candidness, okay?

                            97

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1           I assume ---

2                THE COURT:    (Interposing)    Thank you.    I

3      gotcha.    Thank you.

4           Go ahead Ms. Pope-Starnes.

5                MS. POPE-STARNES:    Thank you.

6    Q    **(By Ms. Pope-Starnes, continuing)**    Doctor I'm not

7      asking you if you assume that he's here.    I'm asking

8      if you actually recognize him?

9    A    I have to be honest.    I can't say that.

10   Q    Okay.

11        Now when you spoke with the parents did you

12     obtain a history from them?

13   A    Yes.    Umm --- and umm --- we --- I guess it may have

14     been before we intubated her.    I'm trying to figure

15     out what had occurred.    Umm --- I could refer to my

16     notes.    But the history we obtained from Madison is

17     that she had been vomiting.    And vomiting so

18     therefore not taking in a lot of fluids.    And then

19     that she was upright for awhile and then they said she

20     just went down.    And that's when they called the

21     paramedics.

22   Q    The history that you were given, did it indicate how

23     many times she had vomited?

24   A    I can't remember.    I'd have to look at my notes to

25     see if we documented that.

                              98

1    Q    And would your notes refresh your memory?

2    A    Yeah, they probably would.

3    Q    Again, directing you specifically to your notes which

4         I believe start on page fifty-nine (59) of ninety-one

5         (91).   Would you take a look at your notes please?

6         Read them to yourself to see if they refresh your

7         memory.   And then put them down and let me know when

8         you've had the opportunity to do that.

9    A    My note had said ---

10   Q    (Interposing)    Let me stop you Doctor.

11   A    Sorry.

12   Q    Does that refresh your memory?

13   A    Yes.

14   Q    Okay.

15        And do you recall how many times, if you were

16        told how many times, she had vomited?

17   A    Three times.

18   Q    Okay.

19        In what period of time?

20   A    Umm --- I don't believe we were given a period of time

21        that it had occurred.

22   Q    Okay.

23        And in the history that you were given by the

24        parents umm --- did --- were you told where she was --

25        - you said she was upright and then went down.   Were

99

```
 1        you told where she was upright?

 2   A    I don't recall if they told us where.   Somewhere in

 3        the house.   Umm --- I don't remember if --- I cannot

 4        recall where they said she was.

 5   Q    Would looking at your notes refresh your memory?

 6   A    I did look.   And I must not have put it down where

 7        they had said that.

 8   Q    And when you say upright, do you recall whether or not

 9        you were told she was standing upright or sitting

10        upright?   What type of upright position?

11   A    I'm going by memory.   Maybe I didn't put it in my

12        notes.   But I almost thought they said she'd been in

13        some kind of a, you know, either sitting or a walker

14        and then went down.   But I don't remember all those

15        exact details.

16   Q    And would looking at your notes refresh your memory?

17   A    I don't think so.

18             MS. POPE-STARNES:   May I approach the

19        witness Your Honor?

20             THE COURT:   You may.

21   Q    (By Ms. Pope-Starnes, continuing)   May I have the

22        records?

23        Thank you.

24        Doctor, I'm going to direct your ---

25             MR. WHITE:   Your Honor I'm objecting.
```

100

1      THE COURT:   Go ahead and make the

2   objection.   Go ahead.

3      MR. WHITE:   The objection is because she

4   doesn't think that looking at her notes will refresh

5   her recollection.

6      THE COURT:   Noted.

7      I'll allow it.   Thank you.

8   Q   **(By Ms. Pope-Starnes, continuing)**   Doctor I'm going

9   to direct your attention to page fifty-nine (59) of

10   ninety-one (91), the second paragraph starting,

11   'History of present illness'.   I'd ask you to read

12   that paragraph to yourself.

13   A   Sure.   Okay.   Sorry about that.

14   Q   Now does looking at that paragraph refresh your memory

15   as to what type of upright position the history was

16   given?

17   A   Umm --- she umm ---

18      THE COURT:   (Interposing)   Just 'Yes' or

19   'No'.   It does or it doesn't refresh your

20   recollection.

21      THE WITNESS:   Yes.   It makes me remember,

22   yes.

23   Q   **(By Ms. Pope-Starnes, continuing)**   Okay.

24      And what type of upright position was she in?

25   A   Umm --- upright, kind of ---

101

1        MR. WHITE:   (Interposing)   Objection.

2    She cannot testify as to what was stated.

3        THE COURT:   Okay.

4        MR. WHITE:   The form of the question is

5    improper.

6        THE COURT:   Got it.

7    Go ahead.   Rephrase.   Rephrase.

8  Q  **(By Ms. Pope-Starnes, continuing)**   Does that refresh

9    your recollection as to the history that you were

10   given as to what type of upright position she was in?

11 A   Yes it does.

12 Q   And what history were you given?

13 A   I was given that she was sitting on the floor with her

14   Dad.   And then she started making gurgling noises and

15   then went down.

16 Q   In the history that you were given, were you given any

17   other information about vomiting previous to that day?

18 A   I don't believe so.

19 Q   Now Doctor, I'm going to direct your attention again

20   to the paragraph on page fifty-nine (59) of ninety-one

21   (91), history of present illness.

22       THE COURT:   Just a second.

23   Go ahead Mr. White.

24       MR. WHITE:   I'm going to object Judge.

25   I'm going to object because if she says, 'No',

                        102

1    then it's --- please allow the witness to testify,

2    Judge.   I ask that the Prosecutor not lead her own

3    witness.

4              MS. POPE-STARNES:   Your Honor, if I might,

5    may I respond?

6              THE COURT:   Go ahead Ms. Pope-Starnes.

7              MS. POPE-STARNES:   I believe under the

8    rules of evidence I can ask a witness under past

9    recollection for it or I can impeach them if they say

10   that it does not.   Even if it's my own witness,

11   again, under the rules of evidence.

12             THE COURT:   Noted.   And the Court will

13   permit it.   We'll allow it.

14        Your objection is noted Mr. White.

15        Go ahead.

16             MS. POPE-STARNES:   Thank you.

17   Q   **(By Ms. Pope-Starnes, continuing)**   Again Doctor

18   directing your attention to page fifty-nine (59) of

19   ninety-one (91), the paragraph history of present

20   illness.

21   A   Okay.   Take note that ---

22   Q   (Interposing)   Just one minute please.

23   A   Mm-hmm.

24   Q   The eleventh (11th) line down of that paragraph.

25   A   Yes.   He had said that ---

                         103

1    Q    (Interposing)    Does that refresh your recollection?

2    A    Yes it does refresh my recollection.

3    Q    And were you given information by one of the parents

4         in regards to whether or not the child had been sick

5         the previous day?

6    A    Yes.    He had said that they had been sick the

7         previous day and had been vomiting the previous day

8         also.

9    Q    Okay.

10        And do you know which parent gave you that

11        history?

12   A    That was from the father.

13   Q    In the history that you obtained from the parents did

14        they give you any information about a recent trauma

15        that had been sustained by the child?

16   A    We did not --- no.    I did not obtain any history of

17        any trauma recently.

18   Q    Okay.

19        When we talk about the word trauma can you

20        explain to the Jury what that means to you?

21   A    Uh --- trauma to me is any injury, any fall, any

22        tripping, anything as simple as you know, running up

23        the flight of stairs and falling is trauma.

24   Q    Does that also include things more serious?

25   A    Sure.

104

1  Q   Car accident ---

2  A   (Interposing)   Absolutely.   Motor vehicle accident.

3  Q   During the history that you were obtaining from the

4      parents were you given any history of family history

5      that there was a family history of seizures?

6  A   No.

7  Q   Did there come a point where you got --- you got the

8      results from the CAT scan?

9  A   Yes.

10 Q   What were the results of the CAT scan?

11 A   The CAT scan umm --- to reflect exactly what the

12     original --- what the reading was but the confirm on

13     CAT scan was that there was blood noted on CAT scan.

14         MR. WHITE:   I'm sorry.   I just --- your

15     answer just kind of trailed off Doctor.

16         THE WITNESS:   Oh.

17         THE COURT:   Can you say that again?   Just

18     a little bit louder.

19         THE WITNESS:   There was blood noted on the

20     CAT scan.

21 Q   **(By Ms. Pope-Starnes, continuing)**   What happened

22     then?

23 A   Well by --- after she obtained her CAT scan she really

24     was transferred up to the pediatric intensive care

25     unit.   Umm --- and those results were relayed up to

105

1     the pediatric intensive care unit.

2  Q   And what is the pediatric intensive care unit?

3  A   *Pediatric intensive care unit is an intensive care*

4     *unit just for children.*

5  Q   And during the time that she remained under your

6     treatment in the emergency department, did she ever

7     become responsive?

8  A   No.

9         MS. POPE-STARNES:   May I have just one

10     moment Your Honor?

11         THE COURT:   You may.

12     (Whereupon a brief delay was had.)

13             * * *

14         MS. POPE-STARNES:   Thank you.   I have no

15     other questions of this witness.

16         THE COURT:   A couple minutes to.   What do

17     you want to do?

18         MR. WHITE:   Your Honor, I'm going to need

19     about a half hour, forty-five (45) minutes.   Maybe we

20     should ---

21         THE COURT:   (Interposing)   Prefer just to

22     start fresh?

23         MR. WHITE:   (Continuing)   after lunch.

24         THE COURT:   Okay.   All right.

25     Ladies and Gentlemen, it is close to the noon

106

1     hour.   We'll break at this time until one-thirty

2     (1:30).   I'd ask you to return to the Jury --- your

3     Jury room.   I don't want to get mixed up with the

4     other one.   Don't talk about the case.   And in a

5     couple of minutes Mr. Rondack will excuse you for

6     lunch.   See you back at one-thirty (1:30) okay?

7        Thanks very much.

8          THE CLERK:   All rise for the Jury.

9     (Whereupon the Jury was returned to the Jury room.)

10                    * * *

11          THE COURT:   Thank you.

12       The record will reflect that the Jury has been

13    excused.   Folks you can be seated.   We'll resume at

14    one-thirty (1:30).

15       Mr. White and Ms. Pope-Starnes, take a look and

16    see.   Mr. White you can propose some language.   See

17    if you can both reach an agreement as to that.   As to

18    the Exhibit 1.

19          MR. WHITE:   Does this witness have to

20    leave, do you know?

21          THE WITNESS:   I have a shift to be at by

22    four (4:00) and uh ---

23          MR. WHITE:   (Interposing)   I figure about

24    a half hour starting at one-thirty (1:30).

25          THE COURT:   Okay.

                      107

1          (Whereupon a recess was had.)

2               *  *  *

3          THE CLERK:    The Court calls People versus

4     McBurney, case number 07 214651 FC.

5          THE COURT:    Doctor, when the Jury comes

6     back, I'll just remind you in front of them that you

7     are still under oath and all that stuff, okay?

8          THE WITNESS:    That's fine.

9          THE COURT:    By the way Counsel, when the

10    Jury comes back, I think that my clerk tells me that

11    there was one Juror, Mr. Hurd, (phonetic) that's in

12    the far corner there who was kind of crouched.    And

13    barring any objection from you, I'll invited him, I

14    don't know if he wants to, we'll switch him to the

15    back so long as at the time of the polling of the Jury

16    we bring him back down to his normal seat.    I don't

17    know if he'll want to do it or not.

18          MS. POPE-STARNES:    To give him more room?

19          THE COURT:    Yeah.    To give him more room,

20    okay?

21          MS. POPE-STARNES:    That's fine.    I have no

22    objection to that.

23          THE COURT:    Okay.    Fine.    Thank you.

24          MR. WHITE:    No objections.

25          THE COURT:    All right Jeff, you can bring

                              108

```
1     in the Jury.

2          THE CLERK:   All rise for the Jury.

3     (Whereupon the Jury was returned to the courtroom.)

4                    *  *  *

5          THE CLERK:   Please be seated.

6          THE COURT:   The record will reflect that

7     the Jury is back.   The case has been called.

8     Counsels' names have been noted.

9        I should have asked Jeff to mention this to you

10    back in the Jury room.

11       Mr. Hurd, you're --- it's no mystery that you're

12    a rather tall fellow.   If it's rough ---

13         THE JUROR:   I'm fine.

14         THE COURT:   Are you sure?

15         THE JUROR:   Yes.

16         THE COURT:   Because we can squeeze you to

17    the back and have Ms. Chamberlain (phonetic) and

18    everybody scoot down a little.

19         THE JUROR:   No.   That's all right.

20         THE COURT:   Okay.   If it turns out to be a

21    problem just let us know or let Jeff know and then we

22    can move it around later on, okay?

23         THE JUROR:   Sure.   Thanks.

24         THE COURT:   All right.

25       And the record will further reflect that the
```

109

1    doctor is back on the witness stand.

2         Doctor you are reminded you are still under oath,

3    required to testify truthfully and honestly, okay?

4              THE WITNESS:   Yes.

5              THE COURT:    Thank you.

6         Mr. White.

7         **WHEREUPON ATHENA SIKAVITSAS HAVING BEEN**

8    **PREVIOUSLY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH**

9    **AND NOTHING BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

10                    **CROSS-EXAMINATION**

11   BY MR. WHITE:

12   Q    Doctor, my name is Robert White.    I represent Steven

13        McBurney.    We've never met before have we?

14   A    No.

15   Q    I'll ask you some questions.    Please ask me to

16        rephrase the question if you do not understand it ---

17   A    (Interposing)    Okay.

18   Q    (Continuing)    or you think it needs to be stated in

19        another way.    I'll be happy to do it, okay?

20   A    Do me a favor?    Can you just be a little louder?

21              THE COURT:    I don't know if he can

22        actually.

23         No offense, Mr. White.    It's been that way.

24   Q    **(By Mr. White, continuing)**    Umm --- if I go too high?

25         Okay.    I will try to be as loud as you need.

                         110

1        Doctor, when you take a history and when you're

2    in the emergency, how do you do that?

3        Do you actually take notes or do you place it in

4    the computer simultaneously?

5  A   It depends on the situation.

6  Q   Okay.

7        How did you do it in this case?

8  A   Umm --- I --- this is an acute case.   There's really

9    we --- it's been verbal contact.

10 Q   Okay.

11       So what you did, and correct me if I'm wrong, is

12   mother and father were there?

13 A   Mm-hmm.

14 Q   You --- is that a 'Yes'?

15 A   Correct.

16 Q   Okay.

17       And you spoke to them?

18 A   Correct.

19 Q   And they spoke to you?

20 A   Correct.

21 Q   And then at some later point in time you record those

22   statements, correct?

23 A   Correct.

24 Q   Okay.

25       And you record those statements into your

111

1    computer correct?

2  A    Umm --- they're dictated.

3  Q    Okay.

4        I'm sorry.   Dictated which goes into the

5    computer?

6  A    Correct.

7  Q    And those become part of what's called the CareWeb

8    notes, is that a fair statement?

9  A    Yes.

10  Q    Okay.

11        Umm --- and what you were referring to earlier

12    when you were looking at your records were your

13    CareWeb notes in this case?

14  A    Correct.

15  Q    And can you tell the Jury when you dictated these

16    particular uh --- your notes regarding the history

17    given in this case?

18  A    Can you rephrase that?   What do you mean by when?

19  Q    When with respect to the history given by the parents.

20  A    The note was dictated shortly after the whole event,

21    after the patient left our unit and went up to the

22    pediatric intensive care unit.

