STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN

OAKLAND COUNTY **07-214651-FC**

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

Plaintiff,

v                                   No. 07 214651FC

STEVEN LINDSEY MCBURNEY

Defendant

_____/

JURY HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

FEBRUARY 22, 2008
* * * *

RECEIVED FOR FILING
OAKLAND COUNTY CLERK
BY:____
DEPUTY COUNTY CLERK
2008 AUG 14  A 11: 25

APPEARANCES:

Sarah Pope Starnes, Esq.
   On behalf of the People

Robert White, Esq.
   On behalf of Defendant

Barbara Reznick, Court Reporter

1

# I N D E X

**PAGE**

<u>WITNESSES-PEOPLE</u>

HEATHER MCBURNEY

    Continued Cross-Examination, by Mr. White.........10
    Redirect Examination, by Ms. Pope-Starnes........11
    Recross-Examination, by Mr. White................54

DOCTOR CORMAC MAHER

    Direct Examination, by Ms. Pope-Starnes...........57
    Voir Dire, by Mr. White...........................62
    Continued Direct Examination, by Ms. Pope-Starnes.64
    Cross-Examination, by Mr. White..................104
    Redirect Examination, by Ms. Pope-Starnes.......135

SERGEANT PAUL SUMNER

    Direct Examination, by Ms. Pope-Starnes..........141
    Cross-Examination, by Mr. White..................156
    Redirect Examination, by Ms. Pope-Starnes.......198
    Recross Examination, by Mr. White...............201

DOCTOR LEENA DEV

    Direct Examination, by Ms. Pope-Starnes..........203

<u>EXHIBITS</u>

    Exhibit Number A..................................04
    Exhibit Number C..................................10
    Exhibit Number 7.................................155
    Exhibit Number 8.................................155
    Exhibit Number 9.................................209

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1               Pontiac, Michigan

2               FRIDAY, FEBRUARY 22, 2008

3                      * * *

4               THE CLERK:    The Court calls People

5    versus McBurney, case number 07 214651 FC.

6               MS. POPE-STARNES:    Sarah Pope-Starnes

7    appearing on behalf of the People.

8               THE COURT:    Good morning.

9               MR. WHITE:    Robert White appearing on

10   behalf of Mr. McBurney.

11              THE COURT:    Good morning.

12        The witness ready to proceed?

13              MR. WHITE:    A couple of matters.

14              THE COURT:    I knew it.    That's why I

15   didn't want to ask the question.

16        Is she available though, ready?    Is she ready,

17   Ms. Pope-Starnes?

18              MS. POPE-STARNES:    Yes.    She's right

19   outside.

20              THE COURT:    Okay.    Go ahead.

21              MR. WHITE:    I have proposed Exhibit A,

22   the certified copy of the St. Joseph's Mercy Hospital

23   records.

24              THE COURT:    Okay.

25              MR. WHITE:    I have showed them to sister

                            3

1    Counsel umm --- and I move for their entry.

2                    THE COURT:   Okay.

3                    MS. POPE-STARNES:   No objections.

4                    THE COURT:   That's Exhibit ---

5                    MR. WHITE:   (Interposing)   And   ---

6                    MS. POPE-STARNES:   (Interposing)   A.

7                    THE COURT:   (Continuing)   A.   No

8    objection so ---

9                    MR. WHITE:   (Interposing)   A.

10                   THE COURT:   Exhibit A.   No objection.

11   So admitted.

12       Go ahead.

13                   MR. WHITE:   Uh --- if I may inquire is

14   the complete medical records of U of M going to be

15   produced?

16                   MS. POPE-STARNES:   My investigator umm -

17   -- was able to contact both hospitals yesterday and

18   we were at --- in Ann Arbor at eight o'clock (8:00)

19   picking up everything.   But because of the roads

20   it's not here at eight-thirty (8:30).   So he's

21   supposed to bring them down to us as soon as he

22   arrives.

23                   MR. WHITE:   Okay.   Very good.

24                   THE COURT:   Okay.   Great.

25                   MR. WHITE:   With that can I just before

4

1 I lose track?

2    THE COURT: Yeah. Go ahead. Go

3 ahead.

4    MR. WHITE: Now A has been admitted. B

5 has been admitted.

6    THE COURT: Go ahead.

7    MR. WHITE: Not C.

8    MS. POPE-STARNES: I'm sorry. What was

9 B?

10    MR. WHITE: B is the photos.

11    THE COURT: A group of photos.

12    MS. POPE-STARNES: Thank you.

13    MR. WHITE: A is St. Joseph's Hospital

14 records. B is a book of photos. C I'm going to

15 offer this morning. D has been admitted.

16    MS. POPE-STARNES: D? I'll ask after

17 he's all done.

18    MR. WHITE: H, I and J, those are all

19 large photos. Excuse me, J is the crib.

20    THE COURT: Correct. That's what my

21 notes are showing.

22    MR. WHITE: What was denied admission

23 was the three large photos E, F, and G.

24    THE COURT: I'm looking for E. I have

25 F as in Frank and G as in good. I don't have any

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      note for E as in excellent.

2          Do you show that Barb?

3              THE COURT REPORTER:   E and F, no.

4              THE COURT:   You don't show an E?

5              THE COURT REPORTER:   No.   D, I and H,

6      yes.

7              THE COURT:   Where is E Mr. White?

8              MR. WHITE:   E was a large picture of the

9      crib.

10             THE COURT:   I don't know if that one was

11     offered.

12             MR. WHITE:   I did not offer it?

13             MS. POPE-STARNES:   I think that ---

14             MR. WHITE:   (Interposing)   It was

15     already contained in the book.

16             THE COURT:   You want to move for it

17     right now in case I make the same decision?

18             MR. WHITE:   All right.

19             THE COURT:   You won't have to hear me on

20     the record?

21             MR. WHITE:   Sure.   Sure.

22         I ask you Proposed Exhibit E, I move for its

23     admission.

24             MS. POPE-STARNES:   And I would have the

25     same objection.   One or the other, either the one

1    from the book or this one.

2              MR. WHITE:    Okay.

3         With that Judge, you made your ruling.

4              THE COURT:    Okay.

5         I'll deny its admission as duplicative.   If you

6    choose to, we can --- I don't want to confuse the

7    matters but if you choose to put the big one in and

8    take the little one out, but I've ruled as to that.

9              MR. WHITE:    Okay.

10             THE COURT:    Leave it at that.

11             MR. WHITE:    I just wanted to make sure

12   before I lose track.

13             THE COURT:    Gotcha.   No, that's fine.

14             MR. WHITE:    So, all right.

15        So E, F, and G have been excluded.   C has not

16   been offered yet.   A, B, D, H, I, J have been

17   admitted.

18             THE COURT:    Thank you.

19             MR. WHITE:    Thank you.

20             MS. POPE-STARNES:    And my question is

21   simply, the records of Doctor Adams and Doctor

22   Lipkin, are they marked and what letters are they?

23             MR. WHITE:    I have not marked Doctor

24   Adams.   Doctor Adams is the pediatrician who has not

25   testified yet.   And he will be producing his records

7

1      as part of his testimony.

2                      MS. POPE-STARNES:    Okay.

3                      MR. WHITE:    It's Doctor Piro and Doctor

4      Lipkin.

5                      MS. POPE-STARNES:    Okay.

6                      MR. WHITE:    I have not lettered those

7      yet and my process server is going today to serve

8      subpoenas for certified copies of those records.

9                      THE COURT:    Okay.  Good enough.

10          All right.    Thanks.

11                     MS. POPE-STARNES:    Thank you.

12                     THE COURT:    Can you bring in your

13     witness, Ms. Pope-Starnes?

14          And Jeff, you can get the Jury assembled and

15     ready.

16                     MS. POPE-STARNES:    Judge?

17                     THE COURT:    Yes?

18                     MS. POPE-STARNES:    We're going to need a

19     minute.

20                     THE COURT:    Okay.

21                     THE CLERK:    All rise for the Jury.

22     (Whereupon the Jury was returned to the courtroom at

23     9:25am.)

24                             *  *  *

25                     THE COURT:    Good morning everyone.

                                8

1           All set to go or is he ---

2               A VOICE:    I just need to grab my

3       notebook.

4               THE COURT:    Okay.

5           Jeff can you grab it?

6               THE CLERK:    Yes, Judge.

7               THE COURT:    All right.

8           You may all be seated.

9           And before you sit Ma'am, we'll just have you

10      sworn one more time since it's another day.

11          **Do you swear that the testimony you are about to**

12      **give will be the truth, so help you God?**

13              THE WITNESS:    **I do.**

14              THE COURT:    Okay.    If you'll have a seat

15      there.

16          Case has been called.    Counsels' names have been

17      noted.

18          Again, good morning everyone.

19          We are on cross-examination I believe Mr. White,

20      correct?

21              MR. WHITE:    That is correct.

22              THE COURT:    You may proceed.

23          **H E A T H E R   M C B U R N E Y**

24      **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

25      **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

9

1    2HOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED

2    AND TESTIFIED AS FOLLOWS:

3                    CONTINUED CROSS-EXAMINATION

4    BY MR. WHITE:

5    Q    I just have one more question while the notepad is

6         being brought in.

7              THE COURT:   Oh okay.

8    Q    (By Mr. White, continuing)   Heather, I'm going to

9         show you proposed Exhibit C.

10   A    Okay.

11   Q    Do you recognize this?

12   A    Yes.

13   Q    Okay.

14        Does this picture accurately depict your home?

15   A    Yes.

16   Q    On 311 Scott Street in South Lyon?

17   A    Yes.

18   Q    As of November thirtieth (30th), two thousand six

19        (2006)?

20   A    Yes.

21   Q    Okay.

22              MR. WHITE:   I move for its entry.

23              MS. POPE-STARNES:   No objection.

24              THE COURT:   So admitted.

25              MR. WHITE:   I have nothing further at this

                              10

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    time Judge.

2              THE COURT:    Thank you.

3         Ms. Pope-Starnes.

4         A little bit of an easier podium?

5              MS. POPE-STARNES:   Did you change it?

6              THE COURT:    Sure did.

7              MS. POPE-STARNES:   I'm sorry, Judge.   I

8    didn't notice.

9              THE COURT:   I was working all night in my

10   shop on that thing.

11             MS. POPE-STARNES:   Thank you.   I

12   appreciate that.

13             THE COURT:   I wouldn't trust it though.

14             MS. POPE-STARNES:   I like it.   It's

15   smaller.

16             **REDIRECT EXAMINATION**

17   **BY MS. POPE-STARNES**

18   **Q**   Okay.

19        Mrs. McBurney, I just --- I just have a few

20   questions for you.

21        When --- what was Madison's due date?

22   A    Umm --- December twenty-seventh (27th), two thousand

23        five (2005).

24   Q    So it was the same day she was born?

25   A    Yes.

                              11

1    Q    The photographs in Defense Exhibit B, the book of

2         photographs of the family?

3    A    Yes.

4    Q    In that book there are photographs of the Defendant

5         and Madison.

6             Do you know who took those photographs?

7    A    I did.

8    Q    Now on cross-examination you testified that on uh ---

9         October twenty-seventh (27th), Madison went to Doctor

10        Adams for her first cold and then she was back in on

11        November third um --- because she was still having

12        some problems with some fever and some other issues.

13            Did she get better from that?

14    A    After she was started on antibiotic, yes.

15    Q    Okay.

16            And did that resolve itself?

17    A    Yes.

18    Q    Now you testified that she had an MRI at St. Jo's,

19        excuse me, University of Michigan Hospital on August

20        thirty-first (31st) and subsequent to that she was

21        given a CAT scan on September eleventh (11th) of two

22        thousand and six (2006)?

23    A    Yes.

24    Q    Okay.

25            Did you --- were you able to confirm with the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      doctors the results of that examination?

2  A    Umm --- results were given to Doctor Adams.

3  Q    Okay.

4        And were you able to confirm that he received

5      those results?

6  A    Yes.

7  Q    Okay.

8        And was any further treatment ordered?

9  A    No.

10  Q    Now I'd like to talk to you about your testimony about

11      the February sixteenth (16th) of two thousand and six

12      (2006) incident when Madison was taken to St. Jo's of

13      Ann Arbor emergency room.

14  A    Yes.

15  Q    Who was home with Madison when that happened?

16  A    Steve.

17  Q    Was there anyone else there?

18  A    No.

19  Q    And I believe you testified that uh --- he told you

20      that he'd been carrying her in a bouncy seat and he

21      tripped and fell?

22  A    Umm --- yes.  He lost --- he said he lost his balance

23      coming around the futon and fell carrying her.

24  Q    Where is the futon in your home?

25  A    Umm --- it's in the office.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  Q   What's the flooring in that room?

2  A   Carpet.

3  Q   Is there padding underneath?

4  A   I believe so.

5  Q   And did he tell you how far Madison fell?

6  A   Not that I remember, no.

7  Q   How tall is your husband?

8  A   I believe he is five-nine (5'9").

9  Q   What was Madison's demeanor when you saw her after

10     that incident?

11 A   Umm --- she was fine.

12 Q   Was she crying, fussy, whining, any of those things?

13 A   No.

14 Q   Did you observe any visible injuries?

15 A   I did not see any, no.

16 Q   Did you look at her?

17 A   Yes.

18 Q   After you took her to St. Jo's emergency room where

19     they examined her and she was released, did you

20     observe any concerning signs?

21 A   No.

22 Q   You also testified on cross-examination, I believe,

23     that your parents had come to your home four or five

24     times for visits?

25 A   Yes.

14

1    Q    But that also they would come to some friends' homes

2         in Howell and that sometimes you would go to visit

3         there?

4    A    Yes.

5    Q    About how many times did you visit them with Madison

6         at their friends' home in Howell?

7    A    Umm --- I'd say five or six times.

8    Q    Was there ever anywhere else that you would visit with

9         them besides their friends' home or your home or their

10        home?

11   A    Umm --- visit, I'm sorry?   Visit with my parents?

12   Q    Yes.

13   A    Umm --- no.

14   Q    Now on cross-examination when you testified again

15        about your day with Madison on November thirtieth

16        (30th) of two thousand and six (2006), you talked

17        about a couple of times when you were changing her she

18        would pout her lip out?

19   A    Yes.

20   Q    Okay.

21             Now as I understand it, you had previously

22        testified that twice when you laid her down for naps

23        that day you didn't see that reaction?

24   A    No.

25   Q    Was Madison verbal at that time?

15

1   A   Umm --- just she would just babble.

2   Q   Okay.

3   A   Umm --- she didn't have any words yet, no.

4   Q   Well was she able to tell you if she had an upset

5       stomach or a headache?

6   A   No.

7   Q   Was she fussing at her head at all that day?

8   A   With her head?

9   Q   Yes.

10  A   Umm --- not that I noticed, no.

11  Q   Well please help me understand how was it that you

12      knew that she had a headache?

13  A   I was just assuming that she was --- felt

14      uncomfortable.   She was relieved.   She would stop

15      pouting when she was laid down.   Umm --- I just

16      thought she was achy, maybe had a headache because she

17      wasn't feeling well.   It was just an assumption.

18  Q   So you don't know do you whether or not she had a

19      headache?

20  A   No.

21  Q   Now you testified on cross-examination about an

22      incident where Madison lost her balance when she was

23      sitting on the carpet and tipped back and her head hit

24      the carpet?

25  A   Yes.

16

1  Q   That's the first time you've ever told anybody about

2      that isn't it?

3  A   The first time I was asked about it, yes.

4  Q   Did you tell the police about that at the hospital?

5  A   Not that I remember, no.

6  Q   When the doctors at the hospital asked you for a

7      history while they were trying to figure out what was

8      wrong with Madison, did you tell them about that?

9  A   In the emergency room?

10 Q   Any of the doctors?

11 A   I know that I told them that she was --- they would

12     ask if she walking and fell over.  I don't know for

13     sure if I said that she --- of that incident, no.

14 Q   Well ---

15 A   (Interposing)  I did explain how she would tip over

16     though.  She was not completely steady yet.

17 Q   But you testified yesterday she was not walking yet?

18 A   Correct.  That's what they would usually ask first.

19 Q   After this --- well let me ask you this.  This

20     incident that you're talking about where she was

21     sitting on the carpet and tipped over, when did that

22     happen?

23 A   She was, I don't know an exact day.  She was about

24     ten months old.

25 Q   So approximately when does that mean?

17

1   A   Umm --- it would have been in November.

2   Q   As a nurse are you familiar with the signs to watch

3       for when someone has a concussion?

4   A   Yes.

5   Q   What kind of symptoms do you watch for?

6   A   Umm --- lethargic, umm --- change in your mental

7       status.   Umm --- umm --- that's all I can think of

8       right now really.

9   Q   Okay.

10       Did you see any of those signs after that

11       incident?

12   A   No.

13   Q   Did Madison ever --- was she ever involved in a car

14       accident?

15   A   No.

16   Q   Did she ever fall from more than one story?

17   A   No.

18   Q   Were you responsible for her injuries on November

19       thirtieth (30th) of two thousand and six (2006)?

20   A   No.

21   Q   You testified on cross-examination about her being

22       tired and clingy on November thirtieth (30th)?

23   A   Yes.

24   Q   Had she ever had days before where she was tired?

25   A   Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Q    Had she ever had days before that she was clingy?

2    A    Yes.

3    Q    You also testified on cross-examination that you

4         recalled telling someone at the hospital when you were

5         giving history about the MRSA?

6    A    Yes.

7    Q    Do you recall who you told?

8    A    Umm --- I mentioned it more than once.   I don't know

9         who all I told about it.

10   Q    You testified that when you were first in the

11        pediatric intensive care unit with Madison that she

12        was responsive to your touch?

13   A    Yes.

14   Q    How did she respond to your touch?

15   A    She would move her foot away if I touched her foot.

16        She would kind of grasp a little bit with her hand if

17        I touched her hand.   And when they would suction her

18        out she would suck on the hose.   That's about all she

19        did.   She moved her arm a little bit once.

20   Q    And how did she move her arm?

21   A    Just it --- she had --- they had --- they had like a

22        little board underneath her arm because her IV was

23        there.   But she would just --- she just moved her arm

24        up one time.

25   Q    Okay.

19

1       Do you know what posturing is?

2    A   Yes.

3    Q   Was she doing that?

4    A   No.

5    Q   Did she begin to do that at some point?

6    A   No.

7    Q   Okay.

8        Now you testified on cross-examination that you

9        did not think that you were a suspect?

10   A   Yes.

11   Q   When Sergeant Sovik and Detective Sederlund talked to

12       you in the conference room, Sergeant Sovik asked you

13       whether or not you had caused the injuries to Madison,

14       do you recall that?

15   A   No.

16   Q   Who were the only people with Madison on November

17       thirtieth (30th), two thousand and six (2006)?

18   A   Throughout the day, Steve and myself.

19   Q   Now I want to talk to you Mrs. McBurney about umm ---

20       your statement about seeing a tape recorder that

21       doesn't --- you don't know if it's recording?

22   A   Yes.

23   Q   Describe what you saw.

24   A   Umm --- you want the size, the approximate size?

25   Q   Whatever --- however a description you can give us.

1  A    Umm --- a light brown, tan strap.    Umm --- can I use

2       the Kleenex box again?    I would say it was about

3       maybe that (indicating) big.    Maybe a little bit

4       wider.    Umm ---

5  Q    (Interposing)    The size of your hand or what you're

6       showing underneath your hand on the box?

7  A    Oh, I'm sorry.    Up above here (indicating).    Maybe a

8       little bit wider.    Umm --- I don't know how else to

9       describe it.

10 Q    And where did you see it?

11 A    The first time I saw it was when Officer Sovik pulled

12      back his jacket at one time.    And then I saw it umm -

13      --

14 Q    (Interposing)    And did you see that to his left or

15      his right?

16 A    It was on his left.

17 Q    Okay.

18          And where was it in relation to his body when you

19      saw it?

20 A    Umm --- it was umm --- on his left side about ribs,

21      about waist level.

22 Q    What color was it?

23 A    Umm --- the strap was like a brownish tan color.    And

24      it was ---kind of fit inside.    I didn't inspect it

25      for a long time.

                              21

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    Q    Okay.

2         Could you tell if he was carrying a gun in his

3         waist?

4    A    No.

5    Q    Could you tell if he was carrying a cell phone or a

6         pager on his waist?

7    A    No.

8    Q    Do you recall what type of jacket he was wearing?

9    A    Yes.

10   Q    What was it?

11   A    It was a black leather jacket.

12   Q    Okay.

13        And do you recall whether or not he was wearing a

14        pocket guard, a badge, on the outside of his pocket?

15   A    No.

16   Q    Okay.

17        Now you testified yesterday that at some point

18        when the officers had left the room that you saw it

19        sitting either on a chair or on the floor?

20   A    Yes.

21   Q    When did he take it off?

22   A    Umm --- there was a period of time when I was not in

23        the room.   I can't say when he took it off?

24   Q    When did you first see it?

25   A    Umm --- the first time I saw it is when I was in the

                                22

1   room with the officers.

2   Q   So you didn't see him remove it?

3   A   No.

4   Q   Do you recall testifying at a hearing before Judge

5       O'Brien on September twenty-fifth (25th) of two

6       thousand and seven (2007)?

7   A   Yes.

8   Q   And you didn't say anything during that hearing about

9       hearing a button click, did you?

10              MR. WHITE:   Your Honor, the question is

11      whether it was asked and whether she gave a prior

12      consistent statement.   The form of that question is

13      improper.   If it's not asked, it can't be a prior

14      inconsistent.   She'd have to give direct response to

15      a question.

16              MS. POPE-STARNES:   I'll ask it a different

17      way Judge.

18              THE COURT:   Go ahead.

19  Q   **(By Ms. Pope-Starnes, continuing)**   Yesterday did you

20      testify that you heard a button click?

21  A   Yes.

22  Q   Okay.

23          During the hearing on September twenty-fifth

24      (25th) of two thousand seven (2007), you never

25      testified to that did you?

                        23

1          MR. WHITE:   Your Honor, the question is

2    still improper because it has to be preceded was she

3    asked.

4          THE COURT:   I gotcha.

5          MR. WHITE:   So if that was asked and she

6    gave a contradictory response ---

7          THE COURT:   (Interposing)   I hear you.   I

8    hear you.

9        Any response to that?

10         MS. POPE-STARNES:   Yes, Your Honor.   I

11   don't believe that that has to be the question.   If

12   Counsel wants to follow up with that question he

13   certainly can.   But I have a right to impeach the

14   witness in regards to their testimony.

15         THE COURT:   Well in fairness Counsel, there

16   was the witness now and then can only respond to

17   questions that are asked.   And if the question was

18   never asked then I would sustain the objection.   And

19   I will if it hasn't been asked of her at that time.

20   She's not allowed to sit here and just give a

21   narrative.   She can only respond to questions that

22   are asked of her and I don't know.   I don't have the

23   transcript.   I don't know if it was asked or not so.

24  Q   **(By Ms. Pope-Starnes, continuing)**   Did you describe

25   this device that you believe that you saw during the

                                24

1    hearing on September twenty-fifth (25th) of two

2    thousand and seven (2007)?

3              MR. WHITE:    The form of the question is

4    still improper.    It is whether she was asked a

5    previous question, Judge.    You're absolutely right,

6    she ---

7              THE COURT:    (Interposing)    I'm not saying

8    that she wasn't asked but I sustain the objection at

9    this time until you can establish that the question

10   was asked or some derivative of it.

11   Q    **(By Ms. Pope-Starnes, continuing)**    Yesterday you

12   testified that you moved Sergeant Sovik's jacket to

13   look at the device, is that right?

14   A    Yes.

15   Q    Okay.

16        Do you recall testifying on September twenty-

17   fifth (25th) of two thousand and seven (2007), I'll

18   direct you to page one-sixty-seven (167) of the

19   transcript, Counsel, that you just saw it from the

20   position you were sitting in?

21   A    Yes.

22   Q    Yesterday you testified that you never said anything

23   about the device.

24        Do you recall testifying to that?

25   A    I'm sorry.    I don't understand what you're asking me.

25

1   Q   Okay, I'll ask it differently.

2       Yesterday you were asked a question about whether

3      or not you said anything to anyone about seeing this

4      device and you said that you did not, do you recall

5      that?

6   A   Umm --- about I don't remember exactly what ---

7   Q   (Interposing)   Did you testify yesterday about

8      whether or not you said anything to the officers or

9      your husband about this device?

10   A   Umm --- I misunderstood the question I guess.   I

11      thought what he was asking umm --- why I didn't ask

12      them about the recording device.   I didn't --- I'm

13      sorry.   I guess I just misunderstood.   I thought ---

14      I didn't realize he was asking in general of

15      everybody.

16   Q   Did you say anything to anyone about this recording

17      device that day at the hospital?

18   A   I mentioned it to Steve when we were in the room

19      together alone.

20   Q   You were asked on September twenty-fifth (25th) of two

21      thousand and seven (2007), 'When was it you became

22      aware as you testified that you believe that Sergeant

23      Sovik had something under his jacket,' do you recall

24      that?

25   A   Yes.

26

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   And do you recall what your answer was?

2   A   Yes.

3   Q   What was your answer?

4   A   Officer Sovik asked me a question.   When I answered

5       it he had a pen in his hand.   He put his hand, I'm

6       not sure exactly if he threw the pen down or put the

7       pen down, leaned back a little bit in his chair,

8       opened up his jacket and I believe that's as much as I

9       said and then that's when I saw the recording device.

10  Q   There's nothing there about pushing a button is there?

11          MR. WHITE:   Objection Your Honor.   This is

12      the same question.

13          MS. POPE-STARNES:   No.   It's in response

14      to this answer Your Honor.

15          MR. WHITE:   No it isn't.   The form of the

16      question is improper.

17          THE COURT:   It's a rhetorical question in

18      any event.   The Court will sustain the objection.

19  Q   **(By Ms. Pope-Starnes, continuing)**   Now I need to

20      clarify with you Mrs. McBurney, yesterday Counsel

21      asked you several questions about whether or not your

22      husband said something.   And each time you responded,

23      'Don't remember that.'   'No.'

24  A   Yes.

25  Q   He asked you, 'Whether or not your husband said he was

27

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    mad.'

2         Was your answer that you, 'Don't remember that,'

3    or 'No, he didn't say that'?

4              MR. WHITE:   Well I guess this is asking the

5    witness to uh --- if she doesn't know, I guess she's

6    asking the witness to speculate.   In that respect

7    Judge I think the form of the question is improper.

8              MS. POPE-STARNES:   I'm not asking her ---

9              THE COURT:   (Interposing)   I don't buy

10   that it's speculation.   It's overruled.

11             MS. POPE-STARNES:   Thank you.

12             THE COURT:   Go ahead.

13             THE WITNESS:   Umm --- that no, I don't

14   remember.

15  Q    **(By Ms. Pope-Starnes, continuing)**   The answer is ---

16  A    (Interposing)   I don't remember.

17  Q    (Continuing)   that you don't remember?

18  A    Correct.

19  Q    Counsel asked you, 'If your husband said that Madison

20       had been screaming.'

21            Again, your answer was, 'Don't remember that,

22       no.'

23            Is it that, 'You do not remember' or 'No, he did

24       not say that'?

25  A    I do not remember.

28

1  Q  Counsel asked you, 'If your husband had said that

2     Madison was screaming in his ear'.

3        Again, your answer was, 'Don't remember, no.'

4        Is it that you don't remember that or that he did

5     not say that?

6  A  I don't remember.

7  Q  Okay.

8        He also asked you, 'If you recall your husband

9     saying something about being two feet away'.

10        And again, you had given the same response.   Can

11     you tell us please was it that you don't remember or

12     he did not say that?

13  A  I don't remember.

14  Q  Okay.

15        Counsel asked you, 'If your husband had said

16     anything about Madison's head hitting part of the

17     crib.'

18        I have the same question Mrs. McBurney.   Do you

19     remember if it was, 'That he did not say that' or 'You

20     don't recall'?

21  A  I don't remember.

22  Q  Okay.

23        Now I'm a little bit confused and I need your

24     help clarifying so I understand.

25               MR. WHITE:   Objection Your Honor.   That's

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    a narrative statement.   She's not to be the test.

2    Just ask questions.

3              MS. POPE-STARNES:   I'm trying to ask a

4    question Your Honor.

