STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN

OAKLAND
COUNTY  07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

Plaintiff,

v                                    No. 07 214651FC

STEVEN LINDSEY MCBURNEY

Defendant

_____/

JURY HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

FEBRUARY 25, 2008

* * * *

RECEIVED FOR FILING

2008 AUG 14  A 11: 25

OAKLAND COUNTY CLERK
BY: _____
DEPUTY COUNTY CLERK

APPEARANCES:

Sarah Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of Defendant

Barbara Reznick, Court Reporter

1

# I N D E X

**PAGE**

## WITNESSES-PEOPLE

DOCTOR LEENA DEV

    Continued Direct Examination, by Ms. Pope-Starnes.18
    Cross-Examination by Mr. White....................36
    Redirect Examination, by Ms. Pope-Starnes.........70
    Recross-Examination, by Mr. White.................74

SERGEANT DOUGLAS BAAKI

    Direct Examination, by Ms. Pope-Starnes...........80
    Cross-Examination, by Mr. White...................90
    Redirect Examination, by Ms. Pope-Starnes.........97

## EXHIBITS

    Exhibit Number 10.................................22
    Exhibit Number 11.................................22
    Exhibit Number 12.................................22
    Exhibit Number 13.................................22
    Exhibit Number 15.................................34
    Exhibit K........................................92
    Exhibit M........................................92
    Exhibit O........................................92
    Exhibit P........................................92
    Exhibit Q........................................92

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1                              Pontiac, Michigan

 2                              MONDAY, FEBRUARY 25, 2008

 3                      * * *

 4              THE CLERK:    The Court calls People

 5      versus McBurney, case number 07 214651 FC.

 6              MS. POPE-STARNES:    Good morning Your

 7      Honor.   Sarah Pope-Starnes, assistant prosecuting

 8      attorney.

 9              THE COURT:    Good morning.

10              MR. WHITE:    Robert White appearing on

11      behalf of Mr. McBurney.

12              THE COURT:    Good morning.

13         Is that --- and he's present obviously for the

14      record?

15              MR. WHITE:    Yes.   He's standing

16      immediately to my right.

17              THE COURT:    Is the umm --- this whatever

18      you call this projector thing, are you going to be

19      using it immediately?

20              MS. POPE-STARNES:    Yes.

21              THE COURT:    Okay.   That's fine because

22      it's kind of loud.

23         But Mr. White, you wanted to make a record

24      beforehand?

