STATE OF MICHIGAN

IN THE 6TH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN,

    V

STEVEN LINDSEY MC BURNEY,

_____/

No. 07-214651 FC

OAKLAND COUNTY **07-214651-FC**

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

TRIAL

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

February 26, 2008

* * *

APPEARANCES

Sara Pope-Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of defendant

Barbara Reznick, Court Reporter

RECEIVED FOR FILING

OAKLAND COUNTY CLERK
BY:
DEPUTY COUNTY CLERK

2008 AUG 14 A 11: 25

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# I N D E X

WITNESSES

Dr. Ronald Uscinski

| | |
|---|---|
| Direct examination by Mr. White | 3 |
| Cross examination by Ms. Pope Starnes | 61 |
| Redirect examination by Mr. White | 101 |

Officer Chris Sederlund

| | |
|---|---|
| Direct examination by Ms. Pope Starnes | 103 |
| Cross examination by Mr. White | 142 |
| Redirect examination by Ms. Pope Starnes | 157 |

Matthew Calus

| | |
|---|---|
| Direct examination by Ms. Pope Starnes | 160 |

EXHIBITS

| | |
|---|---|
| Defense Exhibit R | 15 |
| Defense Exhibit S | 15 |
| Defense Exhibit T | 38 |
| Defense Exhibit V | 48 |
| Defense Exhibit W | 53 |
| Defense Exhibit X | 53 |

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Pontiac, Michigan

February 26, 2008

\* \* \* \*

THE CLERK:  The Court calls People v McBurney, case number 07-214651 FC.

THE COURT:  Ms. Pope-Starnes, Mr. White, good morning.

MS. POPE-STARNES:   Good morning, Your Honor, Sara Pope Starnes for the Prosecuting Attorney.

THE COURT:  Thank you.

MR. WHITE:  Robert White appearing on behalf of Mr. McBurney.

THE COURT:  Who is present.

MR. WHITE:  Seated to my immediate right.

THE COURT:  Thank you. I understand that the jury is fully here, it's a little bit late but there's some traffic issues with the weather and your witness is here, is that right, Mr.White?

MR. WHITE:  That's right.

THE COURT:  All right. When the – we can have him called up and when the jury comes in do you want to just mention so the jury is not perplexed and I'll let you do the speaking that, Judge, can we call this witness out of order, something like that, is that acceptable?

MR. WHITE:  Yes, I will.

THE COURT:  Are we ready to proceed?

MR. WHITE:  Yes, Judge.

THE COURT:  Okay. Jeff, you can bring in the jury.

(Jury seated at 9:15 a.m.)

THE COURT: Good morning everyone. Glad you all made it back here safe and sound considering the weather conditions, appreciate it.

The record reflect that the jury is back and the case has been called, counsels names have been noted and we left off with the prosecutor's witness and now, Mr. White?

MR. WHITE: Your Honor, I move to allow the defense to present their expert witness, Dr. Ronald Uscinski knowing that the prosecutor's proofs are not completed; however, because of travel arrangements scheduling, this is the day that we slotted a long time ago and we did not expect that we'd be going so long. So I'd ask the Court to allow Dr. Uscinski to testify at this time.

THE COURT: Thank you. Ms. Pope-Starnes?

MS. POPE-STARNES: No objection.

THE COURT: All right, very well, we'll proceed and call the witness.

MR. WHITE: Then I'd like to call Dr. Uscinski to the witness stand. Doctor, if you would approach.

THE COURT: Mr. White will escort you up here to the witness stand.

Good morning sir.

A        Good morning.

THE COURT: And if you could please face my clerk and raise your right hand to be sworn.

4

RONALD HENRY USCINSKI,

Was thereupon called as a witness herein and after having been first

duly sworn, was examined and testified as follows:

THE COURT:  Thank you. You may be seated. Mr. White, you

may proceed.

DIRECT EXAMINATION

BY MR. WHITE:

Q       Would you state your full name please?

A       Sure. My name is Ronald Henry U-s-c-i-n-s-k-i.

Q       And do you have a profession?

A       Yes.

Q       What is that profession?

A       I am a physician.

Q       Okay. And are you licensed to practice medicine?

A       Yes.

Q       And how long have you been so licensed?

A       Since 1968.

Q       Do you have a specialty, doctor?

A       Yes, I do.

Q       And what is that?

A       I'm a clinical neurosurgeon.

Q       And where do you practice?

A       In the Washington D.C. area.

Q       Your medical education, where did you attend medical school?

A       Medical school?

Q      Yes?

A      Georgetown University.

Q      And your –

      MS. POPE-STARNES:  Your Honor, I'll stipulate to the doctor's credentials and that he could be qualified as an expert in neurosurgery.

      THE COURT:  Thank you. Mr. White?

      MR. WHITE:  I would like to highlight some of the –

      THE COURT:  Go ahead. But you're moving for his qualifications?

      MR. WHITE:  Yes, I move for his qualifications

      THE COURT:  There being no objection so qualified but you can go ahead Mr. White.

      MR. WHITE:  I would like to. Thank you.

Q      (By Mr. White, continuing):  Doctor, and your residency was?

A      At Georgetown University in neurosurgery.

Q      Okay. Do you have any military medical experience?

A      Yes, I do.

Q      Where is that?

A      Well I served as a medical officer in the United States Navy.

Q      Okay. Any particular assignment?

A      Yes.

Q      Where was that?

6

A     I spent nine months as a medical officer assigned to the Marines at

      Paris Island and then I volunteered for special duty assignment and I

      was a medical officer in the Navy on a nuclear submarine.

Q     And, doctor, you're board certified?

A     In neurosurgery.

Q     And how long have you been board certified?

A     Since 1978.

Q     And do you belong to any professional societies?

A     Yes.

Q     Could you give the jury an idea of what societies you belong to?

A     Sure.  I belong to the American Association of Neurological Surgeons

      including its pediatric subsection, the Congress of Neurosurgeons, the

      Polish Academy of Neurosurgeons and local medical societies, the

      Research Society of Neurosurgeons; those are the major ones.

Q     If we could back up to your certifications doctor, is there a

      certification definition or delineation regarding the difference between

      a neurosurgeon who is for adults or pediatrics?

A     As far as the American Board of Neurosurgery is concerned no, there

      isn't, you're a neurosurgeon or you're not. If you want to restrict

      yourself to one area or another, that's fine with them.

Q     Have you published doctor?

A     Yes.

Q     And can you give the jury an idea of what kind of publications you've

      done?

A    Sure.  I've co-authored a couple of articles dealing with mirror

radiology and a diagnostic procedure called ultrasound way back in the

80's and since then I've written articles on mechanisms of head

injuries in children but specifically the so-called Shaken Baby

Syndrome.

Q    Okay. Do you have any publications in progress?

A    Yes, I do.

Q    And what is that?

A    There's one in press.

Q    In press?

A    And it deals with what I consider to be one of the origins of the

bleeding that occurs as attributed to manual shaking in infants.

Q    And what is that?

A    Pardon?

Q    What is – what is the publication?

A    It's an international Japanese journal that's N-e-u-r-o-l-o-g-i-c-a M-e-

d-i-c-o C-h-i-r-u-r-g-i-c-a.  That's it, it's French for neurosurgery, in

the Japanese Journal.

Q    And the subject of that publication?

A    Pardon?

Q    The subject of that publication?

A    Oh, okay.  The – in a previous work and previous to what I wrote it's

been demonstrated that human beings can't shake babies hard enough

with enough force to give them intracranial injuries physically and

number two, if they shook babies hard enough they would break the

8

baby's neck first. The injury threshold for the neck is within range of humans shaking infants, particularly young infants with no neck control. And humans don't get head control until they're about four months old. And these children, the majority of them that are seen with the attributed injury being shaking have what are older injuries, they're called chronic subdural hematomas.

So the question I was asking myself is if this is a four-month-old baby with an older injury, where did it come from? And we have glibly written this off as being attributed to birth. Well, I happened to see a picture a few years ago of a three year old –

MS. POPE-STARNES: Objection, narrative Your Honor.

MR. WHITE: Well, I asked him about his publication, he's answering a question.

THE COURT: Just throw out a quick question.

MR. WHITE: Pardon?

THE COURT: Just go ahead, I'll sustain as to narrative, break it up a little bit.

Q     (By Mr. White, continuing): And, again, the source of your investigation of this particular publication?

A     Okay. The source came from primatology, not medicine and it turns out that we are primates just like all gorillas and chimpanzees are but all non-human primates are born with head control, in fact not only are they born with head control, they assist in delivery, they crawl out from the mother facing the mother.

9

We're born in what's called the occipitoanterior position, they are all born in the occipitoposterior position. They have head control, we don't. They crawl, we can't crawl until we're nine months old and yet we're supposed to be at the top of the evolutionary tree.

It turns out that between three and four million years ago when human beings stood erect and walked on their hind legs the pelvis got smaller, that freed up the upper extremities but that freed up the upper extremities to build a lot of gross and fine motor movement, typing, playing an instrument, et cetera; that required more brain so the brain got bigger. We also developed cognition, self-awareness and intellect, the brain got bigger. So nature was faced with a problem, how do you fit the head that's too big through a pelvis that's now too small and nature solved it in two ways, the first way is the head has to deform as it comes out, the second way is that the nervous system is not hard wired.

THE COURT: I'm sorry, just a little bit slower.

A    Okay. The nervous system is not hard wired. The final wiring is not complete until long after we're born. If it were, the bulk of the brain would be increased so much that we'd never get born and the rate-limiting factor in human evolution is therefore the size of the maternal pelvis and we're a compromise, a very effective compromise but a compromise.

The last half of the 19th and the first half of the 20th century obstetricians –

MS. POPE-STARNES:  Objection to the narrative.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: Sustained.

Q    (By Mr. White, continuing): Okay. And then after you made the
determination that the pelvis was getting smaller, brain getting bigger,
in your paper what's the next conclusion?

MS. POPE-STARNES:  Objection as to relevancy, how does
this –

MR. WHITE:  Your Honor, I'm asking –

MS. POPE-STARNES:   - may I please finish my objection,
Your Honor –

MR. WHITE:  I'm sorry.

THE COURT:  Go ahead Ms. Pope-Starnes.

MS. POPE-STARNES:   How does this have to do with –
there's no evidence before this Court that this has something to do
with something that happened at birth.

MR. WHITE:  Oh –

MS. POPE-STARNES:   What relevance is there to this?

THE COURT:  Thank you.  Mr. White.

MR. WHITE:  Your Honor, I believe we've heard from the
prosecution witnesses over and over that a hematoma can be caused by
the birthing of a child, the birth of a child.  So to help the jury
understand this process, this is exactly what the doctor is explaining.

THE COURT:  Objection – go ahead.

MS. POPE-STARNES:   However, the evidence has been very
clear that from the September 11th C.T Scan that it was clear that there
were no subdural hematomas; so this is irrelevant.

11

MR. WHITE:  That's –

THE COURT:  Objection is noted and overruled. Go ahead.

Q      (By Mr. White, continuing):  Go ahead doctor. The next step of your investigations?

A      All right. Obstetricians and others were very successful in eliminating the major head injuries that occurred at birth.  But the more subtle ones escaped clinical detection, as a matter of fact there's a recent paper that came out from the University of North Carolina showed that some twenty-five percent of normal vaginal deliveries have intracranial bleeding of some sort.

MS. POPE-STARNES:  Objection as to relevancy. The medical records show that this was a cesarean birth, this is not relevant, Your Honor.

THE COURT:  Just answer the question that's asked, don't go beyond about as to some other journal, okay.  Go ahead Mr. White.

Q      (By Mr. White, continuing):  The next step in your investigation?

A      All right. Including cesarean sections, the major injuries are undetected, the minor ones may occur, be undetected and become clinically apparent weeks or months later as chronic subdural hematomas.

Q      Thank you.  Have you done any presentations doctor?

A      Yes.

Q      Okay. In the continental United States?

A      Yes.

Q      Outside of the continental United States?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       Yes.

Q       Most recently where?

A       Luanda.

Q       And the nature of that presentation?

A       The nature of that presentation was – the title was neurosurgery – I'm

        sorry, Medicine, Neurosurgery and Scientific Methodology.

Q       And when did you do that presentation?

A       This past January.

Q       Are you affiliated with any hospitals?

A       Yes.

Q       And what hospitals?

A       Georgetown University Hospital, George Washington University

        Hospital, Suburban Hospital in Maryland, Shea Grove Adventist

        Hospital in Maryland and Montgomery General Hospital in Maryland.

Q       Do you actively practice medicine, doctor?

A       Yes.

Q       Do you actively perform surgery?

A       Yes.

Q       In neurosurgery, if you can just give the jury the definition?

A       Sure.

Q       Would you please?

A       Neurosurgery is a discipline of surgery that deals with disease,

        deformity or dysfunction of the nervous system, its containing

        elements and its vascular supply.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       Could you give the jury an idea of how many surgeries you've

performed in this year, 2008?

A       This year?

Q       Yes?

A       I would say so far, close to twenty.

Q       And as an average on a yearly basis, how many surgeries have you

performed?

A       I used to do a hundred forty to a hundred sixty, now it's about a

hundred and ten to a hundred twenty a year.

Q       And have you testified before as an expert?

A       Yes.

Q       Give the jury approximately how many times you've been qualified as

an expert?

A       In total in my entire career, maybe a little over a hundred times; the

majority of them in the last ten years.

        MR. WHITE:  If I may approach the witness, Your Honor?

        THE COURT:  Ms. Pope-Starnes has seen it?

        MR. WHITE:  Yes.

        THE COURT:  Okay. You may approach.

Q       (By Mr. White, continuing):  Doctor, I'm handing you proposed

Exhibit R-

        MR. WHITE:  And I'd note, Judge, that although I marked

previously R, I did not offer that so –

        THE COURT:  So we're not dealing with two different r's, just

one, okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

MR. WHITE:  One R.  I didn't offer it.

THE COURT:  Okay.

Q      (By Mr. White, continuing):  Is that – doctor, is that an updated copy

of your Curriculum Vitae?

A      Yes.

MR. WHITE:  Move for entry of Exhibit R.

MS. POPE-STARNES:   No objection.

THE COURT:  So admitted.

(Whereupon defense Exhibit R

was received in evidence)

Q      (By Mr. White, continuing):  Doctor, I want to move into discussion of

the skull and brain and I'm going to approach with Exhibit S, which –

if you would, doctor does that, as a tool – would that assist you as a

tool to explain the skull and the inside of the skull?

A      Sure.

MR. WHITE:  Okay. I'd move for entry of Exhibit S.

MS. POPE-STARNES:   No objection.

THE COURT:  So admitted.

(Whereupon defense Exhibit S

was received in evidence)

MR. WHITE:  And I believe I can put it up on the projector so

if I may?

15

THE COURT: Go ahead.

Q       (By Mr. White, continuing): Doctor, could you explain to the jury the specific parts of the skull that are shown here in this diagram, including the inside of the skull?

A       Okay. There are two pictures, one on the right and one on the left, this is an adult, but the – specifically for our purposes, the anatomy of a child or even an infant would be similar enough.

        You can see the scalp and its layers as indicated by the red mark here, and then you see the skull. The skull in an infant is a lot thinner than this. And then there are three layers of tissue beneath the skull within the confines of the skull and outside the brain; the first is a gray leathery looking thick fibrous tissues called the dura matter and there is a potential space between the dura and the inner surface of the skull and that's called the epi or outside dura space.

        The next layer is called the a-r-a-c-h-n-o-i-d, and that's depicted as being light green here and there is a potential space between the dura and the arachnoid called the subdural space.

        The third layer is called the p-i-a, and that's actually the outer layer of the brain itself, pia matter. And there is an actual space between the pia and the arachnoid and that's called the subarachnoid space and the reason it's an actual space is that there is clear watery fluid in there called cerebral spinal fluid.

        Now most of that cerebral spinal fluid is made inside your brain which is actually hollow, it's got four cavities in it called ventricles and these ventricles all communicate with one another and

16

there's a plexus of tissue in there that manufactures this fluid; the fluid gets into the ventricular system, gets out of the ventricular system through little openings at the base of the skull, flows down the spinal canal at the base of the skull through this, on the left hand diagram you can see where it's part of an oval opening, it's dark, it's called the f-o-r-a-m-e-n m-a-g-n-u-m, which is Latin for the big hole. That's where the spinal cord connects with the brain itself as a adult.

Cerebral spinal fluid flows down that way, comes back up and then flows around the brain and the brain is literally supported in and buffeted by – buffered by this cerebral spinal fluid, which is then absorbed by specialized structures between the dura and the arachnoid that you can see here, and it's a dynamic process.

A key concept to understand here and from here on, is that this is all biologically active tissue which means it is living tissue and because it's living tissue, it requires a blood supply, it requires arteries carrying blood and nutrients in and veins carrying carbon dioxide and waste material out. At the cellular level metabolism takes place, nutrients get oxidized, waste material is produced, it's taken out by the circulatory system.

For the brain itself, you can see what is designated as gray matter, which is the outer surface, the surface of the brain, which are actually the nerve cells themselves and white matter which is within the confines of the brain itself. Now the reason it's called white matter is because it looked white to the anatomist and the gray matter looked gray. That doesn't always image the same on an imaging study but

17

that's why it's called that. Now the gray matter contains the cells, the white matter contains the nerve fibers which are running to various different parts of the brain and also ultimately to and from the body.

What you can see here is a potential space between the dura and the skull called the epidural space and there is also a potential space between the dura and the arachnoid called the subdural space, the reason they're potential is its like two pieces of Saran Wrap together, there's no space in between unless you put something in there, then it becomes an actual space.

As far as the dura itself, in the diagram on the left, you can see the dura as it is covering the inner surface of the skull and you can also see that there are in-foldings of this dura, there's one large in-folding that actually passes down between the two cerebral hemispheres and that's called the f-a-l-x, and that starts in the front of your head, behind your eyes in the midline and goes to the back of your head of the occipital region and you can also see another in-folding of this dura called the tentorium and it was called the tentorium because it has a tent like appearance, and that tentorium passes the midline and attaches to the falx; now nature was very efficient about this, the brain has a blood supply also, it's got four arteries supplying it and you can see two of them here on this diagram near the two carotid arteries, two other arteries come up to the base through the foramen magnum and they form a plexus cross connecting with each other here, kind of like a traffic circle and then from there other blood vessels go and arteries break into smaller and smaller vessels and they nourish the brain.

18

From there you pass into small blood vessels called capillaries and then larger vessels called venaels and then veins and you can see that the venous drainage system, some of it's passing into the falx at its lower margin and then there's a large part passing into the falx at its upper margin and they join together by another vein that comes together with the falx and the tentorium and that blood eventually is taken out of the head proper. This is a closed system and an important concept.

There's another important concept in the central nervous system that is unique among all other organ systems in the body because it exists in a closed space surrounded by bone, so if something gets in there it can start taking up space that should be occupied by the brain the brain has to be moved aside. If it happens slowly over a long period of time the brain can accommodate. If there's a sudden expansion the brain does not tolerate that very well and the patient gets sick, that's another point to remember.

You can see inside the skull here the various compartments where different lobes of the brain are, behind the eyes are the two frontal lobes, medial or inward from each ear are the two temporal lobes or where they should rest and I'm indicating right there, and then you can see the tentorium actually supports the back part of the head, the back part of the cerebral hemispheres where the occipital lobes sit. Now the tentorium also forms a structure for both support and separation, there's a large opening in front of the tentorium and that's where a structure called the brain stem passes and that mediates a lot

19

of vital functions and then behind the brain stem sits the cerebellum which is separated from the occipital lobes by the tentorium itself.

The only other point that I want to make right now for terminology is if you look at the surface of the brain it looks like cauliflower and it's got little ridges and little furrows, the ridges are called gyri and the furrows are called sulci and you can see them on various imaging techniques that we use.

Q    Doctor is the subdural space compartmentalized?

A    Compartmentalized, no, it's not. It exists – it exists as a potential space but that subdural space is all over the inside of the head because the dura is all over the inside of the head and so that, you can theoretically trace a molecule of water from the right temporal fossa up to the vertex, down the falx to the other side to the left temporal fossa, over the tentorium and down into the spine. Its all one space, one potential space.

Q    Doctor what is a subdural hematoma?

A    Okay. A subdural hematoma is – hematoma is a collection of blood, it's a blood clot; subdural means its in what we call the subdural space and it's therefore a collection of blood in the subdural space.

Q    How would one get a subdural hematoma?

A    Okay. One gets a subdural hematoma because vessels, blood vessels usually veins are being torn and bleeding is occurring.

Q    Okay. In an infant what are the causes of subdural hematomas?

A    The number one cause is mechanical disruption of vessels which is trauma, you can get bleeding when you either have a normal blood

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

vessel that's disrupted, a weakened blood vessel that gives way or a defect in the normal body mechanism that does not allow blood to seal off when it leaks.

So there are congenital anomalies or diseases, vascular malformations, various types of syndromes where the blood vessels are congenitally weak-walled and they're prone to leaking, so that's one way, aside from trauma.

And another way is a patient with a clotting disorder who may have an injury that would normally self seal because blood usually self-seals when it leaks, that's why you get a scab when you cut yourself, like hemophilia for instance, bleeding will continue. So you've either got a disruption of normal vessel, a less than adequate injury to an abnormal vessel or a problem with clotting.

Q     Now I believe you indicated that it's possible to have a subdural hematoma as a result of burping?

A     Yes.

Q     Would you differentiate for the jury the difference between an acute, sub-acute and chronic subdural hematoma?

A     Sure. An acute subdural hematoma is one that is seen immediately after an obvious injury. You fall down a flight of stairs, you get a head injury, you're in a coma, you are still having convulsions, somebody does a C.T. scan if they see an acute subdural, you also usually see an injury to the brain itself. So the acute subdural is one that's seen immediately after the injury.

21

A sub-acute subdural hematoma is one that may be seen after an injury, but has been allowed to stay in place for a period of one to three or maybe four days, so there is an injury and there is a subdural, but the subdural has aged somewhat.

Chronic subdural is a different thing altogether. Chronic subdural hematoma occurs, may occur after trauma but the original hemorrhage is not detected and this is usually because the trauma is not deemed to be severe enough at the time, it seems like a trivial injury. But with a chronic subdural hematoma the normal process of ridding the subdural space, what we refer to as the subdural space of blood doesn't work right and so instead of the blood being gradually absorbed, not only does it stay there but the bleeding increases by a very specific mechanism.

Q     What is that mechanism doctor?

A     Okay. The best way to answer that is as follows: When neurosurgeons encounter patients with chronic subdural hematomas, there may be no direct history of injury or history of injury that occurred weeks or months earlier and the patients were fine or almost fine in the interval. And yet when we operate on them we find fresh blood in the chronic subdural and this was known over a hundred years ago. We never had an adequate explanation for why there was fresh bleeding in the subdural.

