STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND



07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

PEOPLE OF THE STATE OF MICHIGAN

    Plaintiff,

V           No. 07 214651FC

STEVEN LINDSEY MCBURNEY

    Defendant

_____/

BY: DEPUTY COUNTY CLERK
OAKLAND COUNTY CLERK
2008 AUG 14 A 11: 24
RECEIVED FOR FILING

JURY HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

FEBRUARY 27, 2008
\* \* \* \*

APPEARANCES:

Sarah Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of Defendant

Barbara Reznick, Court Reporter

1

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# I N D E X

**PAGE**

**WITNESSES-PEOPLE**

**MATTHEW CALUS**

    Cross-Examination, by Mr. White...................05
    Redirect Examination, by Ms. Pope-Starnes........25

**DOCTOR FOLAFOLUWA ODETOLA**

    Direct Examination, by Ms. Pope-Starnes...........28
    Voir Dire, by Mr. White...........................32
    Direct Examination continued, by Ms. Pope-Starnes.32
    Cross-Examination, by Mr. White...................57
    Redirect Examination, by Ms. Pope-Starnes.........76

2

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1        Pontiac, Michigan

2        WEDNESDAY, FEBRUARY 27, 2008

3                    * * *

4        THE CLERK:    The Court calls People

5    versus McBurney, case number 07 214651 FC.

6        MR. WHITE:    Good ---

7        MS. POPE-STARNES:    (Interposing)    Good

8    afternoon Your Honor.

9        MR. WHITE:    (Continuing)    afternoon

10    Your Honor.    Sorry.

11        MS. POPE-STARNES:    Sarah Pope-Starnes,

12    assistant prosecuting attorney on behalf of the

13    People.

14        THE COURT:    Thank you.

15        MR. WHITE:    Robert White appearing on

16    behalf of Mr. McBurney to my immediate right.

17        THE COURT:    Thank you Counsel.

18        Ready to proceed?

19        MR. WHITE:    Yes.

20        THE COURT:    Sir, why don't you come on

21    back up and get situated.    It's another day.    Once

22    the Jury is here, I'll have you resworn, okay?

23        And Jeff or Jessica, bring in the Jury?

24        THE CLERK:    Yes Your Honor.

25        THE COURT:    Oh by the way.    This South

3

1     Lyon gentleman, from the --- there's a form, don't

2     worry.  We'll see if we can find it just to make

3     sure that we got everything proper, okay?

4                    A VOICE:    Appreciate it.

5                    THE COURT:    No problem.

6                    THE CLERK:    All rise for the Jury.

7     (Whereupon the Jury was returned to the courtroom.)

8                    * * *

9                    THE COURT:    Hello again everyone.    Long

10    time no see.

11         You may all be seated.

12         The record will reflect that the Jury is back.

13         Thank you.    You may be seated or actually I'll

14    have you stand up in just a second anyways.

15         The case has been called.    Counsels' names have

16    been noted.    As you can see the witness is back on

17    the stand.

18         And since it's another day Sir, I'd ask you to

19    please stand, face my Clerk, and raise your right

20    hand to be sworn.

21                    THE CLERK:    **Do you swear the testimony**

22    **you are about to give will be the truth, so help you**

23    **God?**

24                    THE WITNESS:    **Yes.**

25                    THE COURT:    Okay.    You can have a seat

                              4

1   there.

2          I believe we left off getting ready for cross-

3   exam, is that correct?

4                  MR. WHITE:    I believe so.

5                  THE COURT:    Okay.    Mr. White, you may

6   proceed.

7                  MR. WHITE:    May I move the podium Judge?

8                  THE COURT:    Sure.    Mm-hmm.

9              **M A T T H E W   C A L U S**

10  **WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER**

11  **HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE**

12  **WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED**

13  **AND TESTIFIED AS FOLLOWS:**

14                  **CROSS-EXAMINATION**

15  **BY MR. WHITE:**

16  **Q**   Mr. Calus, uh ---

17                  MR. WHITE:    If I may I approach the

18  witness Your Honor?

19                  THE COURT:    You may.

20                  MR. WHITE:    I have a document.    I'm

21  just going to ask him to look at it briefly.    It's

22  the Washington --- Washtenaw County EMS run.

23                  THE COURT REPORTER:    I'm sorry.    I

24  can't hear you.

25                  MR. WHITE:    The Washtenaw County EMS run

                            5

1      of November thirtieth (30th).

2   **(By Mr. White, continuing)**   Have you seen that document

3      before?

4  A   Yes.

5  Q   And is that your writing?

6  A   Yes.

7  Q   Okay.  All right.

8      And when did you prepare this document Mr.

9      Calus?

10  A   I --- it would have been after the call on that date.

11  Q   And how long after?

12  A   At the hospital.  From the time we arrived at the

13      hospital, probably fifteen (15), twenty (20) minutes.

14  Q   Okay.

15      And did you prepare this document with anybody's

16      assistance?

17  A   I believe that's all my writing.

18  Q   Did anyone help you with the information that was

19      provided in this document?

20  A   Yes.  Some of the information was obtained from the

21      firefighters that were on scene that I therefore

22      wrote on my document.

23  Q   Right.

24      I mean --- but what I'm asking is if when you

25      actually filled out this form was somebody helping

6

1    you at the time putting in the content?

2  A  It's all my writing there.

3  Q  So you did it all by yourself?

4  A  Yes.

5  Q  Okay.

6       Umm --- and umm --- on November thirtieth (30th)

7     when you responded to 311 Scott Street in South Lyon,

8     you arrived and uh --- the child was being given

9     oxygen, correct?

10 A  Yes.

11 Q  Okay.

12      And umm --- the child had not been intubated?

13 A  No.

14 Q  And the child was not breathing on her own, correct?

15 A  That's not correct.

16 Q  She was given oxygen but she was breathing on her own

17    also?

18 A  Yes.

19 Q  She was having agonal respirations?

20 A  No.

21 Q  And what are agonal respirations?

22 A  Agonal respirations are spontaneous respirations that

23    is pretty much like the body's last defense to try to

24    make itself breathe again.

25 Q  Okay.

7

```
 1          Now what is the reason why, to your
 2     understanding, a child this age is being given
 3     oxygen?   What is the first thing that you thought
 4     of?
 5   A  It's standard treatment for anybody with respiratory
 6     distress.
 7   Q  So it meant that the child in your mind was under
 8     respiratory distress, right?
 9   A  Well anybody that's unresponsive ---
10   Q  (Interposing)   Is that a 'Yes' or a 'No'?
11   A  Can you repeat the question?
12   Q  Did it mean at the time that you walked in there and
13     saw her being given oxygen that she was in
14     respiratory distress?
15          MS. POPE-STARNES:   Objection.   Calls
16     for speculation.   He testified someone else was
17     doing it.   Someone else has made that decision.
18     It's speculation as to why someone else would have
19     done it.
20          MR. WHITE:   I'm not asking ---
21          THE COURT:   (Interposing)   Go ahead.
22     Respond.
23          MR. WHITE:   I'm not asking him to
24     speculate why someone else was doing it.   I'm asking
25     him why?   What he thought at that time.
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                    THE COURT:    From a medical perspective?

2                    MR. WHITE:    From a medical perspective.

3                    THE COURT:    The Court will allow the

4          answer.

5                    THE WITNESS:    I had not obtained all the

6          information from the time I walked in.    The oxygen

7          was already being given.

8    **(By Mr. White, continuing)**    Okay.

9               But did that mean to you that the child was in

10          respiratory distress?

11   A    At that point I didn't know if the child was in

12          respiratory distress.

13   Q    Okay.

14              So it didn't mean anything to you, is that your

15          testimony?

16   A    It's standard treatment for pretty much anything.

17   Q    Okay.

18              Anything.    Okay.

19              But you knew from your dispatch --- you knew

20          from your dispatch that you have a situation that

21          you're walking into with an infant barely breathing,

22          correct?

23   A    Yes.

24   Q    Okay.

25              Now umm --- how long after you walked in the

                                  9

1      door did you walk out with the child?

2   A   Four, five, six minutes.   Something like that.

3   Q   And is it a fair statement Mr. Calus that things were

4      pretty hectic, correct?

5   A   There's --- there were a lot of people there.   I

6      mean I don't think it was all chaos.   I think

7      everybody had their position filled.

8   Q   Okay.

9         But you had a child in a medical emergency

10      situation, correct?

11  A   It always adds a lot ---

12  Q   (Interposing)   Unless you were ---

13  A   (Continuing)   of anxiety.   What was your question?

14  Q   My question is you had a child in an emergency

15      medical situation?

16  A   It appeared that way, yes.

17  Q   Now when you picked up the child and took her into

18      the ambulance, did you do so with oxygen still on her

19      face?

20  A   Yes.

21  Q   Okay.

22         So she remained oxygenated up to the time that

23      you picked her up all the way into the ambulance,

24      correct?

25  A   Yes.

10

1  Q  Now umm --- you did hear some of the history given,

2     isn't that true?

3  A  Yes.

4  Q  From Mr. McBurney, the father?

5  A  I don't recall who gave it to me in the house.    I

6     believe it was one of the firefighters that told me

7     in the house.   I remember Mr. McBurney gave me the

8     information in the ambulance when I specifically

9     asked him.

10 Q  He told you that, 'The child had been vomiting during

11    the day'?

12 A  I don't recall if he was the one that specifically

13    told me that or if it was the firefighter.   I

14    believe he told me at the house, yes.

15 Q  Okay.

16    The child had been sick during the day, correct.

17 A  No.   No.

18 Q  He said, 'The child had been vomiting'?

19 A  He said, 'The child vomited.'   He said, 'The child

20    was acting normal when it woke up from its nap and

21    then vomited.   Vomited after feeding.'   I'd have to

22    look at my report to recall the order of events.

23 Q  Doesn't your report say, 'Patients father stated ---

24            MS. POPE-STARNES:    (Interposing)

25    Objection.   He said that he would have to look at

11

FORM CSR - LASER   REPORTERS PAPER & MFG. CO. 800-626-6313

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

```
 1              his report.  I think he should be given an

 2              opportunity to refresh his memory before he's

 3              impeached.

