

STATE OF MICHIGAN

IN THE SIXTH JUDICIAL CIRCUIT COURT, COUNTY OF OAKLAND

THE PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff,

VERSUS –            File No. 2007-214651-FC

STEVEN LINSEY MCBURNEY,

    Defendant,

_____/

**OAKLAND COUNTY** 07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY.STEV

BY: DEPUTY COUNTY CLERK / OAKLAND COUNTY CLERK / 2008 AUG 14 A 11: 24 / RECEIVED FOR FILING

**TRIAL**

    Proceedings had in the above-entitled

matter, held before the **HONORABLE DANIEL PATRICK**

**O'BRIEN,** Judge of the Sixth Judicial Circuit Court

for the County of Oakland, Michigan on Thursday,

February 28th, 2008 7th day.


APPEARANCES:


SARA POPE-STARNES
Assistant Prosecuting Attorney

    Appearing on behalf of the People

ROBERT WHITE
Attorney-at-Law

    Appearing on behalf of the Defendant

Lynn E. Erickson, Court Reporter, CSR-0188

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

# I N D E X

WITNESSES:                                          PAGE

    **FOR THE PEOPLE:**

CRAIG JOHNSTON:

  DIRECT EXAMINATION, BY MS. POPE-STARNES    5
  CROSS-EXAMINATION, BY MR. WHITE    12
  REDIRECT EXAMINATION, BY MS. POPE-STARNES    21

 KEVIN SCHULDT:

  DIRECT EXAMINATION, BY MS. POPE-STARNES    22
  CROSS-EXAMINATION, By MR. WHITE    35
  REDIRECT EXAMINATION, BY MS. POPE-STARNES    44

CHRISTOPHER SOVIK:

  DIRECT EXAMINATION, BY MS. POPE-STARNES    46
  CROSS-EXAMINATION, BY MR. WHITE    76
  REDIRECT EXAMINATION, BY MS. POPE-STARNES    112
  RECROSS-EXAMINATION, BY MR. WHITE    115

    **FOR THE DEFENSE:**

KEVIN SCHULDT:

  DIRECT EXAMINATION, BY MR. WHITE    117
  CROSS-EXAMINATION, BY MS. POPE-STARNES    119

LYNN PETERSON:

  DIRECT EXAMINATION, BY MR. WHITE    121
  CROSS-EXAMINATION, BY MS. POPE-STARNES    128

SHARON KLUMP:

  DIRECT EXAMINATION, BY MR. WHITE    131
  CROSS-EXAMINATION, BY MS. POPE-STARNES    136

GARY LINBILLE:

  DIRECT EXAMINATION, BY MR. WHITE    138
  CROSS-EXAMINATION, BY MS. POPE-STARNES    144

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

6TH Judicial Circuit Court

County of Oakland, Michigan

Thursday February 28th, 2008

(7th day)

\* \*

THE CLERK: All rise. The Honorable Daniel Patrick O'Brien presiding.

THE COURT: Be seated everyone. Thank you.

Go ahead.

THE CLERK: The Court calls People Versus Steven McBurney, docket number 2007-2 1 4 6 5 1-FC.

MS. POPE-STARNES: Sara Pope-Starnes, your Honor, appearing on behalf of the People.

THE COURT: Good morning.

MR. WHITE: Robert White, on behalf of the Defendant McBurney.

We are ready.

THE COURT: Thank you, good morning, everyone, have a seat.

And are we ready to proceed, then?

MS. POPE-STARNES: Yes.

THE COURT: That railing is --- I don't know if that matters, but ---

And, the next witness is here and ready?

All right. Jeff, you can bring in the Jury.

(Whereupon the Jury was returned to the courtroom at 9:00 a.m.)

o * *

THE CLERK: All rise for the Jury.

THE COURT: Good morning.

Good morning, everyone.

THE JURORS EN MASSE: Good morning.

THE COURT: You may all be seated.

The record will reflect that the Jury is back.

And the record will also reflect that we have a new friend here, if you were wondering. Lynn Erickson, who is here today. Barb is a fair weather friend, she just split on me. I'm just kidding. She's working elsewhere, but Lynn's covering today.

Matter of fact, she has been --- I

won't say how long she has been here, but this is her old home back in the --- I won't say in the olden days.

The record will reflect, as I have indicated the Jury is back, the case has been called and Counsel's names have been noted for the record and we can resume.

Miss Pope-Starnes call the next witness.

MS. POPE-STARNES: We call Craig Johnston to the stand.

THE COURT: If you would approach this way, please. Raise your right hand and be sworn.

THE CLERK: **Do you swear the testimony you are about to give is the truth, so help you, God?**

THE WITNESS: **Yes.**

THE COURT: Thanks, have a seat there.

(Whereupon the witness was sworn at 9:10 a.m.)

\* \* \*

**C R A I G   J O H N S T O N**

**After having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:**

MS. POPE-STARNES: May I move the podium, your Honor.

THE COURT: You may.

MS. POPE-STARNES: Thank you.

### DIRECT EXAMINATION

**BY MS. POPE-STARNES:**

Q    Sir, while I am doing this, would you please state your name and spell your last name.

A    Craig Johnston, J O H N S T O N.

Q    Are you employed, sir?

A    Yes, I am.

Q    How are you employed?

A    I'm a Lieutenant with the South Lyon Fire Department, which is a purely on-call department. Also I work for Ford Motor Company full-time.

Q    How long have you worked for the South Lyon Fire Department?

A    Since 1993.

Q    And, what are your responsibilities there?

A    Lieutenant. I over-see training, I over-see vehicles and part of the command staff for operations.

THE COURT: Could you keep it up just a little bit louder, okay.

THE WITNESS: Okay.

Q **(By Ms. Pope-Starnes, continuing)** If I could direct your attention back to Thursday, November 30th, of 2006.

Do you recall if you responded to Scott Street on that day?

A Yes, I did.

Q Approximately what time did you respond?

A Mid-evening --- or early evening. I want to say it was around seven o'clock (7:00). I am not sure of the exact time.

Q Would you tell the Jury, please, of anything you observed when you arrived at that location?

A As I arrived, I arrived in my personal vehicle, our rescue --- our first responding rescue was arriving. Prior to me being there, there was two fire fighters in there just ahead of me.

Q Did you see them there?

A Yes. I was probably four feet behind them. As we entered there was a baby on the floor. And then there was a father probably halfway

between the baby and the kitchen talking on the phone.

Q    Would you recognize that person if you saw him again?

A    Yes, I would.

Q    I'm sorry, sir, you have to keep your voice up.

A    Yes. Yes, I would.

Q    You have to keep it up so the Defense Counsel can hear you and the very last Juror in the box can hear you, okay?

A    Okay.

Q    Thank you.

Can you tell us, please, if that person is in the courtroom today and if so, describe where they are located and what they are wearing?

A    Yes, they are. There in the defense, in the suit. The gentleman on the left.

MS. POPE-STARNES: Okay. May the record reflect that the Witness has identified the Defendant?

THE COURT: Any objection?

MR. WHITE: No objection, Judge.

8

Q    **(By Ms. Pope-Starnes, continuing)**  Can you tell us, please, what happened then?

A    Two fire fighters started treating on a child. And I immediately went to where the Defendant was.  He --- I told him I needed to talk to him and I started asking him questions at that point in time.

Q    Do you recall who your first responders were that started to work on the child?

A    Tim Wilson and David Johnston.

Q    What happened when you asked the Defendant --- what happened when you told the Defendant you needed to speak with him?

A    He got off the phone at that point in time.

Q    What happened then?

A    I asked him, I said, 'What happened?'

              He said he was feeding the baby.  He got --- left, went to the bathroom.  He pointed towards the south end of the house, and he said, when he came back the baby was almost in a seizure type activity.

              And that's when he started calling for 9 1 1.

Q    Were you able to observe the room that you were
     in where the baby was?

A    Yes.

Q    Did you observe anything in that room?

A    Um --- like I said, as we walked in the door the
     baby was directly ahead of us on the floor.
     Probably six feet in the door.   Then to the
     right of us was a couch, sort of dividing the
     living room to the way you walked in.

          In front of the couch there was a
     coffee table probably three foot square.   Just
     to the left of that there was a bouncy-chair.

Q    Where was that in the room?

A    That was just to the --- it was almost to the
     center of the room.  It was just to the left of
     the coffee table, which was farther in from the
     couch than what we were.

Q    And, what, if anything was the bouncy-chair
     seated on?

A    It was sitting on the floor.

Q    Did you observe anything else?

A    I believe there was a baby bottle about two feet
     in front of that on the floor.  Other than that
     nothing else.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Did you observe anyone else in the home besides
     the Defendant and the baby?

A    Just my two fire fighters that had already
     arrived.

Q    Now, you said that the baby was laying on the
     floor, I think you said about six feet inside
     the door.  Do you recall what direction the baby
     was lying?

A    The baby's head was towards the door, with the
     feet facing towards the kitchen.  Face up.

Q    What happened then, sir?

A    I asked the Defendant, at the time, because my
     two fire fighters were starting to treat ---
     trying ---  hey were suctioning it and
     administering oxygen I asked the Defendant if
     the baby had any medical history, was on any
     medications or had any allergies, which he
     stated 'No.'

Q    What happened then?

A    Right after that my second arriving vehicle, or
     squad showed up.  One of my fire fighters
     started doing paperwork.  HVA, the ambulance,
     Huron Valley Ambulance. arrived and basically
     decided it was a load and go situation.

MR. WHITE: Objection as to what the ambulance personnel decided.

THE COURT: Sustained.

Q **(By Ms. Pope-Starnes, continuing)** Please tell us what happened next after the Huron Valley ambulance personnel arrived?

A They came in and started taking over care of the infant, the child.

Q How long after they did that did they remain in the home?

A One to two minutes. I believe our total on time scene was --- it was like two to three minutes to arrive from the time we got the 9 1 1 call came in and within ten (10) to twelve (12) minutes from that time of our arrival we were back at our station. So the time was very quick. Everything went real fast.

Q How far away is your station from Scott Street?

A Probably three-quarters of a mile.

Q What did you observe minutes after the paramedics arrived?

A They immediately grabbed the patient, went to the ambulance. I sent one of my sergeants that was on my squad ---

Q      (Interposing)  Who was that?

A      Sergeant Schuldt.  He went in the back with the
ambulance and the fire fighter, Tim Wilson, that
was originally on our first rescue in drove the
ambulance in.

        MS. POPE-STARNES:  May I have just a
moment, please?

            THE COURT:  You may.

            (Whereupon a brief delay was had.)

    *   *   *

            MS. POPE-STARNES:  Thank you, sir.

        I have no other questions of this
witness, your Honor.

            THE COURT: Mr. White.

## CROSS-EXAMINATION

**BY MR. WHITE:**

Q      Lieutenant, my name is Robert White.  I have a
few questions, if you would, sir.

        Have you reviewed your run report
before you testified today?

A      I looked at it last week.

Q      Okay.  Tell me, if you can remember, isn't it
true that the dispatch, the 9 1 1 call, excuse

13

me, came at seven-nineteen (7:19) on November
30th?

A    I'm not sure of the exact minute.

Q    Would your report ---

A    (Interposing)   I know when I looked at it, it
said --- I looked at the times to see how long
it took us to get there and how long we were
there.

Q    Would your report refresh your recollection?

A    Yes, it would.

            MR. WHITE:  May I approach the
witness?

            THE COURT:   You may.

Q    **(By Mr. White, continuing)**  I belief I have it
all there (indicating).

A    Yes.

Q    All right.  The 9 1 1 call was at seven-nineteen
(7:19).

A    Right.

Q    November 30th.

            You're arrival was three minutes
later, at seven-twenty-two (7:22), isn't that
right?

A    Okay.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And the time of departure was what time?

A    It doesn't give us the time of departure, it gives us the time we were all cleared back in our station, both vehicles.

Q    So, the all clear is actually back at the station, not leaving the house?

A    Right.

Q    Okay. If I may --- I don't have any other questions regarding this. Thank you.

         Now, when you went in behind two fire fighters, and they immediately began engaging the baby, true?

A    True.

Q    And they suctioned him out, and immediately applying oxygen; correct?

A    Yes.

Q    Did you notice the child was having difficulty breathing?

A    Yes.

Q    And, what are agonal respirations?

         MS. POPE-STARNES: Objection, there is no foundation this witness knows, and I ask that a foundation be laid.

THE COURT: As to foundation,

sustained.

MR. WHITE: Okay.

Q     **(By Mr. White, continuing)** How long have you

been a fire fighter?

A     Thirty-one (31) years.

Q     Are you --- have you had licensed medical

training?

A     M F R.

Q     Pardon?

A     Medical First Responder.

Q     Okay. And, how long have you been licensed or

certified?

A     Twenty-five (25) years.

Q     Do you know what agonal respirations are?

A     I have a good idea.

Q     What are they?

A     Slow, difficult breathing. Almost snoring.

Q     And, was that the situation that was presented

on November 30th, approximately seven-twenty-two

(7:22), when you arrived?

A     It was slow breathing, yes.

Q    And, you said, Lieutenant, that after the fire

     fighters were rendering aid, you took the father

     to the side and asked him questions?

A    Yes.

Q    Okay.  About the child's medical history,

     medications, and any allergies?

A    Yes.

Q    And, according to you he said 'none.'

A    Correct.

Q    Isn't it true that he told you that the child

     had been sick all day?

A    No.

Q    Did you speak to Officer Sovik shortly after

     this incident?

A    I think it was the following day or two days

     later.

Q    Okay.  You spoke to him and you gave him an oral

     statement?

A    Correct.

Q    That --- about the circumstances of this run;

     correct?

A    That's correct.

Q    And, didn't you tell him that the father said

     that, 'The child had been sick all day.'?

A    I'm not sure.

Q    And, sir, didn't you provide a written statement in this case, also?

A    I'm not sure.  I --- I believe I did an oral statement.

Q    Okay.

        If I may approach?

        (Whereupon a discussion was had between the Court and a Juror.)

    *   *   *

        THE COURT:  Do you want a cough drop or anything.

        THE JUROR:  I have one.

        THE COURT:  You have one?  It's not working?

        THE JUROR:  It's not working.

        THE COURT:  Okay.  Anything else that I can get you?  Or smack her on the back once or twice.

        Okay.  You're all right, do you want to take a ---

        THE JUROR:  (Interposing)  Pardon me?

        THE COURT:  Do you need to take a

break or something, do you think?  I hate to ---

I know, but you're . . .

        THE JUROR:  I hate to stop everything.

        THE COURT:  I mean, but we have to

have you obviously focus, so if you ---

        THE JUROR:  (Interposing)  May I have

a break?

        THE COURT:  Sure.  Yeah, absolutely.

        Do you need a couple of minutes, we

can have everybody go on back, or do you just

want to sneak back there by yourself for a

minute.

        THE JUROR:  I can just run real quick.

        THE COURT:  Go right ahead.  Go ahead.

        Please all rise for the Juror.

        (Whereupon a brief delay was had while

        the Juror exited the courtroom.)

      * *

        THE COURT:  Thanks, you may all be

seated.

        The record will reflect that the Juror

is back and we are ready to proceed.

        Go ahead, Mr. White.

Q    **(By Mr. White, continuing)**  My question was, did
     you prepare a written statement in this case?

A    I don't remember.

Q    Okay.

          MR. WHITE:  If I may approach the
     witness, your Honor.

Q    **(By Mr. White, continuing)**  Look at this
     document and see if that refreshes your
     recollection?

          MS. POPE-STARNES:  I am going to
     object?

          I believe the appropriate question
     will be 'Do you recognize this?  Is this your
     statement?'  He said, 'He doesn't remember if he
     wrote.'

          THE COURT:  Yeah, true.  Fair enough.
     Have you ever seen that piece of paper before,
     sir?

          THE WITNESS:  Yes.  Yes.  Yes.

          THE COURT:  Okay.  Go ahead Mr. White.

Q    **(By Mr. White, continuing)**  Is that your written
     statement?

A    Yes, it is.

Q    Okay.  Is that your signature at the bottom?

A     Yes, it is.

Q     Okay.  At the time you wrote it you made a
      truthful statement contained therein?

A     Yes

Q     Okay.  And, in fact, the father did tell you
      'The child had been sick all day.'  Isn't that
      true?

A     Now I look at it, it does, yes.

Q     Okay.

            MR. WHITE:  May I approach.

Q     **(By Mr. White, continuing)**  Okay.  In fact,
      Lieutenant, when you were interviewed by
      Sergeant Sovik you also told Sergeant Sovik that
      the child had been sick all day; isn't that ---

            MS. POPE-STARNES:  (Interposing)
      Objection.  Asked and answered.  He testified
      earlier he didn't remember if he told him.

