STATE OF MICHIGAN

IN THE SIXTH JUDICIAL CIRCUIT COURT, COUNTY OF OAKLAND

THE PEOPLE OF THE STATE OF MICHIGAN,

OAKLAND COUNTY **07-214651-FC**

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

        Plaintiff,

VERSUS -           File No. 2007-214651-FC

STEVEN LINSEY MCBURNEY,

        Defendant,

                            /

*(margin stamp: BY: DEPUTY COUNTY CLERK / OAKLAND COUNTY CLERK / 2008 AUG 14 A 11: 23 / RECEIVED FOR FILING)*

**TRIAL**

        Proceedings had in the above-entitled

matter, held before the **HONORABLE DANIEL PATRICK**

**O'BRIEN,** Judge of the Sixth Judicial Circuit Court

for the County of Oakland, Michigan on Friday,

February 29th, 2008 8th day.

APPEARANCES:

SARA POPE-STARNES
Assistant Prosecuting Attorney

    Appearing on behalf of the People

ROBERT WHITE
Attorney-at-Law

    Appearing on behalf of the Defendant

Lynn E. Erickson, Court Reporter, CSR-0188

# I N D E X

WITNESSES:                                               **PAGE**

    **FOR THE PEOPLE:**

DR. LJUBISA DRAGOVIC:

   Direct Examination, by Ms. Pope-Starnes    6
   Cross-Examination, by Mr. White    59
   Redirect Examination, by Ms. Pope-Starnes  106
   Recross-Examination, by Mr. White  110

    **FOR THE DEFENDANT:**

DR. ROBERT ADAMS:

DIRECT EXAMINATION, BY MR. WHITE    125
CROSS-EXAMINATION, By MS. POPE-STARNES    126

  DIRECT EXAMINATION,  BY MS. POPE-STARNES
  CROSS-EXAMINATION,  BY MR. WHITE
  REDIRECT EXAMINATION, BY MS. POPE-STARNES
  RECROSS-EXAMINATION, BY MR. WHITE

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

6th Judicial Circuit Court

County of Oakland, Michigan

Friday, February 29th, 2008

(8th day)

* * *

THE CLERK:   All rise.   The Honorable Daniel Patrick O'Brien presiding.

THE COURT:   Be seated everyone.   Thank you.

Go ahead.

THE CLERK:   The Court calls People versus Steven McBurney, docket number 2007-2 1 4 6 5 1-FC.

MS. POPE-STARNES:   Good morning, your Honor, Sara Pope-Starnes, Assistant Prosecuting Attorney.

THE COURT:   Good morning.

MR. WHITE:   Robert White, appearing on behalf of the Defendant McBurney.

We are ready.

THE COURT:   Thank you, good morning,

Are you ready to proceed?

MS. POPE-STARNES:   Yes.

MR. WHITE:   We are.

THE COURT:  Would you bring in the Jury.

THE COURT:  So Counsel is aware, I am going to mention to the Jury the importance of being on time.  I guess there is one that's been kind of routinely tardy.  So I'll just make a --- I won't point it out to the Juror in particular, but just kind of mention it to them. Just so you know what is going on.

(Whereupon the Jury was returned to the courtroom at 9:10 a.m.)

* * *

THE CLERK:  All rise for the Jury.

THE COURT:  Good morning everyone.

THE JURORS EN MASSE:  Good morning.

THE COURT:  You may all be seated.

How are you feeling back there, Ma'am? Still feeling tough.  Okay.  Appreciate your perseverance.

Your may all be seated, the record will reflect that the Jury is back, the case has been called and Counsel's names have been noted for the record.

Ladies and Gentlemen, just a brief

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

thing before we get going, more for the Jury's benefit then for mine, I've kind of got to emphasize the importance of everybody trying to be here on time, and it is not for my sake or for the lawyer's sake, or for the litigant's sake, but rather for the Jury's sake.

If everybody was late from the Jury that is fine, because I'm trying my best to accommodate all of you.  But, if some of you not prompt then it kind of is unfair to everybody else.  So --- not to mention it is kind of difficult for the litigants and the witnesses and everybody else.

But, if everybody could do your best we are almost getting towards the end.  So if everybody could make a concerted effort to get here on time that would be great.   Thank you.

Ms. Pope-Starnes.

MS. POPE-STARNES: Your Honor, the People would call Dr. Dragovic to the stand.

THE COURT:  Thank you.

Sir, if you would approach this way, please.

I would ask you to face my Clerk and raise your right hand and be sworn.

THE CLERK: **Do you swear the testimony you are about to give is the truth, so help you, God?**

THE WITNESS: **I do.**

THE COURT: Thanks. You can have a seat there.

(Whereupon the witness was sworn at 9:10 a.m.)

\* \* \*

**L J U B I S A   J O V A N   D R A G O V I C**

**After having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:**

**DIRECT EXAMINATION**

**BY MS. POPE-STARNES:**

Q    Sir, could you please state your name and spell your first and last name for the record.

A    I am Ljubisa Jovan Dragovic. That's L J U B I S A. My middle J O V A N. Last D R A G O V I C.

Q    And, can you tell the Jury, please, how you are employed?

6

A    I'm a Forensic Pathologist and a Neuropathologist, and I am employed in the capacity of the Chief Medical Examiner and Chief Forensic Pathologist for the County of Oakland.

Q    Dr. Dragovic, where did you attend medical school?

A    University of Belgrade in Belgrade. It used to be Yugoslavia, a country that doesn't exist any more, but the city is still there and the university and the medical school.

Q    What year did you graduate from medical school?

A    Almost thirty-three (33) years ago. Back in 1975.

Q    After completing medical school, what did you do next in the course of your profession?

A    I did a rotating internship at the university hospitals there.

    I did my compulsory military service there for eleven and a half months, which I worked in the capacity of regimental medical officer.

    Then I did some general practice, together with my wife, at a rural town in northeast part of that country at the time.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Then I joined the Department of
Pathology at Queen's University in Kingston,
Canada and specialized in pathology.

Then I was --- I was certified by the
American Board of Pathology Department, taking
the specialty exam in anatomical pathology, back
in 1982.

Then I continued sub-specializing in
Neuropathology there and my senior fellowship
year was at the University of Toronto, Toronto,
Canada.

Then I got certified in that specialty
in the Board of Pathology, that was back in '85.

Then that year we moved to this
county, because my wife was recruited by a major
hospital system here, and I had no choice but to
tag along with the kids and the dog and
everybody else.

So, I started working as a consultant
for the University downtown, Wayne State
University at the division of Biological
Psychiatry as a Neuropathology consultant.

And, somehow I got identified as a
suitable recipient for an award and this was

Russell S. Fisher Fellowship award that took me to Baltimore, Maryland to special in forensic pathology.

And, there at the Office of the Chief Medical Examiner for the State of Maryland I completed my specialty training in forensic pathology.

And, in the meantime while I was there and took the specialty exam, got certified in that specialty and got recruited to come back to work in Detroit as a forensic pathologist and neuropathologist for the Wayne County Medical Examiner's Office.

And, I started there in 1987, July 1st, 1987. Worked there for about three and a half years serving in different capacities including being acting Chief Medical Examiner there.

And then I was recruited by this County to lead the Medical Examiner's Officer here and I have been working in that capacity this is my eighteenth (18th) year now, seventeen (17) years plus.

Q     Now, Dr. Dragovic, can you explain the word
      'forensic pathology' for us?

A     Yes.  Forensic pathologist is a physician that
      specializes in 'forensic pathology'.

      Forensic pathology is 'public' pathology.
It is a branch of medicine and pathology that
deals with public issues.  Word 'forensic' comes
from Latin word 'forum', which is a place of
public gathering.  And a forensic pathologist is
one that is designated by virtue his or her
functioning and by the general expectations of
the public to do the investigation of a death.

      Defining the cause of death, that is
why someone died and the manner of death that is
how that came upon that person.  And report it
to the public or representatives of the public.
For example, Juries and the Court of law.

Q     What is a 'neuropathologist'?

A     A neuropathologist' is a physician specializing
      in the area of neuropathology, which is the
      discipline of understanding of mechanisms of
      diseases and injuries of the brain, the spinal
      chord, peripheral nerves, skeletal muscles.

Q    Now, Dr. Dragovic, during the course of your

duties as the Chief Medical Examiner in Oakland

County, approximately how many autopsies do you

perform a year?

A    That is variable.  The figure of the years has

varied from about three hundred (300) plus to

about a hundred (100), or even less than a

hundred (100), in the years that we had full

compliment of forensic pathologists, because

then I don't have to --- to work as much in the

trenches as --- and spend more time to reviewing

the materials and overseeing the functioning of

the agency as a whole.

Q    Okay.  In the course of your work as --- do you

also conduct autopsies for other counties?

A    Oh, we have done on and off over years to inter-

governmental contract work for Livingston County

and work for Genesee County.

We also take cases per request from

any jurisdiction in the State or out of the

State.  Of course that would be the parties that

requested, whether that is government or private

entities pay our county for those services.  So,

that's taxpayer's benefit also.

Q   Is it always a Prosecutor's Offices that make
    those requests of you?

A   No, it can be criminal defense attorneys, civil
    attorneys, depending on the issues involved.
    Human rights attorneys, Constitutional lawyers,
    it really varies from case to case and they know
    that we are available for those services coast
    to coast and they send us cases from time to
    time.

Q   Dr. Dragovic, have you ever been qualified as an
    expert in a Court of Law?

A   Yes, Ma'am.

Q   Approximately how many times?

A   I don't keep track of that, but sometimes it's
    once a week, once every couple of weeks, other
    times it might be several times in a given day,
    depending on how many situations I have to run
    to court about.

Q   And has this been over the course of your --- I
    think you said eighteen (18) years with the
    Oakland County Medical Examiner's Office?

A   Well, eighteen (18) years with the Oakland
    County and the years before with Wayne County
    and another year with the State of Maryland.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And, do you know --- can you give us some
     examples of the different courts that you have
     been qualified as an expert?

A    District Courts, Circuit Courts, Federal Courts,
     in the State, throughout the State, out the
     State, east coast, west coast, down southern
     States, Florida, Alabama, New Mexico,
     California.

           MS. POPE-STARNES:  Your Honor, I would
     ask that this witness be qualified as an expert
     in forensic pathology and neuropathology.

           MR. WHITE:  No objection.

           HE COURT:  So qualified.

           THE WITNESS:  Thank you, your Honor.

Q    **(By Ms. Pope-Starnes, continuing)**  Now, Dr.
     Dragovic, did you have occasion have occasion to
     perform an autopsy on a little girl by the name
     of Madison McBurney?

A    Yes, Ma'am.

Q    Do you recall when it was that you performed
     that autopsy?

A    It was almost a year and a half, a year plus
     ago.

           MR. WHITE:  Your Honor, if the good

13

Doctor is going to review his file, I would ask that he try to testify first and then ---

THE COURT: Sure. Just as a recollection if he needs it.

MS. POPE-STARNES May I approach the witness?

THE COURT: You may.

Q   **(By Ms. Pope-Starnes, continuing)** Dr. Dragovic, I am showing you what has been marked as People's proposed Exhibit Number 17 (indicting).

Do you recognize that, sir?

A   Yes, this is a --- Exhibit 17 is a photostatic copy of the original Autopsy Protocol that I issued on Madison Olivia McBurney.

Q   Okay. Is this a fair and accurate copy?

A   Yes, it is.

Q   Okay. And, is this Autopsy Protocol kept in the normal and ordinary course of business of the Oakland County Medical Examiner's Office?

A   Yes, it is.

MS. POPE-STARNES: Your Honor, I would move for the admission of People's proposed Exhibit 17 as People's Exhibit 17.

MR. WHITE: May I take one quick look at it?

MS. POPE-STARNES: Yes. I would ask that the record reflect I did show Counsel this Exhibit before we began.

MR. WHITE: She did.

No objections.

THE COURT: So admitted.

Q **(By Ms. Pope-Starnes, continuing)** Dr. Dragovoc, would your Autopsy Protocol refresh your memory as to --- specifically what dates you conducted the autopsy on Madison McBurney?

A Certainly. And that is why I pulled it out, because I handle hundreds of cases and have no way of remembering the particulars of every single case without refreshing my memory from the records.

Q Do you have a copy of your Autopsy Protocol?

A I have the original Protocol here.

Q I asked you to look at that and read it silently to yourself. After you have had an opportunity to refresh your memory, let me know, please?

A Yes. I have done so.

Q Does that refresh your memory?

A    Yes, it does.

Q    When did you conduct the autopsy on Madison
     McBurney?

A    I performed the autopsy on the 6th day of
     December, 2006 on the deceased, who was eleven
     (11) months of age and it started the autopsy at
     eight forty (8:40) in the morning.

Q    And, can you tell the Jury, please, what was the
     first thing you did when you began to conduct
     the autopsy of Madison McBurney?

A    Examined the outside of the body.  Documented
     the findings from the outside of the body.

          And I proceeded opening the body
     cavities and examining the organs within the
     body cavities and documenting those as well.

Q    What were your external examination, if any?

A    The external examination revealed some defects
     on the scalp.

          MR. WHITE:  Your Honor, excuse me.  I
     would ask if he not read from his Autopsy.  If
     he needs it to ---

          THE COURT REPORTER:  (Interposing) I'm
     sorry, I can't hear you Mr. White.

          MR. WHITE:  I'm sorry.  I'm sorry.

THE COURT REPORTER: We're going to have problem.

MR. WHITE: I'm sorry. I'm sorry. I asked the Doctor if he would not read from his Autopsy, if he needs it to refresh his recollection that he could tell you.

MS. POPE-STARNES: Your Honor, he was not. He had it in his hands and he was looking at the Jury as he was talking, not at the document.

THE COURT: I don't know what he was doing or not doing, but Doctor, if you could just do that to the extent that you can speak from memory do so, and if you can't just notify the Prosecutor and she will tell you what to do.

THE WITNESS: I will, your Honor.

THE COURT: Thank you.

THE WITNESS: Just in general, without looking at the details in the Protocol, there were defects on the scalp, and there was loss of hair from the scalp that was related to the condition. A pre-existing condition of this baby.

There were --- there was some indications of medical treatment rendered, with a catheter being present and the upper part of the right side of the head. And, for the purposes of monitoring the pressure within the head.

And that was basically the extent of the --- of anything of significant on the outside of the body.

The child, I have to refresh my memory about the actual length of the --- of the child's body was twenty-eight (28) inches. And the weight was thirty-two (32) pounds.

Q **(By Ms. Pope-Starnes, continuing)** And, was it a female or male?

A This was a male --- I'm sorry, this was a female child, a white female child.

Q Based on your education and experience Dr. Dragovic, was her size and weight appropriate for an eleven (11) month old?

A Well, without checking the milligrams, I would say yes, it is reflective of the age. But there may be some variation up and down when one

compares the statistically, the majority of children of that age.

Q    Can you describe for the Jury the defects of the scalp that you observed?

A    The defects in the scalp was there was missing hair, which we refer to as 'alopecia', or baldness, which is focal, or those were areas of missing hair.

      And the skin looked like scared skin, but actually the --- these were the incomplete formation of the scalp there as a result of congenital anomaly that the baby had. They are congenital aphasia of the skin.

Q    After you completed the external --- excuse me, external examination of Madison's body, can you tell the Jury, please what you did next?

A    Then I proceeded in opening the body cavities, and examined the organs within the body cavities, that means the chest and belly cavity, and the head, the cranial cavity.

      Examined the brain only after it was prepared for subsequent examination after preparation and fixative,  Examined the brain

coverings and photographically documented those finings.

And then examined the bottoms of the eyes and the eye nerve, the 'optic nerve', the second nerve --- second cranial nerves in relation to the findings of the head.

The findings in the head, basically, were reflective of 'old bleed' under the hard coverings of the brain.

Q    What is that, Doctor?

A    'Old bleed'.

Q    The range, the area that you are talking about where you observed that?

A    I'm talking about the space beneath the hard coverings of the brain that we refer to in medicine as 'dura'. 'Dura' meaning the hard membrane.

So there was a remote bleed and then there was a more recent bleed that would have been approximately days or up to a week or so. Just based on gross examination.

Those were --- structures were subsequently prepared in foramen for further

examination and I continued that examination at
a later date.

And I examined the brain tissue and
the brain coverings as well.

Q    Can you explain to the Jury why it is that you
have to fixate the brain and do this later
examination?

A    Sure.  The brain tissue is jello-like and it
cannot be successfully examined if it is
examined fresh.  It has to be hardened in order
to keep its margins and to offer itself when one
cross-sections to check for injury, defect,
damage of any type.

So, it is a standard procedure to
remove the brain tissue, place it in formaline
fixitive.  It gets hardened after approximately
two or so weeks, whenever it is ready for
examination it is examined then and
photographically documented.

Q    Can you tell the Jury when you conducted that
examination of the brain after it had been in
the formaline what, if anything, you observed?

A    I observed evidence of, as I indicated earlier,
the old bleed beneath the dura, beneath the hard

covering and the recent bleed of the hard coverings.

I also observed that the brain was --- I observed early on, during the actual autopsy, the brain was swollen and showed evidence or herniation, which is a phenomena where the brain function is compromised.

The brain becomes swollen and tries to expand within the skull. Since there is no enough space in the skull the brain is forced to seep down through the opening of the skull at the bottom of it.

The crate opening that we refer to as 'foramen magnum', where the brain stem and the spinal chord continues.

