STATE OF MICHIGAN

IN THE SIXTH JUDICIAL CIRCUIT COURT, COUNTY OF OAKLAND

THE PEOPLE OF THE STATE OF MICHIGAN,

OAKLAND COUNTY 07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY.STEV

            Plaintiff,

VERSUS –                          File No. 2007-214651-FC

STEVEN LINSEY MCBURNEY,

            Defendant,

_____/

**TRIAL**

            Proceedings had in the above-entitled

matter, held before the **HONORABLE DANIEL PATRICK**

**O'BRIEN,** Judge of the Sixth Judicial Circuit Court

for the County of Oakland, Michigan on March 3rd,

2008.

APPEARANCES:

SARA POPE-STARNES
Assistant Prosecuting Attorney

    Appearing on behalf of the People

ROBERT WHITE
Attorney-at-Law

    Appearing on behalf of the Defendant

Lynn E. Erickson, Court Reporter, CSR-0188

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

## I N D E X

WITNESSES:                                              PAGE

    FOR THE PEOPLE:

DR. MOHAMNAD IBRAHIM

Direct Examination, by Ms. Pope-Starnes      10
Cross-Examination, by Mr. White              38

MOTION FOR DIRECTED VERDICT

      By Mr. White                          47
      By Ms. Pope-Starnes                   55
      By Mr. White                          68

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

6th Judicial Circuit Court

County of Oakland, Michigan

March 3rd, 2008.

(9TH Day)

\*   \*   \*

THE CLERK:   The Court calls People versus McBurney, case number 07-214651 FC.

MS. POPE-STARNES:   Good morning, your Honor, Sara Pope-Starnes, Assistant Prosecuting Attorney on behalf of the People.

THE COURT:   Good morning.

MR. WHITE:   Robert White, on behalf of Mr. McBurney.

THE COURT:   Good morning.

The Court has called the case right now, even though your client is not up here, just to get things in gear.   We are still waiting on some of the Jurors.

Anything preliminary that we need to do?

MR. WHITE:   Yes, your Honor.

I have a Motion for Directed Verdict and I would like my client to be present.   And, if the Court would like to have argument on this

after the conclusion of all the testimony, in the context of the Jury Instructions probably would be the most efficient use of time.

But, I would like to argue.

THE COURT: All right. Anything else, other than that, then?

MR. WHITE: I don't perceive anything.

THE COURT: Okay. All right.

Then, when we have the full Jury ---

THE CLERK: (Interposing) One more.

THE COURT: Okay. Same one?

THE CLERK: No, your Honor.

THE COURT: Okay.

MS. POPE-STARNES: The rebuttal witness is here.

THE COURT: Okay. All right. Very well.

Then, when the Jury is here, and we are only missing one, we will come on in and I understand that then the Prosecutor will move to admit Exhibit 16, Defense would move to admit Exhibits Y, Z, and double A.

There is a stipulation regarding chain of custody, and then the People will rest, the

Defense will rest, and then the rebuttal witness, and then . . .

MS. POPE-STARNES: Yes.

Your Honor, I would ask that we be allowed to move for admission of our Exhibits, put on the stipulation and then rest. Then let the Defendant in their final Exhibits and then rest.

MR. WHITE: Right.

THE COURT: Then the rebuttal witness, and then we'll deal with your directed verdict at whatever point in time that it is most convenient.

Okay. All right. Very well.

When the other Juror gets here, then we'll have the Defendant brought up and we'll take it from there.

Okay?

MS. POPE-STARNES: Thank you, your Honor.

THE COURT: Thank you.

THE CLERK: All rise.

(Whereupon a brief delay was had.)

*    *    *

THE CLERK: The Court calls People versus McBurney, case number 0 7 - 2 1 4 6 5 1-FC.

THE COURT: Counsel's appearances are noted for the record, and Mr. White your client is present with you, correct?

MR. WHITE: That's correct.

THE COURT: Good morning. Thank you.

Ready to proceed, then? I understand the Jury is here.

Jeff, you can bring in the Jury.

(Whereupon the Jury was brought into the courtroom.)

*    *    *

THE COURT: Good morning, everyone.

THE JURORS EN MASSE: Good morning.

THE COURT: Welcome back. Hope you all had a good weekend. Thank you. You may all be seated.

The record will reflect that the Jury is back.

The record will reflect, also, that Mrs. Resnick missed us so bad she wanted to come back. So, welcome back. Thank you.

The case has been called, Counsel's names have been noted for the record and we are ready to proceed, thank you.

Miss Pope-Starnes.

MS. POPE-STARNES: Your Honor, the People would move for the admission of People's proposed Exhibit 16 and People's Exhibit 16, a Certified Copy of the Medical Records for Nicolas Kennedy.

THE COURT: Mr. White.

MR. WHITE: We've had argument and you know my objection on that, your Honor.

THE COURT: All right. Thank you.

With that noted for the record he Court will admit Exhibit 16.

MS. POPE-STARNES: And, your Honor, we have a stipulation, if I may place that on the record?

THE COURT: Mr. White, is that agreeable placed on the record?

MR. WHITE: I --- yes, sir.

THE COURT: Go ahead.

MS. POPE-STARNES: We would stipulate to the chain of custody of the body of Madison

McBurney from the University of Michigan

Hospital to the Oakland County Medical

Examiner's Office by the Michigan Removal

Service on December 5th, 2006.

        MR. WHITE:  That is correct, your

Honor.

        THE COURT:  All right.

        So noted.

        MS. POPE-STARNES:  With the admission

of that Exhibit and that stipulation the People

rest.

        THE COURT:  Thanks, your Honor.

        Mr. White?

        MR. WHITE:  Yes, your Honor, then we

would move to admit Exhibits Y, Z, and double A.

'Y' being the Washtenaw/Livingston County EMS

chart for the run of eleven thirty (11/30).

        'Z' being the Certified Copy of

Medical Records of Brighton Dermatology.

        'Double AA' being the Certified Copy

of the Medical Records of Dr. Gregory Piro.

        And I believe 'BB' was already

admitted through Dr. Adams testimony.

        THE COURT:  Thank you.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Miss Pope-Starnes?

MS. POPE-STARNES:  No objection.

THE COURT:  Those admitted --- those Exhibits are admitted.

Okay.  Mr. White.

MR. WHITE:  And, with that the Defendant rests.

THE COURT:  Thank you.

Both parties having rested, Miss Pope-Starnes.

MS. POPE-STARNES:  We have one rebuttal witness.

THE COURT:  All right.  Very well.

MS. POPE-STARNES:  The People would call ---

MR. WHITE:  (Interposing)  Just for a second.

Your Honor, I told you about the motion I would like to bring, but we ---

THE COURT:  (Interposing)  Yes, sure. We will certainly handle that one.

Thank you.

Go ahead Miss Pope-Starnes

MS. POPE-STARNES:  Your Honor, the

People would call Dr. Ibrahim to the stand.

