STATE OF MICHIGAN

IN THE SIXTH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff,

v                                         No. 0

STEVEN LINDSEY MCBURNEY

Defendant

_____/

OAKLAND COUNTY  07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

JURY HEARING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

MARCH 04, 2008
* * * *

RECEIVED FOR FILING
OAKLAND COUNTY CLERK
2008 AUG 14  A 11: 23
BY: _____
DEPUTY COUNTY CLERK

APPEARANCES:

Sarah Pope Starnes, Esq.
   On behalf of the People

Robert White, Esq.
   On behalf of Defendant

Barbara Reznick, Court Reporter

1

I N D E X

**PAGE**

CLOSING ARGUMENTS:

BY MS. POPE-STARNES................................37

BY MR. WHITE......................................81

REBUTTAL ARGUMENT:

BY MS. POPE-STARNES...............................111

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          Pontiac, Michigan

2          TUESDAY, MARCH 04, 2008

3                    * * *

4          THE CLERK:  The Court calls People

5     versus McBurney, case number 07 214651 FC.

6          MS. POPE-STARNES:  Good morning Your

7     Honor.  Sarah Pope-Starnes, assistant prosecuting

8     attorney.

9          THE COURT:  Good morning.

10         MR. WHITE:  Robert White appearing on

11    behalf of Mr. McBurney.

12         THE COURT:  Thank you.  The record

13    will reflect that Mr. McBurney is not present.

14    However it's up to you Mr. White.  We either wait

15    for him to come on up, argue the instructions, and if

16    we do that then we have to wait for all the Jurors to

17    get here and there's no crossing in-between.  Or we

18    can do the arguments right now while we're waiting

19    for the rest of the Jurors to come in.

20         MR. WHITE:  We can do the arguments

21    right now.

22         THE COURT:  Okay.  All right.

23       Let's first start off with the --- someone can

24    recite those instructions to which we have a meeting

25    of the minds and then we can deal with the ones that

                            3

1     are objected to.

2             MR. WHITE:  Okay.

3             THE COURT:  If whoever has a second, go

4     ahead and start reciting them.  I'm not even looking

5     at any instructions right now.

6             MR. WHITE:  Okay.

7       I believe we agree on **3.1**, Duties of Judge and

8     Jury.

9             THE COURT:  You can just say the number

10    if you would?

11            MR. WHITE:  Okay.

12      **3.2, 3.3, 3.5, 3.6, 3.10, 4.1, 4.3, 4.5, 4.7,**

13    **4.9, 4.16, 5.2, 5.3, 5.10.**

14           MS. POPE-STARNES:  I agree Your Honor

15    but we have, we had to finalize that uh --- and we

16    have not.  I've not seen finalized copies from the

17    Defense.  I have a copy of our original draft.

18           MR. WHITE:  We've just ---

19           MS. POPE-STARNES:  (Interposing)  We've

20    agreed to it.  We just need to list the doctors ---

21           MR. WHITE:  (Interposing)  Yes.

22           THE COURT:  Oh.  That's the expert one?

23           MR. WHITE:  Yes.  We just have to list

24    all the doctors.

25           THE COURT:  Okay.  All right.  Very

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1       well.

2                    MR. WHITE:   **5.11, 7.2,** I believe umm ---

3       **17.18, 7.3a, 17.20, 3.11** with modification depending

4       on the Court's ruling on a lesser includance.   **3.13,**

5       **3.14, 3.15, 3.16,** and the verdict form of **3.23** is yet

6       to be finalized depending on the Court's ruling.

7                    MS. POPE-STARNES:   Well **3.23** is a

8       separate instruction entitled verdict form.   And

9       then there's a separate verdict form.   And I agree

10      that the verdict form ultimately comes from the

11      Court's ruling.

12                   THE COURT:   **3.23** is the one that says I

13      prepared the verdict form?

14                   MS. POPE-STARNES:   Correct.

15                   THE COURT:   Okay.   All right.   Very

16      well.

17           That leaves for arguments, either one of you?

18           Is there what, five?

19                   MS. POPE-STARNES:   **4.11,** and umm ---

20                   THE COURT:   (Interposing)   Versus **5.8c**?

21                   MS. POPE-STARNES:   Correct.   Language

22      only in **16.4, 16.5** and **16.10.   17.21, 17.23** and

23      **16.23** and **16.15** which the Defense presented

24      yesterday.

25                   THE COURT:   Okay.   Umm --- the list of

5

1    the agreed, that is agreed Ms. Pope-Starnes?

2                    MS. POPE-STARNES:   Yes.

3                    THE COURT:   All right.

4          And the list of the disputed, likewise, Mr.

5    White, stipulate those are the disputed ones?

6                    MR. WHITE:   Yes.

7                    THE COURT:   Okay.   Very well.

8          Whoever wants to leadoff on the **4.11** versus

9    **5.8c**?

10                   MS. POPE-STARNES:   Well I will Your

11   Honor.

12         The People filed a notice sometime the end of

13   two thousand and seven (2007), under **MCL 768.27d**

14   which is the prior acts, domestic violence statute.

15   We did not file that under **404b.**   Counsel for the

16   Defendant filed a motion objecting to addition of any

17   prior acts or similar acts under that statute and

18   also objected to **404b.**

19         The Court did note umm --- the things that the

20   two had in common during a motion hearing but I

21   believe the **5.8c** specifically is instruction for

22   evidence that is admitted under **MCL 768.27d.**   And

23   that **4.11** is specifically instruction for **404b.**   And

24   **4.11** is more eliminative than **5.8c.**   The statute

25   specifically says,

6

1        **"That the evidence may be offered**

2            **for any purpose for which it's**

3            **relevant."**

4        **404b** is more eliminating.   So I believe that

5    the **5.8c** instruction is more appropriate in this

6    case.   Especially as the People did not bring a

7    motion to the floor for this.

8            THE COURT:   I don't want to oversimplify

9    it, but am I correct in --- in --- in this analysis?

10       That **5.8c** can be used for propensity purposes.

11   And but for --- but for the statute, the new statute,

12   it would not have been admissible for propensity

13   purposes because of **404b**?

14           MS. POPE-STARNES:   I would agree.   We

15   would have had to file a motion and have a hearing

16   under **404b** and have the Court rule as to whether or

17   not it was admissible for any of the purposes

18   enumerated specifically in **404b.**

19           THE COURT:   And Mr. White.

20           MR. WHITE:   Your Honor, the instruction

21   says,        **"The Prosecution has entered**

22           **introduced evidence of claimed acts**

23           **of domestic violence by Defendant**

24           **for which he is not on trial."**

25       Domestic violence is a term of art and it

7

FORM CSR - LASER   REPORTERS PAPER & MFG. CO   800-626-6313

1    suggests a finding of domestic violence that is some

2    kind of intentional perpetration of a harm against a

3    family member.   And in this case, umm --- the call,

4    the prior case was a plea of no contest to reckless

5    causing of serious injury.   Umm --- we believe that,

6    you know, the characterization of that as domestic

7    violence is improper.   They would have to prove the

8    intentional nature of that act.   It can't be done.

9    Wasn't done.   It's not going to be done in this

10   case.   So that's why we suggested **4.11** is a better

11   instruction because it says,

12                  **"Committed improper acts for which**

13                  **he is not on trial."**

14       Umm --- and limits the Jury's consideration to

15   not being able to say that, 'He's a bad man.   That

16   he's done this in conformity with prior acts.'

17       It specifically addresses the concern of **404b**

18   which I believe this Court still has to do under the

19   domestic violence statute.   There's still --- still

20   a balancing that there has to be.   This is limited

21   for --- this is introduced for a limited purpose.

22   And that's why we suggest **4.11** which doesn't recite

23   domestic violence because that would be the first

24   time the Jury would ever hear that phrase.   And that

25   it's limited for a specific purpose that is to show

8

1  absence of mistake, things that are allowed under

2  **404b.** I believe Judge that it's a more proper

3  instruction.

4        THE COURT: Thank you.

5        MS. POPE-STARNES: Your Honor, if I may?

6  Specifically the phrase domestic violence comes

7  from the statute and it's defined. It doesn't

8  require a conviction. It specifically defines it

9  as, you know,

10              **"Acts or attempts of acts within a**

11              **family or household."**

12  And contrary to what Counsel has indicated the

13  Court of Appeals has recently issued an opinion and I

14  don't have the cite. It is published, **People vs**

15  **Patterson** which was issued on September eleventh

16  (11th), two thousand seven (2007) where the Court

17  said,

18              **"Once it meets 768.27 b you'd don't**

19              **need to get to 404b."**

20  So I disagree with Counsel on that and the Court

21  of Appeals has already ruled on that issue.

22        THE COURT: Anything further on that

23  matter?

24        MR. WHITE: Nothing Your Honor.

25        THE COURT: All right.

1     Go ahead with the **16.4**, **16.5**, **16.10**. These are

2     all joined together because it's choice of words

3     which would do it for one, you'll do it for all, I

4     guess. Is that correct?

5              MS. POPE-STARNES: That's correct Your

6     Honor.

7              THE COURT: Okay. Whoever wants to

8     speak on it, go ahead.

9              MS. POPE-STARNES: We've asked that the

10    cause of death in those be listed as was indicated by

11    the Medical Examiner, who's required by law to find

12    the cause and the manner of death. And his

13    testimony is that the cause of death was from blunt

14    force trauma. We've asked that it simply say that,

15    'It is a result of blunt force trauma.'

16              THE COURT: Mr. White?

17              MR. WHITE: And I believe the act has to

18    specifically be in there, what caused the blunt force

19    trauma. And now the medical examiner is saying, 'As

20    a --- the blunt force trauma as a result of being

21    thrown into her crib.'

22        So uh --- the medical conclusion needs a factual

23    basis. And since it appears that that is now Doctor

24    Dragovic's testimony, which he actually gave a

25    demonstration to the Jury, that I believe that umm --

10

1   - it's important for the Jury to hear those two

2   words, those two ideas together because that's now

3   the theory of the Prosecutor's case.  Which it

4   wasn't the theory of the Prosecutor's case at the

5   beginning of this case.  Which was the child's head

6   hit the rail.  So I believe it's critically

7   important Judge to be able to put the medical umm ---

8   definition conjoined with the facts supposedly that

9   it's based upon.

10         MS. POPE-STARNES:  Your Honor,

11   specifically Doctor Dragovic indicated that he did

12   not make an opinion as to where the child impacted

13   the head.  He said he didn't know.  He wasn't

14   present but he could tell based upon his training and

15   experience as a forensic pathologist, as a

16   neuropathologist, and based upon the autopsy that the

17   injury was as a result of blunt force trauma.  And

18   the demonstration at the crib, we started here at the

19   rail, if the Court will recount --- recall, and then

20   went to the crib.  And he was explaining to the Jury

21   what he meant by the term 'Unyielding surface.'

22         THE COURT:  Anything else on that?

23         MR. WHITE:  Yes.  Just, you know, he

24   had to emphasize the lack of external injury.  The

25   high probability it was a padded surface.

11

1          THE COURT:   Gotcha.   Right.   Okay.

2     Thank you.

3          **17.21 and 17.23**?

4          MR. WHITE:   Those are my requested

5     instructions Judge.   And umm --- basically they

6     mirror **17**,  first and second degree child abuse.

7     **17, 18,** and **19,** which is requires intentional causing

8     of physical injury.   **17.20** recklessly causing

9     serious physical injury.   Those two correspond in

10    the sense that though harm in those two is

11    contemplated only to be physical harm not serious

12    physical harm.

13         And I believe based upon the testimony

14    that's been produced in this Court, not only by the

15    Defense, but by the Prosecution that the act of

16    throwing her into her crib, onto her mattress, could

17    have been an innocuous act.   It could not, it may

18    not have been the act that caused this chronic

19    subdural hematoma to rebleed.   It may have been

20    started already during the day when the child was in

21    distress with the testimony given by the mother.   So

22    the Jury could find that he did this act, you know,

23    intentionally.   He threw her into the crib causing

24    her physical harm, you know, but not serious physical

25    harm.   The serious physical harm was caused by a

12

1    chronic condition that has been in existence for

2    months and months and months that may have been

3    symptom --- symptomatic already Judge by virtue of,

4    you know, the child's health during the day.

5         Again, the same argument with the recklessness.

6    It could be a reckless act causing physical harm.

7    Umm --- and what is the definition of physical harm?

8    We don't have that in these two particular

9    instructions nor in the statute.   I mean a uh ---

10   just, you know, any kind of physical harm could be

11   construed as meeting these standards.   Serious

12   physical harm is something that it is defined to a

13   degree.   But the Jury certainly could find based

14   upon Doctor Uscinski's testimony and Doctor Dragovic

15   that the child being in a vulnerable condition that

16   the act itself was not the precipitating factor.

17   And that's why I believe that these two instructions

18   should be given.

19              THE COURT:   Is this a dispute over

20   whether or not, again, I don't know if I'm

21   oversimplifying or not, the word serious?   It's a --

22   - it's a dispute over the word 'Serious'?

23              MR. WHITE:   Serious physical, yes.

24              THE COURT:   And is it your position or

25   do you concede that there's no dispute the baby died?

13

1    And the cause of death going with one theory is a

2    preexisting condition plus some triggering effect,

3    however minimal necessary, those two factors wed

4    together equals death. And you're saying, and I

5    don't want to put words in your mouth, tell me if I'm

6    wrong, preexisting condition, we have --- let's just

7    think of it as a math equation. We have preexisting

8    condition and on the other side of the equal sign we

9    have death. And the variable is what the act was

10   that triggered the rebleed. And that could have

11   been the throwing, it could have been anything else.

12        MR. WHITE:  But it could have been

13   spontaneously too Judge.  And the doctors ---

14        THE COURT:  (Interposing)  And well ---

15        MR. WHITE:  (Continuing)  the doctors

16   from U. of M. agreed.

17        THE COURT:  And --- and that touches on

18   an issue.  And I'm sorry for interrupting but you

19   could follow-up on it.  Every time I heard anyone

20   testify about spontaneous they said, 'Spontaneous.'

21   And then when it was defined, it never --- it wasn't

22   just something that had no triggering effect.

23   Spontaneous was used that --- that the triggering

24   event could have been very, very minor but

25   nevertheless there was an event, in any event.

14

1    There was some event.   Spontaneous wasn't just

2    nothing happened.   Someone said, 'It could have been

3    burping, it could have been bouncing, could have been

4    throwing the baby but it had to be something.'   And

5    so I don't know.   Maybe they were using the word

6    spontaneous a little bit too loosely.   But I --- I

7    don't know what, --- what, you can go ahead and

8    argue.

9         MR. WHITE:   Well and I beg to differ

10   Judge because in my --- in my questions of Doctor

11   Maher, Doctor Dev, and umm --- uh --- Doctor Maher

12   and Doctor Dev, specifically about chronic subdural

13   hematomas, and that they can be caused by the umm ---

14   the rebleed can be caused by minimal force and can be

15   caused spontaneously.   And that was the extent,

16   spontaneously.

17   Doctor Uscinski says, 'The force can be trivial

18   such as burping, coughing, you know, tipping over or

19   spontaneous.'   And he did not give an example.   And

20   what --- and it's not just an abstraction Judge.

21   There's more than a little evidence that the child

22   was in distress throughout the day because of the,

23   you know, the symptoms that she was exhibiting.

24   That she was symptomatic for this particular head

25   injury during the day.   So a Jury could conclude

15

1    that she'd already begun rebleeding, by virtue of the

2    vomiting, the headaches, the lethargy, the not being

3    herself. And remember, it's a registered nurse

4    mother who is testifying to this effect Judge. So

5    it may not have been the impact of the mattress.

6    And when you're saying there, you know, and

7    Doctor Dragovic said, 'There has to be some trauma',

8    even though he says, 'A child is less vulnerable.'

9    But there are facts on this record to support the

10    finding of spontaneity. That it could happen. And

11    specifically that this child was in distress as a

12    result that this particular condition earlier in the

13    day, before this event even happened. The alleged,

14    you know, the critical event.

15    THE COURT: If --- if it was triggered,

16    if the previous --- the rebleed was triggered by the

17    throwing, there'd be no dispute that it's serious

18    physical harm, is that right or wrong?

19    MR. WHITE: I would believe so, yes

20    Judge. If that was the sole evidence that that was

21    the beginning of the child's symptoms, it was that,

22    you know, but it's not. There was extensive

23    evidence that the child was in distress throughout

24    the day.

25    THE COURT: Okay.

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

1          MS. POPE-STARNES:  First of all, Counsel

2     is incorrect about what the statute says.  The

3     statute does define physical harm and it says,

4              **"Any injury to a child."**

5          Now in regards to serious physical harm, don't

6     forget Judge, we don't just have the testimony that

7     there was a subdural hematoma.  We also have

8     testimony from Doctor Ibraham yesterday that there

9     was an acute subarachnoid hemorrhage and that's

10     reflected in the autopsy protocol.

11          Also Doctor Dragovic testified that there was an

12     epidural hemorrhage to the spine below the area of

13     the neck in the upper back which was hemorrhaging in

14     the spinal area.  And that that was the result of

15     blunt force trauma as well.  And the statute talks

16     about any internal injury.  It specifically says in

17     defining serious harm;

18              **"Including but not limited to".**

19          And in the list of enumerating physical harm is;

20              **"Internal injury."**

21          So we have more than just this chronic or remote

22     hematoma.  Furthermore the case law is very clear

23     about this.  If instruction is to be given on a

24     lesser offense, it must be supported by a rational

25     view of the evidence.  And I would refer the Court

17

1    to People versus Badgley, (phonetic).   I have a

2    copy.   It's unpublished.   It's out of Macomb County

3    Circuit Court from January twenty-third (23rd) of two

4    thousand and seven (2007), where there is no dispute

5    that the victim died after suffering a serious

6    physical injury, which was brain damage, subdural

7    hematoma, skull fracture.   The dispute was whether

8    the Defendant acted with the necessary intent.   And

9    in that case the Court said;

10   **"That that should not go to the Jury**

11   **on those lessers of third and fourth**

12   **degree."**

13   The Court said the same thing in People versus

14   Ormsby (phonetic) which again is unpublished.   It's

15   from the Court of Appeals, May nineteenth (19th), of

16   two thousand (2000).   And I have a copy of that.

17   And the Court says the same thing in People versus

18   Lutz (phonetic) which is unpublished from the Court

19   of Appeals from May twenty-seventh (27th) of two

20   thousand and three (2003).

21   It's not supported by a rational view of the

22   evidence in this case.   There is serious physical

23   harm.   There's a subarachnoid hemorrhage which is

24   acute which is new.   And there's the epidural

25   hemorrhage.   So even --- not even getting to this

18

1    argument about whether or not the chronic subdural

2    re-bled, we still have serious physical injury and

3    evidence of it.   And it's in the autopsy protocol

4    and it's on the record in the testimony.

5              MR. WHITE:   Well Judge, remember this

6    epidural hemorrhage was --- was testified to by

7    Doctor Dragovic.   Umm --- was in contradiction to

8    his earlier testimony in preliminary examination.   I

9    asked, 'If any soft tissue damage was done to the

10   neck'.

11             'No.'

12        Now he says, 'There's evidence of epidural

13   hemorrhage.'

14        And I think that has to be taken with a grain of

15   salt.   Especially since his initial opinion was

16   blunt force trauma due to hitting a rail and now it's

17   the mattress.   And I see --- you can see obviously

18   he's just trying to buttress his change of opinion.

19   And the Jury, you know, is there some evidence to

20   suggest that this was a spontaneous, could be a

21   spontaneous rebleed of a chronic condition.   And I

22   believe that the record is replete with this basis

23   for asking for this instruction.   The Jury could

24   conclude that yes, Steve intentionally or recklessly

25   caused physical harm but not serious physical harm.

19

1           THE COURT:   Thank you.

2       All right.  We're on **16.23** and **16.15?**

3           MR. WHITE:  Yes.  Those are my ---

4    **16.15** is my request.  Umm --- and this is just part

5    and parcel of the argument just made Judge.  The

6    Jury could find yes, that ultimately Madison died of

7    complications from a chronic subdural hematoma,

8    remote subdural hemorrhage, but Defendant's act was

9    not the cause.

10          THE COURT:  I'm sorry for interrupting.

11   Shall --- is there a reason to combine these two or

12   keep them separately?  I mean in terms, for purposes

13   of argument.

14          MS. POPE-STARNES:  Separate Judge.

15          MR. WHITE:  **16.15** is separate.

16          THE COURT:  Okay.  But let's --- let's,

17   which one do you want to argue?

18          MR. WHITE:  **16.15** Judge.

19          THE COURT:  Well go ahead.

20          MR. WHITE:  Umm --- and if I may read

21   it?  It is not enough that the Defendant's act made

22   it possible for death to occur.  In order to find

23   that the death of Madison was caused by Defendant you

24   must find beyond a reasonable doubt that the death

25   was a natural or necessary result of Defendant's act.

20

1    And I believe that is absolutely important Judge

2    because we have here a potentially innocuous event

3    that becomes fatal. And that is a head striking a

4    child's mattress in a crib. But for the chronic

5    condition, the Jury could easily conclude that that

6    act was not the cause of death. So I do believe it

7    is appropriate.

