STATE OF MICHIGAN

IN THE 6TH CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN,

        v                                No. 07 214651 FC

STEVEN LINDSEY MC BURNEY,

           Defendant,

_____/

OAKLAND COUNTY    07-214651-FC

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

SENTENCING

BEFORE HONORABLE DANIEL PATRICK O'BRIEN

March 31, 2008

* * * *

APPEARANCES

Sara Pope Starnes, Esq.
  On behalf of the People

Robert White, Esq.
  On behalf of defendant

RECEIVED FOR FILING

OAKLAND COUNTY CLERK
BY:
DEPUTY COUNTY CLERK

2008 AUG 14 A 11: 23

Barbara Reznick, Court Reporter

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1

# I N D E X

**WITNESSES**

NONE

**EXHIBITS**

NONE

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Pontiac, Michigan

March 31, 2008

* * * *

THE CLERK: Court calls an add on to the docket, People v McBurney, case number 07-214651 FC.

MS. POPE STARNES: Good afternoon, Your Honor, Sara Pope Starnes, Assistant Prosecuting Attorney on behalf of the People.

THE COURT: Good afternoon.

MR. WHITE: Robert White appearing on behalf of Mr. McBurney who stands to my immediate right.

THE COURT: Good afternoon counsel and sir.

Who wants to lead off?

MS. POPE STARNES: Your Honor, I think the first thing we need to address is the Habitual Offender Action.

THE COURT: Go ahead.

MS. POPE STARNES: That's still pending.

THE COURT: Mr. White, do you have any issue with that or how do you want to proceed – do you tender your client to the court at this time?

MR. WHITE: Yes, I do.

THE COURT: Sir, as best you can please raise your right hand to be sworn.

STEVEN LINDSEY MC BURNEY,

Was thereupon called as a witness herein and after having been first duly sworn, was examined and testified as follows:

THE COURT: Okay. You can put your hand down. The

prosecutor is going to ask you some questions, okay.

EXAMINATION

BY MS. POPE STARNES:

Q      Is it true that on or about October 27, 1998 in the Circuit Court for the

County of Wayne, State of Michigan you were convicted of Child

Abuse in the 2nd Degree?

A      That's correct..

THE COURT: Anything further?

MS. POPE STARNES: No, Your Honor.

THE COURT: People satisfied?

MS. POPE STARNES: Yes.

THE COURT: Defense, any questions?

MR. WHITE: No questions.

THE COURT: Thank you. All right. Who wants to take it

from here. I understand there's – today – the record should reflect

today is the date set for sentencing in this matter. The court has

received sentencing memorandums from both the prosecutor and the

defense. There were some challenges to the guideline scoring by the

probation department.  Does anyone want to start off with that?

MR. WHITE: Yes, Your Honor. As to the factual content

regarding my client's personal history, his family history, we do find it

to be factually accurate.

However, the description offered by the agent of the offense

which basically appears to be a recitation of the first six pages of the

4

police report, you sat through this trial, Judge, you know that many issues were contested and I am not going to spend the next five or six hours arguing points that we went through in detail in the two and a half weeks of the trial.

However, there is what we feel is a substantial error in the scoring of the guidelines, specifically, two specific criteria in the Offense Variables; OV 7 and OV 10.

OV 7 has to do with aggravated physical abuse. There is no question Madison died as a result of brain swelling caused by some traumatic event; brain swelling that could not be controlled, ultimately to dysfunction and the shutting down of her vital systems.

The Medical Examiner corroborated the defense expert that she had a pre-existing brain hemorrhage of possibly months old rendering the child more vulnerable to lesser amounts of force to cause her to be symptomatic. His testimony was also clear that the child in all probability struck a padded surface, the mattress of her crib and it was a singular act. In fact in his testimony, it was a rapid snapping movement. The testimony from the police indicating the nature of the events surrounding the impact, frustration with the child crying, a somewhat limited conscious event; nothing sadistic, nothing intended to torture, not even approaching the deceptive brutality in the sense of cases that interpret this particular offense variable. Remember the Medical Examiner's testimony regarding the amount of force. It wasn't a quantifiable measurement, it wasn't off a three story building, or thirty-five miles per hour, it was the damage done – the force is

5

explained by the amount of damage done an unknown amount of force.

