# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEVEN LINDSEY MCBURNEY,

        Defendant-Appellant.

UNPUBLISHED
September 10, 2009

No. 285485
Oakland Circuit Court
LC No. 2007-214651-FC

Before: O'Connell, P.J., and Talbot and Stephens, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and first-degree child abuse, MCL 750.136b(2). Defendant was sentenced as a second-felony habitual offender, MCL 769.10, to concurrent prison terms of 30 to 60 years for the murder conviction and 15 to 22-1/2 years for the child abuse conviction. We affirm.

Defendant's convictions arise from the death of his 11-month-old daughter. The medical examiner determined that the victim died as a result of blunt force trauma to the head and related complications caused by subdural hemorrhaging, including loss of blood flow and oxygen supply to parts of the brain. In a statement to the police, defendant admitted that while caring for the victim, he could not get her to stop crying and screaming. He explained that he became angry and frustrated, and then threw the victim into her crib from approximately two feet away, causing her head to strike the padded bars. The victim immediately had a seizure and became unresponsive.

At trial, the prosecution presented evidence that in 1998, while caring for another child who was 4-1/2 months old, defendant became angry and frustrated when the child would not stop crying. He began shaking and bouncing the child hard, causing subdural hematomas, retinal hemorrhages, a subarachnoid hemorrhage, and a skull fracture.

## I. Prosecutorial Misconduct

Defendant first argues on appeal that the prosecutor unfairly impeached and attacked his defense expert, Dr. Ronald Uscinski, thereby denying him a fair trial. We disagree.

Claims of prosecutorial misconduct are reviewed on a case-by-case basis, and challenged remarks are reviewed in context. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123

(1999). The test for prosecutorial misconduct is whether the defendant was deprived of a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995). Defendant objected at trial to the prosecutor's questions concerning Dr. Uscinski's testimony and fees in other cases, and the percentage of his income that was attributable to testifying in cases involving children with head injuries, thereby preserving those claims. However, he did not object to the prosecutor's questions concerning Dr. Uscinski's fees or whether they had met before, or to the prosecutor's comments during closing argument. Accordingly, these latter issues are unpreserved. We review unpreserved claims of misconduct for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000).[1] "[A]ppellate review is precluded unless a curative instruction could not have eliminated possible prejudice or failure to consider the issue would result in a miscarriage of justice." *Noble, supra* at 660; see also *Schutte, supra* at 721-722.

Defendant argues that the prosecutor improperly referred to facts not in evidence by stating that she and Dr. Uscinski had met before. "A prosecutor may not argue the effect of testimony that was not entered into evidence at trial." *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). Here, however, the challenged conduct involves a question at the beginning of the prosecutor's cross-examination in which she asked Dr. Uscinski whether they had met before. Dr. Uscinski responded that the prosecutor looked familiar. This conduct does not involve any argument regarding evidence not presented to the jury. Thus, there was no plain error. Further, the jury was aware that Dr. Uscinski had testified in other cases. We fail to see how defendant was prejudiced by this brief exchange.

Defendant next argues that it was improper for the prosecutor to question Dr. Uscinski about his fees in this and other cases. We disagree. In *People v Unger*, 278 Mich App 210, 236-237; 749 NW2d 272 (2008), this Court stated that while a prosecutor may not denigrate defense counsel,

> [t]he prosecution is free to argue that defense counsel had "bought" [an expert]'s testimony by paying him a substantial amount of money. This statement did not denigrate defense counsel as much as it tended to denigrate the expert witness himself. Moreover, counsel is always free to argue from the evidence presented at trial that an expert witness had a financial motive to testify. The record supports the prosecution's argument that [the expert] was substantially compensated for his testimony, and we therefore find no error in this regard. [Citations omitted.]

Thus, a prosecutor does not commit misconduct by arguing that a defense expert has been "bought" and has a financial motive to testify. In the present case, it was not improper for the prosecutor to attempt to show that defendant had "bought" Dr. Uscinski's testimony, that Dr. Uscinski had a financial motive to testify in a certain manner, that Dr. Uscinski had a niche, and that his testimony should not be believed. There was no misconduct.

---

[1] Abrogated on other grounds in *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

Defendant also argues that the prosecutor improperly impeached Dr. Uscinski by using transcripts from other cases in which he had testified, for the purpose of showing that Dr. Uscinski had a pattern of testifying that brain injuries in children are caused by chronic subdural rebleeds. We disagree.

The prosecutor attempted to use the transcripts to unsuccessfully refresh Dr. Uscinski's recollection. The transcripts were not read to the witness for impeachment, and were not introduced into evidence. A prosecutor is entitled to show that a defendant has "bought" an expert's testimony, and that the expert should not be believed. *Unger, supra* at 236-237. By attempting to refresh Dr. Uscinski's recollection concerning his testimony in other cases, the prosecutor was attempting to elicit evidence in support of an argument that Dr. Uscinski is a professional witness, with a financial motive and a particular point of view, and that he should not be believed. A finding of "prosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *Noble, supra* at 660 (citation omitted). There was no misconduct.

Defendant further argues that it was improper for the prosecutor to argue during closing argument that, for a price, one could find a witness to say anything, and that Dr. Uscinski was that witness. We again disagree. As defendant correctly observes, an unsupported, prejudicial attack on a defendant's expert can require reversal. *People v Howard*, 226 Mich App 528, 545; 575 NW2d 16 (1997). However, such attacks are not improper if supported by the record. *Id.* at 545-546. In the present case, the prosecutor was entitled to forcefully attack the credibility of defendant's expert, and her attacks were properly founded in the evidence. See *Unger, supra* at 236-237. Accordingly, there was no misconduct.

## II. Evidence of Prior Acts of Domestic Violence

Defendant argues that the trial court erred in admitting evidence of his prior abuse of another child, and that the cautionary instruction provided to the jury was insufficient to cure the resulting prejudice. Defendant further argues that the admission of the other child's medical records violated his right of confrontation. We disagree.

### A. Prior Acts of Domestic Violence

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998). Preliminary questions of law concerning admissibility, such as whether a rule or statute precludes the admission of the evidence, are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

The prosecutor offered the evidence of defendant's prior abuse of another child under MCL 768.27b(1), which provides:

> Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible *for any purpose for which it is relevant*, if it is not otherwise excluded under Michigan rule of evidence 403. [Emphasis added.]

Defendant does not dispute that the evidence of his abuse of another child involved an act of domestic violence that qualifies for admission under MCL 768.27b(1). Instead, defendant argues that the evidence should not have been admitted because it was irrelevant, tended to prove his propensity to physically abuse children, and was more prejudicial than probative.

In *People v Pattison*, 276 Mich App 613, 615-616; 741 NW2d 558 (2007), this Court considered a related statute, MCL 768.27a, which addresses evidence of other acts of criminal sexual conduct rather than evidence of other acts of domestic violence. The Court examined the statute in relation to MRE 404(b)(1), which prohibits evidence of prior bad acts to prove the character of a person in order to show action in conformity therewith. The Court recognized that in enacting MCL 768.27a, the Legislature made a policy decision to allow the admission of certain kinds of evidence for any relevant purpose, including proving a defendant's propensity to commit certain kinds of acts, regardless of MRE 404(b). *Id.* at 620-621. In *People v Schultz*, 278 Mich App 776, 779; 754 NW2d 925 (2008), this Court recognized that because of the similarities between MCL 768.27a and MCL 768.27b, the *Pattison* Court's comments concerning MCL 768.27a(1) were equally applicable to MCL 768.27b(1).

Thus, under *Pattison* and *Schultz*, defendant's argument that the evidence of his prior abuse of another child was not admissible to show his propensity for abusing children is without merit. Nonetheless, we note that the prosecutor in this case did not offer the evidence for a propensity purpose, but rather to prove defendant's knowledge and intent. Moreover, we disagree with defendant's argument that the evidence was not relevant to these purposes or that its admission was unduly prejudicial under MRE 403.

To convict defendant of first-degree child abuse, MCL 750.136b(2), the prosecutor was required to prove that defendant "knowingly or intentionally" caused serious physical harm to the victim. To convict defendant of murder, the prosecutor was required to prove that he acted with malice, which "is defined as either the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998).

Evidence that defendant previously became exasperated with another child's crying and shook the child hard until the child went limp and stopped breathing, and that the child suffered subdural hematomas, a subarachnoid hematoma, retinal hemorrhages, and a skull fracture, was relevant to defendant's knowledge of what would happen to the victim in this case if she was shaken or forcefully thrown into her crib from a distance of approximately two feet. The evidence was probative of whether defendant knowingly and intentionally injured the victim, and whether he acted in wanton and willful disregard of the likelihood that the natural tendency of his behavior was to cause death or great bodily harm to the victim. Defendant's knowledge and intent were the principal issues in the case. While the evidence was prejudicial, its prejudicial effect did not substantially outweigh the probative value of the evidence. Therefore, the trial court did not abuse its discretion in admitting the evidence.

Defendant also argues that the admission of the other child's medical records, which contained a medical diagnosis of shaken baby syndrome, violated his Sixth Amendment right of confrontation. We again disagree. We review constitutional questions de novo. *People v McPherson*, 263 Mich App 124, 131; 687 NW2d 370 (2004).

In *Crawford v Washington*, 541 US 36, 53-56; 124 S Ct 1354; 158 L Ed 2d 177 (2004), the United States Supreme Court held that, under the Confrontation Clause, a testimonial statement of a witness absent from trial is not admissible for its truth unless the declarant is unavailable and there has been a prior opportunity for adequate cross-examination. As such, *Crawford* is applicable only to substantive use of testimonial hearsay. *Id.* at 59 n 9. The Confrontation Clause does not prohibit the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted. *McPherson, supra* at 133, citing *Crawford, supra* at 59 n 9. In this instance, the challenged medical records were offered not to prove a propensity by defendant for abuse or to establish the allegations regarding his abuse of Madison. Rather, the records were introduced to show that defendant understood or had reason to know the consequences of his improper handling of a young child and the risk of injury. As such, the records did not violate defendant's right of confrontation pursuant to *Crawford.* Based on our determination regarding the admissibility of the challenged evidence, we need not address defendant's contention regarding the adequacy of the cautionary instruction provided by the trial court to the jury.

A defendant is entitled to a new trial if his or her right to confrontation is violated unless the error is deemed harmless beyond a reasonable doubt. *People v Bauder,* 269 Mich App 174, 179; 712 NW2d 506 (2005). Although we have determined that defendant's right to confrontation was not violated, even if admission of the child's medical records comprised error, the evidence of defendant's guilt was sufficiently established that any error would have been harmless and a new trial would not be warranted. *Id.* at 179-180.

### III. Sentencing

Defendant argues that the trial court erred in scoring 50 points for offense variable ("OV") 7 of the sentencing guidelines, and by considering his failure to admit responsibility for this crime. We disagree.

Application of the legislative sentencing guidelines is a question of law to be reviewed de novo on appeal. *People v Libbett*, 251 Mich App 353, 365; 650 NW2d 407 (2002). When scoring the guidelines, "[a] sentencing court has discretion in determining the number of points to be scored, provided that evidence of record adequately supports a particular score." *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002); see also *People v Leversee*, 243 Mich App 337, 349; 622 NW2d 325 (2000). Absent an error in the scoring of the guidelines or reliance on inaccurate information, a minimum sentence that is within the guidelines range "shall" be affirmed on appeal. MCL 769.34(10); *Libbett, supra* at 363-364.

MCL 777.37(1)(a) provides that 50 points may be scored for OV 7 if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." The trial court determined that 50 points should be scored because defendant treated the victim with excessive brutality. Because the statute uses the word "or" as a disjunctive, a court can properly assess 50 points for excessive brutality without demonstrating that a defendant acted for the purpose of increasing the victim's fear and anxiety.

The evidence showed that defendant became angry and frustrated when the 11-month-old victim would not stop crying. He threw her from a distance of approximately two feet into her

crib, causing her head to strike the padded bars.  The victim sustained an epidural hemorrhage to her spine, at the lower neck and upper back area.  Her head moved with sufficient force that blood vessels in the subdural region of her brain were damaged, causing bleeding.  She suffered a subdural hematoma that led to brain swelling, retinal hemorrhaging, brain herniation, pre-mortem necrosis of brain tissue, and eventually death.  Considering the child's age, size, and helplessness, the evidence supports the trial court's finding that defendant acted with excessive brutality.  The trial court did not abuse its discretion in scoring 50 points for OV 7.

Defendant also argues that the trial court improperly enhanced his sentence because of his failure to admit responsibility for this crime.  We disagree.  It is well established that "a sentencing court cannot, in whole or in part, base its sentence on a defendant's refusal to admit guilt."  *People v Wesley*, 428 Mich 708, 711; 411 NW2d 159 (1987).  The trial court did not punish defendant for his refusal to admit guilt.  Rather, the trial court was responding to defendant's comments and explaining why it did not find defendant's purported acceptance of responsibility to be genuine.  Regardless, the trial court sentenced defendant well within the sentencing guidelines range of 225 to 468 months or life.  Because defendant has not established a scoring error or reliance on inaccurate information, we must affirm defendant's sentences. MCL 769.34(10).

Affirmed.

/s/ Peter D. O'Connell
/s/ Michael J. Talbot
/s/ Cynthia Diane Stephens

85

| STATE OF MICHIGAN<br>6th JUDICIAL CIRCUIT<br>OAKLAND COUNTY | CLAIM OF APPEAL AND<br>ORDER APPOINTING COUNSEL | CASE NO. AND SUFFIX<br>2007-214651      FC |
|---|---|---|

Court Address

1200 N. TELEGRAPH, DEPT. 404 PONTIAC, MI 48341

Court Telephone No
248-858-0374

| **People of THE STATE OF MICHIGAN** | Date of Birth, Address, and inmate number (if known)<br>SAGINAW CORRECTIONAL FACILITY      06-25-1975<br>9625      PIERCE ROAD      286959<br>FREELAND      MI   48623 |
|---|---|

v

| Defendant Name, Last | First | Middle |
|---|---|---|
| MCBURNEY | STEVEN | LINDSEY |

| Offense Information | | | | | | | | Terms of Incarceration | | | | | | | | | | Intermediate Sanctions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Minimum | | | Maximum | | | | | | | Probation | | | | | | | |
| Date | Description | PACC Code | H | C | A | S | Y | M | D | Y | M | D | K | P | J | Y | M | D | R | F | O |
| 11-30-2007 | HOMICIDE/MURDER/2ND DEGI | 750.317 | 2 | | | | | 30 | | | 60 | | | | X | | | | | | | X |
| 11-30-2007 | CHILD ABUSE/1ST DEGREE | 750.136B2 | 2 | | | | | 15 | | | 22 | | | | X | | | | | | | |

H=Habitual  C=Conspiracy  A=Attempt  S=Solicitation  Y=Year  M=Month  D=Day  K=Consecutive  P=Prison  J=Jail  R=Restitution  F=Fine  O=Other

The defendant claims an appeal from a final judgment or order entered on 03-31-2008 in the 6th Circuit Court, OAKLAND County, Michigan by Judge DANIEL O'BRIEN 51394. Copies of the final judgment or order being appealed and docket entries are attached for the Court of Appeals, appointed counsel, and Michigan Appellate Assigned Counsel System.

On 04-10-2008 the defendant filed a request for appointment of counsel and a declaration of indigency.

**IT IS ORDERED:**

JOHN LAZAR
Name of Appellate Counsel

2304 E. ELEVEN MILE RD.
Address

ROYAL OAK, MI 48067-2338
City, State, Zip

248 543 0390
Telephone No.

16477
Bar No.

is appointed counsel for the defendant in post-conviction proceedings. If appointed counsel cannot or will not accept this appointment, counsel shall notify the court immediately.

The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts indicated below and any other transcripts requested by counsel in this case not previously transcribed. Transcripts shall be filed within 28 days for pleas or 91 days for trials from the date ordered or requested [MCR 7.210(B)]. Reporter(s)/recorder(s) shall be paid as provided by law.

| TRANSCRIPTS ORDERED | REPORTER/RECORDER NAME | OTHER DESCRIPTION | NUMBER | PROCEEDING DATE |
|---|---|---|---|---|
| SENTENCE | BARBARA REZNICK | | | 03-31-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-19-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-21-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-22-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-25-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-26-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 02-27-2008 |
| JURY TRIAL | LYNN ERICKSON | | | 02-28-2008 |
| JURY TRIAL | LYNN ERICKSON | | | 02-29-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 03-03-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 03-04-2008 |
| JURY TRIAL | BARBARA REZNICK | | | 03-05-2008 |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they become available. The clerk shall also forward documents upon request by counsel. [MCR 6.433]

May 13, 2008
Date

DANIEL PATRICK O'BRIEN
Judge

51394
Bar No.

**CERTIFICATE OF MAILING**

I certify that on this date I mailed a copy of this claim of appeal to appointed counsel, defendant, court reporter(s)/recorder(s), prosecutor, Court of Appeals, and Michigan Appellate Assigned Counsel System (MAACS). I also mailed a copy of the final judgment or order being appealed and docket entries to appointed counsel, the Court of Appeals, and MAACS. I also mailed a copy of the defendant's request for appointment of counsel to appointed counsel, the prosecutor, and MAACS.

May 13, 2008
Date

Robinson
Signature

RECEIVED
2008 MAY 19 PM 1:45

CC403 (12/96)

Page 1 of 1

TII.84/11/88   3:01:34.90822

| STATE OF MICHIGAN<br>6th JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | *** AMENDED 04/10/2008 ***<br>JUDGMENT OF SENTENCE<br>COMMITMENT TO<br>DEPARTMENT OF CORRECTIONS | OAKLAND COUNTY: 07-214651-FC |
|---|---|---|

ORI: **MI-630015J**   Court Address: 1200 N. Telegraph Rd.,   Pontiac, MI 4834·
Police Report No.

JUDGE DANIEL P. O'BRIEN
PEOPLE v MCBURNEY,STEV

| THE PEOPLE OF THE STATE OF MICHIGAN | V | Defendant's name, address, and telephone no. 248-456-8851<br>MCBURNEY,STEVEN,LINDSEY,<br>311 SCOTT ST<br>SOUTH LYON          MI      48178 |
|---|---|---|

| | CTN/TCN<br>63-06-028058-01 | SID | DOB<br>06/25/1975 |
|---|---|---|---|

| Prosecuting Attorney Name<br>DAVID G. GORCYCA | Bar No.<br>P41352 | Defendant Attorney Name<br>ROBERT F. WHITE | Bar No.<br>P31788 |
|---|---|---|---|

## THE COURT FINDS:

1. The defendant plead / found guilty on 03/05/2008   of the crime(s) stated below:

| Count | CONVICTED BY | | | Crime | CHARGE CODE(S)<br>MCL citation/PACC Code | |
|---|---|---|---|---|---|---|
| | Plea | Court | Jury | | | |
| 1 | | | NG | HOMICIDE-MUR FIRST DEG-FELONY | 750.316-B | ACQUITTED |
| 2 | | | G | HOMICIDE MURDER-SECOND DEGREE | 750.317 | |
| 3 | | | G | CHILD ABUSE-FIRST DEGREE | 750.136B2 | |

**** SENTENCE ENHANCED PURSUANT TO MCL 769.13(2ND)
*For plea: insert "G" for guilty plea, "NC" for nolo contendere, or "MI" for guilty but mentally ill.  For dismissal: insert "D" for dismissed by court or "NP" for dismissed by prosecutor/plaintiff.

☐ 2. The conviction is reportable to the Secretary of State under MCL 257.625(20)(b).
☐ 3. HIV testing and sex offender registration is completed
☐ 4. The defendant has been fingerprinted according to MCL 28.243.

Defendant's driver license number

### IT IS ORDERED:

☐ 5. Probation is revoked.
6. Participating in a special alternative incarceration unit is ☒ prohibited.  ☐ permitted.
7. Defendant is sentenced to custody of Michigan Department of Corrections This sentence shall be executed immediately.

| Count | SENTENCE DATE | MINIMUM | | | MAXIMUM | | DATE SENTENCE BEGINS | JAIL CREDIT | | OTHER INFORMATION |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Years | Mos. | Days | Years | Mos. | | Mos. | Days | |
| 2 | 03/31/2008 | 030 | 0 | 0 | 060 | 0 | 03/31/2008 | 0 | 484 | |
| 3 | 03/31/2008 | 015 | 0 | 0 | 022 | 6 | 03/31/2008 | 0 | 484 | |

☐ 8. Sentence(s) to be served consecutively to: (if this item is not checked, the sentence is concurrent)
  ☐ each other.  ☐ case numbers _____  ☐ parole.
9. Defendant shall pay as follows:
  $120.00 FOR STATE MINIMUM COSTS. PAY $60.00 ASSESSMENT FOR THE CRIME VICTIM RIGHTS FUND.

  Fines, Costs, and Fees not paid within 56 days of the date of this judgment are subject to a 20% late penalty on the amount owed.

☐ 10. The concealed weapon board shall ☐ suspend for _____ days  ☐ permanently revoke  the concealed weapon license, permit number _____ , issued by _____ County.

11. Court recommendation:
  COMPLY WITH DNA TESTING. COUNT TWO AND COUNT THREE CONCURRENT TO EACH OTHER.

**CC219b (6/05) JUDGMENT OF SENTENCE, COMMITMENT TO DEPARTMENT OF CORRECTIONS**
*Page 1*
**COURT FILE**

TIL.04/11/08 :01:34.90823

| STATE OF MICHIGAN<br>6th JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | *** AMENDED 04/10/2008 ***<br>JUDGMENT OF SENTENCE<br>COMMITMENT TO<br>DEPARTMENT OF CORRECTIONS | CASE NO.<br>2007-214651-FC |
|---|---|---|

ORI: **MI-630015J**   Court Address: 1200 N. Telegraph Rd.,   Pontiac, MI 48341      Court telephone no:
Police Report No.

| THE PEOPLE OF THE STATE OF<br>MICHIGAN | V | Defendant's name, address, and telephone no. 248-456-8851<br>MCBURNEY,STEVEN,LINDSEY,<br>311 SCOTT ST<br>SOUTH LYON          MI     48178 |
|---|---|---|

| | CTN/TCN<br>63-06-028058-01 | SID | DOB<br>06/25/1975 |

| Prosecuting Attorney Name<br>DAVID G. GORCYCA | Bar No.<br>P41352 |
|---|---|

| Defendant Attorney Name<br>ROBERT F. WHITE | Bar No.<br>P31788 |
|---|---|

DATED: 03/31/2008

Judge DANIEL P. O'BRIEN                    P51394

Under MCL 769.16a the court clerk shall send a copy of this order to the Michigan State Police Criminal History Record.

I certify that this is a correct and complete abstract from the original court records. The sheriff shall, without needless delay, deliver defendant to the Michigan Department of Corrections at a place designated by the department.

Deputy court clerk

MCL 765.15(2), MCL 769.16a, MCL 775.22, MCL 780.766
MCR 6.427(A)

CC219b (6/05) JUDGMENT OF SENTENCE, COMMITMENT TO DEPARTMENT OF CORRECTIONS
*Page 2*
COURT FILE

Approved, Michigan Court of Appeals

| LOWER COURT<br><br>**07-214651FC** | **Electronically Filed**<br><br>**BRIEF COVER PAGE** | CASE NO.<br>Lower Court  **07-214651FC**<br>Court of Appeals  **285485** |
|---|---|---|

(Short title of case)

Case Name: **People v. Steven Lindsey Mcburney**

1. Brief Type (select one):
   - [ ] APPELLANT(S)
   - [ ] CROSS-APPELLANT(S)
   - [ ] OTHER [identify]:
   - [ ] APPELLEE(S)
   - [ ] CROSS-APPELLEE(S)
   - [ ] REPLY
   - [ ] AMICUS

2. This brief is filed by or on behalf of [insert party name(s)]: **Steven Lindsey Mcburney**

3. [ ] This brief is in response to a brief filed on          by          .

4. ORAL ARGUMENT:   [ ] REQUESTED       [ ] NOT REQUESTED

5. [ ] THE APPEAL INVOLVES A RULING THAT A PROVISION OF THE CONSTITUTION, A STATUTE, RULE OR REGULATION, OR OTHER STATE GOVERNMENTAL ACTION IS INVALID.
   [See MCR 7.212(C)(12) to determine if this applies.]