23  Q    Can you give me some times?

24  A    Umm --- probably within thirty (30) minutes post-

25    event.

```
 1   Q    And when you say probably, how are you saying this?

 2        How can you say probably?

 3   A    Umm --- I would say probably because it's been a year-

 4        and-a-half since that happened.   And I can't remember

 5        exactly when I dictated that note.

 6   Q    And is it a fair statement that you couldn't at that

 7        time you cannot remember exactly what was said to you?

 8   A    What do you mean by that?

 9   Q    That the exact words of the history given, is it

10        possible that you could not remember the history

11        verbatim?

12   A    Umm --- at this very second or at the time of the

13        patient presentation and to dictate the note?   There

14        are two different occurrences here.   At this very

15        second I'm not sure if anybody would have the memory

16        of a year-and-a-half down the road.

17   Q    Answer my question.

18   A    Then what was your question or rephrase it.   I'm

19        sorry.

20   Q    Okay.

21            The question was at the time you dictated did you

22        dictate the history given verbatim?

23   A    Verbatim?   What do you mean by verbatim?

24   Q    Well what's the definition of verbatim?

25                   THE COURT:   Did you do it word for word?

                              113
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          THE WITNESS:   Word for word, probably as

2     best as possible that we obtained from --- word for

3     word of what we obtained from the father.

4          Does that answer your question?

5  Q   **(By Mr. White, continuing)**   No it doesn't.

6  A   Okay.

7  Q   Did you do it verbatim?

8          MS. POPE-STARNES:   I have an objection.

9     That's been answered.   She's answered the question to

10    the best of her ability Your Honor.

11         THE COURT:   Can you --- can you say --- and

12    it might be a little bit confusing when you say we.

13    And that's okay.   But do you --- can you recollect

14    whether when you sat down with the tape recorder did

15    you have a --- they used to call them Dictaphones but

16    whatever it was.   Do you --- can you say whether you

17    were basically a parrot word for word, everything that

18    they said exactly as they said it?   Can you say ---

19         THE WITNESS:   (Interposing)   To the best

20    of our recollection of it, yes.

21         THE COURT:   To the best of your

22    recollection of it?

23         THE WITNESS:   Yes.   To the best of my

24    recollection, yes.

25         THE COURT:   Okay.   Okay.

                          114

1    Q    **(By Mr. White, continuing)**    So as you sit here now

2       testifying fourteen (14) months later, you can say

3       that it was verbatim, is that your testimony?

4          MS. POPE-STARNES:    Your Honor that's been

5       *asked and answered.*

6           .    THE COURT:    I've got it.    I've got it.

7       Go ahead.

8    Q    **(By Mr. White, continuing)**    And you talked to both

9       the mother and the father, correct?

10   A    They were both present at the time at the time that I

11       talked to them.

12   Q    Did you talk to the mother and father?

13   A    Yes.

14   Q    Okay.

15       And both mother and father gave you history,

16       correct?

17   A    Yes.

18   Q    Okay.

19       And this history was given, you can't remember

20       before --- before the initial contact with Madison or

21       some time after, isn't that your testimony?

22   A    No.    I said I didn't remember if the contact was

23       before or after we intubated Madison.

24   Q    ·   Okay.

25       And do you remember now when it was?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   A   Yes.   It was probably in that time period as we were

2       getting ready but before we intubated her.

3   Q   Before you intubated her?

4   A   Correct.

5   Q   Was that --- and how long had she been there when you

6       intubated her?

7   A   Umm --- I can't answer that exactly.   But if you look

8       through our note it took us about fifteen (15) minutes

9       to get her stopping to seize and then we intubated

10      after that.

11  Q   Okay.

12          So can you tell me how long she was there before

13      you intubated her?

14  A   I would say between fifteen (15) and twenty (20)

15      minutes.

16  Q   There's no question in your mind you were informed

17      that she had three episodes of emesis during the day?

18  A   Correct.

19  Q   Emesis being vomiting, correct?

20  A   Vomiting, correct.

21  Q   And that you have, there was no question in your mind,

22      that you were informed that the EMS crew was having

23      trouble intubating her?

24  A   Correct.

25  Q   That she, in fact, could not be intubated, correct?

1    A    By EMS correct.

2    Q    Correct.

3         And she was not intubated initially upon contact

4         with the hospital, correct?

5    A    Correct.

6    Q    And there's a note in here that says uh --- upon

7         arrival chemstick, excuse me, chemstick upon arrival

8         which was noted at two eighty-six (286).

9         Any significance to you with that chemstick of

10        two eighty-six (286)?

11   A    As to what Sir?

12   Q    What is a chemstick?

13   A    It's a quick poke of the finger to give us an idea

14        where the blood glucose level is.

15   Q    Okay.

16        And two eighty-six (286) is that acceptable to

17        you?

18   A    It's high.

19   Q    It's high?

20   A    Mm-hmm.

21   Q    And what's normal for say an eleven (11) month old?

22   A    (No verbal response.)

23   Q    A normal range.

24   A    Anywhere from maybe sixty (60) to a hundred and fifty

25        (150).

117

LII 08/14/08 13:35:25.89423

1   Q    Okay.

2        The fact that it was high was there any

3        significance to that to you?

4   A    As far as what?

5   Q    Anything.

6   A    That it was high.   That's --- that's all that I

7        noted.

8   Q    And when you said during your direct examination, the

9        Prosecutor was able to show you about the statement in

10       here that said, 'Dad stated the patient had been

11       vomiting since previous day,' do you actually remember

12       that statement or it's just you noted it in your

13       records?

14  A    I noted it in my records.

15  Q    You don't have an independent recollection, correct?

16  A    Umm --- I'm assuming that that's what he told us and

17       that's --- that's what was recorded at the time.

18  Q    So you don't have any independent recollection, true?

19  A    At this very moment, no.

20  Q    Okay.

21       Is it possible that the father had said that she

22       had been vomiting all day?

23  A    Which day?   That day or the previous day?

24  Q    All day on that day.

25  A    Umm --- I cannot answer that at this point.

                              118

1  Q    When you did your dictating into the CareWeb notes had

2       you reviewed the nurse's records yet?

3  A    No.

4  Q    Okay.

5            Were you informed Doctor that the child had MRSA?

6  A    No.

7  Q    Did you ever discover that by looking through the

8       records?

9  A    When she presented to me and I saw her in the

10      emergency room I did not have any of that knowledge.

11      But what do you mean by MRSA?

12 Q    What do you think MRSA means?

13 A    I know what MRSA means but I want to know what your

14      understanding --- what is it that you're asking?

15 Q    (Interposing)   Well let me ask you.

16 A    Okay.

17 Q    What's MRSA?

18 A    MRSA means methicillin resistant staphylococcus ---

19              THE COURT REPORTER:   I'm sorry.

20              THE COURT:   I was predicting that one.

21              THE WITNESS:   Methicillin resistant staph

22      aureus.

23              THE COURT REPORTER:   Okay.

24 Q    **(By Mr. White, continuing)**   Okay.

25          What is it?

                        119

1  A   It's a bacterial.   It's staph aureus.   And the

2      reason it's called methicillin resistant is because

3      that strain of staph aureus, the bacteria, is

4      resistant to methicillin which is our usual type of

5      penicillin based antibiotic that's used for it.

6  Q   At anytime Doctor have you ever been made aware that

7      the child had MRSA?

8  A   At that very instant in time that we saw her, no.

9  Q   How about now?

10 A   Just what you just told me Sir.

11 Q   Did you review the hospital records before you came

12     here and testified today?

13 A   Only my note.

14 Q   Nothing else?

15 A   No.

16 Q   Did you read --- review the CT scan that you

17     referenced earlier in your testimony the eleven thirty

18     (11/30) CT scan?

19 A   Did I review the reading of it or the actual scan

20     itself?

21 Q   The reading of it.

22 A   Umm --- I probably did review the reading of it and I

23     remember reviewing the actual scan itself.

24 Q   Before you came here today?

25 A   Uh --- day before, correct.

120

1    Q    Two days ago?

2    A    Mm-hmm.

3    Q    Is that a 'Yes'?

4    A    Yes.

5    Q    Okay.

6         The night of November thirtieth (30th) did you

7    review the actual scan itself?

8    A    Yes.   Because ...

9    Q    Now uh --- you were informed of the cutis aplasia,

10   correct?

11   A    Correct.

12   Q    You were informed of the hip dysplasia, correct?

13   A    Correct.

14   Q    But you don't have any record of being informed of

15   MRSA correct?

16   A    Correct.

17   Q    Okay.

18        And uh --- you did a physical examination of this

19   child, correct?

20   A    Correct.

21   Q    You did yourself?

22   A    Correct.

23   Q    Okay.

24        And you examined the child, all the extremities

25   of the child?

                        121

1   A    Yes.    Arms and legs.

2   Q    Okay.

3            And the head?

4   A    And the hip, no?

5   Q    No, no.    Wait.

6   A    Excuse me.    What do you mean?

7   Q    The head.

8   A    The head, yes.

9   Q    Okay.

10           So that's part of your job, correct?

11  A    Correct.

12  Q    As an ER physician, pediatric emergency physician,

13       correct?

14  A    Correct.

15  Q    And isn't it true Doctor, that you found absolutely no

16       indication of trauma?

17  A    We did not see any ---

18  Q    (Interposing)    Excuse me.

19           I just asked you from your perspective.    I don't

20       mean to be rude.

21               MS. POPE-STARNES:    Objection.

22           I would ask the witness be allowed to finish

23       answering the question.

24               THE COURT:    Doctor this has been kind of a

25       recurring theme.    And it's not really a problem but

                                122

1    we need to be ---

2              THE WITNESS:   (Interposing)   I'm sorry.

3              THE COURT:   No, that's okay.   I don't mean

4    to be trite about it but as we all watch the political

5    candidates as they run for Judge and they talk about

6    we won Texas and we lost Indiana, they're referring to

7    their campaign.   But they're talking about them

8    themselves.   And what I need you to do is talk about

9    what you observed.   Just answer his question as it

10   relates to you.   And if there is a need to go beyond

11   that the Prosecutor will ask you or Mr. White will ask

12   you.

13             THE WITNESS:   Could you rephrase that

14   question?   What do you mean by trauma?

15   Q   **(By Mr. White, continuing)**   Well it doesn't matter

16   what I mean.   It's what do you mean.

17       What do you mean by ---

18             THE COURT:   (Interposing)   Hold on.

19   Let's start over.   Let's just start over.

20             MS. POPE-STARNES:   Objection.   If I may

21   Your Honor?

22             THE COURT:   Go ahead.

23             MS. POPE-STARNES:   Mr. White began his

24   examination by telling the witness if she didn't

25   understand to let him know.   And I think that she's

                           123

1    attempted to do that and it's resulting in this

2    interquest.

3            THE COURT:    I know.

4            THE WITNESS:    Thank you.

5            THE COURT:    And I was going to direct Mr.

6    White to state the question over again.

7        Go ahead.

8  Q   **(By Mr. White, continuing)**    You understood the

9    question until I asked you to say I.

10            THE COURT:    Yeah but I have no idea what

11    the question was now so ask it again.

12            MR. WHITE:    I will rephrase it Judge.

13  Q   **(By Mr. White, continuing)**    You examined --- you,

14    yourself examined the child?

15  A   Correct.

16  Q   Thoroughly, correct?

17  A   Correct.

18  Q   Okay.

19        Part of your job, correct?

20  A   Mm-hmm.

21  Q   Is that a 'Yes'?

22  A   Correct.    That's a yes.

23  Q   Okay.

24        And what you found was a well-developed, well-

25    nourished girl, correct?

124

1  A    Correct.

2  Q    Who was unresponsive with increased tone through the

3       upper and lower extremities, correct?

4  A    Correct.

5  Q    Head was normal, normal cephalic and atraumatic?

6  A    Correct.

7  Q    Atraumatic means what?

8  A    Means we did not see any abnormality on the head

9       itself.   Any bruising on the head itself.

10 Q    You did not see abnormality or bruising, correct?

11 A    Correct.

12 Q    Okay.

13       She had an anterior fontanel that was open and

14      fingertip in size, was appreciated to pulsate with

15      heartbeat.

16       Anything unusual about that?

17 A    No.

18 Q    Okay.

19       Umm --- the fontanel was not tense, correct?

20 A    Correct.

21 Q    Okay.

22       She had a small area at the vertex of her scalp

23      with an altered skin consistency.

24 A    Correct.

25 Q    Correct?

125

1              Aplasia congenita?

2    A    Correct.

3    Q    Okay.

4              There was no apparent bruising or hematoma

5         anywhere on her head, correct?

6    A    Correct.

7    Q    Her pupils were constricted, pinpoint bilaterally,

8         initially had an eye deviation to the right, correct?

9    A    Correct.

10   Q    And excuse me, I'm going to try to say this word, neck

11        was without any significant lymphan ---

12   A    (Interposing)    Lymphadenopathy.

13   Q    Okay.

14             L Y M P H A D E N O P A T H Y.

15             What does that mean Doctor?

16   A    Lymph nodes swelling.

17   Q    Did you notice anything unusual about her neck?

18   A    Besides the lymphadenopathy, no.    What was on the ---

19   Q    (Interposing)    Any soft tissue damage?

20   A    Of the neck?

21   Q    Of the neck.

22   A    No.

23   Q    Any bruising in the neck?

24   A    No.

25   Q    Is there anything that you saw Doctor or felt or

                              126

1    anything by your physical examination to support a

2    finding that this child had suffered some kind of

3    external trauma to anywhere on the body including the

4    head?

5  A    Would you rephrase that question?

6  Q    Anything that you found Doctor from your examination,

7    your physical examination of the body, that caused you

8    to believe that this child had suffered some kind of

9    external trauma?

10  A    On the outside of her body, the external exam did not

11    show any external trauma.

12  Q    Same question to the head.

13    Anything that you found in your physical

14    examination of her neck and head that she suffered any

15    kind of external trauma?

16  A    On the outside of her head, neck, we did not see

17    evidence of an external trauma.

18  Q    Were you satisfied when the child was presented to you

19    for emergency treatment that she received proper

20    oxygenation up to that point?

21  A    That she had received proper oxygenation, yes.

22  Q    Okay.

23    Was she breathing on her own?

24  A    Yes.    She was breathing on her own.

25  Q    She was having spontaneous but weak breaths ---

127

1      breaths isn't that true?

2    A    Correct.

3    Q    And it was difficult for you to obtain a pulse

4         oximetry, correct?

5    A    Correct.

6    Q    And it says, however it appeared to be saturating in

7         the high eighties (80's), correct?

8    A    Correct.

9    Q    On a 10 L of oxygen by blow-by.

10        What does that mean?   If you could interpret

11        that for the Jury.

12   A    What part would you like interpreted?   The whole

13        thing or ---

14   Q    (Interposing)   The whole thing.

15   A    Okay.

16        The pulse oximeter as I think we discussed before

17        is an infrared signal that gives us an idea of how

18        well the saturations are.   It does not give us oxygen

19        level.   She was at seizing so it has to pick up a

20        pulse.   It's very difficult to get a good reading on

21        this when you have somebody who is moving.   Even a

22        person who is not seizing and if they keep

23        manipulating the extremity that this pulse oximeter is

24        on, it can't pick up a pulse to give us a good wave

25        signal.   So that was the first issue.

128

1          And then what was going on is that she was just

2     being administered oxygen at a flow-rate of ten

3     liters.

4  Q   And then the rest of that sentence because this is

5     *kind of a half sentence.*

6          It says, occasionally needed additional bag

7     breaths to keep her saturations up.

8  A   Right.

9  Q   And again, saturations.    What does that mean?

10 A   That's what I just said.    The saturations are what

11    the reading is off the pulse oximeter.

12 Q   Okay.

13 A   They're saturations.    They're not true oxygen levels.

14 Q   But the idea was to keep her oxygen level up, correct?

15 A   Correct.

16 Q   Absolutely.

17         And occasionally you needed bag --- bag-valve

18    mask administration, correct?

19 A   Correct.

20 Q   And then at some point because of the use of the anti-

21    seizure medications and the fear that would reduce the

22    amount of oxygen you decided to intubate, correct?

23 A   It wasn't the reduction of the oxygenation.    It was

24    the reduction in her spontaneous respirations also.

25 Q   That she was --- her breathing was becoming more

                            129

1       labored?

2   A   Not labored.   Less spontaneous.

3   Q   Less spontaneous.

4           So less oxygen going into the body, correct?

5   A   Less oxygen, yes.   From her not breathing.

6   Q   Less oxygen into the brain also, correct?

7   A   Mm --- I don't think we ever had a period of not

8       administering oxygen to her.

9   Q   I'm talking about when her breaths became less

10      spontaneous.   That's also a part that the oxygen does

11      not flow to the brain as it should.

12  A   It can't.

13  Q   Pardon?

14  A   If you don't breathe you don't get oxygen to your

15      brain, correct.

16  Q   That was a concern at this point, correct?

17  A   That she wasn't going to get oxygen to her brain?

18      No.   We were supplying that oxygen.

19  Q   Oxygen.

20          But we needed to --- we needed to intubate,

21      correct?

22  A   We needed to maintain her airway and that's why we

23      intubated her.   Not that her oxygenation was an issue

24      for us at that point.

25  Q   But her eyes, if I may quote, 'Her eyes reverted to

                            130

1    midline and she seemed to be slightly more responsive

2    with some moaning,' isn't that correct?

3  A  After we had administered some of the anti-seizure

4    medication.

5  Q  So that's a true statement that you have here,

6    correct?

7  A  Yes.

8  Q  What do we say her eyes reverted to midline, what do

9    you mean by that?

10 A  I remember previously I had said when she first came

11   in and our exam showed that her eyes, she preferred to

12   look to the right and as you stopped the --- and that

13   happening during the seizure.   So as her eyes went

14   from being right-sided deviated to become more central

15   we feel that the seizure is resolving and she's coming

16   out of the seizure.

17 Q  Okay.

18      So she's not seizing, correct?

19 A  At that ---

20 Q  (Interposing)   Coming out of the seizure?

21 A  She's coming out of it.

22 Q  Okay.

23      And then she has some spontaneous uh --- when

24   moaning is that she's somewhat conscious or?

25 A  It's possible but not very conscious.

131

1    Q    Okay.

2         And when it says due to the borderline

3    saturations, manipulation of the tube ultimately

4    resulted in it being placed eleven (11) centimeters at

5    lip, correct?

6    A    Correct.

7    Q    Okay.

8         So you'd had some trouble also intubating the

9    child?

10   A    Correct.

11   Q    Okay.

12   A    We didn't --- can I just verify what your statement

13        is?   Where you are on your statement?

14   Q    Yes, please.

15   A    Where you are on your statement is after the child had

16        been intubated.

17   Q    What was the first part of your statement?

18   A    I said can I correct what you were talking about?

19   Q    Okay.

20   A    Because what the eleven (11) centimeters is when we

21        intubate somebody, there's readings on the

22        endotrachial tube.   So you know if you are in

23        alignment, you know where that reading is, the

24        centimeter reading at the lip.   So then we know that

25        it's in good placement.   And what they meant and when

132

1    you intubate somebody, it's not an easy procedure to

2    do.   So when you're intubating you always want to

3    check to make sure that you are in good position.   So

4    one thing that we check is on the reading of it, where

5    are we when we have it at the lip.   So that's what

6    that is in relation to.

7  Q    Okay.

8        But the initial attempt to intubate was not

9    successful, correct?

10  A    Correct.

11            MS. POPE-STARNES:   Objection.   Asked and

12    answered.

13            THE COURT:   We've got it.   We've got it.

14            MR. WHITE:   Okay.

15  Q    **(By Mr. White, continuing)**   And then in the process

16    of continuing to try to intubate her you had to use --

17    - continue to use the bag-valve mask ventilation,

18    correct?

19  A    Correct.

20  Q    And the portable chest x-ray that was done, it was

21    done right there, correct?

22  A    After intubation.

23  Q    After intubation.

24        The purpose of that x-ray is to make sure that

25    the tube is in the right spot, correct?

133

1   A    Correct.

2   Q    And is it a fair statement that x-ray also showed

3        nothing unusual to you about the chest?

4   A    There was some concerns about some focality in the

5        upper lobes that we were concerned about.

6   Q    What do you mean by that?

7   A    Well you've got upper, lower, midlobes of the lung.

8        And the tube was in great position and then there were

9        some concerns about just --- x-rays are based on

10       density so you can never say exactly what you think it

11       is.   But the densities were different in the upper

12       lobes than they were in the other parts of the lobes.

13             MR. WHITE:   Umm --- if I may approach

14       please to show her this?

15             THE COURT:   Yeah.   What is it just so that

16       Ms. Pope-Starnes knows what you're going to show her?

17             MR. WHITE:   I'm looking at her notes which

18       is a portable chest x-ray.

19             THE WITNESS:   Mm-hmm.

20             MR. WHITE:   And if I just --- if I could

21       just ---

22             THE WITNESS:   (Interposing)   Are you

23       talking about that atelectasis on there?

24             THE COURT:   You can approach.

25   **Q**    **(By Mr. White, continuing)**   Pardon?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1   A    You said the atelectal focal, atelectasis?

 2   Q    Yes.

 3            If you'd just show me what you were talking about

 4        on there.

 5   A    That's a density.   Atelectasises are increased

 6        densities.   Borderline high.

 7            Where are you on these?

 8   Q    I was right down here.

 9   A    Can I read it?   Yes?   No?

10                THE COURT:   We have to show it ---

11                MS. POPE-STARNES:   (Interposing)   Can I

12        ask what page please?

13                THE WITNESS:   At the bottom of page fifty-

14        one (51).

15                MS. POPE-STARNES:   Thank you.

16                THE WITNESS:   The very last paragraph ---

17                THE COURT:   (Interposing)   And when you

18        read it, just read slow, okay?

19                THE WITNESS:   I'm sorry.

20        The portable chest x-ray was obtained to confirm

21        endotrachial tube placement.   The tube was noted

22        approximately one point centimeter (1.cm) above the

23        cricord where we want it to be which is just below the

24        clavicle.   Bilateral pachy-opacities or where we're

25        pretty sure where we felt were possibly an aspiration
```

135

1    but we didn't know for sure.

2  Q    **(By Mr. White, continuing)**    That is what you just

3    talked about?

4  A    Yeah.

5  Q    Okay.

6         Is that indicative of a trauma in your opinion?

7  A    Umm --- not usually.   It's more of either from

8    seizing or just from us intubating somebody or

9    somebody who's been vomiting and they can aspirate.

10    So it's not indicative of ---

11  Q    (Interposing)    And the fact that this child, you'd

12    been given a history of vomiting that's not unusual to

13    have that?

14  A    Not necessarily.

15  Q    Okay.

16         Now when you read the CT scan and saw the

17    hemorrhaging could you tell whether it was acute,

18    subacute or chronic?

19  A    Umm --- we knew that there was acute bleeding.

20  Q    Could you tell ---

21  A    (Interposing)    Could I tell ---

22  Q    (Continuing)    whether there was --- could you tell

23    whether there was subacute bleeding?

24  A    No.   I couldn't tell that.

25  Q    Could you tell whether there was chronic bleeding?

136

1   A   I cannot tell that.

2   Q   Can you tell the Jury what those three phrases mean,

3       acute, subacute ---

4   A   (Interposing)   I can try.

5           Acute bleeding means that the bleeding happened

6       recently which is usually within seventy-two (72)

7       hours.   And you can see on CAT scans why.   It's very

8       bright.   CAT scans are a type of x-ray.   So they're

9       all based on density, just like I said with the x-ray,

10      everything is based on density.   Air is a less dense,

11      it looks very dark and everything else looks whiter

12      depending on how dense it is.

13          Blood on CAT scans shows up very bright.   Acute

14      blood within seventy-two (72) hours.   Umm ---

15      somebody who's had a bleed before and resolves has

16      more of a not quite what I call white look to it but

17      perhaps more of a denser look to it.   And a really

18      chronic older one looks even more dense than that.

19  Q   And is there --- is there a time frame for subacute?

20      You said with acute seventy-two (72) hours.   Subacute

21      is there a time frame in your profession?

22  A   Can I answer that?   I'm not a radiologist.   My job

23      is not to read any kind of neuro CT or I'm going to

24      give you how long something is.   My job is as an

25      acute ER physician.   I'm looking for acute bleeding.

                          137

1        So when I see bright red blood that's acute bleeding.

2        You may have to ask your radiologist or the

3        neuroradiologist for those other time periods for you.

4  Q     You don't have an operative definition of subacute or

5        chronic?

6  A     Chronic is something that is probably --- no, I'm not

7        even going to answer that.   I'm sorry.   I'll talk

8        about the acute because that's mostly what I deal

9        with.

10 Q     And isn't it true doctor that the uh --- the

11       calvarium, the skull showed no signs of any fractures?

12 A     Correct.

13 Q     Or lucencies, correct?

14 A     Correct.

15 Q     Or intraventricular hemorrhage, correct?

16 A     Correct.

17            MR. WHITE:    Nothing further.

18            THE COURT:   Ms. Pope-Starnes.

19            **REDIRECT EXAMINATION**

20 **BY MS. POPE-STARNES:**

21 Q     When we say intraventricular hemorrhage, what are we

22       talking about Doctor?

23 A     Umm --- there is the brain parachyma on the outside

24       and then the ventricles.   And the ventricles are

25       where the space is, where the CSF fluid is.    An

                        138

1    intraventricular bleeding can happen from --- that

2    happens within the ventricles itself and we did not

3    see any of that.