5              THE COURT:   Go ahead.   Go ahead.

6              MS. POPE-STARNES:   May I proceed Your

7    Honor?

8              THE COURT:   You may.

9              MS. POPE-STARNES:   Thank you.

10   Q   **(By Ms. Pope-Starnes, continuing)**   You testified that

11       when you came back into the conference room at the

12       hospital ---

13   A   (Interposing)   Yes.

14   Q   (Continuing)   that, if I understand correctly, you

15       testified that you recall Sergeant Sovik speaking

16       first?

17   A   Yes.

18   Q   But you testified that you, 'Didn't remember what he

19       said.'   Then you testified that you remembered your

20       husband saying that he, I believe it was that, 'He

21       threw Madison' and then you didn't remember anything

22       else'?

23             MR. WHITE:   Objection.

24             MS. POPE-STARNES:   May I finish the

25   question, Your Honor?

30

1           MR. WHITE:   Objection.   That's not her

2      testimony.   That's mischaracteration ---

3      mischaracterization ---

4           MS. POPE-STARNES:   (Interposing)   May I

5      finish the question Your Honor?

6           MR. WHITE:   (Continuing)   of the

7      testimony.

8           THE COURT:   One at a time.   One at a time.

9      Okay?

10      Thank you.   Thank you.

11      Go ahead.   Finish the question.

12           MS. POPE-STARNES:   If I'd been allowed to

13      finish the question I --- my --- what I was saying

14      was, is that what you testified to?

15           MR. WHITE:   The form of the question is

16      improper.

17           THE COURT:   The form --- sustained as to

18      form.   Just rephrase, Ms. Pope-Starnes.

19   Q   **(By Ms. Pope-Starnes, continuing)**   Do you recall

20      Defense Counsel taking you through what happened in

21      the room when you came back in the room?

22   A   Yes.

23   Q   Okay.

24      What was the first thing that you remember?

25   A   Umm --- Officer Sovik said something to me.

31

1    Q    Do you remember what it was that he said?

2    A    Yes.

3    Q    Okay.

4         Did you testify yesterday that you didn't

5    remember what he said?

6    A    No.    I started to say what he was going to say and

7    you stopped me and said that it was hearsay evidence

8    so I wasn't supposed to say that.

9    Q    Okay.    All right.

10        What do you remember next?

11   A    Umm --- I ---

12             THE COURT:    (Interposing)    I'm sorry for

13   interrupting but remember next meaning back at the ---

14             MS. POPE-STARNES:    (Interposing)    Yes.

15             THE COURT:    (Continuing)    at the hospital

16   or next, yesterday?

17   Q    **(By Ms. Pope-Starnes, continuing)**    Back at the

18   hospital.

19   A    Umm --- the next thing was that what Steve said.    Umm

20   --- is that --- that he threw her into the crib.

21   Q    Do you recall your husband saying anything before

22   that?

23   A    No.

24   Q    Do you recall you saying anything to your husband

25   before that?

32

1   A    I know there was a pause for a while.   Then I said

2         something to the Detective, you know, just tell me.

3         But that's all I really remember.

4   Q    And was that pause before or after Sergeant Sovik

5         first said something to you when you came in?

6   A    After.

7   Q    Mrs. McBurney, didn't --- wasn't the first thing your

8         husband said was asking you how ---

9            MR. WHITE:   (Interposing) Objection as to

10        leading nature of the question Judge.   She's ---

11        that's still her witness.

12           THE COURT:   Rephrase it Ms. Pope-Starnes.

13   Q    **(By Ms. Pope-Starnes, continuing)**   Isn't it --- did

14        your husband say something else to you about Nicholas

15        Kennedy first?

16           MR. WHITE:   Objection as to this Judge.

17        You've ruled on this issue.

18           MS. POPE-STARNES:   That's just how Your

19        Honor.

20           THE COURT:   Go ahead.

21           MR. WHITE:   Well then I don't know if this

22        is something that we should take up right now Judge.

23           THE COURT:   Come on up, please Counsel.

24         Bear with us folks.   I'm sorry.

25         (Whereupon a discussion was held at the Bench out

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    of hearing of the Jury and the Court Reporter.)

2                          * * *

3          THE COURT:   Jeff, would you excuse the Jury

4    for just a couple of minutes?

5          THE CLERK:   All rise for the Jury.

6          THE COURT:   Please don't talk about the

7    case.   Thanks.

8          (Whereupon the Jury was returned to the Jury room

9    at 9:55am).

10                         * * *

11         THE COURT:   Ma'am, if you want to have a

12   seat back there so you can go outside for a couple of

13   minutes go ahead, okay?

14         THE WITNESS:   Okay.

15         THE COURT:   You may all be seated.

16      The record will reflect that the Jury is excused

17   and I've permitted Mrs. McBurney to sneak outside for

18   a couple of minutes.   There was a request that the

19   Court excuse the Jury for a couple of moments just so

20   we can get a foundation a little bit.

21      Ms. Pope-Starnes, you were beginning to question

22   the witness about the --- well you tell me.   You were

23   starting in what regard?

24         MS. POPE-STARNES:   Your Honor, the Court

25   heard the Walker hearing in this case.   And as the

34

1    Court recalls the testimony from the Walker hearing,

2    there was an argument about what was said in the room,

3    when the police were in the room, with the victim's

4    mother and the Defendant.  She's testified that

5    nothing else was said except the statement uh --- that

6    there's some statement by Sergeant Sovik.  She's now

7    said that she asked the Defendant, 'What happened'.

8         And that the Defendant's response was that, 'He

9    threw the child into the crib.'

10        And she testified yesterday that's all that was

11   said.  That's contrary to the testimony of the police

12   officers from the Walker hearing, from the preliminary

13   examination and what I'll be asking them to testify to

14   in the trial.

15            THE COURT:   Go slow with me.   How --- so

16   you're going to ---

17            MS. POPE-STARNES:   (Interposing)  Well let

18   me go a little further ---

19            THE COURT:   (Interposing)  Go ahead.

20            MS. POPE-STARNES:   (Continuing)  if I can?

21   Maybe that will clarify it for you.

22            THE COURT:   Because I don't hear the

23   impeachment yes --- yet.

24            MS. POPE-STARNES:   I'm getting there.   So

25   now she's said, 'That's all that they said.'

                              35

1       The officers, if the Court recalls the Walker

2   hearing testimony, they testified that Sergeant Sovik

3   said something when they came in the room.   That the

4   first thing said by the Defendant to her was, 'How do

5   you know about Nicholas Kennedy?'

6       And that she responded to him about that.   Then

7   she asked him what happened.   Then he says --- then

8   he goes on to talk about it and gives a description

9   after asking --- asked by the officers as to what

10  happened.   So this is contrary to her testimony

11  yesterday where she says, 'Nothing else was said, then

12  got up and left the room.'

13      In order to impeach her under the Court rules I

14  have to ask her first to give her the opportunity to

15  respond before I can bring that out through the

16  officers.

17          THE COURT:   And forgive me.   The record

18  will speak for itself but maybe there's an agreement

19  that she testified just a minute ago that nothing else

20  was said or that I don't recollect or recall if

21  anything else was said.

22          MS. POPE-STARNES:   Her testimony yesterday

23  was that, 'Nothing else was said.'

24          THE COURT:   Any dispute as to that as to

25  yesterday so I don't have to take the time to listen

36

1    to the tape?

2               MR. WHITE:    Judge. Uh --- I ---

3               THE COURT:    (Interposing)    Just on that

4    issue.

5               MR. WHITE:    I can't remember whether she

6    said, 'I can't remember,' or 'I' --- you know, that's

7    all I can say.

8               THE COURT:    Or nothing else?

9               MR. WHITE:    ·I can't remember because

10   there's some, I think the only thing she could

11   identify being said was, 'I threw --- I threw her into

12   the crib.'

13       But all the rest seems to say that, 'I can't

14   remember.'

15              THE COURT:    Okay.

16       Then there's --- okay.    Thank you.

17       Go ahead, Ms. Pope-Starnes, assuming that she did

18   affirmatively state nothing else was said, go ahead

19   with your argument.    Or does that cover it?    Is that

20   your argument?

21              MS. POPE-STARNES:    Well at some point I

22   reiterate all the details.    If the Court recalls, the

23   officers testified about statements that were made and

24   after the Defendant made the statements that Sergeant

25   Sovik asked some questions and gathered more

                               37

1    information.    Part of their argument is that these

2    officers are not telling the truth and that this never

3    happened.    So I --- I have the right to impeach her

4    as to this.    And I have to ask her these questions

5    first under the rules of evidence before I can bring

6    that out through the officers.

7         THE COURT:    Let me make sure, I hate to

8    belabor the record, that I've got your argument.

9    Your argument is as follows.

10        She said at the Walker hearing, 'That the

11   Defendant' --- let's back up.    At the Walker hearing

12   there was testimony from the witness about the scene

13   in the room with the Defendant, the officers and

14   herself.    And in the Walker hearing while she was

15   testifying to that scene she testified to words that

16   the Defendant said concerning the Nicholas incident.

17        MS. POPE-STARNES:    I'm not talking about

18   the Walker hearing.

19        THE COURT:    No.

20        MS. POPE-STARNES:    I'm talking about that

21   for this particular purpose I'm talking about her

22   testimony here in Court now.

23        THE COURT:    Go slow with me.

24        But you're trying to impeach her with Walker

25   hearing testimony?

                              38

1           MS. POPE-STARNES:   No.   What I'm ---

2           THE COURT:   (Interposing)   Oh.   Okay.

3           MS. POPE-STARNES:   (Continuing)   trying to

4   do is direct the Court's attention to help the Court

5   know the picture of what I'm saying.   Because I'm ---

6           THE COURT:   (Interposing)   Okay.   Just

7   break it down to specifically the impeachment.

8           MS. POPE-STARNES:   All right.   Let me try

9   it this way.

10      She testified yesterday that, 'She came in this

11  room.   That Sergeant Sovik said something first.'

12      Today she said, 'She asked the Defendant to tell

13  me what happened and that he said that he threw

14  Madison in the crib.'

15      She testified yesterday, 'Nothing else was said.

16  That the police officers got up and left the room.'

17      We know from the preliminary examination and from

18  the police report and from the Walker hearing that the

19  officers have testified and will testify that what

20  happened was, is when she came in the room, Sergeant

21  Sovik spoke first.   That the Defendant said to her,

22  'How did you know about Nicholas'.   That she

23  responded to that.   That then she asked him what ---

24  tell me what happened.   And he said he threw Madison

25  in the crib.   And then there was more conversation,

39

1   more statements by the Defendant and then some

2   questions by the officers.   And then they left the

3   room.

4            THE COURT:   Okay, but you've got to ---

5   maybe I'm just slow.   You've got to go with me here.

6   You're trying to impeach her today with prior incon --

7   - statements, prior inconsistent statements by her

8   before?

9            MS. POPE-STARNES:   No.   In this trial

10  today and yesterday.

11           THE COURT:   Right.   But she --- so what is

12  it that she said yesterday that is inconsistent with

13  what she said today?

14           MS. POPE-STARNES:   She said, 'That nothing

15  else was said in the room.'   She has said that, 'The

16  first statement made by the Defendant was, How do you

17  know about Nicholas.'   That has not been her

18  testimony today.

19           THE COURT:   She said some prior time

20  Nicholas ---

21           MS. POPE-STARNES:   (Interposing)   No.

22  The officers will testify that that's what happened.

23           THE COURT:   Okay.

24        But how is that impeaching her that someone else

25  said something different?   Just go --- help me out.

40

1    How is it that if I say, 'The light was green,' and

2    someone else says, 'The light was red,' how does that

3    person's statement that, 'The light was red', impeach

4    my testimony that 'The light was green'?

5         It's not impeachment.   It might be weight ---

6         MS. POPE-STARNES:   (Interposing)   The

7    Defendant is arguing that the officers are not being

8    truthful about this.   And they're offering her

9    testimony that this was all that was said.   Sergeant

10   Sovik said something.   I said, 'What happened'.   And

11   the Defendant made this statement only.

12        THE COURT:   Okay.

13        Why do you need that ---

14        MS. POPE-STARNES:   (Interposing)   Because

15   under the rules of evidence ---

16        THE COURT:   (Continuing)   so you would

17   call these witnesses ---

18        MS. POPE-STARNES:   (Continuing)   I can't

19   get out through the officers that there were other

20   things said by her without asking her first.

21        THE COURT:   Other things said by her,

22   correct.   So she said on some prior occasion ---

23        MS. POPE-STARNES:   (Interposing)   The

24   officers will testify that when the Defendant said,

25   'How do you know about Nicholas', she responded.   She

41

1   has denied that that happened.   I can't get that

2   statement in unless she --- I confront her with it

3   first.   And I have to get there with it.

4           THE COURT:   Okay.   All right.   I think

5   I'm on track with you.

6           MS. POPE-STARNES:   Okay.

7           THE COURT:   Mr. White?

8           MR. WHITE:   Okay.

9      First of all Your Honor, she's leading, she's

10  asking leading questions.   The form of the question

11  is improper.   Secondly, you've ruled on this

12  substantive evidence which is arguably very dangerous

13  evidence for you to allow it in any capacity, any

14  capacity, because the possibility this could taint

15  this trial.

16          THE COURT:   Go ahead.

17          MR. WHITE:   You've made a limited ruling,

18  okay, as to what is admissible regarding Nicholas

19  Kennedy.   This witness, over and over again, as we

20  hear because of we can assume the trauma of not only

21  that night but of being here talking about her dead

22  daughter, can't remember, okay?   The fact that she

23  can't remember is not necessarily impeachment.   She

24  didn't emphatically say, 'Nothing else was said.'

25  You can see over and over again she says, 'I cannot

42

1    remember.'   They're going in the backdoor to try to

2    get evidence in about a very, very dangerous subject

3    Judge.

4              THE COURT:    Thank you.

5              MR. WHITE:    So I don't believe it should be

6    permitted under these circumstances.

7              THE COURT:    Thank you.

8         The Court, if the Court has --- that the Court

9    has ruled substantively does not preclude for further

10   introductions for impeachment purposes.    There is not

11   a meeting of the minds as to whether or not she

12   testified yesterday quote, 'I don't remember', or

13   quote, 'Nothing else was said'.    So we'll check that

14   out real quick and if it is indeed, 'Nothing else was

15   said', I respect your objection Mr. White but the

16   Court would overrule same and I don't find that my

17   ruling as to a substantive issue precludes inquiry

18   into --- for impeachment purposes.    And the Court

19   finds that that would be proper impeachment assuming

20   she does that.    Uh --- that she did say that.    Go

21   off the record for a minute.

22              (Whereupon the record was stopped.)

23                   *   *   *

24              THE COURT:    I have --- I don't recollect

25   and I'm not going to rely just on my notes but Ms.

43

1   Pope-Starnes, you're saying she did yesterday say

2   that.

3       Mr. White, with all due respect and I certainly

4   respect you as an Officer of the Court, you didn't

5   say, 'She did not'.   You just said you, 'Don't

6   remember.'

7           MR. WHITE:   Well I'm just being candid.

8           THE COURT:   I know.

9           MR. WHITE:   I can't sit there and say ---

10          THE COURT:   (Interposing)   And like I

11  said, I respect you as an Officer of the Court.

12      Ms. Pope-Starnes, I'll uh --- I'll --- that's

13  your position?

14          MS. POPE-STARNES:   Judge, the only other

15  way to do it more quickly is for me to ask her, 'If

16  anything else was said' and to see what her response

17  is.

18          THE COURT:   Okay.

19      You know what?   Fair enough.

20          MS. POPE-STARNES:   Whatever way the Court

21  wants to handle it.

22          THE COURT:   Okay.   Maybe for expediency

23  purposes that would be a better way to go about it.

24  All right.   Umm --- with that you'll bring her back

25  in.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          And Jeff, you can bring back in the Jury.

2              THE CLERK:   All rise for the Jury.

3      (Whereupon the Jury was returned to the courtroom.)

4                          *  *  *

5              THE COURT:   You folks are getting really

6      good at that.   It's work, even flow.

7          You may all be seated.

8          The record will reflect that the Jury is back.

9          Thank you again, everyone.

10         And Ms. McBurney is back on the stand obviously.

11     Counsels' names have been noted for the record.

12         And Ms. McBurney, you are reminded you are still

13     under oath, required to testify truthfully and

14     honestly.   Thank you.

15         Ms. Pope-Starnes.

16             MS. POPE-STARNES:   May I proceed?

17             THE COURT:   You may.

18             MS. POPE-STARNES:   Thank you.

19             **WHEREUPON HEATHER McBURNEY HAVING BEEN**

20     **PREVIOUSLY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH**

21     **AND NOTHING BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

22             **CONTINUED REDIRECT EXAMINATION**

23  **BY MS. POPE-STARNES:**

24  Q    Okay Mrs. McBurney, again, I'm going to direct your

25       attention back to when you came into the conference

45

1    room at the hospital and the police and the Defendant

2    were there.

3         What was the first thing that happened when you

4    came in the room?

5  A  Umm --- I sat down and Officer Sovik spoke.

6  Q  Then what happened?

7  A  And then umm --- there was quiet.  Umm --- Steve was

8    not saying anything.  And then that's when I said to

9    him, 'Tell me' or something like that I said.  Umm --

10   - and then that's when Steve said that, 'He threw her

11   into the crib'.

12 Q  What happened then?

13 A  All I can really remember next is Officer Sovik

14   speaking again before they left the room.

15 Q  Did anyone else speak before they left the room

16   besides Officer Sovik?

17 A  Not that I can remember.

18 Q  Did you say anything else besides, 'What happened?

19 A  Not that I can remember.

20 Q  Can you recall saying ---

21        THE COURT:   (Interposing)   Do you have a

22   transcript or anything to see if it will refresh her

23   recollection?  She says she doesn't recall anything.

24        MR. WHITE:   My objection is to the form of

25   the question.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          MS. POPE-STARNES:    May I approach the

2     witness, Your Honor?

3          THE COURT:    Respectfully as to the form,

4     the Court overrules the objection.    And ---

5          MR. WHITE:    (Interposing)    And I thought

6     you made a ruling.    I though you made a ruling and I

7     ask you to respect your ruling about what this ---

8     where this next step would be Judge.

9          THE COURT:    Counsel, I understand and

10    that's why I have asked Counsel and invited Counsel

11    since she says, 'She cannot recall',  she's certainly

12    entitled to show her something to see if it refreshes

13    her recollection.

14        Counsel, you may approach.

15          MS. POPE-STARNES:    Thank you.

16  Q   **(By Ms. Pope-Starnes, continuing)**    I'm showing you

17    page five of fourteen (14) of the South Lyon Police

18    report.    I'm going to direct your attention to the

19    last paragraph, the first three sentences.    I'd ask

20    you to read that silently.

21          MR. WHITE:    Your Honor, I'll object.

22          THE COURT:    Just one second.

23        Ma'am, hold tight.

24          MR. WHITE:    I'll object.

25          THE COURT:    Let --- hold on a minute.    Let

47

1    her finish the statement.

2         You asked her to what?

3              MS. POPE-STARNES:    Read it silently to

4    herself and then hand it back to me when she's done.

5              THE COURT:    Okay.    Just a second Ma'am.

6         Mr. White?

7              MR. WHITE:    The first question is, would

8    something refresh her recollection, the first

9    question.    She hasn't stated that.

10             THE COURT:    Okay.    Go ahead.

11             MR. WHITE:    Secondly,   ---

12             THE COURT:    (Interposing)    Ask her the

13   question.

14   Q    **(By Ms. Pope-Starnes, continuing)**    Would something

15   refresh your recollection?

16   A    Yes.

17             THE COURT:    Second question.    Second?

18             MR. WHITE:    What would refresh her

19   recollection?

20             MS. POPE-STARNES:    Your Honor, I don't have

21   to ask her that.    The Court ruled that I ---

22             THE COURT:    (Interposing)    That's fine.

23             MS. POPE-STARNES:    (Continuing)    under the

24   statute, I don't have to show her anything.

25             THE COURT:    I gotcha.    Thank you Counsel.

                              48

1    Noted.    Anything else?

2        The Court will permit this, permit her to show

3    her that.

4        MR. WHITE:    Your Honor, I believe you're

5    violating your own ruling in the presence of the Jury.

6    Again, I respectfully ask, I ask that we not go here.

7    Because all you're --- what you're doing is allowing

8    them to go through the back door which they can't go

9    through the front door.

10       THE COURT:    That --- you've made that

11   comment noted and I've respected and will overrule it.

12       Go ahead.

13   Q   **(By Ms. Pope-Starnes, continuing)**    Please read that

14   silently to yourself, the last paragraph, the first, I

15   believe, four sentences.    And then hand it back to me

16   after you've had the opportunity to do that.

17       Have you had the opportunity to read that?

18   A   Yes.

19   Q   Now does that refresh your recollection as to whether

20   or not you said anything else in the conference room?

21   A   Oh.    I really don't remember.

22   Q   You testified on cross-examination that after the

23   officers left the room, that you and your husband had

24   a conversation?

25   A   Yes.

49

1   Q     What did you talk about?

2   A     Umm --- uh --- we talked about his son.

3                 MR. WHITE:    Objection Your Honor.

4         Objection.

5                 THE COURT:    Is that ---

6                 MR. WHITE:    (Interposing)    It's not being

7         offered for impeachment.    It's being offered in

8         violation of this Court's order regarding admission of

9         evidence.

10                THE COURT:    Anything further on this than

11        this line?

12                MS. POPE-STARNES:    First of all, Your

13        Honor, I've moved on from that.    I've moved onto

14        something else.    I believe I've done what I can for

15        impeachment on that issue.    My next line of

16        questioning has been, she was asked by the Defense on

17        cross-examination, about did she have a further

18        conversation with her husband when the police left the

19        room.    I'm asking what that conversation was.    There

20        are no officers present so this is not a statement for

21        law enforcement.    And I believe that her statement

22        that she just said has nothing to do with any

23        violation of the Court's order or section ---

24                THE COURT:    (Interposing)    Come on up for

25        a second please?    Come on.

50

1    (Whereupon a discussion was held at the Bench out of

2    hearing of the Jury and the Court Reporter.)

3                              *  *  *

4              THE COURT:   The Court will construe the

5    objection as a motion to strike,   Since the answer

6    was already received, and the Court will respectfully

7    deny that motion to strike and you may proceed Ms.

8    Pope-Starnes.

9              MS. POPE-STARNES:   Thank you.

10   Q   **(By Ms. Pope-Starnes, continuing)**   What else did your

11   husband say while the two of you were alone in the

12   conference room?

13   A   Umm --- He told me what his name was.

14   Q   What whose name was?

15   A   His son's.

16   Q   What was his name?

17   A   Nicholas Chase Kennedy.

18   Q   What, if anything else, did you talk about?

19   A   Umm --- can I have just a minute to try to ---

20   Q   (Interposing)   Of course you can.

21             THE COURT:   The question is, what, if

22   anything else.

23   Q   **(By Ms. Pope-Starnes, continuing)**   Do you have some

24   water?

25   A   Yes.

                              51

1        Umm --- I'm drawing a blank right now.

2    Q    Okay.

3        I just have a few more questions for you.

4        You umm --- talked about Madison's health that

5    day.

6            MR. WHITE:    Objection.    Objection.    That

7    is not a question Judge.    That's improper.    I asked

8    it be stricken.

9            THE COURT:    Sustained.    Sustained as to

10   form.    Sustained.

11           MS. POPE-STARNES:    May I proceed Your

12   Honor?

13           THE COURT:    You may.

14           MS. POPE-STARNES:    Thank you.

15   Q    **(By Ms. Pope-Starnes, continuing)**    You talked

16   yesterday, you testified about Madison's health on

17   November thirtieth (30th) of two thousand and six

18   (2006).    Do you remember that?

19   A    Yes.

20   Q    Okay.

21       And do you remember when was Thanksgiving in

22   relationship to November thirtieth (30th) of two

23   thousand and six (2006)?

24   A    It would have been, I believe it was not that

25   Thursday, but the Thursday before.

52

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   Were you with family?

2   A   Umm --- I know that we were with his family on one

3       weekend.   And I believe we did not get to go out to

4       my parents' house until it had to have been that

5       Friday.

6   Q   The Friday before?

7   A   It was the Friday after.

8   Q   Okay.

9         The Friday after Thanksgiving?

10   A   Yes.

11   Q   Was it the Friday before November thirtieth (30th)?

12   A   Yes.

13   Q   Okay.

14         You testified yesterday that you never saw

15       bruises, scrapes or swelling on Madison?

16   A   Yes.

17   Q   She never had any bruises or scrapes or swelling?

18   A   No.   Not even a diaper rash.   No.

19   Q   As of November thirtieth (30th) of two thousand and

20       six (2006), how many hours a day would the Defendant

21       be alone with your daughter?

22   A   Umm --- alone?   Umm --- from when I left at six-

23       thirty p.m. (6:30pm) till I returned home in the

24       morning about four a.m. (4:00am).

25         MS. POPE-STARNES:   May I have just one

1    moment, Your Honor?

2              THE COURT:   You may.

3         (Whereupon a brief delay was had.)

4                    * * *

5              MS. POPE-STARNES:   Thank you.

6              THE COURT:   Mr. White?

7              MR. WHITE:   Just a couple other questions,

8    okay?

9                   **RECROSS-EXAMINATION**

10   **BY MR. WHITE:**

11   Q    Now you now you said Heather that Madison had been

12        tired before and clinging days before November

13        thirtieth (30th)?

14   A    Yes.

15   Q    Okay.

16        Had she ever had a day like November thirtieth

17        (30th) before with the vomiting, the projectile

18        vomiting, the tired, clingy, unusual nap, the

19        headache?   Anything like that ---

20              MS. POPE-STARNES:   (Interposing)

21        Objection.   That's a mischaracterization.   She said

22        it was speculation on her part as to whether or not

23        the child had a headache.

24              THE COURT:   Sustained as to that.

25        Rephrase.

                         54

1        MR. WHITE:    Well Judge, ---

2        THE COURT:    (Interposing)    Rephrase.    Go

3    ahead.

4        MR. WHITE:    (Continuing)    how would she

5    know.

6  Q    **(By Mr. White, continuing)**    Your perception of a

7    headache.    Did she ever have a day like that before?

8  A    The headache, my assumption of her having a headache

9    was new.    The vomiting was new.    Umm ---

10 Q    (Interposing)    Okay.

11        What about all those things ---

12 A    (Continuing) the early morning nap was ---

13 Q    (Interposing)    All those things ---

14        MS. POPE-STARNES:    (Interposing)

15    Objection.    I'm asking that she be allowed to finish

16    her answer.

17        THE COURT:    One at a time.    Yep.    Go

18    ahead.

19        THE WITNESS:    The early morning nap was

20    new.    She did have occasions of being tired and

21    clingy on other days, yes.

22 Q    **(By Mr. White, continuing)**    So all those other things

23    that you talked about were the first time that you had

24    ever seen them and experienced those things as a

25    mother?

1   A    Yes.

2               MR. WHITE:    Nothing further.

3               THE COURT:    Anything further?

4               MS. POPE-STARNES:    No.

5               THE COURT:    Thank you Ma'am.    You're all

6    set.

7               MS. POPE-STARNES:    May this witness be

8    excused?

9               THE COURT:    Sure.

10              MR. WHITE:    Yes.    Thank you.

11              MS. POPE-STARNES:    Your Honor, the People

12   would call Doctor Cormac Maher to the stand.

13              THE COURT:    Thank you.

14              THE CLERK:    **Do you swear that the testimony**

15   **you are about to give will be the truth so help you**

16   **God?**

17              THE WITNESS:    **Yes.**

18              THE COURT:    Thanks.    You can have a seat

19   there.

20        You may proceed, Ms. Pope-Starnes.

21              MS. POPE-STARNES:    Thank you Your Honor.

22              **D O C T O R    C O R M A C    M A H E R**

23   **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

24   **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

25   **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

56

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    **AND TESTIFIED AS FOLLOWS:**

2              **DIRECT EXAMINATION**

3    BY MS. POPE-STARNES:

4    Q    Sir, would you please state your name and spell your

5         last name for the record.

6    A    Cormac Maher.   M A H E R.

7    Q    Sir, I'm going to ask you to please keep your voice up

8         so that the last Jurors seated in the Jury box can

9         hear you.

10             Can you do that?

11   A    Yes.

12   Q    Thank you.

13             Are you employed Sir?

14   A    Yes.

15   Q    How are you employed?

16   A    I'm a pediatric neurosurgeon.

17   Q    Where did you attend medical school?

18   A    Georgetown University.

19   Q    And when did you graduate from medical school?

20   A    Nineteen ninety-eight (1998).

21   Q    Did you complete a residency program?

22   A    Yes.

23   Q    And where did you complete a residency program?

24   A    The Mayo Clinic.

25   Q    And did you have an area of uh --- particular medicine

57

1        that you focused on in your residency?