25              MR. WHITE:    Yes I do, Your Honor.    And
```

                                    3

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    I thank you for an opportunity to discuss this matter

2    in chambers before we came to open Court.

3                    THE COURT:    Just do it a little bit

4    louder if you would for Mrs. Reznick because of that

5    ---

6                    MR. WHITE:    (Interposing)    Yes.

7                    THE COURT:    (Continuing)    thing.

8                    MR. WHITE:    My concern is Judge that

9    there have been several occasions which I believe

10   I've had the Prosecutor's witnesses in a difficult

11   position explaining their answers.    And the Court

12   has sua sponte intervened on their behalf.    And I

13   don't fault the Court.    You may do the same thing

14   with the Defense witnesses, but the question is, you

15   know, what if that opportunity doesn't arise with the

16   Defense witnesses?    And when you intervene on their

17   behalf it's, you know, as if I am doing something

18   wrong because you are the Court.    You wear the black

19   robe.    And I don't think that's a proper uh ---

20   steps to take in this --- in a case like --- in any

21   case.

22                    THE COURT:    Can you give me like an

23   example.    And I'm not challenging you; I'm just kind

24   of curious trying to reflect on it.

25                    MR. WHITE:    For one, you know, as the

4

1    Doctor Sikavitsas, Sickvitis, whatever, when she

2    wanted to argue with me about verbatim.    'What do

3    you mean by verbatim', a common word uh --- that we

4    all know.    We certainly would think that a licensed

5    medical physician would understand verbatim.    And

6    then immediately you stepped in and said, 'Word for

7    word.'

8         Uh --- when Doctor Maher was testifying and I

9    wanted to object.    And I did several times about,

10   you know, him using the word 'We'.    You know, ---

11             THE COURT:    Using the word?

12             MR. WHITE:    We.    We.

13             THE COURT:    We.    Oh.    Okay.

14             MR. WHITE:    W E.

15             THE COURT:    Right.

16             MR. WHITE:    As opposed.    And you

17   cautioned him but uh --- I think the caution was,

18   'Well you know, it's this legal terminology.

19   There's a way to approach it and there's the way you

20   do it.    Try your best.'

21        But as it's likely the objection is not

22   colorable.    And it absolutely is meritorious.    You

23   know, that he is speaking on behalf of other people.

24   And when you and I start to argue about this thing,

25   if I stand up and say, 'Objection Judge, he's, you

                          5

1  know, putting forth hearsay evidence,' and, you know,

2  it's like an inconvenience to the Doctor to ask him

3  to attend to the rules of evidence and properly

4  testify.   And I don't want this conflict going on

5  between the Court and I.

6              THE COURT:   Are you saying, 'There has

7  been a conflict'?

8              MR. WHITE:   Well no.   I just --- as if

9  the, you know, 'Oh come on, try your best.   But, you

10  know, you could go ahead and use the word we.'

11     And I just --- Judge, all I ask if I make an

12  objection and it's colorable, sustain it.   And if

13  I'm wrong, overrule it.   Please don't try to

14  intervene on behalf of the Prosecutor's witnesses

15  unless, you know, if you believe I'm being abusive,

16  absolutely, you're absolutely entitled to.   If

17  sister Counsel believes there's a meritorious

18  objection, please.   But when you intervene sua

19  sponte it's as if I am doing something wrong because

20  there's no objection from the other side.   And I

21  don't know if the Court wants to project that image.

22  I know that --- I know you don't.

23     Specifically about the testimony of Detective

24  Sumner and me confronting him with his prior

25  inconsistent testimony.   A big hoopla was made that

6

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          this was not provided in discovery.   Number one,

2          it's not discoverable.   Number two, the way I was

3          doing was completely acceptable under the Court

4          rules.   I do not have to show him his prior

5          inconsistent statement.   I do not.   And, in fact,

6          he never asked to see it.   You asked that I provide

7          him a copy.   On the record you asked.   And here I'm

8          put in a position of saying either to you Judge, you

9          know, well wait a minute.   She's hasn't asked.   He

10         hasn't asked.   And now you're asking.   So if I say,

11         'No' to you, it's as if I'm trying to, you know,

12         somehow subjugate the authority of the Court.   And

13         all I ask Judge is that, you know, that to the extent

14         that's happened, this is a long case and it's full of

15         conflict and, you know.   I just ask that it not

16         happen anymore because I believe that the amount of

17         conflict, excuse me just one second.

18                    THE COURT:   Go ahead.

19                    MR. WHITE:   Thank you.   Is going to

20         continue.   So I ask respectfully and I proffer a

21         proposed instruction to the Court specifically about

22         this Detective Sumner testimony because it's what

23         kept me up Friday night.   And I think the Jury has

24         the impression I did something wrong with him.   And

25         I just don't feel that's appropriate.   I did follow

                              7

1    the Court rules.    Eventually he did have a copy, my

2    personal copy.    Uh --- so I just --- I don't want

3    the Jury to feel that it's something underhanded that

4    was done.    So I ask the Court to consider that

5    instruction.

6            THE COURT:    Mr. White, let me ask you,

7    what you've given the Court is a **CJI 2nd 4.5** prior

8    inconsistency may be used to impeach a witness which

9    is the standard Jury instruction and then you've

10   handwritten something in here.    Would you propose

11   that I --- that this be or supplant or take --- or

12   take --- let me back up.

13       Each Counsel has given me a copy of me of

14   proposed final instructions.    Would you say that ---

15   are you asking me to take your **4.5** in that packet and

16   put this in its place?

17           MR. WHITE:    No.    I'm asking you to read

18   the handwritten portion to the Jury now.

19           THE COURT:    Oh.    Read it now.

20           MR. WHITE:    Yes.

21           THE COURT:    Okay.

22           MR. WHITE:    Because it's fresh in their

23   minds.    This is an event that happened Friday

24   afternoon.    Uh --- we sent a considerable amount of

25   time umm --- allowing this witness to review the

8

1     testimony.   I think the way it happened and the

2     suggestion that it was not provided in discovery, the

3     suggestion he didn't have a review, chance to review

4     it, leaves the Jury with a firm impression that I did

5     something underhanded.   My asking --- my request is

6     because the Court put me in a predicament of either

7     insisting upon compliance for the Court rules, or

8     acquiescing to the Court's request to allow him to

9     review it.   I respect your --- you asked, I say

10    'Yes.'   But --- so I ask at this point that you

11    consider giving my handwritten instruction.   I gave

12    you the typed instruction just to see where --- how

13    the two compare.

14              THE COURT:   Ms. Pope-Starnes, have you

15    seen this?

16              MS. POPE-STARNES:   I have.

17              THE COURT:   Okay.   Go ahead.

18              MS. POPE-STARNES:   Do you want a

19    response?

20              THE COURT:   You may.

21              MS. POPE-STARNES:   First of all Your

22    Honor, I don't think that this Court, I think it's

23    very clear that this Court is not taking sides one

24    way or the other.   You have ruled for and against

25    both Counsels in this matter.   And I think the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

9

1    record is quite clear to that.

2         In regards to umm --- in regards to the Court

3    saying things, it is the Court's responsibility

4    through a trial to make sure that the law is

5    followed.   And the Court can sua sponte do that.

6    Now in regards to this whole matter with Doctor

7    Sikavitsas, as I said when I stood up and objected,

8    there was a considerable amount of banter not really

9    question and answer going back and forth between

10   defense counsel and Doctor Sikavitsas.   But he

11   started his questioning of her by inviting her to ask

12   --- to tell him if she didn't understand the

13   questions.   And so she did that.   And I think when

14   the Court intervened it's because this banter was

15   going back and forth instead of question and answer,

16   question and answer.   And the Court was trying to

17   address that.

18        And, you know, the people that take the stand

19   are not lawyers.   And it's not unusual for a Court

20   to step in and to say to them, 'This is what you need

21   to do.'   Because it's the Court's responsibility to

22   make sure the law is followed.   And I think the

23   Court has done this in this case.   And it's clearly

24   not taken sides either way because you've ruled both

25   ways.

1      And regards to this whole business with the 'We'

2   objection?  It's not a legal objection.  And I

3   guess I'm going to start up and --- start standing up

4   and saying, 'Objection.  There's no legal objection

5   being made by the other side.'  If Counsel wants to

6   stand up and object to say, 'Hearsay', that's a legal

7   objection.  But saying the word we is a meritorious

8   objection is not a legal objection.

9      And I think the Court is trying to help the

10  witness in order to move the matter along because

11  each of the doctors have testified they work as a

12  team.  Clearly their testimony was from them as

13  individuals.

14      In regards to the issue with Detective Sumner.

15  I think the second paragraph is inappropriate.  It

16  makes now the Court make it look like it's taking

17  sides with the Defense.  I think the best thing to

18  do, if the Court wants to give an instruction now, is

19  to use the first paragraph of **MRE 613 a,** which simply

20  says,         **"In examining a witness concerning a**

21              **prior statement made by the witness**

22              **whether written or not, the**

23              **statement need not be shown nor**

24              **context disclosed to the witness at**

25              **that time.  But on request it shall**

11

1                    be shown or disclosed to opposing

2                    Counsel and the witness."

3          If the Court's inclined to give some kind of

4     instructions to the Jury right now, I would ask that

5     it be that and nothing more.   But to go on and state

6     specifically Defense Counsel and Detective Sumner,

7     now, not only do you look you're favoring the

8     Defense, but you look like you're criticizing the

9     witness.   And I think that if the Court simply uses

10    **MRE 613 a,** then the Court has given an instruction as

11    to the law and is clearly being fair and impartial

12    and not taking sides in this matter.

13                    THE COURT:   Mr. White, anything further?

14                    MR. WHITE:   The reason I wanted to

15    specifically address Detective Sumner and the reason

16    is because you asked me not the --- not the

17    Prosecutor to provide a copy.   She screamed, 'Lack

18    of discovery.'   That's what hurt --- she --- that's

19    what --- that's being the objection that was made

20    when we had the uh --- discussion at the Bench.   But

21    uh --- I think considering the fact that we took a

22    break, allowed the person an opportunity to examine

23    the transcript, uh --- left the Jury with the

24    impression that I had done something wrong.   And I

25    just don't believe that's fair Judge.

                              12

1       THE COURT:    Thank you.

2           The Court has heard the arguments of Counsel.

3       This is a multifaceted request and comment by Mr.

4       White.    And it's been responded to likewise by the

5       People.    The Court will treat them in segregated

6       portions.

7           First, with respect to the uh --- uh ---

8       respectful complaint and request that the Court not

9       intervene.    First, let me emphasize that the Court's

10      recollection is there has been occasions where I have

11      intervened perhaps not solicited by anyone.    And uh

12      --- I will emphasize it's not been for the reasons

13      stated by Mr. White, nor respectfully the reasons

14      stated by Ms. Pope-Starnes.    The Court's reason for

15      intervening was not because that it sensed that there

16      was some bantering going on.    But likewise also did

17      not intervene because I thought that uh --- opposing

18      counsel was doing anything untoward.    The Court's

19      responsibility, among others, is to make sure that

20      the trial proceeds in an expeditious fair manner.

21      And it was the Court's intervention solely for that

22      purpose to try to get things moving along.    And as

23      things languish and we're getting hung up on 'We's'

24      and all these other, I don't want to call them trite

25      but other matters, I have taken the liberty to

13

1   intervene to try to move things along for the Jury's

2   benefit.   And that was the singular and sole reason

3   why the Court did so.   Not because I thought there

4   was anything inappropriate or anything else.   Uh ---

5   nor was I trying to convey anything to the Jury that

6   I believe that there was anything inappropriate going

7   on.   But, let's just get this matter moving for

8   their sake.   They've been waiting a long time.   And

9   I didn't feel that it was inappropriate and the Court

10   did so for that reason alone.

11      And with respect to the future, I will continue

12   to do my job to the best of my ability.   We'll leave

13   it at that.

14      With respect to the uh --- other matter brought

15   up by Mr. White and the issue concerning Detective

16   Sumner, give me a minute and let me think on it for a

17   second.

18      (Whereupon a brief delay was had.)

19            * * *

20      THE COURT:   The Court has considered

21   Counsel's argument with respect to the Detective

22   Sumner issue and looked at the proposed special

23   instruction by Mr. White be given during the trial.

24   And the People's objection to same.   And the

25   People's alternative request to read **MRE 613 a.**   The

14

1    Court has considered, again, the arguments of both

2    alternatives.   And the Court finds it appropriate

3    with some tweaking, the Court will read **MRE 613 a.**

4    And I will read it as follows: Ladies and Gentlemen

5    of the Jury, as I've said before, I may have given

6    you instructions, I have given you instructions

7    before trial and I will give you some instructions

8    after the proofs.   And I may be giving you some

9    throughout, words to this effect.   I may have given

10   you some throughout already and I'll do so again.

11        Now relating back to the Defendant's cross-exam

12   of Detective Sumner and then I'll read **MRE 613 a.**

13              MR. WHITE:   Thank you Judge.

14              THE COURT:   Ready to proceed then?

15              MS. POPE-STARNES:   Yes.

16              THE COURT:   All right.

17        Jeff, will you bring in the Jury?

18              THE CLERK:   *Please rise for the Jury.*

19        (Whereupon the Jury was returned to the

20   courtroom at 9:15am.)

21                   *  *  *

22              THE COURT:   Thank you.   Appreciate it.

23        You may all be seated.

24        The record will reflect that the Jury is back.