The answer to that question was made in the 1970's in an experiment. We know that the normal way in which a subdural hematoma is absorbed is that the dura, which is biologically active

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

tissue, that gray material that you see there, it's got a blood supply too; that dura begins the process of getting rid of blood from a subdural space and over the first several days what happens is that cells begin to migrate from the inner surface of the dura to try to enclose the subdural hematoma. You can see that microscopically after about maybe three days, you can see them with the naked eye after about two weeks, they are a gray covering, if you want I've got pictures, if you don't, that's okay, it's a gray covering, it looks a little bit like the dura but it's a lot thinner.

After two weeks you can see it with the naked eye. From two to four weeks, not only is the outer surface of the subdural covered by the inner surface that's closest to the arachnoid, the next layer, also gets covered so you have a membrane on the outside called the neo-membrane and the membrane on the inside.

Now in the 1970's the Japanese took –

MS. POPE-STARNES: Objection to the narrative.

Q  (By Mr. White, continuing): Was there any – you referenced, was there any specific study –

A  Yes –

Q  - as to the new blood –

A  - it was directly addressed.

Q  Okay. Doctor, what study was that?

A  Okay. The Japanese took a group of patients with known chronic subdurals and put them in the hospital and they drew samples of blood from an arm or a leg, peripheral blood, not blood in the subdural. They

23

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

labeled the red cells with an isotope that could be tracked called

radioactive chromium, they re-injected them back into the patients.

The following day they took them into surgery and they operated on

them and they took out the blood in the subdural and they found cells

with radioactive chromium in there. So the next question was how is

this stuff getting there? These people are in a hospital situation,

they're not being traumatized in any way. It was then that the looked at

the membranes carefully and they found three different cells inside the

membrane, the first type of cell was called the fibroblast, that cell

makes the membrane, it makes the structural matrix of the tissue that is

the membrane itself, it constructs it.

The second type of cell is called the capillary endothelial cell,

e-n-d-o-t-h-e-l-i-a-l. These are the same kinds of cells that line the

inner surfaces of blood vessels and these cells hook up and they make

long tiny tubules with lots and lots of communications in between

them and this is a carriage channel, this is the way of getting blood

from the dura into the membrane and out again. And it is at this level

that the subdural is removed. These cells have large – however, have

large spaces in between them and blood can leak out and get into the

subdural; if you look at a subdural hematoma itself, over the first few

days the blood which is clotted blood begins to liquefy. There is a

long chain molecule called fibrin, which is the clot itself, and it takes

calcium to precipitate this fibrin which is in your blood stream. There

are also red cells in your blood and the red cells contain a long chain

molecule called hemoglobin at the center of which is the molecule

iron, this is oxygen transport.  These molecules – the cells die, the fiber molecules have to be broken up into smaller molecules and taken out of the system.  This process is accomplished by these endothelial – this endothelial network.

And the third type of cell makes an enzyme that dissolves blood clots and it's called a f-i-b-r-i-n-o-l-y-t-i-c enzyme.  That enzyme dissolves blood so it breaks up the clot. The problem is that the capillary network leaks blood also.  Now normally blood is self-sealing and the leaks should seal themselves off easily; however, if the enzyme system is over-active re-bleeding occurs into the subdural.  So it's actually a dynamic process.  If re-bleeding is outpaced by re-absorption, the subdural goes away.  If re-bleeding outpaces re-absorption, the subdural may enlarge slowly with time and may eventually reach such size as to cause problems.

So the problem with re-bleeding is due to the enzyme activity within the confines of the subdural membrane.

Q      The life span of a normal acute subdural hematoma, does it have a life span, doctor?

A      All factors considered, if a patient comes in with acute subdural bleeding and there is a linear progression of the subdural being removed, it will last for, I don't know, maybe a month or six weeks at the outside and be absorbed unless the enzymatic activity doesn't work right.

Q      Is there a life span for a chronic subdural hematoma?

A      Until it's gone.

25

Q    Is there a specific type of person, individual or age group or anything
     that is subject or is vulnerable to chronic subdural hematoma?

A    Well, you – we tend to see patients with chronic subdurals in two age
     categories, very young and very old or very young and old.

Q    Okay. Why the young?

A    You see them in the young because the skull has to grow to
     accommodate the growing brain.  The skull actually grows for the first
     several years of life to accommodate the brain that is also growing
     inside it, that's why your skull is not one bone, it's several and they
     join and the joints are called sutures and they can expand.  If you have
     something else in there that's growing like a subdural, the skull may
     grow to accommodate both.

         In older people as you get older the brain tends to shrink a little
     bit so that leaves extra space inside the closed volume of the skull and
     with that extra space some of the veins, and these may not be the same
     veins that caused subdurals originally, but some of the veins travel
     from the surface of the brain, you can actually see it on this picture
     here, from the surface of the brain to the –

         MS. POPE-STARNES:   Your Honor, I'm going to object, this
     is – he is now talking about old people, it's irrelevant.  The child in
     this case is eleven months old. I'd ask that he stick to what's relevant.

         MR. WHITE:  I made a statement in opening about the
     difference, the etiology of chronic subdural hematomas in young and
     old so he is trying to give the very basis for what I said in my opening.

         THE COURT:  We've got it, okay.  Go ahead.

26

Q      (By Mr. White, continuing):  Thank you.  Now, doctor what can cause
       a chronic subdural hematoma to re-bleed in an infant?

A      It can happen spontaneously, it can happen with a trivial incident, it
       can happen with bouncing a baby on your knee, coughing, sneezing,
       burping.

Q      And is re-bleeding a critical medical event for a chronic subdural
       hematoma?

A      It can be.

Q      And  when it re-bleeds, what is the affect that it has on the individual
       that has a chronic subdural hematoma?

A      Well, if it's an ongoing process and a steady ongoing process, there
       may not be anything, but if there's a sudden change or if there's a
       certain point reached where there's a physiologic way, functional way
       in which the blood affects the brain, not just mechanical distortions by
       increasing in volume but a functional way in which it alters neuroma
       conduction and you have a seizure, any one of those can lead to
       somebody getting very ill very quickly.

Q      And what is the mechanism, what is happening in the brain when a
       chronic subdural hematoma re-bleeds?

A      Again, one of two things, the brain may become distorted or pushed or
       the blood being close to the surface of the brain, blood is a chemical
       irritant, it doesn't belong outside of a blood vessel, may irritate the
       neurons, cause them to fire adherently and trigger off what we know as
       a seizure; in other words, you've got a bunch of neurons that are firing
       off in an abnormal way.

                                                                        27

Q    And is the volume of the chronic subdural hematoma being changed at

     this point?

A    It may or may not be.

Q    Okay. And the blood, bleeding on the brain, what is that doing?

A    Pardon?

Q    The blood that's coming out of the chronic subdural hematoma, what

     is that doing to the brain?

A    Well, again, one of two things; on its proximity to the brain, despite

     the fact that the membrane separating it, it may alter neuronal

     conduction and –

Q    Would you define that, altered -?

A    Altered neuronal conduction?

Q    What does that mean?

A    Makes the nerves misfire. If they fire in a certain way and something

     comes in, they're not firing the way the should, it's like a violin out of

     tune, it doesn't make music.

Q    And what does that cause to happen to the function of the brain, the

     brain's functioning at that point?

A    It's altered, it's altered, you could have a seizure, you could lose

     consciousness, extremities twitch, you don't breath right.

Q    And is the brain reacting in terms of shrinking, swelling or anything of

     that nature?

A    As a secondary phenomenon that may happen.

Q    As what?

A    Pardon?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    What is happening in the secondary phenomenon?

A    One of the things that happen with seizure activity is normal respiratory movement is altered, changed and the brain has an absolute metabolic requirement for oxygen, if you deprive the brain of oxygen for between four and five minutes it starts to die. And so if seizing is continued or with seizing someone vomits or has food in their mouth and can't get rid of it, the airway gets obstructed. So in addition to the seizure you now have another source of loss of oxygen and the brain needs it very quickly. That's why we put airways in patients who are having seizures or turn them over and try and clear their airway because you've got to keep the brain getting profuse with oxygen.

Q    And if the brain doesn't have oxygen, what is the affect?

A    It starts to die.

Q    Doctor what is a hypoxic ischemic injury?

A    Hypoxic means not enough oxygen, ischemic really means almost the same thing, not enough oxygen, injury, the cells are being injured not necessarily mechanically but metabolically by the deprivation of oxygen.

Q    If a chronic subdural hematoma is being irritated, what are the external signs that one would see in a child, a parent for instance observing, not having any idea of what's going on inside, externally?

A    Well, you may see an alteration in mental status, the child is not normally alert, they're listless, lethargic, floppy, they may vomit and they may seize, eyes may turn inward.

29

Q    Doctor did you, at my request, did you review certain medical records for Madison McBurney in this case?

A    Yes, I did.

Q    And the medical records you reviewed were what?

A    Let's see, I've got them here, I reviewed the birth records, I reviewed the checkup records for condition known as aplasia cutis congenita and the records surrounding the admission of November 30th.

Q    To what hospital?

A    2006. University of Michigan Hospital, the EMS records also.

Q    Okay. And did you review the radiological tests?

A    I did.

Q    And based upon your review of all of the documents that you've enumerated here, did you form an opinion to a reasonable degree of medical certainty as to what was the injuries that were presented on November 30, 2006, when Madison was seen in E.R. at University of Michigan?

A    Yes.

Q    What was the nature of her trauma?

A    She was unconscious, she had been seizing, she had airway compromise and she had what looks to me like a chronic subdural hematoma that had re-bled and she also had radio graphically the affects of oxygen deprivation to the brain.

Q    Now did you have an opportunity, Doctor, to review any MRI or C.T. scan prior to the child's admission of November 30th?

A    Yes, I did.

30

Q      Okay. The first radiological test that you looked at prior to November 30th was what?

A      I think it was August 31st.

Q      And that was what?

A      I think it was an MRI scan –yes, it was an MRI scan.

Q      Okay. Briefly could you tell the jury what an MRI scan is?

A      Sure.  MRI means magnetic resonance imaging and what happens is that a patient is placed in a magnet and the protons in their body are lined up in a certain way. If you've ever done the high school experiment where you have a piece of paper and you put the metal filings on it and a bar magnet underneath, they line up, it's the same idea.

The reason MRI scanning is used and is so useful is that it images water and water is a component of life and is in just about every tissue of the body, but its least amount is involved, there's not very much water involved.  So the advantage of the MRI scanning or magnetic resonance scanning is it sees, it looks through bone as if it weren't there.  And using that principle and other techniques they use with the machinery, it's able to image different tissue density based on their water content.

Q      And C.T. scan?

A      The C.T. scan is based on a different principle, similar but based on a different principle.  The C.T. scan is based on an X-ray, X-rays penetrate water, X-rays penetrate soft tissues, they penetrate fat, but they don't penetrate bone very well and they don't penetrate foreign –

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

31

they don't penetrate metal. So in C.T. scanning, it can be sophisticated enough that you can actually demonstrate different tissue densities and this is true in the brain, you can differentiate gray matter and white matter. The problem with C.T. scanning inside the skull though is that as the contours of the skull change the amount of bone that the scanner sees changes also and the images at various points inside the skull tend to be not as clear.

So MRI scanning is better for imaging intracranial contents under certain circumstances than C.T. scanning is.

Q   If you would, doctor, could you put the August 31st MRI – this has already been admitted into evidence – could you put that on the screen please?

A   I'll try to.

Q   While the jury is waiting, is there a name for this picture?

A   Oh, it's part of a lecture, it's called the truth and it's the final slide in a lecture that I use and the truth may be very hard to see –

MS. POPE-STARNES:   Objection as to relevancy, Your Honor.

A   I don't know if this disk is here.

Q   Well, it's here, we have it as Exhibit 1.

A   Oh, wait a minute, I have it, I'm sorry. It's tempting to push buttons but it doesn't make it work any faster. It's working.

All right. This is –

MS. POPE-STARNES:   Objection, there's no question before the witness.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

32

THE COURT: Go ahead Mr. White.

Q     (By Mr. White, continuing): Doctor, what do we have up here on the slide right now?

A     We have two pictures of an MRI scan of the brain for Madison McBurney and these are in what is called the sagittal plane. I can explain that if you want?

Q     What is the sagittal plane?

A     The body is divided up into different planes, depending on how you want to look at it, the axial plane is looking as if my body were towards you and you were taking images through my body from the top of the head down through the feet, that's the axial plane, the axial plane goes from the top to the bottom, top of the head to bottom of the feet.

       The sagittal plane goes from one side of the body to the other side of the body, from right to left or left to right and the coronal plane goes from the front to the back, so you're able to put the body as it were in a three dimensional graph and when we talk about different images in different planes we understand what we're saying. This is the sagittal plane.

       What you can see here – you might see it better if the lights were dim, but actually I think this will be good enough.

       MR. WHITE: May I?

       THE COURT: Over there by the door, I don't know which ones are which.

Q     (By Mr. White, continuing): Okay.

33

A        This is an almost equivalent picture on the right-hand side. As a minor

point you can see the teeth and the teeth look black, the reason the

teeth look black is because the scan doesn't see them, the reason the

scan doesn't see them is because there's no water in the enamel of the

teeth. Again, we're imaging protons.

What you can see here is one of the ventricles of the brain and

you can actually see the cortical surface with the gyri and the sulci that

you saw earlier in the anatomic diagram, you can see the cerebellum,

you can see the frontal lobe, you can see part of – well, you can see the

frontal lobe here, you can see a portion of the temporal lobe which

means that this picture is not in the midline because you wouldn't see

the temporal lobe in the midline, it's off to one side, actually it's a

little bit off to the left.

And you can see fluid – you can see a space outside the brain

but inside where the bone ought to be and that's the subdural space

and you can just barely see a little bit of gray here and then you can

see dark outside it. Dark because bone has got more calcium than

blood, even though infant bone has got a blood supply.

And what you can see here is this white area, that white area is

fresh blood and its in the subdural space and if you look at it from one

image to another, let's try and do that here, you can actually see, if you

envision what you are seeing are different cuts through different areas

in the sagittal plane, you see a little blood and a little blood lateral to it

and a little blood lateral to it, what you're seeing is sort of a pancake

affect of that blood layered over the surface of the brain.

34

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Now this picture here is going from – is going to the midline and this is actually the midline here, you can see the spinal cord, you can see the medulla, you can see the fourth ventricle which is a little triangular shaped area there in front of the cerebellum, you can see a connection between the fourth ventricle and the third ventricle right there. So that's a midline view. And you don't see very much of this subdural collection in the midline. But if you go out towards – well, laterally, towards the left actually it is, you can see it a little better. So what you see there is subdural blood and immediately along – I'm not sure how well you can see this here but immediately anterior and posterior to it, this whitish area feathers out to a gray. So it's blood with differing ages. It's fresh and older blood.

Q    So do we have – is it acute and chronic at this point?

A    It's chronic with a little bit of re-bleeding.

Q    Doctor –

A    Fresh blood, it's fresh blood and therefore you would say acute blood but acute blood does not mean acute injury, acute blood means re-bleeding, fresh bleeding.

Q    This space as you pointed out with your pointer, is there anything unusual about the space here, spacing around this blood?

A    The only thing is – the only thing that's unusual is that there is a little more space between the surface of the brain and the surface of the skull than you would expect. That's not surprising because you've got a little bit of chronic subdural there and the skull can accommodate that.

35

Q     The whiteness of the image where the blood is, what does that represent?

A     You usually see – in this particular type of MRI scan, this particular scan sequence, blood – both blood and fat image white, you can differentiate between fresh blood and fat by doing other imaging, it turns out it's fresh blood, this is baby fat you can see here.

Q     Can you tell, Doctor, from looking at this MRI when this subdural hematoma arose?

A     No, you just say it's there.

Q     Can you tell how it arose, how it happened?

A     No.

Q     As a physician, if you read this MRI, would this cause you concern?

A     As a physician?

Q     Yes?

A     Well, it's bleeding in a place where you should normally – you should not ordinarily have bleeding so yes, I'd be a little concerned.

      MR. WHITE:  Now – if I may approach Judge, with proposed Exhibit?

      THE COURT:  You may.

Q     (By Mr. White, continuing):  This is proposed Exhibit T, Doctor, I'm going to hand you proposed Exhibit T and –

      THE COURT:  Have you seen it Ms. Pope-Starnes?

      MR. WHITE:  Yes. I gave her a copy.

      THE COURT:  Okay.

36

Q      (By Mr. White, continuing):  Is that a copy of what you've shown here

on the screen from the MRI?

A      Yes.  These are pictures that were included in what I've just shown

you, same patient.

Q      Realizing the limitations of a copy machine is this an accurate

depiction of the MRI depicted on the screen?

A      Yes.

                MR. WHITE:  Okay. Move for entry of Exhibit T, Your Honor

                MS. POPE-STARNES:   Your Honor, may I look at it please?

                THE COURT:  Yes.

                MS. POPE-STARNES:   May I have just a moment please,

Your Honor, mine were all marked so I need to see if this is –

                THE COURT:  Go ahead.

Q      (By Mr. White, continuing):  And Doctor, while she's looking at that –

                MS. POPE-STARNES:   If I may, Your Honor,  I'd like the

opportunity to listen to the question as well.

                MR. WHITE:  I was just going to have him put the disk onto

another image from August 31, 2006.

                MS. POPE-STARNES:   Thank you.

                THE COURT:  I'm sorry, did you move for it's admission?

                MR. WHITE:  Yes, I did.

                THE COURT:  Any objection?

                MS. POPE-STARNES:  No.

                THE COURT:  So admitted.

                           :

37

(Whereupon Defense Exhibit T

was received in evidence)

Q    (By Mr. White, continuing):  And Doctor is it possible, are these

possible to put on the screen at the same time, the different images

from the –

        MR. WHITE:  If I may approach?

        THE COURT:  Is this T or –

        MR. WHITE:  This is actually U, I'm just asking to put it up on

the screen.

A    That's it, that's the one, the one on the right is the same as the image

on the right here.

Q    (By Mr. White, continuing):  Okay.  Is –

A    It's the one on the upper right.

Q    Now what are we looking at here on the upper right here, Doctor?

A    This is an axial view and this is a view as if we're taking image slices

from the top down and looking – actually from the bottom up and

looking from the bottom up.

Q    Okay.  And what are we seeing here on the right, the right spot there?

A    Okay.  As a small point, if you look on the scan you'll see an R on the

left-hand side of the screen and an L on the right-hand side of the

screen, this is the patient's right side on the left-hand side of the screen

and the patient's left side on the right-hand side of the screen, just to

avoid confusion.

        The reason for this is when a radiologist is looking at a patient,

he's looking from the patient's feet up to the patient's head so the

38

patient's left side is on the radiologist's right side, it gets confusing because when a surgeon looks we usually are looking from the head down so the images are reversed.

So for our purposes here and so that you understand this, the R is on your left but it's the patient's right, the L is on your right but it's the patient's left. And again, you can see on the left side, this is called the cortical ribbon and you can see the gyri and the sulci with spaces with fluid in between; in fact you can even make a little bit of differentiation between what's called the gray matter and the white matter. And toward the back – incidentally, there's one other little point too, you can see a dark, a black –

MS. POPE-STARNES: Your Honor, objection –

THE COURT: Sustained.

Q   (By Mr. White, continuing): Okay.

THE COURT: Go ahead.

A   All right.

Q   (By Mr. White, continuing): What is this spot right over here, the black spot?

A   The black spot, this is a living patient and blood is flowing at the time and what you're seeing here is a sequence of pictures with a time interval in between, even though it's only a few milliseconds, well, the protons that were imaged initially are now not there any more so the scanner sees black. However, at the bottom of the scan, just about almost six o'clock, there is a white area sitting on top of a cortical gyri and there's a little bit of white also just lateral or outside of that area I

39

pointed to earlier, that corresponds, this area in the back here at almost

six o'clock corresponds very well, precisely actually, to the same

white area that you can see on the coronal view and so that fits. And

that shows it's in the subdural space, it shows it's white, it can't be

anything else but blood. So it's a little bit of fresh blood.

And you can see that on the previous image, which is a little

farther down on the head and you can see it on that image and you can

see it on the following image branching out a little –

MS. POPE-STARNES:   Your Honor, I'm going to object and

ask that the doctor specifically refer to the image and how its listed on

there so that I know what it is.

THE COURT:  Just –

A      Sure.

THE COURT:  Mr. White, you lead him along, what you want

him to do or whatever.

Q      (By Mr. White, continuing):  Could you see it from the other images

too, doctor?

A      You can, yes. I think there are images – in fact I know there are

images, 24, 25, and 26 of 28.

MR. WHITE:  If I may approach the doctor again, Your Honor,

with proposed Exhibit U.

THE COURT:  You may.

Q      (By Mr. White, continuing):  Doctor, I'm handing you proposed

Exhibit U, are those the images that you just referenced?

A      They are yes, they're images 24, 25 and 26 and 28.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       Okay. And given the limitations of the copy machine do those

        accurately depict the images that you've just described?

A       Yes.

                MR. WHITE:  Move for entry of Exhibit U?

                THE COURT:  Any objection?

                MS. POPE-STARNES:  My only objection to this, Your

Honor, is it is redundant. This has already been in evidence, so is the

radiology report, so it's cumulative.

                THE COURT:  Any reason to identify these things separately?

                MR. WHITE:  Because, Judge, there is no way the jury is

going to be able to take the disk in the jury room and look at them.

                THE COURT:  Then why did we move for their admission?

Why are they admitted? I mean –

                MR. WHITE:  So we can offer testimony about –

                THE COURT:  Recognizing there's no dispute that they're

duplicative though, right, you don't dispute that?

                MR. WHITE:  Well, they're not duplicative, Judge, because

the disk itself is not –

                THE COURT:  They –

                MR. WHITE:  - it's not a good picture.

                THE COURT:  Okay. Fair enough. But they depict the same

picture, correct?

                MR. WHITE:  Well, they should, certainly.

                THE COURT:  Okay. And he's testified to that.  Recognizing

they depict duplicative things and the objection is cumulative, the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Court will admit it with the caveat that this is already admitted into evidence. And we'll talk about that later. Go ahead. Admitted over objection.

         (Whereupon defense Exhibit U

         was received in evidence)

Q    (By Mr. White, continuing):  Doctor, seeing acute and chronic hematoma that you've testified to as is represented in the images on August 31, 2006, would you expect this blood to completely be out of the brain or the subdural space within two weeks?

A    Probably not.

Q    Okay. If you could look at your – did you review any other kind of radiological tests prior to the November 30th C.T. scan?

A    Yes.

Q    And what was that?

A    There was a C.T. scan made on September 11th.

Q    Okay. And if you could, it's already been admitted into evidence, if you could find that, doctor?

A    Okay. There it is.

Q    Okay. And would you, on the image on the left, well what do we have here on the left?

A    On the left?

Q    Yes?

A    On the left is what you have what is called a scalp view; what happens is that a patient is wheeled on their back into a scanner and this is – you do C.T. scan and MRI scans too for that matter with patient's like

this, they're actually lying down, they're supine, they're lying on their back and they're wheeled into the scanner, so don't get the idea that the patient is sitting up or standing up, that's not correct.