 4                        THE COURT:   Go ahead.

 5                        MR. WHITE:   If I may approach?

 6                        THE COURT:   You may approach.

 7                        THE WITNESS:   Okay.

 8    (By Mr. White, continuing)   Does that refresh your

 9              recollection?

10    A    Yes.

11    Q    The father did tell you that the child had been

12              vomiting throughout the day, correct?

13    A    That's what it states in my report, yes.

14    Q    Now umm --- other than this EMS run did you uh ---

15              prepare any kind of written statement in this case?

16    A    A written statement, no.

17    Q    Umm --- the child --- the father had told you that

18              the child was barely breathing, correct?

19    A    I don't recall who told me that the child was barely

20              breathing.

21    Q    Would your report refresh your recollection?

22    A    Yes it would.

23    Q    Okay.

24                        MR. WHITE:   If I may approach again Your

25              Honor?
```

1      THE COURT:   You may.

2  **(By Mr. White, continuing)**   Why don't you just read it,

3      the whole thing and then I won't have to keep on

4      coming back up?

5  A    Okay.

6  Q    Does that refresh your recollection?

7  A    Yes.

8  Q    Okay.

9          The father did tell you that the child was

10     barely breathing, correct?

11 A    That's what it says in my report.

12 Q    Okay.

13         Written by you, right?

14             MS. POPE-STARNES:   Objection.   Asked

15     and answered.

16             THE COURT:   Sustained.

17 **(By Mr. White, continuing)**   Now uh --- so you knew you had

18     a child in respiratory distress.   You knew the

19     father provided information the child is barely

20     breathing.   The father had provided you information

21     that the child was vomiting throughout the day,

22     correct?

23             MS. POPE-STARNES:   Objection.   Asked

24     and answered.

25             THE COURT:   Sustained.

13

1    **(By Mr. White, continuing)**    Now when you got in the

2    hospital --- got into the ambulance Mr. Calus, you in

3    the back with the child, correct?

4    A    Yes.

5    Q    Father went in the front passenger seat, correct?

6    A    Yes.

7    Q    Okay.

8         And umm --- firefighter Kevin Schuldt was in the

9    back, a South Lyon firefighter, correct?

10   A    Yes.

11   Q    With you, right?

12   A    Yes.

13   Q    And the driver of the vehicle was who?

14   A    It was another firefighter.

15   Q    Who was that?

16   A    Tim Wilson.

17   Q    Now when you umm --- went into the ambulance the

18   child was flaccid initially, correct?

19   A    Yes.

20   Q    Okay.

21        Pupils pinpoint?

22   A    Yes.

23   Q    Okay.

24        And in approximately five minutes away from the

25   residence the child's eyes rolled back in her head,

14

1    correct?

2  A  From the residence?  I wasn't there five minutes

3     before.  I'm not sure.

4  Q  Five miles --- five minutes away from the residence

5     as you were leaving the residence.  Five minutes or

6     less away from the residence as you were proceeding

7     to University of Michigan Hospital.

8  A  I don't believe I recorded that time.  I'm not sure.

9  Q  Did the child's eyes roll back in her head?

10 A  I do not recall.

11 Q  Okay.

12     And umm --- did the child go into extreme

13     respiratory distress while in the ambulance?

14 A  No.

15 Q  And isn't it true that there were several times when

16     the child's pulse was seventy (70) or less?  Seventy

17     (70) beats or less per minute?

18 A  I'd have to check my report to see if that was

19     documented.

20         MR. WHITE:  May I approach this witness

21     again Your Honor?

22         THE COURT:  You may.  You may.

23         THE WITNESS:  No.  I didn't document it

24     that the pulse went below seventy (70).

25 Q  **(By Mr. White, continuing)**  So what you're saying is

                          15

1      if it's not documented on your report, it's not true,

2      is that a fair statement?

3   A   I don't understand what you're asking me.

4   Q   What I'm asking you first of all, do you remember

5      independently of your report, whether the child's

6      pulse was seventy (70) beats a minute or less,

7      anytime while she was in that ambulance?

8   A   No.

9   Q   You don't remember?   Or you're saying, 'No that it

10      wasn't'?

11  A   I'm saying if it's not documented that I don't

12      believe it happened.   I would have documented if it

13      dropped below what was on there.

14  Q   What happens when a person's pulse, a child eleven

15      (11) months old, gets below seventy (70) beats per

16      minute?

17  A   It slows down.

18  Q   What happens to ---

19  A   (Interposing)   That's slower than normal.

20  Q   What's happening to the body, in your training?

21  A   The blood pressure may go lower.   Umm --- I'm sure

22      there's a number of events that can happen.

23  Q   Okay.

24      From your training what is happening to the ---

25      to the body at that point?   What is happening to

16

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1      that person?

2   A   It would be decompensating.

3   Q   Well what does that mean?

4   A   Getting worse.

5   Q   So she went into the --- she went into the ambulance

6      with a mask of $O_2$, correct?

7   A   Mm-hmm.

8   Q   Being bagged, right?

9   A   Yes.

10  Q   But then decided to try another procedure to try to

11     give her more oxygen, correct?

12  A   Yes.

13  Q   And what was that?

14  A   (No verbal response.)

15  Q   What was that?

16  A   Well to get more oxygen you mean?

17  Q   Yes.

18  A   Well the non-rebreather that we had her on is a

19     hundred percent (100%) oxygen so we couldn't really

20     give her more than that.

21  Q   Okay.

22        So why did you try to change the --- why did you

23     try to take the mask off and do something else?

24  A   When we tried intubating?   Is that what you're

25     referring to?

17

1   Q   Well ---

2   A   (Interposing)   When my partner and I tried

3       intubating?

4   Q   Your partner, firefighter Timmerman, correct?

5   A   No.

6   Q   Who else was in the back then?

7   A   Dennis Timmerman, who's a paramedic.   Kevin Schuldt

8       was a firefighter.

9   Q   Okay.

10          I'm sorry.   Kevin Schuldt was a firefighter.

11          So you tried intubating her, correct?

12  A   Yes.

13  Q   And you couldn't, could you?

14  A   Well it wasn't that I couldn't.   It's that I

15      determined she wasn't going to be responsive to it.

16      She still had a gag reflex.

17  Q   So you weren't able to intubate her?

18          MS. POPE-STARNES:   Objection.   Asked

19      and answered.

20          THE COURT:   I got it.   Sustained.

21  **Q   (By Mr. White, continuing)**   What else did you try to

22      do to get her oxygen?

23  A   We assisted, well ---

24  Q   (Interposing)   I asked you.

25  A   Well Kevin and I ---

18

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    Q    (Interposing)   There you go.

2    A    (Continuing)   Kevin and I assisted ventilations with

3         a bag-valve mask.

4    Q    Anything else?

5    A    We --- as Kevin and I, Kevin was holding the oxygen

6         for me while I attempted the intubation.   He was

7         holding the oxygen next to the child's face to get

8         blow-by oxygen while we --- while I attempted

9         intubating.

10   Q    And you were asking Kevin for help in giving the

11        child oxygen, isn't that true?

12   A    It was more of a mutual understanding that he knew

13        what to do.

14   Q    All I asked Sir, did you ask Kevin for help to

15        oxygenate this child?

16   A    I --- I --- he knew what to do.

17   Q    Did you ask him for help?

18   A    No.   I don't think I had to ask him.

19   Q    Now the father was in the front looking back through

20        the back window, correct?   At his ---

21   A    (Interposing)   At times, yes.

22   Q    Okay.

23             At times?

24   A    Yes.

25   Q    Okay.

19

1          Did you make continuous eye contact with the

2          father throughout this period of time?

3  A    No.

4  Q    Okay.

5          Was there some discussion about her medical

6          condition, correct?

7  A    Yes.

8  Q    Okay.

9          And he told you or said in your presence that

10         she had MRSA, correct?

11  A    Yes.

12  Q    Okay.

13         That she was taking an antibiotic for the MRSA,

14         correct?

15  A    No.

16  Q    Never said that.  Okay.

17         Umm --- now you said as you were approaching the

18         hospital the child started posturing, correct?

19  A    I believe in my report I said, 'The patient started

20         moving extremities.'

21  Q    Okay.

22         Does that mean posturing to you?

23  A    At the --- what I documented --- what I documented is

24         that the patient started moving.

25  A    Does that mean posturing to you?

20

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1    A    No.

2    Q    Okay.

3         What does posturing mean to you?

4    A    Posturing means unpurposeful movements.

5    Q    What is the pulse, the different pulse measurements

6         that you have in your report?

7    A    (No verbal response.)

8    Q    You took them at three different times, correct?

9    A    A hundred and eight (108), a hundred and three (103)

10        and a hundred and nine (109).

11   Q    All acceptable?

12   A    Yes.

13   Q    Okay.

14        So there's nothing indicated in here --- in

15        there about seventy (70) beats per minute in your

16        report, correct?

17             MS. POPE-STARNES:   Objection.   Asked

18        and answered.

19             MR. WHITE:   I asked ---

20             THE COURT:   (Interposing)   I'll allow

21        it.   I'll allow it.

22             MS. POPE-STARNES:   He's already

23        testified it wasn't in ---

24             THE COURT:   (Interposing)   Hang on.

25             MS. POPE-STARNES:   (Continuing)   his

                           21

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1     report in response to that Your Honor.

2            THE COURT:   Noted.   Noted.

3  **Q**  **(By Mr. White, continuing)**   Nothing was written in

4     your report about seventy (70) beats per minute?

5  A   I could look through it again and see.  I don't

6     believe so.

7  Q   Okay.

8        If you want to, go right ahead.

9  A   No.   It doesn't say anything about a heart rate of

10     seventy (70).

11  Q   And it doesn't say anything about the child being in

12     extreme respiratory distress either does it?

13          MS. POPE-STARNES:   Objection.  Asked

14     and answered.

15          MR. WHITE:   The report Judge.  I asked

16     him about the report.

17          THE COURT:   I think that you did ask

18     him about what's in the report before.

19          MR. WHITE:   Okay.  My apologies Judge.

20          THE COURT:   Sure.

21  **Q**  **(By Mr. White, continuing)**   Now you were interviewed

22     by the police in this case, correct?

23  A   Yes.

24  Q   And isn't it true Mr. Calus, at all times that Mr.

25     McBurney conducted himself as a concerned parent?

1   A   I think it's a matter of opinion.

2   Q   Well in your opinion?

3   A   No.

4   Q   So what did he do that says, that tells you at that

5       time that he was not acting as a concerned parent?

6   A   My mother said, 'If that would have happened she

7       would have been hysterical.'

8   Q   What did Mr. McBurney do that tells you on that

9       night, November thirtieth (30th), two thousand six

10      (2006), he was not acting as a concerned parent?

11  A   I believe he was extremely calm.

12  Q   Anything else?

13  A   No.

14  Q   Is that indicated in your report anywhere?

15  A   It doesn't pertain to patient care.

16              THE COURT:   Just 'Yes' or 'No'.

17  **Q   (By Mr. White, continuing)**   Is that indicated in

18      your report?

19  A   No.

20  Q   Now you talked to these police officers haven't you?

21  A   Yes.

22  Q   About this case?

23  A   Yes.

24  Q   You talked to them about your testimony?

25  A   About?

1 Q Your testimony.

2 A Yes.

3 Q Now you also visually inspected that child, examined

4   her, correct?

5 A Yes.

6 Q And there's no sign of any trauma whatsoever, isn't

7   that true?

8 A That's correct.

9 Q Okay.

10      MR. WHITE: Nothing further.

11      THE COURT: Ms. Pope-Starnes.

12      MR. WHITE: Actually I do. I'm going

13   to mark an unmarked copy of that EMS report as

14   Exhibit, I believe, Y and move for its entry.

15      MS. POPE-STARNES: I would ask for the

16   Court to withhold a ruling on that. Typically the

17   EMS reports are part of the medical records. And it

18   would be cumulative if it is. Therefore we could

19   check into it later.

20   If it is not, I don't have an objection.

21      THE COURT: Okay. Okay. Fair enough.

22      MR. WHITE: I don't believe that it is

23   but if it is ---

24      THE COURT: (Interposing) Somebody

25   make a note to remember to address that potential Y.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