Q     **(By Mr. White, continuing)**  Seeing your written
      statement, does that refresh your recollection?

A     My written statement says I did that.  I don't
      remember if I told Sergeant Sovik that.

Q     All right.  Now, isn't it true, Lieutenant, you
      saw no signs of trauma on the child?

A     Yes.

Q    Okay.

A    I --- to be honest with you, I didn't get real
     close to the child.

Q    Okay.  You did observe you saw no signs of
     trauma?

A    Correct.

Q    And, what you saw was a concerned parent; isn't
     that true?

A    Yeah.

Q    Okay.  And, did you tell Sergeant Sovik that
     'Steven McBurney was acting like a concerned
     parent.'

A    I don't remember.

Q    And, did you tell Sergeant Sovik, 'That there
     was no indication that would cause him to
     suspect that McBurney had assaulted Madison.'

A    I didn't suspect anything.

Q    Okay.  My question though is, did you, in fact,
     tell Sergeant Sovik that one or two days later?

A    I told him --- I probably --- probably the
     statement I said --- I don't remember what
     exactly I said to him, then.

Q    Okay.  So, it is possible you said those
     statements, you just don't remember?

22

A     Correct.

Q     Okay.

        MR. WHITE:  Okay.  I have nothing
further.

        THE COURT:  Counsel?

### REDIRECT EXAMINATION

**BY MS. POPE-STARNES:**

**Q**     Did you personally examine the child?

A     No.

Q     Okay.  About how close did you come to the child
at any point during that?

A     I probably walked within two feet of them, the
fire fighters.  Like I stated, the fire fighters
were in the door.  They were at the head and
foot of it.  I walked past them to get to the
father.

Q     Approximately how many fire runs do you do a
year?

A     Our department runs about six hundred and fifty
(650), and I probably run about three hundred
(300) calls a year.

Q     And, about how many reports do you write a year?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A      I don't write a lot of the reports because I ---

each different fire fighter writes each report.

So I probably do twenty (20) a year, maybe.

The people that handle the patient do

that. I am a command staff.

MS. POPE-STARNES:  Thank you.

THE COURT:  Anything further?

MR. WHITE:  I have nothing further.

THE COURT:  Thank you, sir, you are

all set.

MS. POPE-STARNES:  May this witness be

excused, your Honor?

MR. WHITE:  No objection.

THE COURT:  Yes.  Thank you.

MS. POPE-STARNES:  People would

call Kevin Schuldt to the stand.

THE COURT:  Please raise your right

hand and be sworn.

**Do you swear that the testimony you**

**are about to give will be the truth, so help**

**you, God?**

THE WITNESS:  Yes.

(Whereupon the witness was sworn

in at (9:30 a.m.)

### K E V I N   S C H U L D T

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH,**

**THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS**

**EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MS. POPE-STARNES:**

**Q**   Sir, would you please state your name and spell

your last name?

A   Kevin Schuldt, S C H U L D T.

Q   Are you employed, sir?

A   Pardon me?

Q   Are you employed?

A   Yes.

Q   How are you employed?

A   Through the South Lyon Fire Department.

Q   How long have you worked in the South Lyon Fire

Department?

A   Approximately eight years.

Q   And, what is your position with the South Lyon

Fire Department?

A   Sergeant.

Q   What duties does that include as a sergeant?

A   Um --- taking care of station duties and making

sure things get done in the proper order.

Q    Do you have any training as a First Responder?

A    I'm an EMT Basic.

Q    Can you explain to us what an EMT Basic is?

A    There is three stages --- or there are four
     stages, there's Medical First Responder, then
     you have Emergency Medical Technician Basic, and
     then you have an Emergency Medical Technician
     Specialist and then you have Paramedic.

              On the second stage a little more
     airway and advance training then a Medical First
     Responder, which is what we run as on the South
     Lyon Fire Department.

Q    Now, Mr. --- Sergeant Schuldt, if I could direct
     your attention back to November 30th of 2006.
     Were you called into work on that day?

A    Yes, I was.

Q    Do you recall if you were dispatched to an
     address on Scott Street, in the City of South
     Lyon?

A    Yes, I was.

Q    Do you recall, approximately, what time that
     was?

A    Not off hand, I would have to look at . . .

Q    Okay.

（顶部噪声）

A   (Continuing)  . . . the report.  It was in the
    evening.

Q   What, if anything, did you observe when you
    arrived at that address?

A   I was the second unit on scene.  And, when I
    walked in the child was laying on the floor,
    already in care of two of our South Lyon Fire
    Department personnel.

Q   Who was that?

A   I don't recall who was attending.

Q   Okay.

A   Um ---

Q   What happened then?

A   I walked in with Huron Valley Ambulance.  And as
    I walked in I heard somebody ask the father what
    had happened.

            MR. WHITE:  Objection as to the
    hearsay.

Q   **(By Ms. Pope-Starnes, continuing)**  Well, let me
    ask you this, sir.  After you walked in did you
    hear --- let me ask you this.

            Would you recognize the father, if you
    saw him again?

A   Yes, I would.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Is that person in the courtroom today?

A    Yes, he is.

Q    Can you tell the Jury, please, where he is
     located and describe what he is wearing?

A    He's wearing --- he's in a grayish suit, white
     shirt.

              MS. POPE-STARNES:  May the record
     reflect the witness has identified the
     Defendant.

              THE COURT:  Any objection?

              MR. WHITE:  No objection, Judge.

              THE COURT:  So noted.

Q    **(By Ms. Pope-Starnes, continuing)**  After you
     entered the home did you hear the Defendant make
     any statements?

A    Yes, I did.

Q    What did you hear him say?

A    That he was feeding the child and the child ---
     I believe --- yes, he was feeding the child in a
     bouncy-seat and the child spit the bottle out.
     At that time he picked the child up and walked
     towards --- and he pointed towards the back of
     the house.  And, when he got to the back of the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

house the child had stopped breathing and that

is all I heard that he had said.

Q    What happened then, sir?

A    The paramedics from the Huron Valley Ambulance

said that ---

Q    (Interposing)  I am going to stop you.  Without

telling us what somebody else said, can you tell

us what happened next?

A    It was a load-and-go.

Q    What does that mean?

A    That the child was in dire need of emergency

transport to the hospital.  So the paramedic

picked her up and we walked out the door.  While

we were walking out the door I was holding the

oxygen on her face.

Q    Now, describe please for the Jury how oxygen was

being administered?

A    It's a not --- excuse me --- a non-rebreather

mask.  It has a bag on the bottom that fills up

with oxygen and we had it in front of her face

for a 'blow-by' it's called.  So that she is

constantly getting oxygen, even if she is having

shallow respirations.  She is still getting pure

oxygen into her body.

Q    What happened then?

A    We walked out to the ambulance and the paramedic
     asked me to ride ---

Q    (Interposing)  Again, let me stop you.  Without
     telling us what somebody else said, what did you
     do next?

A    I got into the ambulance and was asked ---

Q    (Interposing)  You can't tell us what somebody
     else said, sir.

A    Okay.

Q    Just tell us what actions you took, or what you
     saw.

A    I rode in the ambulance to the hospital.

Q    Okay.  Which part of the ambulance were you
     riding in?

A    In the back with the child.

Q    Okay.  Who, if anyone else, was in there?

A    Dennis Timmerman and Matt Calus.

Q    Was there anyone else in any other part of the
     ambulance that you could see?

A    There was Tim Wilson, who is a fire fighter with
     the South Lyon Fire Department, was driving.
     And then the father was in the passenger's seat
     in the front.

Q   Can you describe for us the layout of the
    ambulance?

A   It's pretty much a pick-up truck in the front
    and then a big cab in the back.  There is a
    little window pass-through that you can talk to
    the driver or the passenger from the rear.

            In the back you have a bench seat on
    the passenger's side and then a small jump-seat
    on the left side, of the --- where the driver's
    side, and then another jump-seat way behind the
    wall that is in between the front of the cab and
    the back of the rig.

Q   Now, Sergeant, were you doing anything to assist
    the paramedics when you were riding in the back
    seat?

A   Yes, I was.

Q   What were you doing?

A   I was administering oxygen to the child the
    whole way there.

Q   Were you able to observe the baby while you were
    administering oxygen?

A   Yes, I was.

Q   During the transport of the baby, can you tell
    the Jury, please, what if anything you observed?

A       At first the baby was very flaccid, not moving.
Her eyes were pinpoint.  Her pupils were
pinpoint and not much response --- no response
from anything that we did for her.

Q       What does 'flaccid' mean to you?

A       Limp.

Q       What, if anything else did you observe on the --
- in watching the baby while you were in the
ambulance?

A       Her eyes rolled back in her head a couple of
minutes away from the hospital.  And I kept
watching the monitor.

Q       What type of monitor?

A       I'm not sure.  It's --- um --- it's Huron Valley
Ambulance's monitor that can tell you the pulse,
blood pressure, the rhythm that the baby's heart
is going in.

Q       Where was that monitor in relation to where you
were in the ambulance?

A       Straight across from me on the bench.

Q       And, was this monitor hooked up to the baby in
some way?

A       Yes, it was.

Q       How was that?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     It had a three lead on her?

Q     What kind of things were you able to observe on
      the monitor?

A     The only thing that I really know how to read on
      that monitor, because I am not trained on it is
      the pulse and the blood pressure.

            The blood pressure was not hooked up.
      The pulse was and I noticed the pulse --- I was
      watching the pulse pretty much the whole way
      there.

            And at certain times it had dropped
      down to seventy (70).  Most of the time it was
      in the low one hundreds (100), but at some times
      it had dropped to seventies (70).

Q     Now, if you can recall, what were the paramedics
      doing as you were administering the oxygen
      during the ride to the hospital?

A     Paramedic Timmerman, he was trying to start an
      IV, and paramedic Calus was trying to prepare to
      innovate.

Q     Did you observe whether or not an IV was
      started?

A     I do not recall.

Q    Okay. And did you observe whether or not the

baby was intubated?

A    There was an attempt, but was unable to

intubate.

Q    Can you describe what you saw?

A    Paramedic Calus took the laryngoscope, which is

used to open up the airway to put the tube down

in.

        As soon as he put the tube --- or the

laryngoscope in the mouth the baby started doing

a suctioning motion.

Q    Did you see that?

A    Yes, I did.

Q    What about --- what, if anything else, did you

see?

A    Um --- regarding?

Q    Let me ask you this.

        Did you see the paramedic go any

further in an attempt to intubate the baby?

A    No.

Q    And, can you describe for the Jury --- now, you

testified that you were administering oxygen,

how did you do that at the point that he was

attempting to intubate?

34

A    With the blow-by mask it was right next to her
     face.

Q    During the remainder of the transport to the
     hospital, did you observe any other behavior?

A    The baby, just prior to getting to the hospital,
     started to withdraw her hands up and get a
     little stiff.  More movement in her arms coming
     up.

Q    Were you able to observe the Defendant during
     the transport to the hospital?

A    Occasionally.

Q    At any point during the transport to the
     hospital, did you hear him make any statements?

A    Yes.

Q    What did you hear?

A    The Paramedic Calus had asked ---

Q    (Interposing)  Not telling us what someone else
     said.

A    He said --- stated that the child had Mersa ---

Q    (Interposing)  Who's he?  The Defendant?

A    The Defendant.

Q    Okay.  I'm sorry.  I don't mean to interrupt,
     I'm just trying to clarify.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    The Defendant stated that the child had Mersa.
     That she was on antibiotics and the Doctor
     stated that she would be okay, that there is no
     risk of transmitting it.

Q    Did you hear the Defendant say anything else
     during the ride to the hospital?

A    No, I did not.

Q    During the times that you were able to observe
     the Defendant, can you describe his demeanor?

A    Would I describe his demeanor?

Q    Could you please, from the times that you were
     able to see him, can you describe his demeanor?

A    Just kind of a blank stare.  Didn't really say
     anything, other than if he was asked.

Q    Can you tell us what happened when you arrived
     at the hospital?

A    We got out the back of the ambulance while I was
     still administering oxygen.  We walked into the
     emergency room and transferred the care to the
     doctors.

Q    Did you see whether or not the Defendant exited
     the ambulance?

A    No, I did not.

Q    Do you know whether or not he got out the front

     or the back?

A    I know he ---

             MR. WHITE:   (Interposing)  I think he

     testified he didn't see where he exited the

     ambulance, so I object to him recalling, one,

     it's speculative.

             THE COURT:   Rephrase the question,

     Counsel.

             MS. POPE-STARNES:   Okay.  I can

     rephrase.

Q    **(By Ms. Pope-Starnes, continuing)**   I can ask

     another question.

             The window that is between the front

     area, where the Defendant was seated and the

     back area of the ambulance, is that large enough

     for a person the Defendant's size to fit

     through?

A    No.

Q    After the patient care of the baby was

     transferred over to the emergency staff, did you

     have any further contact with the baby or with

     the Defendant?

A    No, I did not.

MS. POPE-STARNES: May I have just one moment, your Honor?

THE COURT: You may.

(Whereupon a brief delay was had.)

* * *

MS. POPE-STARNES: Thank you.

I have no other questions, your Honor.

THE COURT: Mr. White.

**CROSS-EXAMINATIN**

**BY MR. WHITE:**

Q    Sergeant Schuldt, my name is Robert White. I have a few questions for you.

How long were you in the house before you left in the ambulance?

A    Maybe --- maybe three minutes, four minutes, if that.

Q    In the dispatch to 311 Scott Street, was barely breathing, correct?

THE COURT REPORTER: I'm sorry, sir, I can't hear you.

MR. WHITE: I'm sorry.

Q    **(By Mr. White, continuing)** The dispatch to 311 Scott Street was for an infant barely breathing; isn't that true?

A    I can't answer that like that.

Q    Respitory distress situation?

A    I believe it came in as a 'difficulty breathing.

Q    Okay.  In other words, a respitory distress?

A    Those are two different --- I mean, two
     different things there.

Q    Okay.  Did you review the records in the South
     Lyon Fire Department run on this case?

A    Yes, I did.

Q    Okay.  If I showed it to you, would it help you
     differentiate whether it was 'infant barely
     breathing' or 'respitory distress'?

A    It might.

          MR. WHITE:  If I may approach?

          THE COURT:  You may.

          MR. WHITE:  Well, your Honor, I am
     going to object.  This --- at this point ---

          THE COURT:  (Interposing)  Hold on,
     sir.

          MS. POPE-STARNES:  (Continuing) . . .
     calls for hearsay.  It's being offered more than
     just for his state of mind at this point.  He is
     offering it for the truth of the matter
     asserted.

THE COURT:  What I'll do, Mr. White, is you can show him the document and he can see if he can refresh his recollection and then you can elicit a 'yes' or 'no' whether it refreshs his recollection.  But then don't go further.

The objection is jumping the gun little bit.

MR. WHITE:  All right.

Q    **(By Mr. White, continuing)**  Does that refresh your recollection?

A    Yes, it does.

Q    Okay.  The documents that I handed you, are those the South Lyon Fire Department records regarding this incident?

A    Yes, it is.

Q    Okay.  And, in fact it was a 'respitory distress' run, correct?

A    According to this, yes.

Q    Okay.

MR. WHITE:  If I may, your Honor?

THE COURT:  You want to retrieve it, go ahead?

MR. WHITE:  Yes.

40

Q    **(By Mr. White, continuing)**  I don't think I have

any further questions regarding this.

Now, when the baby was in the back of

the ambulance with you, at several points the

child was in extreme respitory distress; isn't

that true?

A    I can't answer that.

Q    Did you provide a written report in this matter?

A    Yes, I did.

Q    Okay.   If I showed you your written report,

would that refresh your recollection?

A    I remember my report.

Q    All right.  As to the question was the child in

extreme respitory distress, would it refresh

your recollection if --- to look at your written

report?

A    I know that I had written that in there.

Q    So, you did write in there 'the child was in

extreme respitory distress', and you were asked

to assist the paramedic in ventilating the

child, correct?

A    Yes.

Q    And, you also testified that several --- the

child's pulse had dropped to below seventy (70)

while being transported to U of M, isn't that true?

A    No.

Q    In fact, didn't you write in your report, 'I observed numerous times during the transport that the child's pulse would drop to around seventy (70) beats per minute.'?

A    Yes.

Q    Okay.  So, that is a true statement?

A    That is, yes.

Q    Okay.  When the child's pulse dropping to seventy beats per minute (70), what does that mean to you as an E M T Basic?

A    That we need to get him into an A L S Unit, which is an Advanced Life Support Unit, which she was --- or she was in.  And that's where the paramedics takeover.

      I was acting as a Medical First Responder, as protocol for our fire department. Even though I am a E M T Basic I cannot work as an E M T Basic on our fire department.