So that type of situation creates the compromise of respiratory function and when --- when the person is still alive and generally that is a complication which a person dies unless some medical intervention is implemented.

And this simply happens because there is compromise space over the surface of the brain because there is blood accumulating there pushing on the brain causing this to happen.

As a result of that condition I also found on examination of the brain tissue that there was extensive rotting of the brain tissue. The infarcts that occur as a result of compromised blood flow because of brain swelling, herniations.

Q    What is 'infarcts', what does that mean?

A    'Infarct' it means rotten tissue. This is the tissue that is deprived of adequate blood supply and where there is no blood supply any tissue that is deprived of blood supply rots. Basically falls apart.

Q    The term 'necrosis', Dr. Dragovic, what does that mean?

A    "Necrosis' is basically rotting.

       And, of course, it happens before death, that is how we identify necrosis. Necrosis does not occur after death. It's a pre-mortive.

Q    Did you find evidence of necrosis and infracts to Madison's brain?

A    Yes. Well, necrosis and infracts is the same except 'infract' is a particular area that is defined. So, whenever we say 'infract' that

means that particular part of that tissue, brain
tissue, is necrotic.

Q    Can you tell us the 'bleeds' that you are
talking about beneath the dura, what portions of
the brain did you observe that in?

A    It was over the brain, both sides of the brain.

Q    Both, 'bi-laterally'?

A    Yes, both sides.  'Bi-laterally' is both sides.

Q    When you are talking about the word 'organizing'
in regards to a 'subdural hemorrhage', or
'hematoma', what does that mean?

A    'Organizing' is the process of healing.  Any
time an injury to the body takes place, if the
body continues to live and it is not eliminated,
life is not eliminated by that injury, the body
makes every attempt to heal whatever has been
injured.

And this organization, any time there
is loss of blood within the body, into the body
space, the body cavity, there will be an attempt
by the body to organize, to wall off that
particular area and to absorb that accumulation
of blood and take it away because it's

24

compromising the function of the organ. In this particular case the brain.

So, that's what I mean with 'organization'. Organization starts at the point of injury. The moment the injury is rendered upon any tissue, including brain, the organization begins because the body is trying to fight back. To heal.

When I am talking about 'organizing', I am talking about something that is happening relative to recent injury. Of organizing would be a situation reflective of something that is happening over a period of hours, days, weeks. There is --- in this particular case there had been previous head trauma and previous complete organization underneath both sides of the dura, or about the surface of the brain.

So, there were two distinct processes.

One that is remote and was remote and healed over and another one that was recent, that was reflected even occurring over a period of some days.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Q    Dr. Dragovic, so do I understand from what you
     just said, that the old injury, the previous
     head trauma had completed organization?

A    Yes.

          MR. WHITE:   Objection, your Honor.   I
     object to the leading nature of the question.

          THE COURT:   Sustain that so you can
     rephrase, Counsel.

Q    **(By Ms. Pope-Starnes, continuing)**   Can you tell
     the Jury whether or not the previous head trauma
     had completed organization or not?

A    Yes, it had.   There was evidence of fibrosis, or
     scarring there, and evidence of --- of massive
     accumulation of blood pigment that was deposited
     in between the layers of scar tissue.

Q    Will you explain, please, how 'brain swelling'
     occurs?

A    'Brain swelling' is a vital reaction of the
     brain.   That is the only way the brain reacts to
     anything that's causing any trouble for the
     brain.

          Whether it's an infection, whether
     it's trauma, it's a blunt force trauma, a blunt
     force trauma of bleeding, or simply deprivation

of oxygen supply. The brain is going to --- the tissue gets swollen.

The cells automatically pick up more fluid from the spaces in between them and the brain just gets swollen, increases in size. That is how the brain reacts anytime it's acutely damaged by any type of force.

Q    And, when the swelling incurs, I know you testified how the herniation occurs, but what then is the consequence to the body of the brain herniation?

A    Well, the swelling starts at the point the injury is rendered. Just like anything in life, the life forgets, but that swelling may not be manifest immediately. It may take some time. It may take many minutes to hours for the swelling to reach the proportions where the brain does not have any more space within the skull and starts to push it's lower part to seep down through the opening at the base of the skull.

I have a model here if ---

Q    A model of ---

A    (Interposing)  Of a human head.

Q    Would that be helpful, Doctor, in explaining
     this to the Jury?

A    I think it is for demonstrative purposes only.
     This is a simple, not to scale, model of a human
     ---

          MR. WHITE:  (Interposing)  Just one
     minute, Doctor.

          Judge, could I just push this up so my
     client and I can see.

          THE COURT:  You may.  Just one second.

          MR. WHITE:  Thank you.

          THE COURT:  Yes.

          THE WITNESS:  As I said, this model is
     not to scale, but it is for the purpose of
     illustrating what actually the anatomical
     relationships are within the head.

          We're talking about the cranial
     cavity, where the brain is contained within.
     And, what I have been talking about here you
     have the top of the head (indicating), it is
     artificially cut out to allow us to look inside.

          The tough membrane that we are talking
     about, the 'dura' is depicted here as this
     smooth surface over one side of the brain.

It is stripped over the other side and exposes the bone underneath. So, the 'dura' sits tightly adherent to the bone. On top and on the bottom of the skull.

As damage occurs to the blood vessels that are present in that space in between the inter-surface of this tight membrane and the surface of the brain as a result of movement, sudden movement, and displacement the bleeding starts and the blood accumulates in that space.

As a result of that the accumulation of blood, the more blood accumulates the more space is taken and it pushes the brain down (indicating).

The brain, as a result of that gets swollen, tries to expand but it cannot because there is so much space within, within the skull. And, as the brain gets swollen, the top doesn't allow to go anywhere, so it is the bottom, this round hole down here (indicating) in this model that we refer to as foramen magnum.

The brain stem gets connected to the spinal chord through that foramen and goes down in the spinal canal. Because of the seeping of

the soft jelly-like brain, that is swollen, the
part that are closest to this anatomical
structure, at the bottom of the skull are the
parts of the cerebellum. We refer to them as
'cerebellum tonsils' (phonetic), these are
little tonsils (phonetic) these are little
tonsil like,  bulb-like structures that are down
there next to the brain stem.

As a result of them pushing down on
this swollen brain, this mass goes down, pushes
at the brain stem (indicating).  The push
compromises the breathing function and other
vital functions because all the vital functions
are centered in our brain stem and that will
lead to unresponsiveness of the individual.

In the meantime, this --- this whole
structure that is gone down is we call a
'herniation', bulging down, because of the
squeeze it will become necrotic because of
interference of blood supply.  So you have
complete breakdown.

And, then as a result the swelling of
the brain throughout there is going to be

compromised blood supply to the rest of the
brain.

So, wherever the pressure is the
greatest, the blood vessels will be shut down
and compressed and that's why you get, as a
result, as a consequence, if a person survives
long enough or periods of days, you get necrosis
of the brain elsewhere. You get those infracts
that we talked about earlier.

Q    What was the condition of Madison's brain stem
on your examination?

A    The brain stem was necrotic because of the
pressure of the swollen brain downward. This
whole area inside was necrotic (indicating).

Also the cerebellum was necrotic,
completely disintegrate as a result of impaired
circulation because of expansion of the brain.
The swelling of the brain as a result of that
subdural bleed that occurred as a result of
trauma.

Q    If the brain stem becomes partially or fully
necrotic, what effect does it have on a child's
ability to breath?

31

A    Well, if the brain stem is affected extensively
     the child cannot breath, or no one can breath on
     their own. They may be artificially kept on the
     respitory support for periods of time, but the
     longer that process the longer the process of
     dying of the brain tissue while on respirators.

Q    Now you testified, Dr. Dragovich that you
     examined portions of Madison's eye.

A    That's correct.

Q    Can you explain that, please?

A    The eyes are --- the bottoms of the eyes are
     looked at for evidence of changes, because they
     are --- they are generally accessible to
     clinical examination.  And those showed
     hemorrhage.

          These hemorrhages in the bottoms of
     the eyes are the result of this process of
     massive brain swelling and impaired venous
     return of the blood flow through the bottom of
     the eyes and other associated structures,
     because all of these structures are
     interconnected with the brain.

Q    And that area of the bottom of the eyes, what is
     that called?

A    The innermost layer of the bottom of the eye is 'retina'. And, those are known in medical terminology as 'retinal hemorrhages'.

Q    Now, specifically what did you find from your microscopic examination?

A    The critical findings in microscopic examination pertain to the aging of --- or establishing the origin, the time of origin of subdural hemorrhages.

And while the recent subdural was days old, with very early attempt to organize there was remote subdural that was present for months, many months. I would say something like three, four months or so. Or beyond.

Q    And, when you say 'days old', is that from the time of the autopsy, or from death, or from injury, what are you talking about?

A    Time of death, obviously, because 'autopsy' is the examination of the dead body, when death --- when death comes about all the vital reactions stop. So there is no continued healing after death. So, it is from the point in time of someone's death looking backward, retrospectively.

Q    Now, Dr. Dragovich, after completing your
     examination, including neuropathological
     examination of the brain, did you form a
     diagnosis or opinion as to what happened to
     Madison?

A    Yes.  The cause of death --- I established the
     cause of death which was blunt trauma of head
     and complications, because those complications
     that we talked about occurred as a result of
     that primary occurrence of injury and the manner
     of death was homicide, because it is the result
     --- it was the result, a purposeful act of
     another person.

          That was how death came upon the
     person.

Q    Can you explain to the Jury, please what you
     mean by 'blunt force trauma'?

A    'Blunt force trauma' is an injury to human body,
     any part of human body rendered by physical
     contact with a blunt object.

          Now, the blunt object can be a lot of
     things.  It can be a two-by-four (2X4), it can
     be a lead pipe, it can be a stick, it can be a
     floor, a wall.  It can be a mattress, padded or

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

unpadded. It can be a carpeted floor, it can be a stairway. It can be part of the vehicle, anything that does not have sharp margins to generate the actual breaking of the integrity of the surface human body is considered a blunt force.

For example, a knife that has one sharp edge and the other pretty wide blunt edge, if someone strikes someone with that blunt edge, it is a blunt force, not sharp force. But, if someone gets his body in contact with that sharp edge that's sharp force.

So, that is the definition of 'blunt force trauma'. Again, trauma result --- injury resulting from contact, physical contact with a surface that doesn't have sharp edges.

Q    What happens when there is blunt force trauma to the head?

A    Well, when there is blunt force trauma to the head there is head injury. There is injury to the brain, which is the most precious part that we have in our heads, believed to be the most precious part. Is the most vulnerable organ, tissue as one considers blunt force trauma of

head because through the skull, which is the
hard covering of the brain and the dura
underneath, being the hard membrane, the
physical force is transmitted.

It affects the brain in many different
ways. It depends on how it is rendered and how
it is sustained. And there are numerous ways
that the injuries of the head can result in the
injury of the brain and numerous ways those can
be sustained of course.

Q   Now, Dr. Dragovic, in the course of your
experience, have you ever seen blunt force
trauma to the head when you have done autopsies
where there is no external visible damage to the
head, like a bruise or a laceration?

A   Sure.

Q   And, what is a 'skull fracture'?

A   A 'skull fracture' is loss of integrity of the
bony structure that encloses the brain.

The skull in our bony structure that
covers the brain and if there is fracture of the
skull, it means there is breakage, physical
separation and the loss of continuity of that
structure.

Q    And, then again, in the course of your

     experience in conducting autopsies, have you

     ever found that there is blunt force trauma to

     the head where there is no skull fracture?

A    Sure.

Q    Now, what happens when the head and the surface

     --- the blunt force --- or, excuse me, the blunt

     surface that the head is striking, what happens

     if that surface does not yield to the head?

A    Well, if the surface does not yield it will

     bring the head of an individual to stop.  And it

     does so suddenly that's under the proposition

     that the head is moving.

            I mean, you can have all kinds of

     situations where the head is stationary and it

     changes completely the outcome and the

     complications.

            However, if the head is a moving

     object and strikes and unyielding surface, that

     sudden stop of the head will result in changes

     within the head itself, because the brain that

     is within the head is suspended by these hard

     structures.  The dura that we talked about and

     the skull around it.  And the moment the head

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

stops, the skull will stop at the contact with
the unyielding surface. The brain will, because
of inertia, and because of that minimal space in
between those structures will continue to travel
and will bounce back.

As a result of that movement the snap
here, that movement, the greater the chance for
major damage for the blood vessels on the
surface of the brain that inter connect with the
dura and the greater the chance for a person to
have subdural bleed, or subdural hemorrhage.

Q    Do you have a model, or a doll with you today,
which you can use as demonstrative evidence to
give an example of this to the Jury?

A    Yeah. I brought the one that is routinely used
by us in our office for reenactments. This is
the model of this baby is not to scale. I think
it is at least several inches smaller than the -
-- the decedent in question.

Q    And, can you demonstrate for the Jury the
process that you just talked about of what
occurs when the head strikes a non-moving
surface?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     Well, if I can do it on this surface
      (indicating) first, and then if there is ---
      maybe I can use the --- I see that there is a
      crib there.

           What we are talking about is the head
      striking against the unyielding surface.  Of
      course, if this unyielding surface is not
      padded, if it is hard surface, the metal or hard
      wood, the impact to the scalp will result in
      some bruising or even in breaking of the skin,
      and tearing of the skin of scalp because the
      blood vessels within are suffering from that
      impact.

           One could actually see evidence of
      contact, physical contact with an unyielding
      surface.  But if this area is padded
      (indicating), that means covered by some fluffy
      material like a chair seat or chair back, when
      the head impacts that particular structure.  The
      fluffiness of the padding is in so it protects
      the actual scalp.  There is no damage in the
      skull.  There is no damage in the skull, but the
      head is soft and the continuation of brain's
      inertial movement and bouncing back is

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

maintained. And that is why you have that detrimental effect of sudden stalking impacting the surface.

I can probably demonstrate, is this --

MS. POPE-STARNES: (Interposing) May the witness step down, your Honor?

HE COURT: You may.

(Whereupon the witness left the stand.)

\*        \*        \*

MS. POPE-STARNES: Doctor, this has been admitted as Defense Exhibit J.

Q      **(By Ms. Pope-Starnes, continuing)**      Does this Exhibit have the type of padding or surface that you were talking about?

A      Yes.

Q      And, can you demonstrate to the Jury what you are talking about in reference to, if the hard surface is covered by something?

A      Well, either the sides of the crib, sides of the crib or the bottom is padded, but it is obviously a mattress.

The sudden open arresting the size of

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

the body, arresting the movement of the head,
the motion will result in this chain of dynamics
within the head that caused damage of the brain,
and that can happen like this (indicating), like
this (indicating).

      Of this much of a distance, which is a
foot and a half or so, two feet.

Q    Dr. Dragovic, the injuries that you found ---
are the injuries that you found on autopsy
consistent with the following hypothetical:

      Someone taking the child and throwing
her from two feet away into a crib and the child
hitting her head against the wooden slats of the
crib?

A    Yes. This what I just demonstrated.

Q    Now, Dr. Dragovic, are you familiar with
something called 'hip displacia'?

A    Yes.

Q    Does hip displacia have anything to do with the
cause of Madison McBurney's death?

A    Well, hip displacia is a physical impediment in
a developing child. So, hip displacia to an
extent prevent the developing child from being
able to ambulate on his or her own.

And, in that fashion hip displacia allows for --- with that handicap, physical handicap that limits the movements of the child under the circumstances.

Q   And, are you familiar with 'aplasia cutis congenita'?

A   'Aplacia cutis congenita' is the medical term --- medical term where the skin is not maintaining complete integrity throughout the body and there are areas that simply, for whatever congenital reason defect, do not allow skin to kind of continue smoothly, but rather show these spots that need to be provoked to heal or --- or impress anyone looking at them as scared areas, which this girl had, I think, three of them over her head and the areas of hair loss.  'Efocal elbish.'

Q   And did that condition in Madison McBurney have anything to do with her cause of death?

A   It didn't have anything to do with the cause of death or mechanism of death.  It was a finding that had been present ever since the birth of this child.

42

Q    And, are you familiar with some called the
     'mersa'?

A    I'm sorry?

Q    Are you familiar with something called 'mersa'?

A    'Mersa' is a clinical concept of 'methocycline
     resistant staphococcusoris'.   That's a strain
     of bugs.

          We call them 'bugs' and they are
     present on the --- in the environment.  And it
     is derived from a clinical concept where you
     treat any infection by any bacteria, any bug
     gets into the body and some of them are
     resistant --- some strains are resistant to
     certain antibiotics.

          And, this particular one is
     resistant to antibiotic called Methicillin.  So
     that's where the coinage of the --- of that
     clinical concept is from.

Q    Did you find any evidence that Madison had been
     suffering from mersa?

A    There is no --- there was no evidence of
     infectious process in the body that I could talk
     about, certainly not the septic process that

would imply some type of antibiotic resistant bug.

Q    Now, Dr. Dragovic, when you --- if --- if a body that comes to the Oakland County Medical Examiner's Office is the person who previously had been hospitalized and then taken to the Oakland County Medical Examiner's Office, in part of your investigation into the cause and manner of death, is it a common practice for you to review the hospital medical records?

A    Well, sure, it is part of the investigation. An investigation is the process where you sort a lot of things out. You gather investigation from various sources. You gather investigation from the hospital where an individual that has been injured survived for a period of time.

You talk, if you need to, to those doctors. They give you their view of things. You send out the investigators to gather information elsewhere.