THE COURT:  Thank you.

Sir, can you come on up this way,

please.

Ask you to face my clerk, please, and

raise your right hand to be sworn.

THE CLERK:  **Do you swear the testimony**

**you are about to give will be the truth, so help**

**you, God?**

THE WITNESS:  I do.

THE COURT:  Thanks, you can have a

seat there (indicating).

Counsel, you may proceed.

MS. POPE-STARNES:  Thank you,

your Honor.

**M O H A N N A D    I B R A H I M**

**After having been first duly sworn to tell the**

**truth, the whole truth, and nothing but the**

**truth, was examined and testified as f ollows:**

**DIRECT EXAMINATION**

BY MS. POPE-STARNES:

Q    Sir, would you please state your name and spell

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

your first and last name.

A   It is M O H A N, as in Nancy, another N A D, as

in David.  Last name is Ibrahim, I B, as in boy,

R, as in Robert, A H I M, as in Michael.

Q   Dr. Ibrahim, can I ask you please, I know you

are soft spoken.  But you need to keep your

voice up so Defense Counsel and all the Jurors

can hear you.

A   Certainly.  All right.

Q   Can you tell us, please what is your educational

background?

A   Well, I'm a neurologist.  I work at the

University of Michigan.

Q   Where did you attend medical school?

A   Syria, Damascus, Syria.

Q   And, when did you complete medical school?

A   1994.

Q   Following your graduation from medical school,

did you do a residency program?

A   Yes.

Q   And, where did you do that?

A   I did it in Pennsylvania Hospital, Philadelphia,

Pennsylvania.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Q    What was the area of specialty of your
     residency?

A    Radiology.

Q    And, following the completion of that program,
     did you participate in a Fellowship or any other
     type of program?

A    Yes.  I went for Pediatric Neurology Radiology
     Fellowship.  That's in hospital for sick
     children's in Toronto, Ontario.  And another
     Fellowship, actually, it is adult neuroradiology
     at the University of Michigan, Ann Arbor,
     Michigan.

Q    In regards to the pediatric neuroradiology
     fellowship, when did you complete that program?
     Two thousand four (2004).
     And, in regards to the adult radiology --- was
     It neuroradiology for adults, or just radiology?

A    We usually call it neuroradiology actually.

Q    In regards to your Fellowship for adult
     neuroradiology, when did you complete that?

A    Two thousand five (2005).

Q    After you completed these Fellowships, where did
     you practice them?

A    University of Michigan.

Q     And you hold a license to practice medicine in
      the State of Michigan?

A     Yes.

Q     Do you hold any Board Certifications?

A     Yes.

Q     In what area?

A     American Board of Radiology and I have a
      certificate of added qualifications in
      neuroradiology.

Q     Can you tell us, please, what is specifically
      the area of radiology in general?

A     In neuro --- what I am practicing?

Q     No, let's start with radiology.

A     Okay.

Q     What is the specialty of 'radiology'?

A     Well, basically it is imaging of different areas
      of the body.  You know, using different
      localities.  This could be CT Scan, M R I, or
      even plan images.  And what with looking at
      those images we can take an idea of what is
      happening inside the body without the need to
      cut the body basically.

Q     And then specifically what is the area of
      'neuroradiology'?

A   Well, it is the study of the brain, anything related
    to the central nervous system.  So the brain, the
    spine, sometimes the peripheral nervous system, that
    is what we usually read.

Q   Can you tell the Jury approximately how many M R I's
    and C T Scans involved in the area of neuroradiology
    do you review a year?

A   I think roughly seven thousand (7000), between C T
    Scan and the M R I.

            MS. POPE-STARNES:  Your Honor, I would
    ask that the Doctor be qualified as an expert in
    Pediatric Neuroradiology.

            THE COURT:  Mr. White?

            MR. WHITE:  All right.  If I may.

            **VOIR DIRE**

BY MR. WHITE:

Q   Doctor, have you ever testified in court before?

A   No.

Q   Have you ever been qualified as an expert?

A   I'm not sure what . . .

Q   Um --- well, if you've never --- I'll back up.

            So this is your first time in court
    testifying?

A   Exactly.

14

MR. WHITE: Well, your Honor, I do have an objection then. He has no prior experience as an expert witness. I don't believe he is qualified to sit and --- especially as a rebuttal witness in this case.

And I don't think they have laid enough of a foundation. The fact that he has a medical degree, the fact that he practices at the University of Michigan, I don't believe they have laid enough foundation to say that he can testify now as an expert witness to aid the Jury in a matter that they have covered many times.

So, I object to this doctor's testimony, your Honor. I object to his qualification as an expert and his testimony.

MS. POPE-STARNES: First of all, your Honor, there is always a first time for every expert witness to be qualified as an expert. He has testified in regards to his educational background, he concluded a residency program, and he completed two fellowship programs. He is Board Certified in Radiology and Board Certified in Neuroradiology.

If simply the objection is he has never been qualified before, that is really not a basis for

him not to be qualified now. And I don't believe that Counsel has given the Court any basis as to which he is not qualified.

THE COURT: Thank you. The Court has heard the arguments of Counsel, considered the testimony from the witness. The Court notes the objections from the Defendant and the Court will qualify him as an expert noting the objections which are preserved.

Thank you. You may proceed.

### DIRECT EXAMINATION
### (Continuing)

BY MS. POPE-STARNES:

Q    Now, Doctor Ibrahim, during the course of your work as a neuro --- as a pediatric neuropathologist at the University of Michigan, did you have occasion to consult on a case of a child by the name of Madison McBurney?

A    Yes.

Q    Okay. And, did you review any of her radiological images during her admission subsequent to November 30th, of 2006?

A    Yes.

Q    Which images did you review at that time?

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

A   I reviewed the M R I in November 30th.

Q   And, since then, have you had occasion to review all

of her M R I's and C T Scans that she had done in the

course of her lifetime at the University of Michigan?

A   Yes.

        MS. POPE-STARNES:  Your Honor, we have

already, in an attempt to save time, we have already

inserted the discs from People's Exhibit 1 and I

would like to proceed with that.

        THE COURT:  Okay.

Q   **(By Ms. Pope-Starnes, continuing)**  Doctor, this is a

laser pointer, you just push the button (indicating).

        Now, Doctor, I would like you to talk first

about in Madison's case what structures in the brain

or in the head, if you were looking at, in her M R I?

A   Well, we --- I mean in that specific case we looked

at the brain itself and the spaces that surround the

brain.

Q   And, in the review of her M R I , her first M R I,

subsequent to her November 30th admission in 2006, can

you tell the Jury what you observed?

A   Well, there was evidence of disc like area, a small

area of abnormality outside the brain that covers the

cerebral hemisphere. And that was considered either
evidence of blood, hematoma, or evidence of lypoma.

Q I'm sorry, Doctor, I'm talking about in November ---

A (Interposing) Oh, I'm sorry.