8              THE COURT: From the People?

9              MS. POPE-STARNES: Your Honor, I would

10   disagree. I think if you look at the case law that

11   accompanies this instruction it's talking about

12   whether or not there's an intervening cause.

13   There's no testimony that there's an intervening

14   cause. And the testimony is clear from the record

15   that umm --- even if this child did have a chronic

16   subdural hematoma which re-bled, Doctor Dragovic

17   testified that there was force necessary to do that.

18   And that actually was done by the Defendant. It's

19   an act of the Defendant.

20        So I think that this is confusing for the Jury.

21   It's misleading to the Jury. Umm --- Counsel left

22   out the first line which is in parentheses, 'There

23   may be more than one cause of death.'

24        There's no testimony in this record of more than

25   one cause of death.

                          21

1       THE COURT:   By the way on that note, I

2   looked at the instruction as well.   That's

3   bracketed.   And nowhere in the notes that I saw is

4   there an explanation for why it's bracketed.   And I

5   think in other instructions whenever there's

6   bracketed material there's a description as to when

7   you use it or why you use it, why it's bracketed.

8       MS. POPE-STARNES:   Right.   And there's

9   not in this.   I defer to the Court.

10      THE COURT:   Okay.

11      MS. POPE-STARNES:   But it does

12  specifically talk in the note about when one of the

13  issues is whether death was caused by some

14  intervening cause.   And there's no testimony of that

15  here.

16      And quite frankly Your Honor, I don't want the

17  Jury to be confused in saying that the removal from

18  child (sic) support is some intervening cause ---

19      THE COURT:   (Interposing)   You mean

20  life-support?

21      MS. POPE-STARNES:   Or life-support,

22  thank you.   Because there's case law right on point

23  that that is not an intervening cause of death.

24      THE COURT:   Okay.

25      MR. WHITE:   I don't intend to argue

                        22

1    withdrawal of life-support is the cause of death

2    Judge.   Umm --- and I don't believe that we disagree

3    that the cause of death was as a result of Madison's

4    brain swelling to the point of becoming dysfunctional

5    in comparing the brain stem shutting the core --- the

6    body's vital organs.   But the act of throwing her

7    onto her mattress may not have been the precipitating

8    factor.   Uh --- she had a preexisting condition ---

9    condition.   The Jury could conclude that this

10    condition which existed before this was the cause of

11    the death, not my client's act.

12                    THE COURT:   **16.23**?

13                    MR. WHITE:   I requested this Judge

14    because it addresses the issue of malice I believe.

15    And I know that the instruction was originally

16    drafted to deal with diminished capacity of defense

17    which has now been removed.   Uh --- and again the

18    instruction says remove the third line which I did.

19    But the allegation regarding the felony-murder, the

20    malice is that the testimony of the police was that,

21    you know, the child screaming in his ear.   And that

22    he threw her violently into the rail.   But it's the

23    issue of his state of mind at the time he did this.

24    Whether there was this malice, intent to kill, intent

25    to cause great bodily harm, umm --- intent to

23

1    knowingly create a very high risk of death or great

2    bodily harm.    Knowing that that result would likely

3    occur.    Umm --- and so that's the state of mind that

4    the Jury would have to, you know, conclude he was in

5    at the time of this act of throwing her into the

6    crib.    And I believe that this focuses the Jury on

7    this specific state of mind, this malice requirement

8    of felony-murder.    So I believe it's appropriate.

9            MS. POPE-STARNES:    Your Honor,

10   respectfully I absolutely disagree.    Now they went

11   through this in People versus Mayner (phonetic) where

12   they talked about intent.    And they talked about

13   whether or not it was significant and it was

14   appropriately covered under the Jury instructions.

15   And as a result of this, this specific intent

16   instruction was changed because the Supreme Court

17   said this is already addressed in the specific

18   instructions.

19           And my argument to this Court is this issue is

20   already addressed in the specific instruction of the

21   felony-murder and second degree murder.    The second

22   element that's specifically discussed is mens rea and

23   has to do with whether or not there was intent to

24   kill, intent to commit great bodily harm or the

25   language about putting someone at risk where the

24

1    likely result is death or great bodily harm.    Those

2    are already addressed specifically.    Intent is

3    already addressed specifically in the first-degree

4    child abuse instruction.    This instruction

5    specifically starts out with the language;

6                    **"You have heard evidence concerning**

7                    **the Defendant's mental condition at**

8                    **the time of the alleged crime."**

9    No the Jury hasn't.    They have not heard any

10   evidence of that.    The statement that he --- that he

11   claimed to the officers that he was mad and

12   frustrated, that's not what that's talking about.

13   This instruction was specifically designed originally

14   for diminished capacity which is now no longer a

15   defense in this state.    And this issue is also

16   addressed in the Badgley case that I cited to the

17   Court as unpublished from January of two thousand and

18   seven (2007).

19   Now the Court talks about, you know, the fact

20   that an expert can be offered by the defense in

21   regards to the state of mind.    But this is not an

22   appropriate discussion.    And the issue of intent and

23   the issue of mens rea is addressed specifically in

24   the specific instructions of felony-murder and

25   second-degree murder.    And to give the Jury this on

25

1    top of that is simply confusing.

2            THE COURT:    Thank you.

3        Anything?

4            MR. WHITE:    I just, I guess it's not the

5    content is the nature of the objection.    It appears

6    the objection is covered.    And in matters of such

7    importance I don't see the prejudice of asking the

8    Jury to concentrate on the malice requirement of the

9    first-degree felony-murder uh --- charge.    That is

10   intent to kill, so on and so forth.    So I believe it

11   should be given.

12           THE COURT:    Thank you.    Thank you.

13       The Court has heard the arguments of Counsel

14   first and foremost based upon the stipulations.    The

15   Court will need those instructions that have been

16   agreed to.    And I'll ask, direct Counsel

17   respectfully to meet with my staff attorney, Ms.

18   Garelik, afterwards to compile a final set so that

19   everybody's on the same page.    And I'll certainly

20   have copies made for you so that we're all literally

21   on the same page.

22       With respect to the arguments, **4.11** versus **4.8c.**

23   The Court orders as follows ---

24           MS. POPE-STARNES:    (Interposing)    I'm

25   sorry Your Honor.    It's **5.8c** I believe.

26

1          THE COURT:  I misspoke.

2          MS. POPE-STARNES:  I just want to make

3    sure that we agree.  I apologize.

4          THE COURT:  No, no.  That's good.  No,

5    let's have it clear.  No and thank you.

6          **4.11** versus **5.8c**.  The Court orders as follows;

7    the Court adopts the Prosecutor's arguments and

8    grants **5.8c,** and consequently **4.11** is denied.  The

9    Court is persuaded by their arguments.

10          With respect to **16.4, 16.5,** and **16.10,** the

11    phrase to be included there the Court orders as

12    follows; the Court directs that the language be

13    quote, "Blunt force trauma."  The Court does not

14    order language concerning being thrown into the crib

15    because the evidence is hypothetical whether the

16    blunt force trauma was due to the throwing into the

17    crib or something else.

18          With respect to **17.21** and **17.23,** the Court

19    orders as follows; based upon the evidence of other

20    injuries through Doctor Ibraham and Doctor Dragovic,

21    besides the rebleed issue, the Court finds the

22    serious physical injury, the Defendant's credibility

23    challenge of Doctor Dragovic which is the Court finds

24    a weight issue notwithstanding.

25          With respect to **16.15,** the Court orders as

27

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    follows; the reasons by the Defendant, the Court

2    grants same.   The Court will allow the language to

3    be --- language to be added to that instruction that

4    this does not include removal from life-support.

5        With respect to **16.23**, the Court orders as

6    follows; the Court finds this offered instruction was

7    already addressed in other instructions.   The Court

8    also does not find that the Defendant's alleged

9    statement about being mad or being upset about the

10   crying qualifies under the subparagraph 1 of this

11   instruction.

12       So with those rulings I'll have Counsel go ---

13            MR. WHITE:   (Interposing)   I just --- I

14   just missed on **17.21** and **17.23**, the two misdemeanors,

15   child abuse, you ruled those out?

16            THE COURT:   That, well I don't know what

17   if they're misdemeanors or not, but yes.

18            MR. WHITE:   Okay.   So those are out.

19            THE COURT:   Yes.

20       So I'll instruct Counsel now to meet ---

21       Ms. Garelik can you take a couple of minutes

22   with them ---

23            MS. GARELIK:   (Interposing)   Yes.

24            THE COURT:   (Continuing)   and get sets

25   together?

28

1          MR. WHITE:   Your Honor can I?

2          THE COURT:   Go ahead.   Go ahead.

3          MR. WHITE:   I have a couple of

4     evidentiary issues while we're here.

5          Umm --- you directed us to try to retype that

6     one page in the University of Michigan records which

7     is Exhibit 1.   And which is this particular page.

8     It's thirty-seven (37) of ninety-one (91.)

9          I've done my best using the typewriter that I

10    have.   And I'll show it to sister Counsel.   I don't

11    know if she was able to do anything better.

12         MS. POPE-STARNES:   I don't have access

13    to any type of typewriter.   We don't have that kind

14    of equipment anymore.

15         THE COURT:   How does that look?

16         While your checking I'll just see how we're

17    doing on the Juror.

18         How we doing?

19         A VOICE:   Good.

20         THE COURT:   Okay.

21         Well have you looked at it?

22         MS. POPE-STARNES:   That's fine Your

23    Honor.

24         THE COURT:   Okay.   Very well.

25         MR. WHITE:   Okay.   And with regard ---

                        29

1    MS. POPE-STARNES:    (Interposing)   And

2    is this my copy?

3    MR. WHITE:   No.   That's one copy and I

4    need to make copies.

5    MS. POPE-STARNES:   Okay.

6    I'd like a copy made please so I can put it in

7    the Exhibit.

8    THE COURT:   You can use our copier.

9    Go ahead.

10   MR. WHITE:   With regard to admitted

11   Exhibits, T, U, V, W, and X, I've had uh --- blown up

12   copies of each one of these made.   Taking this

13   Exhibit and blowing it up.   Umm --- and I ask to

14   move for entry of the replacement Exhibits in lieu of

15   the Exhibits that were admitted into evidence.

16   Number one because they're more legible most but, you

17   know, they're the exact same Exhibit.   There's no

18   prejudice.   Uh --- so I'd ask that the replacement

19   Exhibits be admitted in lieu of the copies which,

20   again, with the limitations of a copy machine and

21   under the circumstances uh --- I believe it's proper

22   for the Jury to consider these.

23   THE COURT:   Ms. Pope-Starnes?

24   MS. POPE-STARNES:   Well Your Honor, I

25   think they can be used clearly as demonstrative

30

1   Exhibits during closing.   But I don't think it's

2   proper to admit them at this point.   Admission of an

3   Exhibit requires a witness to identify it and

4   authenticate and we've closed proofs in this case.

5   So I don't have an objection to Counsel using them as

6   demonstrative Exhibits during closing argument.   I

7   do have an objection for them being substituted in

8   for Exhibits which were already admitted after a

9   witness identified them and talked about their

10  authenticity.

11              THE COURT:   Mr. White.

12              MR. WHITE:   I looked for authority

13  Judge, I could not find any and I just wanted to make

14  sure the Jury has a clear copy.   Because of the

15  scheduling of bringing Doctor Uscinski in and using a

16  copy machine, we weren't able to get these until the

17  eleventh (11th) hour.

18              THE COURT:   Well let me ask you both.

19  Is anybody aware of any law where demonstrative

20  Exhibits can be delivered into the Jury room?

21              MS. POPE-STARNES:   I don't know that

22  they can.   They have to be admitted as Exhibits.

23              THE COURT:   The answer is 'No'?

24              MR. WHITE:   I don't believe that they

25  can Judge.

31

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1          THE COURT:   Okay.   All right.

2          MS. POPE-STARNES:   And Doctor Ibraham

3    was here yesterday.   We could have asked to have him

4    identify them.

5          THE COURT:   Gotcha.   I --- I loathe to

6    disrupt anything in a record for appellate purposes

7    and so forth.   And I uh --- I feel constrained not

8    to do so Mr. White.   And I'll certainly invite you

9    to use them as a significant degree in front of the

10   Jury.   But I better --- I better stay my hand in

11   that regard.

12         MR. WHITE:   Very good Judge.   And I

13   have one more demonstrative Exhibit which is all

14   Madison's doctor appointments, everything that she

15   had over the course of her life prepared from the

16   records in this case.   And I just intend to use it

17   as per demonstrative purposes.

18         THE COURT:   Very well.   Thank you.

19   All right.

20         MS. POPE-STARNES:   I would just inquire

21   then.   Those records, that reflects records which

22   have all been admitted into the record, the records

23   from Doctor Adams, Doctor Piro, Doctor Lipkin?

24         MR. WHITE:   St. Jo's and University of

25   Michigan.

                        32

1          MS. POPE-STARNES:   Okay.   And Doctor

2     Adam's medical records are what Exhibit letter?

3          MR. WHITE:   BB.

4          MS. POPE-STARNES:   Thank you.

5          THE COURT:   Thank you.

6     With that ---

7          MS. POPE-STARNES:   (Interposing)   Your

8     Honor, I do have just one other very minor thing.

9          THE COURT:   Go ahead.

10         MS. POPE-STARNES:   I would ask, I've

11    noted in the last few days this door is very noisy.

12    And sometimes the outside door causes this door to

13    slam shut.   I would ask during the time that we're

14    doing closing arguments if we can, that we either

15    have the courtroom door locked so that there's no

16    traffic in and out distracting or maybe a sign put

17    outside.

18         THE COURT:   Any objection, Mr. White?

19         MR. WHITE:   No objection.

20         THE COURT:   I do that during

21    instructions.   I certainly can extend and broaden

22    that to closing arguments as well.

23    Thank you.

24         MS. POPE-STARNES:   Thank you Judge.

25         THE COURT:   We'll break at this time.

33

1          Why don't we before I have the Defendant brought

2      up, give me maybe a five or ten minute lead time so

3      you can compile all the instructions together and

4      then I'll have him called up?

5                    MR. WHITE:    Okay.

6                    THE COURT:    Sound good?

7                    MR. WHITE:    Do you want a theory of the

8      case from us?

9                    MS. POPE-STARNES:    I waive theory of the

10     case Your Honor.

11                   MR. WHITE:    Same here.

12                   THE COURT:    Okay.

13                   MR. WHITE:    My theory would have been

14     given at closing.

15                   THE COURT:    Then I'll just read the

16     straight out instructions.

17          Thank you.

18                   MR. WHITE:    Thank you.

19          (Whereupon a recess was had.)

20                        *  *  *

21                   THE CLERK:    The Court calls People

22     versus McBurney, case number 07 214651 FC.

23                   THE COURT:    Counsel?

24                   MS. POPE-STARNES:    Sarah Pope-Starnes,

25     assistant prosecuting attorney on behalf of the

34

1    People.

2              THE COURT:    Thank you.

3              MR. WHITE:    Robert White appearing on

4    behalf of Mr. McBurney, standing to my immediate

5    right.

6              THE COURT:    Thank you.

7         Good morning.    Ready to proceed?

8              MS. POPE-STARNES:    We are Your Honor.

9              THE COURT:    All right.    Thank you.

10             MR. WHITE:    Yes.

11             THE COURT:    Jeff, you can bring in the

12   Jury.

13             THE CLERK:    Yes, Your Honor.

14             MS. POPE-STARNES:    And Your Honor, in

15   regards to the doors of the courtroom?

16             THE COURT:    He's going to take care of

17   it.    And by the way, and thank you.

18        Folks that are here in Court I just wanted to

19   make a brief announcement.    You're all welcome

20   obviously to stay but those that stay are in for the

21   duration umm --- at least until a break.    And uh --

22   - Jeff is going to keep that door locked and then

23   keep an eye on that one, okay.

24             THE CLERK:    Yes Your Honor.

25             THE COURT:    Thank you.

                          35

1          You can bring in the Jury.

2     (Whereupon the Jury was returned to the courtroom at

3     10:05am.)

4                    *  *  *

5          THE COURT:   Good morning everyone.

6          You may all be seated.   The record will reflect

7     that the Jury is back.

8          Ladies and Gentlemen, at risk of sounding

9     insincere by apologizing yet again, I'm going to say

10    it anyways.   I do apologize.   We have been working

11    on the matter and I appreciate everybody's patience

12    and indulgence here.

13         And with that.

14              MS. POPE-STARNES:   May we approach?

15              THE COURT:   You may.   Sure.

16    (Whereupon a discussion was held at the Bench out of

17    hearing of the Jury and the Court Reporter.)

18                    *  *  *

19              THE COURT:   Yeah, Counsel brought up a

20    good point and I think maybe you're all in agreement.

21    We've been doing the note taking or allowed you to do

22    the note taking for the evidence portion of the case

23    but during the closing arguments I'd ask you to just

24    set them off to the side or collect them or whatever

25    if you would.   And uh --- just listen folks, all

                         36

1    right?   Thank you very much.

2        Ms. Pope-Starnes.

3                    **CLOSING ARGUMENTS**

4            MS. POPE-STARNES:   Ladies and Gentlemen,

5    I know that it's been a very long two-and-a-half

6    weeks.   And I want to start out by thanking you on

7    behalf of the People of the State of Michigan and on

8    behalf of myself personally for your patience and

9    your time and your attention throughout this matter.

10       If you'll recall we talked in opening statements

11   about the crimes that the Defendant is charged with.

12   He's charged with First Degree Felony Murder and

13   count two is First Degree Child Abuse.

14       And you'll recall that I talked to you about the

15   parts or the elements of those crimes.   Now I'd like

16   to talk to you about the facts or the testimony as it

17   came out in this case.   And I'd like to talk to you

18   in more of a chronological order than the witnesses

19   were able to appear.

20       Heather McBurney testified that she was the

21   mother of Madison McBurney, that the Defendant is her

22   husband and Madison was his daughter.   She told you

23   that in November of nineteen (19), excuse me, two

24   thousand and six (2006) that Madison was

25   approximately eleven (11) months old.   That she was

                        37

1  born with hip dysplasia, that she was born with a

2  congenital condition to her scalp that had the

3  appearance of skinned knees not healing.  She told

4  you that they resided on Scott Street in the city of

5  South Lyon here in Oakland County.  And that the day

6  before November thirtieth (30th) on the --- on

7  November twenty-ninth (29th) Madison was fine.

8      On November thirtieth (30th) she said she got up

9  sometime six (6:00) to six-forty-five (6:45) in the

10  morning and she got Madison up.  That Madison was

11  awake when she went into her room.  She was playing

12  with her bumper pad and she said she had a little bit

13  of spit up on her face and her sleeper.

14      Now you recall that Heather McBurney testified

15  that she, as any parent, recognizes the difference

16  between projectile vomiting and baby spit up.  And

17  she said that appeared to be spit up to her.  She

18  testified that a little bit later in the morning

19  Madison took a nap for about twenty (20) minutes.

20  And after the nap she was going to give her a bath.

21  And then as she was running the bath Madison

22  projectile vomited.  That she called in the

23  Defendant so that she could get cleaned up and she

24  could clean Madison up.  And then she gave her a

25  bath.  And she told you that Madison seemed to be

38

1    okay during the bath.    That she played a little bit

2    in the tub.

3        Later in the day Madison threw up a little bit

4    more.    And she told you that it was just enough that

5    she had to change Madison's shirt.    But she was able

6    to eat later.    She was able to hold food down.    She

7    told you that about noon (12:00) Madison took a nap

8    for forty-five (45) minutes.    And she said, 'Madison

9    was fine.    There was no reaction to being laid down

10   for that nap.'

11       She said that, 'During the afternoon after

12   Madison got up from that nap, that she drank some

13   apple juice and that had some water in it.    She kept

14   that down.    She played on the floor.'    That she sat

15   in Heather's lap.    She gave her more food which

16   Madison kept down.    And about five o'clock (5:00)

17   Heather McBurney started to get dinner ready and get

18   ready for work.

19       She told you that about five (5:00) to five-

20   forty-five (5:45) she laid Madison down in her crib.

21   And Madison appeared to be normal at that point.

22   And when she last saw her she was laying in her crib

23   playing with a toy.

24       Heather McBurney told you that she left for work

25   at about six o'clock (6:00) and sometime shortly

39

1  after seven (7:00) she got a call from the Defendant

2  where he makes his first statement telling her that

3  Madison had collapsed and that the paramedics were

4  working on her.   She told you that with the help

5  from somebody from work that she got to the

6  University of Michigan Hospital and pulled up at

7  about the same time that the ambulance was.   And she

8  testified that she saw them bring Madison out of the

9  back of the ambulance.   And that the Defendant

10  exited the back of the ambulance.

11  She said that after they got to the hospital the

12  Defendant told her that the baby had been sitting on

13  the floor and he was putting some clothes away and

14  the baby fell back stiff and then limp.   Heather

15  McBurney told you that she stayed with Madison.   She

16  was there in the hospital except, I believe she said,

17  she left very briefly one day to get some other

18  clothes because she was in her work clothes.   That

19  she stayed with her day and night, that she didn't

20  sleep much.   She knew that Madison was in very

21  serious condition and she knew that Madison was not

22  expected to live.