We know this, Judge, that she didn't have any fractures, she didn't have any dislocations, she did not have a bruise, she did not have a cut, she never had a scratch. The child, besides her medical condition which she was being treated for over the course of her lifetime never had one sign of abuse, not one sign other than the hematoma, the chronic subdural hematoma that was present on November 30th.

Now for the court to accept the theory of the prosecution and the probation department was that somehow this was caused by my client, what happened also originated in a conviction, that there was a prior abuse, because we know from the testimony of all of the doctors that the subdural hematoma could have arisen accidentally, it could have arisen at birth, it could have arisen in the fall in February, it could have arisen by a trivial event. We knew it was chronic on November 30th, but we did not know the extent of which the child was suffering at the time of this particular event.

To say that – to go backwards in time – that the severe head injury must have been caused by this definition, sadism, torture, excessive brutality, I think is bootstrapping; we had – in all respects, we did not know, we had a healthy child with the exception of the hip dysplasia, the aplasia and the M.R.S.A., but we did not know that she had this condition. Obviously it was not known or unappreciated by U of M, certainly not known by the parents, and remember, the mother is

6

an R.N. in this state. So we believe that that score should be zero on OV 7.

THE COURT: Go ahead, you can speak to 10.

MR. WHITE: And OV 10, exploitation of the child's vulnerability. Exploit under the statute is defined as manipulation for selfish or unethical purposes. Here again, we have a spontaneous singular act out of frustration, Judge, that not knowing the child's vulnerability, that had nothing to do with the child – it had nothing to do with the child's medical condition, it had something to do with the inability to deal with a – an event that caused frustration to occur; a reprehensible act, a thoughtless act, but certainly not conscious exploitation and we believe that those two variables, OV 7 and OV 10 should be scored as zero.

THE COURT: Are those the only ones you challenge from the probation – otherwise the Probation Department, you don't dispute?

MR. WHITE: Yes, that's it.

THE COURT: Thank you. Ms. Pope Starnes.

MS. POPE STARNES: Well, first of all in regards to OV 7 I think that the Probation Department correctly scored this at fifty points. It is excessive brutality to take an eleven month old baby that you already know suffers from a disability, requires a parent not only to care for them, feed them and provide for them, but this child can't get around; she has to rely on her parent to move her. And here we have a child that is upset and screaming and crying and this defendant's response to his own child after previously being convicted

7

in Wayne County of abusing a child in Wayne County, his response is
to throw her. Now in his statement to the probation officer he again
changes what he claims happens. It's different from the statement that
came out during trial, the statement that was made to the officers, that
Madison was screaming and crying and that he got mad and frustrated
and threw her into her crib and her head hit the back of the crib. She
didn't just suffer a subdural hematoma, she had subarachnoid
hemorrhages, she had retinal hemorrhages and she had the epidural
hemorrhage to the spinal area. This was excessive brutality.

        In regards to OV 10, Your Honor, exploitation of a victim's
vulnerability, again, we're talking about a child that cannot talk,
cannot communicate, cannot get help, at eleven months old is
completely relying upon him, suffers from a disability, it's clear that
that – those ten points should be scored.

        And after this, Your Honor, I'd also like to address the child
abuse, count two scoring.

        THE COURT: Go ahead.

        MS. POPE STARNES: I think probation has incorrectly
scored OV 3, that should be a hundred points, not fifty points –

        THE COURT: Do you have the guidelines with you Mr.
White?

        MR. WHITE: Let me see.

        THE COURT: You say what now?

        MS. POPE STARNES: OV 3, degree of physical injury to a
victim should be scored at one hundred points, the victim was killed.

                                                                    8

THE COURT: And what's it scored presently?

MS. POPE STARNES: Fifty. That's – the fifty says –

THE COURT: Dates of the offense?

MS. POPE STARNES: - no, fifty involves an offense having to do with operation of a vehicle or ORV, snowmobile, aircraft or locomotive; and as the court knows from sitting through the trial, that's not what we have, this is not something involving a vehicular incident.

THE COURT: Mr. White?