6. As required by MCR 7.212(C), this brief contains, in the following order: [check applicable boxes to verify]
   - [ ] Table of Contents [MCR 7.212(C)(2)]
   - [ ] Index of Authorities [MCR 7.212(C)(3)]
   - [ ] Jurisdictional Statement [MCR 7.212(C)(4)]
   - [ ] Statement of Questions [MCR 7.212(C)(5)]
   - [ ] Statement of Facts (with citation to the record) [MCR 7.212(C)(6)]
   - [ ] Arguments (with applicable standard of review) [MCR 7.212(C)(7)]
   - [ ] Relief Requested [MCR 7.212(C)(9)]
   - [ ] Signature [MCR 7.212(C)(9)]

7. This brief is signed by [type name]: **Brandy Y. Robinson**

   Signing Attorney's Bar No. [if any]: **(P66895)**

(10/06) **E-File Brief Cover Page**

MCR 7.212(C)

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................................ ii

STATEMENT OF QUESTIONS PRESENTED ................................................... iii

STATEMENT OF FACTS ...................................................................................... 1

I.   THE PROSECUTION DENIED DEFENDANT A FAIR TRIAL BY UNFAIRLY
     IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND
     IMPEACHING HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS. ........... 9

II.  DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE
     WAS TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE.  US CONST AMS V,
     XIV; MICH CONST 1963 ART I § 17 ................................................................ 14

III. DUE PROCESS REQUIRES RESENTENCING WHERE THE COURT
     PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT
     RESPONSIBILITY AND WHERE THE LEGISLATIVE SENTENCING
     GUIDELINES WERE MISSCORED AS TO OFFENSE VARIABLE AND 7,
     RESULTING IN A SENTENCE BASED ON INACCURATE INFORMATION.  US
     CONST AM XIV; MICH CONST 1963 ART I, § 17.. ........................................ 18

SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT ........................... 21

BYR*McBurney BOA Backup.doc*23524  December 4, 2008
Steven Lindsey Mcburney

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

i

## <u>STATEMENT OF JURISDICTION</u>

Defendant-Appellant was convicted in the Oakland County Circuit Court by jury trial or bench trial, and a Judgment of Sentence was entered on March 31, 2008. A Claim of Appeal was filed on Claim_Filed by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel dated April 10, 2008, as authorized by MCR 6.425(F)(3). This Court has jurisdiction in this appeal as of right provided for by Mich Const 1963, art 1, §20, pursuant to MCL 600.308(1); MCL 770.3; MCR 7.203(A), MCR 7.204(A)(2).

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

# STATEMENT OF QUESTIONS PRESENTED

I.    DID THE PROSECUTION DENY DEFENDANT A FAIR TRIAL BY UNFAIRLY
      IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND IMPEACHING
      HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS

                    Trial Court answers, "No".

                    Defendant-Appellant answers, "Yes".

II.   WAS  DEFENDANT DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE WAS
      TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE.  US CONST AMS V, XIV;
      MICH CONST 1963 ART I § 17?

                    Trial Court answers, "No".

                    Defendant-Appellant answers, "Yes".

III.  DOES DUE PROCESS REQUIRE RESENTENCING WHERE THE COURT
      PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT RESPONSIBILITY
      AND WHERE THE LEGISLATIVE SENTENCING GUIDELINES WERE MISSCORED
      AS TO OFFENSE VARIABLE AND 7, RESULTING IN A SENTENCE BASED ON
      INACCURATE INFORMATION.  US CONST AM XIV; MICH CONST 1963 ART I, §
      17.?

                    Trial Court answers, "No".

                    Defendant-Appellant answers, "Yes".

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

**STATEMENT OF FACTS**

When rescue workers arrived at Madison McBurney's home at 7:20 p.m. on November 30, 2007, they found her laying face-up on the floor. *2/28[1] 7, 11.* Her body was limp and she was having difficulty breathing. *2/26 169; 2/28 16.* Madison remained unresponsive to treatment, so paramedics rushed her to the University of Michigan Hospital. *2/26 173; 2/28 32.*

At the direction of pediatric emergency room doctor **Athena Sikavitsas,**[2] Madison received anti-seizure medication. *2/21 87-88.* Suspecting a brain abnormality, Dr. Sikavitsas ordered a CAT scan of Madison's head, which revealed the presence of blood. *2/21 92-94, 105, 137.* The doctor found no bruising or evidence of external trauma to Madison's head, neck or the rest of her eleven-month old body. *2/21 121-27.*

According to **Dr. Cormac Maher,**[3] Madison had both old and new blood in her brain's subdural space.[4] *2/22 70, 73-74.* The doctor believed the bleeding existed in two different areas of the brain. *2/22 74, 91.* He also saw small brain contusions or blood in her subarachnoid space. *2/22 92.* Madison's brain injury was diffuse, and there was swelling in her optic disc.[5] This suggested increased cranial pressure, which doctors tried to relieve through medication and by draining fluid. *2/22 82, 84.* When this proved unsuccessful, the only remaining option was to remove a portion of Madison's skull. *2/22 84-85.* Madison's parents declined that treatment after

---

[1] For the purposes of this brief, the trial transcripts will be referred to by date and page number.
[2] Dr. Sikavitsas testified as a prosecution expert in pediatric emergency medicine. *2/21 81.*
[3] Dr. Maher was qualified as a prosecution expert in pediatric neurosurgery.
[4] Dr. Maher described the human brain as having three layers: (1) the "pia" layer, which covers the brain directly; (2) an "arachnoid" layer that covers the pia; and (3) the "dura," a tough membrane beneath one's skull. *2/22 64.* Dr. Maher referred to the area beneath the dura as the subdural space. He similarly characterized the area beneath the arachnoid as the subarachnoid space. *2/22 64.*
[5] This condition is referred to as papilledema, according to Dr. Maher. *2/22 78.*

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

considering the risks involved.  *2/22 84-86.*  Madison eventually died in the hospital a few days later.[6]  *2/27 55.*

**Dr. Ljubisa Jovan Dragovic,** an expert forensic pathologist and neuropathologist, performed an autopsy on Madison.  Dr. Dragovich deemed Madison's death a homicide.  He concluded that she died from complications arising from blunt trauma of the head.  *2/29 34.*

*Theories.*  The prosecution believed Mr. McBurney killed his daughter by forcefully throwing her into her crib.  Mr. McBurney admitted to carelessly throwing Madison, but believed she had an unknown pre-existing condition that made her more susceptible to injury.  The defense argued that Madison's death was an accident.

*Testimony of the First Responders.*  When **Craig Johnston** of the South Lyon Fire Department responded to the dispatch, Mr. McBurney told him Madison had been sick all day.  *2/28 21.*  He said he was feeding Madison and went to the bathroom.  When he returned, she was having seizures. *2/28 9.*  **Kevin Schuldt** of the South Lyon Fire Department overheard Mr. McBurney describing the incident to a third party.  Mr. McBurney said Madison spit up a bottle in her bouncy seat and stopped breathing when he walked her to the back of the house.  *2/28 28-29.*

According to paramedic **Matthew Calus**, Mr. McBurney said Madison had been vomiting all day.  *2/27 12.*  Shortly after giving her formula, Madison vomited again and became unresponsive.  *2/26 166.*[7]  Mr. Calus believed Mr. McBurney behaved extremely calmly during the ordeal, volunteering no information.  *2/27 25.*

*Observations of the University of Michigan Medical Staff.*  **Dr. Sikavitsas** testified that Mr. McBurney said Madison had vomited three times and was sitting upright on the floor when she

---

[6] **Dr. Folafoluwa Odetola** headed up Madison's PICU team.  His testimony was substantially similar to that of Dr. Maher's.  He too concluded Madison died from severe non-accidental brain injury.  *2/27 57.*

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

started making "gurgling" noises and "just went down." *2/21 98-99*. The doctor claimed Mr. McBurney also told her Madison had been vomiting and sick the day before. *2/21 104*.

**Dr. Leena Dev** testified as the head of the university's child protection team. *2/22 204, 207*. Mr. McBurney and his wife, Heather, said they were Madison's parents and primary caregivers. They said Madison was fine when Heather left for work. Mr. McBurney told Dr. Dev that Madison woke up, drank part of a bottle and vomited. He changed her diaper, put on her leg brace and pajamas and set Madison on the floor. Mr. McBurney then heard a gurgling noise and saw Madison stiffen and arch her back. *2/22 212*.

Dr. Dev examined Madison at the hospital and concluded that Madison's injury stemmed from "abusive head trauma," e.g. trauma inflicted in and around the brain. She based her opinion on (1) the fact that the history given by Mr. McBurney differed from the findings; (2) the fact that the history given changed over time; and (3) the presence of subdural and retinal hemorrhaging. *2/22 218-19*. In her opinion, abusive head trauma arises from a rapid acceleration and deceleration of the brain, which ruptures veins and leads to subdural and retinal hemorrhage. This hemorrhaging may cause the brain to swell, causing irritability, vomiting, breathing problems and/or seizures. *2/25 28-30*. Dr. Dev's report equated abusive head trauma with shaken baby syndrome. *2/25 63*.

Dr. Dev saw no indications that Madison ever lacked oxygen. *2/25 35*. While she was aware of both chronic and acute subdural hematomas in Madison's brain, Dr. Dev's disagreed with the defense theory that Madison's injury stemmed from a chronic subdural hematoma that re-bled. *2/25 64, 73, 76*.

*Madison's Medical History*. Madison saw doctors frequently for several reasons during her life. First, she was born with dislocated hips. Her mother, **Heather McBurney** testified that Madison

---

[7] In terms of medical history, Mr. McBurney told Calus his daughter had a bacterial infection and a congenital hip condition called hip dysplasia. *2/26 174*.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

wore a leg brace and could not crawl at eleven months. *2/21 146-49*. She also had wounds on her scalp that did not heal after birth.[8]  Madison underwent an MRI in August 2006 and a CAT scan in September 2006 to examine the scalp condition. *2/21 200-01*. She had also contracted a bacterial infection called MRSA[9] which required medical treatment. Finally, in February of 2006, Mr. McBurney accidentally dropped Madison from a bouncy seat. He and Heather took Madison to the emergency room immediately, but the hospital discharged her with instructions to take Tylenol. *2/21 209-10*.

**Dr. Robert Adams**, a defense expert in family medicine, testified as Madison's primary doctor. He examined her at several well-baby visits and she seemed normal, save for a cold and her scalp and hip conditions. Dr. Adams never suspected Madison to be a victim of child abuse. *2/29 128-35*.

*The Investigation.*  According to Heather McBurney, on the day of the incident, Madison vomited several times and seemed more tired than normal. She pouted a bit a couple of times when Heather laid her down; Heather thought Madison might have a headache. *2/21 243*. She seemed much better when Heather McBurney left for work around 6:00 p.m. Shortly after 7:00 p.m., Mr. McBurney called Heather and said Madison had collapsed. Heather left work and met the ambulance at the hospital. Mr. McBurney told her that while he put Madison's dirty clothes and diaper away, she fell back on the floor, stiffened and then became limp. *2/21 152-60*.

Heather was present for a portion of her husband's police interview, along with Offiicer Sederlund, and Sovik. She testified over defense objection that Mr. McBurney told her he threw Madison into the crib. *2/21 163-69*. Heather thought Officer Sovik had a tape recorder during the conversation. *2.21 252-53, 257*.

---

[8] The scalp condition was called aplasia cutis congenital, according to Heather McBurney. *2/21 198*.
[9] According to testimony from several doctors at trial, MRSA was the acronym for methicillin-resistant staphylococcus aureus. *See, e.g. 2/21 119-20*.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

*The Testimony of Police Witnesses and Forensic Experts*.  In March of 1998, **Sergeant Paul Sumner** investigated Mr. McBurney for injuries sustained by his son, Nicholas Kennedy.  He testified about the investigation over defense objection.  Sgt. Sumner claimed Mr. McBurney initially denied injuring Nicholas.  He then admitted falling once with the child, but said that Nicholas suffered no injury.  On the date of the alleged incident, Mr. McBurney acknowledged being home alone with Nicholas.  He claimed the boy stopped breathing shortly after his mother left for work. *2/22 143-48.*

Mr. McBurney came to the police department later and changed his story.  He disclosed another incident wherein Nicholas hit his head on a carpeted cement floor.  Mr. McBurney never told anyone about the injury.  After some prompting from Sgt. Sumner,  Mr. McBurney explained that after his girlfriend left for work, Nicholas became upset and was crying.  Mr. McBurney said he bounced Nicholas while trying to give him a bottle, but grew frustrated.  He started shaking and bouncing the baby hard.  Nicholas stopped breathing and went limp.  Mr. McBurney called for help.  He eventually authored a statement to that effect which was published to the jury over objection. *2/22 149-53, 155.*

**Officers Chris Sederlund and Christopher Sovik** investigated Madison's case.  They interviewed Mr. McBurney at the hospital and his oral statements were admitted over defense objection.  Mr. McBurney initially denied having other children or injuring Nicholas.  He said he believed Nicholas's injuries were worse.

The officers claimed Mr. McBurney said on the date of the incident Madison spit up a bottle after taking a nap.  He changed Madison's pajamas and diapers and affixed her leg brace.  He placed her on the bedroom floor but noticed her gurgling and struggling to breathe.  Mr. McBurney told the officers Madison fell backwards and began having a seizure.  She became rigid and unresponsive,

prompting him to call 911. He gave her rescue breaths while waiting for the ambulance. *2/26 118-22; 2/28 64-69*. Mr. McBurney also admitted previously dropping Madison from her bouncy chair.

In response to a statement that officers knew he committed the crime, Mr. McBurney said his life was over. *2/26 147; 2/28 73-79*. He told his wife that Madison was screaming and crying inconsolably, and that he grew frustrated. He threw Madison into the crib from two feet away and she hit the back of her head on the crib bars. He said Madison immediately went into a seizure. He grabbed her from the crib, but was she was limp, unresponsive and having trouble breathing. *2/26 131*.

In performing the autopsy, Dr. Dragovic did not see evidence that Madison suffered from violent shaking. *2/29 103*. He found both older and more recent bleeds within Madison's subdural matter.[10] Madison's brain and brain stem had swollen sufficiently to impair her breathing and cause retinal hemorrhaging.[11] *2/29 20-33*. Dr. Dragovic opined that a chronic subdural hematoma is a pre-existing condition that would make a person more vulnerable to re-injury. Such a person could sustain significant damage from a lesser amount of force than ordinarily required. *2/29 47-48*.

*The Defense Witnesses*. Neurosurgeon expert **Dr. Ronald Uscinski** challenged the assumptions associated with shaken baby syndrome. Dr. Uscinski opined that human beings cannot shake babies with enough force to produce intracranial injuries. He believed that truly forceful shaking would break a baby's neck. *2/26 8-9*.

According to Dr. Uscinski, a chronic subdural hematoma has the capacity to re-bleed. *2/26 25-27*. Rebleeding can irritate the brain, causing seizures, loss of consciousness, and/or breathing difficulty. The seizures can lead to oxygen deprivation, which can ultimately cause brain death. Rebleeding symptoms include lethargy, vomiting, seizure and floppiness. *2/26 27-29*. Dr. Uscinski

---

[10] Dr. Dragovic believed the old bleed reflected evidence of previous head trauma.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

believed Madison suffered from are-bleeding chronic subdural hematoma, coupled with oxygen deprivation to her brain. *2/26 30*. He interpreted the acute blood on Madison's MRI as evidence of fresh re re-bleeding, not necessarily acute injury. *2/26 35*. In Dr. Uscinski's view, the September CAT scan showed signs of degraded blood products in Madison's subdural space. He believed the hematomas from the August MRI had not completely resolved by the September CAT scan. *2/26 42-48*. He also opined that it still existed as of the day of the incident. *2/26 51*.

Dr. Uscinski testified that Madison did not receive enough oxygen to her brain, which could cause swelling and eventually brain death. Moreover, nothing from the medical records indicated Madison had bumps, bruises, skull fractures or other external evidence of blunt injury to her head. *2/26 56-58*. Dr. Uscinski did not believe the external trauma caused her brain to swell. Rather, in his opinion, Madison had suffered the effects of oxygen deprivation and attempts to restore her circulation only increased swelling. *2/26 59*.

Over defense objection, the prosecution impeached Dr. Uscinski with transcripts of his alleged statements and conclusions in eight completely unrelated trials. *2/26 81-84, 88-97*.

**Lynn Schumann-Peterson** and **Sharon Klump** cared for Madison at Pitter-Patter Learning Care. According to their testimony, Madison appeared happy and properly clothed and fed during her tine there. She seldom cried and never screamed, vomited or appeared irritable. Neither woman was concerned about Madison's welfare outside of day care. *2/28 140-53*.

**Gary Linbille** was Madison's maternal grandfather. He viewed Mr. McBurney as loving, protective and attentive over Madison. *2/28 155, 161*. On cross-examination, he admitted overhearing Mr. McBurney give conflicting accounts about where in the house Madison fell over. *2/28 166*.

---

[11] Dr. Dragovic also opined that Madison sustained epidural hemorrhages in the lower part of her neck / upper part of her mid-back area. *2/29 66*.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

*The Prosecution's Rebuttal Case.*  **Dr. Mohannad Ibrahim,** an expert pediatric neuroradiologist, testified   to rebut Dr. Uscinski's testimony.   While Madison's August 2006 MRI showed the presence of either fat or a subdural hematoma, Dr. Ibrahim saw no fat in Madison's September 2006 CAT scan.   An MRI taken after Madison's hospitalization revealed hematomas of different ages. One of the hematomas existed in the same place as the hematoma revealed on the August MRI.   Dr. Ibrahim also saw blood in the subarachnoid space.   To his knowledge, a subdural hemorrhage could not re-bleed into the subarachnoid space. *3/3 16-38*

On March 5, 2008 following a trial before the Honorable Daniel P. O'Brien, an Oakland County jury convicted Defendant-Appellant Steven McBurney of second-degree murder[12] and first degree child abuse.[13]   Judge O'Brien sentenced Mr. McBurney to 30-60 years imprisonment for second-degree murder and 15 - 22.5 years for child abuse.   Mr. McBurney now appeals as a matter of right.

---

[12] MCL 750.317.
[13] MCL 750.136b(2).

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM



RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

I.      **THE PROSECUTION DENIED DEFENDANT A FAIR TRIAL BY UNFAIRLY IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND IMPEACHING HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS.**

*Issue Preservation and Standard of Review.*   Trial counsel preserved this issue for appeal by objecting to the government's impeachment tactics. *2/26 67-71; 82-97.*   The trial court's decision on the handling of witnesses is reviewed for an abuse of discretion. *People v Hall,* 433 Mich 573, 585 (1989).   Claims of prosecutorial misconduct implicate the due process right to a fair trial and must be reviewed by appellate courts *de novo. People v Abraham,* 256 Mich App 265, 276; 662 NW2d 836 (2003).

*Argument.*   The defense at Mr. McBurney's trial was accident, and that Madison was pre-disposed to being seriously injured, even with slight force.   Mr. McBurney did not take the stand his own defense.   Instead, he presented an expert witness – Dr. Uscinski – to support his theory that his daughter was susceptible serious injury from even moderate force.

In cross-examining Dr. Uscinski, the prosecutor argued with him about the price of his services, both here and in other trials:

| | |
|---|---|
| PROSECUTOR: | Did you receive any money in relation to this case, doctor? |
| USCINSKI: | Yes. |
| PROSECUTOR: | For what? |
| USCINSKI: | Time, not testimony, ma'am time. |
| PROSECUTOR: | And how much did you receive or will you receive? |
| USCINSKI: | Somewhere between twelve and thirteen thousand dollars, and that's an estimate. |
| PROSECUTOR: | Isn't it true that in November of 199 you were a witness for the defense in the Louise Woodward case? *2/26 68.* |

9

Over defense objection, Dr. Uscinski was forced to reveal his fees in the Woodward case and others.

The prosecutor continued along this line by questioning the doctor about his professional conclusions in other matters. Over defense objection, she asked the doctor to recount his findings in the Woodward case, along with Colorado v Waddle, Tennessee v Stringer, California v Velahbid, Texas v Cathy Stewart, and others. *2/26 90-93.* When the doctor responded that he could not recall, the prosecutor attempted to impeach him with transcripts of his testimony in those cases. *2/26 93-97.* The facts of those matters, of course, were never presented to Mr. McBurney's jury.

The prosecutor relied heavily on this exchange during closing arguments:

> Now I don't have much to say about Doctor Uscinski's testimony. This is a man who goes around the country and testifies. Testifies only on behalf of the defense. He testified he has never testified on behalf of the prosecution. He goes around and he testifies about children that he's never seen, that he's never touched, that he's never treated. . . .
>
> The Defendant had to go a long way to find somebody who would dispute these doctors. All the way to Maryland or Virginia for twelve ($12,000) or thirteen thousand dollars ($13,000) of his time. And recall how much of an argument he had to give me about was he getting paid for his time or his testimony, instead of just coming out and saying "I'm paid this." Apparently you can get anyone to say anything for enough money. Although in Doctor Uscinski's case it's not just anything is it? He has a pattern of testifying that it's a chronic subdural rebleed. *3/4 69-71.*

In *People v Tyson*, 423 Mich 357 (1985), the Michigan Supreme Court reversed because of similar prosecutorial mistreatment of the defense expert witness. There, the prosecutor argued without evidentiary support that the defense expert was paid for his testimony and that was his motivation for testifying. He also argued that the defense expert lacked integrity and that the prosecution's expert was an "unbiased expert who works for the State of Michigan." *Id*, at 366 367. There was an objection, and the trial court allowed the defense attorney to argue in his closing statement that the psychiatrist was appointed, and working for far less money than he would be

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

privately treating patients. The Michigan Supreme Court nonetheless ruled that the prosecutor had committed reversible error, not cured by defense counsel's responsive argument, holding in part:

> "This personal attack on the defendant's expert was intended to, and did, distract the jury from the real issues, and required defendant to defend on an issue that was improperly before the jury. Clearly, the critical issue in this case was whether or not defendant was insane. This case, as are so many others, was obviously decided on the basis of which expert the jury chose to believe. For this reason, it is especially important to protect against prosecutorial misconduct designed to impugn the credibility of the defendant's expert witness." Id, 376.

While in *Tyson* there apparently had been no testimony about the fees paid to the expert, *Tyson* should not be interpreted to mean that, once an expert testifies as to his fee, arguments and insinuations that he has been bought and sold and his opinion therefore has no validity, are permissible. Certainly the cases relied upon by *Tyson* do not support this limitation. *Id* at 374-375. *See People v Williams*, 218 Mich 697 (1922) (prosecutor's argument that the defense experts had prostituted themselves by testifying in the defendant's behalf constituted reversible error: "[I]t was not permissible for the jury to take the personal opinion of the prosecutor..." Id at 707); *People v Cowles*, 246 Mich 429, 431-433 (1928):

> The prosecuting attorney had a right to analyze the testimony, urge the jury, upon reason existing in the case to reject it and point out, if possible, its inapplicability. But invective, ridicule, injection of his belief, and innuendoes was not permissible argument, and was unfair to the experts and prejudicial to defendant. *See People v Williams*, 218 Mich 697. *Cowles*, at 432-433, quoted with approval in *Tyson* at 433.

As stated above, it is the deliberate attempt to distract the jury from the actual issues and from a fair and dispassionate evaluation of the evidence that *Tyson* forbade. While it may be permissible to ask a witness if he is receiving a fee to show bias, without more evidentiary support, the prosecutor should not be allowed to make the fee an issue and to insinuate that the expert has prostituted himself by flying around the country to give identical testimony on behalf of criminal defendants. As this Court has observed, "in a case that turns largely on conflicting expert testimony,

11

a prosecutor must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts." *People v Unger,* 278 Mich App 210, 240 (2008). The jury should have been free to analyze Dr. Uscinski's opinion with an impartial evaluation of his qualifications, the extent of his investigations, his competence in applying medical principles, and the evidentiary and logical support for his conclusions. Nevertheless, the prosecutor sought to convince the jury that she believed Uscinski was a hired gun unworthy of consideration, and that they should do the same.

Furthermore, as in *People v Burrell*, 127 Mich App 721 (1983), the prosecutor improperly suggested that Dr. Uscinski habitually gave false testimony. The prosecutor in *Burrell* asked the defendant's alibi witness if she testified for criminal defendants on a regular basis. In strongly condemning the misconduct, the *Burrell* court observed that "by suggesting that [the witness] testifies regularly for the defense, [the prosecutor] insinuated that [the witness] regularly perjures herself. There was no evidence whatsoever that [she] had ever committed perjury." *Id* at 727. The Court deemed the insinuation particularly damaging since the prosecutor noted that the witness had testified for the defense at trials where he represented the government. *Id.* Like the situation in *Burrell,* the prosecutor here asked Dr. Uscinski if they had met before. *2/26 61.* She suggested in occurred in June of 2006 before the Honorable Steven Andrews of the same court. *2/26 61.* prosecutor intimated that he personally believed that Foster had perjured herself on those occasions.

A prosecutor may not argue facts not evidence to the jury. In *Berger v US,* 295 US 78, 88 (1935), *overruled on other grounds by Stirone v US,* 361 US 212 (1935), the Supreme Court described the policy underlying this rule:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done ... He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is ... his

12

> duty to refrain from improper methods calculated to produce a
> wrongful conviction ...

*Id* at 88. Thus, because a strong possibility exists that a jury may unduly credit the prosecution's

view of the facts, inappropriate suggestions and assertions of personal knowledge are generally

deemed improper. *Id. See also, Washington v Hofbauer*, 228 F3d 689, 699-702 (CA 6, 2000); *People v*

*McCain*, 84 Mich App 210, 215 (1978); *People v Knolton*, 86 Mich App 424 (1978).

Accordingly, such arguments have been held to require reversal, even without an objection,

*Knolton, supra; McCain, supra, People v Haines*, 105 Mich App 213 (1981); *Burrell, supra.* The trial court's

error in permitting this cross-examination was not harmless, where the case truly involved a battle of

the experts. Because the improper attack on Mr. McBurney's key witness may have been the

decisive factor in the mind of a juror who voted to convict, reversal is required.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

II.    **DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE WAS TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE.  US CONST AMS V, XIV; MICH CONST 1963 ART I § 17.**

*Issue Preservation and Standard of Review:*  Whether other acts are admissible for a proper purpose is reviewed de novo. Whether their probative value is substantially outweighed by the danger of unfair prejudice is reviewed for abuse of discretion.  *People v Crawford*, 458 Mich 376, 438 (1998).