4  Q  For those of us that aren't medical when you just said

5    CSF, what is that?

6  A  Cerebral spinal fluid.   That's what bathes our brain.

7    That's the fluid that runs within our head through

8    those ventricles down our spinal column and comes back

9    up literally.

10  Q  During the period of time that Madison was in the

11    emergency department did you ever have any concern

12    that she wasn't getting enough oxygen?

13  A  No.   We did not.

14  Q  You were asked some questions and talked to Counsel

15    about consciousness.

16       Did you do a Glasgow coma scale on Madison?

17  A  If it's not in my notes --- oh.   Can I --- we

18    probably didn't do a formal Glasgow coma scale but

19    what we do --- that she wasn't verbal.   She wasn't

20    responsive which puts her somewhere in the range of

21    about eight or nine if you do it from that point of

22    view.

23  Q  Well let's talk about what is the Glasgow coma scale?

24  A  The Glasgow coma scale is --- is really just a scale

25    that's used to give us an idea.   It's really more for

                             139

1      umm --- how conscious somebody is and how responsive

2      they are.   Used a lot for trauma and not so ---

3      really to kind of gauge what our prognosis is in due

4      time depending on what the Glasgow coma scale is.

5  Q   And uh --- the highest level of consciousness what

6      number is that?

7  A   Fifteen (15).

8  Q   And the lowest?

9  A   Umm --- you walk in at three.   I mean --- what I

10     should mean is if you --- the lowest number you can

11     get is a three.

12 Q   Did her state of consciousness change at all during

13     the time that she was in the emergency room ---

14 A   (Interposing)   I think she was pretty unresponsive

15     most of the time she was with us.

16 Q   (Continuing)   as you...

17         Now Doctor you were asked questions about whether

18     you observed any bruising or external trauma.

19         Did you have um --- well you testified about how

20     long you've worked as an emergency room physician.

21 A   Correct.

22 Q   Have you ever seen patients before that are suffering

23     from subdural hematomas or hemorrhaging in the brain

24     where you don't see any evidence externally on the

25     body of injury?

140

1    A    Yes.

2    Q    And did you have any concerns about trauma to this

3         child even though you didn't see any bruises or

4         external symptoms?

5    A    Umm --- I'm always concerned about trauma.

6    Q    At any point in the history given to you by the

7         parents were you given any history by them that the

8         child's had MRSA?

9    A    No.

10   Q    Thank you.

11             MS. POPE-STARNES:    I have no other

12        questions for this witness, Your Honor.

13             THE COURT:   Mr. White.

14             **RECROSS-EXAMINATION**

15   **BY MR. WHITE:**

16   Q    Is it a fair statement Doctor that you did not put any

17        of your concerns about trauma in your notes?

18   A    Can you rephrase that?

19   Q    Isn't it a true statement Doctor that you did not put

20        any concerns that you may have about trauma in this

21        case in your notes?

22   A    No.   We --- we did not document any trauma.

23   Q    Thank you.

24             THE COURT:   All set, Ms. Pope-Starnes?

25             MS. POPE-STARNES:    Yes.   Thank you.

                           141

```
 1              THE COURT:   Thank you Doctor, you're all
 2       set.
 3              MS. POPE-STARNES:   Judge may this witness
 4       be excused?
 5              THE COURT:   Any objection?
 6              MR. WHITE:   Yes.   Oh.   She can be
 7       excused.
 8              THE COURT:   Okay.   Gotcha.
 9          You're all set.
10              THE WITNESS:   Thank you.
11              THE COURT:   Thank you.
12          Ms. Pope-Starnes, you may call your next witness.
13              MS. POPE-STARNES:   The People would call
14       Heather McBurney.
15              THE COURT:   Ma'am, I'd ask if you'd please
16       stand and face my clerk and raise your right hand to
17       be sworn.
18              THE CLERK:   **Do you swear that the testimony**
19       **you are about to give will be the truth, so help you**
20       **God?**
21              THE WITNESS:   **I do**.
22              THE COURT:   You need to speak up real loud,
23       okay Ma'am?
24              THE WITNESS:   Okay.
25              THE COURT:   Thanks.
```

142

1          MS. POPE-STARNES:   May I proceed Your

2    Honor?

3          THE COURT:   Yes Counsel.

4          MS. POPE-STARNES:   Thank you.

5          **H E A T H E R   M C B U R N E Y**

6    **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

7    **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

8    **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

9    **AND TESTIFIED AS FOLLOWS:**

10         **DIRECT EXAMINATION**

11   **BY MS. POPE-STARNES:**

12   Q    Would you please state your name and spell your last

13        name for the record?

14   A    Heather McBurney.   M C B U R N E Y.

15   Q    Mrs. McBurney, do you know someone by the name of

16        Steven McBurney?

17   A    Yes.

18   Q    How do you know him?

19   A    He's my husband.

20   Q    Is he in Court today?

21   A    Can you tell us please where he's located and point

22        out what he is wearing today?

23         MR. WHITE:   We'll stipulate Judge that this

24    is ---

25         MS. POPE-STARNES:   (Interposing)   I'm

143

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1     sorry Your Honor but for purposes of trial I'd ---

2           MR. WHITE:   (Continuing)   But this is her

3     husband.

4           THE COURT:   Can we do one at a time?

5       I understand your stipulation.

6       Go ahead and I'll allow you to proceed.

7           MS. POPE-STARNES:   Thank you Your Honor.

8       For the purposes of the record for trial I would

9     not like to stipulate.

10          THE COURT:   I understand.

11          MS. POPE-STARNES:   Thank you.

12          THE COURT:   Go ahead and proceed.

13          MS. POPE-STARNES:   Thank you.

14  Q   **(By Ms. Pope-Starnes, continuing)**   Go ahead.   If you

15     can identify him please?

16  A   Umm --- he's wearing a dark suit.

17          MS. POPE-STARNES:   May the record reflect

18     that the witness had identified the Defendant, Your

19     Honor?

20          THE COURT:   Any objection recognizing that?

21          MR. WHITE:   No objection.

22          THE COURT:   So noted.   Thank you.

23  Q   **(By Ms. Pope-Starnes, continuing)**   How long have you

24     known the Defendant?

25  A   Umm --- for five years.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q    And when were you married?

2   A    March fifth, two thousand five (2005).

3   Q    Now Mrs. McBurney, did there come a point where you

4         and your husband lived on Scott Street in the city of

5         South Lyon?

6   A    Yes.

7   Q    If you recall, when did you start living there?

8   A    Umm --- it was April of two thousand four (2004).

9   Q    During the time that you and Mr. McBurney were married

10        did you have any children?

11   A    Yes.

12   Q    When did you have a child?

13   A    Umm --- She was born on December twenty-seventh

14        (27th), two thousand five (2005).

15   Q    And what was her name?

16   A    Madison.

17   Q    Can you tell us about Madison?

18   A    What would you like to know?

19   Q    Was she a fussy child?   Was she a happy child?   Can

20        you tell us about her?

21   A    She was a happy child.

22   Q    Did you have any concerns about her health when she

23        was born?

24   A    Umm --- yes.

25   Q    What was that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   A   She was born with her hips dislocated.   Umm --- she

2       also had open areas to the back of her head when she

3       was born.

4   Q   Okay.

5           Now Mrs. McBurney, what is your college

6       education?

7   A   Umm --- I have an associate's degree in nursing.

8   Q   And are you licensed as a registered nurse?

9   A   Yes.

10  Q   And how long have you worked as a nurse?

11  A   Umm --- I've been a nurse for nine years.

12  Q   And do you have a particular area of practice that you

13      work in?

14  A   Umm --- the majority of my nursing career I've worked

15      in orthopedics.

16  Q   Okay.

17          And with adults, children ---

18  A   (Interposing)   Adults.

19  Q   (Continuing)   elderly?

20          Adults?

21  A   Mm-hmm.

22  Q   Okay.

23          Now where was Madison born?

24  A   She was born at umm --- St. Joseph Hospital in Ann

25      Arbor.

146

1   Q   And umm --- what type of birth was it?

2   A   She was a C-section.

3   Q   Okay.

4       How soon after her birth were the dislocated hips

5       diagnosed, if you can recall?

6   A   Umm --- she was --- they --- she was born with

7       dislocated hips.   They had to put them back in the

8       socket.

9   Q   You said that there was also an issue at birth about,

10      I believe you said, some open spots in the back of her

11      head?

12  A   Yes.

13  Q   Was that diagnosed at birth?

14  A   No.

15  Q   When did you get a diagnosis about that?

16  A   It was probably July --- July.

17  Q   Of what year?

18  A   Of two thousand and six (2006).

19  Q   Okay.

20      Now these spots on her head.   Did you come to

21      learn what they are called?

22  A   Yes.

23  Q   What is that?

24  A   Aplasia cutis congenita.

25  Q   And how many of these spots were there?

147

```
 1   A    Three.

 2   Q    Can you describe to the Jury what it looked like?

 3   A    Umm --- pretty much it looked like what a wound would

 4        look like if a scab fell off.

 5   Q    Okay.

 6             Did it bleed?

 7   A    No.

 8   Q    Okay.

 9             And did you seek treatment for that?

10   A    Yes.

11   Q    Okay.

12             Sometime after Madison was born was she also

13        diagnosed with hip dysplasia?

14   A    Yes.

15   Q    Okay.

16             Approximately when was that?

17   A    That was March of two thousand and six (2006).

18   Q    Okay.

19             And what was the treatment for that?

20   A    She was put into a Pavlik harness.

21   Q    Can you tell us what that is?

22   A    Umm --- it went around both of her legs.   The straps

23        went over her shoulder and a strap went around her

24        chest and it kept her legs up into a frog position,

25        outward and at ninety (90) degrees.
```

1    Q    And how long did she have to wear that harness?

2    A    Umm --- she was in it twenty-four (24) hours a day.

3         After about two months she was allowed to be out of it

4         for two hours a day.   And about another month after

5         that she was down to twelve (12) hours a day.   Umm --

6         - when she was six months old she was put into a

7         brace.

8    Q    Okay.

9              And for which leg?

10   A    Umm --- she --- they saw hip dysplasia in both hips

11        but it was greater on the left than the right.

12   Q    And so the brace was for the left leg?

13   A    It --- she had to go on both.

14   Q    Okay.

15             Now I want to direct your attention to November

16        thirtieth (30th), of two thousand and six (2006).

17             About how old was Madison at that time?

18   A    She was eleven (11) months old.

19   Q    Okay.

20             Was she crawling then?

21   A    No.

22   Q    Okay.

23             Umm --- can you describe, was she able to move

24        around at all?

25   A    Umm --- yes.   She could push herself up into a

                              149

```
 1        sitting position and she would move forward.   She

 2        would do the splits and walk her hands down to be on

 3        her stomach.   And she could roll.

 4   Q    Okay.

 5            Was she trying to pull herself up on furniture

 6        yet?

 7   A    No.

 8   Q    Okay.

 9            Now in November of two thousand and six (2006),

10        who lived in your home on Scott Street?

11   A    Umm --- Steve, Madison and myself.

12   Q    And umm --- did you have --- what was your work

13        schedule at that time?

14   A    I was working seven pm (7:00pm) to three-thirty am

15        (3:30am).

16   Q    And on November thirtieth (30th) of two thousand and

17        six (2006), do you remember that day?

18   A    Yes.

19   Q    Can you tell us how the day started?

20   A    Umm --- Steve had gotten up early to go outside with

21        some of the guys that he worked with to put in a new

22        sewer line outside of the house.   Umm  --- I got up

23        about six-thirty (6:30), quarter to seven (6:45).

24        Umm --- and I went into check on Madison and she was

25        awake.
```

150

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   And what was she doing if you remember?

2   A   She was just laying there playing with the bumper on

3       the crib.

4   Q   What happened then?

5   A   She had some dried spit-up on the side of her face and

6       on her sleeper.  So I got her up and I washed her

7       off.  And I got a bottle made for her.

8   Q   What happened then?

9   A   She drank her bottle.  Sat on the couch with me.

10      Umm ---

11  Q   (Interposing)  If you can remember Mrs. McBurney,

12      about what time was it at that point?

13  A   About nine o'clock (9:00).

14  Q   Okay.

15        What happened then?

16  A   Umm --- I laid out --- I was laying on my back on the

17      couch.  Madison fell asleep laying on my chest.  And

18      umm --- maybe about twenty (20) minutes or so, about

19      ten o'clock (10:00) I took her in to give her a bath.

20  Q   When you say in?

21  A   I took her into the bathroom to give her a bath.

22  Q   Okay.

23        And what happened then?

24  A   Umm --- I had --- she was sitting on the floor next to

25      me.  I was letting the bathtub fill up.  And umm ---

1       then she threw up.   I called for Steve.   He came in.

2       I had to get a new shirt and new towel and stuff.   So

3       he sat there with her for a little bit on the --- on

4       the floor to make sure she was okay.   She seemed to

5       feel okay.   I gave her her bath.   She seemed okay in

6       the bath.   She didn't throw up anymore.   I got her

7       out and got her dressed.   Umm --- it was going to ---

8       I took her out into the front room, the living room.

9   Q   Okay.

10          Let me stop you there for a minute.   .

11          When --- when you talk about, I know that you

12      said that she threw up in the bathroom.   And you said

13      earlier there was spit up on her face and sleeper?

14  A   Yes.

15  Q   Is there a difference to you in spitting up and

16      throwing up?

17  A   Yes.

18  Q   Can you explain to the Jury what that is?

19  A   Umm --- spitting up would be a small amount that comes

20      up with like burping.   Umm --- throwing up would be a

21      large amount of digested or undigested food.

22  Q   Okay.

23          With what you saw on her face and her sleeper

24      when you went into her room in the morning, were you

25      concerned that she was sick at that point?

1    A    No, other than her stomach was growling when I got her

2         up.

3    Q    Okay.

4              Had she been sick the day before?

5    A    No.

6    Q    Okay.

7              Had she vomited the day before?

8    A    No.

9    Q    But clearly what happened in the bathroom she had

10        vomited?

11   A    Yes.

12   Q    Okay.

13             Now you said that umm --- you went ahead and gave

14        her a bath?

15   A    Yes.

16   Q    Umm --- did she play in the bathtub?

17   A    A little bit, yes.

18   Q    Okay.

19             And then what happened after the bath?

20   A    Umm --- I got her out, got her dressed.   Umm --- I

21        took her out into the front room.   Was umm --- tried

22        to feed her a little baby food to see if her stomach

23        could handle it.   Just plain baby food.   Umm ---

24   Q    (Interposing)   About, if you know, what time was

25        that?

153

1    A    I would say close to eleven (11:00).

2    Q    What happened when you tried to give her a little

3         plain baby food if anything?

4    A    She threw up again, a small amount.   Enough to change

5         her.   I had to change her shirt.   Umm --- but she

6         didn't --- it didn't seem to bother her.   She didn't

7         act like she wasn't feeling well other than she did

8         seem more tired, wanting to lay down again.

9    Q    If you recall, did she --- had she slept through the

10        night the night before?

11   A    Umm --- I got home about four o'clock (4:00).   She

12        was asleep when I got home.

13   Q    Okay.

14   A    And umm --- I did not hear her fuss when I got up.

15        She was just laying in there.   Umm --- I don't know

16        how long she had been awake.

17   Q    Okay.

18            So since you were home from four am (4:00am) she

19        didn't seem to have gotten up during that period of

20        time of the night?

21   A    No.

22   Q    Okay.

23            What happened then?

24   A    I let her go in.   I took her in and let her lay down.

25        She took a little nap probably about forty-five (45)

154

1    minutes.

2  Q    When was that?

3  A    This was umm --- probably close to noon (12:00).

4  Q    And how did she react to being put down for a nap?

5  A    She was --- she laid right down, fell asleep.

6  Q    Did --- and what was her reaction to being laid down?

7  A    She didn't have any problem with that.   She wasn't

8       upset about it.   She was tired.

9  Q    Okay.

10        And you said she napped for about forty-five (45)

11       minutes.

12        What happened then?

13  A    Umm --- she got up.   Umm --- I gave her some apple

14       juice with water.   Wanted to keep her hydrated.   I -

15       --

16  Q    (Interposing)   Did she keep that down?

17  A    Yes.

18  Q    What happened then if you can remember?

19  A    Umm --- I played on the floor with her for a little

20       bit.   Umm --- she played but umm --- I would say more

21       wanted to sit on my lap, just kind of be next to me

22       more than play with her toys but she did still play

23       with me.   Umm --- I gave her some more of her baby

24       food.

25  Q    And did she eat that?

                              155

1    A    Yes.

2    Q    And was she able to keep that down?

3    A    Yes.

4    Q    Do you know about what time that was?

5    A    I don't really know.

6    Q    Okay.

7         What happened after that?

8    A    Umm --- I just umm --- entertained her for the

9         afternoon.   Did things around the house.   Put her in

10        her walker umm --- for a little bit but she seemed

11        uncomfortable in the walker.   I took her out of the

12        walker and umm --- probably about five o'clock (5:00)

13        I started to make dinner and get ready to go to work.

14   Q    Okay.

15        Now you said she seemed uncomfortable in the

16        walker.   What position was she in, in the walker?

17   A    Umm --- she stands up in the walker.

18   Q    Okay.

19        You said about five o'clock (5:00) you started to

20        make dinner and to get ready for work?