2    A   Neurosurgery.

3    Q   Was it just neurosurgery in general or pediatric

4        neurosurgery at that point?

5    A   Both.

6    Q   What is a fellowship, Doctor?

7    A   A fellowship in neurosurgery is additional training

8        that you pursue after completing your residency.

9        Your residency is the basic requirement to be a

10       neurosurgeon, a practicing neurosurgeon.   Most

11       neurosurgeons stop training at that point.   A

12       fellowship is important if you want to specialize in

13       one area of neurosurgery such as pediatric

14       neurosurgery, vascular neurosurgery.   So I pursued

15       two fellowships following my residency training.

16   Q   What was the first fellowship that you pursued

17       following your residency training?

18   A   The first fellowship I pursued was in pediatric

19       neurosurgery.

20   Q   And specifically that means the area of neurosurgery

21       involving children?

22   A   That's correct.

23   Q   And where did you pursue that fellowship?

24   A   Harvard Medical School.   Boston Children's Hospital.

25   Q   And did you complete that program?

58

1   A    Yes.

2   Q    And what was the next fellowship that you pursued?

3   A    It was in vascular neurosurgery, bleeding disorders of

4        the brain involving surgical treatment.

5   Q    And where did you complete that?

6   A    Harvard Medical School, the Brigham and Women's

7        Hospital.

8   Q    I'm sorry, what?

9   A    Harvard Medical School, Brigham and Women's Hospital.

10  Q    Brigham and Women's Hospital?

11  A    That's correct.

12  Q    And when did you complete those fellowships?

13  A    The pediatric fellowship I completed in June of two

14       thousand and five (2005).   And the cerebrovascular

15       fellowship I completed in June of two thousand and six

16       (2006).

17  Q    Do you hold a medical license?

18  A    Yes.

19  Q    And how long have you held a medical license?

20  A    Umm --- the first medical license I received was

21       during residency training and that would have been in

22       Minnesota in, I want to say, nineteen ninety-nine

23       (1999), but it could have been nineteen ninety-eight

24       (1998).   I'm not certain.   It's one or the other.

25       Umm --- and uh --- when I moved to Boston I

59

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       transferred my medical license to Massachusetts.   And

2       I've been licensed in Massachusetts from two thousand

3       and four (2004) until that may have recently lapsed

4       because I moved to Michigan in two thousand and six

5       (2006).   And I've been licensed in Michigan since umm

6       --- approximately March of two thousand and six

7       (2006).

8   Q   Since you have moved to Michigan what has your

9       practice consisted of?

10  A   Pediatric neurosurgery.

11  Q   And where?

12  A   The University of Michigan Hospital.

13  Q   Can you tell the Jury please what hospitals you've

14      been affiliated with?

15  A   Medical school was Georgetown University Hospital and

16      then the Mayo Clinic in Rochester, Minnesota.   Then

17      Boston Children's Hospital, the Brigham and Women's

18      Hospital, University of Michigan Hospitals.

19  Q   In your present --- well what is your present position

20      at University of Michigan Hospital?

21  A   I'm an assistant professor of neurosurgery.

22  Q   And so what duties does that entail?

23  A   The majority of my time is spent treating patients

24      with neurosurgical problems.   I treat virtually

25      entirely children in my practice.   Occasionally on

60

1       call I'll treat an adult patient but almost always

2       it's infants and children.   Across the spectrum of

3       neurological disorders, because of my training, my

4       specialty is vascular and bleeding disorders in

5       children but I'll also treat brain tumors in children,

6       other kinds of trauma in children, bleeding in

7       children, hydrocephalus in children.   Occasionally

8       spine disorders but mostly the brain.

9    Q  And are you also then as part of that position, you

10      also do teaching?

11   A  That's correct.   We train residents in neurosurgery

12      at the university.   We take two residents a year.

13      It's a seven year program and we train them to perform

14      neurosurgical operations and treat patients with

15      neurosurgical diseases.

16   Q  Approximately how many children do you treat a year?

17   A  In terms of surgical treatments it's about two hundred

18      and fifty (250) a year.   In terms of surgical and

19      non-surgical treatments, patients that we see and

20      evaluate and decide to not pursue surgery, it would

21      probably be, I would have to estimate that it would

22      probably be about ten times that number.

23   Q  And approximately how many of the children that you

24      treat a year or see a year, do their issues involve

25      vascular neurological issues?

61

1   A    Uh --- again, we don't, at least I don't keep exact

2         track of these numbers, so I'd have to give you an

3         estimation.   But I would say if you include all cases

4         where there's bleeding in the head, uh --- that we

5         evaluate, I would give you an estimation of sixty (60)

6         or seventy (70).   But again, that's just an

7         estimation because I don't keep track of those numbers

8         exactly.

9               MS. POPE-STARNES:   Your Honor, I would ask

10        that this witness be qualified as an expert in

11        pediatric neurosurgery.

12             THE COURT:   Any objection?

13             MR. WHITE:   Just if I may Voir Dire?

14             THE COURT:   You may.   You may.

15                  **VOIR DIRE**

16  **BY MR WHITE:**

17   Q    All right Doctor, my name is Robert White   I

18         represent Mr. McBurney.   Have you ever testified in

19         Court before?

20   A    No.

21   Q    Okay.

22         Ever been qualified as an expert witness in Court

23         before then?

24   A    I've never been asked to testify before.

25   Q    Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1        Did you review any documents before you came to

2        testify today?

3   A    Yes.   I reviewed the medical record.

4   Q    The medical record of?

5   A    Of Madison McBurney.

6   Q    Okay.

7        And that medical record consists of what?

8   A    Uh --- it consisted of my own operative notes, my own

9        progress notes in the hospital uh --- and various

10       notes from the other consultants that were involved in

11       her care.

12  Q    Did you review the complete medical record?

13  A    I reviewed it depends on what you mean by complete.

14       The medical record is very extensive and it includes a

15       lot of details.   And I cannot tell you that I know

16       every single detail in the medical record that

17       wouldn't be truthful.   But I did spend a long time

18       reviewing the medical record and taking all of the

19       points that I felt were important.

20  Q    Okay.

21            MR. WHITE:   I have no objection to this

22       particular doctor testifying as an expert at this

23       time.

24            THE COURT:   Thank you.   So noted.

25       Ms. Pope-Starnes, you may proceed.

63

1          MS. POPE-STARNES:    Thank you Your Honor.

2              **DIRECT EXAMINATION CONTINUED**

3  **BY MS. POPE-STARNES:**

4  Q   Now Doctor Maher, I'd like to start out by asking you

5      if you could please explain to the Jury the basic

6      structures of the brain?

7  A   It's hard to know where to begin.   The brain

8      obviously is an organ in the head.   It has several

9      coverings on top of it.   It has a pia layer which is

10     a very thin layer which sits right on top of the brain

11     and is fixed to the brain itself.   It has a slightly

12     thicker covering called the arachnoid layer which sits

13     on top of the pia layer and forms a space between that

14     pia and arachnoid layer, that's called the sub-

15     arachnoid layer or sub-arachnoid space.   And then on

16     top of the arachnoid there's dura covering which is a

17     very thick tough membrane on top of the brain.   And

18     the space underneath the dura is called the subdural

19     there.   The space on top of the dura is called the

20     epidural space.   And then on top of all of that you

21     have the skull.

22         Within the brain itself obviously the anatomy is

23     complex and has ---

24  Q   (Interposing)   Well let me ask you this.

25  A   (Continuing)   thousands of structures, so I'm not

                           64

1        really sure where to begin with that.

2   Q    Okay.

3        Are there more --- is there more than one lobe to

4        the brain?

5   A    Absolutely.

6   Q    Can you explain the different lobes of the brain to

7        the Jury?

8   A    Sure.

9   Q    And where their locations are?

10  A    There are different lobes to the brain.   The frontal

11       lobes, we have two hemispheres.   The brain is split

12       in half down the middle, okay?   And in each half we

13       have frontal lobes here (indicating), left frontal

14       lobe, right frontal lobe.   We have parietal lobes

15       back here (indicating), left parietal lobe, right

16       parietal lobe.   There are occipital lobes, left

17       occipital lobe, right occipital lobe and then there

18       are temporal lobes, left temporal lobe, right temporal

19       lobe, okay?

20       All of those lobes are in what's called the

21       supratentorial compartment because they're in the top

22       half of the brain.   They're over the tentorium

23       cerebelli.   And beneath the tentorium we have a

24       different part of the brain called the cerebellum

25       which is in the back of the head, back here

65

1    (indicating).

2         In addition to those lobes in the cerebellum we

3    have a brain stem which sits in front of the

4    cerebellum underneath all of the of the other lobes

5    that I described.   And the brain stem controls

6    breathing, swallowing, a lot of the very basic

7    functions that allow us to live.   That's --- that's

8    right in the center of the brain.   It's very

9    difficult to point to because it's really no more

10   accurate to point to this side (indicating) or this

11   side (indicating).   It's right in the center.

12        There are, again, many other structures besides

13   the basic lobes, besides the brain stem, besides the

14   cerebellum but that's an overall picture of the brain.

15   Q   Are you familiar with a term bridging veins?

16   A   Yes.

17   Q   Can you explain what bridging veins are please?

18   A   The venous drainage of the brain, again, it's

19   relatively complex.   And some of the blood that

20   enters the brain will leave through veins that are

21   deep inside the brain.   And some of the blood that

22   enters the brain will leave the brain through what's

23   called bridging veins.   And bridging veins are veins

24   that go from the brain's surface through that subdural

25   space and into the dura membrane that we talked about.

66

1       So they're called bridging veins because they bridge

2       that space, okay?   They are not a --- usually not an

3       extremely important source of egress or outflow of

4       blood from the brain but they are --- everything in

5       the brain is somewhat important so...   But that's

6       what a bridging vein is.   It's just one type of

7       venous drainage from the brain and it's in that

8       subdural space.

9   Q   And are they actually connected to the brain?

10  A   Yes.

11  Q   And then I believe you said that they --- are they

12      actually connected then to the ---

13  A   (Interposing)   To the venous structures within the

14      dura matter.   The dura which is that tough membrane

15      that we talked about is actually in two sheets.   And

16      the sheets can be split apart in some areas and the

17      venous blood can run in-between those two sheets.   So

18      a bridging vein connects the cortical veins on the

19      brain's surface through that subdural space and into

20      the dura matter veins.   And then the blood can

21      continue to flow through that and then out.

22  Q   When --- can you tell us what the phrase subdural

23      hematoma or hemorrhage means?

24  A   Mm-hmm.   A hematoma or hemorrhage is a blood

25      collection somewhere.   A subdural hematoma qualifies

67

1   that and tells us where it is.   It's in the subdural

2   space which is that space that's on top of the brain

3   and underneath the dura.

4   Q   Now Doctor Maher, if I can direct your attention back

5   to um --- on or about November thirtieth (30th) or

6   December first, of two thousand and six (2006), umm --

7   - did you treat a patient by the name of Madison

8   McBurney?

9   A   Yes.

10  Q   Can you tell the Jury please about your first contact

11  with Madison?

12  A   My first contact with Madison was the morning after

13  her admission to the hospital.   She had been

14  previously seen and evaluated by a number of my

15  colleagues in the emergency department and the ICU as

16  well as the on-call person on the neurosurgery team.

17  I saw her in the morning and evaluated her imaging

18  studies.   Looked at her exam.   Called together the

19  treating physicians.

20  Q   Now when you talk about imaging studies what are you

21  talking about?

22  A   She had pictures of her brain that were taken.   A CT

23  scan as well as I --- I should check the medical

24  records and check the timing of this, but I think the

25  MRI scan had been done just immediately prior to that

68

1      as well.

2   Q   Okay.

3          At some point did you have an opportunity to

4      review an MRI scan?

5   A   Absolutely.

6   Q   Can you tell us what a CT scan is?

7   A   A CT scan is a kind of way of looking at the brain.

8      It's based on radiation principles just like x-rays

9      except it gives us very good images of the brain

10      because it gives us slices of the brain.   So we could

11      start here (indicating) and take a slice as if we were

12      taking a slice like this (indicating) and then a slice

13      like this (indicating) and then a slice like this

14      (indicating) and we can stack those slices and we can

15      actually see what's going on inside the brain.   It is

16      fairly accurate at showing us acute blood or new blood

17      in the head.   It can show us a number of other things

18      as well.   It can show us if there are any signs of

19      pressure sometimes.   Sometimes it can show us if

20      there are any strokes.   It's relatively quick to get

21      a CT scan and that's why it's always, I shouldn't say

22      always, usually the first study that will be obtained

23      and in the case of a critically injured child uh ---

24      in some ways, not in absolutely everyway, but in some

25      ways it's not as accurate as an MRI scan.   An MRI

1     scan takes longer to obtain.   It requires a lot of

2     effort on the part of the anesthesiologist to monitor

3     a child who's taking a while inside an MRI scanner.

4     So for that reason the MRI scanner is usually not the

5     first test we get.   But in some ways the MRI scanner

6     which is relatively newer technology does provide us

7     with a little bit more accurate information.

8  Q  What does --- what is an MRI scanner?

9  A  An MRI scanner is --- doesn't use radiation instead it

10    uses magnetic principles where we, again I shouldn't

11    speak as a --- as a person who's an expert on physics

12    and an MRI scanner.   But basically you --- you put a

13    magnetic field through the water cells in the body and

14    you polarize them and then you let them relax.   And

15    by studying how all the cells relax you can get a

16    little bit of a picture, actually a very good picture,

17    of what's going on in the brain or any other body

18    tissue that you happen to be imaging.   So the

19    pictures in general are clearer than on a CT scan.

20    You can see more fine detail on an MRI scan than a CT

21    scan.   Again, it takes a little bit longer to obtain.

22 Q  Now uh --- after you had the opportunity to umm ---

23    examine Madison and review these records from the

24    radiology reports as well as the other physicians,

25    what was going on with Madison at that point?

70

1    A    Mm-hmm.   On that morning Madison was in the intensive

2         care unit at the Children's Hospital.   And she was

3         quite ill.   She had been given Phenobarbital which is

4         a sedating medicine that can be given to stop any

5         seizures that were thought to be going on.   She had

6         been given Ativan which is also a sedating medicine.

7         We were breathing for her with a ventilator, I

8         believe, on that morning.   I shouldn't say we.   The

9         ICU team was in charge of that but they had her on a

10        ventilator and were breathing for her.   So she was --

11        - she was quite ill for sure.

12             Umm --- in terms of her neurological examination

13        that morning, I could check the record to tell you

14        exactly what I noticed word for word.   But in general

15        I can tell you that she looked neurologically ill.

16        That her level of consciousness was impaired.   That

17        when we stimulated her arms and her legs with what we

18        call deep stimulation but essentially it's a little

19        bit of pain applied to the fingernails and the

20        toenails to see what the response will be, that she

21        had an impaired response to that.   There was some

22        thought that morning that she was a little bit better

23        than she had been several hours previously.   And we

24        were initially hopeful um --- that she was going to

25        show some signs of improvement.   As you may know

                                  71

1    already that ultimately wasn't the case.   But that

2    was our initial thought that morning.

3  Q   And what treatment umm --- did you do at that point?

4  A   Mm-hmm.   At that point the treatment was controlling

5    all of her ventilatory measures, making sure that she

6    was getting enough oxygen, making sure we were

7    breathing correctly for her.   Her head had been

8    elevated to decrease any potential pressure problems

9    that she may have.   I should say, did you ask me what

10    the CT showed and what the MRI showed?

11  Q   Not yet.

12  A   Okay.

13      We'll get to that.   But I should say that based

14    on that CT scan the intracranial pressure didn't seem

15    to be quite elevated so we weren't as ---

16  Q   (Interposing)   Let me stop you there.

17          MR. WHITE:   I'm sorry.   He turned his head

18    away Judge.

19      Doctor what did you just say?

20          THE WITNESS:   I said, based on the initial

21    CT scan, there were no signs of obviously elevated

22    intracranial pressure.

23  Q   **(By Ms. Pope-Starnes, continuing)**   When you talk

24    about intracranial pressure, can you please explain

25    that?

72

1   A   Yeah.   The --- the brain is in a compartment that we

2       described with the various membranes on top of it and

3       the skull on top of it.   And that's the intracranial

4       compartment.   It's uh --- when you --- if you want to

5       get very simplistic about it, you can think of it as a

6       box.   It's a closed box.   And if you increase the

7       volume of something inside that closed box that will

8       increase the pressure inside the box.   And so when we

9       talk about intracranial pressure we're simply talking

10      about how much pressure is inside the skull.   How

11      much pressure is inside the cranium.   That's a very

12      important consideration when you're dealing with a

13      child with any sort of a brain issue because the

14      intracranial pressure uh --- when it's elevated can

15      cause all sorts of problems.   So we are very aware of

16      elevated intracranial pressure and try to prevent that

17      when we can.

18  Q   What was the results of the first CAT scan and MRI of

19      Madison?

20  A   Mm-hmm.   The first CAT --- now this child had had

21      previous CAT scans.   But the first CAT scan from this

22      hospital admission that we're speaking about ---

23  Q   (Interposing)   Yes.

24  A   (Continuing)   demonstrated blood in the head under

25      the dura.   So the subdural space that we talked

73

1  about, significantly there appeared to be two

2  different ages for this blood, okay?   Based on how

3  bright the blood is on the CAT scan we can tell if it

4  is brand new or if it is older.   And if some of it is

5  one intensity, one brightness and some of it is

6  another brightness, we can tell that this didn't

7  happen at the same time.   This happened at different

8  times.   The blood that was in the back of the head

9  along the tentorium that we talked about on the left

10  side was bright.   The blood that was in the front

11  part of the head along the frontal lobe on the left

12  side was darker indicating that it did not occur at

13  the same time, that there were different aged bleeding

14  episodes, okay?   Different compartments or different

15  or over different lobes of the brain.   And it ---

16  Q   (Interposing)   Now I just want to ask a question here

17  Doctor.

18     So are these two different places in the brain?

19  A   Mm-hmm.   It depends on what you mean by different.

20  They're on the same side of the head but they're over

21  different lobes.   The older blood was mostly over the

22  frontal lobe although if we look at the pictures we

23  can see that it can goes back a little bit but mostly

24  over the frontal lobe.   The new blood was in the back

25  and the left side.   I'm showing you the right

74

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    (indicating) just because I'm facing the right here

2    but it's in the back and the left side over that

3    tentorium underneath the occipital lobe.   So I would

4    say that's different, yes, but it also depends on your

5    definition of the word.

6  Q    What was your diagnosis at that point after you'd had

7    an opportunity to conduct an examination to review the

8    initial CAT scan and the MRI from Madison's November

9    thirtieth (30th) admission and review the medical

10    record?

11  A    Okay.   On the basis of this admission and this CAT

12    scan our diagnosis was subdural hematomas, an old

13    subdural hematoma and a new subdural hematoma.

14  Q    Now you testified that Madison seemed a little better

15    that morning.

16        Can you tell the Jury what happened next during

17    the course of her admission?

18  A    Yeah.   Well the --- the ICU team continued to

19    evaluate Madison.   She had uh --- various theories at

20    the time for what was going on with her as there

21    usually is when an ill child gets admitted to the

22    hospital.   So they pursued an MRI scan which we

23    haven't talked about yet but we will talk about.

24    They also asked an ophthalmologist to come and dilate

25    the pupils so they could look into the back of the eye

75

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    and to gather more information that way.    They also

2    asked various other team members such as uh ---

3    neurologists to come by and evaluate her as well as

4    the ICU team.

5    Q    *Doctor can you tell the Jury what is a differential*

6    *diagnosis?*

7    A    For subdural hematomas?

8    Q    No, in general.

9    A    Yeah.    Differential diagnosis here is trauma, non-

10    accidental meaning intentional trauma versus

11    accidental trauma.    At least initially you think

12    about things like spontaneous bleeding.    Could this

13    blood just have got there by itself because of some

14    abnormality with this child because of a bleeding

15    disorder say or some arterious venous malformation or

16    what we call dural arterial venous fistulas that can

17    sometimes bleed into the space.    That's --- that's

18    all part of a broad differential diagnosis meaning an

19    all encompassing differential diagnosis.    As you

20    learn more about a child and learn more about the big

21    picture, the overall picture of the child, and what

22    other doctors are seeing in their examinations you can

23    start to narrow that differential diagnosis.

24    Q    Okay.

25         And do the --- the testing and the consultations

76

1       from the other specialties help narrow the

2       differential diagnosis?

3   A   Yes.

4   Q   And --- and what is --- is the purpose of a

5       differential diagnosis to find out what's wrong with

6       the patient?

7   A   No.   The purpose of a differential diagnosis is to be

8       sure that you're not missing something.   You want to

9       consider all the possibilities.   You want to think

10      about everything that it could possibly be.   You

11      might have a list of ten things or twenty (20) things.

12      It doesn't mean that it is each of those ten things or

13      twenty (20) things.   You just, at least, want to

14      consider it.   Could it be this?   Could it be this?

15      What is the evidence that would suggest that it is

16      this or isn't this?   And we talked about these

17      things.   We go over these things with the other

18      consulting physicians and eventually narrow the

19      differential diagnosis as we learn more about the

20      child as we continue to examine the child, as we get

21      more testing and as other physicians are able to

22      examine the child and add their expertise based on

23      what their training is.

24  Q   What was the next contact that you personally had with

25      Madison?

77

1  A   Uh --- the next contact that I had with Madison I

2      believe was going up to the intensive care unit a few

3      hours later to discuss her case with the ICU team and

4      with the ophthalmology team.   They had dilated one of

5      Madison's pupils and taken a very good look inside one

6      of her eyes and saw what we call papilledema.

7  Q   What is papilledema?

8  A   Papilledema is swelling of the optic disc which is

9      something we can see when we look into the back of the

10     eye not apparent on the surface.   It's on the retina.

11     So looking in the back of the eye like when you go to

12     an eye doctor for glasses or something, sometimes have

13     that test done.   Papilledema is swelling of the optic

14     disc and the reason it's important for us is because

15     we use that as a marker for elevated pressure inside

16     the head.   When the pressure is elevated inside the

17     head that pressure is transmitted down the optic

18     nerve, the eye nerve, which ends in the back of the

19     eye.   And when that nerve swells, when that disc

20     swells which is the end of the nerve, that implies

21     pressure inside the head.   So I was notified that

22     that was the finding and uh --- immediately went up to

23     talk to the ICU team, the other physicians, as well as

24     Madison's family about the next step.   The neurology

25     team was involved at this point as well.

78

1  Q    And then what happened?

2  A    And uh --- had recommended an intracranial pressure

3       monitoring device.

4  Q    Okay.

5       Can you explain to the Jury please what an

6       intracranial pressure monitoring device is?

7  A    Yes.  There are various ways we have of learning what

8       the pressure is inside the head.  I've given you one

9       indirect way where we can look in the back of the

10      eyes.  But there are some more direct ways where we

11      can actually put a monitor inside the head and that

12      will give us a number.  It will tell us how high the

13      pressure is inside the head.  One of those ways is

14      just by putting an electrode inside the brain and that

15      reads like any electrode, a pressure monitor.  It

16      tells you the pressure is ten or twenty (20) or thirty

17      (30) millimeters of mercury.  Another way to do it

18      and the way we chose to pursue this in Madison's case

19      is by putting in what's called an external ventricular

20      drain, sometimes called a ventriculostomy.  And

21      that's a tube that you can place through the skull and

22      through the brain into the fluid-filled spaces inside

23      the head.  Everybody has ventricles or fluid-filled

24      spaces in the central part of their brain.

25      When somebody has elevated pressure one useful

                              79

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    thing to do is put a ventriculostomy or a tube into

2    that fluid-filled space.  Because, number one, it

3    tells you how high the pressure is inside the brain,

4    we can transduce the pressure just like transducing

5    any other pressure.

6  Q  What does transduce mean for those of us that are not

7    medical people?

8  A  It --- connecting into a pressure-monitoring device

9    that will tell us this fluid column inside this head

10    is ten millimeters of mercury or twenty (20)

11    millimeters of mercury or different pressures inside

12    the head.  So it has the advantage, number one, we

13    can --- we can learn the pressure just like with the

14    other device.  But number two, we can actually

15    relieve some of that pressure theoretically by

16    draining fluid out.  In addition to that, the uh ---

17    neurology team had been eager to get some spinal fluid

18    from Madison.  We talked about a differential

19    diagnosis and they wanted to make sure we were looking

20    into every possibility so we wanted to send spinal

21    fluid for analysis as well.  And the ventriculostomy

22    could allow us to do that because obviously it drains

23    spinal fluid from inside the head to outside the head.

24    So it's a pressure-monitoring device.  It can be a

25    pressure-treatment device because we're draining fluid

80

1    out of that closed box.   And it can be sometimes a

2    diagnostic device because we can get fluid so...

3  Q  Did you conduct a procedure to give Madison this type

4    of device?

5  A  Yes.   After discussing this procedure with Madison's

6    family we decided to go forward and put this tube into

7    the middle of her brain.   And she was brought down to

8    the operating room and we did put the ventriculostomy

9    tube in her brain.

10 Q  Do you recall what date it was that you did that?

11 A  That was the day after she came in.   I think that was

12   December first.   I could check the record.

13 Q  And were you successful in that procedure?

14 A  Yes.

15 Q  Okay.

16       After you put that device in were you able to

17   find out what her pressures were at that time in her

18   brain?

19 A  Yes.   Her pressures were very elevated.

20 Q  Do you recall approximately what they were?

21 A  I can tell you that approximately they were fifty (50)

22   or sixty (60).

23 Q  What is normal in a child Madison's age?

24 A  We consider less than twenty (20) acceptable.   That

25   doesn't mean it's normal.   Normal would be ten or

81

1    less.   When we have a ventriculostomy and often we're

2    measuring in centimeters of water, we have a fluid

3    column of water and it just goes up ten, twenty (20),

4    thirty (30), forty (40), fifty (50) centimeters.

5    Madison's was very high.   I consider anything over

6    twenty (20) elevated.   I consider anything much

7    higher than that very elevated.   She was in the very

8    elevated range right from the start.   So we drained

9    fluid from her head aggressively to try to treat that

10   pressure as well as ---

11   Q    (Interposing)   Was she treated with medications as

12        well?

13   A    She was.   She was treated, number one, she had

14        sedation on board which treats intracranial pressure.

15        When you're calm and relaxed it lowers your

16        intracranial pressure.   She also was treated with

17        something called hypertonic saline, a three percent

18        (3%) saline which has the effect of lowering your

19        intracranial pressure.   And she was given quite a lot

20        of that as well.   In addition to that, we were

21        hyperventilating or over-breathing on the breathing

22        tube through a ---

23   Q    (Interposing)   Why is that?

24   A    It's a --- I'm trying to think of a way of explaining

25        it.   If you hyperventilate a patient or over-breathe,

82

```
 1          if you breathe more rapidly for them than they would
 2          ordinarily breathe, there's a relatively complex
 3          feedback loop in the body.   When you bring --- over-
 4          breathing brings down the carbon dioxide level which
 5          essentially clamps down on some arteries and brings
 6          down the pressure inside the brain.   So it's a
 7          relatively standard way in somebody who has a
 8          critically elevated intracranial pressure of lowering
 9          the intracranial pressure.   It works very well in the
10          short term.   And it's something we can't rely on over
11          many, many days.   But when somebody's in big trouble
12          like Madison was, it's something that we use.
13    Q     Now Doctor Maher, can you tell the Jury when you see a
14          child with the elevated intracranial pressures such as
15          Madison had, what are your concerns about what's going
16          on in her head at that time?
17    A     Mm-hmm.   The --- the trouble with having elevated
18          intracranial pressure is that it compresses the brain
19          very seriously.   And also we worry about something
20          called a cerebral perfusion pressure which is the
21          ability of blood to get into the brain.   The arterial
22          pressure is --- is only so high and it can't push
23          against very high pressure inside the head.   So
24          that's why we try to lower the intracranial pressure
25          so that there's still a head of pressure with blood
```

83

1       going up to the head.

2  Q    Were you concerned about brain damage?

3  A    Absolutely.   Yeah.

4  Q    The course of treatments that you began after you had

5       the monitor in place, were those successful?

6  A    No.   She had what we called refractory intracranial

7       pressure meaning that despite all of our maximum

8       medical measures, everything we could think of short

9       of something else we'll probably talk about, uh --- we

10      were not successful in lowering her intracranial

11      pressure.   Pressure stayed elevated despite our

12      measures.