25   The case has been called.   And Counsels' names have

15

1       been noted for the record.

2           And again, thank you folks.   Appreciate your

3       promptness and perseverance throughout these

4       proceedings.

5           As we left off it was with Doctor Dev, I think

6       is how I think you say her name.   And we're going to

7       resume with her in just one moment.   There was

8       another thing that I wanted to say.

9           If you can remember, I've said before that I

10      have given you instructions, well if you can remember

11      I gave you instructions before the trial.   I'll

12      certainly give you some instructions after the close

13      of proofs.   And I've indicated that perhaps I'll be

14      giving you instructions throughout the trial.   I may

15      have already done so throughout the trial but I'm

16      going to give you an additional one now relating back

17      to the Defendant's cross-examination of Detective

18      Sumner.

19          In examining the witness concerning a prior

20      statement made by a witness, whether written or not,

21      the statement need not be shown nor its contents

22      disclosed to the witness at that time but on the

23      request --- but on request it shall be shown or

24      disclosed to opposing counsel and the witness.

25          So just keep that in mind, okay?

16

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       Thank you.

2       Ms. Pope-Starnes, you may begin to resume.

3               MS. POPE-STARNES:   Your Honor, the

4       People are going to call Doctor Leena Dev.

5               THE COURT:   Doctor, if you'd approach

6       please?

7           It's another day over the weekend.   I'd ask you

8       to please face my Clerk and raise your right hand to

9       be sworn.

10              THE CLERK:   **Do you swear the testimony**

11      **you are about to give will be the truth, so help you**

12      **God?**

13              THE WITNESS:   **I do.**

14              THE COURT:   Thank you.   You can have a

15      seat there (indicating).

16              MS. POPE-STARNES:   Your Honor, may I

17      move the podium please?

18              THE COURT:   Sure.

19              MS. POPE-STARNES:   Thank you.

20          May I proceed?

21              THE COURT:   You may proceed.

22              MS. POPE-STARNES:   Thank you.

23      **D O C T O R    L E E N A    D E V**

24      **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

25      **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

17

1  **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

2  **AND TESTIFIED AS FOLLOWS:**

3        **DIRECT EXAMINATION CONTINUED**

4  BY MS. POPE-STARNES:

5  Q   Now Doctor Dev, I believe where we left off on

6      Friday, I had asked you if your review of the medical

7      records revealed that the history given for Madison

8      had changed over time?

9  A   Yes, it did.

10 Q   Now I'm going to ask you about your opinion and the

11     diagnosis of trauma to Madison's brain from, I

12     believe you said, inflicted abuse?

13 A   Abusive head trauma.

14 Q   Yes.

15     I'd like to start out by asking you to explain

16     the makeup of the brain to the Jury.

17          MS. POPE-STARNES:   Let the records

18     reflect that I'm showing Counsel what has been marked

19     as People's Proposed Exhibits 10 through 14.

20          THE COURT:   Thank you.

21          MR. WHITE:   I've reviewed the Exhibits

22     Judge.   If I can just get a chance to have them

23     copied real quick because I believe she's going to

24     testify from them.   So if I could have them ---

25          THE COURT:   (Interposing)   Have them

                        18

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    while she's?

2              MR. WHITE:    Testifying.

3              THE COURT:    Any objection?    We can run

4    them through the Xerox machine?

5              MS. POPE-STARNES:    No.

6              THE COURT:    All right.

7              MR. WHITE:    I'll run back there right

8    now.

9              THE COURT:    I'll get somebody to do

10   that.

11        Obviously can you jump to different, some other

12   questions in the meantime?    If you can.

13              MS. POPE-STARNES:    Yes.    I sure can.

14   Thank you Judge.

15   Q    **(By Ms. Pope-Starnes, continuing)**    Doctor Dev, in

16   the meantime, have you ever had a case where you've

17   diagnosed a child as uh --- suffering from suspected

18   child abuse where you've not observed bruises, or

19   external injuries?

20   A    Yes.

21   Q    Did you have an opportunity to review the MRI of

22   Madison that was done on August thirty-first (31st)

23   of two thousand and six (2006)?

24   A    Yes I did.

25   Q    And were there any recommendations for any kind of

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      follow-up from that?

2  A   Uh --- the recommendations for follow-up were to have

3      a CT scan to better clarify whether there was any

4      blood or whether there was what they call a lipoma

5      that was found on the MRI.

6  Q   And was the follow-up CT scan done at the University

7      of Michigan Hospital?

8  A   Yes it was.

9  Q   When was that done?

10 A   September eleventh (11th), two thousand and six

11     (2006).

12 Q   Did you have an opportunity to review that?

13 A   Yes I did.

14 Q   And was there any recommendations for follow-up from

15     the September eleventh (11th), two thousand and six

16     (2006) CT?

17 A   Yes.   The follow-up was to have an MRI done two or

18     three months later.

19 Q   And was that done?

20 A   It was done while --- so it was September, October,

21     November eleventh (11th) so it was not done two

22     months later.   It was done three months later when

23     she came into the hospital for a separate reason.

24 Q   And that was done on what day?

25 A   So the follow-up, the MRI was not done as a follow-up

20

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    but it was because of her condition that brought her

2    into the hospital and that was done on December first

3    of two thousand and six (2006).

4  Q    And did you have an opportunity to review that MRI?

5  A    Yes I did.

6  Q    Okay.

7        And did that MRI examine the same areas of the

8    brain that had been of concern from the August MRI

9    and the September CAT scan?

10             MR. WHITE:   Objection.   As to the

11    leading nature of the question.

12             MS. POPE-STARNES:   I'm not suggesting

13    the answer Your Honor.   She can give the answer.

14    I'm not suggesting the answer in this question.

15             THE COURT:   I'll allow it.   I'll allow

16    it.

17  Q    **(By Ms. Pope-Starnes, continuing)**   Go ahead Doctor.

18  A    Could you repeat the question?

19  Q    Yes.

20        Did the December first MRI examine the same

21    areas that were of concern in the August two thousand

22    and six (2006) MRI and the September eleventh (11th)

23    CAT scan?

24  A    It showed those same areas along with other areas as

25    well, yes.

21

1    Q     Now Doctor ---

2                  MS. POPE-STARNES:   May I approach the

3          witness, Your Honor?

4                  THE COURT:   You may.

5    Q     **(By Ms. Pope-Starnes, continuing)**   I'm showing you

6          what has been marked as People's Proposed Exhibits 10

7          through 14.   And I ask you to look at those.

8                And are those --- do you recognize those

9          diagrams?

10   A     Yes.

11   Q     Okay.

12               And are those diagrams a fair and accurate

13         depiction of some of the structures found in the

14         brain?

15   A     Yes.

16                 MS. POPE-STARNES:   I would move for the

17         admission of People's Proposed Exhibits 10, 11, 12,

18         and 13 as People's Exhibits 10, 11, 12, and 13.

19                 THE COURT:   Any objections Mr. White?

20                 MR. WHITE:   Not 14?

21                 MS. POPE-STARNES:   I'm not going to do

22         14 at this time.

23                 MR. WHITE:   No objection.

24                 THE COURT:   So admitted.

25                 MS. POPE-STARNES:   Your Honor, may I

22

1    publish these so that the Doctor can use them to

2    explain?

3              THE COURT:    Publish them to the Jury?

4              MS. POPE-STARNES:    To the ---

5              THE COURT:    (Interposing)   Oh.   Yes,

6    you may.

7              MS. POPE-STARNES:    Thank you.

8  Q   **(By Ms. Pope-Starnes, continuing)**    Now Doctor Dev,

9      I'm showing People's Exhibit 10.

10       Can you explain to the Jury these (indicating)

11     areas of the brain please?

12 A   Sure.   This (indicating) is showing the uh --- the

13     brownish area is the skull.   And then the area

14     that's open is where the skull is lifted off so that

15     we can get a better idea of what uh --- what the

16     structures are internally.   And uh --- what we see

17     there is, the best way that I explain it is, that

18     there's three sort of layers of sort of plastic bags,

19     sort of the best way, they're membranes that are

20     protecting the brain.   And so what we see is the

21     outer layer is the dura, so that's one layer of

22     protection.   And then the next layer below that for

23     getting closer to the brain is the arachnoid matter.

24     And then um --- going between all of that are blood

25     vessels that go back and forth supplying nourishment

23

1    to the um --- the under surface of the skull as well

2    as the um --- those layers and going all the way to

3    the brain.   So it's taking blood back and forth from

4    all those different layers back and forth to the

5    brain and all the way down to the heart as well and

6    coming from the heart.   And so that is a depiction

7    of what it would look like where you see the skull

8    and then under the skull you have the dural layer and

9    you have the arachnoid layer and you have the brain.

10   And you have the arteries and veins running back and

11   forth from all of that.

12   Q    Now Doctor, I'm going to show you People's Exhibit

13        11.   This depicts the sagittal sinus?

14   A    Yes.

15   Q    Could you explain to the Jury please what that is?

16   A    The sagittal sinus is a large vein that takes blood

17        away from the brain and takes it back down to the

18        heart.   So it's just a large vein that does the job

19        of kind of draining the --- the old, the used blood

20        and I should say the best way is, the deoxygenated

21        blood, taking it down to the heart.

22   Q    Now I'm going to show you People's Exhibit 13.

23             Can you explain this please?

24   A    This is just a depiction of what the brain looks

25        like.   This is nothing to do with the layers or the

24

1    veins or anything like that but just the various

2    parts of the brain.   So the larger part is the

3    cerebral hemisphere.   And then below that is the

4    cerebellum and that's in the side view.   And then in

5    the top view you're just looking at the cerebral

6    hemisphere from the top.   And you can see that

7    there's two sides to it.

8  Q    And this Exhibit also shows the brain stem?

9  A    Yes it does.   It shows the very --- the small part

10    that's coming down from the cerebellum is the brain

11    stem.

12  Q    Now Doctor Dev, I'm showing you People's Exhibit 12.

13        Can you explain this please?

14  A    The picture that is on the left is basically showing

15    what, kind of an outside view.   If the --- again, if

16    the skull is lifted up, you can see what's underneath

17    and this is showing a little bit of --- the side view

18    is not showing the dural layer but it's just

19    basically showing the superior sagittal sinus where

20    the blood umm ---vessels, the veins are attaching to

21    the superior sagittal sinus and then that superior

22    sagittal sinus will then drain deoxygenated blood and

23    take it back to the heart.

24        On the other view, on the right hand side,

25    what's that show ---what that is, is sort of like a

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    cross-section and so the superior sagittal sinus

2    shows up as just a little bit of a triangle umm ---

3    over there (indicating) at the top where it's ---

4    where that arrow is.   And again, you can see that

5    there's veins that are going into the superior

6    sagittal sinus and they're kind of going in as a

7    bridge and into that triangular area.   All that gray

8    --- all the tan sort of in the middle is the brain.

9    And then what you can see is pointing to the dura,

10   the arrow that's pointing to the dura, is basically

11   showing you that that is one of the layers of

12   protection to the brain.   On the outside of it you

13   have the skull, you have this first --- actually the

14   first tan layer is the skin and then the skull and

15   then the dural layer.

16  Q   Now Doctor Dev, what are bridging veins?

17  A   So bridging --- bridging veins are veins that are

18      what I had explained before.   They are taking the

19      blood, the deoxygenated blood from the brain and

20      draining it into the superior sagittal sinus.   And

21      so they are bridging the brain to the sagittal sinus

22      and draining the deoxygenated blood.

23  Q   And are the bridging veins connected to any --- any

24      part of the head or the brain?

25  A   Well they're connected to the --- the brain itself.

26

1      And then they're connected to the bridging ---

2      they're connected to the superior sagittal sinus.

3  Q   Now Doctor Dev, can you talk to us about the

4      mechanism of injury in abusive head trauma?

5  A   Well we think that ---

6                  MR. WHITE:    Objection as to hearsay.

7                  THE COURT:    Sustained.

8  Q   **(By Ms. Pope-Starnes, continuing)**    If you could

9      please answer in --- as to yourself and not speaking

10     for anyone else.

11 A   Okay.

12 Q   Thank you.

13 A   The exact mechanism of abusive head trauma is

14     controversial but it is felt to be from a

15     acceleration deceleration ---

16                  MR. WHITE:    Objection.    If she's ---

17     objection.    That's the same thing.    Hearsay.

18                  MS. POPE-STARNES:    Your Honor, she has

19     not referred to anyone else.    She has said 'It is

20     felt.'    She's testifying for herself.    Counsel is

21     free to cross-examine her on this.

22                  THE COURT:    If --- if indeed --- if the

23     phrase, 'It is felt' is what she felt than I will

24     overrule the objection.    But I don't know if 'It is

25     felt' is she speaking for herself or someone else so.

27

1  Q   **(By Ms. Pope-Starnes, continuing)**   Doctor Dev, are

2      you testifying from your opinion or someone else's?

3  A   My own opinion.

4  Q   Thank you.

5               MS. POPE-STARNES:   May I proceed Your

6      Honor?

7               THE COURT:   You may proceed.

8  Q   **(By Ms. Pope-Starnes, continuing)**   Go ahead.

9  A   Could you repeat the question?

10 Q   Yes.

11     You were trying to explain to the Jury the

12     mechanism of injury for abusive head trauma.

13 A   The mechanism is controversial but I'm trying to

14     figure out the best way to word this.   I feel that

15     it is from the push --- pushing and pulling of those

16     bridging veins that occur with rapid acceleration and

17     deceleration.   And the brain is moving back and

18     forth inside a closed cranial vault, inside the skull

19     and the brain is being pulled back and forth.   And

20     those bridging veins are getting tugged on and

21     there's only so much stretch on them that they can

22     tear and rupture which can lead to subdural

23     hemorrhages and hemorrhages around the brain.   As

24     well as a similar thing occurring in the back of the

25     eye which results in pulling and umm --- pulling and

28