Anyway, the patient is – so you have to think of that picture as being rotated ninety degrees counter-clockwise and the patient is wheeled into the scanner and a series – one image is taken like this and then a series of grids are outlined on the patient's head as to where you want the levels of the scan itself to be made and then the scan is completed.

Q     And what if anything unusual would you find in the 9/11 C.T. scan?

A     On the left?

Q     Anything – any of the images?

A     Okay. Well, on the right, you're seeing the images depicted and you're seeing the images from the base of the skull on up.

MS. POPE-STARNES:  Again, Your Honor, for the record, so that it's clear I would ask that he specifically indicate what image it is.

A     I was about to do that.

This is the base of the skull and –

THE COURT:  We're talking the right side picture?

A     Right side picture, yes.

MS. POPE-STARNES:  Your Honor, for the record –

MR. WHITE:  That's what I asked him to describe, Judge, on the right side.

MS. POPE-STARNES:  Your Honor, so the record is clear and so that it matches the evidence, I'm sure somewhere on this screen

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

there is not a page number, I'm being simplistic, but there is a number or something that's a reference to this image number. I'd ask that he give the image number each time that he refers to the screen so the record remains clear.

THE COURT: Mr. White –

MR. WHITE: That's not an objection, that's the way that she wants him to do it, she can do that when she questions him.

THE COURT: For record purposes, is there any problem with doing it that way, Mr. White? For my understanding and for the jury's understanding if they want to look at the third picture that was talked about on direct, if the jury wants to so identify, do you have any problem with going that way?

MR. WHITE: I don't have any problem with it, but I don't want to hear that it's – well, we're narrating stuff and he's educating the jury, I don't want to hear that objection.

THE COURT: Understood. I'll allow it to be identified that way.

MS. POPE-STARNES: Thank you.

THE COURT: If you would doctor, okay.

A    Okay.

Q    (By Mr. White, continuing): Okay. On the right, what is the number of the image that you're referring to?

A    That image is image one of twenty-six.

Q    Okay.

A    But we're not going to use that image.

44

Q        Okay. All right. If you could bring up on the screen images that would

         help us answer our questions?

A        All right.

Q        What image are we looking at now, doctor?

A        This is image number 26 and all this does is illustrate the problems

         with the C.T. scanning, you can see what's called the scattering effect

         and that's because of the different densities of bone that the scanner

         has to look through.

              Now –

              THE COURT:  I'm sorry, was that 7 of 26 or was that actually

         26?

A        Seven of 26 –

              THE COURT:  Okay.

A        Now as we move higher up and particularly to images number 8 and 9,

         *you can see at the periphery there is some grayish material that is*

         outside the brain but inside the skull.  And if you follow that material,

         and again, we're going to go from images 6 through 10, particularly at

         the patient's right side toward the top, inside the skull, but outside the

         brain, just in front of the frontal lobe, about maybe between ten and

         eleven o'clock as we're looking at it –

Q        (By Mr. White, continuing):  Could you point that out with your

         pointer, doctor?

A        You can see the normal cortical convolutions here, you can see the

         gyri and the sulci, you can see extra cerebral fluid and you can see

         bone which images white because there's calcium in it.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

45

Now normally this would be expected to be cerebral spinal fluid which is clear and which doesn't have any debris in it And yet in this scan on this series, and this is a subtle finding but it's there, you can see irregularities in that space and it goes up to image number 12, they are not blood vessels, one does not normally see blood vessels in that area, they don't have the character – that finding doesn't have the characteristic appearance of blood vessels, there's not much else it can be except since we know this patient has had intracranial bleeding in the subdural space, it's degenerating subdural hematoma.

Q    And could you, for the juries edification, could you use your pointer and point that out please?

A    What I'll do is I'll hold the pointer on the area as I scroll up and down, so you can – all right, we're going to be starting at image number 7, this is the area in question, and I'm going to hold the pointer actually on the bone, right there but if you look underneath the bone inside the skull, you'll see the changes, there.

One of those areas may be a blood vessel because it looks a little tubular but there is material around it also.

Q    And that material is?

A    That material is extra cerebral but inside the skull, it's in an area where the finding, the radiographic finding out to be homogeneous and yet it's not, it's stippled.

Q    What would that indicate to you, doctor, what does that indicate?

A    To me that indicates that there is degraded blood products in the subdural space.

46

Q       In terms of using the terminology acute, chronic hematoma, what

        would that indicate?

A       It's chronic.

                MR. WHITE:  If I may approach the witness with proposed

        Exhibit V, again of our copy system.

                THE COURT:  You may.

Q       (By Mr. White, continuing):  Doctor, I'm handing you proposed

        Exhibit V, does that contain the images that we've discussed here?

A       It's two of them, it's number 10 and 11, it's not all of them and – it's

        not all of them.

Q       Okay. And the other ones that are depicted in Exhibit V?

A       There are others.

Q       Could you read the numbers on those?

A       I think these are images 20 and 21.

Q       Okay. Can you bring those up?

A       Sure. This is image 20 and this is image 21.

Q       Anything significant about either of those?

A       What's significant to me is that in image number 21 and again, there's

        a little bit of a scattered effect, but this is the area where there was

        fresh blood seen on the C.T. scan – I'm sorry, on the MRI scan of the

        30th.

Q       And what do we see here, doctor, what is this image –

A       Right. Given the limitations of scanning and the scatter effect that you

        have and given the fact that it was the cortical gyri that's underneath

        there, there's an awful lot of space between that gyri and the surface of

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

the brain. And the material that's in that space again is not the dark color of cerebral spinal fluid; again, given the limitations of the scatter effect that you see here, which is the dark area, it's a little too gray, there's more in it than just cerebral spinal fluid.

Q    And what would that indicate to you, what would be in it?

A    My interpretation of that is that there's some degenerative protein products and that's still a little bit of chronic subdural hematoma.

MR. WHITE: I'd move for entry of Exhibit V Your Honor?

THE COURT: Is that V as in Victor?

MR. WHITE: V, right.

THE COURT: Ms. Pope-Starnes, same objection?

MS. POPE-STARNES: Same objection, cumulative, Your Honor.

THE COURT: Noted. I'll admit it over the objection.

(Whereupon defense Exhibit V was received into evidence)

Q    (By Mr. White, continuing): So comparing the 8/31 MRI with the 9/11 C.T. scan, doctor, would it be your opinion that that acute subdural hematoma and that acute and or chronic subdural hematoma that you saw August 31st had completely resolved by September 11th?

A    My opinion is that it had not completely resolved.

Q    Okay. If I may get that Exhibit. And what's the next radiological test that you reviewed in reviewing this case, doctor?

A    The C.T. scan of November 30th.

Q    Okay. If you could pull that out, please.

48

A       All right, it's there.

Q       And the image – these are numbered images 1 and 2?

A       On the left are images 1 and 2 and on the right are images 1 of 28 so there are two images in the completed scan on the left and 28 scan on the right.

Q       And again, the positioning of the child is –

A       Supine, he's on his back – she, she's on her back, sorry.

Q       And anything significant, doctor, for the juries edification as to the image that's on the right side?

A       The right side?  Well, this is another C.T. scan that was made on the 30th and again there were 28 slices through this scan, same technique used in this as in the previous scan.

Q       Okay. In your review of the different C.T. scan images that were taken on November 30th, did you find anything unusual?

A       Yes.

Q       If you could put those images up.

A       I'm going to try and get to the relevant images here. All right. We'll start with image number 9.

Q       Again, where are we looking?

A       This is image number 9 of 28 images, this is a C.T. scan of the brain and again, the patient's left side is on your right side and the right side is on your left side. And what you're looking at here is that in-folding of the dura that we referred to earlier as the tentorium.  That is this structure right here, it separates the posterior temporal lobe from the cerebellum. And there is a bone that passes from close to the midline

49

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

laterally called the p-e-t-r-o-u-s and the tentorium attaches on to that. So you've got the anatomy straight here, and that's what's being looked at here.

Now, this is actually above that petrous bone and it's sort of above the tentorium where you have this whiteness here and this whiteness is not quite as dense as bone but nevertheless it's white and as we proceed from image number 9 of 28 to 10, to 11, that area becomes much more diffuse and there may be some more below and above the tentorium, that's fresh blood.

And we can now see it actually in image number 12, a portion of it appears to be underneath the occipital lobe here and some of it may even be retracting along the tentorium itself.

Q     And what would that indicate to you, doctor?

A     Pardon?

Q     What would that indicate to you?

A     That's fresh blood. There's another finding on this particular picture also which is relevant.

Q     What is that?

A     If you look anterior on the patient's left side and I don't know if I can – I don't think I can magnify this but I'll try to – nope – I don't want to make the computer it doesn't want to do – but if you look anterior around the frontal lobe at between one o'clock and three o'clock, you'll see a white linear streak outside the brain but inside the skull and you'll see a radial opaque area external to it, between it and the skull and some internal fluid also.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       What does that represent?

A       That is the membrane of a chronic subdural hematoma. But more

        importantly the outer membrane is the one that is intimately associated

        with the dura and the dura is intimately associated with the skull. This

        can't be an outer membrane, this is an inner membrane and that

        establishes this subdural is at least a month old, at least.

Q       Were you able to make a determination, doctor, whether the subdural

        hematoma that was shown on the August 31, 2006, whether it still

        existed as of November 30, 2006?

A       I think more likely than not it did.

Q       Okay. In what area, you can show the images to the jury, what area

        evidences that hematoma that was there August 31 was still there on

        September 30th (sic)?

A       Well, you have this and subdurals tend to track on the inner surface of

        the dura – wait a second, it's right here – you have this, meaning this

        particular finding on this image 12 of 28 and as we track it up further,

        13, you can see remnants of that same streak, 14, same thing, in fact if

        you look at the back of where that streak is at about three o'clock, you

        can see a little bit of fresh white. If we follow that up, you see it again

        on image number 15 and again on 16 and 17, and now as you get

        closer to the top of the head, you see fresh blood again at between five

        and six o'clock, which is the same area you saw the blood back in

        August.

Q       And again as I was looking down, that area is where?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Between five and six o'clock on image 24 of 28 and again, the

       subdural space is continuous so the subdural space in this image,

       which is image number 24 of 28 is continuous with all the rest of the

       images that we've looked at in 24 on down.

Q     When you say continuous, doctor, would you tell the jury what you

       mean by that?

A     It's not compartmentalized, it's one space.

              MR. WHITE:  Your Honor, if I may approach with proposed

       Exhibits W and X, I've tendered to sister counsel.

              THE COURT:  You may approach.

              MS. POPE-STARNES:  Your Honor, may I look, I don't have

       anything marked for them.

              MR. WHITE:  I think I have the stickers on the back –

              MS. POPE-STARNES:  Thank you.

              MR. WHITE:  So they don't cover up any part of the image.

Q     (By Mr. White, continuing):  Proposed Exhibit W and proposed

       Exhibit X, are these the images that you've just referenced in your

       discussion?

A     Yes, on the upper left of the first picture you've handed me is the scalp

       view –

              MS. POPE-STARNES:  I'm sorry, Your Honor, is he referring

       to W or X?

              THE COURT:  It's on the back.

Q     (By Mr. White, continuing):  I put the sticker on the back, doctor.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     W. The second one on the upper right is image 11 of 28, and 12 of 28,

then 15 of 28 and I referred to those here on the screen.

Q     And given limitations of the copy machine, does that accurately depict

the images that we've discussed here on the screen?

A     Yes.

      MR. WHITE:  I'd move for entry, Judge, Exhibit W and X.

      THE COURT:  Was there talk about both, did you identify W

and X?

A     I did, marked W and X.

      THE COURT:  Okay. Ms. Pope-Starnes, same objection?

      MS. POPE-STARNES:  Yes.

      THE COURT:  Noted, and preserved for the record and so

admitted.

            (Whereupon defense Exhibits W and X

            were received into evidence)

      MS. POPE-STARNES:  Thank you.

Q     (By Mr. White, continuing):  If I can get those pictures, doctor, if I

may approach.

      Now what are we seeing here, doctor, November 30, 2006, as it

relates to the MRI of August 31, 2006?

A     I'm sorry, would you repeat the question?

Q     What are we seeing here, November 30, 2006, compared to August 31,

2006, what has happened to this hematoma?

A     The subdural has gotten larger and has re-bled.

Q     Is re-bled synonymous with symptomatic?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     And becomes symptomatic, yes, re-bled with symptomatology.

Q     Now, doctor, would there be a concern if the MRI shows old blood in the front the skull but new blood in the back, excuse me –

A     Concern about what?

Q     About this being different – a different hematoma as opposed to old blood versus new blood?

A     Oh, the answer is no, I can give you reasons if you want?

Q     Why?

A     Okay. Number one, when you're supine and you have space with a liquid in it, and you put blood cells in it, blood cells contain protein which contains hemoglobin which contains iron and it settles. There's a test called a hematocrit which is based on blood settling and you can count, you can determine the amount of blood cells versus serum and that's one way it's done. The other one is that when we operate on patients with subdurals, you can drain the – you may drain the entire subdural after a single burr hole and – you know, I've done that on numerous occasions. In fact you can drain bilateral subdurals in children through an operation on one side.

Q     The fact that there was old blood in the front of the C.T. and new blood in back, would that be of any concern to you?

A     No.

Q     Could it mean that there is multiple trauma possibly?

A     In a patient with chronic subdural?

Q     Yes?

A     No.

FORM CSR-LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q   Now it's not possible to put the August 31, 2006 MRI up next to the
    November 30th C.T. scan, is it?

A   I can try.

Q   Now I'm looking at the image you have on the right, same location on
    August 31st?

A   You're asking me to compare the location on the scan of November
    30th the axial view on the left side towards the vortex of the head with
    a similar scan on August 31st MRI scan?

Q   Right?

A   Okay. It's the images number 24, 25 and 26.

Q   Is this the same hematoma that's shown November 30, 2006?

A   And re-bled, yes.

Q   Doctor, in your review of the records, when this child was admitted
    through emergency, was this child properly oxygenated?

A   Sorry?

Q   Was this – in your review of the records, in the admission of the child
    through emergency at University of Michigan Hospital, November
    30th, was this child properly oxygenated?

A   I'm not sure what you mean by properly.  They made an attempt to
    oxygenate, but I don't believe they were successful.

Q   Okay. Well, what were your concerns about the observations about the
    attempt to oxygenate this child?

A   Sorry?

Q   Your concerns about the procedures used to oxygenate this child?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    They tried to oxygenate him, they understood that and – however, the
     – they were unable to insert an airway, a breathing tube, a tube down
     into the trachea which is the surest way of maintaining someone who
     is  oxygenated when they're unconscious and seizing and they were
     unable to do that.

Q    Was there any finding about the oxygen level that caused you
     concern?

A    There was one.

Q    What was that?

A    He had a – there's note after he was in the hospital that he was – he
     required intubation, he had gotten worse again and before they
     intubated him they drew a blood sample and they said it was a venous
     blood sample and you should have less oxygen in venous blood than
     arterial blood because the oxygen gets extracted. But given the normal
     ranges, his oxygen level was still far below normal ranges.

Q    And what would that mean to you doctor?

A    It means he wasn't being – he was not getting enough oxygen to his
     brain.

Q    And what happens when there's insufficient oxygen supplied to the
     brain?

A    It starts to die.

Q    Does it swell?

A    Yes, it does, particularly if – it will swell if circulation is being
     maintained, yes. This is – circulation meaning blood is getting to the
     brain but the blood is not carrying oxygen.

56

Q    Could you make a determination based upon the November 30, 2006

C.T. scan whether this was a survivable event, whether this child

would survive with the nature and extent of the brain injury presented?

A    On the scan of November 30th?

Q    Yes?

A    No, I don't think you can make that kind of determination from that

scan.

Q    Would you consider it a medical emergency then?

A    Yes.

Q    Doctor, you reviewed the medical records, including the C.T. scan and

MRI's and all radiological tests, was there any evidence this child

suffered injury as a result of blunt trauma?

A    At the time the scans were made, no.

Q    As of November 30, 2006, any evidence in the MRI or C.T. scan to

support a finding that this child suffered blunt trauma injury?

A    Only the MRI or C.T. scan?

Q    Yes?

A    No.

Q    What about anything else in the records, anything?

A    There was nothing from the medical records to suggest that suffered

blunt trauma.

Q    What would be indicative of blunt trauma?

A    Any external evidence of injury.

Q    Such as?

A    Bumps, bruises.

57

Q    Okay. In the head?

A    Skull fracture in the head.

Q    Okay. Would there be any injury to the brain?

A    I'm sorry?

Q    Would there be any specific injury to the brain?

A    With blunt trauma in a child like this you're asking me?

Q    Yes?

A    If you had blunt trauma of significance to a child like this, one would expect to see bruising on the surface of the brain, in other words, there would be bleeding actually in the substance of the brain itself, that was not evident here. All the bleeding is outside of the brain.

Q    And, doctor, what would be the precipitating cause of this chronic subdural hematoma re-bleeding to the point of a medical emergency on November 30, 2006?

A    Well, the with a chronic subdural you don't need any precipitating cause, it can happen – it can happen spontaneously after trivial things such as burping or gagging on food, that's why you burp children and – or a minor injury, I mean a child could fall down and not even strike their head, fall down and strike their rump, that deceleration may be enough.

Q    A minor injury to the head?

A    Yes.

Q    Doctor, if Madison were vomiting, irritable, lethargic, tired, not herself on the day of November 30th, what would that indicate to you?

A    In knowing what we know now, that this subdural might be causing symptoms.

Q    And what is going on when the subdural is causing symptoms, what is going on in the brain that would cause these kind of symptoms?

A    It's being irritated. It may be being displaced mechanically by an increase in the volume of the subdural or electrochemistry by the presence of a subdural irritating neurons.

Q    Okay. And you've reviewed the medical records of the hospitalization until the child passed on December 4th?

A    Yes, I did.

Q    What was happening over the course of the child's admission to University of Michigan Hospital? What was happening to her brain?

A    She was being treated intensively, they recognized – they certainly recognized they had a problem but she was – she had suffered the effects of oxygen deprivation and so by attempting to maintain and restore her circulation the net effect was only to increase the amount of brain swelling, which they were trying to control but the brain was swelling as the neurons were dying.

    MR. WHITE: If I may have just a minute, Your Honor.

    I have nothing further of this witness.

    THE COURT: Thank you.

    We've been going for quite a stretch. We'll take a short recess.

    THE CLERK: All rise.

                  (Jury excused at 11:05 a.m.)

THE CLERK: The Court calls People v McBurney, case number 07 214651 FC.

THE COURT: Good morning again everyone. You may all be seated. The record may reflect that the jury is back, the case has been called, counsel's names have been noted for the record and the witness is back no the stand.

Doctor, you're reminded you're still under oath, required to testify truthfully and honestly, okay.

Ms. Pope Starnes you may –

MR. WHITE: Your Honor, I have –

THE COURT: I'm sorry?

MR. WHITE: One more question for the doctor?

THE COURT: Go ahead.

MR. WHITE: I'm sorry.

DIRECT EXAMINATION

CONTINUED BY MR. WHITE:

Q      Doctor, did external trauma from Madison cause her brain to swell?

A      No.

Q      What caused her brain to swell in this case to this critical stage?

A      Oxygen deprivation with continued circulation of the oxygen in the blood.

MR. WHITE: Thank you, Judge and thank you doctor, I don't have anything further.

THE COURT: Sure. Thank you. Ms. Pope Starnes.

MS. POPE STARNES: May I proceed?

THE COURT: You may proceed.

CROSS EXAMINATION

BY MS. POPE STARNES:

Q      Dr. Uscinski, you and I have met before, haven't we?

A      I think you look familiar.

Q      In fact in June of 2006 you came and testified before the Honorable

Steven Andrews in the case of People v Troy Vigrosh (phoen) didn't

you?

A      I remember the name, I don't remember testifying.

Q      I'd like to start out by talking to you about your Curriculum Vitae, it

indicates that you are a clinical assistant professor and clinical

associate professor, is that correct?

A      Yes.

Q      So you're not a full fledged professor, are you?

A      Clinical – I'm a clinical professor and not a full professor, that's

correct.

Q      You're not a pediatrician, are you?

A      That's correct.

Q      And you are not board certified as a pediatrician are you?

A      Also correct.

Q      Are you familiar with the American Academy of Pediatrics?

A      Somewhat.

Q      That's an organization of pediatricians, correct?

A      That's correct.

Q      You're not a member of that organization, are you?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A No, I'm not a pediatrician.

Q You testified on direct examination about the number of surgeries on average that you perform a year, tell the jury, please, are these adults and children, just adults or just children?

A They're a mixture.

Q And how many of these surgeries have you performed on infants?

A Infants?

Q Yes?

A From last January or last February to this February about –

Q I'm asking 2008, doctor?

A One.

Q Okay. And for 2007 how many?

A Let's see, I'd say about a dozen, as an estimate.

Q You are not an ophthalmologist, correct?

A Not designated ophthalmologist, that's correct.

Q And you're not board certified in ophthalmology, are you?

A That's correct.

Q Now your Curriculum Vitae indicates you've made presentations to the National Child Abuse Defense Resource Center in 2000, 2001 and 2006, correct?

A I believe so.

Q And that's a group of criminal defense attorneys, is that correct?

A No.

Q What is the Child Abuse Defense Resource Center?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       It's an organization that provides a resource for attorneys, prosecution

and defense actually, and other interested parties in studying various

aspects of child abuse, not restricted to the Shaken Baby Syndrome.

Q       Are you familiar with the National District Attorney's Association?

A       I've heard the term.

Q       Have you ever been invited by them to speak?

A       Not yet.

Q       Have you ever been invited by any prosecuting attorneys' association

in any states in this country?

A       I have to qualify the answer as yes because I lectured to the Judge

Advocate General's Court for the Air Force, which is both prosecution

and defense.

       MS. POPE STARNES:  Objection, non-responsive.

       MR. WHITE:  Your Honor –

Q       (By Ms. Pope-Starnes, continuing):  The question specifically was –

       THE COURT:  One at a time, one at a time –

Q       (By Ms. Pope-Starnes, continuing):  - prosecuting attorney association

of states, the Judge Advocate General has to do with the military, it

does not have to do with state government.

       THE COURT:  Mr. White.

       MR. WHITE:  I believe he gave a fair response of his

interpretation of the question.

       THE COURT: Understood. The Court will sustain the

objection.

Q      (By Ms. Pope-Starnes, continuing):  Specifically in regard to

prosecuting attorney associations in the fifty states of this country,

have you been invited to speak by any of them?

A      Not yet.

Q      Where do you do your work out of, what state?

A      State, Maryland.

Q      So you came here from Maryland to testify?

A      No.

Q      Where did you come from?

A      I came from Virginia.

Q      Okay. Tell the jury please, how many times have you testified as a

defense expert in cases involving children with brain injuries?