```
 1                    Good luck Barb.

 2                         Okay.   Ms. Pope-Starnes.

 3                         MS. POPE-STARNES:   Thank you.

 4                    REDIRECT EXAMINATION

 5      BY MS. POPE-STARNES:

 6  Q   During umm --- the transport of Madison to the

 7      hospital was the Defendant volunteering information

 8      to you?

 9  A   I had to ask him for information.

10  Q   Did the Defendant say anything spontaneously without

11      you asking during the transport?

12  A   I don't --- I don't think so.

13  Q   What type of information do you put in your --- what

14      do you call your report?

15  A   Just an EMS report.

16  Q   Okay.

17          What kind of information do you put in your EMS

18      report?

19  A   Things that pertained to what happened with the event

20      starting from past illness to treatment given.   Just

21      mainly pertinent things that go directly towards the

22      patient care.   Talking about maybe being sick

23      earlier in the day or not.   Just things pertinent to

24      what's going on right now.

25  Q   And if a family member is with the patient in the

                              25
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          ambulance as you're transporting them, do you report

2          on them in your EMS report?

3     A    Do we document if they're there?

4     Q    No.

5               Do you document about them?   What they do?

6          What they say?

7     A    No.

8     Q    Do you have an independent recollection about the

9          Defendant and his demeanor during that transport?

10    A    Yes.

11    Q    Thank you.

12              MS. POPE-STARNES:   I have no other

13         questions, Your Honor.

14              THE COURT:   Mr. White, anything further?

15              MR. WHITE:   Nothing further Judge.

16              THE COURT:   Thank you.

17         Sir, you're all set.

18              THE WITNESS:   Thank you.

19         Do I get to go home?

20              THE COURT:   Yeah.   Is there any

21         objection Counsel?

22              MS. POPE-STARNES:   May he be excused,

23         Your Honor?

24              MR. WHITE:   No objection.

25              THE COURT:   Well he asked to go home.

                              26

1    I don't know.   Better check with your boss.   Well

2    you go home and Judge said, 'I could.'   Thank you

3    Sir.

4         Next witness.

5                   MS. POPE-STARNES:   Your Honor, the

6    People would call Doctor Odetola to the stand.

7                   THE COURT:   Thank you.

8         Good morning.   No up here.   Sir, if you could

9    come on up here please?

10                   MS. POPE-STARNES:   No.   He's not the

11   witness Your Honor.

12                   THE COURT:   Oh.   Sorry.

13        Sir, please step up here, face my Clerk and

14   raise your right hand.

15                   THE CLERK:   **Do you swear the testimony**

16   **you are about to give will be the truth, so help you**

17   **God?**

18                   THE WITNESS:   **Yes I do.**

19                   THE COURT:   Thank you.   You can have a

20   seat there.

21                   THE WITNESS:   Okay.

22                   MS. POPE-STARNES:   May I proceed Your

23   Honor?

24                   THE COURT:   You may.

25                   MS. POPE-STARNES:   Thank you.

                            27

```
 1        DOCTOR   FOLAFOLUWA   ODETOLA
 2    WAS THEREUPON CALLED AS A WITNESS HEREIN, AND AFTER
 3    HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE
 4    WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS EXAMINED
 5    AND TESTIFIED AS FOLLOWS:
 6                    DIRECT EXAMINATION
 7   BY MS. POPE-STARNES:
 8   Q    Sir, would you please state your name and spell your
 9        last name?
10   A    My name is, excuse me, Folafoluwa, that's all right.
11        The last name is spelled O D E T as in Tom O L A.
12                    THE COURT REPORTER:    What was the first
13        name?
14                    THE COURT:    Do you want the first?
15   Q    (By Ms. Pope-Starnes, continuing)    Could you spell
16        the first name please?
17   A    F O L A F O L U W A.
18   Q    Can you tell us please where you received your
19        education?
20   A    I was actually trained in quite a number of places.
21        My medical school training was in Nigeria under the
22        British system.    And thereafter I trained in
23        pediatrics in Children's Hospital in New Jersey.
24        And then in pediatric intensive care at the
25        University of Michigan.    Thereafter I've also done
```

28

```
 1              two different research fellowships at the University
 2              of North Carolina, Chapel Hill and the University of
 3              Michigan.
 4    Q    Now umm --- Doctor what year did you receive --- what
 5         year did you complete medical school?
 6    A    Nineteen-ninety-two (1992).
 7    Q    And where did you do your residency?
 8    A    Children's Hospital of New Jersey.
 9    Q    Okay.
10              And that was in pediatrics?
11    A    Yes.
12    Q    And when did you complete that program?
13    A    Nineteen-ninety-eight (1998).
14    Q    And then did you do a second residency or what was
15         the program in intensive care?
16    A    So the program in intensive care is a fellowship.
17         So it's --- it's a part of graduate medical training.
18         So beyond pediatric residency training I then did
19         pediatric intensive care training at the University -
20         --
21    Q    (Interposing)   When did you complete your
22         fellowship?
23    A    Two thousand and one (2001).
24    Q    And Doctor are you licensed to practice medicine?
25    A    Yes I am.
```

29

1    Q    And where do you hold licenses?

2    A    Uh --- the Country of Nigeria, the State of North

3         Carolina and the State of Michigan.

4    Q    Do you hold any board certifications?

5    A    Yes I do.

6    Q    In what areas?

7    A    Pediatrics, nineteen-ninety-eight (1998), pediatric

8         critical care medicine, two thousand and two (2002).

9              MR. WHITE:   I'm sorry.   What was the

10        second?

11             THE COURT:   The second?   The second

12        one.

13             THE WITNESS:   Pediatric critical care

14        medicine or ---

15   **Q    (By Ms. Pope-Starnes, continuing)**   (Interposing)

16        Pediatric intensive care.

17   A    (Continuing)   pediatric intensive care.

18   Q    Following the completion of your fellowship what type

19        of work did you do?

20   A    Umm --- so I finished my fellowship in two thousand

21        and one (2001) at the University of Michigan.   And

22        thereafter went to the University of North Carolina,

23        Chapel Hill for a research fellowship in health

24        services research and research methodology.   At the

25        same time I was also an attending physician at the

30

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1       University of North Carolina Hospitals.   And that

2       was between two thousand and one (2001) and two

3       thousand and three (2003).

4   Q   And when you were working at University of North

5       Carolina as an attending physician did you have any

6       other specialty?

7   A   Pediatric intensive care.

8   Q   Following that program you came to the University of

9       Michigan?

10  A   Yes I did.

11  Q   And what is your work that you do at the University

12      of Michigan?

13  A   So I --- I'm actually an attending physician at the

14      University of Michigan pediatric ICU.   Umm --- I

15      also research for the child health organization and

16      research unit within the University of Michigan.

17  Q   Have you ever testified before, Doctor Odetola?

18  A   Yes I have.

19  Q   In what Courts, if you can recall?

20  A   Specifically in two thousand and --- I'm trying to

21      keep it exact, a period.   It was two thousand and

22      three (2003) I think it was.   Wayne County.

23  Q   And at the time were you qualified as an expert?

24  A   Yes.

25              MS. POPE-STARNES:   Your Honor, I would

                            31

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   ask that this witness be qualified as an expert in

2   pediatrics and as a pediatric intensivist.