Q    But you're an E M T Basic, what does it means when someone's pulse is dropping to seventy (70) beats per minute?

How do you interpret what is happening
in the body?

A   I'm not a doctor, I --- I can't say exactly ---
if it drops below seventy (70), then you need to
take ---

MS. POPE-STARNES: (Interposing) I am
going to object to the relevancy. There is no
testimony it was below seventy (70) it was below
seventy (70) so this is irrelevant.

COURT: Sustained. And it was non-responsive
beyond that.

MR. WHITE: I had asked the question
and he's already answered.

THE COURT: I understood.

MR. WHITE: So, she's objecting to her
witness's answer.

THE COURT: I know.

Q   **(By Mr. White, continuing)** Now, isn't it true -
-- let me back up, excuse me.

You gave an oral statement to Sergeant
Sovik shortly after this run; isn't that true?

A   I believe so, yes.

Q   Okay. And, how long after?

A   I believe it was two or three days.

43

Q     And where was that?

A     At the fire department.

Q     And where were you at during this interview?

A     In a closed door office.

Q     Okay.  Were you alone with Sergeant Sovik?

A     No.

Q     Okay.  Who else was with you?

A     Officer Sederlund.

Q     Okay.  And, do you know how long you were in th
      this room?

A     I don't recall.

Q     At the time your recollection of the events was
      pretty clear?

A     Yes.

Q     Okay.  And, did you notice that Sederlund ---
      Officer Sederlund or Officer Sovik took any
      notes during this interview?

A     I do believe so, but I'm not sure.

Q     Okay.  Do you think --- can you remember or not,
      sir?

            MS. POPE-STARNES:  Objection, asked
      and answered, he said he's not sure.

THE COURT: In fairness the question -
-- the answer was a little bit confusing. You
can ask the question.

Q  **(By Mr. White, continuing)**  Are you speculating?
Are you guessing?

A  In regards to. . .

Q  The taking of notes.

A  I was not paying attention whether or not they
were taking notes. So, no, I can't testify that
they were absolutely taking notes, no.

Q  Did you notice whether they were recording your
statement in any way, with any kind of
electronic recording device?

A  I do think I remember that they stated to me
that they were going to tape record it.

Q  Okay.

MS. POPE-STARNES: I am going to ask
that that be struck as hearsay.

MR. WHITE: Oh, --- Okay.

MS. POPE-STARNES: He is offer it for
the truth of the matter asserted and it's
hearsay, and I would ask that it be stricken.

MR. WHITE: No ---

THE COURT: (Interposing) If I do, I
will do it later on, we'll address this later
on.

Go ahead, Mr. White

Q    **(By Mr. White, continuing)** Okay. Now, you
indicated in your direct examination that you
observed Steve, the father, occasionally during
the transport, correct?

A    Correct.

Q    By the way, the transportation time, do you know
how long it was from the time that you left the
house until you got to U of M?

A    No, I do not.

Q    Would the --- would the South Lyon Fire
Department records refresh your recollection?

A    No, we don't keep track of time from  --- for
the ambulance.

Q    So, and when you observed Steve, he was looking
back into the ambulance, isn't that true?

A    A few times, yes.

Q    Tell me --- well, did you tell Officer Sovik and
Officer Sederlund, when you gave your oral
statement, that was possibly recorded ---

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MS. POPE-STARNES (Interposing)

Objection, your Honor. This is why I asked that

this be struck. It's hearsay and Counsel is

continuing to use it.

MR. WHITE: Oh, it is not hearsay,

Judge.

THE COURT: Counsel, ask the question

without that, I said I would take that up later

on. So take that part out.

Q **(By Mr. White, continuing)** Did you say to

Officer Sederlund/Sovik that 'McBurney looked

back at the child the entire trip to the

hospital.'

A I don't know if I said that or not.

Q Would you refer --- would the police report in

this case refresh your recollection as to what

you said?

A I suppose.

Q Okay.

MR. WHITE: If I may approach?

THE COURT: You may.

THE WITNESS: Okay.

Q **(By Mr. White, continuing)** Does that refresh

your recollection?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

A      Yeah.  It tells me that it's in the report hear,

yes.

Q      Okay.  But, my question is does that refresh

your recollection as to what you said to Sovik

and Sederlund?

A      No, it does not.

Q      Oh, thank you.

MR. WHITE:  Nothing further of this

witness, your Honor.

### REDIRECT EXAMINATION

**BY MS. POPE-STARNES:**

Q      Sergeant, is a round seventy (70) in a pulse the

same to you as below seventy (70)?

A      No, it is not.

Q      Thank you.

MS. POPE-STARNES:  I have no other

questions.

THE COURT:  Anything further?

MR. WHITE:  (No verbal response.)

THE COURT:  Sir, you are all set.  You

may be excused.  Thank you.

MS. POPE-STARNES:  Your Honor, the

People call Sergeant Sovik to the stand.

THE COURT:  Very well.

Approach here, please.  Please raise

your right hand and be sworn.

Yeah, go ahead.

**Do you swear the testimony you are about to give**

**will be the truth, so help you, God?**

THE WITNESS:  I do.

THE COURT:  Have a seat there.

{Whereupon the witness was sworn at

10:00 a.m.)

**C H R I S T O P H E R   S O V I K**

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH,**

**THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS**

**EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT  EXAMINATION**

**BY MS. POPE-STARNES:**

**Q**    Please state your name and spell your last name

for the record.

THE COURT:   Counsel, I'm sorry, well,

go ahead and do that, if Counsel will approach

for a second.

You can go ahead.

THE WITNESS:  Christopher Sovik, S O

V, as in Victor, I K.

(Whereupon a discussion was held at
the Bench out of the hearing of the
Jury and the Court  Reporter.)

\*   \*   \*

THE COURT:  Thank you, go ahead, Counsel.

Q   **(By Ms. Pope-Starnes, continuing)** How are you
employed, Sergeant?

A   I'm a Sergeant with the South Lyon Police
Department.

Q   How long have you been employed, Officer?

A   Sixteen (16) years, three months and seven days.

Q   What is your educational background, Officer?

A   I have a Bachelor of Science in Psychology with
a minor in Sociology from Alabama Lazarine
University.

Q   And, did you attend the Police Academy?

A   I did, yes in March of 1991.

Q   Have you had any other training for your work as
a police officer?

A   Yes, I have had approximately seventy (70) or
eighty (80) additional classes.  They are called
Advanced Training.  Anything beyond the Academy
is called Advanced Training.

Q     Have you attended any schools in regards to
      conducting investigations?

A     Yes, I have attended approximately five or six
      classes on interview interrogations.

Q     How long have you been a Sergeant with the South
      Lyon Police Department?

A     Since February of 1997.

Q     Have you worked as a Detective for the
      Department?

A     I have, yes.

Q     And how is that set up in your department?

A     Well, when I actually got promoted in 1997 it
      was a Detective-Sergeant position.  Currently
      what it is --- is Officers --- mostly younger
      Officers who want experience, it's a rotation,
      anyone that expresses interest in being a
      Detective, there is either a six month or nine
      month or year rotation depending on who wants to
      do it.

              It gives officers opportunities to
      experience the process.

Q     How many officers are there in the Department
      altogether?

51

A    There are eighteen from the chief down to the
     lowest man.

Q    Sergeant Sovik, if I could direct your attention
     to December 2nd of 2006, were you working that
     day?

A    No.

Q    Did there come a point that day where you were
     dispatched or called in to the department?

A    There was, yes.

Q    What time was that, do you know?

A    Between seven and seven thirty (7:30) that
     evening, p.m.

Q    What was the nature of the dispatch?

A    I was advised that a child had been sick ---

          MR. WHITE:  (Interposing)  Well ---
     that's hearsay.

          THE COURT:  What was your response,
     Counsel?

          MS. POPE-STARNES:  I have argued
     before to the Court that there is case law that
     indicates that a dispatch is allowable for
     purposes of showing the Officer's state of mind.

          THE COURT:  Based on your response

not your response then, the Court sustains ---

over-rules the objection.

        HE COURT: Go ahead.

        THE WTNESS: I was advised that

information that told me that there was a child

admitted to a hospital with severe injuries and

that she was expected to die.

Q    **(By Ms. Pope-Starnes, continuing)**    Did you

respond to the Police Department?

A    Yes.

Q    Approximately what time did you arrive then?

A    Approximately nine-fifteen (9:15) p.m.

Q    And, would you tell the Jury what you did when

you arrived?

A    I obtained more information and I looked for a

tape recorder.

        I received more information from the

parents of the child I interviewed fire

fighters. I drove to the Northville Township

Police Department, and then I drove to the U of

M Hospital.

Q    Okay. Now, let's start with --- you testified

that part of what you did when you were at the

station was you looked for a tape recorder?

FORM CSR - LASER REPORTERS PAPER & MFG. CO 800-626-6313

A    Yes.

Q    Tell the Jury, please, what attempts you made to
     look for a tape recorder.

A    When I was hired in 1981 I knew that we had a
     tape recorder.  It was a 1972 model, cassette.
     It was from a room that the clerical people
     share for supplies letters, other stuff.  I
     remember that it was always up on top of the
     filing cabinet.  That was the first place I went
     to look for it when it was there.

                And I can't recall the last time I saw
     It.  When I went to get it it was not there.

Q    Were you able to locate any recording equipment
     at the station, anything?

A    No.

Q    When you left the station, after receiving for
     information, after looking for the tape
     recorder, and interviewing fire fighters, was
     anyone with you?

A    No.

Q    When you interviewed the fire fighters, was
     anyone with you?

A    No.

Q    Were any officers assigned to this
     investigation, if you know?

A    Yes.

Q    Who is that?

A    At the time Officer Sederlund was the Detective,
     Detective Sederlund.

Q    And, was he with you at all day?

A    Would you repeat that question, please?

Q    Yeah.  Was he with you helping you in the
     investigation at all on the evening of the
     second?

A    Absolutely, yes.

Q    Okay.  At what point were you together?

A    After I interviewed the fire fighters, we were
     together from that point --- my next step was to
     drive to the Northville Township Police
     Department with Sederlund in the passenger's
     seat of my car.

Q    After you finished at the Northville Township
     Police Department, what did you do next?

A    I drove to the University of Michigan Hospital.

Q    And, was Detective Sederlund with you when you
     drove to the University of Michigan Hospital?

A    Yes, he was.

Q    Okay.  And, do you recall approximately what
     time did you arrive at the hospital?

A    I want to say around twelve-thirty (12:00) p.m,
     on December 3rd, twelve-thirty (12:30) a.m.

Q    What did you do when you arrived at the
     University of Michigan Hospital?

A    I spoke with a case worker from Washtenaw
     Protective Services.

Q    Do you recall that person's name?

A    Sara Weaver.

Q    After speaking with her, what did you do next?

A    I went to the fourth floor of the
     Pediatric/Intensive Care Unit.

Q    Was anyone with you at that time?

A    Detective Sederlund.

Q    What did you do when you arrived at the
     Pediatric/Intensive Care Unit?

A    I spoke with --- I spoke with a nurse, I spoke
     with a doctor, and I spoke with Heather McBurney
     and the Defendant, Steve McBurney.

Q    Now, where were you when you spoke with the
     nurse?

A    We were in a very large conference room on the
     fourth floor Pediatric/Intensive Care Unit.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Okay.  Can you describe this room for us?

A    It was about ten (10) or twelve (12) feet wide, about twenty (20) feet long.  There was a large wooden table in the middle of it.  There were large wooden chairs around it.  There was a computer in the room and there were medical supplies and other things toward the back of the room.

Q    Were there any windows in this room?

A    Yes.  There were several windows, there was a window  above the door, there was actually a window in the door, and then there were windows around the door about half way up they were all windows.

Q    And, how many doors were there to the room?

A    There was one.

Q    When you spoke to the nurse in this room, was there anyone else present?

A    Sara Weaver was present.

Q    Was there anyone else that was present?

A    Detective Sederlund.

Q    Anyone else?

A    At which time?

Q    At the time you spoke with the nurse?

A    No.

Q    You said that you spoke with a doctor.  Where
     did you see the doctor?

A    In that conference room.

Q    And who was present when you spoke to him?

A    Sara Weaver and Detective Sederlund and myself.

Q    And, you testified that you spoke with the
     baby's mother?

A    Yes.

Q    Where did you speak with her?

A    In that same conference room.

Q    And, tell the Jury, please who else was present
     when you spoke with Mrs. McBurney?

A    There was a nurse named, Regina Carr.  Sara
     Weaver, from Protective Services Washtenaw
     County, Heather was there, McBurney, myself, and
     Detective Sederluand.

Q    Can you describe Mrs. McBurney's demeanor when
     you spoke with her?

A    She was very frail.  She was upset.  She was
     crying.  She looked like she had the weight of
     the world on her shoulders.  Very upset.

Q    About what time was it, when you began to speak
     with her?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A     Twelve-thirty (12:30), twelve-twenty (12:20)

      somewhere in that area.

Q     And, approximately how long did you speak with

      her?

A     About an hour and a half, if I can recall.

      Somewhere around there.

Q     What happened after you spoke with Heather

      McBurney?

A     She left the room and then Mr. McBurney entered

      the room later.

Q     Would you recognize Mr. McBurney, if you saw him

      again?

A     Yes.

Q     Is he in the courtroom today?

A     Yes, he is.

Q     Would you tell the Jury, please, where he is

      located and what he is wearing.

A     He's seated to the right of Mr. White in the

      blue suit, the white shirt.

              MS. POPE-STARNES:  May the record

      reflect the Witness has identified the

      Defendant?

              THE COURT:  Any objection?

              MR. WHITE:  No objection.

THE COURT:  So noted.

Q  **(By Ms. Pope-Starnes, continuing)**  Who was in
the room at that point when the Defendant came
in?

A  Myself and Detective Sederlund.

Q  Approximately what time was it when the
Defendant came into the conference room?

A  Two o'clock (2:00) in the morning.

Q  And, where was the two of you located in the
conference room?

A  I was sitting at the table.  If you walked into
the conference room the table is in front of
you, I was on the right hand side of the table.

Q  Where was Detective Sederlund?

A  He was across from me on the left hand side of
the table.

Q  And, where was the Defendant?

A  As soon as you walk in he sat down at the head
of the table, so his back would have been to the
door.

Q  Who was the closest to the door?

A  The Defendant.

Q  Now, did you ask the Defendant if he would speak
with you?

A    Yes.

Q    Did he agree to do that?

A    Yes.

Q    Was he under arrest at that time?

A    No.

Q    Now, Sergeant Sovik, in the course of your work
     as a police officer, you have training and
     experience in observing people who are under the
     influence of alcohol or controlled substances.

A    Absolutely.

Q    And --- excuse me.  And were you able to observe
     whether or not you believed the Defendant was
     under the influence of any alcohol or controlled
     substances?

A    I was able to observe and I came to the
     conclusion that he was not.

Q    During the time that you spoke with him, did you
     deprive him of anything to drink?

A    No.

Q    How about medication?

A    No.

Q    Did you threaten him at any time?

A    Never.

Q    Did you use any force or coercion to get him to
speak with you?

A    No.

Q    What happened after the Defendant agreed to
speak with you?

A    I identified myself and I told him why I was at
the hospital.

Q    What happened then?

A    I asked him to tell me about his family,
Heather.

He said that he had been married to
Heather four about two years and they had one
child in common, who was almost a year old, and
that was Madison.

He said that Madison --- he said that
Madison had some complications from her hip
dysplacia.  She was required to wear a brace,
but only at night because the condition was
getting better.

I asked him if he had any other
children, he said, 'No.'

Q    What happened then?

A    I said, 'Well, tell me about the case.'

'Tell me about the events of the day

of the thirtieth (30th), beginning right after
you called 9 1 1.'

Q    What, if anything, did he say then?

A    He said that, 'Madison had been throwing up
throughout the day, wasn't feeling that good.'
He said that he and Heather put Madison down for
a nap at six o'clock (6:00). Heather goes to
work and he wakes her up an hour later and helps
with her separation anxiety from Heather.

This day was the same followed the
same process, nothing out of the ordinary. I
think he said, 'She woke up a bit cranky, but
nothing out of the ordinary.'

Once he got her up from her nap he put
her in her bouncy-seat and gave her a bottle.

Q    Did he say where he put her in the bouncy-seat?

A    They had the bouncy-seat in their living room of
their home.

Q    What, if anything else did he say?

A    He said that Madison spit out the bottle. So he
picked up Madison, took her out of the bouncy-
seat, and carried her to her bedroom.

He disrobed her, he changed her

diaper, put the clothes back on her, put the brace back on her leg then he sat her down on the floor in her bedroom.