You ask about information from some witnesses of a kind and all of that is taken with a grain of salt. Not to diminish the good work people do in places where the medical care

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

is rendered, but if those people had all the answers then there wouldn't have been a need for that investigation or for an autopsy.

If they knew everything it would have been considered final, and I could happily retire under those circumstances quite frankly. But that does not happen, so it is a painstaking process of sorting out things from beliefs.

Beliefs by police, beliefs by other investigators, police by our investigators from our office that independently gather information. Their impressions, the impressions of the doctors, impressions of the nurses, all kinds of specialists, they have impressions and personal beliefs about things.

Yes, you have to look at all of that you, of course, cannot take that for granted and at it's face value. It is what --- those are the materials that one has to review and to set aside some of the things and to consider some of the information.

Obviously it is important to have some idea about the timeline. We have to know when an individual is admitted to the hospital, when

the individual was first rendered care, when the

individual first came under the consideration

for being given care or reported as injured.

You need that.

But then, what goes through the minds

of the great people that keep us alive, in all

the area hospitals and throughout the state, is

really not so much critical and important for

our consideration in our investigation because

their business is to keep the people alive, and

they may do it with more or less success.

Our business is to provide some real

answers about the cause and manner of death,

that's our Statutory duty and that's how we go

about it.  Without trying to put down any other

professional, please understand that.

Q    All these professionals you talk about, are

doctors who make clinical findings, the police

officers who do --- who conduct the

investigations, after you do an autopsy do you

ever find that you disagree with them?

A    It's unbelievable how difficult it is to drive

back the information from the objective findings

from the autopsy, including the evidentiary

photographs into the heads of some of the most
esteemed specialists in the field.   Sometimes.
Not all the times.

But, that is simply because medicine
is practiced by human beings, human beings who
have their knowledge, their beliefs, their
habits, their dogmas, and their egos, just like
everybody else.

MR. WHITE:   I'm sorry, Doctor, did you
say 'dogmas'?

THE WITNESS:   'Dogma' and 'egos'.

MR. WHITE:   'Egos', E G O S, right?

THE WITNESS:   Yes.

Q     **(By Ms. Pope-Starnes, continuing)**   Now, Dr.
Dragovic, do you have an opinion as to whether
or not the remote, or chronic, or old subdural
hematoma that you observed with Madison
McBurney, could have just rebled spontaneously?

A     The remote subdurals do not rebleed
spontaneously, but they will make the individual
who has them as a pre-existing condition more
vulnerable to re-injury and a lesser amount of
force would result in the same kind of injury
simply because they --- there is a change

already in vascularization of the area above the
brain, in the hard coverings of the brain, that
is already being compromised for the rest of
someone's life.

So it is not like an individual
without any injury prior to this particular
occurrence.

Q    Is there anyway for you to measure the amount of
force that is needed?

A    No.   The --- the way to look at it is that the
outcome is a reflection of the force.   And as I
demonstrated there the movement that is fast,
that is not the resulting in breaking of every
structure in someone's body.

But the snap in this movement, and the
relatively short distance that's all it takes.
And, again, with a compromised individual,
previously compromised individual, because of
pre-existing condition it is easier to render
this damage by applying less force.

MR. WHITE:   I'm sorry, Doctor?

THE WITNESS:   By applying less force.

MS. POPE-STARNES:   Your Honor, I have

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

already shown these to Counsel, but for the

record, I am showing Counsel People's proposed

Exhibits 18 through 24.

THE COURT: Eighteen (18) through

what?

MS. POPE-STARNES: Twenty-four (24).

May I approach the witness, your

Honor?

THE COURT: You may.

Q **(By Ms. Pope-Starnes, continuing)** Dr. Dragovic,

during the process at autopsy, is it part of

your practice to photograph the body?

A Yes.

Q Showing you what has been marked as People's

proposed 18 through 24, and ask you if you

recognize these?

A Eighteen (18) through 24 Exhibit are part of the

evidentiary photographs that were taken during

the various phases of examination of the

deceased, Madison McBurney.

The Exhibits 18 and 19 were taken at

the time --- I mean photos were taken at the

time of the actual examination of the body.

The Exhibits 20 through 24 were taken
at a subsequent date during the examination of
brain tissue and the brain coverings.

Q    And, are People's proposed Exhibits 18 through
24, are those photographs a fair and accurate
depiction of the body and the brain of Madison
McBurney during the initial autopsy and the
subsequent examination of the brain?

A    Yeah, they are a fair depiction of the parts of
the body that are addressed in these
photographs.  The many other photographs I can
tell you there is altogether twenty-three (23)
plus images plus the multiple brain images that
cover the rest of the body.

But these are --- these are the --- in
particular the head, the areas of the head and
some areas of the brain tissue.

MS. POPE-STARNES:  I would move for
the admission of People's proposed 18 through 24
as People's Exhibits 18 through 24.

MR. WHITE:   No objection.

THE COURT:   Okay.

MS. POPE-STARNES:  May we approach,
your Honor?

(Whereupon a discussion was held at
the Bench, out of the hearing of the
Jury and the Court Reporter.)

\*     \*     \*

THE COURT:  We are having some
technical difficulties here Ladies and
Gentlemen, you can go out for a little while.
We'll take a short recess while we try to get
that situated.

Please don't talk about the case.

Thanks.

Please rise for the Jury.

(Whereupon the Jury left the courtroom
at 10:10 a.m.)

\*     \*     \*

THE COURT:  Thank you.  You may all be
seated.

The record will reflect that the Jury
has been excused.

We want to treat this then as a break.

Deputies, we'll just give you a
jingle, okay?

Thanks.

THE CLERK:  All rise.

(Whereupon a brief recess was taken.)

\*   \*   \*

THE COURT:   I would note for the record the Defendant is back, parties ready to proceed?

MS. POPE-STARNES:   Yes.

THE COURT:   All right.

Doctor, when the Jury comes back what I normally remind you in front of them you are still under oath, and required to testify truthfully and honestly.

Thank you.

Jeff, you can bring in the Jury.

(Whereupon the Jury was returned to the courtroom at 10:30 a.m.)

\*   \*   \*

THE CLERK:   All rise for the Jury.

THE COURT:   Good morning, again, everyone.

You may all be seated.

The record may reflect that the Jury is back, the case has been called, Counsel's names have been noted.

The Witness is back on the stand.

Doctor, I would remind you you are still under

oath required to testify truthfully and

honestly.

**L J U B I S A     J O V A N    D R A G O V I C**

**AFTER HAVING BEEN PREVIOUSLY SWORN TO TELL THE TRUTH,**

**THE WHOLE TRUTH AND NOTHING BUT THE TRUTH WAS**

**EXAMINED AND TESTIFIED FURTHER AS FOLLOWS:**

THE COURT:  Miss Pope-Starnes, you may

proceed.

### DIRECT EXAMINATION
### (Conintuing)

**BY MS. POPE-STARNES:**

**Q**    Doctor, I would like to go through the

photographs that were admitted into evidence.

MS. POPE-STARNES:  May I approach the

Witness, your Honor.

THE COURT:  You may.

**Q**    **(By Ms. Pope-Starnes, continuing)**  And ask you

to explain those to the Jury.

I will give you this pointer.  Just

point it this towards the screen.

First I am going to show you People's

Exhibit 18, can you explain that (indicating)?

A     Yes.  This is the scalp of the child, the
      Madison McBurney, viewed from above and the back
      (indicating).

            And these are the areas of lack of
      hair, what we refer to as 'alopecia.'

            And these two are the points of scar-
      like, or actually scar tissue that these
      reflect of this aplasia cutis congenita', which
      is the congenital lack of development of skin,
      better translation (indicating).

Q     Now, Dr. Dragovic, I show you People's Exhibit
      19, can you explain that for the Jury
      (indicating)?

A     The appearance here is one of the skull without
      the scalp.  The scalp, this is the back part of
      the skull (indicating), where the scalp is
      reflected backward and the front part of the
      skull, which is sectioned through the middle
      here (indicating), along this line (indicating),
      and the front part is pulled up there
      (indicating).  The back part is pulled out here
      (indicating).  And it just shows the secreted
      findings underneath.

There is no particular finding there
as it relates to the --- to this skin condition
or the lack of hair, or loss of hair.

There is a little dip here
(indicating), the catheter that was placed by
the hospital people at the time to the front
part of the right side of the head to monitor
the pressure within the head, in order to try to
cope with the brain swelling.

Q    Now I'm going to show you People's Exhibit 20,
if you would explain this to the Jury, please
(indicating)?

A    This shows the blood underneath the dura.  This
is the hard covering, the 'dura' (indicating),
which was placed in the formaline together with
the brain, and this is the --- the dark material
here (indicating) is the blood that is hardened
by formaline, and that is the recent infarct.

The remote infarct are those strips
there (indicating) and the strip here
(indicating), the membrane that is remote
'subdural hemorrhage' that we talked about
earlier that occurred months prior to this
injury.

Q    Now, Doctor, I want to show you People's Exhibit
     20, explain this, please (indicating).

          THE COURT:  Is that the --- maybe I
     have the numbers wrong.

          MS. POPE-STARNES:  No, I'll fix it.

Q    **(By Ms. Pope-Starnes, continuing)**  Well, let's
     go to 21 (indicating).

A    Okay.  Exhibit 21 shows the view of the brain
     from the left side and below (indicating).

          And, as you remember, when I displayed
     on the model the brain stem and the surrounding
     cerebellum, which in the situation of the brain
     swelling undergoes necrosis, because of the
     impaired blood supply.

          Everything here, in this picture,
     (indicating) is necrotic.  The cerebellum is
     necrotic in this area (indicating).  The brain
     stem that is right underneath it is compressed
     by the cerebellum.  And then the larger veins of
     the surface show clotting because of impaired
     circulation through the brain.

          Basically this --- this child was
     rendered brain dead as a result of massive brain

swelling and herniation and the circulation and
blood supply stopped.

So you see these mottled areas
(indicating), which are actually extensive areas
of necrosis and infarct. Simply tissue breaking
down because there is impaired blood supply.

Q   Now, People's Exhibit 22, would you explain that
(indicating)?

A   Exhibit 22 shows a cross-section of the brain.
This is the right half of the brain
(indicating), and this is the left half of the
brain (indicating).

And these large mottled area show
necrosis of the tissue, the infracts that I
talked about earlier (indicating).

Also you can see how there is loss of
--- of the form of the convolutions and grooves
(indicating), everything is matted together
because this is a swollen brain.

Normal brain is nicely outlined
convolutions and grooves, is the cortex of the
brain. This is lost.

And the distinction between the gray
matter and the white matter is lost simply

because of impairments of circulation because of

the extreme swelling.

Q    Dr. Dragovic, I show you People's Exhibit 23

(indicating), could you explain that?

A    This is a cross-section of the brain toward the

back part of the brain (indicating), and it

shows another large area of necrosis and

basically it is the same phenomena with part of

the brain stem, upper brain stem and cross-

section and shows the extensive mottling of that

area because of necrosis (indicating), rotting

of the brain stem.

Q    I will show you People's Exhibit 24, if you can

explain that, please (indicating).

A    Of course, in this Exhibit you see both halves

of the brain.  Toward the back are extensively

necrotic and they are falling apart because of

these hugh infarcts that have resulted from

impaired blood supply because of the expanding

of the brain, swelling and pressing on the blood

vessels.

              And the blood vessels collapse and

cannot put the blood through.

Q    Finally, Dr. Dragovic, can you tell the Jury did
you come to an opinion within a reasonable
degree of medical certainty about the manner of
death?

A    Yes.  Death is a homicide, because the trauma
was rendered by someone else upon this child,
and the randomness of this as well.

Q    Thank you.

            MS. POPE-STARNES:  Thank you, Dr.
Dragovic, I have no other questions of this
witness, your Honor.

            THE COURT:  Cross-exam.

                    **CROSS-EXAMINATION**

**BY MR. WHITE:**

Q    Doctor.

A    Good morning, sir.

Q    Good morning.

            So the three stages of an autopsy, an
autopsy of this type would be, Number one, an
External Examination of the body and the head?

A    Yes, sir.

Q    Number two, an Internal --- actually, let me
back up.  An examination of the body and head,

internally and externally, a physical

examination; isn't that true?

A    Yes.

Q    Okay.

          And, Number two, you have to have your

microscopic analysis of the brain and pictures

we just saw?

A    Correct.

Q    Which takes a considerable period of time?

A    It takes weeks.

Q    Yes.

          And, also you gather information from

outside sources, such as medical records?

A    Yes.

Q    Police reports?

A    Yes.

Q    And, you had, as part of your investigation in

this case, the medical records from University

of Michigan?

A    I believe so.

Q    And, you had the police reports from the South

Lyon Police Department?

A    I believe.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    And, included in the police reports are
     statements allegedly made by the accused in this
     case, Mr. McBurney?

A    I think there was some reference to that, too,
     yes.

Q    Okay.  It is not your job as Medical Examiner
     that you go to the scene of the crime, the
     alleged crime; is that true?

A    It depends.  If there is something of --- first
     of all, the scene is still available and
     preserved and not disturbed and there is a
     particular matter that needs to be addressed,
     then I will go to the scene.  Or one of my
     deputies will go to the scene for a correlation
     of finding other purposes.

              Don't go to all the scenes, but every
     once in a while when there's an opportunity and
     there is a need to follow up on that, yes, we do
     go.

Q    But, you didn't go to the scene of this, did
     you?

A    That is correct.

Q    Okay.

A    Because the scene did not exist ---

Q    (Interposing)  Hold on.

A    I'm sorry go ahead.

Q    The scene had already been spoiled; isn't that true?

A    Well ---

Q    (Interposing)  It had been altered?

A    Altered.  Because of the fact that the --- the deceased was not --- had not been deceased at the time and that it was medical intervention rendered or removed from the environment and all kinds of changes that take place in the course of time.

Q    Okay.  And, it is a fair statement, Doctor, this is the first time that you have seen Madison's crib; isn't that true?

A    Yes.

Q    Okay.  So, it is a fair statement that prior to your autopsy you did not inspect this crib at all?

A    That is correct.

Q    You didn't inspect the mattress, correct?

A    That's correct.

Q    You made no tests?

A    That's correct.

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Didn't inspect the crib itself, the outside
     railings or anything, correct?

A    That's correct.

Q    For evidence of any kind impact, correct?

A    I did not see that crib until this morning.

Q    Okay.  Thank you.

          And, you didn't obtain any other
     records regarding the child's medical history?

          Including birth records, treatment
     records, things of that nature, pediatrician
     records?

A    To tell you the truth, I'm not sure.  I cannot
     remember off the top of my head.  Some of the
     records might have been included in the
     materials that are the decedent's.

          There is a thick stack of records
     that is in a separate file, but I don't
     remember.

Q    And, isn't it true, Doctor, that you also didn't
     review the radiological testing in this case
     also?

A    That's correct.  I'm not a radiologist and I
     find no ---

Q    (Interposing)  And I don't mean to be rude, if I
just ask a question answer it yes or no.

A    Sure.  No.

Q    I know that your propensity to educate is
profound, but ---

          MS. POPE-STARNES:  (Interposing)
Objection.  The commentary is unnecessary, your
Honor.

          THE COURT:  Both of you just ask the
question and, Doctor, just answer, okay?

          THE WITNESS:  Sure, your Honor.

Q    **(By Mr. White, continuing)**  Now, we can agree,
Doctor, your external examination of Madison
found a 'Well developed, well nourished eleven
(11) month old baby'; true?

A    Yes.

Q    Okay.  And the external examination of the body
revealed 'No contusions.'  'Contusions' being
bruises; correct?

A    That's correct.

Q    No 'lacerations'?  'Lacerations' meaning where
the skin is compromised; correct?

A    Tears.

Q    Tears.

A    'Laceration' is tear.

Q    Tear.  A scrape, a cut, things of that nature?

A    A 'scrape' is 'abrasion.'

            'Bruise' is 'contusion'.

            'Laceration' is tear.

Q    Okay.  And we didn't find any of those either,
     did we?

A    That's correct, sir.

Q    And, it is also true that in your physical
     examination of the skull, the outside, did not
     find any bruises or lascerations, or anything of
     that nature; true?

A    That's correct.

Q    Okay.  Now, the only thing that was, I guess, an
     abnormal finding you say was her skin condition.
     The lesions that you pointed out regarding
     these?

A    (Interposing)  As far as the outside
     abnormalities?

Q    Yes.

A    Yeah, the skin condition and the lack of hair,
     yes.

Q    Okay.  I believe you referenced also the
     entrance of the I C P monitor.  There was a
     catheter that was placed in also?

A    That's correct.

Q    But, otherwise then that, it was an unremarkable
     skull, correct?   The outside?

A    The skull was unremarkable from the outside.

Q    And the skin too surrounding the skull?

A    The 'scalp'.  The skin that surrounds the skull
     is the scalp.

Q    Okay.  And, you also examined the neck, too,
     isn't that right?

A    Yes.

Q    Okay.  You found no damage to the soft tissues
     of the neck, isn't that true?

A    Well, it is true that there was no damage in the
     upper part of the neck, but it is true that the
     lower part of the neck and upper part of the
     mid-back area are contained epidural hemorrhages
     indicated in my report.

Q    But, 'epidural hemorrhages' is caused by the
     brain swelling, pushing down into ---

A       (Interposing)  No, no, no, we are not fixing

figs with pomegranates here.  That's a totally

different process.

The epidural hemorrhage that I

referred to in my autopsy protocol is the

bleeding on the top of the hard covering of the

spinal cord, which was also organizing.  And

that is indicative of blunt trauma to that part

of the body.