Q (Continuing) . . . in November of 2006, when she was
admitted to the hospital?

A Well, yeah. Then --- that second M R I actually
showed evidence of extensive extra-axial
abnormalities outside the brain. And they all looked
like hematomas of different ages. Some of them were
chronic, some were sub-acute, and the brain itself
showed the severe ischemic injury.

Q Can you tell us specifically in that M R I of
November 30th or December 1st, of 2006, what --- what
injuries you observed?

A Well, the outside of the brain there was evidence of
subdura hematomas, just --- it was present on both
sides of the brain on the right and left side.

And, these subdurals were ranging again in
age from sub-acute, some of them chronic, and some of
them were actually acute.

And, in the brain itself there was evidence
of ischemic --- ischemic injury that involves both
the cerebral, which is --- some people call the brain

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

the 'cerebellum and the cerebellum' and it was sever

ischemic injury.

Q    Can you bring up that MRI on the screen?

A    Sure.

Q    And, Doctor, I am going to ask you, when you have the

screen that you want on there can you refer to it,

please by the image number?

A    Certainly.

Q    By the dates and by the image number?

A    Is it possible to show the illustrated image first,

or ---

Q    (Interposing)   Would the illustrative image help you

in your explanation to the Jury?

A    Yes.

Q    Okay.   And, do you have an illustrative image for

demonstrative purposes with you today?

A    Yes.

Q    Do you have that there?

A    Yes.

Q    Will you explain that demonstrative exhibit, please,

to the Jury?

A    Yes.   Basically this is --- I'm pointing using the

arrow here.   So basically this is just an image that

I --- that we have illustrating the cut in the brain.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

And, just to explain things in here (indicating), this is the scalp, the bone that covers the entire brain. This is the extra axial spaces that exist outside the brain.

And this axial spaces has the multiple layers, so this is what we call the 'dura' (indicating), which is the blue one.

This is what we call the 'arachnoid membrane', which is the yellow one (indicating).

And this is --- the last one is the 'pia matter', which usually involves the brain itself (indicating).

And this cut here (indicating) is the --- the brain cell.

So, what I am going to show right now, and you can see this MRI is just to explain --- well, the issues that usually corresponds to abnormalities. For example, extra axial blood, which usually exists in this area (indicating) or something that is related to the brain.

Q    Can you show us in this image if --- which area of subdural hemorrhage would be shown at?

A    Sure. This is the 'dura' (indicating), which is the most outside membrane that surrounds the brain. And

immediately it appears we run what we call the 'subdural' ones so we rate the area that displaces the arachnoid membrane.

Q    Okay.  And if you were talking about a 'sub-arachnoid hemorrhage, where would that be?

A    When we talk about sub-arachnoid with hemorrhage, we usually refer to this area (indicating), which is usually existed inferior with the arachnoid, between the arachnoid membrane and the brain itself.

Q    Below?  You mean below?

A    Yes.

Q    Okay.  Now, if we can go first to the first MRI that she had after she was admitted to the hospital November 30th?

A    All right.  So this is the MRI --- Oh, I'm sorry.

This is the MRI dated December, 2006.

Q    What image number is this that we are looking at?

A    I still have to find the image actually.

Is it possible to dim the lights?

MS. POPE-STARNES:  May I, your Honor?

THE COURT:  I'm not sure which ones, so go ahead.

Q    **(By Ms. Pope-Starnes, continuing)**  Does that help, Doctor?

A    Um, actually the front one is the more important.

          Okay.  That's perfect.  Thank you.

          So, basically, for example ---

Q    (Interposing)  So, can you tell us what image number

     we are looking at here?

A    Yes.  This is the axiom calibrated images, and image

     number --- it is 17.

Q    Seventeen (17) of twenty-eight (28)

A    Of twenty-eight (28) yes.

Q    And, what are we looking at here?

A    Yeah.  This is a cross-section of image, which is

     this area (indicating) and the extracts in the space,

     which is this area (indicating).

Q    And, are we able to observe any of the injuries in

     this image, seventeen (17) of twenty-eight (28)?

A    Yes.

Q    Okay.  Can you explain to the Jury what injury you

     see here (indicating)?

A    Yes.  There is evidence of extract normality's.  For

     example, see this kind of like curving in here

     (indicating), which is as you can see it is bright,

     it is almost white. This is suggestive of the

     presence of subdural blood.

22

Now the more anterior actually there is an area that I --- sorry.

More anterior. There is another area here (indicating), which is also unusually large, and it does displace the arachnoid matter. This white line (indicating) is the arachnoid matter and I am just going to go back a little bit.

So, basically, if this is the 'dura' (indicating), this is the 'subdural' of blood and it will displace the arachnoid matter so you can see the membrane of the arachnoid.

Just going back to the image itself, here you can see the subdural space and this here is the arachnoid matter that is being displaced by fluid collection.

Q   Now, Doctor, the area that you are talking about right now.

A   Um-hum.

Q   Which lobe of the brain is that?

A   Well, this is --- sorry --- so posteriorly this is the parietal occipital region, and anteriorally this is the frontal region (indicating).

Q   And the one that is in the 'parietal occipital' area, are you able to age that injury?

A     Well, grossly it is sub-acute blunt faced.

Q     And, what does that mean?

A     Usually the --- you know, the blood consists of
      hemoglobin, and the hemoglobin in there changes with
      time.  So, an imaging reply to the first --- the
      first component of the blood is hemoglobin, that is
      during the normal hemoglobin.

            Now, when --- and the gross degradation, it
      will become what we call 'mid-hemoglobin'.  So, mid-
      hemoglobin usually it takes anywhere between three --
      - actually roughly a week to two months to develop.
      And, what we see here (indicating), this area, for
      example (indicating), this is suggestive of mid-
      hemoglobin, and this is what we suggest of sub acute
      hematoma, anywhere between one week to two months.

Q     Now, Doctor, the other area that you were referring
      to, I believe you said was in the temporal lobe area?

A     In the frontal area, yeah.

Q     In the frontal, thank you.

            And, are you able to age that injury?

A     That is more chronic.  This is more than two months
      of age.

Q     I believe your testimony was in this December 1st MRI
      that you could observe a 'sub acute', a 'chronic',

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

and an 'acute'.  Are you able to see an acute injury
in this slide?

A  So, just change the format a little bit here
(indicating) and just make the images side-by-side.

   Well, I am showing here images of side-to-
side.  And so on the right side here (indicating)
it's a ---

Q  (Interposing)  Okay.  On the right side what image
number is that?

A  Image number 20.

Q  Okay.

A  Axial pia images?

Q  Of how many images?  Twenty (20) of?

A  Twenty-eight (28).

Q  Okay.  On the left side, what images?

A  Actually, I'm sorry, it has to be the same.  So,
image number 20 of the axial pia images.

Q  So, now, what is the difference between the weight
that you are talking about?

A  Well, MRI is a way, you know, we try to study the
protons within the brain, and it is a little bit ---
we try to --- we say --- we try to excite the protons
and then we see their behavior.