23  She testified that in the early morning hours of

24  Sunday, December third, she was called into a

25  conference room down the hall from Madison's hospital

40

1     room.    And that she met with Sergeant Sovik and

2     Detective Sederlund and spoke with them.    And she

3     told you that she thought maybe Sergeant Sovik had a

4     tape recorder that she might have heard a noise.

5     She said that after she spoke with them that she went

6     back to Madison's room.    And she was later called

7     back to the conference room where her husband, the

8     Defendant, now was with the detectives.    She told

9     you that Sergeant Sovik spoke first but she couldn't

10     remember what he said.    And that the Defendant said

11     he threw Madison in the crib.    She told you that she

12     didn't remember anything more being said after that.

13     She said she was stunned.    And that later after the

14     police left the room she spoke with the Defendant,

15     her husband, alone.    And she testified she couldn't

16     remember that conversation except that there was

17     something in it about the Defendant's son, Nicholas

18     Kennedy.

19          Now Ladies and Gentlemen, when you think about

20     and are weighing the credibility of witnesses'

21     testimony, and the Judge will give you an instruction

22     about that and how to consider whether or not

23     witnesses are credible, when you think about this and

24     you think about Heather McBurney remember that this

25     is a woman who was grieving and is still grieving for

41

1    her daughter.    That she was in shock when this

2    happened.    That this is a terrible, terrible thing.

3    She leaves for work and her daughter's lying in a bed

4    playing with a toy.    And the next thing she knows,

5    she's in a critical care unit, pediatric intensive

6    care unit.    She's going to die.    She's had little

7    to no sleep for days.

8         So when you think about her credibility and you

9    hear things like the witnesses from the first

10   responders and the paramedics, and they testify about

11   the layout of the ambulance and the Defendant

12   couldn't get out the back of the door because there

13   wasn't, that's not how the ambulance was setup.    And

14   you think about whether or not she was able to judge

15   whether or not Sergeant Sovik had a recording device.

16   I believe one of the officers told you, 'I wish we

17   had had one.'    Sergeant Sovik testified he had his

18   gun on one hip and a cell phone on the other.    Well

19   when you think about her and her credibility remember

20   that she is a grieving mother and had to suffer the

21   death of her child.

22        You hear testimony from Lieutenant Craig

23   Johnston from the South Lyon Fire Department.    That

24   on November thirtieth (30th) sometime around seven

25   p.m. (7:00pm) they were dispatched to the McBurney

                              42

1    home on Scott Street.   He told you they were there

2    within three minutes.   And that two of his first

3    responders came in and began working on Madison

4    immediately.   He told you he remembers that the baby

5    was laying on the floor right inside the front door,

6    about six feet from the door.   That her head was

7    towards the door, that she was laying face up.   He

8    remembers seeing a bouncy chair on the floor of the

9    living room and a bottle on the floor about two feet

10   away.   He told you the Defendant was on the

11   telephone when he came in.   And now we have another

12   statement of the Defendant.   To Lieutenant Johnston

13   he said, 'That the baby had been sick all day.'   He

14   fed her a bottle.   That he went to the other room.

15   That he came out and the baby was having seizure-like

16   activity.   He told Lieutenant Johnston, 'That the

17   baby had no medical history and was not on any

18   medications.'   Lieutenant Johnston told you that

19   those first responders suctioned the baby and gave

20   oxygen immediately   And then after a second squad of

21   first responders and the ambulance arrived it was a

22   load and go situation.   This is an infant who needs

23   an emergent care.   And one of the paramedics picked

24   up that baby and they went to the ambulance and they

25   left.   And he told you that he sent firefighter

43

1     Wilson and a Sergeant Schuldt with the ambulance to

2     assist the paramedics.

3          You heard testimony from Sergeant Schuldt that

4     he is a basic EMT with the South Lyon Fire

5     Department.   That he was one of the first responders

6     who was called to that scene.   That the first two

7     first responders and the Lieutenant were already

8     there.   He arrived about the same time as the

9     ambulance.   He told you that when he went in he saw

10    the baby on the floor with the other two first

11    responders attending to the baby.   He identified the

12    Defendant.   He told you that he heard the Defendant

13    say he'd been feeding the baby in a bouncy seat.

14    That the baby had spit the bottle out.   That he

15    picked up the baby and took her to a room to change

16    her.   And he testified that he saw the Defendant

17    point towards a back area of the home.   And that the

18    Defendant said when he got her to the back of the

19    house the baby stopped breathing.   Sergeant Schuldt

20    testified that they were using a mask rebreather with

21    blow-by air.   And that after one of the paramedics

22    picked her up and carried her outside, he went with

23    them.   And his responsibility during the whole ride

24    was making sure that that child had oxygen.   And he

25    did that.   Even as there was an attempt to intubate

44

1     her which couldn't be done because she still had a

2     sucking reflex, he still had that oxygen he told you,

3     right there.    He told you about his observations of

4     Madison during the transport at the time to

5     University of Michigan Hospital.    That at one time

6     her eyes were pinpoint.    And that when they got

7     closer to the hospital her eyes rolled back in her

8     head.    And she began to draw her arms up and become

9     more stiff.    He told you the Defendant only spoke

10    when he was asked questions in the ambulance.    And

11    that the Defendant sat up in the front part of the

12    ambulance by the driver.    He said he recalled the

13    Defendant saying that, 'Madison had MRSA and was on

14    an antibiotics,' when they were in the ambulance.

15    But that the Doctor had said that Madison would be

16    fine.

17         You heard testimony from Matthew Calus who was a

18    paramedic with Huron Valley Ambulance.    He told you

19    he as well with his partner were dispatched to the

20    home on Scott Street on November thirtieth (30th) of

21    two thousand and six (2006).    That the South Lyon

22    Fire Department was already on the scene.    That when

23    he came inside the baby was right inside the door and

24    they were administering oxygen.    He told you the

25    father, the Defendant, gave a history at the scene.

45

1       The baby woke up from a nap.    Was normal after the

2       nap.    That he fed the baby formula.    And he left

3       the room and came back.    That she coughed and was

4       unresponsive.    He told you that he personally picked

5       up Madison and carried her to the ambulance.    That

6       it was a load and go situation.    And that during the

7       transport he was trying to figure out what they were

8       dealing with.    He talked about maybe it was a

9       seizure but it didn't appear to be to him because her

10      arms and legs were limp and flaccid.    They weren't

11      stiff.    And father told him when he asked him, 'That

12      there was no history of seizure.'    He wondered if it

13      was poisoning but the Defendant said, 'That there

14      were no drugs or chemicals that had been ingested by

15      the child.'    He wondered if it was an issue with her

16      blood sugar but the testing showed that it was within

17      normal limits even on the higher side.    He said that

18      in the hos --- in the ambulance during the transport

19      that the Defendant said that, 'The child had MRSA and

20      hip dysplasia.'    But denied that she was on any

21      medications or had any allergies.    And Sergeant

22      Schuldt told you that the Defendant's behavior was

23      not consistent with that of a concerned parent.

24      That he was extremely calm during the ride.    Didn't

25      say anything except when specifically asked a

46

1    question.

2        You heard testimony from Doctor Sikavitsas, the

3    emergency room physician, who testified that when

4    Madison arrived in the emergency room at Mott

5    Children's Hospital at U. of M. that she was

6    unresponsive.   That her eyes were shifted towards

7    the right which she said indicated to her an abnormal

8    focus on the brain.   Madison was breathing on her

9    own and that she had increased tone.   She talked

10   about the treatment that they began.   They

11   immediately began to give her medications to address

12   any possible seizure activity.   She testified that

13   after she gave her Phenobarbital that tone improved

14   and the eyes went back to midline.   She told you

15   that she intubated Madison.   That she gave --- put a

16   breathing tube down her throat.   Not because they

17   had lost her airway and she was not getting

18   sufficient oxygen but because they wanted to do it to

19   preserve or protect that airway.   She told you that

20   she ordered some lab testing be done and that a CT or

21   CAT scan be done.   And that the results of that CT

22   was that there was blood or bleeding in Madison's

23   brain.   She testified that she got a history from

24   the ambulance personnel first and then while the

25   parents were in the room a history was given.   And

47

1    in that history that was given in the emergency room
2    the information was that Madison had had three
3    episodes of vomiting that day.   That she'd been
4    sitting on the floor with --- on the floor with the
5    Defendant.   That she made a gurgling noise and fell
6    over.   That the Defendant denied that the baby or,
7    excuse me, the Defendant claimed that the baby had
8    been vomiting since the previous day.   And that the
9    parents denied any recent trauma, injury, fall,
10   tripping.   And said, 'That there was no history of
11   seizures.'
12       You heard testimony from Doctor Odetola, who is
13   a pediatric intensive care unit physician, who began
14   to care for Madison on December first of two thousand
15   and six (2006) when she was in the pediatric
16   intensive care unit.   He told you and talked to you
17   about what some people call the differential
18   diagnosis.   He called it prioritization.   That
19   there were different things.   He tried to prioritize
20   them and tried to figure out what was going on so
21   that they could treat Madison.   He told you that
22   they --- he made sure that she was on medication.
23   That she was sedated.   That her head was kept
24   midline and elevated.   That he consulted with
25   specialists in other areas.   That she was given

                            48

1    antibiotic --- antibiotics and antiviral agents in

2    case it was some type of infection.   That an

3    intracranial pressure monitor was put in by a

4    neurosurgeon.  And that they used this not only to

5    gauge her pressure but that way they could test her

6    cerebral spinal fluid to see if there was any kind of

7    infection.

8              THE COURT:   Hold on one second Counsel.

9    I'm sorry.

10             Jeff you can...

11             A VOICE:   I'm sorry.

12             MS. POPE-STARNES:   He told you that he

13   ordered lab work of the blood of the different fluids

14   of the body.   And he told you that he reviewed other

15   testing, the CT scan, the MRI scan.   And that he

16   placed a central venous catheter.   He testified that

17   he ruled out infection.   From the lab tests that

18   were done there were no signs of infection.   And

19   that his diagnosis was there was trauma to the brain.

20   A severe brain injury of a nonaccidental nature.

21             You heard testimony from Doctor Maher who is a

22   pediatric neurosurgeon, one who actually saw and

23   treated Madison.   Doctor Maher told you that when he

24   saw Madison on December first, I think his words

25   were, 'Quite ill.'   That she was under sedation and

                         49

1   she was on a ventilator.    That he reviewed the CAT

2   scan of November thirtieth (30th) and December ---

3   and the MRI of December first and that he observed

4   that she had injuries to the brain of two different

5   ages.    He told you that in the frontal lobe area was

6   an older or chronic subdural hematoma and that there

7   was another hematoma over the supratentorial area of

8   the temporal lobe and that that was acute.    He also

9   was aware that her optic disc was bulging.    He told

10  you that that's an indicator of swelling in the brain

11  and a marker for elevated pressure in the head.    He

12  told you that his differential diagnoses were number

13  one, that this, there was a traumatic injury,

14  possibly intentional, possibly accidental.    Number

15  two, a blood vessel malformation.    Number three,

16  extra large spaces in the head.    Number four, a

17  bleeding disorder.    And he testified that he was

18  able to rule out the bleeding disorder.    From the

19  tests that they did there was no bleeding disorder

20  that Madison was suffering from.    From a review of

21  the MRI and the CT he did not have concern for extra

22  large spaces in the brain.    And the results showed

23  no evidence from the imaging of blood vessel

24  malformation.    That left him with traumatic injury,

25  accidental or intentional.    And he told you that no

50

1       history had been given that this child had been

2       involved in an accident.   He testified it was his

3       opinion that this was not consistent with a chronic

4       subdural hematoma rebleeding.   He said the severity

5       of the injury indicated that to him.   That it does

6       not lead to devastating injuries of this nature.

7            You heard testimony from Doctor Leena Dev who is

8       a pediatrician and the head of the child protection

9       team at University of Michigan Hospital.   She told

10      you that she was asked to consult on this case.   And

11      then on December first of two thousand and six (2006)

12      she came in to see Madison.   She told you that she

13      takes a history herself.   And she took a history

14      from both parents, both the Defendant and Heather

15      were there in the room sitting together within

16      earshot of each other as she took a history from

17      them.   And the history that was given to her was

18      that Madison was well all day on November thirtieth

19      (30th).   That she took a nap at five-forty-five

20      (5:45).   At six o'clock (6:00) mother left for work.

21      The Defendant woke Madison up between seven (7:00)

22      and seven-fifteen p.m. (7:15pm).   That he put her in

23      a bouncy chair and gave her milk, a bottle of milk.

24      And she drank about two ounces of it.   That Madison

25      threw the bottle on the floor.   And he took her in

51

1    her room, changed her diaper, changed her into

2    pajamas and put her brace on.   That he set her on

3    the floor and that she was gurgling.   That he looked

4    at her and all four of her limbs became stiff with

5    her back arching and that he called nine-one-one

6    (911).   Doctor Dev talked to you about the physical

7    examination that she was able to do.   Her review of

8    the CT's and the MRI's with a neuroradiologist, I

9    believe she said it was Doctor Doug Quint.   That she

10   reviewed the other reports, medical records, and

11   other testing.   And it was her opinion and diagnosis

12   that Madison had suffered from abusive head trauma.

13   A brain injury from inflicted trauma.   That she

14   concluded this from the subdural hemorrhaging, the

15   retinal hemorrhaging in the retina of the eye, the

16   fact that the history changed.   In her review of the

17   medical records she told you that the history given

18   to Doctor Leber, Doctor Dev, herself, and Doctor

19   Annich were all different.   And that the last

20   radiology images ruled out medical causes.

21        Now Ladies and Gentlemen, People's Exhibit 1,

22   the medical records from the University of Michigan

23   Hospital are in evidence.   And the Judge will tell

24   you in the Jury instructions that if you would like

25   to see any of the Exhibits during your deliberations,

52

1   all you have to do is ask for them.   I invite you to

2   look at histories in Doctor Leber's, Doctor Yang's,

3   Doctor Dev's and Doctor Annich's medical reports and

4   see whether or not the history being given of what

5   happened to Madison is the same or if there are

6   inconsistencies.

7        You heard testimony yesterday from Doctor

8   Ibraham who is a pediatric neuroradiologist.   He

9   specializes in that.   He completed a fellowship in

10  that.   He is board certified in that.   And he

11  reviews over seven thousand (7,000) images a year.

12  He told you that he reviewed Madison's MRI's and CT

13  scans including the MRI from August of two thousand

14  and six (2006) and the CT scan from September

15  eleventh (11th) of two thousand and six (2006).   He

16  told you contrary to the neurosurgeon, Doctor

17  Uscinski's testimony that there was not an old and a

18  new subdural hematoma in the August thirty-first

19  (31st) MRI.   He said that when he looked at it he

20  saw a subacute subdural hematoma.   And it could have

21  possibly been a lipoma as initially expressed in that

22  radiology report.   He told you in the December first

23  MRI he observed subdural hematomas on the right and

24  the left side.   Subacute in the parietal and

25  occipital area --- area.   Chronic or older in the

53

1    frontal lobe area.    And in the left temporal area an

2    acute subarachnoid hemorrhage.    Brand new in the

3    subarachnoid space.    And remember he put those

4    diagrams up on the screen for you.    The subarachnoid

5    space is a different layer of the brain than the

6    subdural space.

7        When you think about it, think about a box that

8    is packaged and wrapped.    And that box has to be

9    shipped so it's put inside of another box.

10   Different layers of the brain that are separated, the

11   subarachnoid space and the subdural space.    And in

12   that subarachnoid space a brand new hemorrhage.

13       People's Exhibit 17, the autopsy protocol.    I

14   encourage you to ask for that and to look at that in

15   your deliberation.    And note where Doctor Dragovic

16   talks about the subarachnoid hemorrhage in the

17   temporal area.

18       Now you've heard testimony from Detective

19   Sederlund and Sergeant Sovik, the two officers that

20   were assigned to investigate these injuries to

21   Madison.    They told you that they received a call on

22   Saturday, December second, of two thousand and six

23   (2006).    That they were not working that day, that

24   they each came into the station sometime late in the

25   evening.    They told you about the different things

54

1    that they did after they were briefed.    Attempting

2    to interview the first responders, the firefighters.

3    Attempting to interview the paramedics.    Detective

4    Sederlund talked about trying to find something to

5    record an interview with.    And that in their small

6    department in a drawer stuffed in with some other

7    things he found an old cassette recorder.    That it

8    didn't work.    And when he looked at it the battery

9    compartment was corroded.    He got some new

10   batteries.    That still didn't work and he threw it

11   out.

12       Sergeant Sovik told you he made an attempt to

13   locate a recording device but they didn't have any.

14   And they left the police and they went to Northville

15   Township Police Department.    After they left there

16   they went to the University of Michigan Hospital.

17   They were met by Sarah Weaver from protective

18   services in Washtenaw County and they spoke with her.

19   They went up to the pediatric intensive care unit and

20   they spoke with a doctor in a conference room.

21   After that they asked if they could speak with

22   Heather McBurney.    And a nurse, Regina Cunnard

23   (phonetic) stayed in the room with Heather while they

24   spoke with her.    They told you they spoke with her

25   for about an hour to an hour-and-a-half.    That she

55

1    was frail, that she was upset and she was crying.

2    Of course they spoke with Heather McBurney.    There

3    were only two people with that baby that day, Heather

4    and the Defendant.

5        After they spoke with Heather they interviewed

6    the Defendant.    They told you that he was not under

7    arrest at the time.    And that he agreed to speak

8    with them.    And he told them that he and Heather had

9    been married for two years.    That they had one child

10   Madison who was almost a year old.    That Madison

11   suffered from hip dysplasia.    That she was born with

12   that and she had to wear a brace.    And he told them

13   that he had no other children.    They asked him what

14   happened on November thirtieth (30th) of two thousand

15   and six (2006).    He talked to them about Madison

16   throwing up through the day and not feeling well.

17   He said that, 'Heather left for work at about six

18   o'clock (6:00) and that Madison had been put down for

19   a nap just before that', as was their normal routine

20   because Madison was suffering from separation

21   anxiety.    He told them that Madison was a bit cranky

22   but nothing out of the ordinary when she woke up.

23   And that he took her to the living room and put her

24   in the bouncy seat and gave her a bottle.    He said,

25   'That she spit the bottle out.'    That he took her to

56

1     the bedroom to change her.   And he changed her

2     diaper, put on her pajamas and brace.   That he sat

3     her on the floor while he was putting something away

4     and she began to have difficulty breathing and was

5     gurgling on her spit.   He said, 'That it was normal

6     or common for her to gurgle on her spit.'   He told

7     them that she fell backwards and began seizing, that

8     her limbs were rigid and she became unresponsive.

9     He said, 'Her limbs loosened.'   He disrobed her

10    because he was having a hard time seeing if she was

11    breathing and he called nine-one-one (911).   He told

12    them that he gave her rescue breaths.   He said, 'The

13    fire department and an ambulance arrived and Madison

14    was taken to U. of M. Hospital'.

15         Sergeant Sovik asked the Defendant about

16    Nicholas Kennedy and the Northville Township

17    investigation.   And his response was that Nicholas

18    Kennedy was not his son.   Sergeant Sovik asked him

19    about the injuries to Nicholas and he said that he

20    wasn't responsible for the injuries to that child.

21    Sergeant Sovik asked how that child suffered or

22    sustained fractures.   Asked if he had told Heather

23    about the investigation.   And the Defendant said he

24    hadn't.   When Detective Sergeant Sederlund told him

25    that the injuries sustained by Madison were the same

57

injuries that Nicholas Kennedy sustained, the Defendant's response was, 'Those injuries were worse.'

The Defendant admitted to them that he and Heather were the only caretakers of Madison on November thirtieth (30th) and in the immediate days before that. Sergeant Sovik confronted the Defendant and told him that there was medical evidence that Madison had suffered from nonaccidental trauma due to abuse. And the Defendant denied responsibility for Madison's injuries. Sergeant Sovik asked the Defendant if he was saying that his wife, Heather, did this. And his response was, 'I don't know. I can't believe that she would do something like this.'

When asked what should be the penalty if this is an accident his response was, he should have to go to the funeral and burial. He claimed to the detectives that a couple months prior, and you can compare this to the St. Jo's Ann Arbor records which were admitted into evidence, which are dated February of two thousand and six (2006), but the Defendant said a couple of months prior he was carrying Madison in a bouncy chair. That it caught on furniture. That she tipped out of the chair and fell five feet

58

1  and was taken to St. Jo's in Ann Arbor to the

2  emergency department. When you think about whether

3  or not that statement's credible, think about the

4  fact that Sergeant Sovik testified that the Defendant

5  is approximately five feet eight inches in height but

6  claimed that Madison fell from a distance of five

7  feet.

8  The Defendant said to the officers, 'My life is

9  over.' And Sergeant Sovik told him, 'I know you

10  caused these injuries. Tell us what happened.'

11  They asked him if it would be easier, uh ---

12  would it be easier to talk about this or tell this if

13  Heather was there. And he asked to see Heather.

14  Sergeant Sederlund continued to talk to the Defendant

15  while, excuse me, Sergeant Sovik continued to talk to

16  the Defendant while Detective Sederlund went to get

17  Heather. When she came back in the room she sat

18  down next to the Defendant. There was a statement

19  made and then the Defendant said, 'You knew about

20  Nicholas Kennedy?' And said he would have told her

21  but things were going well and moving quickly and he

22  didn't want to ruin it. And said, 'I made a

23  mistake. I threw her into the crib.'