MR. WHITE: I don't know, in mine the Probation Department says fifty –

THE COURT: Okay.

MR. WHITE: So I have no idea.

THE COURT: Okay. Ms. Pope Starnes anything further?

MS. POPE STARNES: Yes. And in my memorandum to the court I believe I was in error, I was looking at the wrong Grid, I did have C 6 as probation does on Count II, the child abuse 1st degree but I believe they are correct on the range of fifty-seven to hundred eighteen.

THE COURT: Okay. Anything further, with respect to OV 3 as to the child abuse, there being no contest to the position of the prosecutor, the court would modify that. I'll give counsel one minute to respond to a couple of the questions that I have, I don't want to belabor it, but with respect to OV 7, take a look at the language there and the question I ask, and again, you can answer if you wish or speak

9

to it; is the looking at the words excessive brutality, is that an independent clause or is it dependent upon the final clause, 'designed to substantially increase the fear and anxiety of victim suffered during the offense'; if you follow what I'm saying?

MR. WHITE: I'm saying that I believe it's part and parcel of that, you know, that there must be some kind of intent to cause some kind of conscious pain and suffering to make the victim appear – you look at the cases that have to do with repeated offenses, multiple beatings, Criminal Sexual Conduct multiple times, it's something that, you know, the victim where the victim is made consciously apprehensive and fearful of that which they are going to be perpetrated upon.

THE COURT: Do you challenge that excessive brutality must carry with it a design by the perpetrator to increase the fear and anxiety?

MS. POPE STARNES: I think excessive brutality does that by some nature, yes.

THE COURT: Okay. All right.

MR. WHITE: If I might respond?

THE COURT: Go ahead if you want.

MR. WHITE: Spontaneous, a spontaneous act, frustration highly fits that definition.

THE COURT: Okay.

MS. POPE STARNES: Your Honor, I would indicate the word or does appear in a sentence though.

10

THE COURT: It appears both before and after the phrase, excessive brutality –

MS. POPE STARNES: Yes –

THE COURT: - so one would think and I'm no linguist but one would think that a comma would precede excessive brutality. It doesn't matter, I've heard enough on it, I'll make my call and leave it for other minds to correct or maintain.

Mr. White you may speak.

MR. WHITE: Your Honor, thank you for your patience in sitting through this trial, it was a very very complicated, very emotional, it is a tragedy of monumental proportions for those who were actively involved will never recover, including Mr. McBurney. And I believe that he accepts responsibility for the actions leading to the death of Madison McBurney.

What was not known on November 30th is the degree in which she had existing brain hemorrhage that was potentially months old that made her so vulnerable to minor amounts of force that would cause such traumatic brain injury as in this case. And that's supported by the People's proofs as well, Judge.

So what was the force? What was the force? Throwing her onto her mattress, the back of her head hitting a mattress? That appears to be the Medical Examiner's testimony, that this was enough to cause this injury. In any stretch of the imagination, Judge, I don't believe you can construe that he intended to kill or cause great bodily harm to his daughter at this point. It was a reprehensible act, it was ill thought,

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

it was in all respects something that he will regret the rest of his life. But does it amount to a murderous rage? I don't – I can't imagine, we've seen the medical history of the child, the exhibits were, you know, extensive about the amount of time that this child was being seen by doctors for other reasons, her mother is a Registered Nurse. If there was ongoing abuse, someone surely would have seen it or noticed something. But I believe that this is a tragic accident caused by an act, obviously the act of someone is an intentional act but in no way could he foresee the consequences.

I'd ask for the court to consider this, knowing that you have, you know, the same knowledge that the jury did, and all this, sitting through this trial and making this – and I do believe that Mr. McBurney accepts responsibility for this horrific decision and the loss that he's caused not only to himself but most of all his wife, the mother of his child who firmly believes that this was an unintended thing and that he loved his daughter. She lived with him day to day.

THE COURT: Anyone besides your client that you would request to speak to the court?

MR. WHITE: I anticipated the mother being here today, it appears that she is not.

MS. POPE STARNES: I received a phone call from her father yesterday, she will not be here today.