*Argument:*  Mr. McBurney was charged with and convicted of abusing and killing his infant daughter, Madison.  Yet, his jury's perceptions were tainted with irrelevant and unfairly prejudicial evidence of alleged abuse against his son from a prior relationship.  Practically speaking, the entire trial was an assault on Mr. McBurney' character -- not based upon the specific charge which had been lodged against him, and which the prosecutor bore the burden of proving -- but resting on the prosecutor's depiction of him as a man who had a propensity to physically abuse his children.

The admission of evidence concerning alleged violence against Nicholas Kennedy denied Mr. McBurney his due process right to fair trial and his right to confront his accusers. US Const amend XIV; Const 1963, art 1 § 17; *Crawford v Washington,* 541 US 36 (2004); *Lisenba v California*, 314 US 219, 236 (1941) (due process requires fundamental fairness in use of evidence against a defendant). The guilt or innocence of an accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrong doing. 1A J. Wigmore, Wigmore on Evidence, ' 58.2, 1212-1213 (3d ed Tiller rev 1983). The evidence here was inadmissible because it was (2) irrelevant; (3) vastly more prejudicial than probative; and (4) caused the jury to convict based upon an impermissible inference that Mr. McBurney was guilty because he had a propensity to commit child abuse. MRE 401, 403, 404.

14

MCL 768.27b sets forth the new framework under Michigan law for admitting evidence of prior acts of domestic violence:

> Sec. 27b.(1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

Here, the prosecution offered evidence about Nicholas Kennedy to prove Mr. McBurney knew the consequences that could flow from handling an infant roughly. The prosecution argued that such evidence was relevant to proving the knowledge and intent elements of second-degree murder. Notwithstanding the prosecutor's proffered purpose, the logical relationship between the proffered evidence and the ultimate fact sought to be proven must be closely scrutinized. *Crawford, supra* at 388.

One determines logical relevance by looking to Michigan Rules of Evidence 401 and 402. MRE 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Similarly, in pertinent part, MRE 402 provides that all relevant evidence is admissible, and that evidence which is not relevant is not admissible.

As *Crawford* teaches, "evidence is relevant if two components are present, materiality and probative value. Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action. "In other words, is the fact to be proven truly in issue?" *Crawford, supra* at 388-89. Furthermore, a fact that is "of consequence" to the action is a material fact. *Id.* "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial." 1 McCormick, Evidence (4th ed), § 185, p 773.

15

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

The defendant in *Crawford* was tried on charges of possession with intent to deliver cocaine, after drugs were found on his person and drugs and paraphernalia were found in his car. He denied knowing about the drugs in the car. In an effort establish the defendant's knowledge of the presence of the cocaine in the car and his intent to deliver it, the prosecution offered evidence that he had previously been convicted of this same offense for actually delivering cocaine. The *Crawford* Court held that this evidence was inadmissible because there was no showing of how the prior act evidence bore on the determination of whether the defendant committed the charged offense, other than by invoking the impermissible inference of bad character.

While the *Crawford* analysis focused in part on admissibility of under MRE 404(b), it also placed significant emphasis on relevancy under MRE 401 and 402. The *Crawford* court observed that relevance is not an inherent characteristic, and that prior bad acts are not intrinsically relevant to a particular proffered purpose. Rather relevance reflects "a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *Crawford, supra* at 387-88 (quoting *United States v Sampson*, 980 F.2d 883, 888 (CA 3, 1992). Like the irrelevancy between the prior drug delivery offense and the charged act of drug possession with intent to deliver in *Crawford*, the events which allegedly occurred with Nicholas Kennedy had no tendency to prove Mr. McBurney's commission of the charged offense involving Madison. *People v Pattison*, 276 Mich App 413 (2007) does not compel a different result, for even that court acknowledged that MCL 768.27b must yield to balancing test of MRE 403.

Thus, even assuming the evidence of Nicholas's Kennedy's injuries was probative of a material fact, the danger of unfair prejudice substantially outweighed whatever marginal probative value it might have had. The *Crawford* decision emphasized the importance of assessing whether unjust harm may result from admitting the evidence, and if so, of excluding it notwithstanding

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

16

relevance.  Similarly, nothing in the text of MCL 768.27b calls for a particularly lenient application of MRE 403.  Undoubtedly, a unique stigma is associated with child abuse, particularly involving suspected cases of Shaken Baby Syndrome.  This reality made it extremely likely that the jury would deliver a guilty verdict not because Mr. McBurney's intentionally harmed Madison – but because they sought to punish a repeat offender. The prior evidence detracted from the central issue of Mr. McBurney's trial – e.g. whether the cause of death here was negligent or accidental, rather than malicious.

While the similar acts evidence had very little probative value, its prejudicial effect on the jury was likely phenomenal.  The jury simply could not avoid the temptation to convict based on determining, not that Mr. McBurney committed the charged act, but that he was a bad man who had a habit of abusing his children.

The defense objected to the similar acts testimony, and the court gave an inadequate cautionary instruction based on MCL 768.27b.  *See CJI 5.8c.*  Because the instruction did not guide the jury according to the principles a court must consider in evaluating MRE 403, it could not have "undone" the harm which resulted from listening to testimony of the other incidents.  It is clearly "more probable than not" that Mr. McBurney was deprived of a fair trial as a result of the admission of testimony and prosecutorial argument about his alleged abuse of his son. *People v Lukity*, 460 Mich 484.  Reversal is required.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

III.   **DUE PROCESS REQUIRES RESENTENCING WHERE THE COURT PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT RESPONSIBILITY AND WHERE THE LEGISLATIVE SENTENCING GUIDELINES WERE MISSCORED AS TO OFFENSE VARIABLE AND 7, RESULTING IN A SENTENCE BASED ON INACCURATE INFORMATION. US CONST AM XIV; MICH CONST 1963 ART I, § 17..**

*Issue Preservation and Standard of Review.* Mr. McBurney challenged the scoring of OV 7 at sentencing, so this issue is preserved for appellate review. *3/31 7-10.* Whether the trial court correctly applied the statutory sentencing guidelines is a question of law subject to de novo review. *People v Morson,* 471 Mich 248 (2004); *People v Libbett,* 251 Mich App 353; 365 (2002). This Court reviews factual decisions made at sentencing under a "clearly erroneous" standard of review. *People v Fields,* 448 Mich 58, 77 (1995). This Court applies de novo review to constitutional questions. *People v Hill,* 257 Mich App 126, 149-150 (2003). Preserved scoring errors that alter the recommended guidelines range entitle the defendant to a new sentencing hearing. People v Francisco, 474 Mich 82, 89-92; 711 NW2d 44 (2006).

*Analysis.* The trial court erred by misscoring OV-7. Under the Michigan and United States Constitutions, every defendant enjoys a due process right to be sentenced on the basis of accurate information and in accordance with the law. *Townsend v Burke,* 334 US 736 (1948); *People v Lee,* 391 Mich 618, 636-637 (1974); *People v Malkowski,* 385 Mich 244 (1971). Further, MCR 2.613(A) provides that a sentence must be consistent with "substantial justice." Our Supreme Court has found that "it is difficult to imagine something 'more inconsistent with substantial justice' than requiring a defendant to serve a sentence that is based upon inaccurate information." *People v Francisco,* 474 Mich 82, 91, n6 (2006). Here, Mr. McBurney' sentence is predicated upon inflated guidelines. He is therefore entitled to resentencing. *Id.* at 91-92.

To justify a score of 50 points under OV-7, the prosecution must establish that "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase

the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). For purposes of OV-7, "sadism" is defined as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(3).

At sentencing, Mr. McBurney objected to the scoring of OV-7. His objection was based on an argument that Mr. McBurney never intended to cause his daughter conscious pain or suffering. Rather, the testimony at trial showed that, if anything, Mr. McBurney acted spontaneously in an act of frustration. *3/31 9-10*. This finding was consistent with the jury's verdict of second degree murder. Neglecting that fact, the trial court scored OV 7 at fifty points. He relied heavily on the fact that Madison was an infant who experienced harshness and brutality during her medical treatment, "her consciousness not withstanding." *3/31 16*.

Nevertheless, OV 7 was more properly scored at zero. This Court's published opinions on the subject reveal that a score of fifty points is warranted when defendants do, in fact, go beyond what is necessary to commit the crime by engaging in sadistic and excessively brutal conduct. For instance, in the case of *People v James*, 267 Mich App 675 (2005) this Court determined that 50 points were appropriate for OV 7 because the defendant "repeatedly stomped the victim's face and chest after the victim was lying unconscious on the ground. Additionally, the victim was deprived of oxygen for a period of four to six minutes, causing him to have anoxic encephalopathy, i.e., significant brain damage from lack of oxygen, and currently remains comatose with little or no chance of ever regaining consciousness." And in *People v Kegler*, 168 Mich App 187 (2005), this Court upheld a score of 50 points where the defendant transported her victim's unconscious naked body outside in part because of her admission that she did so with the intent to humiliate him. It was unclear at exactly which point the victim in the *Kegler* case died, but this Court held that the victim's potential inability to perceive fear and anxiety (due to unconsciousness or death) was not dispositive. The focus must remain on the Defendant's intent to increase the victim's fear and anxiety. *Id.*

19

Under that standard, one cannot reasonably argue that Mr. McBurney intended to cause the pain and suffering endured by his daughter. Based on this scoring error, Mr. McBurney should have only been assessed a total of sixty-five points under his offense variables. Proper scoring under the guidelines would have reduced him to a class C-IV offender, with an adjusted guidelines range of 108-225 months. This is a significant decrease from the 360 month prison term to which Mr. McBurney was actually sentenced. Resentencing is therefore required. *Francisco, supra* at 90-91.

Alternatively, this court should remand for resentencing where the trial judge commented on the fact that Mr. McBurney took "no responsibility for [his] action and consequently do not acknowledge any wrongdoing." *3/31 21.* It is axiomatic that a sentencing court cannot, in whole or part, base its sentence on a defendant's refusal to admit guilt. *People v Lonsby,* 474 Mich 996 (2006) (citing *People v Wesley,* 428 Mich 708, 711 (1987).

.

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

## <u>SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT</u>

**WHEREFORE**, for the foregoing reasons, Defendant-Appellant asks that this

Honorable Court reverse his conviction.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Brandy Y. Robinson

BY:_____

**BRANDY Y. ROBINSON (P66895)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 256-9833

Dated:  December 4, 2008

RECEIVED by Michigan Court of Appeals 12/4/2008 11:52:38 PM

21

Approved, Michigan Court of Appeals

| LOWER COURT<br><br>07-214651FC | Electronically Filed<br><br>**BRIEF COVER PAGE** | CASE NO.<br><br>Lower Court  07-214651FC<br><br>Court of Appeals  285485 |
|---|---|---|

(Short title of case)

Case Name: **People v. Steven Lindsey Mcburney**

1. Brief Type (select one):

   ☒ APPELLANT(S)      ☐ APPELLEE(S)      ☐ REPLY

   ☐ CROSS-APPELLANT(S)    ☐ CROSS-APPELLEE(S)    ☐ AMICUS

   ☐ OTHER [identify]:

2. This brief is filed by or on behalf of [insert party name(s)]: **Steven Lindsey Mcburney**

3. ☐ This brief is in response to a brief filed on          by          .

4. ORAL ARGUMENT:      ☒ REQUESTED      ☐ NOT REQUESTED

5. ☐ THE APPEAL INVOLVES A RULING THAT A PROVISION OF THE CONSTITUTION, A STATUTE, RULE OR REGULATION, OR OTHER STATE GOVERNMENTAL ACTION IS INVALID.
   [See MCR 7.212(C)(12) to determine if this applies.]

6. As required by MCR 7.212(C), this brief contains, in the following order: [check applicable boxes to verify]

   ☒ Table of Contents [MCR 7.212(C)(2)]

   ☒ Index of Authorities [MCR 7.212(C)(3)]

   ☒ Jurisdictional Statement [MCR 7.212(C)(4)]

   ☒ Statement of Questions [MCR 7.212(C)(5)]

   ☒ Statement of Facts (with citation to the record) [MCR 7.212(C)(6)]

   ☒ Arguments (with applicable standard of review) [MCR 7.212(C)(7)]

   ☒ Relief Requested [MCR 7.212(C)(9)]

   ☒ Signature [MCR 7.212(C)(9)]

7. This brief is signed by [type name]: **Brandy Y. Robinson**

   Signing Attorney's Bar No. [if any]: **(P66895)**

(10/06) **E-File Brief Cover Page**                                    MCR 7.212(C)

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION ......................................................................................iv

STATEMENT OF QUESTIONS PRESENTED ...................................................................v

STATEMENT OF FACTS ...........................................................................................1

I.    THE PROSECUTION DENIED DEFENDANT A FAIR TRIAL BY UNFAIRLY IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND IMPEACHING HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS............9

II.   DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE WAS TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE.  US CONST AMS V, XIV; MICH CONST 1963 ART I § 17. ..................................................................... 14

III.  DUE PROCESS REQUIRES RESENTENCING WHERE THE COURT PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT RESPONSIBILITY AND WHERE THE LEGISLATIVE SENTENCING GUIDELINES WERE MISSCORED AS TO OFFENSE VARIABLE 7, RESULTING IN A SENTENCE BASED ON INACCURATE INFORMATION.  US CONST AM XIV; MICH CONST 1963 ART I, § 17. .......................................................... 19

SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT ..........................22

BYR*McBurney BOA Backup.doc*23524  December 4, 2008
Steven Lindsey Mcburney

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

# TABLE OF AUTHORITIES

## CASES

*Berger* v *US*, 295 US 78 (1935), *overruled on other grounds by Stirone v US*, 361 US 212 (1935) ..................................................................................................................... ...........12; 13

*Crawford* v *Washington*, 541 US 36 (2004) ...............................................14; 15; 16

*Lisenba* v *California*, 314 US 219 (1941) ..............................................................14

*People* v *Abraham*, 256 Mich App 265; 662 NW2d 836 (2003)...........................9

*People* v *Burrell*, 127 Mich App 721 (1983) ...............................................12; 13

*People* v *Cowles*, 246 Mich 429 (1928).............................................................11

*People* v *Crawford*, 458 Mich 376 (1998) ..................................................14; 15; 16

*People* v *Fields*, 448 Mich 58 (1995) ...............................................................18

*People* v *Francisco*, 474 Mich 82; 711 NW2d 44 (2006).........................18; 20

*People* v *Hall*, 433 Mich 573 (1989) ................................................................9

*People* v *Haines*, 105 Mich App 213 (1981) ....................................................13

*People* v *Hill*, 257 Mich App 126 (2003) .........................................................18

*People* v *James*, 267 Mich App 675 (2005) .....................................................19

*People* v *Kegler*, 168 Mich App 187 (2005).....................................................19

*People* v *Knolton*, 86 Mich App 424 (1978).....................................................13

*People* v *Lee*, 391 Mich 618 (1974)................................................................18

*People* v *Libbett*, 251 Mich App 353 (2002) ..................................................18

*People* v *Lonsby*, 474 Mich 996 (2006)...........................................................20

*People* v *Lukity*, 460 Mich 484 ......................................................................17

*People* v *Malkowski*, 385 Mich 244 (1971) .....................................................18

i

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

*People* v *McCain*, 84 Mich App 210 (1978) ..................................................................13

*People* v *Morson*, 471 Mich 248 (2004) ......................................................................18

*People* v *Pattison*, 276 Mich App 413 (2007) ...........................................................16

*People* v *Tyson*, 423 Mich 357 (1985) ................................................................10; 11

*People* v *Unger*, 278 Mich App 210 (2008) ..............................................................12

*People* v *Wesley*, 428 Mich 708 (1987) ......................................................................20

*People* v *Williams*, 218 Mich 697 (1922) ..................................................................11

*Townsend* v *Burke*, 334 US 736 (1948) .....................................................................18

*United States* v *Sampson*, 980 F.2d 883 (CA 3, 1992) ..........................................16

*Washington* v *Hofbauer*, 228 F3d 689 (CA 6, 2000)..............................................13

**CONSTITUTIONS, STATUTES, COURT RULES**

MCL 600.308(1) ...................................................................................................... i

MCL 750.136b(2) .....................................................................................................8

MCL 750.317 ...........................................................................................................8

MCL 768.27b ...............................................................................................15; 16; 17

MCL 770.3 ............................................................................................................... i

MCL 777.37(1)(a)....................................................................................................19

MCR 2.613(A) .........................................................................................................18

MCR 6.425(F)(3) ..................................................................................................... i

MCR 7.203(A), MCR 7.204(A)(2) ......................................................................... i

MRE 401.........................................................................................................15; 16

MRE 402 ...................................................................................................................15

MRE 403..................................................................................................16; 17

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

MRE 404(b) ...................................................................................................16

Mich Const 1963 art I, § 17 ......................................................................... 1, 18, ii

Mich Const 1963, art 1, §20.................................................................................... i

US Const amend XIV ........................................................................................14

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

## STATEMENT OF JURISDICTION

Defendant-Appellant was convicted in the Oakland County Circuit Court by jury trial, and a Judgment of Sentence was entered on March 31, 2008. A Claim of Appeal was filed on June 4, 2008 by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel dated April 10, 2008, as authorized by MCR 6.425(F)(3). This Court has jurisdiction in this appeal as of right provided for by Mich Const 1963, art 1, §20, pursuant to MCL 600.308(1); MCL 770.3; MCR 7.203(A), MCR 7.204(A)(2).

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

iv

## STATEMENT OF QUESTIONS PRESENTED

I.   DID THE PROSECUTION DENY DEFENDANT A FAIR TRIAL BY UNFAIRLY IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND IMPEACHING HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS?

Trial Court answers, "No".

Defendant-Appellant answers, "Yes".

II.   WAS DEFENDANT DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE WAS TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE US CONST AMS V, XIV; MICH CONST 1963 ART I § 17

Trial Court answers, "No".

Defendant-Appellant answers, "Yes".

III.   DOES DUE PROCESS REQUIRE RESENTENCING WHERE THE COURT PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT RESPONSIBILITY AND WHERE THE LEGISLATIVE SENTENCING GUIDELINES WERE MISSCORED AS TO OFFENSE VARIABLE AND 7, RESULTING IN A SENTENCE BASED ON INACCURATE INFORMATION? US CONST AM XIV; MICH CONST 1963 ART I, § 17.

Trial Court answers, "No".

Defendant-Appellant answers, "Yes".

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

## STATEMENT OF FACTS

When rescue workers arrived at Madison McBurney's home at 7:20 p.m. on November 30, 2007, they found her laying face-up on the floor.  *2/28[1] 7, 11.*  Her body was limp and she was having difficulty breathing.  *2/26 169; 2/28 16.*  Madison remained unresponsive to treatment, so paramedics rushed her to the University of Michigan Hospital.  *2/26 173;  2/28 32.*

At the direction of pediatric emergency room doctor **Athena Sikavitsas,**[2] Madison received anti-seizure medication.  *2/21 87-88.*  Suspecting a brain abnormality, Dr. Sikavitsas ordered a CAT scan of Madison's head, which revealed the presence of blood.  *2/21 92-94, 105, 137.*  The doctor found no bruising or evidence of external trauma to Madison's head, neck or the rest of her eleven-month old body.  *2/21 121-27.*

According to **Dr. Cormac Maher,**[3] Madison had both old and new blood in her brain's subdural space.[4]  *2/22 70, 73-74.*  The doctor believed the bleeding existed in two different areas of the brain.  *2/22 74, 91.*  He also saw small brain contusions or blood in her subarachnoid space.  *2/22 92.*  Madison's brain injury was diffuse, and there was swelling in her optic disc.[5]  This suggested increased cranial pressure, which doctors tried to relieve through medication and by draining fluid.  *2/22 82, 84.*  When this proved unsuccessful, the only remaining option was to remove a portion of Madison's skull.  *2/22 84-85.*  Madison's parents declined that treatment after

---

[1] For the purposes of this brief, the trial and sentencing transcripts will be referred to by date and page number.
[2] Dr. Sikavitsas testified as a prosecution expert in pediatric emergency medicine.  *2/21 81.*
[3] Dr. Maher was qualified as a prosecution expert in pediatric neurosurgery.
[4] Dr. Maher described the human brain as having three layers:  (1) the "pia" layer, which covers the brain directly; (2) an "arachnoid" layer that covers the pia; and (3) the "dura," a tough membrane beneath one's skull.  *2/22 64.*  Dr. Maher referred to the area beneath the dura as the subdural space.  He characterized the area beneath the arachnoid as the subarachnoid space.  *2/22 64.*
[5] This condition is referred to as papilledema, according to Dr. Maher.  *2/22 78.*

1

considering the risks involved. *2/22 84-86*. Madison eventually died in the hospital a few days later.[6] *2/27 55*.

**Dr. Ljubisa Jovan Dragovic,** an expert forensic pathologist and neuropathologist, performed an autopsy on Madison. Dr. Dragovich deemed Madison's death a homicide. He concluded that she died from complications arising from blunt trauma of the head. *2/29 34*.

*Theories.* The prosecution believed Mr. McBurney killed his daughter by forcefully throwing her into a crib. Mr. McBurney admitted throwing Madison, but believed she had a latent pre-existing condition that made her more susceptible to injury. The defense argued that Madison's death was an accident.

*Testimony of the First Responders.* When **Craig Johnston** of the South Lyon Fire Department responded to the dispatch, Mr. McBurney told him Madison had been sick all day. *2/28 21*. He said he was feeding Madison and went to the bathroom. When he returned, she was having seizures. *2/28 9*. **Kevin Schuldt** of the South Lyon Fire Department overheard Mr. McBurney describing the incident to a third party. Mr. McBurney said Madison spit up a bottle in her bouncy seat and stopped breathing when he walked her to the back of the house. *2/28 28-29*.

According to paramedic **Matthew Calus**, Mr. McBurney said Madison had been vomiting all day. *2/27 12*. Shortly after giving her formula, Madison vomited again and became unresponsive. *2/26 166*.[7] Mr. Calus believed Mr. McBurney behaved extremely calmly during the ordeal, volunteering no information. *2/27 25*.

---

[6] **Dr. Folafoluwa Odetola** headed up Madison's PICU team. His testimony was substantially similar to that of Dr. Maher's. He too concluded Madison died from severe non-accidental brain injury. *2/27 57*.

[7] In terms of medical history, Mr. McBurney told Calus his daughter had a bacterial infection and a congenital hip condition called hip dysplasia. *2/26 174*.

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

*Observations of the University of Michigan Medical Staff.*  **Dr. Sikavitsas** testified that Mr. McBurney said Madison had vomited three times and was sitting upright on the floor when she started making "gurgling" noises and "just went down." *2/21 98-99.* The doctor claimed Mr. McBurney also told her Madison had been vomiting and sick the day before. *2/21 104.*

**Dr. Leena Dev** testified as the head of the university's child protection team. *2/22 204, 207.* Mr. McBurney and his wife, Heather, said they were Madison's parents and primary caregivers. They said Madison was fine when Heather left for work. Mr. McBurney told Dr. Dev that Madison woke up, drank part of a bottle and vomited. He changed her diaper, put on her leg brace and pajamas and set Madison on the floor. Mr. McBurney then heard a gurgling noise and saw Madison stiffen and arch her back. *2/22 212.*

Dr. Dev examined Madison at the hospital and concluded that Madison's injury stemmed from "abusive head trauma," e.g. trauma inflicted in and around the brain. She based her opinion on (1) the fact that the history given by Mr. McBurney differed from the findings; (2) the fact that the history given changed over time; and (3) the presence of subdural and retinal hemorrhaging. *2/22 218-19.* In her opinion, abusive head trauma arises from a rapid acceleration and deceleration of the brain, which ruptures veins and leads to subdural and retinal hemorrhage. This hemorrhaging may cause the brain to swell, causing irritability, vomiting, breathing problems and/or seizures. *2/25 28-30.* Dr. Dev's report equated abusive head trauma with shaken baby syndrome. *2/25 63.*

Dr. Dev saw no indications that Madison ever lacked oxygen. *2/25 35.* While she was aware of both chronic and acute subdural hematomas in Madison's brain, Dr. Dev disagreed with the defense theory that Madison's injury stemmed from a chronic subdural hematoma that re-bled. *2/25 64, 73, 76.*

*Madison's Medical History.* Madison saw doctors frequently for several reasons during her life. First, she was born with dislocated hips. Her mother, **Heather McBurney** testified that Madison

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

3

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

wore a leg brace and could not crawl at eleven months. *2/21 146-49*. She also had wounds on her scalp that did not heal after birth.[8] Madison underwent an MRI in August 2006 and a CAT scan in September 2006 to examine the scalp condition. *2/21 200-01*. She had also contracted a bacterial infection called MRSA[9] which required medical treatment. Finally, in February of 2006, Mr. McBurney accidentally dropped Madison from a bouncy seat. He and Heather took Madison to the emergency room immediately, but the hospital discharged her with instructions to take Tylenol. *2/21 209-10*.

**Dr. Robert Adams**, a defense expert in family medicine, testified as Madison's primary doctor. He examined her at several well-baby visits and she seemed normal, save for a cold and her scalp and hip conditions. Dr. Adams never suspected Madison to be a victim of child abuse. *2/29 128-35*.