21   A    Yes.

22   Q    What happened then?

23   A    Umm --- I went into work about --- I usually left

24        about six-thirty (6:30).   I left about a half hour

25        early.   Umm --- I laid her down in her crib and

156

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1        probably about fifteen (15) minutes before I left umm
 2        ---
 3   Q    (Interposing)   So that would be about five forty-five
 4        (5:45), would that be right?
 5   A    Yes.
 6   Q    How did she react when you laid her in her crib at
 7        that point?
 8   A    She didn't have any problem with that.   Umm ---
 9   Q    (Interposing)   Do you recall what she was doing in
10        her crib when you laid her down?
11   A    She just laid there.   When I went back and checked on
12        her about fifteen (15) minutes later umm --- she was
13        just playing with a toy in there laying in her crib.
14   Q    And then what time did you leave for work?
15   A    I left right around six o'clock (6:00).
16   Q    Okay.
17        Whose care did you leave Madison in that night,
18        that evening?
19   A    With Steve.
20   Q    Was there anyone else home when you left?
21   A    No.
22   Q    How was Madison when you left?
23   A    She was content, just playing with her toys.
24   Q    Did you have any concern that she still was sick?
25   A    Umm --- I wouldn't say probably she was back to a
```

157

1     hundred percent (100%) but that she was feeling a lot

2     better than this morning --- that morning.

3  Q  Now did there come a point after you got to work that

4     you were contacted by your husband?

5  A  Yes.

6  Q  Do you know about when that happened, about what time?

7  A  I know that it was after seven.   I don't know about

8     how long after that.

9  Q  Okay.

10     And what, if anything, did he say to you on the

11     telephone?

12  A  Umm --- he said that umm --- 'Madison had collapsed

13     and I need to come home.'

14  Q  Did he say anything else during that phone call?

15  A  I --- I asked him, 'What?'   'To repeat it.'

16     And he said that, 'Madison had collapsed and that

17     the ambulance was there.'

18  Q  What happened then?

19  A  I --- I got my coat and purse and I went out to my

20     car.   And I called him back again to find out what

21     hospital they were going to and ---

22  Q  (Interposing)   Were you able to reach him?

23  A  Yes.   And he said that, 'They were going to U of M

24     Hospital.'

25  Q  Did he say anything else to you at that point?

1  A    No.

2  Q    Did he say anything to you during either of those

3       phone conversations about her condition?

4  A    No.

5  Q    Did he say anything else about what had happened

6       during either of those phone calls?

7  A    No.

8  Q    What happened then?

9  A    Umm --- I went back inside.  I wasn't sure how to get

10      to U of M from where I work.  And umm --- my boss was

11      still there.  And I got into her car and she took me

12      to the hospital.

13 Q    Can you tell us what, if anything, happened when you

14      arrived at the University of Michigan Hospital?

15 A    We arrived there just as the ambulance was there.  I

16      saw Steve get out of the back.  Umm --- I was already

17      out of the car and I saw them umm --- take Madison out

18      of the back of the ambulance.

19 Q    What happened then?

20 A    I followed them into the ER.  They sat us down in

21      some chairs.  And umm --- they started umm --- to

22      work on Madison.

23 Q    Where --- where were the chairs where you were sitting

24      in relation to where Madison was?

25 A    I was straight across from where she was.

                         159

1    Q    Were you in the same little area of the emergency

2         room?

3    A    Yes.

4    Q    Did there come a point where you gave someone from the

5         emergency room a history, a medical history of

6         Madison?

7    A    Yes.

8    Q    While you were in the emergency room with your husband

9         did he tell you anything more about what had happened

10        to Madison?

11   A    Umm --- yes.

12   Q    What did he say?

13   A    He said that, 'She was sitting on the floor.'   And he

14        was putting away her clothes in the hamper and her

15        diaper in the diaper pail and she fell back on the

16        floor and she was --- her body got really stiff and

17        that she would (indicating) and then she went limp.

18   Q    Now Mrs. McBurney, are you familiar with the phrase

19        separation anxiety?

20   A    Yes.

21   Q    And did Madison, was she going through that?

22   A    Yes.

23   Q    And about how long had she been going through that?

24   A    Umm --- I would say probably a month-and-a-half.

25   Q    And who was she reacting to being separated from if

160

1       you know?

2   A   Umm --- I would say myself the most.   Umm --- she

3       really would try to get anybody's attention if they

4       weren't looking at her.   With me it was the most she

5       wanted.   She would try to get me to look at her.

6   Q   Okay.

7           If you were doing things in your home umm ---

8       while, you know, she was in a bouncy seat or swing or

9       whatever, and you stepped into another room, would she

10      begin to show signs of a separation anxiety?

11  A   Yes.

12  Q   Okay.

13          And how would she exhibit that?

14  A   It was kind of like umm --- she would babble to

15      herself but do it a little bit louder when she

16      couldn't see me to try to get my attention.   Umm ---

17      kind of a whine.

18  Q   Did she cry?

19  A   No.

20  Q   Was --- was this a problem when you would leave for

21      work?

22  A   Umm --- when she did start with the separation from me

23      umm --- the anxiety from me, umm --- if I put her into

24      bed and she didn't see me leave she wouldn't do that.

25  Q   Okay.

161

1        So did that become a routine to do that when you

2    would have to leave for work?

3  A   Yes.

4  Q   Now umm --- as I understand it, after Madison was in

5    the emergency room, at some point she was admitted to

6    the University Hospital?

7  A   Yes.

8  Q   Okay.

9        And do you recall how many days she was there?

10  A   Umm --- she was taken into the ER on a Thursday and

11    she passed away on Monday.

12  Q   Okay.

13        Did you remain at the hospital with her the

14    entire time?

15  A   Yes except for maybe two hours on that following

16    Friday to go home and change my clothes and take a

17    shower because I had come right from work.

18  Q   Okay.

19        Where would you stay at night?

20  A   Umm --- I would stay in her room.   They also had a

21    lounge there.   Umm --- I tried to sleep in there a

22    couple times but I couldn't.   I would just stay in

23    her room.

24  Q   Were you able to get any sleep during the period of

25    time that you were there with Madison?

162

1  A    Umm --- a little.

2  Q    Okay.

3        Did there come a point when you were at the

4  hospital with Madison that you became aware of the

5  fact that her situation or her condition was very

6  serious?

7  A    Yes.

8  Q    How soon was that after she was brought to the

9  hospital?

10  A    Umm --- I would say that I really noticed probably

11  that starting that Saturday morning.

12  Q    That must have been very difficult for you, I'm sorry.

13        At some point Mrs. McBurney, late Saturday night,

14  early Sunday morning, umm --- did a nurse come to the

15  room to get you?

16  A    Yes.

17  Q    Okay.

18        Do you remember the nurse's name?

19  A    Yes, Regina.

20  Q    And uh --- did you go with the nurse?

21  A    Yes.

22  Q    And where did you go?

23  A    To a conference room umm --- down the hall.

24  Q    Who, if anyone, was in the conference room?

25  A    Umm --- Officer Sederlund, Officer Sovik and Sarah

163

```
 1           Weaver from child protective services.

 2     Q     And uh --- Regina the nurse you talked about, did she

 3           stay with you or leave?

 4     A     (No verbal response.)

 5     Q     If you can remember.

 6     A     I believe she was there the whole time.    I do

 7           remember seeing her at one point.

 8     Q     Can --- can you describe this room for us?

 9     A     Umm --- there was a long table, chairs on either side.

10           The door was behind me.    Umm --- there was a monitor,

11           a TV monitor, computer monitor in there.    Umm ---

12     Q     (Interposing)    Is this like a conference room?

13     A     Yes.

14     Q     Okay.

15           And umm --- where were the officers located in

16           the room?

17     A     Umm --- Officer Sovik was on my right-hand side.    I

18           was sitting at the head of the table.    And Officer

19           Sederlund was on my left-hand side and Sarah Weaver

20           was to the left of him.

21     Q     Okay.

22           And do you remember where the nurse was?

23     A     Umm --- the time that I remember seeing her, she was

24           sitting --- she was back behind me.    I just remember

25           seeing her out of the corner of my eye at one point.
```

164

1  Q    And where was the door to the room in relation to

2       where you were sitting?

3  A    It was behind me.

4  Q    Okay.

5          Did you talk to the officers for awhile?

6  A    Yes.

7  Q    Can you describe their demeanor when you talked to

8       them?

9  A    Umm --- they were umm --- calm.   Umm --- I don't ---

10  Q   (Interposing)   Did they raise their voices to you at

11      all?

12  A    No.

13  Q   Were they polite to you?

14  A    Yes.

15  Q   Do you know about how long you talked to them?

16  A    I don't know.

17  Q   Okay.

18        What happened when you were done speaking with

19      them?

20  A    Umm --- I got up and the nurse was there.   And she

21      walked me back to Madison's room.

22  Q   Now when you got back to Madison's room who was there?

23  A    Umm --- Steve was in the room with Madison.

24  Q   Did you have any other family with you that week

25      besides your husband?

165

1    A    Umm --- my parents came over.   They were sleeping at

2         my house at the time.

3    Q    And what are their names?

4    A    Gary and Susan Linville.

5    Q    Okay.

6         Did there come a point that your husband left the

7         room?

8    A    Yes.

9    Q    About how long was that, if you know?

10   A    Umm --- she took him immediately out after she

11        returned me to the room.

12   Q    Okay.

13        Do you know how long he was gone from the room?

14   A    I don't know.

15   Q    Okay.

16        Do you remember if it was light or dark outside?

17   A    Dark.

18   Q    Did there come a point where someone came back to the

19        room?

20   A    Yes.

21   Q    Who was that?

22   A    The nurse came back.

23   Q    The same nurse, Regina, you told us about?

24   A    Yes.

25   Q    Okay.

166

1        And what happened then?

2  A   Umm --- she took me back to the same conference room

3      where the officers were.

4  Q   Okay.

5        Now who was in the conference room when you went

6      back?

7  A   Umm --- Officer Sovik, Officer Sederlund and Steve.

8  Q   Okay.

9        You had mentioned Sarah Weaver.   Was she still

10     there?

11  A   No.

12  Q   And when you went back into the room, did the nurse go

13     back in the room with you or did she leave?

14  A   She left.

15  Q   Okay.

16        Where was your husband sitted --- seated in the

17     room?

18  A   Umm --- he was sitting at the head of the table.

19  Q   And were the officers in the same or a different

20     position as they'd been in when you left?

21  A   They were in the same position.

22  Q   And what did you do when you went in the room?

23  A   Umm --- I sat down.   Umm --- I was sitting to the

24     left of Officer Sovik.   And umm --- umm --- I was umm

25     --- the officer started to ---

167

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q    (Interposing)   Well let me stop you there for a

2        second.

3             So you said you were sitting to the left of

4        Sergeant Sovik.   Where was your husband in relation

5        to where you were sitting?

6   A    Umm --- he was to the left of me.

7   Q    Okay.

8             So you were sitting between them?

9   A    Yes.

10  Q    While you were in the room, did your husband make any

11       statements to you about what had happened to Madison?

12            MR. WHITE:   Your Honor, you know I have an

13       ongoing objection about this.   And we've had hearings

14       and stuff.

15            THE COURT:   That's been discussed.

16            MR. WHITE:   So I just want to continue my

17       objection.

18            THE COURT:   Noted.   Thank you.

19            MS. POPE-STARNES:   I believe this has

20       already been addressed by the law --- by the Courts.

21       Excuse me.

22            May I proceed Your Honor?

23            THE COURT:   Yes.

24            MS. POPE-STARNES:   Thank you.

25  Q    **(By Ms. Pope-Starnes, continuing)**   Mrs. McBurney, I

1      believe my question to you was, did your husband make

2      any statements to you about what had happened to

3      Madison?

4    A   Umm --- he said that he threw her into the crib.

5    Q   Did he say anything else?

6    A   No.   Not that I remember.

7    Q   Okay.

8          What was your reaction to that?

9    A   I was just stunned, I guess.

10   Q   Now you had testified that there had came a point on

11      Monday or Tuesday that Madison passed away?

12   A   Yes.

13   Q   Do you remember what the day was?

14   A   Monday.

15   Q   And were you with her?

16   A   Yes.

17   Q   Okay.

18          I want to talk to you about the well-baby doctor

19      visits that you took Madison for, okay?

20   A   Okay.

21   Q   Are you okay to proceed?

22   A   Yes.

23   Q   Okay.

24          Would you like a glass of water?

25   A   Yes please.

169

```
 1    Q    Okay.

 2    A    Thank you.

 3              THE COURT:   Jeff, bring a couple more

 4         Styrofoam cups too for both Counsel's tables, okay?

 5         They need some water.

 6    Q    (By Ms. Pope-Starnes, continuing)   Okay?

 7    A    Okay.

 8    Q    All right.

 9              Who was Madison's regular pediatrician?

10    A    Doctor Adams.

11    Q    Okay.

12              And did you take her for well-baby visits?

13    A    Yes.

14    Q    I'm not going to ask you the specific dates, but

15         approximately how often?

16    A    Umm --- more often at first and then it was

17         approximately every three months.

18    Q    Okay.

19              Did the doctor kind of give you an idea or the

20         office kind of give you an idea of when they wanted to

21         see her back?

22    A    Yes.

23    Q    And did you stick with the schedule they gave you?

24    A    Yes.

25    Q    Okay.
```

1           And umm --- did there come a point where you were

2     getting treatment for the aplasia cutis congenita?

3  A   Yes.

4  Q   Okay.

5           And by November thirtieth (30th) of two thousand

6     and six (2006), had any of those three spots healed or

7     begun to heal?

8  A   Umm --- the --- she did have a spot that healed right

9     after she was born.   Umm --- the other two spots were

10    still open.

11 Q   Now are you familiar with something called MRSA?

12 A   Yes.

13 Q   Did there come a point where Madison was diagnosed

14    with that?

15 A   Yes.

16 Q   When was that?

17 A   Umm --- around November thirteenth (13th).

18 Q   And do you remember the name of the doctor who

19    diagnosed that?

20 A   (No verbal response.)

21 Q   Was it Doctor Adams?

22 A   No.

23 Q   Okay.

24 A   Doctor Lipkin (phonetic).

25 Q   And did he give you any prescription to treat that?

                        171

1  A   Yes.

2  Q   What did he give you?

3  A   Uh --- Bactroban.

4  Q   Okay.

5      And how often were you supposed to --- what is

6      that?   Is that oral?   Is it topical?

7  A   It's a --- it's a topical.

8  Q   Okay.

9      And how often were you supposed to apply that?

10 A   Umm --- I believe I was putting that on three times a

11     day.

12 Q   Okay.

13     And were you applying it and giving her that as

14     you had been instructed by the doctor?

15 A   Yes.

16 Q   When did you start doing that?

17 A   Umm --- I picked up the prescription the day I left

18     the hospital.   It was started that night.

19 Q   Did --- did it --- is Doctor Lipkin's office in a

20     hospital?

21 A   No.

22 Q   Okay.

23 A   It's umm --- it's --- I believe it's called Genoa

24     Township Medical Center.

25 Q   Okay.

172

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      Was it the same day or a different day that

2   Doctor Lipkin diagnosed the MRSA that you began giving

3   her the prescription of the Bactroban?

4   A   It was the same day.

5   Q   Okay.

6          MS. POPE-STARNES:   Your Honor, I'd ask the

7   record to reflect that I'm showing Counsel what has

8   been marked as People's Proposed Exhibits 2 through 6.

9   I've already shown them to them --- to him but I would

10  like to do that for the record.

11         May I approach the witness Your Honor?

12         THE COURT:   You may.

13  **Q   (By Ms. Pope-Starnes, continuing)**   Mrs. McBurney, I'm

14  showing you what has been marked as People's Proposed

15  Exhibit 2.

16  A   I'm sorry?

17  Q   You okay?

18  A   Yeah.

19  Q   And ask you if you recognize that?

20  A   Yes.   That's Madison's swing.

21  Q   Is this a photograph?

22  A   Yes.

23  Q   Okay.

24         And you're saying it's a photograph of Madison's

25  swing?

173

1   A   Yes.

2   Q   Where is this photograph taken?

3   A   In Madison's bedroom.

4   Q   Is this a fair and accurate depiction of how that area

5       of Madison's bedroom looked on approximately November

6       thirtieth (30th) of two thousand and six (2006)?

7   A   Yes.

8   Q   I'm now showing you what has been marked as People's

9       Proposed Exhibit 3 and ask you if you recognize that?

10  A   Yes.

11  Q   Is that a photograph?

12  A   Yes.

13  Q   And that's a photograph of what?

14  A   Madison's crib.

15  Q   Okay.

16          And do you recognize the area where that is

17      taken?

18  A   Yes.

19  Q   That's in Madison's bedroom?

20  A   Yes.

21  Q   Is this photograph a fair and accurate depiction of

22      how that area of Madison's bedroom looked on or about

23      November thirtieth (30th) of two thousand and six

24      (2006)?

25  A   Yes.

174

1  Q    I'm showing you what has been marked as People's

2       Proposed Exhibit 4.   Do you recognize that?

3  A    Yes.

4  Q    And what is that?

5  A    *Umm --- this is the chair, the rocking chair, in*

6       Madison's bedroom.

7  Q    This is a photograph of that?

8  A    Yes.

9  Q    And is this photograph a fair and accurate depiction

10      of that area of Madison's bedroom with the chair and

11      part of the crib on or about November thirtieth (30th)

12      of two thousand and six (2006)?

13 A    Yes.

14 Q    I'm showing you what has been marked as People's

15      Proposed Exhibit 5.   Do you recognize that?

16 A    Yes.

17 Q    Is that a photograph?

18 A    Yes.

19 Q    And what is that a photograph of?

20 A    That's Madison's changing table in her bedroom.

21 Q    And is that a fair and accurate depiction of the

22      changing table area of Madison's bedroom on or about

23      *November thirtieth (30th) of two thousand and six*

24      *(2006)?*

25 A    Yes.

1    Q    And finally I'm showing you what has been marked as

2         People's Proposed Exhibit 6.   Do you recognize that?

3    A    Yes.

4    Q    And what is that?

5    A    That's the front door of our house.

6    Q    Is that a photograph of that area?

7    A    Yes.

8    Q    And is that a fair and accurate depiction of that area

9         of your home on or about November thirtieth (30th) of

10        two thousand and six (2006)?

11   A    Yes.

12   Q    Thank you.

13             MS. POPE-STARNES:   Your Honor, I would move

14        for the admission of People's Proposed Exhibits 2

15        through 6.

16             MR. WHITE:   No objection.

17             THE COURT:   So admitted.

18   Q    **(By Ms. Pope-Starnes, continuing)**   At the hospital

19        did there come a point where um --- Sergeant Sovik and

20        Detective Sederlund asked you to sign or give

21        permission or consent for your home to be searched?

22             MR. WHITE:   I'm questioning the relevance

23        of this Judge.

24             THE COURT:   Okay.

25        Well go ahead with some relevance.

                              176

```
1              MR. WHITE:   I'm objecting.

2              MS. POPE-STARNES:   Well I'm going to be

3      admitting it as an Exhibit so ...

4          My offer of proof is this Honor --- Your Honor.

5      I have another witness that's a police officer that's

6      going to testify that he went to the home.   That he

7      took photographs and that he took items from the home.

8      Obviously he has to legally do that.   And so I'm

9      laying the foundation for that.

10             THE COURT:   Thank you.

11         Mr. White?

12             MR. WHITE:   I don't believe there's much

13     dispute but I guess that's appropriate.

14             THE COURT:   You may proceed.

15             MS. POPE-STARNES:   Thank you.

16  Q    (By Ms. Pope-Starnes, continuing)   Do you recall the

17     question Mrs. McBurney?

18  A    Can you repeat it please?

19  Q    I sure can.

20         Did there come a point um --- when you were at

21     the hospital that Sergeant Sovik and Detective

22     Sederlund asked you if you would consent for the

23     police to search your home on Scott Street?

24  A    Yes.

25  Q    Okay.
```

177

1          And did you sign a written consent to search

2     form?

3 A    I know I wrote out something.   I don't know exactly

4     what I wrote.

5 Q    Okay.

6          MS. POPE-STARNES:   May I have just one

7     moment please, Your Honor?

8          THE COURT:   You may.

9          (Whereupon a brief delay was had.)

10              * * *

11         MS. POPE-STARNES:   May I have just one more

12    moment please Judge?

13         THE COURT:   Yes.

14         (Whereupon a brief delay was had.)

15              * * *

16         MS. POPE-STARNES:   Thank you.

17    I have no other questions Your Honor.

18         THE COURT:   Mr. White.

19         **CROSS-EXAMINATION**

20 **BY MR. WHITE:**

21 **Q**    Heather, how old are you?

22 A    Thirty-five (35).

23 Q    And where did you go to high school?.

24 A    Umm --- Brighton High School.

25 Q    Any siblings?

178

1   A    Yes.   I have one sister, Janet.

2   Q    And I believe you testified you got your nursing

3        degree from Oakland County Community College?

4   A    Yes.

5   Q    And you've been a registered nurse for nine years?

6   A    Yes.

7   Q    And you work where?

8   A    I work at Heartland Health Care Center in Ann Arbor.

9   Q    And what is your position there?

10  A    Umm --- I'm an RN.

11  Q    How long have you worked there?

12  A    Seven years.   About seven years.

13  Q    As part of your job as being an RN for Heartland are

14       you under the responsibility, the mandatory reporting

15       act, regarding suspected abuse?

16  A    Yes.

17  Q    I believe you indicated you met Steve five years ago?

18  A    Yes.

19  Q    And how did you meet him?

20  A    Umm --- through a mutual friend.

21  Q    That friend would be Kyle?

22  A    Yes.

23  Q    Okay.

24       And you met him July of two thousand two (2002)?

25  A    August.

179

```
 1   Q    I'm sorry, August.

 2   A    August.

 3   Q    And after you met Mr. --- after you met Steve at

 4        Kyle's, you met at Kyle's correct?

 5   A    Actually I met him at the house that he was renting

 6        from.   I was --- I was driving home from a wedding

 7        and called Kyle and he was at Steve's house so ...

 8   Q    I see.   I'm sorry.

 9             And uh --- you started dating after that?

10   A    Yes.

11   Q    And then would have been about what time?

12   A    Umm --- talked for a while on the phone and computer.

13        We started dating in September.

14   Q    September of that year, two thousand two (2002)?

15   A    Yes.

16   Q    And umm --- Steve was living where at that time, what

17        area?

18   A    He was living in Canton.

19   Q    And where were you living?

20   A    I was living in Howell.

21   Q    And were you living on your own?

22   A    Yes.

23   Q    And was Steve living on own --- on his own?

24   A    Yes.

25   Q    Okay.
```

```
1           And where was Steve working at that time?

2    A   He was working at S. M. Lawn Service.

3    Q   Okay.

4           And his boss was who?

5    A   Umm --- Scott Merriman (phonetic).

6    Q   Okay.

7           And did Steve retain that employment throughout

8        your relationship?

9    A   Yes.

10   Q   Okay.

11          His boss always the same, Scott Merriman?

12   A   Yes.

13   Q   Umm --- was there a point that you ceased living

14       separately and started living together?

15   A   Yes.

16   Q   And when was that approximately?

17   A   Umm --- that was July of two thousand and three

18       (2003).

19   Q   And when you moved in together, uh --- where did you

20       reside?