13  Q   What is a, I believe, it's craniectomy?   What is

14      that?

15  A   A craniectomy is removing a patient's skull.   We

16      talked about how the cranium is a closed box and the

17      pressure inside the closed box can --- can be

18      elevated.   And ways you can treat that by trying to

19      bring things out of the box like bringing the fluid

20      out of the box with the ventriculostomy.   When those

21      measures are not successful occasionally we consider

22      something else which is called a craniectomy, which is

23      removing the skull.   Or if you want to use the box

24      analogy it's opening the lid off the box so that

25      whatever's inside it can expand out.   It is a --- I

84

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       think that it's fair to say that it's somewhat

2       controversial in its use in America although it is

3       used from time to time.  And certainly we do it from

4       time to time in the right situation.  I think it's

5       important in the situation like Madison's where our

6       backs are against the wall and we can't think of

7       anything we can do to help a child to at least

8       consider that operation although it seems radical to

9       remove someone's skull and let the brain expand out.

10  Q    Was that considered in Madison's case?

11  A    It was considered.  And I spoke with Madison's mother

12      about that operation.  And we had a very long

13      discussion about the various pros and cons of trying

14      something that radical in Madison's case.  And uh ---

15      after that very long discussion, Madison's caregivers

16      felt that that wasn't in her best interest.  And I

17      though that that was a good choice on their part.

18  Q    Doctor Maher, based on your experience even in cases

19      where you do a craniectomy, the brain damage that has

20      already occurred to a child, is that permanent?

21  A    Yes, it can be.  And that's the trouble with

22      craniectomies.  And that's what we talked about with

23      Madison's caregivers that day.  The --- the

24      significant problem with hemicraniectomies is that we

25      know that it increases the risk of what's called a

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    permanent vegetative state.   Of somebody with an

2    absolutely awful and unrecoverable neurological injury

3    and we somehow manage to --- to make them survive but

4    in an --- in a state that they can't do anything.

5    They have no brain function or no significant brain

6    function that would lead to any quality of life.

7    This is a very difficult decision for families to face

8    when posed with the suggestion that they could simply

9    not have a very significant chance of helping their

10   loved one but instead be increasing their risk of

11   doing something like that.   For that reason my

12   personal opinion, surgeons differ a little bit, but

13   everybody's a little bit cautious with recommending

14   that kind of an operation just because the outcomes

15   can be so poor.   In Madison's case, especially with

16   the pressures being as high as they were, indicating

17   an injury as bad as hers was, I certainly thought that

18   this was an appropriate decision on the family's part.

19   I ---

20 Q   (Interposing)   Did Madison continue to decline in her

21   health at that point?

22 A   Yes.   I could refer to the record and tell you

23   exactly what the timeframe was.   She hung on for a

24   couple of days but she did have a continuous

25   neurological decline over the next couple of days.

86

1  Q   . Was there any further treatment that you could give

2      her?

3  A    There was medical treatment that we discussed but

4      there was no further treatment other than what we've

5      discussed what the ICU team was instituting.

6           THE COURT:   Hold that thought right there.

7      Umm --- do you have a bit more?   And I don't want to

8      rush.

9           MS. POPE-STARNES:   Yes, I do.

10          THE COURT:   Okay.   Well then there's ---

11     we've been going for awhile.·   So we'll take a short

12     recess.

13     All right, Doctor.   Thank you.

14     Please everyone don't talk about the case.

15 Thank you.

16          THE CLERK:   All rise for the Jury.

17     (Whereupon the Jury was returned to the Jury room

18     at 11:00am).

19                  *  *  *

20          THE COURT:   Doctor, if you want a thing of

21     water, if you want to bring it up here.

22          THE WITNESS:   That would be great.   I'd

23     appreciate it.

24          THE COURT:   Okay, fine.   We'll get you

25     one.

87

1    Thank you.   The record will reflect that the

2    Jury's been excused and you may all be seated.   We'll

3    take a break for ten, fifteen (15) minutes.

4         Doctor, you're all set.

5         Jeff, could you get the Doctor some water when we

6    come back?

7              THE CLERK:   Yes Judge.

8              (Whereupon a break was had.)

9                        *  *  *

10             THE CLERK:   The Court calls People

11    versus McBurney, case number 07 214651 FC.

12             THE COURT:   Mr. White, Ms. Pope-Starnes,

13     your appearances are noted in the record and it is

14     back up.   Doctor is back on the witness stand.

15        Doctor when the Jury comes in, I'm just going to

16    remind you, you are still under oath and required to

17    testify truthfully and honestly.

18        You can bring the Jury back in.

19        Sorry about the delay everybody.   I got involved

20    in some issues upstairs.

21             A VOICE:   We have a little disturbance up

22    on the fourth floor Your Honor.

23             THE COURT:   What's that?

24             A VOICE:   A little disturbance.   A little

25    pushing and shoving.

88

1          THE COURT:   Got that taken care of?

2          A VOICE:   Yes Your Honor.

3          THE COURT REPORTER:   We heard it was the

4     second floor.

5          THE COURT:   Somebody fell down to the

6     second floor.

7          THE COURT REPORTER:   Oh.

8          THE COURT:   After the Defense Counsel had

9     taken care of them.

10         THE CLERK:   All rise for the Jury.

11         (Whereupon the Jury was returned to the courtroom

12    at 11:35am.)

13                    *  *  *

14         THE COURT:   You may all be seated.

15         The record will reflect that the Jury is back.

16    The case has been called.   Counsels' names have been

17    noted.   And the Doctor is back on the witness stand.

18         And Doctor, you are reminded that you are still

19    under oath, required to testify truthfully and

20    honestly.   Thank you.

21         Ms. Pope-Starnes, whenever you're ready.

22         **WHEREUPON DOCTOR CORMAC MAHER HAVING BEEN**

23    **PREVIOUSLY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH**

24    **AND NOTHING BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

25              **CONTINUED DIRECT EXAMINATION**

89

1    **BY MS. POPE-STARNES:**

2    Q    Now Doctor Maher, I believe when we walked off, I

3         wanted to ask you about the MRI.

4              Umm --- how many different MRI's were done on

5         Madison during her November thirtieth (30th) admission

6         to University of Michigan Hospital?

7    A    One.

8    Q    Okay.

9              And did you have an opportunity to review the

10        MRI?

11   A    Yes.

12   Q    Can you talk about the findings in the MRI?

13   A    There were multiple findings.   The uh --- with

14        respect to the blood that we've already spoken about,

15        the MRI also demonstrated blood just like the CT scan

16        did.

17   Q    I'm very sorry Doctor Maher.   I can't hear you.

18   A    Sorry.   With respect to the blood on the brain in the

19        subdural space that we saw in the CT scan, the MRI

20        scan also demonstrated that blood.   Specifically it

21        showed blood in the subdural space on the left side in

22        the frontal area, kind of right up here (indicating),

23        as well as in the supratentorial area, back here

24        (indicating).   Just like on the CT scan, the MRI scan

25        suggested that the blood was of at least two different

90

FORM CSR·LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       ages and that the blood in the frontal area looked

2       older than older than the blood in the posterior area

3       on top of the tentorium.    The blood on top of the

4       tentorium looked much newer.

5            In addition to that there were some other

6       findings in the temporal lobe that we've talked about

7       which ends right about here (indicating).    At the

8       very front part of the temporal lobe there was a

9       little bit of brightness especially on a special kind

10      of MRI scan that was done called a diffusion scan.

11      That brightness suggested to us an injury either

12      within the very, very front of the temporal lobe

13      itself, the brain itself, ---

14                MR. WHITE:    (Interposing)    Excuse me.

15      Excuse me Doctor.    I just ask the doctor to speak for

16      himself.    And I know that what he's doing.    I just

17      ask rather than use the word us or we.

18                THE WITNESS:    Sure.

19                THE COURT:    Okay.    Thank you.    Noted.

20          Go ahead.

21  Q   **(By Ms. Pope-Starnes, continuing)**    I'm sorry Doctor.

22      I believe you were saying there was some brightness on

23      the diffusion scan?

24  A   Right.

25  Q   And what does that mean to you?

                                91

1  A    It --- it implies that there's blood in a certain part

2       of the brain.   It was at the very, very front part of

3       the brain and the front part of the temporal lobe of

4       the brain, the left side.   And that could have been

5       subarachnoid blood or it could have been what we call

6       a contusion right at the very front part of the

7       temporal lobe.   A contusion is blood within the brain

8       itself.   It didn't look particularly subdural to me

9       although it was next to the subdural space.   It

10      didn't look like it was in the subdural space.

11      That's what I thought and  ---

12 Q    (Interposing)   Well let me ---

13 A    (Continuing)   that's ---

14 Q    (Interposing)   Well let me ask you about that.

15      So you said it could have been a contusion or

16      subarachnoid?

17 A    Right.

18 Q    Subarachnoid meaning below the arachnoid?

19 A    Exactly, which is a different compartment underneath

20      the subdural compartment and just on top of the brain.

21 Q    Okay.

22      And what do you mean by contusion?

23 A    A contusion is blood within the brain itself.   A

24      large amount of blood within the brain itself we

25      usually don't call a contusion we call that a

                              92

1    intraparenchymal hemorrhage or intracerebral

2    hemorrhage.   When they're little spots sometimes

3    we'll call those spots contusions, sort of a bruise on

4    the brain.   Uh --- and we saw that on the, again, on

5    the temporal tip of that MRI scan.

6         In addition, to that there was a sign of ---

7    signs of very diffuse brain injury on the MRI itself,

8    especially on the, what we call the T2 weighted scans,

9    which show us edema or the brain's all sucking up

10   water when they're injured.   Then it showed us some

11   signs of that and lots of --- not lots, several

12   different things could cause that.   Lack of oxygen

13   can cause the brain to swell.   Injury can cause the

14   brain to swell, like a trauma.   And the T2 weighted

15   scan showed that not just in the area where the

16   bleeding was but really scattered quite diffusely

17   throughout the brain there was --- there was some T2

18   changes within the brain substance itself, again not

19   in the subdural space but within the brain substance

20   itself.   Those are the relevant findings on the MRI

21   that I can recall right now.

22 Q  Now the injuries that you observed to Madison through

23   your examination, through the review of the CAT scan

24   and the MRI, umm --- specifically the subdural

25   hematomas that you saw, can you talk to the Jury about

93

1      what are the possible causes of subdural hematomas?

2  A   There are multiple causes of subdural hematomas, some

3      more likely than others.   There is a traumatic

4      subdural hematoma.   Somebody who has been injured

5      either as an accident or as an intentional injury can

6      have bleeding in the subdural space causing a subdural

7      hematoma.   You can have blood vessel malformations

8      such as dural arteriovenous fistulas which can cause

9      subdural hematomas, usually in the area near where

10     that fistula would be.   And arteriovenous

11     malformation can rarely do it although not very

12     commonly.   Occasionally in children with very, very

13     large, what we call extra-axial spaces, or a very,

14     very large space between the brain and the skull

15     itself, you can get bleeding in that space.   You've

16     heard the phrase, 'Nature abhors a vacuum.'   And

17     there's a space there (indicating), and sometimes a

18     relatively minor injury can fill a space with blood,

19     In children who have that condition of the enlarged

20     extra-axial spaces or sometimes a similar condition

21     you'll hear described as benign external

22     hydrocephalus, which is an enlarged space on top of

23     the brain.   That's a cause as well.   Children can

24     have bleeding disorders.   They can have a narrative

25     bleeding disorders or bleeding disorders that only

94

1    they have and not inherited from their family that can

2    cause an easy bleeding not just in the head but

3    throughout their body.   Easy bruising throughout

4    their body.   Nose bleeds and also bleeding in the

5    head of which one manifestation might be subdural

6    hematomas.   So there are certainly multiple causes of

7    subdural hematomas.   Like in ---

8  Q  (Interposing)   Was there blood work done on Madison?

9  A  (Continuing)   some rarer than others.

10    Blood work done?   Yes, there was.   I ---

11 Q  (Interposing)   Were you able to rule out whether or

12    not she had any of those bleeding disorders that would

13    cause a subdural hematoma?

14 A  Based on the blood work we did, we didn't see any

15    evidence for bleeding disorders.

16 Q  You talked about uh --- it could be caused by blood

17    vessel malformation.

18    Did you see any evidence of that?

19 A  No.   On any of the imaging that she had either before

20    or during this episode, we did not see any blood

21    vessel malformations to account for that.

22 Q  You talked about umm --- children that have large,

23    extra-axial spaces.

24    Did you see any evidence of that?

25 A  No.   And she had had a previous MRI scan that did not

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    show that.

2  Q   Okay.

3       You had an opportunity to review a previous MRI

4    scan?

5  A   Yes.

6  Q   When was that done?

7  A   It had been performed, I think about two months

8    earlier.  It was August, I want to say, the end of

9    August.

10  Q   Of two thousand and six (2006)?

11  A   Of the same year of two thousand and six (2006).

12  Q   And do you know where that was done?

13  A   That was done at the University of Michigan.

14  Q   And were you able to review that?

15  A   Yes.  When she came to the hospital with this injury

16    I reviewed it retrospectively.

17  Q   So you from both that and the MRI done when she was

18    admitted, from her November thirtieth (30th)

19    admission, did you see any evidence of the large

20    extra-action --- extra-axial space?

21  A   No.

22  Q   Were you given any information that she was involved

23    in an accidental traumatic event?

24  A   At the time that she first presented to us?

25  Q   Yes.

96

1    A    No.

2    Q    When you talk about accidental traumatic events, would

3         that include things like a motor vehicle accident?

4    A    Yes.

5    Q    Now Doctor Maher, can you talk to the Jury please um -

6         -- from your finding of the August of two thousand and

7         six (2006) MRI?   What, if anything you observed in

8         that?

9    A    The August two thousand and six (2006) MRI did show

10        one area in the left parietal lobe and that's a

11        different area than we've been talking about so far

12        located around here (indicating) where there was high

13        intensity umm --- a little spot of high intensity on

14        that lobe within the brain itself.   Not in the

15        subdural space but within the brain itself.   And the

16        differential diagnosis at that time was blood, a spot

17        of blood within the brain itself or perhaps something

18        else.   Something more unusual like a lipoma which is

19        a kind of fat tumor.   The radiologist that

20        interpreted that at the time recommended getting more

21        pictures down the road in order to clarify that.

22        With the idea that a spot of blood within the brain if

23        you leave it long enough will often go away.   You can

24        see that it goes away and think that it was blood.

25   Q    Was there any follow-up testing done?

97

1 A When she --- there was a CT scan which no trace of

2   blood in that area was seen. And then ---

3 Q (Interposing) When was --- I'm sorry to interrupt.

4   When was that CT scan done?

5 A I think September but I would have to check exactly.

6 Q Okay.

7   Of what year?

8 A Of two thousand and six (2006).

9 Q And do you know where that was done?

10 A At the University of Michigan.

11 Q And did you have the opportunity to review the results

12   of that CT scan?

13 A Yes. When Madison came to the hospital with this

14   injury we went back and looked at all of her old

15   scans.

16 Q And did you personally go back and look at them?

17 A Yes.

18 Q Okay.

19   And umm --- what, if anything, did you find from

20   the September of two thousand and six (2006) CT scan?

21 A There was no evidence of blood in that location.

22 Q Was there any evidence that it was lipoma or fat tumor

23   as you had talked about?

24 A No. It just wasn't seen on that CT scan. In

25   addition there was no subdural blood at that time in

98

1     September.

2 Q   Now was there before her admission to the hospital on

3     November thirtieth (30th), was there a subsequent MRI

4     done at the University of Michigan Hospital?

5 A   I'm only aware of two MRI scans.   The first one

6     showing the spot that we talked about.   And the next

7     one being during her hospitalization after the injury

8     which is ---

9 Q   (Interposing)   And the umm --- your review of the MRI

10    that was done after her admission on November

11    thirtieth (30th), the blood or lipoma or fat tumor

12    that was observed in the August, two thousand and six

13    (2006) MRI in the left parietal lobe ---

14 A   (Interposing)   Correct.

15 Q   (Continuing)   was that still there?

16 A   It was not.

17 Q   Now Doctor Maher when you talk about umm --- the old

18    and new subdural hematomas that you observed from the

19    MRI and the CAT scans after her admission on the

20    November thirtieth (30th), umm --- are you able ---

21    are you able to actually tell the Jury ages of these?

22 A   We can accurately say that there are two different

23    ages.   We can less accurately predict exact ages.

24    Based on the fact that it was bright on the CAT scan

25    when she first came in, the blood in the back it was

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    bright on the CAT scan, and because of its

2    characteristics on the MRI scan we predict that it

3    wasn't more than a few days old at the most.   It

4    could have been a day or two.   It could have been

5    more than that.   The blood in the front we know is

6    much older because it was low density on the CAT scan

7    and had different characteristics on the MRI scan.

8    Predicting the exact age of that is difficult at least

9    for me.   And I think difficult for anybody with any

10   degree of certainty.   But we can say quite surely

11   that it was definitely, significantly older.   More

12   than just a few days older.

13   Q    Now Doctor Maher there's been a question raised as to

14        whether or not um --- the symptoms that Madison

15        displayed on November thirtieth (30th) of two thousand

16        and six (2006), were not from a new subdural hematoma

17        but from a rebleed of a chronic or old subdural

18        hematoma.   Do you have an opinion about that?

19   A    I think that's not likely for a couple of reasons.

20        Number one, the new and the old blood were in

21        different parts of the brain.   The old blood was in

22        the front.   Most of the new bleeding was in the back.

23        And usually when you have rebleeding into an old

24        hematoma it's rebleeding into the old hematoma, into

25        the same site or very close site.   In addition to

100

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    that the symptoms in Madison's case far outstripped

2    any kind of uh --- usual course of a hematoma that

3    size.   The hematoma that we saw on the CT scan was

4    sizeable but it's the kind of thing that by itself,

5    when it's just a subdural hematoma, often doesn't

6    require surgery and often doesn't lead to devastating

7    neurological problems.   We can watch it over time and

8    watch it go away on its own.

9        The intracranial pressure, I've told you before,

10   didn't look elevated on that first CAT scan.   It was

11   not impressive on the CAT scan which isn't a great way

12   of looking at intracranial pressure, that's true but

13   it tells us some things.   We can see, for instance,

14   how much the blood is displacing the brain.   If it's

15   pushing on the brain a whole lot or just a little bit.

16   And it was pushing on the brain a little bit.   The

17   kind of thing that by itself, the blood by itself,

18   you'd expect a child to be able to survive.

19       What I'm getting at is that the severity of her

20   injuries far outstripped the subdural hematomas.

21   Making us immediately concerned that there was

22   something far beyond what we were seeing on the CAT

23   scan that was going on with her, a more extensive

24   injury that wasn't apparent on the CAT scan.   A more

25   extensive injury to her brain itself.   You don't see

101

```
 1          that when somebody has a simple episode of a small

 2          rebleed into a preexisting subdural hematoma.    That

 3          doesn't happen.    If somebody has a small amount of

 4          blood that rebleeds into a preexisting subdural

 5          hematoma, they can get sick.    Sure, they can get sick

 6          but they --- they tend to not present in an extremist

 7          or as sick as Madison was.    In other words, at

 8          death's door.    So I don't --- I can't remember the

 9          question.    I think ---

10    Q     I think you answered it.

11    A     Yeah.

12    Q     Doctor after you and the other physicians went through

13          the differential diagnosis and were able to rule out

14          other causes, were you able to come up with a final

15          diagnosis?

16    A     The final diagnosis was really reached with a team of

17          physicians which I was just a part.    And it takes

18          into account a number of factors, the brain scans, the

19          CT scan, the MRI scan, the findings of the

20          tremendously elevated intracranial pressure, the eye

21          findings, the findings of the people that had talked

22          to various family members.    In the end, we made a

23          diagnosis ---

24                MR. WHITE:    (Interposing)    I'd just ask

25          that you speak for himself --- that he speak for
```

102

1     himself.

2           THE COURT:  Yeah.  You might be using we

3     as a common vernacular but if it's your diagnosis than

4     if you'd just say yours.

5           THE WITNESS:  Well ---

6           THE COURT:  (Interposing)  Recognizing

7     that other people might share it.

8           THE WITNESS:  Sure.  I was using we as I

9     thought sort of a medical team.

10          THE COURT:  Right.

11          THE WITNESS:  Together we came up with the

12     diagnosis.  I was one small part of that.  But in

13     the end, we thought she died of ---

14          MR. WHITE:  (Interposing)  Your Honor, I

15     just asked that he speak for himself.

16          THE WITNESS:  Okay.

17          MR. WHITE:  I'm sorry, Doctor.  I know

18     that's not the way you do it normally but for purpose

19     of this.

20          THE WITNESS:  Yeah.  In the end, I thought

21     that Madison died of a severe intracranial injury.

22     Again that, that something had happened to Madison

23     that far outstripped what would cause a subdural

24     hematoma of that size.  And what that was, I left up

25     to other physicians to sort out based on based on

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    other information that they had that goes beyond my

2    area of neurosurgery.   And uh --- they spoke to me

3    about that and I was certainly involved with those

4    decisions.   But from my standpoint I could say that -

5    -- that she had a severe injury that goes beyond a

6    subdural hematoma and goes beyond even a small

7    subdural hematoma bleeding into itself.   And with

8    another subdural hematoma she had a very extensive,

9    very terrible injury.

10            MS. POPE-STARNES:   May I have just one

11   minute please, Your Honor?

12            THE COURT:   Yes.

13        (Whereupon a brief delay was had.)

14                     * * *

15            MS. POPE-STARNES:   Thank you.

16        I have no other questions.

17            THE COURT:   Thank you.

18        Mr. White.

19            **CROSS-EXAMINATION**

20   **BY MR. WHITE:**

21   Q    Doctor, you're a professor at the University?

22   A    That's correct.

23   Q    Okay.

24        So I'm going to ask you to be an educator knowing

25        that none of us have the --- the uh --- grasp of the

                            104

1     terms that you do.   And acute, subacute and chronic.

2     Could you define those three sets of terms?

3  A  Mm-hmm.   They can be defined slightly differently by

4     different people but everybody agrees in generalities

5     that acute means new.   For me, that means within a

6     day or two.   Some people might push it to three days.

7     Subacute to me means starting in that two or three day

8     range.   Chronic means long-term.   Something that's

9     been there for a week, two weeks, three weeks,

10    especially a month.   That's very chronic.   Uh --- so

11    again, it's uh --- it's frankly as far as I'm

12    concerned terms that have a little bit of gray area

13    between them.   There's a gray area between acute and

14    subacute and there's a gray area between subacute and

15    chronic.   But in general acute means new, subacute is

16    less new, a few days old and chronic is older than

17    that.   We're talking usually in the order of weeks.

18  Q  Hypoxic?   Hypoxia?

19  A  A lack of oxygen.

20  Q  Okay.

21     Ischemic.   I S C H E M I C.

22  A  Cell death that results usually from a loss of oxygen.

23  Q  Edema?

24  A  Swelling of the cells.   Especially the --- you can

25    have swelling of the brain in general.   But usually

105

1    it means that on a cellular level the cells are

2    sucking in water and expanding.

3  Q    Hypoxic ischemic injuries?

4  A    Cell death from lack of oxygen.

5  Q    Diffuse axonal injury?

6  A    Diffuse axonal injury is a result of trauma.    The

7    nerve cells, the little cell bodies, and then axons

8    that they send out from their cell bodies is like the

9    wiring of the nervous system.    And these things are -

10    -- are very long and very fragile.    And after an

11    injury or an accident the axons can be sheared or

12    broken like the broken cables and that causes what we

13    call DAI or diffuse axonal injury.    It's a ---

14  Q    (Interposing)    The shearing concept is with the DAI

15    the diffuse axonal injury, correct?

16  A    That's the usual mechanism for diffuse axonal injury.

17  Q    As opposed to the hypoxic ischemic injury, correct?

18  A    Uh --- correct, although some injuries can cause both.

19  Q    Umm --- the difference between a hematoma and a

20    hemorrhage?

21  A    They're used interchangeably.    A hematoma tends to be

22    a collection of blood.    We think of it as like a ball

23    of blood sometimes but it doesn't have to be.    It can

24    be a collection of blood anywhere.    You can have a

25    hemorrhage that is a hematoma but a hemorrhage can

106

1       also be in other spaces such as the subarachnoid space

2       where it tends to be more diffuse and spread out.

3       And we usually don't refer to those as hematomas

4       because they're not big collections of blood

5       somewhere.

6  Q   The term focal effacement?  It says in here, 'Mild

7       focal effacement'.

8  A   Mm~hmm.   It depends on the context but I think that

9       goes back to what we were talking about with the ---

10      the amount of pressure on the brain as judged from the

11      CT scan.   Sometimes we'll say, 'There's significant

12      effacement' if we think it's pushing on the brain a

13      lot or not so much effacement, mild effacement if it's

14      not pushing on the brain very much.   It can be used

15      in many different contexts but usually that's what it

16      means.

17  Q   The term infarction, intracranial infarction?

18  A   Mm~hmm.   That's the result of ischemia.   That's an

19      area of the brain that has undergone a stroke or dying

20      because of lack of oxygen.

21  Q   Now the term intracranial.   Intracranial.

22      Is that --- could you explain what the expansive

23      definition of that is?

24  A   Inside the head.

25  Q   Inside the head.

107

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1              Calvarium?

2    A    The skull.

3    Q    The skull.

4              So the bony part of the skull?

5    A    Correct.

6    Q    And uh --- I believe you touched on it, pappadea

7         (sic).

8    A    Papilledema?

9    Q    Papilledema.    Excuse me.

10   A    Mm~hmm.    Papilledema is swelling of the optic disc at

11        the end of the optic nerve.    It implies elevated

12        intracranial pressure.

13   Q    When the term chronicity is used?    It's a variation

14        of chronic.

15   A    It means degree --- degree of oldness.    It could be a

16        --- it could be very chronic and the degree of

17        chronicity is great or it could be not very chronic or

18        acute in which case there's not a great degree of

19        chronicity.

20   Q    Umm --- you reviewed in your context of your ---

21              THE COURT:    (Interposing)    I'm sorry for

22        interrupting but what I was thinking is if you have

23        more terminology let's get that done and then we'll

24        break for lunch.    Or does that pretty much cover it?

25              MR. WHITE:    That pretty much covers it

                              108

1    Judge.

2              THE COURT:    All right.    Obviously we're

3    not going to be done with the doctor before the lunch

4    hour since it's twelve o'clock (12:00) now.

5         So we will break for lunch at this time Ladies

6    and Gentlemen.    Appreciate your patience.    Not that

7    --- not that we have ever been waiting on you.    I

8    know it's been the other way around.    But what I

9    would kind of suggest and invite you to do, if you

10    come back a little bit before one-thirty (1:30), that

11    way once we have all of you here then perhaps we can

12    make the delay a little bit less.    But we'll just

13    wait to be seen.    By all --- by no means am I

14    suggesting you guys are tardy because it's the other

15    way around.    I'm certainly aware of that.

16         Please don't discuss the case and have a nice

17    lunch, okay?

18              THE CLERK:    All rise for the Jury.

19    (Whereupon the Jury was returned to the Jury room.)

20                   *  *  *

21         (Whereupon a lunch recess was had.)

22                   *  *  *

23              THE CLERK:    The Court calls People versus

24    McBurney, case number 07 214651 FC.

25              THE COURT:    Ms. Pope-Starnes?

                              109

1          MS. POPE-STARNES:   Sarah Pope-Starnes,

2     assistant prosecuting attorney.

3          THE COURT:    Thank you.

4          MR. WHITE:    Robert White, appearing on

5     behalf of Mr. McBurney.

6          THE COURT:    Thanks.

7       What's going on?

8          MS. POPE-STARNES:   As I mentioned

9     yesterday, the issue that the only records they sent

10    me were the admission from November thirtieth (30th)

11    on from U of M.

12         THE COURT:    Mm-hmm.

13         MS. POPE-STARNES:   The investigator came

14    this morning and brought me the records and indicated

15    there's a letter that's addressed to you that I

16    glanced at and it says, 'Only you can open this.'

17         THE COURT:    It's probably got anthrax in it

18    or something.

19         MS. POPE-STARNES:   While I believe it's

20    perhaps because it was a subpoena signed by the party

21    and not by the Court.   So apparently they don't know

22    the Michigan Court Rules.   And um --- and they're

23    worried about HIPAA violations so they want only the

24    Court opening this.   I told Counsel that I'm

25    concerned.   It sure did not feel like there's a disc

110

1    in here of the radiology records that we asked.   And

2    during my lunch hour I had the investigator calling

3    them to find out where's the disc.   So umm ---

4                THE COURT:   I'll take it.

5                MR. WHITE:   I --- well I'll open the

6    package first.