```
 1          stretching of the veins in the back of the eye,

 2          resulting in hemorrhages in the back of the eye.

 3   Q      What area of the back of the eye?

 4   A      The retina.

 5   Q      Okay.

 6              Now you referred to it as a, I think you said,

 7          'A closed vault.'   The skull is like a closed box?

 8   A      Yes it is.

 9   Q      And if a child's head impacts something what happens

10          inside the head?

11   A      So what happens inside the head is that there can be

12          injury to the brain.   There can be rupture of blood

13          vessels and loss of perfusion, loss of blood supply

14          to the brain.

15   Q      Is there room inside the skull for the brain to move?

16   A      Yes.

17   Q      So if there is an impact to the child's head can the

18          brain move inside the skull?

19   A      Yes.

20   Q      Is --- can you tell us about the amount of space the

21          brain has to move?

22   A      Umm --- I can't remember exactly how many milliliters

23          of volume a child her age would have but there is ---

24          there's space there because there is cerebral spinal

25          fluid there.   So there is fluid there that the brain
```

29

1       is floating around in but it's not very much.

2   Q   And are you familiar with the phrase, 'Coup and

3       contrecoup'?

4   A   Yes.

5   Q   Can you explain that to the Jury please?

6   A   Coup and contrecoup injuries are when um --- there

7       is, again, a sort of a bouncing back and forth.    And

8       so there might be injury to the front part of the

9       brain as well as the back of the brain because of the

10      movement of the brain inside the cranial cavity.

11  Q   And are those brains --- bridging veins, are they

12      limited in how far they can move?

13  A   Yes.

14  Q   Now what happens in the brain once a hemorrhage has

15      started?

16  A   Once a hemorrhage has started there is lack of blood

17      supply to the brain tissue and which results in ---

18      which can result in swelling and irritation to the

19      brain.   Which then can result in umm --- the child -

20      -- the symptom --- the symptoms that a child might

21      have would be turning blue, stopping breathing,

22      having seizures, that sort of thing.

23  Q   And when we talk about the phrase 'Cascade effect',

24      what does that mean?

25  A   So cascade effect means that there's one thing that

30

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1         leads to another that leads to another and so on.

2    Q    When the swelling begins in the brain from the

3         subdural hemorrhage, what happens then?

4    Q    When the swelling begins umm ---to the --- from the

5         subdural hemorrhage, the uh --- the brain is not able

6         to do the job that it's supposed to do.   It's not

7         going to conduct the nerves as well so we get

8         symptoms like seizures or difficulty breathing or

9         passing out, loss of consciousness.   Umm --- or

10        there can be milder symptoms such as just acting

11        irritable, being fussy and vomiting.

12   Q    Now Doctor Dev, are you familiar with umm --- hip

13        dysplasia?

14   A    Yes.

15   Q    What is that.

16   A    Congenital uh --- she had developmental dysplasia of

17        the hip which is basically the ball and socket joint

18        of the hip in some children just isn't fitting quite

19        right.

20   Q    From your examination of Madison, your review of the

21        medical records and the MRI's and the CT's in this

22        case, do you have an opinion as to whether or not the

23        hip dysplasia had any involvement in the brain injury

24        that Madison had?

25   A    Yes.

31

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  Q    What's your opinion?

2  A    That it did not have any involvement with her brain.

3  Q    Were you ever given any information that Madison was

4       suffering from something called MRSA?

5  A    I was not given that information.

6  Q    Do you know what MRSA is?

7  A    Yes.

8  Q    What is MRSA?

9  A    It's methicillin-resistant Staphylococcus aureus.

10 Q    And from your examination of Madison and the review

11      of the medical records ---

12           THE COURT:    (Interposing)    Let her go

13      ahead and finish that question.    Just hold off

14      Doctor on an answer, okay?

15 **Q    (By Ms. Pope-Starnes, continuing)**    From your

16      examination of Madison, your review of the medical

17      records and the CT scans and the MRI's, did you have

18      an opinion as to whether or not the MRSA was involved

19      in Madison's head injuries?

20 A    Yes.

21 Q    And what is that opinion?

22 A    My opinion was that it was not involved with her head

23      injury.

24 Q    Did you observe any medical evidence of MRSA from

25      your examination of Madison?

32

1          MR. WHITE:    Asked and answered Judge.

2          THE COURT:    I'll allow it.

3          THE WITNESS:    Could you repeat the

4     question?

5     **Q      (By Ms. Pope-Starnes, continuing)**    Did you observe

6          any medical evidence of MRSA to Madison when you

7          conducted your medical examination?

8     A    No I did not.

9     Q    And what is aplasia cutis congenita?

10    A    Uh --- that is a skin condition that is --- that

11         children can be born with.    It's fairly rare.

12         About three in ten thousand (10,000) although the

13         numbers are not quite known.    Umm --- and basically

14         it's just a disruption in the skin.    It can also be

15         linked to disruptions on the --- on the scalp and in

16         the bony area of the skull as well.

17    Q    And did you observe this during your physical

18         examination of Madison?

19    A    I did not.

20    Q    Why is that?

21    A    Because her head was covered by the time I saw her.

22              MS. POPE-STARNES:    Please let the record

23         reflect I'm showing Counsel what's has been marked as

24         People's Proposed Exhibit 15.

25              May I approach the witness?

33

1              THE COURT:   You may.

2    Q    **(By Ms. Pope-Starnes, continuing)**   I'm showing you

3         what's been marked as People's Proposed Exhibit 15.

4              Do you recognize that?

5    A    Yes, I do.

6    Q    And what is that?

7    A    This is a photograph that I took of Madison McBurney

8         on December fourth, two thousand and six (2006).

9    Q    Is this a fair and accurate depiction of how Madison

10        looked at that time?

11   A    Yes.

12   Q    And has it been altered in any way?

13   A    No.

14              MS. POPE-STARNES:   Move for the

15        admission of People's Proposed Exhibit 15 as People's

16        Exhibit 15.

17              THE COURT:   Any objection?

18              MR. WHITE:   No objection.

19              THE COURT:   So admitted.

20   Q    **(By Ms. Pope-Starnes, continuing)**   And the bandage

21        or covering to Madison's head that could be observed

22        in People's Exhibit 15, was that there when you

23        conducted your physical examination?

24   A    Yes, it was.

25   Q    Doctor Dev, from your review of the medical records,

34

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      the CAT scans, the MRI's, and your physical

2      examination of Madison, did you have any medical

3      opinion as to whether or not this aplasia cutis

4      congenita condition had anything to do with the brain

5      injury that Madison suffered?

6  A    Yes I did.

7  Q    What is your opinion?

8  A    That it did not have to do with the brain injury that

9      she shut --- that she suffered.

10  Q    And why do you say that?

11  A    Because it is not linked to subdural hemorrhages or

12      retinal hemorrhages.   That condition is not linked

13      to subdural hemorrhages or retinal hemorrhages.

14          Can I have some water?

15            THE COURT REPORTER:   Sure.

16          She just wants some water.

17            THE COURT:   Oh.   Yeah.   Is there some

18      water in there?

19  Q    **(By Ms. Pope-Starnes, continuing)**   Doctor Dev, from

20      your review of the medical records did you find any

21      evidence that Madison was ever lacking oxygen?

22  A    No.

23            MS. POPE-STARNES:   Thank you.   I have

24      no other questions of this witness.

25            THE COURT:   Thank you.

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          If you can bring that up to her?

2          Mr. White.

3               THE WITNESS:    Thank you.

4               THE COURT REPORTER:    It's all right.

5          **CROSS-EXAMINATION**

6   BY MR. WHITE:

7   Q    Doctor Dev, umm --- now you've worked with

8        prosecutors and police?

9   A    Pardon?

10  Q    You've worked with prosecutors and police?

11  A    I do as part of my job, yes.

12  Q    Okay.

13          And you give seminars?

14  A    Yes.

15  Q    And consider yourself a specialist in the field of

16       abuse, is that a fair statement?

17  A    Child abuse pediatrics, yes.

18  Q    Now uh --- we can agree that science, including

19       medical science, it's important that conclusions

20       based upon critical analysis of empirical data,

21       correct?

22  A    Yes.

23  Q    Empirical meaning observable, measurable, correct?

24  A    Most of the time, yes.

25  Q    Okay.

36

1           And certainly when we want in the field of

2      science, in your science, that we want to avoid

3      assumptions based without any kind of empirical base,

4      correct?

5  A    Correct.

6  Q    Because when we make such assumptions that might lead

7      us to an erroneous conclusion, correct?

8  A    Correct.

9  Q    Now in Madison McBurney's case you were consulted

10     because there was a suspicion of child abuse,

11     correct?

12 A    Correct.

13 Q    And the records show that Madison was admitted to U.

14     of M., was seen at ER on November thirtieth (30th) at

15     seven-fifty-five (7:55), isn't that true?

16 A    I don't know the exact time but, yes, she was in the

17     ER on that day.

18 Q    If I said seven-fifty-five (7:55), nineteen-fifty-

19     five (19:55), would you have any reason to disagree?

20 A    No.

21 Q    And at what time did you receive your request to

22     consult?

23 A    I heard about her case the morning of the first.

24 Q    What time the morning of the first?

25 A    It would have been when I was coming into the

                              37

1     hospital.  So around nine o'clock (9:00) in the

2     morning.

3  Q  And what time did you see Madison initially?  What

4     time of the day?

5  A  I don't know the exact time that I saw her.  I know

6     I saw her that day.

7  Q  Okay.

8          So you don't know what time.  You know you saw

9     her though in pediatric --- peakack (phonetic) excuse

10    me, pediatric intensive care, correct?

11 A  Yes.

12 Q  And she was in her bed, correct?

13 A  Yes.

14 Q  In her room?

15 A  Yes.

16 Q  And her parents were there?

17 A  Yes.

18 Q  Okay.

19         And her parents being Steven and Heather

20    McBurney?

21 A  Yes.

22 Q  Two people that you've never seen before?

23 A  Yes.

24 Q  Never talked to?

25 A  Yes.

38

1  Q   And, I believe, you testified before you went there

2      you reviewed the hospital records regarding Madison,

3      Madison McBurney?

4  A   I'm not sure which order I did that in, but that is

5      something that I usually do.  I try to get to know

6      what the child was brought in for.

7  Q   Can you say to this Jury though that you actually

8      reviewed the records before you went to Madison's

9      room and conducted your examination and elicited a

10     history from the parents?

11 A   I think I did.  But again I can't say one hundred

12     percent (100%) because it was so long ago.

13 Q   Okay.

14         Then if you did, you would have known that there

15     were two histories already taken from Steven and

16     Heather McBurney, isn't that correct?

17 A   Yes.

18 Q   Okay.

19         Umm --- a history from the ER physician,

20     correct?

21 A   Yes.

22 Q   And a history from the first pediatrician that

23     Madison saw in pediatrics (sic) intensive care, which

24     should be Doctor Linda Yang, correct?

25 A   Well actually that --- they ---their notes probably

                              39

1       came up onto our system much later because they ---

2       the ER note would come up right away.   So I'm ---

3       actually I'm not sure if there were two histories on

4       CareWeb at that point or not.   I know there was an

5       ER note but then I don't know what else had come up

6       by then, by the time I saw them.

7   Q    But the ER note was from Doctor?

8   A    Sikavitsas.

9   Q    Sikavitsas.   Thank you.

10       But you can't say whether the other history that

11       was given to Doctor Linda Yang, you actually reviewed

12       it?

13   A    I reviewed, I honestly do not know if I saw that

14       before or afterwards.   I try to get a --- I try to

15       get an idea of what the child is in there for and

16       then I go see the child.   And I'm not sure which

17       notes I actually reviewed.

18   Q    Okay.

19       Did you actually review the MRI's of August

20       thirty-first (31st), twelve one (12/1)?

21   A    I did not until after I saw her.

22   Q    Okay.

23       Did you actually review the CAT scans of

24       November, excuse me, September eleventh (11th) and

25       November thirtieth (30th)?

1    A     I did review them but not until after I saw her.

2    Q     So if I'm understanding your testimony correctly,

3          then you may --- you did review the ER notes from

4          Doctor Sickavitias (sic), Sikavitsas, but you can't

5          testify whether you reviewed anything else for

6          certain?

7    A     At the time before I went to see her.    But

8          subsequently, obviously reviewed it.    But ---

9    Q     (Interposing)    Before you went to see her ---

10   A     (Continuing)    before I went to see her, I know I

11         looked at the ER note.    I looked at the reports of

12         the MRI and CT scans and then I went in to see her

13         because I always go in to see the kids as soon as

14         possible especially when I hear from the ICU that

15         they are not in good shape.

16   Q     Is there anything else that you can testify that you

17         did prior to going into Madison's room?

18   A     No.

19   Q     Okay.

20         And umm --- you indicated in your direct

21         testimony that there were four different, I believe

22         the word inconsistent, histories given.    Is that ---

23         do you remember your testimony?

24   A     Yes.

25   Q     Okay.

41

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1              And one was to you, correct?

 2    A   Yes.

 3    Q   And the other was to three other doctors including

 4        Doctor Yang, Doctor Maher, is that true?

 5    A   No.

 6    Q   Did you see the Prosecutor's head go back and forth?

 7    A   No.

 8    Q   Okay.

 9              What other doctors did you review?

10    A   It's Doctor Yang, Doctor Gail Annich, and Doctor

11        Steve Leber.

12    Q   Okay.

13              Now when you say the history given was

14        inconsistent, that's not accurate is it?

15    A   I'm not sure.   The history that was reported in

16        CareWeb?

17    Q   Right.   Sure.

18              So you made an assumption in making that

19        statement, did you not?

20    A   I assumed that the doctors are recording the

21        appropriate history.

22    Q   Okay.

23              In fact, there are many assumptions that you

24        made in that testimony, isn't that true?

25    A   No.   I don't --- I'm not sure what you're trying to
```

1          say.

2    Q     Okay.

3                Let me ask.   We know you didn't hear any of

4          those doctors ask the questions of Steve and Heather,

5          correct?

6    A     Correct.

7    Q     We know that you didn't hear any response that Steve

8          and Heather gave, correct?

9    A     To those other doctors?

10   Q     Yes.

11   A     Correct.

12   Q     Okay.

13               And we know that you didn't --- you weren't

14         involved in the actual recording of those statements

15         into the CareWeb notes, correct?

16   A     Correct.

17   Q     Okay.

18               So there's at least three assumptions there,

19         correct?

20   A     Yes.

21   Q     Okay.

22               And so when you say the history given that's not

23         really a true statement, is it?

24                    MS. POPE-STARNES:   Objection.   Asked

25         and answered.

                                43

1          THE COURT:    I'll allow it.

2          THE WITNESS:    Yes.

3    Q    **(By Mr. White, continuing)**    Okay.

4          It's based upon your assumptions, correct?

5    A    Yes.

6    Q    Now it's not uncommon for you Doctor in situations

7         such as was presented to you on December first, two

8         thousand and six (2006) that parents, especially

9         young parents, to be very upset, correct?

10   A    Yes.

11   Q    Okay.

12         Sometimes, deprived of sleep because of the

13        nature, lengths of the injury?

14   A    Yes.

15   Q    Okay.

16         And sometimes not responsive to questions that

17        you may have regarding the specific condition and

18        history of the child, correct?

19   A    Correct.

20   Q    Okay.

21         Now you said in your direct testimony the

22        parents said, 'Madison was well all day'?

23   A    Yes.

24   Q    Okay.

25         Who said that?

44

```
 1   A    I don't remember and I didn't record it.

 2   Q    Okay.

 3             You didn't record it.   Let me ask you this.

 4             After you had this history from Steve and/or

 5        Heather, whoever you took it from, how long after

 6        that did you put your notes in the CareWeb system?

 7   A    Umm --- can I look at my notes?   I'm not sure when I

 8        dictated it so I can ---

 9   Q    (Interposing) Would your notes refresh your

10        recollection?

11   A    Yes.

12             I dictated my note on December second, two

13        thousand and six (2006).

14   Q    And what time on December second?

15   A    I do not know that and I do not have a record of when

16        that was.

17   Q    So we don't know how long it was after this initial

18        consult with the parents that you actually dictated

19        it?

20   A    Correct.

21   Q    And that was into the CareWeb system?

22   A    Correct.

23   Q    Because you can't testify when you were there,

24        correct?   In Madison's room with the parents?

25   A    Correct.
```

45

1    Q    Okay.

2         So we know that at least over to the next day,

3         correct?

4    A    Correct.

5    Q    We know you didn't take notes at the time that you

6         got the history from the parents, correct?

7    A    No.   That's not correct.

8    Q    You do have notes?

9    A    I ---

10   Q    (Interposing)   Do you have notes?

11   A    I don't have notes anymore.   I shred them after I

12        dictate them.

13   Q    Okay.

14        So you did take notes?

15   A    I did take notes.

16   Q    Okay.

17        So umm --- when you'd heard from Steve or

18        Heather, you can't recall, that 'Madison was well all

19        day', did that cause you any concern?

20   A    That --- that her being well ---

21   Q    (Interposing)   Yes.

22   A    Did that cause me any concern?   No, it was not

23        concerning that --- well, it was not concerning

24        medically that she was well.   That's a good thing

25        but it was concerning when it came to my opinion

46

1       because someone doesn't deteriorate that fast.   So

2       yes, it was concerning to know that she was well and

3       then by seven o'clock (7:00) she was quite the

4       opposite.   So it was concerning to me in that way.

5   Q   But you already knew if you reviewed Doctor

6       Sikavitsas's notes that she had vomited three times

7       earlier that day?

8   A   Yes.

9   Q   Did you ask the parents about that?

10  A   No.   I let them give ---

11  A   (Interposing)   Did you ask the parents ---

12              MS. POPE-STARNES:   (Interposing)

13      Objection.   I ask the witness be allowed to answer

14      the question and not be interrupted.

15              MR. WHITE:   Judge, I just --- she did

16      answer.

17              THE COURT:   In fairness, ---

18              MS. POPE-STARNES:   (Interposing) She was

19      still talking, Your Honor.

20              THE COURT:   I know.   I know.   She

21      answered the question.   Go ahead.

22  Q   **(By Mr. White, continuing)**   Now you said that you

23      had, 'No one told you about MRSA,' either Steve or

24      Heather?

25  A   Yes.

47

1    Q    Okay.

2         And MRSA is potentially a fatal staph infection,

3         isn't that true?

4    A    Yes.

5    Q    Okay.

6         So whether it was ultimately shown by any tests,

7         it's potentially a matter of significant concern if

8         she had MRSA, correct?

9    A    Yes.

10   Q    Okay.

11        And we know if you reviewed the records, the

12        nurse's notes clearly show the child had MRSA,

13        correct?

14   A    Yes.

15   Q    Okay.

16        And we know that if you reviewed the record,

17        Doctor Yang's notes also clearly indicate that the

18        child had MRSA, correct?

19   A    Yes.

20   Q    And we also know that Doctor Yang clearly indicated

21        the child was taking a medication called Bactroban

22        for the MRSA, correct?

23   A    Yes.

24   Q    So you knew all those things when you went into

25        Madison's room on December first, correct?

48

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   A      No I did not.

2   Q      Okay.

3          So you didn't review the records is what you're

4          saying?

5   A      Doctor Yang's notes ---

6   Q      (Interposing)    Did you review the records or not?

7                  MS. POPE-STARNES:    I'm going to object

8          and ask that he specify which record.    He's asked

9          for different things.