A      I would say close to – between eighty-five and ninety, close to ninety.

Q      Now Dr. Uscinski how many hours did you spend preparing for this

case?

A      Oh, I'd say between twenty and thirty.

Q      Well, you do know from your preparations and your review of all of

the records that Madison McBurney was a little girl, not a little boy,

don't you?

A      I recall that.

Q      Do you recall referring repeatedly to Madison McBurney during your

direct testimony as he?

A      I also recall re – correcting myself –

Q      Yes or no, doctor?

A      Yes, I do and I'm amplifying –

MS. POPE STARNES: Thank you – objection, that's the limit of my question, Your Honor.

THE COURT: We've got it.

MR. WHITE: Your Honor, I'd ask the prosecution to conduct herself in a respectful and professional manner and – okay I ask that because otherwise this is going turn into a free for all and I'd ask, Judge, that we – as I have tried to do, respect the witnesses that are on the witness stand in this case.

So please, Judge, I don't want this to turn into a fracas.

MS. POPE STARNES: Your Honor, if I may, I believe I am being respectful but I would like the witness to answer specifically the question that I've asked him, not go into narrative and not add to it.

THE COURT: You both with all due respect have had your opportunity to speak, both of you now, and the jury has heard it all. You don't need me to say anything further.

You may proceed.

MS. POPE STARNES: Thank you Your Honor.

Q (By Ms. Pope-Starnes, continuing): Now, Dr. Uscinski, do you recall being interviewed and featured in an article about expert witnesses called Witness for the Prosecution and the Defense and the Plaintiff from Physicians Practice in September of 2005?

A No.

MS. POPE STARNES: May I – well, first of all, Your Honor, I'd like to show counsel, let the record reflect I'm showing counsel a copy of the article.

65

MR. WHITE:  Is this my copy?

MS. POPE STARNES:  No.

MR. WHITE:  Do I have a copy?

MS. POPE STARNES:  Certainly after I've completed my examination of the witness.

May I approach the witness Your Honor?

MR. WHITE:  Don't I get a copy beforehand?

MS. POPE STARNES:  I believe, Your Honor, the rule of evidence indicates that I must show it to counsel and the witness and I've done that.

MR. WHITE:  Your Honor, I believe what we're doing, this is an article written by somebody else and I don't know what evidentiary value it has at this point.

THE COURT:  Hold your objection, I'll allow her to approach at this time and we'll see what happens.

MS. POPE STARNES:  May I approach?

THE COURT:  You may approach.

MS. POPE STARNES:  Thank you.

Q    (By Ms. Pope-Starnes, continuing):  Doctor, I'd ask you to take a look at that? Look to the back side as well, Dr. Uscinski, it's on the back side as well, it's on the back side also.

A    Okay.

Q    Does that refresh your recollection about being featured in that article?

A    Yes. If you're going to ask me questions I'd like to be able to read from it.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Certainly. And in fact your picture appears in that article, correct?

A      Yes, it does.

Q      Isn't it true that you stated in that article I don't particularly like what
       I'm doing, my training is as a neurosurgeon and I really belong in an
       operating room?

               MR. WHITE: Objection as to what relevance it has, number
       one. And number two is it being offered as a prior inconsistent
       statement? It's not. So I object to the relevance of the question.

               THE COURT: Relevance objection counsel.

               MS. POPE STARNES: It goes to his credibility, Your Honor.
       He's testifying, he's presenting himself to this jury as an expert
       witness and I think this goes to his credibility.

               THE COURT: The court respects the response but sustain the
       objection, whether he likes it or doesn't like it, I don't find to be
       relevant so the court will sustain the objection.

               MS. POPE STARNES: Thank you.

Q      (By Ms. Pope-Starnes, continuing): Now, doctor, you accept fees for
       your testimony, don't you?

A      No.

Q      Were you paid to testify in this case?

A      No.

Q      You have received no monies for your testimony and your preparation
       in this case?

A      No.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO. 800-826-6313

Q        Isn't it true in the past that you have been paid for your testimony and

         your preparation in cases?

A        I'm answering the questions you're asking, yes.

Q        Did you receive any money in relation to this case, doctor?

A        Yes.

Q        For what?

A        Time, not testimony, ma'am, time.

Q        And how much did you receive or will you receive?

A        Somewhere between twelve and thirteen thousand dollars, and that's

         an estimate.

Q        Isn't it true that in November of 1999 you were a witness for the

         defense in the Louise Woodward case?

         MR. WHITE:  Objection, Your Honor, this has no relevance to

this particular case.

         MS. POPE STARNES:  It does, it's all in the same line, Your

Honor, in regards to the monies that he's received and gave testimony

about that, it goes to his credibility.

         MR. WHITE:  I don't see his prior involvement in another case

– we don't know, we should not know any facts so it has no bearing to

his testimony in this case, Judge.

         THE COURT:  At this juncture the court will overrule the

objection, subject to renewal depending on how it develops, how the

line develops. You may proceed.

Q        (By Ms. Pope-Starnes, continuing):  Do you recall testifying as a

         witness for the defense in that case?

68

A      Which case?

Q      The Louise Woodward case?

A      Yes, I do.

Q      And how much were you paid for your testimony in that case?

MR. WHITE:  Objection as to this case, it has no relevance,

Judge.  We don't know what the facts are in Louise Woodward and it

would be misleading to the jury.

THE COURT:  Relevancy objection.

MS. POPE STARNES:  Your Honor, it goes to how much he is

paid at this point and it goes to his credibility, not right now as to the

facts.

MR. WHITE:  He's testified how much he's paid, Judge, in

this case.

THE COURT:  How is it relevant, counsel?  I'm still not seeing

it?

MS. POPE STARNES:  Your Honor, the doctor has testified

today that he's just paid for his preparation, I have testimony to

impeach him where he's testified in the past about how much he's paid

an hour for testimony and how much he's paid for preparation.  And I

think it goes to his credibility because he's testified today that he's

only paid for his preparation, not for his testimony.

THE COURT:  Develop some questions first as to this case and

preparation and break it down and then perhaps I'll allow the inquiry

into the other case.  But at this juncture the court will sustain it without

prejudice.

MR. WHITE: But I'll object to the mischaracterization of his testimony. He's testified that he's paid based on his time, time.

THE COURT: Noted.

MR. WHITE: Time.

THE COURT: Noted. Ms. Pope Starnes.

Q    (By Ms. Pope-Starnes, continuing): Do you recall testifying in the Louise Woodward case?

A    Yes.

Q    And that case involved a nanny who was accused of shaking a baby and causing injuries, correct?

A    That's correct.

Q    And do you recall testifying that in that case you were paid nine hundred dollars an hour for your testimony and three hundred dollars an hour for your preparation?

A    That is incorrectly phrased. I'll help you if you want.

Q    Isn't it true that when you testified in the Barosh (phoen), in June of 2006 before Judge Andrews of this circuit court, that your testimony was that in the Woodward case that you were you paid nine hundred dollars an hour for testimony and three hundred dollars an hour for preparation?

A    That's for testimony time and preparation time.

Q    My question sir was, was that your testimony?

A    Yes, that's correct.

Q     What percentage of your income for 2007, doctor, was made up from

your time in cases where you testified on behalf of the defense

involving a child that suffered head injury?

        THE COURT:  Hold on, doctor.

        MR. WHITE:  Objection, Your Honor, this is irrelevant to the

proceedings before you.

        COURT REPORTER:  I cannot hear you, Mr. White –

        MR. WHITE:  I'm sorry.  I'm trying not to shout.  Objection.

It's irrelevant to this proceeding.

        THE COURT:  Thank you.

        MS. POPE STARNES:  It goes to his credibility, Your Honor.

He's presenting himself  -

        THE COURT:  Overruled, I'll allow it, I'll allow it.  Go ahead.

A     About fifteen percent.

Q     (By Ms. Pope-Starnes, continuing):  Now specifically what records did

you review in this case in preparation?

A     Medical records.

Q     What medical records?

A     Medical records of the hospitalization at University of Michigan

Hospital, birth records and I think I mentioned this earlier actually, and

some records about evaluation for aplasia cutis congenital.

Q     Did you read the autopsy protocol?

A     Yes, that would include that in the medical records.

Q     Did you read the police report?

A     I don't believe I read the police report.

71

Q      Now you did not write a report in this case, did you, sir?

A      That's correct.

Q      Why not?

A      I wasn't asked to.

Q      It's not uncommon for you to write a letter or a report in these cases, is
       it?

A      I don't know if it's common or uncommon but if I'm asked to, I do.

Q      In the case of Tracy Barosh (phoen) you wrote two letters for the
       defendant in that case, didn't you?

            MR. WHITE:  Objection. What –

A      I don't remember – it's possible.

            MR. WHITE:  Okay. Judge, objection.

            THE COURT:  Motion to strike the answer?

            MR. WHITE:  Yes, motion to strike, it's not relevant, not

relevant to this proceeding. When do we start talking about –

            THE COURT:  I've got you.

            MS. POPE STARNES:  Again, Your Honor, it goes to his

credibility.  He's testified he wasn't asked to write one in this case and

I can impeach him with other cases where he has written –

            THE COURT:  The objection is noted and the motion to strike

is granted.  The court doesn't find it relevant here as to – on that issue.

Q      (By Ms. Pope-Starnes, continuing):  You don't believe that a human

can shake infants with sufficient force to cause cranial injury, correct?

A      Shaking alone?

72

Q      That was the question.

A      Are you asking me – shake, period?

Q      That was the question?

A      I want to make sure I understand your question before I answer it. Just

       shaking?

Q      Yes?

A      Cranial injury?

Q      Yes?

A      No.

Q      But you do believe that a human can shake infants with impact with

       sufficient force to achieve the necessary injury threshold for causing

       such cranial injury, don't you?

A      Yes, I do.

Q      In fact in the case of People v Tracy Barosh (phoen) you testified that

       human beings cannot shake children hard enough to cause inter-cranial

       injuries of this nature and the only ways these injuries can be caused is

       with an impact, not shaking, correct?

A      I don't remember that --

              MR. WHITE: Objection, objection, it's not being offered for

       any purpose, Judge. It's not relevant.

              THE COURT: Counsel –

              MS. POPE STARNES: It is relevant Your Honor. Counsel

       went extensively with this witness into whether or not he believes in

       shaking and Shaken Baby Syndrome. This has been an issue that they

       have brought up.

                                                                        73

THE COURT: Noted. And the court will direct you, go beyond – next question, the court sustains that objection. He's answered affirmatively that those two combined together can cause the injury so we don't need it from that testimony before.

Q      (By Ms. Pope-Starnes, continuing): You did not personally perform surgery on Madison, did you?

A      That's correct.

Q      You did not personally treat Madison, correct?

A      That's correct.

Q      In fact you never personally saw her, did you?

A      That's correct, only her scans.

Q      Did you speak with any of the treating physicians?

A      No.

Q      Did you attempt to speak with any of the treating physicians?

A      No.

Q      Were you present at her autopsy?

A      No.

Q      Did you attempt to contact Dr. Dragovich to discuss the autopsy?

A      I spoke with him briefly.

Q      When?

A      Last week.

Q      At a conference?

A      That's correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Before you spoke with him last week at a conference you made no attempt to contact him in regards to this autopsy and his findings, did you?

A      That's correct, since I knew he'd be at the conference.

Q      Is it your testimony that you spoke with him at the conference about this case?

A      Yes.

Q      Did you review his microscopic slides while you were talking to him?

A      No.

Q      Did you ask to?

A      No.

Q      Had you seen them?

A      No.

Q      Did you speak with the neurosurgeon that was involved in this case, Dr. Maher?

A      No.

Q      Did you speak with the ophthalmologist, Dr. Margolin?

A      No.

Q      Now in regards to Madison, why did her chronic subdural hematoma re-bleed in your opinion?

A      Why?

Q      Yes?

A      I don't know that I can tell you specifically why, I can just tell you that it did.

75

Q    Well I believe that it was your testimony that it was – did you say

     about – your opinion was it was about six weeks old?

A    No.

Q    How old did you say?

A    I don't know how old it is.

Q    You didn't testify on direct examination about an opinion about how

     old it was – the chronic was?

A    No. What I said, in reference to the term six weeks I believe is that

     under circumstances where you have a linear regression of an acute

     subdural hematoma, that if it would absorb, reabsorb or resolve or go

     away it would go away between four and six weeks.

Q    Well I'm asking you doctor specifically in this case, do you have an

     opinion as to how old the chronic subdural hematoma that was

     observed on November 30th in a C.T. scan, do you have an opinion as

     to how old it was at that time?

A    How old?

Q    Yes?

A    No.

Q    When specifically is it your opinion that Madison's chronic subdural

     hematoma began to re-bleed?

A    I don't have an opinion on that.

Q    Is it your testimony that it is your opinion that Madison had a chronic

     subdural – or excuse me, a subdural hematoma from birth?

A    I don't know, it's possible, I just don't know.

Q    You testified you looked at the birth records?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes, I did.

Q    Okay. What's an Abgar (phonetic) score?

A    It's a way of grading patients, infants.

Q    On a scale of what?

A    On a scale?

Q    What is the scale, what is the score, what numbers is it between?

A    One and three – I'm sorry, one and two, and it's named after a woman named Virgina Abgar (phoen).

Q    Isn't it true, sir, that the scale goes up to ten?

A    No. The scale individual parameter is between zero, one and two and there are five parameters.

Q    And what is the total possible score?

A    The total possible score is ten but it has to be broken down individually.

Q    Isn't it true that Madison's Abgar (phoen) scores at birth were nine and nine?

A    That's correct. It's also irrelevant but it's correct.

        MS. POPE STARNES: I'm going to object and ask that be struck, it's only for the court and the jury to decide what is relevant, not the witness.

        THE COURT: Just try to answer just the question that's asked, okay, doctor.

A    Okay.

        THE COURT: Go ahead.

77

Q      (By Ms. Pope-Starnes, continuing): Isn't it also true that Madison was

born at forty weeks gestation?

A      That's correct.

Q      Isn't it also true that she had – that she was born caesarean?

A      I believe so.

Q      And don't the medical records also indicate that there were no

complications in delivery?

A      To the mother, that's correct.

　　　　MS. POPE STARNES: May I have the exhibits please,

counsel, the birth records? Thank you.

　　　　May I approach the witness, Your Honor?

　　　　THE COURT: You may.

Q      (By Ms. Pope-Starnes, continuing): Sir, I'm showing you –

　　　　MS. POPE STARNES: There's no sticker on that report –

　　　　MR. WHITE: It was – I spilled water on it, it was A, that's

what happened and the sticker came off. I'll put another one on it.

Q      (By Ms. Pope-Starnes, continuing): I'm showing you Defendant's

Exhibit A, can you point out to me please where it says that mother

had no complications?

A      I don't know that I can point out to you where it says that the mother

had no complications but I can say that there were no complications to

the mother.

Q      Please don't close it. Thank you

A      Your welcome.

Q      Isn't it true it says in the paragraph that is in all capitals, first sentence, excuse me – first paragraph second sentence:

"No complications".

A      I think I might have missed something in the medical records.

Q      Does it say that?

A      Yes, that's correct.

Q      Now you've testified as I understand it, that you believe that if there was some impact injury there would be some evidence of it, a bruise, a fracture or something to the head or to the skull, is that correct?

A      That's correct.

Q      What is the mechanism of injury for skull fractures to an infant?

A      Skull bends and breaks.

Q      How does that happen?

A      Infant's skull is malleable, flexible, it bends and then breaks.

Q      Does it do that spontaneously?

A      No, you have to have an impact, something has to be pushing against it.

Q      You are not a forensic pathologist, are you?

A      That's correct.

Q      You are not a neuro-pathologist, are you?

A      That's also correct.

Q      Can you tell the jury please how many autopsies have you personally performed?

A      My intent is that people don't get autopsied.

MS. POPE STARNES:  Objection, non-responsive –

79

A    So I don't do autopsies. I've never done an autopsy.

Q    (By Ms. Pope-Starnes, continuing): Do you recall, sir, in past

testimony giving an example in trying to help a jury understand about

– something about egg yolks in a jar?

A    Yes.

Q    Can you explain that?

A    Sure.

Q    Go ahead?

A    Okay. I used an example as teaching, the concept behind –

MS. POPE STARNES: I'm sorry, the jurors are indicating

they can't hear.

THE COURT: Did you say in teaching?

A    In teaching, yes. The concept behind the so-called Shaken Baby

Syndrome is that the brain is moved inside the skull to such an extent

that it strikes the inner surface of the skull and may be bruised or that

blood vessels that are running between the brain and the skull become

torn and that results in bleeding.

There is a certain amount of movement of the brain inside the

skull but that movement is not of sufficient degree to cause those kinds

of injuries given the type of movement and acceleration that people go

through with manual shaking. So I use the example of taking a small

jar, smaller than the size of a baby's head and filling it up with raw

eggs and putting the cap on the jar under water so there's no air inside

and no matter how hard you shake it, you will not break the yolks

inside the shell – inside the jar. That's the -

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       Now doctor in that example –

A       Excuse me – that's the example.

Q       In that example there are no bridging banks, correct?

A       That's correct.

Q       When was the first time you testified as an expert witness in this issue about infants or children suffering head injuries?

A       About infants or children suffering head injuries?

Q       Specifically in cases involving Shaken Baby Syndrome or abuse head trauma?

A       Well in cases involving the so-called Shaken Baby Syndrome the first time I testified was in 1997.

Q       In what case?

A       I'm sorry?

Q       In what case?

A       It was in the Woodward case.

Q       Isn't it true, sir, that in that case you testified the injuries were caused by a subdural re-bleed that was chronic that began to re-bleed?

        MR. WHITE:  Objection, Your Honor, as to the relevance of this case.  We don't know the facts of that case –

        MS. POPE STARNES:  It would –

        THE COURT:  Go ahead.

        MR. WHITE:  - it would be misleading to the jury.  We don't know – we're not going to try that case in this case and that's what the – it's not relevant, it's not fair Judge.

MS. POPE STARNES:  It is relevant, Your Honor, they are presenting testimony a defense that they claim that this is a chronic subdural hematoma that re-bled.  If this witness has testified to that before then it's relevant to his credibility.

THE COURT:  The court notes the objection – notes the response, I'll sustain the objection.

MS. POPE STARNES:  Your Honor, I would ask that the jury be removed so that I can make a record.

THE COURT:  Can both counsel approach for a moment?

(Whereupon a brief discussion

was had off the record)

THE COURT:  Ladies and gentlemen, it's about five – ten minutes to twelve, we'll break for lunch at this time.  I'd ask you not to talk about the case, we'll resume at 1:30.  Don't leave until my assistant, Mr. Romback tells you to leave, okay.  Thank you All rise for the jury.

(Jury excused at 11:50 a.m.)

THE COURT:  Go ahead Ms. Pope Starnes. Yes, he can step down, that's fine.  Go ahead Ms. Pope Starnes.

MS. POPE STARNES:  Your Honor, I'd like to make this record.  As an offer of proof I have from prior testimony of this doctor a minimum of eight cases where he has testified to the exact same thing and I believe that it's important for the jury to know that, that he has a history as a paid expert of coming in and testifying to the exact same thing in every case.

82

THE COURT: Okay. That's it – if that question was posed, perhaps I'd allow that answer – or allow that inquiry.

MS. POPE STARNES: I will try to do it on a case by case basis, Your Honor, and give him an opportunity to say whether or not he recalls a specific case.

THE COURT: Well, anything Mr. White?

MR. WHITE: Well, sure, I mean are we going to try all those cases? Are we going to – because if she asks about – then I'll go into the facts and all and you know, and we'll bring in witnesses –

THE COURT: Okay.

MR. WHITE: - and we'll have, you know, eight trials, because to say –

THE COURT: I've got it –

MR. WHITE: - that he's testified of his ninety to a hundred times testifying as an expert witness he's found this of eight possible occasions, then we're going to have to retry everyone of those cases because the jury would have to understand the facts underlying, including the volumes of medical evidence under which – by which he reached that conclusion, Judge.

THE COURT: I'll allow – noted – I'll allow the question to be asked of those times have you testified in the past, whatever number it is on to this issue, I'll allow that question recognizing that, but the question that you were asking –

MS. POPE STARNES: For clarification the court is allowing me to ask it in one question rather than to try to refresh his memory as to each specific case?

THE COURT: You can ask the question as you posed it outside of the jury's presence, have you testified X number of times on chronic – I'm not going to try to repeat the medical terminology; the court will allow that specific question and he can say yes or no to that.

Anything further?

MR. WHITE: Well, I didn't like that ruling –

THE COURT: Okay. Noted. All right. It is five minutes to so we might as well just – instead of bringing them in for that, just keep going, we'll just resume at 1:30. There's going to be redirect anyway so we won't be done before lunch with this witness in any event. So have a nice lunch and we'll be back at 1:30.

Deputies, we'll give you a call, okay.

THE CLERK: All rise.

(Whereupon a pause was

had in these proceedings)

THE CLERK: Calling People v McBurney, case number 07 214651 FC.

MR. WHITE: Good afternoon, Your Honor, Robert White appearing on behalf of Mr. McBurney.

THE COURT: Thank you.

MS. POPE STARNES: Good afternoon, Your Honor, Sara Pope Starnes, Assistant Prosecuting Attorney.

84

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT:  Good afternoon. Are you ready to proceed?

MR. WHITE:  Yes, Judge. Do you want the doctor to come up now?

THE COURT:  Doctor, if you can come on back up.

Jeff, you can bring in the jury.

(Jury seated at 1:35 p.m.)

THE COURT:  Good afternoon everyone.  Thank you. You may all be seated.  The record reflect that the jury is back, the case has been called and counsel's names have been noted and the doctor is back on the witness stand and you're reminded you're still under oath, required to testify truthfully and honestly.

Okay. Ms. Pope Starnes, you may proceed.

MS. POPE STARNES:  Thank you.

Q    (By Ms. Pope-Starnes, continuing):  You testified that there were many things – on direct examination you testified there were many things that could cause a chronic subdural to re-bleed in an infant and I think some of the examples you gave were that it could be spontaneous, burping, sneezing, bouncing on the knee, is that correct?

A    Yes.

Q    Could throwing a child cause that?

A    Throwing?

Q    Yes?

A    Sure.

Q    Now what is it that you base your testimony on that there was an issue with the child needing to be intubated?

85

A What I base my testimony on?

Q Yes?

A Well number one, the fact that the child didn't have a patent airway and when they arrived on the scene they removed something from her mouth.

Q Where is it in the medical records that she did not have a patent airway?

A I don't remember but I remember reading it, do you want me to look? I'll find it.

Q Yes, please.

A Sure.

   MR. WHITE:  Where are you records?

A I think they're on the table at the end there.

   MR. WHITE:  If I may approach the witness.

   THE COURT:  You may.

A Okay. I know there are several notations but the one here that I have is from –

Q (By Ms. Pope-Starnes, continuing):  Referring to where?