3        THE COURT:   Mr. White.

4        MR. WHITE:   Just if I could ask some

5   questions?

6        THE COURT:   You may.

7        **VOIR DIRE**

8 **BY MR. WHITE:**

9 **Q**  What was your qualification in two thousand three

10   (2003) in Wayne County?

11 A  In terms of that I was a pediatric intensivist so I

12   practiced pediatric intensive care.

13 Q  Was that how you were qualified?

14 A  Yes.

15 Q  Okay.

16        MR. WHITE:   I have no objection.

17        THE COURT:   So qualified.

18        **DIRECT EXAMINATION CONTINUED**

19 **BY MS. POPE-STARNES:**

20 **Q**  Now Doctor can you explain to the Jury what does an

21   attending physician for an pediatric intensive care

22   unit do?

23 A  Umm --- your duty as an attending physician is to be

24   the head of a team that provides care to critically

25   ill children within a pediatric ICU setting.   That

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1        involves coordinating care and delivering care to

2        children within the ICU.   The team involves or

3        includes resident trainees, fellows in pediatric

4        intensive care training, uh --- critical care

5        pharmacists, respiratory therapists, nurses and

6        families.

7    Q   Doctor Odetola if I can direct your attention back to

8        December first of two thousand and six (2006), did

9        you see a patient or a child by the name of Madison

10       McBurney in your pediatric intensive care unit?

11   A   Yes I did.

12   Q   When was the first time that you encountered Madison

13       that day?

14   A   To be specific, probably about seven-thirty (7:30)

15       that morning.

16   Q   And can you tell the Jury please what, if anything,

17       you observed?

18   A   Umm --- so once I get to the ICU in the morning I

19       essentially go through and uh --- figure out which

20       patients just came into the ICU.   And I learned she

21       had actually been admitted overnight into the ICU.

22       And the next step is then to evaluate the care that

23       had been provided and to move things ahead.

24   Q   Did you do that in Madison's case?

25   A   Yes I did.

33

1    Q    And when you evaluate the care that she was provided

2         what does that mean that you do?

3    A    Essentially it involves a complete review.   And I

4         believe strongly that it all starts at the bedside.

5         So the child has to be evaluated in terms of physical

6         examination.   Umm --- thereafter we then look at

7         what the care is that has been provided.   This would

8         involve the --- all the laboratory work that has been

9         done at that time.   Umm --- what the findings were.

10        Treatments that have been offered in terms of both

11        the laboratory investigations tied into what

12        medications the child would be on.   Specifically in

13        Madison's case that was done.   And also what kinds

14        of nutrition were we providing and what were our next

15        steps in this --- in her care.

16   Q    Can you tell us please at that point what, if any ---

17        the physical examination of Madison what, if

18        anything, you observed?

19   A    And umm --- I can remember clearly she was in a crib

20        which is where we put infants.   She was intubated

21        and sedated.   And intubated essentially means that

22        you have a piece of plastic tubing sitting in the

23        airpipe.   Now this was connected to a ventilator or

24        a breathing machine.   Umm --- the findings that were

25        pertinent in terms of what I saw at that point

34

1    included the fact that umm --- she wasn't moving.

2    She umm --- had going through the different systems,

3    pupils were reactive which is part of our

4    neurological exam.   We would also look at other

5    parts of the exam including was she able to actually

6    react to touch.   And in her instance she was

7    actually able to move to my touch, both her hands,

8    arms and her lower extremities.

9  Q  So as I understand you said, 'She wasn't moving on

10     her own but she did react to touch'?

11 A   Yes.

12 Q   Okay.

13     What if anything else did you observe?

14 A   Umm --- the other parts of the exam included

15     listening to the heart and uh --- checking her

16     pulses.   Also listening to her lung sounds.   And

17     these were at that point, all normal.   Then checked

18     the abdomen.   Sort of a head to toe kind of

19     approach.   Umm --- no significant findings,

20     abnormal findings were elicited at that point.   Umm

21     --- and examination of the skin is also done to just

22     make sure there aren't lesions or rashes or ---

23 Q   (Interposing)   Did you observe anything?

24 A   No.

25 Q   What did you do next in the course of treatment of

35

```
 1              Madison?

 2    A    Umm --- at that point in time I reviewed the scans,

 3         essentially the head CT scan that had been done

 4         overnight.   And umm --- per the radiologist there

 5         were certain findings that were of concern at that

 6         point in time that might guide her therapy.   What

 7         they reported and what I also saw on the CT scan was

 8         evidence of umm --- blood collection in what is known

 9         as the subdural space between the brain and the

10         skull, predominantly on the left side of the --- of

11         the brain.   Umm --- that in itself was concerning to

12         me because the next question I had in my mind was if

13         you have blood collection within that space it means

14         something.   And we then have to then go to the next

15         step of trying to figure out what that might be.

16              And the truth of it is the collection of blood

17         in that space means there is some breach of

18         structure.   Essentially you expect blood to stay

19         within the blood vessels.   And if for some reason

20         the blood isn't there and has leaked out between the

21         brain and the skull, we need to figure out why.

22    Q    At that point did you have one specific diagnosis for

23         Madison?

24    A    Umm --- there's a prioritization in terms of

25         diagnosis.   The ---
```

36

1  Q    (Interposing)  I'm sorry.  What?

2  A    There is a prioritization in terms of ---

3  Q    (Interposing)  Prior, okay.

4  A    (Continuing)  diagnosis when the child is critically

5      ill.  The first thing that actually screams at one

6      as a pediatrician and also as a pediatric intensivist

7      is the idea of infection, infection, infection.  So

8      what we do is we take that as our number one, sort of

9      concern.  And then step beyond that.  So when she

10     came in she was put on antibiotics.  And along with

11     that was also an antiviral agent just in case if, you

12     know, this was some kind of viral infections.  So

13     she was already on three different agents at that

14     point.

15  Q    The point that you saw her first thing Tuesday,

16     excuse me, Friday morning?

17  A    Yes.  Umm --- which is what we would normally do, to

18     treat for infection to start off.

19            MR. WHITE:  I just Your Honor I just, so

20     I don't interrupt the doctor continually, I just ask

21     that he testify from his own perspective not we.

22            MS. POPE-STARNES:  I believe that he has

23     been.

24            THE COURT:  If ever there's an occasion

25     where you're going to say, 'We', just say, 'I', okay.

37

1   I don't know if that happened or not.

2       Go ahead Counselor.

3   Q   **(By Ms. Pope-Starnes, continuing)**   Doctor I believe

4       you testified she had already been placed on a series

5       of antibiotics and an antiviral agent?

6   A   That's right.

7   Q   What is a --- what is a differential diagnosis?

8   A   In this instance the way I see this and the way I

9       actually look at conditions of this nature is if you

10      have that blood collection there, there has to have

11      been something that led to it and one has to figure

12      out what that is.   And so the next step in terms of

13      my prioritization was infection and then trauma to

14      the brain.   Both especially because of the

15      collection between the brain and the skull.

16          And the way we --- I proceeded to take care of

17      her was to insure that certain things were done.   So

18      once you have that blood collection you need to

19      figure out well, if there's injury to the brain then

20      we need to make sure certain things are done.   So

21      what we did in her instance ---

22          MR. WHITE:   (Interposing)   Objection.

23      I just asked he speak from I.

24          MS. POPE-STARNES:   If I may ask another

25      question Your Honor?

                        38

```
 1              THE COURT:   Go ahead Counsel.
 2   Q   (By Ms. Pope-Starnes, continuing)   As the attending
 3       physician are you directing other people to do things
 4       for Madison's treatment?
 5   A   Yes.
 6   Q   And as the attending physician was it your
 7       responsibility and decision what treatment was to
 8       happen next?
 9   A   Yes.
10   Q   Did you make a decision?
11   A   Yes.
12   Q   Did you instruct other people to follow through with
13       that treatment?
14   A   Yes.
15   Q   When you had this list of your priorities of possible
16       infection or possibly trauma to the brain, what
17       treatment did you order at that point?
18   A   So umm --- in terms of the bedside care we
19       essentially made sure certain things were done.
20       Essentially we wanted the head in the midline.   We
21       wanted the head of the bed elevated at a certain
22       degree.   Umm --- and that was ---
23   Q   (Interposing)   What does it mean, you want the head
24       at the midline?
25   A   So essentially because the truth of it is, blood
```

39

1    flows into the brain and flows out.  You want

2    drainage of blood away from the brain.  So by

3    keeping the head at the midline you insure there

4    isn't any kinking of the blood vessels that lead up

5    from the brain.  And that was being done even as of

6    the time I saw her.  The elevation of the head of

7    the bed thirty (30) degrees also insures drainage of

8    blood away from the head.

9  Q  Did you prescribe medications to try and deal with

10   this issue besides the antibiotics and the antiviral

11   agent?

12 A  Yes.  Prior to my seeing her she had been placed on

13   a medication called Phenobarbital for concerns of

14   seizure activity prior to presenting to the pediatric

15   intensive care unit.  Umm --- in this kind of

16   situation in which we were worried about injury to

17   the brain ---

18           MR. WHITE:  (Interposing)  Objection as

19   to we Judge.  This is he's --- he's using 'We were

20   worried.'  Now this is someone else is involved

21   here.

22           THE COURT:  Understood.

23        Sustained.

24        Just when you're talking about what's going on

25   inside someone's head, no pun intended, pertaining to

40

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    this case, what's going on in your mind, just I,

2    okay, instead of we.

3          Go ahead.   You can continue.

4  Q   **(By Ms. Pope-Starnes, continuing)**    Go ahead Doctor.

5  A   So in my concern for injury to the brain, we

6    continued the medication for seizure control which in

7    itself would help us control any pressure within the

8    brain.   The next step to guide us was to actually

9    consult a number of specialists.   So we had a

10    neurology staff consulted.   Neurosurgery was also on

11    consult.   Ophthalmology was consulted.   And we also

12    wanted to make sure prior to getting into the ICU if

13    any other services had been consulted or not.   So

14    essentially trying to streamline her care.