Q    What did he say happened after that?

A    He was putting some clothes away, he was throwing the diaper away. He said that he looked down and he noticed that Madison was having some difficulty breathing and she was gurgling up some spit. He said it was not uncommon for her to gurgle on her spit.

Q    I'm sorry. Did you say he said it was common, or it --- I didn't hear the word that you used.

A    He said that it was common for her to gurgle on her spit. He said that he noticed he said she fell backwards, having a seizure. Her limbs tightened up then she became unresponsive.

       He reached out and grabbed her, and then her limbs became loose. He called 9 1 1, explained the situation that was happening. He got some rescue breath instructions for Madison. He disrobed her down to her diaper and he brought her to the front door of the home to await medical personnel.

FORM CSR-LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Did he say anything else at that time about what happened on November 30th, 2006?

A    He said that the ambulance came. He got into the ambulance with Madison and they went to the hospital, U of M Hospital.

Q    What happened next.

A    I asked him about Nicholas Kennedy and ---

MR. WHITE: (Interposing) Objection, your Honor.

THE COURT: Is that all that you asked him at that point?

THE WITNESS: As far as ---

THE COURT: (Interposing) Just yes or no, or is there more things that came out of your mouth?

THE WITNESS: There is more?

THE COURT: Okay.

Go ahead.

MR. WHITE: I object.

THE COURT REPORTER: I'm sorry, Mr. White I can't hear you.

MR. WHITE: I'm sorry. I'm sorry.

THE COURT REPORTER: You're whispering.

MR. WHITE: I'm sorry. Object, its beyond the perimeters of the Court's ruling.

THE COURT: Okay. Counsel?

MS. POPE-STARNES: Your Honor, it's not beyond the perimeters of the Court's ruling.

I believe that this is being offered in regards to showing inconsistent statements. I can offer it to the Court ---

THE COURT: (Interposing) Is it --- are we referring to ---

MS. POPE-STARNES: (Interposing) May we approach?

THE COURT: You may.

(Whereupon a discussion was held at the Bench out of the hearing of the Jury and the Court Reporter.)

\* \* \*

THE COURT: Objection's noted and over-ruled, you may proceed.

THE WITNESS: I asked him about Nicholas Kennedy in the 1990 Northville Township investigation.

Q **(By Ms. Pope-Starnes, continuing)** What was his response?

A     He said that Nicholas Kennedy was not his child.

          I then asked him to tell me about the injuries to Nicholas Kennedy.

          He said, 'I wasn't responsible for the injuries to that child.

          I then asked him how Nicholas Kennedy sustained skull fractures?  There was no response.

          There was then more conversation about the 1990 investigation ---

Q     (Interposing)  Let me stop you, Sergeant.

          After that, did you continue a conversation with him?

A     Yes.

Q     What happened after that?

A     After the conversation I had with him, I asked him if he had informed his wife, Heather, about the 1998 investigation.  He said that he did not.  And I told him --- I informed him that she knew ---

          MR. WHITE:  (Interposing)  Objection, asked --- objection, your Honor, as to this content.

THE COURT:  Just break it up with the questions.

Just don't make it a narrative.

Go ahead.

Q    **(By Ms. Pope-Starnes, continuing)**  Thank you.

What happened next?

A    I informed him that she knew about investigation ---

MR. WHITE:  (Interposing)  Objection, that's the same thing.

THE COURT:  That objection is sustained.

Q    **(By Ms. Pope-Starnes, continuing)**  Did you say something next, or did the Defendant?

A    The Defendant responded to my question.

Q    So you asked a question then?

A    After I asked ---

Q    (Interposing)  Without telling us what you asked is what I am trying to get at with you.

So, you asked the question next?

A    Yes.

Q    What, if anything, did the Defendant say?

A    He didn't say anything.

Q    What happened then?

A     I informed him that the injuries to Madison were

      the same injuries to Nicholas Kennedy.  He

      response was those injuries were worse.

             MR. WHITE: Objection.  Objection, your

      Honor.

             Same objection to this line of

      questioning.

             THE COURT:  As to the questions that

      were asked by the Officer, that objection is

      sustained.  But as to the responses the

      sustaining objection is noted and over-ruled.

Q     **(By Ms. Pope-Starnes, continuing)**  So, you asked

      another question and you said his response was

      'Those injuries were worse.'?

A     Yes.

Q     What happened then?

A     I asked him about the caregivers, who were the

      caregivers on November 30th.

Q     And the caregiver for who?

A     For Madison.

Q     And what, if anything did he say?

A     He said that Heather and himself were the only

      caregivers on that day.

             I asked him, I said, 'Well, a couple

of days prior to the 30th who were Madison's

caregivers then?

Q    Did he respond?

A    Yes, he did.

Q    And, what did he say?

A    He said it was just he and Heather.

Q    What happened next, Sergeant?

A    I informed him that I was informed by the

medical personnel that the injuries that Madison

sustained were non-accidental injuries.  They

were traumatic injuries due from abuse and

neglect.

Q    What was his response?

A    I don't think he had a response.

Q    What happened then?

A    There was some conversation --- Detective

Sederlund said a couple of things, and then I

asked the next question.  I said, I said, 'You

told me that you and Heather were the caregivers

on the 30th,' I said, then I asked him, 'Were you

responsible for these injuries to Madison?'  And

he said, 'No.'

           I said, 'Are you telling me that

Heather is responsible for these injuries?'

And he said, 'I don't know. I can't

Believe she could do something like this.'

Q    And what happened then?

A    I asked him, 'What he thinks the penalty should

be to a person who caused these injuries to this

child?'

Q    Did he respond?

A    He did, he said, 'Depends if it was accidental

or intentional.'

Q    What happened then?

A    I said, 'Well, lets say it was an accident?'

He said, 'Well, I think he should have

to go to the funeral and burial and that that

would be enough punishment.'

Q    Did the interview continue?

A    It did, yes.

Q    Okay.  What happened then?

A    There was more conversation, I think about a

couple of other things, and then during the

conversation I had learned that --- Steven told

me that there was another accident.

Q    What did he say?

A    He said a couple of months prior to November 30th

he was alone with Madison.  He said she was in a

bouncy-seat. He went to move her, so he picked up the whole bouncy-seat, with her in there and as he was attempting to move it the bottom of the seat got caught on a piece of furniture causing the seat to tip over. Madison fell out of the seat onto the floor.

Q    I said, 'Well, how high was she?'

A    He said, 'Five feet.'

Q    Now, at that point, how long before the November 30th incident did he claim this happened?

A    A couple of months.

Q    Did he say whether or not Madison was injured or not?

A    I don't recall. He said he took her to the hospital.

Q    Did he say what hospital he took her to?

A    St. Joe's, Ann Arbor.

Q    I'm sorry, I didn't hear you?

A    St. Joe's, Ann Arbor.

Q    What happened after that?

A    He said, 'I caused these injuries to Madison.'

        I said, 'I know you caused these injuries to Madison.' He didn't respond.

I said, 'You know,' I said, 'good
people do some bad things at times.' I said,
'Heather said you were a good man, a loving
husband, excellent father.' I said, 'I know how
it is, how difficult children can be, I have
three of my own. I've done the diapers and
everything. I said, 'You just made mistake like
all good parents do.'

Q    What, if anything was his response?

A    His response to this, he said, 'My life is
over.'

Q    Now, Sergeant Sovik, why did you tell him that
you thought he was a good father and this was a
mistake?

A    In my interview class and my training experience
in an interview it is my goal, it's my purpose,
to make him feel as comfortable with me as
possible.

The more somebody feels comfortable
with you the more information they will --- you
will elicit from them. And I was just trying to
gain that common ground with him.

Q    What happened next in the interview?

A    I responded to him by saying, 'You're life's not
     over.'   I said, 'Your life's just beginning.'   I
     said, 'Heather is going to need you now, You're
     going to need Heather.   You are going to need
     really get through this.'   And I said, 'Just
     tell her what happened.'

          I said, --- he didn't respond.
     I said he was under estimating his wife.   I
     said, 'She's going to stick by him, she was
     going to love him and support him.'

Q    What happened then?

A    I believe Detective Sederlund said a couple of
     things to him.   After he was done I said --- I
     said, 'It would be easier to tell Heather what
     happened on the 30th if we were here?'   If I was
     here?'   He said, 'Yeah, I would really like
     that.'

Q    What happened then?

A    I directed Detective Sederlund to go and get
     Heather.

Q    Tell the Jury, please, what happened then?

A    I continued talking to Steve telling him what a
     good father, a loving husband, about how Heather

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

loved him. And I said, 'Sometimes we just make mistakes.'

Q    Why did you say this?

A    At this point I am still trying to get more information from him. Trying to make him feel comfortable.

Q    What happened then?

A    He started crying.

Q    What happened next?

A    Heather came back into the room.

Q    When Heather came back into the room, what did Detective Sederlund do?

A    He sat back in the same seat he was sitting on.

Q    And, where did Mrs. McBurney sit?

A    She came in the conference room and she was actually --- she sat to the right of Steven, and she was --- so she would have been to my left. She would have been between Steven and I.

Q    What happened next?

A    I made a statement to Heather. I said, 'Steven has something to tell you. He's going to say he made a mistake. He doesn't think you are going to forgive him. I told him that you are going

to forgive him, you are going to love him, you are going to stand by him.'

Q    What happened then?

A    The question was posed to Steven, by Heather, ---

Q    (Interposing)  After she asked the question, then what happened?

A    He said, 'I made a ---'  If I could back up.

After I made a statement to Heather there was some silence, there was a pause in the room.  Steven was the first one to talk.  He actually looked at Heather and said, 'You knew about Nicholas Kennedy?'

MR. WHITE:  I'll object.

THE COURT:  So noted.

THE WITNESS:  There was a response by Heather.

Q    **(By Ms. Pope-Starnes, continuing)**  After she responded, what happened next?

A    He said, 'I would have told you earlier, but the relationship was going good, things were moving right along.  I didn't want to ruin --- I didn't want to ruin anything.  I didn't want to ruin the relationship.'

Q    What happened then?

A    A question was posed Steven.

Q    By who?

A    Heather.

Q    After Heather asked a question, what happened
     then?

A    He said, 'I made a mistake.'

            Another question was posed to Steven
     from Heather.  He said that 'He threw her in the
     crib.'

Q    Tell the Jury what happened next.

A    I asked him to tell me what happened in
     Madison's bedroom.

Q    I apologize, I didn't hear the end of what you
     said.

A    I asked him to tell me what happened in
     Madison's bedroom.

Q    What, if anything, did he say?

A    He said that Madison was in the bouncy-seat. He
     said he gave her a --- she left at seven o'clock
     (7:00) that day.   He put her in a bouncy-seat
     and he gave her a bottle.

            She spit the bottle out.  He picked

her out of the bouncy-seat, carried her into Madison's bedroom, started changing Madison.

She was screaming and crying. He disrobed her, he changed the diaper, put the clothes back on her, put the brace on her. While she continued to scream and cry while he is changing her. He picked her up and he attempted to console her. Madison was --- continued screaming and crying in his ear. He said he got mad and frustrated and he threw the baby in the crib.

Q   What, if anything else, did he say about throwing her in the crib?

A   I said, 'Well, how far away from the crib were you?'

He said, 'Two feet'. He said, 'When I threw her in the crib that the back of her head hit the bars.'

Q   What did he say next?

A   He said that Madison had a seizure, seized then became unresponsive. He grabbed her and held her. He said he had some difficulty in determining whether she was breathing or not. She became limp.

He called 9 1 1, explained what had happened. He gave her rescue breaths and then he brought her out in to the living room, to the front door of the residence to await medical personnel.

Q   During this statement, did he say anything else about how Madison's behavior had been that day or days prior?

A   I recall, when I first started the interview, he just said that she had been throwing up throughout the day and that she had been cranky that day. I don't recall anything in a couple of days prior to, I can't recall.

Q   Did the Defendant make any further statements to Heather McBurney about Madison's behavior.

A   He did say at one point that --- after they had talked about their relationship, he did say that, he said, 'You know how difficult Madison has been these days. That's why I wanted you to work dayshift so we could tag-team her at night because she has been so difficult.'

And he made some type of statement or --- to how Madison was --- how she was difficult during the separation anxiety, how hard it is

for her to deal with, how hard it is for him to deal with her.

Q    What happened next?

A    I left the room.

Q    Who remained in the room?

A    Heather and the Defendant.

Q    Where was Detective Sederlund, at that point?

A    He was out in the hall with me.

Q    After you and Detective Sederlund were out in the hallway, what happened after that?

A    We discussed what we had just heard. We made a determination that ---

        MR. WHITE:  (Interposing)  As to Sederlund's situation, Judge, this is ---

        THE WITNESS:  (Interposing)   I made the determination that we were going to arrest him.

Q    **(By Ms. Pope-Starnes, continuing)** Approximately how long were you out of the room?

A    Five or ten (10) minutes, it wasn't long.

Q    And, who returned to the room after the five or ten (10) minutes?

A    Detective Sederlund.

Q    What happened then?

A    Steven and Heather came out of the room.  I told
     Steven to go say good-bye to his daughter.

Q    And, what happened?

A    He was handcuffed and taken back to the South
     Lyon Police Department.

Q    At some point did you obtain consent to search
     the home from the Defendant and Heather
     McBurney?

A    I did.

Q    Did you notify anyone in your department about
     that?

A    I contacted Sergeant Baaki.

Q    Did you instruct him to do anything?

A    I instructed him to go to the home at 3 11 Scott
     street and to confiscate the crib.

Q    Now, Sergeant Sovik, after the arrest of the
     Defendant, did your investigation continue?

A    Yes.

Q    How did it continue?

A    I had to write the report, some follow-up,
     transport him back to the station for booking.

Q    Do you recall when it was that you wrote the
     report?

A    I got back to the station after the interview
     with the Defendant.  I think I did some
     paperwork that morning, then I came back in that
     afternoon for three hours, and I continued
     writing the report on the following Monday,
     which would have been December 4th.

Q    Did you do it by yourself, or did you work with
     someone else?

A    I worked with Detective Sederlund.

Q    Did there come a point that week where you
     attended the autopsy of Madison McBurney?

A    I did.

Q    Did you interview other witnesses?

A    Yes.

Q    Now, Sergeant Sovik, when you interviewed the
     Defendant at the University of Michigan
     hospital, in the conference room, did you have
     any recording equipment?

A    No.

Q    Do you remember what you were wearing that day?

A    I do.  Exactly.  Actually I had this blue shirt
     on, I had a red tie, I had khaki dress pants on,
     I had a black belt.  And I had this

identification badge hanging on this pocket right here (indicating).

Q    You're indicating your shirt pocket or your jacket pocket?

A    My shirt pocket, I was not wearing a jacket. Well, I had a leather jacket on.  Black leather jacket over the top of my clothes.

I had a set of handcuffs on my back, I had a gun on my right hand side, and I had a Verizon Treo phone on my left hand side.

Q    A what?

A    A Verizon Treo phone.

Q    Can you spell that?

A    T R E O.

Q    Do you know whether or not that phone was able to record?

A    I don't know.

Q    Did you use it to record?

A    No.

Q    Did you leave any recording equipment in the room when you and Detective Sederlund were out in the hall?

A    No.

MS. POPE-STARNES: May I have just a moment, please?

(Whereupon a brief delay was had.)

● * *

MS. POPE-STARNES: I have nothing further, your Honor.

MR. WHITE: I have just a couple of questions before the break.

THE COURT: Go ahead.

**CROSS-EXAMINATION**

**BY MR. WHITE:**

Q    Officer Sovik, you didn't record any interview of this whole investigation; isn't that true?

A    That is correct.

Q    Okay. Now, you didn't record any interview at the hospital with Sara Weaver, right?

A    Correct.

Q    Dr. Fleming?

A    Correct.

Q    Heather McBurney?

A    Correct.

Q    It's your testimony you didn't record the interview with Steve McBurney?

A    Correct.

Q    And, you didn't interview --- you didn't tape

     record or --- excuse me, electronically record

     any interview with any of the fire fighters

     either, did you?

A    That's correct.

Q    Okay.  So, there would be no --- there would be

     no reason for you tell any of the fire fighters

     that you were going to record them, correct?

          MS. POPE-STARNES:  Your Honor,

     standing  objection as to hearsay in regards to

     this issue.

          THE COURT:  Response?

          MR. WHITE:  Well, it's not a hearsay

     statement, but . . .

          THE COURT:  Over-ruled.  Go ahead.

          THE WITNESS:  Can you repeat the

     question, please?

Q    **(By Mr. White, continuing)**  You would have no

     reason to tell any of the fire fighters that you

     were intending to record the interview, correct?