Of course the trauma to that part of

the body is not a lethal condition, but it is

indicative of the contact, the blunt contact

with some blunt object.

Q       Where was that?

A       That was --- you check into my autopsy protocol,

I'll read it for you.  It's in the ---

"There is moderate organized epidural bleed

. . ."

Oh, I'm sorry, your Honor, on page 3

of 10. Under 'Evidence of Injury.'

"There is moderate organized epidural bleed

in the lower cervical and upper thoracic

region of the spine."

Q    But, we agree Doctor that the soft tissues of
     the neck, there is no indication of injury;
     isn't that true?

          An indication that that baby was
     shaken?

A    I wouldn't throw papayas into this salad.  That
     has nothing to do with this concept.

          I'm talking about --- if you are
     asking me about soft tissue, you have to be very
     specific.  There is so much soft tissue
     structure in the neck, except for the actual
     spine.  So spine is the only hard tissue.
     Everything else, including the covering of the
     spinal cord and the spinal cord are considered
     soft tissue.

          So, strictly speaking, as I indicated
     in my protocol, lower part of the neck, the
     epidural blood accumulation reflects soft
     tissue.

          Upper thoracic, that is upper chest,
     mid-chest area, upper area of the spine, there
     showed some epidural bleed.  That is indicative
     of some blunt force rendered to that area of

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

body. And that is what I am trying to

emphasize, nothing beyond that.

Q   Was there damage to the soft tissue of the neck,

that's what I'm trying to determine?

A   I just explained that there was, that this is

considered soft tissue of the lower part of the

neck.

So, if there is bleeding --- yes,

there is. The answer is yes.

Q   Now, you examined the skull itself; correct?

A   Yes, sir.

Q   And, you found no evidence of a fracture?

A   That is correct.

Q   And, you found no evidence of bruising

underneath the skin either, above the skull?

A   That's correct.

Q   Doctor, will you explain what a 'diffuse axonal

injury' is for the Jury?

A   A 'diffuse axonal injury' is generally accepted,

not correct, though causive of wide spread

damage of white matter structures within the

brain.

Q   Damage to the brain itself?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     I just explained what it is, referring ---

      pertaining to damage of white matter structures

      within the brain.

            The brain has --- I have to explain

      this.  Consists of the gray matter, which is our

      cortex and deeply seated gray matter structures.

            And then the white matter that is

      actually the ensheavment of those relays or

      connections of all the cells in gray matter.

            So, when we are talking the 'diffuse

      axonal injury' we are referring to damage to the

      white matter structures within the brain.  And,

      the expansion of the brain stem and the spinal

      cord, of course.

Q     And how would such an injury occur?

A     Well, there are all kinds of ways to ---

      physically these are situations where there is

      strain, and assuring forces during the impact of

      the head against some unyielding surface will

      produce damage to the blood vessels and the

      white matter structures that are altogether and

      cause tearing in those areas.

            As these areas are torn, there will be

      commensurate dysfunction, neurological

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

dysfunction in a person.  The person may be
unconscious, may have some deficits, may
survive, they may complicate and die, or
whatnot.

Q    And, would you compare that to a 'hypoxic
     ischemic' injury?

A    Well, hypoxic ischemic injury is injury that is
     a result of deprivation of oxygen supply or
     blood supply.

          'Hypoxic' means oxygen is not supplied
     adequately.  'Ischemic' is the blood vessels are
     compromised by being compressed. by ripped ---
     by being ripped, torn, or otherwise compromises
     that do not deliver the blood to the tissues to
     the brain.

          So, those can be mistaken frequently
     by some, I am just saying, because practice
     teaches us every day that people frequently
     misconceive that these hypoxic ischemic changes
     are actually evidence so-called a clone of
     multi-vocal axonal injury types.

          Of course, they are not correct, but
     it takes an autopsy and a careful examination of
     the brain to sort that out.

So, general clinical assumption is
that 'Whatever gives a signal under a particular
imaging may be considered as a fusic axonal
injury and, of course, you draw it up at this
point.

Yes, generally there is a mix-up
between those that occur --- damages that occur
as a result of oxygen and blood deprivation and
those that are the result of actual physical
breakdown because of the force applied.

Q    And, we have, in Madison's case a swelling of
the brain caused by the loss of blood and
oxygen; isn't that true?

A    No, we have --- it's a simplistic ---

Q    (Interposing)  Is it true or not, sir?

A    Not completely.  And ---

Q    (Interposing)  Is it true or not, sir?

A    As I indicated, sir, not completely.

Q    Okay.

A    And I'm here to tell the truth, the complete
truth, remember.

Q    I don't have any questions.

A    Okay.  Thank you.

Q    I believe we'll get around to it.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A    All right.

Q    I don't mean to cut you off.

            Now, remember when you testified in
      this case before and I asked you about 'soft
      tissue injury to the neck'?

A    (No verbal response.)

Q    And, I am referring to your testimony in May of
      2007?

            If I may, I asked you ---

A    (Interposing)   Can you please quote the page.
      Sir.?

Q    I will do.   Page 20 --- excuse me.   Page 36.

A    My question was:

            "And also, I believe your report indicates
            that there is no soft tissue injuries that
            you could detect either."

            I'm sorry.   I'm sorry.   I'll read it
      again.

            "And also I believe your report indicates
            that there is no soft tissue injury that
            you could detect either, correct?"

            Your answer:   "That is correct.

            Specifically in the neck area."

A    That is correct.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Your answering --- Your answer is:

"That is correct."

Do you remember your testimony?

A    Yes.

Q    Okay.  Thank you.

Now, when the term 'global hypoxic
ischemea' is used, Doctor, would you please tell
the Jury what that term means to you?

A    'Global' erroneously pertains to the globe, the
planet earth.  And it is transposed constant to
reference on to the brain, imagining the brain
being something akin to a globe and if most of
the brain tissue is deprived of oxygen, then you
have a so-called quote/unquote clinical term
'global hypoxia' or 'globabl penoxia'.

These are clinical terms, and I try
not to dabble into clinical medicine.  I try not
to render the care of the living.  So, I really
do not get to use the terminology very much.

Q    Did you find 'global hypoxic ischemea' with
Madison?

A    I wouldn't refer that --- that is not part of my
--- my term, my pathology jargon.  But, if
someone said in clinical setting that they

74

concluded that this child had 'global ischemea',
'global hypoxia', I don't mean to argue about
that with them. I am not trying to hair split
the precision terms.

Q    Let's talk about the dura --- the 'subdura
space.'

It's really --- it's virtual space, is
it not?

A    That is correct.

Q    If only exists insofar as something is inside
it, correct?

A    Correct.

Q    Okay. In fact, in a normal healthy human being,
we are not supposed to have anything inside the
subdural space?

A    That is correct.

Q    And, ---

A    (Interposing) I mean, there is no space. You
said it's virtual. It doesn't --- if one
membrane is touching the other membrane and
that's it.

Q    And, if there is blood in that space it is
called a 'subdural hematoma'; correct?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A     A 'subdural hematoma' is a term --- is a
      clinical term means 'accumulation in the
      particular area.'

              'Hematoma' means accumulation of
      blood.  It is a clinical term.  We don't call it
      'subdural hematoma.'

Q     You call is 'subdural hemorrhage'.

A     'Hemorrhage', yeah.

Q     So, hemorrhage and hematoma are really a --- it
      depends on whether you are a clinician or
      whether you are pathologist.

A     Well, yeah.  'Hematoma' is localized
      accumulation of blood.  'Hemorrhage' is a
      reflection of the dynamic process where there
      was damage to the blood vessels as a result of
      force and there was bleed.

              Hemorrhage is a bleed.

Q     Okay.  But, we can agree, Doctor, that subdural
      hemorrhages don't necessarily have to occur by
      force, isn't that true?

A     Well, if you give me some examples where they
      don't occur by force, I will happily agree with
      you.  If you list them.

              If you don't, I will have a tendency

not to agree with you.

Q    Well, I was trying to remember what you said on
     direct examination.

A    Whatever if you refresh my memory, I can help
     you with that.

Q    You don't remember what you said?

A    Sir, I'm coming of age. I'm fifty-seven (57).
     And I ---

Q    (Interposing) How old are you?

A    Fifty-seven (57). Getting on to being fifty-
     eight (58) in June. So, I --- whatever is there
     on paper I tried to refresh my memory with, I
     can't keep all the facts of everything in my
     head, I apologize.

Q    The fact that there is blood in the subdural
     space, doesn't mean that there is intentional
     injury; isn't that true?

A    That's acceptable.

Q    Because we can have a breaking of veins causing
     bleeding in the subdural space caused by purely
     accidental injury; isn't that correct?

A    Sure, I can give you an example. I had an F B I
     Agent one time that walked down the street,

stepped on a piece fell backward and developed
subdural hemorrhage as a result of head trauma.

Yes, that is accidental death. But,
you have to have a set of circumstances along
with it.

Q    Sure. Each case on its merits?

A    Absolutely. Each case in death investigation we
talking about case specific assessment. There
are no approximation. or generalization. or
statistical gains.

In clinical medicine people try to
make a diagnosis based on general approximation.
based on differential diagnosis. In death
investigation it's a completely different
ballgame. Everything is case specific.

Q    So, my next question, and I think you might have
already answered it, is trauma is not
necessarily the intentional act; true?

A    That is correct.

Q    Trauma can be --- fall backwards as you just
described your F B I Agent.

A    Yes.

Q    Trauma could be a fall down the stairs?

A    Slip on a banana peel on the street, any kind of
     consideration there, or even some worse object
     that one can encounter on the street.

Q    And, it is certainly helpful in your
     determination of whether trauma --- trauma ---
     specifically trauma to the skull, trauma to ---
     causing subdural hematoma, subdural hemorrhage
     as to what type of problem it was, whether it
     was accidental or intentional; correct?

A    Well, this is the --- what the purpose of
     investigation is to establish how that came upon
     a person.  And then obviously with application
     of autopsy, knowledge of science, and common
     sense.  Don't do anything without common sense.

Q    So, that is part of your determination.  With
     that long answer, you can say yes, determine
     whether it is accidental or intentional,
     correct?

A    I'm trying to clarify some points.  Yes.

Q    Now, you have made it quite clear on direct
     examination, Doctor, that Madison had old blood
     in the subdural space; true?

A    That is correct.

Q    In fact, blood that was months and months old?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    That is correct.

Q    At least three to four months, correct?

A    Correct.  I --- I have no diagnostic perimeter

     to age beyond a certain number of months, and we

     know that this child was eleven (11) months of

     age.

            So, it could have been three or four

     months, could have been six months prior to her

     death, it could have been seven months prior to

     her death.

Q    Okay.

A    There is no way to tell.

Q    But, that blood, that old blood that was in the

     subdural space, was an abnormal condition that

     existed within, correct?

A    Yes, it was.

Q    Okay.  And, you are certainly not offering to

     the Jury any theory of how that blood got there,

     correct?

A    That blood ---

Q    (Interposing)  Sir, just answer yes or no.

            Are you offering to this Jury a theory

     of how that blood got there, yes or no.

A    I --- I have not been asked.  I have not been

     asked about any theory.

Q    Well, I am asking you now?

A    By all means.  If you are asking me about how

     that blood came ---

Q    (Interposing)  No, I'm --- that's okay.

               As part of your Autopsy Protocol, did

     you make any specific finding of how the old

     blood, that was in Madison's subdural space, was

     months and months old, did you make any finding

     about how it got there?

A    Of course --- I know it was by trauma.

Q    Did you make any finding?

A    I indicated it was remote subdural hemorrhage.

Q    That's it, isn't that true?

A    Yes.  But, it is by trauma.  It is the result of

     trauma.

Q    And that trauma, you have no idea how?

A    Correct.

Q    Whether it was intentional or accidental; isn't

     that true?

               Yes or no, sir?

A    Well ---

Q    (Interposing)  Yes or no?

A    No, sir.

Q    Okay.

A    And I can elaborate.

Q    Just answer my questions, okay.

            So we certainly didn't see any

     evidence, old evidence of skull fracture; isn't

     that true?

A    That is correct.

Q    We didn't see any old evidence of any kind of

     bruising anywhere; correct?

A    Yes.

Q    That were healed on the outside of the body;

     correct?

A    Well, bruises heal on the outside of the body

     over a period of days, sir.  So, I indicated

     that there was no evidence of trauma.

            But you're asking about old trauma

     now.  And you've got to specify what type of age

     are we talking about.

            Are we talking about days, or are we

     talking about weeks because after a couple of

     weeks you don't find, everybody here in this

     room, I believe by now knows that every bruise

heals over a couple of weeks on everybody's

surface of the body. That's the point.

Q  Okay. Do you want to answer my question now?

MS. POPE-STARNES: I'm going to object

to asked and answered. The Doctor has testified

at the beginning of his testimony on cross-

examination that there were no findings of

bruises, or lacerations, or scrapes, or anything

to the outside of the body. So this is asked

and answered.

THE COURT: Let me hear the question,

Mr. White.

Q  **(By Mr. White, continuing)** My question is, 'You

did not find any evidence of old injury

whatsoever on the surface of this child'?

THE COURT: I'll ---

MR. WHITE: (Interposing) Skin.

THE COURT: (Continuing) I'll

find that's a different question. I'll allow

it.

Q  **(By Mr. White, continuing)** Yes or no, sir.

A  I do not understand the question, sir?

Q  You don't?

A  I don't.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    Okay.  Let me rephrase it.

          Isn't it true, Doctor, that you didn't

     find evidence of any old injury of the child,

     whether it be days, or months, or any length of

     time on the outside of this child's body?

A    Still not following you.  Can you please repeat

     that question, sir?

Q    Isn't it true, Doctor, that you did not find any

     evidence of old injury on the outside of this

     child?  External examination of this child?

A    Again, I ask you to just qualify for me 'old

     injury'.  What --- Okay, if you --- if you ---

     give me the foundation of what you consider the

     old injury or we can agree on that it will be

     easier for everyone to follow.

          This way I'm at loss.

          THE COURT:  I'll permit, even though

     it was asked and answered before, maybe if you

     ask the question get rid of the word 'old'.

          MR. WHITE:  Well, okay.  That was my

     next question.

          THE COURT:  Go ahead.

Q    **(By Mr. White, continuing)**  So, we can assume,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Doctor, since you didn't find any evidence of
any injury to the external part of this child
there was no evidence of old injury also; isn't
that true?

A    That's correct.

Q    Okay. So, you also didn't find any evidence of
old fractures within the body either, any part
of the skeleton?

A    That is correct.

Q    The ribs, arms, legs, any part?

A    That is correct.

Q    Any evidence of dislocation either, of any part
of joints, anything; isn't that ---

A    (Interposing) Well, the ---

Q    (Interposing) Isn't it true or not, Doctor?

A    Not completely, and I have to explain because
there was ---

Q    (Interposing) Well, Doctor you can explain if
someone else asks you the question.

A    There was ---

Q    (Interposing) Answer yes or no.

Q    (Interposing) Isn't it true, Doctor, that you
found no evidence of dislocation of this child's
joints, bones, anywhere on her body?

THE COURT: Can you answer true or not true?

THE WITNESS: I cannot, your Honor, I have to explain, because this child had hypoglacia, --- displacia of the hip and at certain times the joint can be dislocated and at other times can be back in place.

So, this question yes or no is --- is eliminating this consideration because it was a special consideration that was handicapping this child.

Q **(By Mr. White, continuing)** So, other than the hip displacia?

A Yeah, I agree with everything else, but again, there are exceptions. Sorry.

Q Now, knowing this blood was months and months old, old blood, it was an abnormal condition in Madison's subdural space. You also testified that it was --- it made her more vulnerable to trauma that would induce injuries like she suffered in this case, isn't that true?

A That's correct.

Q Okay. So, it's a fair statement, Doctor, a person who had Madison's condition, the amount

· of trauma that would be necessary to activate

what was --- happened in this case, the brain

swelling, the cycle of the oxygen and blood

deprivation, it took less trauma; isn't that

true?

A    Now you missed there that ---

Q    (Interposing)  Isn't it true, Doctor?

A    It cannot be true the way you put it, sir.

Q    Sir, isn't it true --- I will do my best to try

to rephrase the question.  I would ask you to do

your best to try to ---

        MS. POPE-STARNES:  Objection.  He

indicated --- based on the way it was asked, now

Counsel is arguing with him.

        THE COURT:  The objection is --- I am

not characterizing whether it was arguing or

not, but the question was --- the answer was

satisfactory.  You can rephrase.

Q    **(By Mr. White, continuing)**  Isn't it true that

the subdural --- chronic subdural hemorrhage

that she had made her more vulnerable to even

trivial amounts of trauma to cause the injury

that presented itself at the hospital on

November 30th, 2006?

A    I did not understand your question, sir because
     you have to explain what you mean by 'trivial'?

          And, ---

Q    (Interposing) Well, okay.

          You say 'chronic subdural hematoma ---
     'hemorrhage' in your words and not spontaneously
     received; is that your testimony?

A    Yes.

Q    Okay. You also said on direct examination that
     the condition that she had, having the old
     blood, months and months old in her head, that
     the amount of trauma made her more vulnerable --
     - excuse me, the condition made her vulnerable;
     correct?

A    Yes.

Q    Okay. So an otherwise healthy eleven (11) month
     old versus Madison, it would take less trauma to
     cause the injuries that she suffered; correct?

A    Yes.