So there are two times when we see how they react to the excitation. Usually the excitation occurs with subjecting the protons to very strong magnetic field. It is very strong that excites the protons. And then after they get excited we image -- - we try to read their reaction to this excitation.

This occurs during two different times. We --- something we call p-one (phonetic), which is usually a very short usually --- we are talking about milliseconds here, so sixty (60) --- six hundred sixteen (616) milliseconds or the time, and this is the duration of the image. But the timing actually is thirteen (13) milliseconds. That's the p-one weighted image.

The T-one (phonetic) weight image is usually a little bit longer so it is kind of different perimeters. So it --- here the perimeters three thousand six hundred sixty (3660) milliseconds. And the image actually usually images at 103. It is the perimeters we use to create something called T-one weighted, which is a little bit earlier time, imagining time versus T-2 weight, which is a little bit later imaging time.

Q    And then what can you see here in these images 8 of

     19 excuse me --- 20 and 28 the T-one and the T-2

     images?

A    Yeah.  So there is evidence of this fluid level, you

     know, if you can see here (indicating), this

     brightness is probably the CSF fluid that surrounds

     the brain.

Q    What is 'CFS' fluid?

A    'Cerebral spinal fluid', which is usually a fluid

     that, you know, surrounds the brain.  The brain is

     bathed by fluid we call it the CFS.  So here this

     bright stuff is what we call the CFS and this area

     here (indicating), which as you can see the brain

     sharp interferes between the two, this is blood

     components (indicating).

Q    And, is this the parietal occipital area?

A    This is behind parietal area, right parietal area.

Q    Is this the injury you testified was sub acute?

A    Uh ---

          MR. WHITE:  I am going to object to the

     continuing use of the word 'injury'.  He has

     testified 'abnormality'.

          THE COURT:  Rephrase.

Q  **(By Ms. Pope-Starnes, continuing)** Is this the sub

acute hematoma that you testified about?

A  Yes.

Q  And, what, if any other hematomas or abnormalities

can you observe?

A  Well, I mean, these basically is two are sub acute

(indicating), and this here (indicating), and again

you can see them that the arachnoid membrane being

displaced.  This arachnoid membrane, so this is a

more chronic hematoma, older than two months of age.

Also there was evidence of an additional

one --- I have to change the --- a different sequence

(indicating).  This is what we call flare sequence

(indicating).

Q  And what image numbers are these?

A  Image number 19 of 28.

Q  And, what if anything can you observe in these

images?

A  There is evidence of extra axial fluid collection.

Q  And, where is that?

A  In the right frontal mainly.  I'm sorry, this here

(indicating), you can see it.  You can see the blood

--- the brain, I'm sorry.

Q    So, as I understand your testimony, then, on the
December 1st of 2006 MRI, you were able to observe
the chronic hematoma to both the right and the left?

A    Correct.

        MR. WHITE:  Objection as to the leading
nature of the question.  He has already answered it
and then it's asked and answered.

        MS. POPE-STARNES:  I have not asked, your
Honor, if it was on the right and the left.

        MR. WHITE:  One of the questions ---

        THE COURT:  (Interposing)  Rephrase and
omit the leading nature of it.

Q    **(By Ms. Pope-Starnes, continuing)**  Can you tell the
Jury, please, if you can see this on one side or both
sides or home many sides you can see this on?

A    It's bi-lateral, basically.

Q    And, what does 'bi-lateral' mean?

A    Well, bi-lateral, you know, there are two cerebral
hemispheres.  You have a left here (indicating) and
the right, and this is separated by what we call a
falx, it is really a very thick membrane that
separates the two compartments from each other.

Q    Now, you testified there was an 'acute injury'.  Can
you show that to the Jury, please?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

MR. WHITE: Objection as to the word 'injury', he doesn't use that word, Judge. That's a leading question. That's a mischaracterization of his testimony.

THE COURT: Rephrase with the terminology.

Q   **(By Ms. Pope-Starnes, continuing)** You testified, sir, that there was an abnormality that was acute, could you please show that to the Jury?

A   Actually the abnormalities I mentioned were in the brain itself. So, is that ---

Q   (Interposing) Are you able to show that to the Jury?

A   Sure. We basically here --- initially talking about the extra axial spaces, you know, the spaces that surrounds the brain showed multiple subdural blood collection.

There is now injury in the brain itself, which is what we think is an acute ischemic injury to the brain.

Q   And, where is that?

A   Uh --- that is seen diffusely, so basically this is what we call 'diffusion weighted image', and diffusion weighted image basically we will evaluate the --- the mobility of the water in the brain itself.

So, any cells that are about to die or did, the water will not flow in them. Any cells that have, you know, that are still alive, the water does goes through them.

For example, any area that is very bright here (indicating), this is areas that are into coming injury. The water is unable to flow through them. So you can see bilateral abnormalities, this is seen in the frontal and the parietal regions.

For the other area, for example here (indicating), this is a normal brain fragment.

Q    Now, Doctor, why were these images taken of Madison?

A    It is all the same MRI in December 1st.

Q    And are you able to tell what time on December 1st, of 2006 they were taken?

A    Yes, actually here (indicating) it's two o'clock (2:00) in the morning.

Q    A.m or p.m.?

A    A.m.

THE COURT:    And that's what image, for identification purposes, which one are you looking at?

THE WITNESS:    Actually image number 17 out of the 50, five zero.

31

THE COURT: Okay.

Q **(By Ms. Pope-Starnes, continuing)** What, if any, sub-arachnoid abnormalities did you observe?

A There was --- I think there was a bone sub-arachnoid Hemorrhage. Sorry. I again have to change.

All right. So, basically here (indicating) here we have what we call ---

Q (Interposing) I'm sorry, Doctor, first what image number are we looking at?

A Sure. This is image number eight out of forty-five (45).

Q And, what does this image show us?

A Okay. So, this is basically the sagital T-one weighted. It is a cut that was sagital in the brain.

Q What does 'sagital' mean?

A Um --- 'Sagital' is basically like --- well, we have three different orientations for the body. Something we call 'axial', which is transverse.

'Coronal' --- I'm not sure what coronal --- coronal usually it's longitudinal cut. Usually comes in this way (indicating) versus sagital, which comes this way (indicating).

I don't know if this explains it enough.

Q So, what does image eight of twenty-five (25) show?

A   All right.  So, basically this is a sagital T-one weighted image, and here you can see actually evidence of --- it looks like blood in the sub-acute stage (indicating), and this is in sub-arachnoid space.

So, this is a dura (indicating), it's a dural blood arachnoid and this here (indicating) between the arachnoid matter and the brain itself, it's a sub-arachnoid hemorrhage usually.  And, so going back to the MRI itself, here you can see --- so here is the sub-dural space from here to here (indicating).  This is the adjacent abutting the brain, so it is most likely a sub-arachnoid hemorrhage.