24  Sergeant Sovik testified the Defendant said that

25  Madison had been difficult. That it had been hard

59

1     for him to deal with her.   That he wished that

2     Heather had been put on a dayshift so they could tag

3     team Madison.   And then he said, 'You know how

4     difficult it is for me to care for her due to her

5     separation anxiety.'

6         He was asked what happened in Madison's bedroom.

7     And he said he put her in the bouncy seat in the

8     living room.   He gave her a bottle.   She spit that

9     up.   He picked her up.   He took her back in the

10    bedroom.   He changed her.   Put her in her pajamas.

11    Put her brace on.   And he said, 'She was screaming

12    and crying as this was happening.'   That she

13    continued to scream and cry.   That he attempted to

14    console her.   Picked her up and she was screaming

15    and crying in his ear.   And then he got mad and

16    frustrated and threw her into the crib.   He said he

17    was about two feet away from the crib.   And he said

18    he threw her into the crib and her head hit the bars.

19    The Defendant claimed she was immediately

20    unresponsive and seizing.   And that he grabbed her

21    and tried to help her.   That she was limp and having

22    trouble breathing and he disrobed her.   That he

23    called nine-one-one (911) and he gave her rescue

24    breaths.

25        After the Detectives got that statement about

60

1   what had happened, they obtained consent to search

2   the home of the McBurney's where photographs were

3   taken and the crib was taken into evidence.

4        Now you heard testimony from Detective Sergeant

5   Paul Sumner of the Northville Township Police

6   Department who told you that in February of nineteen-

7   ninety-eight (1998) he was a detective for their

8   department.   And he was assigned an investigation in

9   the early days of March of nineteen-ninety-eight

10  (1998) to investigate injuries received by a child by

11  the name of Nicholas Kennedy.   He told you that he

12  went to Northridge Apartments off of Seven Mile Road.

13  And he spoke with the Defendant.   The Defendant let

14  him come in the home.   They sat at the kitchen table

15  and they talked.   He identified the Defendant.   And

16  he told you that the Defendant said, 'Nicholas

17  Kennedy was his son.'   And that he didn't know how

18  he was injured.   That at that point he gave the

19  story that at one time he was stepping over a child

20  seat while carrying Nicholas and tripped and fell but

21  Nicholas never hit the ground.   Boy does that story

22  sound like something else, doesn't it?   Then on

23  February twenty-seventh (27th) of nineteen-ninety-

24  eight (1998) he had watched Nicholas after work.

25  That he was the caretaker alone for Nicholas and when

61

1　　Nicholas stopped breathing he called nine-one-one

2　　(911).  He wrote out a statement.  You can ask to

3　　look at that statement, People's Exhibit 7.

4　　Sergeant Sumner said after he spoke with him he left

5　　the Defendant's home and that later that day, in the

6　　evening, he got a call from the Defendant.  He

7　　doesn't remember after almost ten years the nature of

8　　that call except that the Defendant was coming up to

9　　the police station to talk with him.  He said he was

10　　not under arrest.  In fact after they spoke at the

11　　police station the Defendant left on his own.  Said

12　　they spoke in an office.  And at the point the

13　　Defendant claimed to him that when Nicholas was a

14　　month and a half old he accidentally dropped him from

15　　his lap.  And that the baby fell two to three feet,

16　　landed on his back on the carpeted floor that's over

17　　cement underneath.  And that he didn't tell anyone

18　　this had happened.  Sergeant Sumner told you the

19　　interview continued.  The Defendant began to cry and

20　　then he said that on February twenty-seventh (27th)

21　　of nineteen-ninety-eight (1998) that he returned home

22　　from working the midnight shift at about six-thirty

23　　(6:30) in the morning.  That his girlfriend,

24　　Nicholas's mother, left for work at about seven a.m.

25　　7:00am).  That he tried to give Nicholas a bottle.

62

1       That Nicholas was upset and crying and he wouldn't

2       stop.   The Defendant became frustrated and he began

3       bouncing and shaking the baby on his hip.   And that

4       he called nine-one-one (911) after the baby stopped

5       breathing.   Sergeant Sumner testified the Defendant

6       said he knew he was bouncing and shaking Nicholas too

7       hard.   That it was harder than Nicholas's mother

8       would have done.   And he knew that his actions

9       caused the injuries to his son.   His written

10      statement at that point, People's Exhibit 8, was

11      admitted into evidence.   And Sergeant Sumner told

12      you the Defendant didn't go into the detail in the

13      written statement that he gave in the oral statement.

14      And that that's not uncommon.

15          Ladies and Gentlemen, I encourage you to ask for

16      and look at the medical records of Nicholas Kennedy,

17      People's Exhibit 16.   Ask yourselves if this sounds

18      familiar.   Subdural hemorrhages, retinal

19      hemorrhages, subarachnoid hemorrhage, and in

20      Nicholas's case, skull fracture.   The medical

21      records show that Nicholas Kennedy was between four

22      and four and a half months of age on February twenty-

23      seventh (27th), nineteen-ninety-eight (1998) when he

24      was admitted to Children's Hospital of Michigan.

25          There was a stipulation that Madison's body was

63

1   transported, that there was a chain of custody.   On

2   December fifth of two thousand and six (2006) from

3   the University of Michigan Hospital to the Oakland

4   County Medical Examiner's office by Michigan Removal

5   Service.

6        You heard testimony then from Doctor Dragovic

7   who is the Oakland County Examiner.   He's a forensic

8   pathologist and specializes in the area of

9   neuropathology, the pathology of the brain and the

10  nervous system.   Unlike any other witness in this

11  case, Doctor Dragovic was able to see Madison's brain

12  and her body in ways that a treating physician

13  doesn't get to look at because they're trying to

14  maintain and preserve life.

15       He told you that his autopsy revealed that

16  Madison had what he called an old, or remote bleed

17  and a new bleed.   And you'll recall he talked about

18  the word organizational or organizing, the process of

19  healing.   And he said that the old bleed was

20  organized.   It had completed organization.   He said

21  that it was approximately three to four months,

22  possibly beyond.   And he said there was no

23  scientific way to accurately gauge the age.   He told

24  you that the new bleed was organizing and it was days

25  old from Madison's, the time of Madison's death.

64

1       He said she suffered from severe brain swelling

2   due to reaction to blunt trauma of the head that was

3   the cause of her subdural bleed.  And she suffered

4   the complications, infarcts, necrosis and herniation.

5   He found evidence of hemorrhaging to the retinas of

6   both eyes.  And he told you, and it's in the autopsy

7   protocol, that there was an epidural bleed in the

8   spine, below the neck to the upper back area that is

9   indicative of blunt force trauma to that area of the

10  back.  He testified that the cause of Madison's

11  death was blunt force trauma and its complications.

12  And he tried to explain to you the difference between

13  --- or what blunt force trauma is.  You'll recall he

14  talked about an unyielding surface.  If you remember

15  first, he demonstrated with the doll up here on the

16  bar.  And then he got up and he demonstrated with

17  the doll several times on the crib.  And he talked

18  about that unyielding surface.  That when the head

19  impacts with a surface that does not yield or give

20  way that there's a lag of the brain.  And the sudden

21  snapping movement will create ripping of the blood

22  vessels that result in bleeding.

23      He testified he has done numerous autopsies.

24  And he told you that it is not unusual not to find

25  bruising or external injury to a body or to find

65

1    injury inside the body from blunt force trauma.

2    That some types of padding can protect the body from

3    fracture or bruising or laceration. He told you

4    that Madison's injuries were consistent with a child

5    being thrown into a crib from two feet away and

6    hitting the head against the wooden slats. He told

7    you that her manner of death is homicide. That this

8    was a purposeful act of another person. Remember,

9    Madison McBurney was not crawling. She was not

10   trying to pull herself up. She was not walking.

11   This child was not ambulatory. In many ways for a

12   child her age she was disabled and she relied on

13   another human being, an adult, to move her around

14   with the exception of being able to push herself up

15   and to let herself down.

16   He told you that Madison was rendered brain-dead

17   by these injuries. That there was no evidence of

18   infection from his autopsy. And the MRSA and the

19   skin congenital problem and the hip dysplasia had

20   nothing to do with her cause of death. And he told

21   you based on Madison's physical impediment, he knew

22   she didn't do this to herself. That she could not

23   have climbed up on something and fallen or jumped

24   down off of something.

25   He was asked questions about how much force is

66

1    necessary to cause this injury. And he testified

2    the outcome is the reflection of the force. That

3    you can't actually conduct a physical measurement of

4    it but you know based on the outcome. And in this

5    case you know how serious Madison's injuries were.

6    He told you that subdural hematomas do not

7    spontaneously rebleed, that some force is required.

8    You'll recall he was asked repeated questions about

9    diffuse axonal injury and hypoxic-ischemic injuries.

10   And he said those terms are often mixed-up and it

11   takes an autopsy and an actual examination of the

12   brain to sort it out. He said in Madison's case

13   these injuries were not a result of the loss of blood

14   or oxygen supply. He knows from the autopsy from

15   looking, from fixing the brain in formalin and

16   conducting an examination. And you saw the pictures

17   of how detailed that examination of the brain was.

18   And he even testified that they went on to do a

19   microscopic examination. He said the blood and

20   oxygen supply was lost as a result of the consequence

21   of the blunt trauma to Madison's head.

22       He told you Ladies and Gentlemen, that that old

23   blood, that chronic or remote hematoma, that that is

24   not normal. That's abnormal to that subdural space,

25   that subdural space. And it got there as a result

67

1      of trauma.

2            Now Ladies and Gentlemen, you heard from some

3      defense witnesses in this case.  Sharon Klump and

4      Lynn Peterson, very nice ladies that worked for

5      Pitter Patter.  But they only knew this family and

6      this baby for six weeks.  They testified that they

7      would see the Defendant in the morning when he

8      dropped her off.  They never saw any signs of

9      separation anxiety although Heather McBurney

10     testified about the separation anxieties but they

11     never saw Madison on November thirtieth (30th).  In

12     fact, they recall after there was a diagnosis of

13     MRSA, sometime around November thirteenth (13th) or

14     fourteenth (14th), if you rely on your memories for

15     the day, that Madison didn't return to the daycare.

16     So they didn't see her November thirtieth (30th) or

17     the days immediately preceding that.  And they had

18     no idea how the Defendant behaved when he was alone

19     with Madison.

20           You heard testimony from Heather McBurney's

21     father, Gary Linville who told you that he heard the

22     Defendant tell two different stories.  That the

23     Defendant told him that he'd been changing Madison's

24     clothes in the living room, went back for an outfit

25     and the baby fell over and went into convulsions.

68

1    But at another point in the hospital when there were

2    some friends there, he heard the Defendant say that

3    he'd been changing Madison's clothes in the bedroom

4    and she went into convulsions.

5         What is it that our mothers used to say about?

6    If you tell the truth you don't have to remember it

7    because it's the truth.    It's the lies that are

8    difficult to remember.

9         Now I don't have much to say about Doctor

10   Uscinski's testimony.    This is a man who goes around

11   the country and testifies.    Testifies only on behalf

12   of the defense.    He testified he has never testified

13   on behalf of the prosecution.    He goes around and he

14   testifies about children that he's never seen, that

15   he's never touched, that he's never treated.    He

16   wants to tell you that he knows better than Doctor

17   Maher, who was the pediatric neurosurgeon, who did

18   the procedure on Madison and treated her.    He wants

19   to tell you that he knows better than Doctor Ibraham

20   who is a pediatric neuroradiologist.    Unlike Doctor

21   Uscinski, Doctor Ibraham is board certified in the

22   area of pediatric neuroradiology.    Recall Doctor

23   Uscinski is just simply a neurosurgeon and that he

24   doesn't even specialize in children.    He treats

25   children and adults.    And he wants you to think that

69

1    he knows better than Doctor Dragovic, a forensic

2    pathologist, a neuropathologist.    Recall how many

3    autopsies Doctor Uscinski said he's personally done.

4    I believe the answer was, 'Zero.'    He knows better

5    than the man who looked at Madison's body, who fixed

6    her brain in formalin and had to examine her brain,

7    and who looked at microscopic slides of Madison's

8    brain.    He knows better.    Doctor Uscinski wasn't

9    present for any of these things.    And he didn't call

10   and talk to any of these people.    He made some

11   reference to bumping into Doctor Dragovic a week or

12   so before the trial at a conference.    He didn't call

13   and talk to him about his findings and ask questions

14   and ask to look at things.

15      The Defendant had to go a long way to find

16   somebody who would dispute these doctors.    All the

17   way to Maryland or Virginia for twelve ($12,000) or

18   thirteen thousand dollars ($13,000) of his time.

19   And recall how much of an argument he had to give me

20   about was he getting paid for his time or his

21   testimony, instead of just coming out and saying,

22   'I'm paid this.'    Apparently you can get anyone to

23   say anything for enough money.    Although in Doctor

24   Uscinski's case it's not just anything is it?    He

25   has a pattern of testifying that it's a chronic

70

1    subdural rebleed.   Forgetting the conflicting

2    statements by the Defendant.   Forgetting the fact

3    that there was an epidural hemorrhage to the spine.

4    Forgetting the fact that there was a subarachnoid

5    hemorrhage that's in a different space than the

6    subdural.   This man for that much money and his

7    thirty (30) hours couldn't even remember the sex of

8    this child when he testified.   He told you this was

9    a boy.   He kept calling Madison he.

10        You heard testimony from Doctor Adams who was

11   Madison's pediatrician.   He told you that he saw

12   Madison since she was about a week or two old.   That

13   every time with the exception of one time, Madison

14   was with her mother.   And now that one time she was

15   with her father.   He told you that he was never told

16   about the February twenty-sixth (26th) incident when

17   Madison was taken to St. Joseph's Hospital and

18   emergency room in Ann Arbor.   Never received any

19   medical records.   Was never given that in a follow-

20   up history.   He testified he was never given a

21   history of any accidents to Madison or any falls.

22   And he told you those symptoms that Heather McBurney

23   testified about that happened on November thirtieth

24   (30th), those are consist with the stomach flu too.

25   He told you that as a practice he would check --- he

71

1     would check the fontanel or soft spot during her

2     physical exam and he was never concerned with that.

3     And he told you that, 'You don't throw infants

4     because injuries can happen.'

5          Now the Defendant is charged with Felony Murder.

6     And remember again we talked about this crime being

7     made up of parts.    And it's the responsibility of

8     the People to prove each and every part or element of

9     this crime beyond a reasonable doubt.    And that's

10    all we have to prove.

11         The first part or element that the Defendant

12    caused the death of Madison McBurney.    How do you

13    know that the Defendant caused her death?    You know

14    this because on November thirtieth (30th) of two

15    thousand and six (2006) when Heather McBurney left,

16    her daughter was fine.    She was in her crib.    She

17    was playing with a toy.    She kept food down.    She

18    seemed back to normal.    You know that this child,

19    that Madison, was alone with the Defendant during

20    that period of time.    And that shortly after seven

21    p.m. (7:00pm) now suddenly Madison is nonresponsive.

22    Within three minutes the first responders are there.

23    And don't forget the Defendant said he'd been giving

24    her rescue breaths.    They give her oxygen.    She's

25    put in an ambulance.    She's taken to University of

72

1    Michigan Hospital.   And she's given medical

2    treatment.   They do everything they can think of to

3    help her within reason.   But by December fourth of

4    two thousand and six (2006), Madison is dead.

5            MR. WHITE:   Your Honor, I'm going to

6    object to this illustration.   This does not

7    correctly state Jury's instructions.   It doesn't.

8    There's matters that are omitted here Judge.   And if

9    she's going to put up what you're going to instruct

10   the Jury, I'd ask that it be word for word.   This

11   does not.

12           MS. POPE-STARNES:   Your Honor, this is a

13   demonstrative Exhibit.   As I indicated in opening to

14   the Jury they have to rely on the instructions of the

15   Court.   And I will explain to the Jury why I am only

16   listing one of the mens rea requirements on two.

17           THE COURT:   Ladies and Gentlemen, I will

18   just let you know also that I will be reading the

19   full instructions to you.   This is comprehensive.

20   Umm --- just keep that in mind, okay?

21           Go ahead Counsel.

22           MS. POPE-STARNES:   Thank you.

23           Now again, what evidence do you have of the

24   cause of death?   You know from the autopsy the cause

25   of death was blunt force trauma.   There are old and

                          73

1    new hematomas, subdural and subarachnoid.   You know

2    that there is new hemorrhaging to the spine area that

3    is consistent with blunt force trauma.   Doctor

4    Dragovic told you that force is necessary to do this.

5    And this child was not ambulating.   Someone had to

6    have done this to her.   And the Defendant said, 'I

7    threw her into the crib.'

8         Now number two, the state of mind.   Now the

9    Judge will read you this instruction that talks about

10   that we have to prove the Defendant had one of three

11   states of mind, the intent to kill, the intent to do

12   great bodily harm, or knowingly create a very high

13   risk of death or great bodily harm knowing that death

14   or such harm would be the likely result of his

15   actions.   The one I want to ask you to focus on

16   because I only have to prove one of those three not

17   all three is the one that I have on this

18   demonstrative Exhibit.   That the Defendant knowingly

19   created a very high risk of great bodily harm knowing

20   that such harm would be the likely result of his

21   actions.

22        How do you know that?   Doctor Adams told you,

23   'You don't throw babies because they can get hurt.'

24   Ladies and Gentlemen, everyone knows we don't throw

25   babies because they can get hurt.   And that

74

1      Defendant knows it better than anyone else because in

2      nineteen-ninety-eight (1998) he injured a child with

3      fractures and hematomas and retinal hemorrhaging.

4      He knows personally.  He's done it before.   He

5      knows great bodily harm can result to a child from

6      rough handling because he's done it before.   He's

7      not a new father that has a brand-new baby and he

8      doesn't know what to do.   He's someone who has done

9      this before, these same types of injuries.   He knew

10     what the likely result of that was.

11          And Ladies and Gentlemen, if he wants to argue

12     that he didn't know that she had a preexisting

13     condition, look at the Defense Exhibit BB where

14     Doctor Adams talks about in his Exhibit and talks

15     about on the stand, he told the Defendant the results

16     of that MRI from August thirty-first (31st) of two

17     thousand and six (2006).   It says right in this

18     medical record, lipoma or blood.   And that man knows

19     what blood in a baby's brain means because he has

20     experience in this.   He knew of that risk.

21          Look at the pictures of this bedroom.   Ask to

22     see these pictures.   This bedroom is filled with

23     furniture and toys.   A bed, a chair, a changing

24     table, a swing, toys.   No matter where he threw her

25     in that room she was going to get hurt.

75

1       And remember what Doctor Dragovic said.    'You

2    can't give a mathematical measurement to the force

3    used but the outcome is a reflection of the force.'

4       And finally in order to prove felony murder, the

5    People have to prove that when the Defendant caused

6    the death of Madison, he was committing the crime of

7    child abuse in the first degree.

8       Now let's talk about child abuse in the first

9    degree.    Two of these elements are uncontraverted.

10    It is uncontraverted that he was the father of

11    Madison McBurney.    And it is uncontraverted that

12    Madison was under eighteen (18) years of age.    So

13    all that leaves to prove is that he did knowingly or

14    intentionally cause serious physical harm.    The

15    statement was not, 'That he dropped her.    That she

16    slipped out of his hands.    That he lost control of

17    her.'    But it was, 'That he threw her.'    Throwing

18    is an intentional act.    It's not an accident.    It's

19    intentional.    He knew he would cause serious

20    physical harm.

21       Now the instruction talks about the definition

22    of things that are serious physical harm, including

23    but not limited to brain damage, or skull or bone

24    fracture, subdural hemorrhage or hematoma,

25    dislocation, sprain, internal injury, poisoning,

76

1    burns, scalds, or severe cuts.   Brain damage.

2    Madison suffered brain damage.   Subdural hemorrhage

3    or hematoma.   There's testimony of that.   Internal

4    injury.   The hemorrhage to the spinal area which

5    Doctor Dragovic says is caused by blunt force trauma.

6    He knew this would cause serious physical injury and

7    he knew because he's done it before.   He knows what

8    the rough handling of an infant results in.

9         Now you're also going to be given instruction

10    about a lesser offense of second degree murder.

11    That he has to prove --- that we have to prove that

12    he caused the death of Madison.   And again,

13    remember we talked about those three states of mind.

14    And that we only have to prove one of those three.

15    And the one I ask you to focus on is that he

16    knowingly created a very high risk of great bodily

17    harm, knowing that such harm would be the likely

18    result of his actions.   He knew.   He never told

19    Heather because he knew.   He lied about it because

20    he knew.

21         You're also going to get an instruction on

22    involuntary manslaughter.   And I ask you to listen

23    very carefully to that.   And I'm not going to go

24    through the details of that.   But one of the

25    requirements is that the Defendant acted in a grossly

77

1    negligent manner.   Ladies and Gentlemen, this is not

2    a case of gross negligence.   We are not talking

3    about somebody that's playing with a child, maybe

4    swinging them around and isn't doing it in a safe

5    area, is grossly negligent and the child gets

6    injured.   We're talking about an intentional act.