THE COURT: Thank you. Ms. Pope Starnes

MS. POPE STARNES: Your Honor, with all due respect to counsel, I disagree with him. The Medical Examiner was very clear,

12

although they can't quantitatively measure the force, the injury is determined by the amount of force used and this court heard about the massive injuries that this child suffered. The doctors talked about how quickly, how quickly she got worse and worse to the point where she was brain dead. And again, counsel says there's no intent to kill or to commit great bodily harm; the jury disagreed. They convicted this defendant of 2nd Degree Murder. He couldn't foresee the consequences? That's just bologna, Judge. He has been convicted as this court knows and has heard over and over and over again of 2nd Degree Child Abuse involving Nicholas Kennedy, a child who sustained a skull fracture, bilateral subdural hematoma and retinal hemorrhaging. He knows what rough handling of a child can do.

And in regards to accepting responsibility, that is not reflecting in his statement in the presentence investigation. Now he's claiming that he put her down on the mattress and that he just did it too hard; that's not accepting responsibility. His statement is more about him, about this – this is all about him, nothing in there reflects taking responsibility and recognizing that his actions have resulted in a child not going to school, not graduating from high school, not getting married, not having children of her own, all as a result of his actions.

And I would ask the court to follow the recommendation set forth by the Probation Department.

THE COURT: By the Probation Department or by you?

MS. POPE STARNES: The thirty to sixty, Your Honor.

THE COURT: Okay. Ms. Storeng?

13

MS. STORENG: Nothing, Your Honor.

THE COURT: Sir – oh by the way is there anyone that you say wants to speak to the court?

MS. POPE STARNES: No, Mr. Linville indicated in a letter to me that he sent a letter to the court because he wasn't sure if he was going to make it here today because he lives out of town and asked me to make sure that the court received that letter.

THE COURT: The record will reflect that I have received same as well as the defendant's mother and Mr. Linville, I'll acknowledge that one as well.

Sir, you may speak.

Q   Your Honor, I used horrible horrible discretion taking care of my daughter, there's no excuse for what I did, I take full responsibility for my actions and the consequences of it. There is no doubt in my mind that – I'm sorry – I loved my daughter dearly and I never intended to hurt her or even worse, kill her. I want to thank my family and my wife for standing by my side during this time. I want to apologize to everybody this has affected. In the future I hope I can have a life again and move on, I'll never forget her. This was an accident, I didn't murder my daughter. I hope – especially Heather I hope she can find it in her heart to forgive me for what I did. That's all I have.

THE COURT: Thank you. To the prosecutor, one last question, even if excessive brutality is independent, how can there ever be a 2nd Degree Murder conviction without 'excessive brutality'? In other words, this should be an automatic, correct or incorrect? Can you

14

give me an example of 2nd Degree Murder that would not be excessively brutal?

MS. POPE STARNES:  A shooting might not be, depending on the facts and circumstances –

THE COURT:  From the –

MS. POPE STARNES:  - in this case, Judge, I think the difference is that this is something where it doesn't just take pulling the trigger, this takes the force of his body of picking this child up and the action of throwing her, a child who is upset, who is crying, who is screaming, what she deserves to be is comforted and loved and instead he takes his adult body and uses his force and strength to throw her.

THE COURT:  Whether I agree or disagree with that offer, I think is irrelevant at this time.  Brutal, the court learned is defined by Oxford's as savagely, viciously, cruel or harsh.

The trial court finds, this court – I find that Madison was treated with excessive brutality.  The court looks not only at the act of throwing but the judicially noticeable tenderness, meekness and susceptibility of an eleven month old baby.  The fact of throwing combined with the characteristics of the baby bear on the excessive brutality.  The court also considers what the baby endured thereafter.  The court also finds by judicial notice the medical treatment this eleven month old baby underwent was also brutal or as Oxford defines brutal, as harsh.  True this brutality was through the care-giving hands of medical personnel but the fact that the physical contact with the baby was borne of and guided by care for her cannot be intelligently

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

debated to be anything less than harsh or brutal, her consciousness notwithstanding. Though this physical contact was good in the sense that it was providing care, the court must attribute to the defendant as the instigating cause the full breadth of the pain and fear that this little baby experienced with strangers in her home.