*The Investigation.* According to Heather McBurney, on the day of the incident, Madison vomited several times and seemed more tired than normal. She pouted a bit a couple of times when Heather laid her down; Heather thought Madison might have a headache. *2/21 243*. She seemed much better when Heather McBurney left for work around 6:00 p.m. Shortly after 7:00 p.m., Mr. McBurney called Heather and said Madison had collapsed. Heather left work and met the ambulance at the hospital. Mr. McBurney told her that while he put Madison's dirty clothes and diaper away, she fell back on the floor, stiffened and then became limp. *2/21 152-60*.

Heather was present for a portion of her husband's police interview, along with Offiicer Sederlund, and Sovik. She testified over defense objection that Mr. McBurney told her he threw Madison into the crib. *2/21 163-69*. Heather thought Officer Sovik had a tape recorder during the conversation. *2.21 252-53, 257*.

---

[8] The scalp condition was called aplasia cutis congenital, according to Heather McBurney. *2/21 198*.
[9] According to testimony from several doctors at trial, MRSA was the acronym for methicillin-resistant staphylococcus aureus. *See, e.g. 2/21 119-20*.

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

*The Testimony of Police Witnesses and Forensic Experts.*   In March of 1998, **Sergeant Paul Sumner** investigated Mr. McBurney for injuries sustained by his son, Nicholas Kennedy.  He testified about the investigation over defense objection.  Sgt. Sumner claimed Mr. McBurney initially denied injuring Nicholas.  He then admitted falling once with the child, but said that Nicholas suffered no injury.  On the date of the alleged incident, Mr. McBurney acknowledged being home alone with Nicholas.  He claimed the boy stopped breathing shortly after his mother left for work. *2/22 143-48.*

Mr. McBurney came to the police department later and changed his story.  He disclosed another incident wherein Nicholas hit his head on a carpeted cement floor.  Mr. McBurney never told anyone about the injury.  After some prompting from Sgt. Sumner, Mr. McBurney explained that after his girlfriend left for work, Nicholas became upset and was crying.  Mr. McBurney said he bounced Nicholas while trying to give him a bottle, but grew frustrated.  He started shaking and bouncing the baby hard.  Nicholas stopped breathing and went limp.  Mr. McBurney called for help.  He eventually authored a statement to that effect which was published to the jury over objection. *2/22 149-53, 155.*

**Officers Chris Sederlund and Christopher Sovik** investigated Madison's case.  They interviewed Mr. McBurney at the hospital and his oral statements were admitted over defense objection.  Mr. McBurney initially denied having other children or injuring Nicholas.  He said he believed Nicholas's injuries were worse.

The officers claimed Mr. McBurney said on the date of the incident Madison spit up a bottle after taking a nap.  He changed Madison's pajamas and diapers and affixed her leg brace.  He placed her on the bedroom floor but noticed her gurgling and struggling to breathe.  Mr. McBurney told the officers Madison fell backwards and began having a seizure.  She became rigid and unresponsive,

prompting him to call 911.  He gave her rescue breaths while waiting for the ambulance.  *2/26 118-22; 2/28 64-69*.  Mr. McBurney also admitted previously dropping Madison from her bouncy chair.

In response to a statement that officers knew he committed the crime, Mr. McBurney said his life was over.  *2/26 147; 2/28 73-79*.  He told his wife that Madison was screaming and crying inconsolably, and that he grew frustrated.  He threw Madison into the crib from two feet away and she hit the back of her head on the crib bars.  He said Madison immediately went into a seizure.  He grabbed her from the crib, but was she was limp, unresponsive and having trouble breathing.  *2/26 131*.

In performing the autopsy, Dr. Dragovic did not see evidence that Madison suffered from violent shaking.  *2/29 103*.  He found both older and more recent bleeds within Madison's subdural matter.[10]  Madison's brain and brain stem had swollen sufficiently to impair her breathing and cause retinal hemorrhaging.[11]  *2/29 20-33*.    Dr. Dragovic opined that a chronic subdural hematoma is a pre-existing condition that would make a person more vulnerable to re-injury.  Such a person could sustain significant damage from a lesser amount of force than ordinarily required.  *2/29 47-48*.

*The Defense Witnesses.*    Neurosurgeon expert **Dr. Ronald Uscinski** challenged the assumptions associated with shaken baby syndrome.  Dr. Uscinski opined that human beings cannot shake babies with enough force to produce intracranial injuries.  He believed that truly forceful shaking would break a baby's neck.  *2/26 8-9*.

According to Dr. Uscinski, a chronic subdural hematoma has the capacity to re-bleed.  *2/26 25-27*.  Rebleeding can irritate the brain, causing seizures, loss of consciousness, and/or breathing difficulty.  The seizures can lead to oxygen deprivation, which can ultimately cause brain death.  Re-

---

[10] Dr. Dragovic believed the old bleed reflected evidence of previous head trauma.

[11] Dr. Dragovic also opined that Madison sustained epidural hemorrhages in the lower part of her neck / upper part of her mid-back area.  *2/29 66*.

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

bleeding symptoms include lethargy, vomiting, seizure and floppiness. *2/26 27-29*. Dr. Uscinski believed Madison suffered from a re-bleeding chronic subdural hematoma, coupled with oxygen deprivation to her brain. *2/26 30*. He interpreted the acute blood on Madison's MRI as evidence of fresh re re-bleeding, not necessarily acute injury. *2/26 35*. In Dr. Uscinski's view, the September CAT scan showed signs of degraded blood products in Madison's subdural space. He believed the hematomas from the August MRI had not completely resolved by the September CAT scan. *2/26 42-48*. He also opined that it still existed as of the day of the incident. *2/26 51*.

Dr. Uscinski testified that Madison did not receive enough oxygen to her brain, which could cause swelling and eventually brain death. Moreover, nothing from the medical records indicated Madison had bumps, bruises, skull fractures or other external evidence of blunt injury to her head. *2/26 56-58*. Dr. Uscinski did not believe the external trauma caused her brain to swell. Rather, in his opinion, Madison had suffered the effects of oxygen deprivation and attempts to restore her circulation only increased swelling. *2/26 59*.

Over defense objection, the prosecution impeached Dr. Uscinski with transcripts of his alleged statements and conclusions in eight completely unrelated trials. *2/26 81-84, 88-97*.

**Lynn Schumann-Peterson** and **Sharon Klump** cared for Madison at Pitter-Patter Learning Care. According to their testimony, Madison appeared happy and properly clothed and fed. She seldom cried and never screamed, vomited or appeared irritable. Neither woman was concerned about Madison's welfare outside of day care. *2/28 140-53*.

**Gary Linbille** was Madison's maternal grandfather. He viewed Mr. McBurney as loving, protective and attentive over Madison. *2/28 155, 161*. On cross-examination, he admitted overhearing Mr. McBurney give conflicting accounts about where in the house Madison fell over. *2/28 166*.

*The Prosecution's Rebuttal Case.* **Dr. Mohannad Ibrahim,** an expert pediatric neuroradiologist, testified to rebut Dr. Uscinski's testimony. While Madison's August 2006 MRI showed the presence of either fat or a subdural hematoma, Dr. Ibrahim saw no fat in Madison's September 2006 CAT scan. An MRI taken after Madison's hospitalization revealed hematomas of different ages. One of the hematomas existed in the same place as the hematoma revealed on the August MRI. Dr. Ibrahim also saw blood in the subarachnoid space. To his knowledge, a subdural hemorrhage could not re-bleed into the subarachnoid space.*3/3 16-38.*

On March 5, 2008 following a trial before the Honorable Daniel P. O'Brien, an Oakland County jury convicted Defendant-Appellant Steven McBurney of second-degree murder[12] and first degree child abuse.[13] Judge O'Brien sentenced Mr. McBurney to 30-60 years imprisonment for second-degree murder and 15 - 22.5 years for child abuse. Mr. McBurney now appeals as a matter of right.

---

[12] MCL 750.317.
[13] MCL 750.136b(2).

8

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

I.    **THE PROSECUTION DENIED DEFENDANT A FAIR TRIAL BY UNFAIRLY IMPUGNING THE CREDIBILITY OF THE DEFENSE EXPERT AND IMPEACHING HIM WITH TESTIMONY FROM 8 UNRELATED TRIALS.**

*Issue Preservation and Standard of Review.*    Trial counsel preserved this issue for appeal by objecting to the government's impeachment tactics. *2/26 67-71; 82-97.* The trial court's decision on the handling of witnesses is reviewed for an abuse of discretion. *People v Hall,* 433 Mich 573, 585 (1989). Claims of prosecutorial misconduct implicate the due process right to a fair trial and must be reviewed by appellate courts *de novo. People v Abraham,* 256 Mich App 265, 276; 662 NW2d 836 (2003).

*Argument.*    The defense at Mr. McBurney's trial was accident, and that Madison was predisposed to being seriously injured, even with slight force. Mr. McBurney did not take the stand in his own defense. Instead, he presented an expert witness – Dr. Uscinski – to support his theory that his daughter was susceptible to serious injury from even moderate force.

In cross-examining Dr. Uscinski, the prosecutor argued with him about the price of his services, both here and in other trials:

| | |
|---|---|
| PROSECUTOR: | Did you receive any money in relation to this case, doctor? |
| USCINSKI: | Yes. |
| PROSECUTOR: | For what? |
| USCINSKI: | Time, not testimony, ma'am time. |
| PROSECUTOR: | And how much did you receive or will you receive? |
| USCINSKI: | Somewhere between twelve and thirteen thousand dollars, and that's an estimate. |
| PROSECUTOR: | Isn't it true that in November of 199 you were a witness for the defense in the Louise Woodward case? *2/26 68.* |

9

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

Over defense objection, Dr. Uscinski was forced to reveal his fees in the Woodward case and others.

The prosecutor continued along this line by questioning the doctor about his professional conclusions in other matters. Over defense objection, she asked the doctor to recount his findings in the Woodward case, along with *Colorado v Waddle,* Tennessee v Stringer, California v Velahbid, Texas v Cathy Stewart, and others. *2/26 90-93.* When the doctor responded that he could not recall, the prosecutor attempted to impeach him with transcripts of his testimony in those cases. *2/26 93-97.* The facts of those matters, of course, were never presented to Mr. McBurney's jury.

The prosecutor relied heavily on this exchange during closing arguments:

> Now I don't have much to say about Doctor Uscinski's testimony. This is a man who goes around the country and testifies. Testifies only on behalf of the defense. He testified he has never testified on behalf of the prosecution. He goes around and he testifies about children that he's never seen, that he's never touched, that he's never treated. . . .
>
> The Defendant had to go a long way to find somebody who would dispute these doctors. All the way to Maryland or Virginia for twelve ($12,000) or thirteen thousand dollars ($13,000) of his time. And recall how much of an argument he had to give me about was he getting paid for his time or his testimony, instead of just coming out and saying "I'm paid this." Apparently you can get anyone to say anything for enough money. Although in Doctor Uscinski's case it's not just anything is it? He has a pattern of testifying that it's a chronic subdural rebleed. *3/4 69-71.*

In *People v Tyson*, 423 Mich 357 (1985), the Michigan Supreme Court reversed because of similar prosecutorial mistreatment of the defense expert witness. There, the prosecutor argued without evidentiary support that the defense expert was paid for his testimony and that was his motivation for testifying. He also argued that the defense expert lacked integrity and that the prosecution's expert was an "unbiased expert who works for the State of Michigan." *Id,* at 366 367. There was an objection, and the trial court allowed the defense attorney to argue in his closing statement that the psychiatrist was appointed, and working for far less money than he would be

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

10

privately treating patients.  The Michigan Supreme Court nonetheless ruled that the prosecutor had

committed reversible error, not cured by defense counsel's responsive argument, holding in part:

> "This personal attack on the defendant's expert was intended to, and
> did, distract the jury from the real issues, and required defendant to
> defend on an issue that was improperly before the jury.  Clearly, the
> critical issue in this case was whether or not defendant was insane.  This
> case, as are so many others, was obviously decided on the basis of
> which expert the jury chose to believe.  For this reason, it is especially
> important to protect against prosecutorial misconduct designed to
> impugn the credibility of the defendant's expert witness." Id, 376.

While in *Tyson* there apparently had been no testimony about the fees paid to the expert,

*Tyson* should not be interpreted to mean that, once an expert testifies as to his fee, arguments and

insinuations that he has been bought and sold and his opinion therefore has no validity, are

permissible.  Certainly the cases relied upon by *Tyson* do not support this limitation.  *Id* at 374-375.

*See People v Williams,* 218 Mich 697 (1922) (prosecutor's argument that the defense experts had

prostituted themselves by testifying in the defendant's behalf constituted reversible error: "[I]t was

not permissible for the jury to take the personal opinion of the prosecutor..." Id at 707); *People v*

*Cowles,* 246 Mich 429, 431-433 (1928):

> The prosecuting attorney had a right to analyze the testimony, urge the
> jury, upon reason existing in the case to reject it and point out, if
> possible, its inapplicability. But invective, ridicule, injection of his belief,
> and innuendoes was not permissible argument, and was unfair to the
> experts and prejudicial to defendant. *See People v Williams,* 218 Mich 697.
> *Cowles,* at 432-433, quoted with approval in *Tyson* at 433.

As stated above, it is the deliberate attempt to distract the jury from the actual issues and

from a fair and dispassionate evaluation of the evidence that *Tyson* forbade.  While it may be

permissible to ask a witness if he is receiving a fee to show bias, without more evidentiary support,

the prosecutor should not be allowed to make the fee an issue and to insinuate that the expert has

prostituted himself by flying around the country to give identical testimony on behalf of criminal

defendants.  As this Court has observed, "in a case that turns largely on conflicting expert testimony,

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

a prosecutor must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts." *People v Unger,* 278 Mich App 210, 240 (2008). The jury should have been free to analyze Dr. Uscinski's opinion with an impartial evaluation of his qualifications, the extent of his investigations, his competence in applying medical principles, and the evidentiary and logical support for his conclusions. Nevertheless, the prosecutor sought to convince the jury that she believed Uscinski was a hired gun unworthy of consideration, and that they should do the same.

Furthermore, as in *People v Burrell,* 127 Mich App 721 (1983), the prosecutor improperly suggested that Dr. Uscinski habitually gave false testimony. The prosecutor in *Burrell* asked the defendant's alibi witness if she testified for criminal defendants on a regular basis. In strongly condemning the misconduct, the *Burrell* court observed that "by suggesting that [the witness] testifies regularly for the defense, [the prosecutor] insinuated that [the witness] regularly perjures herself. There was no evidence whatsoever that [she] had ever committed perjury." *Id* at 727. The Court deemed the insinuation particularly damaging since the prosecutor noted that the witness had testified for the defense at trials where he represented the government. *Id.* Like the situation in *Burrell,* the prosecutor here asked Dr. Uscinski if they had met before. *2/26 61.* She suggested it occurred in June of 2006 before the Honorable Steven Andrews of the same court. *2/26 61.*

A prosecutor may not argue facts not in evidence to the jury. In *Berger v US,* 295 US 78, 88 (1935), *overruled on other grounds by Stirone v US,* 361 US 212 (1935), the Supreme Court described the policy underlying this rule:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done … He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is … his duty to refrain from improper methods calculated to produce a wrongful conviction …

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

*Id* at 88. Thus, because a strong possibility exists that a jury may unduly credit the prosecution's view of the facts, inappropriate suggestions and assertions of personal knowledge are generally deemed improper. *Id. See also, Washington v Hofbauer*, 228 F3d 689, 699-702 (CA 6, 2000); *People v McCain,* 84 Mich App 210, 215 (1978); *People v Knolton,* 86 Mich App 424 (1978).

Accordingly, such arguments have been held to require reversal, even without an objection, *Knolton, supra; McCain, supra, People v Haines*, 105 Mich App 213 (1981); *Burrell, supra.* The trial court's error in permitting this cross-examination was not harmless, where the case truly involved a battle of the experts. Because the improper attack on Mr. McBurney's key witness may have been the decisive factor in the mind of a juror who voted to convict, reversal is required.

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

## II.   DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL WHERE HE WAS TRIED ON THE BASIS OF SIMILAR ACTS EVIDENCE. US CONST AMS V, XIV; MICH CONST 1963 ART I § 17.

*Issue Preservation and Standard of Review:* Trial counsel preserved this issue for appeal by objecting to the disputed evidence in a pre-trial motion and again at the end of trial. *3/3 7.* Whether other acts are admissible for a proper purpose is reviewed de novo. Whether their probative value is substantially outweighed by the danger of unfair prejudice is reviewed for abuse of discretion. *People v Crawford,* 458 Mich 376, 438 (1998).

*Argument:* Mr. McBurney was charged with and convicted of abusing and killing his infant daughter, Madison. Yet, his jury's perceptions were tainted with irrelevant and unfairly prejudicial evidence of alleged abuse against his son from a prior relationship. Practically speaking, the entire trial was an assault on Mr. McBurney' character -- not based upon the specific charge which had been lodged against him, and which the prosecutor bore the burden of proving -- but resting on the prosecutor's depiction of him as a man who had a propensity to physically abuse his children.

The admission of evidence concerning alleged violence against Nicholas Kennedy denied Mr. McBurney his due process right to fair trial and his right to confront his accusers. US Const amend XIV; Const 1963, art 1 § 17; *Crawford v Washington,* 541 US 36 (2004); *People v Lonsby, i268 Mich App 375 (2005); Lisenba v California,* 314 US 219, 236 (1941) (due process requires fundamental fairness in use of evidence against a defendant). The guilt or innocence of an accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrong doing. 1A J. Wigmore, Wigmore on Evidence, ' 58.2, 1212-1213 (3d ed Tiller rev 1983). The evidence here was inadmissible because it was (2) irrelevant; (3) vastly more prejudicial than probative; and (4) caused the jury to convict based upon an

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

impermissible inference that Mr. McBurney was guilty because he had a propensity to commit child abuse. MRE 401, 403, 404.

MCL 768.27b sets forth the new framework under Michigan law for admitting evidence of prior acts of domestic violence:

> Sec. 27b.(1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

Here, the prosecution offered medical records and testimony from a police officer about Nicholas Kennedy to prove Mr. McBurney knew the consequences that could flow from handling an infant roughly. The prosecution argued that such evidence was relevant to proving the knowledge and intent elements of second-degree murder. Notwithstanding the prosecutor's proffered purpose, the logical relationship between the proffered evidence and the ultimate fact sought to be proven must be closely scrutinized. *Crawford, supra* at 388.

One determines logical relevance by looking to Michigan Rules of Evidence 401 and 402. MRE 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Similarly, in pertinent part, MRE 402 provides that all relevant evidence is admissible, and that evidence which is not relevant is not admissible.

As *Crawford* teaches, "evidence is relevant if two components are present, materiality and probative value. Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action. "In other words, is the fact to be proven truly in issue?" *Crawford, supra* at 388-89.  Furthermore, a fact that is "of consequence" to the action is a material fact. *Id.* "Materiality looks to the relation between the propositions for which the evidence is offered and the

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial." 1 McCormick, Evidence (4th ed), § 185, p 773.

The defendant in Crawford was tried on charges of possession with intent to deliver cocaine, after drugs were found on his person and drugs and paraphernalia were found in his car. He denied knowing about the drugs in the car. In an effort establish the defendant's knowledge of the presence of the cocaine in the car and his intent to deliver it, the prosecution offered evidence that he had previously been convicted of this same offense for actually delivering cocaine. The *Crawford* Court held that this evidence was inadmissible because there was no showing of how the prior act evidence bore on the determination of whether the defendant committed the charged offense, other than by invoking the impermissible inference of bad character.

While the *Crawford* analysis focused in part on admissibility of under MRE 404(b), it also placed significant emphasis on relevancy under MRE 401 and 402. The *Crawford* court observed that relevance is not an inherent characteristic, and that prior bad acts are not intrinsically relevant to a particular proffered purpose. Rather, relevance reflects "a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *Crawford, supra* at 387-88 (quoting *United States v Sampson,* 980 F.2d 883, 888 (CA 3, 1992). Like the irrelevancy between the prior drug delivery offense and the charged act of drug possession with intent to deliver in *Crawford,* the events which allegedly occurred with Nicholas Kennedy had no tendency to prove Mr. McBurney's commission of the charged offense involving Madison. *People v Pattison,* 276 Mich App 413 (2007) does not compel a different result, for even that court acknowledged that MCL 768.27b must yield to balancing test of MRE 403.

Thus, even assuming the evidence of Nicholas's Kennedy's injuries was probative of a material fact, the danger of unfair prejudice substantially outweighed whatever marginal probative

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

16

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

value it might have had. The *Crawford* decision emphasized the importance of assessing whether unjust harm may result from admitting the evidence, and if so, of excluding it notwithstanding relevance. Similarly, nothing in the text of MCL 768.27b calls for a particularly lenient application of MRE 403. Undoubtedly, a unique stigma is associated with child abuse, particularly involving suspected cases of Shaken Baby Syndrome. This reality made it extremely likely that the jury would deliver a guilty verdict not because Mr. McBurney intentionally harmed Madison – but because they sought to punish a repeat offender. The prior evidence detracted from the central issue of Mr. McBurney's trial – e.g. whether the cause of death here was negligent or accidental, rather than malicious.

While the similar acts evidence had very little probative value, its prejudicial effect on the jury was likely phenomenal. The jury simply could not avoid the temptation to convict based on determining, not that Mr. McBurney committed the charged act, but that he was a bad man who had a habit of abusing his children.

The admission of the Nicholas's medical records also violated Mr. McBurney's right to confront the witnesses against him, in violation of *Crawford v Washington, supra*. In that case, the US Supreme Court held that to satisfy the confrontation clause, testimonial hearsay is not admissible against a defendant unless the declarant is unavailable and the defendant had a previous opportunity to cross examine that person. *Id* at 68. Without articulating a strict definition of "testimonial," the Court noted that pretrial statements are testimonial if the declarant would reasonably expect the statement to be used in a prosecutorial manner, or under circumstances that would lead an objective witness to reasonably believe the statement would be available for use at a later trial. *Id* at 51-52. The statements in Nicholas Kennedy's medical records referring to shaken baby syndrome, child abuse and other non-accidental trauma went beyond mere medical diagnosis. They suggested an

intentional mechanism by which the child sustained the injury.  As such, an objective witness would have believed the statements could be used at a later criminal trial.

The defense objected to the similar acts testimony, and the court gave an inadequate cautionary instruction based on MCL 768.27b.  *See CJI 5.8c.*  Because the instruction did not guide the jury according to the principles a court must consider in evaluating MRE 403, it could not have "undone" the harm which resulted from listening to testimony of the other incidents.  It is clearly "more probable than not" that Mr. McBurney was deprived of a fair trial as a result of the admission of testimony and prosecutorial argument about his alleged abuse of his son. *People v Lukity,* 460 Mich 484.  Reversal is required.

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

III. **DUE PROCESS REQUIRES RESENTENCING WHERE THE COURT PENALIZED THE DEFENDANT FOR REFUSING TO ADMIT RESPONSIBILITY AND WHERE THE LEGISLATIVE SENTENCING GUIDELINES WERE MISSCORED AS TO OFFENSE VARIABLE 7, RESULTING IN A SENTENCE BASED ON INACCURATE INFORMATION. US CONST AM XIV; MICH CONST 1963 ART I, § 17..**

*Issue Preservation and Standard of Review.* Mr. McBurney challenged the scoring of OV 7 at sentencing, so this issue is preserved for appellate review. *3/31 7-10.* Whether the trial court correctly applied the statutory sentencing guidelines is a question of law subject to de novo review. *People v Morson,* 471 Mich 248 (2004); *People v Libbett,* 251 Mich App 353; 365 (2002). This Court reviews factual decisions made at sentencing under a "clearly erroneous" standard of review. *People v Fields,* 448 Mich 58, 77 (1995). This Court applies de novo review to constitutional questions. *People v Hill,* 257 Mich App 126, 149-150 (2003). Preserved scoring errors that alter the recommended guidelines range entitle the defendant to a new sentencing hearing. *People v Francisco,* 474 Mich 82, 89-92 (2006).

*Argument:* The trial court erred by misscoring OV-7. Under the Michigan and United States Constitutions, every defendant enjoys a due process right to be sentenced on the basis of accurate information and in accordance with the law. *Townsend v Burke,* 334 US 736 (1948); *People v Lee,* 391 Mich 618, 636-637 (1974); *People v Malkowski,* 385 Mich 244 (1971). Further, MCR 2.613(A) provides that a sentence must be consistent with "substantial justice." Our Supreme Court has found that "it is difficult to imagine something 'more inconsistent with substantial justice' than requiring a defendant to serve a sentence that is based upon inaccurate information." *People v Francisco,* 474 Mich 82, 91, n6 (2006). Here, Mr. McBurney' sentence is predicated upon inflated guidelines. He is therefore entitled to resentencing. *Id.* at 91-92.

To justify a score of 50 points under OV-7, the prosecution must establish that "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

19

the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). For purposes of OV-7, "sadism" is defined as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(3).