21   A   Umm --- Novi.

22   Q   And umm --- was it an apartment, house ---

23   A   (Interposing)   apartment.

24   Q   Okay.

25          And you continued to work at Heartland?
```

181

1   A   Yes.

2   Q   And Steve continued to work at S. M. Lawn Service?

3   A   Yes.

4   Q   And then there came a time that you purchased a home,

5      correct?

6   A   Yes.

7   Q   The home at three-eleven (311) Scott Street?

8   A   Yes.

9   Q   Okay.

10        And umm --- you've already seen a picture of that

11      --- the inside of that home, correct?

12   A   Yes.

13   Q   And that's where you live now?

14   A   Yes.

15   Q   Umm --- and do you remember when that was purchased?

16   A   Umm --- April of two thousand and four (2004).

17   Q   Okay.

18        And you moved in immediately?

19   A   Yes.

20   Q   And umm --- have you always since you and Steve

21      started living together, have you always --- have you

22      always continuously lived together until on or about

23      December second, two thousand (2000)?

24   A   Yes.

25   Q   Two thousand and six (2006)?

1   A   Yes.

2   Q   Umm --- and you were married on March fifth, two

3       thousand and five (2005)?

4   A   Yes.

5   Q   Las Vegas?

6   A   Yes.

7   Q   Friends and family present?

8   A   Yes.

9   Q   And you came back and had a reception afterwards?

10  A   Yes.

11  Q   And uh --- after your reception did you discover that

12      you were pregnant?

13  A   Yes.

14  Q   And umm --- what was Steve's reaction?

15  A   Umm --- he was happy.

16  Q   How about yours?

17  A   I was a little shocked.

18  Q   Okay.

19          And why was that?

20  A   Umm --- because it was not planned.

21  Q   Umm --- and so it was sometime in March that we

22      conceived?

23  A   Yes.

24  Q   And then you continued to work all the way up to when?

25  A   Umm --- I called in the day that I went for my C-

183

1    section.

2  Q   Okay.

3    And tell the Jury about how that happened. Was

4    that a regular doctor visit? Was that something

5    extraordinary or ...

6  A   Umm --- it was a regular doctor visit. I would try

7    to go either before work or after work. The

8    appointment that day was before work. Umm --- I had

9    a regular checkup. They --- the doctor wanted to do

10    an ultrasound just to check for position and saw that

11    she was breech.

12  Q   Okay.

13    Had you had any problems up to that point with

14    your pregnancy Heather?

15  A   Umm --- I had what was called hyperemesis gravidia

16    (sic) I believe they called it.

17  Q   And what was that?

18  A   Umm --- I had excessive vomiting the entire pregnancy.

19  Q   Okay.

20    And you had that and you continued to work all

21    the way up to the day that you delivered your

22    daughter?

23  A   Yes.

24  Q   Uh --- and when you were informed that it was

25    necessary to take her by C-section, what happened

184

1     next?   Did you go right to the hospital?

2  A  Umm --- he --- the doctor umm --- said that he could

3     do it at eleven o'clock (11:00) that day.   Umm --- so

4     I left.   Called Steve.   Met him at home.   Umm ---

5     got the stuff that I needed and we drove to St. Joseph

6     Hospital.

7  Q  St. Joseph's in Ann Arbor?

8  A  Yes.

9  Q  And uh --- she was delivered by Cesarean section?

10  A  Yes.

11  Q  Okay.

12     And uh --- you stayed in St. Jo's from twelve

13     twenty-seven (12/27) to twelve thirty (12/30), isn't

14     that true?

15  A  Yes.

16  Q  Okay.

17     Umm --- all right.   I believe we've already

18     admitted the St. Jo's Hospital records.   And I just

19     want to make them for the record that this is Exhibit

20     A.

21     THE COURT:   Was that part of --- part of

22     Exhibit 1 for ---

23     MR. WHITE:   (Interposing)   No.   We made a

24     pretrial motion regarding St. Jo's Hospital records.

25     THE COURT:   Oh, okay.   Okay.

185

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1           MR. WHITE:   And so I just wanted to let you

2     know that I've marked this as Exhibit A.

3           THE COURT:   This --- are you moving for its

4     admission right now or ...

5           MR. WHITE:   I believe I already did.   And

6     I believe you ruled.   I'll do it again.

7           MS. POPE-STARNES:   May I --- may we

8     approach?

9           THE COURT:   You may.   You may.

10          (Whereupon a discussion was held at the Bench out

11     of hearing of the Jury and the Court Reporter.)

12                     * * *

13  **Q   (By Mr. White, continuing)**   How did you learn Heather

14     that Madison's hips were dislocated?

15  A    I'm sorry?

16  Q    How did you discover after you had birth, gave birth

17     and recovering from a Cesarean section that her hips

18     were dislocated at birth?

19  A    Umm --- as I was getting into my hospital bed umm ---

20     from the operating room, they said that they had to

21     pop her legs --- hips back into joint umm --- after

22     she was born.

23  Q    Okay.

24          And did they tell you the position that she was

25     in at the time of ---

                          186

```
 1              MS. POPE-STARNES:    (Interposing)

 2        Objection, hearsay.

 3                 THE COURT:   Sustained.

 4                 MR. WHITE:   Okay.

 5   Q    (By Mr. White, continuing)    Okay.

 6           But she was born breech, correct?

 7   A    Yes.

 8   Q    Okay.

 9           And umm --- when did you notice the spots on her

10        head?

11   A    Umm --- I noticed the spots when I took her hat off.

12        They had a hat on her and when I took the hat off I

13        noticed them.

14   Q    Did she have hair?

15   A    Yes.

16   Q    Okay.

17           And you noticed those spots.   Did they have

18        hair?

19   A    Yes.

20   Q    Okay.

21           Any explanation given to you?

22   A    Umm --- I had asked about it and umm --- they said

23        that it was probably from ---

24                 MS. POPE-STARNES:    (Interposing)

25        Objection.   It would be hearsay Your Honor as to what
```

187

1    they said.

2         THE COURT:   It's --- it's kind of ---

3    Ma'am, no disrespect to you.   It's really hard in a

4    Court proceeding, but you've got to try to focus just

5    on the question that's asked and don't go beyond that.

6         THE WITNESS:   Okay.

7         THE COURT:   *You're doing fine.*

8    Go ahead Mr. White.

9         MR. WHITE:   You know, I believe we've had a

10   ruling regarding the medical records Judge.   And I

11   guess that would clear a lot of matters up.   So maybe

12   we can take a break and review the fact that this has

13   already been admitted once.

14        THE COURT:   We're talking about the thing

15   that we were talking about up here?

16        MR. WHITE:   Yes.   Yes.   That would remove

17   a lot of the hearsay part of this.

18        THE COURT:   Just so everybody's not kept in

19   the lurch, I made a ruling on something earlier and we

20   don't have a meeting of the minds as to what the ---

21   what the ruling was.   Recollections are not that

22   good.   So umm --- is there --- is there any --- you

23   need to get this reconciled right now?

24   And if you do, you do.

25        MR. WHITE:   I can go back.   I can go back

188

1    to it Judge.

2                    THE COURT:   Are you sure?

3                    MR. WHITE:   I will.

4                    THE COURT:   I mean ---

5                    MR. WHITE:   (Interposing)   I will go back

6    to it.   No problem.

7                    THE COURT:   Okay.   All right.   All right.

8                    MR. WHITE:   And after our break we'll just

9    look at our notes.

10   Q    **(By Mr. White, continuing)**   In umm --- you went home

11        *on December thirtieth (30th)?*

12   A    Yes.

13   Q    Was Steve there throughout your periods of

14        consciousness during the birth of your daughter?

15   A    Yes.

16   Q    Okay.

17        Did he appear excited to you?

18   A    Yes.

19   Q    Okay.

20        Umm --- and umm ---when you returned home you

21        returned home to the Scott Street address, correct?

22   A    Yes.

23   Q    And did you have her room all made up?

24   A    Yes.

25   Q    And her bed?

189

1   A    Yes.

2   Q    Okay.

3           I'm going to show you Exhibit B which has also

4   been admitted per our notes.

5           Would you like to see this Exhibit, Counselor?

6               MS. POPE-STARNES:    That I have no objection

7   to.

8               THE COURT:    You may approach.

9               MR. WHITE:    Okay.    If I may, Your Honor?

10              THE COURT:    You may certainly approach.

11  Q    **(By Mr. White, continuing)**    I'm going to ask you just

12  to look through this briefly Heather.

13  A    Okay.

14  Q    And uh --- just look through it and I'm going to ask

15  you some questions, okay?

16  A    (No verbal response.)

17  Q    It's already been admitted into evidence so just take

18  a look at it.

19              THE COURT:    While she's checking it out

20  just so we're clear on the record, I don't --- did we

21  identify it by letter previously?

22          And if not why don't we just do it right now?

23              MS. POPE-STARNES:    No.    I don't think it

24  was actually admitted Your Honor but I indicated I

25  have no objection to it.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          THE COURT:   Okay.

2          MS. POPE-STARNES:   So I don't think there's

3     been a ruling from the Court with a letter or actually

4     saying it's officially admitted by the Court into

5     evidence.

6          THE COURT:   So it's Proposed Exhibit ---

7          MS. POPE-STARNES:   (Interposing)   Again, I

8     have no objection.

9          THE COURT:   Thank you.

10         It's Proposed Exhibit B and move for its

11    admission formally here?

12         MR. WHITE:   Yes.

13         THE COURT:   No objection.

14         The Court so admits it.

15         MR. WHITE:   Right.   And I agree.   Yes I

16    agree that there was no letters at that time.

17         THE COURT:   Okay.

18         MR. WHITE:   We --- just the substance of

19    the evidence.

20         THE COURT:   Good enough.

21   Q    **(By Mr. White, continuing)**   If you can look at that

22    back page?   It's the very last page.

23         Is the whole Exhibit Heather pictures of Madison

24    from birth all the way up to, I believe, November?

25   A    November nineteenth (19th).

                          191

1  Q    Two thousand and six (2006) correct?

2  A    Yes.

3  Q    Did the last picture of that Exhibit, the picture of

4       her crib as it was prepared for her?

5  A    Yes.   Yes.

6  Q    Was that generally how the crib was kept throughout

7       the time period?

8  A    Yes.

9  Q    Umm --- and the room that you've already seen pictures

10      of, is that how the room was kept from the time that

11      she was brought home to the time that she left for the

12      hospital on November thirtieth (30th)?

13 A    Yes.

14 Q    Umm --- the pictures that are marked in there, are the

15      majority of those pictures of Heather?   Excuse me, of

16      Madison?

17 A    Yes.

18 Q    Who took most of those pictures?

19 A    Umm --- I would say Steve.   He's better.   I don't

20      really know how to work the camera very well.

21 Q    Okay.

22          And umm --- did the pictures that are presented

23      in Exhibit B actively reflect Heather's, excuse me,

24      Madison's disposition? ·

25 A    Yes.

192

1   Q   You said she was a happy baby?

2   A   Yes.

3   Q   She slept well generally?

4   A   Yes.

5   Q   She ate well?

6   A   Yes.

7   Q   The separation anxiety that we spoke about earlier,

8       would she have that too when Steve left the room?

9   A   Yes.   But I was ---

10  Q   (Interposing)   Not to the degree that when you left

11      the room?

12  A   Yes.

13  Q   Umm --- now Doctor Adams was your pediatrician?

14  A   Yes.

15  Q   Brighton Family Care?

16  A   Yes.

17  Q   And when you went home umm --- from the hospital, your

18      well-baby checkups umm --- were, if I may, January

19      twenty-fourth (24th), January thirty-first (31st)

20      March seventeenth (17th), May seventeenth (17th), July

21      twenty-fourth (24th), and October twenty-fourth

22      (24th).   Is that a fair statement?

23  A   Yes.

24  Q   Okay.

25          And on October twenty-fourth (24th) she had labs

193

1       --- her labs done, correct?

2    A   Yes.

3    Q   And they all came back normal, correct?

4    A   Yes.

5    Q   Okay.

6        Umm --- would you take her primarily to a wave --

7        - well-baby checkup?

8    A   Yes.

9    Q   Okay.

10       Did Steve ever take Madison to the well-baby

11       checkups?

12   A   No.

13   Q   Okay.

14       Umm --- now she also saw Doctor Adams on October

15       twenty-seventh (27th) for her first cold, isn't that

16       true?

17   A   Yes.

18   Q   Okay.

19       And Steve took her to that?

20   A   Yes.

21   Q   Okay.

22       And umm --- she had to go back though because she

23       had some fever, she wasn't --- at night, correct?

24   A   Yes.

25   Q   And she continued to have a runny nose?

194

1    A    (No verbal response.)

2    Q    Was it ---

3    A    (Interposing)    Yes.

4    Q    Okay.

5         And you took her back on November third (3rd)?

6    A    Yes.

7    Q    Okay.

8         And were any prescriptions given?

9    A    Yes.   She was given an oral antibiotic.

10   Q    And amoxicillin?

11   A    Yes.

12   Q    And uh --- that you administered that as the doctor

13        directed?

14   A    Yes.

15   Q    Do you know how long you had given her amoxicillin?

16   A    A week to ten days.

17   Q    And did her fever and cold, did it get her --- did it

18        get better?

19   A    Yes.

20   Q    Okay.

21        Uh --- other than Doctor umm --- Adams, when is

22        the first time that you took her to another doctor

23        other than for her well-baby checkups?

24   A    Umm --- she went in March for her first ultrasound.

25   Q    And why was that?

                           195

1   A   Umm --- because I wanted to know if she had --- if her

2       hips were okay.

3   Q   Okay.

4       Were you satisfied at that point of the

5       explanations you were given?

6   A   No.

7   Q   And where did she have her ultrasound?

8   A   At St. Jo's Hospital in Ann Arbor.

9   Q   Okay.

10      And it's at that time that she was diagnosed that

11      she had the hip dysplasia?

12   A  Yes.

13   Q  Both hips, but more of her left hip?

14   A  More on the left, yes.

15   Q  Okay.

16      And you're understanding of that condition, what

17      did that mean to you?

18   A  Umm --- her hip would slide in and out of socket umm -

19      -- as she straightened out her leg, it would slide in

20      and out.  On the left it was --- she had more hip

21      dysplasia.  Her --- she had a shallow hip socket on

22      that side.

23   Q  And once she was diagnosed at St. Jo's with the hip

24      dysplasia did she continue to treat at St. Jo's?

25   A  No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  Q  Who else treated her for the hip dysplasia?

2  A  Umm --- she was followed by Doctor Craig at U of M

3    Hospital.

4  Q  And umm --- if you know how many times that she saw --

5    - would that have been at Taubman Center?

6  A  Yes.

7  Q  Okay.

8       Which is right next to U of M Hospital, part of

9    it?

10  A  Yes.

11  Q  Uh --- would it be a fair statement that she saw

12    Doctor Craig on April eleventh (11th) for the first

13    time?

14  A  Yes.

15  Q  Okay.

16       And then if I may, other appointment days, and

17    correct me if I'm wrong, April twentieth (20th), May

18    fourth (4th), May sixteenth (16th), June eighth (8th),

19    July sixth (6th), September twelfth (12th) and

20    November fourteenth (14th)?

21  A  Yes.

22  Q  Okay.

23       And is fair also to say that Heather you took

24    Madison to each one of those appointments?

25  A  Yes.

197

```
1   Q    And she started having x-rays in July through the
2        hospital?
3   A    Yes.
4   Q    On her hips?
5   A    Yes.
6   Q    Okay.
7        And umm --- then as of November fourteenth (14th)
8        umm --- was she still in the harness, the Pavlik
9        harness?
10  A    No.   She was umm --- at six months old she was
11       changed to a brace, a hard plastic brace.
12  Q    Okay.
13       And when would she war --- when would she wear
14       that?
15  A    Umm --- she would wear it at night.   She had to wear
16       it twelve (12) hours a day and she wore it throughout
17       the night, seven pm (7:00pm) to seven am (7:00am).
18  Q    Okay.
19       Now umm --- when was she diagnosed with the
20       aplasia cutis congenita?
21  A    May I look at my piece of paper?
22  Q    Sure.
23       Would it refresh your recollection?
24  A    Yes.
25  Q    Okay.
```

198

1           Go ahead.

2    A    Umm --- on June first.

3    Q    What doctor saw her then?

4    A    That was Doctor Piro.

5    Q    Okay.

6           As umm --- why were you taking her to another

7    doctor about this condition?

8    A    Umm --- because the wound on her head had not healed

9    yet.   It was still open.

10   Q    Okay.

11          Was this something you had discussed with Doctor

12   Adams?

13   A    Yes.

14   Q    Okay.

15          Was there treatment rendered by Doctor Adams for

16   the uh --- the spots?

17   A    Yes.

18   Q    Okay.

19          Did the spots resolve themselves?

20   A    No.

21   Q    Okay.

22          And it was on June first you discovered that it

23   was aplasia cutis congenita?

24   A    Yes.

25   Q    ACC?

                           199

1   A    Yes.

2   Q    Umm --- and what was the recommended course of action

3        then?

4   A    Umm --- to get an MRI done.

5   Q    Okay.

6   A    Oh.   I'm sorry.   That's wrong.

7   Q    Okay.

8            Go ahead.

9   A    I'm sorry.

10  Q    No, that's fine.

11  A    Umm --- they wanted me to umm --- follow-up at U of M

12       dermatology.

13  Q    And did you do that?

14  A    Yes.

15  Q    Okay.

16           And was that appointment with Doctor Adams,

17       excuse me, Doctor Piro was on June first and then on

18       June twenty-eighth (28th) you went to U of M

19       dermatology?

20  A    Yes.

21  Q    Okay.

22           And umm --- was it there that they suggested an

23       MRI be done?

24  A    Yes.

25  Q    Okay.

                              200