7                MS. POPE-STARNES:   We'd like to know what

8    dates the records are that are in there.

9                MR. WHITE:   Of course.   Of course.

10        How appropriate is it if there's something extra

11   in there?

12               THE COURT:   That's exactly why I gave it to

13   him.

14               MR. WHITE:   I'm going to stand back here.

15               THE COURT:   So you opened this thing?

16               MS. POPE-STARNES:   Yeah.   That one was

17   opened and we were told --- the investigator was told

18   that you had to read that first and that only you

19   could open the sealed one.   And it's supposed to be

20   from a lawyer from the University of Michigan Health

21   System.

22               THE COURT:   So I can save Ms. Reznick the

23   trouble and maybe if you want to make it part of the

24   appellate record rather than read it all into the

25   record, Counsel want to just take a look at it?   I

                           111

1    don't think it's much of an issue but see what it

2    says.

3              MS. POPE-STARNES:   I already read it.

4              THE COURT:   Oh.   You already read the one

5    that was ---

6              MS. POPE-STARNES:   (Interposing)   Not the

7    one that was --- that was sealed?

8              THE COURT:   This is the one that was in the

9    sealed one.

10             MS. POPE-STARNES:   Oh no, then I haven't.

11         It's the same.

12             THE COURT:   Is it the same thing?

13             MS. POPE-STARNES:   Yes.

14             THE COURT:   So I don't care if you guys

15    want to draw up an order and I can sign it so that I

16    can have the stamp of the Court, even though I would

17    say that's sufficient.   Your subpoena was sufficient

18    but ---

19             MR. WHITE:   (Interposing)   Where are the

20    discs?

21             THE COURT:   I'm not --- this is all that

22    appeared.

23        Counsel, anything to talk about with respect to

24    this or are we just satisfied to ---

25             MR. WHITE:   Nothing to talk about right

                           112

1    now.

2              THE COURT:   Okay.   All right.   Very well.

3    Thank you.

4         Doctor, would you come back up here if you would?

5         Parties are ready and we can proceed with the

6    trial.

7         Thanks.

8              THE COURT REPORTER:   Doctor, how do you

9    spell your first name?

10             THE WITNESS:   C O R M A C.

11             THE COURT REPORTER:   I keep wanting to add

12   a K on there.

13             THE WITNESS:   Everybody does, but there's

14   no K.

15             THE CLERK:   All rise for the Jury.

16   (Whereupon the Jury was returned to the courtroom.)

17                       *  *  *

18             THE COURT:   Good afternoon everyone.

19   Thanks for your promptness.   Again, I appreciate

20   that.   You may all be seated.

21        The record will reflect that the Jury is back.

22   The case has been called.   Counsels' names have been

23   noted and the Doctor is back on the stand.

24        And you're reminded you're still under oath and

25   required to testify truthfully and honestly, okay?

                          113

1          Thank you.

2          Mr. White, you may proceed.

3               MR. WHITE:   Before I inquire I do have a

4     couple more definitions if you'd be so kind?

5               THE COURT:   Okay.   That's fine.

6     **WHEREUPON DOCTOR CORMAC MAHER HAVING BEEN PREVIOUSLY**

7     **SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING**

8     **BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

9                    **CONTINUED RECROSS-EXAMINATION**

10    **BY MR. WHITE:**

11    Q    The term is ischemic cascade?

12    A    The ischemic cascade refers to a sequence of chemical

13         reactions usually within the cell as the cell is in

14         the process of dying from ischemia.   Where one step

15         leads to another, releases toxins which leads to

16         another problem and so on.   And it's a --- it's a ---

17         essentially a --- our way of understanding how cells

18         die as they're dying from ischemia.

19    Q    And uh --- the term hygroma.   H Y G R O M A.

20    A    A hygroma is a collection of --- usually of spinal

21         fluid as it's currently used.   Usually within the

22         subdural space.

23    Q    Doctor, is it --- is it a fair statement to say for a

24         lay person, a parent for instance who has a young

25         child, indications of a head injury would be vomiting,

                              114

1       one indication?

2    A  Could be.

3    Q  Lethargy?

4    A  Could be.

5    Q  Tiredness?

6    A  Sometimes.

7    Q  Irritability?

8    A  Sometimes.

9    Q  And a child just not normally herself or his self?

10   A  Again, sometimes.

11   Q  Doctor, are you familiar with a Doctor Ronald

12      Uscinski?

13   A  No.

14   Q  Now if I could ask you to umm --- give the Jurors

15      further education.   A subdural hematoma in its acute

16      stage, meaning it's new, correct?

17   A  Correct.

18   Q  Okay.

19          And is it a fair statement that the medical

20      profession really doesn't know how much force is

21      necessary to create or cause an acute subdural

22      hematoma?

23   A  It can be different in different situations that's

24      true.

25   Q  But as far as a quantum of force, of mega --- can we

                            115

1    say in your profession, this is how much force is

2    necessary?

3 A  You're correct.  If what you're saying is, 'There are

4    certain forces that's going to be predictive of

5    causing a subdural every time and below that threshold

6    will never cause a subdural,' that's correct.   So it

7    can be different in different cases.

8 Q  Different in different cases?

9 A  Yes.

10 Q  So as far as a unit of measurement we don't have that?

11 A  Well that's true.

12 Q  And uh --- we know that chronic subdural hematomas

13    must start as an acute subdural hematoma?

14 A  That is correct.

15 Q  And acute subdural hematomas can start in a variety of

16    different ways, correct?

17 A  That's correct.

18 Q  Even at birth?

19 A  That's correct.

20 Q  Sometimes a trivial fall?

21 A  Sometimes.

22 Q  Sometimes a more severe traumatic impact injury,

23    correct?

24 A  That's correct.

25 Q  And umm --- acute subdural hematomas sometimes resolve

116

1    themselves without any kind of medical intervention?

2  A  That is correct.

3  Q  Many times is it conceivable Doctor that the medical

4    profession might not treat the majority of subdural

5    hematomas, acute in their nature, because people don't

6    know their children have them, don't take them to the

7    doctor?

8  A  We don't know how many children are out there that we

9    don't know about, that don't see us.  Of the children

10    that do see us in this age group, it's true that we

11    probably don't operate on the majority of them, yes.

12  Q  And when an acute subdural hematoma goes into the

13    subacute phase and then into the chronic phase, what

14    is happening in this process?  Can you explain to the

15    Jury how you move from acute to chronic?

16  A  Mm-hmm.  Lots of things are happening in this

17    process.  As a generality from a surgeon's

18    standpoint, an acute subdural hematoma is a clot,

19    usually has some form or substance to it like jelly

20    almost.  And as it goes through the process of aging

21    it tends to get thinner over time so that by the time

22    it's a chronic subdural hematoma it's more watery or

23    fluid-like.  That again, from a surgeon's standpoint,

24    is the most critical difference between an acute

25    subdural hematoma and a chronic subdural hematoma.

117

1    There are other changes on a more cellular level that

2    other people are more qualified to discuss but it has

3    to do with the oxygen characteristics changing over

4    time within the hematoma and so on.   But from a

5    surgeon's standpoint the most important difference is

6    that the acute subdural hematomas tend to have some

7    form or substance like jelly and then the chronic ones

8    are watery.

9  Q  And umm --- the process of going from acute to

10    subacute to chronic?   It's possible that this

11    hematoma grows, isn't that true?

12  A  It happens sometimes.

13  Q  And what is the mechanism that causes it to grow?

14  A  Mm-hmm.   The usual mechanism is that there's an

15    osmotic effect.   Osmotic effect is a little bit

16    difficult to explain but it's a --- because of the

17    chemical makeup of the hematoma itself, water has a

18    tendency to cross into that hematoma and can cause a

19    little bit of a volume expansion over time.   So

20    sometimes subdural hematomas, as you've already said

21    Counselor, go away on their own with no treatment.

22    And occasionally they'll grow over time.

23  Q  Okay.

24        And occasionally they'll grow over time and

25    become symptomatic?

118

1   A   Occasionally.

2   Q   Okay.

3       And occasionally that symptom --- that

4       symptomatic uh --- state can cause severe

5       complications?

6   A   Occasionally.

7   Q   Including death?

8   A   If it gets big enough.

9   Q   And this concept of rebleeding Doctor ---

10  A   (Interposing)   Mm-hmm.

11  Q   (Continuing)   uh --- rebleeding of a chronic subdural

12      hematoma, can you explain to the Jury what that ---

13      that process is?

14  A   Sure.   Subdural hematomas as they're aging, and we

15      talked about they're going from the jelly-like

16      substance to a more watery substance, one other thing

17      that can happen is that it can organize a little bit

18      on a cellular level and form little membranes.   Those

19      membranes are friable or delicate and sometimes have

20      little blood vessels in them.   Sometimes can bleed by

21      themselves.   And sometimes therefore we see subdural

22      hematomas form and then rebleed into themselves and

23      grow.

24  Q   And sometimes the rebleeding can be spontaneous, is

25      that a fair statement?

119

1   A   It's fair to say that at least sometimes we don't

2       recognize the exact mechanism for why rebleeding

3       occurs, yeah.

4   Q   And sometimes it can be traumatic, the cause of a

5       rebleed?

6   A   Sometimes.   For sure sometimes it's traumatic and

7       sometimes the trauma may be relatively minor if a

8       subdural bleeds into itself to where we don't

9       recognize it.

10  Q   And a chronic subdural hematoma that is in its

11      symptomatic stage, from a parent's standpoint, would

12      it be uncommon for that parent to see their child

13      vomiting?

14  A   Can you repeat the question?

15  Q   In a chronic subdural hematoma that's in its

16      symptomatic stage ---

17  A   (Interposing)    Sure.

18  Q   (Continuing)    from a parent's standpoint ---

19  A   (Interposing)    Okay.

20  Q   (Continuing)    observing their child who has a chronic

21      subdural hematoma symptomatic ---

22  A   (Interposing)    That is symptomatic.

23  Q   Is symptomatic.   Not uncommon to see the child

24      vomiting?

25  A   The child could be vomiting.

                         120

1  Q    Irritable?

2  A    It's possible.

3  Q    Lethargy, tiredness?

4  A    All of those things are possible.

5  Q    And including the fact --- including the child not

6       having the same normal disposition?

7  A    All of those things are possible but not necessary.

8       In other words, some people with symptomatic subdural

9       hematomas don't have those symptoms.

10 Q    But sometimes they do?

11 A    Sometimes they do.

12 Q    Umm --- in this particular case, Madison had five

13      frontal chronic subdural hematomas, isn't that true?

14 A    Mm-hmm.   My recollection of the MRI scan and the CT

15      scan was that it was worse on the left in terms of the

16      chronically.

17 Q    Yeah, but we had five frontal.

18 A    Mm-hmm.

19 Q    Both frontal lobes had chronic subdural hematomas,

20      correct?

21 A    I follow you.   Yeah.   Definitely worse on the left.

22 Q    Of an unknown date in its etiologies, beginning,

23      correct?

24 A    That's true to a certain extent except that we don't

25      see it on the MRI scans from a couple of months

121

1   earlier.  So I think that that helps us date it at

2   least more recently than that.

3  Q  So as the MRI scans, you're talking about August

4   thirty-first (31st)?

5  A  That's correct.  Yeah.

6  Q  Okay.

7   That your belief is that the acute subdural

8   hematoma that became chronic subdural hematoma as of

9   November thirtieth (30th), must have occurred after

10   August thirty-first (31st)?

11  A  Right.  And after that CT scan when it was September

12   ---

13  Q  (Interposing)   September eleventh (11th).

14  A  Eleventh (11th), right.

15  Q  Okay.

16   And you testified earlier though that the, as far

17   as the sophisticated mechanism for measuring of the

18   MRI, in your opinion, is a better mechanism for

19   measuring?

20  A  For measuring blood.

21  Q  Uhh --- hematomas.  Blood in the brain?

22  A  It depends.  The MRI is certainly better than CT

23   scans in some respects.  For looking for very acute

24   blood occasionally the CT scan is actually quite

25   sensitive because it's bright white on a CT scan.

122

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    The MRI scan is certainly better in other respects

2    though.

3 Q  But certainly something could show up in the MRI that

4    did not show up on a CT scan?

5 A  That's possible.

6 Q  Umm --- and the blood products that were seen on

7    August thirty-first (31st), two thousand six (2006) in

8    the MRI on Madison, that was an acute subdural

9    hematoma, was it not?

10 A  The August thirty-first (31st) MRI scan?

11 Q  The August thirty-first (31st) MRI.

12 A  You're talking about the blood in the left parietal

13    area?

14 Q  Yes.   That ---

15 A  (Interposing)   No.   That was not a subdural.   The

16    blood we're talking about from August thirty-first

17    (31st) was liquid within the brain.

18 Q  Okay.

19        And your review of the records of the University

20    of Michigan uh --- regarding the treatment of Madison

21    McBurney.   There are several doctors who indicate

22    that that were --- that was an acute subdural

23    hematoma.

24 A  Are you talking about ---

25 Q  (Interposing)   Doctor Leber.

123

1   A    I don't think you're correct.    You're talking about

2        the August thirty-first (31st) scan?

3   Q    Sure.

4   A    I'd like to see that record.

5   Q    Hold on.    If I --- mine's all marked up.    Page

6        thirty-one (31) to sixty-seven (67).    It's Doctor

7        Steven Leber.

8                   MR. WHITE:    If I may approach Judge?

9                   THE COURT:    Sure.

10  **Q    (By Mr. White, continuing)**    All right.    And this is

11       a mess.    So I --- I just put in some stuff.    So this

12       is what I'm looking for, right here, Doctor Leber.

13                  MS. POPE-STARNES:    I'm going to object

14       here.    He's indicated he would like to see the report

15       from that test.    Not Doctor Leber's report who is

16       someone who treated the child after the November

17       thirtieth (30th) admission.

18                  THE COURT:    What are you --- go ahead.

19            Do you have that?

20                  MR. WHITE:    The August thirty-first (31st)

21       report?

22                  THE COURT:    Is that what you're showing

23       him?

24                  MR. WHITE:    No.    I'm showing him Doctor

25       Leber's notes.    If he says he wants to see the

124

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    report, I'll gladly show him ---

2            THE WITNESS:   (Interposing)   I would like

3    to see the MRI report.

4            MS. POPE-STARNES:   That --- that --- I

5    understand that.

6            THE COURT:   Okay.   All right.   See if you

7    ---

8            MR. WHITE:   (Interposing)   I'll see if I

9    can find it.

10      Is that what you just put in?

11           MS. POPE-STARNES:   It should be in the very

12    back in a paper-clip section.

13           MR. WHITE:   Okay.

14           THE WITNESS:   This is not in the sequence

15    that we're used to.

16  Q  **(By Mr. White, continuing)**   I do believe it covers

17    the time period.

18  A  I don't think the report is in here.   Well maybe

19    fifty-five (55).

20           MS. POPE-STARNES:   I believe it starts on

21    page two-eighty-five (285) of your discovery.

22  Q  **(By Mr. White, continuing)**   Did you find the August

23    thirty-first (31st) MRI?

24  A  No.   I've got the CT report from afterwards.

25           THE COURT:   Is there a way Doctor that

125

1    someone else could look for it possibly?

2              THE WITNESS:   I found it here.

3              THE COURT:   Oh, you've got it, okay.

4              THE WITNESS:   The MRI report from the

5    *radiologist does not specify.*   But this was not

6    interpreted as a subdural hematoma.

7  Q   **(By Mr. White, continuing)**   But you're saying the

8      report itself dated August thirty-first (31st), the

9      MRI, does not specify, correct?

10 A   That's correct.   All we can say based on the report

11     is that it was blood adjacent to the left parietal

12     lobe, the left parietal convexity.

13 Q   And you actually in part of your treatment of Madison

14     read the MRI yourself, correct?

15 A   That is correct.

16 Q   Okay.

17        And it's your conclusion that based upon your

18     reading of the test that this was not an acute

19     subdural hematoma?

20 A   Which part?

21 Q   Is that a fair statement?

22 A   No.   That's --- that's not correct.

23 Q   So if you could tell me --- tell me how I'm wrong?

24 A   When I first evaluated Madison my impression was that

25     the posterior hematoma on the left was acute and that

126

1    the frontal one on the left was not.

2  Q  I'm talking about the August thirty-first (31st) MRI.

3  A  Yeah.   This --- when I was treating Madison this

4     didn't have anything to do with my neurosurgical

5     treatment at the time so this is investigation that we

6     did after the fact.

7  Q  Okay.

8        So is it a fair statement that you did not read

9     the August thirty-first (31st) MRI as part of your

10    treatment of Madison at the time that you were

11    treating her?

12 A  At the time that I put the ventriculostomy in?

13 Q  Right.

14 A  Not on that first day.   That's correct.

15 Q  Okay.

16       And when was the first time that you read the

17    August thirty-first (31st) MRI?

18 A  I can't say exactly but it was during her

19    hospitalization.

20 Q  Okay.

21       But before she passed?

22 A  That's correct.

23 Q  Okay.

24       And after reading the MRI, is it your statement

25    that that was not a subdural hematoma, an acute

127

1   subdural hematoma that was detected on August thirty-
2   first (31st), two thousand six (2006)?
3   A   My impression is that the blood on the left parietal
4       convexity was, I can't age it, but it was either blood
5       or a lipoma based on that first MRI scan.   Lipomas
6       shouldn't disappear on their own therefore we're left
7       with the impression that it was blood.
8   Q   Okay.
9   A   Okay?
10  Q   And could you say ---
11  A   (Interposing)   Exactly how old it was I can't say.
12      It didn't enter into my calculation except that it was
13      there.
14  Q   And did that blood on August thirty-first (31st),
15      blood equal hematoma?
16  A   Blood is a hematoma, yes.
17  Q   Thank you.    Thank you.
18      You just couldn't tell its age, correct?
19  A   No.
20  Q   Now Doctor, you've indicated that it is, excuse me, if
21      we could back up.
22      Do you have that August thirty-first (31st) MRI?
23  A   Yeah.
24  Q   And it says at some point that the cerebral volume is
25      low.   Excuse me.   It says cerebral --- cerebral

128

1      volume is mildly low for patient's age.

2             Is there any significance to that statement?

3   A   No.   I think I see what you're getting at and I

4       wasn't impressed with the extracts, those spaces were

5       large.

6   Q   Okay.

7             So as far as what we talked about earlier about

8       this intra-axial spaces ---

9   A   (Interposing)   Right.

10  Q   (Continuing)   and the possibility of blood, you

11      didn't see that as being a possibility for Madison at

12      this point?

13  A   I didn't think it was likely for Madison at this

14      point.

15  Q   Okay.   Thank you.

16  A   I would say that usually when we see that phenomenon

17      it's because the extra-axial spaces are significantly

18      enlarged and I didn't think that was the case for her.

19      Everybody has extra-axial spaces.

20  Q   Right.

21  A   The question is, is it significantly larger than

22      normal.   I didn't think so.

23  Q   Sure.   Thank you.

24            Now you've indicated in your direct testimony

25      Doctor that Madison suffered a severe injury, much

                              129

```
 1           greater than what you believed to be a subdural

 2           hematoma?

 3      A    Correct.

 4      Q    Okay.

 5                And --- but you did not indicate the cause of the

 6           injury.   Are you comfortable making that clear for

 7           me?

 8      A    I think the --- the other doctors that were caregivers

 9           at the time have come to some conclusions about the

10           cause of the injury based on many other factors

11           besides the brain injuries that I was treating.   And

12           based on that they've come to the conclusions that I'm

13           comfortable with.

14      Q    Okay.

15                As far as you're conclusions?

16      A    My conclusion can only go so far.   My conclusion is

17           that --- that Madison had subdural hematomas of

18           different ages as well as evidence of other brain

19           injury.   As well as a very, very diffuse brain injury

20           going beyond what we see from subdural hematomas of

21           that size.

22      Q    Okay.

23                And based upon that conclusion your --- is it

24           your conclusion that uh --- excuse me.   Based upon

25           that finding is your conclusion that the injury must
```

                                    130

1       have been nonaccidental?

2    A  I told you that I didn't come to that conclusion.

3    Q  Okay.   Thank you.

4    A  That when other physicians did, I --- I could see why

5       they thought that.

6    Q  You yourself did not come to that conclusion?

7    A  I didn't come to a different conclusion.   My

8       conclusion was that she was badly hurt and other

9       physicians ---

10   Q  (Interposing)   And I appreciate what other physicians

11      but ---

12   A  (Continuing)   tried to get to the bottom of it.

13   Q  (Continuing)   since you're testifying and I can't

14      cross-examine them unless they get up there.

15   A  Yeah.

16   Q  And you know from your treatment of Madison that she

17      had no skeletal injuries, isn't that true?

18   A  That's correct.   The, again, the other physicians did

19      a skeletal ---

20   Q  (Interposing)   I'm just asking you to answer the

21      question.

22              THE COURT:   Hold on.

23              THE WITNESS:   Well let me answer the

24      question.

25              THE COURT:   You know ---

                          131

1          MR. WHITE:   (Interposing)   I'm not asking

2     what other physicians said I'm asking you.

3          MS. POPE-STARNES:   Objection.

4          THE COURT:   In fairness I think ---

5          MS. POPE-STARNES:   (Continuing)   The Court

6     was starting to rule and I think that would be more

7     appropriate than Counsel interrupting the witness.

8          THE COURT:   In fairness Doctor, I think

9     that was an answer to the question.

10         Go ahead, Mr. White.

11  Q   **(By Mr. White, continuing)**  · I'm just directing my

12    question to you.   And so please just testify to what

13    you can testify to.

14  A   Okay.   Well let me say ---

15  Q   (Interposing)   There's no question in front of you

16    Doctor.

17         And there was no soft tissue injury to any

18    part of the body that you could see either, isn't that

19    true?

20  A   I treated her brain injuries.

21  Q   Did you see any soft tissue injury, detect, find

22    anything?

23  A   No.   But I think this line of questioning is not

24    appropriate for me.   I really do.

25  Q   Well I --- I guess that's up to the fellow sitting

                         132

1    right next to you.

2          THE COURT:    In fairness find implies

3    sought.    And he's not testifying that he sought it

4    but didn't see any is.

5  Q    **(By Mr. White, continuing)**    Then did you see we have

6    no fractures?    Did you see that?

7  A    Not that I could see.

8  Q    Including any fractures of the skull, the calvarium,

9    isn't that true?

10 A    That is true.

11 Q    You said you weren't really looking for soft tissue

12    injury, correct?

13 A    I was concerned with the brain injuries, that's

14    correct.

15 Q    Okay.

16        And you weren't looking for any skin injuries

17    also, bruising, scrapes, things of that nature?

18 A    Guess it depends what you mean.    As a neurosurgeon

19    we're involved in the care team.    We talked a lot to

20    other people.    We're aware of what's going on with

21    the patient as they're going through this.    Me

22    personally, was I the person in charge of looking for

23    soft tissue injuries and bone injuries?    No, that's

24    not me.    But I'm aware of what's going on as the

25    patient is getting cared for.

133

1    Q    And you're aware that there was no indication

2         whatsoever of any injury to the soft tissues of this

3         child, correct?

4    A    Soft tissue is a broad term.   I'm aware of some other

5         injuries to the child.

6    Q    You were aware --- were you aware of any soft tissue

7         injury?

8    A    It depends what you mean by soft tissue.   I'm aware

9         of ventral hemorrhages to the child.

10   Q    Any soft tissue injuries to the neck?

11   A    No, not that I'm aware of.

12   Q    And even though you weren't looking, you were also

13        aware that there was no injuries indicant ---

14        indicated on the skin of the child, correct?

15        Bruising, scraping, things of that nature?

16   A    Not that I'm aware of.

17   Q    Did you form an opinion Doctor, as to when the injury,

18        the severe injury that you diagnosed occurred?   Did

19        you form an opinion ---

20   A    (Interposing)   Mm-hmm.

21   Q    (Continuing)   as to when this severe injury that you

22        diagnosed occurred?

23   A    It's difficult for me to pinpoint it down to an exact

24        hour or timeframe but I felt like it was shortly

25        before the patient arrived at the hospital.   Whether

134

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1     it was twenty-four (24) or twelve (12) or one hour

2     before the patient arrived in the hospital I can't

3     say.   But I don't think it was many days before the

4     patient arrived in the hospital.

5  Q    Did you form an opinion?

6  A    At least with respect to the last bleed.

7  Q    Okay.

8     Did you form an opinion as to when the prior

9     injuries occurred, the prior bleeding?

10  A    You're talking about the chronic subdural?

11  Q    Yes.

12  A    I can't say.   The large --- larger subdural up in the

13     left frontal area obviously occurred at least several

14     weeks before.   Speculation.

15  Q    Possibly, possibly months but definitely you believe

16     it occurred after the ---

17  A    (Interposing)   Again there wasn't a large subdural

18     there in that August scan so not many months before.

19  Q    Okay.   Thank you.

20     MR. WHITE:   I have nothing further.

21     THE COURT:   Ms. Pope-Starnes?

22     **REDIRECT EXAMINATION**

23  **BY MS POPE-STARNES:**

24  **Q**    I just have a few questions Doctor.

25     Counsel asked you questions about a unit of

135

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    measurement of force that could cause these types of

2    injuries.   Is there anyway to test for that?

3  A   I'm not sure I understand the question.   You mean as

4    an experimental ---

5  Q   (Interposing)   Yes.

6  A   (Continuing)   type of animal model?   Sure.   And

7    people have carried out such experiments.   The

8    trouble is in reality when you're dealing with

9    patients, patients are made differently.   And

10    sometimes it can be more force for some and less force

11    for others.

12  Q   And testing on animals is not the same thing as a

13    human child?

14  A   No.

15  Q   Testing on dolls is not the same thing as a human

16    child?

17  A   No.

18  Q   And you can't test on human children?

19  A   Obviously not.   There's too much variability to make

20    any strong predictions about an exact mechanism that's

21    required to cause these injuries.

22  Q   The symptoms, the range of symptoms that Counsel went

23    through, vomiting, lethargy, tiredness, irritability,

24    as a doctor, do you ever see these as symptoms of

25    things other than head injury?

136

```
 1   A    All the time.   That, of course, is the great
 2        difficulty is that patients without severe head
 3        injuries can have some of these symptoms.   And
 4        patients with severe head injuries sometimes can have
 5        completely different symptoms so it can be --- it can
 6        be tricky.
 7   Q    Counsel talked to you about the progression of an
 8        acute hematoma to chronic ---
 9   A    (Interposing)   Right.
10   Q    (Continuing)   and a rebleed.
11            In your opinion is that what was going on with
12        Madison McBurney?
13   A    It doesn't fit with the facts very easily.   A lot of
14        long leaps of judgment there which are pretty hard to
15        believe.   Rebleeding when it occurs in a subdural
16        hematoma usually occurs within the subdural hematoma
17        space because that space has already been expanded a
18        little bit.   It's the easiest place for rebleeding to
19        occur.   In other words, if it's a left frontal
20        hematoma it's going to rebleed, usually it rebleeds in
21        the adjacent area or the same area.   Pretty hard to
22        believe it rebleeds for the first time in an area
23        that's not adjacent all the way on the other side of
24        the head.   So again that seems unlikely.
25   Q    Were there any other reasons why it doesn't fit with
```

137

1     the facts?

2  A    Well there are other things that we see on the MRI

3     scan such as the dot of diffusion change on the MRI of

4     the left temporal lobe which suggests that there may

5     be another space involved.   There's the findings

6     noted by the other physicians taking care of her.    I

7     don't know whether I should address that or not.

8     Probably not.   But the findings of the other

9     physicians certainly doesn't support that idea either.

10     Finally the spaces that she had were not terribly

11     large and it's not typical for a patient that we see

12     that has a problem with subdurals that bleed and

13     rebleed and rebleed.   Umm --- finally also, I just

14     said finally but here's another point, the brain

15     injury that she had, the very diffuse brain injury

16     that she had with the massive rise in the intracranial

17     pressure, doesn't go along with a relatively small

18     subdural hematoma that bled in a different location

19     again in a relatively small volume.   I'd struggle to

20     explain how a very small hematoma like that would

21     cause such a diffuse injury.   So for all of those

22     reasons it's a --- it seems unlikely.