10                 THE COURT:    Yes.

11                 MS. POPE-STARNES:    And he needs ---

12                 THE COURT:    (Interposing)    Sustained.

13                 MS. POPE-STARNES:    (Continuing)    to

14         specify which record.

15                 THE COURT:    Sustained.

16  **Q**      **(By Mr. White, continuing)**    Did you review Doctor

17         Yang's notes?

18  A      I do not remember.

19  Q      Okay.

20         And we know that, excuse me, you know that

21         Bactroban is an antibacterial ointment, correct?

22  A      Yes.

23  Q      Okay.

24         Now isn't it possible Doctor that you made a

25         mistake about Madison?    Either Steve or Heather

49

1        saying that, 'Madison was well that day?'

2    A   That I made a mistake how?

3    Q   In recording something that may have not been said by

4        one of the parents?

5    A   I'm usually pretty good about recording but that's

6        possible.

7    Q   Okay.

8            Now you say in your CareWeb notes that the child

9        is taking Bactroban for the aplasia cutis congenita?

10   A   In my notes?

11   Q   Well let me ask you this.

12           Do you say that in your notes?

13   A   I don't think I do.   May I review my ---

14   Q   (Interposing)   Okay.

15           Go ahead.   Review your notes.

16   A   I say that she was taking Amoxicillin for an early

17       ear infection.

18   Q   Current medications.   Current medications include

19       Bactroban for her aplasia cutis congenita.

20   A   Right.   Yes.   You're right.

21   Q   So what you did is you put down an antibacterial

22       ointment for a congenital --- congenital condition,

23       correct?

24   A   That's what the parents told me, yes.

25   Q   That's what you put down, right?

50

1    A    Yes.

2    Q    Okay.

3         And you know that Bactroban is not used for

4         congenital conditions, correct?

5    A    Yes.

6    Q    Okay.

7         So now you're saying this is the parent's fault

8         too that you were told this, correct?

9              MS. POPE-STARNES:   Objection.

10    Argumentative.

11    Q    **(By Mr. White, continuing)**   You didn't make a

12         mistake here either, did you?

13              MS. POPE-STARNES:   I'm sorry Your Honor

14    but there's an objection before the Court.

15              THE COURT:   And he changed his question

16    so I guess he abandoned it.

17         Start over Mr. White.

18    Q    **(By Mr. White, continuing)**   Now with regard to

19         putting Bactroban down as a treatment for a

20         congenital condition, you didn't make a mistake here

21         either, did you?

22    A    I should have asked them why she was using the

23         Bactroban and I did not.

24    Q    Did you make a mistake or not?

25    A    I'm not sure because I wrote down what they told me.

51

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    I didn't know about the MRSA so I didn't not put it

2    there on purpose.  I didn't know at the time when I

3    wrote the note.  I did not know that she had MRSA

4    and was using Bactroban for MRSA.  I was told by the

5    parents that she was using Bactroban for the aplasia

6    cutis congenita and I wrote it, I recorded it that

7    way.

8  Q  Didn't this --- didn't this red flag to you that

9    someone would use an antibacterial ointment for a

10   congenital --- congenital condition?

11 A  I felt that it was probably something that some

12   dermatologist had prescribed them and that they were

13   following those instructions.  It did not set off a

14   red flag to me.

15 Q  Okay.

16       And then so you did make a mistake, that's your

17   testimony?

18            MS. POPE-STARNES:  Objection.  Asked

19   and answered.

20            THE COURT:  Sustained.

21       We got an answer.  Move on.

22 Q  **(By Mr. White, continuing)**  Now uh --- when you went

23   to Madison's room, you'd already talked to --- you'd

24   already reviewed some of the records, correct?

25 A  Yes.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q    You had talked to protective services workers,

2         correct?

3   A    No, not at that point.

4   Q    And had you talked to any of the detectives yet?

5   A    No.

6   Q    So when it says here an inpatient consult, type of

7         service, inpatient consult, reason for consult;

8         suspected abuse.  Source of information, CareWeb

9         notes and parents, protective service workers and

10        detectives, that's not true either, is it?

11  A    It is true.

12  Q    Now are you board certified in radiology Doctor?

13  A    No.

14  Q    But you reviewed the actual MRI of August thirty-

15        first (31st), correct?

16  A    With the neuroradiologist.

17  Q    Did you actually look at the film yourself?

18  A    Yes.

19  Q    Okay.

20        And did you --- and the neuroradiologist was

21        who?

22  A    Uh --- at that time it was with Doctor Doug Quint.

23  Q    Okay.

24        And you reviewed the September eleventh (11th)

25        CAT scan, correct?

1    A    Yes.

2    Q    And you reviewed the notes from it, correct?

3    A    Yes.

4    Q    Okay.

5         So we know or actually you know that there was

6         blood detected on the August thirty-first (31st) MRI,

7         correct?

8    A    It was blood or a lipoma is the way that the report

9         read.

10   Q    Okay.

11        And you know that the radiologist indicated that

12        umm --- the cerebral volume of the child was mildly

13        low, correct?

14   A    Yes.

15   Q    Okay.

16        And the reason why the MRI was being done on

17        August thirty-first (31st), two thousand and six

18        (2006)?

19   A    Pardon?

20   Q    The reason why the MRI was being done on August

21        thirty-first (31st), two thousand six (2006), do you

22        know why?

23   A    Yes.

24   Q    Why?

25   A    Because there was --- because of her aplasia cutis

54

```
 1        congenita there was concern that there might be a

 2        scalp defect.

 3   Q    Okay.

 4   A    So the dermatologist had ordered that.

 5   Q    Okay.

 6             Doctor Piro, correct?

 7   A    I'm not sure who had --- who the actual person is.

 8   Q    Because the possibility there were blood products on

 9        Madison's brain on August thirty-first (31st), that's

10        why the CT scan on September eleventh (11th) was

11        ordered, correct?

12   A    Yes.

13   Q    Okay.

14             And the CT scan did not show evidence of any

15        blood products, correct?

16   A    Yes.

17   Q    Okay.

18             And we also know that the examiner clearly says

19        in his report, 'It is possible that if blood products

20        were present at the time of the August thirty-first

21        (31st), two thousand six (2006) MRI, they may not be

22        visible on a CT performed at this time', correct?

23   A    Yes.

24   Q    Okay.

25             And a follow-up MRI of two to three months was
```

55

1      suggested, correct?

2 A    Yes.

3 Q    Okay.

4      And certainly an MRI wasn't done before she had

5      reentered the hospital on November thirtieth (30th),

6      correct?

7            MS. POPE-STARNES:   Objection.   Calls

8      for hearsay and speculation.

9 Q   **(By Mr. White, continuing)**   To the extent of your

10     knowledge was there any other MRI's done, CAT scans

11     done, after August, excuse me, September eleventh

12     (11th), two thousand six (2006)?

13           MS. POPE-STARNES:   Objection.   Same

14     objection.   She can only answer as to whether or not

15     it was done at her institution based on the medical

16     records that were admitted into evidence.

17           MR. WHITE:   While I asked it to her

18     knowledge.

19           THE COURT:   Rephrase it with that

20     particular, Mr. White.

21 Q   **(By Mr. White, continuing)**   Were you ever apprised

22     by any other person that Madison had any other MRI's

23     or CAT scars --- CAT scans done?

24           MS. POPE-STARNES:   Objection.   Hearsay.

25           MR. WHITE:   It's not.

56

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          THE COURT:   Go back to the other

2     question.   I liked the other question better.

3          MR. WHITE:   And I thought it was a

4     proper question.   And that's exactly what I'm

5     talking about.

6          THE COURT:   Go ahead.   Go ahead.   Go

7     ahead, let me hear it.   Just let me hear the

8     question Mr. White.

9  Q   **(By Mr. White, continuing)**   Did Madison, to your

10     knowledge, did Madison have any other MRI's or CAT

11     scuns (phonetic) --- CAT scans done after nine-eleven

12     (9/11) until she entered the hospital on November

13     thirtieth (30th)?

14 A   No.

15 Q   Now when you physically examined her you found a

16     healthy, well-nourished, excuse me, well-nourished,

17     well-developed child, correct?

18 A   Yes.

19 Q   Okay.

20          Umm --- you did discuss that the survey had

21     already shown no fractures of any kind, correct?

22 A   Correct.

23 Q   No dislocations, correct?

24 A   Correct.

25 Q   Umm --- you did a full physical examination of her

57

1      body, correct?   Not only visually but you used your

2      hands and instruments to determine whether there was

3      any kind of signs of injury to the body, correct?

4   A   Correct.

5   Q   Okay.

6          And we can agree that there was no signs

7      whatsoever of any injury to her body, correct?

8   A   Externally, yes.

9   Q   Externally to her body.   Bruises, scrapes, or

10     anything of that nature, correct?

11  A   Correct.

12         And there's no evidence of any internal injury

13     to her body either, correct?

14  A   No.   That's not correct.

15  Q   Where was --- to her body?

16  A   Internally?

17  Q   Yes.

18  A   Like her brain?

19  Q   No.   Her body, not her head.

20  A   Well ---

21             MS. POPE-STARNES:   (Interposing)

22     Objection Your Honor.   The body is part --- the head

23     is part of the body.

24             THE COURT:   Sustained as to the form.

25             MS. POPE-STARNES:   This is becoming

                          58

1          argumentative.

2                    THE COURT:    Sustained as to form.

3     Q    **(By Mr. White, continuing)**    Well let's separate the

4          head and the body.    Let's just for simplistic

5          purposes.    The head different from the body.

6                    Anything indicative of injury to the legs?

7     A    No.

8     Q    Feet?

9     A    No.

10    Q    Arms?

11    A    No.

12    Q    Chest?

13    A    No.

14    Q    Anything else from the neck down?

15    A    No.

16    Q    There's no injury to the neck either, was there?

17    A    I was not able to completely examine her neck because

18         it was umm --- there was too much instrumentation

19         around it.

20    Q    To the extent of the examination that you conducted,

21         could you determine if there was any evidence of

22         injury to the neck?

23    A    No.

24    Q    And you knew from the review of the nurse's notes and

25         the ER notes that there were no observable injuries

                              59

1        to the exterior of the head, correct?

2   A    Just from the nurse's notes.   I could not make that

3        assessment on my own.

4   Q    Okay.

5            But you did review the nurse's notes.   And you

6        know that the people who saw her before the bandages

7        were put on, that no one saw any evidence of any

8        injury to her head, fair enough?

9   A    Yes.

10  Q    Any part of the history that was given to you, do you

11       say who told you what?

12  A    I did not.

13  Q    You can't say if it was Steve or Heather?

14  A    No I did not.   In this case I did not record who ---

15       exactly who said what part of the history.

16  Q    And can we agree that you saw Steve and Heather both

17       when they were distraught?

18  A    Yes.

19  Q    Did you make any determination how long any --- any -

20       -- whether they had slept within a twenty-four (24)

21       hour period?

22  A    I didn't.   I don't know of that.

23  Q    Now in the field of child abuse Doctor, umm ---

24       there's many different kinds of child abuse as

25       defined in your profession --- profession, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    A    Many different kinds of child abuse?

2    Q    Child abuse as defined in your profession.

3    A    I'm not sure what you mean.    Just the various

4         categories of child abuse?

5    Q    Sure.

6    A    Yeah.    Yes.

7    Q    Okay.

8              I believe the Prosecutor went over some of it

9         with you as part of your direct testimony yesterday?

10   A    Yes.

11   Q    Some are, I think, referenced abusive head trauma?

12   A    Yes.

13   Q    And that is a new phrase in the field, is it not?

14   A    Yes.

15   Q    Okay.

16             The old phrase was shaken-baby syndrome?

17   A    Yes.

18   Q    And this abusive head trauma when did this become the

19        term of art?

20   A    I'm not sure exactly when.    Maybe about five to ten

21        years ago but I don't know exactly when.

22   Q    This Munchausen by proxy is an ever expanding field?

23   A    It's a field.    I don't know if it's an expanding

24        field or not but ---

25   Q    (Interposing)    Okay.

61

1   This is something of a rather recent development

2   also, isn't that true?

3   A   No.

4   Q   Okay.

5       Now that the Jury has heard that term, knowing

6   it has little relevance to this, would you just

7   briefly explain what that is?