A - the – a run by the fire department to – for call number 524 and I don't – let's see, there's a number at the right-hand bottom of the page that says twenty-six, I'll be happy to show it to you, but it says:

   "On Thursday, November 30[th] I responded to a
   call at 311 South Street, the call involved an infant
   having agonal respirations.  Upon arrival we
   administered blow-by oxygen and did a quick
   suction to clear the throat of obstructions.

There is another notation – let's see if I can find it, where they
removed a whitish fluid from the mouth.

Q       And doctor, any obstructions that are referred to specifically in the
EMT's records talk about a milky white substance, correct?

A       That's correct.

Q       You're also aware of the fact that the defendant father told those same
EMT's that he had been administering rescue breaths, correct?

A       Maybe – yes, I think so.

Q       Okay.

A       Yes, there is another notation on page 45, narrative, South Lyon Fire
Department, it's just one page and I'm not sure if it's complete but it
says:

> "SLFD removed fluid from infant's mouth with
> a quick suction."

Q       So this was fluid?

A       That's what it says here.

Q       From the mouth?

A       That's what it says here. And also it says 'agonal respirations'.

Q       Now where in the records does it indicate that the airway was
compromised other than that, that it had to be preserved, that
intubation was required?

A       The child was seizing, anybody seizing has a compromised airway by
definition.

Q       Were you present in the ambulance at that time?

A       Was I present in the ambulance?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Yes?

A      Nope.

Q      Were you present in the emergency room?

A      Nope.

Q      Have you talked with Doctor Sikavitsas as the emergency physician

who treated Madison?

A      No.

Q      I believe you also testified that the precipitating cause for a chronic

subdural to re-bleed could also be a child falling from standing up onto

their rump I believe is the word you used, correct?

A      Yes, I did use that word and yes, he could have.

Q      Are you aware of the fact sir that this child was not mobile?

A      Yes.

Q      Are you aware of the fact that she could not stand?

A      Yes.

Q      You're aware of the fact that she could not crawl or walk?

A      That's correct.

Q      Now, you testified that you have testified in approximately I believe

you said eighty-five to ninety times as a defense expert in cases

involving children where there's allegations of Shaken Baby

Syndrome or abuse head trauma, is that correct?

A      That's not correct as you phrased it.  I've testified probably eighty-five

to ninety cases in instances where there has been either allegations of

shaking or allegations of inflicted trauma of some nature.

Q      How many of those cases did you testify that it was as a result of a

chronic subdural hematoma that had re-bled?

      MR. WHITE:  Your Honor, you have my objection, we

discussed it.  I don't believe we should retry all the cases because it

would be misleading to the jury unless the jury knew the facts of the

case, so I believe, Judge, that we're compromising the situation,

you've ruled, I respect your ruling but I don't believe it's fair.

      THE COURT:  Understood, preserved and noted. You may

proceed, counsel.

A      Okay. Your question again?

Q      (By Ms. Pope-Starnes, continuing):  How many of those cases did you

testify that it was your opinion that the child had suffered a chronic

subdural hematoma that had re-bled?

A      I have no idea.

Q      More then ten?

A      I just said I have no idea. It may be more than ten, it is less than ninety,

I don't know.

      MS. POPE STARNES:  May I proceed with the question, Your

Honor, specifically?

      THE COURT:  Let me hear the question first. Let me hear the

question.

Q      (By Ms. Pope-Starnes, continuing):  Was that your testimony in the

Woodward case?

      MR. WHITE:  Objection, objection, Judge, because we can't

understand his testimony unless you hear the facts.

89

MS. POPE STARNES: He testified –

THE COURT: I understand, I note the objection and I find it to be the same objection as before and it's preserved.

If you know, sir, I'll allow the answer.

Q     (By Ms. Pope-Starnes, continuing): Was that your testimony in the Woodward case?

A     Yes.

Q     How about in the case of Indiana versus Nicholson in 2003?

A     I don't remember –

MR. WHITE: Same objection –

THE COURT: Standing objection noted. I've got you.

A     I don't remember.

Q     (By Ms. Pope-Starnes, continuing): How about the case of Ohio versus Youngert (phoen)?

A     I don't remember.

Q     How about the case of Colorado versus Waddle (phoen)?

A     Yes, and it's Wadle (phoen).

Q     l-e, thank you. Tennessee v Stringer (phoen)?

A     I don't remember.

Q     California versus – and I'll spell this last name for you, V-e-l-a-h-b-i-d?

A     I remember the case, I don't remember the circumstances or details, possibly.

Q     Texas versus Cathy Stewart (phoen)?

A      Again, I remember the name I don't remember the circumstances of the case.

MS. POPE STARNES:  Please let the record reflect I'm showing counsel transcript from that case, specifically page 41.

THE COURT:  Do you want to approach with it or something or what?

MS. POPE STARNES:  No, I'm just – as to the rules of evidence I'm giving counsel an opportunity before I ask to impeach the witness what would refresh his recollection.

May I proceed Your Honor?

MR. WHITE:  Wait a minute.

THE COURT:  Go ahead, go ahead.

MR. WHITE:  And she's not going to impeach him if he can't recall.  He didn't ask to have his recollection refreshed.  If you admit this then I want you to admit the entire transcript of that trial, okay. If we're going to go into his testimony then let's go – let's have the jury hear all of the facts of each and every case, okay. Because we can't understand how the doctor's testified, in what context unless there is a factual basis under which he derived his opinion.

So to allow this is again, it's bushwhacking, Judge, is what it is and you cannot continue to allow this and expect this to be a fair trial, you cannot, because it's – like me asking Dr. Dragovich how many times has he said it's a homicide; I'll guarantee he'll say one hundred percent, okay.

THE COURT:  I've got your point, I've got your point, Mr. White. Thank you

MR. WHITE:  So are we going to re-try because I'll ask to put in the transcript in each and every volume, volume, because we cannot sit and give this jury a fair impression what this witness has testified to.  He's here to testify about this case, Judge.

MS. POPE STARNES:  And it's on cross examination, I have the right to ask questions in regards to his credibility, including his prior testimony and if this is a pattern of his testifying in this manner.

THE COURT:  We are dealing with hypothesis that haven't yet been borne out in the record.  Do you – we haven't talked about whether anything is being admitted or not –

MS. POPE STARNES:  I'm not seeking to admit it, Your Honor –

THE COURT:  I understand counsel. Let me – what is it that you wish to do, ask him a question or approach him or what?

MS. POPE STARNES:  I would like to ask him whether or not this transcript might refresh his memory and give him an opportunity to look at it.

THE COURT:  You can ask – let me – you can ask that question and we're dealing with which case?

MS. POPE STARNES:  Texas versus Stewart (phoen).

Q    (By Ms. Pope-Starnes, continuing):  Dr. Uscinski if you had an opportunity to look at the transcripts, do you think that that might refresh your memory as to what your opinion was in that case?

92

A      I don't know.

Q      Might it?

A      *Might, might not.*

       MS. POPE STARNES:  May I approach the witness?

       THE COURT:  Yes, knowing Mr. White –

       MR. WHITE:  He didn't ask for it.

       THE COURT:  I understand.

       MR. WHITE:  He didn't ask for it and there's no court rule –

we're making rules now – there is no court rule that says that she can

approach the witness when he has not asked to have his recollection

refreshed.

       THE COURT:  Noted, noted.  I disagree respectfully.  You

may approach.

Q      (By Ms. Pope-Starnes, continuing):  Sir, I'm now showing you a

transcript that's noted as Texas versus Cathy Stewart (phoen) –

       MR. WHITE:  Now how would he know that? How would he

know that?

       MS. POPE STARNES:  I'm asking him if that's what it is, for

the record, I am showing him the cover page.

       THE COURT:  If you can answer, sir?

A      You're showing me a piece of paper that has writing on it and it says

reporter's record volume seven of volumes – it doesn't say, trial court,

cause number –

       THE COURT:  Okay. I don't need you to read from it.

A      Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: Can you identify what that is? Do you have any idea?

A     No.

THE COURT: Okay. You may proceed.

Q     (By Ms. Pope-Starnes, continuing): I'm going to direct your attention to page 41 and ask you to read that to yourself, please.

A     Okay, I've read it.

Q     You've had an opportunity to read that to yourself?

A     Yes.

Q     And does that refresh your memory as to what your opinion was in that case?

A     First off I don't know that this is a case and it doesn't refresh my memory, it's what I say.

Q     Did you say that in that case?

A     I don't know. What are we looking – I'm not sure what we're looking at?

THE COURT: That's okay, we've got the answers.

Q     (By Ms. Pope-Starnes, continuing): In the case of People v Tracy Barosh (phoen), in which you testified before Judge Andrews in this courthouse on June 22nd and June 23rd of 2006, was that opinion, did you give that opinion in that case?

A     I don't remember.

Q     Would looking at the transcript of your testimony in that case refresh your memory?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

MR. WHITE:  Same objection. He's not asking to have it read and is it being offered for impeachment?  No, it's not.

THE COURT:  She can ask to see if anything will refresh his recollection, whether it's a transcript or a tennis shoe.

Q     (By Ms. Pope-Starnes, continuing):  Answer the question please, sir?

A     Repeat the question.

Q     Would looking at the transcript of your testimony from that trial refresh your memory?

A     Same answer to the previous question about the previous transcript, I don't know.

MS. POPE STARNES:  May I approach the witness, Your Honor.

THE COURT:  You may.

Q     (By Ms. Pope-Starnes, continuing):  Directing your attention to page 222 through 234.

A     You said 222 to 224?

Q     Two hundred thirty-four.

A     From 222 to 234?

Q     Yes. It does not refresh your memory?

A     Nope.

Q     Do you recall testifying in that case that you spent about thirty hours in preparation?

A     I don't remember.

Q     How much time do you spend on average in preparation for a case?

MR. WHITE: Objection, as to relevancy. He testified as to what he did in this case.

MS. POPE STARNES: He testified that he doesn't remember, I can go into his credibility, Your Honor.

THE COURT: Is there – can you say that there is an average amount of time or you don't know or there is a –

A    I can't give you a good answer, I – usually well over twelve and I don't know, at times I've spent fifty hours and at times more. I have no idea how to answer that question.

Q    (By Ms. Pope-Starnes, continuing): In any of those cases did you personally see or treat the child?

MR. WHITE: Objection, as to any of those – first of all, the form of the question is improper any of what cases and secondly it's not relevant to the determination in this case.

He's admitted in this case that he was not the treating physician once.

THE COURT: Understood. As to the form, she's talking about any of those other cases that you've testified to and as to the relevancy, the standing objection, the court respectfully overrules –

A    I'm not sure I understand your question. Are you talking about cases that you've asked me to look at or cases – trial transcripts, whatever it is we're looking at here, those cases or other cases in which I've testified, have I examined children?

Q    (By Ms. Pope-Starnes, continuing): The eight cases that we've just went through –

A    The what cases?

Q    The eight cases that we just went through?

A    I didn't see eight cases. You just gave me two transcripts –

        THE COURT: Go ahead.

Q    (By Ms. Pope-Starnes, continuing): In the Woodward case, the Indiana

        v Nicholson case, Ohio v Yonkers (phoen) Colorado v Wadell (phoen)

        please excuse me if I mispronounce it –

A    It's Wadley (phoen) –

Q    - Tenalsy (phoen)  v Stringer (phoen) California v Balaga (phoen),

        Texas v Stewart (phoen) or People of the State of Michigan v Tracy

        Barosh (phoen) –

A    Okay.

Q    - in any of those cases did you personally see or treat the child

        involved in those cases?

A    The –

Q    Yes or no?

A    I can't answer it with yes or no, I'm going to have to have a little

        latitude on that.

Q    You have testified and lectured numerous times about chronic

        subdural hematoma briefly, how many studies have you personally

        conducted –

        MR. WHITE: Objection as to an editorial comment, that's not

    a question. There's a demonstrative statement, declarant statement.

        THE COURT: Let me –

        MR. WHITE: I'd ask you to strike it.

                                                                    97

THE COURT:  Let me hear the question.

MS. POPE STARNES:  This is cross examination, Your

Honor.  And I'd really like the opportunity for the witness to be able to

answer the question uninterrupted without legal objection so that the

jury can hear the response.

THE COURT:  Let me hear the question again, and, sir, hold

off in anticipation of an objection.

MS. POPE STARNES:  He has testified and lectured and he's

been testifying about his testimony and the fact that he makes

presentations –

THE COURT:  I know –

MS. POPE STARNES:  My question, Your Honor, is:

Q       (By Ms. Pope-Starnes, continuing):  You testified that you've testified

and lectured numerous times about subdural hematomas rebleeding.

My question is what – how many studies have you personally

conducted?

MR. WHITE:  My objection is as to the first part of that, I

don't think he's ever testified to that affect and she can't testify for

him -

THE COURT:  I've got you –

MR. WHITE:  Ask the question and then he'll answer.

MS. POPE STARNES:  It's –

THE COURT:  I'll allow it –

MS. POPE STARNES:  -cross examination –

THE COURT:  I'll allow it.

MS. POPE STARNES:  Thank you.

Q    (By Ms. Pope-Starnes, continuing):  How many studies have you

personally conducted on this issue?

A    One could say hundreds.  I'll explain that if you wish.

Q    No.

A    Okay.

Q    Is it true you've previously testified in the Tracy Barosh (phoen) case

you haven't done studies, you've done homework?

A    I'm sorry, would you – is that a question?  I didn't catch it.

Q    Yes, it is?

A    What's the question?

Q    Isn't it true you previously testified in the case of the People of the

State of Michigan v Tracy Barosh (phoen), I haven't done studies, I've

done homework.

MR. WHITE:  What was the question? What was the question

that was asked in the previous –

Q    (By Ms. Pope-Starnes, continuing):  The question was has he

previously testified to that?

MR. WHITE:  What was the question in the Tracy Barosh

case?

THE COURT:  No, I understand. I'll allow the question.

A    Okay. The question again is what?

Q    (By Ms. Pope-Starnes, continuing):  We're talking about whether or

not you have personally done studies –

A    Define studies –

MS. POPE STARNES: Your Honor, I'd ask the court to direct the witness not to ask questions, that's the responsibility of the lawyers, not the witness. If he can't answer the question he can indicate to the court that he can't answer the question as it's been formed.

A     I did.

THE COURT: Can you – you define study as you would first and then we'll allow the question from the prosecutor.

A     Define study as I would?

THE COURT: Yes?

A     Okay. My definition of study means looking at a problem, it means investigating, doing homework, looking at literature other people have written, and finally, looking at the patients you yourself have operated on. And I've done hundreds of operations on –

THE COURT: Okay. That's all right. Just your definition.

A     Okay.

THE COURT: I've got it.

Q     (By Ms. Pope-Starnes, continuing): Have you done testing in this area, yes or no?

A     Yes.

Q     What testing?

A     I've operated on patients with chronic subdural hematomas, I've taken samples of the dura and the membranes and sent them off for analysis, I've actually got a video tape of an operation on a chronic subdural hematoma. I have –

100

Q       Doctor, are you familiar with the scientific process?

A       I'm sorry?

Q       Are you familiar with the scientific process?

A       Well, you will have to explain in order for me to answer that what you mean by scientific process?

Q       Thank you doctor. You've answered the question. Are you a neuroradiologist?

A       No.

Q       In fact you're not a radiologist, are you?

A       That's correct, I am not – yes, I'm not.

       MS. POPE STARNES: Your Honor, I have no other questions.

       THE COURT: Mr. White.

       REDIRECT EXAMINATION

BY MR. WHITE:

Q       Just briefly doctor. You've indicated when the prosecutor asked you whether you had – she had asked you whether you had reviewed the medical film or slides and the autopsy in this case?

A       Right.

Q       Okay. Did you review the autopsy photos?

A       Photographs, not slides, photographs, yes.

Q       And you reviewed those on your computer that you have in front of you?

A       Yes.

Q    And upon reviewing the autopsy photos did it change your opinion in

this case?

A    Not a bit.

Q    Did it alter it in any way, confirm, modify?

A    It confirmed.

MR. WHITE:  Nothing further.

THE COURT:  Anything Ms. Pope Starnes?

MS. POPE STARNES:  No.

THE COURT:  Thank you, sir, you're all set.

A    Thank you. Okay.

THE COURT:  Go ahead.

MR. WHITE:  We have to dismantle this so I'd – if I can

approach?

THE COURT:  Go ahead, go ahead and help.

MR. WHITE:  It's going to take a couple minutes in order to

get him –

THE COURT:  I'm wondering, like five or ten minutes?

MR. WHITE:  Five minutes.

THE COURT:  Do you just want to take a stretch for a minute?

I'll tell you what – would you rather just stay here?

MR. WHITE:  If you don't mind.

THE COURT:  Go ahead.

You had just the one witness in your case?

MR. WHITE:  Yes, yes. Thank you Ms. Prosecutor for

allowing me to present this witness out of order.

THE COURT:  Okay. We'll resume with the People's case, Ms. Pope Starnes.

MS. POPE STARNES:  Yes, Your Honor.  Your Honor, the People would call Detective Sederlund.

THE COURT:  Detective, if you'd approach please. Raise your right hand to be sworn.

CHRIS  SEDERLUND,

Was thereupon called as a witness herein, and after having been first duly sworn, was examined and testified as follows:

MR. WHITE:  Your Honor, I'd move to sequester Officer Sovik.

THE COURT:  If counsel will approach on another matter for just a second.

(Whereupon a brief discussion

was had off the record)

THE COURT:  Just for a moment, Jeff, will you please excuse the jury for a moment.

THE CLERK:  All rise for the jury.

THE COURT:  Sorry.

(Jury excused at 2:20 p.m.)

THE COURT:  Record reflect that the jury has been excused. You may be seated. The record will further reflect that we've had an at bar conference while the jury was waiting after the detective was called and it was in response – the court directed counsel to approach and that was in response to Mr. White's objection or request that

103

Detective Sovik be excused under sequestration and that's why I had counsel approach and we discussed off the record.

Who wishes to speak on this? I haven't made a decision right now although counsel, Ms. Pope Starnes, you contend that I have previously.

MS. POPE STARNES: Yes, Your Honor, before the trial started this was an issue that was addressed by the court. And I have two parts to this and the first part I am going to address –

THE COURT: Go ahead.

MS. POPE STARNES: - I have been quiet about this throughout the trial. We began this trial with four minutes into my opening statement, counsel getting up and moving boxes and interrupting and distracting the jury from my opening statement. Through two different People's witnesses, he sat over at the other side of the room and was shuffling paper like this, I made no objection to it at that time; now he's not making legal objections but he keeps repeating in front of the jury things that are unfair. I would ask that this be handled professionally and following the rules of law and the rules of evidence. I have not interrupted counsel or distracted the jury when he is questioning and he continues to do that and is inappropriate. And I think this motion is another attempt to do that because the court has already ruled on this at the beginning of the trial. There was a discussion before we even brought a jury pool in about whether or not the witnesses should be sequestered. And I made the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

argument that both officers – both of these detectives or sergeants are officers in charge and are necessary for me to present my case.

And the court took a break briefly or went on to something else and had me look up the rule and I read it to the court about the exclusion of witnesses:

> "A person whose presence is shown by
> a party to be essential to the presentation
> of a parties cause."

These gentlemen both investigated the case. Counsel is asking again, even though the court has already ruled on this to sequester the witnesses, depriving me of someone that I need to help me present this case to the jury.

THE COURT: Mr. White?

MR. WHITE: I will respond to the issue of sequestration and that is that if – and it's odd and I, you know, I don't know everything but I – this is the first time where I've had two OCI's, two officers in charge, so I can't say I've made this argument before. But since the distinct possibility is that these two officers, their testimony will deviate from each other and the importance of this issue, the importance of this case to my client, I think it's just proper to have a sequestration order since Officer Sovik has not testified before.

I can't tell you, Judge, as I remember your previous order where it encompasses this situation. I think that you were talking about witnesses, you know, that – other witnesses besides these two and them being present, whether they interviewed other people, but I'll

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

tell you that I can't remember whether it encompasses this specific situation.

I know Officer Sovik has not testified, number one. Number two, I know that there's a distinct Sederlund and Sovik's testimony could be divergent. So – and the purpose of a sequestration order is so that we do not allow a witness to hear what the other person said and possibly conform your testimony. I am just asking that Sovik be excused from the room for the purpose – until he testifies, so – I think I'm just asking for a standard sequestration order.

THE COURT: Ms. Pope Starnes.

MS. POPE STARNES: Your Honor, I have the transcript. Sergeant Sovik testified essentially at the preliminary examination and both Officer Sederlund and Sergeant Sovik, if the court can recall, testified at length during the Walker Hearing. We have the transcript of their testimony. So it will be clear whether or not there's any deviation in their testimony anyway. Part of what I indicated to the court before the trial started is that they already know, there has already been these other hearings and they've already sat through and there's already been all this testimony reported.

THE COURT: Thank you. The court has heard the arguments of counsel. First and foremost – or firstly, the court will not make its decision based on the argument, whether it's sincere or not that they've already heard it before, two wrongs don't make a right. So my decision – if it was wrong in the first place and that's a bad phrase, two wrongs don't make a right, that's not my reason.

But the fact that it's been done before is not a reason for me to do it again or the fact that they've sat through previous testimony is not a reason for the court to grant or deny the motion, it has to be on its own merits.

The other argument is that it's essential. Also, there is reference to the fact that or the claim that perhaps the court ruled on this previously before the jury was brought in. There is a jury waiting, I know that they're eager to proceed. That in and of itself is not reason for me to not try to endeavor to do what's right but I certainly am not going to take the time now to evaluate whether or not I've ruled on this already. My recollection for what it's worth was that I addressed the sequestration of the officer in charge with respect to other witnesses, not with respect to themselves. That's my recollection, I could be wrong and the record will bear itself out and I'm not going to order the transcript or review the tape right now to try to figure that out. I'll decide it on its own merits whatsoever.

And the argument that the court finds would be relevant would be whether or not it's essential to the prosecutor in this instance and the court appreciates the arguments and I understand that it's been done before, I respectfully don't find that it's essential for this – for one officer in charge to be present when the other officer in charge is being questioned. That's the ruling, it's tough to make the call but that's the ruling of the court. So the court will grant the sequestration order as it relates to the respective officer testifying.

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

So with that, detective thank you, if you'd please excuse

yourself.

(Officer Sovik excused)

THE COURT:  You can bring in the jury.

(Jury seated at 2:15 p.m.)

THE COURT:  Thank you everyone, appreciate your patience.

You may all be seated.  The record reflect that the jury is back, the

case continues, we had to interrupt the proceedings.

Ms. Pope Starnes you may proceed.

DIRECT EXAMINATION

BY MS. POPE STARNES:

Q       Sir, would you please state your name and spell your last name and

        spell your last name for the record?

A       Officer Chris S-e-d-e-r-l-u-n-d.

Q       Can I ask you to keep your voice up, please?

A       Sure.

Q       Are you employed, sir?

A       Yes, I am.