15          Thereafter we umm --- discuss her care on rounds

16    which is essentially patient care rounds to insure

17    that no stones are left unturned.   And listen to her

18    consultants in terms of what they needed to add to

19    her overall care.

20  Q   After you met on rounds and listened to the

21    consultants what did you decide was to be done next?

22  A   The decision was made to have an intracranial

23    pressure monitor inserted.

24  Q   Can you tell the Jury what is an intracranial

25    pressure monitor is?

41

 1    A    An intracranial pressure monitor is essentially a
 2         device that measures pressure within the brain.   And
 3         it helps guide therapy because it actually serves as
 4         a window to the brain itself.   That if there's any
 5         evidence of injury and elevation of pressure, we will
 6         then, excuse me correction, I will then be able to
 7         treat such elevation in pressure.
 8    Q    Now was there a placement of an intracranial pressure
 9         monitor done with Madison?
10    A    Yes it was done.
11    Q    And was that something that you did or that one of
12         your specialists did?
13    A    One of our specialists did it.
14    Q    Were there any procedures on December first, of two
15         thousand and six (2006) that you performed on
16         Madison?
17    A    Yes.
18    Q    What was that?
19    A    It was a placement of a central venous catheter.
20    Q    What is that?
21    A    That is a vascular access device that is placed in
22         one of the large veins of the body to cover a number
23         of functions.   It gives us an idea of the pressure
24         within the blood vessels, the veins particularly.
25         It also provides the ability to administer

                              42

1      medications, do frequent blood sampling as needed and

2      also gives us the opportunity to give medications to

3      support blood pressure if needed.

4  Q   After the intracranial pressure monitor was placed

5      and the venous catheter, did you evaluate Madison

6      after that?

7  A   Yes.

8  Q   Can you tell the Jury what you found at that point?

9  A   Umm --- this was --- the procedure itself was done

10     the evening of the first.  And at that point in

11     terms of her physical examination the pupils were

12     still reactive in terms of her neurological exam.

13     She still had some reaction to touch, sort of deep

14     touch in this instance.  Umm --- and the rest of the

15     physical examination was essentially as we found

16     earlier in the morning of the first.

17  Q  When was the first time that you were able to use the

18     intracranial pressure monitor to know what her

19     pressures were?  Was it on the first or on the ---

20  A  (Interposing)  On the first.

21  Q  Okay.

22         And what kind of pressures was she having at

23     that point?

24  A   The --- the initial pressure measured was greater

25     than twenty (20).

43

1   Q   Greater than twenty (20)?

2   A   Yes.

3   Q   Can you tell the Jury for a child Madison's age, what

4       is the normal pressure?

5   A   For infants it's been documented that the pressure

6       should be less than ten in a normal healthy infant.

7   Q   So when you find that her intracranial pressure is

8       over twenty (20) are you concerned at that point?

9   A   Yes.

10  Q   And what does that mean to you that's going on in the

11      head?

12  A   What was obvious to me was that there was elevation -

13      -- elevated intracranial pressure.  The skull itself

14      is a thick structure.  There are three different ---

15      three different structures within the skull.  So we

16      have a brain, we have blood, and we have spinal

17      fluid.  And under the most circumstances if

18      everything is well they all interact and there isn't

19      any problem.  If there's any perturbation, for

20      example if the brain is swollen, it then competes for

21      space with spinal fluid and blood.  The same goes

22      for the other structures.  But the truth of it is

23      the swelling of the brain mechanically actually, can

24      actually cut off blood supply to the brain and also

25      the spinal fluid, just mechanically.

44

1     So once I saw the pressure being more than

2   twenty (20) and to be more specific, by the time she

3   actually got up to the ICU from the operating room,

4   the pressures were actually close to fifty (50). So

5   essentially ---

6 Q (Interposing) Let me stop you there Doctor.

7 A Yes.

8 Q How much time elapsed between it was the time in the

9   operating room where the procedure was done, where it

10  was in the twenties (20's) and the time she got to

11  her room where it was, I'm sorry, you said, 'It was

12  fifty (50) to sixty (60)'? Is that what you said?

13 A In terms of the pressure itself it was about fifty

14  (50) when she got up to the ICU.

15 Q Well how much time had passed?

16 A Umm --- the trip itself from the operating room to

17  the ICU would on the average be anywhere from ten to

18  fifteen (15) minutes at most. Umm --- oftentimes

19  once the procedure is done and the patient is done

20  with the procedure, you essentially bring them up

21  straight to the ICU. So we measured the pressures

22  by essentially connecting the device to a pressure-

23  measuring device and can actually read it on the

24  monitor. The device also makes it possible for us

25  to have continuous monitoring of this pressure. Umm

```
 1              --- yes, go ahead.

 2   Q    Doctor Odetola, if you'd tell the Jury when she

 3        returned to the ICU and you found that her pressures

 4        were in the fifties (50's) and sixties (60's), what

 5        treatment did you do at that time?

 6   A    We continued all the treatments that we had been

 7        providing her.   Umm --- the other medication I added

 8        to the mix here, she'd actually received a dose of

 9        that earlier in the day was three percent (3%)

10        saline.

11   Q    What does three percent (3%) saline do?

12   A    Three percent (3%) saline essentially helps us as an

13        adjunct to try to reduce elevated pressure within the

14        head.

15   Q    Was that --- did you have any success with that?

16   A    We did not.

17   Q    Were there any other medications or procedures that

18        you attempted to try to reduce that pressure to the

19        brain?

20   A    The --- the medications she was on were essentially

21        continued and titrated.

22   Q    What does titrated mean for those of us who aren't

23        doctors?

24   A    Titration essentially means you try to fine tune the

25        dose of medication's effect.   And once you have
```

46

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1            elevated pressures within the skull you try to

 2            actually keep things quiet.   What I mean by that is

 3            the brain doesn't see anymore perturbation.   So the

 4            things we did in this instance was to make sure that

 5            she was well sedated.   She wasn't agitated in

 6            anyway.   That we did not have a seizure, correction,

 7            that there was no seizure activity.   That she did

 8            not have a fever and that her blood pressure was

 9            adequate.

10   Q        And was there any seizure activity?

11   A        No.

12   Q        Did she have a fever?

13   A        No.

14   Q        And was her blood pressure adequate?

15   A        Yes.

16   Q        Did there come a point when you considered other

17            procedures for Madison?

18   A        Yes.

19   Q        What other procedure did you consider?

20   A        We --- we --- had to start a blood pressure medicine

21            at a point called Epinephrine.

22   Q        Why did you have to do that?

23   A        The reason was as time progressed on the first going

24            into the second of December, there was sustained in

25            this region the pressure within the head.   And for
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1     us to be able to be reassured that we were providing

2     blood flow to the brain, we had to keep the blood

3     pressure at normal or slightly higher.   Because then

4     we were competing with severely elevated pressure

5     within the head.   And this number is known as the

6     cerebral perfusion pressure.   Umm --- to --- to

7     essentially make sure that we were getting blood flow

8     to the brain.   So we started that.

9  Q  And when approximately was the start of that?

10 A  I can't give you an exact time but it was probably

11    the earlier of the second.   Sometime in the earlier

12    of the second.

13 Q  Were there any other procedures that you considered

14    at that point?

15 A  Yes.   Yes.

16 Q  What was that?

17 A  Decompressive craniectomy.

18 Q  What is that?

19 A  Decompressive craniectomy is essentially removal of a

20    bone flap from the skull to allow expansion of a

21    swollen brain to continue.

22 Q  And uh --- did you have discussion with the parents

23    about that procedure?

24 A  Yes.

25 Q  And did the parents make a decision as to whether or

48

```
 1              not that procedure should be done?

 2    A    Umm --- yes they did.

 3    Q    And what was the decision.

 4                   MR. WHITE:   I ask that he designate as

 5              to the parent.

 6                   THE COURT:   Okay.

 7                   MS. POPE-STARNES:   May we approach

 8              please?

 9                   THE COURT:   Go ahead.   You can

10              approach.

11              (Whereupon a discussion was held at the Bench out of

12              hearing of the Jury and the Court Reporter.)

13                              * * *

14    Q    (By Ms. Pope-Starnes, continuing)   Who was present

15              when you spoke to them?

16    A    The neurosurgeon.

17    Q    And was the mother present?

18    A    Yes.

19    Q    Was the father present?

20    A    Yes.

21    Q    Okay.

22              Did the mother tell you whether or not she

23              wanted the craniectomy done?

24    A    Specifically I can't recall that.

25    Q    Do you recall whether or not they were in agreement
```

49

1     about the decision?

2  A    No.   I can't speak to that.

3  Q    Were you ever requested to do a craniectomy?

4  A    No.

5  Q    Was one done?

6  A    No.

7  Q    At that point Doctor Odetola, did you recommend that

8     procedure for Madison?

9  A    Yes.

10  Q    Why?

11  A    We had, correction, clinically it was evident at the

12     bedside that the --- the elevated pressure within the

13     head was not responding to medical therapy.  In that

14     instance the options that I had at that point were to

15     continue all the medical treatment that we were

16     offering or also to include decompressive craniectomy

17     as essentially a last ditch effort to control the

18     elevated pressure in the head.

19  Q    Now have you treated patients in the intensive care

20     unit or children that have had a craniectomy done?

21  A    Yes.

22  Q    Is doing a craniectomy a guarantee that this will

23     reduce the pressure and that the child will survive?

24  A    No.

25  Q    Are there risks to the craniectomy?

50

1   A    Yes there are.

2   Q    What are the risks?

3   A    A trip to the operating room in a child who is

4        already on a blood pressure supportive medication,

5        the risk of bleeding.  Anesthetic risks would be

6        considered in this kind of decision.