A    That is correct.

Q    Including Kevin Schuldt, correct?

A    Correct.

Q    Okay.   And, --- Now, you took notes of all the
     interviews, is that a fair statement?

A    Well, no.   I personally did not take notes.   I
     may have taken a couple of notes, but Sederlund
     was taking all the notes.

Q    Well, let me ask you.   Did you take notes of the
     interview with the fire fighters?

A    No.

Q    Okay.   So, you didn't take notes.   You didn't
     record, correct?

A    Correct.

Q    Yet somehow you put in the police report that
     was prepared early Sunday, Sunday afternoon, and
     Monday, you put in statements made by the fire
     fighters, which look like they're about a page
     in length?

A    Okay.

Q    Is that true?

A    Yes, sir.

Q    Okay.   You were able to remember that from your
     recollection?

A    That was part of it.   I also had their written
     statements.

Q    Now, what happened to your notes?

A    I'm having difficulty trying to remember if I
     took any notes.  I took some notes.  I don't
     know where my notes are at right now.

Q    Pardon?

A    I said I don't know where my notes are right
     now.  I don't even remember taking hardly any
     notes at all.

Q    So, is it your testimony that you shredded your
     notes?

A    I may have, what little I had.  Shredder, got
     destroyed, usually I make a practice of
     shredding them, but . . .

Q    Wait, I'm not --- Just answer the question.  Did
     you shred your notes?

A    I don't recall exactly.

Q    Okay.  Did you have your notes when there was a
     prior hearing in this case in April for the
     27th?

A    (Interposing)  I had made notes ---

Q    (Interposing)  Did you have your notes at a
     prior hearing in this case in April before Judge
     McKenzie?

A    No.  I don't think I had any notes for the whole
     interview process.  I don't think I had any
     notes --- took any notes at all.  So, no.

Q    Okay.  So, I asked you on April 27th, you were
     testifying before Judge McKenzie, you were sworn
     to tell the truth, correct?

A    Yes, sir.

Q    I asked you, page 104, line 19; "Did you
     preserve those notes?"

            And you answered, "I may have them in
     the station somewhere."

            Do you remember that testimony?

A    Yes.

Q    And, I asked you on page --- line 25, "Those
     notes could still exist?"

            And you said, "They may."?  Correct?

A    Possibly, yes.

Q    I asked for Sederlund's notes also, do you
     remember that?

A    Yes.

Q    What was your response?

A    Possibly they may.

Q    So, you weren't in the active of shredding of
     the notes at that point, were you?

A    Say that again?

Q    You weren't active in any shredding of the

     notes, either yours or Sederlund's by that time,

     isn't that true?

A    I don't know --- I don't understand your

     question.

Q    I'm sorry.  I know it is sort of an awkward

     question.

          Did you partake in any note shredding

     at any time regarding the notes taken in this

     case?

A    No.

Q    Did you see Sederlund shred his notes taken in

     this case?

A    No.

Q    And you know that we've asked that those notes

     be produced, correct?

A    Yes.

Q    And they have not been produced, have they?

A    Which notes?

Q    Your notes?

A    I didn't have any notes.  I don't remember even

     taking any notes for this.  I didn't have any

     notes.

Q    Okay.  Sederlund's notes?

A    Sederlund had notes, yes.

Q    They haven't been produced either, have they?

A    Some of them have.

Q    The note regarding the 'swear to'?

A    Yes.

Q    Okay.  What about the notes regarding the
     interview with Sara Weaver?

A    I think there's a --- we do have a note with her
     name on there.  I mean if that's a note.  Her
     name is on there along with some other people
     that we talked to.

Q    The notes of the interview?

A    I don't believe so, they are not in the file.

Q    The notes of the interview with Dr. Fleming,
     have they been produced?

A    No.

Q    The notes of the interview with Heather
     McBurney, have they been produced?

A    No.

Q    The notes of the interview with Steven McBurney,
     have they been produced?

A    No.

Q     Okay.  And, we certainly have --- excuse me.

      You and Officer Sederlund haven't produced any

      recordings of any of those interviews either,

      have you?

A     That's correct.

Q     Because you say none of it was recorded?

A     I wish it would have been.

Q     You say none of it was recorded, is that

      correct?

A     That is correct.

Q     All right.

            Now, on December 2nd, that was a

      Saturday, true?

A     Yes, sir.

Q     You got up at five o'clock (5:00) that day?

A     Five-thirty (5:30).

Q     Five-thirty.  Five-thirty (5:30)?

A     Yes, sir.

            MR. WHITE:  Your Honor, could I

      approach --- sister counsel and I approach for a

      second?

            THE COURT:  You may.

(Whereupon a discussion was held at the
Bench, out of the hearing of the Jury and
the Court Reporter.)

●   *   *

THE COURT:  It's about five minutes to
eleven, we've been going for quite a stretch at
this time.  Ladies and Gentlemen, we will take a
recess and I would ask you to return to the Jury
room.  Don't talk about the case.  Okay.  We'll
be back with you.

THE CLERK:  All rise for the Jury.

(Whereupon the Jury left the courtroom at
10:50 a.m. and a recess was taken.)

*  *  *

THE COURT:  Thank you.

The record will reflect the Jury is
excused.  You may all be seated.  We'll take a
break for a little while.  Deputy, we'll give
you a call, okay.

THE DEPUTY:  Thank you, Judge.

THE COURT:  Counsel, Miss Pope-
Starnes, Mr. White, your appearances are noted
the Defendant is present and ready to proceed.

MS. POPE-STARNES:  Your Honor, I have

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

one matter. The Court said that the Court would

withhold ruling on Sergeant Schuldt's statement

or testimony that he thought Sergeant Sovik said

that he was recording him.

I ask that that be stricken as

hearsay.

THE COURT: Thank you.

Mr. White.

MR. WHITE: It's not hearsay, because

he said that he made no such statement to

Sergeant Schuldt or anybody else, and that is a

prior inconsistent statement. That is not

hearsay.

First of all ---

THE COURT: (Interposing) Hold on,

before --- let me --- I don't want to have to

replay the tape, but I don't recollect

specifics. Can you recollect specifically what

the question was and what the answer was.

MS. POPE-STARNES: I don't recollect

what the question was, but the answer was, 'That

he thought he remembered that Sergeant Sovik

told him that he was going to be recording him.'

When he was talking to him.

THE COURT:  Okay.

MS. POPE-STARNES:  And I asked after He said it that it be stricken as hearsay and the Court said the Court was going to withhold.

THE COURT:  Okay. And, you say that is not hearsay, or you dispute her rendition?

MR. WHITE:  Um --- the way I remember it is 'Were there any recording devices --- were there any recording devices.'  'I remember I was asked by one of them if they could record it.'

THE COURT:  And, you say that is not hearsay?

MR. WHITE:  That is not hearsay. Number 1.

Number 2, he's made --- in his testimony here, plus his Affidavit, all his other testimony throughout this case, including the Walker Hearing, that he never recorded any of the interviews with any of the witnesses.

Okay.  So, it is not hearsay.  It goes --- it is an inconsistent statement of this Officer, Judge.

THE COURT:  It is not hearsay because it is inconsistent?

MR. WHITE:  No, it is not hearsay because it is not being offered for the proof -- - to prove the truth of the matter asserted.  It is an inconsistent statement of the police officer, sure it is.  And I ask the Court, as I have asked numerous times in this case for recordings and this is extremely troubling that we have a witness come forward at this time and state that this police officer asked to record the interview.

An interview that he did not take any notes.  So, not only is it proper for the Jury to consider whether this police officer is telling the truth as to this issue, but as to all issues including statements regarding the statements of my client is absolutely critical evidence in the case.

MS. POPE-STARNES:  Your Honor, if I may respond.

Number 1, it is clear it is being offered for the truth of the matter asserted, based on Counsel's argument.

Number 2, M R E 6 13, clearly says, 'For prior inconsistent statements you must

first ask the witness, the person who has made the statement, and then if there is a prior inconsistent. . .' because you have to give them an opportunity to correct it first.

So, correctly if it is done properly Sergeant Sovik should be asked first in front of the Jury and then if he does not correct it, then you can bring in the other witness to offer the prior inconsistent statement.

That's not what Counsel did.  He asked this witness first before giving Sergeant Sovik that opportunity.  So he has not followed the Rule of Evidence in regards to that.

THE COURT:  Thank you.  The Court has --- I've got to call it, folks.  We've got to call it.  I've heard the arguments of both Counsel and I will grant the motion for the reasons stated by the People.

If you want to draw something up, I will certainly consider it and read it.

All right.  Thank you.

MR. WHITE:  Well, then I am going to move for a mistrial.

THE COURT:  Okay.

MR. WHITE: I'm moving for a mistrial

now, because this is the critical part of the

case. And, if you can't allow me to present

this evidence without --- I beg to differ with

the Court, then my client is not getting a fair

trial.

It simply --- this is the critical

issue of the case is the accuracy of the

statements made by my client, because the

medical evidence certainly don't show, certainly

had no support to the alleged statements of my

client.

And you've already got an Affidavit

from this police officer as part of our request,

our discovery request that he had no recording

devices for any witness.

Would you like to see that Affidavit?

THE COURT: Do you have a motion

pending before the Court, Mr. White? Proceed

with your motion.

MR. WHITE: Would you like to see the

Affidavit?

THE COURT: Don't ask --- don't ask me

a question.

MR. WHITE: Well, I'm going to ask you a question, because I am going to ask you if you are familiar with the facts of the case. He made a prior --- he's made a statement in this case. In this court record, that there were no recording devices.

Now he says none.

THE COURT: Okay.

MR. WHITE: A witness has come forward after he has testified at exam, at a Walker Hearing, and supplied an Affidavit. He said he asked that --- that this police officer asked if he could record the interview. It is clear, Judge it's an inconsistent statement. It's clear and if you're not going to give me a fair shot at the Jury regarding this case then mistry it. Mistry it, okay? Because I don't think the Court's ruling is fair, and I don't think it gives Mr. McBurney a fair trial.

THE COURT: Response to the motion?

MS. POPE-STARNES: My response is, your Honor, if he wants to show a prior inconsistent statement of this witness he has to ask the witness first, and then if it is still

inconsistent to his belief, then bring in the other person.  He has hasn't followed the Rules of Evidence.

THE COURT:  The motion --- the motion is for a mistrial.

MS. POPE-STARNES:  And I don't believe that there is a basis that has been shown, under the law, for this case to be mistried.

Counsel still has the opportunity to bring that witness back and then do it properly under the Rules of Evidence.  There is no reason to mistry this.

And, he still has to follow the Rules of Evidence and the statement that came in was hearsay.

THE COURT:  Anything final?

MR. WHITE:  I would ask for a mistrial, because we have not been provided with the tapes and I have asked over and over again. And if it doesn't trouble the Court, it certainly troubles me.

THE COURT:  The Court denies the mistrial for the reasons stated by the People.

You may proceed.  Bring in the Jury.

MR. WHITE:   Then I would like Officer Schuldt back today.

THE COURT:   Noted.

MR. WHITE:   If it is procedure then I'll bring him back today.

THE COURT:   So noted.

MR. WHITE:   What ---

THE COURT:   (Interposing)   Well, then talk to her.   What --- I don't know, what do you want me to go out an find him?

MR. WHITE:   No, I want you to order him to be returned.

MS. POPE-STARNES:   The Witness --- the Court did release the Witness.

THE COURT:   Do you have the access to the Witness?   I don't have his phone number.   I don't know how Counsel expects me to go find him.   He just said to order him to do it and I'll go out there and chase him down to find him.

MS. POPE-STARNES:   I understand, Judge.

MR. WHITE:   No, I want the Court's order.

THE COURT: Then supply the Court with the ability to do so, Mr. White. I can just yell I'm ordering him to be here, but he's not here so he's not listening.

So, if you want to talk to Counsel privately and maybe she can get a phone number to you and you can call him and if he doesn't appear we can deal with it.

MR. WHITE: Do you have a problem ---

THE COURT: (Interposing) If you ask me one more question, Mr. White, when I've told you in advance, 'Do not ask me questions', there will be contempt proceedings. I told you, do not ask me questions and I'm telling you again, 'Do not ask questions.'

MR. WHITE: The Court ---

THE COURT: (Interposing) We will address --- we will address the issue about your request off the record after the Jury has resumed --- has retired for lunch, but we will proceed with the jury trial now on cross-examination.

You can talk to Miss Pope-Starnes

About finding this witness, and if you need my

assistance I will consider it at that time.  But

not now, I don't have the information to make it

happen.

Bring in the Jury.

THE CLERK:  All rise for the Jury.

(Whereupon the Jury was returned to

the courtroom at 11:40 a.m.)

\*   \*   \*

THE COURT:  Good morning again,

everyone.  Thank you for your patience.

The record will reflect that the Jury

is back, the case has been called, Counsel's

names have been noted for the record.  The

witness is back on the stand and, sir, you are

reminded you are still under oath required to

testify truthfully and honestly.

Thank you.

Mr. White, you may proceed.

**C H R I S T O P H E R   S O V I K**

**After having been previously sworn to tell the truth,**

**the whole truth, and nothing but the truth was**

**examined further as follows:**

**CROSS-EXAMINATION**

**BY MR. WHITE:**

Q   Officer, before you left the Northville Police
Department on December 2nd, 2006, the four fire
fighters that you personally interviewed alone
were Craig Johnston, correct?

A   Yes, sir.

Q   David Johnson?

A   Yes, sir.

Q   Alex Smith?

A   Yes, sir.

Q   And Kevin Schuldt?

A   Yes, sir.

Q   Did you say to any of them, that you request
permission to record any of the interviews?

A   No.

Q   Did you, in fact, record any of the interviews?

A   No.

Q   Now, correct me if I'm wrong. What your
testimony today is you don't recall whether you
destroyed your notes?

A   That is correct.

Q   Okay. So, when I asked for your notes to be
produced in this case before, you supplied an
Affidavit, did you not?

A    Yes, sir.

Q    Okay. And, your Affidavit says, 'Any notes I took during the interview of witnesses during the McBurney investigation were destroyed after written police reports were completed.'

        Is that your signed Affidavit?

A    Yes, sir.

Q    Okay. So, when I asked before they were destroyed, now they may be around, correct? Is that your testimony?

A    No.

Q    All right. Now, you also said that that Affidavit that you possessed, paragraph 6, 'That I did not use or possess any recording device during the interview of any witnesses involving Madison McBurney.' Right?

A    Yes, sir.

Q    That's a true statement.

A    Absolutely.

Q    Okay. Now, you said you made some attempt to find a recorder before you left the station?

A    Yes, sir.

Q    Sederlund made an attempt also, correct?

A    Yes, sir.

Q     Okay.  Neither one of you were successful in
      finding a workable recorder; is that a fair
      statement?

A     That's correct.

Q     Okay.  But, that was the extent of your attempt
      to try to get any kind of electronic recording
      device, according to you, correct?

A     Yes, sir.

Q     Okay.  You didn't stop at any stores?

A     No, sir.

Q     You didn't ask the police officers or police
      department, whoever you talked to in Northville
      Township for a recorder, did you?

A     No, sir.

Q     And, you certainly didn't ask anybody at the
      hospital to assist you in giving you a recording
      device for these most important interviews that
      were coming up?

A     I did not request any.

Q     Okay.  And, this was your first big case, is
      that a fair statement?

A     Yes, sir.

Q     Okay.  You'd been up since five-thirty (5:30) in
      the morning?

A    Yes, sir.

Q    Were arriving at the hospital sometime after
     midnight?

A    No, sir --- oh, yes, sir.  Yes.

Q    You hadn't slept all day?

A    That's correct.

Q    Weren't taking any --- excuse me, ingesting any
     caffine?

A    No, sir.

Q    Okay.  And, weren't taking many notes at all,
     were you?

A    Yes, that's correct.

Q    Okay.  And, Officer Sederlund, was he taking
     many notes?

A    Yes.

Q    Okay.  So then he took notes with Sara Weaver?

A    I think so.

Q    And he took the notes with Dr. Fleming?

A    Yes, sir.

Q    And he took the notes with Heather McBurney?

A    Yes, sir.

Q    And he took the notes with Steve McBurney?

A    Yes, sir.

Q     What kind of police equipment did you have on
      your person that night?

A     I had my gun on my right side.  I had my
      handcuffs in my back belt loop.  And I had my
      identification badge.

Q     Okay.  And, did you have any kind of strap
      across your chest at any time during any of the
      interviews?

A     I don't believe so.

Q     Did you have any kind of device that would click
      when you put your hand on it?

A     No.

Q     Now, when you interviewed Dr. Fleming, you
      discussed the nature of Madison's injuries?

A     Yes, sir.