Q    And I'll fault myself for that, not being
     precise.

          MS. POPE-STARNES: Objection as to the
     commentary and the narrative.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

THE COURT: That's all right. That's all right.

Q    **(By Mr. White, continuing)** Now, the word 'organizing' you --- I think you used it in the sense that once there is trauma to --- and specifically this instance, the brain, immediately the body starts to heal?

A    Attempts to, yes.

Q    Attempts to heal?

A    Yes.

Q    So, when we say 'organizing' bi-lateral subdural hemorrhages that means that they are actually trying to heal themselves, correct?

A    Yes.

Q    Okay. And the 'chronic subdural hematoma' is a --- something that actually can grow inside; isn't that true?

A    If we are not talking about that type of finding in this case, and this is mixing mangos with papayas.

Q    Sir, I'm asking that --- please, I don't mean to argue with you. I asked you questions and they require yes or no. And, if you can't, then just say no.

A    As a neuropathologist I cannot answer this
     question.  You will have to ask the clinician
     who is dealing with 'chronic subdural hematoma.'

          I am dealing here, in this particular
     case, with remote --- evidence of remote
     subdural hemorrhage, it is a completely
     different anatomical entity.

          And this game of words does not help.

Q    You would ask a neurosurgeon question?

A    Yes.

Q    A neurosurgeon ---

A    (Interposing)  To treat --- to treat a person
     with chronic subdural.

Q    A neurosurgeon would have the most experience,
     the training in making a determination about a
     chronic subdural hematoma.

          MS. POPE-STARNES:  Objection, your
     Honor, it calls for speculation.

               MR. WHITE:  No it's not.

               He's in the medical field.

               THE COURT:  I'll allow the answer.

               THE WITNESS:  The neurosurgeon is ---

               THE COURT:  (Interposing)  Doctor ---
     go ahead with the question.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    **(By Mr. White, continuing)**  Isn't it true a

neurosurgeon would be more appropriate ---

appropriately trained, has the experience to

make this conclusion?

A    Only in the living.

Only in the living it is true.  Not in

the dead, never in the dead, only in the living.

Q    All right.  Okay.  A neurosurgeon would read the

x-rays; correct?

A    Um --- well, first of all I've got ---

THE COURT:  (Interposing)  Can you

answer that question?

THE WITNESS:  Well, I'm not here to

define what a neurosurgeon would do or wouldn't

do.  A neurosurgeon is not the radiologist, your

Honor.

A radiologist reads the x-rays, or

would read the x-rays and report to the

neurosurgeon.

THE COURT:  You can't testify what a

neurosurgeon would ---

THE WITNESS:  (Interposing)  Exactly,

your Honor.

I have explained, I hope.

Q  **(By Mr. White, continuing)** You have explained that you can't testify what a neurosurgeon does, is that your testimony?

MS. POPE-STARNES: Objection. It's asked and answered, your Honor.

THE WITNESS: That is ---

THE COURT: (Interposing) We got it. We got it.

Q  **(By Mr. White, continuing)** So, when you said that the old blood, the old subdural hemorrhages actually walled-off the particular blood, I believe that is your words, 'walled-off' that particular blood.

A  Yes.

Q  Do you remember that testimony?

A  No, sir. If you could point to me what we are talking about?

Q  It was about forty-five (45) minutes ago.

A  What, specifically, are we talking about?

Q  The chronic, the old blood that was in Madison's brain the effect it has walling off?

A  I did not use that terminology, sir, under such circumstance at all. I was talking about organizing recent blood, and I was talking about

laying of fibrous tissue as --- and accumulation of blood pigment in among those layers as an indicator of remote subdural hemorrhage.

There is no reference in my testimony today about some imaginary 'old blood' that you have come up with. And that may be your idea, but it is not something that was a finding anywhere in this case.

Q    Okay.  Now, we know, Doctor, that brain swelling is caused by a variety of different mechanisms; true?

A    True.

Q    True.  Trauma, right?

A    Yes.

Q    Accidental or intentional, correct?

A    We investigate the trauma ---

Q    (Interposing)  Sir ---

A    (Continuing)  . . .to call it accidental or intentional, or inflicted.  Anything trauma, anything, any unfavorable circumstance can react and create brain to react in such a way.

Q    It doesn't matter whether it is accidental or intentional?

A    True.

Q   It is an insult to the brain, causing it to swell?

A   Yes

Q   Okay. And, I believe you indicated that infection can also cause swelling?

A   True.

Q   And, certainly a loss of blood, or reduction of blood, a loss of oxygen, or reduction of oxygen can cause swelling also?

A   Sure.

Q   Now, you didn't make a finding about where the impact occurred, the blunt force; isn't that true?

A   That is correct.

Q   Okay. So, you are not going to tell the Jury that a specific spot on her head, that you can clearly point to that she suffered blunt force trauma; isn't that true?

A   Of course it's true. I did not make any attempt to doing that in the first place.

Q   And we certainly --- you're not going to offer to the Jury that Madison hit a particular type of object; isn't that true?

A     That is correct.  I cannot be certain about the
      type of object, but I can infer based on my
      examination experience that it was a padded
      structure.

Q     It was a padded structure?  Something like this
      mattress; correct?

A     A mattress or any type of bedding that --- a
      bedding around the sides of the crib or anything
      else.

Q     Okay.  You took your demonstration doll, you
      threw it on the mattress, didn't you?

A     Yeah, I can do that again, if you want.

Q     No, no.  That's all right.

            And you certainly didn't make any
      findings about the amount of force either, a
      quantifiable measurement of force; isn't that
      true?

A     That's impossible to do that.

Q     Thank you.  My next question.

            It's impossible isn't it, Doctor?

A     That's correct.  The --- the ---

Q     (Interposing)  I'll ask it, just give me a
      chance.

Because your way of determining whether the force is necessary --- strike that. Let's try again.

Your way of concluding whether the force is sufficient is by the alternative outcome that it produced; true?

A    That's correct.  The damage that there is created by.

Q    Okay.  So, when you make a finding of blunt force trauma, you're saying an unknown amount of force to a --- not a specific area of skull on a surface that you don't know may be padded.

Is that a fair statement?

A    I wouldn't use the same style as you did, but you're getting somewhere near.  Of course, with some mischaracterization, but, I can't argue.

Q    Okay.  So, you didn't find any evidence of wood splinters in the scalp; correct?

A    At the time --- I remember of never mentioned or found in this case, no, sir.

Q    Okay.  So, . . . and it is not common if the blunt force object happens to be of wood, a wooden surface, that the wood also gets imbedded

in the skull, or splinters, sometimes
microscopic splinters?

A     Only --- only it if it a particularly loosely
put together wooden surface with some inherent
defects or some pre-existing rotting in that
surface, or something like that.

Where actual physical contact and it
creates damage in the surface, but other
surfaces do not allow for that, so it's --- it's
again case specific.

Q     Case specific.

A     Yes.

Q     And certainly it could happen even on a smooth
surface if the force is great enough, correct?

A     Depending on the surface, the physical structure
of that surface that is impacted, yeah.

Q     And, you certainly didn't make any findings on
what angle the blunt force trauma was on
Madison's head; isn't that true?

A     I did not accomplish that based on my
professional knowledge and experience.  Maybe
someone could, but not me.  Sorry.

Q     Now, knowing that --- found that was trauma that
started these events, trauma that was, you

believe, to be within days of your exam? Or a
couple of days?

A    Within days, about four to six days prior to the
actual death, that would be the general range of
estimation.

Q    That was the precipitating event?

A    No, I was talking about the --- based on the
microscopic analysis of the subdural ---
organizing subdural hemorrhage, my estimation is
that the trauma occurred somewhere in the range
between four and six days.

Q    And, ---

A    (Interposing)  Plus/minus a day too.  I mean,
there is --- is also some variation there.  It's
an estimation.  There is no better measure than
that, based on tissue changes under the
microscope.

Q    But, isn't it true, Doctor, though based upon
your examination, external, internal, the
microscopic analysis, just looking at Madison
there is no way that you can determine whether
this was done purposeful; isn't that true?

A    Well ---

Q    (Interposing)  Yes or no, please?

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-526-6313

A    No, sir.  Because ---

Q    (Interposing)  The Doctor just answer it, I'll
     give you an opportunity.

          Without looking at the police report
     you couldn't tell whether this child fell off a
     counter; isn't that true, and hit the back of
     her head?

A    No, sir.

Q    True or not?

A    No, sir.

Q    Okay.

A    This ---

Q    (Interposing)  Sir, you couldn't tell whether
     she was in a motor vehicle accident; isn't that
     true?

A    I think that ---

Q    (Interposing)  Sir, just answer yes or no.

A    I can't answer these questions, because they
     make no sense, the ---

Q    (Interposing)  Sir, isn't it true that you could
     not determine whether this child suffered trauma
     as a result of accidental means, based upon your
     examination alone, internal and external?

A    No, sir.

Q    In fact, you look at the police report --- in

     fact, these police officers were there during

     the autopsy, were they not?

A    They were.

Q    Okay.  That's how you formed your conclusions

     that it was a purposeful act of another; isn't

     that true?

A    No, it is not true, sir.

Q    Now, you gave a demonstration and you threw that

     baby very forcefully into the bed; isn't that

     true?

A    Not particularly forceful?

Q    That's not particularly forceful to you?

A    No.

Q    Okay.  And can I see your baby?

A    This is a model.

Q    A model (indicating).

          So, when you threw this model on the

     mattress you're saying you did not throw it

     forcefully?

A    That is correct.

Q    Okay.  But, you threw it giving an illustration

     the type of unyielding object to a force causing

     trauma, correct?

A    Moving head, affecting the unyielding surface.

Q    Okay.  You don't have any idea how forceful,
     what measurement of force caused the trauma in
     this case?

          MS. POPE-STARNES:  Objection, asked
     and answered.

          MR. WHITE:  I didn't ---

          MS. POPE-STARNES:  (Interposing)  He
     asked him about ten (10) minutes ago if he could
     measure the force necessary, and he said, 'No.'

          MR. WHITE:  That was a hypothetical,
     Judge.  This is case specific.

          THE COURT:  I'll allow, let's move on
     after that?

          THE WITNESS:  That's correct.

Q    **(By Mr. White, continuing)**  That's correct.  So,
     you don't know if it was like this (indicating),
     correct?

A    (Laughing).

Q    Sir, just answer the question.

A    Not correct, sir, because ---

Q    (Interposing)  Sir, just answer the question.

A    Not correct.

Q    Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

And, you don't know --- you certainly didn't know height of person that would do it, correct? Whether the physical characteristics, whether he was tall, short, didn't have any idea of that?

A     Those specific information about the individual I did not have. I did have specific information about the baby.

Q     About the child?

A     That the child ---

Q     (Interposing) But the one you said committed the homicide, this is the one that you're saying committed this act, you didn't have any information; isn't that true. Sir?

A     Because --- because the condition ---

Q     (Interposing) Sir, isn't it true ---

        MS. POPE-STARNES: (Interposing) I'm going to object, it is argumentative. It is the People of the State of Michigan that charged the Defendant with the crime.

        The Medical Examiner reaches --- his testimony is he reaches an opinion as to the cause and manner of death.

        So Counsel is being argumentative.

THE COURT:  We --- I've got the answer.  The answer has been supplied.  He provided the answer.

MR. WHITE:  If I may approach?

THE COURT:  You may.  You may.

Q   **(By Mr. White, continuing)**  Was Madison a shaken baby?

A   I'm sorry?

Q   Was Madison a shaken baby?

A   I do not use that term, and I did not see any evidence of physical contact that would provide the basis for allegation of violent shaking.

MR. WHITE:  One second, Judge?

(Whereupon a brief delay was had.)

\*   \*   \*

Q   **(By Mr. White, continuing)**  Now, you know from reviewing the records, Doctor, that Madison was on life-support, true?

A   That was my understanding.

Q   So, that means that she was not breathing on her own?

A   That's correct.

Q    Okay.  Which, I believe, indicated that it then
     would --- so the necrosis actually started
     before death, correct?

A    Necrosis do not occur after death, sir.  Only --
     - it's a phenomenon of life.

Q    Oh.  Okay.  So the necrosis actually started
     while she was in the hospital?

A    Sure.

Q    And, do you know how long she was on life-
     support?

A    I believe for the duration, until she was
     discontinued.

Q    But, do you know how long that was, what period
     of time it was, Doctor?

A    I don't have anything specific in front of me.
     If you show me a document I would read it.
     Again, I have limited capability of memorizing
     things that are not, in my mind, relevant to
     assessment.

Q    So we can agree, Doctor, that person, child,
     eleven (11) month old child with chronic
     subdural hemorrhage --- if I may use your words
     --- 'a lesser amount of force is necessary to
     cause the injury.'

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MS. POPE-STARNES:  Objection, asked and answered.

MR. WHITE:  I used his words, not mine.

MS. POPE-STARNES:  And in using his words he's repeating it.  He has the answer.

THE COURT:  Okay.  Do me a favor, ask the question without the break in between and let me hear it.  It sounds like it was asked and answered.

MR. WHITE:  Okay.

Q    **(By Mr. White, continuing)** All right.  Isn't it true, a person with chronic subdural hemorrhage it takes a lesser amount of force to cause the injuries that Madison suffered; isn't that true?

MS. POPE-STARNES:  Objection. Asked and answered.

THE COURT:  Sustained.

MR. WHITE:  All right.  Thank you.

I didn't use his words, Judge, I used it hypothetically.

THE COURT:  Noted.

Q    **(By Mr. White, continuing)**  She was a compromised individual; correct?

A    Yes.

Q    In fact, on slide number 20, I believe you

     pointed out a chronic subdural hemorrhage, a

     striking?

A    The membrane?

Q    Yes.

A    Yeah.

Q    All right.

          I have nothing further at this time.

                    **REDIRECT EXAMINATION**

**BY MS. POPE-STARNES:**

**Q**   Doctor Dragovic, did you need to inspect the

     crib to make a determination as to the cause and

     manner of death of Madison McBurney?

A    No.

Q    Why not?

A    Because the findings in this infant, this is not

     a child, it is an eleven (11) month old infant

     that is handicapped and cannot ambulate on its

     own.   Indicative of injury, of infliction.

          Had this been a two-year old, two-year

     old charged with it's hopping off the counter to

     the chair, to the table left, right and fell as

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

a result of slipping or tripping, that would
have been a totally different consideration.

Q Counsel asked you about whether or not you
reviewed and radiology records?

A I did not, Ma'am?

Q Why not?

A Because I am not the radiologist, and I don't
dabble in --- in the diagnostic assistant to
radiographic shadows. That's what radiologists
do and they report it. For the living. For the
benefit of the living for the most part.

Q The epidermal hemorrhage that you were referring
to in the area of the spine, specifically where
was that?

A It was at the bottom of the neck. Actually it
was the backbone --- within the backbone, the
bottom of the neck and the upper part of the
mid-back.

So, this is the spine that is getting
from the neck area into the back, upper mid-
back. That particular area that curved area of
body that is the area that contained organizing
epidural hemorrhage, which was indicative of
blunt trauma resulting from the contact and some

unyielding surface of that particular part of
the body.

Q    And then, do I understand correctly that you are
saying that it was organizing that that was
something more recent in age?

A    Yeah, that was approximately the same, if not
simultaneous as the subdural hemorrhage that I
found over the convexities.

Q    In your opinion, Dr. Dragovic, are --- were this
infant's injuries as a result of blood and
oxygen loss to the brain?

A    No, this is --- the blood and oxygen supply that
was lost was lost as a consequence of blunt
trauma of the head.

          The brain reacted to the injury by
swelling, and then in that process of reacting
it impaired in and of itself the continuation of
adequate blood supply.

          So, it is what I referred to as blunt
force trauma of head and complications.  That's
the complication, not the originator of this
process.

Q    When we talk about the remote hemorrhage to this
infant, I believe you said that you know that it

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

was by trauma that it got there, or a result of

trauma, can you say what caused that?

A     I cannot offer a specific mechanism, but, again,

we are dealing with a situation that occurred

early on in infancy, where the --- the child

would have been even or more limited movement

and would be directly dependant to being moved

by others, because at the age of four months,

five months, the baby does not hop around and

does not take a dive out of the crib.  It has to

be someone moving the baby and taking care of

the baby.

That is where common sense comes into

picture in addressing any of these problems with

positive science information.

Q     And in regards to your conclusion that the

manner of death in this case was homicide, how

did you form a conclusion that this was caused

by a purposeful act of another?

A     Well, again ---

MR. WHITE:  (Interposing)  Objection,

your Honor.  This has been asked and answered on

direct.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

MS. POPE-STARNES:  This was specifically asked by Counsel on cross-examination, and I think I have the right to address it.

THE COURT:  It is within the scope of the cross I'll allow it.  Go ahead.

MR. WHITE:  I don't know if she has already covered it and I covered it, I don't think --- and again, it has been asked and answered.

THE COURT:  Noted.  Go ahead.

THE WITNESS:  Well, it is a process of consideration and looking, what is reasonable, what is logical and what is not.  And, if you exclude the ability of this child to be hopping around and moving on her own, then it had to have been someone else.

And, I don't know who that someone was, because I wasn't there at the time.  But, it had to be a grown-up handling this baby.

MS. POPE-STARNES:  Thank you, I have no other questions.

**RECROSS-EXAMINATION**

**BY MR. WHITE:**

Q   Well, Doctor, babies baby fall, right?

A   (No verbal response.)

Q   Babies fall, say you put a child on a counter
    and look away and the child falls, correct?