And, you can see that the brain is immediately adjacent to this area (indicating).  This is different, for example, than this blood, where you can see it is a sub-dural blood, separated by an area in the brain itself (indicating).

Q   And, what area of the brain is the sub-arachnoid hemorrhage in?

A   Left temporal.

Q   Now, Dr. Ibrahim, did you have an opportunity to review Madison's August 31st, MRI?

A    Yes.

Q    Can you tell the Jury what, if anything, you found
     when you reviewed that?

A    Well, that's what --- I mistakenly said there was
     evidence of abnormality over the left parietal area.
     We were suspecting either a sub-dural hematoma or a -
     --

          MR. WHITE:  (Interposing)  Objection.
     Excuse me.  I just want to remind the Doctor to speak
     singularly --- singular as opposed to plural.  So ---

          THE COURT:  (Interposing)  The 'we' instead
     of 'I', if you can?

          THE WITNESS:  Oh, I'm sorry.  I apologize.

          So, what I was referring actually both to
     the report and to my opinion.  But I can talk about
     my opinion.

          So, basically I suspected the presence of
     either sub-dural hematoma or lypoma.

Q    **(By Ms. Pope-Starnes, continuing)**  What is the
     'lypoma'?

A    Lypoma basically is fat.  Fat when, you know, it's a
     fancy terminology of saying 'fat'.  We usually say
     'lypoma'.

Q  Can you bring up the August 31st MRI of Madison and

   show that to the Jury?

A  Sure.

Q  Now, first, can you explain to us what images we are

   looking at?

A  Sure.  So basically we are looking at a sagital T-one

   weighted image.  Image number 9 of twenty-one (21),

   and the other image, the axial two-one weighted

   image, image 26 out of 28.

Q  And, what do these images show?

A  All right.  So basically here is the starting with

   the sagital image (indicating).  You can see this

   area, which is bright, you know, it is very bright.

        And the signal characteristics are either

   sagistical sub-dural hematoma or a lypoma.

Q  And, what area of the brain is this?

A  Left parietal.

Q  And, are you able to age this?

A  It is a sub-acute.  Anywhere between one week to two

   months at least.

Q  Besides this abnormality, do you --- did you find any

   other abnormalities in Madison's August 31st, 2006

   MRI?

A  No.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Now, just --- can I on straight why it was suggested as possible lypoma?

MR. WHITE: There is no question.

THE COURT: Sustained.

THE WITNESS: Okay.

Q  **(By Ms. Pope-Starnes, continuing)** Okay. Now, Doctor, I am going to ask you, did you have an opportunity to review the September 11th, 2006 CR or Cat Scan of Madison?

A  Yes. Yes, I did.

Q  And, can you tell the Jury what, if anything, you found in your review f that CT scan?

A  Well, the --- basically I didn't see any abnormality.

Q  I'm sorry?

A  I did not see any abnormality.

Q  Does a CT Scan show you the same things an MRI does?

A  Um --- yes and no. That's a very broad question, basically.

Some abnormalities can be better seen on CT Scan, some abnormalities are better seen on MRI. But, definitely MRI is more superior to CT Scan for evaluation of any abnormality.

Q  Now, you testified about the sub-dural hemorrhage or suspected lypoma on the August 31st MRI. Did you see

any evidence of the lypoma from the September 11th CT

Scan?

A   No

Q   Based on your training and education and experience,

if there was a lypoma there, would you expect still

be able to see it from --- in the CT Scan on

September 11th, from the images that you reviewed?

A   Yes.  Yes.

Q   Now, this sub-dural hematoma in the left parietal

area that was sub-acute that you saw in the August

31st MRI, did you see any evidence of that in the

December 1st, MRI?

A   Well, hematomas do mature, you know.  There is

evidence of hematoma in the same area.  I'm not sure

if it is the same hematoma that got larger, or a

totally different hematoma.

Q   So, in answer to my question, did you see something

in the same area or not?

A   Yes, I did.

         MR. WHITE:  Asked ---

         My apologies, I believe it has been asked

and answered.

         THE COURT:  I'll allow it.  I'll allow it.

         MS. POPE-STARNES:  Thank you.

37

Q   **(By Ms. Pope-Starnes, continuing)**  Now, Dr. Ibrahim,

the sub-arachnoid space, is that joined with the sub-

dural space?

A   No.

Q   Based on your education, and training, and

experience, do you know whether or not a subdural

hemorrhage can rebleed into the sub-arachnoid space?

A   No.

Q   No, you don't know, or no, it can't?

A   No.  Not to my knowledge.

          MS. POPE-STARNES:  May I have just a

moment, your Honor?

          THE COURT:  Yes.

          (Whereupon a brief delay was had.)

          *    *    *

          MS. POPE-STARNES:  Thank you, I have no

other questions of this witness, your Honor.

          THE COURT:  Cross-examine.

          **CROSS-EXAMINATION**

BY MR. WHITE:

Q   Doctor, what's the first time you saw any of the

radiological tests involving Madison?

A   In December 1st.

Q   December 1st?

A    Two thousand six (2006).

Q    Okay. Was that your first involvement in the case?

A    Correct.

Q    Okay. And, did you actually perform the MRI?

A    No.

Q    Okay. Did you actually perform any of the radiological tests, at all, for Madison?

A    No.

Q    Okay. And, your next involvement was when?

A    Just when I was called for as an expert witness.

Q    Okay. When was that?

A    Last week.

        MS. POPE-STARNES: Objection as to relevancy your Honor.

        MR. WHITE: I believe it is very relevant.

        THE COURT: The question is what?

        MR. WHITE: When was he next --- his next involvement in the Madison McBurney case?

        MS. POPE-STARNES: No, your Honor, he testified it was week, and then the question was when were you called about that. I don't believe that it is relevant as to when he was called as a witness.

THE COURT:  As to when the telephone, or the ---

MR. WHITE:  (Interposing)  If I can rephrase.

THE COURT:  Go ahead.

Q  **(By Mr. White, continuing)**  My question is, Doctor, which I believe you have already answered is, you said testified --- you were involved on December 1st, 2006, correct?

A  Correct.

Q  Okay.  You didn't perform any of the radiological tests involving Madison, correct?

MS. POPE-STARNES:  Judge, asked and answered.

MR. WHITE:  I'm just ---

THE COURT:  (Interposing)  I'll allow it.

MR. WHITE:  (Continuing)  . . . leading up, Judge.

THE COURT:  I'll allow it.  I'll allow it.

Q  **(By Mr. White, continuing)**  And so then the next involvement, your next involvement in the Madison McBurney case was when?

A  Last week.

Q   Okay.  Last week when you received a call from the
Prosecutor?

        MS. POPE-STARNES:  Objection as to
relevancy.

        THE COURT:  I'll allow it.

Q   **(By Mr. White, continuing)**  Is that true?

A   Yes.

Q   Okay.  And, then you read then the other MRIs and
Cat Scans?