7    Throwing is not an accident.   He never claimed he

8    dropped her or lost control of her or that she

9    slipped.   He said he threw her.   It's an

10   intentional act.   It's not gross negligence.   It's

11   intentional.

12       Now it's clear from the testimony in this case

13   that the defense is going to argue that this was an

14   accident.   What evidence do you have to show that

15   this was not an accident?

16       They offered testimony through Doctor Uscinski

17   that there was a chronic subdural hematoma that bled,

18   re-bled.   It was possibly spontaneous and could

19   happen with a cough or a burp.

20       Doctor Dragovic told you that some force is

21   necessary.   And you can tell, you can gauge the

22   force by the outcome.   This child had extensive

23   injuries to her brain.   Look at the autopsy

24   protocol.   Look at the medical records.   And recall

25   Doctor Maher, the neurosurgeon from University of

78

1    Michigan talking about the extent of this child's

2    injuries. And how this is so inconsistent with a

3    chronic rebleed because her injuries were so

4    extensive.

5        When you think about whether or not this is an

6    accident, think about how many different statements

7    the Defendant made. If this was an accident tell

8    the truth from the beginning. Why not tell the

9    truth? If you didn't do anything wrong, why not

10   just tell the truth? Why the need for all these

11   different statements?

12       When you're wondering about whether this was an

13   accident and you're considering that, think about the

14   conflicting statements he made in Nicholas's --- the

15   investigation involving Nicholas Kennedy. First

16   denying any injuries. Then giving some stories

17   about tripping or about Nicholas falling off of his

18   lap accidentally. When you think about those, think

19   about was he even completely truthful in his last

20   statement where he claimed that he was shaking and

21   bouncing the baby too hard on his hip. Because

22   remember Doctor Dragovic, I believe it was, talked

23   about what it takes to cause a skull fracture.

24   Something more was done to Nicholas to actually

25   fracture his skull.

79

1        This was not an accident.   This Defendant knows

2   what rough handling of an infant can do.   He knows

3   the likely result of these actions is great bodily

4   harm.   Remember.   How did he describe Nicholas's

5   injuries compared to Madison's?   Those were worse,

6   except Madison's dead.

7        Ladies and Gentlemen, Madison McBurney deserved

8   better than this.   This was a baby who was born with

9   a little congenital skin disorder to her scalp.   She

10   was born with hip dysplasia which in some ways

11   disabled her for a child that age.   Couldn't learn

12   to crawl, pull herself up or walk by eleven months.

13   Had to rely on her parents and her caretakers to move

14   her.   This baby deserved better than this.   She

15   deserved to be treated with gentleness and care.

16        And what ways do babies have to communicate with

17   us when something's wrong?   When they don't feel

18   good or they're hungry or when their diaper is wet or

19   dirty?   They cry.   And a crying baby is no reason

20   to throw them.   And this Defendant knew from

21   Nicholas Kennedy, his son, and the injuries that

22   Nicholas sustained as a result of what he did to

23   Nicholas what the likely result of his actions were.

24        Ladies and Gentlemen, we have proven each and

25   every element of the crime of felony murder, and

80

1    first degree child abuse in this case.    And I would

2    ask you to find the Defendant guilty as charged.

3            Thank you.

4                THE COURT:    Thank you.

5        Mr. White.

6                MR. WHITE:    On behalf of my client, Mr.

7    McBurney, I also wanted to thank you for your

8    patience in this very lengthy trial in which there's

9    been a lot of complicated medical terminology.    And

10   there is --- you're involved in the decision

11   involving a real human tragedy.    Not TV, not

12   magazines, not somebody else.    You are involved in

13   interpreting and deciding facts and how the law

14   applies to these facts.    And a loss that as a parent

15   you can have no greater.    No one should ever, ever

16   outlive their children at any age.    Umm --- the

17   length we can all agree though is necessary if ---

18   because matters of such importance are involved.    I

19   think it's better to err on the side of caution.

20       I told you from the beginning during the Jury

21   selection this would be very challenging, both

22   viscerally in your guts and intellectually because it

23   involves the death of a baby.    It involves the ---

24   it involves a father accused of murdering her.    It

25   involves a father who had prior child abuse

                          81

1    investigation ten years ago.

2        And I ask you at the outset your willingness to

3    separate the emotion that's created by those charges

4    and the prior investigation from the application to

5    the --- of the facts of the law of this case.    And

6    what I do believe that you've been able to see is

7    there is a difference between actual facts and

8    evidence.    And there is a difference between truth

9    and ambition.    And there's a difference between the

10   fair presentation of the facts and circumstances

11   involving Madison's death and the desire to win at

12   all costs.

13       Now before I comment on the prosecution's

14   proofs, I will tell you from the beginning that

15   Steven McBurney is a careless man.    Careless.    He

16   was careless with Nicholas.    He was careless with

17   Madison.    And on November thirtieth (30th) he did a

18   stupid thing.    He threw her into her crib where she

19   hit her head on the mattress.    Deplorable parental

20   discretion.    However this is a charge of murder.

21   First degree felony murder and first degree child

22   abuse.    And what has done --- and what the

23   prosecution has done with manipulation of evidence is

24   suggest to you that carelessness is murder, is an

25   intent to cause death, great bodily harm or knowingly

82

1    create the high risk of death or great bodily harm,

2    knowing that that result would occur.

3         And they would like you to arrive at this

4    conclusion based upon the emotion that's engendered

5    from an old --- ten-year-old case and the uh ---

6    Nicholas Kennedy's injuries.   That should be the

7    emotional impetus for you to forget about the facts

8    in this case.   To overlook the unrebutted evidence

9    that Madison's death was accidental.

10        What the prosecution is suggesting is careless

11   once, can't be careless twice.   It has to be

12   something else.   And that they ask you to uh ---

13   reach that conclusion based upon emotion and not

14   intellectual dissection of the evidence in this case.

15        The first question I ask for you to ask

16   yourselves when you go back into the Jury room is,

17   has the prosecution been fair with the presentation

18   of evidence?   Have you got a fair umm --- picture of

19   the evidence both inculpating, that is indicating of

20   guilt, and exculpating, indicating innocence.

21        The first question I ask you to ask yourselves

22   is, why didn't the police in either case produce the

23   actual recorded statements of Steven McBurney?   Why

24   did Detective Sumner emphatically deny on his

25   examination that he recorded Steve on March second,

83

1     nineteen-ninety-eight (1998) when he came into ---

2     into the police station?  Yet when confronted with

3     his prior testimony says, 'Oh yes.  I remember.  I

4     had a recorder but I stuck it in my pocket.  I

5     thought I put the tape in correctly.'  But it turned

6     out after the interview was over he discovered that

7     he had put the tape in wrong and it didn't record.

8     Why did he boast that the law does not require a

9     recording?  Why do Steven's written statements not

10    reflect the statements that he allegedly made to

11    Detective Summer --- Sumner that day?  Why is there

12    no mention of shaking Nicholas?  Why does --- does

13    Steven admit that he dropped Nicholas on a carpeted

14    cement floor?  Why does Nick --- Steven only say

15    that he shook Nicholas, excuse me, he bounced

16    Nicholas too hard on his hip, harder than what the

17    mother, Christa, normally did?

18         Because that's what was said as Detective Sumner

19    stood over him.  And that was --- which was done.

20    There was accidental injury in Nicholas Kennedy.

21    Accidental, ten years ago.  And no matter how

22    difficult, how alarming those injuries may seem,

23    there's nothing to indicate that they're more ---

24    nothing more than accidental.  And look at the

25    medical records.  Look.  Nicholas had skull

84

1     fractures indicative of being dropped on a carpeted

2     cement floor.  He had chronic blood loss indicating

3     old blood from just like you learned in this case,

4     old blood.

5         That is the impetus the prosecution wants you to

6     have in determining that Madison's injuries were

7     intentional.  Why didn't Sederlund and Sovik produce

8     the recorded statement, the actual recorded

9     statement?  Why haven't they?  Why have they

10    continually denied it?  Why did they make ---

11    testify that they made, you know, in their big case,

12    their first big case, they made some half-hearted

13    effort to get a recorder.  Looked in a drawer,

14    looked, you know, and then that was supposedly the

15    end of it.  Knowing they're going to interview

16    doctors.  Knowing they're going to interview both

17    parents.  Knowing that this is a case of potentially

18    extreme medical complexity, why wouldn't they do

19    something else?  Seven-thirty (7:30), eight o'clock

20    (8:00) on a Saturday night.  Here they're suggesting

21    the South Lyon Police Department has no recording,

22    viable recording devices.  Why wouldn't they just

23    stop at Best Buy?  Why wouldn't they go --- they

24    went to the Northville Police Department.  Why

25    wouldn't they ask them for a recorder?  They were at

85

1       the University of Michigan Hospital.  You know, why

2       wouldn't they ask?

3           Well because they didn't have to because they

4       had a recorder.  They recorded his statement.  And

5       you can see from what happened with Sumner and what

6       with these two, it's a police trick to be able to

7       say, 'Well when an accused makes incriminating

8       statements but we don't have enough, we'll just say

9       we don't have a recording.  We'll just have our

10      notes which we'll later say are shredded.  And then

11      uh --- then the accused is unable to defend himself

12      from statements that we say he made but he didn't.'

13          However, I ask this.  Why did Kevin Schuldt

14      come in here and say, conveniently after the break,

15      that he could not remember if Detective Sovik asked

16      to record him on December second?  Was that being

17      fair with you?  Why would Detective Sederlund say he

18      sat across from Sovik for three-and-a-half hours

19      covering Steve's interview and not be able to say

20      whether Sovik took one single note?  Why would Sovik

21      say in April when he's testifying in this case, last

22      April, that he had his notes, they were around the

23      station somewhere but then later sign an affidavit

24      that they were shredded immediately upon the

25      completion of the police report?  Why would both

86

1     police officers put in their joint police reports

2     that upon Heather returning to the room Steven made

3     two quotes that are in quotes in the police report?

4          "I made a mistake.   I threw her into her crib."

5          Only things quoted.   Only things said.

6          Now it's not a coincidence Ladies and Gentlemen

7     that what Heather can remember of that joint

8     conference is exactly what is in quotes in their

9     statement and their report.   Steve said, 'I made a

10    mistake.   I threw her into the crib.'

11         Now what motivation would Heather have to say

12    that she believed Sovik had a recorder?   She heard

13    it.   She saw it on his person.   She saw it on the

14    floor when they were talking alone.   Why wouldn't

15    the words, mad, screamed, screamed in his ear, two

16    feet away, hit her head on the rails, why wouldn't

17    all those be in quotes?   Why if he really said those

18    words, knowing that they had been told by the

19    University of Michigan Doctor Fleming that Madison

20    was suffering from shaken-baby syndrome, why wouldn't

21    and there had been supposedly told that she hit her

22    head on one of the rails, why wouldn't they

23    immediately order forensic tests done of that crib to

24    determine whether there's any evidence of impact, any

25    evidence whatsoever?   Because remember, after those

87

1    statement's supposedly made, they stepped out of the

2    room, called the Prosecutor, and then got consent to

3    search the home and confiscate the crib. If those

4    statements were made, they certainly would have

5    ordered a forensic analysis of that crib because

6    that's evidence. And that's evidence if it's there.

7    If it's evidence indicating guilt. If it's not

8    there, it's evidence indicating innocence.

9         Why would Matt Calus, the young EMT, come in and

10    say in his direct testimony that the father gave no

11    history regarding the child being ill that day? Why

12    would he say that when it's right in his report,

13    child, excuse me, father indicated that child was

14    sick throughout the day? Excuse me. Child ---

15    father indicated that the child was vomiting

16    throughout the day. Why minimize this issue

17    regarding the respiratory distress that Madison was

18    in? And believe me, you've heard it over and over

19    again. They want to suggest that she was somehow

20    properly oxygenated. Why? Because lack of proper

21    oxygenation in a situation like this causes the brain

22    to swell. Why would they minimize this through this

23    kid's testimony when according to the firefighter

24    Schuldt, who was in the --- in the ambulance said,

25    'The child was in a state of extreme respiratory

88

1    distress'?

2        They were scrambling.    She was bag-valve

3    masked, being oxygenated.    That was not enough.

4    They couldn't intubate her.    Her pulse was dropping

5    to seventy (70) beats per minute.

6        And why this suggestion that there's

7    inconsistent histories regarding the child's medical

8    condition under these extremely frantic situations?

9    Craig Johnston saying that, 'There was no indication

10   from the father whether the child had MRSA or was on

11   any antibiotics', when it's clear that it was said?

12   It was said to Kevin Schuldt.    It was clear why?

13   Because why?    Why is this being done?    Because they

14   don't want to be fair with the presentation of the

15   evidence.    And again, remember, this is just ---

16   these are split-second decisions.    A lot is going

17   on.    Nobody is taking notes.

18       Now with the doctors that testified from

19   University of Michigan it's interesting, in fact,

20   it's compelling, that the prosecution would suggest

21   to you that Steven McBurney must have known that his

22   actions would cause serious physical injury to

23   Madison because of her preexisting condition that he

24   was informed of on her August thirty-first (31st) or

25   after the August thirty-first (31st) MRI.

89

1          Well if that's true, why didn't any University

2     of Michigan doctor, who at any time read that MRI,

3     know the same thing?   Why?   If Steven should have

4     known, being told that she had possible blood

5     products on her brain or a lipoma, why wouldn't the

6     doctors from U. of M. know also that this is

7     potentially a critical situation?   Why?   Why?

8          You'll answer that question why.

9          The word is hubris.   It is a Greek word for

10    pride.   Not just pride but pride above mistake.   It

11    is replete throughout our history that those who

12    believe they are beyond mistake are dangerous people.

13    And it's clear from the testimony of the doctors at

14    U. of M. they have to be beyond mistake in this case.

15    They have to be.   They have to suggest that this was

16    somebody's fault other than their own.   They have

17    to.    That is why Doctor Sikavitsas would argue with

18    me about the meaning of the word verbatim which is,

19    you know, I know the medical training is different

20    from the legal training and maybe we all come in

21    contact with that word probably in eighth or ninth

22    grade.   It means word for word.

23         Why would she say in her uh --- remembering of

24    the history the father said, 'She had been vomiting

25    since the previous day'?   Why?   Is there a

90

1    possibility she misheard things?   Is there a
2    possibility we have a critically ill injured child
3    that maybe you're not hearing things right?   Why
4    would they put --- why would this doctor put this
5    mistake on Mr. McBurney when it possibly could be her
6    own?   Why would she minimize most importantly the
7    respiratory distress of the child knowing that the
8    child was not breathing properly?   Had failed
9    intubation.   In fact, this doctor also could not
10   intubate initially.

11        Now you look at the records.   Please look at
12   all the Exhibits, prosecution's and defense.
13   Exhibit Number 1 is the University of Michigan's
14   records.   The child arrived at seven-fifty-five
15   (7:55) in the emergency department.   Intubation was
16   not completed until after eight-fifteen (8:15).   The
17   nine-one-one (911) call was at seven-nine --- the
18   child got up at seven (7:00).   The nine-one-one
19   (911) call was at seven-nineteen (7:19).   Arrival
20   was at seven-twenty-two (7:22).   For almost an hour
21   that child would not have a proper oxygen supply.
22   Why has that been minimized?   Why?   Because they
23   wanted to put --- they wanted to put Steven in the
24   worst light possible.   It has to be all his fault.
25   It can't be their fault.   It can't.

91

1       Why would Doctor Maher minimize the differential

2   diagnosis to fail to include a chronic subdural

3   hematoma, bleeding disorders, large intra-axial

4   spaces, possible infection?   Yet this doctor also

5   acknowledged upon cross-examination that a chronic

6   subdural hematoma can spontaneously rebleed.   And

7   remember that this is at the point of the

8   prosecution's proofs.   Now we took some witnesses

9   out of order because of the scheduling and

10  everything, that the prosecution is still pounding

11  that there's no new blood after the --- after August

12  thirty-first (31st) to September eleventh (11th) CAT

13  scan shows that all that blood went away, in fact, a

14  clear CAT scan, suggesting that there was continuing

15  injury after September eleventh (11th).   Yet Doctor

16  Maher indicated that these signs that Madison had

17  that day, the vomiting including projectile, the

18  lethargy, the clingingness (sic), the lack of being

19  herself, these are all indicative of traumatic brain

20  injury.   Symptoms of traumatic brain injury.

21       Doctor Dev, the head of the child protection

22  team, whose scientific opinion is --- is valued by

23  many but who would suggest to you on her direct

24  examination that four different histories were given.

25  And that simply was an inaccurate misleading

                            92

1     statement.   She only heard one.   As a scientist

2     that's all she could testify to.   But she could read

3     the records and see that other statements were

4     recorded from --- by other doctors.   And what was

5     said?   She didn't know.   Why is that being said?

6     Why is that being said?   As if not only Steve but

7     Heather is misleading people as to the circumstances

8     of Madison being there, to put blame on Heather, to

9     discredit her.   The parents.   The parents.

10        She said, 'The parents never told me about the

11    MRSA.'   Yet you look in those hospital records, the

12    nurses arriving --- the arriving nurse's record

13    clearly indicated MRSA.   The doctor who saw uh ---

14    Madison initially in pediatric intensive care, the

15    workup regarding the history was extensive including

16    MRSA, including taking Bactroban for MRSA, the

17    antibacterial ointment.   She would suggest to you

18    that despite all these other people, that the parents

19    said to her on December first, 'Madison was well all

20    day.'

21        And Bactroban being used for the aplasia which

22    is the congenital birth defect.   And her response to

23    me when I asked her, 'Could you have made a mistake,'

24    was on most occasions like a little teen-age, 'That's

25    what they said.'   Well that's not what they said.

93

1    The doctor made a mistake. But she must be above

2    mistakes because it's somebody else's fault. It's

3    Steve. It's Heather. Why would she claim --- why

4    would she claim that all the blood was gone when you

5    can see it from the nine-eleven (9/11) CT scan? Why

6    would she claim that? Why would she say, 'That

7    there's no evidence to suggest that Madison was not

8    properly oxygenated'?

9        Why would Doctor Odetola come in and say that he

10   suggested the craniectomy. And Doctor Maher

11   testified that it was discussed. The parents made a

12   decision. Yet he didn't feel strongly enough about

13   it to seek legal counsel. Is this just putting the

14   blame on the parents? And why do we have this last

15   doctor come in and testify after being contacted last

16   week about this case. Last week. Read the films.

17   Hurry it up. We need some testimony. And he

18   didn't look comfortable. And I don't think he

19   directly misled you but I also don't believe that he

20   understood why he was here. Because what he was

21   supposed to testify that the uh --- blood that was in

22   the CAT scan on November thirtieth (30th) was all new

23   from September eleventh (11th). He didn't do that.

24   He didn't do that at all. He said, 'That blood was

25   old, old. Three, four, five, six, seven months

1 old.'   And it was in the same spot as it was on

2 August thirty-first (31st).

3  And I'll ask you this.   This is --- this is

4 critical.   Why is the defense being put in a

5 position of being the first and the first witness to

6 actually put up the film?   Why are we --- why do we

7 have to prove our innocence by actually putting up

8 the MRI's and the CAT scans to show you --- show you

9 exactly where the blood was on August thirty-first

10 (31st)?   On September eleventh (11th) where the

11 differential spinal fluid was still in the brain?

12 Indications of blood on November thirtieth (30th) CAT

13 scan?

14  The Exhibits that you have to go in the Jury

15 room are smaller but these have been blown up.   Why

16 are we the first ones to show you the blood that was

17 here (indicating), that was ignored?   That was still

18 on August thirty-first (31st).   September eleventh

19 (11th).   And why didn't the last doctor, Doctor

20 Iverson (sic) put up the September eleventh (11th)

21 CAT scan to show you if it was supposedly clear?

22 Well obviously he couldn't because he said, 'The

23 blood was old.'

24  September, excuse me, November thirtieth (30th).

25 The blood in the same locations only expanded from

95

1     August thirty-first (31st).  So that was the first
2     testimony that you heard that the actual reading of
3     the CT's and MRI's showed an existence of chronic
4     subdural hematoma.   And isn't it interesting that a
5     prosecution did not ask one question of Doctor
6     Uscinski of a substantive nature?   Not one question
7     about his reading of the MRI of eight thirty-one
8     (8/31), of September eleven (11) CT scan, of November
9     thirty (30).   Why?   Why didn't she ask one
10    question?   Instead it was a personal attack on him
11    as a person, as a neurosurgeon, as a umm --- hired
12    gun.   Uh --- her prior case of the eighty (80) to
13    eighty-five (85) other cases that he's testified in
14    involving pediatric injuries.   The eight or nine he
15    had diagnosed a chronic subdural hematoma.

16        Why didn't the prosecution consult his own
17    medical examiner before the personal attack on Doctor
18    Uscinski who was the witness last Friday morning who
19    testified that clearly Madison had a remote subdural
20    hemorrhage in existence for three, four, five, six,
21    seven as late as eight months?   So the prosecution's
22    theory of the case must then change because we can't
23    say, 'That there's all new blood since September
24    eleventh (11th).'   We have to say something else.
25    We have to say that, 'Well there's old blood but it

                              96

1    doesn't make a difference.'