Accordingly, the court will score OV 7 with the fifty points.

With respect to OV 10, the only argued category is victim's exploitation; the guidelines define exploiting a victim in this case as 'manipulating' – I'm applying it to this case – 'manipulating Madison for McBurney's selfish or unethical purposes. The court finds the prosecutor's argument could prevail from the perspective that the defendant wanted Madison to quit crying and screaming, however, the court does not find that this conduct is what was contemplated by this text. The court does not find that this conduct was exploitive as defined by the guidelines.

Having so declared that, does that alter the scoring on the guidelines?

MS. POPE STARNES: No, Your Honor. OV 3 is a hundred points or more, that changes it to a hundred fifteen.

THE COURT: Do you dispute that, Mr. White, that's the bottom line?

MR. WHITE: It goes down to one fifteen, that's correct.

THE COURT: But the bottom line is the same, the guidelines?

MR. WHITE: That's correct, yes.

THE COURT: Okay. The probation – the presentence report proposes that the – this conduct demonstrates a pattern because he's done this before, something similar before and I ask again with only one minute to either counsel, is there something about a criminal who commits the same crime over and over again that is worse than a criminal who commits different crimes over and over again? In other words if I was – I don't know whether the guidelines contemplate pattern of conduct but assuming that they don't, why should I punish someone who commits the same crime ten times worse than someone who commits ten different crimes? Does anybody want to comment on that?

MR. WHITE: The guidelines do, Your Honor, address a pattern of criminal conduct.

THE COURT: Okay. So you say it's already subsumed so don't consider it again obviously?

MR. WHITE: Yes, it's already –

THE COURT: Do you recognize or acknowledge that Ms. Pope Starnes?

MS. POPE STARNES: No. I talked to the probation officer and what she was concerned with is OV 13 is not able to be scored in this case because we're not talking about three or more crimes but the guidelines talk about an OV 13, the fact that you can, for continuing pattern of criminal behavior and because there has been this repeat behavior by the defendant, the probation officer believed that it was

17

appropriate that the court should consider that, even though it doesn't

fall within the three or more crimes listed in OV 13.

But because of the unique facts, the victim's that we're talking

about, the injuries, the severity of the abuse, that the continued pattern

of criminal behavior is important for the court to consider.

THE COURT:  Anything further?

MR. WHITE:  Just remember the prior offense was reckless –

THE COURT:  Noted –

MR. WHITE:  - not intentional but it was reckless.

THE COURT:  This, the court finds is covered by what the

court will say in a couple moments and therefore I need not answer

whether I take that into consideration – won't take it into consideration

because I feel it's mooted by more.

I have, just so the record is clear, I've said it in other cases and

I'll say it here sir for your understanding, I figure out what the

guidelines are and I put everybody right in the middle of the

guidelines.  Good things about the person that are not contemplated by

the guidelines bring the person down, bad things that are not

contemplated by the guidelines bring the person up.

I have gone through everything that I could go through to

figure out what things apply in that category that have not been

contemplated by the guidelines and I feel that everything has except

what you've had to say here today as well as your description in the

offense and I think it merits – and I'm going to have to move quickly –

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

think it merits looking at your description of the offense and I take heed of everything that you've told me here today.

Looking at your description, taking the first sentence, on the evening of November 30th I woke Madison up at 6:56 p.m., the court – and this isn't meant to be a punishment to you, I'm just noting for the record, that was not helpful for the court for sentencing purposes. Again, I'm not faulting you, I'm just saying it didn't help me.

The next sentence, she was sitting up with her hand on the bumper, likewise that was not helpful for sentencing. I picked her up and held her for a while, not helpful for sentencing; I then changed her diaper and put her into her pajamas, likewise, not helpful for sentencing; I took her out into the living room to give her a bottle, not helpful for sentencing; she drank only a little bit of it, not helpful for sentencing. I then carried her to the bedroom and was going to lay her down, not helpful for sentencing. As I was lowering her down into the crib I thrust (threw) her down to the mattress. This sentence is helpful for what it does not say; it does not say why you did it, the silence speaks loudly that, this is how I interpret it, you want to avoid for some reason explaining why, either fear of consequences to yourself or guilty conscience, I don't know which.