At sentencing, Mr. McBurney objected to the scoring of OV-7. His objection was based on an argument that Mr. McBurney never intended to cause his daughter conscious pain or suffering. Rather, the testimony at trial showed that, if anything, Mr. McBurney acted spontaneously in an act of frustration. *3/31 9-10*. This finding was consistent with the jury's verdict of second degree murder. Neglecting that fact, the trial court scored OV 7 at fifty points. He relied heavily on the fact that Madison was an infant who experienced harshness and brutality during her medical treatment, "her consciousness not withstanding." *3/31 16*.

Nevertheless, OV 7 was more properly scored at zero. This Court's published opinions on the subject reveal that a score of fifty points is warranted when defendants do, in fact, go beyond what is necessary to commit the crime by engaging in sadistic and excessively brutal conduct. For instance, in the case of *People v James*, 267 Mich App 675 (2005) this Court determined that 50 points were appropriate for OV 7 because the defendant "repeatedly stomped the victim's face and chest after the victim was lying unconscious on the ground. Additionally, the victim was deprived of oxygen for a period of four to six minutes, causing him to have anoxic encephalopathy, i.e., significant brain damage from lack of oxygen, and currently remains comatose with little or no chance of ever regaining consciousness." And in *People v Kegler,* 168 Mich App 187 (2005), this Court upheld a score of 50 points where the defendant transported her victim's unconscious naked body outside in part because of her admission that she did so with the intent to humiliate him. It was unclear at exactly which point the victim in the *Kegler* case died, but this Court held that the victim's potential inability to perceive fear and anxiety (due to unconsciousness or death) was not dispositive. The focus must remain on the Defendant's intent to increase the victim's fear and anxiety. *Id.*

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

20

Under that standard, one cannot reasonably argue that Mr. McBurney intended to cause the pain and suffering endured by his daughter. Based on this scoring error, Mr. McBurney should have only been assessed a total of sixty-five points under his offense variables. Proper scoring under the guidelines would have reduced him to a class C-IV offender, with an adjusted guidelines range of 108-225 months. This is a significant decrease from the 360 month prison term to which Mr. McBurney was actually sentenced. Resentencing is therefore required. *Francisco, supra* at 90-91.

Alternatively, this court should remand for resentencing where the trial judge commented on the fact that Mr. McBurney took "no responsibility for [his] action and consequently d[id] not acknowledge any wrongdoing." *3/31 21*. It is axiomatic that a sentencing court cannot, in whole or part, base its sentence on a defendant's refusal to admit guilt. *People v Jackson,* 474 Mich 996 (2006) (citing *People v Wesley,* 428 Mich 708, 711 (1987)).

## SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT

**WHEREFORE,** for the foregoing reasons, Defendant-Appellant asks that this Honorable Court reverse his conviction.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

/s/ Brandy Y. Robinson

BY:_____

**BRANDY Y. ROBINSON (P66895)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Dated:  December 4, 2008

RECEIVED by Michigan Court of Appeals 12/5/2008 4:35:56 PM

22

STATE OF MICHIGAN

IN THE COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

                    Court of Appeals
                    No. 285485

-vs-
                    Oakland Circuit Court
                    No. 2007-214651 FC

STEVEN McBURNEY,

          Defendant-Appellant.

_____/

APPELLEE'S BRIEF

ORAL ARGUMENT REQUESTED

JESSICA R. COOPER
PROSECUTING ATTORNEY
OAKLAND COUNTY

JOHN S. PALLAS
CHIEF, APPELLATE DIVISION

BY: KATHRYN G. BARNES (P41929)
Assistant Prosecuting Attorney
Oakland County Prosecutor's Office
1200 North Telegraph Road
Pontiac, MI 48341
(248) 858-0656

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

<u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................I

INDEX TO AUTHORITIES CITED.........................................................................II

COUNTER-STATEMENT REGARDING JURISDICTION....................................VI

COUNTER-STATEMENT OF QUESTIONS PRESENTED...................................VII

COUNTER-STATEMENT OF FACTS.................................................................... 1

ARGUMENT.................................................................................................................. 26

    I.   THE PROSECUTOR'S CROSS-EXAMINATION OF THE DEFENSE EXPERT WITNESS WAS A PROPER EXPLORATION OF THE WITNESS' CREDIBILITY AND WAS A PROPER SUBJECT OF COMMENT IN CLOSING ARGUMENT........................................................................................................ 26

        *Standard of Review* ...................................................................... 26
        *Issue (non)preservation* .............................................................. 26

    II.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING EVIDENCE OF DEFENDANT'S PRIOR ABUSE OF HIS INFANT SON, AND ADMISSION OF MEDICAL RECORDS ARISING FROM THAT PRIOR INCIDENT DID NOT VIOLATE DEFENDANT'S RIGHT TO CONFRONTATION........................................................................................... 35

        *Standard of Review* ...................................................................... 35
        *Issue preservation* ........................................................................ 36
            a. Procedural background ....................................................... 36
            b. discussion .............................................................................. 39

    III.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ASSESSING POINTS FOR OV 7, AND DID NOT IMPROPERLY PUNISH DEFENDANT FOR REFUSING TO ADMIT GUILT.................................................. 45

        *Standard of Review* ...................................................................... 45
        *Issue (non)preservation* .............................................................. 45

    RELIEF .................................................................................................................. 50

INDEX TO AUTHORITIES CITED

CASES

*Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004) ......... 37, 38, 43, 44

*People v Bahoda*, 448 Mich 261; 531 NW2d 659 (1995) ............................................ 33

*People v Blunt*, __ Mich App __; __ NW2d __ (1/13/09) ........................................... 48

*People v Broden*, 428 Mich 343; 408 NW2d 789 (1987) ........................................... 49

*People v Burrell*, 127 Mich App 721; 339 NW2d 239 (1983) ................................ 33, 35

*People v Carines*, 460 Mich 750; 597 NW2d 130 (1999) ............................... 26, 31, 34

*People v Chatfield*, 170 Mich App 831; 428 NW2d 788 (1988) ................................. 27

*People v Clark*, unpublished opinion per curiam of the Court of Appeals, decided 3/6/07 (Docket No. 266088) ................................................................................................ 48

*People v Conley,* 270 Mich App 301; 715 NW2d 377 (2006) ...................................... 49

*People v Cowles*, 246 Mich 429; 224 NW 387 (1929) ................................................ 33

*People v Crawford*, 458 Mich 376; 582 NW2d 785 (1998) .................................... 42, 43

*People v Curry*, 175 Mich App 33; 437 NW2d 310 (1989) ........................................ 30

*People v Deleon*, unpublished opinion per curiam of the Court of Appeals, decided 9/18/07 (Docket No. 269574) ...................................................................................... 42

*People v Dobek*, 274 Mich App 58; 732 NW2d 546 (2007), lv den 480 Mich 897 (2007) ... 30, 49

*People v Drayton*, 168 Mich App 174; 423 NW2d 606 (1988) ................................... 49

*People v Greer*, unpublished opinion per curiam of the Court of Appeals, decided 6/13/97 (docket No. 148473) ................................................................................................... 27

*People v Hedelsky*, 162 Mich App 382; 412 NW2d 746 (1987) ................................. 26

*People v Hine*, 467 Mich 242; 650 NW2d 659 (2002) ........................................... 35, 42

*People v Hornsby*, 251 Mich App 462; 650 NW2d 700 (2002) ................................... 45

*People v Houston*, 473 Mich 399; 702 NW2d 530 (2005) .......................................... 46

*People v Howard*, 226 Mich App 528; 575 NW2d 16 (1997), lv den 459 Mich 884 (1998) ....... 33

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

*People v Jackson*, unpublished opinion per curiam of the Court of Appeals, decided 7/31/03 (Docket No. 233435).................................................................... 32

*People v Jambor*, 273 Mich App 477; 729 NW2d 569 (2007)........................... 44

*People v James*, 267 Mich App 675; 705 NW2d 724 (2005), lv den 474 Mich 982 (2005)........ 48

*People v Johnson*, 187 Mich App 621; 468 NW2d 307 (1991), lv den 439 Mich 978 (1992)................................................................................................... 33

*People v Kegler*, 268 Mich 187; 706 NW2d 744 (2005), lv den 474 Mich 1075 (2006)............. 47

*People v Layher*, 464 Mich 756; 631 NW2d 281 (2001) ........................................ 27

*People v Leversee*, 243 Mich App 337; 622 NW2d 325 (2000), lv den 464 Mich 858 (2001)..................................................................................................... 45

*People v Lodge*, 157 Mich App 544; 403 NW2d 591 (1987), lv den 429 Mich 851 (1987)....... 32

*People v Lukity*, 460 Mich 484 NW2d 607 (1999) ............................................. 35, 44

*People v Marji*, 180 Mich App 525; 447 NW2d 835 (1989).................................... 33

*People v McLaughlin*, 258 Mich App 635; 672 NW2d 860 (2003), lv den 469 Mich 1045 (2004)..................................................................................................... 43

*People v Pattison*, 276 Mich App 613; 741 NW2d 558 (2007).......................... 40, 42

*People v Perkins*, 116 Mich App 624; 323 NW2d 311 (1982)................................. 31

*People v Petri*, 279 Mich App 407, 411; __ NW2d __ (2008) ............................... 40

*People v Pipes*, 475 Mich 267; 715 NW2d 290 (2006) ........................................ 36

*People v Rodriguez*, unpublished opinion per curiam of the Court of Appeals, decided 3/18/97 (Docket No. 183425)....................................................................... 34

*People v Ross*, 145 Mich App 483; 378 NW2d 517 (1985) ................................... 26

*People v Sabin*, 463 Mich 43; 614 NW2d 888 (2000)......................................... 36

*People v Schultz*, 278 Mich App 776; 754 NW2d 925 (2008), lv den 758 Mich 256 (2008)................................................................................................. 39, 40

*People v Shepherd*, 472 Mich 343; 697 NW2d 144 (2005)................................... 44

*People v Spanke*, 254 Mich App 642; 658 NW2d 504 (2003) ............................... 49

*People v Starr*, 457 Mich 490; 577 NW2d 673 (1998) .................................. 41, 42, 43

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

*People v Taylor*, __ Mich __; __ NW2d __ (12/08)................................................................ 44

*People v Tyson*, 423 Mich 357; 377 NW2d 738 (1985) ...................................................... 33

*People v Unger*, 278 Mich App 210; 749 NW2d 272 (2008)........................................ 34, 35

*People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993) ............................................. 42, 43

*People v Weems*, 19 Mich App 553; 172 NW2d 865 (1969)............................................... 43

*People v Wilcox*, 280 Mich App 53; __ NW2d __ (2008) .................................................... 42

*People v Williams*, 162 Mich App 542; 414 NW2d 139 (1987)..................................... 32, 33

*People v Williams*, 218 Mich 697; 188 NW 413 (1985)..................................................... 33

*State v Womack*, 592 So2d 872 (La App, 1991) .................................................................. 30

*United States v Ellis*, 460 F3d 920 (CA7, 2006)................................................................. 44

*Westland v Okopski*, 208 Mich App 66; 527 NW2d 780 (1994), lv den 450 Mich 921 (1995)..................................................................................................................................... 29

STATUTES

MCL 750.136b ........................................................................................................................... 1

MCL 750.316 ............................................................................................................................. 1

MCL 750.317 ............................................................................................................................. 1

MCL 768.27b .......................................................................................... 36, 37, 39, 40, 42, 43

MCL 769.10 ............................................................................................................................... 1

MCL 777.33 ............................................................................................................................ 45

MCL 777.37 ........................................................................................................................ 45, 48

OTHER AUTHORITIES

31A Am Jur 2d, Expert and Opinion Evidence, §75 ........................................................... 27

CJI2d 5.8c ............................................................................................................................... 39

Wade & Kolenda, Michigan Courtroom Evidence (2008 supplement to 4th ed).......................... 44

3 Wharton's Criminal Evidence 15th ed, §13:18.................................................................... 27

RULES

MCR 6.425(F)(3) ......................................................................................................... vi

MCR 7.203(A) ............................................................................................................ vi

MCR 7.215(C)(1) ........................................................................................................ 27

MRE 403 ............................................................................................................. 37, 41

MRE 611(b) ........................................................................................................ 27, 29

MRE 612 ................................................................................................................. 31

MRE 613 ................................................................................................................. 31

MRE 803(6) ........................................................................................................ 43, 44

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

COUNTER-STATEMENT REGARDING JURISDICTION

Defendant appeals as of right, pursuant to MCR 7.203(A), from the judgment of sentence (after jury trial) entered on or about April 1, 2008, by the Oakland County Circuit Court. Defendant requested the appointment of appellate counsel on or about April 10, 2008. The claim of appeal was filed on or about May 14, 2008, see MCR 6.425(G)(3).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

vi

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

<u>COUNTER-STATEMENT OF QUESTIONS PRESENTED</u>

I.   DID THE PROSECUTOR'S CROSS-EXAMINATION OF THE DEFENSE EXPERT WITNESS REFLECT A PROPER EXPLORATION OF THE WITNESS' CREDIBILITY, AND WAS IT A PROPER SUBJECT OF COMMENT IN CLOSING ARGUMENT ?

The trial court answered, "Yes".

Defendant contends the answer should be, "No".

The People contend the answer is, "Yes".

II.   DID THE TRIAL COURT ACT WITHIN ITS DISCRETION IN ALLOWING EVIDENCE OF DEFENDANT'S PRIOR ABUSE OF HIS INFANT SON, AND PROPERLY RULE THAT ADMISSION OF MEDICAL RECORDS ARISING FROM THAT PRIOR INCIDENT DID NOT VIOLATE DEFENDANT'S RIGHT TO CONFRONTATION ?

The trial court would answer, "Yes".

Defendant contends the answer should be, "No".

The People contend the answer is, "Yes".

III.   DID THE TRIAL COURT ACT WITHIN ITS DISCRETION IN ASSESSING POINTS FOR OV 7, AND IN COMMENTING ON DEFENDANT'S REMAKRS AT SENTENCING?

The trial court would answered, "Yes".

Defendant contends the answer should be, "No".

The People contend the answer is, "Yes".

vii

COUNTER-STATEMENT OF FACTS

Defendant Steven McBurney was charged in this case with first degree felony murder, MCL 750.316, and first degree child abuse, MCL 750.136b. On March 5, 2008, a jury found Defendant guilty of second degree murder, MCL 750.317, and first degree child abuse (XI, 17)[1]. On March 31, 2008, Judge Daniel P. O'Brien sentenced Defendant as a habitual-second, MCL 769.10, to 30-60 years in prison for the murder and 15-22½ years for the child abuse (Sent, 21-22). Defendant appeals as of right.

This case arose out of an incident on the evening of November 30, 2006, in which Defendant threw his 11-month-old daughter Madison into her crib, causing a fatal brain injury when her head hit the crib bars. Evidence at trial revealed the following.

Heather McBurney is Defendant's wife (II, 143). They had one child: Madison who was born on December 27, 2005 (II, 145). Madison was born with dislocated hips (II, 145-146, 186), and in March of 2006, she was diagnosed with hip displasia (II, 148, 195-196), i.e. a shallow hip socket that caused her leg to slide in and out of the socket (II, 196), for which she wore a brace/harness to stabilize her legs (II, 148-149, 198). In June or July of 2006, Madison was

---

[1] Transcript abbreviations are as follows,
    "I" . . . . . trial proceedings on February 19, 2008
    "II" . . . . trial proceedings on February 21, 2008
    "III" . . . . trial proceedings on February 22, 1008
    "IV" . . . . trial proceedings on February 25, 2008
    "V" . . . . trial proceedings on February 26, 2008
    "VI" . . . . trial proceedings on February 27, 2008
    "VII . . . . trial proceedings on February 28, 2008
    "VIII" . . . trial proceedings on February 29, 2008
    "IX" . . . trial proceedings on March 3, 2008
    "X" . . . . . trial proceedings on March 4, 2008
    "XI" . . . .. trial proceedings on March 5, 2008
    "Sent" . . . sentencing proceedings on March 31, 2008.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

1

diagnosed as having a skin condition called aplasia cutis congenital (II, 147, 171, 198-199; IV, 33)[2]. But Madison was a happy baby (II, 145), who generally ate well and slept well (II, 193). Ms. McBurney had only heard Madison scream or cry loudly one time, when she was having stomach pain (II, 236-237).

In November of 2006, Ms. McBurney, Defendant, and Madison lived in a house at 311 Scott Street (II, 150, 182) in South Lyon (III, 10). Madison was 11 months old (II, 149). She was not crawling (II, 149), but she could push herself up to a seated position and could roll (II, 149-150, 245). Ms. McBurney was a licensed registered nurse (II, 146) and worked the evening shift from 7:00 p.m. to 3:30 a.m. (II, 150). Defendant worked for a lawn service (II, 181), working days (II, 222). Ms. McBurney took care of Madison during the day, and Defendant took care of Madison when Ms. McBurney was at work (II, 222, 224). For a brief period starting in mid-October, both Defendant and Ms. McBurney worked days and they used Pitter Patter Daycare in South Lyon for Madison (II, 228-229). But they had to pull her out of daycare when she was diagnosed with MRSA (II, 230).[3] Ms. McBurney then went back to working the evening shift (II, 230).

On November 30, 2006, Ms. McBurney got up at about 6:30 a.m. and went to check on Madison (II, 150).[4] Madison was lying in her crib, awake (II, 150-151). There was some spit-up on Madison's face and sleeper, so Ms. McBurney cleaned her up (II, 151). Ms. McBurney testified that spit-up was different than vomit, it was just a small amount that came up when Madison burped (II, 152) and was not unusual (II, 236), so she did not feel concerned that

---

[2] This was manifested by three open, reddish areas on the back of her head (II, 146, 147-148, 171).
[3] Methicillin Resistant Staph Aureus (II, 119-120) is a potentially fatal staph infection (IV, 48). Ms. McBurney testified that, around November 14th, Madison was diagnosed with MRSA (II, 171, 205-206).
[4] Defendant had left early to do some work on the outside of the house (II, 150)

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Madison was sick (II, 152-153). Madison had not been sick the day before and had not vomited the day before (II, 153, 235). At about 9:00 a.m. Ms. McBurney made up a bottle for Madison and sat with her on the couch while she drank it (II, 151). Ms. McBurney lied down on the couch, and Madison fell asleep on her chest (II, 151). At about 10:00 Ms. McBurney took Madison into the bathroom to give her a bath (II, 151). Madison sat on the floor next to Ms. McBurney as she filled the tub with water (II, 151). Madison vomited (II, 151-152, 239). Ms. McBurney characterized it as projectile vomiting, and she had never seen Madison do that before, so thought she might be coming down with the flu (II, 239-240). Defendant came in to help Ms. McBurney clean up (II, 242-243). But then Madison seemed to be okay (II, 152). Ms. McBurney gave Madison a bath (II, 152) and Madison played in the tub during her bath (II, 153).

After the bath, Ms. McBurney dressed Madison (II, 152). At about 11:00 (II, 153-154), Ms. McBurney gave her some baby food to see if her stomach could handle it (II, 153, 240). She threw up a little of it (II, 154). Madison did not act like she wasn't feeling well, she just seemed tired (II, 154). Ms. McBurney put Madison down for a nap (II, 154). Madison napped for about 45 minutes (II, 154-155). When Madison awakened from her nap, Ms. McBurney gave her some apple juice, and Madison was able to keep that down (II, 155). They played (II, 155). Then Ms. McBurney gave Madison some more baby food, and she was able to keep that down (II, 155-156). The rest of the afternoon went normally (II, 156). At one point Ms. McBurney put Madison in her walker (in a standing position), but Madison seemed uncomfortable in it, so Ms. McBurney took her out of it (II, 156). A couple of times during the day Madison pouted her lip out, which made Ms. McBurney wonder if she might have a headache (II, 243-244; III, 15-16), but Madison would then return to her normal, playful self (II, 244).

At about 5:00 Ms. McBurney started to make dinner and get ready for work (II, 156). At

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

about 5:45, Ms. McBurney laid Madison in her crib (II, 156-157). At 6:00 Ms. McBurney left for work (II, 157). Before leaving, she checked on Madison, and Madison was laying there playing with a toy and appeared content (II, 157). Madison was feeling better than she had that morning (II, 157-158). For the preceding month or so, Madison had been experiencing some separation anxiety when Ms. McBurney left (II, 160-161), she would babble or whine seeking attention, but not cry (II, 161).

At 7:20 p.m. the South Lyon Fire Dept responded to a 911 call from the house (VII, 7, 14). When the fire fighters arrived, there was a baby on the floor, and Defendant was nearby on the phone (VII, 7). Lt. Craig Johnston testified that the baby's breathing was slow (VII, 15-16). Two firefighters started treating the baby, and Lt. Johnston spoke to Defendant (VII, 9). Defendant got off the phone (VII, 9). Lt. Johnston asked Defendant what happened (VII, 9). Defendant said he had been feeding the baby and then went to the bathroom; when he came back the baby was having a seizure, so he called 911 (VII, 9). Lt. Johnston saw a bouncy chair on the floor in the living room, and a baby bottle was lying on the floor about two feet in front of the bouncy chair (VII, 10). Lt. Johnston asked Defendant if the baby had any medical history or was on any medications, and Defendant said no (VII, 11), but Defendant claimed that the baby had been sick all day (VII, 21).

The ambulance arrived about a minute after the firemen, and the ambulance personnel took over treating the baby (VII, 11-12; V, 161-162; VI, 7). The firefighters had applied an oxygen mask to Madison face (V, 164), which was standard for most patients (VI, 9).

Fire department EMT Sgt. Schuldt testified that Defendant said that he was feeding the baby in the bouncy seat and the baby spit the bottle out (VII, 28), Defendant picked her up and walked toward the back of the house (VII, 28), and when he got to the back of the house she had

stopped breathing (VII, 28-29).

Ambulance paramedic Matthew Calus testified that Defendant did not behave in a manner typical of a concerned parent, Defendant seemed unusually calm under the circumstances (VI, 22-23). Defendant told the paramedics that Madison was acting normally [but had vomited during the day (V, 12)], he gave her a bottle and left the room, and when he came back into the room Madison was coughing and then vomited and became unresponsive (V, 166). Defendant told the paramedics there had been no seizure (V, 169).

Sometime after 7:00, Heather McBurney got a call at work from Defendant (II, 158). Defendant said that Madison had collapsed and that an ambulance was there (II, 158). Ms. McBurney found out what hospital they were going to and immediately left work, headed for the hospital (II, 158-159).

Paramedic Calus recognized it as a serious situation (V, 164) requiring speedy transport to a hospital (V, 165; VII, 29). So he picked up Madison and carried her out to the ambulance (VII, 29; V, 164-165). Sgt. Schuldt held the oxygen mask on her face as she was carried out to the ambulance (VII, 29). Her body was totally limp (V, 169). They drove her to the University of Michigan hospital (V, 165, 173). Defendant rode in the ambulance with them (V, 165) in the front passenger seat (VII, 30). While en route, Defendant said that Madison had hip displasia and MRSA, for which she was on antibiotics (V, 174; VII, 36). But Defendant otherwise just sat there with a blank stare, saying nothing except responding when he was asked something (VII, ). In addition to an oxygen feed, the paramedics bagged Madison to get extra oxygen into her (V, 170; VI, 17), but she was breathing on her own (VI, 7). Mr. Calus attempted to intubate – insert a breathing tube down her trachea – but was unsuccessful (V, 170-171; VII, s a precaution not an immediate necessity because there were no signs that Madison's

5

airway had failed (V, 171). During transport Madison started to draw her hands up and get stiff (V, 172; VII, 35).

When the ambulance arrived at the hospital, they took Madison into the ER (VII, 36).

Ms. McBurney arrived at the U of M Hospital just as the ambulance was arriving with Madison and Defendant (II, 159). They went into the ER, and treatment of Madison began (II, 159). As Ms. McBurney and Defendant waited, he told her more about what had happened (II, 160). Defendant told Ms. McBurney that Madison had been sitting on the floor while he was straightening some laundry, and Madison fell back on the floor, her body got really stiff, and then she went limp (II, 160).

Dr. Athena Sikavitsas is a pediatric emergency room physician (II, 77) at U of M hospital (II, 79). She was qualified without objection as an expert in pediatric emergency medicine (II, 81). When Madison came into the ER, she was receiving oxygen by mask and valve bag (II, 86). The initial assessment revealed that Madison was breathing on her own, but weakly (II, 86, 127-128); her circulation was okay (II, 86); but she had neurological problems and was rigid and seizing (II, 87, 91, 92) and unresponsive (II, 87-88). Medications were administered in an effort to stop her seizure (II, 88, 91, 92-93). It then became necessary to intubate Madison to support her breathing (II, 93).

While these treatments were being administered, Madison's parents came into the room (II, 95). The medical history was gathered from both parents (II, 115). Defendant said that Madison had vomited three times (II, 98, 99, 118), then she was sitting upright on the floor, started making gurgling noises and went down (II, 98, 102). Defendant claimed that Madison had been sick and vomiting the prior day too (II, 104). He reported no recent trauma (II, 104), and Dr. Sikavitsas saw no visible signs of head or neck trauma, such as bruising (II, 122, 125, 126, 127).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

A head CT scan revealed blood from an "acute" hemorrhage (I, 94, 105, 136).[5] Acute means bleeding that happened within the past 72 hours, which shows up brightly on a CT scan (II, 137). Dr. Sikavitsas could not tell at that time whether there was any subacute or chronic, i.e. older, bleeding (II, 136-137). Madison then was transferred to the pediatric intensive care unit (II, 105), she was still unresponsive (II, 106, 140).