```
 1            And an MRI was suggested because the possibility
 2       of problems underneath the skin level?
 3  A    Yes.
 4  Q    Okay.
 5            And was that MRI done?
 6  A    Yes.
 7  Q    And on August twenty-eighth (28th), two thousand six
 8       (2006)?
 9  A    August thirty-first (31st).
10  Q    August thirty-first (31st), my apologies.
11            Umm --- and uh --- did she have any more
12       treatment as a result of the aplasia cutis congenita?
13  A    No.
14  Q    Was there a CAT scan on November, excuse me, September
15       eleventh (11th) of two thousand six (2006)?
16  A    Yes.
17  Q    Okay.
18            Do you know how many times she went to U of M for
19       her ACC but it would be just ---
20  A    (Interposing)   Once.   One time.
21  Q    One time.
22            One time on June twenty-eighth (28th) and then
23       one time for the MRI and one time for the CT scan?
24  A    Yes.
25  Q    Okay.
```

201

1        And umm --- isn't it true that on August thirty-

2    first (31st) the MRI was done and that you were

3    notified that there was a reading that there were

4    blood products ---

5              MS. POPE-STARNES:   Objection.   Calls for

6    hearsay.

7              THE COURT:   Well hold on.

8         Let me hear the full question unless you're

9    yielding to that?

10             MR. WHITE:   Oh no.

11             THE COURT:   Go ahead.   Let me hear the

12   question.

13        Ma'am, don't answer it yet, okay?

14             THE WITNESS:   Okay.

15             THE COURT:   Go ahead Mr. White.

16   Q   **(By Mr. White, continuing)**   Isn't it true that you

17   were informed that the MRI showed possible blood

18   products on the brain as a result of the test?

19             THE COURT:   Hold on a second, Ma'am.

20             MS. POPE-STARNES:   I believe it's hearsay

21   Your Honor.   He's asking, 'Were you informed.'   So

22   were you told is something that you hear from someone

23   else.

24             THE COURT:   I gotcha.

25        Mr. White?

202

1          MR. WHITE:   The uh --- University of

2    Michigan Hospital records are in evidence.   That MRI

3    test is in there Judge.   It is and it clearly shows

4    that it's possible blood products or a lipoma.

5          THE COURT:   Okay.

6       Then what do you need her to repeat it then for?

7          MR. WHITE:   Well because she's the Mom and

8    she's being notified and whether there was any action

9    taken Judge.

10         THE COURT:   Okay.

11      Well that's a different question.   I'll --- I'll

12   ---

13         MR. WHITE:   (Interposing)   First of all I

14   have to get that she knew.

15         THE COURT:   Understood.   Understood.

16      At this time since I haven't read all the records

17   and everything else and I don't know if there's a

18   stipulation, if there is, the Counsel can make that

19   stipulation that they're contained in the records or

20   leave it for the Jury when it's submitted to them.

21   Umm --- but I don't see any other reason to solicit it

22   from her at this time.

23         MS. POPE-STARNES:   Your Honor --- Your

24   Honor, for clarification, those are not part of

25   People's Exhibit 1.   People's Exhibit 1 only contains

                            203

1    records from the admission from November thirtieth

2    (30th) of two thousand and six (2006).

3              THE COURT:   Okay.

4         Like I said, until I --- there is a stipulation

5    or we look at the records.   But at this time the

6    objection is sustained as to hearsay, subject to being

7    reviewed later on.

8              MR. WHITE:   Well Judge I ---

9              THE COURT:   (Interposing)   Go ahead.

10             MR. WHITE:   If they're not part of the

11   records, if that MRI because all the other subsequent

12   MRI's are based on a comparison to eight thirty-one

13   (8/31) MRI and nine-eleven (9/11) CT scan, if they're

14   not part of that Exhibit then they have been removed.

15             THE COURT:   Well again ---

16             MR. WHITE:   (Interposing)   It's clearly in

17   the evidence Judge.

18             THE COURT:   Well we've got other things we

19   have to do off the record in looking and recollecting

20   our memories and so forth, so you can go look through

21   the records later on.   All right?

22             MR. WHITE:   Okay.   Thank you Judge.

23  Q   **(By Mr. White, continuing)**   Umm --- did Madison see

24      any other doctors other than what we've talked about?

25  A   Umm --- yes.

204

1   Q    Who?

2   A    Doctor Lipkin.

3   Q    Okay.

4        And why did she see Doctor Lipkin?

5   A    Because her wound was still not healed on her head.

6   Q    Okay.

7        And how was it that you got Doctor Lipkin?

8   A    Umm --- I had gone to him before.   He's a

9        dermatologist.   It's out of my umm --- umm --- out of

10       district for my insurance.

11  Q    Okay.

12       And uh --- is it with Doctor Lipkin that uh ---

13       excuse me.   When did she see Doctor Lipkin first?

14  A    May I look?

15  Q    If your notes will refresh your recollection.

16  A    Umm --- Doctor Lipkin was on ten thirty (10/30).

17  Q    Okay.

18       And is it that time that you was --- you were

19       told that she had MRSA?

20  A    No.

21  Q    Okay.

22       They took some --- a biopsy culture?

23  A    Yes.

24  Q    And you returned on November fourteenth (14th)?

25  A    Yes.

205

1   Q   And is that when you were informed that she had MRSA?

2   A   Yes.

3   Q   Okay.

4       And umm --- you were given a prescription of

5       Bactroban for the MRSA?

6   A   Yes.

7   Q   Okay.

8       Were you given any indication when she received -

9       -- when she picked up the staph infection?   How long

10      had she had it?

11          MS. POPE-STARNES:   Objection.   That would

12      be hearsay Your Honor.

13          MR. WHITE:   Your Honor, actually she was

14      the one who opened the door asking for hearsay Judge.

15          THE COURT:   Let me hear the question again

16      Mr. White.

17          MR. WHITE:   Were you given any indication

18      when she got this staph infection?

19          THE COURT:   And your response to the

20      hearsay objection is that she opened the door?

21          MR. WHITE:   She opened --- she did.

22          THE COURT:   Ms. Pope-Starnes?

23          MS. POPE-STARNES:   What I asked was, was

24      there a point where she was diagnosed with MRSA.   I

25      didn't open the door to any hearsay.

                            206

1          THE COURT:   Anything further?

2          MR. WHITE:   It's the same --- same question

3   Judge.

4          MS. POPE-STARNES:   No Your Honor.   Counsel

5   has repeatedly asked her questions about to your

6   knowledge, and it's along those same lines.   It

7   wasn't opening the door to hearsay, what were you told

8   about this, things like that.

9          THE COURT:   All right.

10          MS. POPE-STARNES:   More specifically this.

11          MR. WHITE:   How would she know Judge?

12   A      THE COURT:   You're --- duly noted.

13      I'll sustain the objection.

14   Q   **(By Mr. White, continuing)**   And you applied the

15   Bactroban as --- as uh --- you were supposed to,

16   correct?

17   A   Yes.

18   Q   Okay.

19      And umm --- did you have any follow-up

20   appointments with Doctor Lipkin regarding the MRSA?

21   A   Yes.

22   Q   And when was that?

23   A   November twenty-eighth (28th).

24   Q   Okay.

25      And was the MRSA still there?

1    A    They did not do a second culture.

2    Q    Okay.

3              Any further uh --- instructions how to treat it

4         or anything?

5    A    She was to continue with the antibiotic for five more

6         days.    And I requested to have a uh --- an

7         appointment with infection control.

8    Q    An infectious disease specialist?

9    A    Yes.

10   Q    Okay.

11             Other that that, other than all the doctors we've

12        talked about, all the other appointments, is there any

13        other appointment or doctor that you can think of that

14        Madison saw?

15   A    (No verbal response.)

16   Q    I'll preface that question ---

17   A    (Interposing)    No.

18   Q    Other than February sixteenth (16th), two thousand six

19        (2006)?

20   A    No.

21   Q    Could you tell the Jury what happened on February

22        sixteenth (16th), two thousand six (2006)?

23   A    Umm --- umm --- I got umm --- a phone call umm ---

24        from Steve that umm --- while he was carrying Madison

25        in her bouncy seat, he tripped and fell.    And he

208

1   called on his way up to my work umm --- so we could go

2   up to the emergency room with her.

3 Q   Okay.

4       When Steve called you how did he --- how did he

5   sound in the telephone?

6 A   He was crying on the phone.

7 Q   And umm --- did he come to where you were working?

8 A   Yes.

9 Q   Obviously with Madison?

10 A   Yes.

11 Q   Okay.

12      Umm --- and did you look at her?

13 A   Yes.

14 Q   And obviously, did she appear injured to you?

15 A   No.

16 Q   And where did you go from work?

17 A   Umm --- I had Steve go over to St. Joseph umm --- ER

18   in Ann Arbor and then I met them over there about

19   twenty (20) minutes later.

20 Q   Okay.

21      And was Madison checked out by the ER physician?

22 A   Yes.

23 Q   Were any x-rays or MRI's or CT scans done?

24 A   No.

25 Q   Was she released from care?

209

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  A    Yes.

2  Q    Released with instructions to use Tylenol?

3  A    Yes.

4  Q    And return if there were any problems?

5  A    Yes.

6  Q    When you left the hospital with Madison did you see

7       *whether you noticed anything different or wrong with*

8       *her?*

9  A    No.

10 Q    Okay.

11      What about the days and weeks after that?

12 A    No.

13 Q    Okay.

14      What about Steve?   What was his condition like

15      in the hospital?

16 A    He was very upset.

17 Q    Was he still crying?

18 A    Yes.

19           THE COURT:   Mr. White, we've been going for

20      a stretch now.   I don't know if this is a good time

21      for a break?

22           MR. WHITE:   Okay.   I'm going to be a while

23      longer Judge, so...

24           THE COURT:   Sure.   Okay.   All right.

25           Ladies and Gentlemen, we'll take a short recess

                          210

1  now.  Just return to the Jury room.  Please don't

2  talk about the case okay?

3      Thanks.

4          THE CLERK:  All rise for the Jury.

5  (Whereupon the Jury was returned to the Jury room.)

6              * * *

7          THE COURT:  All right.  If we're going to

8  be going past four (4:00) or four-thirty (4:30) then

9  we can address the --- what the record reflects as to

10 the one ruling.

11     You folks can be seated if you'd like.

12     I'll see if we can look at the tape in the

13 meantime.  I don't know how long that will take.

14 And then the records issue.

15         MS. POPE-STARNES:  Your Honor, here's the

16 records issue, okay?

17     We originally requested all records for the

18 child.  And that's what we gave in discovery.

19 Subsequently when I requested a certified copy and I

20 thought that I made this clear to Counsel, when I

21 requested a certified copy, all the hospital sent me

22 this time was just November thirtieth (30th) on.

23 Yes, in discovery he's been given everything.  I

24 haven't removed anything from this.  This is what

25 they sent me.  Now I don't have any objection to

211

1   those records coming in.  But what I was trying to

2   indicate on the record was that is not in this

3   Exhibit.

4               THE COURT:   Okay.

5               MS. POPE-STARNES:   Because what they

6   certified for me, for whatever reason, they only

7   limited to this admission.

8               THE COURT:   To that timeframe?

9               MS. POPE-STARNES:   Yes.

10              THE COURT:   Okay.  All right.  Okay.

11       As it stands now ---

12              MS. POPE-STARNES:   (Interposing)  The

13  subpoena was for everything.   That's not what they

14  gave me.

15              THE COURT:   What's your ETA on getting it

16  if we were --- if you were to seek it, either one of

17  you?

18              MS. POPE-STARNES:   Well if he's asking

19  specifically for the MRI and the CT ---

20              MR. WHITE:   (Interposing)  And all the

21  other records that were produced in discovery that are

22  part of the U of M records that were a discovery

23  package.   That were used as part of this hospital's

24  evaluation of this child being whatever.   It was not

25  accidental injury.   That's all part of it Judge.

                          212

1    And I am shocked to hear ---

2            MS. POPE-STARNES:   (Interposing)   Your

3    Honor, I --- I ---

4            MR. WHITE:   (Continuing)   for the first

5    time that this --- this has been not part of the

6    record.

7            THE COURT:   Okay.

8        While we continue to talk about the past we are

9    not achieving any accomplishment for the future so ---

10           MS. POPE-STARNES:   (Interposing)   And I've

11   also indicated Your Honor that I have no objection to

12   those things coming in.   That's all they sent me.

13           THE COURT:   All right.

14       Then I'll charge you both with the responsibility

15   of seeking and procuring the full uh --- certified ---

16   the record --- the full records uh --- certified.

17       As to the other matter, it's simply a question of

18   looking at the record and seeing what was uh --- what

19   has transpired.   I'll uh --- check although I'm going

20   to give my Court Reporter a chance to take a break

21   rather than currycomb through the archives and find

22   out what it is.   But at some point, that's all the

23   issue is, is to determine what I said before so...

24           MR. WHITE:   That's great.

25           THE COURT:   So we can look into that when

                            213

1   we can.

2          MR. WHITE:   Okay.   Thank you.

3      I would like to look at that Exhibit.

4          MS. POPE-STARNES:   You're more than welcome

5   to.

6          THE COURT:   Okay.   Go ahead.

7      Thank you deputies.

8          THE CLERK:   All rise.

9      (Whereupon a recess was had.)

10                 *  *  *

11         THE CLERK:   The Court calls People versus

12  McBurney, case number 07 214651 FC.

13         THE COURT:   Ms. Pope-Starnes, Mr. White,

14  you are noted --- appearances are noted.   The

15  Defendant is present.

16     Uh --- what say you?   Want to keep going or do -

17  -- anything to talk about in regards to the other

18  matters?

19         MS. POPE-STARNES:   Well in regards to the

20  medical records uh --- Counsel had an opportunity to

21  look at them.   I did subpoena and its right on the

22  witness list, I did subpoena the entire records.

23  What we gave him before was not certified.   I can't

24  lay the proper foundation.   What I've done is I've

25  contacted an investigator from our office or I can

                        214

1    have either a paralegal contact them and he is going

2    to get contacts --- his contact person in the records

3    department at U of M.   And she'll try to get them

4    tomorrow if they can to certify the records from birth

5    up until November thirtieth (30th).   And then I've

6    been through all my discovery letters and everything

7    that I had.   I do not have any CD's from U of M.   So

8    I've also requested that he request from U of M any

9    and all x-rays, CT's and MRI's that was --- were done

10   anytime between birth and the date of death.

11        Now I don't know if they can do that tomorrow but

12   he's going to contact them today and ---

13             THE COURT:   (Interposing)   They meaning U

14   of M?

15             MS. POPE-STARNES:   Yes.

16             THE COURT:   Well I would hazard a guess

17   that if they said they couldn't, there might be an

18   issue because they've already been told to do it and

19   they haven't perhaps.   But we'll cross that bridge

20   when we get to it.

21        Go ahead.

22             MS. POPE-STARNES:   If someone was to ask

23   the Court yes, to do something.   Their normally very

24   responsive to us on these things, so...

25             THE COURT:   Okay.

                          215

1    Mr. White?

2         MR. WHITE:    Yeah.    All I want is the

3    complete medical file and all the records and the disc

4    which I had two copies of the disc but one was lost by

5    a doctor.    So Doctor Uscinski has my copies of the

6    disc.    There's two CD's that contain all the

7    radiological tests on there which Doctor Uscinski is

8    going to testify to on Tuesday.    So I just need

9    everything admitted and including, you know all the

10   radiological tests so we can have the record complete.

11        THE COURT:    Okay.

12        MR. WHITE:    Okay.

13        THE COURT:    All right.    Thanks.

14        MR. WHITE:    And uh --- I believe the St.

15   Jo's records were the next issue.

16        THE COURT:    Yeah.    Umm --- I'm listening

17   to the tape.    There is a dispute as to what took

18   place.    And I hate to create another record to speak

19   to what is contained on the record.    I would propose

20   so we can get this Jury going that we wait until

21   later.    I can listen to the tape.    I'll even invite

22   you both to listen to the tape so we don't have to

23   create another record.    But I don't know how that

24   impacts you when you're questioning the witness.

25        MR. WHITE:    Well all I want, you know, the

216

1    records that I proffered as evidence came from the

2    Prosecutor's office.   Umm --- and that's what I

3    believe I indicated to sister Counsel when I moved for

4    admission.   The other two sets of the medical records

5    came as a result of an authorization.   I believe that

6    those St. Jo's records that she gave me were

7    certified.   That's why I said, 'Well the ones you've

8    given me I'll just move into evidence.'   And I

9    believe that was the basis of your ruling, because we

10   got --- she got them.   They were certified to her.

11   She gave them to me in discovery.   I'm just putting

12   them in.

13        MS. POPE-STARNES:   If I have certification

14   I would have included in the discovery packet the

15   certification letter that comes on top.   Many of the

16   records we were originally given were not certified.

17   So I don't know if they're complete.

18        THE COURT:   Let me ask you this Ms. Pope-

19   Starnes.   Your basic --- because his argument ---

20   basically what we're doing is reconsidering that which

21   we don't recollect I said or ruled on before but maybe

22   this is the quickest route.   Mr. White's argument is

23   a good practical argument.   It says, 'Hey it came

24   from you so you can't be ragging on whether they're

25   good or not.'

217

1          But you're saying, 'I gave you a bunch of stuff.

2   I'm not attesting to anything.   I'm just giving you

3   what I've got and so therefore I'm not --- I'm still

4   standing by my demand.'

5          MS. POPE-STARNES:   There's two problems.

6   Number one, I'm not the records-keeper so I don't know

7   what they gave me is complete.   The only way I know

8   that it's complete is when I get the certification.

9          THE COURT:   Hey Jeff, come here.   I need

10  water.   That's okay.

11         MS. POPE-STARNES:   When I get that same

12  certification that the rules of evidence require.   On

13  top of that, even if I give something that's complete

14  it still has to satisfy the rules of evidence for the

15  admissibility of it.   It either has to have a

16  records-keeper or a certification.   And I'm happy to

17  stipulate to the certification if there is one ---

18         THE COURT:   (Interposing)   Is this just a

19  timing ---

20         MS. POPE-STARNES:   (Continuing)   and not

21  just something from the records-keeper.

22         THE COURT:   Is this just a time issue Mr.

23  White because I think you conceded, I'll subpoena the

24  records-keeper for Dr. Piro and Dr. Adams perhaps.

25         MR. WHITE:   That's correct.

                            218

1          THE COURT:   And it was just a time issue as

2    to why --- as to the St. Joseph's records right now.

3    Other than time, got no problem getting them

4    certified, either one of you, correct?

5          MR. WHITE:   Well uh ---

6          THE COURT:   (Interposing)   Is that an

7    oversimplification?

8          MR. WHITE:   No, no.   It's hitting it right

9    on the head.   Umm --- but I think you've already

10   admitted the St. Jo's record.   And I just asked --- I

11   don't need anymore today Judge.   I may not need it

12   anymore as part of my questioning of Heather.   You

13   know, ultimately and I want them into evidence though

14   as part of my final argument.

15         THE COURT:   Then how about we do it this

16   way?   No harm, no foul, if you're okay to keep the

17   train moving right now.   One or both of you get a

18   certified copy and at some point during the

19   proceedings we'll have them admitted.   There won't be

20   any issues.   They'll be certified and then take it

21   from there.   Is that --- is that okay to keep the

22   matter going?

23         MS. POPE-STARNES:   Yes.   I will just

24   indicate in regards to the time issue and the other

25   record, in the past because I subpoena these kind of

219

1    records all the time, in the past when they've

2    forgotten the certification, these offices are

3    normally very accommodating if you call them. But I

4    am going to have to send --- you're going to have to

5    send a person or you've just got to send me a letter

6    saying this is complete and they're normally very

7    accommodating with that. So...

8           MR. WHITE:  To her.  Not to me.  So I ask

9    because she speaks for the County ---

10          MS. POPE-STARNES:  (Interposing)  He's ---

11   he's got an authorization letter.

12          THE COURT:  I'm going to charge you both

13   with the responsibility.  Just get it done.

14          MR. WHITE:  Thank you Judge.

15          MS. POPE-STARNES:  Your Honor ---

16          THE COURT:  (Interposing)  You --- you ---

17   you are the one that originally procured them right

18   Ms. ---

19          MS. POPE-STARNES:  (Interposing)  Only the

20   St. Jo's record.

21          THE COURT:  You're right.  You're right.

22          MS. POPE-STARNES:  He's talking about the

23   other records.

24          THE COURT:  You handle St. Jo's.

25      You handle Doctor ---

220

1              MR. WHITE:    (Interposing)    Piro and Doctor

2       --- Doctor Lipkin.

3              THE COURT:    Thank you.    Done.    All right.

4          Jeff, tell Deborah, Ms. Garelik that we're good.

5       We're okay.    We've got it resolved.

6          And then you can bring in the Jury.

7          Ma'am, if you'd come on back up?    We'll just

8       have you get situated up here.    And then when the

9       Jury is brought in, I'm just going to remind you, you

10      are still under oath, required to testify truthfully

11      and honestly, okay?

12         Just be careful walking up there, okay?

13             THE CLERK:    All rise for the Jury.

14      (Whereupon the Jury was returned to the courtroom.)

15                        *  *  *

16             THE COURT:    Good afternoon again everyone.

17      Thank you.    You may all be seated.

18         The record will reflect that the Jury is back and

19      the case has been called.    The Counsels' names have

20      been noted.    You'll see obviously that Mrs. McBurney

21      is back on the stand.

22         And Mrs. McBurney, you are reminded you are still

23      under oath and required to testify truthfully and

24      honestly okay?

25             THE WITNESS:    Okay,

                              221

1          THE COURT:    Thank you.

2          Mr. White you may proceed.

3          MR. WHITE:    Thank you.

4      **WHEREUPON HEATHER MCBURNEY HAVING BEEN PREVIOUSLY**

5   **SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING**

6   **BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

7          **CONTINUED CROSS-EXAMINATION**

8   **BY MR. WHITE:**

9   **Q**    Heather, you returned to work after giving birth to

10       Madison approximately six weeks later?

11  A    Yes.

12  Q    Okay.

13       And what were the childcare arrangements at that

14       time?

15  A    Umm --- at that time I was umm --- working nights and

16       umm --- Steve would be working days.   He was not back

17       to work fulltime.   Umm --- my shift at that time was

18       four (4:00) to twelve-thirty (12:30).

19  Q    Four pm (4:00pm) till twelve-thirty am (12:30am)?

20  A    Yes.

21  Q    Okay.

22       And uh --- when you would go to work uh ---

23       that's when Steve would be in charge of taking care of

24       Madison?

25  A    Yes.

                        222

1    Q    Okay.

2         And uh --- Steve was working snow at that point?

3    A    Yes.

4    Q    And he returned to work to the lawn service in the

5         spring?

6    A    Yes.

7    Q    And umm --- did you keep the same shift when he

8         started working the day lawn-service job?

9    A    Umm --- no.  My shift changed to seven (7:00) to

10        three-thirty am (3:30am).

11   Q    And a given working day at that point was what?   What

12        time would you go to bed in the morning?

13   A    Umm --- four (4:00), four-thirty (4:30) in the

14        morning.

15   Q    After returning home from work?

16   A    Yes.

17   Q    Madison would be sleeping at that point?

18   A    Yes.

19   Q    Steve would be sleeping?

20   A    Yes.

21   Q    And he would get up first?

22   A    Yes.

23   Q    Go to work?

24   A    Yes.

25   Q    And you would get up with Madison?

223

1   A   Yes.

2   Q   Umm --- and umm --- that started approximately when in

3       the spring?

4   A   I don't know for sure.   I can't remember.

5   Q   Onset of warm weather?

6   A   Yes.

7   Q   The need for people in getting their lawns mowed and

8       stuff?

9   A   Yes.

10  Q   Okay.

11          And uh --- did that schedule continue through the

12      balance of the summer into the fall?

13  A   Yes.

14  Q   So Steve would work during the day.   You would take

15      care of Madison.   He would come home from work and

16      you would go to work?

17  A   Yes.

18  Q   And you would work until approximately three-thirty

19      (3:30)?

20  A   Yes.

21  Q   And come home and go to sleep at four o'clock (4:00)?

22  A   Yes.

23  Q   So umm --- you were getting on an average of how much

24      sleep per night?

25  A   Per day?

224

```
 1   Q    Yes, for a twenty-four (24) hour period.