23  Q    Doctor, I know that you had told the Jury on cross-

24     examination your job is the brain.   Umm --- are there

25     other physicians whose responsibility it is to do a

138

1  physical examination of the body for injuries to the

2  skin?

3  A   Absolutely.   There's a number of other physicians.

4  There's ER physicians that would see a patient like

5  Madison in the emergency department for a complete

6  examination.   There's ICU physicians that are ---

7  that take a more general view than the neurosurgeon is

8  able to take while the patient has been admitted to

9  the hospital in the intensive care unit.   There are

10  child protection type physicians that become involved

11  in situations like Madison's who are in charge of

12  performing a complete physical examination on a

13  patient like Madison.   There's ophthalmology

14  physicians that are in charge of looking in the eyes

15  to look for signs of trouble with the eyes which I

16  think you'll hear about at some other time.   So

17  there's a large team of people that take care of a

18  patient like Madison.   And although we're a part of

19  that team for sure there are other people that are

20  involved.

21  Q   Now you testified that umm --- in the records that you

22  reviewed there's no evidence of fractures?

23  A   Yeah, that's correct.

24  Q   Have you seen children before who have suffered from

25  traumatic brain injury who do not have fractures and

139

1       do not have bruises?

2   A   Absolutely.

3   Q   Thank you.

4               MS. POPE-STARNES:   Your Honor, I have no

5       other questions of this witness.

6               THE COURT:   Thank you.

7           Mr. White?

8               MR. WHITE:   I have no other questions.

9               THE COURT:   Thank you Doctor.   You're all

10      set.

11              MS. POPE-STARNES:   May he be excused?

12              THE COURT:   Any objections?

13              MR. WHITE:   No objection.

14              THE COURT:   Yep.   You can be excused.

15      Thank you Doctor.

16              MS. POPE-STARNES:   Your Honor, the People

17      would call Sergeant Paul Sumner to the stand.

18              THE COURT:   Okay.

19              THE CLERK:   **Do you swear that the testimony**

20      **you are about to give will be the truth so help you**

21      **God?**

22              THE WITNESS:   **I do.**

23              THE COURT:   Thank you.   You can have a

24      seat there.

25              MS. POPE-STARNES:   May I have just a

                            140

1      moment, Your Honor?

2              THE COURT:    You may.

3          (Whereupon a brief delay was had.)

4                      *  *  *

5              MS. POPE-STARNES:    May I proceed?

6              THE COURT:    You may.

7              MS. POPE-STARNES:    Thank you.

8      **S E A R G E A N T    P A U L    S U M N E R**

9  **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

10 **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

11 **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

12 **AND TESTIFIED AS FOLLOWS:**

13              **DIRECT EXAMINATION**

14 BY MS. POPE-STARNES:

15 Q   Sir would you please state your name and spell your

16     last name for the record?

17 A   My name is Paul Sumner.   S U M N E R.

18 Q   How are you employed Sir?

19 A   I'm currently a police sergeant with Northville

20     Township Police in Wayne County.

21 Q   How long have you been a police officer?

22 A   Approximately eighteen (18) years.

23 Q   I'd like to direct your attention back to nineteen-

24     ninety-eight (1998).

25         What department did you work for at that time?

                      141

1    A    At that time I was a Detective for Northville Township
2         Police Department.
3    Q    How long did you work as a detective?
4    A    Eight years.
5    Q    Specifically Sergeant Sumner I'm going to direct your
6         attention to umm --- approximately March second of
7         nineteen-ninety-eight (1998).
8             Were you involved in an investigation involving
9         the injuries of four month old by the name of Nicholas
10        Kennedy?
11   A    Yes I was.
12   Q    What did you do when you received that assignment?
13   A    I received an assignment of a possible abuse case at
14        which time I learned where the residence was, where
15        the child lived prior to being hospitalized.   And I
16        proceeded to that residence to attempt to interview
17        the parents, the caretakers or whoever was at the
18        house.
19   Q    Where was the residence?
20   A    It was in Northridge Apartment complex off of Seven
21        Mile in Northville, Michigan.
22   Q    Do you recall approximately what time of day it was
23        that you went to that residence?
24   A    It was approximately three-thirty (3:30) in the
25        afternoon on, I believe, it was March second,

                              142

1    nineteen-ninety-eight (1998).

2  Q  Did you find anyone at home?

3  A  Yes I did.

4  Q  Who?

5  A  Mr. Steven McBurney.

6  Q  Would you recognize Mr. McBurney if you saw him again?

7  A  Yes.   He's seated in the --- next to Defense Counsel

8     in the uh --- blue sport coat.

9          MS. POPE-STARNES:   May the record reflect

10    that the witness has identified the Defendant?

11          THE COURT:   Any objection?

12          MR. WHITE:   No objection.

13          THE COURT:   So noted.

14 Q  **(By Ms. Pope-Starnes, continuing)**   Was anyone with

15    you when you went to the residence to interview Mr.

16    McBurney?

17 A  I had a uniformed officer with me at the time.

18 Q  Okay.

19          Were you in uniform or plainclothes at that time?

20 A  I was a detective in plainclothes at that time.

21 Q  Did you speak with Mr. McBurney?

22 A  Yes I did.

23 Q  Was he under arrest at the time?

24 A  No he was not.

25 Q  Where did you speak with him?

143

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    A    Initially I --- the way the apartment complex is setup

2         is there's --- you have to buzz through the exterior

3         door to get into the internal doors.   Umm --- there

4         was a buzz.   I then subsequently went in.   Umm ---

5         Mr. Burney (sic) allowed me into his house and we sat

6         at his kitchen table and spoke.

7    Q    Did you ask Mr. McBurney questions about how Nicholas

8         Kennedy was injured?

9    A    Yes I did.

10   Q    What, if anything, did he say about that?

11   A    Umm ---

12              MR. WHITE:   Your Honor, I just want to have

13        my standing objection on all of this but I'm not going

14        to continue to object but I'm certainly ---

15              THE COURT:   (Interposing)   Yep.   No

16        absolutely it's noted.   Thank you Mr. White.

17           Go ahead.

18   Q    **(By Ms. Pope-Starnes, continuing)**   Go ahead.

19   A    At the time of the investigation when I sat down with

20        Mr. McBurney at his house, I explained to him that I

21        was at his residence on a uh --- abuse investigation

22        involving his son, Nicholas Kennedy.   My objections

23        (sic) at that time were to determine who was watching

24        the child, who were the caretakers of the child and to

25        obtain some preliminary information umm --- about how

                              144

1       the child was cared for and things of that nature.

2       Subsequently while speaking with Mr. McBurney, I did

3       ask him if he knew of any plausible explanations of

4       how his child was injured.

5   Q   And what was his response?

6   A   He advised me that he did not know of any reasons why

7       his child was injured.   And then I asked him if he --

8       - if he had injured his child.   At that time he told

9       me that he had not injured his child.   Umm --- I

10      asked him for a written statement on the matter.   Uh

11      --- he completed a written statement on the matter.

12      In his written statement he explained that he had

13      fallen one time with the child but the child was not

14      injured.   Umm --- I advised him that uh --- I would

15      subsequently be in contact with him.   And that I was

16      beginning the investigation, just developing my

17      building blocks on the case.

18         I then left his police --- I left his apartment

19      and went back to my police department.

20  Q   Now Sergeant, the information about him previously

21      falling with the child, when was the first time that

22      he told you about that?

23  A   That was in his written statement, on the initial

24      written statement.   I subsequently did have another

25      written statement.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1   Q    When you spoke with him before he gave you the written

 2        statement did he tell you about that large fall?

 3   A    Yes.   He made reference to a uh --- baby gate and

 4        then he wrote it in his written statement.

 5   Q    And did you ask him who, if anyone else, was watching

 6        the child that day besides him?

 7   A    At that time I had asked him who were the primary

 8        caretakers of the child.   And Mr. McBurney advised

 9        that he was, his girlfriend at the time Christa

10        Kennedy was, and that his girlfriend's mother, Linda

11        Kennedy also cared for the child.   Umm --- and then I

12        spoke with him further and determined that on the day

13        of the injury, the day --- I believe it was on the

14        February twenty-seventh (27th), nineteen-ninety-eight

15        (1998) when his child stopped breathing, he was the

16        lone caretaker of the child when he subsequently

17        dialed nine-one-one (911) for a child not breathing.

18   Q    Did he give you some --- any kind of information as to

19        umm --- like times as to when on the date of the

20        injury as to when individuals were caring for him?

21   A    Yes.   He did give me a rundown that he worked the

22        midnight shift and that his wife took care of the

23        child while he was at work.   And then when he would

24        come home from work he would turn his --- he would

25        turn Nicholas, his son, over to Christa, the
```

146

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    biological mother, and that would normally take place,

2    I believe, it was around six-thirty (6:30) in the

3    morning.   And on the date in question when the ---

4    the --- Nicholas stopped breathing it was around the

5    time of six-thirty (6:30) or seven (7:00) when he came

6    home.   I believe he came home around six (6:00),

7    sixish.   And uh --- Christa the mother ended up

8    leaving about seven o'clock (7:00) for her occupation.

9  Q    Do you have a copy of that written statement with you?

10  A    I have a copy of the written statements.   Yes, Ma'am.

11  Q    And where would that be right now?

12  A    It would be in that case and if you hand it to me I

13       can produce it.

14              MS. POPE-STARNES:   May I approach?

15              THE COURT:   You may.

16  Q    **(By Ms. Pope-Starnes, continuing)**   Are these records

17       kept in the normal ordinary course of business of your

18       department?

19  A    At that time they were kept in uh --- a different type

20       of file system, but yes.

21  Q    While you're looking for that I'm going to move on.

22            So after your interview concluded you left the

23       apartment?

24  A    After preliminary invest --- investigation I left and

25       went back to my department.

147

1    Q    Okay.

2         And the uniformed officer that you were there

3    with, did he leave as well?

4    A    Yes he did.

5    Q    Okay.

6         Did there come a point where you spoke with the

7    *Defendant again?*

8    A    Yes.    I --- I spoke with him later in the evening

9    when he called my police department and requested to

10   speak with me.

11   Q    On the same date that you had spoken with him at his

12   home?

13   A    Yes.

14   Q    Do you recall approximately what time it was that he

15   called you?

16   A    It was approximately seven-thirtyish (7:30).    Seven-

17   thirtyish (7:30) that he arrived at the police

18   department so subsequently a little bit before that.

19   He's only a couple of miles from the police

20   department.

21   Q    Did you speak with him at the police department?

22   A    I did speak with him in one of the offices at

23   Northville Township Police Department.

24   Q    Was anyone else present besides you and the Defendant?

25   A    Present for portions of the interview uh --- was at

148

1     that time, Sergeant John Worth.

2   Q   And was the Defendant in custody at that point?

3   A   No.   When Mr. McBurney came to the police station um

4       ---

5             MR. WHITE:   (Interposing)   I believe he's

6       answered the question.   'Yes' or 'No'.

7             MS. POPE-STARNES:   Your Honor, this is my

8       questioning.   Non-responsive is an objection for the

9       questioner only.

10            THE COURT:   I'll allow it.

11        Go ahead.

12            THE WITNESS:   When --- when Mr. McBurney

13      had contacted me and came into the station, I

14      subsequently said, 'Well you contacted me.   You

15      understand you're not under arrest and you're free to

16      leave.   And that we're going to be speaking in an

17      office.'

18        And then I --- I afforded him at the conclusion

19      of speaking with me, he would be leaving for the

20      night.

21  Q   Did he indicate to you whether or not he under ---

22  A   (Interposing)   And that he may as well stop the

23      interview at any point and leave.

24  Q   Okay.

25        Did he indicate to you whether or not he

149

1    understood those things?

2  A   Yes.  He understood those.  I was very confident of

3    that.

4  Q   And did he agree to speak with you?

5  A   Yes.

6  Q   What happened then?

7  A   I spoke with Mr. McBurney for several minutes umm ---

8    at which time he had explained to me that there was an

9    incident where he had dropped Nicholas while he was

10    caring for him and that Nicholas had fallen onto the

11    ground and that their (coughing) excuse me, their

12    apartment was a carpeted cement floor.  And that

13    Nicholas had hit his head on the back of the --- on

14    the back of his head onto the cement carpeted floor.

15    He then --- I then asked him, 'If he told anyone about

16    that.'  He then informed that he did not tell anyone

17    about the --- about the fall.  And then the next day

18    Christa Kennedy and there was another family member

19    which I don't recall, had mentioned to me the comment

20    that his head was swollen and that he did not tell his

21    wife that he had dropped the child at that time.

22  Q   Now Christa Kennedy was Nicholas's mother?

23  A   Christa Kennedy was the biological mother of Nicholas,

24    and is currently.

25  Q   Okay.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          And uh --- were, if you know, were Mr. McBurney

2          and Ms. Kennedy married at that point?

3     A    It's was my understanding that they were boyfriend and

4          girlfriend.

5     Q    Okay.

6          And did he tell you how old Nicholas was when he

7          allegedly accidentally dropped him?

8     A    I believe it was approximately a month-and-a-half old.

9     Q    Did he tell you how far Nicholas had allegedly fallen?

10    A    Two to three feet.

11    Q    After you talked about this alleged incident, what

12         happened next in the interview?

13    A    Umm --- Mr. McBurney continued to sit in the chair.

14         He was upset.   He hadn't began crying yet but he was

15         looking down.   He was acting umm --- like there was

16         more --- more to speak about.   Often when you do

17         interviews, some will start to talk to you and they'll

18         tell you a portion of a --- of a event and then

19         they'll stop and they'll hesitate.   If you give them

20         time or if you ask them, 'Is there more information

21         that we need to speak of', after waiting several

22         minutes often they will explain additional facts that

23         took place in the incident.   And then you'll have

24         various points again where you'll stop.   And it's

25         like the tip of an iceberg where you keep going each

151

1       time there's a pause.    And we had paused for a

2       moment.

3   Q   So you did pause in this case?

4   A   There was a slight pause when Mr. McBurney --- and

5       then subsequently I had made reference to him that we

6       needed to know all the information for the doctors so

7       that we could get Nicholas some help.    And then at

8       that point umm --- he started crying.    And then he

9       explained some other events that took place up on the

10      day that the child stopped breathing.

11  Q   What did he say?

12  A   He explained to me that he came home from his midnight

13      shift.    And then while on his midnight shift, excuse

14      me, once he was home from his midnight shift, his wife

15      was getting, or excuse me, Christa was getting ready

16      to leave for work and that she turned over the child

17      to him.    It was in the area of about seven a.m.

18      (7:00am).    And that he took over the normal caring of

19      the child which entailed at that time giving him a ---

20      a bottle.    He explained to me that uh --- Nicholas

21      was upset and was crying and that he was trying to

22      give him a bottle.    And that he was walking around

23      the apartment and he was bouncing him on his knee ---

24      on his --- bouncing him while he was giving him a

25      bottle.    Excuse me.

152

1   were. He then explained that Nicholas wouldn't stop

2   crying.   That he got upset.   That he was frustrated

3   and that he began shaking and bouncing the baby,

4   Nicholas.   At which point Nicholas went limp, stopped

5   breathing.   Subsequently Northville Township --- he

6   called Northville Township Police Fire and Rescue and

7   the emergency staff responded and subsequently took

8   Nicholas to an emergency facility.

9  Q   Did you talk to the Defendant about whether or not his

10      bouncing and shaking of the baby was too hard?

11 A   Yes Ma'am.

12 Q   And what did he say?

13 A   He advised me that he --- that it was harder than

14      Christa had done and that he knew that the bouncing,

15      shaking, and it's in my report, but that his actions

16      caused the injury to his son.   He then subsequently

17      completed another written statement and put it into

18      his own words.

19 Q   And do you have both of those written statements with

20      you?

21 A   Yes I do.

22          MS. POPE-STARNES:   May I approach the

23      witness, Your Honor?

24          THE COURT:   You may.

25          THE WITNESS:   Would you like me to remove

153

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      them?

2                     MS. POPE-STARNES:   Yes please.

3                     THE WITNESS:   The statement from his

4      apartment and the statement from his confession at

5      Northville Township Police Department.

6                     MS. POPE-STARNES:   Please let the record

7      reflect that I'm showing Counsel People's Proposed

8      Exhibits 7 and 8.

9                     May I approach the witness again, Your

10     Honor?

11                    THE COURT:   You may.

12     **(By Ms. Pope-Starnes, continuing)**   Sir, I'm showing you

13         what now has been marked as People's Proposed Exhibit

14         7.   Do you recognize that?

15  A    Yes Ma'am.

16  Q    And what is that?

17  A    That's Mr. McBurney's initial statement at his

18         residence in the Northridge Apartment complex.

19  Q    And has this been altered in anyway?

20  A    No Ma'am.

21  Q    It's a fair and accurate copy of the statement that he

22         gave you on or about March second of nineteen-ninety-

23         eight (1998)?

24  A    Nineteen-ninety-eight (1998), yes Ma'am.

25  Q    Thank you.

                            154

1         I'm showing you now what's been marked as

2    People's Proposed Exhibit 8 and ask you if you

3    recognize that?

4  A    Yes Ma'am, I do.

5  Q    And what is that?

6  A    This is the second written statement that Mr. McBurney

7    made.  This one was at Northville Township Police

8    Department in one of our offices.

9  Q    And is it a fair and accurate copy of that statement?

10  A    Yes it is.

11  Q    Has it been altered in anyway?

12  A    No.

13         MS. POPE-STARNES:  I would move for the

14    admission of People's Proposed Exhibit 7 and 8 as

15    People's Exhibit 7 and 8.

16         THE COURT:  Recognizing the fundamental

17    objection, anything else beside that?

18         MR. WHITE:  No.

19         THE COURT:  Okay.  And that objection is

20    preserved and I'll admit the Exhibits.

21         MR. WHITE:  Thank you.

22         MS. POPE-STARNES:  May I have just one

23    moment please, Your Honor?

24         THE COURT:  Yes.

25     (Whereupon a brief delay was had.)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

```
 1                        *  *  *

 2             MS. POPE-STARNES:    Thank you.    I have no

 3        other questions.

 4             THE COURT:    Thank you.

 5          Mr. White.

 6                   CROSS-EXAMINATION

 7  BY MR. WHITE:

 8  Q    Detective?

 9  A    Yes, Sir.

10  Q    Uh --- March of two-thousand-nine (2009) --- March of

11       nineteen-ninety-eight (1998), you had been a detective

12       approximately six months, isn't that true?

13  A    It was the end of nineteen-ninety-seven (1997) is when

14       I became --- very close, yes Sir.

15  Q    Okay.

16          The end of nineteen-ninety-seven (1997) you

17       became a detective for Northville.    This is March

18       second, nineteen-ninety-eight (1998)?

19  A    That's correct.

20  Q    So just a few months you were a detective at this

21       point?

22  A    Yes Sir.

23  Q    So is it a fair statement that this is your first big

24       case?

25  A    I would say that's a fair statement, yes Sir.

                          156
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Q    And umm --- is it a fair statement that umm --- you

2         never interviewed Christa Kennedy other than at the

3         hospital, correct?

4    A    That's incorrect Sir.

5    Q    Okay.

6         And when did you interview Christa Kennedy?

7    A    I did not interview Christa Kennedy at the hospital.

8         I interviewed Christa Kennedy at Northville Township

9         Police Department.

10   Q    And when did you do that?

11   A    That was as the investigation went on.   I don't know

12        the specific date but it was subsequently after I

13        interviewed Mr. McBurney.

14   Q    And when was that date?

15   A    I have the records but the date off the top of my

16        head, I can pull them up for you if you'd like, but it

17        was after his interview and statements.   I then

18        interviewed his mother-in-law as well.

19   Q    Isn't it true you did not interview Christa Kennedy

20        until March thirty-first (31st), nineteen-ninety-eight

21        (1998), isn't that true?

22   A    I would need to see the records to fairly give you an

23        answer on that but ---

24   Q    (Interposing)   Okay.

25        Go ahead and look at your file.

                           157

1   A   Do you want to provide them to me or ---

2   Q   (Interposing)   Where's your ---

3   A   (Interposing)   I can open my file.

4   Q   Yeah.   Go ahead.   I assumed you had your file.

5           THE COURT:   Go ahead.   That's fine.

6       I do appreciate that you didn't dig into it until

7      someone tells you to.   All right, so go ahead.

8           THE WITNESS:   Give me one moment please.

9      It is a large file with many records.

10  Q   **(By Mr. White, continuing)**   Okay.

11  A   One moment Counselor, I do have it in some order here.

12  Q   All right.

13  A   Can I set this on your desk?

14          THE COURT REPORTER:   Sure.

15          THE WITNESS:   Counselor, you are correct.

16     I did do interviews on Linda Kennedy and Christa

17     Kennedy on the thirty-first (31st).   March thirty-

18     first (31st), nineteen-ninety-eight (1998).

19  Q   **(By Mr. White, continuing)**   In fact, they weren't

20     even interviews, were they?   You were really just

21     collecting evidence against Steven McBurney, isn't

22     that true?

23  A   No Sir.   That is not true.

24  Q   Now the questions you asked them on that date really

25     had to do with Steven McBurney as a suspect of your

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       investigation, isn't that true?

2    A  Well Sir, I'm looking at the first question.   It

3       says, 'Was Nicholas ---

4    Q  (Interposing)   No.   I'm asking if it was true or

5       not?   Answer my question.

6    A  Can you ask it again?

7    Q  Isn't it true Officer, that the only reason you asked

8       Linda Kennedy and Christa Kennedy any questions in

9       your con --- your investigation was the only suspect

10      was Steven McBurney?

11   A  I was doing this at direction of the Wayne County

12      child abuse Prosecutor.

13   Q  'Yes' or 'No' Sir?

14   A  The answer is no.   I was told to do an investigation

15      so I did it.   You're confusing me with your

16      terminology Sir.

17   Q  Okay.

18          Which part --- what is there a word you don't

19      understand?

20              THE COURT:   Just let's --- let's just

21      rephrase or go ahead and ask it again.

22   Q  **(By Mr. White, continuing)**   You had no --- you had at

23      this point on March thirty-first (31st), nineteen-

24      ninety-eight (1998), twenty-nine (29) days after you

25      interviewed Steven McBurney is the first time that you

1      interviewed Christa Kennedy and Linda Kennedy?

2                    MS. POPE-STARNES:   Objection.   Asked and

3      answered.

4                    THE COURT:   I'll allow it.   I'll allow it.

5                    THE WITNESS:   That is a correct statement,

6      Sir.

7  Q   **(By Mr. White, continuing)**   Okay.

8          Now when you went to Steven McBurney's house on

9      March second, nineteen-ninety-eight (1998), you went

10     with a uniformed police officer, correct?

11 A   Yes Sir.

12 Q   You went at three-thirty (3:30) in the afternoon,

13     right?

14 A   Yes Sir.

15 Q   Okay.

16 A   Approximately.

17 Q   And you were there to talk to the parents regarding a

18     suspected abuse case?

19 A   That's correct.

20 Q   And you talked to the father?

21 A   Yes.

22 Q   On that day twice?

23 A   Yes.

24 Q   And yet you didn't talk to the mother until twenty-

25     nine (29) days later?

                              160

1   A   That's correct.   The mother ---

2   Q   (Interposing)   And the other caregiver, Linda Kennedy

3       the grandmother, until twenty-nine (29) days later,

4       correct?

5   A   That's correct.

6   Q   Okay.

7       Now we know that when you interviewed Steve at

8       his house on March second at approximately three-

9       thirty (3:30) in the afternoon, that he was answering

10      your questions, correct?

11  A   Yes.

12  Q   And umm --- wasn't under arrest?

13  A   That's correct.

14  Q   He was being cooperative with you?

15  A   That's correct.

16  Q   And that he gave you voluntarily a written statement?

17  A   Yes Sir.

18  Q   And the written statement was how long into the

19      interview?   How long did that take?

20  A   The interview was --- was short.   We were sitting at

21      the kitchen table.   Time is hard for me to give you a

22      fair answer after this amount of time but it was a

23      short interview I did with him.   And it was a short

24      written statement.   That's the fairest statement I

25      can make to you Sir.

                        161

1  Q   Okay.

2      And umm --- after he wrote out his statement?

3  A   Yes Sir?

4  Q   You went over it?

5  A   Yes.

6  Q   Okay.

7      You went over it with him, correct?

8  A   Yep.   And he actually signed --- they sign the bottom

9      of the statement form.

10 Q   You put a time on it, correct?

11 A   Uh --- my understanding, yes.

12 Q   Okay.

13     And then you left his house and you went back to

14     the Northville Police Department, correct?

15 A   Uh --- yep, subsequently.   Yeah.

16 Q   Okay.

17     And you gave him a card?

18 A   I ---

19 Q   (Interposing)   A card?

20 A   I wouldn't argue that.   I probably gave him a card.

21 Q   You said, 'Call me if you have anything else to add',

22     correct?

23 A   That would be a normal course of an investigator or

24     police officers so I'd say that's a fair statement.

25 Q   Okay.

162

1      And he called later on that evening, correct?

2  A    Yes Sir.

3  Q    Okay.

4      And when he called you he told you that he had --

5      - he remembered another incident.    He told you on the

6      telephone, isn't that true?

7  A    It's my understanding that he told me he had something

8      else to tell me.    And he might have made reference to

9      another incident.    This was ten years ago but he

10     wanted to come see me is what --- what stuck in my

11     mind.

12  Q   He told you about another incident which he dropped --

13     - he remembered that he dropped Nicholas?

14  A   He told me that he wanted to talk about another

15     incident.    I cannot remember the specifics to the

16     conversation because he was going to come see me at

17     the police department.    He was the one who wanted to

18     have the additional interview.    So I cannot remember

19     after ten years a five minute phone conversation.

20  Q   But it is possible that he told you that he had

21     something else to tell you, correct?

22         MS. POPE-STARNES:    Objection.    Asked and

23     answered Your Honor.

24         THE COURT:    The Court sustains that.

25  Q   **(By Mr. White, continuing)**    Now when he told you ---

                          163

Case 2:11-cv-12046-VAR-MKM  ECF No. 8-14, PageID.1582  Filed 11/17/11  Page 165 of 225

```
 1        when he wrote out his written statement at the
 2        apartment, he told you about tripping over the gate
 3        with Nicholas, correct?
 4    A   He made reference to that and then he actually wrote
 5        it in his statement.   That's kind of where this
 6        conversation stemmed from that.
 7    Q   Okay.
 8            Somehow you didn't include it in your police
 9        report, did you?
10    A   Well the written statement is part of my police
11        report.
12    Q   Did you include it in your police report?
13    A   The written statement is part of ---
14                MS. POPE-STARNES:   (Interposing)
15        Objection.   Asked and answered.   He has said, 'The
16        written statement is a part of his police report.'
17                THE COURT:   Okay.
18            And Officer, you've got to stop talking when the
19        Prosecutor interrupts.
20                THE WITNESS:   I'm sorry.
21                MS. POPE-STARNES:   Your Honor I apologize.
22        I think I interrupted him in an attempt to get my
23        objection on the record.
24                THE COURT:   Okay.
25            Well, it's always the --- it's tough for the
```

164

```
1    witness but it's kind of your job to stop talking
2    whenever someone stands up.
3         Let's move on.
4  Q  (By Mr. White, continuing)   The narrative portion of
5    your police report, you have a narrative portion?
6  A  Yes.   The narrative ---
7  Q  (Interposing)   Did you describe certain things that
8    happened on March second, approximately three-thirty
9    (3:30) in the afternoon at his apartment, correct?
10 A  Now you're accurate Counselor.   And the narrative
11   does not have that portion ---
12 Q  (Interposing)   Well wait a minute.   Just answer my
13   question.
14        You described things in your narrative report,
15   correct?
16 A  There are things that I described in my narrative
17   report that I'm not allowed to speak of to follow the
18   guidelines of this Court.   I can speak them if you
19   would like.
20        MR. WHITE:   Judge, I ask the witness to
21   quit this.
22        Just answer the question.
23        THE COURT:   I got it.   I got it.
24        If you can answer it 'Yes' or 'No' just do it
25   that way, if you can.
```

1          Go ahead and ask it again.

2    Q    **(By Mr. White, continuing)**    Isn't it true that you

3         wrote out a narrative portion of your police report?

4    A    Yes.

5    Q    Okay.

6          And isn't it true that the narrative portion

7         included events that occurred in this apartment at

8         three-thirty (3:30) in the afternoon?