8   A   Munchausen syndrome by proxy is another form of child

9   abuse which used to be called Munchausen syndrome by

10  proxy but the terminology is changing.  And we're

11  sort of moving to the terminology medical abuse or

12  pediatric condition falsification.  And basically

13  it's when a parent does something to a child

14  intentionally to --- in that they either exaggerate,

15  they fabricate, they misrepresent medical

16  information.  Or they induce symptoms in a child

17  which then leads to medical intervention or

18  evaluation by specialists, blood draws, et cetera, et

19  cetera.  So it's --- it's umm --- it's --- the best

20  way to describe it is falsifying a condition in a

21  child by a parent.  So pediatric condition

22  falsification formerly known as Munchausen syndrome

23  by proxy.

24  Q   Now there's also child abuse by neglect too?

25  A   Yes.

1    Q    Failure to properly treat your child's medical

2         conditions or have your child treated, correct?

3    A    Yes.

4    Q    And there's more graphic kinds of child abuse when

5         there's intentional injury caused by objects, things

6         of that nature?    Burns, cuts, uh --- being beaten,

7         things of that nature?

8    A    Yes.

9    Q    So you have a panorama of child abuse possibilities

10        from ignoring your child's needs, all the way up to

11        purposeful acts, correct?

12   A    Correct.

13   Q    Now --- and you determined that Madison was the

14        victim of abusive head trauma, correct?

15   A    Yes.

16   Q    Shaken-baby syndrome, isn't that true?

17   A    It's not called that anymore and I don't use that

18        terminology.    I put it in my note because sometimes

19        people want to know what I mean by abusive head

20        trauma but I try to stay away from that term.

21   Q    So when it says here that in your note, 'Should be

22        noted that her CT and MRI findings are highly

23        concerning for abusive head trauma, parentheses

24        shaken-baby syndrome, that's your notes, correct?

25   A    Yes.

63

1    Q    Okay.

2         And we know that when we have abusive head

3         trauma that the vast majority of times there's some

4         other indication of other injury to the child,

5         correct?

6    A    Yes.

7    Q    Okay.

8         Injury that was not present in this child,

9         correct?

10   A    No.

11   Q    Now we also know that Doctor if you review the

12        records that there was old blood in Madison's brain,

13        correct?

14   A    Yes.

15   Q    Chronic subdural hematomas?

16   A    Yes.

17   Q    What is a chronic subdural hematoma?

18   A    Chronic subdural hematoma is when there is blood that

19        has been there for a certain amount of time.   And as

20        the blood ages and parts, different components of the

21        blood, start getting resorbed, it starts looking a

22        little bit older.   And so the neuroradiologist

23        described it as chronic, based I'm thinking, based on

24        the color of the blood.

25   Q    And umm --- how old was that blood would you say?

64

1    A    I don't know.

2    Q    Is it your testimony that the hematoma that was

3         detected on August thirty-first (31st), two thousand

4         six (2006) had completely resolved itself by

5         September eleventh (11th)?

6    A    Yes.

7    Q    Is it your testimony that the blood that was there

8         August thirty-first (31st) could not become a chronic

9         subdural hematoma that was ultimately detected on

10        November thirtieth (30th)?

11   A    Yes.

12   Q    Now what happened was there was some event that

13        triggered this ischemic cascade of --- in Madison's

14        brain, correct?

15   A    Yes.

16   Q    Causing the brain to swell, causing blood and oxygen

17        to be deprived, correct?

18   A    Yes.

19   Q    And causing the brain to continue to swell?

20   A    Yes.

21   Q    And that --- it enlarged and was swelled over the

22        course of the time that she was in your hospital,

23        correct?

24   A    Yes.   Well before she got there and then throughout

25        the rest of her stay.

65

1  Q   Okay.

2         We know from Doctor Sikavit --- Sikavitsas's

3      notes that her fontanel was uh --- was not tense at

4      the time she examined her, correct?

5  A   Yes.

6  Q   Which means there was not swelling to that degree,

7      correct?

8  A   Correct.

9  Q   At the time that you examine --- examined her there

10     was tenseness, correct?

11 A   Yes.

12 Q   So we did have an increase in the swelling over that

13     one day, correct?

14 A   Yes.

15 Q   Okay.

16        And a fontanel that is tense or enlarged is a

17     medical emergency, correct?

18 A   Yes.   That's why she was in the ICU.

19 Q   Now we know chronic subdural hematomas come from a

20     variety of different sources, excuse me, let me

21     strike that.

22        Acute subdural hematomas can occur as a result

23     of a variety of different reasons, correct?

24 A   Yes.

25 Q   Acute meaning new?

66

1   A   Yes.

2   Q   Okay.

3           It can occur during birth?

4   A   Yes.

5   Q   Okay.

6           It can occur as a result of an accident,

7       correct?   A fall?

8   A   I would have to --- it would --- it would depend on

9       the history and what kind of fall.

10  Q   Well, well okay.

11          A fall.   Let's say a fall down the stairs or a

12      fall off the porch or something like that.

13  A   It would depend.   Depending on the mechanics of the

14      fall.

15  Q   Okay.

16          Is it possible to get an acute subdural hematoma

17      by an accident?

18  A   Sure.

19  Q   An accidental cause, correct?

20  A   Yes.

21  Q   And then it's possible that acute subdural hematoma

22      that may be accidentally created becomes a chronic

23      subdural hematoma, correct?

24  A   Yes.

25  Q   Can you explain to the Jury the mechanism by which an

1       acute subdural hematoma becomes chronic?

2   A   An acute subdural hematoma is a fresh, fresh blood,

3       in that --- under that dural layer, under kind of

4       that membrane.   And it really depends on the body's

5       ability to resorb that blood or whether there's

6       continued bleeding.   And if it stays there for a

7       while then eventually it mixes with the cerebral

8       spinal fluid that is also there and kind of has a

9       sort of chronicity to it.   It just stays there

10      longer than being completely resorbed.

11  Q   And a chronic subdural hematoma can become

12      symptomatic spontaneously, correct?

13  A   Yes.

14  Q   Spontaneously means without trauma, correct?

15  A   Umm --- within --- with umm innocent falls it can

16      happen.   A chronic can rebleed.

17  Q   Rebleed on its own, right?

18  A   Yes.

19  Q   Okay.

20          And also a chronic subdural hematoma can be

21      symptomatic as a result --- as a result of a trivial

22      event too, correct?

23  A   Not usually symptomatic though.   Not to the extent

24      that she had it.   I mean there might be some ---

25  Q   (Interposing)   I'm not asking specifically.   I'm

68

1          asking for more of an example to educate the Jury

2          about how chronic subdural hematomas can become

3          symptomatic.  It can become symptomatic as a result

4          of a trivial event?

5 A     Yes.

6 Q     Such as a minor fall?

7 A     Yes.

8 Q     An event that may not have caused serious injury but

9          because of the existence of the chronic blood it

10         causes --- it becomes symptomatic, correct?

11 A     Yes.

12 Q     Okay.

13           Now the retinal hemorrhages that you talked

14          about.  Retinal hemorrhages umm --- are due to an

15          increase in pressure of the veins, correct?

16 A     They can be.  But they can also be from the

17          stretching and pulling of veins as well.

18 Q     Well I'm asking about it can be caused by an increase

19          in the brain swelling, correct?

20 A     Yes.

21 Q     Causing more pressure to be put on the vein, the

22          veins around the eye, correct?

23 A     Yes.

24 Q     Causing hemorrhages, correct?

25 A     Yes.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1   Q    It doesn't necessarily mean that a child that has

2        retinal hemorrhages is a shaken baby, correct?

3   A    It does not necessarily mean, in general, it does not

4        mean that.

5   Q    In general, correct.

6        It means that it could mean the brain is swollen

7        causing hemorrhages, correct?

8   A    Yes.

9   Q    Okay.

10       And we have a chronic subdural hematoma become

11       symptomatic causing the brain to swell you can also

12       have the effect of the retinal hemorrhages also,

13       correct?

14  A    Yes.

15  Q    Okay.

16            THE COURT:    All set, Mr. White?

17            MR. WHITE:    Yes.   I said, 'Nothing

18       further.'

19            THE COURT:    I didn't hear you.

20            MR. WHITE:    I'm sorry.

21            THE COURT:   Ms. Pope-Starnes?

22            MS. POPE-STARNES:    Thank you, Your

23       Honor.

24                    **REDIRECT EXAMINATION**

25  **BY MS. POPE-STARNES:**

70

1    Q    Doctor, I just have a few questions.

2         What is the reason doctors take a history from a

3         patient or someone who is with a patient?

4              MR. WHITE:    Your Honor, I'd object to

5         the hearsay nature of the question.

6              THE COURT:    Okay.    Rephrase.

7    Q    **(By Ms. Pope-Starnes, continuing)**    What is --- let

8         me ask you this.

9         Doctor Dev, did you go to medical school?

10   A    Yes.

11   Q    And part of dying --- diagnosing a patient were you

12        taught that you had to take a history?

13   A    Yes.

14   Q    Okay.

15        Were there other doctors in your classroom at

16        medical school?

17   A    Yes.

18   Q    And umm --- so when you treat a patient or are

19        diagnosing a patient, do you take a history?

20   A    Yes I do.

21   Q    When you took the history of Madison, where was the

22        Defendant?

23   A    In the room.

24   Q    Where was Madison's mother?

25   A    In the room.

71

1  Q    How far away were they from each other?

2  A    Next to each other.

3  Q    During the course of your work as --- with the child

4       protection team from the University of Michigan, do

5       you ever have cases where you rule out child abuse?

6  A    Yes.

7  Q    Was it concerning to you that the history that you

8       received from the parents in this case was different

9       from what you saw in the medical notes?

10  A   Yes.

11  Q   Did you complete a medical report in this case?

12  A   Yes.

13  Q   And can you tell the Jury --- can you tell the Jury

14       did you do that all at once?

15  A   Complete the medical report?

16  Q   Yes.

17  A   No.   I dictate what I can.   And then as more

18       information comes in, just so that it's a complete

19       report so I don't have to dictate one note after the

20       other, I put it all in one place, so I add to it.

21  Q   And did you do that in this case in your medical

22       report for Madison?

23  A   Yes I did.

24  Q   The opinion that you gave to the Jury was that based

25       on every --- all the information that you had?

72

1    A    Yes.

2    Q    You were asked questions on cross-examination by

3         Counsel about a fall.  And can an acute subdural

4         hematoma, be caused by a fall?

5    A    Depending on the force of the fall, yes.

6    Q    For example, what?

7    A    Such as falling from a second-story window onto a

8         driveway.

9    Q    Were you given any kind of history that that had

10        happened to Madison?

11   A    No.

12   Q    Could an acute subdural hematoma be caused from a

13        child Madison's age and Madison's size sitting on a

14        carpeted floor and falling backwards or sideways and

15        hitting their head on the carpeted floor?

16   A    No.

17   Q    Why not.

18   A    There is not enough force to be pulling and pushing

19        on those bridging veins to be able to cause an acute

20        subdural hematoma.

21   Q    Do you have an opinion about whether or not Madison's

22        injury was as a result of a chronic subdural hematoma

23        which re-bled?

24   A    Yes?

25   Q    What is your opinion?

73

```
 1    A      It is not from that.

 2    Q      Why.

 3    A      Because chronic subdural hematomas that rebleed do

 4           not cause symptoms to the extent that Madison had.

 5    Q      Thank you.

 6                    MS. POPE-STARNES:   I have no other

 7           questions Your Honor.

 8                    THE COURT:   Mr. White.

 9                    RECROSS-EXAMINATION

10    BY MR. WHITE:

11    Q      Well a chronic subdural hematoma that's rebleeding

12           can cause these kinds of symptoms though, in a child

13           though, correct?

14    A      (No verbal response.)

15    Q      Vomiting?

16    A      Yes.

17    Q      Irritability?

18    A      Yes.

19    Q      Umm --- the child being lethargic?

20    A      Yes.

21    Q      The child not being his or herself, correct?

22    A      Yes.

23    Q      Okay.

24                And isn't it true Doctor that the medical

25           profession doesn't have a quantity of measurement to
```

74

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1            --- to determine what --- how much force is needed

2            for an acute subdural hematoma?

3   A     Correct.

4   Q     Okay.

5            That it depends on each particular individual

6            that's involved?