Q       How are you employed?

A       With the City of South Lyon Police Department.

Q       How long have you been a police officer?

A       August of this year will be my fourteenth year.

Q       What is your educational background?

A       I have a Bachelor Degree out of Michigan State University in Criminal

        Justice.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q       Did you attend the police academy?

A       Yes, I did.

Q       When did you attend the police academy?

A       '94, I believe.

Q       Were you able to successfully complete the police academy?

A       Yes, I was.

Q       Have you had any other training as a police officer?

A       Numerous on the job training, such as interviewing, interrogation,

        detective school, detection of drunk drivers.

Q       If you can recall, when did you attend detective school?

A       '99, 2000, maybe 2001, it's been a while.

Q       I'm sorry?

A       It's been a while.

Q       Okay. Are you saying each of those years or –

A       No, it was between those years if I remember correctly.

Q       And how long was that for?

A       I believe it was a week if I remember correctly.

Q       Do you recall where the training and school was offered?

A       I want to say OCC at the police academy here in Auburn Hills.

Q       Okay. Now has all your work with the Southfield Police Department –

        excuse me -South Lyon Police Department been as a uniformed police

        officer?

A       Not all of it, no.

Q       What other assignments have you had?

A       Detective bureau.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      How does that work in your department?

A      It rotates.

Q      For what length of time?

A      It varies. I've been in there for a year and a half, I've been in there for six months, I've been in for nine months, on average it's a year.

Q      And how much total time have you spent working in the detective bureau?

A      I'd say roughly half my time as a police officer.

Q      So that would be approximately seven –

A      Six and a half or seven years.

Q      Working in the detective bureau approximately cases did you handle?

A      In my career?

Q      Yes?

A      Thousands.

Q      And how many people are assigned to work as a detective at a time in that department?

A      Well, when I first got there we were a very small department, I think I was the seventh officer when I first got there fourteen years ago, there was just one detective in there along with the lieutenant, now there's two along with the lieutenant.

Q      Now currently today what is your assignment?

A      I'm back on the road.

Q      And when you say on the road, what does that mean?

A      I'm a road officer.

Q      Do you ride around in a patrol car in uniform?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Correct.

Q    If I could direct your attention back to December 2, 2006, what was your assignment at that time?

A    I was a detective in the detective bureau.

Q    And do you recall how long you had been in the detective bureau during that rotation?

A    I was going – I believe it was going on a year, I think I went in in January of '0 – the start of '06.

Q    Now again, directing your attention to December 2, 2006, do you recall if that was a day that you working?

A    No, I was not working that day.

Q    Do you recall what day of the week it was?

A    Saturday.

Q    Did there come a point that day where you were dispatched or contacted by your department to report for work?

A    Yes, I was.

Q    Approximately when was that, if you recall?

A    I want to say it was around 8 p.m.

Q    What was the nature of the dispatch or contact?

    MR. WHITE:  Objection, Your Honor, that's asking for hearsay.

    MS. POPE STARNES:  Well, it's the state of mind, Your Honor, and case law is clear as to dispatches.

    THE COURT:  For the purpose of indicating why he did what he did next –

MS. POPE STARNES:  Yes –

THE COURT:  - the court will overrule the objection and allow the answer.

A    I was contacted regarding an infant that was expected to die.

Q    (By Ms. Pope-Starnes, continuing):  What did you do after you received that notice?

A    I was ordered to come in and pursue an investigation.

Q    And did you do that?

A    Yes, I did.

Q    Approximately what time did you respond to the police department?

A    I want to say it was 8:45 or 9:00 maybe if I remember correctly.

Q    What happened when you arrived at the police department that night?

A    Sergeant Baaki briefed me on what was happening.

Q    Was anyone else present during that briefing besides you and Sergeant Baaki?

A    I think Sovik was there at a later – he got there after I did.

Q    Who is Sovik?

A    Sergeant Sovik.

Q    What happened then?

A    Sergeant Sovik met with fire personnel at which time I tried to locate a recorder, I found one in the – we have two desks in the back squad room that are full of paperclips, screwdrivers, tools, drug scales, it's just full of clutter.  I found one in there, located it –

Q    What was the purpose of looking for a recorder?

A    To record the interview.

112

A    I found this recorder, pushed play, it didn't work, so I assumed the
     batteries were dead, I took the back off and where the batteries were
     encased, it was completely corroded.

Q    What did you do then?

A    I got new batteries, put them in there and it still didn't work.

Q    What happened next?

A    I became disgusted and just threw it in the trash can.

Q    Did you look for any other recording equipment?

A    No. There were interviews to be done and it was pretty hectic around
     the station at that time, so I believe I spoke with Mr. Calus.

Q    At that time were you aware of there being any other recording
     equipment in your department?

A    No, I was not.

Q    Now you said that the next thing you did was you spoke with Mr.
     Calus, who is that?

A    He is a paramedic for Huron Valley Ambulance.

Q    After you spoke with Mr. Calus, what happened then?

A    After Sergeant – Sergeant Sovik and I responded to Northville
     Township.

Q    What happened then?

A    We reviewed the 1998 investigation on microfiche.

Q    After you did that where or what did you do next? Where did you go
     and what did you do next?

A    We went to U of M  Hospital and met with Sarah Weaver, I believe
     she's with Washtenaw County Children Protective Services.

113

Q    Now, sir, approximately what time was it that you arrived at

University of Michigan Hospital?

A    I want to say it was around midnight if I'm remembering correctly, it

was around midnight.

Q    After you spoke with Sarah Weaver of Washtenaw County Children

Protective Services, what did you do next?

A    We were led to the pediatric unit which I believe was on the fourth

floor by a security guard and we were let into a conference room by

medical staff, I think it was nurses.

Q    At that point who was present in the conference room?

A    Regina, I can't remember her last name, Kynard maybe, the nurse,

Sarah Weaver, Sergeant Sovik and myself.

Q    What happened next?

A    They brought in Dr. Fleming.

Q    Did you speak with Dr. Fleming?

A    Yes, we did.

Q    Who was present if you can recall when you spoke to Dr. Fleming?

A    Sarah Weaver, Regina Kynard, the nurse and I think Sergeant Sovik

and I, if I remember correctly.

Q    What happened after you spoke with Dr. Fleming?

A    He instructed us on the -

        MR. WHITE:  Objection as to what Dr. Fleming said, it would

be hearsay.

        THE COURT:  Sustained

Q    (By Ms. Pope-Starnes, continuing):  Did you talk with Dr. Fleming?

A       Yes.

Q       Did you get information from him?

A       About Madison, yes.

Q       After speaking with him, what did you do next?

A       We met with Heather McBurney.

Q       Where did you meet with her?

A       In the conference room.

Q       Now can you recall, Detective Sederlund about what time was it when you first met with Heather McBurney?

A       I don't recall, I'm going to say 12:30 or 1:00 maybe.

Q       So we're into the next day now?

A       Yes, we're in the next day now, it is Sunday.

Q       Where did you meet with Heather McBurney?

A       In the conference room.

Q       And who was present when you met with her?

A       Everybody I mentioned before with the exception of Dr. Fleming.

Q       So the nurse, protective services and you and Sergeant Sovik?

A       Correct.

Q       About how long did you speak with Heather McBurney?

A       Roughly an hour, hour and a half.

Q       After you spoke with her what happened next?

A       We requested to speak with Steven McBurney.

Q       Would you recognize Steven McBurney if you saw him again?

A       Yes, I would.

Q       Is he in court today?

A    Yes, he is.

Q    Can you tell the jury, please, describe what he's wearing and where he
     is located in the courtroom?

A    He's at defense table wearing the blue suit jacket and white shirt.

     MS. POPE STARNES: May the record reflect that the witness
     has identified the defendant, Steven McBurney?

     THE COURT: Any objection?

     MR. WHITE: No objection.

     THE COURT: So noted.

Q    (By Ms. Pope-Starnes, continuing): Did you speak with the
     defendant?

A    Yes, we did.

Q    Where did you speak with him?

A    In the conference room.

Q    Now can you describe for the jury the layout of this conference room?

A    If this was the door going into the conference room right here
     (indicating) it's long, I'm going to say probably fifteen feet wide by
     maybe thirty feet long if I remember correctly, it has a long table down
     the center of it and there was approximately ten or twelve chairs
     around this table, it was a wood table. There was some clutter around
     the sides, I believe boxes of papers, I know there was a computer there
     because Dr. Fleming was working on it when he was talking with us.
     There was a window, I believe it was on the left side of the door where
     you can look out, it's a big picture window where you can look out

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

and you can see the nurse's station and I think there's a window above
the door if I remember correctly.

Q    Were there any other windows for this room?

A    No, just around the door.

Q    And how many doors were there?

A    One that I saw.

Q    Do you recall where you were located in this room?

A    Again, if I was facing the table here (indicating) I was here
(indicating), Mr. McBurney was here at the end of the table
(indicating), and Sergeant Sovik was across.

Q    Who was closest to the door?

A    Steven McBurney was.

Q    Now when you spoke with the defendant who was present?

A    Myself and Sergeant Sovik.

Q    Did you record your interview with the defendant?

A    No, we did not.

Q    Why not?

A    I had no recorder.

Q    Approximately what time did you begin your interview?

A    I want to say roughly it was around two a.m.

Q    Did you ask Mr. McBurney if you could speak with him?

A    Yes.

Q    And did he agree with you?

A    Yes, he did.

Q    Was he under arrest at that time?

FORM CSR -LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    No, he was not.

Q    How did this interview begin?

A    Sergeant Sovik and I introduced ourselves as we normally do –

        MR. WHITE:  Your Honor, if I may just add an objection as to what Sergeant Sovik may have said, that would be hearsay, and secondly without standing up again about my objection to the nature of my client's statements, I just want to have a continuing objection.

        THE COURT:  Continuing is noted and as to the hearsay, that will be sustained.  You can proceed.

A    Introductions were made.

Q    (By Ms. Pope-Starnes, continuing):  Did you introduce yourself?

A    Yes, I did.

Q    Had you ever met Steven McBurney before that?

A    No.

Q    What happened then?

A    Steven was – we got a little history – I'm sorry – Steven was asked about his history, he was married for two years, had a child, Madison, she was one year old.

Q    Who did he say he was married to?

A    Heather McBurney.

Q    Did he give you any history about Madison or information about Madison's medical history?

A    Yes.  He said she had hip dysplasia, she had to wear a leg brace but only at night because the condition was improving.

Q    Did you ask him whether or not he had any other children?

A      Yes, we did –

        MR. WHITE:  Objection, Your Honor, objection.  The court has made a ruling in regard to this issue.

        THE COURT:  Well, it was a leading question, but –

        MR. WHITE:  Yes, that too but we've addressed this situation about the admissibility of the evidence.  So I object because it goes beyond the court's ruling.

        MS. POPE STARNES:  I disagree, Your Honor.

        THE COURT:  Is there, on this line more questions or are you going to get into other stuff?

        MS. POPE STARNES:  At this point there's just one question in regards to this line.

        THE COURT:  Come on up for a second counsel.

                (Whereupon a brief discussion

                was had off the record)

        THE COURT:  You may proceed.

Q      (By Ms. Pope-Starnes, continuing):  What did the defendant say next?

A      Reference – are we still on the same question?

Q      I believe you had said that he had given you a history, medical history about Madison?

A      Yes.

Q      What happened then?

A      We asked him if he had any other children.

Q      And what –

        MR. WHITE:  Objection as to we – that's hearsay

THE COURT:  Sustained as to we.

A       Steven was asked if he had any other children.

MR. WHITE:  Again, if he can say he's asked it, fine but if he's not asking it, then he can't testify, that's hearsay so I object, Your Honor.

THE COURT:  Form of the question. Rephrase the question Ms. Pope Starnes.

Q       (By Ms. Pope-Starnes, continuing):  Who spoke next?

A       Regarding – who spoke next regarding?  I'm sorry?

Q       The next question that was asked of the defendant, who asked it?

A       I believe Sergeant Sovik.

Q       What was the defendant – what did the defendant say next?

A       That he had no children, no other children.

Q       Was the defendant asked what happened to Madison on November 30, 2006?

MR. WHITE:  Objection as to the form of the question.

THE COURT:  Form of the question, sustained.

Q       (By Ms. Pope-Starnes, continuing):  What happened next?

A       Steven was asked what happened on November 30, 2006.

MR. WHITE:  Objection, objection, if this witness can testify – Judge, you know what I'm saying –

THE COURT:  I know, yes –

MR. WHITE:  - hearsay.

THE COURT:  Sustained. And counsel, just –

120

Q     (By Ms. Pope-Starnes, continuing):  Who asked the next question if you can recall?

A     I don't recall.

Q     Did the defendant respond?

A     Steven stated that Madison was not feeling well throughout the day, she vomited he told us a few times, Steven stated that Heather went to work at six p.m. or the midnight shift as she normally does, and that they put Madison down for a nap at this time or shortly before this time because she had separation anxiety from Heather.  Steven continues and stated that when – after Heather left, when he woke Madison up she was a bit cranky but nothing out of the ordinary after he woke her up –

Q     Did he say what time that was?

A     I think he said – Steven said shortly after seven o'clock p.m.

Q     What if anything else did the defendant state at that point?

A     Steven stated that after he woke her up he brought her into the living room, put her in her bouncy seat and gave her a bottle and that she spit the bottle out onto the floor.

Q     What did he say then?

A     Steven told – Steven stated that he took her into her bedroom, changed her diaper, put her pajamas on and her leg brace on, which again is customary for the night time –

Q     I'm sorry?

A     Which is customary for her going to sleep at night with the leg brace on.

Q        Thank you.  What if anything else did he say next?

A        Steven stated that after he changed her he put her in the center of the
         floor in the bedroom and started putting clothes away at which time he
         noticed that she was having difficulty breathing and was gurgling.

Q        What if anything else did he tell you?

A        Steven stated that for her to gurgle is not uncommon, she normally
         gurgles on her spit –

Q        Did he continue?

A        Yes, he did.

Q        What else did he say?

A        Moments later – Steven stated that moments later after he noticed she
         was having trouble breathing and gurgling, she fell backwards and
         started having a seizure.  Steven advised that she became rigid and
         unresponsive shortly after.

Q        Did he say what became rigid?

A        I'm sorry?

Q        Did he say what became rigid? He said she became rigid?

A        I don't recall if he mentioned that, he just said she became rigid.

Q        What if anything did he say next?

A        He – Steven stated that he went and called 911, when he returned back
         to Madison she was – had turned limp,  loosened up, at which time he
         disrobed her down to her diaper.

Q        Did he say anything further?

A        Yes.  Steven stated that he immediately took her into the living room
         to wait EMS and fire arrival and that he gave her rescue breaths as

122

directed by dispatch – I don't know if it was H V dispatch or police

dispatch.

Q    What is H V dispatch?

A    Huron Valley ambulance.

Q    What if anything did he say happened on that day?

A    Madison was transported to U of M Hospital by Huron Valley

Ambulance where she sought medical treatment.

Q    I'm sorry, I can't hear you?

A    Where she had gotten medical treatment.

Q    What happened next in the interview?

A    Steven was asked about Nicholas Kennedy.

       MR. WHITE:  Objection Judge.

       THE COURT:  We'll strike that unless you know who – did

you – do you know if you asked that question, if you know?

A    I believe Sergeant Sovik asked that question.

       THE COURT:  Okay. Then ladies and gentlemen, just strike

that question, okay.

Q    (By Ms. Pope-Starnes, continuing):  What did the defendant say to

that?

A    That Nicholas Kennedy wasn't his son –

       MR. WHITE:  Objection – that's already been asked and

answered, Judge.

       THE COURT:  I don't know if it has or not, I haven't heard –

       MR. WHITE:  Okay. Sorry -

       THE COURT:  No, that's all right –

123

MR. WHITE: I think he did say but again, I think this is something we've covered.

THE COURT: Same objection.

MR. WHITE: We've covered this Judge.

MS. POPE STARNES: Your Honor, if I may. I am asking in the chronologically – in the order of events, what happened next –

THE COURT: I understand –

MS. POPE STARNES: He's testified that something was asked earlier and there was a response, that they were told what happened that day by the defendant and now this is the defendant's next statement.

THE COURT: Objection is noted. You may proceed, overruled.

Q    (By Ms. Pope-Starnes, continuing): What was the defendant's next statement?

MR. WHITE: To the extent it involves Nicholas Kennedy, Judge, and you've made a ruling, it's in a written order, there's a specific ruling the court has made and I'd ask that we abide by your order, okay.

THE COURT: The comment implies that I'm not and so I will disregard that implication there.

This is consistent with what was talked about earlier and what was inquired into?

MS. POPE STARNES: This is another statement that's being offered to show inconsistencies in the statements by the defendant.

THE COURT:  One more time, counsel, approach.

Sorry folks, just bear with us.

> (Whereupon a brief discussion
>
> was had off the record)

THE COURT:  Go ahead.

Q      (By Ms. Pope-Starnes, continuing):  What was the defendant's next statement?

A      Next statement?

Q      Yes?

A      That he did not cause injuries to Nicholas Kennedy.

MR. WHITE:  I'm sorry, I didn't – I'm sorry –

A      That he didn't cause injuries to Nicholas Kennedy.

MR. WHITE:  Thank you.

Q      (By Ms. Pope-Starnes, continuing):  Now when you were interviewing the defendant did you make any attempt to find out if Madison had been in anyone else's care?

A      Yes, we did.

Q      How did you do that?

A      I believe we asked both Heather and Steven and –

Q      Okay. Let me ask you, did the defendant respond to that inquiry?

A      Yes, he did.

Q      And what did he tell you?

A      He stated that him and Heather were the only two caregivers for the previous days up to her – up to this incident.

Q      Who spoke next regarding this incident?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

A     Sergeant Sovik.

Q     After he did that, what did the defendant state?

A     Yes.

Q     What did he say next?

A     He denied causing any injuries to Madison.

Q     What did he say after that?

A     He stated – the question was asked, what should happen to

somebody –

         MR. WHITE:  Objection as to the – objection –

         THE COURT:  Objection sustained.  Lay a foundation for the

question or skip it.

Q     (By Ms. Pope-Starnes, continuing):  Who asked the next question, if

you can remember?

A     I don't recall.

Q     Do you remember what the defendant said next?

A     He stated that it would depend of it was an accident or intentional.

Q     What did the defendant say next?

A     He believed the punishment for – in the event of an accident should be

that he should have to go to the burial and the funeral and that would

be enough punishment.

Q     What happened next in the course of the interview?

A     We – Steven was asked –

Q     Who spoke next?

A     I don't recall if it was Sergeant Sovik or I, it could have been me.

Q     And what did the defendant say?

126

A     He stated that he was carrying Madison in her bouncy chair, referring to the accident that happened a couple months prior and that the corner of the bouncy chair caught on the couch and that she flipped out of the bouncy chair and landed on her head.  He stated that was about – approximately five feet she fell.  He also indicated that they took her to the hospital after that event.

Q     I'm sorry, I have to ask you to keep your voice up, with the noise in the hall.

A     Can't hear me, I'm sorry, I'll speak up.

Q     I'm sorry, can you repeat that – I don't think –

A     The entire thing regarding the previous?

Q     The very end of it?

A     He stated that he took her to the hospital after she fell out of the bouncy chair.

Q     And did he give you a distance that he claimed that she fell?

A     Five feet.

Q     Did he say what hospital she was taken to?

A     I don't recall, I don't recall.

Q     Do you recall if in fact when this happened?

A     I think he said a couple months prior to the November 30th.

Q     Do you recall whether or not you were given an exact date?

A     I don't believe we were if I remember correctly, not to my knowledge.

Q     What did he say next?

A     His next statement out of his mouth was that his life was over.

Q     Now Detective Sederlund, did you threaten the defendant at all?

A    Absolutely not.

Q    Did you use any force or coercion to get him to give his statement?

A    Absolutely not.

Q    Did you deprive him of any food or any liquids or something to drink?

A    No.

Q    What was your demeanor when you were talking with him?

A    Professional, just like we're talking right now, we're discussing what happened.

Q    Did you raise your voice?

A    No.

Q    Do you recall if you swore at him?

A    No, I did not swear at him.

Q    Now you testified that you've been a police officer for almost fourteen years and you've been to the academy and other training, have you had the opportunity to learn how to detect when someone is under the influence of alcohol or controlled substances?

A    Yes, I have.

Q    Did you have any reason to believe based on your training and experience the defendant was under the influence of alcohol or controlled substances when you spoke with him?

A    He was not.

Q    Did he appear to be sleep deprived?

A    He didn't appear – he wasn't falling asleep while we were talking to him, no.

128

Q    Did he appear to understand what the conversations were that were going on in the room?

A    Yes, he did.

Q    After he made this statement, my life is over, who spoke next?

A    Sergeant Sovik.

Q    What was the next thing after Sergeant Sovik spoke that the defendant said?

A    He said he wanted to speak with Heather McBurney.

Q    What did you do after he asked to speak to Heather?

A    I went to the nurse's station and requested a nurse to get Heather McBurney for me.

Q    What happened next?

A    I went back and sat down and Heather was shortly thereafter brought in by the nurse.

Q    Did Heather come into the room and sit down?

A    Yes, she did.

Q    And where was she seated in the room?

A    Right next to Steven, they were almost facing each other.

Q    At this point who was in the room?

A    Myself and Sergeant Sovik, Steven and Heather McBurney.

Q    What happened next?

A    Steven turned to Heather and told her that he made a mistake.

Q    What happened then?

A    Can I revert back counsel to a prior statement that I remember was made?

Q      I'm sorry?

A      Can I revert back to a prior statement that I remember that was made?

Q      Not at this point. After he said he made a mistake, what happened next? Who spoke then?

A      Heather.

Q      After she spoke, then who spoke?

A      Steven.

Q      And what did he say?

A      He said he threw Madison in the crib.

Q      What happened then?

A      Steven told Heather that Madison had been difficult the past few days because of her separation anxiety, he commented to Heather that he wished she was on day shift so they can tag team Madison because of how difficult she's been when Heather goes to work.

Q      Did defendant say anything else at that point?

A      That was defendant's statement to Heather. No, he didn't – I don't believe he said anything else.

Q      All right. Who spoke next?

A      I don't recall if it was Sergeant Sovik or I, I can't recall, it could have been me.

Q      After one of you spoke, did defendant say something?

A      Yes, he did.

Q      Can you tell the jury what he said?

A      Steven told us that on November 30, 2006, Heather went to work as normal and that he put Madison down for a nap and when he woke her

130

up she was a bit cranky.  He brought her into the living room, put her into her bouncy seat and gave her a bottle at which time she spit it out. Steven advised that when she spit the bottle out, he took her out of the bouncy seat, brought her back into her bedroom where he changed her – changed her diaper, put her in her pajamas and put her leg brace on and at this time she was screaming and crying.  Steven stated that after he changed her she continued to scream and cry and that he picked her up in an attempt to console her –

Q    What did he say next?