7   Q    At that point when the craniectomy was discussed, did

8        you already have concerns that there would have been

9        permanent brain damage to Madison?

10  A    Yes.

11  Q    Why?

12  A    Progressive of the time from the first until the

13       third umm --- was a series of clinical findings at

14       the bedside.  And as a clinician essentially rely a

15       lot on whatever is seen at the bedside.  And in her

16       treatment with all the different medications that we

17       were giving her, apart from all the technology at the

18       bedside, including the breathing machine and all the

19       medications we were giving to control this pressure

20       within the head, we were not successful.

21       Correction, I wasn't successful in correcting or

22       reducing the elevated pressure within her brain.

23          I also had to then consider the findings on

24       repeat images of her brain.

25  Q    What type of images?

51

1 A So she had, coming in she had had a CT scan of the

2   head done.  She also had an MRI of the brain done.

3   And  a follow-up CT scan done on the second.  So we

4   at least had three different sets of images.  And

5   what was really concerning to me apart from what I

6   could elicit at the bedside was the extent of injury

7   on the imaging of the brain.

8    Going also through the second of December into

9   the third, I also saw evidence of loss of some of the

10   findings that I had on the first.

11 Q Which findings are those?

12 A So I --- I noticed on clinical exam that certain

13   reflexes were no longer being observed on her

14   neurological exam.  And when I see that, I

15   specifically mean umm --- what are known as brain

16   stem reflexes.  So at the bedside we try to elicit

17   certain findings in her.  We try to find what is

18   known as a corneal reflex.  We essentially stimulate

19   the cornea the eye umm --- to see if we can

20   actually get twitching of the eyelids.  By the

21   third, I could not elicit that on the left side.  I

22   could get it on the right side partially.

23    I also had gone from an exam on the first where

24   she actually had her react to touch on her

25   extremities to one in which I essentially could not

52

1    elicit that on the third, late on the third.

2  Q  So there was no response on the third?

3  A  No.  Putting that in context with all the other

4     essentially intensive therapies that we were offering

5     was really worrisome to me.

6  Q  If a craniectomy had been done and her life had been

7     preserved ---

8              MR. WHITE:  (Interposing)  Your Honor,

9     just ---

10             THE COURT:  (Interposing)  Just let her

11    --- let her finish the question.

12             Hold on, on an answer.

13             Go ahead Counsel.

14  Q  **(By Ms. Pope-Starnes, continuing)**  If a craniectomy

15    had been done and you'd been able to maintain her

16    life, would you have been able to guarantee that

17    there wasn't any permanent brain damage?

18             THE COURT:  Hold on Doctor.

19             MR. WHITE:  My objection is it's

20    speculative.  The form of the question is improper

21    because it suggests an answer that is not --- it's

22    not something that he's testified to so it's leading.

23    So the form of the question is improper too.  Its

24    asking him to speculate and asking him to comment

25    about a fact not in evidence.

53

1        MS. POPE-STARNES:   He has been qualified

2    as an expert which under the rules of evidence allows

3    him to give his opinion as an expert witness Your

4    Honor.

5        THE COURT:   A couple more foundational

6    questions and then I'll respectfully --- well let me

7    hear the --- sustain at this time.   You can ask some

8    foundational questions about whether or not he has

9    the training to be able to answer that question.

10   Q    **(By Ms. Pope-Starnes, continuing)**   Doctor have you

11   treated patients before who have had craniectomies?

12   A    Yes.

13   Q    And in the course of doing that have you seen the

14   results of those craniectomies?

15   A    Yes.

16   Q    Have you had patients who have passed away after

17   having a craniectomy?

18   A    Yes.

19   Q    Have you had patients who have lived after having a

20   craniectomy?

21   A    Yes.

22   Q    And have you been able to observe from the patients

23   that lived whether or not any of them suffered

24   permanent brain damage?

25   A    Yes.

54

1    Q    In Madison's case do you have an opinion about

2         whether or not she would have still suffered

3         permanent --- whether she would have suffered

4         permanent brain damage if a crainiec --- craniectomy

5         had been performed?

6                   MR. WHITE:   I believe that's been asked

7         and answered Judge.

8                   THE COURT:   I'll allow it.

9                   THE WITNESS:   My opinion on that based

10        on the severity of the brain injury was that there

11        would be long-lasting, essentially long-lasting

12        sequelae from the injury.

13   Q    **(By Ms. Pope-Starnes, continuing)**   Sequelae?

14   A    Yes.

15   Q    What does that mean?

16   A    Essentially after effects from that injury.

17   Q    Now Doctor Odetola umm --- after there was a decision

18        not to do the craniectomy were there any other

19        procedures that you were able to do?

20   A    No.

21   Q    And did there come a point when Madison passed away?

22   A    Yes.

23   Q    When was that?

24   A    That was on the fourth of December, two thousand and

25        six (2006).

                              55

1   Q   Now you began in your testimony talking about the

2        priorities, infection, trauma to the brain.  Were

3        you able to rule out infection?

4   A   Yes.

5   Q   How were you able to do that?

6   A   On --- on insertion of the intracranial pressure

7        device, the neurosurgeons actually took samples of

8        spinal, cerebral spinal fluid.  And this was tested

9        essentially for viruses and bacteria.  And this came

10        back negative for those.  Umm --- we also did not

11        have any bacteria growing in other body fluids like

12        urine or blood.

13   Q   The testing that you had done, well let me ask you

14        this.

15        Are you familiar with something called MRSA?

16   A   Yes.

17   Q   Okay.

18        The testing that you had done and the testing

19        that was done from the cerebral spinal fluid, the

20        urine and her blood, would any of that testing have

21        indicated whether or not Madison was suffering from

22        MRSA?

23   A   Yes.

24   Q   And did any of it indicate that she was suffering

25        from MRSA?

56

```
 1    A     No.

 2    Q     Did you have ultimately after doing the tests and

 3          treating Madison and consulting with specialists, did

 4          you also come to a conclusion as to your diagnosis in

 5          regards to Madison?

 6    A     Yes.

 7    Q     What was that?

 8    A     Severe brain injury of a nonaccidental nature.

 9                 MS. POPE-STARNES:   May I have just one

10          moment Your Honor?

11                 THE COURT:   You may.

12          (Whereupon a brief delay was had.)

13                          *  *  *

14                 MS. POPE-STARNES:   Thank you.   I have

15          no other questions.

16                 THE COURT:   Mr. White.

17                      CROSS-EXAMINATION

18    BY MR. WHITE:

19    Q     Doctor, my name is Robert White.

20          What is hypertension?

21    A     Hypertension is elevated blood pressure.

22    Q     And what can happen with hypertension?   What

23          happened with, specifically, did Madison have

24          hypertension?

25    A     No.
```

57

```
 1   Q    Is there a difference between hypertension and

 2        hypertensive?

 3   A    Hypertensive essentially describes the existence of

 4        hypertension.

 5   Q    So I'm looking at your notes and it says, 'Patient is

 6        also hypertensive.'

 7             Do you recall that?

 8   A    Hypertensive.  I just as a part of clarification ---

 9   Q    (Interposing)   I'm asking do you recall that?

10             MS. POPE-STARNES:   Well I'm going to

11        object.   It's a mischaracterization.   I'd ask that

12        he be allowed to look at his notes.

13             THE COURT:   Mr. White.   Go ahead.

14        What?

15             MR. WHITE:   It's not a

16        mischaracterization.   He hasn't asked to look at his

17        notes.   I asked him if she was hypertensive,

18        hypertension.   He said, 'No.'   Hypertensive is just

19        another term.   I said, 'I'm looking at his notes and

20        it says, 'Peso (sic) --- patient is also

21        hypertensive.'

22             THE COURT:   What's the question?

23   Q    (By Mr. White, continuing)   My question is umm ---

24        is that what your note says?   Want to look at it?

25   A    If you don't mind my asking, what date was that?
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

| | | |
|---|---|---|
| 1 | Q | The way I read it Doctor it looks like it's twelve |
| 2 | | two (12/2). |
| 3 | A | Twelve two (12/2). |
| 4 | Q | I'm having a little difficult time reading your notes |
| 5 | | from twelve one (12/1) and twelve two (12/2). |
| 6 | A | Okay. |
| 7 | Q | Do you remember?   Does this refresh your |
| 8 | | recollection? |
| 9 | A | I took care of her for a period of three days.   And |
| 10 | | during that period I would do several examinations. |
| 11 | Q | My question is, 'Does this refresh your |
| 12 | | recollection?' |
| 13 | | THE COURT:   Well --- |
| 14 | **Q** | **(By Mr. White, continuing)**   (Interposing) Do you |
| 15 | | want to look at your notes? |
| 16 | A | Yes. |
| 17 | Q | Okay. |
| 18 | | Did you bring any of them today? |
| 19 | A | Yes.   Excuse me.   Thank you. |
| 20 | | MS. POPE-STARNES:   While the Doctor is |
| 21 | | looking Your Honor, I'm going to object to the |
| 22 | | foundation of the question.   The Doctor has |
| 23 | | testified over a period of days.   He's testified |
| 24 | | about different things at different times.   And |
| 25 | | there's no foundation as to when he is talking about. |

59

1          So I object to the form of the question and its

2          having an improper foundation.

3                    THE COURT:   The question is, 'Whether or

4          not the word hypertensive is contained in any of his

5          reports', Mr. White?   Or is that a misstatement of

6          what the question was?

7                    MR. WHITE:   Well my question was, 'Was

8          she hyperten --- did she have hypertension.'

9                    THE COURT:   Well ---

10                   MR. WHITE:   (Interposing)   Is

11         hypertension the same thing ---

12                   THE COURT:   (Interposing)   Then let's

13         start fresh because I thought that you were asking

14         whether a word is contained in the document.   So let

15         me --- let's start fresh.   Ask --- ask a question.

16                   MR. WHITE:   Of you or him?

17                   THE COURT:   No.   Of him and then I'll

18         decide if it's objectionable or not.

19                   MR. WHITE:   Okay.

20             I want to give him a chance to review his notes.

21                   THE COURT:   Okay.

22             Go ahead.   Continue.

23    Q    **(By Mr. White, continuing)**   Doctor have you had a

24         chance to review your notes?

25    A    Yes I have.

60

1    Q    And how many entries do you have in your notes

2         regarding Madison?

3              How many different entries?

4    A    Starting from the first, three.

5    Q    And if I'm correct, it's one on December first and

6         two on December second?

7    A    The --- no, that's not correct.  The second there

8         was a note timed six-forty-five am (6:45am).  And

9         the second note on the second that I signed off at

10        six o' three pm (6:03pm).  There's a third note.

11        This was on the third of December that I signed off

12        at seven-thirty-eight pm (7:38pm).

13   Q    So there's nothing on December first then?

14   A    No.

15   Q    Maybe I misunderstood your testimony but did you not

16        see her on the first?

17   A    Yes.  The --- yes, I did.

18   Q    Okay.

19             So she was admitted the evening prior, November

20        thirtieth (30th)?

21   A    Mm-hmm.

22   Q    And you saw her in the morning on your normal shift?

23   A    Yes.

24   Q    On December first, but you didn't make any entries in

25        your notes until December second?

61

1    A    That's right.

2    Q    Okay.

3         Now after looking at your notes regarding your

4         entries now my question was, 'Was Madison

5         hypertensive.'

6              THE COURT:    Go ahead.

7              MS. POPE-STARNES:    Objection.

8         Foundation as to when.

9    **Q**    **(By Mr. White, continuing)**    At anytime that you saw

10        her.

11   A    Yes.    Can I go on?

12   Q    Well I guess that answered my question.

13        In fact you made several findings of

14        hypertension with Madison, correct?

15   A    There's a note on the second.

16   Q    There's one that says, 'Over the past sixteen (16)

17        hours Madison has has --- Madison has had sustained',

18        I'm reading it just the way it is, 'Has had sustained

19        severe medically dash refractory intracranial

20        hypertension.'

21        Did you find that?

22   A    Mm-hmm.

23   Q    That's your statement, correct?

24   A    Yes.

25   Q    Okay.

62