Q     And you talked with her?

A     Yes, sir.

Q     Now, when you interviewed Heather, in the room
      were Regina, the nurse, Sara Weaver, Child
      Protective Service Worker, Officer Sederlund and
      yourself, true?

A     Yes, sir.

Q     And, when you were done with Heather you had
      Regina escort Heather back to Madison's room?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I don't know if she escorted her or not.  I know
     she left the room at one point.

Q    Okay.  And she left the room with Regina, isn't
     that true?

A    Yes, sir.

Q    Okay.  And then after Heather left the room
     Steven was brought back in the room?

A    Yes.

Q    Okay.  And, in that room was Steven, yourself,
     and Sara Weaver?

A    I don't recall if she was in there when he came
     in.

Q    Okay.  In fact she was, and you stated something
     to her, 'Do you need anything else?'  Isn't that
     true?

A    I don't recall her being in there.

Q    So you don't remember that?

A    No.

Q    Okay.  And then she stated something and you
     walked her?

A    I walked out?

Q    No, she walked out.

A    I don't remember her being in there when Steven
     was in there.

Q    Okay.  Now, during the interview, we can agree

     that Sara Weaver wasn't in there?

A    That is correct.

Q    And, we know that prior to start --- before you

     started interrogating Steven about what

     happened, you didn't give him his Miranda

     Rights, isn't that true?

A    That is correct.

Q    Okay.  You didn't ask him how long he had been

     without sleep?

A    I did not.

Q    Okay.  You didn't ask him whether he was under

     any medication?

A    No.

Q    You didn't ask him if he needed food or water,

     did you?

A    I did not.

Q    Okay.  In fact, when you interviewed him, you

     noticed that it looked like he had just woke up,

     isn't that a fair statement?

A    Yes.

Q    Now, when you asked him about injuries to

     Madison.  You, in fact, told him that you know

     he caused the injuries, isn't that true?

A    I said those words.

Q    You said those words?

A    Yes.

Q    In fact, you said those words repeatedly, did

     you not?

A    No, sir.

Q    In fact, you told him that you had conclusive

     evidence that Madison's injuries were non-

     accidental, correct?

A    Yes, sir.

Q    And that they were indicative of 'shaken baby

     syndrome'?

A    I did not say that to him.

Q    And that was information that you received from

     Dr. Fleming?

A    (No verbal response.)

Q    And, after you told him that you know he caused

     the injuries to Madison, that's when he said,

     'My life is over.'?

A    Eventually he said that, yes.

Q    Okay.  And that's in quotes in your police

     report, correct?

A    Yes.

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Okay.  And then Sederlund left.  You had a

     discussion that you conveyed to the Jury with

     Steven after Sederlund was out of the room,

     about Heather saying he was a good father,

     people make mistakes, loved his daughter,

     correct?

A    Yes, sir.

Q    You are putting yourself on the same plain with

     him?

A    Yes, sir.

Q    Is that your testimony?

A    Yes, sir, that's correct.

Q    Okay.  You learned that in interrogation

     classes, correct?

A    Yes.

Q    And Steve began crying?

A    He did.

Q    And, shortly thereafter Heather was brought back

     into the room?

A    Yes.

Q    The first thing that he said about Heather,

     excuse me, about Madison after some discourse

     was, 'I made a mistake.'  Correct?

A    That's not the first thing he said.

Q    About Madison?

A    Yes.

Q    And that's in quotes in your police report too, correct?

A    It might be.

Q    Would you like to see it?

A    If you say it is, then I will take your word for it.

Q    Okay.  And then Steve said, 'I threw her into the crib.'

         Correct?

A    Yes.

Q    And that's in quotes, too, isn't it?

A    If you are telling me it is, then I'll take your word for it and say yes.

Q    Can I --- please ---

A    (Interposing)  I don't recall.  I will have to take a look at it.

Q    Would you like to take a look at it?

A    So I can better answer your question, yes, sir.

Q    Okay.

         MR. WHITE:  If I may approach.

         THE WITNESS:  Yes, they are.

Q   **(By Mr. White, continuing)**   Okay.   Again, now

regarding the conversation with Steven at this

point, there is nothing else in your police

report from that point on that is in quotes; is

that a fair statement?

A   That could be true.

Q   Okay.   Would you like to look at it?

A   If I could, so I can give you an honest answer,

yes.

          That is correct.

Q   Okay.

          MR. WHITE:   If I may approach, again.

Q   **(By Mr. White, continuing)**   So, it is your

testimony, though, that Steve said a bunch of

other statements that you believe were

incriminating, but somehow they did not end up

in your police report with quotes on them?   Is

that your testimony?

A   Yes, sir.

Q   Okay.   And, supposedly he said that he threw her

into the crib and the back of her head hit one

of the what?

A   Bars.

Q    Bars.  Is that what it says?  Is that what he
     said?

A    That's what he said, yes.

Q    He didn't say spindle, did he?

A    No, sir.

Q    He didn't.  That was your word?

A    Yes, sir.

Q    Okay.  Now, you said that Steve said that
     Madison was screaming in his ear?

A    Yes, sir.

Q    Threw her in the crib and hit one of the bars?

A    (No verbal response.)

Q    He didn't demonstrate anything to you, isn't
     that true?

A    That is correct, he did not.

Q    You didn't ask him to demonstrate anything to
     him --- to you, did you?

A    No, sir.

Q    Okay.  You didn't ask where in the crib her head
     supposedly hit on the bars, did you?

A    No.

Q    You didn't ask him whether she made any noises
     after her head supposedly hit the bars, did you?

A    Nope.

Q    You didn't ask him whether there was any damage
     done to any of the bars in the crib, did you?

A    No.

Q    In fact, when you contacted Baaki to confiscate
     this crib, you didn't instruct that officer, or
     any officer, to conduct one iota of forensic
     analysis of this --- to this crib, did you?

A    No.

Q    So, the situation presented to you at that point
     was a possible comp impact injury to the crib,
     to one of the bars, the child serious injuries
     and you don't even ask that there --- it be
     inspected for any evidence of contact, isn't
     that true?

A    You're asking me if I assigned someone to do
     that?

Q    Yes.

A    I did not.

Q    Okày.  You were the Officer-in-charge of this
     case, isn't that true?

A    One of them.

Q    In fact, the only thing that you instructed
     Baaki to do is grab the crib and take it to the
     South Lyon Police Department, correct?

A    I advised him to confiscate the crib and take it back to the Department, yes, sir.

Q    Okay. And, that crib has been in your possession, or the possession of the South Lyon Police Department since then, correct?

A    Yes, sir.

Q    Okay. So it can be brought to court?

A`    Yes, sir.

Q    And there has not one bit of analytical forensic investigation of this crib whatsoever, has there?

A    There has not.

Q    Okay. You haven't looked for a spot where the head hit, have you?

A    Are you asking me?

Q    You?

A    Yes, sir.

Q    You looked for a spot?

A    Yes, sir.

Q    You did?

A    Yes, sir.

Q    Where is that in any of your reports?

A    It's not.

Q   Okay. You didn't have any forensic scientist
    look, did you?

A   No, sir.

Q   In fact, there was a sheet on this bed too,
    wasn't there, that was confiscated?

A   There still is, just underneath. It has been a
    while since I've had kids. I put it together
    wrong.

Q   Okay. And you didn't have any forensic analysis
    done on that sheet either, did you?

A   No.

Q   Okay. Now, he told you about the other
    accident involving Madison where he was carrying
    her in the bouncy-seat and it --- the bottom, it
    caught on the edge of the couch and she tipped
    out and fell approximately five feet to the
    floor.

        You remember that conversation?

A   Yes, sir.

Q   Okay. In fact, --- excuse me --- he told you it
    was much earlier than a couple of months before,
    isn't that true?

A   No, it is not true.

Q    In fact, he told you it was February of that
     year?

A    He did not.

Q    In fact, he also demonstrated how it happened,
     did he not?

A    Yes, sir.

Q    Okay. He also told you that he took Madison to
     the mother and the both of them took Madison to
     the hospital?

A    Yes, sir.

Q    Now, when you left the room with Sederlund and
     left Heather and Steve in that room. There was
     a conversation that took place between Heather
     and Steve, wasn't that true?

A    There may have been.

Q    Okay. And that conversation was recorded by the
     device that you had on your person and then on
     the floor during that interview, correct?

A    No.

Q    And, that conversation is also included in your
     police report, isn't that true?

A    No. I don't know what conversation they had.

Q    It was a conversation about Madison and the
     child care arrangements, isn't that true?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A     Could you be more specific, Counselor?

Q     It was the conversation that Steve and Heather

      had about Madison and child care arrangements,

      isn't that true?

A     I'm not understanding what child care

      arrangements your discussing.  That you're

      questioning?

Q     The ones that you talked about on direct

      examination?

A     The testimony that I gave ---

Q     (Interposing)  Isn't that true, yes or no?

A     If you could try your question one more time,

      Counselor?

Q     The conversation that took place while you were

      out of the room and Sederlund was out of the

      room, was the conversation that Steve and

      Heather had about the child care arrangements,

      isn't that true?

A     No, that is not true.

              MR. WHITE:  Nothing further.

              THE COURT:  It's a couple of minutes

      to twelve o'clock, so if you have questions, the

      People, we'll break at this time for lunch.

Ladies and Gentlemen, like I have said before, please don't discuss the case and just return to the jury room for a couple minutes and we will resume at one-thirty (1:30).

Thank you.

THE CLERK:  All rise for the Jury.

(Whereupon the Jury left the courtroom at 12:00 noon.)

\*   \*   \*

THE COURT:  Thank you.  The record will reflect that the Jury is excused.  You may all be seated. You're all set, sir and we'll resume at one thirty (1:30).

MR. WHITE:  I would ask the Court to issue and order that the Witness Kevin Schuldt return today or tomorrow.  I would ask the Court to issue an order.

THE COURT:  Miss Pope-Starnes, do you have any information on this person?

MS. POPE-STARNES:  He is employed by the South Lyon Fire Department we can try calling, we have the telephone number to call there.  I don't know where he was going from here.  They are paid on call, I don't know if he

has a different job in addition to that. I will
supply a phone number so that you can ---

THE COURT: (Interposing) Give
Counsel the phone number, I'll take the motion
under advisement. Mr. White, you try first
before I order it and see if you can do it on a
less intrusive means. And if that's a problem
then let me know and I will address it at that
time.

MR. WHITE: I will, thank you.

THE COURT: Thank you Deputies, we're
fine. Okay.

(Whereupon the matter was recessed for
the luncheon recess.)

* * *

THE CLERK: Calling the case number 0 7
- 2 1 4 6 5 1 - FC.

MS. POPE-STARNES: Good afternoon,
your Honor, Sara Pope-Starnes, Assistant
Prosecutor Attorney, on behalf of the People.

MR. WHITE: Robert White, on behalf of
the Defendant, Steven McBurney.

THE COURT: Good afternoon, he's
present here for the record?

MR. WHITE: A couple of matters. I have a couple more questions of Officer Sovik, if ---

THE COURT: (Interposing) Pardon?

MR. WHITE: I do have a couple more questions of Officer Sovik, if you don't mind.

THE COURT: Have a seat.

MR. WHITE: I do have a couple more questions of Officer Sovik, if you don't mind.

I have tendered to Sister Counsel the Curriculum Vita of Dr. Robert Adams, who is going to be called to testify as a pediatrician in this case.

I didn't expect to qualify him as an expert, but I do now. So I will just wanted to let the Prosecutor know and the Court know he is being called tomorrow at one-thirty (1:30).

I did serve two subpoenas for medical records for Dr. Gregory Pyro (phonetic), and Dr. Lipton's (phonetic) office, which is Brighton Dermatology. In fact, one of the doctors was actually served, both proofs of service are back in my office, but they were to produce certified copies of records yesterday of their file.

They did not. They sent me uncertified copies in the mail. I will try to contact them by phone if they will produce them tomorrow. I will ask the Court, upon proving a proof of service to issue the appropriate for them to appear and show cause why they shouldn't be held in contempt for non-compliance with a subpoena.

THE COURT: Do you want to call them on a break today and use our phone and then if we can nip it in the bud a little bit?

MR. WHITE: I will try. The phone number is back in my office, but I will try to get them to give us a certified copy by days end tomorrow.

THE COURT Okay.

MR. WHITE: And so that is my preliminary matters.

THE COURT: Okay. All right. Are you ready to proceed then, both of you?

MS. POPE-STARNES: Yes, I think I would just have the same response. You know, I would not have an objection if they even just

FAXed over the documents.  I would agree to a

FAX.

            THE COURT:  All right.

            MR. WHITE:  I need to do everything

right, this is a ---

            THE COURT:  (Interposing)  All right.

That's fine.

            MR. WHITE:  Thank you.

            THE COURT:  Bring the Jury in.

            (Whereupon the Jury was returned to

            the courtroom at 1:40 p.m.)

    \*   \*   \*

            THE CLERK:  All rise for the Jury.

            THE COURT:  Good afternoon, again,

everyone.

            Thank you.  You may all be seated.

The record will reflect that the Jury is

back, the case has been called, Counsel's names

have been noted for the record and the witness

is back on the stand.

            Sir, you are reminded you are still

under oath required to testify truthfully and

honestly.

            THE WITNESS:  Yes, sir.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

THE COURT:  Mr. White, you may

continue.

**C H R I S T O P H E R    S O V I K**

**After have been previously sworn to tell the truth,**

**the whole truth and nothing but the truth, was**

**examined and testified further as follows:**

### CROSS-EXAMINATION
### (Continuing)

**BY MR. WHITE:**

Q    Officer, just so the record is clear, isn't it

true that you asked South Lyon fire fighter,

Kevin Schuldt, permission to record his

interview?

A    Absolutely not.

Q    Isn't it true that you recorded his interview?

A    No.

Q    Isn't it true that you had a recorder with you?

A    No.

MR. WHITE:  I don't have any further

questions.

Thank you.

### REDIRECT EXAMINATION

**BY MS. POPE-STARNES:**

Q   Sergeant Sovik, Counsel asked you on cross-examination if you had any kind of strap that you were wearing, that you had about your body at the time of the interview of Defendant in the conference room in the early morning hours of December 3rd of 2006.

Can you describe the clothes that you were wearing?

A   I had a black leather jacket at about mid-waist right here (indicating) there are two strings that kind of hung down so you could actually tightened near the waist.

Q   Were you sleep deprived at the time of that interview?

A   No.

Q   Did the Defendant appear to be sleep deprived at the time of that interview?

A   No.

Q   Did he appear to understand the questions that you were asking him?

A   Yes.

Q   Why didn't you give him, or advise him of his Miranda Rights, or give him Miranda Rights?

A   He wasn't in custody.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    You were asked some questions about the crib and

     whether or not you had any forensic analysis of

     it done.

              Where was the crib kept in your police

     department?

A    It was kept in what is called the 'evidence

     cage', which is in the sally-port, which is

     where the cars come in.  The second half of the

     sally-port is where we store files and other

     evidence and other things.

Q    And, did you look at the crib?

A    Yes.

Q    When did you look at the crib?

A    About a week after the initial interview.

Q    Can you tell the Jury what, if anything, unusual

     you found at the crib?

A    I didn't notice anything unusual about the crib.

Q    Why didn't you send the crib to the crime lab to

     have some kind of forensic analysis done?

A    After I inspected it there was no --- there were

     no cracks in any of the bars or the inside the

     crib itself.  I knew from the investigation

     there was no blood anywhere.  I just assumed ---

     I just knew it was Madison's crib, so I didn't

think there was any analysis that needed to be done. I mean, what we were going to find in there was stuff from Madison.

Q When you looked at it, did you see anything that was discolored or could be considered to even possibly be blood in there?

A No.

Q How tall is the Defendant?

A About five eight.

Q Finally, you were asked a question by Counsel about what occurred in the conference room when you and Detective Sederlund stepped out and locked the Defendant and Mrs. McBurney in the conference room?

A (No verbal response.)

Q Were you present in that room when you left it?

A No.

Q Do you have any personal knowledge of any conversation that might have gone on in that room?

A No.

Q Do you have any personal knowledge of whether or not a conversation even occurred when you left the room?

A    I do from a previous hearing.

Q    I'm talking about personal knowledge that you
     witnessed that night.

A    No.  I did not even see them talking.

Q    Okay.

             MS. POPE-STARNES:  Thank you, I have
     no other questions.

### RECROSS-EXAMINATION

**BY MR. WHITE:**

Q    Officer, you are not a trained forensic
     scientist are you?

A    I am not.

Q    Okay.  You don't have any certification in any
     respect in that regard?

A    Absolutely none.

Q    Okay.  We know that some evidence is not visible
     to the naked eye, isn't that true?