A   Well, that's clearly an act of someone else.   If
    they --- if someone else leaves a baby, we're
    talking about a baby.   You claim babies fall.
    Babies do not fall from the sky.   Babies can
    only fall from areas where improperly,
    carelessly, negligently placed they can roll off
    or fall.   That constitutes a purposeful act too.

Q   So negligence is a purposeful act, in your
    definition?

        MS. POPE-STARNES:   I am going to
    object, he is now asking him to argue about a
    legal term, your Honor.

        MR. WHITE:   Judge, Judge ---

        THE COURT:   (Interposing)  Is it ---
    let   --- the   Court --- is it a rhetorical
    question?

        MR. WHITE:   No, it is not.   It's
    asking ---

        THE COURT:   (Interposing)  As we are -
    -- I'll allow the question and then no more,

FORM CSR-LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

because it is getting into legal grounds, but I
will allow the question.

Q   **(By Mr. White, continuing)**  I'll change the word
'accident'.  Okay.  Accident.

Well, you're not saying 'accidental'
injuries are intentional, are you?

Those terms are not synonymous in your
book, are they?

A   I don't understand your question, sir.

Q   Well, for instance, someone sets a child on a
counter, turns away, albeit let's say that poor
exercise in parental discretion.  Child falls,
blunt force trauma to the floor, that is not an
intentional, purposeful act in your book, is it?

Yes or no?

A   Not necessarily, but we are talking about case
specific situation, sir, and ---

Q   (Interposing)  We're talking about --- we're
talking about reading the police report and
determining based upon what was said that you
were able to determine that it was a purposeful
act; isn't that true?

MS. POPE-STARNES:  Objection, that
goes beyond the scope of redirect.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT:  We're --- go on.  Go on.

Q    **(By Mr. White, continuing)**  Now this epi ---
this bleed in the neck.

Now, what you are saying that is
apparently she must have hit hard enough on the
mattress to cause this hemorrhaging back here
(indicating)?

A    There was a contact with an unyielding surface.
How hard enough in your imagination I'm --- I
apologize, I cannot conform to that.  But, I am
just saying that there is evidence that the
bottom of the neck, and I can show on you, for
everyone where the area is so that everybody
understands, anatomically speaking.

It is clearly an indicator of contact
with an unyielding surface.  And bleeding
occurring as a result of that.

Q    With a padded unyielding surface?

A    With a padded unyielding surface, sure, because
there was no bruise ---

Q    (Interposing)  Okay.

A    . . . outside.

Q    So, when the Prosecutor asked you in April of
this year, on page 34, line 14;

'Doctor, are the injuries that you found on the autopsy consistent with the following hypothetical, someone taking this child and throwing it two feet, from two feet away into a crib and the baby hitting it's head against the wooden slats on the side of the crib?'

Your answer; 'Yes, if it is consistent with that.'

MS. POPE-STARNES:  Objection, it's beyond the scope of redirect as well.

MR. WHITE:  It is not, Judge.

THE COURT:  I'll allow it.

THE WITNESS:  Can you point to it again, the page number?

Q   **(By Mr. White, continuing)**  Page 34.

A   Okay.

Q   Line 14.

A   Yes, it is consistent with that, it's consistent with --- with exactly what you see right there. It is consistent.

Is it case specific?  No, that was not the question, sir.

Q   Thank you, Doctor.

A      You're welcome, sir.

        MR. WHITE:  Nothing further.

        THE COURT:  Anything further?

        MS. POPE-STARNES:  No.

        THE COURT:  Thank you, sir, you are all set.

        THE WITNESS:  Thank you, your Honor.

        MS. POPE-STARNES:  May he be excused, your Honor.

        MR. WHITE:  Yes.

        THE COURT:  Counsel approach. Scheduling matters.

        (Whereupon a discussion was held at

        the Bench, out of the hearing of the

        Jury and the Court Reporter.)

        *     *     *

        THE COURT:  Ten minutes to. We're pretty close, so we will break for lunch at this time.   Please return to the Jury room.   Don't talk about the case and in a couple of minutes we'll break for lunch, okay?  Thank you.

        All rise for the Jury.

        (Whereupon the Jury was excused at

        11:50 a.m. for the luncheon recess.)

\*   \*   \*

THE COURT: Thank you, you may all be seated. The record may reflect that the Jury has left the courtroom.

Just keep them back there for a second.

Just keep them back there for a minute.

All right.

Okay. Go ahead.

MS. POPE-STARNES: Your Honor, as I indicated at the Bench, I understood there was a stipulation in regards to the chain of the body itself by Michigan Removal Service from University Hospital to the Oakland County Medical Examiner on December 5th, of 2006.

It was my understanding in talking to Counsel before the trial started that they would agree to stipulate to that.

Also, I have now, redacted the language of Battered Child Syndrome, which the Court instructed in People's proposed Exhibit 16, which was the medical records of Nicholas Kennedy from Children's Hospital. And so now I

am going to be moving for the admission of these records.

Counsel indicated at the Bench that there is now a new problem.

THE COURT: What's that, the first leg as to the chain.

MR. WHITE: Stipulated.

THE COURT: Okay. And, the Exhibit that you are referring to Miss Pope-Starnes ---

MS. POPE-STARNES: (Interposing) Sixteen (16).

THE COURT: Okay. Just let me catch up to everybody. Hold on.

MS. POPE-STARNES: I don't think you have it in your list yet, Judge. We talked about it.

THE COURT: Well, I put it proposed.

MS POPE-STARNES: It's not marked yet.

THE COURT: Got ya.

Can I see it while Mr. White is speaking on it?

Do you know what this document is (indicating), Mr. White?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

MR. WHITE: Sure.

THE COURT: Go ahead.

MR. WHITE: I didn't see the redacted --- I see, I didn't look at it.

HE COURT: Okay. I do admit that I'm thinking about something totally different. So, bear with me, again.

MR. WHITE: We have the issue of --- regarding the U of M records and that one sentence which is still not resolved yet.

THE COURT: That's what I was thinking we were talking about. Can you help me out one more time. What's this document?

MS. POPE-STARNES: Both the Children's Hospital and Michigan records for Nicholas Kennedy.

And before the trial started Counsel objected to the word 'Shaken Baby Syndrome' and 'Battered Child Syndrome'. And the Court made it's ruling that 'Battered Child Syndrome' or whatever it was at that point was to be taken out, and that Shaken Baby Syndrome could be left in.

So, I have redacted that and I want to move for its admission. And Counsel indicated, at the Bench, there was a problem.

THE COURT: Go ahead, Mr. White. I think I have caught up to everybody now.

MR. WHITE: Okay. And it is not a new argument, it is the same argument, but the Court said when we were discussing this, 'shaken' doesn't necessarily mean intentional. That the child could be shaken by other means. It is not necessarily, it is not necessarily mean a not accidental injury.

I think there is a plethora of evidence by all the doctors that the diagnosis of 'Shaken Baby Syndrome' connotes non-accidental injury.

In fact, Alena Dev, in her report, in this particular case says, 'Abusive head trauma paren shaken infant syndrome.'

So, my argument is, Judge, the same, but I believe the facts should help the Court understand that this diagnosis is a medical/legal diagnosis of an intentional act causing injury.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

And that would be the same, Judge, as the 'Battered Child Syndrome' that this is a finding of a testimonial nature.

THE COURT: Well, arguably you are asking --- you're moving for reconsideration of the Court's previous decision ---

MR. WHITE: (Interposing) In light of the evidence that has come out.

THE COURT: Go ahead. Miss Pope-Starnes.

MS. POPE-STARNES: Well, the operative word there is 'diagnosis', and these people all talk about it. Not Dr. Dragovic, but the clinicians who treat living people all talk about it as a diagnosis. It is not a legal term.

And I believe that was the Court's Ruling initially was that because it was a diagnosis and not testimonial or a term for court, that that's why it was admissible.

THE COURT: Okay. Anything further.

MR. WHITE: I believe it is a testimonial nature, Judge, under Crawford versus Davis it is a --- it is clear from the testimony

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

a finding of non-accidental injury. It has been supported by not only testimony. The document - -- there is going to be a document that goes right to the Jury that says.

'A head trauma, shaken baby syndrome' and so I ask because this is being offered without opportunity to cross-examine that it be stricken.

Because it also says in there, Judge, there is a medical diagnosis in the proposed Exhibit are clear, you know, bilateral skull fractures, the subdural hematoma, those are medical terms. But, when you make a diagnosis of 'Shaken Baby Syndrome' it is for the purpose of determining child abuse, intentional child abuse.

And, so one who would make that diagnosis would certainly understand there is a possibility of ultimately testifying about it in court.

THE COURT: All right. The Court will accept the stipulation of the parties as to the chain, if that's the proper vernacular, and I

will allow that stipulation to be stated on the record.

With the Court's decision on this other matter, you rest after that; is that correct, or don't know for sure, or what?

MS. POPE-STARNES: Well I guess I have to hear the Court's ruling.

THE COURT: Okay.

MS. POPE-STARNES: Because I have conducted the entire trial on the basis of the Court's initial ruling.

THE COURT: Understood. Understood. Okay. The answer is, 'I don't know yet.' Okay. All right.

It is now five minutes to twelve (12), we are not going to resume in any event and I will take that matter under advisement. We'll resume at one-thirty (1:30) and I will let you know at that time.

Thank you.

THE CLERK: All rise.

(Whereupon the matter was recessed at this time for the luncheon recess.)

* * *

THE CLERK: Calling the case of Steven McBurney, case number 2007-2 1 4 6 5 1 -FC.

THE COURT: Counsel.

MS. POPE-STARNES: Sara Pope-Starnes, Assistant Prosecuting Attorney.

MR. WHITE: Robert White, appearing on behalf of Mr. McBurney.

THE COURT: Thank you. Good afternoon. And are you ready to proceed now?

Let me first interject. The issue that has --- is pending as proposed Exhibit 16, we'll talk about later on, let's get this witness completed.

MS. POPE-STARNES: I can't rest without knowing ---

THE COURT: (Interposing) I --- anticipating my position, I'm not just stating a question, a statement of fact.

MR. WHITE: So these other Exhibits, we'll just ---

THE COURT: (Interposing) Let's take this witness, let's get accomplished what we can with the witness, okay?

Jeff, bring in the Jury.

THE CLERK: Yes, your Honor.

All rise for the Jury.

(Whereupon the Jury was returned to the courtroom at 2:15 p.m.)

\*    \*    \*

THE COURT: You may be seated.

Afternoon, again, everyone. I'm glad that I don't have to say good evening.

Thank you. You may all be seated.

The record will reflect that the Jury is back, the case has been called and Counsel's names have been noted for the record.

Mr. White, you may proceed with a witness.

MR. WHITE: If I may, your Honor, I would like to call Dr. Robert Adams to the witness stand.

THE COURT: Good afternoon, sir. If you would please follow Mr. White up to the witness stand.

I would ask you to please raise your right hand to be sworn.

THE CLERK: **Do you swear that the**

testimony you are about to give will be the truth, so help you, God?

           THE WITNESS: I do.

           THE COURT: Thank you, you may have a seat right there.

**R O B E R T   A D A M S**

**AFTER HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

BY MR. WHITE:

Q    Would you please state your full name?

A    Robert Paul Adams.

           THE COURT: Would you keep it up, real loud, okay.

           THE WITNESS: Robert Paul Adams, M.D.

Q    **(By Mr. White, continuing)** And, Doctor, obviously your profession is that of a physician?

A    Yes.

Q    Okay. And, where did you do your pre-medical education?

A    At the University of Michigan.

Q    And, your medical education?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Wayne State University in Detroit.

Q    And, when did you graduate from medical school?

A    In 1982.

Q    And, your residency?

A    Family Practice at St. John Hospital in Detroit.

Q    And your internship?

A    Same.

Q    Okay.  And, how long has it been --- are you Board Certified?

A    Yes.

Q    And, when did you become Board Certified?

A    In 1985.

Q    And, what kind of Board Certification do you have?

A    American Board of Family Medicine.

Q    Are you a member of any professional societies or memberships?

A    Michigan State Medical Society.

Q    Um --- and, do you have any specific --- any other specific accreditations?

A    I'm a Fellow of the American Academy of Family Practice.

Q    Um --- have you ever testified before?

A    Yes.

Q    Have you ever been qualified as an expert?

A    No.

Q    And your practice is specifically focused on what area?

A    Family medicine.

Q    Okay.  Would you explain what 'Family Medicine' is?

A    We take care of people from birth to death, men and women.

            MR. WHITE:  I move for qualification of Dr. Adams as an expert in the field of Family Medicine?

            THE COURT:  Miss Pope-Starnes?

            MS. POPE-STARNES:  No objection.

            THE COURT:  So qualified.

Q    **(By Mr. White, continuing)**  Dr. ---

            If I may approach?

            THE COURT:  You may.

            MR. WHITE:  Thank you, your Honor.

Q    **(By Mr. White, continuing)**  Not looking at this first.

A    Yes.

Q    Doctor, did you have an occasion to treat a patient known as Madison McBurney?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A    Yes.

Q    Okay.  Did you bring the complete file that you
     keep in your office regarding Madison McBurney?

A    I brought a complete copy.

Q    Okay.  And, your business is Brighton Family
     Care?

A    Correct.

Q    Okay.  I have handed you Exhibit BB; is that
     correct?

              THE COURT:  Is that 'Boy Boy'?

              MR. WHITE:  'Boy Boy', yes.

              THE WITNESS:  Yes.

Q    **(By Mr. White, continuing)**  Is that a complete
     and accurate copy of the file, your medical file
     that you have kept on your patient Madison
     McBurney?

A    Yes.

              MR. WHITE:  I move for entry of
     Exhibit BB.

              THE COURT:  Any objections?

              MS. POPE-STARNES:  Just a couple  of
     questions, please?

              **VOIR DIRE**

**BY MS. POPE-STARNES:**

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Doctor, these are the records that you keep in
     your normal ordinary course of business?

A    Yeah.

          MS. POPE-STARNES:  I have no
     objection.

          THE COURT:  So admitted.

Q    **(By Mr. White, continuing)**  Now, Doctor, now
     regarding this, do you recall the first time
     that you saw Madison as a patient?

A    Yes.

Q    When was that?

A    That was a two week well child check, I believe.

Q    Okay.  And, you said 'a well check-up'?

A    Correct.

Q    And, would you explain to the Jury what a 'well
     check-up' is?

A    That's a visit that the parents bring the child
     to make sure that they are developing properly,
     eating properly, and also often time --- a time
     when immunizations are given, but not always.

Q    Is there a schedule that you have for infants,
     regarding the frequency of well check-ups?

A    Yes.

Q    Okay.  And, that schedule is what, Doctor?

A    Typically two weeks, one month, two, four, six,
     nine, twelve (12), fifteen (15), eighteen (18),
     twenty-four (24), sometimes thirty (30), and
     then yearly after that.  And sometimes they miss
     or sometimes they come late.

Q    Okay.  If you can, tell the Jury do you know the
     dates of the well check-ups that Madison had?

A    I would have to check the record to see exactly.

Q    Would your records, excuse me proposed Exhibit
     BB refresh your recollection?

A    Yes.

Q    I would like you to, if you could, look at that
     and I would ask you the dates of the well check-
     ups?

          Why don't we do a one-by-one, it would
     probably be easier.

          The first?

A    Was a one week check on one three o-six
     (1/3/06).

Q    Okay.  And, how was she doing at that time?

A    There were no problems.

Q    Okay.  Next check up?

A    Was a four week check on January 24th, 2006.

Q    And how was she doing then?

A    She was developing well, and there was some
     question of a hip-click.

Q    Okay.  The next check up?

A    Was a three month check on March 17th, of 2006.

          MS. POPE-STARNES:  I object, your

     Honor, and ask he can refresh his memory from

     the records, but he appears to be reading from

     the records.

          MR. WHITE:  Okay.

          THE COURT:  Direct him, Mr. White.

Q    **(By Mr. White, continuing)**   And --- okay, we'll
     do it one-by-one, Doctor.

          And, I believe you said March 16th?

A    March 17th.

Q    March 17th, I'm sorry.

          And do you have independent

     recollection of how she was doing that day?

A    Uh --- there were no visits where there were any
     problems.

Q    Okay.  Would --- did Madison's well check-ups
     follow the schedule that you outlined earlier in
     your testimony?

A    Within reason.

Q    Could you tell me, independently, Doctor,
     without looking at your records when the next
     check up was?

A    No.

Q    Would reviewing the records refresh your
     recollection?

A    The next visit was a four month check on May 7th.

Q    Okay.  And, would you particularly remember when
     the next check up was?

A    No.

Q    Would your records refresh your recollections?

A    Yes.

Q    Okay.  Will you tell me when the next check up
     was?

A    The next check up was the six month check on
     July 24th.

Q    Okay.  And, would your memory allow you to
     remember the next check up?

A    No.

Q    Would you records refresh that?

A    The next visit was a ten (10) month on October
     24th.

Q    Okay.  And, do you remember the next check up?

A    No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Would reviewing your report or your records
     refresh your recollection?

A    The next visit was a sickness and there were no
     well child visits after the last one that I
     mentioned.

Q    I'm sorry, October 24th was the last well check
     up?

A    Yes.

Q    And, the next visit was when, Doctor?

A    Was November 3rd.

Q    Okay.  And, if you can recall, do you remember
     the nature of the sick visit that she had?

A    I think it was for a cold.

Q    Okay.  And, do you remember how she was treated
     by you?