A   Well, I did read them in the beginning, also.

Q   Now, actually Madison had a MRI on August 31st, 2006,
true?

A   (No verbal response.)

Q   Would you take --- and I am going to turn on the
lights, okay?

        Madison had an August 31st, 2006 MRI at the
University of Michigan, true?

A   Correct.

Q   She had a CAT Scan September 11th, University of
Michigan, isn't that correct?

A   Correct.

Q   She had a November 30th CAT Scan, correct?

A   Correct.

Q   And she had a December 1st, MRI, correct?

A   Correct.

Q   Okay.  And, she had one more test after that, isn't
    that true?

A   Yes.

Q   And, that was what?

A   December 3rd.

Q   And that was an MRI also?

A   No, it was a CT-Scan.

Q   And CT-Scan and CAT Scan are used interchangeably,
    right?

A   Right.

Q   Okay.  So, and last week when the Prosecutor called
    you, then you read all those films?

A   Um --- yes, all them and when --- back in November I
    read everything from November backwards.

Q   Okay.

A   So the only thing I had last week was the final CT-
    Scan.

Q   Okay.  Is it a fair statement --- is it a fair
    statement, Doctor, that the blood that you saw, the
    hematoma that was present on November 30th, was more
    than two months old?

MS. POPE-STARNES: Objection as to foundation, which one? He has testified that he saw more than one.

Q **(By Mr. White, continuing)** Well, first of all the chronic blood.

Is it a fair statement that the chronic blood was at least two months old?

A Yes.

Q Okay. Is it a fair statement, Doctor, that it was at least three months old?

A Maybe.

Q Four months old?

A That's maybe.

Q Five months old?

A Possible.

Q Six months?

A Possible.

Q Seven months?

A I'm not sure how old she by then, she is probably two months. Yes, I guess.

Q Okay. More than seven months after?

A I don't know actually.

Q   And, it's true, Doctor, that reviewing these
    radiological tests, all of them, there is no evidence
    of any skull fracture whatsoever?

A   No.

Q   Would bruising on the --- in the skin, outside the
    skull, but the accumulation of blood in the skin show
    on an MRI?

A   A bruising itself cannot be shown on imaging.  Any --
    - any blood collection, hematoma underneath the skin,
    yes can be shown.

Q   Underneath the skin?

A   Yes.

Q   But above the skull?

A   Correct.

Q   Okay.  And, isn't it true that there was no blood
    shown at any point, any of the MRIs, CAT Scans above
    the skull beneath the skin, isn't that true?

A   Correct?

            THE COURT:  Hold on one second.

            Mr. McCarthy, would you do me a favor,
    would you just ask them to be quiet out there in the
    hallway?

            Yeah, thank you very much.

            (Whereupon a brief delay was had.)

                    *    *    *

         MR. WHITE:  I have nothing further of this

witness.

         MS. POPE-STARNES:  Nothing further.

         THE COURT:   Thank you, sir.  You are all

set, you may be excused.  Just be careful stepping

down.

         MS. POPE-STARNES:  People rest, your Honor.

         THE COURT:  Okay.

         Any --- hopefully my Clerk is listening

with a microphone or whatever.  Look at that, right

on.

         We'll take a break for just a couple of

minutes, Ladies and Gentlemen.  We'll take it from

there and let you know what is going on.

         Please don't talk about the case.

         Thank you.

         THE CLERK:  All rise for the Jury.

         (Whereupon the Jury left the courtroom.)

         *    *    *

         THE COURT:  Thank you, you may all be

seated.

         The record will reflect that the Jury is

excused.

Okay. How --- what do you want to do now?

MR. WHITE: Your Honor, I guess I would have a motion for Directed Verdict. If the Court wants to entertain it now, I ---

THE COURT: (Interposing) Want to do that?

MR. WHITE: Sure.

THE COURT: All right. Just before we get into it, how about the Jury, is it, again, the same understanding we're good with them for the day and then resume tomorrow morning?

MR. WHITE: I have no further witnesses.

THE COURT: Likewise Ms. Pope-Starnes' perspective, we can have them excused then for the day?

MS. POPE-STARNES: Yes. Although, your Honor, I think it is important to let the Jury know that they are coming back to closing arguments tomorrow.

THE COURT: All right. Jeff, go ahead and tell the Jury thank you, and tell them we are working on matters and we'll be ready to proceed for their matter tomorrow at 8:15.

THE CLERK: Yes, your Honor.

THE COURT: Thank you.

Mr. White.

MR. WHITE:   Your Honor --- your Honor, the charge is First Degree Felony Murder ---

THE COURT:   (Interposing)   Thank you, Mr. McCarthy.

MR. WHITE:   (Continuing)   And Child Abuse First Degree.

We respectfully submit to the Court that the Prosecution has failed to meet its burden. Failed to produce sufficient evidence, and taken at a light most favorable to the Prosecution that would allow any trier of fact, including a rational trier or fact, come to the conclusion that there is proof beyond a reasonable doubt that these two offenses that have been charged have been committed.

And, specifically with regards to Felony Murder, the first element of proof is that my client caused the death of Madison, which is highly suspect in the case, Judge, and it is highly suspect based on the Prosecutor's own witnesses.

It is clear now, it is clear that Madison had a pre-existing condition of potentially fatal consequence; that is in the words of the Medical Examiner, and old brain hemorrhage bi-lateral.  That

is blood in the subdural space that had been there as late as seven, eight months compromising the integrity of the space making the child more vulnerable to ultimate symptomatic consequences in the injuries that she ultimately received in this case.

I don't believe that the Prosecution has proven beyond a doubt that assumed that Mr. McBurney placed Madison in her crib on the mattress too hard that caused her death. The preexisting condition, which is unrefuted was becoming symptomatic earlier in the day by her signs that she showed, tired, vomiting, episode of projectile vomiting. Mother interpreting his discomfort as she laid her back to change her diaper indicating aggravation, pain in the head, clinging, behavior of the child prove unknown, unseen before in her life. Despite her variety of medical conditions she was healthy, well nourished, well developed that day she was beginning to have the symptoms of the long existing brain hemorrhage become active.

Secondly, Judge, and the most problematic of the Prosecutor's proofs regarding the First Degree Felony Murder is the malice.

The malice requirement which is contained in the second count. That is that Mr. McBurney had an intent to kill, intent to cause great bodily harm, or knowingly created a high risk of death or great bodily harm knowing --- knowing that death or great bodily harm is a likely result of his actions.

And that, Judge, is where the Prosecutor's proofs fall far short to let anybody ever consider this charge.

The testimony of the Medical Examiner itself suggests that the blunt force impact that the child suffered shortly before hospitalization, he could not state exactly when, one to two days, was on a padded surface because of the lack of external injury that was --- it was not tested in the examination of the child. Both body and skull, inside and out other than the pre-existing brain hemorrhages.