2        Now Doctor Dragovic said that, 'Madison's

3    injuries were as a result of blunt force trauma,'

4    although he could not say what part of the back of

5    the head.  He couldn't say how much force.  He

6    couldn't say what angle.  He could not say what

7    surface.  He could not say what trajectory.  He

8    just said, 'The swelling that started was started as

9    a result of a traumatic event.'  Although he did

10   tell you very candidly, 'That Madison was in a

11   vulnerable state because of her existing remote

12   subdural hemorrhage.'  And it would take less force

13   than it would normally under those circumstances to

14   cause the trauma giving rise to the swelling which

15   gives rise to the continued loss of blood to the

16   brain which is a vicious circle cycle then causes the

17   brain to swell down the openings of the lower part of

18   the skull and into the brain stem which controls the

19   vital organs.

20       Now Doctor Maher and Doctor Dev begrudgingly

21   admitted that chronic subdural hematomas can rebleed

22   spontaneously.  Medical fact.  Doctor Uscinski

23   testified to that.  Doctor Dragovic would not go

24   that far.  Said, 'It must have been as a result of

25   some trauma.'  How much the statement was, 'Well the

97

1   damage done determines the force.'   That doesn't

2   sound very scientific.   But we do know this.   There

3   is no signs of any trauma whatsoever to the skull.

4   None whatsoever.   And he did not say that it was

5   blunt force as a result of the child hitting the

6   rails when he testified here.   No.   He testified to

7   that in April.   Now he's testified that it must have

8   been a padded surface because we have no skull

9   fracture.   We don't have a bruise.   We don't have

10  anything to indicate that the child's, Madison's head

11  hit a hard surface.   So we have to conform the

12  testimony to what the actual proofs are showing is

13  there's no sign of injury.   And he'll tell --- well

14  the first time he'll say, 'Well then there's also

15  showing that there's hemorrhaging on the back of the

16  neck.'   In --- in, excuse me, interesting since he

17  testified before that her head hit the rails.   Now

18  he's saying, 'Her head hit the mattress or must have

19  hit the mattress or a padded surface but there's

20  injury to the neck.'   When I asked him before, 'Was

21  there any soft tissue damage', he said, 'No.'   And

22  when I asked him, 'Whether the demonstration that he

23  gave regarding throwing the model into the crib was

24  forceful', he said, 'No.'   I beg to differ.   And

25  when he gave his opinion it must have been a homicide

98

1      because that has a --- has to be a purposeful act,

2      well children suffer injuries all the time that ---

3      to the head that are not purposeful.   And if you

4      have a situation where the child is susceptible to

5      small amounts of force that would cause serious

6      injury, tipping over, there's a magnitude, a

7      multitude of different examples that you could give

8      to show that it would not be --- it would not require

9      the purposeful act of another.   But obviously when

10     he initially testified that he just read the police

11     report.   And he said, 'Oh they said that he said

12     that he threw the child into the crib, hit the

13     rails.'   But the massive amount of medical evidence

14     suggests there's no other signs of injury.

15     Skeletal, soft tissue, scratching, bruising, anything

16     to suggest that this child was mishandled in anyway.

17          Now I gave you an opening statement what I

18     thought the proofs would show.   And I believe we

19     have been consistent throughout in our presentation

20     of our defense in this case.   That there was a

21     chronic subdural hematoma that became symptomatic on

22     November thirtieth (30th), two thousand six (2006).

23     The origin of the --- of the uh --- hematoma, it

24     could have been from birth.   It could have been from

25     Steve being careless with Madison on February

99

1 sixteenth (16th).  It could have been from tipping

2 over.  Doctor Uscinski was very medically

3 appropriate with you in saying he doesn't know.  All

4 we know it existed on August thirty-first (31st)

5 because it's shown.  We know it existed.

6 So I put up --- I took the uh --- excuse me.

7 This is all the doctors and all the treatment that

8 Madison received over the course of her eleven (11)

9 months of life.  And Doctor Dragovic would suggest

10 there must have been some trauma, you know,

11 intentional trauma causing the initial hematoma.

12 That is, that there must have been prior abuse.  And

13 I ask you to look at how many times this child was

14 seen on a regular basis for treatment.  Not only her

15 well-being checkups but for her hip dysplasia, her

16 aplasia and the MRSA, including x-rays.

17 Now that --- Heather testified that she went

18 back to work shortly about six weeks after Madison

19 was born which puts right into the February range

20 when --- and this is when Steven dropped her.  Now

21 and then shortly thereafter Steven went back to work

22 at lawn maintenance.  And that he would work the

23 days and she would work the nights and they would

24 exchange Madison in the afternoon.  And sometimes

25 even Heather having to take Madison to work in Ann

100

1    Arbor uh --- to uh --- because Steve was working

2    late.   So and she believed it was about April.   So

3    from April all the way to mid-October is when they

4    got Pitter Patter involved.   This is and the

5    situation was Steve working during the days, cutting

6    lawns during the dog days of summer.   Getting his

7    daughter at home or bringing her home, watching her

8    throughout the night.   Heather coming home.   If

9    there was abuse, if there was any abuse whatsoever of

10   any kind, wouldn't it be shown through this period of

11   time?   From April to October when they are hustling

12   their fannies off to make a living, have a family,

13   and trying to provide childcare on their own.

14   Wouldn't some doctor, including her regular doctor,

15   find out that somehow Madison was being mistreated?

16   Honestly?   No.   The answer is no.   No.   No.

17   Because there was no mistreatment.

18       In mid-October she goes into Pitter Patter.

19   Mid-October.   Stays six weeks.   Umm --- and this is

20   after September eleventh (11th) CAT scan obviously.

21   And uh --- I thought the testimony of Lynn Peterson

22   and Sharon Klump was accurate, truthful, and very

23   illustrative of what we have told you from the

24   beginning.   Madison was a healthy, happy baby who

25   hardly ever cried.   She has slept well.   She ate

101

1 well. And that was their experience with this

2 child. They never heard her scream. In fact,

3 their words were, 'She was a delight.' But on

4 November fourteenth (14th) she had to be taken out

5 because of the MRSA. But she still continued to see

6 doctors, Doctor Lipkin was being treated --- treating

7 her for the MRSA which was in her head. And if

8 she's suffering head injuries you certainly would

9 think that someone would be able to indicate, show

10 something that here's a doctor looking at her. Uh –

11 -- that if she's being mistreated someone would have

12 noticed. But she wasn't. She wasn't.

13  I just --- this (indicating) is the house.

14 This is Heather and Steven's and Madison's home as of

15 December second, December third, two thousand six

16 (2006). A nice home in South Lyon, Michigan,

17 getting ready for Christmas. This is the scene as

18 taken by the police, Sergeant Baaki, when he came

19 into the home on December second. The refrigerator

20 as prepared by Heather and Steve. And Heather said,

21 'Steve did most of it.'

22  The photo album which is into evidence, Heather

23 will --- I ask you to please take it in because of --

24 - a show of a healthy, nourished, well-loved baby.

25 Uh --- pictures primarily taken by her father. This

102

1     picture, October eleventh (11th), Heather testified,

2     'Taken by Steve and she is looking at her father with

3     the love that she has for him as he had for her.'

4         And this is one week, actually less than one

5     week before November thirtieth (30th), taken at

6     Thanksgiving celebration at Steve's mother's.  it

7     just speaks volumes.  It speaks a thousand if not a

8     million words.

9         Now I ask you to look at all the Exhibits.  And

10    I ask you to be able to understand intellectually the

11    proofs and the lack of the proofs.  And not allow

12    the prosecution's plea to your emotions dictate your

13    determination of the facts and application of the law

14    to the facts.

15        There are no winners in a case like this.

16    There are no winners.  Everybody has lost by virtue

17    of losing a precious gift.  And there's many people

18    who believe childbirth is a miracle because many

19    people can't do it.

20        Now to say that Steven acted carelessly on

21    November thirtieth (30th), I would not disagree.

22    But to say that he knew his child was vulnerable?

23    That's absolutely untrue.  Who knew?  Her mother is

24    a registered nurse.  She didn't know.  You can feel

25    and see the pain that Heather had testifying about

1     that day.   How she thought she should have known

2     because of the vomiting, because of the projectile

3     vomiting, because of the headache, because of her irr

4     --- irritability, lack of being herself, the

5     sleepiness.   No one knew she had a brain hemorrhage.

6     No one knew.   No one knew a minor amount of force

7     could cause --- become symptomatic if it was not

8     being already by virtue of the symptoms that she was

9     showing.   No one knew.

10     Now Steve lied numerous times.   Numerous times.

11     There's no secret in that.   There's no secret.   He

12     --- he did not disclose that he threw her into the

13     crib.   No question.   He was scared.   He did a

14     stupid thing.   It's, you know, there's no question.

15     Who would ever expect that her head hitting that

16     mattress in that crib could cause such severe brain

17     injury?   How could he have ever known that his

18     daughter had a potentially fatal condition that could

19     erupt spontaneously?   That may have been erupted at

20     that time.   Who could have known?   If it was hard

21     enough to cause any kind of damage why wasn't it

22     shown?   Why wasn't it?   Why don't we have even a

23     bruise anywhere on the skull?   Why would if the head

24     hit the mattress or the neck hit the mattress so

25     hard, why wouldn't we have damage to the soft tissue

104

1    in the neck?

2        Now I ask you to keep in mind that swelling is

3    exacerbated by the lack of proper oxygenation.  Now

4    remember when the child, when Madison got to

5    emergency, her fontanel, the soft spot was soft.

6    It's only a day later that it became indicative of

7    swelling.  And then a day later the intracranial

8    pressure monitor was put in.  And after going up as

9    high as twenty (20) when ten is the limit, as high as

10    twenty (20) before she even gets back to pediatric

11    intensive care, its tripled almost to fifty (50) to

12    sixty (60).

13        Why did every doctor from U. of M. minimize the

14    old blood?  Why?  When it is so apparent.  Why

15    does their conclusions which were based upon shaken-

16    baby syndrome which they have now abandoned to a

17    third theory, say, old blood and new blood must mean

18    nonaccidental injury?  When it's clear that through

19    the medical training that the chronic subdural

20    hematoma can absorb new blood.  Doctor Maher

21    testified it was unlikely because the old blood was

22    in the front.  And you remember his example.  And

23    the new blood was in the back.  And we addressed

24    that with Doctor Uscinski.  It's because the red

25    blood cells are more prone to gravitational pull.

1     The child is CT scanned laying down. That was his

2     opinion about the unlikeliness of chronic subdural

3     hematoma is because the old blood was in the front

4     and the new blood in the back.

5         The picture that Doctor Uscinski had up that was

6     in-between the slides and the OR picture, it's called

7     truth. You look long enough and it will come to

8     you. It will appear. You look long enough in this

9     case it will come to you. Madison's death was an

10    accident. There was no intent to cause his daughter

11    any serious harm. No one knew about her condition

12    even those who in the medical profession who are

13    charged with the knowledge of interpreting those

14    MRI's and those CAT scans. Who would have known

15    that an act, irresponsible as it was, of throwing her

16    into her crib onto her mattress would cause the

17    reaggravation of an existing brain hemorrhage.

18        I ask that you not decide this case based upon

19    the desire of the prosecution to win. To prove, to

20    prove, prove a charge that's simply isn't

21    appropriate, that this man murdered his daughter.

22    This is not about someone's career. This is about a

23    tragic death of an infant child that there are many

24    factors involved in determining the cause of death,

25    the intent, the carelessness. But to simply point a

106

1    finger at him and say, 'Because of Nicholas Kennedy

2    you can't be careless anymore.  You must have done

3    this on purpose.  You must have intended to injure

4    your daughter,' is simply taking the facts and it's

5    like sports and steroids, you know, to win the race,

6    to hit the ball, whatever, honorable goals.  Crime

7    solution, crime prevention, honorable goals.  But

8    when you exceed the bounds of fairness, when you

9    break the rules by which you're supposed to operate,

10   then haven't we lost sight of what we're trying to

11   accomplish?  When you shade all the facts such that

12   it looks like the worst possible result, when you

13   fail to present the most critical evidence in the

14   case, when you change your theory, shaken-baby to

15   head hit the rails, now baby must have hit the

16   mattress too hard then it becomes about money not

17   about justice.

18         I ask for your verdict, not guilty on Count 1.

19   A finding of carelessness, recklessness on Count 2,

20   child abuse.  There is no intent to harm the child

21   that he worshiped.

22         Thank you.

23               THE COURT:  Ladies and Gentlemen, we've

24   been going for two hours.  I'm just going to ask you

25   for a minute to go with Ms. Neff for just a second.

                            107

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1     Just stretch your legs and then I'll speak to you

2     more on as to what we're doing on that.  Again, just

3     please don't talk about the case.  Thank you.

4          THE CLERK:  All rise for the Jury.

5     (Whereupon the Jury was returned to the Jury room.)

6               * * *

7          THE COURT:  Anything from Counsel as to

8     rebuttal and instructions?  Any comment as to when?

9     Now or later?

10         MS. POPE-STARNES:  I'd rather do

11    rebuttal right now Judge.

12         THE COURT:  Mr. White any input?

13         MR. WHITE:  That's fine.

14         THE COURT:  Well it may be with you guys

15    but my staff and also my deputies, I want to ---

16         MS. POPE-STARNES:  (Interposing)

17    That's fine.  I understand.

18         THE COURT:  Sure.  Have you guys chime

19    in.  How's it work on your end?

20       Proceed or break?  I'm kind of thinking my

21    staff, especially Ms. Reznick, she's been going two

22    hours straight so that might control everything.

23    But do you guys have anything?

24         A DEPUTY:  You're the boss Your Honor.

25    Whatever you say.

1        THE COURT:   All right.   Very well.

2        The Court will for the benefit of the Jury we've

3    been going for two hours but most importantly for the

4    staff, the Court will take a break.   I've got a

5    Judge's meeting in any event.   But we'll resume at

6    one-thirty (1:30) even though we went into the lunch

7    hour, okay?

8        MS. POPE-STARNES:   Okay.

9        THE COURT:   Thank you.   And then I'll

10   proceed directly into instructions after that.

11       THE CLERK:   All rise.

12       A DEPUTY:   Do you want us back at one-

13   thirty (1:30)?

14       THE COURT:   We'll call you.

15       A DEPUTY:   Okay Sir.

16       THE COURT:   All right.   Thank you.

17       (Whereupon a lunch recess was had.)

18               * * *

19       THE CLERK:   The Court calls the case of

20   People versus McBurney, case number 07 214651 FC.

21       THE COURT:   Counsels' appearances are

22   noted.   Ms. Pope-Starnes, Mr. White and your client

23   is present, I can see that there.   I did ask my

24   Clerk to ask informally if anybody has any druthers

25   as to when the alternate is excused.   Doesn't make

                    109

1       any difference to me other than someone's going to

2       have to sit and listen to me drone on for ten,

3       fifteen (15) minutes for instructions.   But if

4       everybody agrees to do so I don't care.

5                    MS. POPE-STARNES:   Well I believe it

6       would be appropriate until the Jury's been instructed

7       ---

8                    THE COURT:   (Interposing)   Okay.

9                    MS. POPE-STARNES:   (Continuing)   so

10      that there's no chance that there's any issue until

11      the case actually goes to the Jury.

12                   THE COURT:   Fair enough.   Okay.

13         So you can --- ready to proceed?

14                   MS. POPE-STARNES:   I am.

15                   THE COURT:   You can bring in the Jury.

16                   THE CLERK:   Yes Judge.

17      (Whereupon the Jury was returned to the courtroom.)

18                              * * *

19                   THE COURT:   Good afternoon again

20      everyone.   Please be seated.

21         Jeff can you check that door, same thing.

22         And again same thing to the folks that are here.

23      You're welcome to stay but we'll be uninterrupted

24      throughout.   Matter of fact I would include not only

25      the rebuttal but also the instructions, the ten or

                              110

1    fifteen (15) minutes or so.

2         Ms. Pope-Starnes, you may proceed.

3              MS. POPE-STARNES:   Thank you.

4              **REBUTTAL ARGUMENT**

5              MS. POPE-STARNES:   You know I have to

6    say Ladies and Gentlemen of the Jury, the Defense

7    argument reminds me of uh --- I don't know if any of

8    you have ever heard of Zig Ziegler, he's a

9    motivational speaker.   And one of the things he

10   does, one of the stories he tells, is about somebody

11   who tries to distract their responsibility for

12   something by blaming someone else.   And he puts it

13   as, 'Don't look here.   Look yonder.'   And there was

14   an awful lot of that in the defense argument.   Don't

15   look at Mr. McBurney.   Look at the mistakes everyone

16   else allegedly has made.

17        I really don't know what Counsel's talking

18   about, about a winner in this matter.   There are no

19   prizes awarded.   And no matter what I do or the

20   detectives do or the doctors do, Madison McBurney

21   cannot be brought back.

22        The purpose for being here is to give the

23   Defendant a trial which he is entitled to by a Jury

24   of his peers to determine whether or not he committed

25   a crime.

111

1       The purpose of offering information to you about
2   Nicholas Kennedy has nothing to do with emotion.    It
3   is another piece of evidence for you to consider when
4   you're trying to decide whether or not this Defendant
5   knew what the likely result of his actions were.
6   And if this was a case where there was a father and
7   this was their first baby, you wouldn't have that
8   information.   But in this case you have information
9   about the experience he's had before and what he
10  knows.
11      The Defense wants to make a big deal about look
12  over here.   There's no police recordings in either
13  case.   First of all, Sergeant Sumner is asked to
14  testify about and asked questions about testimony
15  from ten years ago.   He's told you he's had other
16  cases where there's been recordings and haven't been
17  recordings.   He tried to testify from his memory as
18  best as he could.   And told you that he reviewed
19  full police report before he testified.
20      No recordings in this case.    Detective
21  Sederlund and Sergeant Sovik have told you they
22  didn't record his statements.   They wish they had
23  but they didn't.
24      Defense talked about accidental injuries to
25  Nicholas.   Accidental injuries to Nicholas.

112

1    People's Exhibit 16 talks about the injuries to

2    Nicholas.   Talks about the diagnosis, the medical

3    diagnosis of shaken-baby syndrome.   The Defendant's

4    statements in his written as well as his verbal

5    statements.   That's no accident.   Look at the

6    medical records where it talks about a subacute

7    hematoma or hemorrhage to Nicholas Kennedy at four

8    months of age.   And he claims that he had dropped

9    him when he was one-and-a-half months of age.   You

10   know from the testimony that period of time is not

11   consistent with something still being subacute at

12   four months of age.

13        This whole thing about the head hitting the

14   mattress.   There was no testimony in this record

15   that this child's head hit the mattress.   Four times

16   it was said in the defense closing but there was no

17   testimony from this stand that Madison's head hit the

18   mattress.   The testimony was that the Defendant said

19   he threw her and her head hit the crib.

20        Doctor Dragovic told you he wasn't there.   He

21   can tell you it's blunt force trauma.   He doesn't

22   know what portion of this crib that her head hit or

23   her back for that matter where she sustained the

24   hemorrhage to her back.   He talked to you about

25   unyielding surfaces and said that they can be

113

1    something soft, like the bumper pad or the mattress.

2    And he talked to you about the fact that it's

3    possible that there are no visible external injuries

4    to the scalp because it could have been protected by

5    a soft surface.

6         This whole thing about why wasn't this crib sent

7    to the crime lab to be tested.   Sergeant Sovik told

8    you he looked at this crib.   He did not observe

9    anything that looked like blood to him.   That he had

10   no information that she was bleeding.   There's no

11   testimony in this record Madison was bleeding.   That

12   he looked at it and he didn't see any evidence of

13   damage to it.   And Ladies and Gentlemen, whose crib

14   is this?   This was Madison's crib.   She was eleven

15   months old.   So whose hair and skin is going to be

16   in this crib.   This isn't some visiting, you know,

17   this isn't some other child's crib that Madison used

18   one time.   So maybe there's going to be some

19   evidence on it.   This is Madison's crib.

20        The Defense argued the police should have gone

21   to Best Buy because it was seven (7:00) to seven-

22   thirty p.m. (7:30pm).   The problem with that is,

23   Sergeant Sovik testified, they were not working that

24   Saturday.   He got to the police station at nine-

25   fifteen p.m. (9:15pm) Saturday night.   Both officers

114

1    testified --- testified about getting briefed.

2    About trying to talk to some of the first responder

3    witnesses.   About trying to find equipment.   It's

4    well past nine o'clock (9:00).

5        Now this whole business about challenging the

6    officers testimony about the Defendant's statements.

7    Remember, number one, Heather McBurney said she

8    couldn't remember.   After her husband said he threw

9    Madison in the crib, oh my gosh, of course she can't

10   remember.   Her husband just admitted to her what he

11   did to this baby.   Her baby is dying.   She is in

12   grief.   She is in shock.   She hasn't slept.   Does

13   it make any sense to you that what would have

14   happened is, he said, he makes that statement, 'I

15   threw her in the crib.'   And the police are like,

16   'Okay.   That's it.   We're out of the room.   We're

17   not taking anymore statements here.   We don't need

18   to know anything else.'   Of course that makes no

19   sense.   What makes sense?   Think about the

20   officers' statements.   That there was further

21   conversation.   That Sergeant Sovik asked, 'Well tell

22   us about what happened then.'