Next sentence, I immediately picked her up and sat her on the floor, not helpful for sentencing. I couldn't believe I had done that and was going to sit with her for awhile, not helpful for sentencing. She fell over and I called 911; not helpful for sentencing. I love my daughter very much, I love my daughter Madison very much and never

19

intended to hurt her; this is helpful for whittling away reasons for why you did it but it is not helpful beyond that. Telling me why you did not intend something doesn't help me learn what you did intend.

Next sentence, I made a mistake. And I must say with all due respect, this is smoke, this is too broad to ascribe any meaning. This may or may not have been intentionally so crafted to say that. I don't know what that's supposed to mean.

The next sentence, I used horrible parental discretion in the care of Madison and then you said that again today and again respectfully the court finds that this is smoke. Horrible parental discretion is not defined, either intentionally or not by you, I don't know.

The next sentence, I think about it every day and miss the time we spent together. This is about your suffering and it is valuable for what it's worth. I feel my intentions have been misunderstood; the court respectfully finds that this is irrelevant. With every choice is a consequence. If you do not speak you probably will be misunderstood. If you don't speak because you choose not to fight, that could be admirable; if you don't speak because you're trying to protect yourself, that is cowardice.

I regret that I did not testify to answer any and all questions asked of me; not helpful for sentencing. I take responsibility for my actions and realize the impact of them. This is not helpful if you do not define your actions. I was proud to be her dad and my family meant everything to me. This is of some value. I'm sorry I let my

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

family down, my wife down and Madison down; this is of some value but, again, you do not define how you let them down.

This was an accident, not murder. If you really believe that this was an accident then you have no reason to be sorry other than what everybody here in this courtroom would be sorry that she's passed, but you have no reason to be sorry for your family. This sentence, I must interpret it as disingenuous or at least your purported sorrow is disingenuous; I can't reconcile them.

The final paragraph I'll just – I won't say it all but that is talking about yourself and I find this paragraph is helpful in learning how you are hurt by this situation.

I just find that you now for the second time take no responsibility for your action and consequently do not acknowledge any wrongdoing. To say you used horrible discretion, parental discretion is a masked way of avoiding responsibility; you say you take responsibility for your action yet your actions according to you is using horrible parental discretion. If you do not define what horrible parental discretion is, I can't define it for you, I have no idea what that's supposed to mean.

Middle of the guidelines for you, sir, is twenty-eight years, ten and a half months, there being no change to the guideline range. It is conceivable under my way of doing math and my way of assessing sentences that thirty-four years to sixty years would be appropriate; however, I will stay my hand and I believe the increase from mid-range is appropriate, I won't go beyond that, which is thirty years to

21

sixty years with respect to Count I; credit for four hundred eighty-four days.

With respect to Count II, fifteen years to twenty-two and a half years, credit of four hundred eighty-four days.

The court orders Crime Victim's Rights fee of sixty dollars, state costs of a hundred twenty dollars, comply with DNA testing if you haven't already. And that will be the sentence of the court. I wish you and your family the best of luck for everyone that was involved in this tragic situation.

Thank you.

MR. WHITE: As to the sentences, Judge, concurrent?

THE COURT: I believe that's concurrent, I don't think there's any dispute over that.

Do you have a copy of the appellate rights form?

MR. WHITE: I don't, Judge.

THE COURT: Can you give him one. Here, you can approach.

MR. WHITE: If I may.

THE COURT: Yes.

MR. WHITE: I'll acknowledge receipt of the appellate rights form, Your Honor and tender it to him.

THE COURT: Thank you. Okay.

\* \* \* \*

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

STATE OF MICHIGAN)

COUNTY OF OAKLAND)

    I, Barbara Reznick, Court Reporter, State of Michigan, do

hereby certify that the foregoing pages comprise a full, true and correct

transcript of the proceedings had in the People v Steven L. McBurney, before

Honorable Daniel Patrick O'Brien in Pontiac, Michigan on March 31, 2008.

          Barbara Reznick, CER 1333
          1200 N. Telegraph, Pontiac, MI 48341
          (248) 858-5841

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313