When Dr. Folafoluwa Odetola, a pediatric intensive care specialist at the U of M Hospital (VI, 29-31), saw Madison early the next morning (VI, 33), she was not moving on her own, but reacted to touch (VI, 35), and her pupils were reactive (VI, 35).

Dr. Cormac Maher is a pediatric neurosurgeon at the hospital (III, 57, 60). He was qualified as an expert in pediatric neurosurgery without objection (III, 62-63). Dr. Maher saw Madison the morning after she came into the hospital (III, 68). She was in intensive care, on a ventilator, and heavily sedated to stop any seizures (III, 71). Dr. Maher testified that Madison's initial CT scan showed blood under the dura (III, 73), which is a thick membrane on top of the brain (III, 64). The diagnosis was two subdural hematomas (III, 75), which are collections of blood on top of the brain and under the dura (III, 67-68). The age of the blood can be detected from how brightly it appears on the scan, and Madison appeared to have blood of two different ages (III, 74), i.e. that happened at two different times (III, 74, 75). The two hematomas were over two different lobes of Madison's brain (III, 74-75). There was bright/new blood on the left, back, along the tentorium portion of her brain (III, 74, 65-66). This was "much newer" than the other hematoma (III, 91), and was approximately 1-3 days old (III, 99-100). The older blood was on the left frontal lobe portion of her brain (III, 74) and was "definitely, significantly older", although Dr.

---

[5] Dr. Sikavitsas testified that it was not uncommon for there to be no external evidence of subdural hematomas or hemorrhaging in the brain (II, 140-141).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Maher could not pinpoint its age (III, 100). An MRI showed the same thing (III, 90-91).

The MRI also showed some bright blood in the very front temporal lobe, which appeared to be in the brain itself rather than in the subdural space (III, 91-93). The MRI further showed diffuse signs of edema/injury scattered throughout Madison's brain (III, 93, 130). Madison did not have a skull fracture, but traumatic brain injuries are not necessarily accompanied by fractures or bruises (III, 139-140).

Dr. Leena Dev is the director of the child protection team at U of M Hospital (III, 204). She was qualified without objection as an expert in pediatrics and child abuse pediatrics (III, 209-210). On December 1, 2006, Dr. Dev was called in to consult on Madison (III, 210). When Dr. Dev saw Madison in the pediatric ICU, Madison was on a ventilator and feeding tube, and was minimally responsive (III, 213). Madison had no broken bones (III, 217) and appeared well-nourished (IV, 57) with no visible external injuries (IV, 58).

Dr. Dev spoke to Madison's parents to get a medical history (III, 211). The parents said that Madison had been fine all day (III, 212). Defendant got her up from a nap at 7:00-7:15 p.m. to give her a bottle (III, 212). He put Madison in a bouncy chair and gave her a bottle (III, 212). She drank some and then threw the bottle aside (III, 212). Defendant changed her diaper, put on her brace, put on her pajamas, and sat her on the floor (III, 212). Defendant then heard a gurgling sound and, when Defendant looked over at Madison, she was stiff and had her back arched (III, 212). Defendant then called 911 (III, 212).

The November 30th CT scan had shown no signs of elevated pressure inside Madison's skull (III, 72-73), but an ophthalmologist at the hospital detected a papilledema on Madison's retina, which was a sign of intracranial pressure (III, 78), and on December 1st Madison's

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

fontanel [the soft spot on a baby's head] was tense, indicating extra pressure (III, 214).[6] So the medical team inserted a intracranial monitor/tube to drain fluid from Madison's brain (III, 81; VI, 41-42) on the evening of December 1st (VI, 43). Testing revealed that the pressure inside her head was very high (III, 81-82), 5-6 times the normal level (VI, 45). Her brain was swelling significantly (VI, 63, 64). Dr. Maher testified that such pressure has the potential to block blood flow to the brain and cause brain damage (III, 83-84).

Dr. Maher testified that subdural hematomas can be caused by trauma, i.e. an intentional or accidental injury (III, 94). They can also be caused by blood vessel malformations (III, 94); or can occur in children with large extra-axial spaces, i.e. gaps between their brain and their skull, when they suffer relatively minor injuries (III, 94); or can result from bleeding disorders (III, 94-95). There was no evidence of blood vessel malformation in Madison (III, 95), nor of extra-axial spaces (III, 95-96, 129), and blood work on Madison detected no bleeding disorders (III, 95). A team of physicians evaluated Madison's condition (III, 76-77) and reached a differential diagnosis of non-accidental trauma (III, 76), rather than spontaneous bleeding due to some sort of arterial or venous abnormality or bleeding disorder (III, 76).

Dr. Maher and Dr. Dev each reviewed an MRI that had been taken of Madison's head in late August of 2006 (III, 95-96; IV, 19).[7] The August MRI showed a "high intensity" spot in her left parietal lobe – a different location than any of the blood detected in the November scan – in the brain itself not the subdural space, that was either a spot of blood [of uncertain age (III, 128)] or a lipoma [fatty tumor] (III, 97, 123, 126; IV, 19-20, 54), so follow up testing was

---

[6] Madison's fontanel had been soft when she was examined in the emergency room (IV, 66).
[7] That MRI had been ordered by a dermatologist to see if there may be a scalp defect related to the Madison's aplasia cutis congenital (II, 200-201; IV, 54-55).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

recommended, with the understanding that if the spot went away that meant it had been blood (III, 97). Both Dr. Maher and Dr. Dev testified that the follow up CT scan in September showed no blood or lipoma at that spot (III, 97-98; IV, 55), and the November 30th MRI also showed no lipoma or blood at that spot, which meant that the spot seen in August had been blood rather than a lipoma (III, 127-128; IV, 65), and that the blood had resolved itself (IV, 65).[8] Dr. Maher testified that Madison's September CT scan showed no subdural blood in any location (III, 98-99). So that blood was not the older blood seen on the scans when Madison was hospitalized in this case (IV, 65).

Dr. Maher testified that the injuries he saw when Madison came into the hospital on November 30th were not likely the result of re-bleeds or chronic or old subdural hematomas (III, 100).[9] Typically, a rebleed shows up as old and new blood at the same location or very near it, and here the old and new blood were at different locations (III, 100, 137). Further, Dr. Maher testified that Madison's devastating neurological symptoms far outstripped the usual course of a hematoma of the size noted on the scans, which often go away on their own (III, 101), and evidenced a much more extensive, diffuse injury to the brain itself, not apparent on the scans (III, 101-102, 138), and far more extensive than the symptoms that would be present with a mere rebleed (III, 101-102, 138). Dr. Maher held the opinion that the injury occurred shortly before Madison arrived at the hospital (III, 134-135).[10]

Dr. Dev also concluded that Madison's injuries were not the result of a rebleed (IV, 73-

_____

[8] Dr. Dev testified that reabsorption causes the blood to disappear (IV, 68).
[9] A chronic hematoma can become symptomatic if it rebleeds or there is further trauma (IV, 68-69).
[10] On cross examination Dr. Maher testified that vomiting and tiredness can be signs of a head injury (III, 114-115, 120-121). But on redirect he testified that those symptoms routinely do not reflect a head injury (III, 136-137).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

74). Dr. Dev explained that rebleeds do not cause symptoms to the extent that that Madison had (IV, 74).

After examining Madison and reviewing all scans and test results, Dr. Dev formed the opinion that Madison's condition was likely the result of abusive head trauma [formerly known as shaken-baby syndrome (IV, 61)] – trauma to the brain (III, 218; IV, 63). She based that conclusion on several factors (III, 218), including the nature of the injuries, namely the subdural and retinal hemorrhages (III, 219), the fact that the history given by the parents was inconsistent with Madison's condition (III, 218) and with the history they had given to other doctors at the hospital (III, 218-219). Dr. Dev testified that many things can cause a subdural hematoma, including birth, or an accident, or a severe fall (IV, 66-67, 73). But a subdural hematoma would not be caused by a child of Madison's age and size falling backwards while sitting on the floor and hitting her head on the floor (IV, 73), such an event would not have enough force to cause that injury (IV, 73).

Dr. Dev explained that the mechanism of abusive head trauma is acceleration and deceleration or bouncing movement of the brain inside the skull, which puts strain on the bridge veins (IV, 27, 28, 29-30) that carry blood from the brain back to the heart (IV, 25-26). If the veins are strained too far, they tear and rupture causing hemorrhages (IV, 28). Such brain movement similarly affects the veins supplying the retinas in the eyes (IV, 28-29). The hemorrhages reduce blood supply to brain tissue, which causes brain swelling, which in turn can cause the child to stop breathing or have seizures (IV, 30-31).[11]

Dr. Odetola's diagnosis of Madison was that she had a severe brain injury of a non-

---

[11] Dr. Dev also testified that there was no sign that Madison was ever lacking oxygen (IV, 35).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

accidental nature (VI, 57), i.e. Madison could not have caused that sort of injury by herself (VI, 70). Dr. Odetola also testified that the retinal hemorrhages were not the product of brain swelling but of a shearing injury in which bridge veins on the brain were sheared when force is applied, such as acceleration and deceleration (VI, 73-75).

On December 2, 2006 (IV, 81), Sgt. Douglas Baaki of the South Lyon Police Department was contacted by a protective services worker about Madison (IV, 81-82). Sgt. Baaki relayed the information to Det. Chris Sederlund and Det. Sgt. Christopher Sovik (IV, 83-84; V, 111-112). Detectives Sederlund and Sovik then went to Northville Twp to review the records for an investigation the Northville police had conducted in 1998 (V, 113; VII, 55).

In March of 1998, Det. Paul Sumner of the Northville Township Police Department had investigated a possible abuse case involving Defendant's son Nicholas Kennedy (III, 142).[12] Defendant and his girlfriend Christa Kennedy were the caregivers for Nicholas (III, 146). Nicholas' medical records were admitted as an exhibit at trial (IX, 7) and showed that Nicholas was 4½ months old at the time of the incident (See X, 63) and suffered subdural hemorrhages, retinal hemorrhages, a subarachnoid hemorrhage, and a skull fracture (See X, 63). Det. Sumner had interviewed Defendant at the time (III, 142-143), asking about how Nicholas got injured (III, 144). Defendant said he did not know and denied injuring Nicholas (III, 145). Defendant said that he was alone with Nicholas when Nicholas stopped breathing and Defendant then called 911 (III, 146). But, later that day, Defendant called Det. Sumner and asked to speak with him (III, 148). Defendant went to the police station (III, 148) and told Det. Sumner that there had been an incident when Nicholas was a month and a half old where he accidentally dropped Nicholas and

---

[12] Nicholas Kennedy's mother was Defendant's girlfriend Christa Kennedy (III, 146).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Nicholas hit his head on the floor, but Defendant had never told anyone about it (III, 150, 151, 187). Defendant then paused and just sat there silently, upset and with his eyes downcast (III, 151-152). Det. Sumner said he needed to know all the information so the doctors could help Nicholas (III, 152). Defendant started to cry and gave more information about Nicholas' injuries (III, 152). Defendant said that he had just gotten home from working the midnight shift, and Christa had just left for work, leaving Defendant alone with Nicholas (III, 152). Nicholas was crying, and Defendant tried to give him a bottle (III, 152). Defendant bounced Nicholas as he was giving him the bottle (III, 152). Nicholas would not stop crying, and Defendant got upset and frustrated (III, 153). Defendant started shaking and bouncing Nicholas (III, 153, 188). Nicholas then went limp and stopped breathing (III, 153). Defendant called EMS and Nicholas was taken to the hospital (III, 153). Defendant admitted to Det. Sumner that he shook Nicholas too hard and caused his injuries (III, 153).

After gathering information from the Northville police, Detectives Sederlund and Sovik drove to the U of M hospital, arriving there at about midnight (V, 113-114; VII, 53, 55, 56). They spoke to the protective services caseworker (V, 113; VII, 56). Then they went to a large conference room in the pediatric intensive care unit (V, 114; VII, 56-59). The detectives spoke to a nurse and to a doctor, and then spoke to Heather McBurney (II, 163-164; V, 114-115; VII, 56-59). Ms. McBurney was upset and crying (VII, 58), and the interview with her lasted about an hour and a half (V, 115; VII, 59). After speaking to the detectives, Ms. McBurney went back to Madison's room (II, 165).

Then the detectives spoke to Defendant (V, 115-116; VII, 59). Defendant agreed to speak to them, he was not under arrest (V, 117; VII, 61). The interview began at about 2:00 a.m. (V, 117; VII, 60). While getting background information, they asked Defendant if he had any other

13

children, and Defendant said no (V, 120; VII, 62). Sgt. Sovik asked Defendant to tell him what happened to Madison (VII, 62). Defendant said that Madison had been throwing up throughout the day and wasn't feeling good (V, 121; VII, 63). They put Madison down for her nap shortly before Heather left for work at about 6:00 p.m. (V, 121). At about 7:00, Defendant woke up Madison (V, 121; VII, 63). She was a little cranky, but nothing out of the ordinary (V, 121; VII, 63). Defendant put Madison in her bouncy seat in the living room and gave her a bottle (V, 121; VII, 63). Madison spit the bottle out onto the floor (V, 121; VII, 63). Defendant then carried Madison into her bedroom (V, 121; VII, 63). He changed her diaper, put on her pajamas, put her brace on her legs, and then sat her down on the bedroom floor (V, 121-122; VII, 63-64). Defendant discarded the dirty diaper and put some clothes away (V, 122; VII, 64). Defendant told the detectives that he then looked over and noticed that Madison was having trouble breathing and was gurgling up some spit – it was not uncommon for her to gurgle on her spit (V, 122; VII, 64). Madison then fell backwards, having a seizure (V, 122; VII, 64). Her limbs tightened up, and she became rigid and unresponsive (V, 122; VII, 64). When he picked her up she was limp (VII, 64). He called 911, and the dispatcher instructed him on how to do rescue breaths (V, 122-123; VII, 64). Defendant disrobed Madison down to her diaper and brought her out to the living room to wait for help to arrive (V, 122; VII, 64). The ambulance came and brought Madison to the hospital (V, 123; VII, 65).

Sgt. Sovik then asked Defendant about Nicholas Kennedy (VII, 65, 66), and the prior investigation in Northville (VII, 66). Defendant said Nicholas was not his child (V, 123-124; VII, 67). Sgt. Sovik asked Defendant to tell him about Nicholas' injuries (VII, 67). Defendant said he was not responsible for injuries to Nicholas (V, 125; VII, 67). Sgt. Sovik asked Defendant how Nicholas sustained skull fractures, and Defendant did not respond (VII, 67). Sgt. Sovik asked

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

14

Defendant if he ever told Heather about that 1998 investigation, and Defendant said no (VII, 67). Defendant said that Nicholas' injuries had been worse than Madison's (VII, 69).

Sgt. Sovik told Defendant that the medical staff had said that Madison's injuries were non-accidental, they were traumatic injuries caused by abuse (VII, 70). Defendant said nothing (VII, 70). Sgt. Sovik asked Defendant if he was responsible for the injuries, and Defendant said no (V, 126; VII, 70). Defendant told the detectives that he and his wife were Madison's only caregivers in the days leading up to her hospitalization (V, 125; VII, 69-71). When asked if Heather did it, Defendant said he did not know, but he could not believe she would do something like that (VII, 70-71). Sgt. Sovik asked Defendant what he thought the penalty should be for someone who did that to a child (VII, 71). Defendant said it would depend if it were accidental or intentional, if it were an accident just going to the funeral would be punishment enough (V, 126; VII, 71).

During the ensuing conversation, Defendant said that there had been an incident a couple of months earlier in which he was carrying Madison in her bouncy chair, the corner of the bouncy chair caught on the couch, and Madison flipped out of the chair, fell about 5 feet, and landed on her head (V, 127; VII, 71-72). Defendant said he and his wife took Madison to the hospital after that event (V, 127; VII, 72, 118).

Defendant then said, "I caused these injuries to Madison" (VII, 72). Sgt. Sovik said that he knew that, and that he understood how difficult children can be (VII, 72-73). Defendant said, "My life is over" (V, 127-148; VII, 73). Sgt. Sovik assured Defendant that his life was not over and that his wife would need him (VII, 74). Sgt. Sovik urged Defendant to tell his wife what happened (VII, 74). Defendant said he wanted to speak to his wife (V, 129). Det. Sederlund went and got Heather McBurney (V, 129; VII, 74). Defendant started crying (VII, 75). Ms. McBurney

15

came into the room and sat down (II, 167; V, 129; VII, 75). Sgt. Sovik told her that Defendant

had something to tell her (VII, 75). Defendant asked her, "You knew about Nicholas Kennedy?"

(VII, 76). After she responded, Defendant said he would have told her sooner, but he was afraid

of ruining their relationship (VII, 76).

Defendant then said to his wife, "I made a mistake" (V, 129, 148; VII, 77). "I threw her

into the crib", he said (II, 169, 256; V, 130, 148; VII, 77, 112). Ms. McBurney was stunned (II,

169). Sgt. Sovik asked Defendant to tell what really happened with Madison (VII, 77).

Defendant told the detectives that when he woke Madison up from her nap on November

30th she was cranky (V, 130-131). Defendant put Madison in her bouncy seat and gave her a

bottle (VII, 77). She spit the bottle out (V, 131; VII, 77). Defendant picked Madison up out of

her bouncy seat and carried her into her bedroom (V, 131; VII, 77-78). He started to change her

(VII, 78). Madison was screaming and crying (VII, 78). He changed her diaper and her clothes

and put her brace on (VII, 78). Madison screamed and cried while Defendant put on her pajamas

and leg brace (V, 131, 159). Defendant picked her up to try to comfort her (V, 131; VII, 78).

Madison continued to scream and cry in his ear (VII, 78). He got angry and "frustrated", and he

threw Madison into the crib (V, 131, 159; VII, 78). Defendant said he was about two feet away

from the crib at the time (V, 131; VII, 78, 113-114). The back of Madison's head hit the crib bars

(V, 131; VII, 78, 113-114). Madison immediately went into a seizure and became unresponsive

(V, 131; VII, 78). He picked her up, and she was limp (V, 131; VII, 78). He could not tell if she

was breathing (V, 132; VII, 78). Defendant then called 911 (V, 132; VII, 79). He gave her rescue

breaths and carried her into the living room to await EMS (V, 132; VII, 79).

Defendant and Heather talked about their relationship, and Defendant said to her, "You

know how difficult Madison has been these days" (V, 130; VII, 79). Defendant said it was hard

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

16

for him to deal with Madison (VII, 79-80). Defendant said that was why he had wanted Heather to work the day shift, so that they could tag-team their nighttime care of Madison because she had been so difficult (V, 130; VII, 79).

Sgt. Sovik and Det. Sederlund stepped out into the hall to discuss things (VII, 80). Then they arrested Defendant and took him to the South Lyon police station (V, 133; VII, 81). Sgt. Sovik later inspected the crib and found nothing of evidentiary value (VII, 127-128).

Meanwhile, the medical team was continuing treatment in an effort to maintain blood flow to Madison's brain (VI, 46-48). But efforts to reduce Madison's intracranial pressure were unsuccessful (III, 84; VI, 51). Over the next two days, Madison's condition deteriorated, some physical reflexes were gone and she was no longer responsive to touch (VI, 52-53). A follow-up CT scan done on December 2nd showed brain injury to a concerning extent (VI, 52), extensive collection of blood and "restricted diffusion" injury related to reduced blood flow and oxygen to the brain (VI, 70). Dr. Odetola testified that by this point Madison had already suffered permanent brain damage (VI, 51). It was his opinion that Madison had suffered severe brain injury that, at best, would cause long-lasting effects from the injury (VI, 55).

The medical team considered the extreme and controversial, last ditch option of a craniectomy, i.e. removing a large portion of Madison's skull (III, 84-85; VI, 48). Although that procedure can extend life, it increases the risk of the patient winding up in a persistent vegetative state (III, 85-86; VI, 50-51, 54, 76-77). They consulted with Madison's family (III, 85) and ultimately the family and Dr. Maher decided that a craniectomy was not in Madison's best interests (III, 85-86; VI, 50). Dr. Maher testified that given the very high intracranial pressure that existed and the severity of Madison's injury, her prognosis was poor (III, 86). There were no other treatment options (III, 87).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Madison clung to life for a couple of days but declined neurologically (III, 86). Madison passed away on December 4, 2006 (II, 162; VI, 55), after her mother authorized withdrawal of life support (VI, 67). Madison was not able to sustain life on her own (VI, 78).

Dr. Maher testified that his final diagnosis was that Madison died of severe intracranial injury (III, 102-103), a "very extensive, very terrible injury", much more severe than a subdural hematomas or a rebleed (III, 103-104) and that it occurred shortly before Madison arrived at the hospital (III, 134-135).

Dr. Ljubisa Dragovic is the Oakland County Medical Examiner (VIII, 7). He was qualified without objection as an expert in forensic pathology and neuropathology (IX, 13). He performed an autopsy on Madison on December 6, 2006 (IX, 13, 16). Madison was 11 months old (VIII, 16) she weighed 32 pounds and was 28 inches long, which was within normal ranges (VIII, 18). During the external exam, Dr. Dragovic noticed defects on her scalp due to a preexisting condition (VIII, 17), a congenital aphasia (VIII, 19), but no internal damage due to that condition (VIII, 54-55). Nothing else significant was found on the outside of Madison's body (VIII, 18).

Inside Madison's head there were signs of an old bleed in the subdural area, as well as a more recent bleed (VIII, 20, 21-22). Microscopic examination showed that the older bleed was 3-4 months old (VIII, 33). The more recent bleed was 1 day to 1 week old (VIII, 20, 33), 4-6 days before death (VIII, 98). They were on both sides of the brain (VIII, 24). The old bleed had been caused by a previous head trauma (VIII, 25, 81). Dr. Dragovic testified that old subdural hematomas do not rebleed spontaneously (VIII, 47), but they do make the patient more susceptible to re-injury (VIII, 47-48).

Dr. Dragovic's examination also showed internal hemorrhages in Madison's lower neck

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

and upper back, indicative of a blunt trauma to that area as well (VIII, 66-67, 68-69, 113), the age of these hemorrhages was about the same as the new bleed in her brain (VIII, 107-108).

Madison's brain was swollen (VIII, 22). Dr. Dragovic testified that the brain swells as a reaction to damage, such trauma, infection, or lack of oxygen (VIII, 26-27). Dr. Dragovic testified that Madison's brain swelling was caused by trauma-induced subdural bleeding (VIII, 31, 29). Brain swelling does not occur immediately after the injury, it may take hours (VIII, 27). Here, the swelling had caused the brain to encroach down into the opening at the base of Madison's skull and compress her brain stem, which would compromise respiratory function (VIII, 22, 30). Swelling also had the effect of cutting off blood supply to brain tissue (VIII, 31). Examination of Madison's brain showed extensive areas of rotting brain tissue – areas of tissue that were dead due to deprivation of blood supply pre-mortem (VIII, 23-24, 31, 56). Blood circulation had been impaired throughout her brain (VIII, 56). There was diffuse injury throughout the white matter of her brain (VIII, 69-70). In Madison's eyes were retinal hemorrhages (VIII, 32-33). Dr. Dragovic summarized, "this child was rendered brain dead as a result of massive brain swelling and herniation and the circulation and blood supply stopped (VIII, 56-57).

Dr. Dragovic concluded that the cause of Madison's death was blunt head trauma and complications of that trauma (VIII, 34). Such head trauma could occur without any externally visible injuries or skull fracture (VIII, 36-37), and there was no skull fracture here (VIII, 69). Dr. Dragovic explained that when a there is a blunt trauma to the head, the brain keeps moving due to inertia and bounces back when the skull stops due to making contact with an unyielding surface (VIII, 37-38). The result of that movement can be major damage to the blood vessels on the brain surface, causing subdural bleeding (VIII, 38). Dr. Dragovic testified that if a baby's

head hit the bars of a crib and there was some sort of bedding on the bars, a brain injury could occur without any externally visible mark (VIII, 39-41). Madison's injuries were consistent with being thrown from a distance of 2 feet into a crib and her head hitting the bars on the crib (VIII, 41, 95). It would only take the snap movement involved in a short distance to cause the injury (VIII, 48).

Dr. Dragovic testified that it can be difficult to determine with premortem tests and scans whether brain damage is caused by oxygen/blood deprivation or by trauma-induced tearing of white matter tissue, but a post-mortem examination can conclusively establish which occurred (VIII, 69-72). Madison's injuries were not the result of oxygen/blood loss to the brain, but rather that oxygen/blood loss was the complication resulting from the original injury source: blunt force trauma (VIII, 108).

Dr. Dragovic classified the manner of Madison's death as homicide, i.e. it was the result of a purposeful act by another person (VIII, 34, 59). Dr. Dragovic's conclusion that it was a purposeful act by another was based on the fact that Madison's hip displasia rendered her unable to ambulate on her own (VIII, 106, 110).

Madison's hip displasia and aplasia cutis congenita played no role in her death (VIII, 41-42; IV, 31-33, 34-35). And post mortem testing revealed that Madison did not have MRSA (VIII, 43-44).

The defense called several witnesses at trial.

Dr. Ronald Uscinski was qualified without objection as an expert in neurosurgery (V, 6). But, on cross examination, he acknowledged that only a small part of his experience involved infants (V, 62, 14). Dr. Uscinski had published an article espousing the view that human beings cannot shake a baby hard enough to cause intracranial injuries and, if they could, it would break

the baby's neck (V, 8-9).