 2   A    Umm --- about four hours, three-and-a-half, four

 3        hours.

 4   Q    Umm --- and were there times Heather that because

 5        Steve worked late that you had to actually take

 6        Madison to work in Ann Arbor?

 7   A    Yes.

 8   Q    And Steve had to come and pick her up?

 9   A    Yes.

10   Q    And bring her back home?

11   A    Yes.

12   Q    Okay.

13            And was there a discussion Heather about, you

14        know, changing this routine, changing the care giving

15        routine?

16   A    Yes.

17   Q    Okay.

18            And what was that discussion about?

19   A    Umm --- we wanted to start Madison in daycare.

20   Q    Okay.

21            Did he tell you why?

22   A    Umm --- he was worried about me ---

23                 MS. POPE-STARNES:    (Interposing)

24        Objection.   Your Honor, this is hearsay,   It's not a

25        statement against interest by a party's own evidence
```

225

1    or it's hearsay,

2              THE COURT:    Mr. White.

3              MR. WHITE:    Umm --- I don't know if it's --

4    - it's to prove the truth of the matter asserted.    I

5    don't believe we're offering it for that purpose

6    Judge.

7              THE COURT:    What are you offering it for

8    then?

9              MR. WHITE:    To give it --- a state of mind

10   why this was being done.

11             THE COURT:    I'll --- I'll sustain the

12   objection.

13             MR. WHITE:    Okay.

14   Q    **(By Mr. White, continuing)**    And did you have a

15   concern about you driving home at night so late?

16   A    Yes.

17   Q    And being able to stay awake?

18   A    Yes.

19   Q    Okay.

20        And umm --- so the discussion was to alleviate

21   that and put Madison in childcare?

22   A    Yes.

23   Q    Okay.

24        And uh --- the uh --- the program of finding a

25   childcare facility, tell the Court --- tell the Jury

226

1      what you did.

2   A   Umm --- we spent a day and umm --- and went to five --

3      - five different daycares.   Kind of getting a look at

4      the environment umm --- and the people.

5   Q   Okay.

6          Did you do it together, you and Steve?

7   A   Yes.

8   Q   And did you do it with Madison?

9   A   Yes.

10  Q   Okay.

11         And umm --- did you look at daycares in the

12     geographic area?

13  A   Yes.

14  Q   Okay.

15         Umm --- and did you finally select one?

16  A   Yes.

17  Q   And what was that?

18  A   Umm --- Pitter Patter Daycare.

19  Q   And did Steve go into all five daycares to check ---

20  A   (Interposing)   Yes.

21  Q   (Continuing) this thing out?

22         Did you go into all five?

23  A   I went into four.

24  Q   Okay.

25         And when you went into the four that you went

                          227

1         into together, did both of you ask questions about it?

2  A   Yes.

3  Q   And whether you felt comfortable and all the rules and

4         regulations?

5  A   Yes.

6  Q   And you observed everything as to whether you wanted

7         to put your daughter in this --- this environment?

8  A   Yes.

9  Q   And you selected Pitter Patter which I believe is on

10        Ten Mile Road in South Lyon?

11 A   Yes.

12 Q   Okay.

13        And what was the day that she started there?

14 A   It was in October.   I don't remember the exact date.

15 Q   October eighteenth (18th)?

16 A   It was mid-October, yes.

17 Q   Okay.

18        And at that time did you switch your schedule?

19 A   Yes.

20 Q   To days?

21 A   Yes.

22 Q   Okay.

23        So both of you were working days?

24 A   Yes.

25 Q   And umm --- and then you had your family time at

228

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1        night?

 2   A    Yes.

 3   Q    Who would take Madison to daycare?

 4   A    Steve.

 5   Q    Okay.

 6            And umm --- what time would he leave the house in

 7        the morning?

 8   A    Umm --- I'm not sure what time exactly.   He would ---

 9        I wasn't home.

10   Q    Okay.

11            You would leave before him?

12   A    Yes.

13   Q    And what time did you leave the house?

14   A    I would leave the house at five-thirty (5:30).

15   Q    And uh --- you would pick Madison up from daycare?

16   A    Yes.

17   Q    From Pitter Patter?

18   A    (No verbal response.)

19   Q    And was there one primary person or more that one

20        primary person involved in caring for Madison at

21        Pitter Patter?

22   Q    Umm --- it was umm --- I know he saw different people

23        than the people that I saw when I picked her up.

24   A    Okay.

25            Is there anybody you spoke to specifically at the
```

1    time that you picked her up that you can recall, first

2    or last name?

3  A   Umm --- usually Lynn was there when I picked her up.

4  Q   Okay.

5        Do you remember Lynn's last name?

6  A   No.

7  Q   Okay.

8        Umm --- and why is it that Madison stopped

9    daycare?

10 A   Umm --- I stopped daycare umm --- the day I came back

11   from her appointment and finding out she had MRSA.

12 Q   Okay.

13       So we went from two dayshifts, childcare, to go

14   back to the routine that you had been in before, the

15   months prior to that?

16 A   Yes.

17 Q   Is that a fair statement?

18 A   (No verbal response.)

19 Q   And you went back to the seven pm (7:00pm) to three-

20   thirty am (3:30am) shift?

21 A   Yes.

22 Q   And Steve continued to work days?

23 A   Yes.

24 Q   Umm --- now would you have visitors at the house

25   Heather, after Madison was born?

230

```
 1   A    Yes.

 2   Q    Okay.

 3            Who visited most often?

 4   A    Kyle.

 5   Q    Okay.

 6            Who else?

 7   A    Umm --- my friend Trina, umm ---

 8   Q    (Interposing)    Trina Hartman?

 9   A    Yes.

10   Q    Okay.

11   A    I know my friend Amy Egan would be over there too.

12   Q    Okay.

13            Would they see, excuse me.    Would this be at a

14       time that Madison was awake?

15   A    Yes.

16   Q    Would this be at a time when Steve was with Madison?

17   A    Yes.

18   Q    Okay.

19            What about family?    Would we have family visit

20       too?

21   A    Yes.

22   Q    Your family?

23   A    Yes.

24   Q    Your parents?

25   A    Mm-hmm.    Yes.
```

231

1    Q    Is that a 'Yes'?

2    A    Sorry.    Yes.

3    Q    No problem.

4         How often after Madison was born would your

5    mother and father visit your house with Madison?

6    A    Umm --- they probably came to the house say four or

7    five times.

8    A    How oft --- did you take Madison to where they lived?

9    A    Yes.

10   Q    Okay.

11        And where --- where do they live?

12   A    In Kalamazoo.

13   Q    And how often did you and Steve and Madison visit your

14   parents in Kalamazoo.

15   A    I think it was just the one time.

16   Q    And where was that?   When was that?   Excuse me.

17   A    Thanksgiving.

18   Q    Okay.

19        And who was present during that Thanksgiving.

20   A    My Mom, my Dad, Steve, Madison, myself and my aunt and

21   uncle.

22   Q    Okay.

23        What about Steve's family?   Would his brother

24   Chris visit?

25   A    Umm --- Madison did not see Chris until Thanksgiving.

232

1  Q   Okay.

2  A   The weekend before we had Thanksgiving with Steve's

3     family.

4  Q   Okay.

5        And umm --- there's a picture of Chris and

6     Madison in Exhibit B which is the photo book?

7  A   Yes.

8  Q   Okay.

9        What about Steve's mother Cindy?    Had she seen

10     Madison, visited Madison?

11  A   Yes.

12  Q   Okay.

13        At your home?

14  A   Yes.

15  Q   Okay.

16        At her home?

17  A   No.

18  Q   Okay.

19        And how many times Cindy saw Madison with or

20     without Steve?

21  A   Umm --- I would say probably four or five times with

22     her too.

23  Q   Okay.

24        Umm --- anybody else that you could think of that

25     was at the house or you would visit as a family, the

1    three of you?

2  A   Yes.

3  Q   Who?

4  A   A lot of times when my parents come into town they

5    have friends in Howell.   We would go over there a

6    lot.

7  Q   And their names?

8  A   Gayle and Dennis Sirrault (phonetic).

9  Q   And would that be at a time when your mother and

10    father were there?

11  A   Yes.

12  Q   Okay.

13    Is it a fair statement Heather that the only time

14    that before November thirtieth (30th) two thousand six

15    (2006) that Madison required emergency treatment was

16    on February sixteenth (16th) of that year when Steve

17    called you and said he had dropped her?

18  A   Yes.

19  Q   Okay.

20    All the other times were doctor visits that were

21    scheduled and the appointments were made?

22  A   Yes.

23  Q   Do you know how many times prior to November thirtieth

24    (30th) that doctor --- that Madison was seen by a

25    doctor or treated at a hospital totally for her

1       variety of medical conditions including her well-baby

2       checkups?

3   A   I have a list that I made.

4   Q   Would that refresh your recollection?

5   A   Yes.

6   Q   Would you look at that please?

7   A   Yes.   It looks like twenty-five (25).

8   Q   And if my memory serves me correctly it looks like the

9       last one was November twenty-eighth (28th)?

10  A   Yes.

11  Q   When she had gone back to see Doctor Lipkin for the

12      MRSA?

13  A   Yes.

14  Q   Okay.

15          If we could talk about November thirtieth (30th)

16      please.   Umm --- had you noticed Madison being ill

17      the day before, November twenty-ninth (29th)?

18  A   No.

19  Q   The first thing that you noticed that was --- that you

20      can remember as we sit and talk today is when you went

21      in to get her up, she had spit up on her jammies and a

22      little bit on her face I believe you testified to?

23  A   Yes.

24  Q   Okay.

25          But uh --- Madison spit up?

235

1   A    Yes.

2   Q    And she was one of the babies that would spit up

3        occasionally, correct?

4   A    Yes.

5   Q    Okay.

6             That's not something unusual that you thought at

7        that point?

8   A    Correct.

9   Q    Okay.

10            Umm --- and when she got up was she her normal,

11       playful, joyful self?

12  A    She was a little more tired than usual.

13  Q    Okay.

14  A    But her --- I would say her mood was the same.

15  Q    Okay.

16            And her mood, a happy baby?

17  A    Yes.

18  Q    Okay.

19            Uh --- had you ever heard Madison scream?

20  A    One time I would consider it a scream.   It was a

21       really loud cry.

22  Q    Okay.

23            When was that?

24  A    I believe it was around February of two thousand and

25       six (2006).

236

1   Q    Okay.

2        When she was a couple of months old?

3   A    Yes.

4   Q    Okay.

5        What were the circumstances?

6   A    Umm --- she was --- we umm --- she was pulling up her

7        legs a lot, like her stomach was bothering her.    Gave

8        her some of the umm --- they have Mylanta gas drops

9        for babies.    And I gave her umm --- some of those and

10       umm --- it seemed to relieve her.    She stopped crying

11       and seemed more comfortable after that.

12  Q    So it was a gastro-intestinal problem?

13  A    Yes.

14  Q    To your belief?

15  A    Yes.

16  Q    Okay.

17       And at any other time after that, that you ever

18       heard her would you believe cry loudly or scream?

19  A    No.

20  Q    Okay.

21       Now you got her up and changed her clothes,

22       correct?

23  A    Yes.

24  Q    Like she had spit up on?

25  A    Yes.

237

1  Q   And I believe you testified you fed her a bottle?

2  A   Yes.

3  Q   And she took the bottle?

4  A   Yes.

5  Q   And uh --- you laid down on the couch with her?

6  A   Yes.

7  Q   Okay.

8      And she laid on your tummy and took a nap?

9  A   Yes.

10 Q   Was that something usual at that time of the morning?

11 A   No.

12 Q   Okay.

13     Was that any reason for your concern at that

14     point?

15 A   I thought --- I was starting to think maybe that she

16     might be coming down with something just because she

17     seemed more tired that day.

18 Q   And how long did she sleep on your tummy?

19 A   About I would say twenty (20) minutes or so.

20 Q   Okay.

21     And Steve was outside working on the sewer line?

22 A   Yes.

23 Q   And umm --- it was a Saturday, excuse me.   I'm sorry.

24     It was a Thursday correct?

25 A   Thursday.

238

1  Q   And you were scheduled to work that evening?

2  A   Yes.

3  Q   And after her --- she got up from her little catnap on

4      you, you took her in to give her a bath?

5  A   Yes.

6  Q   Okay.

7         And I believe you said you put her down and took

8      off her clothes and that's when she vomited?

9  A   Umm --- her clothes weren't off yet.  She was sitting

10     on the floor with me in the bathroom and I was

11     starting to run her bathwater.  Umm --- I hadn't

12     gotten her undressed yet.  I umm --- yeah she was

13     still dressed.  I hadn't undressed her yet.

14     Bathwater was running.

15  Q   And she was sitting up?

16  A   Yes.

17  Q   Okay.

18         And what happened?  Did you actually see her

19     vomit?

20  A   Yes.

21  Q   Okay.

22         And would you --- did you ever see her vomit like

23     that before?

24  A   No.

25  Q   Would you characterize it as projectile vomiting?

239

```
 1   A    Yes.

 2   Q    Did that concern you Heather at that point?

 3   A    I --- my first thought was maybe she was getting the

 4        flu.

 5   Q    And you took off her clothes?

 6   A    Yes.

 7   Q    And you put her in the tub?

 8   A    Yes.

 9   Q    And she seemed to play in the tub?

10   A    Yes.

11   Q    And she seemed like she wanted to go back to her usual

12        self?

13   A    Yes.

14   Q    Umm --- and then you got her out of the tub, dressed

15        her?

16   A    Yes.

17   Q    And you went and got her some food, correct?

18   A    Yes.

19   Q    Some baby food, some applesauce?

20   A    No.   Not baby --- the --- the baby cereal.

21   Q    Baby cereal?   I'm sorry.

22   A    Yes.

23   Q    Okay.

24        And did she take that?

25   A    Yes.
```

                              240

1   Q    Okay.

2        Did she eat her normal amount?

3   A    I gave her a little less than usual just to make sure

4        that her stomach was okay.

5   Q    Okay.

6        And where was --- did she spit that up or vomit

7        at that point?

8   A    I believe she threw up before I fed her.

9   Q    Okay.

10       She threw up again after the bathtub?

11  A    Yes.

12  Q    Okay.

13       And would you consider that throw up or spit up?

14  A    It was enough I had to change her shirt.

15  Q    Okay.

16       Considering that it was not unusual for her to

17       spit up, was this at this point concerning you more

18       and more about how she was feeling?

19  A    I just thought that she was --- maybe coming down with

20       something.

21  Q    Okay.

22       But you knew from your perceptions at her mother

23       --- as her mother, that she just wasn't herself?

24  A    Yes.

25  Q    She wasn't feeling well?

241

1   A   Yes.

2   Q   And if my reviews of the medical records and your

3       testimony are correct, really --- she was really

4       healthy despite her having the hip dysplasia, the

5       MRSA, the ACC?

6   A   Yes.

7   Q   She only really had one cold?

8   A   Yes.

9   Q   And that was the couple weeks before then, October

10      twenty-seventh (27th) and you took her back on the

11      thirtieth (30th)?

12  A   Yes.

13  Q   Was Steve in the house at all?    Excuse me.

14  A   Sorry.

15  Q   No problem.

16          Did Steve, was he present during any of these

17      times?

18  A   When she was ---

19  Q   (Interposing)    Throwing up?

20  A   Yes.

21  Q   Okay.

22          And which one?    Was he there for the bathtub?

23  A   Umm --- well I had to call him in umm --- to the

24      bathroom because she had thrown up all over me too.

25      I had to have him go get me clothes and stuff.    But

242

1    he did sit in the bathroom with me after she threw up

2    because I wanted to make sure she was okay before I

3    gave her her bath.

4  Q    Okay.

5        And uh --- what about the other time right before

6    that you were going to feed her?   Was he present then

7    or was he outside?

8  A    He wasn't outside.   I don't remember if he was in the

9    room or not.

10 Q    Okay.

11       So she's acting tired.  She took an

12   extraordinary nap.   She had projectile vomited and

13   spit up and vomited again.   Uh --- was there anything

14   else unusual about the way that she was acting that

15   day Heather?

16 A    Umm --- a couple times when I laid her down to change

17   her umm --- and the time I laid her down to change her

18   shirt, umm --- she would pout her lip out.

19 Q    Okay.

20 A    I thought maybe she had a headache.   She didn't cry.

21   She just pouted her lip out.

22 Q    Okay.

23       So you were thinking that there was something

24   wrong, she had some kind of ache in her head?

25 A    Yes.

243

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Q    And you believe this happened two occasions?

2    A    Yes.

3    Q    If you can recall?

4    A    (No verbal response.)

5    Q    And was it when you were changing her diaper, changing

6         her clothes?

7    A    Yes.

8    Q    Was that something that she would do on a normal basis

9         Heather?

10   A    No.

11   Q    Okay.

12            Had you ever seen that before with Madison?

13   A    No.

14   Q    And I believe you indicated that she would return

15        somewhat to her normal playful self?

16   A    Yes.

17   Q    Try to play, try to be happy?

18   A    Yes.

19   Q    But that she would be clingy to you?

20   A    Yes.

21   Q    Okay.

22            But that --- was that something normal at this

23        time where she would cling to you?

24   A    Not usually, *no.*

25   Q    Umm --- now she --- she wasn't ambulating, she wasn't

                                 244

1    walking, right?

2  A    Right.

3  Q    When she --- and uh --- I believe you indicated that

4       she would --- she could scoot?

5  A    She wouldn't scoot.   She could sit herself up and lay

6       herself down on her stomach.   She would umm --- she

7       could do the splits.   And she would lay on her belly

8       and she would --- her legs would be in the splits and

9       she would walk her hands up until she would be in a

10      sitting position.   And the same way to lay down on

11      her stomach if she wanted to rollover.

12  Q    Kind of like an aerobic stretching exercise?

13  A    Yes.

14  Q    Okay.

15       Umm --- now when she would sit-up she would sit-

16      up independently?

17  A    Yes.

18  Q    Okay.

19       Uh --- would she ever lose her balance and tip

20      over?

21  A    Not very often, but yes.

22  Q    Okay.

23       Anytime you can think of that startled you?

24  A    Umm --- yes.   Umm --- one time umm --- she was

25      probably about ten months old.   She already had her

245

1   brace on, her hard brace on.   And umm --- she was

2   sitting on the carpet next to the kitchen.   I was in

3   the kitchen.   And umm --- she was reaching for a toy

4   that was over to the side of her and she tipped back

5   and it --- her head hit the carpet floor but it was

6   really loud but it was like an echo sound.

7  Q  And how far away were you at this point?

8  A  Umm --- probably from here to the desk (indicating).

9  Q  And you immediately ran over to her?

10  A  Yes.

11  Q  And what was the expression on her face?

12  A  She looked a little stunned and then continued to

13   reach for the toy.

14  Q  Okay.

15   So it appeared like she was all right then?

16  A  Yes.

17  Q  Okay.

18   And that you were probably more shocked than her?

19  A  Yes.

20  Q  Okay.

21   Any other times that you can think of where she

22   tipped over to this degree though Heather?

23  A  No.

24  Q  Okay.

25   Now anything else that you can remember Heather

246

1     about November thirtieth (30th)?   About the signs

2     that she was exhibiting that day that you thought were

3     unusual besides the vomiting, the possible headache,

4     the tiredness, the clinginess, uh --- anything else

5     that you can tell the Jury about what was different

6     about her that day?