9    A    Yes.

10   Q    And isn't it true that the narrative portion of your

11        police report does not reference Steve's statements to

12        you about drop --- falling over the gate with

13        Nicholas?

14   A    The narrative portion, you are correct Sir.

15   Q    Thank you.

16         Now when he came into the apartment --- excuse

17        me, came into the department, you were --- you were

18        aware that he was coming in because he called you and

19        told you?

20   A    Yes Sir.

21   Q    And he told you he was on his way, correct?

22   A    Yes Sir.

23   Q    And when you received that phone call you went and got

24        some kind of recording device, correct?

25   A    No Sir.

1    Q    You didn't?

2    A    No.

3    Q    Didn't have any kind of tape recorder or anything?

4    A    No Sir.

5    Q    A person who is coming to your department and to be --

6         - to make a, what you believe, to be a possibly

7         incriminating statement and you made no attempt to get

8         any kind of video or audio recording device?

9    A    No.   At that time in nineteen-ninety-eight (1998) we

10        did not have ---

11   Q    (Interposing)   That's a 'Yes' or 'No' answer Sir.

12   A    No.   I did not have that type of equipment.

13   Q    In nineteen-ninety-eight (1998)?

14   A    I did not have that type of equipment in Northville

15        Township Police Department.

16   Q    Absolutely sure of that?   Absolutely sure Detective?

17             MS. POPE-STARNES:   Objection.   Asked and

18        answered.

19             THE COURT:   Sustained.

20   **Q    (By Mr. White, continuing)**   You remember when you

21        testified before Officer in this case?

22   A    Several times, yes Sir.

23   Q    Okay.

24        Let me direct your attention to Tuesday, June

25        thirtieth (30th), nineteen-ninety-eight (1998).

                              167

1          MS. POPE-STARNES:   Objection.   There is a

2    reciprocal discovery order in this case.   I have not

3    been provided with this.

4          MR. WHITE:   I'm not using it as evidence.

5    It's for impeachment.

6          THE COURT:   I don't know what the question

7    is.

8          MR. WHITE:   My question is, 'Do you

9    remember testifying in this case', prior to ---

10         THE COURT:   (Interposing)   Come on up

11   folks, Counsel.

12   (Whereupon a discussion was held at the Bench out of

13   hearing of the Jury and the Court Reporter.)

14                    *  *  *

15         MS. POPE-STARNES:   I'm so sorry.

16         THE COURT:   It's okay.   It's okay.

17         MR. WHITE:    My question was ---

18         THE COURT:   (Interposing)   I won't say

19   anything for the record about your face being red.

20         MS. POPE-STARNES:   Beet red?

21         THE COURT:   You're all right.   You're all

22   right.

23      Go ahead Mr. White.

24   Q   **(By Mr. White, continuing)**   Let me refresh your

25   recollection.

                              168

1           My question was, 'On June thirtieth (30th),

2     nineteen-ninety-eight (1998),' line twenty-two (22),

3     page thirty-six (36), 'Knowing that he was there to

4     discuss this incident you ---

5               THE COURT:   (Interposing)   Hold on.

6     Gotta go ---

7               MR. WHITE:   I'm sorry.   I'm sorry.   Let

8     me start again.

9               THE COURT:   Got to go slow.

10   Q   **(By Mr. White, continuing)**   Question.

11         'Knowing that he was there to discuss this

12     incident ---

13               MS. POPE-STARNES:   (Interposing)

14     Objection.

15   Q   **(By Mr. White, continuing)**   you made no pretense ---

16               MS. POPE-STARNES:    (Interposing)

17     Objection.

18               THE COURT:   Hold on.   Hold on Mr. White.

19   Q   **(By Mr. White, continuing)**   to try to record ---

20               THE COURT:   Hold on.

21         Since it's a reading from something, go ahead.

22     Let me hear the objection first.

23               MS. POPE-STARNES:   He said, 'No'.   he

24     should be giving him an opportunity to look at this

25     document first.

169

1          MR. WHITE:    I don't have to under Court

2     rules.

3          MS. POPE-STARNES:    It would be the Rules of

4     Evidence that would apply to this Your Honor.    And I

5     believe that he does.

6          MR. WHITE:    With the Rules of Evidence ---

7          THE COURT:    (Interposing)    Let me hear

8     your question first before you start reading from

9     that.    What's the question that you're asking?

10         MR. WHITE:    I asked him before, several

11    times, did he make any attempt to record the --- the

12    interview knowing that Steven was coming there to

13    possibly make, what he believed to be, incriminating

14    statements.    And his answer was 'No'.    Back in

15    nineteen-ninety-eight (1998) he had no recording

16    devices.    My question was asked previously as prior

17    testimony.

18         THE COURT:    All right.    I ---

19         MR. WHITE:    (Interposing)    I'm going to

20    now read his prior testimony.

21         THE COURT:    Before you do so, I'll give him

22    the opportunity --- I respectfully direct you to give

23    him the opportunity to take a look at it Mr. White.

24    Your objection is noted that it's not required under

25    the rules, but I find that it is.

                           170

1          MR. WHITE:    I will respect the Court's

2    ruling.

3          THE COURT:    Thank you.

4          MR. WHITE:    I'll approach if I may?

5          THE COURT:    Please do.    Yes you may.

6       Just read it to yourself.

7          THE WITNESS:    Yes, Sir.

8       Just that page Sir?

9    Q    **(By Mr. White, continuing)**    No.    See if it goes over

10        to the next page.

11   A    Okay.    Yes Sir.

12        I read it right here, (indicating).

13   Q    So when I asked you in nineteen-ninety-eight (1998)

14        whether you tried to make any recording of it, you did

15        try didn't you?

16   A    I had a hand-held tape recorder from your testimony,

17        that I said in nineteen-ninety-eight (1998).

18   Q    Okay.

19        So you did, right?

20   A    Yes.

21   Q    We can agree that you made an attempt to try to record

22        this interview, correct?

23   A    Yes.    From my comments in Court there, yes Sir.

24   Q    Okay.

25        And you weren't able to record this isn't that

171

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1      true?

 2   A  That's true.

 3   Q  Okay.

 4   A  From my ---

 5   Q  (Interposing)   You put this recorder supposedly in

 6      your pocket but somehow you forgot to put a tape in or

 7      have the tape turned over, is that your testimony?

 8   A  I'm going strictly by what the documents you presented

 9      me which were from some Court proceeding that I had

10      been in previously.   And ---

11            THE COURT:   (Interposing)   Let me do it

12      this way if you could.   Just take a minute and just

13      kind of digest what you read and see if that refreshes

14      your recollection about the date that this interview

15      took place.   See it that just helps you or if that's

16      --- if you're just kind of ---

17            THE WITNESS:   (Interposing)   Your Honor,

18      I'm going strictly by what the written word is on this

19      document.   And there was something about that it had

20      turned off.   I would have to see that again and I can

21      tell you that once I see some --- that it turned off

22      during the interview.   I thought that's what I had

23      said and you had written in there.

24   Q  (By Mr. White, continuing)   Well I didn't write it in

25      there.
```

172

1    A    Excuse me.   You are correct Sir.

2    Q    Do you have independent recollection of this?

3    A    I don't have independent recollection and I'm very

4         sorry.

5    Q    Okay.

6              So you could recall that you didn't have one, now

7         that you know that you did, you can't recall, right?

8                   MS. POPE-STARNES:   Objection.   It's

9         argumentative Your Honor.

10                  THE COURT:   It's a little bit off.

11        Rephrase it.

12   Q    **(By Mr. White, continuing)**   Sir, I asked you back in

13        nineteen-ninety-eight (1998) if you tried to record

14        something and you responded, 'Yes you did', correct?

15   A    (No verbal response.)

16                  THE COURT:   Which time?

17             At that prior proceeding or today?

18   Q    **(By Mr. White, continuing)**   No.   When I asked him

19        back in nineteen-ninety-eight (1998) whether he tried

20        to record the interview with Steven McBurney at

21        Northville Township Police Department, approximately

22        seven-thirty (7:30) at night, you indicated 'Yes, you

23        did try to record', correct?

24   A    Yes, per that document.

25   Q    Okay.

173

1          And that the transcript of your prior testimony

2      indicates that for some reason the recording didn't

3      take place, correct?

4   A   That's correct.

5   Q   And that that the tape was somehow not sitting in the

6      tape recorder right, correct?

7   A   I didn't see that in the written but if you show it to

8      me I'll gladly review it.

9          MR. WHITE:   If I may approach Judge?

10          THE COURT:   You may.

11          THE WITNESS:   Do you know the line

12      Counselor?

13   Q   **(By Mr. White, continuing)**   Just, just read the page.

14      And I think it might go over to the next page so if

15      you want to just ---

16   A   (Interposing)   Okay.

17   Q   So when I go back you need to see it all.

18   A   The highlighting on this one, the second page?

19   Q   Okay.

20          I don't know.   That's my highlighting so if

21      there's anything else you think of interest just go

22      ahead and read it.

23   A   Well Sir, it's been ten years I would need to read

24      this whole document to tell you fairly about it.    I

25      mean, if you tell me the number, I will gladly answer

174

1    the question.

2              THE COURT:   Where --- do you know where the

3    information is located?

4              THE WITNESS:   I've read two-and-a-half

5.   pages.

6              THE COURT:   Go ahead.

7              THE WITNESS:   This is a large document.

8              MR. WHITE:   He needs to read it because I'm

9    going to ask him some more questions.

10             THE COURT:   How about we do this?

11        Can you --- all right.   Do you have a bit more

12   to go on other matters with this witness?

13             MR. WHITE:   But they're all going to ---

14             THE COURT:   (Interposing)   Okay.   All

15   right.

16             MR. WHITE:   So maybe he can, you know,

17   because we're going to be back and forth like this

18   forever.   So maybe we can take a break.   He can read

19   it and then come back.

20             THE COURT:   All right.   We'll go a little

21   bit earlier than we normally would but we'll do it

22   that way.   I think it might be quicker if we go this

23   way.

24             MR. WHITE:   I do too.

25             THE COURT:   We'll take a short recess.

                        175

1    Ladies and Gentlemen, please don't talk about the

2    case, okay?

3         All rise for the Jury.

4         You can start working your way out there.

5    Hopefully Jeff will be out there waiting for you.

6    (Whereupon the Jury was returned to the Jury room at

7    3:00pm.)

8                        *  *  *

9         THE COURT:   The record will reflect that

10    the Jury is excused.

11         Barb are you all right?

12         Do you want to bring him down for a break while

13    you go do this, all right?

14         A VOICE:   Sure.   Thank you.

15         THE COURT:   You know, let us call you

16    because there's a couple of them are down there on

17    break.

18         (Whereupon a recess was had.)

19                        *  *  *

20         THE CLERK:   The Court calls People versus

21    McBurney, case number 07 214651 FC.

22         THE COURT:   Ms. Pope-Starnes, Mr. White

23    your appearances are noted for the record.

24         Mr. McBurney is back.

25         MS. POPE-STARNES:   Your Honor, during the

                        176

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    break our investigator brought the disc from the

2    University of Michigan Hospital.   There's three of

3    them.   They've actually included more than what we

4    needed but what was needed is in here.

5              THE COURT:   Okay.

6              MS. POPE-STARNES:   So we've agreed that

7    we're going to include them with all the other written

8    medical records in People's Exhibit 1.

9              THE COURT:   Okay.

10             MR. WHITE:   Agreed.

11             THE COURT:   Okay.   Very well.

12        So now Exhibit 1 is a complete set of the

13   documents and information.

14             MS. POPE-STARNES:   Yes.

15        The issue then is the line that ---

16             THE COURT:   (Interposing)   Oh.

17             MS. POPE-STARNES:   (Continuing)   the two

18   words were struck from that Defense Counsel was not

19   satisfied with how the line read.

20             THE COURT:   Can you guys work on that?

21   And if I've got to make a decision on it I will but it

22   seems like something we could ---

23             MS. POPE-STARNES:   (Interposing)   Yeah.

24   We haven't addressed it yet.

25             THE COURT:   Okay.   Very well.

                          177

1          MR. WHITE:   Yes.   We'll work on it.

2          THE COURT:   All right.

3      And we'll bring in the Jury I think.   Be right

4   there.   Yeah, I left my file back there too.

5      Go ahead, bring them in Jeff.

6          THE CLERK:   Okay.

7      Please rise for the Jury.

8   (Whereupon the Jury was returned to the courtroom.)

9          THE COURT:   Good afternoon everyone.

10   Thank you.

11      The record will reflect that the Jury is back.

12   The case has been called.   Counsels' names have been

13   noted and the witness is back on the stand.

14      You are reminded Sir you're still under oath and

15   required to testify truthfully and honestly.

16      You may all be seated.

17      Mr. White, you may proceed.

18   **WHEREUPON SERGEANT PAUL SUMNER HAVING BEEN PREVIOUSLY**

19   **SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING**

20   **BUT THE TRUTH WAS EXAMINED AS FOLLOWS:**

21              **CONTINUED CROSS-EXAMINATION**

22   **BY MR. WHITE:**

23   Q   Now Detective Sumner, you took a break.   I gave you

24      my copy of the transcript which was highlighted.   And

25      you had an opportunity to review some of it, isn't

                          178

1    that true?

2  A    I reviewed a portion of it, yes.

3  Q    Okay.

4        And does that refresh your recollection to some

5    degree about your prior testimony?

6  A    Strictly from the written word on these documents.

7  Q    And uh --- does it refresh your recollection about you

8    having a tape recorder on March second, nineteen-

9    ninety-eight (1998) at the Northville Township Police

10    Department?

11  A    Yes.

12  Q    And, in fact, you did have a tape recorder?

13  A    Per my statement here, yes.

14  Q    Okay.

15        And you did put it in your front pocket?

16  A    Can you tell me what page so I can go along with you

17    Sir?

18  Q    Uh --- first of all let me ask you this.

19        Just tell me if you can remember okay?

20  A    I can't remember that Sir.   I'm trying to be honest

21    with you.   This is a lot of paper to remember in

22    twenty (20) minutes.

23  Q    And the reason you had a tape recorder was to tape Mr.

24    McBurney's statement, correct?

25  A    I don't remember if I had a tape recorder without

179

1    reviewing this document.

2            THE COURT:   Can you think of any other

3    reason why you'd have it other than that reason?

4    Just ---

5            THE WITNESS:   (Interposing)   I would have

6    a tape recorder if I was going to deal with a person

7    that I might have it for a statement.   I might not.

8    It was not a requirement.

9            THE COURT:   Okay.

10           THE WITNESS:   But specifically I can't tell

11   you.

12           THE COURT:   You don't remember that's fine.

13           MS. POPE-STARNES:   Your Honor, if I may?

14           THE COURT:   Yes?

15           MS. POPE-STARNES:   Excuse me.   I think

16   what he's indicating is that he does not have an

17   independent recollection.

18           THE COURT:   I get --- and I think that's --

19   - go ahead, Mr. White.

20           MR. WHITE:   Well then all he's got to do is

21   say that.

22           THE COURT:   Yep.

23       I know what you're saying.   You're looking at

24   the notes and you're not disputing it.   But he's

25   asking of you to make a recollection about the actual

                          180

1    time that you interviewed Mr. McBurney.   And if you

2    don't remember, you don't remember.   That's all.

3              THE WITNESS:   Your Honor, just one

4    statement is that I need to know if we're referring to

5    this or for referring to my independent memory or this

6    is ---

7              THE COURT:   (Interposing)   Your

8    independent memory.

9              THE WITNESS:   Okay.   But each time we keep

10   flipping back and forth to these documents.

11             THE COURT:   Fair enough.   Okay.

12        Just characterize accordingly each question, Mr.

13   White.

14             MR. WHITE:   Okay.

15   Q   **(By Mr. White, continuing)**   So uh --- you don't

16   remember having the tape recorder but your review of

17   the transcript helped you remember, right?   Is that a

18   fair statement?

19   A   Yes Sir.

20   Q   Okay.

21        And the reason why you had a tape recorder would

22   be to tape his statement, correct?

23   A   That --- that would be a reason, yes Sir.

24   Q   A reason.

25        And a reason why you as a police officer would

181

1      tape someone's statement would be to make sure that

2      you have an accurate statement?

3    A  That would be a reason Sir.

4    Q  Okay.

5         And that if you needed to use it at a later point

6      in time there would be no dispute as to its

7      completeness and its accuracy, is that a fair

8      statement?

9    A  That's a fair statement also.

10   Q  Okay.

11        And even possible use in Court at some point,

12     correct?

13   A  Yes Sir.

14   Q  So there's no dispute as to what you thought he heard

15     --- you thought he said and what he said, correct?

16   A  That's correct.

17   Q  So that would be the best evidence of a person's

18     statement, it being recorded in some kind of

19     electronic means, by some electronic means, true?

20   A  That's a judgment question Sir but it would be --- it

21     would assist us.

22   Q  Okay.

23        And certainly now, let's say ten years later,

24     that had you recorded it you'd be able to just listen

25     to the recording, true?

182

1  A    That's true.

2  Q    Okay.

3       And the reason why the tape recorder didn't work

4       is because you didn't turn the tape over.

5       First of all, let me ask you this Detective.

6       Do you remember that?

7  A    No.

8  Q    Okay.

9       And if I could ask you to look at page thirty-

10      seven (37), line seventeen (17).

11 A    Page thirty-seven (37), line sixteen (16), yes Sir.

12 Q    Okay.

13      Does that refresh your recollection?

14 A    Of what I testified to, yes Sir.

15 Q    And so is that a true statement that you --- that the

16      tape recorder did not work because you didn't turn the

17      tape over?

18 A    I testified that, 'I believe I didn't turn the tape

19      over.'

20 Q    Okay.

21      So but you had in your pocket the intent of

22      taping --- put it in there.   Knew Steve was coming.

23      Going to question him.   Didn't turn the tape over.

24      You only got parts of the recording, isn't that true?

25 A    That's correct.

183

1    Q    Okay.

2         And you didn't discover that until after Steve

3         left, isn't that true?

4    A    That's true.

5    Q    Okay.

6         So when you're taping someone and with a tape

7         recorder uh --- there would be no reason to take notes

8         at that point, isn't that true?

9    A    No.   I took notes.   I do remember that and from

10        reading this.

11   Q    You do remember by reading the highlighted portion of

12        my transcript?

13   A    Yes.    That's true.

14   Q    So you took notes even though you thought at the time

15        that you were tape recording him?

16   A    That's correct.

17   Q    Okay.

18        Now when he came in the off --- when he came in

19        the --- the police department, umm --- you said there

20        --- you took him in an office to interview him,

21        correct?

22   A    Yes Sir.

23   Q    Okay.

24        And he wasn't crying at that point?

25   A    No.

184

1  Q   He was upset?

2  A   He was upset.    There was ---

3  Q   (Interposing)    Agitated?

4  A   He was upset.

5  Q   Okay.

6      And umm --- indicated to you on the telephone he

7      had something to tell you about Nicholas, correct?

8  A   Uh --- from once again, from here (indicating), I did

9      make a statement what he told me on the telephone.

10     And I have to read that from here if you would like

11     it?

12 Q   No.    That's okay.

13     We agree that he called you?

14 A   Yes Sir.

15 Q   We agree that he called you to tell you that he wanted

16     to come in and talk about Nicholas?

17 A   Yes Sir.

18 Q   Okay.

19     We agree to that.    We don't agree whether he

20     told you that he was coming in to tell you that he

21     remembered another incident in which he dropped

22     Nicholas, okay?

23         MS. POPE-STARNES:    Objection Your Honor.

24     He testified before the break that he didn't remember

25     what was said in the phone call.    He's just now

185

1    testified that he sees what it says in the transcript

2    about what was in the phone call.   But he's already

3    earlier testified to that.   So this question is a

4    mischaracterization of the Sergeant's testimony.

5              THE COURT:   Let me ask you Sir.

6         Sir, let's go back in time not to this transcript

7    but to the phone call, okay?

8         We're both back in time.

9              THE WITNESS:   Okay.

10             THE COURT:   Not to be trite but back in

11   time there.

12             THE WITNESS:   Yes Sir.

13             THE COURT:   Can you remember the

14   conversation back and forth between you and the

15   Defendant?

16             THE WITNESS:   Other than he wanted to come

17   in, I cannot recall.

18             THE COURT:   Okay.   Other than that, okay.

19   Thank you.

20        Go ahead Mr. White.

21   Q    **(By Mr. White, continuing)**   How long were you in the

22   interview room with Mr. McBurney before Sergeant Worth

23   was brought in?

24   A    I have no independent memory how long I was in there.

25   He was in and out several times during the interview

                              186

1       if I recall.

2   Q   And isn't it true that Steven told you in that intrude

3       --- interview room that he had dropped Nicholas

4       approximately at the age of one-and-a-half months?

5   A   Yes.

6   Q   Okay.

7       That he had dropped him from his lap onto the

8       carpeted concrete floor of the apartment that you had

9       went to?

10  A   That's a true statement.

11  Q   Okay.

12      And that he told you that, 'It was an accident',

13      isn't that true?

14  A   That's a true statement.

15  Q   Okay.

16      And he told you that he was bouncing Nicholas on

17      his knee and that as he was bouncing him he dropped

18      him, true statement?

19  A   When he fell on the floor, I --- if memory serves me,

20      that's true Sir.

21  Q   Okay.

22      And he told you that on March, excuse me,

23      February twenty-seventh (27th), excuse me, the twenty-

24      second (22nd), three days or four days before March

25      second, the day you were interviewing him, during the

187

1        --- right before the nine-one-one (911) call, he told

2        you that Nicholas was fussy that day?

3    A    That's correct.

4    Q    Okay.

5             He told you that he tried to give Nicholas a

6        bottle?

7    A    That's correct.

8    Q    That Nicholas was taking the bottle and not taking the

9        bottle, correct?

10   A    That's correct.

11   Q    Okay.

12            And that he had Nicholas on his hip?

13   A    That's correct.

14   Q    And he was bouncing Nicholas, correct?

15   A    And shaking.

16   Q    Okay.

17            Did he say he was bouncing Nicholas?

18   A    Yes Sir, he did.

19   Q    And he said he was bouncing Nicholas and he was

20       bouncing him harder than Christa normally did?

21   A    He made reference to that, yes Sir.

22   Q    Okay.

23            Now you say that he said, 'Shaking', isn't that

24       true?

25   A    Yes Sir.

188

1    Q    Okay.

2         But we agree Officer that his written statement

3         says nothing about shaking, isn't that true?

4    A    That's correct.

5    Q    Okay.

6         And his written statement was prepared while you

7         were standing there, correct?

8    A    I can't recall if I stepped out while he was writing

9         it but I might have been in there.  Can't recall that

10        Sir.

11   Q    But you certainly had the opportunity to review his

12        written statement and ---

13   A    (Interposing)  Yes Sir, I did.

14   Q    (Continuing)  the conclusion?

15   A    Yes Sir, I did.

16   Q    Okay.

17        And you looked at it and then you told him to

18        sign it, isn't that true?

19   A    Yes.  I --- that would have been my normal procedure.

20   Q    Okay.

21        Put a time on it and a date on it?

22   A    I might have put the time on but --- but the time was

23        put on it, yes Sir.

24   Q    And put a date on it?

25   A    Yes Sir.

189

1  Q   And that was all done under your direction, your

2      telling him what to do, isn't that true?

3  A   With the exception of the written statement portion

4      but the date and times, if I wrote them or he wrote

5      them on the top of the statement form, yes.   I would

6      have either told him to or I would have put them in.

7  Q   So then we can agree then Officer that you must have

8      noticed on March second, nineteen-ninety-eight (1998)

9      that there was no reference to shaking in his written

10     statement?

11 A   No.   I had the statement that he provided to me and I

12     used it.

13 Q   I don't know if you understood the question.   And I

14     don't mean to cut you off, but, you must have noticed

15     on March second, nineteen-ninety-eight (1998), after

16     completing the written statement, and we put a time on

17     it and we put a date on it, there was no reference to

18     shaking in that written statement?

19 A   No, I did not notice that.

20 Q   Okay.

21     You did --- you had to prepare your police report

22     at that time right?

23 A   No.   On the interview days, no.

24 Q   Okay.

25     So you prepared your police report sometime

190

1    thereafter, right?

2  A   Yes Sir.

3  Q   After the completion of both --- both his written

4      statements?

5  A   Yes Sir.

6  Q   Okay.

7          You also testified today that he indicated that -

8      -- Steve indicated that he knew that his shaking and

9      bouncing caused the injuries to Nicholas, is that your

10     testimony today?

11 A   Slightly different but I think that it's his actions

12     caused the injury or something like that.

13 Q   His actions caused the injury?

14 A   Yes Sir.   If I remember correctly.

15 Q   We can agree that that was not --- that's not in his

16     written statement either is it?

17 A   I'd have to look at the statement.   There's something

18     referenced that.

19 Q   All right.

20         Look it up.

21 A   Uh --- they've been placed in the Exhibit Sir.

22         Fine.

23             THE COURT:    Somebody have it there?

24             MS. POPE-STARNES:    It's right here.

25             THE COURT:    All right.

                          191

1          If you just pass it up to him Ms. Pope-Starnes or

2     Mr. White?

3               MS. POPE-STARNES:   May I approach Your

4     Honor?

5               THE COURT:   Sure.

6               THE WITNESS:   Okay Counselor.

7   Q   **(By Mr. White, continuing)**   Isn't that true that the

8     statement that he bounced him, that the way his

9     actions, excuse me, let me rephrase that, that his

10    actions caused the injuries to Nicholas, that

11    statement is not there either, is it?

12  A   There is a statement here that ---

13  Q   (Interposing)   Where is it?

14  A   (Continuing)    exact terminology is not there if that

15    answers your question.

16  Q   Okay.

17      That caused the injuries to Nicholas, that's not

18    there either, is it?

19  A   He does not say, 'Caused.'   He uses different

20    terminology.

21  Q   He doesn't say, 'Caused the injuries to Nicholas'?

22  A   No.   It says different terminology.

23  Q   Just answer the question.

24  A   Okay.   No.

25  Q   Okay.

                          192

1       And did you notice that Officer on March second,

2       nineteen-ninety-eight (1998) at the Northville

3       Township Police Department?

4   A   No.

5   Q   That wasn't in there either?

6   A   No.  He used different terminology.

7   Q   Well let me ask you and just answer the question.

8       Did you notice it on that day?

9   A   Not that terminology, no.

10  Q   Okay.

11      Now the tarm --- terminology that you used is not

12      in that written statement, right?

13  A   The terminology that he wrote is what he wrote Sir.

14      You're kind of --- I'm confused.

15          THE COURT:   We got it.

16          MR. WHITE:   Okay.   Thank you.

17  Q   **(By Mr. White, continuing)**   The last sentence of that

18      statement can you read that?

19  A   Yes Sir, I did.

20  Q   Just read it to yourself.

21  A   Got it.

22  Q   You stood over him that night and you told him, 'You

23      better write something about the injuries or I'm going

24      to arrest you', isn't that true?

25          MS. POPE-STARNES:   Objection.   That is not

193

1    the testimony that this officer has given about what

2    happened.

3              THE COURT:    As to the form of the question,

4    Mr. White.    The 'Stood over him', I don't know, I

5    don't remember that.

6              MS. POPE-STARNES:    And threatened to arrest

7    him.    It's a complete mischaracterization of the

8    testimony and it's argumentative.

9              MR. WHITE:    Judge, Judge, is this cross-

10   examination?

11             THE COURT:    Go ahead.    Just rephrase.    Go

12   ahead.

13   Q    **(By Mr. White, continuing)**    Uh --- you stood over him

14   that night and you told him if he didn't complete

15   something about the injuries, that you would arrest

16   him, isn't that true?

17   A    No that's not correct.

18   Q    You didn't swear at him that night?

19   A    I don't recall if we swore back and forth or not Sir.

20   Q    Sergeant Worth didn't come in the room and start

21   yelling?

22   A    I --- Sergeant Worth came in the room and yelled at

23   me.

24   Q    In fact, he came in the room and started yelling at

25   Steven and hit the table so hard it knocked over the

194

1    pop, correct?

2  A  The pop fell over but the yelling was because I was

3     taking up that office and on overtime.   I can

4     remember that part.

5  Q  *So he didn't come in the room, start yelling at Steve,*

6     *use profanity, hit the table so hard that it knocked*

7     *over the pop, yelling at Steve, not you?*

8           MS. POPE-STARNES:   Objection.   Asked and

9     answered.

10          THE COURT:   Just noted.   Go ahead and just

11    answer it Sir.

12          THE WITNESS:   He was yelling at me.

13 Q  **(By Mr. White, continuing)**   He was yelling at you in

14    front of Steven?

15 A  That's fair.   That's true.

16 Q  If you look on page nine of the second day of the

17    transcript, July second, nineteen-ninety-eight (1998),

18    the bottom.

19 A  Is that after what the previous question or ---

20 Q  (Interposing)   July second, nineteen-ninety-eight

21    (1998),  which is the second part of the transcript.

22 A  Second part of the transcript.   Do you have a page

23    Sir?

24 Q  Page nine.

25 A  I believe I have it.

                        195

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   Okay.

2        Why don't you take a look at it?

3        Does that refresh your recollection?

4   A   Yes Sir.

5   Q   In fact, Sergeant Worth wasn't yelling at you was he?

6   A   No.   He did yell at me also about the overtime.   I

7       remember that part like it was yesterday.

8   Q   Okay.

9        So you remember that part?

10  A   Yeah.

11  Q   Okay.

12      But we now remember the other part too?   He was

13     also yelling at Steve wasn't he?

14  A   From what I testified here, I --- I --- he made some

15     comments.

16  Q   Sergeant Worth said, 'I know you didn't take your son

17     and drop him like this (indicating) on the table', and

18     that's the loudest.   He smacked his hand on the table

19     and the pop can fell over.   We picked up the pop and

20     that was it?

21  A   Yes.

22  Q   Okay.

23      Now how many pages of notes did you take that

24     evening?

25  A   I --- I don't recall now.

196

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   Okay.

2       And when you discovered your tape recorder was

3   turned off after the interview was over and you had

4   not taped anything other than an initial beginning,

5   you prepared your police report, correct?

6   A   Yes Sir.

7   Q   Okay.

8       And your police report has a narrative part, it

9   has a factual part about addresses, names, things like

10  that?

11  A   Yes Sir.

12  Q   Okay.

13      You had Steve's written statement, both of them,

14  at that time when you were preparing your narrative

15  report, isn't that true?

16  A   Yes Sir.

17  Q   Okay.

18      Did you make any further contact with Steve to

19  try to get any further information?

20  A   There were other points that I had contact with him

21  but I --- I don't believe I interviewed him anymore on

22  that.

23  Q   Thank you very much.

24          MR. WHITE:    Nothing further.

25          THE COURT:    Ms. Pope-Starnes.

                        197

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       **REDIRECT EXAMINATION**

2   BY MS. POPE-STARNES:

3   Q    Sergeant Sumner?

4   A    Yes Ma'am?

5   Q    *Since March of nineteen-ninety-eight (1998),*

6        approximately how many cases have you handled?

7   A    I couldn't fathom an answer on how many cases I've

8        been involved in and how many interviews I've done.

9   Q    Investigations, more than a hundred (100)?

10  A    Many more than a hundred (100).

11  Q    More than a thousand (1000)?

12  A    Many more than a thousand (1000).

13  Q    Do you have any idea many interviews you've conducted

14       since then?

15  A    I --- no.   I do interviews on a nightly basis.

16  Q    Since nineteen-ninety-eight (1998) have you done other

17       interviews with the person who back in nineteen-

18       ninety-eight (1998) was Sergeant Worth?

19  A    Uh --- a portion of that time.   He's not a sergeant

20       anymore but yes.

21  Q    Do you have independent recollection of all the

22       investigations and interviews that you do?

23  A    No.

24  Q    Okay.

25       As a part of the course of business do you write

198

1      a police report?

2   A   Yes.

3   Q   Okay.

4          And when you don't have an independent relection

5       --- recollection, do you use that police report?

6   A   Yes.   I have to refer to my --- my document.

7   Q   This transcript that you were presented with today,

8       had you ever seen it since that testimony in nineteen-

9       ninety-eight (1998)?

10  A   This document here (indicating), the only time I've

11      seen it is the fifteen (15) minutes I had to look at

12      it.

13  Q   Did you use the words bouncing and shaking in your

14      written narrative police report?

15  A   In the police report, yes Ma'am.

16  Q   How about the words umm --- about actions causing

17      injury to his son?   Did you use those in your police

18      report?

19  A   I believe that terminology is in my police report.

20  Q   Now I want to ask you a question about the interview

21      at the police station.   And let me know if you

22      remember or not.

23          The questions that Counsel was just asking you

24      about Sergeant Worth and hitting the table.   Do you

25      recall whether that was part of a demonstration or

                            199

1    that was done out of like temper or anger?

2  A  Umm --- after reading this, I do recall that the pop

3     was --- actually fell over.   And I believe at the

4     time he was mad about --- about me and overtime.   And

5     then from reading this he did make a comment to him

6     but I can't remember the specifics.   You know, I just

7     remember that I was getting yelled at.

8  Q  At the end of the evening did the Defendant walk out

9     of the door of the police station?

10 A  Yes.   I --- I told him that I would complete some

11    additional paperwork, send it to another jurisdiction,

12    and he left.

13 Q  Umm --- in nineteen-ninety-eight (1998), did your

14    department have a policy that required you to record

15    interviews?

16 A  No it does not.   Did not at that time.   Does not

17    today.

18 Q  And uh --- if you know, in nineteen-ninety-eight

19    (1998) was there any law that required you to record

20    interviews?

21 A  Nineteen-ninety-eight (1998) there was no law.   And

22    presently today, in Michigan, there is no law.

23 Q  Have you had other cases where you've asked people to

24    write out statements after you've conducted an oral

25    interview with them?

                        200

1   A    Numerous times.

2   Q    In the course of your experience as a police officer,

3        is it unusual for a person's details in a written

4        statement --- statement to be different from what

5        they've told you in an oral interview?

6   A    They are often different.

7   Q    If you recall, when you interviewed the Defendant at

8        the police station did you tell him what to write in

9        his statement?

10  A    No.   I don't do that.

11  Q    Did you tell him what to write in his statement that

12       he made to you at the apartment?

13  A    No.

14  Q    Thank you.

15            MS. POPE-STARNES:    I have no other

16       questions for this witness.

17            THE COURT:   Mr. White?

18            **RECROSS-EXAMINATION**

19  **BY MR. WHITE:**

20  Q    Do you remember that independently Detective that you

21       didn't tell Steve or is this just your usual policy?

22  A    I know I didn't tell him because I've never told

23       anyone what to write in a statement.   And I know I

24       didn't.

25  Q    Now in all your interviews you never told anybody one

                            201

1      thing to put in a written statement?

2   A   Other than if they want prosecution, that's it for

3      domestic violence cases.

4   Q   Okay.

5           MR. WHITE:    I have nothing further.

6           THE COURT:    Thank you.

7       Thanks Sergeant.   You're all set.   Thank you.

8      You may be excused.

9           MS. POPE-STARNES:    May this witness be

10      excused Your Honor?

11           THE COURT:    Yes.   Yeah.

12           MR. WHITE:    No objection.

13           THE COURT:    Okay.   Thank you.

14           MS. POPE-STARNES:    Your Honor, the People

15      would call Doctor Leena Dev.

16           THE COURT:    Ma'am, please raise your right

17      hand, face my clerk and be sworn in.

18           THE CLERK:    **Do you swear that the testimony**

19      **you are about to give will be the truth, so help you**

20      **God?**

21           THE WITNESS:    **I do.**

22           THE COURT:    Ms. Pope-Starnes, you may

23      proceed.

24           MS. POPE-STARNES:    May I have just a moment

25      Your Honor?

                           202

1          THE COURT:    Okay.

2             (Whereupon a brief delay was had.)

3

4                    * * *

5          D O C T O R    L E E N A    D E V

6     WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER

7     HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE

8     WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED

9     AND TESTIFIED AS FOLLOWS:

10                DIRECT EXAMINATION

11    BY MS. POPE-STARNES:

12    Q    Doctor would you please state your name and spell your

13         last name for the record?

14              THE COURT:    Would you please spell

15    whichever ones are going to be hard to spell?

16              THE WITNESS:    Do I need a microphone?

17              THE COURT:    No.    Just --- you need to

18    speak up really loud.

19              THE WITNESS:    Okay.

20              THE COURT:    And actually face that

21    (indicating) way.

22              THE WITNESS:    Okay.

23    L E E N A last name D E V.

24              THE COURT REPORTER:    Thank you.

25              THE COURT:    D E V.    Actually what I'll ask

                         203

1    you to do is just talk straight out so that way

2    everybody on this side can see and hopefully on the

3    other side too, okay?    Thank you.

4  Q   **(By Ms. Pope-Starnes, continuing)**    Are you employed

5    Ma'am?

6  A   Yes.

7  Q   How are you employed?

8  A   I'm the medical director of the child protection team

9    at the University of Michigan.

10 Q   Are you a medical doctor?

11 A   Yes.

12 Q   Where did you --- can you tell the Jury please where

13   did you attend medical school?

14 A   I received my medical degree at the University of

15   North Carolina, Chapel Hill.

16 Q   And what year did you receive that degree?

17 A   In nineteen-ninety-seven (1997).

18 Q   Did you complete a residency program?

19 A   Yes I did.

20 Q   And where did you do that?

21 A   I completed my pediatric residency at C.S. Mott

22   Children's Hospital in Ann Arbor in the year two

23   thousand (2000).

24 Q   Following the completion of your residency what work

25   did you do next?

204

1  A    I practiced as a general pediatrician for four years.

2       And after that I joined the child protection team in

3       February of two thousand and five (2005).

4  Q    And where did you work as a general pediatrician?

5  A    As a general pediatrician I worked in three places.

6       The first place was Oakwood Hospital in Dearborn,

7       Michigan.  And then Orchard Pediatrics in West

8       Bloomfield, Michigan.  And then two years at

9       Thundermist Health Center in Woonsocket, Rhode Island.

10  Q    Now Doctor Dev, can you tell the Jury please what

11       states you've held licenses to practice medicine in?

12  A    I've held a license to practice medicine in Michigan,

13       Rhode Island and North Carolina.

14  Q    And do you still currently hold all of those licenses?

15  A    No, I do not.

16  Q    Okay.

17       Which states do you still currently hold a

18       license in?

19  A    Michigan.

20  Q    And why do you no longer have licenses in the other

21       states?

22  A    I am not employed there and don't plan to be employed

23       there.

24  Q    What, if any, hospitals have you been affiliated with

25       besides the University of Michigan Hospital?

205

1   A   Umm --- I've been affiliated with Oakwood Hospital and

2       Health Assistance in Dearborn, Michigan.   With

3       Beaumont Medical Center in Royal Oak and Troy.   And

4       also with Landmark Medical Center in Woonsocket, Rhode

5       Island.

6   Q   Are you board certified?

7   A   Yes.

8   Q   In what area?

9   A   Pediatrics.

10  Q   And how long have you held that board certification?

11  A   Since two thousand and one (2001).

12  Q   Now Doctor Dev is there a board certification in the

13      area of child abuse?

14  A   No.

15  Q   Is there testing being developed for that?

16  A   Yes.

17  Q   And have you applied to be eligible for that testing?

18  A   There is no application at this time because there's

19      no actual test.

20  Q   Okay.

21          And uh --- when is that scheduled to begin, if

22      you know?

23  A   In twenty-thirteen (2013).

24  Q   Have you done any teaching?

25  A   Yes.

                              206

1  Q   Where?

2  A   At Oakwood Hospital and at the University of Michigan.

3  Q   Do you do any teaching outside of the hospital

4      setting?

5  A   Yes, I do.

6  Q   What type of teaching?

7  A   I teach the medical findings in child abuse to

8      protective service workers, to law enforcement and in

9      the past I've also done training for prosecuting

10     attorneys and attorney generals, all in Michigan.

11  Q   Approximately how many children do you see a year?

12  A   Uh --- approximately seventy-five (75) patients a

13     year, give or take.

14  Q   And as the director of the child protection team what

15     are your duties?

16  A   As director of the child protection team my duties are

17     to assist medical teams when there's cases of possible

18     concerns for abuse.  To help them figure out are

19     there other tests that need to be done to rule in or

20     rule out abuse.  I consult on cases that are

21     inpatient in the hospital when there's concern for

22     suspicious bruises, burns, fractures or head trauma.

23     And then also on an outpatient basis for bruises,

24     burns and sexual abuse.

25  Q   Okay.

207

1          Do you also consult on cases involving something

2     called Munchausen by proxy?

3  A   Yes I do.

4          MS. POPE-STARNES:   May I approach Your

5     Honor?

6          Please let the record reflect that I'm showing

7     Counsel what is marked as People's Proposed Exhibit 9.

8     A copy was provided to Counsel last week.

9          MR. WHITE:   Is this page supposed to be

10    blank?   Isn't there something on the back of page

11    two?

12         MS. POPE-STARNES:   May I approach the

13    witness Your Honor?

14         THE COURT:   You may.

15 Q  **(By Ms. Pope-Starnes, continuing)**   Doctor Dev, I'm

16    showing you what has been marked as People's Proposed

17    Exhibit 9 and ask you if you recognize that?

18 A   Yes.

19 Q   And what is that?

20 A   That is my curriculum vitae.

21 Q   And is this a current curriculum vitae?

22 A   Yes.

23 Q   And is this a fair and accurate document?

24 A   Yes.

25         MS. POPE-STARNES:   I would move for the

                          208

1    admission of People's Exhibit --- Proposed Exhibit 9

2    in People's Exhibit Numbers.

3              THE COURT:    Any objection?

4              MR. WHITE:    No objection.

5              THE COURT:    So admitted.

6  Q   **(By Ms. Pope-Starnes, continuing)**    Doctor Dev, have

7      you been qualified to testify as an expert in

8      courtrooms before?

9  A   Yes, I have.

10 Q   Can you tell the Court please what Courts you've

11     testified in before?

12 A   I've testified in Wayne County, Washtenaw County,

13     Oakland County, Monroe County, Jackson County, umm -~-

14     Livingston County and Ingham County and Stanton,

15     Michigan.   I'm not sure what county that is.

16 Q   Okay.

17         And do you know approximately how many times

18     you've been qualified as an expert?

19 A   I've been qualified upwards of twenty (20), twenty-

20     five (25) times as an expert.

21 Q   And when you've previously been qualified as an

22     expert, in what areas have you been qualified as an

23     expert?

24 A   Pediatrics and child abuse pediatrics.

25              MS. POPE-STARNES:    Your Honor, I would ask

209

1       that this witness be qualified as an expert in

2       pediatrics and child abuse pediatrics.

3                    THE COURT:    Any objection?

4                    MR. WHITE:    No objection.

5                    THE COURT:    So qualified.

6   Q    **(By Ms. Pope-Starnes, continuing)**    Now Doctor Dev, if

7       I could direct your attention back to December first

8       of two thousand and six (2006), were you asked to

9       consult involving a child by the name of Madison

10      McBurney?

11  A    Yes, I was.

12  Q    And can you tell the Jury please when you're asked to

13      consult on a case, what is it that you do?

14  A    When I'm asked to consult on a case I review whatever

15      records --- I first ask why I'm being called to

16      consult which is usually because there's a suspicion

17      of abuse or neglect.    And then I review whatever

18      medical records there are on our electronic medical

19      records system at the University of Michigan.    And

20      then after that I will go in and see the patient.    I

21      will, depending on whatever order I can do things in,

22      I'll talk to the medical doctors that are present that

23      are taking care of the child.    Talk to the nurse.

24      Talk to parents and examine the child.    Talk to the

25      child if that's a possibility.

                            210

1   Q    Umm --- did you, in Madison's case, did you review

2        information from your medical records system, I

3        believe called CareWeb?

4   A    Yes.

5   Q    Okay.

6        And did there come a time when you had an

7        opportunity to speak with Madison's parents?

8   A    Yes.

9   Q    When was that?

10  A    I spoke with her parents on December first, two

11       thousand and six (2006).

12  Q    And did you obtain a history from them?

13  A    Yes, I did.

14  Q    Now what is the reason that you request a history from

15       parents or family members?

16  A    The reason that I request a history is because to me

17       that is a thorough examination, is to get a history

18       from the parents.   To get it, collect it on my own,

19       so that I know what information was given to me

20       instead of solely relying on what other people have

21       obtained.

22  Q    Okay.

23       Can you tell the Jury what history you were given

24       by Madison's parents?

25  A    The history that I was given by her parents was that

211

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    she umm --- on the afternoon, on November thirtieth

2    (30th), she had done well all day and then was put

3    down for a nap at uh --- she was put down for a nap.

4    And then mother had gone to work and father had woken

5    her up sometime between seven o'clock (7:00) and

6    seven-fifteen (7:15) to give her a bottle.   He placed

7    her in a bouncy chair.   She was given the bottle.

8    She drank two ounces of the bottle and then threw the

9    bottle.   And he then took her to change her diaper.

10   He changed her diaper.   He put on her brace.   He put

11   on her pajamas and then set her down on the floor.

12   At which point, I did not actually get the time lapse

13   in-between, but he heard a gurgling noise.   He looked

14   over at her and found that she was stiff and she had

15   her arch --- her back arched.   And so then he called

16   nine-one-one (911).   They gave him some instructions.

17   EMS arrived.   They had some difficulty with

18   intubating her and so they provided --- they provided

19   ventilation with a bag and a mask.   And umm ---

20   brought her to the University of Michigan.

21 Q  When you obtained this history from the parents did

22   they indicate whether or not there were any other

23   caretakers of Madison besides them?

24 A  They said that umm --- mother and father were the

25   primary caregivers.   They did occasionally use

212

1    babysitters who were well known to the family.

2  Q    Were you able on that same day to conduct a physical

3       examination of Madison?

4  A    Yes.

5  Q    Where was she when you saw her?

6  A    She was in the pediatric ICU, intensive care unit.

7  Q    Can you describe Madison's appearance when you saw her

8       that day?

9  A    Can I look at my notes?

10  Q    Would your notes refresh your memory?

11  A    Yes, they would.

12  Q    Yes.

13       Just go ahead and read them silently to yourself.

14       And when you've had a chance to do that, set them

15       aside and let me know.

16       Does that refresh your memory?

17  A    Yes.

18  Q    Can you tell the Jury please about Madison's

19       appearance when you saw her ---

20  A    (Interposing)   So what ---

21  Q    (Continuing)   on December first?

22  A    Sorry.   So when I saw her she was lying on the ICU

23       bed.   She was minimally responsive.   She had a

24       breathing tube down her and was on mechanical

25       ventilation.   She had a feeding tube in place.   She

213