7   A     Yes.

8   Q     And that there's many acute subdural hematomas that

9            never make --- the medical profession is not aware of

10           because it happens as a result of a particular event,

11           such as a fall, the child is never brought in for

12           treatment?

13  A     Yes.  I guess.  We wouldn't know unless we scan

14           them.

15  Q     You wouldn't know right?

16           And we certainly can't experiment with humans to

17           cause these because that would be unethical, correct?

18           MS. POPE-STARNES:   Objection.   That's

19           beyond the scope of redirect, Your Honor.

20           THE COURT:   The form is --- sustained.

21  **Q**     **(By Mr. White, continuing)**   And your position is

22           this could not be a chronic subdural hematoma because

23           a rebleed would not cause the symptoms that Madison

24           exhibited, correct?

25  A     Could you repeat that?

75

FORM CSR- LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   Q   I'm sorry.

2       Your opinion was that this was not a chronic

3       subdural hematoma because a rebleeding of a chronic

4       subdural hematoma would not cause the symptoms that

5       Madison exhibited?

6   A   I can't say that it wasn't chronic because that's

7       what the report says but I don't think that it was a

8       rebleed of a chronic.

9   Q   We know there was chronic subdural hematomas,

10      correct?

11  A   Correct.

12  Q   Okay.

13      Because that's referenced in your report,

14      correct?

15  A   Yes.

16  Q   It's just your belief that it was not chronic.   Her

17      symptoms were not caused by the rebleed, correct?

18  A   Correct.

19              MR. WHITE:   Nothing further Judge.

20              THE COURT:   Anything further?

21              MS. POPE-STARNES:   No.

22              THE COURT:   Thank you Doctor.   You're

23      all set.

24              MS. POPE-STARNES:   May this witness be

25      excused?

76

1          THE COURT:    Any objection?

2          MR. WHITE:    No objection.

3          THE COURT:    You're all set Ma'am.

4    Thank you.

5          THE WITNESS:    Thank you.

6          THE COURT:    Any just guesstimate Ms.

7    Pope-Starnes on the next witness.    We can get

8    started for a little while and take a break.    Or we

9    can take a break now.

10          MS. POPE-STARNES:    May we approach?

11          THE COURT:    You may.

12    (Whereupon a discussion was held at the Bench out of

13    hearing of the Jury and the Court Reporter.)

14                    * * *

15          THE COURT:    We're going to take a short

16    break now.    Please don't discuss the case.

17       All rise for the Jury.

18    (Whereupon the Jury was returned to the Jury room.)

19                    * * *

20          THE COURT:    The record will reflect that

21    the Jury has been excused.    You may all be --- well

22    hang tight for a minute because I'll leave.    And

23    then deputies, we'll just give you a call, okay?

24          A DEPUTY:    Yes Judge.

25          THE COURT:    Thanks.

77

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1        THE CLERK:   All rise.

2        (Whereupon a recess was had.)

3             * * *

4        THE CLERK:   The Court calls People

5   versus McBurney, case number 07 214651 FC.

6        THE COURT:   Ms. Pope-Starnes, Mr. White,

7   your appearances are noted.   The Defendant is back.

8      Good morning everyone.

9      Ready to proceed?

10          MS. POPE-STARNES:   Yes.

11          THE COURT:   Mr. White, ready to proceed?

12          MR. WHITE:   Yes, Your Honor.

13          THE COURT:   Okay.

14      Jeff, you can bring in the Jury.

15          MS. POPE-STARNES:   Judge umm --- the

16   Court has now excused Doctor Dev and she's asked

17   whether or not it would be possible if she could

18   return tomorrow just to listen to Doctor Uscinski's

19   testimony?

20          THE COURT:   Any objection?

21          MR. WHITE:   Can I ponder that and give

22   you an answer before the day is out?

23          THE COURT:   Oh.   She's back there.

24   Just leave a cell phone number with the Prosecutor

25   and we'll uh --- it might not be a problem.   We'll

78

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    just certainly let Mr. White ponder on that, okay?

2              MR. WHITE:    I'll let you know.

3              THE COURT:    That's fine.

4              MS. POPE-STARNES:    And Judge, as I

5    indicated this morning in chambers, I have this one

6    other witness I don't want to tie up and have a

7    witness be held over until tomorrow.    So this will

8    be a brief witness.

9              THE COURT:    Okay.   Very well.

10             THE CLERK:    All rise for the Jury.

11   (Whereupon the Jury was returned to the courtroom at

12   11:00am.)

13                  *  *  *

14             THE COURT:    Good morning again,

15   everyone.   Thank you.   You may all be seated.

16        The record will reflect that the Jury is back.

17   The case has been called and Counsels' names have

18   been noted for the record.

19        Ms. Pope-Starnes, you may proceed.

20             MS. POPE-STARNES:    Your Honor, the

21   People would call Sergeant Baaki to the stand.

22             THE COURT:    Sergeant, would you approach

23   please?   Please face my clerk and raise your right

24   hand to be sworn.

25             THE CLERK:    **Do you swear the testimony**

79

1    you are about to give will be the truth, so help you

2    God?

3                    THE WITNESS:    **I do.**

4                    THE COURT:    Thank you.    You can have a

5    seat there.

6                    MS. POPE-STARNES:    May I proceed with

7    the witness Your Honor?

8                    THE COURT:    You may.

9            **S E R G E A N T    D O U G L A S    B A A K I**

10   **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

11   **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

12   **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

13   **AND TESTIFIED AS FOLLOWS:**

14                   **DIRECT EXAMINATION**

15   BY MS. POPE-STARNES:

16   Q    Sir, would you please state your name and spell your

17        last name for the record?

18   A    Sergeant Douglas Baaki.    B A A K I.    CSI, South

19        Lyon Police Department.

20   Q    How long have you been a police officer?

21   A    I've been working with the city of South Lyon as a

22        police officer for seventeen (17) years.    Just over.

23   Q    Did you work with any other police department?

24   A    Monroe County Sheriff's Department for a week.    It

25        was perimeter security.    It wasn't actually a police

                                80

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1        officer.

2    Q   So as a certified police officer have you worked with

3        any other departments besides South Lyons?

4    A   No, I have not.

5    Q   And how long have you worked as a Sergeant?

6    A   I was promoted in ninety-nine ('99).

7    Q   Sergeant Baaki, if I could direct your attention back

8        to December second of two thousand and six (2006),

9        what was your assignment at that time?

10   A   At that time I was currently assigned to the shift

11       supervisor for the midnight shift in the city.

12       Basically working the road and I'm supervising other

13       road patrolman.

14   Q   Did you receive information about a child by the name

15       of Madison McBurney during that work shift?

16   A   Yes I did.

17   Q   Who did you receive that from?

18   A   At first as I was coming on shift, Officer Brooks

19       advised me that a Sarah Weaver ---

20               MR. WHITE:    (Interposing)    Objection.

21       Objection.    It's hearsay.

22               MS. POPE-STARNES:    Objection to that.

23       On response Your Honor, it goes to a state of mind,

24       just as the dispatch does.

25               THE COURT:    Just so long as the

                              81

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    communication is so limited, the Court will sus ---

2    overrule the objection.

3                THE WITNESS:   After I got the

4    information from Officer Brooks, I contacted Ms.

5    Weaver and asked her about what was going on.

6  Q    **(By Ms. Pope-Starnes, continuing)**    And who is Ms.

7    Weaver?

8  A    Ms. Weaver works for Washtenaw County Protective

9    Services.   She was enroute to University of Michigan

10    Hospital.

11                MR. WHITE:   Objection.   He doesn't ---

12    that judgment is beyond his personal knowledge.

13                THE COURT:   Sustained.   Sustained.

14                MS. POPE-STARNES:   Your Honor, I believe

15    the objection is hearsay.   And I will ask the

16    Officer to answer the non-hearsay part of the

17    question.

18                THE COURT:   Thank you, Counsel.   Noted.

19                MS. POPE-STARNES:   Thank you.

20  Q    **(By Ms. Pope-Starnes, continuing)**   Did you have an

21    opportunity to talk to Ms. Weaver?

22  A    Yes I did.

23  Q    And did you obtain the information about Madison

24    McBurney?

25  A    Yes I did.

82

1   Q    And what did you do then?

2   A    At that time I contacted my Lieutenant Sharp.    He

3        was at home.    Advised him that we had ---

4                  MR. WHITE:    (Interposing)    Objection as

5        to, Judge, the hearsay nature.    He wouldn't have any

6        idea of where he was at other than what is disclosed.

7        So I just ask that we proceed with what the officer

8        can personally testify to.

9                  THE COURT:    Just try to answer just the

10       question that's asked, okay?

11                 THE WITNESS:    Okay.    Sorry, Your Honor.

12  **Q**    **(By Ms. Pope-Starnes, continuing)**    Did you have a

13       telephone number for Lieutenant Sharp?

14  A    Yes I did.

15  Q    Did you call it?

16  A    Yes I did.

17  Q    Were you able to reach him?

18  A    Yes I was.

19  Q    What happened next?

20  A    I asked him if I could --- I told him --- I told him

21       what I heard from Ms. Weaver from Washtenaw County

22       Protective Services.    I asked to --- if I could

23       contact a detective uh --- reference this complaint

24       that we took from Ms. Weaver.

25  Q    And subsequent to speaking with Lieutenant Sharp, did

83

1       you contact a detective from your department?

2   A   Yes.

3   Q   Which detective or detectives did you contact?

4   A   I was able to contact Detective Sederlund and

5       Sergeant Sovik.

6   Q   What happened then?

7   A   At that time I knew that those officers were coming

8       enroute to take over the case.    I than ran

9       backgrounds on Heather McBurney and Steven McBurney.

10      And then when they came to the department, I kind of

11      briefed them what protective services had advised me.

12  Q   When you say, 'They came to the department', who are

13      you speaking of?

14  A   Detective Sederlund and Sergeant Sovik.

15  Q   Did you give them the information you had received

16      from Sarah Weaver ---

17  A   (Interposing)    Yes.

18  Q   (Continuing)    from Washtenaw County Protective

19      Services?

20  A   Yes I did.

21  Q   Okay.

22          And did you give them any information you had

23      about the backgrounds at that time?

24  A   Yes I did.

25  Q   What happened then?

84

1    A      After that umm --- they were going to Northville

2           Township Police Department.

3                    MR. WHITE:    Objection Your Honor.    I

4           think it's hearsay as to what they were going to do.

5           They would have to testify.

6                    THE COURT:    Sustained.

7    Q      **(By Ms. Pope-Starnes, continuing)**    Sergeant, can you

8           testify what you did next?

9    A      I'm sorry.

10   Q      Can you testify what you did next?

11   A      After I briefed the officers, they left our

12          department to conduct their investigation.    And then

13          I continued with my patrol duties as --- when I ---

14          because I was still working midnights.    So then I

15          was working.    And then at approximately five o'clock

16          (5:00) the next morning ---

17   Q      (Interposing)    Well let me stop you there.

18               What kind of a shift did you work at that point?

19   A      Midnight shift.    It's basically seven (7:00) to

20          seven (7:00) shift.    Seven at night to seven in the

21          morning.

22   Q      So you were still working at five o'clock (5:00) the

23          next morning?

24   A      Correct.

25   Q      What happened then?

85

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    A    At that time I received a phone call from Sergeant

2         Sovik advising me to go to ---.

3                    MR. WHITE:    (Interposing)    Objection as

4         to ---

5                    MS. POPE-STARNES:    (Interposing)    It

6         goes to state of mind Your Honor.

7                    MR. WHITE:    (Continuing)    hearsay,

8         hearsay nature.    We don't have to go into the

9         content in order to ---

10                   THE COURT:    (Interposing)    To the ---

11        elaborate on the question as to the reason what he

12        was planning on doing with the information or

13        something.

14        As to form, sustained.

15   Q    **(By Ms. Pope-Starnes, continuing)**    Did you speak

16        with Sergeant Sovik at approximately five o'clock

17        (5:00) the next morning?

18   A    Yes, I did.

19   Q    Okay.

20        Did you take an action based upon the

21.       information that you received from Sergeant Sovik?

22   A    Yes I did.

23   Q    What action did you take?

24   A    I went to the McBurney residence on Scott Street and

25        I picked up the crib.

86

1   Q    Okay.

2           Now did you understand that you had permission

3        to do that?