A    He became mad and frustrated and he threw her into the crib.

Q    You used these words, scream and cry, where did you get these words from?

A    Steven McBurney.

Q    Did he talk further about what happened?

A    Yes, he did.

Q    What did he say?

A    Steven said that he was about two feet away when he threw her into the crib and that the back of her head hit the bars on the crib and she went into an immediate seizure.

Q    Did he make any other statements at this point?

A    He stated that he immediately grabbed her out of the crib and – at which time she was limp and unresponsive or having trouble breathing, I'm sorry.

Q    What did he say after that?

A    He stated that he – he couldn't see that she was breathing or was

     having trouble seeing that she was breathing so he disrobed her to see

     if he could see her breathing and that he called 911.

Q    What did he say if anything happened next?

A    After he disrobed her he took her into the living room awaiting EMS

     personnel and he gave her rescue breaths at the direction of dispatch.

Q    Now Sergeant Sederlund after you obtained this statement, was there

     any discussion with the defendant about searching the home?

A    Yes, there was.

Q    Okay. Were you able to obtain consent to search the home?

A    Yes.

Q    Who did you obtain this consent to search the home from?

A    Heather McBurney and Steven McBurney.

Q    Did you get that in writing?

A    Yes, we did.

Q    After you got this statement, after the defendant told you what

     happened, what happened next in this process?

A    Sergeant Sovik and I left the conference room and immediately made

     contact with Prosecutor Kelly Chard.

Q    At any point during that interview did you record the statement?

A    No, we did not.

Q    Did you have any type of recording device on your person?

A    Absolutely not.

Q    How about one of those cell phones, these new type of cell phones that

     sometimes will record things, did you have one of those?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I had a cell phone but there's – it didn't record.

Q    After this interview at the hospital what did you do next in your investigation?

A    We let – I'm sorry – I'm sorry – Steven was allowed to say his last words to his daughter.

Q    He was placed under arrest after that?

A    Yes.

Q    And where was he taken?

A    To South Lyon Police Department.

Q    And what – in the course of your investigation did you obtain a warrant?

      MR. WHITE:  Objection, Your Honor, it's not relevant.

      MS. POPE STARNES:  It is, Your Honor. Defense raised in his opening the lack of investigation done by this police agency and I think that I have a right to pursue what investigation was done by the officers.

      MR. WHITE:  The question was a warrant is here nor there, that's not the investigation. If they did further investigation fine.

      THE COURT:  Break it down a little bit to what's the next thing that happened.  By the way, do you have a bit more to go?

      I think we've been going for a while, at least I know Ms. Reznick has.

      MS. POPE STARNES:  Yes.

THE COURT:  You do? All right. We'll take a short recess now, its five minutes after three. Ladies and gentlemen please don't talk about the case. We'll be back shortly.

THE CLERK:  All rise for the jury.

(Jury excused at 3:05 p.m.)

THE COURT:  The jury has been excused and ladies and gentlemen, be seated. Before we take our break counsel you wanted to put some things on the record, you're welcome to. And detective, you're all set if you want to step down.

MR. WHITE:  Well, Judge, you know my argument –

THE COURT:  Yes.

MR. WHITE:  - you know, I specifically made a comprehensive motion in limine regarding the matters involving Nicholas Kennedy.  Anything, anything, and I believe the record is clear that you asked me in the motion I think it was December 5th I wanted all matters out and, yes, everything, no mention of his name even. And you said well I made a ruling and this ruling was – and I believe it's incorporated in the court order that pursuant to the respective motions of the parties that introduction of the parties – the prosecution can introduce evidence of Detective Sumner – the statements allegedly made by my client to Detective Sumner and the medical records of Children's Hospital were purged from their testimonial content.  And I believe that we've gone far beyond that and I believe I also addressed this before this case started last Tuesday that I did not want to get into matters involving Nicholas with the two

134

O.I.C.'s that the prosecution has in this case and exactly what I asked
not to happen has happened.  And I believe that, you know, I don't
even know if it's correctible at this point, Judge, you know, they try to
do it with Heather and they're doing it with the police officers, I
believe, number one, it's not relevant evidence and number two, you
expressed to me and to my client's position, we're not to retry that
case, that case is over. And I respect your ruling so that's why we
haven't, you know, sought to introduce or anything regarding any
evidence regarding that because I am trying to stay within the confines
of the court's order.  But I believe we've gone off side that, Judge and
I believe – I don't know if it's correctable at this point because it's
something that is dangerous evidence, dangerous evidence and I
certainly don't want the jury to be misled about the circumstances
involving Madison's case with a case that's happened ten years ago
when it's over.

　　　We have a limited ruling as to how that case could come in and
now we've gone beyond that so I'm – I'd ask the court, as I have tried
to do, abide by its ruling and it is limited in two respects, that is
Children's Hospital records and Detective Sumner has already
testified, so nothing else.

　　　THE COURT:  Thank you.  Ms. Pope Starnes.

　　　MS. POPE STARNES:  First of all, Your Honor, those things
are not excluded from the court's order. The court's order says the
People's motion in limine to allow admission of medical records of

Nicholas Kennedy is granted subject to the following condition and that's where the court struck the testimonial content of the record.

It then says the defendant's motion in limine to exclude evidence is denied in part specifically saying the People may introduce in their case in chief the testimony of Detective Sumner about the alleged statements of the defendant regarding the injuries to Nicholas.

It then specifically enumerates in the order what is excluded, that Nicholas Kennedy's mother believes the defendant injured the child, that defendant had had no contact with Nicholas Kennedy for many years, number three, any aspect of the child protective proceedings and it cites the case notes; four, any aspect of the court proceedings for defendant's criminal prosecution, including defendant's conviction, and it cites the case numbers; all facts, instances and opinion and conclusions evidencing or relating to other acts of violence and/or uncontrolled anger by defendant including – and then it talks about statements that were made to Detective Sumner about scars and bad temper and other incidents, mom's observations about holes somewhere in the apartment and other things that came out or that are in Detective Sumner's report.

It does not say anything about these particular statements made during this interview. Furthermore, these statements are evidence of inconsistencies in the defendant's statement.

The first one is that he denied that Nicholas Kennedy was his child and as the court is well aware, the case law is very clear that

136

inconsistencies in the statements by defendant can be considered evidence of the defendant's guilt.

The second statement that he denied causing the injuries. Detective Sumner testified – excuse me, Sergeant Sumner testified that he said he was responsible for the injuries and that he said that he had bounced the child too hard.

These are both inconsistent statements and go to the defendant's truthfulness in making all these different statements to the police officer and they are specifically not addressed in this court's order.

I think regardless of whether or not we have MCLA 768.27 B notice and ruling, that these things would still be admissible because they go to inconsistent statements by the defendant.

THE COURT: Anything further?

MR. WHITE: Nothing.

THE COURT: Thank you. The court has made its ruling previously at bar and allowed the testimony about the statements from the defendant, somewhat rhetorical but nonetheless, it's kind of pointless to even comment on it. Mr. White, you're arguing that I've already made this ruling and that my decision is inconsistent with that ruling. I don't find that my previous ruling in limine is germane to the specific issue that's been raised here.

I can understand your argument that it's related because it pertains to Nicholas and the whole in limine was with respect to Nicholas but the court finds from the statements made by the People,

137

and that was the reason whispered at bar, and that's the reason why the court permitted it in front of the jury. And the court – so it's recognized and your objection is noted.

      MR. WHITE: Thank you.

      THE COURT: Thank you –

      MR. WHITE: Can we take a break?

      THE COURT: Yes, we'll take a break.

             (Whereupon a pause was had

             in these proceedings)

      THE CLERK: Calling People v McBurney, case number 07-214651 FC.

      THE COURT: Ms. Pope Starnes, Mr. White, your appearances are noted for the record and your client is present. Detective are you ready to proceed? Come on back up. I'll just remind you when the jury is back in. You can bring in the jury, Jeff.

             (Jury seated at 2:20)

      THE COURT: You can all be seated. The record reflect the jury is back – I sound like a broken record. The case has been called, counsel's names have been noted and detective is back on the stand, you're reminded you're still under oath, required to testify truthfully and honestly, okay. Thank you.

      Ms. Pope Starnes, you may proceed.

Q    (By Ms. Pope-Starnes, continuing): Did you do anything further in the case on Sunday, December 3rd?

A    We wrote the complaint –

MR. WHITE:  Objection, Your Honor as to – I'd ask if he

testify from his own personal knowledge.

THE COURT:  Sustained as to we.

Q     (By Ms. Pope-Starnes, continuing):  Well, define we?

A     I wrote the complaint with the assistance of Sergeant Sovik.

Q     Was he present –

A     Yes –

Q     - when you wrote it?

A     Yes, he was.

Q     So you saw him there?

A     Yes, we were sitting right next to each other.

Q     And did you complete the police report on that Sunday?

A     No, we did not.

Q     When did you complete it?

A     First thing Monday morning –

MR. WHITE:  Objection, Your Honor, she's mischaracterizing

his testimony.  He said he wrote the complaint, she said the police

reports.

THE COURT:  Okay. Be specific with our language, I don't

know if it's synonymous or different but just be specific.

Q     (By Ms. Pope-Starnes, continuing):  Tell the jury briefly what you

wrote on Sunday?

A     The complaint is the police report.

Q     And when was that completed?

A     The first thing Monday morning.

139

Q	Who completed it?

A	Myself along with Sergeant Sovik.

Q	Did you interview any further witnesses?

A	I believe we talked to – I believe Dr. Dev was interviewed, Christa Shelton/Christa Kennedy.

Q	Anyone else?

A	Not that I can recall.

Q	Did you collect any medical records or physical evidence?

A	Yes, I did.

Q	What did you collect?

A	U of M medical records for previous medical records of Madison and current, on the 30th of November.

Q	Did you attend the autopsy of Madison McBurney?

A	Yes, I did.

Q	When did you attend that, if you can recall?

A	I don't remember exactly, I don't recall.

Q	Okay. Now, Detective Sederlund, during the time that you were interviewing the defendant at the hospital, did you take any notes?

A	Yes, I took many notes.

Q	Okay. And could you see whether or not Sergeant Sovik was taking any notes?

A	Sergeant Sovik had a pad in front of him and a pen, I didn't pay attention if he was writing down notes, he did a lot of talking.

Q	And what if anything did you do with those notes?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A       After I – after I wrote the complaint along with the assistance of

        Sergeant Sovik, we briefed through the complaint, compared them to

        the notes and I shredded the notes –

                MR. WHITE:  Objection, I'm sorry, if he said we, I'm not sure,

        but I'd object to him testifying as to what Sovik did.

                MS. POPE STARNES:  He said I –

                MR. WHITE:  I'm sorry, if he did my apology.

                THE COURT:  Go ahead.

                MS. POPE STARNES:  May I proceed Your Honor.

                THE COURT:  You may.

Q       (By Ms. Pope-Starnes, continuing):  Please tell the jury what you did

        with the notes you –

A       I shredded them –

Q       - after you completed the complaint?

A       I do it with every complaint.

Q       Explain to the jury why you did that?

A       Shredded the notes?

Q       Yes?

A       I shred notes in any case, it doesn't matter if it's a larceny of gas, it

        doesn't matter if it's a – just a simple assault.  If I kept all my notes I'd

        have a locker full of notes, I take countless complaints in a year,

        myself, both on the road and at the detective bureau.  But it's

        customary for most officers, including myself –

                MR. WHITE:  Objection, objection as to most officers –

                THE COURT:  Sustained, sustained.  I've got it.

                                                                                    141

Q       (By Ms. Pope-Starnes, continuing):  Detective Sederlund –

A       Customary for myself to destroy my notes.

Q       Detective Sederlund, does your department have procedures in regards

        to notes?

A       No, we don't.

Q       Do they have someplace to keep notes?

A       No, they don't.

Q       During the course of your training to be a police officer, were you

        taught what the procedures were on note taking and what you do in

        keeping your notes?

A       No, they didn't express anything regarding notes.

Q       And when was it, if you can recall, that the notes were destroyed?

A       It would have been Monday, the first thing Monday afternoon.

        MS. POPE STARNES:  Thank you Your Honor. I have no

        other questions of the witness.

        THE COURT:  Thank you. Mr. White.

        CROSS EXAMINATION

BY MR. WHITE:

Q       Officer, on December 2nd you received the dispatch to come into the

        South Lyon Police Department it was not your day to work, correct?

A       Correct.

Q       And you received notice from Sergeant Baaki that this was potentially

        a very important case, correct?

A       Yes.

Q       And that when you got the police department you were briefed?

142

A     By Sergeant Baaki, yes.

Q     Okay. And you thought it was important enough that in your

investigation you needed to have a recorder to record statements,

correct?

A     Absolutely.

Q     So the first thing that you went and did was to try to find a recorder,

correct?

A     When I got to the station?

Q     You did try to find a recorder, correct?

A     Yes, I did.

Q     Okay. And you made one attempt –

A     That's correct.

Q     - to find one?

A     That's correct.

Q     And one attempt only, correct?

A     That's correct.

Q     When the batteries didn't work you threw the recorder in the trash?

A     That's not what I said, no.

Q     Well, I'm asking what you did?

A     When I discovered that –

Q     I asked you what you did?

A     Can you rephrase that counsel?

Q     You said that you opened the batteries, the back of the batteries or the

top, the batteries were corroded, correct?

A     That's correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      And then you put in new batteries?

A      Correct.

Q      And that didn't work either?

A      Correct.

Q      And so you pitched the recording device, correct?

A      Yes, I did.

Q      And you didn't make any other attempt to get any kind of recording

       device from any other source, correct?

A      That's correct.

Q      Despite the importance of this case?

A      That's correct.

Q      And it's your testimony that Sergeant Sovik didn't have a recording

       device either, is that your testimony?

A      That's correct.

Q      And did he make any attempts in your presence to obtain any kind of

       recording device?

A      No, he did not.

Q      Now when you went to the hospital, you knew you intended to

       interview both mother and father of this child, correct?

A      That's correct.

Q      Okay. And you knew it was very important to record every word that

       each one of them had to say, correct?

A      Verbatim? Are you talking verbatim, counsel?

Q      Yes, you knew it was very important to get the exact words that came

       out of their mouths – mouth, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

A    Are you rephrasing verbatim or are you asking if it was verbatim?

Q    No, I'm asking this, I think you're misunderstanding my question.
     You knew it was important in the interviews of both mother and father
     that you record in some way the exact words that came out of their
     mouth, correct?

A    Correct, not verbatim.

Q    Okay. So you didn't ask anyone at the hospital for any kind of
     recording device –

A    No –

Q    -fair statement?

A    - we did not.

Q    Pardon?

A    No, we did not.

Q    Okay. And please –

A    I did not ask, no.

Q    - I'd just ask if you can from your personal perspective. You didn't
     ask anybody at Northville Township Police Department?

A    No, I did not.

Q    Didn't make any attempt to stop at a store –

A    No, I did not.

Q    Now when you spoke to Heather you didn't make any attempt to find
     out whether there was any child caregivers, did you?

A    (No verbal response)

Q    Did you ask any questions about whether there was any other child
     care providers in the days before the incident?

A     Did I personally?

Q     Yes?

A     I don't recall if I did or Sergeant Sovik did.

Q     I am asking you, do you remember asking the question?

A     I don't recall.

Q     You interviewed Steven right after you interviewed Heather, correct?

A     That's correct.

Q     And when Heather was led out of the room Steven came into the room, correct?

A     Yes.

Q     Okay. And when Steven came into the room Sarah Weaver was in the room, was she not?

A     I don't recall, she could have been just leaving, I don't recall.

Q     Did she say anything that you recall as she was leaving?

A     I don't recall if she said anything or not.

Q     But is it a fair statement that she did not stay for the interview of Steven McBurney?

A     Sarah Weaver was not present for the interview with Steven McBurney.

Q     All right. Now you said you took notes and you know Sovik had a pad and a pen but you can't testify whether he took notes, is that a fair statement of your testimony?

A     It's a fair statement, yes.

Q     Okay. So – and the interview with Heather was approximately an hour, hour and a half?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     If I remember correctly, yes.

Q     Okay. And the interview with Steven was approximately two, two and a half hours, in that length?

A     Roughly, yes.

Q     Okay. So what you're testifying today to is that over that potential portion of three and a half to four hour plus range you did not see whether Sovik took any notes or not?

A     I wasn't paying attention, no.

Q     Okay. Now when you discussed with Steven about Madison, when he said – when you started discussing after approximately an hour into the interview, you had said to him we know that you caused these injuries, correct?

A     Did I personally?

Q     Yes?

A     I believe Sergeant Sovik said that.

Q     You didn't say it?

A     I don't believe I did.

Q     All right. It was said numerous times, correct?

A     Not that I recall.

        MS. POPE STARNES:  Objection, that would call for hearsay, Your Honor.

        MR. WHITE:  Right.

Q     (By Mr. White, continuing):  After that is when Steven said my life is over, correct?

A     Yes, that's correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q     Okay. And you were in the room, Sovik was in the room and Steven was in the room, that was it?

A     That's correct.

Q     Okay. And you put that quote in quotes in your police report, correct?

A     My life is over?

Q     Yes?

A     Yes, we did.

Q     All right. You did?

A     Apologize, yes, I did.

Q     Okay. And when Heather was brought into the room, Steven had asked to talk to Heather, correct?

A     (No verbal response)

Q     Steven asked that Heather be brought into the room?

A     Yes.

Q     Okay. He also asked to speak to doctors, true?

A     No.

Q     No, okay.  But when Heather was brought back into the room, that's when he said I made a mistake?

A     Yes, that's correct.

Q     And that was in quotes also in your police report, correct?

A     I think it is, yes.

Q     Okay. And then he also said I threw her into the crib?

A     Correct, that's correct.

Q     And that's in quotes in your police report?

A     I believe that is also, yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q  Okay. And isn't it true Officer Sederlund, of all Steven's statements regarding Madison, those were the only three statements that you had in quotes in your police report?

A  I'd have to review my police report, I can't recall.

Q  Okay. I have a copy but it's all marked up so would you like to look at your police report?

A  Sure.

Q  Do we have one that's not marked up?

A  We're talking about Steven's testimony, correct?

Q  Yes. Steven, I'm not asking – do you remember my question?

A  Yes, I'm just – I want to make sure it's just about Steven's, right?

Q  Right.

A  Okay.

THE COURT: Just review it, don't say anything, set it down when you're done, okay?

A  Yes, Your Honor.

Q  (By Mr. White, continuing): So my question is regarding your questions to Steven, discussing Madison, there's only three quotes that you directly attribute to him in your police report, correct?

A  That's not true.

Q  Three quotes that are in parenthesis, correct?

A  That's not true.

Q  Regarding Madison?

A  Regarding Madison.

Q  You've looked it over?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A     That's not true, regarding Madison, no, there's others.

Q     We know that you don't put the word screaming in quotes, correct?

A     Correct.

Q     We know that he didn't say cranky, correct?

A     In quotes, yeah, I believe we did.

Q     Cranky?

A     Is in quotes, yes, sir, counsel.

Q     My apologies, I'll look for it but my apologies.

We know that you didn't put the word difficult in quotes, correct?

A     That's correct.

Q     And we know you didn't put the word mad in quotes, did you?

A     That's correct.

Q     And we know also you didn't put the words two feet away from the crib in quotes either, did you?

A     That's correct.

Q     And certainly when you're preparing your police report with Sergeant Sovik – I'm sorry – we also know that you didn't put in there that Madison hit her head on the spindle or anything regarding Madison hitting her head on a hard object is in quotes either, isn't that correct?

A     Correct, that's correct.

Q     Now in preparing your police report with Officer Sovik, you certainly had the opportunity if Steven actually said that, to put those specific items in quotes also, true?

A     I'm sorry, can you rephrase that counsel?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q   We know that when you prepared your police report with Sergeant Sovik you certainly had an opportunity to put those specific matters in quotes also, correct?

A   That's the way I write a report, I've always wrote it for fourteen years that way, so –

Q   You had the opportunity to put in quotes?

A   Which – which phrase?

Q   The phrases that we just went over that you didn't put in quotes?

A   Yeah, yes.

Q   But you did not do that, did you?

A   No.

Q   Now you did save some notes, did you not?

A   If I remember correctly, notes from just different people we talked to, doctors that were involved in the case and I think a portion of my swear to which is when I swear to a warrant, a complaint and warrant.

Q   And these are the notes that you and Officer Sovik put together to go in before the magistrate and swear to the warrant in this correct?

A   Yes, I think it was Judge Powers actually that the warrant was sworn in front of.

Q   And when you put together these notes, it was your intention to include every detail regarding what was important in this case, correct?

A   Correct.

Q   Okay. And we know from your notes that you didn't put anything in there about the child screaming, correct?

151

A    I'd have to review that counsel, I don't recall.  I don't even recall if that's my original swear to, that could be just notes that I jotted down prior to my swear to.

Q    Okay. Again, I have a marked up copy so –

     MR. WHITE:  If I may approach?

     THE COURT:  You may.

Q    (By Mr. White, continuing):  Just take a look at that.

A    Okay.

Q    Does that refresh your recollection?

A    Yes, it does.

Q    Okay. So we know you didn't put anything in there about Madison screaming, correct?

A    That's correct.

Q    You didn't put anything in there about Steven being mad, correct?

A    Correct.

Q    You didn't put anything in there about the child being two feet away, correct?

A    That's correct.

Q    We also know that when you went before Judge Powers you didn't say anything regarding Steven being mad?

A    On the record?

Q    Yes, on the record?

A    I don't recall.

Q    And you didn't say anything about Madison screaming?

A    I don't recall.

152

Q        Okay. And you didn't say anything about Steven being two feet away

         from the crib?

A        I don't recall the contents of the swear to.

Q        Would reviewing the transcript refresh your recollection as to what

         you said?

A        Absolutely, yes.

                 MR. WHITE:  If I may approach Judge?

                 THE COURT:  You may.

                 MS. POPE STARNES:  I have a question as to which swear to

         we're looking at?

                 MR. WHITE:  Both.

                 THE COURT:  You may approach.

A        Which pages counsel?

Q        (By Mr. White, continuing):  The highlighted portions, I'm not sure

         what page.

A        Okay.

Q        Does that refresh your recollection?

A        Yes, it does.

Q        And the dates that you made the swear to were December 4th and

         December 5th?

A        December 4th – I think it was December 4th.

Q        Both on the same day?

A        I think it was – I'm sorry. Yeah, they both say Monday December 4th.

Q        I'm sorry.  And certainly we can agree officer that your memory was

         much – December 4, 2006, correct?

                                                                    153

A    That's correct.

Q    Well, we certainly can agree that your memory was much fresher regarding the details including the statements allegedly made by my client at that time, isn't that a fair statement?

A    Absolutely, yes.

Q    Okay. And certainly your memory when you prepared your notes in December was much fresher then also, correct?

A    Yes.

Q    And when you testified in front of Judge Powers on those two occasions, you testified, giving every single detail of important evidence in this case, isn't that true?