```
 1              And then also a December second note that says
 2         after the entries regarding the ICP being greater
 3         than twenty (20), 'And patient was also
 4         hypertensive', correct?
 5    A    Yes.
 6    Q    And hypertension responded to Fentanyl and Ativan,
 7         correct?
 8    A    Yes.
 9    Q    Now what was happening to her was her brain was
10         swelling, correct?
11    A    Yes.
12    Q    Cutting off blood.   It's a vicious cycle at this
13         point, is it not?
14    A    Could be.
15    Q    Could be.
16              The pressure is mounting because the brain is
17         swelling, pushing against the skull?
18    A    That's right.
19    Q    This intracranial pressure that you were unable to
20         reduce in any significant degree?
21    A    That's right.
22    Q    In fact, by the time you put the ICP in when it was
23         greater than twenty (20), by the time you get her
24         back up to the room, or she was back I should say
25         more appropriately, it had more than doubled,
```

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      correct?

2  A   Yes.

3  Q   Okay.

4          What is happening when the pressure is elevating

5      from a critical level to almost double?   What's

6      happening Doctor in Madison's brain?

7  A   I would --- I would sort of have to speculate on

8      that.

9  Q   Well medically from your perspective Doctor.

10 A   Medically it means that the brain is swelling

11     significantly.

12 Q   The brain is swelling?

13 A   Yes.

14 Q   The brain is swelling and it's becoming more and more

15     critical?

16 A   Yes.

17 Q   Isn't that a true statement?

18 A   Yes.

19 Q   Now you said you discussed a craniectomy with the

20     parents, right?

21 A   Yes.

22 Q   You recommended the procedure, correct?

23 A   In consult with the neurosurgeon.

24 Q   And someone said, but you can't remember who, that it

25     was not a good idea.   They did not approve.   One of

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          the parents, correct?

2     A    Yes.

3     Q    Okay.

4          And no steps were taken to try to do anything

5          further regarding performing a craniec ---

6          craniectomy on the child, correct?

7     A    On the second of December I actually documented that

8          there were two medians.  The neurosurgeon and me

9          being present discussing that option of decompressing

10         the brain.

11    Q    So you discussed it with the parents two separate

12         times?

13    A    Yes.

14    Q    Okay.

15         And is it your testimony on both occasions one

16         or both of the parents declined a craniectomy?

17    A    Yes.

18    Q    Okay.

19         Now Doctor, being in pediatric intensive care

20         and working with critically ill children, uh --- you

21         have to consult with parents on a regular basis,

22         correct?

23    A    Yes.

24    Q    And uh --- if you disagree with a parent's decision

25         that's not the end of the inquiry is it?

65

1   A    Every single case is taken individually.

2   Q    Okay.

3          But there's another step that you could take if

4          you firmly believe that surgical intervention or

5          another medical procedure should be undertaken,

6          correct?

7   A    Yes.

8   Q    And that's to turn it over to your legal department,

9          correct?

10  A    In some cases.

11  Q    To get --- to actually file proceedings to get a

12         Court order to compel this type of proceeding, this

13         surgery, correct?

14  A    Yes.

15  Q    That's available to you?

16  A    Yes.

17  Q    Okay.

18         And this was not done in this case, was it?

19  A    No.

20  Q    Now when you talked --- when you answered the

21         Prosecutor's question about when Madison passed away,

22         you said, 'December fourth', correct?

23  A    That's right.

24  Q    Now Madison didn't pass away naturally did she?

25  A    I wasn't --- I wasn't present then.

```
 1   Q      He wasn't present.

 2          But your records show that life support was

 3          withdrawn, isn't that true?

 4   A      In the records, yes.

 5   Q      Okay.

 6          And mother authorized a withdrawal of life

 7          support, isn't that true?

 8   A      As per the records, yes.

 9   Q      Okay.

10          Now you did a physical exam of Madison true?

11   A      I'm sorry.  I didn't hear.

12   Q      I'm sorry.  I'm sorry.

13          You did a physical examination of ---

14   A      (Interposing)   Several.

15   Q      (Continuing)   Madison?

16          Okay.

17          As far as examining her body, you found nothing

18          unusual, isn't that a true statement?