A    That is correct.

Q    And there are a variety of different ways in
     which to gather evidence, including microscopic
     analysis?

A    Yes, sir.

Q    Chemical tests?

A    Yes, sir.

Q    And none of that was done in this case, isn't
     that true?

A    That is correct.

Q    And, the fact that you could have seen anything
     from your naked eye, in your inspection of the
     crib, after it had been moved out of the house
     and put someplace in the South Lyon Police
     Department, doesn't mean that there wasn't
     evidence there, does it?

A    I --- I'm not sure what you mean by evidence?

Q    Evidence.  Evidence that her head did, in fact,
     hit any hard part of the crib?

A    That's correct.

Q    Okay.

               MR. WHITE:  Nothing further.

               MS. POPE-STARNES  Nothing further.

               THE COURT:  Sir, you are all set.

               MS. POPE-STARNES:  Now, your Honor, it
     is my understanding, by agreement, Counsel is
     going to be calling some defense witnesses out
     of order, and we will be calling the medical
     examiner tomorrow morning at 8:30.

               MR. WHITE:  Does that mean that after
     the medical examiner the People rest?

MS. POPE-STARNES:   I can't answer that at this juncture.

MR. WHITE:   Okay.   Then, with the Court's permission I would like to recall Kevin Schuldt to the witness stand.   He testified earlier.

THE COURT:   Okay.   Is he out there.

MR. WHITE:   Yes.

THE COURT:   Okay.   Please come up back up this way.   Please raise your right hand and be sworn.

THE CLERK:   **Do you swear the testimony you are about to give will be the truth, so help you, God?**

THE WITNESS:   **I do.**

THE COURT:   Okay.   Have a seat, thank you.

**K E V I N     S C H U L D T**

**HAVING BEEN PREVIOUSLY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH WAS RECALLED AND TESTIFIED FURTHER AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. WHITE:**

Q    Mr. Schuldt, thank you for coming back this
     afternoon.

            The questions I asked you about your
     interview on or about December 2nd, 2006 by the
     police officers.

            Do you recall those questions?

A    Yes, I do.

Q    Okay.  My question to you is, Number 1, who was
     present?

A    I know for a fact that Officer Sovik was
     present.

Q    Did he, in fact, ask you permission to record
     the interview?

A    I do not remember.

Q    You testified earlier today that he did ask,
     isn't that true?

            MS. POPE-STARNES:  Objection.  That's
     a mischaracterization of his testimony.  The
     testimony was, 'I think he asked.'

Q    **(By Mr. White, continuing)**  Did you testify
     earlier today that you thought he had?

A    Yes, I did.

Q    Okay.  And now you can't remember?

A    Like I stated before, I thought that he did, but

I don't know for a fact.  No, I do not.

Q    He could have asked?

A    There is a chance.

Q    Okay.  Who have you talked to about this case

since you left here?

A    No one.

Q    You didn't talk to Sovik?

A    I radioed him to check to make sure that ---

Q    (Interposing)   Did you talk to Sovik?

A    Not about this case.  Well, yes, I did.

Q    Do you talk to Sederlund?

A    No, I did not.

Q    Did you talk to anyone about the reason why you

were coming back here?

A    No, I did not.

Q    Didn't, in fact, Officer Sovik tape record your

interview?

A    I do not know.

Q    Did you see him take any notes?

A    Um --- I don't recall.

Q    And, you two were the only two in the room?

A    There was one other person in there.  But, I do

not recall who.

MR. WHITE: Thank you.

### CROSS-EXAMINATION

BY MS. POPE-STARNES:

Q    Well, Counselor asked you if it was possible if

Sergeant Sovik asked you if he could record it,

is it possible that he didn't?

A    Absolutely.

Q    Um --- after you left here, you started to say

on direct examination that you Nextelled or two-

wayed, is that what you said?

A    Yes.

Q    Who did you call?

A    I Nextelled Office Sovik to verify that I needed

to come back here.

Q    And, what happened?

A    He told me he couldn't talk to me.

MR. WHITE: Objection. Objection as

to the hearsay.

MS. POPE-STARNES: I'll ask it a

different way.

Q    **(By Ms. Pope-Starnes, continuing)** Did you speak

with Sergeant Sovik about your testimony after

you left here?

A    No, I did not.

Q    Did you speak with me after you left here?

A    Yes, I did.

Q    And I told you you needed to return?

A    Yes, you did.

Q    And, did I instruct you not to talk to the officers before you came back to testify?

A    Yes, you did.

MS. POPE-STARNES:  I have no other questions.

MR. WHITE:  This witness, I have no further questions.

THE COURT:  Thank you, sir, you are all set.

MR. WHITE:  I have a couple of witnesses I am going to call Lynn Peterson of the Pitter-Patter Learning Center.

THE COURT:  Okay.

Ma'am, if you would follow Counsel up this way.  He will lead you to the witness chair.

Good afternoon.  Before you step up here, and be careful when you do.

Please raise your hand and be sworn.

**Do you swear the testimony you are about to give will be the truth, so help you, God?**

THE WITNESS:   Yes.

THE COURT:   Okay.   Thank you.

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

**BY MR. WHITE:**

Q   Would you please state your name for the record?

A   Lynn Schumann-Peterson.

THE COURT REPORTER:   You'll have to keep your voice up.

THE WITNESS:   Oh, sorry.   Lynn Schumann-Peterson.

THE COURT:   Actually, if you could, just kind of pretend like the people back there are who you are talking to, because we have Jurors that are kind of far away.

Okay?

THE WITNESS:   Okay.

Q   **(By Mr. White, continuing)**   And, Miss Peterson, are you employed?

A   Yes, I am.

Q    And, how are you employed?

A    I am self-employed at Pitter-Patter Learning
     Care.

Q    And what is Pitter-Patter?

A    It is a daycare center in South Lyon.

Q    And, how have you been so employed?

              How long have you been so employed?

A    About seven years.

Q    And, what is the age range of the children that
     attend your business?

A    Six weeks up to six years.

Q    Okay. And, if I could direct your attention,
     did you ever have an occasion to have Madison
     McBurney as a child in your Pitter-Patter
     Learning Center?

A    Yes, we did.

Q    Okay. And, can you tell the Jury when that was?

A    I believe it was from some time in October to
     some time in November of 2006.

Q    And, at that time, Miss Peterson, what part ---
     how do you break down the age groups of the
     different groups?

A    In our facility we have an infant room, a
     toddler room, and a pre-school room. And

       infants are anywhere from birth or six weeks, I

       should say, up to approximately fourteen (14)

       months, sixteen (16) months, somewhere in there.

Q     And, when Madison was in Pitter-Patter, where

       was she at?

A     She was in the infant room.

Q     Okay.  And, if you can recall, do you know how

       many other children were in the infant room at

       that time?

A     You know, to the best of my recollection I would

       say between four and six.

Q     And, Madison was there what time of the day?

A     She arrived at seven a.m. and usually left at

       about two.

Q     And, who was the child care providers --- who

       were the child care providers for that room

       during that period of time?

A     It was usually Sharon Klump, and she was usually

       the main person in there during that time.

       There were some other women who had --- could

       have been there as well.

            I believe Barb Pethers (phonetic)

       works in there and Yolanda Adams might have been

       in that room as well.

Q    Did you --- at that time, did you have an active
     roll and also provide care?

A    Yes.

Q    Okay.  And, how would you do that in relation to
     your job as director?

A    As a director I do check in on all the children
     during the day, and you know I observe as a
     person to give breaks to the teachers, to the
     caregivers, so that they can use the bathroom or
     get something to eat.

          I will go in and watch the children
     and help out in anyway I can.  I --- my office
     is very close to the infant room and so I would
     be in there at nap time, especially if they
     needed assistance with some children who were
     tired or who needed to be rocked to sleep, or to
     be held, or to be feed, or whatever.  So I was
     almost like an extra hand as needed.

Q    Okay.  So, did you have an opportunity to get to
     know Madison McBurney?

A    Yes, I did.

Q    And, prior to Madison becoming a student at your
     learning center, did you meet the parents?

A    I believe that prior to Madison coming, I had

only met Heather and then once Madison started I

believe I had met Steve.

Q    Okay. And, is this Steve seated over here

(indicating), do you recognize him?

A    I'm sorry.

         MS. POPE-STARNES: I object, that is

not the proper identification.

         MR. WHITE: Okay. I'll withdraw the

question.

Q    **(By Mr. White, continuing)** Now, when Madison

started at Pitter-Patter, what time did your

place open up in the morning?

A    We opened at seven a.m.

Q    And, were you there at seven a.m.?

A    On some occasions I was. On most occasions I

would say no. But on a few I was.

Q    Okay. On the few occasions that you were there,

did you have an opportunity to see Madison

McBurney in the morning?

A    Yes.

Q    Did you see who brought her in?

A    Her father brought her.

Q    Okay.  And, when she brought --- when he brought

     her in, did you have an opportunity to see

     Madison's condition when she came in?

A    Yes.

Q    Did --- was she properly clothed?

A    Yes.

Q    Okay.  Did she appear properly fed?

A    Yes.

Q    Did you ever see Steve talk to you or anybody

     else, in your presence, about Madison and how

     she was doing?

A    It was normal, you know, normal parent

     questions.

Q    Okay.

A    Comments.

Q    And, over the course of the time, did you have

     an opportunity to observe Madison in Pitter-

     Patter, and how would you describe her as being?

A    Very happy.  A very pleasant child, easy to care

     for.  Happy, normal child.

Q    Okay.  Would she eat?

A    Yes, she ate adequate amounts for her age.

Q    Did she sleep well?

A    Yes.

Q    Did she cry?

A    Very seldom.

Q    All right.  Did you ever hear her scream?

A    Never.

Q    Did you ever see her vomit?

A    Never.

Q    Did she ever appear tired or listless?

A    Not to my recollection?

Q    Did she ever appear irritable?

A    No.

Q    Did you see anything, or observe anything, Miss
     Peterson, that caused you some --- any concern
     about how she was being treated?

A    Never.

Q    Did you ever see anything with the father,
     Steven, the way he conducted himself with his
     daughter, that caused you concern?

A    Never.

Q    Were you there in the afternoon when --- when
     Madison was picked up?

A    Yes.

Q    Okay.  And, was there one person generally who
     picked her up?

A    Yes.

Q     Who was that?

A     Mother.

Q     Have you ever been contacted by the police or the Prosecutor to give a statement in this case?

A     I was contacted to answer a few questions.

Q     By who?

A     This gentleman right here (indicating).

Q     When was that?

          MS. POPE-STARNES:  Objection as to relevance, your Honor.

          MR. WHITE:  Well, in the space of time ---

I think she has offered to the Jury that the investigation was thorough, I just want to find out when this happened.

          THE COURT:  I'll allow it.

          MS. POPE-STARNES:  Thank you.

Q     **(By Mr. White, continuing)**  When was that?

A     I believe it was early January of this year, 2008.

Q     Two thousand eight (2008).

          MR. WHITE:  One second, if I may, your Honor?

          (Whereupon a brief delay was had.)

• * *

MR. WHITE: Nothing further.

THE COURT: Thank you.

The People?

**CROSS-EXAMINATION**

**BY MS. POPE-STARNES:**

Q   Good afternoon.

Is it Miss or Mrs. Peterson?

A   Mrs.

Q   Okay. Thank you.

Mrs. Peterson, how many times did Madison actually --- how many days did Madison actually attend your daycare?

A   Um --- I want to say she was either four or five days a week. I am not a hundred percent (100%) sure, to be honest with you. But, I believe it was four or five days a week.

Q   And, between October of 2006 and November of 2006, what was the total number of days that she attended?

A   Without my records I really couldn't tell you off hand.

Q   Did you bring your records today?

A   No, I did not.

Q    Do you know whether or not she missed any days
     for illness during that period of time?

A    I believe she missed a day or two for doctor
     visits.

Q    Do you know what day she started with your
     program?

A    Once again, I'm not a hundred percent (100%)
     sure, it was some time in October, I believe.

Q    Do you know what her last day was with your
     program?

A    It was some time in November.

Q    Do you know why she stopped coming to your
     program?

A    Her mother had taken her to a doctor's visit,
     and I believe that day --- it was a Tuesday I
     want to say, and that day her mother called us,
     after the doctor's visit and had said that due
     to medical reasons she needs to pull her out.

Q    Now, of those days that she was there four or
     five days a week, except for the couple of days
     she was at the doctor visits between October and
     November of 2006, how many times did you
     personally care for Madison?

A    Um --- I saw her on a daily basis.  Um --- I

mean, did I pick her up and hold her daily?

Probably two to three times a week.

Q    Have you ever been to Madison's home?

A    No.

Q    So, you don't have any personal knowledge about

what happened in her home on November 30th of

2006, do you?

A    No.

Q    And, do you have any personal knowledge how the

Defendant was with Madison, how her father was

with her when there was no one around?

A    No.

        MS. POPE-STARNES:  I don't have any

other questions, Judge.  Thank you.

        MR. WHITE:  I have nothing further of

this witness.

        THE COURT:  Thank you.  You're all

set.

        MR. WHITE:  If I may assist her?

        THE COURT:  Yes.

        MR. WHITE:  I'll run out in the hall

and get another witness.

        (Whereupon a brief delay was had.)

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

\*   \*   \*

      THE COURT: Would you come up this way. Mr. White will escort you up here to the witness chair.

      Ask you to please raise your right hand and be sworn.

      **Do you swear the testimony you are about to give will be the truth, so help you, God?**

      THE WITNESS: Yes.

      THE COURT: Thank you. Have a seat, thanks.

      (Whereupon the witness was sworn at 2:10 p.m.)

\*   \*   \*

**S H A R O N   K L U M P**

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

    **DIRECT EXAMINATION**

**BY MR. WHITE:**

**Q**    Would you please state your name?

A    Sharon Klump.

THE COURT REPORTER:  Spell your last name for me, please.

THE WITNESS:  K L U M P.

Q  **(By Mr. White, continuing)**  And, Sharon, are you employed?

A  Yes, I am.

Q  And, where are you employed?

A  Pitter-Patter Learning Care.

THE COURT:  Can you do it just a little bit louder for us, okay?

THE WITNESS:  Pitter-Patter Learning Care.

Q  **(By Mr. White, continuing)**  And, what do you do for Pitter-Patter?

A  I work in the baby room.

Q  And, what is the baby room?  What is the age range?

A  Usually fifteen (15) months and under.

Q  Okay.  And, how long have you been so employed?

A  A little over three years.

Q  Okay.  And, do you have children of your own?

A  Yes, I do.

Q  How many children?

A  Three.

Q    How old are they?

            MS. POPE-STARNES:  Objection as to

     relevancy, your Honor.

            THE COURT:  I'll allow a little bit of

     background.

Q    **(By Mr. White, continuing)**  What are the ages of

     your children?

A    Okay.  Forty (40), thirty-seven (37), and

     twenty-nine (29).

Q    Okay.  Did you have an opportunity to get to

     know Madison McBurney in your capacity as a

     childcare provider for Pitter-Patter Learning

     Center?

A    Yes, very well.

Q    Okay.  And, what was --- if I can direct your

     attention back to 2006, fall of 2006, what was

     your schedule?

A    I usually opened at seven o'clock (7:00) and I

     work to approximately two o'clock (2:00).

Q    Okay.  And, do you remember the time period that

     Madison was in Pitter-Patter?

A    Usually from about seven to two.

Q    And, the dates?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Oh, the dates?  No, I don't remember the dates.
     Probably six weeks she was there.

Q    Okay.  And, would --- when she was in Pitter-
     Patter for that six weeks, would she be in the
     infant's group the whole time she was there, and
     would that be your shift the whole time she was
     there?

A    Pretty much.

Q    Would you be the primary caregiver for that
     period of time?

A    Usually me and another girl.

Q    Okay.  Did you have the opportunity to get to
     know Madison?

A    Very well.

Q    Who would bring Madison in in the morning?

A    Her father.

Q    And, when she was brought in in the morning, did
     you ever see them before they actually came in
     the door?

A    Occasionally because we open at seven they were
     waiting in the parking lot.

Q    And, when Madison was brought in by her father,
     did you see the condition that Madison was
     brought in?

Was she properly clothed?

A    Oh, yes.

Q    Did she appear fed?

A    Yes.

Q    Okay.  Did --- did you talk to her father about
     her?

A    Um --- small talk.  You know, 'How's she doing?'
     And, 'What time was she fed?'  Because we record
     what time their first feeding was.

Q    Did he provide the information?

A    Oh, yes.

Q    Okay.  Now, getting to know Madison, and being a
     seasoned mother of your own, yourself, would you
     describe her?  How would you describe her as a
     baby?