A    Not without looking.

Q    Would it refresh you --- would your records
     refresh your recollection?

A    Yes.

                She was treated with Amoxicilian and a
     liquid cold medicine and Tylanol.

Q    Okay.  And did she have any further visits,
     Doctor, do you remember?

A    No.

Q    The last ---

A    (Interposing)  I misspoke, I do not remember.

Q    Okay.  Do not remember.  Would reviewing your records refresh your recollection?

A    Yes.

          That was the last visit.

Q    Okay.  And, at any time, Doctor, that you saw Madison, did you see anything that caused you concern about the way she was being treated away from you?

A    No.

Q    Okay.  Did you see anything that would suggest to you that she was a victim of child abuse?

A    No.

Q    Do you know, Doctor, from your memory who would bring in Madison?

A    The majority of time it was her mother.

Q    Okay.  Did you ever meet her father?

A    I believe on one occasion.

Q    As of the last visit, was she up to date on all her vaccinations?

A    Yes.

Q    Okay.  Was --- other than her hip, I think you mentioned, was she growing normally?

A     Yes.

Q     Okay.  Within the range for a child of her age,
      height, weight, things of that nature?

A     Yes.

Q     Okay.  Any indication that she was not well
      nourished?

A     No.

Q     Now, Doctor, was there a time when you were made
      aware of the results of an August 31st, 2006 M R
      I?

A     Yes.

Q     Okay.  And, how did you become aware of it?

A     I received a written report from the University
      of Michigan.

Q     Okay.  And, did you discuss that with either of
      Madison's parents?

A     Yes, both.

Q     Okay.  Both mother and father?

A     I believe so, yes.

Q     Okay.

              MR. WHITE:  I have nothing further,
      your Honor.

              THE COURT:  Cross-examine.

              **CROSS-EXAMINATION**

**BY MS. POPE-STARNES:**

Q    Good afternoon, Dr. Adams.

A    Good afternoon.

Q    Let's start with the last question Counsel asked
you about the August 31st, M R I.

          That M R I was done based on a
referral that you made, correct?

A    Correct.

Q    And then you received a report from University
of Michigan Hospital from the radiology
department in regards to that, correct?

A    Yes.

Q    Now, you testified that you recall discussing
with the parents the results of that M R I,
correct?

A    Yes.

Q    Isn't it true that your records indicate that on
September 6th of 2006 you had a phone call from
the mother and you discussed the M R I with the
mother?

A    Yes.

Q    Okay.   When did you speak with both parents?

A    Not at the same time, it was sequentially.

Q    And, this was a telephone call?

A     Both times.

Q     So, explain to us how this happened.  You get

      the M R I results and then what happens?

A     Then I called the home to talk to either parent,

      and my staff got mother on line, and I told

      mother about the M R I.

Q     And, then when did you talk to father?

A     I believe it was the next day.

Q     Okay.  Now, you have a note here that says on

      "September 7th R P A wants to talk to M D."

                What does 'R P A' stand for in your

      records?

A     Those are my initials.

Q     Okay.  Where in your notes does it indicate that

      you talked to father?

A     Can I look at the records?

Q     Yes, if you can help me, because I am having a

      hard time reading some of your handwriting.

A     On --- at the top of the page dated 9/6/06 in my

      handwriting there is a --- then a dictation

      dated 9/6/06 where I spoke to Madison's mother,

      Heather.

Q     Okay.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    And then half way down the page on 9/7/06 is
     when --- there was a note about a conversation I
     had with the father.

Q    Okay.

A    There's a ---

Q    (Interposing)  So it was on the 7th of September?

A    Correct.

Q    Okay.  Now, Doctor, once you got that M R I
     report, did you have any concerns?

A    The M R I was ordered looking for structural
     problems related to the aphasia acutis and there
     was a question that there was a lypoma and that
     is the information that I related to Heather and
     to her husband.

Q    And, it also recommended at C T Scan be done to
     follow up, correct?

A    Correct.

Q    And did you do the referral for the follow up C
     T Scan?

A    Yes.

Q    And, did you get a report back from the
     University of Michigan radiology department
     regarding the follow up C T Scan?

A    Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Did you have concerns about those results?

A    Those results were read as normal.

Q    Now, when did you see Madison and treat her for
     Mersa?

A    I did not.

Q    When were you advised that she had ever been
     diagnosed for Mersa?

A    I would need to look at the records to answer
     that question.

Q    Would your records refresh your memory?

A    Yes.

Q    Okay.

A    · Thank you.

              On 11/15/06 we received a phone call
     from Heather stating that she had seen a
     dermatologist, her own dermatologist and that
     dermatologist had done a culture, which showed
     Mersa.

Q    Was the child ever brought back to you after
     that for a follow up visit in regards to that?

A    Regards to the Mersa?

Q    Yes?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A     There was a referral made to an infectious
      specialist and I don't believe I saw her for
      that problem.

Q     Okay.  Now, tell us, please, what is a
      'fontenell'?

A     'Fontenell' is a place --- the skull is made up
      of multiple different bones, and when you are a
      child they are not all fused together.  And over
      time the edges fuse together.

              A 'Fontenell' is an area where there
      is a small gap in those bones.   There is one in
      the front and one in the back.

Q     Sometimes we refer to that as a 'soft spot',
      correct?

A     Yes.

Q     And, during the course of check ups or visits,
      when an infant is brought to you, is it part of
      your practice to check the Fontenell?

A     Yes.

Q     And, why do you do that?

A     It gives an indirect measure of pressure in ---
      within the skull.

Q     And, did you do that when you would see Madison
      for her check ups?

A    It is a usual part of the exam.

Q    And, did you ever note that there was anything
     concerning or unusual about her Fontenell during
     her well baby check ups?

A    No.

Q    Approximately how many children do you see a
     year?

A    I would have to guess its about a thousand.

Q    So, I think it is fair for me to say that in
     treating that many children a year you probably
     see children who suffer from the stomach flu?

A    Yes.

Q    What type of symptoms do you see?

A    Vomiting initially and then diarrhea, sometimes
     fever.

Q    Lethargy?

A    Not with the stomach flu.

Q    When you have a child that it has a fever, do
     you see lethargy?

A    That has a specific medical meaning.  We see
     children who are not as active as usual.

Q    Now, I know you said, Doctor, that you saw
     Madison for one of her well baby visits, I
     believe, it was on March 17th, of 2006, correct?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    Yes.

Q    During that visit were you told that Madison had been taken to the emergency room at St. Joseph's Ann Arbor, in February of 2006?

A    I don't have any recollection of that.

Q    Were you ever given that medical history by the parents in regards to Madison?

A    I do not recall hearing it.

Q    Okay.  How about your records, is that reflected anywhere in your records?

A    No.

Q    Did you ever receive any type of report or letter from St. Joe's of Ann Arbor in regards to a visit to the emergency room in February of 2006 with Madison?

A    No.

Q    Were you ever given any history by the parents that Madison had been involved in a car accident during the time she was your patient?

A    No.

Q    How about did they ever give you any history that she suffered from any type of fall?

A    No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q    Were you ever given any history by the parents
     that she had suffered from any type of accident?

A    No.

Q    Now, Dr. Adams, when you get a patient with
     their first baby and it is one of those very
     first visits, like the one week or two week
     visit, do you counsel the parents on how to care
     for an infant?

A    Yes.

Q    Talk to them about things like supporting the
     head?

A    Yes.

Q    About crib safety, or bed sharing safety issues?

A    Sometimes.

Q    Would you ever counsel a parent that it is
     appropriate to throw an infant?

A    No.

Q    Why not?

A    I wouldn't want to have an injury.

Q    Dr. Adams, did there come a point where you
     learned that Madison had been taken to
     University of Michigan Hospital sometime on
     November 30th, 2006 or thereafter?

A    Yes.

Q    Okay.  And, you actually went to the hospital to
     see Madison and see the family, correct?

A    Yes.

Q    Do you recall when you went?

A    I would have to refer to my notes, if I could?

Q    Okay. Do you think your notes would refresh your
     memory?

A    Yes.

Q    Please, go ahead.

A    Around the 2nd of December.

Q    Do you recall when you were there, Dr. Adams,
     who was there?  Who was present?

A    Heather.

Q    Were there any other times that you were at the
     hospital to visit Madison?

A    Yes.

Q    During any of those times did you have an
     opportunity to speak to Madison's father?

A    Once.

Q    Do you recall which day that was?

A    I don't recall which day.

Q    And, during the time that you were there when he
     was present, did he ever tell you what happened
     on November 30th, 2006?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

A    No, we didn't talk about that.

Q    You only saw the Defendant bring Madison to your
     office one time, correct?

A    That I remember, yes.

Q    Dr. Adams, you weren't present on November 30th
     of 2006 in Madison's home, so you don't have any
     personal knowledge of what happened that day, do
     you?

A    No.

Q    In fact, you don't have any personal knowledge
     of what goes on, or what went on between Madison
     and her father when they were alone, correct?

A    Correct.

         MS. POPE-STARNES:  Thank you very
much, Doctor.

         I have no other questions of this
witness, your Honor.

              THE COURT:  Mr. White?

              MR. WHITE:  I have no other questions.

              I ask that the Doctor be excused, just
leave behind that Exhibit.

              THE WITNESS:  Sure.

              THE COURT:  You're all set.

              MR. WHITE:  Your Honor, if I may?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

THE COURT: You may.

Do you both want to come on up?

(Whereupon a discussion was held at the Bench, out of the hearing of the Jury and the Court Reporter).

         *    *    *

THE COURT: Ladies and Gentlemen, I am going to have you go back to the Jury room for just a couple moments and we will let you know what we are doing from there. Okay.

Please don't talk about the case. Thank you.

All rise for the Jury.

(Whereupon the Jury left the courtroom at 2:40 p.m.)

         *    *    *

THE COURT: Thank you. You may all be seated. The record will reflect that the Jury has been excused.

I'm just going to stand for a minute, because I'm sore a little bit. Let's stay on the record for a second, Lynn.

It's now, for the record, twenty (20) minutes to three. Depending on the Court Ruling would it --- let me put it this way.

Regardless if the Court made a ruling on the one matter about proposed Exhibit 16, is there anything further that either one of you can anticipate that I can do with respect to the Jury today? Closings or whatever?

The question is whether I'm letting them go or have them come back Monday or not.

MS. POPE-STARNES: What I had left was moving for the admission of the Exhibit in front of the Jury and the stipulation.

THE COURT: Okay. We could have done the stip, but other than that would you --- either one of you, assuming that both of you rested today, would either one of you anticipate going forward with closings today?

MS. POPE-STARNES: No. As I indicated the other day I have other rebuttal witness to Doctor Uscinski's testimony.

THE COURT: Regardless of ---

147

MS. POPE-STARNES: (Interposing) Who is prepared to come in first thing Monday morning.

THE COURT: So, no matter what, nothing more for the Jury today, other than possibly some stipulations or some rulings on the record?

MR. WHITE: That's correct.

THE COURT: Okay. Is there any --- we can either bring them back in for the one stipulation or make any difference whether it is today or Monday morning?

MR. WHITE: We can tidy it all up on Monday morning.

THE COURT: Okay. Any perspective from you? Other than the comfort of knowing that something more is being accomplished?

Okay. All right.

Now, don't you folks leave yet, we'll allow the Jury to be excused. Tell them thank you, don't discuss the case we'll see them at 8:30 Monday morning.

THE CLERK: Half day?

THE COURT:   If they enquire about
what is going on just tell them we'll let you
know Monday morning.

Okay.   Thank you.

I'll have --- I'll be with
Counsel in a couple of moments.

We're all set.   Thank you, Deputies.

THE DEPUTY:   Thank you.

THE CLERK:   All rise.

(Whereupon a recess was taken.)

          *     *     *

THE CLERK:   Calling People versus
McBurney, case number 2007-2 1 4 6 5 1-FC.

THE COURT:   Counsel's names ---
appearances are noted for the record.

The Court has come back into court.   I
have been chewing on proposed Exhibit 16 since
it was broached before lunch.   And I'm --- I'm
not going to direct --- I am going to share with
Counsel some questions that I have of myself and
perhaps Counsel could shed some light on it,
perhaps not.

But I'm not --- I'm just sharing some questions. First, the question is did the right to confront witnesses --- strike that.

Did the right to confront the Declarant, who was the author of proposed Exhibit 16, did that right evaporate or was it waived when the Defendant pled no contest? We can take these piecemeal, if anybody wants to respond to it or not. But that's either an actual question directed at Counsel, or it's a rhetorical question.

Anyone?

MR. WHITE: Do you want to do it one-by-one?

THE COURT: However you want. Do you want to speak on it?

MR. WHITE: Sure.

THE COURT: Go ahead.

MR. WHITE: Mr. McBurney pled no contest to Child Abuse Second Degree. Reckless --- recklessly causing serious physical harm to an infant, recklessly causing a --- in fact a negligence or gross negligence standard if I, you know, certainly not intentional.

The difference between that which he pled no contest to and the term 'Shaken Baby' is that shaken baby is meant as a --- it was, and I think its --- I think the Court can glean from the testimony of the doctors in this case, it's being you know shelved, we're putting it as a proper diagnosis.

But, the way it was used then and it was actually used in this case is to connote non-accidental injury. Not accidental.

THE COURT: Let's --- let's for the sake of argument, let's assume that the Declarant is accusing the Defendant. Let's just --- let's just for the sake of argument for this question. My question is does the right to confront witnesses, does the right to confront a testimonial Declarant exist in perpetuity or can that right evaporate or waive?

If he went to trial in front of his accusers, would he still have the right to confront the accusers now. I am using the word 'accusers' loosely. Does that right exist in perpetuity, forever, for future crimes until --- and if in the future he has another child and

this allegation happens again, or does that right evaporate or does he waive that right, or does that right exhaust itself when he does confront them, or waive the right to confront them, by virtue of that adjudication in the no contest in the prior proceeding?

We are not dealing, the accusers --- the Declarant --- when the Declarant was writing down 'Shaken Infant Syndrome', perhaps, just giving the Defendant the benefit of the doubt, that Declarant thought perhaps I can be hailed into court. But, at that time he thought he could be hailed into court on the Nicholas case. Madison, at the time that the Declarant wrote those words down wasn't even born yet.

So, for that person to anticipate being hailed into court in the Prosecution of the Madison case, by definition, he couldn't have anticipated, or the person couldn't have anticipated it.

But that's getting to another question that I have. My first question is whether the right to confront exists in perpetuity?

FORM CSR · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

MR. WHITE: And I say to that, Judge, to the extent that that evidence could ever be used against him it does exist.

THE COURT: Okay.

MR. WHITE: Because if it is going to be evidence against him, then the right of confrontation under the Sixth Amendment would be operative.

THE COURT: I am not saying no, I am not saying yes. That's your comment. I don't think that this was briefed and I don't know if you have any law or if that is just your fundamental Constitutional analysis. Again, I am not saying that these are questions I am soliciting an answer. They are rhetorical questions that are going on in my head. So you can stew on that.

Miss Pope-Starnes, do you want to speak on this?

MS. POPE-STARNES: I think that a person always has a right to confront their accusers. But, I think you don't get to that step in Crawford, because I believe it is not testimony.

THE COURT: Okay. All right. Then we don't need to go further, at least in this case philosophy notwithstanding because there is no dispute as to that --- that leg.

If the --- the question now becomes and by the way, the record should reflect that we are here talking about a matter and the proceeding is Defendant's Motion for Reconsideration of the Court's previous ruling.

So, the basis for the Reconsideration is that there is new evidence, for lack of a better way to put it and that is some evidence on the record.

My question is, what evidence on the record contains a definition of 'Shaken Infant Syndrome' and if there is such a definition on the record, is it undisputed as to what that definition is.

You mentioned Lynn Peterson, I think, but that is the daycare lady.

MR. WHITE: No, I mentioned Dr. Uscinski testified about Shaken Baby Syndrome.

THE COURT: Did he define it?

MR. WHITE: He defined it --- it's his investigation and that his conclusions were that the idea that you could shake an infant so hard, a human being could shake an infant of so many years, taking Madison's years, so hard to cause this rapid acceleration ---

THE COURT: (Interposing) Time out. With all due respect, I understand that he testified that a human could not create the force necessary. But that wasn't my question.

The question was did he define the phrase? Perhaps he acknowledged the phrase, but did he define it? Because what we are dealing with here is whether --- in order for it to be testimonial perhaps and add rhetorical comments here, there must be a connotation of an intent, and that was kind of the basis for why the Court allowed it in the first place as opposed to Battered Child Syndrome.

And you are telling me that there is some evidence on the record that now does --- there is some meat in this record. There is some evidence in this record that dispenses with equivocation on how one can interpret that

phrase. And the only definition is an
intentional connotation.

MR. WHITE: Dr. Alena Dev testified
regarding Shaken Infant Syndrome.

THE COURT: That's who I thought you
said Lynn Peterson, Lynn --- Dr. Dev said by
definition.

MR. WHITE  Yeah, Dr. Dev, and she
said it is being replaced, it is now become an
anachronistic and it is being replaced by
Abusive Head Trauma. And her dep --- and her
findings ---

THE COURT: (Interposing)  Syndrome or
just Abusive Head Trauma?

MR. WHITE: Abusive Head Trauma.

THE COURT: Okay. Go ahead.

MR. WHITE: They love initials A H T.
Her --- she says, and it has been admitted in
this record, Judge, that the finding was
"Madison suffered non-accidental injury, Abusive
Head Trauma paren Shaken Infant Syndrome
unparens." That's her testimony hi-lighting her
written ---

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

THE COURT: I might have to have you repeat that one more time. 'Non-accidental . . .