The Medical Examiner gave his demonstration of the child being thrown at the crib, and I beg to differ that it was forceful, not forceful, but assume that it was even done according to the Medical Examiner's demonstration. In and of itself --- in and of itself that act, assuming that it was done, is

that enough for the Court to infer, for a Jury, a
rational trier of fact to infer, to find that this is
intent to kill, to cause great bodily harm, knowingly
create a high-risk of death or great bodily harm
knowingly that it would --- knowing that it would
likely result.

And I ask the Court to scrutinize the
context in which it is made and the ultimate result.
This is not hitting the child in the head with a hard
object, it is not throwing the child on a hard
surface, it is not a shaken baby, it is a child being
placed too hard on the mattress of her crib.

Now, why was it too hard, Judge?  Why was
it too hard?   The testimony is overwhelming, it's
because she had a pre-existing condition, a chronic
subdural hematoma in the words of Dr. Ushinsky.

Dr. Ushinsky's testimony was that it was --
- it could have been symptomatic spontaneously even
by a show of trivial force.  Even though --- this was
in --- supported by the testimony of Dr. Dev and Dr.
Maher too that chronic subdural hematomas can become
symptomatic spontaneously.

However, Dr. Dragovic also agreed that the
child in that state is more vulnerable to the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

hemorrhage becoming acute, new bleeding by virtue of its pre-existing condition. A condition, Judge, that was not known by anybody.

It is not like the child had a known egg-shell skull. You know, it is not like that she was being treated for something where everybody knew that she had vulnerability. This vulnerability was unknown by parents, by other family members, and certainly most of all, Judge, by the medical community that treated her on a regular basis. Including the University of Michigan Hospital, who had a CT Scan, an MRI and CT Scan.

So the fact that the child's pre-existing vulnerable condition was unknown is a product --- no one can --- that is unrefuted, Judge. Unrefuted. That this vulnerability, the susceptibility to a minor amount of force could cause such fatal injuries.

I tried to put it in context, Judge, I'm not detailing it, I'm not twisting it. Now the Medical Examiner has testified that it was a throw --- that it was an impact to the padded surface of the crib caused the blunt force trauma.

We don't know how much force, there has not been a quantum measurement. We don't know what angle. We don't know trajectory. We don't know distance. These are all things that are --- have been unproven, Judge. Unproven.

We do know that there is no signs, external signs of blunt force. We do know that the child had absolutely no indication of any other injury whatsoever.

I think the last witness of the Prosecutor is helpful in that there wasn't even a sign, Judge, of a bruise, a collection of blood above the skull underneath the skin as of November 30th. Any child who supposedly suffered severe enough head injury at the hands of my client to cause this fatal --- ultimately fatal event, so the point is that it was a minor impact. There is nothing to show otherwise, Judge.

If it was not spontaneous, at most it was my put it in context with a malice requirement. An intent to kill, intent to do great bodily harm, are knowingly creating a very high risk of death or great bodily harm knowing that that result is likely to occur. And Judge, I just --- just don't believe the

Prosecutor has met their burden. And it is not based on Defense witnesses, it's based upon the Prosecutor's own witnesses, including the Medical Examiner.

The fact that he would suggest a purposeful act as the act causing the trauma, I think he is filling in the blanks, because it could have been --- it could have been an accidental act. All we know is in his opinion it required some level of force. He can't tell --- he says the measure of the force is determined by the amount of the damage we know because of her pre-existing condition that amount of force is small.

Now, also as part of the Felony Murder's requirements is the proof that Mr. McBurney committed child abuse in the first degree. That is that he was the parent, and he caused intentionally --- intentionally, Judge, serious physical harm to his child. Serious physical harm.

The serious physical harm is enumerated in the specific Statute, including brain damage, subdural hematoma, subdural hemorrhage. We know from Dr. Uskinsky's testimony 'sub-hematoma' is the word

used by the neurosurgeons, 'hemorrhages' by the
medical ---

        MS. POPE-STARNES: (Interposing) Your
Honor, I have to object to the use of Dr. Ushinsky's
testimony in a motion for Directed Verdict.  It
should be based on the People's case ---

        THE COURT: (Interposing)  Noted.

        MS. POPE-STARNES:  Okay.

        MR. WHITE:  Judge, the condition of brain
hemorrhage, hematoma was already in existence,
existence possibly since birth.  So, to say that Mr.
McBurney caused this by the act on or about November
30th is simply not true.  Simply not true.  There was
chronic blood in her brain causing --- it was a
disaster waiting to happen.

        To say that he intentionally caused this
condition as a result of placing her on the mattress
too hard, it's simply --- it is an absence of proof,
Judge.  The condition was already there.

        I don't want a finding that is not
supported based upon evidence that is not really
pertinent in this case.  The child suffered severe --
- as suggested by the Prosecution is this person
murdered his daughter by throwing her on the mattress

too hard. That is simply an unacceptable finding,
Judge. You have to put it in context, there was a
pre-existing condition no matter how bad the People
don't want to admit it, there was a pre-existing
condition.

The intent to injure, placing her on the
mattress too hard, if --- I'm not saying it was not
an irresponsible act, Judge, but to say he intended
to cause serious physical harm by such an act is far
beyond what the proofs suggested.

Now, I don't believe the charged offense
has been proven, or any charged offenses have been
proven for any rational trier of fact to be able to
convict my client.

And I would ask you to grant this Directed
Verdict and not allow the Jury to consider charges
that are inappropriate in this matter.

Thank you.

THE COURT: Thank you.

MS. POPE-STARNES: Your Honor, as the Court
knows, when ruling on a Motion for Directed Verdict,
the Judge must consider the evidence in the light
most favorable to the People, and I would cite the
Court to **People versus Hampton, 407 Michigan 354,**

**1979.** I also cite to the Court the case of **People versus Magyar, M A G Y A R, 250 Michigan Appeals 408, 2002,** where the Court found that a single blow to a child's head was sufficient for the case to go to the Jury on the charge of Felony Murder.

In this case first Counsel challenges whether or not there is sufficient evidence that the Defendant caused the death.

First of all, the testimony from Dr. Ibrahim, this morning, and it is also in the autopsy protocol, is that there is sub-arachnoid hemorrhage. And Dr. Ibrahim testified that's not related, it's not in the same space as the sub-dural hemorrhages.

Pre-existing condition. Pre-existing condition or not, every one of these medical witnesses in the People's case has testified there is an acute, there is a new sub-dural hematoma. Acute or not --- or chronic or not, there is a new injury to this child. And Dr. Dragovic testified it does not spontaneously rebleed, a force is still required, and he said the only comment he can make about the amount of force necessary, is that you can tell how much force that it would be sufficient to cause the injury. And we have a child with extensive injury.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

Counsel repeatedly says to the Court the
Defendant placed her in her crib.  There is no
testimony of that.  The testimony was that he told
the officers that he threw her.  Throwing is an
intentional act.