23       There is no testimony in this record that

24   Madison didn't get enough oxygen.   The Defendant

25   made statements that he gave her rescue breaths.

                        115

1    The first responders gave her oxygen right away

2    within in three minutes of getting dispatched.    She

3    got oxygen in the ambulance.   She got to the

4    emergency room and an emergency room physician told

5    you she was not concerned that Madison was not

6    getting enough oxygen.   The reason for the

7    intubation was simply to preserve her airway not

8    because she needed it because she wasn't breathing.

9    And remember Doctor Dragovic told us this whole

10   argument about hypoxia and ischemic injuries, that

11   this is very misleading and is often confused.    And

12   until you actually do an autopsy and look at the

13   brain, you can't tell.   And he did that in this

14   case.   And he told you, 'This is not injuries as a

15   result of lack of oxygen.   This is from blunt force

16   trauma and that the injury and swelling that results

17   from that.   And the swelling leads to the oxygen in

18   the blood not being able to get to the brain.'

19   The defense says that Kevin Schuldt umm --- and

20   Lieutenant Johnston --- let me put it this way.

21   That Lieutenant Johnston must be incorrect about the

22   information he got at the house about MRSA because

23   Kevin Schuldt says, 'The father told about the MRSA.'

24   Kevin Schuldt's testimony was, 'That father told in

25   the ambulance.'   Lieutenant Johnston testified he

116

1    was not in the ambulance.  He sent Sergeant Schuldt

2    and firefighter Wilson with the two paramedics.   So

3    that's consistent with Lieutenant Johnston's

4    testimony that at the scene he got these statements.

5    And in the ambulance Sergeant Schuldt first heard the

6    other statements.

7        When you think about whether or not Doctor

8    Sikavitsas was arguing with defense counsel,

9    remember, that was the only witness that counsel

10   invited to tell him if they didn't understand the

11   questions.  And she did.

12       Counsel talked in closing arguments about the

13   histories given and the conflicting histories given.

14   And that maybe the People were saying that Heather

15   wasn't truthful.  But Ladies and Gentlemen, ask

16   yourselves, the only people in the house after

17   Heather went to work were Madison and her father.

18   So where does Heather get the information about what

19   happened after she left.  Madison's not telling her.

20   She's not verbal and we know she's unconscious and

21   unresponsive.  So all the information that Heather

22   has about what happened in that house she got from

23   the Defendant.

24       Now no questions of Doctor Uscinski about the CT

25   and MRI readings by the Prosecutor.  Ladies and

117

1    Gentlemen, Doctor Uscinski is a neurosurgeon.   That

2    means he operates on people and their nervous system

3    and their brain.   He is not a neuroradiologist.   In

4    fact, he's not a radiologist.   The questions were

5    asked by the prosecution of a neuroradiologist,

6    someone who has training and expertise in that area

7    and is qualified to answer those questions.   And if

8    you'll recall, the other physicians from the

9    University of Michigan that testified several times

10   said, 'You know, I can't really answer that.   I'm

11   not qualified to answer that.   You need to ask a

12   radiologist or a neuroradiologist.'   Even Doctor

13   Dragovic said that.

14      Why weren't MRI's and CAT scans shown until

15   rebuttal?   Well number one, it wasn't relevant.   It

16   wasn't necessary.   What did Doctor Dragovic tell

17   you?   I think he said, I think he called them

18   shadows.   And he said he didn't look at them because

19   as he explained to you, those treating physicians are

20   trying to treat Madison and they were trying to make

21   her well.   They need to do that through tests and

22   procedures that are the least invasive they can.

23   But once she has passed away he can do an autopsy and

24   look at things firsthand that none of the doctors can

25   look at.   He doesn't need an MRI or a CAT scan to

1    see what is going on in the brain. He can look at

2    the actual brain himself.

3        And Doctor Ibraham's testimony was presented to

4    show you the credibility or lack thereof of Doctor

5    Uscinski's testimony, who is not a neuroradiologist.

6    Doctor Uscinski claimed on the different Exhibits

7    that were put up and shown on the screen that the

8    August thirty-first (31st) showed an acute and a

9    chronic subdural. Doctor Ibraham said, 'No. There

10   was a subacute hemorrhage or a lipoma there.'

11       Doctor Uscinski said, 'That's just there on the

12   CT in September.' Doctor Ibraham said, 'No. You

13   cannot see it on there. The CT's don't show

14   everything that an MRI does.' And, in fact, a

15   follow-up MRI was supposed to be done in two to three

16   months. And Doctor Ibraham told you that he could

17   still see some evidence of it on the December first

18   MRI.

19       And one of the things that Doctor Uscinski

20   failed to talk about was the subarachnoid hemorrhage

21   that was there on December first that is in a

22   different space. It is not in the subdural space

23   under the dura. It is in the subarachnoid space.

24   It was made very clear in the testimony through this

25   trial that if a subdural rebleeds it rebleeds into

119

1    the subdural space.   Now you have a complete new

2    bleed in a new area and it's acute.   It's brand new

3    on December first.

4        Doctor Dragovic told you that, 'The surface was

5    unyielding.'   He didn't know what the surface was

6    but it was unyielding.

7        Now there are pictures in evidence of the

8    Defendant with Madison.   You can look at those for

9    what its worth.   But the --- remember, the incident

10   with Nicholas happened when the Defendant was alone

11   with Nicholas and no one was around.   The incident

12   with Madison occurred when he was alone with Madison

13   and no one was around.   Someone was present to take

14   those photographs of the Defendant and Madison.   So

15   are they reflective of how the Defendant was when he

16   was alone with Madison?   You'll have to consider

17   that.

18       The most telling thing about what Heather

19   McBurney didn't know?   Because the defense keeps

20   arguing that, 'Well you know, if she had these

21   injuries that there should have been symptoms and

22   mother was a nurse.'   Well first of all, Heather

23   McBurney told you, she's an orthopedic nurse.   But

24   most importantly, what she didn't know, is she didn't

25   know that her husband had abused another child.   If

120

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1  she'd known that then maybe, maybe she would have

2  been alert for signs that he didn't want to watch

3  that child alone.   That he wanted tag-teaming.

4  That he only wanted to watch the child when she was -

5  -- when it was time for her to be sleeping at night.

6      This is not an accident.   This is not a

7  careless person.   He didn't drop her.   He didn't

8  lose control of her.   She didn't slip out of her

9  (sic) hands.   He does an intentional act.   He threw

10  her.

11      What does the evidence show in this case?   The

12  evidence shows this Defendant committed the crime of

13  first degree felony murder.   He caused Madison

14  McBurney's death through blunt force trauma.   And we

15  know he did this because he said, 'I threw her into

16  the crib.'   And then that child had a new

17  subarachnoid hemorrhage.   She's got bleeding in the

18  subdural space and she also has the hemorrhage in the

19  spinal area below the neck.   He knowingly created a

20  very high risk of great bodily harm.   Knowing that

21  such harm would be the likely result of his actions.

22  It's not being offered for a motion.   It's being

23  offered to show his knowledge.   He knows what can

24  happen in the rough handling of an infant because

25  it's happened before.   And Nicholas Kennedy is the

121

1      child it happened to.   And when he did this act

2      causing Madison's death, he was committing the act of

3      first degree child abuse.   He was her parent and she

4      was under the age of eighteen (18).   And he

5      knowingly and intentionally caused serious physical

6      harm.   He does an intentional act of throwing her.

7      He knows what can happen.   And she gets serious

8      physical injuries, internal injuries, bleeding in the

9      spinal --- around the spinal cord.   A subarachnoid

10     hemorrhage.   Subdural hemorrhages.   And she dies.

11     What more serious injury is there than that?

12         This is an intentional act done by a man who

13     knows what will happen if you treat and handle an

14     infant roughly.   He has committed the crime of first

15     degree felony murder and first degree child abuse.

16     And the People would ask you to find him guilty as

17     charged.

18         Thank you.

19             THE COURT:   All right.   If I could just

20     have everyone's attention I'm thinking maybe ten,

21     fifteen (15) minutes for the instructions.

22         Members of the Jury, the evidence and the

23     arguments in this case are finished and I will now

24     instruct you on the law.   That is, I will explain

25     the law that applies to this case.

122

1    Remember that you have taken an oath to return a

2    true and just verdict based only on the evidence and

3    my instructions on the law. You must not let

4    sympathy or prejudice influence your decision. As

5    Jurors you must decide what the facts of this case

6    are. This is your job and nobody else's. You must

7    think about all the evidence and the testimony and

8    then decide what each piece of evidence means and how

9    important you think it is. This includes whether

10    you believe what each of the witnesses said. What

11    you decide about any fact in this case is final.

12    It is my duty to instruct you on the law. You

13    must take the law as I give it to you. If a lawyer

14    says something different about the law follow what I

15    say. At various times I have already given you some

16    instructions about the law. You must take all my

17    instructions together as the law you are to follow.

18    You should not pay attention to some instructions and

19    ignore others. To sum up, it is your job to decide

20    what the facts of the case are, to apply the law as I

21    give it to you and in that way to decide the case.

22    A person accused of a crime is presumed to be

23    innocent. This means that you must start with the

24    presumption that the Defendant is innocent. This

25    presumption continues throughout the trial and

123

1    entitles the Defendant to a verdict of not guilty

2    unless you are satisfied beyond a reasonable doubt

3    that he is guilty.

4        Every crime is made up of parts called elements.

5    The Prosecutor must prove each element of the crime

6    beyond a reasonable doubt.   The Defendant is not

7    required to prove his innocence or to do anything.

8    If you find that the Prosecutor has not proven every

9    element beyond a reasonable doubt then you must find

10   the Defendant not guilty.

11       A reasonable doubt is a fair honest doubt

12   growing out of the evidence or lack of evidence.   It

13   is not merely an imaginary or possible doubt but a

14   doubt based on reason and common sense.   A

15   reasonable doubt is just that, a doubt that is

16   reasonable after careful and considered examination

17   of the facts and circumstances of this case.

18       Every defendant has the absolute right not to

19   testify.   When you decide this case, you must not

20   consider the fact that he did not testify and it must

21   not affect your verdict in anyway.

22       When you discuss the case and decide on your

23   verdict you may only consider the evidence that has

24   been properly admitted in this case.   Therefore it

25   is important for you to understand what is evidence

124

1    and what is not evidence.   Evidence includes only

2    the sworn testimony of witnesses, the Exhibits

3    admitted into evidence, and anything else I told you

4    to consider as evidence.

5        Many things are not evidence and you must be

6    careful not to consider them as such.   I will now

7    describe some of the things that are not evidence.

8    The fact that the Defendant is charged with a crime

9    and is on trial is not evidence.   The lawyers'

10   statements and arguments are not evidence.   They are

11   only meant to help you understand the evidence and

12   each side's legal theories.   The lawyers' questions

13   to witnesses are also not evidence.   You should

14   consider these questions only as they give meaning to

15   the witnesses' answers.   You should only accept

16   things the lawyers say that are supported by the

17   evidence or by your own common sense and general

18   knowledge.

19       My comments, rulings, questions and instructions

20   are also not evidence.   It is my duty to see that

21   the trial is conducted according to the law and to

22   tell you the law that applies to this case.   However

23   when I make a comment or give an instruction I am not

24   trying to influence your vote or express a personal

25   opinion about the case.   If you believe that I ---

125

1    I, strike that. If you believe that I have an

2    opinion about how you should decide this case you

3    must pay no attention to that opinion. You are the

4    only judges of the facts and you should decide this

5    case from the evidence.

6        At times during the trial I have excluded

7    evidence that was offered or stricken testimony that

8    was heard. Do not consider those things in deciding

9    the case. Make your decision only on the evidence

10    that I let in and nothing else. Your decision

11    should be based on all the evidence regardless of

12    which party produced it. You should use your own

13    common sense and general knowledge in weighing and

14    judging the evidence but you should not use any

15    personal knowledge you may have about a place, person

16    or event. To repeat once more, you must decide this

17    case based only on the evidence admitted during this

18    trial.

19        As I said before it is your job to decide what

20    the facts of this case are. You must decide which

21    witnesses you believe and how important you think

22    their testimony is. You do not have to accept or

23    reject everything a witness said. You are free to

24    believe all, none or part of any person's testimony.

25    In deciding which testimony you believe, you should

126

1     rely on your own common sense and everyday

2     experience.   However in deciding whether you believe

3     a witness's testimony you must set aside any bias or

4     prejudice you have based on the race, gender or

5     national origin of the witness.

6          There is no fixed set of rules for judging

7     whether you believe a witness.   But it may help for

8     you to think about these questions.   Was the witness

9     able to see or hear clearly?   How long was the

10    witness watching or listening?   Was anything else

11    going on that might have distracted the witness?

12    Did the witness seem to have a good memory?   How did

13    the witness look and act while testifying?   Did the

14    witness seem to be making an honest effort to tell

15    the truth or did the witness seem to evade the

16    questions or argue with the lawyer?   Does the

17    witness's age and maturity affect how you judge his

18    or her testimony?   Does the witness seem --- does

19    the witness have any bias, prejudice or personal

20    interest in how this case is decided?   Have there

21    been any promises, threats, suggestions or other

22    influences that affected how the witness testified?

23    In general, does the witness have any special reason

24    to tell the truth or any special reason to lie?   All

25    in all how reasonable does the witness's testimony

127

1    seem when you think about all the other evidence in

2    this case?

3        Sometimes the testimony of different witnesses

4    will not agree and you must decide which testimony

5    you accept.  You should think about whether the

6    disagreement involves something important or not and

7    whether you think someone is lying or simply

8    mistaken.  People see and hear things differently.

9    And witnesses may testify honestly but simply be

10   wrong about what they thought they saw or remembered.

11   It is also a good idea to think about which testimony

12   agrees best with the other evidence in this case.

13   However you may conclude that a witness deliberately

14   lied about something that is important to how you

15   decide this case.  If so you may choose not to

16   accept anything the witness said.  On the other hand

17   if you think the witness lied about some things but

18   told the truth about others, you may simply accept

19   the part that you think is true and ignore the rest.

20       The evidence must convince you beyond a

21   reasonable doubt that the crime occurred on or about

22   November thirty (30), two thousand and six (2006) in

23   the city of South Lyon within Oakland County.

24       The prosecution has introduced evidence of a

25   statement that it claims the Defendant made.  Before

128

1   you may consider such an out of Court statement

2   against the Defendant, you must first find that the

3   Defendant actually made the statement as given to

4   you.    If you find the Defendant did make the

5   statement, you may give the statement whatever weight

6   you think it deserves.    In deciding this you should

7   think about how and when the statement was made and

8   about all other evidence in the case.    You may

9   consider the statement in deciding the facts of this

10  case.

11      Facts can be proved by direct evidence from a

12  witness or an Exhibit.    Direct evidence is evidence

13  about what we actually see or hear.    For example if

14  you look outside and see rain falling that is direct

15  evidence that it is raining.    Facts can also be

16  proved by indirect or circumstantial evidence.

17  Circumstantial evidence is evidence that normally or

18  reasonably --- reasonably leads to other facts.    So

19  for example if you see a person come in from outside

20  wearing a raincoat covered with small drops of water

21  that would be circumstantial evidence that it is

22  raining.

23      You may consider circumstantial evidence.

24  Circumstantial evidence by itself or a combination of

25  circumstantial evidence and direct evidence can be

129

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   used to prove the elements of a crime.   In other

2   words, you should consider all the evidence that you

3   believe.

4       If you believe that a witness previously made a

5   statement inconsistent with his or her testimony at

6   this trial the only purpose for which that earlier

7   statement can be considered by you is in deciding

8   whether the witness testified truthfully in Court.

9   The earlier statement is not evidence that what the

10  witness said earlier is true.

11      When the lawyers agree on a statement of facts

12  these are called stipulated facts.   You may regard

13  such stipulated facts as true but you are not

14  required to do so.

15      You may consider whether the Defendant had a

16  reason to commit the alleged crime but a reason by

17  itself is not enough to find a person guilty of a

18  crime.

19      The Prosecutor does not have to prove that the

20  Defendant had a reason to commit the alleged crime.

21  She only has to show that the Defendant actually

22  committed the crime and that he meant to do so.

23      The Defendant's intent may be proved by what he

24  said, what he did, how he did it, or by any other

25  facts and circumstances in evidence.

130

1    You should not decide this case based on which

2    side presented more witnesses.    Instead you should

3    think about each witness and each piece of evidence

4    and whether you believe them.    Then you must decide

5    whether the testimony and evidence you believe proves

6    beyond a reasonable doubt that the Defendant is

7    guilty.

8         You have heard that a lawyer talked to one of

9    the witnesses.    There is nothing wrong with this.

10   A lawyer may talk to a witness to find out what the

11   witness knows about the case and what the witness's

12   testimony would be.

13        The prosecution has introduced evidence of

14   claimed acts of domestic violence by the Defendant

15   for which he is not on trial.    Before you may

16   consider such alleged --- alleged acts as evidence

17   against the Defendant, you must first find that the

18   fact --- that the Defendant actually committed such

19   acts.    If you find that the Defendant did commit

20   those acts you may consider them in deciding if the

21   Defendant committed the offense for which he is now

22   on trial.

23        You have heard testimony from the following

24   witnesses who have given you his or her opinion as an

25   expert.    Doctor Sikavitsas gave you her opinion as

131

1     an expert in the field of emergency room medicine.

2     Doctor Odetola gave you his opinion as an expert in

3     the field of pediatric intensive care.   Doctor Maher

4     gave you his opinion as an expert in the field of

5     pediatric neurosurgery.   Doctor Dev gave you her

6     opinion as an expert in the field of pediatrics and

7     pediatric child abuse.   Doctor Ibraham gave you his

8     opinion as an expert in the field of pediatric neuro-

9     -- neuroradiology.   Doctor Dragovic gave you his

10    opinion as an expert in the field of forensic

11    pathology and neuropathology.   Doctor Uscinski gave

12    you his opinion as an expert in the field of

13    neurosurgery.   Experts are allowed to give opinions

14    in Courts about matters they are experts on.

15    However you do not have to believe an expert's

16    opinion.   Instead you should decide whether you

17    believe it and how important you think it is.   When

18    you decide whether you believe an expert's opinion

19    think carefully about the reasons and facts he or she

20    gave for his or her opinion and whether those facts

21    are true.   You should also think about the expert's

22    qualifications and whether --- and whether his or her

23    opinion makes sense when you think about all the

24    other evidence in the case.

25         You have heard testimony from witnesses who are

132

1       police officers.    That testimony is to be judged by

2       the same standards you use to evaluate the testimony

3       of any other witnesses.

4           The Defendant is charged in Count 1 with First

5       Degree Felony Murder.    To prove this charge the

6       Prosecutor must prove each of the following elements

7       beyond a reasonable doubt.    First that the Defendant

8       caused the death of Madison McBurney.    That is, that

9       Madison McBurney died as a result of injuries from

10      blunt force trauma inflicted by the Defendant.

11      Second that the Defendant had one of these three

12      states of mind.    He intended to kill or he intended

13      to do great bodily harm to Madison McBurney or he

14      knowingly created a very high risk of death or great

15      bodily harm knowing that death or such harm would be

16      the likely result of his actions.    Third that when

17      he did that, the act that caused the death of Madison

18      McBurney, the Defendant was committing the crime of

19      child abuse first degree.

20          For the crime of child abuse first degree the

21      Prosecutor must prove each of the following elements

22      beyond a reasonable doubt.    First that Steven

23      McBurney was the parent or guardian of Madison

24      McBurney.    Second that the Defendant either

25      knowingly or intentionally caused serious physical

133

1    harm to Madison McBurney. By serious physical harm

2    I mean any physical injury to a child that seriously

3    impairs the child's health or physical wellbeing

4    including but not limited to brain damage, a skull or

5    bone fracture, subdural hemorrhage or hematoma,

6    dislocation, sprain, internal injury, poisoning, burn

7    or scald, or severe cut. Third that Madison

8    McBurney was at the time under the age of eighteen

9    (18).

10    Second degree murder. As to Count 1 you may

11    also consider the lesser charge of second degree

12    murder. To prove this charge the Prosecutor must

13    prove each of the following elements beyond a

14    reasonable doubt. First that the Defendant caused

15    the death of Madison McBurney. That is that Madison

16    McBurney died as a result of injuries from blunt

17    force trauma inflicted by the Defendant. Second

18    that the Defendant had one of these three states of

19    mind. He intended to kill or he intended to do

20    great bodily harm to Madison or McBurney or he

21    knowingly created a very high risk of death or great

22    bodily harm knowing that death or such harm would be

23    the likely result of his actions.

24    The Defendant says that he is not guilty of

25    first degree felony murder and second degree murder

1    because Madison McBurney's death was accidental. By

2    this the Defendant means that he did not mean to kill

3    or did not realize that what he did --- did would

4    probably cause a death or cause great bodily harm.

5    If the Defendant did not mean to kill or he did not

6    realize that what he did would probably cause a death

7    than he is not guilty of murder.

8         You may also consider the lesser charge of

9    involuntary manslaughter. To prove this charge the

10    Prosecutor must prove each of the following elements

11    beyond a reasonable doubt. First that the Defendant

12    caused the death of Madison McBurney. That is, that

13    Madison died as the result of blunt force trauma.

14    Second in doing the act that caused Madison's death

15    the Defendant acted in a grossly negligent manner.