After reviewing Madison's medical records, Dr. Uscinski concluded that her injury was not the result of blunt trauma (V, 57) because there was no external evidence of injury, such as bumps, bruises, or a skull fracture (V, 57-58). With a blunt trauma there would typically be bleeding in the brain itself, and Dr. Uscinski's review detected no bleeding in her brain, only outside the brain (V, 58). Dr. Uscinski characterized the nature of Madison's trauma as a chronic subdural hematoma rebleed, and effects of oxygen deprivation to the brain (V, 30).

He testified that her August MRI showed fresh subdural blood surrounded by older blood (V, 32, 34-35), i.e. a chronic hematoma with a little bit of rebleeding (V, 35). Such blood would "probably" not completely disappear in two weeks (V, 42). Dr. Uscinski interpreted the September CT scan (V, 42) as "subtl[y]" showing a grayish material [in the same area as the blood found in the August MRI (V, 47)] that was not bone, was not clear enough to be spinal fluid, and was not blood vessels (V, 45-46). Dr. Uscinski concluded it must be degrading blood, "there's not much else it can be except we know this patient has had intracranial bleeding in the subdural space, it's degenerating subdural hematoma" (V, 46) – degraded blood products in the subdural space (V, 46, 48), i.e. a chronic hematoma (V, 47). Dr. Uscinski expressed the opinion that this was the same chronic hematoma seen in August, which had not completely resolved (V, 48). The November 30th CT scan (V, 48) showed that the hematoma that had been seen in August was gone (V, 51). But Dr. Uscinski interpreted the scan as showing some fresh blood in the same area as the August hematoma (V, 51) reflecting that the subdural hematoma had gotten larger and had re-bled (V, 53). Dr. Uscinski testified that a chronic subdural hematoma can rebleed spontaneously or with a trivial incident like a burp or sneeze (V, 27, 58). Vomiting and lethargy could have been caused by the subdural hematoma (V, 58-59).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Dr. Uscinski expressed the opinion that Madison's brain swelling was not due to external trauma, but was the result of oxygen deprivation (V, 60). Because she was seizing, her airway would have been compromised (V, 87). Dr. Uscinski believed that efforts to oxygenate Madison at the hospital had been unsuccessful (V, 55-56). One of the blood samples showed that Madison's oxygen level was far below normal ranges (V, 56). When the brain does not get enough oxygen, it swells (V, 56). He theorized that the medical team's efforts to maintain her circulation only increased her brain swelling (V, 59).

On cross examination, the prosecutor elicited that Dr. Uscinski had testified as a defense expert about 90 times and had never testified for the prosecution (V, 64). He was being paid $12,000-13,000 for his participation in this case (V, 68), and he derived about 15% of his income from testifying for the defense in cases involving children with head injuries (V, 71). The prosecutor also elicited that Dr. Uscinski had not reviewed any police reports in this case (V, 71), and that he had never treated Madison or spoken to any of the treating physicians (V, 74).

The defense called Dr. Robert Adams as a defense witness. He was qualified without objection as an expert in family medicine (VIII, 127). He was Madison's regular doctor (VIII, 127-129). He did her well-baby checkups (VIII, 129-130). Madison's mother usually brought in her in, one time Defendant did (VIII, 134, 145). Her last well child visit was on October 24th (VIII, 133). Dr. Adams saw Madison on a sick visit when she had a cold on November 3rd (VIII, 133). He never saw anything that caused him to feel concerned about Madison's care or to suspect abuse (VIII, 134). After her August MRI, Dr. Adams referred her for a CT scan, and the results of that came back normal (VIII, 138-139).

The defense called Lynn Schumann-Peterson as a defense witness. Ms. Schumann-Peterson runs the Pitter-Patter daycare center in South Lyon (VII, 137). Madison came there from

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

October, 2006, until some time in November of 2006 (VII, 137). She was there 4-5 days per week (VII, 144) from 7:00 a.m. to 2:00 p.m. (VII, 138). Defendant brought her in the morning (VII, 140), and her mother picked her up in the afternoon (VII, 142-143). Madison appeared properly fed and clothed (VII, 141). Ms. Schumann-Peterson never saw any sign that Madison was being mistreated (VII, 142). Ms. Schumann-Peterson testified that Madison was a happy, normal child who was easy to care for (VII, 141) and seldom cried and never screamed (VII, 142), but she admitted that she did not personally care for Madison at the facility (VII, 138, 145-146).

Sharon Klump worked at the Pitter-Patter daycare center in the baby room (VII, 148). Madison came there for about 6 weeks (VII, 150), from 7:00 a.m. to 2:00 p.m. (VII, 149). Ms. Klump and another girl were Madison's primary caregivers while she was there (VII, 150). Madison appeared properly fed and clothed (VII, 151). Ms. Klump saw no signs that Madison was being mistreated (VII, 152). Madison was a sweet baby, "probably one of the best babies we ever had" (VII. 151). She was easy to put down to sleep (VII, 151). Ms. Klump testified that she never heard Madison cry or scream (VII, 151-152), but admitted that when she was caring for Madison, Madison was not suffering from any separation anxiety (VII, 153). Ms. Klump testified that she never saw Madison vomit or acting listless (VII, 152).

Ms. McBurney's father Gary Linbilie (VII, 155) testified that he had visited with Heather, Defendant, and Madison (VII, 158-159). Defendant appeared to be an attentive, protective, and loving father to Madison (VII, 159, 161). Mr. Linbilie saw nothing in the interaction between Defendant and Madison that caused him concern (VII, 159). And he had never seen Madison cry (VII, 160).

But on cross examination, Mr. Linbilie testified that Defendant changed his story at the

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

hospital about what had happened with Madison. Mr. Linbilie testified that when he got to the hospital, he or his wife asked Defendant what happened (VII, 165). Defendant said that he was changing Madison's clothes in the living room, he left the room to get some clothes and when he came back she had fallen over and was in convulsions (VII, 166). The next day Mr. Linbilie heard Defendant tell a different story about what happened to Madison (VII, 166). Defendant said that it all happened in the bedroom, rather than the living room – Mr. Linbilie noticed the change (VII, 166).

The prosecutor called Dr. Mohannad Ibrahim as a rebuttal witness. Dr. Ibrahim was qualified as an expert in pediatric neuroradiology (IX, 14-16). He reviewed the MRI and CT scans taken during Madison's hospitalization (IX, 16-17). There were hematomas of different ages outside the brain (IX, 18) on both the left and the right sides (IX, 18, 29). There was a subdural hemorrhage a week to two months old toward the back of her head (IX, 22-24) and one toward the front of her head that was more than two months old (IX, 24, 27). One of these hematomas was in the same area as was seen in the August MRI, but Dr. Ibrahim could not determine if it had just gotten larger or if it was a new hematoma (IX, 37). The August MRI showed a spot on the left side of Madison's brain that was either blood or a lipoma (IX, 34-35). The September CT scan showed no abnormality at all (IX, 36). Dr. Ibrahim testified that the hematoma could not have been a re-bleed (IX, 38). There was also severe ischemic injury in the brain itself (IX, 18-19) that was recent and diffuse (IX, 30).

The defense theory was that the fatal brain injury was a chronic hematoma that had re-bled (X, 97, 99-100). The defense admitted that Defendant threw Madison into her crib, but argued that Defendant was merely careless in doing so and could not have envisioned that it would trigger a rebleed (X, 82, 103, 106).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

The jury was instructed on Count I on the charged offense of felony murder predicated on first degree child abuse (X, 133-134, 150-151) as well as the lesser offenses of second degree murder (X, 134, 151-152) and involuntary manslaughter (X, 135-136); and was instructed on Count II on the charged offense of first degree child abuse (X, 136-137) as well as the lesser offense of second degree child abuse (X, 137-138).

After hearing the foregoing evidence, the jury found Defendant guilty of second degree murder and first degree child abuse (XI, 17).

Sentencing took place on March 31, 2008. Defendant admitted that he was a habitual-second, based on his prior conviction of second degree child abuse in 1998 (Sent, 3-4). The trial court Defendant to 30-60 years for the murder and 15-22½ years for the child abuse (Sent, 21-22).

Defendant appeals as of right. Further facts are set forth *infra*, where pertinent to the issues raised on appeal

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

<u>ARGUMENT</u>

I.   THE PROSECUTOR'S CROSS-EXAMINATION OF THE DEFENSE EXPERT WITNESS WAS A PROPER EXPLORATION OF THE WITNESS' CREDIBILITY AND WAS A PROPER SUBJECT OF COMMENT IN CLOSING ARGUMENT.

### *Standard of Review*

With regard to the preserved aspects of this issue (a) decisions regarding the scope of cross examination should not be reversed absent an abuse of discretion, *People v Ross*, 145 Mich App 483, 489-490; 378 NW2d 517 (1985); and (b) prosecutorial misconduct claims focus on whether the prosecutor's acts infected the trial with such unfairness as to make the resulting conviction a denial of due process. *People v Hedelsky*, 162 Mich App 382, 385; 412 NW2d 746 (1987).

With regard to the unpreserved aspects of this issue, review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

### *Issue (non)preservation*

Defendant objected to the portions of the prosecutor's cross-examination of Dr. Uscinski about which he complains on appeal (V, 68, 69, 81-82, 91-92), and raised the issue in a motion for new trial filed 5/12/08. However, Defendant raised no objection to the prosecutor's reference to having met Dr. Uscinski before or to the prosecutor's now-challenged remarks in closing argument.

### *Analysis*

Defendant complains about the prosecutor's questioning of and arguments regarding defense expert Dr. Uscinski. But the prosecutor's questioning and comments were proper in this case.

Defendant argues that the prosecutor should not have been permitted to question Dr. Uscinski regarding his fee. However, this is a proper area of inquiry as it can reveal potential

26

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

bias. MRE 611(b) states that a witness may be cross-examined on any matter relevant to the case, including credibility. Here, the fee questions were appropriate and relevant to the expert's credibility. *People v Layher*, 464 Mich 756, 764; 631 NW2d 281 (2001)(interest or bias of a witness is never irrelevant). Information that the witness is being compensated for testifying is relevant to potential bias on the part of the witness. See *People v Chatfield*, 170 Mich App 831, 833-855; 428 NW2d 788 (1988). As this Court has held, "[t]he prosecutor is clearly permitted to expose a defense witness's bias or prejudice through evidence that the witness is compensated for testifying on defendant's behalf", *People v Greer*, unpublished opinion per curiam of the Court of Appeals, slip op pp 1-2, decided 6/13/97 (docket No. 148473)(attached as Appendix A)[13]; 31A Am Jur 2d, Expert and Opinion Evidence, §75, pp 98-99 ("A court may, in its discretion, allow experts to be cross-examined as to the amount of compensation they received or expect to receive for testifying"); 3 Wharton's Criminal Evidence 15th ed, §13:18, pp 487-488 ("With expert witnesses, unlike lay witnesses, one proper area of cross-examination may be the fee the witness is receiving").

Defendant argues that, even if general fee questions are permissible, the prosecutor went too far here by asking about the fee Dr. Uscinski had charged in another case. But in making his argument, Defendant is pulling questions out of context. The reason that the prosecutor asked about the expert's fee in the other case was to impeach his claim that he did not charge a fee to testify. The prosecutor was able to elicit that in the other case Dr. Uscinski had testified that it was his practice to bill for his testimony.

The prosecutor asked Dr. Uscinski if he accepted fees for his testimony or preparation in

---

[13] The People recognize that unpublished opinions are not precedentially binding under principles of stare decisis, MCR 7.215(C)(1), but offer this citation for its persuasive value.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

this case, and Dr. Uscinski said he had been paid no money for his testimony or preparation (V, 67), but then said he had been paid $12,000-13,000 for his "time", refusing to acknowledge that he had been paid for his preparation or testimony,

> Q    Now, doctor, you accept fees for your testimony, don't you?
> A    No.
> Q    Were you paid to testify in this case?
> A    No.
> Q    You have received no monies for your testimony and your preparation in this case?
> A    No.
> Q    isn't it true in the past that you have been paid for your testimony and your preparation in cases?
> A    I'm answering the questions you're asking, yes.
> Q    Did you receive any money in relation to this case, doctor?
> A    Yes.
> Q    For what?
> A    Time, not testimony, ma'am, time.
> Q    And how much did you receive or will you receive?
> A    Somewhere between twelve and thirteen thousand dollars, and that's an estimate.
>
>                                    (V, 67-68)

In an effort to impeach Dr. Uscinski's odd claim that he was not paid for his preparation or testimony, the prosecutor then asked Dr. Uscinski whether he had testified for the defense in the Louise Woodward case in November 1999 (V, 68). Defense counsel objected that it was irrelevant (V, 68), and the prosecutor responded that it went to the witness' credibility (V, 68). Judge O'Brien overruled the objection (V, 68). Dr. Uscinski said he did testify in that case (V, 68-69). The prosecutor asked him how much he had been paid in that case (V, 69). And, in response to defense counsel's objection that no facts about the other case had been mentioned (V, 69), the prosecutor elicited that the Louise Woodward case involved a nanny who was accused of shaking a baby and causing injuries (V, 70). The prosecutor then elicited from Dr. Uscinski that he had testified in that case that he was paid $900 per hour for testimony, and $300 per hour for preparation (V, 70).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Viewed in context, this questioning was a permissible attempt to clarify the witness' fee arrangement, and to impeach the witness' claim that he was not paid to prepare or testify, see *Westland v Okopski*, 208 Mich App 66, 71; 527 NW2d 780 (1994), lv den 450 Mich 921 (1995).

Next, Defendant argues that the prosecutor should not have been permitted to ask Dr. Uscinski about the conclusions he had reached in other cases and to try to impeach him with transcripts of those cases. But the questioning was permissible, and the prosecutor showed the transcripts to the witness not for impeachment purposes but in an effort to refresh his recollection on a legitimate point of inquiry.

When the prosecutor tried to elicit from Dr. Uscinski that he had frequently testified that a chronic subdural rebleed caused a brain injury rather than shaken-baby syndrome (V, 81), defense counsel raised a relevancy objection (V, 81-82). The jury was excused so the issue could be discussed (V, 82). The prosecutor argued that it was relevant to the doctor's credibility that he had testified to the exact same conclusion in at least 8 other cases in which he was the defense-hired expert (V, 82).[14] The trial judge ruled that the prosecutor could ask a yes or no question regarding whether the witness had testified to the same thing a certain number of times (V, 83-84).

This ruling was not an abuse of discretion. Under MRE 611(b), a witness may be cross-examined on any matter relevant to the case, including credibility. Dr. Uscinski's pattern of expressing the same opinion in other cases demonstrated an expert testimonial niche that was highly relevant to his bias or interest. *State v Womack*, 592 So2d 872, 881 (La App,

---

[14] Dr. Uscinski had staked out a position in a published article that it was impossible for a human being to shake an infant with sufficient force to cause intracranial injuries without breaking the baby's neck (V, 8-9), i.e. that there is no such thing as shaken-baby syndrome, see http://www.jpands.org/vol9no3/uscinski.pdf.

1991)(prosecution could properly explore the diagnoses that the defense expert had reached in other cases). The prosecutor could properly explore the topic. A prosecutor's good faith effort to admit evidence is not misconduct. *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007), lv den 480 Mich 897 (2007). And because the trial court ruled that the questioning was allowable, it cannot be deemed prosecutorial misconduct. *People v Curry*, 175 Mich App 33, 43-44; 437 NW2d 310 (1989).

When the prosecutor asked the simple question about how often Dr. Uscinski had reached the same conclusion, Dr. Uscinski (whom the record shows was extraordinarily defensive and hostile to the prosecutor's questioning) said he could not recall, claiming that he simply had no idea what he had testified to in most of the cases mentioned,

> Q    How many of those cases did you testify that it was your opinion that the child had suffered a chronic subdural hematoma that had re-bled?
> A    I have no idea
> Q    More than ten?
> A    I just said I have no idea. It may be more than ten, it is less than ninety, I don't know.
>
> \* \* \*
>
> Q    Was that your testimony in the Woodward case?
>
> [defense objection based on the facts of that case not being explored, overruled]
>
> A    Yes.
> Q    How about in the case of Indiana versus Nicholson in 2003?
> A    I don't remember.
>
> [standing objection noted]
>
> Q    How about the case of Ohio versus Youngert (phoen)?
> A    I don't remember.
> Q    How about the case of Colorado versus Waddle (phoen)?
> A    Yes, and it's Wadle (phoen).
> Q    Thank you. Tennessee versus Stringer (phoen)?
> A    I don't remember.
> Q    California versus – and I'll spell this last name for you, V-e-l-a-h-b-i-d?
> A    I remember the case, I don't remember the circumstances or details, possibly.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

30

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Q    Texas versus Cathy Stewart (phoen)?

A    Again, I remember the name I don't remember the circumstances of the case.

(V, 89-91)

So the prosecutor attempted to refresh Dr. Uscinski's recollection by showing him transcripts of his prior testimony in two of the other cases (V, 91-95), MRE 612 & 613, over defense objection (V, 91-92). But after reviewing the transcripts, Dr. Uscinski denied that they refreshed his recollection (V, 93-94, 95). The prosecutor asked no further questions about Dr. Uscinski's testimony in the prior cases.[15] The contents of the transcripts were not revealed to the jury.[16]

The record reveals neither an abuse of discretion on the part of the trial court in its handling of this matter, nor any prosecutorial misconduct in exploring this legitimate area of inquiry.

Defendant next complains that the prosecutor argued these topics in closing argument. However, Defendant raised no objection to these remarks, and Defendant has not shown plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 762-764; 597 NW2d 130 (1999). In closing argument, after summarizing the prosecution's evidence (X, 37-67), the prosecutor argued that Dr. Uscinski's testimony should not be given great weight because he had not treated Madison, he had limited experience with infants, he had less experience than the other doctors who testified in the case, and he had been paid a hefty fee by the defense,

> Now I don't have much to say about Doctor Uscinski's testimony. This is a man who goes around the country and testifies. Testifies only on behalf of the defense. He testified he has never testified on behalf of the prosecution. He goes around

---

[15] The prosecutor did ask Dr. Uscinski if he had personally seen or treated any of the children in those other cases (V, 96), and Dr. Uscinski responded that he could not answer with a yes or no (V, 97).

[16] Although no extrinsic evidence on this point was admitted in this case, it would have been permissible. A witness' bias or prejudice may be shown by extrinsic evidence because particular conduct and circumstances are often the only practical means of showing potential bias. *People v Perkins*, 116 Mich App 624, 628; 323 NW2d 311 (1982)[quoting 3A Wigmore, Evidence (Chadbourn Rev), §948, p 784].

31

and he testified about children that he's never seen, that he's never touched, that he's never treated. He wants to tell you that he knows better that Doctor Maher, who was the pediatric neurosurgeon, who did the procedure on Madison and treated her. He wants to tell you that he knows better than Doctor Ibrahim who is a pediatric neuroradiologist. Unlike Doctor Uscinski, Doctor Ibrahim is board certified in the area of pediatric neuroradiology. Recall Doctor Uscinski is just simply a neurosurgeon and that he doesn't even specialize in children. He treats children and adults. And he wants you to think that he knows better than Doctor Dragovic, a forensic pathologist, a neuropathologist. Recall how many autopsies Doctor Uscinski said he's personally done. I believe the answer was "Zero." He knows better than the man who looked at Madison's body, who fixed her brain in formalin and had to examine her brain, and who looked at microscopic slides of Madison's brain. He knows better. Doctor Uscinski wasn't present for any of these things. And he didn't call and talk to any of these people. He made some reference to bumping into Doctor Dragovic a week or so before trial at a conference. He didn't call and talk to him about his findings and ask questions and ask to look at things.

The Defendant had to go a long way to find somebody who would dispute these doctors. All the way to Maryland or Virginia for twelve ($12,000) or thirteen thousand dollars ($13,000) of his time. And recall how much of an argument he had to give me about was he getting paid for his time or his testimony, instead of just coming out and saying, "I'm paid for this." Apparently you can get anyone to say anything for enough money. Although in Doctor Uscinski's case it's not just anything is it? He has a pattern of testifying that it's a chronic subdural rebleed. Forgetting the conflicting statements by the Defendant. Forgetting the fact that there was an epidural hemorrhage to the spine. Forgetting the fact that there was subarachnoid hemorrhage that's in a different space than the subdural. This man for that much money and his thirty (30) hours couldn't even remember the sex of this child when he testified. He told you this was a boy. He kept calling Madison he.

(X, 69-71)

The credibility of witnesses is a proper subject of argument. *People v Lodge*, 157 Mich App 544, 550; 403 NW2d 591 (1987), lv den 429 Mich 851 (1987). As discussed *supra,* the expert's fee was relevant to credibility and bias and was a proper subject of argument. *People v Williams*, 162 Mich App 542, 548-549; 414 NW2d 139 (1987)(characterizing defense expert as a "hired gun"); *People v Jackson*, unpublished opinion per curiam of the Court of Appeals, slip op pp 2-3, decided 7/31/03 (Docket No. 233435)(attached as Appendix B). As discussed *supra*, the fact that the expert had testified to the same conclusion in other cases was relevant to credibility and bias

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

and, as such, was a proper subject for argument. The prosecutor is free to argue the evidence and all reasonable inferences from the evidence to the jury. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *People v Johnson*, 187 Mich App 621, 625; 468 NW2d 307 (1991), lv den 439 Mich 978 (1992). And as this Court held in *People v Marji*, 180 Mich App 525, 538; 447 NW2d 835 (1989), the prosecutor need not phrase his comments in the blandest of terms. Moreover, the trial court instructed the jury that it was up to them to decide whether to believe any of the experts' opinions (X, 131-132, 149-150). In this context, there was no error, much less plain error affecting Defendant's substantial rights, in the prosecutor's closing argument.

Defendant's reliance on *People v Tyson*, 423 Mich 357; 377 NW2d 738 (1985), is misplaced in several respects. First, in *Tyson* a timely objection was raised by the defense. Here on the other hand the issue was forfeited below and, therefore is reviewable only for plain error affecting Defendant's substantial rights. Second, in *Tyson, supra* 423 Mich at 376, the prosecutor's argument that the defense expert was hired to get the defendant "off the hook" was based on facts **not** in evidence. See *People v Howard*, 226 Mich App 528, 545; 575 NW2d 16 (1997), lv den 459 Mich 884 (1998); *Williams, supra* 162 Mich App at 549. Here, however, the fee was properly put in evidence and was a proper subject of argument. *Howard,* supra 226 Mich App at 545-546. Third, unlike *Tyson, supra* 423 Mich at 376, in this case the prosecutor's comments did not distract the jury from the issues in the case, but, rather, appropriately commented on inferences that could be drawn about the witness' credibility.[17] *People v Rodriguez*, unpublished

---

[17] The other cases upon which Defendant relies, *People v Williams*, 218 Mich 697; 188 NW 413 (1985), *People v Cowles*, 246 Mich 429; 224 NW 387 (1929), and *People v Burrell*, 127 Mich App 721; 339 NW2d 239 (1983), are also distinguishable. All of those cases, unlike the instant case, involved preserved claims of error. Furthermore, in *Williams* the prosecutor used highly inflammatory language, referring to the defense experts as having "prostitute[d] themselves", no such extreme invective or name-calling was used by the prosecutor in the instant case. Lastly, the
*(footnote continued on next page. . .)*

33

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

opinion per curiam of the Court of Appeals, slip op p 3, decided 3/18/97 (Docket No. 183425)(attached as Appendix C); cf. *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008)(prosecutor may argue that an expert witness had a financial motive to testify, but may not tell jurors the expert was hired to "fool this jury").

Defendant also argues that the prosecutor implied secret, personal knowledge by referring to having met Dr. Uscinski before. But, in context, what Defendant complains about was a harmless exchange in lieu of the standard introduction attorneys do when they begin questioning a witness. The prosecutor started off her cross examination of Dr. Uscinski by noting that she and the doctor had met before, so there was no need to do the typical introduction,

> Q   Dr. Uscinski, you and I have met before, haven't we?
> A   I think you look familiar.
> Q   In fact in June of 2006 you came and testified before the Honorable Steven Andrews in the case of People v Troy Vigrosh (phone) didn't you?
> A   I remember the name, I don't remember testifying.
> (V, 61)

Nothing about this brief exchange could reasonably be seen as conveying to the jury that the prosecutor had some sort of secret, personal knowledge of the case. As a matter of course and of courtesy, attorneys routinely introduce themselves to opposing witnesses as a prelude to questioning them. The remarks here were the equivalent of that prelude but incorporated the fact that this was not their first meeting – an innocuous acknowledgment that the attorney and the witness were not strangers to one another. Defendant did not object to the brief exchange below, and has not shown how it constituted plain error affecting his substantial rights. *People v*

---

early twentieth century opinion in *Cowles*, which held that the prosecutor improperly denigrated defense experts who were called to testify that the complainant in that rape case was a pathological liar, a "nymphomaniac", and a sexual pervert, should be treated as being of, at best, dubious precedential value for anything under modern legal standards.

34

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

*Carines*, 460 Mich 750, 762-764; 597 NW2d 130 (1999).