7  A   Not that I can think of.

8  Q   Okay.

9         But when you put her down for her nap ---

10  A   (Interposing)   Yes.

11  Q   (Continuing)   to alleviate the separation anxiety,

12     you put her in her bed and went in and checked on her

13     about fifteen (15) minutes later?

14  A   Yes.

15  Q   And she was playing?

16  A   Yes.

17  Q   And she seemed all right to you?

18  A   Yes.

19  Q   And you went off to work?

20  A   Yes.

21  Q   Okay.

22         When you were --- went to the hospital, is it a

23     fair statement Heather that by the time you saw

24     Madison being pulled out of that ambulance that you

25     were in a state of shock?

247

```
1    A    That I was in shock?

2    Q    Yes.   Is it?

3    A    I wasn't expecting to see that, no.

4    Q    And you went into the ER and they gave you a chair?

5    A    Yes.

6    Q    And they started working on Madison right away?

7    A    Yes.

8    Q    And did you have an opporzunity (sic) --- opportunity

9         to see how Steve was doing?

10   A    He was sitting next to me, yes.

11   Q    Okay.

12             How was he doing?   What could you observe?

13   A    He was very upset.

14   Q    Did anyone ask you to give a history of Madison's day

15        and her medical history?

16   A    Umm --- I umm --- I just --- I was able to tell them

17        that she threw up that day.   Umm --- umm --- I told

18        them that she had the MRSA because that was a concern.

19        Umm --- and that the aplasia cutis congenita.   Those

20        are the things that I told them in ER.

21   Q    Okay.

22             Umm --- did you --- do you remember talking about

23        her hip dysplasia?

24   A    I don't remember if I told them that.

25   Q    I know --- I know it's difficult.
```

248

1         Do you remember whether you told them about her

2        taking --- getting the Bactroban treatments from the

3        MRSA?

4  A   Umm --- I don't remember.

5  Q   Okay.

6         Do you remember them asking whether she was on

7        any medications or anything?

8  A   Yes.

9  Q   Okay.

10        Now she was seen at emergency and then

11       transferred up to the pediatric intensive care unit on

12       the fourth floor, right?

13  A   Yes.

14  Q   And you went from emergency right up to the fourth

15       floor with her?

16  A   Yes.

17  Q   Okay.

18        And you stayed with her with the exception of two

19       hours in the time period that you had to run home and

20       get clean clothes and shower on the Friday, correct?

21  A   Yes.

22  Q   And other than the tests that were given where she had

23       to be taken out of the room and so on and so forth,

24       you stayed with her the whole time, isn't that true?

25  A   Umm --- occasionally people would come to the

249

1    hospital.   I would go out into the hallway to talk

2    with them but I stayed with her.

3  Q   What about Steve?

4  A   He stayed with her.   It was the same thing.   We'd go

5    out, talk to people in the hall.   Stay with her in

6    her room.

7  Q   Was there a point in time that her condition worsened

8    considerably?

9  A   Umm --- mostly I noticed umm --- just little things at

10    first.   She stopped responding to us touching her and

11    umm ---

12  Q   (Interposing)   Kind of back up for me.

13       When she --- when she first got up to pediatric

14    intensive care would she respond to your touch?

15  A   Yes.

16  Q   And the day that you felt that she wasn't responding

17    anymore was?

18  A   It was --- the first time I noticed it was Saturday

19    morning.

20  Q   There was this discussion about using the ICP to

21    relieve the pressure on the brain?

22  A   Yes.

23  Q   Okay.

24       There was also a discussion about the craniotomy,

25    removing part of the skull?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    A    Yes.

2    Q    Now when you were brought into this conference room,

3         uh --- and you saw Officers Sederlund and Sovik, did

4         you have an idea what that was about?

5    A    No.

6    Q    Now they weren't rude to you; they were polite; they

7         were calm?

8    A    Yes.

9    Q    They asked you questions?

10   A    Yes.

11   Q    You gave them answers?

12   A    Yes.

13   Q    Okay.

14        And Sarah Weaver from protective services was in

15        there?

16   A    Yes.

17   Q    And Regina the nurse was in there also?

18   A    Yes.

19   Q    Okay.

20        Did they ask you any questions Heather that you

21        believe that were directed to you as a potential

22        abuser of your daughter?

23            MS. POPE-STARNES:    Objection.    Calls for

24        hearsay.

25            MR. WHITE:   No it doesn't.

                              251

1      THE COURT:   I don't find that it calls for

2   hearsay but I would direct you to rephrase it, Mr.

3   White.

4      MR. WHITE:   Okay.

5   Q   **(By Mr. White, continuing)**   Did you interpret any of

6   their questions Heather that you were a suspect in a

7   child abuse case?

8   A   I felt?

9   Q   Yes.

10  A   No.

11  Q   Did they ask you a lot of questions about Steve?

12  A   Umm --- they asked me some questions about Steve.

13  Q   Okay.

14      And you responded?

15  A   Yes.

16  Q   Did you respond truthfully?

17  A   Yes.

18  Q   Okay.

19      Did you at that point when you were in that room

20  have any belief whether you were being recorded?

21  A   No.   Well man umm --- I --- I --- I saw a tape

22  recorder but I don't know if they were recording or

23  not.   I can't say that.

24  Q   What did you see Heather?   What did you see that you

25  thought was a tape recorder?

252

1   A    I saw a umm --- what I noticed was umm --- Officer

2        Sovik pulled back his coat at one point and it looked

3        like pushed the button.   I heard something, you know,

4        like a button shutting off or I don't know how to

5        describe it.   Umm --- I just saw it when he pulled

6        back his coat.

7   Q    And at that point what did you think that was?

8   A    I thought it was a tape recorder.

9   Q    Okay.

10       You left the room and went back to Madison's

11       room?

12  A    Yes.

13  Q    And then Steve left Madison's room, correct?

14  A    Yes.

15  Q    And sometime later you were brought back into that

16       conference room?

17  A    Yes.

18  Q    And in that conference room this time was your

19       husband, Officer Sederlund and Officer Sovik?

20  A    Yes.

21  Q    And not the protective service worker, correct?

22  A    Correct.

23  Q    And I believe you've already given the --- indicated,

24       put everybody where they're at, at the table?

25  A    Yes.

253

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1   Q    And what was the first thing that you --- what was the

 2        first thing that was said then when you walked back

 3        into the room?

 4   A    Umm --- Officer Sovik ---

 5             MS. POPE-STARNES:   (Interposing)

 6        Objection.   Hearsay.

 7             MR. WHITE:   It's not being offered ---

 8        okay.   We'll --- we'll recall it.

 9             THE COURT:   Just hold on.

10             MS. POPE-STARNES:   Well the question was,

11        what was the first ---

12             MR. WHITE:   (Interposing)   We'll recall

13        it.   We'll do it the long way.   We will.

14             THE COURT:   Okay.

15          Go ahead.

16   Q    (By Mr. White, continuing)   Umm --- did Steve say

17        anything?   Who was the first person that spoke?

18   A    Umm --- Officer Sovik.

19   Q    Okay.

20          And umm --- he said to you, 'Steve wants to tell

21        you he made a mistake,' ---

22             MS. POPE-STARNES:   (Interposing)

23        Objection.   Hearsay.

24             MR. WHITE:   What is the proof --- what is

25        the truth of the matter asserted, Judge?
```

254

1          MS. POPE-STARNES:    And what is the purpose

2     ---

3          THE COURT:    (Interposing)    Just --- okay.

4     Let's quit with the rhetorical questions.

5          Do you have a response Mr. White?

6          MR. WHITE:    It's not hearsay because it's

7     not being offered to prove the truth of the matter

8     asserted.

9          THE COURT:    Okay.

10         What's it being offered for?

11         MR. WHITE:    To show the state of mind, how

12    she's responding is the next step.    It is the

13    question that is directed to the Defendant.

14         THE COURT:    I'll sustain the objection.

15         You can approach it a different way.

16         MR. WHITE:    Okay.

17  Q   **(By Mr. White, continuing)**    Did you hear a discussion

18      about Steve making a mistake?

19  A   (No verbal response.)

20  Q   If you can recall Heather.    I know that ---

21  A   That's --- I'm sorry.

22         MS. POPE-STARNES:    Objection Your Honor.

23    He's asked the question.    She's trying to answer.

24    I'd ask that he let her answer.

25         THE COURT:    Go ahead Ma'am.

                              255

1          MR. WHITE:    I'm not about to cut her off.

2          THE COURT:    Go ahead Ma'am.

3          THE WITNESS:    Umm --- no.

4    Q    **(By Mr. White, continuing)**    Okay.

5          What's the first thing that you remember Steve

6    saying?

7    A    Steve saying?

8    Q    Yeah.

9    A    The first thing I remember is umm --- that he said

10   that he threw her into her crib.

11   Q    Okay.

12         Did he say that he was mad at her?

13   A    I don't remember that, no.

14   Q    Did he say that she was screaming?

15   A    I don't remember that, no.

16   Q    Did he say that she was screaming in his ear?

17   A    I don't remember any of that, no.

18   Q    Did he say Heather that he was two feet away?

19   A    I don't remember hearing that, no.

20   Q    Did he say Heather that her head hit any part of the

21   crib?

22   A    No.    I don't remember that.

23   Q    Did there come a point Heather that Officers Sederlund

24   and Sovik left the room?

25   A    Yes.

256

1    Q    Did Steve remain in the room?

2    A    Yes.

3    Q    Did you have a discussion with him?

4    A    Yes.

5    Q    Okay.

6         That device that you saw on Sovik's --- across

7         his chest, was that in the room then?

8    A    Yes.

9    Q    And where was it?

10   A    It was umm --- it was next to me on my right-hand

11        side.   Umm --- I believe it was on the floor but I

12        can't remember for sure if it was on the floor or on

13        the chair.   And I know at one point that I did, that

14        I thought I saw it and I pulled back the jacket a

15        little bit and I could see it.

16   Q    Okay.

17        And at that point, what did you think it was?

18   A    I just thought it was the recorder.

19   Q    Did you say anything?

20   A    No.

21   Q    Was there --- was there a discussion between you and

22        Steve while they were out of the room?

23   A    Yes.

24   Q    Okay.

25        And when you --- did they come back in the room,

257

```
 1            Sederlund and Sovik?

 2   A    Umm --- I remember just Officer Sederlund coming back

 3        in.

 4   Q    Okay.

 5            And umm --- was there any more questioning of

 6        Steve that you can remember?

 7   A    (No verbal response.)

 8   Q    At that point after he came back in the room?

 9   A    No.   All I remember is that having to write something

10        out, the statement.

11   Q    Okay.

12            Madison died on Monday?

13   A    Yes.

14   Q    Over the time period that you lived with Steve and

15        Madison, did you ever see anything on Madison's body

16        that was suspicious, indicative that somehow she was

17        being mistreated in anyway?

18   A    No.

19   Q    A bruise?

20   A    No.

21   Q    A scrape?

22   A    No.

23   Q    A swelling?

24   A    No.

25   Q    What about Steve's behavior with Madison?   Did you
```

```
 1              ever see him lose his patience with his daughter?

 2    A    No.

 3    Q    Did you ever see him swear at her?

 4    A    No.

 5    Q    Umm --- be too rough with her, play or otherwise?

 6    A    No.

 7    Q    Would he help with the essentials regarding her care

 8         such as bathing, feeding, clothing?

 9    A    Yes.

10    Q    Putting her to bed?

11    A    Yes.

12    Q    Is there anytime Heather that there came a belief in

13         your mind, based upon what you saw and heard, that

14         Steve was not a loving father of your daughter?

15    A    No.

16    Q    What about your observations as to Madison's

17         relationship with her father?   How would you

18         characterize that?

19    A    Umm --- she liked to --- she liked to cuddle with him

20         more and she liked to play with me.   I was her

21         playmate.   But she would like to cuddle more with

22         Steve.   She was --- she always liked to touch his

23         face and...

24    Q    Was there ever a time that she looked afraid?

25    A    I'm sorry?
```

259

```
 1   Q   Was there ever that she looked afraid of her father?

 2   A   No.

 3           MR. WHITE:   If I may Your Honor?

 4           THE COURT:   (No verbal response.)

 5   Q   (By Mr. White, continuing)   I'm going to show you

 6       Proposed Exhibit I.

 7           I'd like you to take a look at this.

 8           Can you tell me when this picture was taken?

 9   A   That was umm --- when we had Thanksgiving over at his

10       grandparent's house, Steve's grandparent's house the

11       week before Thanksgiving.

12   Q   Is this a fair and accurate depiction of Steve and

13       Madison Thanksgiving 2of two thousand six (2006)?

14   A   Yes.

15   Q   And their relationship?

16   A   Yes.

17           MR. WHITE:   I move to admit Exhibit I.

18           THE COURT:   Any objections?

19           MS. POPE-STARNES:   (No verbal response.)

20           THE COURT:   So admitted.

21   Q   (By Mr. White, continuing)   I'm going to show you

22       Proposed Exhibit H.

23           Is this --- tell me what this is?

24   A   It's a picture of Madison.

25   Q   And is there a date that's on it?
```

1   A    Yes.

2   Q    October eleventh (11th).

3          Do you remember who took it?

4   A    Steve took that picture.

5   Q    Were you present when he took this?

6   A    Yes.

7   Q    Was she looking at her father?

8   A    Yes.

9          MR. WHITE:   I would move to admit Exhibit

10   H.

11          THE COURT:   Any objections?

12          MS. POPE-STARNES:   No objection.

13          THE COURT:   So admitted.

14   **Q**    **(By Mr. White, continuing)**   Now Proposed Exhibit G, I

15   believe this has already been admitted, the

16   Prosecutor's proofs but it is the condition of the

17   crib the last time that you saw it in the house?

18   A    Yes.

19   Q    Okay.

20          And um --- this is the normal things that are

21   attached to it?

22   A    Yes.

23          MR. WHITE:   Move for its entry.   Entry of

24   Exhibit G, I'm sorry.   I'm sorry.

25          MS. POPE-STARNES:   Your Honor, my objection

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    is that as Counsel said in his questioning, this has

2    already been admitted into evidence and it's a

3    duplicative ---

4              MR. WHITE:    (Interposing)    It's just

5    another picture.

6              THE COURT:    How do you overcome the

7    duplicative argument?

8              MR. WHITE:    Because I'm going to use it as

9    well --- I can take that picture and after it's been

10   admitted and shoot it up just like I have before.

11             THE COURT:    Is this the one that was in

12   your ---

13             MR. WHITE:    (Interposing)    No.    This was

14   part of theirs.

15             THE COURT:    That's what I mean.    The

16   photograph.    There's two photographs.

17        One is in your Exhibit, Ms. Pope-Starnes?

18             MS. POPE-STARNES:    Yes.    It's People's

19   Exhibit 3.

20             THE COURT:    Okay.

21        The Court will respectfully sustain the objection

22   as to that one as to duplicative.

23   Q   **(By Mr. White, continuing)**    I'm going to show you

24   Proposed Exhibit F.

25        Is that a picture of Madison in her bed?

                          262

1    A    Yes.

2    Q    Is the date recorded?

3    A    Yes.

4    Q    Umm --- is that the week you had turned the crib?

5    A    Yes.

6             MR. WHITE:   Move for entry of Exhibit F.

7             MS. POPE-STARNES:   Well my objection to

8    this as I understand this is in the booklet of

9    pictures that was admitted as Defense Exhibit A, so I

10   believe again that it's cumulative.   If it's not in

11   there then I have no objection.   But I believe

12   Counsel told me already that it was.

13            THE COURT:   Do you know if it's in there or

14   not?

15            MR. WHITE:   It is in there Judge.   It is.

16            THE COURT:   Same reason for its admission?

17            MR. WHITE:   I'm just going to use it as a

18   prop to argue for the Jury.   If --- I'm just trying

19   to be able to ---

20            THE COURT:   (Interposing)   Okay, I know.

21   And I appreciate it.   Your objection --- your proffer

22   is noted but for the same reason as the previous one,

23   I sustain the objection.

24            MR. WHITE:   And you know I could have just

25   taken those pictures out, Judge.

                           263

```
1              THE COURT:   Either way.

2          Was that F as in Frank?

3              MR. WHITE:   F.

4    Q    (By Mr. White, continuing)   Proposed Exhibit D.

5          Can you tell me what this is?

6    A    The kitchen in my house.

7    Q    And is that the kitchen the way it was on November

8         thirtieth (30th), two thousand six (2006)?

9    A    Yes.

10   Q    And this accurately depicts the refrigerator?

11   A    Yes.

12   Q    And put that together with that collage there

13        (indicating)?

14   A    The pictures?   Steve made the pictures through

15        magnetic pictures.   Umm --- these --- these are all

16        different things.

17   Q    Who did the lettering?

18   A    Steve did.   He did the letters for it and that's what

19        he put on there.

20             MR. WHITE:   Move for entry of Exhibit D.

21             THE COURT:   Any objections?

22             MS. POPE-STARNES:   (No verbal response.)

23             THE COURT:   So admitted.

24             MR. WHITE:   Okay.

25   Q    (By Mr. White, continuing)   Heather, I'm going to ask
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
1        you to look at something?

2   A    Okay.

3   Q    And umm --- I'm going to mark this Proposed Exhibit H.

4                  THE COURT REPORTER:   You have H.

5                  THE COURT:   You do?   He does?

6                  MR. WHITE:   I'm sorry.

7                  THE COURT REPORTER:   I have H here.

8                  THE COURT:   I do show H already.

9                  MR. WHITE:   I'm sorry, J.

10                 THE COURT:   Thanks Barb.

11                 MR. WHITE:   I'm sorry, Barb.

12  Q    (By Mr. White, continuing)   Is this Madison's crib?

13  A    Yes.

14  Q    Does it look like it's in the same shape that it was

15       November thirtieth (30th), when you left the house?

16  A    From here, yes.

17  Q    Umm --- the mobile was in this (indicating) position?

18  A    No.   It would be up.

19  Q    It --- just elevated a little bit?

20  A    It flips up.

21  Q    Okay.

22            Other than that does it look like the shape that

23       it was in when you left the house November thirtieth

24       (30th)?

25  A    From here, yes.
```

265

1               MR. WHITE:   I move for entry of Exhibit J.

2               MS. POPE-STARNES:   No objection.

3               THE COURT:   So admitted.

4       In terms of the Exhibits and at this juncture

5      does that cover it?   Because it's four-thirty (4:30)

6      now, this might be a time to break.

7               MR. WHITE:   I've got to look through the

8      book.

9               THE COURT:   I'm sorry?

10              MR. WHITE:   I have to look through the

11     book.

12              THE COURT:   Okay.

13              MR. WHITE:   There might be a duplicative

14     photograph.

15              THE COURT:   Want to --- can that wait?

16              MR. WHITE:   Yes.   Sure.

17              THE COURT:   Okay.   All right.

18              MR. WHITE:   Judge I just have a few follow-

19     up questions and I know the Prosecutor is going to

20     have redirect and so it might be a good time to break.

21              THE COURT:   Okay.   All right.   We'll do

22     it that way.

23       Ladies and Gentlemen, I ask you to return to the

24     Jury room for just a couple of moments.   Obviously

25     the same old thing.   Don't discuss the case and we'll

1       see you tomorrow at eight-thirty (8:30).

2           Jeff will let you know when you can go, okay?

3           Thank you.

4               THE CLERK:   All rise for the Jury.

5       (Whereupon the Jury was returned to the Jury room.)

6                        *  *  *

7               THE COURT:   You're all set Ma'am.

8               THE WITNESS:   Okay.

9               THE COURT:   Thank you.

10          The record will reflect that the Jury has been

11      excused.   And we'll break for the evening.

12          Thank you deputies.

13              THE DEPUTY:   You're welcome, Your Honor.

14              THE COURT:   We'll call you tomorrow morning

15      at eight-thirty (8:30).

16              THE CLERK:   All rise.

17      (Whereupon the matter was concluded for this day.)

18                       *  *  *

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

     I, Barbara Reznick, Court Reporter, do hereby certify that the foregoing pages comprise a full, true, and correct transcript of the proceedings had In the Matter of McBurney before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on February 21, 2008.

_____    *Barbara Reznick*

Barbara Reznick,   CER 1333

1200 N. Telegraph, Pontiac, MI. 48341

248) 858-5841

268