```
 1              had several IV lines put in her at that point.   And

 2              umm --- and would you like me to go through all the

 3              parts of the examination?

 4    Q         Did you conduct a physical examination?

 5    A         Yes I did.

 6    Q         Can you tell the Jury please, what was your finding in

 7              the physical ---

 8    A         (Interposing)   On finding ---

 9    Q         (Continuing)   examination?   Excuse me.

10    A         On finding of the physical examination I umm --- found

11              that her fontanel was tense.   She ---

12    Q         (Interposing)   Can you explain to the Jury when

13              you're talking about fontanel, what are you talking

14              about?

15    A         So the fonter --- anterior fontanel is the soft spot

16              in a little baby's head.   And that is usually

17              supposed to be level or soft.   And in her case it was

18              tense meaning there was some sort of extra pressure or

19              concern for --- there's extra --- there's concern for

20              extra pressure there when a fontanel is tense.   Her -

21              -- otherwise the rest of her exam, her --- I examined

22              her heart.   I listened to her lungs, her abdomen and

23              I wasn't able to elicit whether she was in any pain or

24              not because she was not responsive.   But her heart

25              had a regular rate and rhythm.   Her lungs were
```

214

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    essentially clear.   Her abdomen was soft.   And

2    examination of her extremities of her skin showed no

3    bruising that I saw at the time.

4  Q  Umm --- did you review whether or not any type of

5    blood work or labs had been ordered for her?

6  A  Umm --- at that time the blood work that had been

7    ordered was basic med --- basic panels, electrolytes

8    and blood work looking at her white blood count, her

9    hemoglobin, that sort of thing.

10 Q  Doctor Dev, when you were given a history by the

11    parents was anything given to you in the history umm -

12    -- referring to MRSA?

13 A  No.

14 Q  What is MRSA?

15 A  MRSA is methicillin-resistant Staphylococcus aureus

16    which is a bacteria.

17 Q  Eventually was there a lab done of the cerebral spinal

18    fluid of Madison?

19 A  Yes.

20 Q  Okay.

21       And was there any evidence in the cerebral spinal

22    fluid umm --- testing showing that the MRSA was in her

23    cerebral spinal fluid?

24 A  Could you repeat that question?

25 Q  Yeah.   I'm sure I haven't worded it very artfully.

215

1    Was there any evidence of the infection in her

2    cerebral spinal fluid?

3  A    No.

4  Q    Okay.

5    Were you able to review radiological records umm

6    --- including CT's and MRI's at some point?

7  A    Yes I was.

8  Q    Okay.

9    And what dates of CT scans did you review?

10  A    May I review --- may I look at my notes?

11  Q    Would that refresh your memory?

12  A    Yes it would.

13  Q    Yes.

14    Does that refresh your memory?

15  A    Yes.

16  Q    Yes, go ahead.

17  A    She had a CT scan done on November thirtieth (30th),

18    two thousand and six (2006).  And a CT scan done on

19    December second, two thousand and six (2006), and she

20    had an MRI done on December first, two thousand and

21    six (2006).

22  Q    Did you also review a skeletal survey from December

23    first of two thousand and six (2006)?

24  A    Yes, I did.

25  Q    Tell the Jury please what a skeletal survey is?

216

1  A    A skeletal survey is umm --- x-rays of essentially

2          every bone in a child's body that is done with

3          dedicated films to all parts of the child's skeleton.

4          And it has good resolution.  And is basically done to

5          look for any evidence of fractures that one may not

6          have identified on a physical exam or examination of

7          the child.

8  Q    What were the results of the skeletal survey?

9  A    The skeletal survey showed that there were no

10         fractures.

11  Q    Did you have an opportunity to review any opthalm ---

12         opthiomol --- opthamologil --- any ophthalmology

13         reports?

14  A    Yes I did.

15  Q    Okay.

16           And what was the result of those tests?

17  A    The result of that exam, of the ophthalmology

18         examination was that she had diffuse intraretinal and

19         preretinal hemorrhages in her right eye.

20  Q    What does that that mean diffuse intraretinal

21         hemorrhages?

22  A    What that means is that there's retinal hemorrhages

23         throughout the eye in the way the ophthalmologists

24         describe as all quadrants of the eye and in different

25         layers of the eye, of the back of the eye as well.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  Q   You mean the retina?

2  A   Yes.

3  Q   Did you have an opportunity to review previous imaging

4     that had been done on Madison?   An MRI from August of

5     two thousand and six (2006) and a CT scan from

6     September eleventh (11th), two thousand and six?

7  A   Yes.

8  Q   Now Doctor Dev, after you had the opportunity to

9     obtain the history, to look at the records, to look at

10    all the testing, umm --- did you form an opinion and

11    diagnosis in regards to Madison?

12 A   Yes.

13 Q   What was that?

14 A   My opinion was that this uh --- that Madison's

15    condition was more likely the result of abusive head

16    trauma.

17 Q   What is abusive head trauma?

18 A   Abusive head trauma is trauma to the --- the brain and

19    around the brain due to inflicted trauma.

20 Q   And can you tell the Jury what led to that opinion?

21 A   What led me to that opinion was a number of things.

22    First we had a history that was inconsistent with the

23    findings.   And on top of that we had a history that

24    changed over time.   The history that was given to me

25    was very --- was different than the history that was

218

1    given to some of the other physicians that had come to

2    speak with her parents.   And then the physical exam

3    *findings of the subdural hemorrhages as well as the*

4    *retinal hemorrhages.*

5  Q   Okay.

6         How was it that you were able to determine that

7    the history had changed over time?

8  A   I was able to determine that by looking at the history

9    that I had and compared it to the information that

10    other physicians had documented in their notes.

11  Q   How many different histories did you find?

12  A   Four.

13  Q   Other than your history, what other histories did you

14    note?   Who was --- who were the others given to?

15  A   The others were given to the neurologist, the ---

16  Q   (Interposing)   Which neurologist?

17  A   Doctor Steve Leber.

18  Q   Now what is the difference between a neurologist and a

19    neurosurgeon?

20  A   A neuro --- a neurologist is a physician that

21    specializes in the brain but more the function of the

22    brain.   Basically they work in the area of seizures,

23    headaches, after, possibly after head trauma.   And

24    sort of that area versus neurosurgeons who sometimes

25    their work overlaps.   But neurosurgeons are surgeons

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    who then have the ability to operate on the brain as

2    well.

3    Q    So Doctor Leber was a neurologist?

4    A    Yes.

5    Q    Okay.

6         Who else did you see there was a different

7    history given to?

8    A    The neurosurgeon.

9    Q    Which one?

10   A    I believe it was Doctor Maher.   I can check my notes.

11   Q    Would your notes refresh your memory?

12   A    Yes, they would.

13   Q    Yes.

14            THE COURT:   Actually we can get the list of

15   whatever it is and then we can call it at that point,

16   if that would be a good point to break.

17            THE WITNESS:   Sorry.   The neurosurgeon was

18   Doctor Linda Yang.

19   Q    **(By Ms. Pope-Starnes, continuing)**   Would you spell

20   the last name for us?

21   A    Y A N G.

22   Q    Okay.

23        So Doctor Leber, Doctor Yang, yourself, and who

24   was the fourth?

25   A    The pediatric ICU physician.

                              220

1    Q    And who was that?

2    A    Doctor Gail Annich, A N N I C H.

3              THE COURT:   Okay.   All right.

4         Ladies and Gentlemen, Doctor, everyone else,

5    we'll break at this time.   It's now four-thirty

6    (4:30) and we'll resume at uh --- eight-thirty (8:30).

7    Maybe do the same thing.   Get here, fingers-crossed,

8    maybe a little bit beforehand and we might get us

9    moving a little bit quicker.   So we'll try around

10   eight-thirty (8:30), okay?

11        Have a nice weekend everyone.   Thank you very

12   much.   Please don't discuss the case.

13             THE CLERK:   All rise for the Jury.

14   (Whereupon the Jury was returned to the Jury room.)

15                    *  *  *

16             THE COURT:   The record will reflect that

17   the Jury's been excused.

18        Doctor, you're all set.

19             MS. POPE-STARNES:   Judge can I just ---

20             THE COURT:   (Interposing)   Yeah.

21        You're all set Doctor.   Thank you.

22             MS. POPE-STARNES:   I just wanted to make

23   sure I got this right because I was looking for

24   something.

25             THE WITNESS:   I apologize if I delayed

                         221

1    things.

2              THE COURT:    No problem.

3              MS. POPE-STARNES:    You said our schedule is

4    Monday morning, all day Tuesday, Wednesday afternoon

5    and Thursday and Friday all day?

6              THE COURT:    Yep.    And we're on Tuesday ---

7         You're all set.    Thank you.

8         We'll have to talk about Wednesday.    I might

9    have the Jury come in a little bit later because I

10   have some PPO's to deal with.    So just a hearing that

11   might take a half-an-hour or something like that.

12             MR. WHITE:    I thought you were off that

13   docket.

14             THE COURT:    Blame my clerks.    They ---they

15   insisted I keep a case.    And whatever.    But so

16   anyways that's the only hiccup in the proceedings I

17   think.

18        All right.    Let me read this to Mr. White and

19   Ms. Pope-Starnes.    If I remember correctly this is

20   kind of incidental to the proceedings, that thing from

21   U. of M.    They asked for me to do an order in

22   response.    If they did and if Counsel doesn't have

23   any objection, I would propose the following:

24        First step, Prosecution subpoena and Heather

25   McBurney's release and to accommodate the request of

222

1   the duces tecum opponent set forth in the attached

2   letter the Court orders nunc pro tunc to the date of

3   the prosecution's subpoena, the deponent to provide

4   all records of Madison McBurney.   This order also

5   acknowledges receipt of the above.

6        Any problem with that?

7             MS. POPE-STARNES:   None Your Honor.

8             THE COURT:   And if you have a copy of that

9   letter, I can attach it and I'll just give you a copy

10  for your records.

11            MR. WHITE:   No problem.

12            THE COURT:   Thank you.

13        Deputies, thank you for everything.

14            THE DEPUTY:   Have a good weekend.

15            THE COURT:   Thank you.

16  (Whereupon the matter was concluded for this day.)

17                   * * *

223

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

      I, Barbara Reznick, Court Reporter, do hereby certify that the foregoing pages comprise a full, true, and correct transcript of the proceedings had In the Matter of McBurney before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on February 22, 2008.

*Barbara Reznick*

Barbara Reznick,    CER 1333

1200 N. Telegraph, Pontiac, MI. 48341

248) 858-5841

224