4   A    Yes I did.

5   Q    Did you have anyone with you?

6   A    I had another officer, Officer Barber assisting me.

7   Q    Can you tell the Jury please, was anyone at the home

8        when you arrived there?

9   A    It was the mother and father of Heather McBurney were

10       there at the residence at the time.

11   Q    And what, if anything, did you collect from the

12       residence?

13   A    I and Officer Barber assisting me, we both went to

14       the back room.   We took the crib, the bedding, and

15       uh --- toys around the crib.

16   Q    Now I'm going to direct your attention this way,

17       Sergeant Baaki to what's been admitted as Defendant's

18       Exhibit J.

19          Do you recognize that?

20   A    Yes.

21   Q    What is that?

22   A    It appears to be the crib that I took from the

23       McBurney residence that night.

24   Q    With this same bedding and toys?

25   A    Correct.

87

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Q   What, if anything else, did you take?

2   A   And I also took a few photographs of the residence at

3       the time when I was there.

4               MS. POPE-STARNES:   May I approach the

5       witness Your Honor?

6               THE COURT:   You may.

7   **Q**   **(By Ms. Pope-Starnes, continuing)**   Sergeant, I'm

8       going to show you what has been admitted as People's

9       Exhibit 2 through 6 and ask you to look at those.

10          Do you recognize those Exhibits?

11  A   Yes I do.

12  Q   How do you recognize them?

13  A   That --- those were the uh --- that night those were

14      the photos of the interior of the McBurney residence.

15  Q   The photos that you just testified that you took?

16  A   Correct.   Correct.

17  Q   What did you do with the crib and the bedding and the

18      toys after you collected it?

19  A   After we --- it was collected, we transported it back

20      to our station and secured it in our Sallyport cage.

21      We have a caging area that's only accessed by certain

22      individuals for evidence.   And then that was placed

23      into evidence.

24  Q   Now Sergeant were you able to transport the crib in

25      its current state, put all together?

88

1   A   We had to --- we had to take the crib apart and we

2       had to transport it in Officer Barber's truck back to

3       the station.

4   Q   And what, if anything, did you have to do to take it

5       apart?

6   A   We had to --- I had the officer go out and get some

7       kind of, I believe it was some type of Allen wrench

8       to take --- take the crib apart.

9   Q   Were you able to preserve it for evidence umm ---

10      when you had to take it apart?

11  A   Yeah.   We drove it back to the station and we logged

12      it in.   And I put everything together as is, in

13      pieces, as it would fit into our --- into our

14      Sallyport.

15  Q   Did you wear gloves to do that, to take it apart?

16  A   No I did not.

17  Q   Why not?

18  A   I was just instructed to take the crib.   I wasn't

19      advised to use any type of gloves or as far as

20      preserving for prints or anything like that.   Umm --

21      - also working with the tools, I had to use small

22      tools for the uh --- for the Allen wrench so I wasn't

23      able to actually work so I had to use my hands.

24          MS. POPE-STARNES:   May I have just a

25      moment please, Your Honor?

89

1          THE COURT:   You may.

2      (Whereupon a brief delay was had.)

3          * * *

4          MS. POPE-STARNES:   Thank you.   I have

5      no other questions for this witness.

6          THE COURT:   Mr. White.

7          MR. WHITE:   Briefly.

8          **CROSS-EXAMINATION**

9  **BY MR. WHITE:**

10  **Q**     Sergeant Baaki, my name is Robert White.

11          MR. WHITE:   If I may approach Your

12      Honor?

13          THE COURT:   You may.

14  **Q**     **(By Mr. White, continuing)**   With Proposed Exhibits K

15      through S.

16          MR. WHITE:   I'm going to --- if I may

17      approach again, Your Honor?

18          THE COURT:   You may.

19  **Q**     **(By Mr. White, continuing)**   It appears that I have

20      some letter that I've already introduced.   And my

21      apologies.

22          Proposed Exhibit K, have you seen this Officer

23      before?

24  **A**     Yes.

25  **Q**     Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1           And is that a picture that you took that

2      evening?

3  A    Yes.

4  Q    I'm handing you Proposed Exhibit O.

5           A picture you took that evening?

6  A    It looks to me like could be, yes.

7  Q    Okay.

8           And P?

9  A    Yes.

10 Q    Thank you.

11 A    Yes.

12 Q    Sorry.  I'm out of order here.

13          M?

14 A    Yes.

15              MR. WHITE:   May I have one second Judge?

16              THE COURT:   Sure.

17          (Whereupon a brief delay was had.)

18              * * *

19              MR. WHITE:   And Your Honor, I'm not

20     offering, R,S, L, and N because it appears they've

21     already been offered as part of the People's proofs.

22 Q    **(By Mr. White, continuing)**   So as to those pictures

23     that I have shown you Officer that accurately depict

24     the inside of the McBurney residence at the time that

25     you took those pictures?

91

1   A    Yes, it does.

2              MR. WHITE:   I move for entry, Your

3        Honor.

4              MS. POPE-STARNES:   No objection.

5              THE COURT:   So admitted.   And that's

6        for the record, K, M as in mother, O as in operator,

7        P and Q.   So admitted.

8   Q    **(By Mr. White, continuing)**   Umm --- now before you

9        arrived Officer, did you --- did you call ahead and

10       announce to anyone that you were on your way?

11  A    No I did not.

12  Q    Okay.

13            And uh ---. you came it would have been

14       approximately between five a.m. (5:00am) and six a.m.

15       (6:00am) in the morning?

16  A    Approximately.   I believe it was five (5:00) is when

17       I got the call from Sergeant Sovik.   I think five-

18       twenty (5:20) is when I actually got to the

19       residence.

20  Q    Okay.

21  A    That's correct.

22  Q    Okay.

23            And people who identified themselves as

24       Heather's parents came to the door?

25  A    Correct.

1    Q    Okay.

2         And they let you in?

3    A    They did.

4    Q    Okay.

5         They were cooperative with you in you taking the

6         pictures and getting the property that you took out

7         of the house?

8    A    Yes they were cooperative.

9    Q    And it's a fair statement Officer that at no time

10        prior to you dismantling this crib did you do any

11        testing of this crib whatsoever?

12   A    That is correct.

13   Q    You didn't do anything for fingerprints or any kind

14        of examination whatsoever, correct?

15   A    Correct.

16   Q    Okay.

17        And the crib was dismantled by you and Officer

18        Barber and then taken back uh --- and put in the

19        South Lyons Police Department, correct?

20   A    Correct.

21   Q    Okay.

22        And it's a fair statement that you didn't

23        conduct any tests there either, correct?

24   A    Correct.

25   Q    And umm --- now did you get all the bedding including

                              93

1   the sheet?

2  A   As far as what's logged there that --- it appears

3      that I got whatever was there in the room at the time

4      is what I got.   I don't recall if there was a

5      bedding or sheet on it.   If there was a sheet on it

6      there is when I picked it up the first time.

7  Q   Okay.

8  A   That night.   Or that morning.

9  Q   Umm --- do you --- can you see where it's at right

10     now?   Can you see it clearly?

11 A   Yeah.   I mean I don't --- I can't see in it but I

12     can see it clearly.

13 Q   Okay.

14         And --- but you had an opportunity before the

15     Jury was brought back in, you sat right next to it,

16     correct?

17 A   Correct.

18 Q   Could you see it clearly then?

19 A   Yeah.

20 Q   Okay.

21 A   Yes.

22 Q   Is the crib now in the condition that it was at the

23     time that you confiscated it on November, excuse me,

24     December second, two thousand (2000), excuse me,

25     December third, two thousand six (2006)?

94

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    A    Yes.

2    Q    Okay.

3              So the placement of the pad, and the placement

4         of the mattress accurate?

5    A    To the best of my knowledge, yes it is.

6    Q    Okay.

7              The placement of the toys on the crib?

8    A    Yes.

9    Q    Okay.

10             Now umm --- you also took this picture also

11        that's been marked and admitted as Exhibit P?

12   A    Yeah.   If it were with this roll, yes, I took that

13        picture.

14   Q    And you took this picture also?   It's been marked

15        and admitted as C, the outside of the house?

16   A    Yes.

17   Q    Okay.

18             The house was clean?

19   A    Yes it was.

20   Q    Okay.

21             Everything in good order?

22   A    It appeared to be, yes.

23   Q    Okay.

24             And uh --- did you move any furniture before you

25        started dismantling the crib?

1    A    I'm trying to think back.   I don't believe I did.

2         I believe all I did was if I went into the area of

3         the room to get the crib, I don't think I had to move

4         anything in order to get the crib out.   I don't

5         recall if I moved anything.

6    Q    Okay.

7    A    If it was ---

8              MR. WHITE:   (Interposing)   If I may

9         approach Judge?

10             THE COURT:   You may.

11   Q    **(By Mr. White, continuing)**   Now I'm going to show

12        you what's been marked as Exhibit 5.

13             And you can see that there's a chair that's

14        there?

15   A    Yes.

16   Q    Okay.

17             Didn't you have to move that chair?

18   A    That's possible.   If it was in my way from getting

19        the crib out then it's very possible I moved the

20        chair.

21   Q    Okay.

22             It's possible the chair was actually closer to

23        the crib?

24   A    It's possible.

25   Q    Okay.

                              96

1    A    I don't recall the exact location of the chair but if

2         I had to move the chair to get the crib out then I

3         would have moved it.

4    Q    Okay.

5    A    Sure.

6    Q    Thank you.

7                    MR. WHITE:    I have nothing further

8         Judge.

9                    THE COURT:    Anything further?

10                   **REDIRECT EXAMINATION**

11   **BY MS. POPE-STARNES:**

12   **Q**   Was this chair that's depicted in People's Exhibit 5,

13        in the room at the time that you first went into the

14        room?

15   A    If it's --- yes.    Yes.

16   Q    Thank you.

17        And uh --- in regards to Defense Exhibit P, do

18        you have any idea when those things were put on that

19        refrigerator?

20   A    I have --- I do not know when they were there.

21        Placed there.

22   Q    Thank you.

23                   MS. POPE-STARNES:    I have no other

24        questions Your Honor.

25                   THE COURT:    Anything further?

1      MR. WHITE:   Nothing further of this

2  witness.

3      THE COURT:   Thank you Sir.   You're all

4  set.   You can be excused.

5      MS. POPE-STARNES:   Your Honor, I believe

6  that is all the witnesses that we have for today

7  except for the prearrangement of tomorrow morning.

8      THE COURT:   Okay.

9   Anything further?

10   I might have some work for the two of you to do

11  so you won't be free to go.

12   But uh --- Ladies and Gentlemen, ---

13      MR. WHITE:   (Interposing)   Is it

14  compensated work?

15      THE COURT:   What's that?

16      MR. WHITE:   Is it compensated work?

17      THE COURT:   Nope.   Sorry.

18   Umm --- we will be, for what it's worth, we are

19  going to be busy, the three of us, doing some matters

20  in this --- in this case.   We won't be sitting by

21  idly.   And I'll try to get this matter going so we

22  can go use our time efficiently.   But witness

23  availability just didn't work out.   So I'd ask you

24  to return to the Jury room for just a couple of

25  moments.   And I again, will let you know for sure

98

1    but I'm thinking tomorrow it will be eight-thirty

2    (8:30).   And we'll just be running all the way

3    through, okay?   Please don't discuss the case.

4    Thank you so much.

5              THE CLERK:   All rise for the Jury.

6    (Whereupon the Jury was returned to the jury room.)

7                    *  *  *

8              THE COURT:   Thank you.

9         The record will reflect that the Jury's been

10   excused.

11        You may all be seated.

12        I'll actually just have both of you see Ms.

13   Garelik.   Instructions, and just go on over some of

14   the details and so forth.   Okay.?

15        And if you need me, I'll be in chambers as well.

16        All right.

17        Deputies, thank you.

18             A DEPUTY:   You're welcome.

19             THE COURT:   I guess we're set.

20             THE CLERK:   All rise.

21   (Whereupon the matter was concluded for this day.)

22                    *  *  *

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

       I, Barbara Reznick, Court Reporter, do hereby
certify that the foregoing pages comprise a full, true, and
correct transcript of the proceedings had In the Matter of
McBurney before Honorable Daniel Patrick O'Brien in
Pontiac, Michigan on February 25, 2008.

_____

Barbara Reznick,   CER 1333

1200 N. Telegraph, Pontiac, MI. 48341

248) 858-5841

100