A    Not every single detail, no.

Q    Okay. So when the prosecutor asked you in your prior hearing in this case – page 153 of the September 26th hearing, line – there is no number, the line – at the top:

"Did you give the magistrate or the judge every single detail and piece of evidence for this case at your swear to?"

And your answer was:

"That we had, yes."

A    Okay. I trust you if I said that.

Q    Okay. So you did, you gave the magistrate every single detail, correct, that you had?

A    In the swear to, yes.

Q    Now officer I noticed you were upset testifying this afternoon?

A    Yes, I have a one year old daughter so it bothers me.

Q      Okay. And I have a two and a half year old son –

        MS. POPE STARNES:  Objection, Your Honor, the comments are unnecessary.

        MR. WHITE:  Okay.

        THE COURT:  Go ahead.

Q      (By Mr. White, continuing):  And you were upset the night that you interviewed Steven McBurney also, weren't you?

A      No, I was not.

Q      You weren't upset?

A      No.

Q      Okay.

A      Did it bother me, yes.

Q      Did you cry?

A      The night of the interview?

Q      Yes?

A      No, I did not. Oh, I'm sorry, I did when I started walking towards Madison's room.

Q      Now you say you shred your notes because there's not enough space, is that your testimony?

A      Yes, I don't keep notes.

Q      Pardon?

A      I don't keep notes, I don't have enough space in my house to keep notes from fourteen years of police work.

Q      Okay. Certainly the notes would – if there was a dispute as to what was said in a particular interview, especially an interview that was not

155

recorded, that would be helpful, certainly helpful to the jury to understand what was said?

A    *I take notes and I put them in a complaint form on the police report –*

Q    Sir, just answer my question –

      MS. POPE STARNES:  Your Honor, I'm going to object, that calls for speculation as to what would be helpful to any other individual.

      THE COURT:  Kind of rhetorical but I'll allow the question.

A    Can you rephrase counsel, I'm sorry?

Q    (By Mr. White, continuing):  Do we agree, officer, that if there's a possibility of a disparity between what you heard and what someone supposedly said, keeping your notes it may or may not reflect the actual content of your police report, it would be helpful for instance in testifying in front of the jury as to what was actually said, correct?

A    I put in the police report what was said.

Q    Okay. And we know that things that are in the police report are not in the swear to, correct?

A    Yes, the swear to is a synopsis brief of what happened, to the Judge.

Q    It was an account of every single important detail, isn't that –

      MS. POPE STARNES:  Objection, asked and answered.

      MR. WHITE:  He just contradicted himself, Judge.

      MS. POPE STARNES:  Nope, Your Honor, he explained and it's been asked and answered.

      THE COURT:  Again, I kind of think it's somewhat rhetorical since it's been covered but I'll allow it, let's move on.

156

MR. WHITE:  Okay.

Q    (By Mr. White, continuing):  Now you reviewed your police report before you testified today, right?

A    Correct.

Q    Okay. And you talked with Officer Sovik about the case?

A    Oh, absolutely, yes.

Q    And it's important, it's important to be accurate, isn't that true?

A    Regarding what counsel?

Q    Anything regarding this case?

A    Yes, it's important to be accurate, yes.

Q    Everything regarding this case?

A    Yes.

Q    So when you say that Steven McBurney said something but you don't put it in quotes in your police report, that's not being accurate, is it?

A    That's the way I write reports.

Q    Okay. Some things in quotes and some things not in quotes?

A    That's correct.

MR. WHITE:  I don't think I have anything further Judge.

THE COURT:  Ms. Pope Starnes

REDIRECT EXAMINATION

BY MS. POPE STARNES:

Q    What is a swear to?

A    A swear to is – we have a complaint, which is a police report and that police report is a brief synopsis of what actually occurred, we present that to the judge, we're not going to read the entire police report

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

because the judge doesn't want to hear the entire police report so we
brief on what exactly we did in our steps, we don't discuss it in great
detail. We just give a brief on it and he decides if there's enough
probable cause to issue the warrant – or she if it's a female.

Q   Counsel asked you questions about whether or not you were upset the
night during the interview and you said at times you were when you
were walking?

A   Yes, I wasn't upset during the interview but I originally went down to
get I believe it was Steven out of the hospital room where Madison
was and I saw her and I started crying so – don't want to think about it
right now – but I went to the nurses station and said I can't go down
there and I turned back and she went and got him for me.

Q   You were able to calm yourself before you started the interview?

A   Yes, I was.

Q   And all the information that was in the notes that you took, did you put
that in the police report?

A   Absolutely I did.

Q   This business about the quotations that you used in the police report,
can you explain to the jury please?

A   The way I write reports, I've wrote them that way for fourteen years,
it's just the way I write reports.

Q   How do you decide which things you put in quotes?

A   Some things just stick out during an interview regarding – for instance
my life is over, when he said that, that stuck out in my head, boom,
when I was writing the report.

158

Q     The other things you put in your report that are not in quotes, are they true or false?

A     They're absolutely true.

Q     Where did you get the words screaming and crying?

A     From Steven McBurney.

Q     Where did you get the word frustrated?

A     From Steven McBurney.

Q     Where did you get the information, two feet away?

A     From Steven McBurney.

MS. POPE STARNES:  No further questions.

THE COURT:  Mr. White anything further?

MR. WHITE:  Nothing further, Your Honor.

THE COURT:  Thank you. Thank you sir, you're all set.

Ms. Pope Starnes, you can call your next witness.

MS. POPE STARNES:  The People call Matthew Calus to the stand.

THE COURT:  Actually while you're getting him, can both counsel approach real quick.

(Whereupon a brief discussion was had off the record)

THE COURT: Sir, would you approach and raise your right hand to be s worn.

MATTHEW CALUS,

Was thereupon called as a witness herein and after having been first duly sworn, was examined and testified as follows:

159

THE COURT: You can have a seat there.

MS. POPE STARNES: May I proceed Your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. POPE STARNES:

Q      Sir, would you please state your name and spell your last name for the

record?

A      Matthew William C-a-l-u-s.

Q      How are you employed?

A      (No verbal response)

Q      How are you employed?

A      I'm a paramedic for Huron Valley Ambulance.

Q      Can you explain to us what does it mean to be a paramedic?

A      It's the highest level of licensure for care in the field pre-hospital.

Q      What is your education and training background that qualifies you to

be a paramedic?

A      I went through EMT school which is a four month program and then –

MS. POPE STARNES: May I just have one moment, Your

Honor?

THE COURT: Just one second, okay, sir?

Q      (By Ms. Pope-Starnes, continuing): I'm sorry, you may continue.

A      And then the paramedic school was a sixteen month program with five

hundred and some clinical hours.

Q      And then were you tested upon completion of those programs?

A      Yeah, I took a national test and then had to apply for a state license.

160

Q    Did you successfully complete the testing?

A    Yes.

Q    Were you awarded a state license?

A    Yes.

Q    When did you receive the license?

A    Hum –

Q    Approximately?

A    I got my national license in April but I worked in Phoenix so I'm not sure when I got my actual Michigan license.

Q    Do you know what year? The first time?

A    Oh, I believe it was '06, I believe it was somewhere around October, just before October of '06.

Q    Did you do work at EMT before you were licensed as a paramedic?

A    Yeah, I worked for South Lyon Fire for like three and a half or four years prior.

Q    And are you required to have a license to work as an EMT, Emergency Medical Technician?

A    Yes. It's the same thing, we have to go to national and then to state.

Q    Now, sir, I'm going to direct your attention to November 30, 2007, were you working that day?

A    Yes.

Q    And did you work a shift?

A    I was working a twenty-four hour shift, yes.

Q    Okay. Who were you working with if you recall?

A    Dennis Timmerman.

Q    Did there come a point where you were dispatched to – I'm sorry, excuse me, an address on Scott Street in the City of South Lyon?

A    Yes.

Q    Do you recall what time you were dispatched?

A    I'd have to check my report for the exact time.

Q    Okay. Do you have a report that would have recorded what time you were dispatched?

A    Yes, I do.

Q    Do you have that in court with you today?

A    Yes.

Q    Would that refresh your memory?

A    Yes.

        MS. POPE STARNES:  May I approach the witness?

        THE COURT:  You may.

Q    (By Ms. Pope-Starnes, continuing):   Is this a copy of your report, sir?

A    Yes, it is.

Q    I'd ask you to read that silently to yourself and when you've had the opportunity to refresh your memory, hand it back to me.

A    You're asking me the dispatch time?

Q    Yes, but don't answer yet.

A    Okay.

Q    Does that refresh your memory?

A    Yes, it does.

Q    What time were you dispatched?

A    7:21 p.m.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q    What did you do when you received the dispatch?

A    I believe we were out sitting point and we –

      MR. WHITE: Judge, I don't believe – this would –

      MS. POPE STARNES: Your Honor, he can testify to what he

saw. He's not testifying about someone's statement so it's not hearsay.

      MR. WHITE: That's not -

      THE COURT: In fairness, the dispatch, the question was what

he did and then he answered well, we did, so just what you did, okay,

sir. Go ahead counsel.

A    I do not remember if I was driving or if my partner was driving but I

know that I was in the ambulance that responded to the call.

Q    (By Ms. Pope-Starnes, continuing): And where did the ambulance go?

A    It went to the scene or the address.

Q    Thank you. And approximately how long did it take you to get there?

A    I believe it was probably eight or nine minutes, I'd have to check the

exact numbers of that again, I'm sorry.

Q    Do you recall where you were at the time you received the dispatch?

A    I believe we were at Grand River and Milford, we were covering for a

different area as well as our own at the time.

Q    Can you tell the jury please what happened when you arrived at the

address on Scott Street?

A    We grabbed our equipment or I grabbed part of our equipment and

walked towards the house and we went inside and saw that the

firefighters were rendering care.

Q    Okay. Did you recognize the firefighters?

A      Yes.

Q      Do you recall who was there?

A      Yes, I recall at least three of the people that were there.

Q      And who was that?

A      I saw Kevin Schuldt, Craig Johnston and David Johnston and actually

Tim Wilson as well.

Q      Okay. Can you describe to the jury what you saw going on when you

came into the home?

A      I saw two firefighters, the child was right inside the door on the floor

behind the couch and I know that the firefighters, there was two of

them there and they had oxygen on the child on the floor.

Q      When you say oxygen, can you tell us please what apparatus or device

you're talking about?

A      There's a breather mask, that's a mask that goes over the face with the

elastic strap that goes behind that's connected to an oxygen cylinder

that just blows pure medical grade oxygen.

Q      What happened next?

A      We briefly got a report from everybody that was there and I believe

I'm the one that picked up the child and then we went out to the

ambulance because we recognized that it was a situation that we

needed to expedite.

          MR. WHITE:  Objection – I just – I don't mean to be rude, I'd

just ask you testify from personal experience, personal.

A    I picked up the child and there was people that were assisting, carrying the equipment with me and we walked – and I walked with the child out to the ambulance.

Q    (By Ms. Pope-Starnes, continuing):  Did you stop to render any kind of treatment before you picked up the child?

A    We – we kept the child on the oxygen while we were – while I was walking out to the ambulance.

Q    Can you explain to the jury, sir, why was it that you picked the child up and went right to the ambulance?

A    Mainly with pediatrics, its – there's – mean we didn't exactly know, I didn't really exactly know what it was that was causing the issue but gathering the information as quickly as we could, I determined that it was best to expedite our transport to the university hospital.  That's our major pediatric center.

Q    Something called a load and go situation?

A    Yes.

Q    Okay. Now who was it that went in the ambulance to the hospital?

A    Myself, Dennis Timmerman and Kevin Schuldt were the three in the rear of the ambulance and in the front compartment, the driver was Tim Wilson and then the child's father was in the passenger seat up front.

Q    Now up to this point had you spoken to the child's father?

A    Yes.

Q    Okay. Would you recognize the child's father if you saw him again?

A    I – I'm not sure.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q       Okay. Can you tell me whether or not that person is in the courtroom
        today?

A       No, I couldn't.

Q       Okay. Did you get a history from the child's father?

A       Yes, I – I remember that there was – I gathered the history on scene
        and then I remember while we were en route, as we were trying to do
        some diagnostic work to try to figure out what was going on, I reached
        my head up through the window of the ambulance and asked what type
        of medical history the child had.

Q       Okay. Let's first start about at scene, what history did you get from the
        child's father at the scene?

A       He said that – I asked how the thing of events happened, he said that
        he was – the child woke up from a nap and we asked if everything was
        – if the child was acting normal after that, he said the child was acting
        normal, then he said that he fed the child the formula and then left the
        room and came back and when he came back the child was coughing,
        then vomited and then went unresponsive, at which point – I think
        that's all that was actually said in the house at that time to me, that I
        heard.

Q       Now once – were you able to identify the child?

A       Yes.

Q       Did you obtain the child's name from the parent?

A       I'm not sure if that came out of his mouth but yes, we did have the
        information, the firefighters that were on scene wrote down the
        information and gave us the information on paper.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q      Okay. And do your records reflect who the child was?

A      Yes.

Q      Who was the child?

A      The last name being McBurney.

Q      Was it a boy or girl?

A      It was a girl.

Q      Once you got in the ambulance, what happened then?

A      In terms of our care or what was said?

Q      In terms of your care at that point?

A      At that point we kind of started going through our things –

      MR. WHITE:  Again, I'd just ask – I ask that the witness testify from personal experience.

      MS. POPE STARNES:  Your Honor, I have to respond to the objection –

      THE COURT:  Go ahead.

      MS. POPE STARNES:  - because at this point he can testify not only to his care but they're working together on this child and he's observed what other care is going on and they're working in tandem, that's his personal knowledge and he should be allowed to testify to that.

      THE COURT:  I'm going to take some liberties here too.

      Sir, can you distinguish between, and you know what we're talking about with the we and the I?

A      Yes.

THE COURT: Okay. When it's something that involves your mindset, then just say I and talk about just you.

A    We just –

THE COURT: If it's an observation about what other people were doing then you can use the word we. Are you kind of following me or am I –

A    A lot of things are done as a pair, I mean things like assisting ventilations is done as a we, not as an I thing.

THE COURT: And when its with respect to things that you're observing that we are doing; but as to decisions that are being made, don't use we, okay?

A    Okay.

THE COURT: Okay. So go ahead.

Q    (By Ms. Pope-Starnes, continuing): In regards to the medical care that's being given to the little girl, what was going on in the ambulance?

A    I know that I, as well as the other people that were there, were – the child remained on the oxygen that we had in the house, I don't recall if it was me or Dennis that checked the blood sugar but that was another thing that we tried to rule out to make sure it was not low blood sugar that could –

Q    Were you there when that was done?

A    Yes.

Q    Did you see that being done?

A    Yes.

Q      Okay. And what if anything were you able to find out from the blood

       sugar test?

A      The blood sugar was on a normal – what would be considered normal,

       not – the only thing that we will treat it as – a paramedic will treat in

       the field is if it's going to be low blood sugar and the blood sugar was

       more on the higher side than the lower side.

Q      What else did you do in terms of medical treatment in the ambulance?

A      The baby's pupils were very small so I obtained a history from the

       father asking if there was any possibility for drugs or chemicals or

       anything like that that the child could have gotten exposed to and it

       was stated that there was no way possible, because that's also a cause

       that we could, as paramedics, could fix or potentially fix.

Q      What happened next in terms of medical treatment?

A      The patient was flaccidly, as paramedics will ask –

Q      What does that mean?  I'm sorry to interrupt you, what does that

       mean, flaccid?

A      When I was holding the baby its arms and its legs were limp, just

       hanging down when I was carrying it, I carried it face up with my hand

       on its head and my arm supporting body with the extremities hanging

       down.  But that, you know, if the baby were to have been stiff or

       whatever that could have given us the indication that it had a seizure;

       we were told that there was no – that there was no history of seizures.

Q      Who told you that?

A      The father.

Q      All right. What other medical care was given?

                                                                            169

A We – as my partner and I, we were assisting ventilations at the point where we recognized that –

  MR. WHITE:  Objection as to we –

A - her eyes –

  THE COURT:  As to the recognizing, yes, just the I, not the we.

A Okay. I was assisting  the ventilations with my partner because the ventilations as we saw it were not adequate but children have a higher respiratory rate then adults do so I recognized as well as the other people that were there that we needed to increase the respiratory rate with the oxygen, the held oxygen, the child needed more then what it was doing on its own.

Q How did you do that?

A With the bag valve mask, it's a seal that goes over the nose and the mouth and then it has a bag device that you use your hand to provide the ventilation to go in.  I thought with my best judgment that it was worth attempting to try to intubate the child, which was putting a tube directly into the trachea, it just gives better control, especially with the fact that he said that the child had vomited, so we wanted to be able to secure that because if the child did vomit again, it was possible for aspiration where it would inhale the vomit and make the respiratory effort a lot worse, so we attempted, my partner and I got the equipment provided and we – and I used the laryngoscope blade which is a metal blade to try to open up the child's mouth to insert the tube and the child actually still had like a sucking type reflex which a lot of

children have, where it actually started sucking on the edge of the

laryngoscope so I didn't proceed any further because I didn't want the

child to gag and potentially vomit because if the child or a person has a

gag reflex you can't – it won't work with the tube, you have to sedate

and those are things that we can't do in the field.

Q     Did you have any reason to believe that the airway had failed at that

point, the child's airway and that intubation was needed to be done

immediately?

A     No.  It was more of a precautionary thing that was something that in

my mind was worth – worth attempting but it wasn't at that point

necessary to do.

Q     What if any other medical treatment was given during the transport?

A     I know my partner Dennis, he was trying to obtain IV access to the

patient just in the event that we needed to give any medications. We

didn't at that time have any indications to give any medications that

we carry, we didn't – the blood sugar wasn't low, we didn't suspect a

seizure, the history kind of ruled out the fact that there was really no

chance from what we were told of any drugs or chemicals involved.

So we – my partner looked for an IV, did not have access to that. We

did get out supplies out to put an interosseus catheter into the baby's

bone if need be.

Q     What does that mean?

A     It's a needle that you drive into the bone and it goes into the bone

marrow and you can hook the tubing up to that to flow fluid and

medications into the bone which would then go into the blood stream

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

if you can't get an IV, it's kind of a secondary with children it's very hard to get IV's because their veins are much smaller, so that's a lot easier and we had that out ready just in case things did change and we did have to give medications or fluid.

Q    Did you do that during the transport?

A    No, we had it sitting out just in case.

Q    Did you observe any change in the child's condition during the transport?

A    As me and the firefighter were assisting the ventilations for the child we noticed or I noticed that the child began to have movements with his extremities, also began to bring its arms towards its core is something that I noticed.

Q    What is that – are you familiar with those types of movements?

A    That's considered, when when – it's a form of posturing where it's called  decussate when the arms come towards the core and that was more – that was movement that wasn't seen previous before, before we were doing the assisting the ventilations, there was no really purposeful movements whatsoever, the baby was just flaccid and then as we were assisting, as my partner and I were assisting the ventilations the movement in the extremities started to happen and then they became to the core so –

Q    And did you do any other treatment as a result of that?

A    I'm sorry as a result to?

Q    Of the decussate posturing?

A    No.  We just maintained the oxygen.

172

Q       Okay. What hospital was the child transported to?

A       University of Michigan.

Q       And what is the layout of this ambulance?

A       There's a driver's seat and passenger seat in the front, then there's a

        divider in the middle between the passenger compartment and the

        patient compartment, they're modular ambulances which means

        they're square and it has a little window that goes between.

Q       Is this – talk to me about the size of the window?

A       About that (indicating) maybe a foot and a half by a foot and a half or

        two feet.

Q       And where was the father during this time, during the ambulance trip?

A       In the passenger seat up front.

Q       Okay. And do you know what door he exited the ambulance from at

        the hospital?

A       It would have had to have been one of the two front – normally –

Q       And what door did the child go out when you got to the hospital?

A       The rear door on the stretcher, there – it would actually have to have

        been the passenger door in the front because there's a computer

        terminal that's in the middle that would be pretty hard to climb over.

Q       And did you get any other information or history from the father

        during the transport to the hospital?

A       During the transport we asked him for – or I asked him for any

        medical history –

                MR. WHITE:  Objection –

                MS. POPE STARNES:  He changed –

173

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

MR. WHITE:  - as to we –

MS. POPE STARNES:  - it to I, Your Honor.

THE COURT:  One at a time.

MR. WHITE:  Okay. As long as he says I –

THE COURT:  The we –

A    I corrected myself.  I asked him if there was any medical history, he said that there was a history of M.E.R.S.A, as well as hip dysplasia, denied any medications or allergies to any medications.

Q    (By Ms. Pope-Starnes, continuing):  Did he make any further statements in regards to the history of the child during the transport?

A    Offhand I'd have to – I'm not sure, I'd have to look through my statements again, that was quite some time ago.

MS. POPE STARNES:  May I have just one moment, Your Honor.

THE COURT:  You may.

MS. POPE STARNES:  Thank you. I have no other questions of this witness.

THE COURT:  Thank you, it's –

MR. WHITE:  I'll be a while.

THE COURT:  Yes, that's what I thought.  We'll break for the evening.  Ladies and gentlemen, please don't talk about the case. We'll have you return to the jury room for just a moment.  I'm debating back and forth in my mind, I've got an emergency matter that has to be handled tomorrow after lunch at 1:30 and with my fingers crossed I'd say it would take me about half an hour. So I would – and

174

if the people don't show up well then I'm just going to be sitting back there so I kind of would leave it to your collective thoughts as to what time – I would propose maybe 2:00 and I'll do my best if they do show up to move it along real quick.  I'll try not to keep you waiting but with that in mind, I'm kind of predicting if they do show up and I move them along pretty quick, a half hour, forty-five minutes, so if you just kind of talk amongst yourselves and we'll report to the lawyers and let you know if you chose 2:00 or 2:15 or whatever, okay. Thanks very much ladies and gentlemen.

   THE CLERK:  All rise for the jury.

      (Jury excused at 4:30 p.m.)

   THE COURT:  Record reflect that the jury has been excused and I'll be free and we'll resume tomorrow and we'll let you know, Jeff, just as soon as they give you – if they say they would rather come in here with their fingers crossed and they don't mind waiting and, you know, that's why I was kind of pushing for 2:00, see what they have to say and we'll let counsel know.

   And counsel also, tomorrow, why don't you – barring any reason against it, why don't you come on in at 1:30 and if there are some things that can be accomplished with respect to jury instructions in light of the progression that we're making ,maybe we can accomplish some of that.  Okay. Thank you. Have a good evening.

   THE CLERK:  All rise.

       * * * *

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

        I, Barbara Reznick, Court Reporter, State of Michigan do

hereby certify that the foregoing pages comprise a full, true and correct

transcript of the proceedings had in the matter of People v Steven McBurney,

before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on

February 26, 2008.

                    *Barbara Reznick*

Barbara Reznick, CER 1333
1200 N. Telegraph, Pontiac, MI 48341
(248) 858-5841