19   A      No, it's not.

20   Q      You did find something unusual in examining her body?

21   A      Over time, yes.

22   Q      What did you find?

23   A      So the exam, the initial exam, did not show any

24          abnormalities.   Essentially the findings ---

25   Q      (Interposing)   I'm sorry.   Did not show any what?
```

67

1    A    Any abnormalities.   The initial exam I did on the

2         morning of the first.   There were several exams done

3         essentially to gauge response to therapy.

4         Essentially to all the treatments that we had given

5         her.   The exam itself changed between the second and

6         the third of December where I no longer had some of

7         the findings that I had on the first.

8    Q    I'm sorry.   You must have misunderstood the

9         question.   When you examined her body, her let's say

10        her exterior extremities, did you find any bruises?

11   A    No.

12   Q    Did you find any cuts?

13   A    No.

14   Q    Okay.

15        Did you find anything of a concerning nature

16        with a possibility of nonaccidental injury?   Any

17        external examination of the child?

18   A    No.

19   Q    Including the head, any finding of external

20        nonaccidental injury?

21   A    No.

22   Q    In fact, your testimony is there was no lesions on

23        the child, right?   Is that your testimony?

24   A    On the exterior, yes.

25   Q    Okay.

68

1    In fact, there were, were there not?

2    A    (No verbal response.)

3    Q    On the head of the child?

4    A    To --- to correlate with nonaccidental injury?

5    Q    No.

6         Any lesions?

7    A    I mean --- I can --- I can essentially --- I mean as

8         per my recollection she had cutis aplasia, yes.

9    Q    Right.   She had it.

10        MS. POPE-STARNES:   I'm going to object.

11   It's a mischaracterization of his testimony.   He

12   said that she had cutis --- she had this condition.

13   Counsel is arguing with him.   The lesions, the

14   Doctor is testifying to something different.

15        THE COURT:   In fairness the question

16   was, 'Were there any outward signs on her head'.

17        MS. POPE-STARNES:   No.   The questions

18   were --- was, did she have any lesions.   He's not

19   asking what the word lesions means to him.   The

20   Doctor's testified that she had this condition.

21        THE COURT:   Then Doctor, the question

22   that was put to you, 'Were there any lesions'?

23        THE WITNESS:   Not that I could observe.

24        THE COURT:   Okay.

25   Q    **(By Mr. White, continuing)**   So you wouldn't classify

69

1    the aplasia cutis congenita that was on her head as a

2    lesion?

3  A    No.

4  Q    Now you said your diagnosis was that it was severe

5    head injury nonaccidental.   Doctor, please explain

6    to the Jury what that --- what that diagnosis was

7    based upon?

8  A    Yes.   Umm --- and to sort of make that simple, I

9    essentially brought together a number of findings.

10    So clinical findings at the bedside.   Treatment.

11    All the laboratory tests that were done.   And the

12    most worrisome findings were essentially what I saw

13    in the images of her brain.   The CT showed

14    collection of blood between the brain and the skull.

15    The MRI that was done later that day actually showed

16    extensive collections of blood and evidence of injury

17    to the brain with what was described as restricted

18    diffusion on the MRI which means a period of injury

19    related to a period of reduced blood flow and oxygen

20    to the brain.   Nonaccidental injury essentially

21    means simply put that you have an infant who has this

22    extent of injury that could not have been caused by

23    him or herself that is a nonaccidental injury.

24  Q    I'm sorry.   By what itself?

25  A    By him or herself.

70

1    Q    Oh I see.   By the child being him or herself.

2         So what you're saying is, you have extensive

3         head injury or brain injury?

4    A    Yes.

5    Q    No exterior injury to the skull?

6    A    Right.

7    Q    The interior injury that could not have been caused

8         by the child?

9    A    Yes.

10   Q    And you know from reviewing the MRI and this CAT scan

11        that there was both old and new blood?

12   A    That is true.

13   Q    Chronic and acute subdural hematomas in that child,

14        correct?

15   A    That is true.

16   Q    Okay.

17        And you know from reviewing the past MRI of

18        August thirty-first (31st), that child had a subdural

19        hematoma as of August thirty-first (31st), two

20        thousand and six (2006), isn't that true?

21              MS. POPE-STARNES:   Objection.   No

22        foundation.   There's been no testimony given to

23        review that.

24              MR. WHITE:   Let me rephrase that.

25   Q    **(By Mr. White, continuing)**   Did you review the

71

| | | |
|---|---|---|
| 1 | | August thirty-first (31st) MRI? |
| 2 | A | The report of it. |
| 3 | Q | Then you know that the child had blood products on -- |
| 4 | | - in the subdural space on August thirty-first |
| 5 | | (31st), two thousand and six (2006), correct? |
| 6 | A | No. |
| 7 | Q | You didn't know that? |
| 8 | A | I would defer to the radiologist who specializes in |
| 9 | | that field of reading images of the brain. |
| 10 | Q | Okay. |
| 11 | | But you've read the report, right? |
| 12 | A | Yes. |
| 13 | Q | And the indication in the report was at least that |
| 14 | | there was blood products or a lipoma, correct? |
| 15 | A | The --- that was the report that there was the |
| 16 | | possibility of a lipoma or some other lesion that |
| 17 | | needed to be correlated clinically. |
| 18 | Q | Okay. |
| 19 | A | That was in the report. |
| 20 | Q | And did this cause you any concern when you were |
| 21 | | making your diagnosis that possibly as early as |
| 22 | | August thirty-first (31st) of two thousand six (2006) |
| 23 | | that the child may have had a hematoma in the |
| 24 | | subdural space? |
| 25 | A | I --- I did not --- I was concerned not based on that |

72

1   MRI or CT in August but more with the most recent

2   that actually showed collection of blood or hematoma,

3   as you said, of different ages. Even from the MRI

4   done on the second of December.

5 Q The fact of the collection of blood of different

6   ages, does that in and of itself, mean it's not

7   accidental injury in your mind?

8 A In itself in my mind means that whatever this is, is

9   of a repetitive nature.

10 Q Okay.

11   So --- and did you make a determination how old

12   that chronic subdural hematomas were?

13 A I did not.

14 Q Okay.

15   Could it be done in your mind?

16 A By a neuroradiologist.

17 Q Did it concern you Doctor that Madison could have a

18   chronic subdural hematoma that became symptomatic on

19   November thirtieth (30th), two thousand six (2006)?

20 A No.

21 Q Now the fact that a person has retinal hemorrhages

22   means that the brain is swelling causing pressure to

23   the veins around the eyes, correct?

24 A No.

25 Q That's not what it means?

73

1    Not an increase in venous pressure around the

2    retina?

3  A   I --- I once again would defer to ophthalmologists

4    and neuro-ophthalmologists in terms of interpretation

5    on that.   From my training and from my experience

6    the occurrence of retinal hemorrhages and

7    intraretinal hemorrhages and holding onto the fact

8    that I already had evidence of collection of blood

9    between the brain and the skull, essentially to me

10   means shearing injury.

11 Q   Essentially means that she was a shaken-baby?

12 A   I wouldn't say that.   I would say essentially that

13   there was --- there had to have been some kind of

14   shearing force applied to her.

15 Q   Okay.

16   What do you mean shearing force?   Please

17   explain that to the Jury.

18 A   The --- the space between the brain and the skull is

19   known as the subdural space.   There's several layers

20   of cover there or coverings of the brain.   So you

21   have what is known as the pia mater, the arachnoid

22   mater and the dura mater.   Between the dura mater

23   and the skull we have that subdural space.   Bridging

24   that space are these blood vessels.   And the only

25   way you can have blood go from within the blood

74

```
 1            vessels between the brain and the skull is for breach
 2            of the vessels to occur.  And it's usually because
 3            of some kind of shearing of the blood vessels, of
 4            these bridging veins.
 5   Q        Okay.
 6                 My question is, again, what do you mean by
 7            shearing, S H E A R I N G?   Shearing, what does that
 8            mean?
 9   A        Essentially it means you have some kind of a force
10            that moves you in a certain direction.   When you
11            have a fixed structure that essentially moves in a
12            reverse direction so you have shearing across that
13            structure.
14   Q        Acceleration, deacceleration (phonetic) forces.
15   A        That could be an analogy.
16   Q        Okay.
17                 Would the diffuse absolve an injury to you?
18   A        From the MRI?
19   Q        Yeah.
20   A        Once again I would defer to the neuroradiologist in
21            terms of that evaluation.
22   Q        Was Madison suffering from global hypoxic ischemia?
23   A        That was --- that was ---
24   Q        (Interposing)   It's a 'Yes' or 'No' question.
25   A        That is not something I can interpret from the
```

75

1        bedside findings.

2    Q   Well you reviewed the records in the case correct?

3    A   Yes.

4    Q   All the MRI's, the radiological tests, correct?

5    A   Yes.

6    Q   All the skeletal surveys, everything that was done in

7        this case.   That's part of your job, correct?

8    A   Yes.

9    Q   Okay.

10        And wasn't there a finding of global hypoxic

11       ischemia, isn't that true?

12   A   Yes.

13                  MR. WHITE:   Nothing further.

14                  THE COURT:   Counsel?

15                  **REDIRECT EXAMINATION**

16   **BY MS. POPE-STARTNES:**

17   **Q**  Doctor Odetola, can you explain to the Jury why you

18       didn't go to the legal department and ask for legal

19       action to be taken to force the craniectomy?

20   A   I was --- I was essentially dealing with a situation

21       that would reflect all the different treatment

22       options that I offered.   Umm --- and in that

23       situation I knew the next step would have to be a

24       very invasive step where this procedure could be

25       attempted to try to control the elevated pressure or

76

1       intracranial hypertension in this case.  Umm --- the

2       data out there in terms of scientific --- scientific

3       evidence for decompressive craniectomy in adults and

4       children who suffer trauma to the head isn't

5       conclusive.  In this instance it would really

6       require consent, informed consent,  from the parents

7       for one to be able to have this child undergo this

8       procedure.

9           I was also facing a situation where the

10      pressures in the brain essentially were going up, up,

11      up.  And I was trying to keep up with her blood

12      pressure to try and get some blood flow to the head.

13      And I knew that if I wasn't able to control that

14      pressure outcomes would be very bad.  That the

15      prognosis would be very, very grave.

16          Why didn't I proceed with talking with the legal

17      team?  The fact that this was going to be a very

18      invasive procedure without huge scientific evidence

19      for benefit.

20  Q   Now at the point that Madison was removed from life-

21      support does your hospital have a protocol that has

22      to be followed in order to do that?

23  A   Yes.

24  Q   What is that protocol?

25  A   According to most things, criteria has to be

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1      satisfied for one to be able to withdraw support,

2      life-support technology.  We would have to make sure

3      that the blood-pressure was normal for age or

4      appropriate for age.  We had to make sure --- we

5      would have to make sure, correction, it would be

6      important to also make sure that her body temperature

7      was normal, within normal range.  That she wasn't --

8      - she didn't have in her system medications that

9      might blunt the ability to breathe.  Those would

10     essentially be the criteria that we would need to

11     fulfill prior to discontinuing support.

12  Q   And based upon your records when Madison was removed

13     from life-support did she meet those criteria?

14  A   Yes.

15  Q   And then following the removal from life-support was

16     Madison able to sustain life on her own?

17  A   Per the report, no.

18  Q   Thank you.

19          MS. POPE-STARNES:   I have no other

20     questions.

21          THE COURT:   Mr. White, anything further?

22          MR. WHITE:   No further questions Your

23     Honor.

24          THE COURT:   Thank you Doctor.   You're

25     all set.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1                    Counsel approach.

2     (Whereupon a discussion was held at the Bench, out of

3     hearing of the Jury and the Court Reporter.)

4                    * * *

5            THE COURT:   Ladies and Gentlemen, we

6     have no additional witnesses for today.  Tomorrow

7     morning should be eight-thirty (8:30) and we'll be

8     going all day.  Please remember don't discuss the

9     case.  Thank you.

10          THE CLERK:  All rise for the Jury.

11    (Whereupon the Jury was returned to the Jury room.)

12                 * * *

13         THE COURT:  You may all be seated.

14      The record will reflect that the Jury is

15    excused.  Just scheduling.  Do we need anything for

16    the record as far as either of you are concerned?

17         MS. POPE-STARNES:  No I don't think so.

18         MR. WHITE:  Yes.  I do if I may.  I

19    would like is Kevin Schuldt going to testify

20    tomorrow?

21         MS. POPE-STARNES:  Yes.

22         MR. WHITE:  Then I will not subpoena him

23    tonight.

24         THE COURT:  Okay.

25         MR. WHITE:  All right?

1        THE COURT:    All right.    Good enough.

2    Okay then we'll --- I'll just diplomatically tell the

3    Jury scheduling wise that we'll end for the day and

4    we'll proceed tomorrow at eight-thirty (8:30)

5    tomorrow and go to it that way.    How does that

6    sound?

7        MR. WHITE:    Sounds good.

8        THE COURT:    Thank you everyone.    Have a

9    good evening.

10    (Whereupon the matter was concluded for this day.)

11                    *  *  *

80

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

        I, Barbara Reznick, Court Reporter, do hereby certify that the foregoing pages comprise a full, true, and correct transcript of the proceedings had In the Matter of McBurney before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on February 27, 2008.

_____

Barbara Reznick,  CER 1333

1200 N. Telegraph, Pontiac, MI. 48341

248) 858-5841

81