A    Um --- She was a little angel.  So sweet.  And
     probably one of the best babies we ever had.

Q    Did she eat well for you?

A    She was a small eater, but she was tiny.  But
     she had a jar of baby food.

Q    Did she sleep well for you?

A    Yeah.  She was very easy to put down.  We just
     laid her down and she went to sleep.

Q    Did she cry, Sharon?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    I never heard her cry.  She was very good

     natured.

Q    Did you ever hear her scream?

A    No.

Q    Did you ever see her vomit?

A    No.  Never.

Q    Did you ever see her acting irritable?

A    Never.

Q    Did you ever see her acting listless?  Listless

     and tired at times when she would normally be

     awake?

A    No.

Q    Did you ever see her acting contrary to this

     disposition of happy baby?  Little angle that

     you talked about?

A    No.

Q    Did you ever see anything, Sharon, on Madison

     that caused you concern about the way that she

     was treated outside your establishment?

A    No.

Q    Did you ever observe anything with regard to her

     father, the way that he conducted himself with

     her in your presence that caused you concern?

A    No.

Q    Were you present when Madison left at the end of
     the day?

A    Occasionally, yes.

Q    Okay.  And, who would pick her up?

A    Her mother.

                    MR. WHITE:  Just a minute, your Honor.

                    (Whereupon a brief delay was had.)

          *   *   *

                    MR. WHITE:  I have nothing further.

                    THE COURT:  Thank you.  Cross-exam.

                    **CROSS-EXAMINATION**

**BY MS. POPE-STARNES:**

Q    Do you know what separation anxiety is?

A    Yes, I think so.

Q    Have you taken care of children who have had
     that?

A    Oh, yes.

Q    Did you ever see that in Madison?

A    No, not at all.

Q    And, you don't have any personal knowledge of
     what happened in her home on November 30th of
     2006, do you?

A    No.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And, you don't know how the Defendant was with
     Madison when no one else was around, do you?

A    No.

          MS. POPE-STARNES:  Thank you.  I have
     no other questions, your Honor.

          MR. WHITE:  I have no other questions.
     Thank you.  If I may walk around that.

          THE COURT:  Yes, just be careful
     stepping down.

          MR. WHITE:  If I may step out in the
     hall, Judge?

          THE COURT:  Yes.

          Sir, if you would just work your way
     up this way.

          THE WITNESS:  Certainly.

          THE COURT:  Please raise your right
     hand and be sworn.

          THE COURT:  **Do you swear the testimony
     you are about to give will be the truth, so help
     you, God.**

          THE WITNESS:  I certainly do.

          THE COURT:  Okay.  Thanks.

          (Whereupon the witness was sworn at
          2:20 p.m.)

\* \* \*

# GARY LINBILIE

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE**

**TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE**

**TRUTH, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

## DIRECT EXAMINATION

BY MR. WHITE:

Q    Would you please state your full name.

A    Gary ---

Q    (Interposing)  And spell your last name.

A    L I N B I L L E.

Q    And, what area do you reside?

A    Kalamazoo, Michigan.

Q    And, are you married?

A    Yes.

Q    And, the name of your wife?

A    Susan.

Q    Do you have children?

A    Two daughters.

Q    And their names?

A    Heather and Shannon.

Q    Is Heather married?

A    Yes.

Q    And, who is Heather's husband?

A     Steven.

Q     Do you recognize him in this courtroom?

A     Yes.

Q     And, how are you employed, sir?

A     Currently I'm retired.

Q     And, what was your previous area or profession?

A     Kind of two.  When I first got out of college I
      worked for pharmaceutical companies and then I
      went in to business for myself designing and
      selling group health insurance programs to both
      small and medium sized companies.

Q     Okay.  If you can recall, when did you first
      meet Steven?

A     Oh, introduced by Heather.  Date-wise, I don't
      know.  Prior to their getting married, probably
      a year before just as a guess.

Q     Okay.  And, did you have an opportunity to visit
      with Heather and Steven together, before they
      were married?

A     A couple of times yes, um-hum.

Q     Did you attend their wedding?

A     Yes.

Q     Where was it?

A     Las Vegas, Nevada.

Q    Okay.  And, did you have an opportunity to visit
     with Steven and Heather after they were married?

A    Yes.

Q    And, they had a child together, Madison?

A    Correct.

Q    Were you present when Madison was born?

A    No, I wasn't.  Kind of odd circumstances.  Both
     daughters were due at the same time, within a
     couple of days of each other.  Our other
     daughter, at that time, lived in South Carolina,
     Charleston.

          She was due two days, I think it was,
     after Heather.  We went to Heather's first.
     Heather's was late  from the original time frame
     everybody was looking at.

          Shannon, our other daughter, had ---
     this was her second child and so we went down to
     South Carolina to take care of that one, because
     she was delivering then.  And then after the
     traveling --- the child in South Carolina was
     born we came back up.

Q    Okay.  Was Heather --- by the time you got back
     up here was Heather home, or was she ---

A    (Interposing)  She was home then.

Q    Okay.  With the baby?

A    Yes.

Q    And with Steve?

A    Yes.

Q    Okay.  After that, did you have an opportunity

to visit with Heather, Steve and Madison?

A    Yes.

Q    During the course of the next eleven (11)

months?

A    Yes.

Q    And, where would it be that you would visit with

them?

A    Um --- primarily two places.  One would have

been their house and the other one was --- some

friends of ours who lived in a small town called

Howell, Michigan, Heather knew them very well,

so we would quite often be at their house.

Accommodations were a little easier

for us to stay over at their house for the

weekend.  We would perhaps see Steve and Heather

for lunch the day before, and then the next day,

on the weekend, they would come over to the

friends house in Howell.  They lived on a lake

we'd fish and ride around on the boat and catch
something.

Q    And, this was with Madison?

A    Yes.

Q    Okay.  Did they ever come to your house in
Kalamazoo?

A    Um --- Once for sure, Thanksgiving, just before
Madison died.

Q    Did you have an opportunity, in your mind, Mr.
Linbille, to observe the relationship between
Steve and Madison?

A    Yes.

Q    And, how would you characterize that
relationship?

A    Very protective and attentive, overly so.

Q    Was their anything you observed, Mr. Linbille
about Steve's behavior with Madison that caused
you concern?

A    No.

Q    Was there anything that you observed about
Madison's health that caused you concern?

A    Well, the only thing that caused me concern was
that she had a hip problem that she had to wear
a brace for.  But that was a problem at birth.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Now, you said you were --- had them visit for
     Thanksgiving?

A    Correct.

Q    Two thousand six (2006)?

A    Yes.

Q    Okay.  And, who was present during that visit?

A    My brother and sister-in-law, Don and Jan Miller
     of --- a sister of my wife. They were from a
     small town in Wisconsin, another small town,
     Lacquan (phonetic), which is near Milwaukee.
     Heather, Steve, Susan and I, I think that was
     probably it.

Q    Was Madison there?

A    Oh, yes, I'm sorry.

Q    And, I assume that you had an opportunity to
     observe what was going on with Steve and Madison
     and Heather.

A    Yes.

Q    Okay.  How would you describe Madison as a baby?

A    I had two daughters. One daughter, Heather,
     never cried, ever.   Shannon, the other
     daughter, never quit crying.

          Madison followed her mother, she never
     cried.  Always just very quiet, looking around.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Q   Did you observe anything unusual that

Thanksgiving, about the way Steve was acting,

Steve was acting with Madison?

A   No.

Q   Was his behavior with her consistent with what

you described, protective?

A   Yes.

Q   Would you characterize him as a loving father?

A   From what I could see, yes.

MR. WHITE:    Nothing further of this

witness.

THE COURT:    Thank you.  Cross-exam.

**CROSS-EXAMINATION**

**BY MS. POPE-STARNES:**

Q   Good afternoon, Mr. Linbille.

A   Good afternoon.

Q   You testified that the Defendant was very

protective and attentive to Madison.  Would you

describe that for the Jury.

A   Yes.  Madison --- well he would always have

Madison right by him.  If Madison started to

drool, you weren't going to be able to get their

faster than Steve was to wipe off the drool, or

feed her the food, or feed her the bottle, or whatever.

Q    Lets talk about Thanksgiving.

A    Okay.

Q    Of 2007. Can you tell the Jury how Madison appeared when you saw her at Thanksgiving?

A    Quiet. Clean, well kept. Watched her mother's every move. It's really quite hard to explain what little babies do. Mothers are better at it then perhaps fathers or grandfathers in explaining what little babies do.

Q    Did she appear sick at all?

A    No.

Q    Did you have any concerns about her sleep for a month or two?

A    No.

Q    Was she walking by that time?

A    No. The --- she had a hip problem when she was born, which is corrected by wearing a splint, which is a strap type of apparatus, and it was taking a considerable length of time for it to improve. So that was my real concern.

Q    So, she wasn't walking, was she even able to crawl with this device?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Not very well, because what essentially she

     would be sitting with her legs spread wide apart

     to keep her one leg into the hip joint.

Q    Now, ---

A    (Interposing)  She liked walking --- watching

     the little dogs running around.  That she did

     for sure.

Q    Mr. Linbille, do you recall how you learned that

     Madison was at the University of Michigan

     Hospital?

A    Yes.  I got a call from my daughter to our house

     ---

          MR. WHITE:  (Interposing)  Objection

     as to the substance of the statement.

          THE COURT:  Okay.  I'll ---

          MS. POPE-STARNES:  (Interposing)  I

     believe he just simply said he got a call from

     his daughter.

          THE COURT:  Yeah, it was kind of a ---

          MS. POPE-STARNES:  (Interposing)  I

     believe it is the answer to my question, your

     Honor.

THE COURT: (Continuing) . . . it's a preventive objection, but go ahead we can move on.

Q   **(By MS. Pope-Starnes, continuing)** After you got a call from your daughter, Mr. Linbille, what did you do?

A   I and my wife packed up and went over there right away.

Q   Do you know which day it was?

A   Ho, ho, ho, it all blended together. I could look it up on my calendar because I had a stress test the next day. What I turned around and came back to do, and then while I was in the doctor's office I got the call that Madison wasn't doing well at all. And didn't take the stress test and went back to the hospital.

Q   When you and your wife got to University of Michigan Hospital, do you recall what part of the hospital Madison was in at that time?

A   Yes, there was one thing I did before I left is --- I had gone to the other school in Michigan, the one that is green and white, so I checked on the computer to see the ranking of the Pediatric Hospital portion in the United States Hospital

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

wise, and Michigan ranked very, very high. So I was happy that she was there. She was in with the best doctors.

Q    Okay. But, my question is, 'Do you recall was she in the Emergency Room, was she in the ICU --
-

A    (Interposing) No, she was --- at that time she was in, I believe, what was called Pediatric Intensive Care.

Q    Okay. So, when you got there, who was there?

A    Uh --- my wife, Heather. They had been up all night. I don't believe Steve was there, I think he had gone home and gone to bed. Lots of nurses, lots of doctors.

Q    Did there come some point during the time that you were at U of M where you asked the Defendant what happened?

A    Yes.

Q    Do you recall what day that was?

A    Uh --- I'm not so sure that I asked. I specifically asked --- it might have been my wife asked the question and he mentioned ---

Q    (Interposing) Let me stop you. First, do you recall one, which day it was?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    It would have been the first day.

Q    And, what was the Defendant's response?

A    The Defendant's response was 'that he was

     changing her clothes in the living room and then

     had gone back for an outfit change', or

     something like that.   'When he came back she had

     fallen over and was in convulsions.'

Q    Did there come a point, sir, later during the

     time that Madison was at the University of

     Michigan, where you heard the Defendant make a

     different statement about what happened to

     Madison on November 30th?

A    Yes.

Q    When was that?

A    It would have probably been at some point the

     following day, when friends of Heather and so-

     forth had come up to the hospital.

Q    And tell the Jury, please, what the Defendant

     said happened at that point?

     A    Off to the side I could hear him giving an

     explanation of what happened.  A similar type of

     story except it was in a different room.   It was

     in the bedroom.   And I thought that that was

     odd, but people get confused sometimes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Now, Mr. Linbille, are you familiar with
     something called 'separation anxiety'?

A    Yes.

Q    And, did you ever see Madison ever show any kind
     of 'separation anxiety'?

A    It is really --- she was such a quiet child it
     is really hard to tell, but she would not stop
     watching her mother.

          If --- most of the time she was with
     the mother when she was around us.  Most of the
     time.  She loved her mother.

Q    And, finally, Mr. Linbille, were you present at
     --- in your daughter's home on November 30th,
     2006?

A    Is that the date that the police came?

Q    On the day that Madison was injured, were you
     present in the home?

          MR. WHITE:  Objection, your Honor.
     That presupposes facts that are not in evidence.
     They are disputed facts.

          THE WITNESS:  I'm sorry, because ---

          THE COURT:  (Interposing)  Just --- it
     can go both ways, just rephrase it Miss Pope-
     Starnes.

THE WITNESS: Could you repeat the question, I'm sorry.

Q **(By Ms. Pope-Starnes, continuing)** The day that Madison went in the ambulance to University of Michigan Hospital, were you present in the --- Heather's home?

A I don't believe so.

Q So, you don't have any personal knowledge of what happened when the Defendant was home alone with Madison, do you?

A Oh, no. No. I had gone that day --- I had gone to the hospital and back home again. My wife stayed. I went back for medical tests the next day.

Q And, Mr. Linbille, isn't it true that you don't have any idea how the Defendant was? How he treated Madison, when he was alone with her?

A I do now. I didn't then.

MS. POPE-STARNES: Thank you. I have no further questions.

MR. WHITE: I have no questions.

THE COURT: Thank you, sir. You're all set

MR. WHITE: My other two witnesses can't be here until tomorrow. I'm sorry, but --

THE COURT: (Interposing) Well, you know what, let's take a break.

I'll take a short recess at this time. I'll talk to Counsel.

All rise for the Jury.

(Whereupon the Jury left the courtroom at 2:30 p.m.)

\*   \*   \*

THE COURT: You all may be seated. Let the record reflect that the Jury has been excused.

I didn't want to talk about scheduling issues in front of the Jury, I didn't need them to get mad one way the other.

MR. WHITE: My apologies.

THE COURT: No, that's all right.

Okay. So, no witnesses anymore from either side right now?

MR. WHITE: I can't right.

THE COURT: Okay. That's --- just finding out. And, nothing from your end?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MS. POPE-STARNES:  Dr. Dragovich.  I
anticipate ---

THE COURT:  (Interposing)  He's
tomorrow.

MS. POPE-STARNES:  I anticipate right
now he will be the last and he is scheduled here
right at eight-thirty (8:30).

MR. WHITE:  And I have one witness
showing up late morning, after Dr. Dragovic and
then Dr. Adams at one-thirty (1:30).  And I
believe that is our case. I'll rest.

THE COURT:  Okay.

MS. POPE-STARNES:  And then the Court
had indicated that if we were done early that
that was when the Court will address any issues.
We also have Jury Instructions.

THE COURT:  I was wondering if --- I
was wondering whether we could get some things
done in that regard.  It would be some things
done, or work on those things in the meantime
right now, since we can't do anything more with
then previously at the end --- at the close of
proofs, but maybe some --- we can make some
headway and work on it now.

MR. WHITE: Okay. I was given some cites by Sister Counsel and the Court's Research Attorney. I would ask --- I would like to go right to the library and get the cases and be able to address it tomorrow. It would make more sense.

THE COURT: Okay. Agreeable?

MS. POPE-STARNES: That's fine.

THE COURT: Okay. All right. We'll --- I will editorialize to the Jury and I will just tell them that Scheduling the way it is and we will just resume at 8:30 tomorrow morning and leave it at that.

MR. WHITE: Thank you.

MS. POPE-STARNES: Okay.

THE COURT: All right. Thank you.

MS. POPE-STARNES: Judge, at this point are you going to tell them that we --- from our discussion yesterday you anticipate that they will have the case in their hands on Tuesday?

THE COURT: Is that still the --- fingers crossed assessment?

MR. WHITE: It looks like it.

THE COURT: Okay. Jeff, you can tell them that too, in case they are inquiring, fingers crossed Tuesday it will be in their hands, okay.

All right. Thanks. Have a good afternoon everyone.

Thank you Deputies, very much.

THE CLERK: All rise.

(Whereupon the matter was completed for this day.)

\* \* \*

CERTIFICATE

STATE OF MICHIGAN )

      SS

COUNTY OF OAKLAND )

     I, **Lynn E. Erickson,** Official Court Reporter for the Sixth Judicial Circuit Court, State of Michigan, do hereby certify that the attached is a true and correct transcript of the hearing held in this matter.

**Lynn E. Erickson, Court Reporter  CSR-0188**