MR. WHITE: Injury.

THE COURT: Injury. Keep going.

MR. WHITE: Her findings were that 'Madison suffered non-accidental injury ---

THE COURT (Interposing) A K A --- I don't want to put words in your mouth.

MR. WHITE: N A I. In this case it was Abusive Head Trauma parens --- and I believe it is Shaken Baby Syndrome --- it might be Shaken Infant Syndrome. I can find it in the record.

THE COURT: A K A, formerly known as or something like that, that's what your getting at?

MR. WHITE: She says, 'Abusive Head Trauma parens Shaken Baby Syndrome unparens.

THE COURT: Anything else on it?

MR. WHITE: And she said, when I said that is a term of art that has now been replaced, I said, 'Why did you put it in there?' And she said, 'Just so people know what I'm talking about. That is they are synonymous.

Non-accidental injury, abusive head trauma in

this case, the type of non-accidental injury

paren Shaken Baby Syndrome.'

THE COURT: While those are three

definitions of the same thing?

MR. WHITE: Well non-accidental ---

this is a specific kind of non-accidental

injury, which is the head, injury to the head.

THE COURT: Okay. So, non-accidental

injury is the big is the --- the big circle and

within it is Abusive Head Trauma slash Shaken

Baby Syndrome?

MR. WHITE: Right.

THE COURT: Miss Pope-Starnes.

MS. POPE-STARNES: Well, that's not

what the record says. It doesn't say 'non-

accidental trauma'. It says, ---

MR. WHITE: (Interposing) I said her

testimony says is is not accidental.

MS. POPE-STARNES: It says, ---

THE COURT: (Interposing) Go ahead.

MS. POPE-STARNES: 'It should be noted

her C T and M R I findings are highly concerning

for Abusive Head Trauma parentheses Shaken Baby

Syndrome given the retinal hemorrhages and
subdural hemorrhages.'

THE COURT:  That is a --- you're
reading from an Exhibit?

MS. POPE-STARNES:  Yes.

THE COURT:  It's from People's Exhibit
1.  It's from Dr. Dev's report.

THE COURT:  And, do you have any ---
is it okay if the Court receives that
information as well?

Do you have anything to say in
response to his contention that the testimony,
the other meat of evidence in this record
provides for a --- what he said?  That he said
that she ---

MS. POPE-STARNES:  (Interposing)
First of all ---

THE COURT:  (Interposing)  Go ahead.

MS. POPE-STARNES:  (Continuing) . . .
I completely disagree that Dr. Uscinski gave a
definition.  In fact, Dr. Uscinski doesn't
believe there is such a thing as Shaken Baby
Syndrome.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

THE COURT: Well, we're getting into the same thing I said before. We're dealing with --- now we just morphed from a definition of the phrase to the consequences from the phrase. So, I don't want to ---

MS. POPE-STARNES: (Interposing) Well, I think what Dr. Dev in this case she talked about Abusive Head Trauma, she talked about non-accidental injury, she talked about the specifics in regards to Madison and her diagnosis of Madison.

And she was asked by Counsel on Cross-Examination about Shaken Baby Syndrome, and she said, 'It's a term that they used to use, that they were moving away from and that she put it in her report. She didn't give a definition of Shaken Baby Syndrome.

And Abuse Head Trauma, quite frankly, has a different definition then Shaken Baby Syndrome, but I don't believe that is in the record.

THE COURT: Okay. Now, the Court has another question, assuming, for the sake of argument that there is some evidence on this

record that defines Shaken Infant, which is the phrase in the proposed Exhibit, if there is some evidence, some evidence in the record that defines the Shaken Infant Syndrome with an intentional characteristic.

The question is, is that statement in the Exhibit --- was it made by an objective Declarant and was it made under circumstances which would lead the Declarant to believe that the statement would be available for later use in a prosecution of the Defendant for an alleged offense at the time that the declaration --- at the time of declaration the offense did not yet occur?

I'm getting too cumbersome. There has been no argument that the right to confront exists independent of a no contest plea. So, let me restate it. Was that phrase made by an objective declarant and was it made under *circumstances which would lead that declarant to* believe that the statement would be later use in a trial?

MS. POPE-STARNES: Your Honor, it was a discharge --- discharge summary from a

hospital. It is done every time a patient is discharged from a hospital.

Now, I suppose you could argue that anything could be used in court at some point. But, the purpose of a discharge summary is to say that this is what your diagnosis was, these are the follow up recommendations whether it is to see another physician, whatever. But it was on a discharge summary.

And --- and there was a case that we cited in our original brief about this ---

THE COURT: (Interposing) Is that the Indiana case?

MS. POPE-STARNES: No. It's People versus Miller. It's unpublished. But I attached it to our initial brief in regards to this issue because it has to do where --- it has to do where a neuropathologist relies on other neuropathologist's report.

And, I mean, you could argue that neuropathologist there's a death, that maybe this is going to come in to court. I --- but the purpose of the doing it has to do with the cause, to find the cause and manner of death.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

And the Court of Appeals said in that case 'A report completed by one pathologist at the request of another for investigative purposes of determining victim's cause of death is clearly not testimonial.'

And it talks about the definition of testimonial evidence applies to evidence by custodial examinations, prior ex-parte testimony of witnesses, depositions, confessions, statements of an official nature that resemble testimony.

And it says, 'An autopsy report documenting the doctor's medical observation clearly does not meet this definition.' And it says right on this discharge sheet 'diagnosis'. I think it says primary diagnosis, secondary diagnosis, diagnoses.

And when I asked the witnesses the questions about this during the trial I said, 'What was your diagnosis?' They are doctors. They are called upon to treat the living as Dr. Dragovic was saying today and they make a diagnosis in an attempt to do that. And that was the purpose of that discharge summary.

THE COURT: Mr. White?

MR. WHITE: Well, they had nothing to do with the discharge summary in this case. That was the Nicholas case we're dealing with right?

THE COURT: Okay.

MR. WHITE: We've had no doctors testify about Nicholas' case.

MS. POPE-STARNES: I'm sorry. I'm talking about the discharge summary for Nicholas.

MR. WHITE: I misunderstood. I thought you were talking about the doctors in this ---

THE COURT: Okay.

MR. WHITE: Testifying about Nicholas.

THE COURT: Question --- go ahead, speak.

MR. WHITE: It's, you know, there are clearly there are clearly medical terms. Subdural hemorrhage, skull fracture, you know, things of that --- and those are contained within the diagnosis. Okay?

But ---

THE COURT: Along with this ---

MR. WHITE: Along with this Shaken Baby/Shaken Infant Syndrome. And the rest of the medical records, you know, show that there was this belief that the child suffered with Shaken Infant Syndrome indicative of non-accidental injuries. Non-accidental, okay.

And so there was the thirty-two hundred (3200) report to C P S, police, you know. You know that what happened to Nicholas' case. So, it is put in the medical diagnosis, but it has legal termination --- it has legal implication because it suggests intentional injury.

THE COURT: Can you harness that thought for a moment, and if you need to come back to it you may.

MR. WHITE: Okay.

THE COURT: But it is peripherally related to my first question. Would --- was it made by an objective declarant, and was it made under circumstances that would lead the declarant to believe that the statement would be available for later use in a trial?

MR. WHITE:  My suggestion --- my response would be to that, Judge, yes it would be because, Number 1 there had already been a referral for, you know, the mandatory reporting law of Michigan that there is suspected child abuse.  And the child abuse in Nicholas' case, the suspected child abuse was Shaken Baby Syndrome.

So, for that declarant, the final --- to put in the final diagnosis knowing that there had already been a Child Protective Services referral, knowing that there had already actually, according to Detective Sumner, he had reported that the father confessed, that I don't think it is too difficult to fathom that when that person put that down, whoever that person is, to say that they may be testifying someday about this particular finding, I think it is well within the reason --- of the bounds of reason.

THE COURT:  With that in mind, now, Mr. White consider the effect of the sentence in Crawford, which discusses the historical hearsay exceptions which, quote,

"By their very nature were not

testimonial hyphen for example, business

records . . . dot, dot, dot, close quote."

Are you following what I am saying?

MR. WHITE: Sure. Sure. And

absolutely, business records. But in --- I

agree, normally these medical records slash

business records, there was a Hearsay Exception,

there still is.

What does Crawford say? Crawford

says,

"The right of confrontation under the

Sixth Amendment addresses those things in

testimonial nature."

THE COURT: In context, though, this

language that is excerpted from the majority

opinion is --- I'm not going to belabor the

record with my Interpretation of what it means,

but that's what the opinion was all --- was, in

part, about. It was saying certain hearsay

exceptions didn't implicate the confrontation

clause, because they were not testimonial ---

not testimonial by their very nature.

For example, business records. So from that sentence it almost sounds like the Supreme Court is saying business records aren't testimonial. I am not saying that it is making that statement, but it's --- it's --- it says what it says.

MR. WHITE: Well, for instance ---

THE COURT: (Interposing) And it was contemplating the eclipse of the confrontation clause over hearsay exceptions. But, it says,

"There are certain hearsay exceptions that don't even get eclipsed by the confrontation clause because they are not a testimonial."

MR. WHITE: But, I don't think, Judge, that is an interpretation of the decision in Crawford that comports with the Sixth Amendment because, for instance, the medical records, the complete medical file of Nicholas also contains nurses notes that says the father confessed, okay?

It --- that argument of Crawford says, 'Well, because it's medical slash business records it doesn't matter, it still comes in.'

Okay?

And so we --- you could, you know, extrapolate that to a degree, that you know, you could have lots of statements an incriminating statement by the accused, supposedly, or something or someone else saying something. An independent outside witness statement being put in medical records that because they are medical records I still don't think --- I still think you have to look at testimonial content of that which is being objected to. Regardless of the type of records that are.

THE COURT: Anything further?

MR. WHITE: Nothing further from me, Judge.

THE COURT: The Court is here and considering this request, Motion for Reconsideration. The Court will dispense with the normal requirement that the Order be reduced to a written form before the Court can rule on Reconsiderations since we are in the middle of a trial and that would certainly be unfair to make that requirement and I'll waive that requirement.

Giving the benefit of the doubt and without reviewing the testimony, the Court will assume that Dr. Dev testified, as the Defendant states, that, along with her medical records that do not connote a necessarily contentional component to the phrase 'Shaken Infant Syndrome' then as it relates to the phrase 'Shaken Infant Syndrome' the record is in the same state that it was in when the Court made it's initial ruling, striking 'Battered' --- the word, the phrase containing the 'Battered' word and leaving the phrase containing the 'Shaken' word.

The intent behind it, under this record may include 'intentional' and may include 'accidental' and, indeed, the evidence the Court finds was made for medical diagnosis and treatment and was, for those reasons, plural not testimonial.  And the Court, therefore, will ratify its earlier decision allowing the phrase in the Exhibit 16.

Mr. White, your objection is certainly noted for the record.  It is very clear on the record.

MR. WHITE:  Thank you.

THE COURT: And, other than that, is that Exhibit otherwise okay to come in?

MR. WHITE: May I take a quick look at it?

MS. POPE-STARNES: I redacted it, the other part as ordered by the Court before the trial started. I gave it to Counsel this morning to look at.

THE COURT: Okay.

Just off the record.

(Whereupon an off the record discussion was had.)

\* \* \*

THE COURT: As to Exhibit --- proposed Exhibit 16?

MR. WHITE: I have reviewed it, Judge, and it is in accordance with the Court's ruling.

THE COURT: Then we'll --- I didn't admit that in front of the Jury, we have to do that.

MS. POPE-STARNES: No.

THE COURT: And the stipulation. Okay.

What else?

MS. POPE-STARNES:  The Jury
Instructions, we went through them and sorted
what we agreed on and what we disagreed on.

THE COURT:  Okay.

MR. WHITE:  Can I just deal with
Exhibits, though?

THE COURT:  Go ahead.

MR. WHITE:  Exhibit Y,
Washtenaw/Livingston County EMS run.  It is not
in the University of Michigan reports.  It was
admitted through Matt Calus.

I think sister-Counsel's objection it
may be cumulative.

MS. POPE-STARNES  If I may, Judge?

I'll just agree to all these things,
okay?

MR. WHITE:  Y ---

MS. POPE-STARNES:  (Interposing)  He
has shown me everything, I've looked at it and I
have no objection to it's admission.

MR. WHITE:  Y --- Z is the Certified
Records of Brighton Dermatology, Dr. Liftkin.
A.A is Certified copy of Dr. Piro's medical
records.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

THE COURT: There being no objections Exhibits Y, Z and A A are admitted.

THE COURT: All right.

MR. WHITE: And then I put the Court on notice, I want to search for some authority over the weekend about blowing up the Exhibits that were admitted through Dr. Uscinski, the M R I and C T Scans.

We were able to print out clear pictures, and I know the Court, they have the discs as part of Exhibit 1, but they won't have the means to access the information contained thereon.

So, my intention is to offer as replacement Exhibits, hopefully on Monday the blown up versions of Exhibit W, --- I'm sorry, I am going to back it up. Exhibit T, Exhibit U, Exhibit W and X.

THE COURT: You have any comment on that, or just wait and see if he has authority or just ---

MS. POPE-STARNES: We'll just see.

THE COURT: That covers it from your end?

MR. WHITE:  It does, Judge.

THE COURT:  All right.

Sorry, Lynn, but just so we don't have any confusion, the Court in this session the Court has made its decision on Defendant's Motion for Reconsideration and for the reasons stated on the record admitted Exhibit 16, which, again, I will entrust to Counsel that they will remind me to do it in front of the Jury.

I have also confirmed the stipulation on chain of custody, which will likewise Counsel will remind me and that will be expressed in front of the Jury.

There has been the admission of Exhibits Y, Z and A A.

The Exhibit 1, the remedial words as to the portion of Exhibit 1 has been remedied, though Counsel's fixed the type face with a font themselves and shared it with each other.

And with that, and after the admission or these things are occurring in front of the Jury, does anyone know about resting or not resting or what's ---

MS. POPE-STARNES:  Well, I would rest
and then as I told the Court, I may have a
rebuttal witness.

THE COURT:  Oh, I forgot, yeah.

And, Mr. White?

MR. WHITE:  In light of her resting, I
would rest also.

THE COURT:  Okay.  And, we can do all
that Monday morning and then we'll proceed with
the rebuttal witness.

On Instructions I understand that
there is a pile that are agreed to and
respective pile that you already disagree to or
you don't know yet?

MS. POPE-STARNES:  There are --- the
majority of them we disagree on and then there
are one or two --- there is the expert witness
one, where we have to fill in everyone now.  You
know, complete that with the Court.

And there is a couple that depend on
the Court's ruling on the ones we disagree on.
For example, the Verdict Form and the
Instruction to the Jury about their order of
deliberations.  Once the Court has ruled and we

know specifically what charges are going to the Jury, then we just finished that.

THE COURT: Can we accomplish any of that right now so we don't have to --- in fact, they are coming in at 8:30 on Monday. Is --- are you both ready to discuss that right now?

MR. WHITE: Um ---

MS. POPE-STARNES: I am.

MR. WHITE: I am exhausted. I fear the quality of my argument is going to be diluted and the issues regarding the Jury Instructions are substantive and I believe the time would be better spent. I do believe if we could have all argument and rulings done by, you know, before lunch break so that Tuesday morning we are able to argue.

THE COURT: Well ---

MR. WHITE: (Interposing) Or ---

Go ahead.

THE COURT: I forgot. The rebuttal witness will occur Monday, is that what they --- okay.

Is it anticipated to do the

Instructions on Tuesday, to read the

Instructions Tuesday morning?

MS. POPE-STARNES:  Following closings,

your Honor.

THE COURT:  But, when would closing --

- when is that anticipated?

MS. POPE-STARNES:  Tuesday morning.

THE COURT:  Tuesday morning?

MR. WHITE:  Yes.

THE COURT:  Okay.

MR. WHITE:  I guess --- my

thought --- I guess we were all working with the

idea that Tuesday morning would be up and going

with closing arguments and Instructions.

THE COURT:  Yeah, right.

MS. POPE-STARNES:  If you will recall

we talked about --- we had a concern about ---

THE COURT:  (Interposing)  Yeah,

Monday afternoon.

MS. POPE-STARNES:  We had a concern

about whether or not there would be sufficient

with the Court's criminal call in the afternoon.

THE COURT:  Yeah.

MR. WHITE:  And, Judge, there is no
reason why if we should linger on with the Jury
Instructions Monday to be here and I know you
are conducting your criminal call.

THE COURT:  No.  As a matter of fact I
am respectfully directing both of you on Monday
lunch time and after lunch work on the
Instructions.

MR. WHITE:  I will stay.

THE COURT:  With Miss Gerlick will be
available in the afternoon, talk to her and then
if rulings need to be made we will squeeze it in
when we can.  Okay.

All right.  Thank you.

Have a good weekend.

THE CLERK:  All rise.

(Whereupon the matter was completed
and recessed for this day.)

*    *    *

CERTIFICATE

STATE OF MICHIGAN )

      SS

COUNTY OF OAKLAND )


    I, **Lynn E. Erickson**, Official

Court Reporter for the Sixth Judicial

Circuit Court, State of Michigan, do

hereby certify that the attached is a true

and correct transcript of the hearing held

in this matter.

**Lynn E. Erickson, Court Reporter   CSR-0188**

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313