Symptomatic earlier in the day.  Evidence
that puffing out her lip is that she has a problem?
Heather McBurney testified that when she laid her
down for her nap twice she didn't do that, she didn't
see any signs of anything.  That when changing her
diaper the baby puffed out her lip.  I didn't hear
any medical testimony that puffing out someone's lip
is evidence of a head injury.  And, there was
testimony from the doctors that these symptoms can
also be symptoms of the flu or other things.

And, more importantly there is testimony in
the record that after the child took a nap in the
afternoon she ate and she kept that food down.  And,
at the time the mother put her down for a nap she
seemed fine, that she was playing with a toy in her
crib.  And the Defendant's statement to the officers
there is no claim that she is vomiting again.

And, keep in mind, Judge, not only is there
the evidence of the sub-dural hematomas chronic and

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

acute.   There is also evidence, Dr. Dragovic there
was an epidural hemorrhage in the spinal area, below
the the neck to the bottom area of the neck and the
upper part of the mid-back.   He has testified that
force was necessary to cause that injury.

Dr. Maher, the neurosurgeon who treated
this child, testified he did not believe this was a
re-bleed because her interracial spaces were not such
that would cause that.    And the other medical
condition, such as blood disorders, there was no
evidence of that in the testing that was done.

Now, in regards to the mensre argument, the
Defendant had one of three states of mind; intended
to kill, intended to do great bodily harm to this
child, or knowingly created a very high risk of death
or great bodily harm knowing that death or such harm
would likely be a result of his actions.

Your Honor, this is exactly why the
evidence about Nicholas Kennedy is relevant.   The
medical records show that Nicholas Kennedy suffered
from skull fractures, subdural hematomas, and retinal
hemorrhaging.   And, in the Defendant's own words to
the detectives 'that child was hurt worse than this
child.'

He claimed that he had bounced or shaken that child too hard, harder than his mother did and admitted to the Detective --- excuse me Detective-Sergeant Summer that he was responsible for Nicholas' injury.  He knew.  He's not a first time parent and this is his first baby.  He's been down this road before.  He knows that rough handling of an infant can resolve in serious physical harm.  In great bodily harm.  And here is this child, Madison, who based on the other things that she has wrong with her deserves more care in her handling and he threw her. He knows rough handling of an infant can result in serious injury.

Remember, Dr. Dragovic testified the outcome is reflective of the force, and it requires a fast movement and snappiness.  There is no testimony that he just dropped this child, that she slipped out of his hands.  The testimony is that he threw her.

Dr. Dragovic testified that these pre-existing conditions, as the Defense says, that this chronic, or what the doctor referred to as 'remote' conogeny, that it does not spontaneously rebleed, that force is required.  And, there is no testimony

or evidence in this record that Dr. Dragovic is filling in the blanks.

Now, in regards to the First Degree Child Abuse. It requires that the Defendant knowingly or intentionally caused serious physical harm. The Defendant did an intentional act, he threw that child in the crib, and he knew what the consequences of that act were. He knew that could result in physical harm because he has already done this once. He has already hurt another child and caused serious physical harm.

And there is an acute injury. There is a new injury. There is a new subdural hematoma, which meets the definition of the Statute as Serious Physical Harm. Although I would indicate to the Court this Statute says, 'Including' but not limited to and lists some enumerated injuries or medical conditions.

Death is certainly serious physical harm. There is no testimony in this record that he placed this child on the mattress too hard. The testimony was that he threw her, that he was approximately two feet from the crib and he threw her. And the Court can look at the pictures that were admitted as the

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

People's Exhibit from that bedroom.  There is furniture and objects all over that room.  There was no safe place to throw an eleven (11) month old child in that room.

The cause of death in this case, your Honor, is Blunt Force Trauma and with --- and that was the testimony of Dr. Dragovic.

It is clear from the evidence in this record, your Honor, that his Motion for Directed Verdict should be denied and I would ask the Court to deny it.

MR. WHITE:  Just briefly, Judge.  You can see how the case has evolved from the Prosecution's standpoint.  When the suggestion was, at the beginning of the case, that my client threw her, causing her head one of the rails.  It has been unsupported by their own witnesses.  Okay?

There is no evidence of an impact on a hard surface.  Okay?  The only evidence is impact upon a soft surface, a lack of external injuries.  That soft surface, it appears that the only possible explanation is the mattress, or the crib, has been put into evidence.  In and of itself, throwing her or not on that mattress, a padded surface, from an

unknown distance is not sufficient for the Jury to consider these charges.

Thank you.

THE COURT: Thank you.

The Court has considered the arguments of Counsel, neither party disputes the perspective that the Court must have in considering such a motion, like favorable --- most favorable to the non-moving party and whether a rational trier of fact could find all necessary elements of the charged offenses.

The Court has heard the arguments, considered the applicable law. The Court notes, not by limitation, but just since they came up during argument all experts testified, even though I am considering only those of the People, nevertheless all experts testified some occurrence must make a re-bleed, albeit the force needed may be much less than would otherwise be required in this case.

The Court finds that there is a question of fact whether the precipitating --- what the precipitating force was. This also assumes that the death was as a result of a re-bleed, even though there is evidence sufficient to suggest that it could be independent of a re-bleed.

The question of intent of the Defendant, that there was a pre-existing condition may, in a rational Jury's collective mind contribute to a verdict in the Defendant's favor, however that is not the analysis that the Court must employ. The existence of such a pre-existing condition does not preclude, as a matter of law, the necessary intent required to meet the charges.

Thus, the question is, whether there is evidence on this record to support the necessary intent. The Court finds that the record is sufficient and a rational trier of fact could find same without repeating and going through all the evidence, the Court finds there is sufficient evidence as to each element to provide the Jury with --- a rational Jury with the --- to be able to find beyond a reasonable doubt in each of the elements of the charged offenses.

The Court respectfully denies the Motion for Directed Verdict.

MR. WHITE: Thank you, Judge.

THE COURT: Thank you.

I will then have Counsel --- is there something further?

MR. WHITE:  No, I just wondered ---

THE COURT:  (Interposing)  Yeah.  Do you want to start working together on the Instructions I will see if my Staff Attorney is available and I'll be available as well, if there is ruling that need to be made.

Thank you.  Take him down.

Thank you deputies, we'll ---

MR. WHITE:  (Interposing)  Because there are some choices that are going to be made, and I need to confer with him.

THE COURT:  Sure.  That's fine. Deputies keep him downstairs.

Okay.  Thank you.

Thank you everyone.

Jeff, you can recess Court.

THE CLERK:  All rise.

(Whereupon the matter was concluded at this time.)

\*    \*    \*

CERTIFICATE

STATE OF MICHIGAN )

      SS

COUNTY OF OAKLAND )


      I, **Lynn E. Erickson,** Official

Court Reporter for the Sixth Judicial

Circuit Court, State of Michigan, do

hereby certify that the attached is a true

and correct transcript of the hearing held

in this matter.

**Lynn E. Erickson, Court Reporter   CSR-0188**

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313