16    Gross negligent means --- gross negligence means more

17    than carelessness. It means willfully disregarding

18    the results to others that might follow from an act

19    or failure to an act. In order to find that the

20    Defendant was grossly negligent you must find each of

21    the following three things beyond a reasonable doubt.

22    First that the Defendant knew of the danger to

23    another. That is, he knew there was a situation

24    that required him to take ordinary care to avoid

25    injuring another. Second that the Defendant could

135

1    have avoid --- could have avoided injuring another by

2    using ordinary care.   Third that the Defendant

3    failed to use ordinary care to prevent injuring

4    another when to a reasonable person it must have been

5    apparent that the result was likely --- likely to be

6    serious injury.   Third also that the Defendant

7    caused the death without lawful excuse or

8    justification.

9        It is not enough that the Defendant's act made

10   it possible for the death to occur.   In order to

11   find that the death of Madison McBurney was caused by

12   the Defendant you must find beyond a reasonable doubt

13   that the death was the natural or necessary result of

14   the Defendant's act.   The removal from life --- the

15   removal from life-support shall not be considered for

16   purposes of this instruction.

17       The Defendant is charged in Count 2 with the

18   crime of First Degree Child Abuse.   To prove this

19   charge the Prosecutor must prove each of the

20   following elements beyond a reasonable doubt.   First

21   that Steven McBurney was the parent or guardian of

22   Madison McBurney.   Second that the Defendant either

23   knowingly or intentionally caused serious physical

24   harm to Madison McBurney.   By serious physical harm

25   I mean any physical injury to a child that seriously

136

1    impairs the child's health or physical wellbeing

2    including but not related to brain damage, a skull or

3    bone fracture, subdural hemorrhage or hematoma,

4    dislocation, sprain, internal injury, burn or scald,

5    or severe cut.   Third that Madison McBurney was at

6    the time under the age of eighteen (18).

7         The Defendant says that he is not guilty of

8    child abuse first degree because he did not intend to

9    cause serious physical harm to Madison.   The

10   Defendant says that his conduct was accidental.   If

11   the Defendant did not intend to cause serious

12   physical harm to Madison he is not guilty.   The

13   Prosecutor must prove beyond a reasonable doubt that

14   the Defendant intended to physically harm Madison.

15        You may also consider the lesser charge of child

16   abuse second degree.   To establish this charge the

17   prosecution must prove each of the following elements

18   beyond a reasonable doubt.   First that Steven

19   Lindsey McBurney is the parent of Madison McBurney.

20   Second that the Defendant did some reckless act.

21   Third that as a result Madison suffered serious

22   physical harm.   By serious physical harm I mean any

23   physical injury to a child that seriously impairs the

24   child's health or physical wellbeing including but

25   not limited to brain damage, a skull or bone

137

1     fracture, subdural hemorrhage or hematoma,

2     dislocation, sprain, internal injury, poisoning, burn

3     or scald, or severe cut.    Fourth that Madison was at

4     the time under the age of eighteen (18).

5         Now when you go to the Jury room you should

6     first choose a foreperson.    The foreperson should

7     see to it that your discussions are carried out in a

8     businesslike way and that everyone has had a fair

9     chance to be heard.

10        A verdict in a criminal case must be unanimous.

11    In order to return a verdict it is necessary that

12    each of you agrees on that verdict.    In the Jury

13    room you will discuss the case among yourselves but

14    ultimately each of you will have to make up your own

15    mind.    Any verdict must represent the individual

16    considered judgment of each Juror.    It is your duty

17    as Jurors to talk to each other and make every

18    reasonable effort to reach an agreement.    Express

19    your opinions and reasons for them but keep an open

20    mind as you listen to your fellow Jurors.    Rethink

21    your opinions and do not hesitate to change your mind

22    if you decide that you were wrong.    Try your best to

23    work out your differences.    However although you

24    should try to reach an agreement, none of you should

25    give up your honest opinion about the case just

138

1    because other Jurors disagree with you or just for

2    the sake of reaching a verdict.   In the end your

3    vote must be your own and you must vote honestly and

4    in good conscience.

5         In this case there are several different crimes

6    that you may consider.   When you discuss Count 1 you

7    must consider the crime of first degree felony murder

8    first.   If you all agree that the Defendant is

9    guilty of that crime you may stop your discussions as

10   to Count 1.

11        If you believe that the Defendant is not guilty

12   of first degree felony murder or if you cannot agree

13   about that crime you should consider the less serious

14   crime of second degree murder.   You decide how long

15   to spend on first degree felony murder before

16   discussion --- before discussing second degree

17   murder.   You can go back to first degree felony

18   murder after discussing second degree murder if you

19   want to.   If you believe that the Defendant is not

20   guilty of second degree murder or if you cannot agree

21   about that crime you should consider the less serious

22   crime of involuntary manslaughter.   You decide how

23   long to spend on first degree felony murder and

24   second degree murder before discussing involuntary

25   manslaughter.   You can go back to first degree

139

1   felony murder and second degree murder after

2   discussing involuntary manslaughter if you want to.

3       You must also consider Count 2, Child Abuse

4   First Degree and decide if the Defendant is guilty or

5   not guilty of that offense.  If you believe the

6   Defendant is not guilty of child abuse first degree

7   or if you cannot agree that crime, you should

8   consider the less serious crime of child abuse second

9   degree.  You decide how long to spend on child abuse

10  first degree before discussing child abuse second

11  degree.  You can go back to child abuse first degree

12  after discussing child abuse second degree if you

13  want to.

14      Possible penalties should not influence your

15  decision.  It is the duty of the Judge to fix the

16  penalty within the limits provided by the law.

17      If you want to communicate with me while you are

18  in the Jury room, please have your foreperson write a

19  note and give it to the Bailiff.  It is not proper

20  for you to talk directly with the Judge, lawyers,

21  Court officers or other people, or Clerks as you

22  recall, or other people involved in the case even if

23  it's seemingly not anything like a big deal, we want

24  more coffee.  Just please write a note, okay?

25      As you discuss the case you must not let anyone

140

1    know, even me, how you're voting stands.   Therefore

2    until you return with a unanimous verdict do not

3    reveal this to anyone outside the Jury room.   If you

4    want to look at any or all of the Exhibits that have

5    been admitted just ask for them, again, by way of a

6    note.

7        When you go to the Jury room you will be given a

8    written copy of these instructions that you have just

9    heard.   As you discuss this case you should think

10   about all my instructions together as the law you are

11   to follow.

12       There's also been prepared a verdict form

13   listing the possible verdicts and I have that here.

14   And that will be given to you as well, okay?

15       Again, uh --- just for a couple of minutes I'll

16   have you return to the Jury room.   Please don't

17   discuss the case then until we give you the --- the

18   signal that you may begin at that time, then you

19   will, okay?

20       Thank you Ladies and Gentlemen.

21       Oh.   You know what?   Hold the show.   I

22   forgot.

23       We have, remember we decided, we said the case

24   was going to be decided by twelve (12) and we have

25   thirteen (13).   So we have an alternate that needs

                           141

1    to be called.

2          Thank you for reminding me Jeff.

3                THE CLERK:   Juror Number 13, Mr. James.

4                THE COURT:   Mr. James, do you have items

5    left in the Jury room, Sir?

6                THE JUROR:   I beg your pardon?

7                THE COURT:   Do you have some items that

8    are left in the Jury room?

9                THE JUROR:   Yeah.

10                THE COURT:   If you would, if you can go

11    back in with everyone.   Again, like I said everyone

12    don't talk about the case yet until Mr. Rondack

13    (phonetic) gives you the go-ahead to do so.

14          If you can gather your things, and if you have

15    to get going I certainly understand.   We have a

16    certificate for you.   Mr. Rondack has to get your

17    badge because we're very economical here.   I also

18    have a certificate showing appreciation on behalf of

19    everyone.   If you have a couple of minutes I'd be

20    happy to talk with you or I'll leave it up to you,

21    okay?

22                THE JUROR:   Okay.

23                THE COURT:   All right.

24          Thank you very much everyone.

25                THE CLERK:   All rise for the Jury.

                         142

1        (Whereupon the Jury was returned to the Jury room at

2        2:25pm.)

3                              * * *

4                THE COURT:   Even with my sticky note,

5        remove alternate, I still forget.

6                You may all be seated.   The record will reflect

7        that the Jury has been excused.

8                Anything further from Counsel at this time?

9                     MR. WHITE:   Yes.

10                    THE COURT:   Go ahead.

11                    MR. WHITE:   Doing the instructions back

12       and forth, the instructions in my package and

13       Prosecutor's package, first of all the **5.10** we forgot

14       to mention Doctor Adams as an expert in the field of

15       med ---

16                    MS. POPE-STARNES:   (Interposing)

17       That's true.

18                    THE COURT:   Okay.

19                    MR. WHITE:   (Continuing)   uh --- family

20       medicine.

21                    THE COURT:   Okay.

22                    MR. WHITE:   Secondly and most important,

23       as to **16.4** and **16.5**, first degree felony murder and

24       second degree murder, paragraph 5 was not included in

25       the instructions which was in my requested

                              143

1    instructions but not the Prosecutor's.   And that

2    paragraph says, 'Fourth that the killing was not

3    justified, excused, or done under circumstances that

4    reduce it to a lesser crime.'

5        So I do believe that **5.10** has to be regiven with

6    Doctor Adams as an expert.   And **16.4** and **16.5** need

7    to be regiven with parenth five in there.

8                 THE COURT:   Ms. Pope-Starnes?

9                 MS. POPE-STARNES:   I would agree.

10                 THE COURT:   Okay.

11        Do you have --- how do you propose the quickest

12    way to handle this would be because it's not, I don't

13    want to use the word boilerplate.

14                 MS. POPE-STARNES:   It is a boilerplate.

15                 THE COURT:   It is boilerplate?

16                 MS. POPE-STARNES:   It's exactly the

17    same.

18                 THE COURT:   Do you have uh ---

19                 MS. POPE-STARNES:   (Interposing)   It's

20    the --- it's --- Judge, if you look at the

21    involuntary manslaughter, which is **16.10**.

22                 THE COURT:   Yes.

23                 MS. POPE-STARNES:   The last paragraph

24    four.   That's the paragraph he's saying that's

25    missing.

144

 1                    THE COURT:   Okay.

 2        Would you both propose that I just read **16.4** and

 3        then go over to **16.10** and pull out sub-para (sic)

 4        four and read it there with it?

 5                    MS. POPE-STARNES:   I think you have to

 6        read the whole instruction.

 7                    THE COURT:   I know.   I know.   I know.

 8        I'll read **16.4** completely and then add to it that

 9        language that happens to be located under **16.10** sub-

10        four.   Am I saying it clearly?

11        And that would also apply to **16.5?**

12                    MR. WHITE:   Well it's actually a little

13        bit different Judge with ---

14                    MS. POPE-STARNES:   (Interposing)   Oh it

15        is?

16                    THE COURT:   Okay.

17                    MR. WHITE:   (Continuing)   murder

18        because it says, 'Reduce it to a lesser crime'.

19                    THE COURT:   Okay.

20                    MR. WHITE:   If I may approach?

21                    THE COURT:   In fact, let me do it this

22        way.   Because we were going to give the Jury the

23        instruction, we need to give them --- it needs to be

24        written out.   I can give my packet to you and you

25        can pencil in what needs to be added.

                             145

```
 1                        MR. WHITE:    Okay.

 2                        THE COURT:    Because we're going to give

 3            them the instructions anyway, right?

 4                        MS. POPE-STARNES:    Yes.

 5                        MR. WHITE:    Right.

 6                        THE COURT:    Okay.    Why don't we do it

 7            that way?

 8                If you'd approach Counsel, I'll give it to you.

 9                Jeff did the one Juror want to take off or what

10            did he ---

11                        THE CLERK:    (Interposing)    He gave me

12            his business card.    I don't believe he was leaving.

13                        THE COURT:    Oh.    Okay.    You don't

14            believe what?

15                        THE CLERK:    I don't believe he was

16            leaving, no.

17                        MS. POPE-STARNES:    I think he said he

18            wanted to talk to you.

19                        THE COURT:    Okay.    If --- take him out

20            of the Jury room.    Grab me the list of Juror

21            certificates or grab me his name out of it.    It's on

22            the --- it's in the Court --- in chambers.    Just

23            have him seat --- have him have a seat in chambers.

24            I don't think that all the Exhibits are out so have

25            him have a seat there, okay?
```

1     THE CLERK:  Yes, Your Honor.  So you

2     just want me to wait out here Judge?

3          THE COURT:  Is that agreeable with you?

4          THE CLERK:  That's fine.

5          MS. POPE-STARNES:  Yes.  And then the

6     formal sentence to the Jury is typed?

7          THE CLERK:  Yes.

8          THE COURT:  Well what I normally do is

9     just give them right back but you guys can correct

10    this and then I can give them the typed up packet.

11         The one about the experts, shall I go through

12    the entire list just to be safe and read them all

13    including Adams?  Or just ---

14         MR. WHITE:  (Interposing)  I think it

15    would be sufficient just to say Doctor Adams

16    testified.

17         MS. POPE-STARNES:  Actually I think

18    appropriate under the case law that if there's an

19    error in instructions that you have to read that

20    instruction in its entirety, unfortunately.

21         THE COURT:  Any comments Mr. White,

22    other than what you've already said?

23         MR. WHITE:  Nothing

24         THE COURT:  All right.  To keep it

25    consistent I'll just read it all over again.

147

1              Jeff would you please bring the Jury back in?

2                  THE CLERK:    Yes Your Honor.

3                  MS. POPE-STARNES:    Judge I know that

4       those three things I think that my secretary can

5       bring it up on the computer.

6                  THE COURT:    Oh if she can, okay.

7           What I'll do is I'll give the packet back.

8                  MS. POPE-STARNES:    I can ask her to

9       email them over.

10                 THE COURT:    Okay.    I'll just give it

11      back.

12                 MS. POPE-STARNES:    Right away.    I'll

13      have her do it immediately.

14                 THE COURT:    **5.10, 16. ---**

15                 THE COURT REPORTER:    (Interposing) four.

16                 THE COURT:    **16.10, ---**

17                 THE COURT REPORTER:    (Interposing) four.

18          No.    **16.4** and **16.5.**

19                 THE COURT:    I'm sorry.    I'm sorry.

20      Thank you Barb.

21                 There it is, **16.4** and ---

22                 THE CLERK:    (Interposing)    All rise for

23      the Jury.

24      (Whereupon the Jury was returned to the courtroom.)

25                 THE COURT:    Good afternoon again

                            148

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    everyone.   Please be seated.

2          The record will reflect that the Jury is back.

3    And what --- that's one of the reason why I say,

4    'Please don't talk about the case until we give you

5    the go-ahead.'   There's a couple of instructions

6    that need some clarification so just please bear with

7    me.

8          Ladies and Gentlemen, you have heard testimony

9    from the following witnesses who have given you his

10   or her opinion as an expert.   Doctor Sikavitas ---

11   Sikavitsas gave you her opinion as an expert in the

12   field of emergency room medicine.   Doctor Odetola

13   gave you his opinion as an expert in the field of

14   pediatric intensive care.   Doctor Maher gave you his

15   opinion as an expert in the field of pediatric

16   neurosurgery.   Doctor Dev gave you her opinion as an

17   expert in the field of pediatrics and pediatric child

18   abuse.   Doctor Ibraham gave you his opinion as an

19   expert in the field of pediatric neuroradiology.

20   Doctor Dragovic gave you his opinion as an expert in

21   the field of forensic pathology and neuropathology.

22   Doctor Uscinski gave you his opinion as an expert in

23   the field of neurosurgery.   Doctor Adams gave you

24   his opinion as an expert in the field of family

25   medicine.   Experts are allowed to give opinions in

149

1    Courts about matters they are experts on.    However
2    you do not have to believe an expert's opinion.
3    Instead you should decide whether you believe it ---
4    whether you believe it and how important you think it
5    is.    When you decide whether you believe an expert's
6    opinion think carefully about the reasons and facts
7    he or she gave for his or her opinion and whether
8    those facts are true.    You should also think about
9    the expert's qualifications and whether his or her
10   opinion makes sense when you think about the other
11   evidence in the case.

12       The Defendant is charged in Count 1 with First
13   Degree Felony Murder.    To prove this charge the
14   Prosecutor must prove each of the following elements
15   beyond a reasonable doubt.    First that the Defendant
16   caused the death of Madison McBurney.    That is, that
17   Madison McBurney died as a result of injuries from
18   blunt force trauma inflicted by the Defendant.
19   Second that the Defendant had one of these three
20   states of mind.    He intended to kill or he intended
21   to do great bodily harm to Madison McBurney or he
22   knowingly created a very high risk of death or great
23   bodily harm knowing that death or such harm would
24   likely be the result of his actions.    Third that
25   when he did the act that caused the death of Madison

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

1    McBurney, the Defendant was committing the crime of

2    child abuse first degree.

3        For the crime of child abuse first degree the

4    Prosecutor must prove each of the following elements

5    beyond a reasonable doubt.  First that Steven

6    McBurney was the parent or guardian of Madison

7    McBurney.  Second that the Defendant either knew or

8    intentionally caused the serious physical harm to

9    Madison McBurney.  By serious physical harm I mean

10   any physical injury to a child that seriously impairs

11   the child's health or physical wellbeing including

12   but not limited to brain damage, a skull or bone

13   fracture, subdural hemorrhage or hematoma,

14   dislocation, sprain, internal injury, poisoning, burn

15   or scald, or severe cut.  Third that Madison

16   McBurney was at the time under the age of eighteen

17   (18).

18       And fourth with respect to the charge of first

19   degree felony murder, that the killing was not

20   justified, excused, or done under circumstances that

21   reduce it to a lesser crime.

22       As to Count 1 you may also consider the lesser

23   charge of second degree murder.  To prove this

24   charge the Prosecutor must prove each of the

25   following elements beyond a reasonable doubt.  First

151

1      that the Defendant caused the death of Madison

2      McBurney.   That is that Madison McBurney died as a

3      result of injuries from blunt force trauma inflicted

4      by the Defendant.   Second that the Defendant had one

5      of these three states of mind.   He intended to kill

6      or he intended to do great bodily harm to Madison or

7      McBurney or he knowingly created a very high risk of

8      death or great bodily harm knowing that death or such

9      harm would like --- would be the likely result of his

10     actions.   Third that the killing was not justified,

11     excused or done under circumstances that reduce it to

12     a lesser crime.

13          Cover it?

14               MR. WHITE:   May we approach?

15               THE COURT:   Yes you may.

16     (Whereupon a discussion was held at the Bench out of

17     hearing of the Jury and the Court Reporter.)

18                        * * *

19               THE COURT:   Ladies and Gentlemen, what

20     I've done was to reread some of the instructions that

21     I missed and left out a couple of words.   And you

22     may have figured out those words by me reading them.

23     That is not to suggest that the other instructions

24     don't apply.   All the instructions, all the lessers,

25     all the other instructions about members of the Jury

                        152

1    the case is now completed, all those other

2    instructions still apply.  And there won't be any

3    question when I give you the final packet which

4    concludes the comprehensive set, okay?

5        So if you just keep that in mind.

6        Once again, it shouldn't be much longer.  I'll

7    have you return to the Jury room and then in a couple

8    of seconds, we'll give you the go-ahead, okay?

9        Thank you folks.

10           THE CLERK:  All rise for the Jury.

11    (Whereupon the Jury was returned to the Jury room.)

12                    * * *

13           THE COURT:  Deputies, thank you very

14    much.  We'll let you know.

15        I will give this packet back Ms. Pope-Starnes to

16    you if you would.  And you can work with Ms. Garelik

17    with Mr. White and insert the proper ones in.  If

18    you'd approach?  And then when it's done just give

19    it back to Jeff.

20           MS. POPE-STARNES:  Your Honor, then are

21    you going to tell the Clerk the Jury can begin

22    deliberating?

23           THE COURT:  Is that agreeable?

24           MR. WHITE:  Agreed.

25           THE COURT:  Okay.

                      153

1         MS. POPE-STARNES:   And Your Honor, I've

2    compiled all our Exhibits, all the People's Exhibits

3    are right here in this rubber band.

4         THE COURT:   Very well, all right.

5    What I'll do is uh --- Counsel when you get the

6    final set, just initial the top page or something and

7    give it to Vincent Rombeck.   And without any

8    objection I will sua sponte so to speak and give them

9    the instructions and then will await notes as to

10   Exhibits and so forth.   Fair enough?

11        Thank you.

12        Thank you Deputies.

13        A DEPUTY:   Thanks Judge.

14        THE CLERK:   All rise.

15        MS. POPE-STARNES:   You're welcome Your

16   Honor.

17        (Whereupon the matter was concluded.)

18                  *  *  *


154

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

I, Barbara Reznick, Court Reporter, do hereby certify that the foregoing pages comprise a full, true, and correct transcript of the proceedings had In the Matter of McBurney before Honorable Daniel Patrick O'Brien in Pontiac, Michigan on March 04, 2008.

*Barbara Reznick*

Barbara Reznick, CER 1333

1200 N. Telegraph, Pontiac, MI. 48341

248) 858-5841

155