In any event, even if the prosecutor's questions and comments were deemed improper, any error was harmless in this case. Defendant has not shown it more probable than not that he would have been acquitted but for the alleged error. *People v Lukity*, 460 Mich 484, 494; 596 NW2d 607 (1999). Defendant argues that this case was a battle of the experts, but it was not. In addition to the expert testimony, there was evidence of Defendant's consciousness of guilt (namely his lies about what transpired), and Defendant's admission that he threw Madison into her crib causing her head to hit the crib bars.[18] No reasonable juror would have voted to acquit Defendant but for the questions and comments of the prosecutor about which Defendant now complains. Moreover, the trial court instructed the jury that it was up to them to decide whether to believe any of the experts' opinions (X, 131-132, 149-150), and the court instructed the jurors that the statements and arguments of the attorneys were not evidence (X, 125). See *Unger, supra* 278 Mich App at 240-241 (such instructions can cure error).

II.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING EVIDENCE OF DEFENDANT'S PRIOR ABUSE OF HIS INFANT SON, AND ADMISSION OF MEDICAL RECORDS ARISING FROM THAT PRIOR INCIDENT DID NOT VIOLATE DEFENDANT'S RIGHT TO CONFRONTATION.

### *Standard of Review*

A trial court's ruling on the admissibility of evidence generally should not be disturbed absent an abuse of discretion. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002). A

---

[18] Defendant's reliance on language from *Unger, supra* 278 Mich App at 240, and *Burrell, supra*, 127 Mich App 725-729, is misplaced because those cases, unlike the instant case, involved pure battles of experts.

35

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

decision on a close question ordinarily cannot be an abuse of discretion. *People v Sabin*, 463 Mich 43, 67; 614 NW2d 888 (2000).

Legal questions concerning the right to confront witnesses at trial are reviewed de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

### *Issue preservation*

Defense counsel argued below that this evidence was inadmissible (Defendant's Motion in Limine filed 11/14/07; Defendant's response filed 11/19/07 to prosecutor's Motion in Limine). Defendant also raised the issue in a post-conviction motion for new trial filed May 12, 2008.

### *Analysis*

Defendant argues that evidence of his prior abuse of his son Nicholas Kennedy should not have been admitted into evidence. But this evidence was properly admissible under MCL 768.27b and did not violate Defendant's right to confrontation.

### a. Procedural background

On November 14, 2007, the prosecution filed a notice of intent to present evidence of other acts of domestic violence under MCL 768.27b, namely Defendant's February 1998, assault on his then 4-month-old son Nicholas Kennedy, which had resulted in Defendant being convicted by plea of third degree child abuse. In that notice the prosecutor asserted that the evidence was relevant to show intent and "knowledge of the severity of injury that will occur in the rough handling of an infant". In that case Defendant had admitted that he bounced and shook the baby too hard, causing a skull fracture and brain hemorrhages.

On November 14, 2007, the prosecution also filed a motion in limine and supporting brief to allow admission of Nicholas' medical records relating to the prior incident, asserting that the

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

records would not violate Defendant's confrontation rights under *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004).[19] In a response filed November 19, 2007, the defense argued that the records were testimonial and were inadmissible under *Crawford*.

On November 14, 2007, the defense filed a motion in limine to exclude all evidence regarding Nicholas because it was irrelevant, overly prejudicial, and barred by MRE 404(b). In a responsive brief filed November 19, 2007, the prosecution argued that the evidence was admissible under MCL 768.27b, was not unfairly prejudicial under MRE 403, and was also admissible under MRE 404(b) to show intent to cause injury to the victim, knowledge of the severity of injury that occurs in the rough handling of an infant, and absence of mistake or accident – in both cases Defendant was left alone to care for his infant child, Defendant became frustrated and angry when the child would not stop crying, and abused the child, causing serious injuries.

On December 5, 2007, the trial court ruled (a) that the medical records could be admitted as relevant to knowledge without violating *Crawford*, but that all testimonial content of those records (namely any opinions or finger-pointing at Defendant as the cause of the injuries) should be redacted out of them (12/5/07 Tr, 22-24; Order filed 2/15/08); and (b) that Defendant's statements to Det. Sumner about Nicholas were admissible as relevant on the issue of Defendant's knowledge (12/5/07 Tr, 24; Order filed 2/15/08). But the trial court prohibited the People from presenting any evidence about the criminal or child protective proceedings relating to Nicholas because they were "duplicative" and not relevant (12/5/07 Tr, 24; Order filed 2/15/08).

---

[19] At the preliminary examination Defendant had objected to those records, claiming that their admission violated his right to confrontation.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

On the first morning of trial, before jury selection, defense counsel stated that he objected to a 4-page record from Children's Hospital regarding Nicholas because it referred to battered child syndrome and shaken baby syndrome, which defense counsel argued was testimonial (I, 14-17). The prosecutor responded that those were medical diagnoses, not statements in anticipation of a court case (I, 15, 17-18). The trial court ruled that the two references in the records to the phrase "shaken baby syndrome" did not connote bad acts and were not testimonial (I, 26-27), but the one reference to "battered child syndrome" must be redacted out of the hospital record because it could connote the commission of wrongdoing by someone and was, therefore, arguably testimonial (I, 27). Defense counsel noted that he had a standing objection to all evidence regarding Nicholas (II, 23). Later, when defense counsel unsuccessfully sought reconsideration of the trial court's ruling regarding "shaken baby syndrome" (VIII, 116-123, 149-171, 174), the trial court noted that business records are not subject to *Crawford* concerns (VIII, 166-168) and reaffirmed its prior ruling, finding it not testimonial (VIII, 169-170).

At trial, Det. Sumner testified that, in March of 1998, he investigated a possible abuse case involving Defendant's son Nicholas Kennedy (III, 142). Defendant and his girlfriend Christa Kennedy were the caregivers for Nicholas (III, 146). Det. Sumner interviewed Defendant at the time (III, 142-143), asking about how Nicholas got injured (III, 144). Defendant said he did not know and denied injuring Nicholas (III, 145). Defendant said that he was alone with Nicholas when Nicholas stopped breathing and Defendant then called 911 (III, 146). Later that day Defendant went to the police station (III, 148) and told a different story (III, 152). Defendant said that he had just gotten home from working the midnight shift, and Christa had just left for work, leaving Defendant alone with Nicholas (III, 152). Nicholas was crying, and Defendant tried to give him a bottle (III, 152). Defendant bounced Nicholas as he was giving him the bottle (III,

152). Nicholas would not stop crying, and Defendant got upset and frustrated (III, 153). Defendant started shaking and bouncing Nicholas (III, 153, 188). Nicholas then went limp and stopped breathing (III, 153). Defendant called EMS and Nicholas was taken to the hospital (III, 153). Defendant admitted to Det. Sumner that he shook Nicholas too hard and caused his injuries (III, 153).

Nicholas' medical records were admitted as an exhibit at trial (IX, 7).[20]

## b. discussion

Defendant argues that evidence of his prior abuse of his son Nicholas Kennedy should not have been admitted into evidence. His arguments lack merit.

The evidence was admissible as a prior act of domestic violence under MCL 768.27b. *People v Schultz*, 278 Mich App 776; 754 NW2d 925 (2008), lv den 758 Mich 256 (2008). That statute states,

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

The statute defines "domestic violence" as, *inter alia*, "Causing or attempting to cause physical

---

[20] The jury was given the standard instruction applicable to this sort of evidence, CJI2d 5.8c,

> The prosecution has introduced evidence of claimed acts of domestic violence by the Defendant for which he is not on trial. Before you may consider such alleged – alleged acts as evidence against the Defendant, you must first find that the fact – that the Defendant actually committed such acts. If you find that the Defendant did commit those acts you may consider them in deciding if the Defendant committed the offense for which he is now on trial.
> (X, 131)

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

or mental harm to a family or household member", MCL 768.27b(5)(a)(i)[21].

The crime charged in this case was an act of domestic violence. The homicide was the infliction of harm to a household member, MCL 768.27b(5)(a)(i). Defendant's prior abuse of his son Nicholas was also an act of domestic violence falling within the terms of the statute. The prior act involved an act of violence committed by Defendant on a person living in his household. Thus the prior act was admissible for **any** relevant purpose.

Here the prior act was relevant to show (a) Defendant's propensity to angry violence in dealing with his infant children when he felt frustrated, and (b) Defendant's knowledge that rough handling of an infant would create a high risk of great bodily harm or death. Defendant complains that the jury may have used this evidence for propensity purposes, but evidence admitted under MCL 768.27b may be considered regarding propensity. As this Court recognized in *Schultz, supra* 278 Mich App at 778, unlike MRE 404(b), this statute requires a showing of nothing more than "the transparency of a person's character as justification for admitting evidence". See also *People v Petri*, 279 Mich App 407, 411; __ NW2d __ (2008)(propensity evidence is relevant under analogous provisions of MCL 768.27a); *People v Pattison*, 276 Mich App 613, 620; 741 NW2d 558 (2007) (propensity evidence is relevant under analogous provisions of MCL 768.27a).

Regardless of whether it could be used for propensity, the prosecutor did not use it that way in this case. The evidence was not used by the prosecutor to show general propensity, but to show Defendant's knowledge that his actions would pose a grave risk to an infant. In fact, in opening statement the prosecutor stated the limited purpose for which she would be offering this

---

[21] "Family or household member" includes any individual with whom the person resides, MCL 768.27b(5)(b).

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

evidence,

> The purpose of this evidence is to show the Defendant knew what would happen if he was too rough in the handling of an infant.
> Remember we talked about the second thing that we have to prove. We have to prove one of those three things. Knowingly create a very high risk of death or great bodily harm knowing that such death or such harm would likely be the result of his actions. And the People will admit the testimony of Detective Sergeant Sumner and those medical records from Children's Hospital for the purpose of evidence of showing that he knew.
>                      (II, 49-50)

The prosecutor also addressed this purpose in closing argument (X, 74-75, 80) and in rebuttal closing argument (X, 112, 121-122).

This was a relevant purpose because one of the elements of the murder charge was that the defendant knowingly created a high risk of great bodily harm or death. Evidence that Defendant had handled his son roughly during infancy and had thereby caused serious injury to his son, was highly relevant in assessing Defendant's understanding of the consequences of his act of throwing his infant daughter into her crib.

The probative value of this evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. This evidence was highly probative in this case. Probative evidence tending to show the defendant's guilt is always prejudicial from the defendant's viewpoint. But the key questions are whether the evidence is **unfairly** prejudicial, and whether that unfair prejudice **substantially** outweighs the probative value of the evidence. MRE 403; *People v Starr,* 457 Mich 490, 499; 577 NW2d 673 (1998). As to prejudice, the Supreme Court's comments in *Starr, supra* at 499-500, seem apt here:

> [W]hile we would agree that the acts described in the proffered testimony are certainly "depraved" and of "monstrous repugnance," such characteristics were inherent in the underlying crime of which defendant stood accused.  The danger the rule seeks to avoid is that of unfair prejudice, not prejudice that stems only from the abhorrent nature of the crime itself.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

The prejudicial effect of the evidence did not stir such passion as to divert the jury from rational consideration of Defendant's guilt or innocence of the charged offenses, see *Starr, supra* 457 Mich at 503. And, in fact, the defense used evidence regarding the prior act to support its defense theory of rush to judgment in opening statement (II, 64, 71). Thus, Defendant cannot claim unfair prejudice.

The evidence was admissible under 768.27b. See *Pattison, supra* at slip op p 1-2; *People v Deleon*, unpublished opinion per curiam of the Court of Appeals, slip op p 3, decided 9/18/07 (Docket No. 269574)(attached as Appendix D).

Although evidence admissible under MCL 768.27b need not comply with MRE 404(b), see *Schultz, supra* 278 Mich App at 778; *People v Wilcox*, 280 Mich App 53, 55; __ NW2d __ (2008)(discussing analogous provisions of MCL 768.27a), the evidence was also admissible under MRE 404(b) in this case. As the prosecutor argued in her responsive brief to Defendant's motion in limine, this evidence would have been admissible under MRE 404(b) to show knowledge and absence of mistake or accident. See *People v Hine*, 467 Mich 242; 650 NW2d 659 (2002). There is no general rule of exclusion relating to other acts evidence. *People v VanderVliet*, 444 Mich 52, 65; 508 NW2d 114 (1993). MRE 404(b) is a rule of inclusion rather than exclusion. *Starr, supra* 457 Mich at 496; *People v Crawford*, 458 Mich 376, 390 n 8; 582 NW2d 785 (1998); *VanderVliet, supra* at 64. As the Supreme Court held in *VanderVliet, supra* at 65,

> There is no policy of general exclusion relating to other acts evidence [footnote omitted]. There is no rule limiting admissibility to the specific exceptions set forth in Rule 404(b). Nor is there a rule requiring exclusion of other misconduct when the defendant interposes a general denial. **Relevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith.**
>
> (emphasis added)

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

So-called bad acts evidence is admissible so long as (1) it is not offered simply to show the defendant's inclination to wrongdoing in general, (2) it is relevant, and (3) the probative value of the evidence is not substantially outweighed by unfair prejudice. *VanderVliet, supra* at 74-75; *Crawford, supra* 458 Mich at 385. Under this "inclusionary theory", other acts evidence may be admitted whenever it is admissible on a noncharacter theory. *VanderVliet, supra* at 65; *Starr, supra* at 496; *Crawford, supra* 458 Mich at 385.

In this case, evidence of the prior abuse was not offered simply to show that Defendant was a bad man generally prone to violence or other criminal activity. On the contrary, it was admitted to show (a) Defendant's knowledge that rough handling of an infant creates a risk of death or great bodily harm, and (b) absence of mistake or accident. As discussed above, the evidence was relevant to these purposes and its probative effect was not substantially outweighed by the danger of unfair prejudice.

Thus, even apart from MCL 768.27b, evidence of Defendant's prior act would have been admissible under MRE 404(b).

Whether viewed under MCL 768.27b or MRE 404(b), the trial court did not abuse its discretion in allowing the evidence.

Defendant also argues that the hospital records regarding Nicholas were admitted in violation of his right to confrontation under *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004). But the medical records were admissible as business records under MRE 803(6). *People v McLaughlin*, 258 Mich App 635, 650-652; 672 NW2d 860 (2003), lv den 469 Mich 1045 (2004); *People v Weems*, 19 Mich App 553, 556 fn *; 172 NW2d 865 (1969). The only portion of the hospital records that Defendant has challenged is a "shaken baby"

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

43

diagnosis[22], but MRE 803(6) expressly states that the business records hearsay exception includes "conditions, opinions, or diagnoses".[23] The hospital records were not prepared in anticipation of litigation, and the disputed phrase was a medical term. Business records are not testimonial under *Crawford. People v Jambor*, 273 Mich App 477, 483-487; 729 NW2d 569 (2007). In fact, in *Crawford, supra* 541 US at 56; 124 S Ct at 1367, the U.S. Supreme Court specifically held that business records are **not** testimonial. Medical records, in particular, are not testimonial. *United States v Ellis*, 460 F3d 920, 924-926 (CA7, 2006). As the federal court noted in *Ellis, supra* 460 F3d at 925-927, medical records are not rendered testimonial simply because the person preparing the record could suspect that they might later be used in a criminal prosecution – the key point is that they were not prepared for that purpose but were prepared in the ordinary course of business. Non-testimonial evidence does not implicate the right to confrontation. *People v Taylor*, __ Mich __, slip op pp 7-10; __ NW2d __ (12/08).

Lastly, even if the trial court abused its discretion in allowing evidence of the prior act, that error would be harmless in this case. Defendant has not shown that he more probably than not would have been acquitted but for this evidence. See *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). And if admission of this evidence violated *Crawford*, the error was harmless beyond a reasonable doubt. See *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005). The strong evidence in this case, including Defendant's admission that he threw baby Madison into her crib, amply supported the jury's verdict with or without evidence of

---

[22] The defense also challenged a reference to "abused child", but the trial court granted the defense request to strike that phrase from the records.

[23] This language pertaining to medical records was added to the rule in 1991 to bring it into conformity with the federal rule. Wade & Kolenda, Michigan Courtroom Evidence (2008 supplement to 4th ed), pp 8-90 & 8-95 to 8-96.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

Defendant's prior act.

III.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ASSESSING POINTS FOR OV 7, AND DID NOT IMPROPERLY PUNISH DEFENDANT FOR REFUSING TO ADMIT GUILT.

### Standard of Review

Guidelines scoring decisions should be upheld if there is any evidence to support the score. *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002); *People v Leversee*, 243 Mich App 337, 349; 622 NW2d 325 (2000), lv den 464 Mich 858 (2001).  If there is evidence to support the scoring, scoring falls within the trial court's discretion. *Hornsby, supra* at 468.

### Issue (non)preservation

Defense counsel objected to the scoring of OV7 at sentencing (Sent, 5-7, 10). Defendant did not raise any objection to the trial court's alleged improper consideration of his refusal to admit guilt.

### Analysis

Defendant argues that he is entitled to resentencing because (a) he was improperly assessed guidelines points for OV 7, and (b) the trial court punished Defendant for his refusal to admit guilt. His arguments lack merit.

Points are assessed under OV 7 for aggravated physical abuse, MCL 777.37(1).  Defendant was assessed 50 points under this variable.[24] The instructions state that 50 points should be

---

[24] If these points were deducted from the scoring, the applicable range would change from Level C III to Level C II. Although there is some indication that the trial court granted the prosecutor's unopposed request to increase the scoring of OV3 to 100 points (Sent, 8-9) – a change that would cancel out the effect of deducting the points assessed under OV 7 and keep Defendant at Level C III – that change would have been in error under MCL 777.33(2)(b); *People v Houston*, 473

*(footnote continued on next page. . .)*

45

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

assessed if "a victim was treated with terrorism, sadism, torture, or excessive brutality designed to substantially increase the fear and anxiety a victim suffered during the offense", MCL 777.37(1)(a).

The prosecution argued in its sentencing memorandum that Defendant should be assessed 50 points for OV 7 because Madison was treated with excessive brutality as evidenced by (a) her injuries; (b) the ruthless act of throwing an 11 month old baby, handicapped with hip displasia; and (c) Madison had brain injuries in various stages of healing which showed ongoing abuse. At sentencing, the prosecutor argued that Defendant's act of throwing baby Madison so that her head hit her crib was extremely brutal, particularly in light of his experience with Nicholas; the impact was hard enough to cause massive injury; that Defendant lied about what he did; and that Madison relied on Defendant for her care and was disabled (Sent, 7-8, 15).

The defense argued in its sentencing memorandum that no points should be assessed for OV 7 because the crime was an isolated, impulsive act that did not produce ongoing, conscious pain and fear. At sentencing defense counsel argued that points should not have been assessed for OV 7 because there was no excessive brutality, there was testimony that the prior bleed made Madison more vulnerable to injury, she probably struck a padded surface, the amount of force was not quantifiable, and there were no external injuries (Sent, 5-7).

The trial court found that Madison was treated with excessive brutality,

> Brutal, the court learned is defined by Oxford's as savagely, viciously, cruel or harsh.
> The trial court finds, this court – I find that Madison was treated with excessive brutality. The court looks not only at the act of throwing but the judicially noticeable tenderness, meekness and susceptibility of an eleven month old baby.

---

Mich 399; 702 NW2d 530 (2005). Defendant did not object to the point assessment under OV 3 below and does not do so on appeal. Presumably because, if the scoring of OV 7 stands, any error in the points assessed under OV 3 would not affect the applicable range.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

The fact of throwing combined with the characteristics of the baby bear on excessive brutality. The court also considers what the baby endured thereafter. The court also finds by judicial notices the medical treatment this eleven month old underwent was brutal or as Oxford defines brutal, as harsh. True this brutality was through the care-giving hands of medical personnel but the fact that the physical contact with the baby was borne of and guided by care for her cannot be intelligently debated to be anything less than harsh or brutal, her consciousness notwithstanding. Though this physical contact was good in the sense that it was providing care, the court must attribute to the defendant as the instigating cause the full breadth of the pain and fear that this little baby experienced with strangers in her home.

Accordingly, the court will score OV 7 with the fifty points.

(Sent, 15-16)

This scoring was not an abuse of discretion.

The facts showed excessive brutality. The victim was a helpless infant. In addition to the vulnerability posed by her age, Madison was also disabled with a hip malformation for which she wore a brace. She was at the mercy of her caretakers for movement. Defendant was her father and her caregiver at the time of the incident. Although the evidence showed that Madison was a normal happy baby, Defendant reacted to her rare crying with anger and frustration. In a violent, angry effort to shut her up, Defendant threw Madison into her crib from a distance of two feet, causing her head to hit the crib bars with sufficient force to cause massive brain injury. That injury necessitated extensive and invasive medical treatment, that ultimately could not save Madison. As the trial court noted, Defendant should be held accountable for the suffering Madison endured while undergoing that treatment. Although Defendant argues that Madison was unconscious while undergoing most of her treatment, the record does not conclusively establish that she experienced no suffering during that treatment. In any event, OV 7 is not limited to pain and suffering while conscious. *People v Kegler*, 268 Mich 187, 191-192; 706 NW2d 744 (2005), lv den 474 Mich 1075 (2006). Defendant's acts subjected the victim to extensive and serious injury. And the severity of the injuries support an inference that Defendant abused Madison for

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

the purpose of producing suffering. *People v Blunt*, __ Mich App __, slip op p 5; __ NW2d __ (1/13/09); *People v James*, 267 Mich App 675, 680-681; 705 NW2d 724 (2005), lv den 474 Mich 982 (2005). These circumstances justified a finding of excessive brutality. *People v Clark*, unpublished opinion per curiam of the Court of Appeals, slip op p 4, decided 3/6/07 (Docket No. 266088)(attached as Appendix E). Further, Madison had brain injuries at various stages of healing, indicating that she may had been subjected to abuse previously. Alternatively, the facts would also support a finding of terrorism. "Terrorism" is defined as "conduct designed to substantially increase the fear and anxiety a victim suffers during the offense", MCL 777.37(2)(a). Here the circumstances supported an inference that Defendant's (irrational) goal was not only to harm the victim and cause her to suffer but to frighten, shock, or cow her into silence to get her to stop crying. The scoring of OV 7 was not an abuse of discretion.

In sum, the trial court acted within its discretion in rejecting Defendant's challenge to the scoring of OV 7.

Defendant also argues that the trial court punished him for refusing to admit guilt. During allocution Defendant claimed that he was taking full responsibility for his actions, but then stated that he "used horrible discretion in taking care of my daughter" and that it was an accident and he never meant to hurt her (Sent, 14). The court responded to Defendant's claim that he was accepting responsibility, by noting that his statements to the court and in the presentence report (see Sent, 19-21) belied that claim,

> I just find that you now for the second time take no responsibility for your action and consequently do not acknowledge any wrongdoing. To say you used horrible discretion, parental discretion is a masked way of avoiding responsibility; you say you take responsibility for your action yet your actions according to you is using horrible parental discretion. If you do not define what horrible parental discretion is, I can't define it for you, I have no idea what that's supposed to mean.
> (Sent, 21).

48

Defendant argues that this comment reflects that he was punished for refusing to admit guilt. But, in fact, the comment simply reflects the court's recognition that Defendant's self-serving claim that he was accepting responsibility for what he had done was false. Because Defendant stated he was accepting full responsibility, the court could properly comment on that claim.

The trial court did not ask Defendant to admit guilt or offer him a lesser sentence if he did so. *People v Conley,* 270 Mich App 301, 314; 715 NW2d 377 (2006); see also *People v Dobek,* 274 Mich App 58, 104; 732 NW2d 546 (2007), lv den 480 Mich 897 (2007). Thus, this Court may conclude that Defendant's sentence, which fell within the guidelines, was not enhanced based on his refusal to admit guilt. *People v Drayton*, 168 Mich App 174, 178-179; 423 NW2d 606 (1988). Some guidance can be found in *People v Spanke*, 254 Mich App 642, 649-650; 658 NW2d 504 (2003). In *Spanke*, the Defendant's presentence report stated that Defendant "appeared to be in denial", and in imposing sentence the trial court referred to the defendant's failure to address his "issues". Defense counsel argued that consideration of such information equated with consideration of the defendant's refusal to admit guilt. This Court rejected that argument, finding that the sentencing court merely was considering rehabilitative potential and lack of remorse. *Spanke, supra* 254 Mich App at 649-650.

Defendant's sentence fell comfortably within the guidelines, which themselves subsume most pertinent sentencing considerations, *People v Broden*, 428 Mich 343, 354; 408 NW2d 789 (1987). The record does not show that any impermissible considerations played a role in the sentence. Defendant is not entitled to resentencing in this context.

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM

<u>RELIEF</u>

WHEREFORE, Jessica R. Cooper, Prosecuting Attorney in and for the County of Oakland, by Kathryn G. Barnes, Assistant Prosecuting Attorney, respectfully requests that this Honorable Court affirm Defendant's conviction and sentence.

Respectfully submitted,

JESSICA R. COOPER
PROSECUTING ATTORNEY
OAKLAND COUNTY

JOHN S. PALLAS
CHIEF, APPELLATE DIVISION


BY:      /s/ Kathryn G. Barnes
(P41929)
Assistant Prosecuting Attorney
Oakland County Prosecutor's Office
1200 N Telegraph Rd
Pontiac, MI 48341
(248) 858-0656

DATED: March 4, 2009

RECEIVED by Michigan Court of Appeals 3/4/2009 4:11:21 PM